1           UNITED STATES BANKRUPTCY COURT
              SOUTHERN DISTRICT OF FLORIDA
2                    MIAMI DIVISION

3

4    IN RE:                    CASE NO. 14-22974-BKC-LMI

5    BANCO CRUZEIRO DO SUL S.A.,

6                Debtor.
     _____/
7    LASPRO CONSULTORES LTDA,    ADV NO. 16-1315-BKC-LMI

8                Plaintiff,
     vs.
9
     ALINIA CORPORATION, et al.,
10
                Defendants.
11   _____/

12

13
                      ECF# (29)
14

15
                   November 22, 2016
16

17           The   above-entitled  cause  came  on   for

18   hearing before the HONORABLE LAUREL  MYERSON   ISICOFF,

19   Chief Judge sitting in the  UNITED  STATES  BANKRUPTCY

20   COURT, in and for the SOUTHERN DISTRICT OF FLORIDA, at

21   301 North Miami Avenue, Courtroom 8, Miami, Miami-Dade

22   County,  Florida,  on  Tuesday,  November  22,  2016,

23   commencing  at or  about  1:32 p.m., and the following

24   proceedings were had:

25     Transcribed from a Digital Audio Recording by:
               Margaret Franzen, Court Reporter

1                          APPEARANCES:

2


3          ASTIGARRAGA DAVIS MULLINS & GROSSMAN, by
                  GREGORY S. GROSSMAN, ESQUIRE
4                  ARNOLDO B. LACAYO, ESQUIRE
                  on behalf of the Plaintiff

5


6


                          BAST AMRON, by
7                    BRETT AMRON, ESQUIRE
                     JEREMY HART, ESQUIRE
8              on behalf of the Defendants

9


10                     ALSO PRESENT:

11


        ENRIQUE FORSSELL, Plaintiff's Brazilian Counsel
12        ANDRE WERNECK, Defendants' Brazilian Counsel
          ECRO - Electronic Court Reporting Operator

13


14                  - - - - - - -

15

16

17

18

19

20

21

22

23

24

25

1            THE COURT:  All right, gentlemen.

2            We're here this afternoon on Laspro

3   Consultores Limitada vs. Alinia Corporation,

4   16-1315.

5            I will take appearances starting with

6   the plaintiff, and I will just remind you all

7   that when you speak, please remember to say who

8   you are each time.  You don't have to repeat the

9   spelling of your name, you don't have to

10  reidentify your client, but -- although I know

11  you all have some distinction in your voices,

12  someone transcribing the hearing might not be as

13  astute, so please don't forget to do that.

14           So, Mr. Grossman, if you'll start with

15  your side, and then we'll hear from Mr. Hart.

16           MR. GROSSMAN:  Thank you, Your Honor.

17           I am Greg Grossman, G-r-o-s-s-m-a-n,

18  along with my law partner, Arnie Lacayo,

19  L-a-c-a-y-o, at counsel table is our Brazilian

20  co-counsel, Enrique Forssell, F-o-r-s-s-e-l-l,

21  and we represent the plaintiff, Laspro

22  Consultores Limitada.

23           THE COURT:  Okay.  Thank you.

24           Mr. Hart.

25           MR. HART:  Good afternoon, Your Honor.

1            Jeremy Hart, H-a-r-t, and I have the

2    pleasure of representing the defendants in this

3    action, Alinia Corporation and 110 CPS, Inc.

4    With me today are Brett Amron, A-m-r-o-n, and our

5    Brazilian co-counsel, Andre Werneck,

6    W-e-r-n-e-c-k.

7            THE COURT:  All right.  Thank you, and for

8    those of you who travelled far, welcome.

9            Okay.  Mr. Hart, this is your motion,

10   so please proceed.  I have reviewed all of the

11   pleadings and most of the case law, so please

12   take that into account in making your

13   presentation.

14           MR. HART:  Thank you so much, Your Honor.

15           If it please the Court, this is a very

16   interesting case because it basically explores

17   the limits of Chapter 15.  I think that

18   Chapter 15 reflects a judicial philosophy that

19   comity is very important to the United States

20   courts.

21           In other words, United States courts

22   will allow a foreign trustee to file an

23   appearance to seek recognition of the

24   proceedings, which are going on in his own

25   country, and to use the United States Bankruptcy

1    Courts in order to assist the foreign estate, but

2    there's limits to comity.

3          The limits to comity really sort of

4    bump up -- we bump up against those limits in

5    this case.  I think it's -- it's very striking

6    that Chapter 15, specifically Section 1521(a)(7),

7    does not allow a foreign trustee to bring

8    avoidance actions, and that's because avoidance

9    is basically a -- a -- a proceeding that should

10   be resolved back in the courts of the trustee's

11   home country, and that's essentially the

12   situation we have here.

13         This bankruptcy in Brazil has been

14   going on in one form or another since 2012.

15   There are claims which have been made against the

16   Indio da Costas, the former owners of the bank,

17   Felippe and Octavio, and those claims are

18   proceeding in Brazil, and the question in those

19   claims is whether or not they are liable to the

20   estate, to the debtor's estate for any damages.

21         What it seems to me is going on here is

22   that frustrated by the slow progress of those

23   cases down in Brazil, the foreign trustee has

24   instructed his Florida attorneys to bring this

25   case in this Court in an effort to short circuit

1    the whole Brazilian process, and I would suggest

2    to the Court that that's not correct, and that is

3    not the objective of Chapter 15.

4             The objective in Chapter 15 is to

5    enforce orders at issue by a foreign Bankruptcy

6    Court, not to adjudicate issues which depend upon

7    foreign law and which properly depend on Brazil.

8             Turning to the specifics of this

9    action, we have basically three different types

10   of claims which have been brought here.  The

11   first set of claims are claims which are

12   avoidance claims under Chapter -- under

13   Section 544 of the Bankruptcy Code, and they've

14   actually chosen to bring them under the New York

15   fraudulent transfer statute.

16             The second set of claims are Brazilian

17   law claims, and the third set of claims are what

18   they are calling aiding and abetting claims,

19   aiding and abetting, if that's possible, and I --

20   I will, of course, turn to that.

21             I think it's fairly clear, in fact,

22   crystal clear, that Chapter 15 does not permit a

23   foreign trustee to bring avoidance claims.

24   Arguments have been made that well, you know,

25   these are New York fraudulent conveyance claims,

1    they're -- you know, that's not specifically
2    prohibited.
3          But the case law, and there's a great
4    history of case law on this, indicates that
5    claims for fraudulent conveyance, claims for
6    constructive trust and equitable lien, when
7    brought in a bankruptcy context are, of course,
8    Chapter 5 -- excuse me, Section 544 claims.  So I
9    think it's very clear that those are just not
10   viable.  A foreign trustee lacks the standing to
11   bring those.
12         The second set of claims is the
13   Brazilian claims, and they've alleged a variety
14   of statutes, and basically we have two arguments
15   regarding that.  The first argument is that these
16   statutes are not particularly amenable to the
17   type of allegations that they're making.
18         We've got to bear in mind here that the
19   defendants are a pair of British Virgin Islands
20   corporations, which are inanimate objects.  The
21   allegations in most of the Brazilian statutory
22   claims are that the corporations somehow did
23   something to either provide bad banking services
24   or to steal money from the debtor bank,
25   et cetera, et cetera, but those allegations just

1   do not fit what we know to be the realities of

2   this case.

3            These corporations are simply vehicles

4   for holding property, and they're British Virgin

5   Islands corporations, which have never been

6   involved in banking.

7            The other argument that we have with

8   regard to those, is that the statute of

9   limitations has run.  I'm not going to dwell on

10  that too much because I know that statute of

11  limitations is quite often a question of fact and

12  I think my friend here, Mr. Grossman, has done a

13  pretty good job in muddying the waters on

14  those -- those issues.

15           So the only other aspect of the

16  Brazilian claims, which I think the Court should

17  pay particular attention to, is, again, the theme

18  of this argument, which is these Brazilian claims

19  just do not belong in this Court.

20           Your valuable time should be used for

21  more important things than assisting a Brazilian

22  Court in resolving claims which are already

23  pending before the Brazilian Court.

24           There's also a real question, before I

25  leave the subject of Brazilian claims, as to why

1    this case needs to be brought at all.  We have
2    demonstrated, I think we have attached to our
3    motions in this -- our -- our memoranda in this
4    case, a freeze order which was entered a couple
5    of years ago down in Brazil, which specifically
6    names the apartments in New York and the valuable
7    artwork and other personal property which is in
8    those apartments in which it freezes them.
9            That order was taken to the D.C.
10   District Court and it was domesticated and
11   registered there.  So the property, which is the
12   subject of this action, the ultimate subject, the
13   apartments and the art, is already tied up, it
14   can't be moved, and it's sitting there waiting
15   for the Brazilian Court to make the determination
16   as to whether the Indio da Costas, the former
17   owners of the bank, are liable to the bankrupt
18   estate, and again, that is a question that the
19   Brazilian Court should decide, not this Court.
20           We've also raised questions as to the
21   authority of local counsel to bring these claims
22   in Brazil, and we have affidavits which are
23   attached to our memoranda, it's necessary to get
24   authority from the Bankruptcy Court to hire
25   counsel in Florida and to bring actions of this

1    sort.

2             Now, the argument's been made there are

3    secret files down in Brazil, which -- which

4    authorize this.  The rationale for these files

5    being secret is because if we disclose that we're

6    hiring foreign counsel, the -- you know, the real

7    targets of this would realize and abscond with

8    their property, but as I just pointed out before,

9    that property is already frozen by an order which

10   has been domesticated in D.C.

11            In addition, since this action has

12   already been brought, since the property is

13   frozen, what is the rationale for these files

14   remaining secret?  If there really is authority,

15   why can't counsel for the plaintiff produce that

16   authority and submit it to this Court?

17            There's another authority issue, as

18   well, and that is that the Court in Brazil is

19   determining whether the Indio da Costas are

20   responsible for damages to the bankrupt estate.

21   Until that has happened, this action should not

22   be brought.

23            This is premature, and I'll quote from

24   language which appeared in the notice of filing

25   of the Chapter 15 proceedings that Mr. Grossman

1   filed last year, and he stated in that filing,

2   under applicable Brazilian law, the personal

3   assets of the administrators of financial

4   institutions are frozen when the Central Bank

5   intervenes in the financial institution.

6           The administrators of financial

7   institutions will have their assets frozen, not

8   allowed to dispose of the assets in any form,

9   directly or indirectly, pledge or offer or

10  guarantee, until final verification of their

11  responsibilities, and it is that final

12  verification of their responsibilities that we're

13  waiting on down in Brazil.  So, again, they're

14  trying to sort of leap over that hurdle and get

15  straight to this Court.

16           I think it would be preferable if they

17  conclude the legal actions down in Brazil, and to

18  the extent the Brazilian Court finds that the

19  Indio da Costas are liable, they come here with

20  that order and then pursue a Section 543, a

21  turnover proceeding, but that's not what they're

22  really trying to do.

23           The final issue, and I think this is

24  probably the easiest issue of all, is the

25  question of aiding and abetting.  They have

1    brought some very interesting aiding and abetting

2    counts alleging that our clients, these inanimate

3    British Virgin Islands corporations, have aided

4    and abetted the Indio da Costas in breaching

5    their fiduciary duty and converting the assets of

6    the debtor and other things like that, which

7    clearly is impossible for a corporation to do.

8              I mean, it's very well established that

9    a corporation, while it may be considered for

10   some legal purposes as a separate person, can

11   only act through its principal.  A corporation

12   cannot conspire with its own principals, it's

13   like somebody talking to themselves, and under

14   those circumstances, I think those claims should

15   be clearly dismissed.

16              The -- the real issue here, I think, is

17   the standing of the plaintiff to bring this

18   action.  Clearly, the plaintiff does not have the

19   right as a foreign trustee to pursue avoidance

20   actions, and so he lacks the standing for that.

21              We contend that the plaintiff lacks the

22   authority of the Brazilian Court to bring this

23   action and to pursue the defendants for property

24   which has not yet been determined to be property

25   of the estate by the Brazilian Court, so again,

1    they lack standing in that respect also, and we

2    believe clearly that there's no claim for the

3    aiding and abetting, and so again, they lack

4    standing there.

5              The bottom line on this, Judge, is

6    really I'm wondering why we're here and why we're

7    not making arguments concerning the ultimate

8    liability of the Indio da Costas and their

9    corporations down in Brazil.

10             This action properly belongs there, and

11   I don't believe that the plaintiff has the

12   standing to bring it here, and if I might have a

13   couple of minutes for rebuttal, Your Honor?

14             THE COURT:  Well, don't -- don't go

15   anywhere.

16             MR. HART:  Thank you, Your Honor.

17             THE COURT:  Let me go through my

18   questions --

19             MR. HART:  Uh-huh.

20             THE COURT:  -- which will require the

21   placing of the glasses.  Okay.  All right.

22             So you're saying that there is no

23   judgment yet against the Indio da Costas.

24             MR. HART:  Correct, Your Honor.  That is

25   pending in actually two courts in Brazil, there is a

1  civil action, and I think Mr. Grossman attached a
2  freeze order, which had been entered in that civil
3  action, to his memorandum in opposition to our motion
4  to dismiss.
5           The other action is pending in the
6  criminal courts in Brazil, in San Paulo, and both
7  of those are in their very early stages.  Things
8  move a little slower down there.
9           THE COURT:  Okay.  So there's been no
10 adjudication by any court of competent jurisdiction
11 or incompetent jurisdiction that the Indio da Costas
12 have done the things that they've been alleged to
13 have done?
14           MR. HART:  That's my understanding, Your
15 Honor, yes.
16           THE COURT:  Okay.  You say that the
17 Brazilian claims don't belong in this Court because
18 they are already pending in Brazil.
19           So you're saying that the very claims
20 that make up part of this amended complaint, are
21 the exact same claims that are being adjudicated
22 by this -- I assume in the civil action in
23 Brazil?
24           MR. HART:  I can't say that, Your Honor --
25           THE COURT:  All right.  So ---

1          MR. HART:  -- because I've not seen the

2   pleadings in that action, but not being a Brazilian

3   attorney, I don't know the full array of claims that

4   would be available in a situation like this, but I

5   think essentially what I'm saying is that claims like

6   these are pending in Brazil.

7          THE COURT:  Okay.  So -- so you don't know

8   whether ---

9          MR. HART:  I don't know.

10          THE COURT:  Okay.  All right.  Hold on, let

11   me just write that down.

12          All right.  You -- you make this

13   argument regarding the fact that the action here

14   is not authorized, yet Mr. Grossman has attached

15   to his response a detailed affidavit from the

16   prosecutor in Brazil, so are you saying that's a

17   false affidavit?

18          MR. HART:  I'm not saying necessarily it's

19   a false affidavit, Your Honor.  What I'm saying is

20   that the prosecutor is simply saying there are secret

21   files and these secret files authorize this.

22          THE COURT:  I understand that.

23          MR. HART:  But there's no reason for these

24   files to be secret.

25          THE COURT:  Okay.  But you're not

1  suggesting, surely, that I should make a decision

2  that the Brazilian Court should unseal files so that

3  I can confirm that what the prosecutor is saying is

4  true?

5            MR. HART:  No, Your Honor, I don't suggest

6  that.

7            THE COURT:  Okay.  So if you believe that

8  those files should be unsealed, then it seems to me

9  that you need to go to Brazil to do that.  So let's

10  just focus on what I can and cannot do.

11            So my question is:  Are you saying that

12  I need to disregard the prosecutor's affidavit

13  because you're suggesting that what he has put in

14  that affidavit is false?

15            MR. HART:  No, Your Honor, I'm not.  But

16  what I am suggesting is that there is another level

17  of authorization, which they lack, and that is

18  exactly what Mr. Grossman put in his notice of

19  filing, which is the question of the ultimate

20  responsibility of the former administrators of the

21  bank has first got to be decided before this case can

22  come up here.

23            Again, I can quote from what he said

24  and it's at ECF -- main case, ECF Number 15,

25  under applicable Brazilian law, Brazilian law,

1  the personal assets of the administrators of

2  financial institutions are frozen when the

3  Central Bank intervenes in the financial

4  institution, which happened in 2012.

5            THE COURT:  All right.

6            MR. HART:  The administrators of financial

7  institutions will have their assets frozen and not be

8  allowed to dispose of the assets in any form,

9  directly or indirectly, et cetera, et cetera, until

10  final verification of their responsibilities, and

11  that's what's pending in Brazil, and I don't think

12  this Court should really overlap with what the

13  Brazilian Court is doing.

14            THE COURT:  Uh-huh, okay.  These two

15  entities, these defendants, are there any independent

16  directors?

17            MR. HART:  I do not know, Your Honor.

18            THE COURT:  Wouldn't your aiding and

19  abetting argument be different if there are

20  independent directors?

21            MR. HART:  It possibly might be, but they'd

22  have to, I guess, collude with somebody else.  That

23  was not alleged in the complaint.

24            THE COURT:  Did it need to be?

25            MR. HART:  I believe it would have to be,

1  given the very extensive case law on this issue,
2  which dates back to the 1950s.
3        THE COURT:  All right.  Give me a moment.
4        All right.  The next question is going
5  to be the same question I ask Mr. Grossman.
6        MR. HART:  Uh-huh.
7        THE COURT:  All right.  Are your -- is your
8  argument regarding the New York avoidance actions,
9  that if a foreign representative comes into court
10 under the authority of Chapter 15, that the foreign
11 representative can never seek relief under
12 nonbankruptcy avoidance laws?
13       MR. HART:  Yes, Your Honor, and -- and I
14 think the rationale for that is -- is pretty clear.
15 Avoidance requires things to be determined, which
16 really ought to be determined by the Court in the
17 trustee's home country, and there's a big distinction
18 between that determination and the determination
19 which has to be made in a 543 turnover action.
20       And so what I'm suggesting is what
21 Chapter 15, the theme of Chapter 15 is, go
22 litigate your issues in your home country, and
23 then you can come up here and use the decisions
24 which have been made in your home country to
25 recover property for the estate.

1              Now, if something is clearly property

2    of the estate, then of course the foreign trustee

3    has the ability to assemble that property, to

4    seek turnover.  He has the ability under 1521,

5    (1) through (6) to go ahead and enforce the stay,

6    he can take discovery, he can take depositions,

7    all of those things are available, but not things

8    which require the application of foreign

9    substantive law.

10             Again ---

11             THE COURT:  Well, let me -- let me ask you

12   something.

13             MR. HART:  Uh-huh.

14             THE COURT:  Let's say that the foreign

15   representative had not sought recognition under

16   Chapter 15, and went directly to a New York court and

17   made the same allegations in a New York court, I am

18   the appointed administrator of this particular

19   estate, and these are the allegations, and under

20   New York law, I would like to seek avoidance of these

21   assets.

22             Are you saying that a foreign person is

23   never permitted to come into a court in the

24   United States and seek relief under the laws of

25   that state?

1          MR. HART:  I think the last part of your

2    question is a bit broad, Your Honor, if I might say

3    so.  A foreign person might be allowed to do that,

4    especially if the conduct which led to the fraudulent

5    conveyance occurred here or was governed by U.S. law,

6    but specifically to this case, we've got a foreign

7    trustee, and federal law is supreme, and 11 U.S.C.

8    1521(a)(7) says that a foreign trustee can't do that.

9          So if I were --

10         THE COURT:  But that's not --

11         MR. HART:  -- defending ---

12         THE COURT:  -- but that's not what

13   1521(a)(7) says.

14         MR. HART:  Well, it says the following are

15   not available to a ---

16         THE COURT:  Right, and those are

17   Bankruptcy Code provisions --

18         MR. HART:  Uh-huh.

19         THE COURT:  -- some of which happen to give

20   the trustee power under nonbankruptcy law, but where

21   in 1521(a)(7) does it say the trustee or I'm sorry,

22   the foreign representative can never bring any kind

23   of avoidance action?

24         It doesn't say that, does it?

25         MR. HART:  Well, would there be any point

Page 21

1    in saying in Chapter 15 and 1521(a)(7), that they

2    can't if there's going to be that kind of an enormous

3    loophole to drive through?

4            I -- I -- I would suggest that that

5    just wouldn't make any sense.

6            THE COURT:  Well, wouldn't it be equally

7    persuasive to say that if the intent of Chapter 15

8    was to disenfranchise a foreign person's right to

9    come into a United States court and seek whatever

10   relief they're legally entitled to --

11           MR. HART:  Uh-huh.

12           THE COURT:  -- I'm not saying that one can

13   just walk in and file an avoidance action if the

14   appropriate condition precedents are not there --

15          MR. HART:  Uh-huh.

16          THE COURT:  -- but don't you think that

17   that would also have to be expressly stated that --

18   that this statute, that this Chapter 15, now means

19   that every other relief that would have otherwise

20   been available to a foreign representative is now

21   foreclosed?

22         MR. HART:  Well, I think 1521(a)(7), it

23   specifically enumerates the chapter sections, the

24   Chapter 5 sections, which are not available to a

25   foreign trustee, and again, I think the rationale for

1    this is very strong.

2              These are things which should be

3    litigated under the law of the trustee's home

4    country, not in our courts here.  The law may

5    differ --

6              THE COURT:  Well ---

7              MR. HART:  -- and so you're basically

8    mixing apples and oranges if you allow a foreign

9    trustee to come here and start arguing that New York

10   fraudulent conveyance law applies to something which

11   occurred offshore, which is governed by the laws of

12   some other country, I -- I think that really

13   frustrates the purpose of Chapter 15, which is

14   comity, that's -- that's the vein that runs through

15   Chapter 15.

16             THE COURT:  Right, but doesn't comity exist

17   irrespective of Chapter 15?

18             MR. HART:  Yes, of course it does, Your

19   Honor.  Chapter 15, simply, I think, creates a

20   statute which recognizes that, and which sets out the

21   parameters of what a foreign trustee can and can't

22   do.

23             THE COURT:  Well, let me ask you this:

24   What if -- and I understand that is not the situation

25   here, what if the civil court had already ruled that

1    the Indio da Costas had -- owe this obligation to the

2    estate in Brazil?

3                    MR. HART:  Uh-huh, the Brazilian civil

4    court, Your Honor?

5                    THE COURT:  Right.

6                    MR. HART:  Yeah.

7                    THE COURT:  The Brazilian civil court had

8    now entered a judgment that says the Indio -- Indio

9    da Costas -- Indio da Costas owe two billion lire, I

10   don't -- I'm --

11                   MR. HART:  Right.

12                   THE COURT:  -- whatever, reais, rather --

13                   MR. HART:  Reais, yes.

14                   THE COURT:  -- okay, to the -- the estate,

15   and then the foreign representative came into

16   New York court with that judgment, domesticated it,

17   and then started a fraudulent conveyance action,

18   still the same answer?

19                   MR. HART:  No, because I don't think they'd

20   have to do the fraudulent conveyance action, they'd

21   just have to be able to pierce the corporate veil to

22   show that the property held by the corporations

23   actually belong to the former owners of the bank.

24                   THE COURT:  Well, I guess they ---

25                   MR. HART:  And that's what I'm basically

1   inviting my friend, Mr. Grossman, to do.  Finish the

2   case in Brazil, and then if you're successful there,

3   bring your judgment up here and then we can come and

4   see you, Your Honor, and, you know, perhaps we have

5   different arguments at that point.

6             THE COURT:  Okay.  Don't go anywhere, I'm

7   not done, that was just one question or series of

8   questions.

9             Okay.  Let's see.  With respect to

10  Mr. Grossman's argument, and I understand that

11  you've -- I won't say you've conceded the statute

12  of limitations point, but you elected not to

13  dwell on it, what is your reaction to

14  Mr. Grossman's arguments that the statute of

15  limitations, with respect to discovery and

16  damages, run from the date of the trustee's

17  appointment?

18            MR. HART:  I -- I don't think, and again,

19  I -- I'm handicapped because I'm not a Brazilian

20  attorney, but my understanding of the argument is

21  that in Brazil they have a discovery doctrine for

22  statute of limitations.  In other words, the statute

23  does not begin to run until the damage caused by the

24  wrongful acts are discovered.

25            Mr. Grossman is, I think, conflating

1  the appointment of the trustee with the
2  discovery, but I would contest that.  I think in
3  our reply we stated that the bank was put into a
4  form of liquidation in 2012, so if there's going
5  to be discovery, it would necessarily have been
6  in 2012 or earlier, not when this current trustee
7  was appointed and, of course, he's had a couple
8  of predecessors who have been disappointed by
9  the -- by the Court, if that's the right way to
10  put it.
11              THE COURT:  Okay.  Well, disappointed if
12  they were removed, I'm sure.
13              Okay.  Don't go anywhere, I'm not done
14  with you yet.  On Page 11 of your motion, you
15  state, in arguing the Brazilian Civil Code,
16  you -- you quote the statute and you say that the
17  allegations of the amended complaint say that the
18  defendants intentionally, recklessly or
19  negligently caused BCSUL to transfer, and then
20  you say that is inconsistent with saying that
21  Felippe and Octavio participated in a scheme of
22  falsified loans.
23              How is intentionally -- the intentional
24  act by the defendant inconsistent with a scheme
25  of falsified loans from Felippe and Octavio, how

1   is that inconsistent?

2          MR. HART:  The defendants are British

3   Virgin Islands corporations.

4          THE COURT:  No, no, I understand that.

5          MR. HART:  One of the defendants was not

6   even formed at the time these alleged wrongdoings

7   took place.  I think the other one wasn't formed

8   until the middle of those acts.

9          The corporations are inanimate objects.

10  They were certainly not used to make fraudulent

11  loans or to exaggerate the balance sheet of the

12  bank, which I understand is what resulted in the

13  payment of more money to the Indio da Costas than

14  they were entitled to.

15         So I just believe that this is -- this

16  allegation is so self repugnant to, you know,

17  what else has been alleged in the complaint and

18  what we know to be the facts, which are alleged

19  both here and in Brazil, that it cannot stand as

20  an alternative allegation.

21         THE COURT:  Do the allegations of the

22  complaint include the formation date of each of the

23  corporations?  I haven't looked at this --

24         MR. HART:  You know, Your Honor --

25         THE COURT:  -- in a couple of days.

Page 27

1          MR. HART:  -- to tell you the truth, I

2     don't recall because I looked it up separately, went

3     to the British Virgin Islands.

4          THE COURT:  Uh-huh.

5          MR. HART:  Let's have a look.

6          THE COURT:  No, no, the reason I'm asking

7     is, of course you understand that for purposes of

8     today, it doesn't really matter what the facts are --

9          MR. HART:  Right.

10          THE COURT:  -- unless it crosses the line,

11     it's just what's been alleged in the complaint.

12          MR. HART:  Indeed, we have to treat those

13     as true, but I -- I think where allegations in one

14     count are so very much at odds with the allegations

15     in another count, that raises a different issue,

16     that's called, I think, the self repugnancy issue.

17          I don't think you can allege that, you

18     know, it's night, and at the same time allege

19     that it's day.

20          THE COURT:  Okay.

21          MR. HART:  There has to be some consistency

22     between the alternative counts.

23          THE COURT:  All right.  I think that's all

24     the questions I have for you, but just as you have

25     reserved for rebuttal, I reserve the right to ask you

1   more questions.

2           MR. HART:  Very good, Your Honor.  Thank

3   you.

4           THE COURT:  Okay.  Thank you.

5           All right.  Mr. Grossman.

6           MR. GROSSMAN:  Thank you, Your Honor.

7   Again, Greg Grossman for the foreign representative.

8           Before Your Honor fires away questions

9   at me, I want to make sure that you understand

10  Mr. Lacayo and I have different pieces of the

11  argument, so he's going to be -- I'm going to

12  talk about the 1521(a)(7) and the standing of

13  foreign representative to bring the fraudulent

14  transfer claim, I'll talk about the constructive

15  trust and equitable lien.

16          Mr. Lacayo has the statute of

17  limitations, the freeze order, and the authority

18  to hire our firm to bring the -- the -- to bring

19  the lawsuit to begin with, and I think I have the

20  aiding and abetting.

21          So just to make sure that if you ask me

22  questions about something that's outside of my

23  sphere, I'll do my best, but I probably will

24  defer to my law partner to ---

25          THE COURT:  It's just like moot court all

1    over again.

2              MR. GROSSMAN:  I hope so, I did well in

3    moot court.

4              So let's talk about 1521(a)(7), Your

5    Honor, and I think -- let me start with, if

6    you've ever watched the questions of the prime

7    minister, the right honorable gentleman,

8    Mr. Hart, I think he just has a false premise

9    here.

10             THE COURT:  Okay.

11             MR. GROSSMAN:  And the false premise is

12   that the reason that 1521(a)(7) exists, in his

13   argument, is that it is necessarily ascribing an idea

14   that avoidance actions should be brought in the home

15   country and not in the country where the 15 is filed.

16             There isn't a case cited for that

17   proposition in the papers.  It is inconsistent

18   with the description of the legislative history

19   of 1521(a)(7), which is a nonuniform provision.

20   It doesn't exist in the EU, it doesn't exist in

21   the rest of the (inaudible).

22             And if you went to that legislative

23   history, you'll see that the reason that the

24   United States put this in was to avoid a conflict

25   of law rule analysis about avoidance actions

Page 30

1   under the Bankruptcy Code, but more importantly,

2   this debate got decided by the 5th Circuit in

3   Condor a while back.

4           Condor, if the Court recalls, I think

5   it's a Mississippi bankruptcy case in which the

6   Mississippi bankruptcy judge said this foreign

7   representative cannot sue these American

8   defendants under Nevis law, St. Kitts and Nevis

9   law because of 1521(a)(7), affirmed at the

10  District Court and reversed by the 5th Circuit.

11          The 5th Circuit said, 1521(a)(7) says

12  you can't bring -- you can't get the relief -- I

13  shouldn't say you can't bring, because it's

14  written as the Court cannot grant the foreign

15  representative the relief under these sections.

16          This does not create a bar to bring a

17  claim under Nevis law, and, in fact, in Condor,

18  they did exactly that post appeal, post decision,

19  they brought those lawsuits, and those lawsuits

20  got litigated.

21          If Mr. Hart's premise was correct,

22  Condor would have been wrongly decided, it would

23  have been decided a different way.

24          Also, interestingly, and we've cited

25  these cases, they're in our papers, Judge, if you

```
 1   go to -- let's see, Hellas, Hellas looked at
 2   whether or not you could bring a -- a law --
 3   claims under UK law.
 4              THE COURT:  All right.  But -- but,
 5   Mr. Grossman --
 6              MR. GROSSMAN:  Uh-huh.
 7              THE COURT:  -- in each of those cases, and
 8   this is within your -- your side of the thing, so --
 9              MR. GROSSMAN:  It is.
10              THE COURT:  -- even though I let Mr. Hart
11   go without interrupting him, because you -- you've
12   divided up your argument, I'm going to have to
13   interrupt you a little bit.
14              MR. GROSSMAN:  Not a problem.
15              THE COURT:  Okay.  So assuming that I agree
16   with you that 1521(a)(7) does not mean that a foreign
17   representative can never bring any avoidance action,
18   just the avoidance actions identified that are
19   Bankruptcy Code specific, okay, let's -- let's say I
20   agree with that argument, do you not, nonetheless, if
21   you are relying on non-Bankruptcy Code law, in this
22   case we'll stick with New York --
23              MR. GROSSMAN:  Uh-huh.
24              THE COURT:  -- to make my life simpler,
25   still have to allege a cause of action under New York
```

1  law?

2          And so my question to you would be, and

3  it goes to somewhat of the dialogue that I had

4  with Mr. Hart, if, in fact, Mr. Hart's

5  supposition is correct, that the civil court in

6  Brazil has not yet made a determination of

7  liability, doesn't your claim under New York law,

8  nonetheless, fail, at least for now, because a

9  condition precedent to a creditor bringing a

10  fraudulent conveyance action under nonbankruptcy

11  law, would be that they have, in fact,

12  established a debt from the transferor -- from

13  the transferor before pursuing a -- what would

14  then be a fraudulent conveyance?

15          MR. GROSSMAN:  No, and I'll think about --

16          THE COURT:  Why?

17          MR. GROSSMAN:  -- what's familiar to us.

18          THE COURT:  Okay.

19          MR. GROSSMAN:  Under 726, the Uniform

20  Fraudulent Transfer Act in Florida --

21          THE COURT:  Uh-huh.

22          MR. GROSSMAN:  -- and the Uniform

23  Fraudulent Conveyance Act as applied in New York, the

24  definition of creditor under these statutes is the

25  holder of a claim.  The definition of claim includes

1    unmatured and contingent.

2          If you -- in state court, and I have

3    filed a few of them, in fact, there's a case

4    called G.E. vs. Chooley (phonetic), which I took

5    to the 3rd, in which we were not the holder of a

6    judgment, but you're the holder of a debt.  The

7    debt can be disputed.  The debt can be

8    contingent.

9          In fact, in the federal rule, you can

10   bring both a lawsuit on the debt and a second

11   count right behind it to avoid the fraudulent

12   transfer that your debtor, who you haven't yet

13   established the liability against, to prevent

14   that debtor from transferring the property.  You

15   can ask for injunctive relief, and I can find you

16   the Federal Rule of Civil Procedure on that, but

17   it says you can bring those claims

18   simultaneously.

19         The only -- the only thing you can't

20   do, is unless and until you've established at the

21   end of the trial that the debt exists, you can't

22   get judgment on the fraudulent transfer, but you

23   can always bring the claim if -- think about an

24   easy fact pattern.

25         I am owed money by Mr. Lacayo, and I

1    haven't yet sued him and gotten my judgment, but

2    I find out that he is transferring all of his

3    assets away.  I then sue him on the debt, I

4    haven't yet gotten judgment, and I back it up

5    with a second count against his fraudulent

6    transferee, perfectly valid.

7              I'm still a creditor because I am

8    claiming a debt, he would be my debtor, and the

9    person who is sued in Count 2 is the fraudulent

10   transferee.

11              THE COURT:  But ---

12              MR. GROSSMAN:  That -- that is -- that's

13   not an un-normal fact pattern, I've litigated that.

14              THE COURT:  Okay.  But, again, to spin it

15   out to its logical conclusion --

16              MR. GROSSMAN:  Surely.

17              THE COURT:  -- unless the law has changed

18   significantly in the last 11 years, what you are

19   describing is essentially a prejudgment writ that

20   provides prejudgment relief against potential assets.

21              So you're saying that you have the

22   right to put a defendant through the cost of a

23   fraudulent conveyance or fraudulent transfer

24   action before you even establish that the person

25   whose assets have been transferred, in fact owes

1  you a debt?

2        MR. GROSSMAN:  Yes.

3        THE COURT:  Okay.

4        MR. GROSSMAN:  It's not a writ, it's not an

5  injunction, it's a lawsuit.

6        THE COURT:  Okay.  So then let me -- let me

7  go then to Mr. Hart's next point.

8        MR. GROSSMAN:  Uh-huh.

9        THE COURT:  If, in fact, the freeze order,

10 which freezes the ability of the defendants in this

11 action to do anything with respect to the apartments

12 or the artwork while the litigation is pending in

13 Brazil, has in fact been domesticated in the

14 United States, does that not give you that same

15 protection until such time, as any, that your client

16 obtains a judgment of liability against the

17 Indio da Costas?

18        MR. GROSSMAN:  I'm going to ask -- I'm

19 going to ask Mr. Lacayo to -- to -- to jump in, but I

20 will -- I will try and answer the Court's questions

21 to the best of my understanding.

22        THE COURT:  Okay.

23        MR. GROSSMAN:  There -- I want to make sure

24 we're talking about the right freeze orders because

25 there's two freeze orders.

1            THE COURT:  Well, I -- I specifically asked
2    about the one that's been domesticated in the
3    United States.
4            MR. GROSSMAN:  But that's not the civil,
5    that's the criminal.
6            THE COURT:  Oh, okay.
7            MR. GROSSMAN:  Okay.  So that's not the
8    Brazilian Bankruptcy Court, that's the criminal.
9            THE COURT:  Okay.
10           MR. GROSSMAN:  So that's got -- my client
11   doesn't participate in the criminal action.
12           THE COURT:  Okay.
13           MR. GROSSMAN:  In the civil freeze order,
14   what I have seen in the civil freeze order is it
15   applies to the individual, the human beings, that
16   used to be the shareholders or the directors and
17   their assets.
18           What I think has been -- happened this
19   morning or this afternoon here, Judge, is that
20   when it is convenient for the corporate
21   defendants in this adversary to say that they are
22   the same as the human beings, they make that
23   argument.
24           When it's convenient for them to say
25   that it is not the same as the human being, they

1   make that argument, as well.  The freeze orders

2   don't list the apartment -- the civil freeze

3   order doesn't list the apartment --

4              THE COURT:  Okay.

5              MR. GROSSMAN:  -- it doesn't list the

6   artwork, it doesn't list -- it's a general freeze

7   order of the personal assets of the human beings who

8   were the directors and the shareholders.

9              So if, in fact -- and by the way, these

10  allegations are in the complaint, one of them, I

11  think it's the Penthouse 2, they -- it got moved

12  into a corporate name and they put it -- they

13  installed a trust to be the owner.

14             So in theory, the only thing frozen

15  under the civil freeze order would be their

16  bene -- the human being's beneficial interest in

17  a trust.  Well, how does that matter?  Well, the

18  penthouse could get a mortgage, it could not pay

19  its real estate taxes for five years, et cetera.

20             I understand the Court's practical

21  issue, which is if you can tie up all of the

22  assets here so that nothing bad happens, then

23  that's -- why not do that and fight elsewhere,

24  but that's not why we're here.

25             If that's really what they wanted to

1   argue before the Court, we'd have a different

2   motion filed, it would be called a motion for

3   forum non conveniens, a motion to evade, this is

4   a motion to dismiss.  Motion for forum non

5   conveniens is a 12(b)(3) motion, that should have

6   been brought.

7          So I -- my concern is that there's a

8   dance going on here, which is that at some point

9   if they buy the -- if you buy the argument here,

10  all of a sudden those corporate defendants would

11  be, what is this Brazilian judge doing with us?

12  We're a BVI corporation owning New York

13  apartments.  You can't have that both ways.

14         From our perspective -- and there are

15  going to be, perhaps, opportunities during the

16  pendency of this case for these corporate

17  defendants to step up to the Court and say,

18  before we try the case, Judge, here's what's

19  happening elsewhere, maybe you should stay the

20  case because this is about to occur, this hasn't

21  occurred.

22         But this is a motion to dismiss, this

23  is the opportunity for us to find out the actual

24  intricacies of these transactions, to make sure

25  that it's not just a game of what the allegations

1   are, but what are the facts?  So some of them we

2   have, but some of them we'd like to learn, which

3   is one of the reasons that, you know, the lawsuit

4   is here.

5           One of the things you get in American

6   style discovery -- and by the way, there's no

7   personal jurisdiction argument that's been

8   raised.  These are corporate -- BVI corporations,

9   but they own apartments in New York and artwork

10  in New York.

11          So there's going to be that

12  opportunity, but they didn't bring that

13  opportunity to the Court now.  So they can try it

14  later on and see if that works, but we're here on

15  a motion to dismiss.

16          And I do want to back up, I know the

17  Court -- I know the Court sort of went through

18  this with Mr. Hart on the 544.  If you actually

19  go back in and read 544, which most bankruptcy

20  lawyers forget to do because we just -- it's sort

21  of ingrained in us, the actual -- 544 doesn't

22  actually have an avoidance action, if you think

23  about it.  It doesn't actually avoid anything.

24  It only clothes a domestic bankruptcy trustee

25  with certain hypothetical powers that it might --

Page 40

1    that the trustee may not have actually had.

2              The word trustee in 1521(a)(7), since

3    it's in Chapter 15, is completely different than

4    the foreign representative, because trustee has

5    its own definition for Chapter 15.

6              When you go to the definition of who a

7    foreign representative is, it's different than

8    what a trustee would be, and that would be

9    1502(6) defines what a trustee is under a

10   Chapter 15.

11             We know that a trustee under other code

12   sections, if it's a debtor-in-possession, it

13   becomes a trustee under 1107, obviously this is

14   not a Chapter 11.

15             We cited for the Court, I think for the

16   unremarkable proposition that when Congress

17   writes particular code sections in a statute,

18   that it means those code sections, which is why

19   the case law says a 553 setoff to do -- you know,

20   to -- to avoid a setoff within X number of days

21   prior to the petition, not excluded under

22   15(a)(7), and we cited the case that applied 553

23   for the benefit of a foreign representative.

24             Mr. Hart already volunteered that a 542

25   motion or lawsuit would be completely appropriate

1    because it is not listed in the enumerated

2    sections, a 533.  How about this one, Judge, 549,

3    a postpetition transfer of property?

4              So after we filed this 15, if somebody

5    had property that was otherwise stayed or was

6    property of the estate as of the date we filed

7    the 15 or the 15 was recognized, if they

8    transferred that property under 549, we could

9    recover it.  That's purely American law, so

10   that's not specifically enumerated in 1521(a)(7)

11   either, and we cited those cases that stand for

12   that proposition, but I will tell you there is an

13   interesting point here on the question under

14   purely New York law.

15             So, again, I reject the premise that

16   our lawsuits have -- are brought under 544.

17   They're clearly not.  They don't say they are,

18   they don't argue 544, they argue New York

19   debtor/creditor law, but there is an interesting

20   point there under -- under New York

21   debtor/creditor law, just like under 726 of the

22   Florida Statutes, Judge, who is a creditor under

23   that statute?

24             And in this case we have -- we have two

25   flavors, there is issue of whether or not the

1 | foreign representative is, in fact, a
2 | representative of the creditors, meaning each of
3 | the individual claimants against the estate in
4 | Brazil, and, therefore, files a lawsuit under
5 | applicable nonbankruptcy law, in this case
6 | New York debtor/creditor law, and is suing in a
7 | representative capacity on behalf of the
8 | creditors, which many courts have said under
9 | Uniform Fraudulent Transfer Act fits close enough
10 | within the definition of creditor under state law
11 | to bring that.
12 |          We cited the Sholes case, there's the
13 | Fannie Mae case out of New York, I think it's
14 | called Friedmans, so there is some of that, and
15 | that's an interesting argument -- it's an
16 | interesting issue.  I can't say that it's well
17 | settled because it's all over the place.
18 |          There's the other side of it, which is
19 | far more clear.  Where the estate -- so now I'm
20 | not talking about representative creditors
21 | individually, I'm talking about the estate, where
22 | the estate itself is the creditor, there is
23 | certainly no doubt, you don't need 544 to bring
24 | an action under New York debtor/creditor law, and
25 | let me give you an example.

1              If it was a domestic bankruptcy trustee

2    under Chapter 7 who sued somebody for an account

3    receivable, and that person, who was the

4    defendant, was fraudulently transferring their

5    assets away, and they filed a fraudulent transfer

6    action against that alleged fraudulent transferee

7    or if they got a judgment, they filed a

8    proceeding supplementary, that domestic

9    bankruptcy trustee is not using 544 at all, has

10   nothing to do with 544.  They don't need any

11   special powers.

12             They're somebody who is owed money, and

13   the person who owed them the money has

14   transferred their property away.  How does that

15   fit here?  Well, we know under Penthouse 2, our

16   allegations, which you have to take as true for

17   purposes of the motion to dismiss, our allegation

18   is diverted funds by Felippe in 2008, bought the

19   apartment -- the Penthouse 2, and then in 2011,

20   he transferred the property to the corporation

21   called Alinia and installed the trust -- a trust

22   as the owner.

23             So who are we in that scenario?  In my

24   view, we're the creditor.  The person who owed us

25   money, Felippe, has, as we allege, fraudulently

1    transferred away an asset for no consideration.
2    That's got nothing to do with 544.  Same thing
3    for Apartment B.  That's why we made the
4    allegations, these items were bought by and
5    through the individuals diverting BCSUL's monies.
6              So I pointed out this interesting --
7    but I don't think you really need to get there,
8    but there is that tension.  I don't think for
9    this case it matters.  You won't -- in my view,
10   you wouldn't need to issue a decision commenting
11   on this interesting point because we are the
12   creditor, the person who owes us money has moved
13   stuff out of the individual's name into corporate
14   vehicles, which, frankly, I think Mr. Hart just
15   admitted, said that they are -- I wrote down the
16   notes -- these are vehicles created to hold
17   property.  That's called transferee.  So our
18   standing derives from a very common fact pattern.
19             I will point out on the more
20   interesting thing in Paragraph 49 of the amended
21   complaint, we do allege that we are a
22   representative of the creditors, but, again, I
23   don't think we need to get there.
24             Let's see.  Let's talk about
25   constructive trust and equitable lien.  The

1    premise that constructive trust and equitable
2    lien claims come under 544 is news to me.  The
3    cases cited were regular constructive trust
4    cases.  If you read the cases cited for the
5    premise, they are certainly cases brought by a
6    bankruptcy trustee seeking an equitable lien, but
7    that doesn't mean that constructive trusts and
8    equitable liens are 544 claims.
9              If a domestic bankruptcy trustee had a
10   claim against a former officer who stole money
11   from the corporation and put it into a corporate
12   vehicle, wouldn't need 544 to ask for a
13   constructive trust against the corporate vehicle
14   holding the res of the constructive trust,
15   wouldn't need 544 at all.
16             Make it easier, it's an outright --
17   it's a theft.  I mean, so it's not a fraudulent
18   transfer issue at all.  Any cause of action,
19   unjust enrichment, he got it by mistake and said,
20   wow, what a windfall.  I got a -- the debtor
21   handed me some money by accident, I'm going to
22   put it in this corporate vehicle, maybe they
23   won't find me, and then the trustee sues them for
24   constructive trust or equitable lien on whatever
25   it is that they bought, that's got nothing to do

1    with 544.

2              THE COURT:  All right.  You're just saying

3    it's 541, it's just a claim that belongs to the

4    estate?

5              MR. GROSSMAN:  Correct.  In the domestic

6    case here, it's just a lawsuit that a person not

7    having to wear anybody else's hat and not needing any

8    hypothetical lien powers or powers of a creditor or

9    the 105 purchaser can bring those claims.

10             On the aiding and abetting issue, which

11   is the -- the one on my -- the last thing on

12   my -- on my ledger compared to Mr. Lacayo, this

13   goes back to my point, which is when it's been

14   convenient to say we're separate, they say

15   they're separate, and when it's convenient to say

16   they're the same, they say they're the same.

17             If, in fact, their position is that

18   Felippe and Octavio so dominated these entities

19   that they are, in fact, the same person,

20   therefore they have the same knowledge, therefore

21   they have all of the same attributes, then we

22   would sue them directly for the same breach.

23             By the way, the cases that they've

24   cited, yeah, they're from 1950, but they're all

25   cases where the shareholder of a corporation sues

1    the trans -- the -- the director's company, the

2    director of the company they're the shareholder

3    of, so you have shareholder, company, director,

4    and they say, well, the director and the company

5    the director created, aided and abetted the

6    company that we were a shareholder of, that's

7    that case law.

8            So that fact pattern, it's almost quasi

9    derivative, if you think about it, because the

10   shareholder, in order to claim that there's a

11   breach of duty to the shareholder, the duty runs

12   to the corporation.

13           Now, there are circumstances where a

14   major shareholder says, well, then the director

15   also owes me an individual duty, but those are

16   far -- you know, few and far between.

17           Generally the notion is the director

18   owes a duty to the corporation, and so at that

19   point, the shareholder -- shareholder suing

20   derivatively on behalf of a corporation, that's

21   the corporation suing itself saying that I'm part

22   of the aiding and abetting scenario.  We don't

23   have that here.

24           THE COURT:  Well, but if, in fact, the

25   corporation is -- is owned and controlled by one

Page 48

1   person --

2           MR. GROSSMAN:  Uh-huh.

3           THE COURT:  -- that is different than if

4   there are independent directors --

5           MR. GROSSMAN:  True.

6           THE COURT:  -- that goes to that whole

7   in pari delicto thing, which I view as a somewhat

8   parallel inquiry, and that is, at what point can you

9   disengage the corporation from its officers for

10  purposes of creating an independent cause of action?

11          And so my question to you, I'll ask

12  you, do you know any better than Mr. Hart knows,

13  whether this -- these entities have any

14  independent directors or officers or you

15  mentioned a trustee somewhere?

16          MR. GROSSMAN:  What we know of Alinia,

17  which is Penthouse 2, the allegations are that

18  Alinia, as a corporate entity, is owned by a trust,

19  and the allegations in our complaint is that it

20  appears to be a self-settled, one-beneficiary trust.

21          Does that mean the trust is separated

22  from the -- the corporation?  Well, who -- you

23  know, is it separate -- is the owner of the

24  entity, the trust, separate from the entity for

25  purposes of aiding and abetting and separate from

1   the human being?

2           From our perspective, we'd like a

3   little latitude to understand the dates and times

4   and mechanisms by which this all was created, and

5   I think at that point we'll be in a better

6   position to understand.

7           So, for instance, if these corporations

8   were from the get go contemplated and they just

9   didn't file the paperwork to put them in, it was

10  always intended to be in the corporate entity's

11  name, then we would make an allegation that it's

12  simply the alter ego of the human being because

13  of the manner in which it was created.

14          If it was always the intent, well,

15  we're going to steal the money first and we're

16  going to put it in this corporation, and we just

17  didn't get around it, then that's going to fit an

18  alter ego theory pretty -- pretty nicely, created

19  or used for an improper purpose, but we don't

20  have that fact now.  All we know is the dry

21  information.

22          There's a corporation that owns

23  Apartment 2 -- I mean, Penthouse 2, there's a

24  trust that's the owner, we see that because of

25  the public record documents, and the person who

1  signs on behalf of the trust is Felippe, that's

2  what we know.

3          THE COURT:  Well, Mr. Grossman, I find it

4  somewhat telling, however, that your response does

5  not cite any cases, and the only -- the best you give

6  me is, well, let us sue them directly.

7          So are you telling me that you have not

8  found a case in the entire United States that

9  recognizes that a corporation can aid and abet

10  its principal or forming person or whatever you

11  call it?

12          MR. GROSSMAN:  We -- we didn't -- we took

13  the cases they had found and we looked for cases to

14  distinguish them, if there was other cases -- if --

15  if, you know, that had cited to them, we didn't find

16  anything.

17          In our separate research to look for,

18  we couldn't find anything.  I think they found a

19  universe of cases.  I can't say that we looked

20  for every case everywhere, but we didn't find

21  anything to it.

22          My point is, if, in fact, the theory

23  isn't aiding and abetting, but it is, in fact,

24  alter ego, my concern is that I don't want to

25  overstep and make an allegation that I can't back

1    up with facts.  So I'm okay, I understand where

2    the Court might be going with that, but I'd like

3    the leeway to explore.

4            I think we're going to get it if any of

5    the other counts survived anyway, but I would

6    hate to have a situation that says, well, if that

7    count is -- is dismissed without prejudice to

8    allege something else, and then I don't get to

9    take any discovery to figure out whether there's

10   something else, that I think would put me at a

11   disadvantage, and that's something I'm trying to

12   find out, which is what is the backbone of the

13   ownership structure, the director structure, the

14   officer structure, getting a copy of the actual

15   trust agreement.

16           Let's see, because perhaps the trust

17   was created even before they moved the entity --

18   the asset into the entity.  If the trust was

19   formed in 2008 when Felippe bought the apartment,

20   and he just didn't move it over, my alter ego

21   claim seems pretty good.  That's what I'm looking

22   for.

23           I just don't want to get caught where

24   you say, well, that count is now dismissed

25   without prejudice, so now you can't take any

Page 52

1  discovery to find out the backbone, that's my

2  point.

3          THE COURT:  But I've been feeling a

4  Twombly/Iqbal moment coming on.

5          MR. GROSSMAN:  Well, I don't want to file

6  anything that you would think would violate Twombly

7  and Iqbal, but you don't think it's plausible that

8  someone creates a trust -- no, seriously, Judge, I

9  mean, is it ---

10          THE COURT:  Mr. Grossman, the whole point

11  of Twombly and Iqbal is that you don't file first and

12  do the discovery later --

13          MR. GROSSMAN:  Exactly.

14          THE COURT:  -- and see if you have facts

15  that back up.

16          MR. GROSSMAN:  And that's what I'm trying

17  not to do.

18          THE COURT:  Okay.  I understand.  Okay.  So

19  you've conceded that at least for now, you have not

20  found any case?

21          MR. GROSSMAN:  I have not.

22          THE COURT:  Okay.

23          MR. GROSSMAN:  I have not.

24          THE COURT:  Okay.

25          MR. GROSSMAN:  Let me just check my notes,

1    Judge, to make sure that I've ---

2              THE COURT:  And while you're doing that,

3    I'll check my questions, how's that?

4              Give me one more second.

5              MR. GROSSMAN:  Yes, ma'am.

6              THE COURT:  Just to close -- oh, never

7    mind, that's a Mr. Lacayo question.

8              MR. GROSSMAN:  You're really going to load

9    him up, aren't you?

10             THE COURT:  Right.  Is Mr. Lacayo also

11   going to discuss the Brazilian claims?

12             MR. GROSSMAN:  Yes, ma'am.

13             THE COURT:  Okay.  All right.  Then I have

14   no more questions.

15             Thank you, Mr. Grossman.

16             MR. GROSSMAN:  Thank you, Your Honor.

17             THE COURT:  All right.  Mr. Lacayo.

18             MR. GROSSMAN:  I hope she goes easy on you.

19             THE COURT:  Okay.  Whenever you're ready.

20             MR. LACAYO:  Thank you, Your Honor.

21             Arnie Lacayo on behalf of the foreign

22   representative, Your Honor.

23             As Mr. Grossman stated, Your Honor, I

24   have a couple of the issues to address,

25   specifically, the issue of the authority of the

1   foreign representative to bring the action, the

2   statute of limitations issues, I believe that

3   Mr. Grossman dealt with the issue of the MLAT,

4   even though that was within my -- my purview, but

5   I'm happy to answer questions the Court may have

6   with respect to that.

7            And so with that, Your Honor, unless

8   you want me to take the issues up in some

9   particular question, I'm happy to begin with a --

10  a discussion of the authority of the foreign

11  representative to -- to bring the action.

12           THE COURT:  Well, before you spend too much

13  time on that --

14           MR. LACAYO:  Sure.

15           THE COURT:  -- it seems to me -- I just

16  want to know, is it your position that all I have to

17  do is -- is accept the prosecutor's affidavit, and if

18  that's all I have to do, and Mr. Hart has conceded

19  that he's not arguing that the prosecutor was lying,

20  are we done with that argument?

21           MR. LACAYO:  I think, Your Honor, that the

22  argument was a bit messy, as presented by the

23  parties, but the bottom line is that the prosecutor

24  has indicated in a piece of paper that we have filed

25  with this Court, that the foreign representative, in

1    fact, had authority to bring this action.

2              We had represented that in our papers.

3    We would ask the Court to accept our own

4    representation as officers of the Court, and, you

5    know, to the extent necessary, Your Honor, I

6    would add that under Article 22, cited in our

7    papers, I won't belabor the point, but the

8    foreign representative has not only the

9    authority, but duty to bring actions on behalf of

10   the estate.

11             For purposes of having a complete

12   record, Your Honor, I would add that under our

13   own rules, Rule 9, in particular, there is no

14   requirement, and I'm referring to Rule 9 of the

15   Civil Procedure Rules, no requirement that a

16   plaintiff allege capacity or authority to sue

17   absent special circumstances.

18             I would add briefly that under

19   11 U.S.C. Section 1509(b), once a court grants a

20   foreign representative recognition under

21   Section 1517, the foreign representative, again,

22   has the capacity to sue and be sued in the courts

23   of the United States and that recognition was

24   granted in this case, and, you know, even going

25   back to Section 323, which is an analogue here,

1    trustees have the same capacity.

2            So with that, on that issue, unless

3    Your Honor had further questions, I think that we

4    would rely on our papers and the authority cited

5    just now for the proposition that our client had

6    the authority to bring the action.

7            THE COURT:  All right.  What about

8    Mr. Hart's argument that, as I view it, as part of

9    this argument, although perhaps it's not, that

10   there's still a second half, and that is the foreign

11   representative doesn't have a judgment against the --

12   I don't -- Indio da Casa -- Indio da Casas, I don't

13   know why I ---

14            MR. LACAYO:  Da Costa, da Costa.

15            THE COURT:  Da Costa.

16            MR. LACAYO:  Yes.

17            THE COURT:  I'm going to write that down so

18   I don't keep (inaudible) that name, Indio da Costa,

19   that -- that because the foreign representative

20   doesn't have any judgment against the Indio da Costa

21   brothers yet, that no matter what the prosecutor

22   says, you still don't have authority to come here.

23            MR. LACAYO:  I believe that we had some

24   discussion from Mr. Grossman on this point, Your

25   Honor, about the -- the notion that Chapter 15 is not

Page 57

1    a tool for requesting and exerting comity solely, but
2    also a -- a -- a statute, a law that allows foreign
3    representatives in their capacities, as they may be
4    in different jurisdictions, to come to this country
5    to adjudicate claims to assets.
6              The recognition order in this case, one
7    of the enumerated pieces of authority granted to
8    the foreign representative, is the authority to
9    look to the assets of the estate and, you know,
10   this adversary action is -- is a -- a venue for
11   airing those issues, particularly where you're
12   dealing with real property located in the estate
13   that a Brazilian Court is not going to have
14   in rem jurisdiction over.
15             THE COURT:  Okay.  All right.  Go ahead.
16             MR. LACAYO:  Moving on, Your Honor, to the
17   statute of limitations arguments, again, these were
18   only dealt with in passing I think, but the -- the
19   issue there is whether we are precluded from bringing
20   the actions brought here in this action in 2016.
21             As argued in our papers, and with the
22   assistance of a declaration by an independent
23   legal expert in our matter, Your Honor, the
24   statute of limitations for the three Brazilian
25   law claims have not -- had not run, and were not

1    expired at the time of the filing of the action.

2            In particular, I would cite Your Honor

3    to the legal opinion of Mr. Oliveira, which was

4    at ECF Number 33, between Pages 42 and 47 of that

5    filing, and would just briefly summarize, Your

6    Honor, that for purposes of the section or

7    Article 130 law, the corresponding article for

8    Article 130 is Article 132, and there it says

9    that the -- and I am reading from the translation

10   at Page 45 of 47, it says the revocatory claim

11   referred to under Article 130 of this law, must

12   be filed by the judicial administrator, by any

13   creditor, or by the public attorney's office

14   within three years from the decree of bankruptcy.

15           Here that date, Your Honor, was in

16   2015, and the expert tells us that we would have

17   the ability to bring that claim through 2018.

18   We ---

19           THE COURT:  Well, what -- what is the

20   two -- two -- 2012 date?  I thought that 2012 was the

21   actual date of the bankruptcy?

22           MR. LACAYO:  20 -- 2015, Your Honor --

23   2012, the liquidation date; right?  Yeah.

24           Your Honor, 2012 is the date in which

25   the Central Bank proceedings are converted into

1   a -- a liquidation proceeding.

2              THE COURT:  Okay.  So why wouldn't that be

3   the operative date?

4              MR. LACAYO:  The article speaks for itself,

5   Your Honor, and it is the decree of bankruptcy date

6   that leads to the -- the clock beginning to run.

7              THE COURT:  Okay.  So the liquidation is

8   not the same as the decree of bankruptcy?

9              MR. LACAYO:  Correct, Your Honor.

10             THE COURT:  Got it.  Okay.

11             MR. LACAYO:  Your Honor, with respect,

12   briefly, to Article 884, dealt with on Page 46 of the

13   opinion of Mr. Oliveira, that one Mr. Oliveira tells

14   us again at Paragraph 25 of his declaration, that

15   considering the case under analysis, he says the

16   unjust enrichment with a loss to a third party

17   occurred, again, upon the decree of the bankruptcy of

18   Banco Cruzeiro do Sul that took place on August 12,

19   2015.

20             Consequently, he concludes the harmed

21   party has three years following the decree of

22   bankruptcy, again, to file a claim of unjust

23   enrichment regarding whichever transaction he,

24   she, it considers suspect or fraudulent.  Again,

25   the action here brought in 2016, was within that

1    time period.

2              And finally, Your Honor, the Law 8.078

3    of 1990 claim, which is a consumer protection

4    law, with respect to the statute of limitations,

5    there the reference is to Article 27, and the

6    independent legal expert concludes that a lawsuit

7    reclaiming any amount arising from any action,

8    product or service begins to run from the

9    knowledge of the loss.

10             Considering the case under the

11   analysis, he says, the statute of limitations for

12   the unjust enrichment did not begin to run until,

13   again, the decree of bankruptcy for Banco

14   Cruzeiro that took place on August 12, 2015, and

15   there, the statute of limitations is a five-year

16   statute that begins to run from the decree of

17   bankruptcy to file the unjust enrichment claim,

18   so a period that would not close until 2020 in

19   this case, Your Honor.

20             THE COURT:  No, stop.  Let's stop right

21   there.

22             MR. LACAYO:  Sure.

23             THE COURT:  Speaking of the consumer

24   protection law, although Mr. Hart did not argue this

25   in his oral presentation, certainly in the written

1    papers there is a focus on this issue of this
2    consumer protection law, and the argument is that
3    this is for banking services.
4            So I know that in your response you
5    seem to suggest that because the consumers
6    received banking services from the bank, and
7    those did not include their money then being used
8    to make these fake loans that were -- was the
9    vehicle by which the money was allegedly stolen,
10   that that somehow takes care of it.
11           But -- but isn't the -- it appears
12   based on the text of the law itself, that this is
13   literally lawsuits arising from the provision or
14   failed to provide banking services, let's say, I
15   don't know, charging excessive interest on loans
16   or charging more for check cashing privileges.
17           I mean, I know very little about
18   Brazilian banking law, but I'm going to assume
19   like good banks anywhere, they try to take as
20   much money from the consumer for their services
21   they provide as possible.
22           So isn't that what this statute really
23   is?  And -- and so, therefore, how could it form
24   a basis for relief sought by the foreign
25   representative under this set of facts?

1           MR. LACAYO:  Sure, Your Honor.  I'm happy

2   to answer that question.  Actually, the Court, I

3   think is -- is recalling a section of argument where

4   the defendants are saying this is not what the

5   plaintiff is arguing.  They're not saying that they

6   were deceived or -- or hurt by some banking practice.

7           We do allege that they were damaged,

8   and the estate certainly can assert damages and

9   claims in connection with the actions of the

10  Indio da Costa individuals, who were managers of

11  the bank, and specifically, we ground our claims

12  in allegations that they not only participated in

13  a scheme that dealt with fake loans, but also

14  that they overvalued or fraudulently valued

15  assets of the bank, such that the bank would pay

16  out dividends that were not legitimate and which

17  benefitted them.

18          That being said, Your Honor, the

19  consumer law is broader than just banking

20  services.  The consumer law applies, and it says,

21  I'll direct the Court to Page 24 of 47 of

22  Document 33, which is our -- our translation of

23  the consumer law.

24          THE COURT:  Okay.  Give me just a moment to

25  get it.  I had it on my iPad, but --

1              MR. LACAYO:  Sure.

2              THE COURT:  -- I didn't bring my iPad out

3      here.

4              MR. HART:  Sure.

5              THE COURT:  Okay.

6              MR. LACAYO:  24 of Document 33.

7              THE COURT:  Okay.  I have it.

8              MR. LACAYO:  Article 14 of that law and

9      Article 25 are cited at the bottom of Page 24, and

10     the service provider here, again, Your Honor, is not

11     limited to -- to banks.  It's anyone that is

12     providing services to a consumer, and it says

13     basically that the service provider is liable

14     regardless of intent for the damages caused to

15     consumers by defects related to the services

16     provided, as well as by insufficient or inadequate

17     information on its fruition.

18             Going back just for a moment, Your

19     Honor, Article 17, which deals with the same law,

20     tells you that all victims of the event are

21     equivalent to consumers, and that is what we have

22     in this context, Your Honor.

23             We have a number of victims that can

24     claim under this consumer protection action

25     because they were damaged by -- by the actions of

1    the -- the defendants here.

2              THE COURT:  Well, but -- but they're not

3    service providers, are they?

4              MR. LACAYO:  Who's that, Your Honor?

5              THE COURT:  Your defendants.  I -- I'm

6    looking at the statute, it says the service provider

7    is liable, that's what it says, and where in your

8    complaint does it say that either of these

9    defendants, one of which I believe Mister -- somebody

10   said might have been formed after the liquidation,

11   how do those defendants become service providers?

12             MR. LACAYO:  They -- they were formed

13   before, Your Honor.

14             THE COURT:  Well, let's say they were

15   formed before.  They're not service providers, are

16   they?  Is there anything here that gives the

17   statutory definition of a service provider under

18   these statutes?

19             MR. LACAYO:  Yes, Your Honor, there is.

20             THE COURT:  And where is that?

21             MR. LACAYO:  Let me just Look back here.

22   Okay.  I am, Your Honor, let's see here, I am going

23   to cite to Article 14 again and 25, and what we write

24   in our paper on this issue, Your Honor, is that ---

25             THE COURT:  Well, you -- wait a minute.

1   You write where, just be specific for me?

2             MR. LACAYO:  In our response to the motion

3   to dismiss at Page 13, so this is Document 33

4   again --

5             THE COURT:  Okay.

6             MR. LACAYO:  -- we say here again, that the

7   amended complaint describes the falsified loan scheme

8   where the da Costas simply manufactured fake loans,

9   artificially inflated assets of BCSUL's books -- on

10  BCSUL's books and records, and distributed dividends

11  to themselves.

12            The law, again, 8.078, '90, it says

13  provides relief to all victims.  As stated, the

14  creditor body is comprised of depositors who lost

15  their deposits and all entities connected to the

16  damages can be directly, without proof of intent,

17  be held liable.

18            Here the allegations in the paragraphs

19  that are cited there above from the amended

20  adversary complaint, are that the defendants here

21  are related to the damages here, and under this

22  law can be held liable without proof of intent,

23  and that is Article ---

24            THE COURT:  I -- I understand -- I

25  understand that's in your response.  It's -- my

1   question is:  Where in the Brazilian statute is

2   service providers defined?  Just because you say it

3   in your response --

4             MR. LACAYO:  Sure.

5             THE COURT:  -- that's your interpretation

6   of what you'd like the law to be.  It may, in fact,

7   be exactly what the law says, that service provider

8   includes those who are not directors, officers or

9   employees of the bank, but nonetheless should be held

10  liable.

11            I'd like -- I am going to guess that a

12  Brazilian statute in this regard would be as

13  precise as one would hope a U.S. statute would

14  be, and that would define what service provider

15  is.

16            So do you have a definition, even if

17  you don't have it in your pleading, I know that

18  you are fluent in Portuguese, unless ---

19            MR. LACAYO:  I wish I were, Your Honor.

20            THE COURT:  I thought you were.

21            MR. LACAYO:  No.

22            THE COURT:  It must have been someone else

23  in your firm.  Okay, never mind.  Okay.  I just

24  remember there was one young man from your firm who

25  was ---

```
 1            MR. LACAYO:  There are -- there are a few,
 2  Your Honor.
 3            THE COURT:  Okay.  Never mind, then.  I'm
 4  going to ask you to, before we end today, go consult
 5  with your co-counsel --
 6            MR. LACAYO:  I will.
 7            THE COURT:  -- who I'm going to hope is
 8  fluent in Portuguese.
 9            MR. LACAYO:  He is, he is, he is, Your
10  Honor, and ---
11            THE COURT:  Both of the gentlemen at the
12  end, otherwise this -- this case is becoming more
13  interesting by the moment.
14            MR. LACAYO:  We will get you an answer on
15  whether the service provider --
16            THE COURT:  Okay.
17            MR. LACAYO:  -- is defined, Your Honor.
18            THE COURT:  Okay.
19            MR. LACAYO:  What -- what -- what I will
20  close with very briefly, is just to point to again,
21  Article 25, and --
22            THE COURT:  Got it right in front of me.
23            MR. LACAYO:  -- and Section 1, that tells
24  us under the Brazilian law, that if there's more than
25  one person or entity responsible for causing the
```

1   damage, all will be jointly liable for the reparation

2   provided on the previous sections.

3            THE COURT:  I see that.

4            MR. LACAYO:  Yeah.

5            THE COURT:  It says precisely, based on

6   your -- your definition -- I'm sorry, your

7   translation, if there is more than one responsible

8   for causing the damage.

9            MR. LACAYO:  Correct.

10            THE COURT:  That means one of two things,

11   either more than one service provider, or when we get

12   to the next part of this whole moment together, then

13   you will have to cite to me when, under Brazilian

14   law, service provider is extended to entities that

15   are not actually service providers.

16            MR. LACAYO:  Right, that -- that is what I

17   was trying to point the Court to earlier, Your Honor.

18            THE COURT:  I understand, but the language

19   you're pointing me to doesn't say that.

20            Okay.  All right.  Let me just write my

21   notes here, Article 25, Paragraph 1.

22            Okay.  Okay.  I think I will let you

23   move on past the consumer services, if you'd

24   like.  I mean, you're welcome to stay here, but

25   if you'd like to move on to the next part of your

1   argument, you may.

2            MR. LACAYO:  Sure, Your Honor, and I'm

3   happy to try to get that answer now or -- or

4   afterward, however you'd like.

5            THE COURT:  Go ahead.

6            MR. LACAYO:  The next issue, Your Honor,

7   that I have here after the -- well, let me see here.

8            Your Honor, one brief point before I

9   continue on the statute of limitations issue, and

10  that is that I wanted and meant to cite to the

11  Court the In Re: Fairfield Century, Limited case.

12  For the record, it's 452 Bankruptcy Reporter 52,

13  out of the Southern District of New York.

14            And on the issue of the statute of

15  limitations, the Fairfield Century case involved

16  a foreign representative that -- for a

17  liquidation proceeding pending in the British

18  Virgin Islands, coincidentally, who had been

19  recognized in the main proceedings in the U.S.

20  under Chapter 15, and had moved for application

21  of the Bankruptcy Code's tolling provisions.

22            I just wanted to briefly mention and

23  not leave out from the presentation today, that

24  those tolling provisions would also be applicable

25  to the claims brought by the foreign

Page 70

1    representative here, and I know that the Court is

2    well aware that Section 108 essentially grants a

3    two-year extension of time for a trustee in

4    bankruptcy to commence actions in the interest of

5    the estate.

6            So I -- I wanted to make sure that I

7    included that.

8            THE COURT:  So what you're saying is --

9    because I haven't read the Fairfield case yet.  What

10   you're -- what you're saying is even if it started to

11   get a little hairy, let's say for lack of a better,

12   more precise legal term, that in addition to the

13   statute of limitations already afforded under

14   Brazilian law, that once the petition for recognition

15   was filed, that the two-year period is also

16   triggered?

17           MR. LACAYO:  Correct, Your Honor, and

18   Fairfield makes clear that the date for the two-year

19   extension begins to run from recognition, so that I

20   wanted to ---

21           THE COURT:  Assuming that it has not

22   already expired?

23           MR. LACAYO:  Correct, correct, Your Honor,

24   and it was not here.

25           THE COURT:  Okay.

1            MR. LACAYO:  I think I've covered, Your

2     Honor, most of what I had.

3            I had also just a few brief points

4     about the freeze order that has been discussed

5     already here.

6            THE COURT:  Okay.

7            MR. LACAYO:  There is no argument, Your

8     Honor, that there is a criminal freeze order in this

9     case, that there is a mutual legal assistance treaty

10    request that was made by the Brazilian criminal

11    authorities to the U.S. authorities under a treaty

12    between the two countries, and that -- and that that

13    exists.

14           Our -- our position, Your Honor, is

15    that this is -- that is a criminal matter

16    independent of our client, the foreign

17    representative of the bankruptcy estate, and

18    there is no requirement that has been pointed to

19    in any of the filings that a -- a criminal

20    adjudication must or should take place before a

21    foreign representative or liquidator can or

22    should bring an action to vindicate the rights

23    that he may have in his capacity as foreign

24    representative.

25               I think Mr. Grossman had covered the

1   civil freeze order that exists here, which is

2   addressed to the former managers of the bank, and

3   not at the defendants that were -- were named in

4   this action.

5           So unless the Court has any -- any

6   further questions, Your Honor, I'm going to find

7   out the answer to that one question that Your

8   Honor had.

9           THE COURT:  All right.  Just give me a

10  moment to make sure that I don't have any other

11  questions for you, okay.  Hold on.

12          All right.  Then I'm going to ask you

13  the question -- no, never mind, we already

14  discussed that.

15          No, I think I don't have any more

16  questions for you, Mr. Lacayo.

17          MR. LACAYO:  Thank you, Your Honor.

18          THE COURT:  All right.  Thank you.

19          All right.  You have more?

20          MR. GROSSMAN:  I just wanted to give you

21  the citation to the -- to the rule that I was

22  referring to.

23          THE COURT:  Which rule?

24          MR. GROSSMAN:  This would be the Rule of

25  Civil Procedure 18, 18(b), joinder of contingent

1    claims under the federal rules, and the last sentence

2    of that section says, in particular, a plaintiff may

3    state a claim for money and a claim to set aside a

4    conveyance that is fraudulent as to that plaintiff

5    without first obtaining a judgment for the money.

6            Remember we had that discussion, Your

7    Honor, about --

8            THE COURT:  No, no, I -- I --

9            MR. GROSSMAN:  -- can you sue before the

10   judgment --

11           THE COURT:  -- know.

12           MR. GROSSMAN:  -- so I wanted you to at

13   least have that.

14           THE COURT:  But this is under federal law

15   and you're asking me to look at New York law.

16           MR. GROSSMAN:  It still -- Rule 18 still

17   applies, 7018 would incorporate it.  It's still a

18   federal pleading standard, we could plead the joinder

19   of the contingent claim, that was my -- that was the

20   point I was making.

21           THE COURT:  Oh, so now I'm going to have to

22   figure out which procedural law applies ---

23           MR. GROSSMAN:  No --

24           THE COURT:  -- on your ---

25           MR. GROSSMAN:  -- no, you always apply

Page 74

1   Federal Rules of Civil Procedure because it is a
2   procedural point.
3               So even if a New York court wouldn't
4   allow you to join the claim, you would -- you
5   would have to -- you would still have to permit
6   the joinder of the claim because the procedural
7   laws govern a claim filed in Federal Court.
8               THE COURT:  Yeah --
9               MR. GROSSMAN:  So I just wanted to point
10  that out.
11              THE COURT:  -- well that's what it says.
12              MR. GROSSMAN:  It's -- it's kind of an
13  arcane provision, but having used it a few times I
14  wanted to make sure the Court knew.
15              And the other point, Your Honor,
16  because we had the -- this is the Fairfield
17  Centry case that Mr. Lacayo just spoke of, and
18  the reason we're talking about it at the hearing,
19  as opposed to having put it in our papers, is
20  that the way that the defendants filed their
21  reply raising this point, that was when it first
22  became clearer that they were making, I think, a
23  slightly different argument, and I want to make
24  sure Your Honor gets this point.
25              From our perspective, if it's from the

Page 75

1   date of the bankruptcy decree in Brazil, we are

2   safely within the statute of limitations.  If you

3   apply 108, to use your phrase, if it got hairy

4   from that point, we'd also be within the statute

5   of limitations.

6            But in addition, if, in fact, the Court

7   was to perceive that the bankruptcy date was the

8   date of the bank liquidation, the administrative

9   bank liquidation, we would still be able, under

10  Fairfield Centry, having the 15 filed while there

11  was the bank liquidation, it hasn't been two

12  years from the date of the 15 recognition, this

13  lawsuit was filed within the two years.

14            So even -- this Court -- my point was

15  all roads lead to Rome.  It doesn't really matter

16  here whether you say, okay, it's the judicial

17  bankruptcy as opposed to the bank insolvency

18  liquidation, either way we're safely -- using

19  108, we're safely within the statute of

20  limitations.

21            Does that makes sense?

22            THE COURT:  No, I -- I under -- I

23  understood that.

24            MR. GROSSMAN:  Okay.

25            THE COURT:  All right.

1              MR. GROSSMAN:  Thank you.

2              THE COURT:  All right.  Mr. Hart.

3              MR. HART:  Thank you, Your Honor.

4              Only a -- a few points, Your Honor, and

5   I'd -- I'd like to start just first of all with

6   an observation, and the observation is that the

7   Chapter 15 was filed by Mr. Grossman and his firm

8   on behalf of the Brazilian trustee in mid 2015.

9   I don't recall if it was in June or July, but to

10  the extent that they needed to take discovery,

11  and I think that was one of Mr. Grossman's

12  points, they've had a year and a half to do so

13  and they could have done so in secret, given the

14  fact that this has been pending, that is one of

15  the powers that is granted to a foreign trustee.

16  There's no doubt they can take discovery.

17              THE COURT:  Does that mean that I --

18  that -- is that relevant to the relief you're seeking

19  here?

20              MR. HART:  I don't believe it is, Your

21  Honor, but Mr. Grossman made the point that you

22  should allow the aiding and abetting counts to stand

23  so he can take discovery, but I -- I just don't think

24  that an unviable cause of action should be allowed to

25  stand just because the plaintiff wants to take

1    discovery, that's the only point I'm --

2              THE COURT:  Okay.

3              MR. HART:  -- trying to make there.  To

4    move on to the more substantive issues, Section 544,

5    there's numerous cases which we cited in our

6    memoranda, which hold that state court fraudulent

7    transfer actions, when brought in the context of a

8    bankruptcy case, are 544 claims, and it's not just in

9    Florida, it's not just Judge Cristol who's held that

10   way, it is also Bankruptcy Courts in New York.

11             So clearly, there's no distinction to

12   be made between a state court action, which is

13   what they've alleged, and whatever other actions

14   might fall under 544 under federal law, they're

15   one and the same as far as --

16             THE COURT:  No, I understand.

17             MR. HART:  -- Bankruptcy Courts.

18             THE COURT:  So your -- your argument is

19   that it goes to my question before, which is any time

20   a foreign representative or any time a bankruptcy

21   trustee --

22             MR. HART:  Uh-huh.

23             THE COURT:  -- brings an action, an

24   avoidance action, it's always under 544 no matter

25   what?

1             MR. HART:  It is going to be based on the

2    case law that I've cited.  Equitable lien --

3             THE COURT:  I -- I understand.

4             MR. HART:  -- constructive trust,

5    fraudulent transfer under state law, all of those ---

6             THE COURT:  Well, why would a constructive

7    trust case or an equitable lien case be anything

8    under 544, when each of those imbues the trustee with

9    powers that would otherwise be held by a non-estate

10   entity?

11            MR. HART:  Uh-huh.

12            THE COURT:  Mr. Grossman's argument is that

13   the constructive trust or equitable lien is a cause

14   of action that belongs to the estate itself, that the

15   trustee doesn't have to assume the mantle of a

16   bona fide purchaser or a judgment lien creditor,

17   so -- so how do you respond to that?

18            How -- how would those actions -- how

19   could a direct cause of action somehow become

20   caught under 544?

21            MR. HART:  Well, again, I think we're

22   assuming quite a lot here, and what -- what

23   Mr. Grossman is assuming is the liability of the

24   Indio da Costas.  Okay.  That ---

25            THE COURT:  No, no, I -- I understand -- I

1    understand your condition precedent argument and -- I

2    understand your condition precedent argument.  I want

3    you to focus on -- on what my question is.

4              MR. HART:  Uh-huh.

5              THE COURT:  Is if the trustee has a direct

6    cause of action, how does 54 -- forgetting about what

7    the condition precedent to bringing the direct cause

8    of action is.

9              MR. HART:  Uh-huh.

10             THE COURT:  Okay.  How is 544 implicated?

11             MR. HART:  Well, 544 gives the trustee the

12   power of a hypothetical lien creditor and it gives

13   the trustee the powers of any creditor who's going to

14   set aside a transfer in favor of the estate.

15             And I'm not really sure there's a valid

16   distinction to be made between the estate itself

17   having a cause of action or some hypothetical

18   creditor having a cause of action, doesn't it in

19   the end all become one and the same?

20             THE COURT:  Okay.  Anything else?

21             MR. HART:  Yes, a few other points, Your

22   Honor.

23             The examples that Mr. Grossman gave you

24   about lawsuits and, you know, Rule 18, which he

25   just cited to the Court, involve cases where all

Page 80

1   of those issues are before the same court.  I
2   think it's important to remember that in this
3   case, the defendants are these British Virgin
4   Islands corporations.
5           The British Virgin Islands corporations
6   themselves have not been alleged or could not
7   possibly be alleged to have committed any conduct
8   which would lead to an award of damages.
9           They're simply vehicles which hold
10  property, and essentially the plaintiff is
11  saying, well, your owners committed some type of
12  a tort or a crime or a breach of contract, or
13  whatever it is that's pending before the
14  Brazilian courts, and so we're coming after you.
15          We're jumping over the issue of
16  liability just to come here and say, well,
17  there's been a fraudulent transfer.  There's no
18  basis to that.
19          The cases that he was citing or the
20  examples that Mr. Grossman was giving to you, are
21  where there's a claim, for example, for
22  conversion against a party, and at the same time
23  because the plaintiff fears that that party is
24  transferring property out of the jurisdiction,
25  out of the reach of the Court, they are entitled

1    to bring some type of a prejudgment-type remedy

2    or fraudulent transfer remedy to prevent that,

3    and I have -- again, assuming the propositions

4    that the plaintiff has cited in their memorandum

5    of law, I have no quarrel with that.  The trouble

6    is, it's not on point, it's wide of the target.

7              THE COURT:  Well, let me ask you a

8    question, Mr. Hart.  Are you now suggesting that a

9    corporation, which is always an inanimate object,

10   unless you're before the Supreme Court and you're

11   issuing a First Amendment right, that the corporation

12   can never act, is that what you're -- you're arguing

13   to me, that ---

14             MR. HART:  No, no, no, I'm not, Your Honor.

15             THE COURT:  Okay.

16             MR. HART:  I'm saying a corporation acts

17   through its principals.

18             THE COURT:  I -- I understand that or

19   through its shareholders or through its employees or

20   through its agents, I totally get that, but you're

21   not suggesting that a corporation by cloaking itself

22   as, I'm just an inanimate object, and I can't do

23   anything without these other folks acting on my

24   behalf, means that it can never be held liable itself

25   for something?

Page 82

1        MR. HART:  A corporation can be held liable

2    itself, but, again, we've got the missing link in

3    this case, and the missing link is, what is it being

4    held liable for?  And that is the question before the

5    Brazilian courts, whether or not the owners of these

6    corporations or those who have some controlling

7    interest in these corporations, have committed acts

8    which would lead to liability as a matter of

9    Brazilian law.

10        THE COURT:  But then you get to

11   Mr. Grossman's Rule 18(b) argument.

12        MR. HART:  Well, no, because that case is

13   pending in Brazil, this case is pending here.  The

14   two are not united.

15        Again, the whole thrust ---

16        THE COURT:  So you're saying Rule 18(b)

17   can't apply here because they are -- you can't join

18   the actions --

19        MR. HART:  Precisely.

20        THE COURT:  -- because one action is

21   pending in Brazil and one action is pending in Miami?

22        MR. HART:  Indeed, Your Honor.  It's my

23   understanding that the claims against the

24   Indio da Costas have been pending in Brazil since, I

25   think, 2012, more or less, 2012, 2013.  So, you know,

1    these actions are -- are fairly mature and well on

2    the way, and essentially what the plaintiff is trying

3    to do is just leap over that barrier, come up here

4    and litigate the case in these very efficient courts

5    which we have here in the Southern District

6    bankruptcy division, and that's not what Chapter 15

7    was designed to do.

8            The ---

9            THE COURT:  Well, then what was Chapter 15

10   designed to do?

11           MR. HART:  Chapter 15 was designed to give

12   a foreign trustee the assistance that a foreign

13   trustee needs to recover property that has been

14   deemed already to be -- to belong to the estate or to

15   which the estate has a claim that has already been

16   decided elsewhere.

17           And I do concede that a foreign trustee

18   can bring avoidance claims under foreign law,

19   okay, but those already -- basically the foreign

20   law claim is already pending in Brazil.

21           THE COURT:  But you said you don't know

22   that for sure?

23           MR. HART:  No, we know that there's a civil

24   case and we know that there's a criminal case.

25   The -- the plaintiff's attorneys themselves have

Page 84

1   admitted to that.

2            THE COURT:  Right, but when I had asked you

3   earlier, you said you weren't sure if the actions

4   brought in Brazil were fraudulent conveyance actions,

5   whether those were the same kinds of actions that

6   were being sought -- at least from the Brazilian

7   standpoint, that were being sought in this Court.

8            MR. HART:  What I think I said, Your Honor,

9   was that I'm not certain what causes of action at all

10  are being asserted in Brazil in terms of Article so

11  and so or Law Number so and so under Brazilian law,

12  but what we do know, is that there is a civil action,

13  which is pending, and we've seen an example of that,

14  which is the freeze order, which is attached to the

15  plaintiff's memoranda, and we've also seen the

16  criminal freeze order, which reflects a criminal

17  case.

18            Now, the issues, you know, in my

19  understanding of civil law, is that there's a

20  great deal of overlap between civil and criminal.

21  So my understanding, vague as it may be because

22  I'm not a Brazilian lawyer, is that there are

23  substantial causes of action being asserted

24  against the Indio da Costas in both of those

25  actions, basically saying, you guys had a scheme

Page 85

1    by which you were able to inflate the bank's

2    assets, pay yourself more than you're entitled to

3    and get away with the money, but, again, that's

4    before the Brazilian Court and it shouldn't, I

5    don't think, be before this Court, it's more

6    appropriate there.

7              To move onto more specifically

8    addressing the freeze order, again, I'm puzzled

9    by why there should be any distinction between

10   the civil case freeze order and the criminal case

11   freeze order.

12             Yes, I agree, the civil case freeze

13   order could be a lot more precise.  The civil

14   case freeze order could identify the property

15   more precisely, and it could identify where it is

16   and so on and so forth, but the criminal freeze

17   order does that.

18             So the property clearly -- it

19   identifies the apartments by address, the

20   corporations which own it.  It identifies the

21   artwork by the names of the paintings and the

22   artists who painted them, and all of that is --

23   has been frozen, and that's been domesticated by

24   the D.C. court pursuant to a request by the

25   Brazilian Government.  So the property is locked

1  up, we don't have to worry about it going

2  anywhere.

3          THE COURT:  So -- so you're saying that

4  your clients would be willing to agree that they're

5  subject of the civil order by virtue of the criminal

6  freeze order or just that they would agree not to do

7  anything with the apartments or the artwork until the

8  civil proceeding was resolved?

9          MR. HART:  I think they're required under

10  Brazilian law and under U.S. law, because the

11  criminal freeze order has been domesticated.

12          THE COURT:  Well, what if the criminal

13  action was resolved?

14          MR. HART:  In favor of our clients, my

15  understanding from talking to Brazilian counsel

16  today, is that resolves everything.

17          If the criminal case is resolved in the

18  favor of the Indio da Costas, the civil case goes

19  away.  So the criminal freeze order perhaps is

20  more precise than the civil one, because it's

21  more important.

22          THE COURT:  So your argument is that I --

23  I -- that the case should be dismissed because that's

24  the relief you're asking --

25          MR. HART:  Indeed.

1              THE COURT:  -- the case should be dismissed

2    because there is a freeze order in place?

3              MR. HART:  The case should be dismissed for

4    a number of reasons.

5              THE COURT:  No, no, I understand that --

6              MR. HART:  Yeah.

7              THE COURT:  -- but -- but one of your

8    arguments is that since there's a freeze order in

9    place, the case should be dismissed.

10             Is there any -- anything that you can

11   cite to where a court in the United States has

12   dismissed a complaint seeking certain rights or

13   certain relief because there is a criminal freeze

14   order in place?

15             MR. HART:  No, Your Honor, I couldn't point

16   to such a case, and I don't think either side cited

17   anything one way or the other on that.

18             The argument, though, is because

19   there's a freeze order, there should be no

20   concern that the property will, you know,

21   disappear or be sold or transferred to a BFP or

22   something like that.

23             THE COURT:  Right, but that's not something

24   I should consider on a motion to dismiss, is it?

25             MR. HART:  Well, I think -- I think in a

1  sense it is, Your Honor, because the fact that the

2  property is frozen in place, allows the Brazilian

3  courts to proceed at their own pace with deciding the

4  issues which are before them, and it's before two

5  courts, the civil court and the criminal court.

6          So the Brazilian Court has imposed

7  these freeze orders, put it on the property, the

8  property is frozen, cannot be transferred, and

9  meanwhile the case can proceed down there.

10          Again, if I -- I think I said in my

11  reply memo you should dismiss this case with

12  prejudice, now I'm -- I'm receding from that.  I

13  think you should dismiss it without prejudice for

14  lack of standing at this point.  Just as

15  Mr. Grossman pointed out in his papers, a

16  dismissal for lack of standing is a dismissal for

17  lack of subject matter jurisdiction, which is

18  necessarily without prejudice.

19          And when, if and when, the plaintiffs

20  get final judgment in Brazil, which shows that

21  the Indio da Costas have stolen money from the

22  bank or are otherwise liable to the debtor bank,

23  then at that point they can come up here and use

24  the remedies which are allowed to a foreign

25  trustee, 542, 543 remedies.

1          THE COURT:  All right.  I -- I just want to

2  make sure that I'm understanding your argument.

3          MR. HART:  Uh-huh.

4          THE COURT:  Let's go back to the freeze

5  order for a moment.

6          MR. HART:  Uh-huh.

7          THE COURT:  Your argument is that a motion

8  to dismiss should be granted when there is a freeze

9  order in place that maintains the status quo?

10          MR. HART:  I -- what I'm saying, Your

11  Honor, I think, is that a -- a motion to dismiss

12  should be granted under the circumstances we have in

13  this case, which involves ongoing litigation in

14  Brazil as to the liability of the principals of the

15  defendant corporations here, and that the Court can

16  rest assured that the dismissal will not prejudice

17  the plaintiff, the estate, or the criminal

18  authorities, if that be the case, as well, in Brazil

19  because there's a freeze order which holds the

20  property in place.

21          THE COURT:  But -- but -- I'm sorry if I'm

22  not asking the question correctly.

23          Where is that -- where is that an

24  element that I should consider in determining

25  whether to grant a motion to dismiss?

1                Isn't my inquiry whether the complaint

2     stays -- states a cause of action, meets the

3     requirements of Rule 8, and if applicable, meets

4     the rules of Rule 9?

5                MR. HART:  Correct, Your Honor, yeah.

6                THE COURT:  Okay, and then with respect to

7     the standing argument, so you're saying that

8     condition precedent creates standing?

9                MR. HART:  I'm saying that there's a number

10    of issues which will sort of rotate around standing.

11    The first one is the fact that a foreign trustee

12    cannot bring a 544.

13                THE COURT:  No, no, I have that one.

14                MR. HART:  Right, right.  The second is the

15    authority.  Now, we're not contesting the

16    prosecutor's affidavit, I can't do that --

17                THE COURT:  Right.

18                MR. HART:  -- in all fairness, but what we

19    can say is that there is another level of authority,

20    which is the authority given -- that Mr. Grossman

21    quoted in his notice of filing --

22                THE COURT:  I understand.

23                MR. HART:  -- which is the issues in Brazil

24    have to be resolved, then Florida counsel will be

25    authorized to go forward with the kind of claims or

Page 91

```
 1   at least some of the claims that they've asserted
 2   here.
 3              So those are really the -- the standing
 4   issues.  I don't believe that -- I mean, you
 5   could almost put it in a -- in a ripeness sense,
 6   I think.  The -- the claims that they have
 7   potentially are not ripe yet.
 8              THE COURT:  Okay.  I just want to make sure
 9   I understand your last point.
10              So you're saying that the language that
11   you quoted from Mr. Grossman's -- let me just get
12   the exact quote, the final verification of their
13   responsibilities, is more than a condition
14   precedent.  You're saying it's more than a
15   condition precedent, it is literally the
16   threshold that must be reached before the
17   authority is triggered?
18              MR. HART:  I think so, it is, Your Honor,
19   yes.
20              THE COURT:  Okay.
21              MR. HART:  Again, because these things are
22   pending already in Brazil and have to be decided by
23   the Court down there.
24              THE COURT:  Okay.  All right.  Anything
25   else?
```

1        MR. HART:  If I could just have a moment to

2   check my notes.  I think you -- I don't know if I

3   need to belabor the consumer protection law, I think

4   Your Honor --

5        THE COURT:  No.

6        MR. HART:  -- understands, you know, the

7   issues there very well.

8        So with that said, I -- I'm done and I

9   thank the Court very much for the time that it's

10  afforded us today.

11       THE COURT:  All right.  Thank you.

12       All right.  I'm going to ask you each

13  to prepare competing orders granting or denying

14  in whole or in part the motion to dismiss.

15       Well, I guess yours is going to say

16  granting in whole, and yours will say denying in

17  whole, and then I'll decide whether it's granting

18  or denying in part, okay.

19       I'm going to give you my tentative

20  rulings.  I'm going to adopt my California

21  colleagues' bizarre methodology of practice for

22  purposes of giving you some helpfulness as to

23  what is of concern to me so that you can address

24  that in your -- in your orders and obviously,

25  although I'm asking you to prepare orders, I

1    expect for them to cite to whatever case law you

2    believe supports the proposition that you are

3    asking.

4            Some of those cites might fall out in

5    the final, but make sure that you -- when in

6    doubt over cite, okay, because -- and again, not

7    string citing, just the cases that you believe

8    really support what you're doing.

9            But let me give you my preliminary

10   thoughts on -- on the things that I'm prepared to

11   give preliminary thoughts on now.  With respect

12   to the 1521(a)(7) argument, while I -- I

13   understand, Mr. Hart, your argument, and I've

14   reviewed the cases that you cited, I am more

15   persuaded by the analysis of the 5th Circuit in

16   the Condor case, and I do believe that 1521(a)(7)

17   is not an absolute bar to bringing avoidance

18   actions that are not specifically delineated

19   under the Bankruptcy Code or that the trustee or

20   the foreign representative is only asserting by

21   using the mantle provided by 544.

22           All right.  So -- so in other words, to

23   the extent that the foreign representative has

24   the right under New York law, separate and apart

25   from being recognized under -- in a Chapter 15

1   proceeding, the ability to bring a fraudulent

2   conveyance action, that 1520(a) -- 1521(a)(7)

3   would not bar that.

4            Having said that, that does not

5   necessarily mean that the plaintiff gets past the

6   motion to dismiss.  Mr. Grossman has argued that

7   he believes under New York law that the ability

8   to bring an avoidance action by a creditor can be

9   one that relies on an unliquidated claim against

10  the original debt obligor.

11            MR. GROSSMAN:  Transferor.

12            THE COURT:  Whatever, that, the transferor.

13  Okay.

14            So to the extent that you disagree,

15  then I'll expect that to be addressed in your

16  order, as well, and Mr. Grossman, obviously on

17  the other side, to cite to whatever New York law

18  you believe supports that.

19            And, of course, to the extent that we

20  get into a discussion of Rule 18(b), which I

21  think is probably going to happen, then, of

22  course, Mr. Grossman, on your side, I will expect

23  you to address Mr. Hart's argument that that rule

24  may, in fact, exist, but it doesn't exist when

25  one action is pending in Brazil and the other

1   action is separate and apart in a different

2   court, even a different country.

3           Okay.  I'm not -- I'm not saying I know

4   what the answer is because you all are going to

5   provide me with that answer.

6           All right.  With respect to the aiding

7   and abetting, at this point I'm going to say

8   probably not.  I think, Mr. Grossman, that you're

9   going to have to do better than let me do

10  discovery because that is the exact same thing

11  that Twombly and Iqbal say you cannot do.

12          So if you can find me cases where it's

13  recognized, I will certainly read them and

14  consider them.  It doesn't mean I'll -- I'll --

15  it will get you past the motion to dismiss, but

16  you're going to have a heck of a lot better

17  chance than you have sitting here today.

18          With respect to the statute of

19  limitations, I -- I don't really think that it's

20  an issue, but because I -- again, I haven't read

21  the Fairfield case, but if I'm remembering, is

22  that Judge Lifland?

23          UNIDENTIFIED SPEAKER:  Yes.

24          THE COURT:  Yeah.  Now, how can I disagree

25  with Judge Lifland, especially on a Chapter 15 issue.

1            But in any event, by all means,
2    Mr. Hart, if you believe that you have an
3    argument, include it, to whatever extent you wish
4    to do so, including whatever support you believe
5    under Brazilian law says the date of liquidation,
6    as opposed to the date of the actual bankruptcy
7    proceeding is the operative date.  It may be that
8    Fairfield is never even implicated.
9            All right.  With respect to the
10   consumer services issue, I'm going to expect to
11   have the Brazilian statute that defines service
12   provider appearing in both of these orders, okay,
13   and I assume I can take judicial notice of an
14   actual statute, itself, and to the extent that
15   you all agree that I can take judicial notice,
16   please do a notice of filing so that we can just
17   take care of that little formality.
18            If, Mr. Grossman, service provider
19   specifically focuses on employees of the bank,
20   directors, officers, blah, blah, blah, then I
21   will expect you to cite whatever law you believe
22   you can rely on that would extend that to a
23   non-service provider type person and, of course,
24   Mr. Hart, you should anticipate countering that
25   in -- in your form of the order.

1          On the equitable lien and the

2    constructive trust, I do not agree with you,

3    Mr. Hart.  I don't think 544 is implemented at

4    all.  I think these are direct causes of action

5    of the estate, of the -- of the foreign

6    representative, and again, for purposes of a

7    motion to dismiss, that the issue under 521(a)(7)

8    is not even implicated.

9          So if you want to include in your form

10   of order to the contrary, obviously you have the

11   right to do so.  I think you can anticipate that

12   at a minimum, that will probably be a partial

13   denial of your motion for summary judgment, but

14   by all means, you can put it in there.

15         With respect to the freeze order, I do

16   not want to see any argument that I shouldn't be

17   concerned because that's not the standard.  I

18   understand your argument, but that's not a

19   standard on a motion to dismiss.

20         The last thing that I have in my notes

21   and, of course, that doesn't mean that you all

22   can't include whatever else you think we didn't

23   cover in a robust way in this argument, and I

24   haven't addressed by my comments, in other words,

25   my comments aren't meant to preclude any other

1   arguments that should be included in the order,

2   okay, but the last one that I'm concerned about

3   for purposes of today is Mr. Hart's last argument

4   on his rebuttal, and that is Mr. Hart's argument

5   that the, quote, "final verification of their

6   responsibilities" language or something else in

7   Brazilian law with respect to an administrator, I

8   think that's the name of the foreign

9   representative under Brazilian law, is

10  administrator; right?

11              UNIDENTIFIED SPEAKER:  Yes, Your Honor.

12              THE COURT:  Okay.  That -- that it's not

13  even a condition precedent issue, but that the actual

14  authority to bring an action in the United States

15  cannot proceed until judgment has been entered

16  because that's what I understand your argument is,

17  Mr. Hart, is that you're saying it's not even a

18  condition precedent type thing.  In other words, that

19  since it's contingent, I shouldn't hear it because

20  you should wait until there's a judgment.

21              You're telling me the administrator

22  can't bring it in the United States because his

23  authority -- it is a he, correct -- his authority

24  to bring the cause of action in the United States

25  has to wait for that adjudication in civil court.

1          I don't necessarily think you're

2   correct, Mr. Hart, but unless I misunderstood

3   your argument, I think you said it was a

4   threshold for authority, not just a condition

5   precedent for ultimate adjudication of the

6   claims.

7          So with that, first, Mr. Grossman, I'll

8   ask if you have any questions and then how long

9   you believe, including the holidays, because I

10  don't want to mess up anybody's holidays --

11          UNIDENTIFIED SPEAKER:  Appreciate that,

12  Your Honor.

13          THE COURT:  -- how long -- any questions

14  and then how long.

15          MR. GROSSMAN:  No questions.

16          THE COURT:  In a microphone, sorry.

17          MR. GROSSMAN:  I don't believe we have any

18  questions on our end.

19          As far as how long, let me look at my

20  table here and see their -- see what their lives

21  are like.

22          UNIDENTIFIED SPEAKER:  We don't have

23  holidays.

24          THE COURT:  You don't have any holidays,

25  you don't even celebrate Christmas?

Page 100

1           UNIDENTIFIED SPEAKER:  No, we have

2    Christmas.

3           THE COURT:  Oh, my gosh.

4           UNIDENTIFIED SPEAKER:  We don't have

5    Thanksgiving.

6           THE COURT:  Oh, okay.  I was going to say,

7    that would be terrible.  I mean, I'm Jewish and even

8    I think you should celebrate Christmas.

9           UNIDENTIFIED SPEAKER:  We -- we have many

10   holidays.

11          THE COURT:  Oh, okay.  I know, I just read

12   about a very interesting holiday that you have about

13   celebrating the African slave --

14          UNIDENTIFIED SPEAKER:  Yes.

15          THE COURT:  -- history of Brazil, which I

16   thought was very interesting, perhaps something we

17   should do here.  Oh, I'm not allowed to say that,

18   never mind.  Okay.  Strike that DAR.  Okay.

19          MR. GROSSMAN:  I'm going to suggest the

20   Friday before Christmas week as the deadline.

21          THE COURT:  That would be the 23rd?

22          UNIDENTIFIED SPEAKER:  Yes.

23          MR. GROSSMAN:  I don't know, I picked that

24   because I figured if we ---

25          THE COURT:  Well, the Sunday -- Christmas

1   is Sunday.

2          UNIDENTIFIED SPEAKER:  Are we talking

3   about December 16th or --

4          THE COURT:  No.

5          UNIDENTIFIED SPEAKER:  -- December 23rd?

6          MR. GROSSMAN:  I'm trying -- what I'm

7   trying to do is pick a date, because if we pick a

8   date that's very close to Christmas, then, you know,

9   if we get it done faster, that's the point.

10          THE COURT:  Then you don't have to ruin

11   your holiday.

12          MR. GROSSMAN:  Correct.  Ruin all of their

13   holidays, I have no holidays.

14          THE COURT:  No, no, you live in the

15   United States and you have two boys.

16          MR. HART:  I'm with Mr. Grossman on that

17   one, Your Honor.  I am taking off for a Christmas

18   Holiday with my lovely wife in Italy, she's Italian,

19   on the 20th of December, so the Friday before -- the

20   20th is a Tuesday, I think Tuesday night I leave.

21          THE COURT:  Well, that would be the 16th,

22   then.

23          MR. HART:  The 16th, yes.

24          THE COURT:  That gives you --

25          MR. HART:  That's good.

Page 102

1              THE COURT:  -- a little less than a month.

2              MR. HART:  I think we can handle it, Judge.

3              MR. GROSSMAN:  Does that work?

4              THE COURT:  All right.  Well, Mr. Lacayo

5    isn't -- didn't break out in a sweat, at least not

6    one that I can see, so, okay.

7              MR. GROSSMAN:  There's even -- there's

8    junior associates, they're going to break out in a

9    sweat.

10             THE COURT:  Okay.

11             MR. HART:  I'm the Jack of all trades.

12             THE COURT:  All right.

13             MR. GROSSMAN:  I think that's actually the

14   holiday party for almost every law firm in Miami-Dade

15   County --

16             THE COURT:  There you go.

17             MR. GROSSMAN:  -- is the 16th of December.

18             THE COURT:  So let's say no later than --

19   let's just say --

20             MR. HART:  You want to wait until Monday?

21             THE COURT:  -- Friday the 16th at midnight.

22             MR. HART:  Or perhaps if -- I don't know if

23   you want ---

24             MR. GROSSMAN:  That's fine, the 19th, the

25   Monday (inaudible).

Page 103

1          MR. HART:  Let's go to the Monday if we

2     could.

3          THE COURT:  That's fine.

4          MR. GROSSMAN:  That works.

5          THE COURT:  Do you want to make it in the

6     morning, the afternoon?

7          MR. HART:  End of the day.

8          THE COURT:  The end of the day.

9          MR. GROSSMAN:  The end of the day is fine.

10          MR. HART:  Yeah, it will give us, if we

11     have ---

12          THE COURT:  Pick a time.

13          MR. HART:  Yeah, midnight on Monday, the

14     19th.

15          THE COURT:  Well, but you know what, let's

16     say 10:00 p.m. so we don't have the, it was filed at

17     12:01, I'll just shoot myself if I have to have that

18     hearing.

19          MR. HART:  Right.

20          THE COURT:  So 10:00 p.m. on December 19th.

21          MR. HART:  Uh-huh.

22          MR. GROSSMAN:  Yes, ma'am.

23          THE COURT:  E-mailed to my Chambers box, I

24     think you both have that.

25          MR. HART:  Right.

Page 104

1              THE COURT:  Remember to copy each other or
2      your collective group, because otherwise it's an
3      ex parte communication.
4              MR. HART:  Uh-huh.
5              THE COURT:  Make sure it's in Word, not
6      PDF, or I may have to hunt you down in Italy.
7      Actually please submit it in PDF, because then I will
8      have to come hunt you down in Italy.
9              MR. HART:  And I get to read Mr. Grossman's
10     on the plane.
11             THE COURT:  I don't want to ---
12             MR. GROSSMAN:  I don't know why -- Judge, I
13     don't know why every argument gets ascribed to me.
14     Like I -- like I literally hunt and pecked out every
15     argument there is.
16             THE COURT:  Yeah, I -- you know what,
17     whatever -- what you do on the plane ride on your --
18     on your holiday is totally up to you, Mr. Hart, I am
19     not going to get into that level --
20             MR. HART:  Thank you, Judge.
21             THE COURT:  -- even if I were a lifetime
22     appointed judge.
23             All right.  So anything else,
24     gentlemen, before we conclude today?
25             MR. LACAYO:  I have a copy of Fairfield for

Page 105

1    the Court if you want it.

2            THE COURT:  Okay, that's fine, if you'll

3    hand it to Ms. Shuler, and she'll hand it up to me

4    before we leave.

5            Now, I'm not -- I have to log myself

6    out, as you see, my law clerk went on holiday, I

7    guess I -- I got an honorary law clerk for the

8    day, so please feel free to go out of the

9    courtroom, I'm going to sit here and log myself

10   out.

11           Okay.  Have a very Happy Thanksgiving,

12   don't eat too much.  For you two, have a happy

13   Thursday.

14                         (Laughter.)

15           (Thereupon, the above-proceedings were

16   concluded.)

17

18

19

20

21

22

23

24

25

Page 106

1

2                          CERTIFICATION

3

4    STATE OF FLORIDA:

5    COUNTY   OF   DADE:

6

7              I, Margaret Franzen, Shorthand Reporter

8    and  Notary  Public in  and for the State of Florida

9    at  Large,  do  hereby  certify  that  the  foregoing

10   proceedings  were  transcribed by me from an audio

11   recording held on the date and from the place as

12   stated in the caption hereto on Page  1 to the best

13   of my ability.

14              WITNESS  my  hand  this  29th day  of

15   November, 2016.

16

17

18        _____

              Margaret Franzen
19         Court Reporter and Notary Public
           in and for the State of Florida at Large
20              Commission #FF100898
          My Commission Expires:  April 14, 2018

21

22

23

24

25