UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:

MASSA FALIDA DO BANCO
CRUZEIRO DO SUL S.A.,
     Debtor in a Foreign Proceeding
_____/

CHAPTER 15
CASE NO.:14-22974 – LMI

LASPRO CONSULTORES LTDA.,
a Brazilian Sociedade Limitada,
     Plaintiff,
v.

ADV. CASE NO. 16-1315-LMI

ALINIA CORPORATION, a British
Virgin Islands Company Limited by Shares,
110 CPS, INC., a British Virgin Islands
Company Limited by Shares,
     Defendants.
_____/

## PLAINTIFF'S MOTION FOR FINAL SUMMARY JUDGMENT OR, ALTERNATIVELY, MOTION FOR PARTIAL SUMMARY JUDGMENT.

Plaintiff, LASPRO CONSULTORES LTDA ("Laspro"), files this Motion for Final

Summary Judgment, or Alternatively, Motion for Partial Summary Judgment, and states:

### UNDISPUTED FACTS

#### A. Brazilian Insolvency Proceedings and Brazilian Insolvency Proceedings Orders.

1.     On June 4, 2012, the Central Bank of Brazil ("BACEN") placed BCSUL, along

with its four affiliated companies, under Special Temporary Administration (the "Brazilian TSAR

Proceeding") appointing the Credit Guarantee Fund (*i.e.*, the FGC or Fundo Garantidor de

Créditos), which is responsible for administering Brazil's deposit insurance program, to function

as the companies' temporary administrator.  See Verified Petition, D.E. 2, ¶16.

2.      On September 14, 2012, BACEN placed BCSUL into extrajudicial liquidation (the "Brazilian Liquidation Proceeding"). See id., ¶18.

3.      On February 22, 2013, BACEN's Inquiry Commission prepared a report on the financial condition of BCSUL and the various actions of Felippe, Octavio and others regarding BCSUL. See BACEN Report, attached hereto as **Exhibit "1",** passim.[1]

4.      BACEN's Inquiry Commission prepared the BACEN Report from its own analysis of the records of BCSUL. See BACEN Report, p. 95 (emphasis added):

> Banco Cruzeiro do Sul S.A. (BCSul) systematically and continuously made false and non-existent, also called "invalid," accounting entries, with personal credit installments with payroll deduction (CPP), resulting in the disclosure of all the accounting statements, such as balance sheets, income statements, quarterly financial information, trial balance sheets, which did not reflect the real economic-financial situation of the institution, misleading clients, national and foreign investors, the Central Bank of Brazil and other monitoring agencies, and the National Financial System.[2]

> This practice was used during at least the ten years prior to the date on which the Temporary Special Administration Regime (TSAR) was decreed.

> **These invalid operations were found by the Central Bank of Brazil, during the period** before **the special administration regime**, **and** later, **by the Credit Guarantee Fund (CGF), by both its own team (audit)** and by hired technology companies - "BSI Consulting" (formerly "ESM Projetos" [ESM Consultoria e Gestão de Projetos em Tecnologia da Informação Ltda. - EPP, CNPJ 05.696.932/0001-34], incorporated by BSI Tecnologia Ltda., CNPJ 53.690.392/0001-24) and "IMS Technology and Services" (IMS Tecnologia e Serviços Ltda., CNPJ 13.778.765/0001-07), and authenticated by a specific consultant, PwC Brasil Independent auditors (an associate of "PricewaterhouseCoopers International Limited"), through due diligence.

---

[1] For any document/order/judgment for which the original Portuguese version has already been filed in this Court, only the English version is attached, to reduce the page-length of the exhibits.

[2] The Fake Salary Loan Scheme and the Asset Overvaluation Scheme as defined in the Amended Complaint, referred to as the "Bankruptcy Crimes" and "Fraud" in the Brazilian Insolvency Proceedings Orders.

2

5.      BACEN's Inquiry Commission found "Total Adjustments" of BRL 1,011,403,000 (for the period April 23, 2007 to October 31, 2007) that caused a reduction in the shareholder equity from BRL 866,246,000 to a negative net Equity or deficit amount of BRL 23,267,000, and BCSUL actually suffered a loss during year 2007.  <u>See</u> BACEN Report, p. 92 – 98; 221 – 222.

6.      BACEN's Inquiry Commission found that the Indio da Costas were responsible for masterminding this scheme.  <u>See</u> BACEN Report, pp.: 146 – 225.

7.      BACEN's Inquiry Commission found "Total Adjustments" of BRL 1,185,543,000 for the period April 2007 to May 2009 and of BRL 1,699,090,000 for the period April 2007 to March 2011.  The adjustment for the period ending May 2009 caused a reduction in the shareholder equity from BRL 1,068,194,000 to a negative net Equity of BRL 117,349,000.  This adjustment carried  forward into the following years.  <u>See</u> BACEN Report, p. 92 – 98; 221 – 223.

8.      On May 29, 2015, BACEN rendered the decision, 170/2015-BCB/DELIQ, OF MAY 29, 2015 ("2015 BACEN Bankruptcy Decision"), a true and correct copy of which is attached hereto as **<u>Exhibit "2"</u>**.  The BACEN Report drafted by BACEN's Inquiry Commission was filed at BACEN and its analyses were adjudicated by BACEN when BACEN imposed administrative sanctions against the Indio da Costas and others for the mismanagement of BCSUL based on the conclusions in the BACEN Report, and permitting the extrajudicial liquidator to petition the Court seeking BCSUL to be put into bankruptcy because of insufficiency of assets to pay at least half of the unsecured creditors and because of the evidence of bankruptcy crimes.  <u>See</u> <u>id</u>.

9.      In the 2015 BACEN Bankruptcy Decision, BACEN specifically referred to the BACEN Report and its conclusions, made certain findings and stated, in pertinent part:

> 4.      In the investigations conducted over the course of the BCSul supervision process and during the RAET, and confirmed in the investigation conducted by the

Central Bank of Brazil, pursuant to the terms of Article 41 of Law no. 6,024 of 1974, together with Article 19 of Decree-Law no 2,321, of February 25, 1987, it was found that the former directors of the institution systematically and continuously recorded false and nonexistent operations, also called "unfounded," treated as personal installment credit withheld from payroll. This accounting recording characterizes a fraudulent act to the detriment of creditors, and resulted in the release of accounting statements that do not reflect the real economic and financial situation of the institution.

See id., ¶4.

8.      In turn, the operational practices adopted by the ex-directors of BCSul, consisting of the recording of false or nonexistent operations, show the presence of grounded evidence of fraudulent acts to the detriment of creditors, which meet the definitions of bankruptcy crimes as per Article 168, heading, and § 1, sections I and II, of Law no. 11,101 of February 9, 2005. This evidence, which was forwarded to the Prosecutor's Office and is being investigated judicially, already authorized the request for bankruptcy under the terms of the final part of line "b" of Art. 21 of Law no. 6024 of 1974; it should be noted that this law does not require the certainty of its existence, but only the presence of elements that configure grounded evidence of the commission of a crime, which, in and of itself, justifies the need for judicial accompanies, through a bankruptcy proceeding.

See id., ¶8.

11.      Based on the foregoing, having met the legal requirements, bankruptcy must be decreed, since the group's financial crisis is not solvable, and there is grounded evidence of bankruptcy crimes at the lead financial institution. For this reason, in accordance with Art. 21, line "b" and Art. 51 of Law no. 6024 of 1974, with subsidiary application of Articles 99 and 197 of Law no. 11,101, of 2005, the liquidator is authorized to request the bankruptcy of the following entities under extrajudicial liquidation:

a. Banco Cruzeiro do Sul S.A.;
b. Cruzeiro do Sul S/A Holding Financeira;
c. Cruzeiro Do Sul S.A. Corretora de Valores e Mercadorias;
d. Cruzeiro do Sul S.A. Distribuidora de Títulos e Valores Mobiliários; and
e. Cruzeiro do Sul S/A Companhia Securitizadora de Créditos Financeiros.

See id., ¶11.

10.      The 2015 BACEN Bankruptcy Decision is based upon the conclusions in the

BACEN Report.  See 2015 BACEN Bankruptcy Decision; Almeida Depo. Tr, pp.: 195:19 – 196:9.

4

11.     BCSUL, under control of Felippe and Octavio, failed to successfully challenge the proceeding from which the BACEN Report emanated within the requisite deadlines.  Thus, the BACEN Report's conclusions are final and no longer appealable in Brazil.  See id.

12.     On August 12, 2015, the 2nd Bankruptcy and Judicial Reorganization Court ("Brazilian Bankruptcy Court") ordered full judicial bankruptcy proceedings of BCSUL because : (1) BCSUL was insolvent; (2) BCSUL did not have sufficient assets to pay at least half of its unsecured debt; (3) there was evidence of bankruptcy crimes; (4) and, that the complexity of the transactions justified direct monitoring by the Judicial branch in a regular bankruptcy proceeding. See Judgment of Bankruptcy and Order Nominating Adjud. Administradores Judiciais Ltda – EPP, as judicial trustee, represented by Vânio Cesar Pickler Aguiar, dated August 12, 2015 ("Conversion and Appointment Order") and Term Sheet dated August 13, 2015 and English translations, attached hereto as Composite **Exhibit "3"**.

13.     In the Conversion and Appointment Order, the Court specifically stated:

> The facts narrated by the liquidators and by the Central Bank of Brazil on page 34 configure evidence of a bankruptcy crime and serve to authorize the bankruptcy decree.  Therefore, the requirement in line 'b', second part of Art. 21 of Law 6.024/1974 has been met.

See id., p. 2.

14.     The Indio da Costas, acting on behalf of BCSUL, and Felippe individually, appealed the Conversion and Appointment Order before the Court of Appeals of the State of São Paulo ("Brazilian Appeals Court"), challenging the BACEN Report's findings and the determination that BCSUL and certain related companies were insolvent.  See Banco Cruzeiro do Sul, S.A. et. al. v. Banco Cruzeiro do Sul, S.A. et. al., Bankruptcy Estate, Court of Appeals of the State of São Paulo, Case: 2180570-25.2015.8.26.0000 ("Conversion and Appointment Order Affirmance"), attached hereto as **Exhibit "4"**.

5

15.     Specifically, the Indio da Costas asserted as follows:

… the decision is null and void by operation of law, insofar as the right of defense was not guaranteed to the companies that became formally bankrupt and those that will be affected by the bankruptcy. They allege that there is no justification for the bankruptcy decree of the Securitizing, Brokerage and Distribution companies, since these companies were profitable at the time the company filed for its own bankruptcy …

They allege that, for the first time in the history of bankruptcy proceedings for financial institutions in Brazil, the basic grounds for the bankruptcy request was the existence of supposed bankruptcy crimes by the controllers/directors. They emphasize the absence of justifications for inclusion of the Group in the bankruptcy because they are not insolvent.

See id., p. 3.

16.     On August 10, 2016, the Brazilian Appeals Court upheld the decision adjudicating the bankruptcy of BCSUL, based upon, among other things, the bankruptcy crimes and fraud, and **rejected** the assertions of the Indio da Costas, stating, in pertinent part[3]:

As can be seen from an analysis of the elements of evidence of the original claim, the Central Bank of Brazil sent an official letter to the liquidator to authorize him to file "an immediate bankruptcy request" for all the appellants, "considering that the financial crisis in the Cruzeiro do Sul Group is insolvable and there is well-grounded evidence of bankruptcy crimes at the leading financial institution" (p. 236). Therefore, the factual situation meets the criteria of the legal description mentioned above, in the absence of any material or procedural irregularity that may be declared.

In this regard, we note that the decision by the Central Bank relative to all the appellants is absolutely clear in regard to the unfeasibility of continuation of the activities of those institutions, since there was proof of the existence of a "substantially integrated" (p. 237) economic-financial group, with shared management and joint business dealings (p. 238).

In fact, not only were operations found that constituted bankruptcy crimes, as indicated, consisting of the recording of false or non-existing transactions, among other fraudulent acts, but also the insolvency of the Group (to the contrary of what the appellants state) ...

---

[3] The application of Law N.º 6024: Art. 13, Paragraph 1 and the effect of the BACEN Report as a final adjudication were recognized in this opinion.  See id., pp.: 5 and 8.

SEQUOR LAW, P.A.

Note that this document also takes into consideration the accounting statements that express the insolvency of the economic group, justifying the inclusion of CRUZEIRO DO SUL S/A CORRETORA DE VALORES E MERCADORIAS (which has assets that exceed its liabilities) precisely because its assets would not be sufficient to make it feasible to continue the special regime for the rest of the group, which is confirmed by the spreadsheet presented in the documents prepared by BACEN

In any event, in line with Article 21, "b," of Law no. 6.024/741, the requirements for a bankruptcy filing are alternative, and in regard to bankruptcy crimes, well-grounded evidence is sufficient, which is present in this case, in light of the information filed by the Prosecutor's Office based on the crimes investigated (p. 878).

See id., pp. 5 - 8.

17.    In addition, Decisão 331/2016-DIORF was made by BACEN on December 12, 2016 ("BACEN Punitive Administrative Decision") attached hereto as **Exhibit "5"**, and affirmed on appeal in for Counsel of Appeals for the Federal Financial System on Voluntary Appeal n. 13409 (administrative case file 10372.000268/2016-42) ("BACEN Punitive Administrative Decision Affirmance").  It is a judgment made in the punitive administrative proceeding conducted by BACEN against BCSUL's former administrators (which includes the Indio da Costas, who were directors as well as controlling shareholders), and clearly specifies the way the wrongdoings took place and pointed to specific actions, as follows:

35. The systematic mention was made through the acquisition of stocks of the FIPs by Cruzeiro do Sul DTVM and Cruzeiro do Sul CVM, which bought / sold the aforementioned stocks from / to investors who wanted to sell / buy them. Still according to the aforementioned affidavit, by determination of Mr. Luis Felippe Indio da Costa, no FIPs subsidiary could be held by Cruzeiro do Sul DTVM or Cruzeiro do Sul CVM on the last day of each month.

36. Due to this determination, Mr. Leopoldino transmitted, at the end of each month, an electronic message addressed to BCSul's wholesale operations area with information on the status of stocks held by Cruzeiro do Sul DTVM and Cruzeiro the CVM. Based on such information, the "applicators" (the issuers of the CCBs listed in Tables 10 to 17) who would "buy" those stocks (with resources from those CCBs) and their Amounts, were defined. At the beginning of the following month the inverse flow was verified, that is, the stocks were

"sold" by those "applicators", who used the Amounts obtained to settle the CCBs.
[…]

49. It should be noted that, at the time of the events, Law 9,613 of 1998 contemplated crimes against the National Financial System between the antecedents previously necessary to characterize the crime of money laundering, so that the allegations of the Ms. Maria Luisa Garcia de Mendonça and Mr. Luís Felippe Índio da Costa that they had no obligation to report such operations to Coaf. In addition, article 13, item I, of Circular 3,461 of 2009, requires only the indication of crime as a criterion to provide communication to the Coaf in a different way from what the defendants seek to assert, which support the need for unequivocal characterization of crime for such purpose end.

See id.

18.     Thus, The BACEN Report has been adjudicated under Brazilian Law by the decisions discuss above, hereinafter referred to as the "Brazilian Insolvency Decisions"[4].  See Law N.º 6024: Art. 13, attached hereto as **Exhibit "6"**.  "The decisions of the intervener shall be subject to appeal, without stay, within ten days of the respective notice, to the Central Bank of Brazil, in a single instance." Id. See also Depo.  Tr. of Wallace de Almeida Corbo, pp.: 192:3:22; 204:19 – 205:3.

19.     These conclusions are consistent with the testimony of numerous former employees of BCSUL, who provided sworn testimony that the Indio da Costas directed them to input fake loans, and with individuals who are "borrowers" of BCSUL on such loans who never executed such loans and never even worked at the public agencies reflected in the records regarding such loans.  See Brazilian Sworn Statements/Depositions, attached hereto as composite **Exhibit "7"**.

---

[4] Comprised of the BACEN Report, the 2015 BACEN Bankruptcy Decision adjudicating BCSUL insolvent, the Conversion and Appointment Order, the 2015 BACEN Bankruptcy Decision Affirmance, affirming the 2015 BACEN Bankruptcy Decision, and BACEN Punitive Administrative Decision, affirmed on appeal in BACEN Punitive Administrative Decision Affirmance.

20.    Between February 19, 2013 and November 22, 2016, the Indio da Costas, both individually and on behalf of BCSUL, filed numerous other motions, appeals and challenges in the Brazilian Insolvency Proceedings to the various orders described above.  See Chart, and filings made by Felippe and Octavio, attached hereto as composite **Exhibit "8"**; Depo. Tr. of Roberto Garcia de Assis Oliveira, pp.: 138:21 – 139:21; Almeida Depo. Tr., pp.: 171:17 – 172:25; 196:13 – 198:20.

21.    The Indio da Costas raised similar arguments and issues in the liability suits brought against them by the Public Prosecutor where they were also rejected.  See Interlocutory Appeal n. 2172463-21.2017.8.26.0000, Court of Appeals for the State of São Paulo, 1st Chamber Reserved to Commercial Law, Reporting Judge Carlos Dias Motta, ruled on February 21, 2018 ("Brazilian Civil Liability Case Appeal"), attached hereto as **Exhibit "9"**.  This decision states, in pertinent part, as follows:

> Interlocutory appeal. Appeal filed against the respectable decision that: 1) under article 36 of Law No. 6.024/1974, recognized the nullity of the donation action taken after the RAET decree, which transferred real estate owned by Luis Octavio Azeredo Lopes Índio da Costa to his son, and such properties were ordered to be attached; and 2) sustained the reversal of the burden of proof against the appellants. Civil action for damages filed by the MPE (State Public Prosecutors' Office) based on articles 39 and 40 of Law No. 6.024/74 and supported by the Central Bank of Brazil's (Bacen) inquiry commission, which ascertained alleged losses caused to third parties in the order of R$2,236,782,000.00. Plaintiff status subsequently assumed by the bankrupt estate upon submission of the appellants' reply, followed by reply alleging presumed fault on the part of the managers for the bankrupt financial institution. Long-standing case law guidance provided by the Honorable STJ (Brazilian Superior Court of Justice) and confirmed by this Honorable TJSP for the possibility of reversing the burden of proof, it being incumbent upon the appellants to produce evidence ruling out the presumed fault for any losses caused during the periods under their management. Precedents. The complaint made a proper request, naming the management period and the name and title of each of the co-defendants. There are no grounds, therefore, to speak of any generic allegation or lack of individualized conduct, as the matter refers*, a priori*, to joint and several liability, it being incumbent upon the appellants to have their defense underpinned by their non-participation/culpability in the

9

facts/irregularities set forth in the complaint delimiting the subject matter of the lawsuit. Public deed of donation between parent and child recorded on May 24, 2012, a few days after RAET was decreed (June 4, 2012). Registry records entered on June 15, 2012. Motion for protective order to attach the donated assets filed by the bankruptcy trustee based on article 45 of Law No. 6.024/74, on a case-law precedent of the Hon. STJ and on articles 168 and 169 of the CC/02 (Brazilian Civil Code of 2002). Absence of nullity due to lack of appropriate reasoning. Possibility that the court may adhere to the same grounds as invoked by the bankruptcy trustee as reason to decide, requiring no repetition. Event in which the case records do not contain any document capable of proving the date on which the none of the instruments were pre-notated, nor were which of the CRI's demands alleged delayed the recording procedure. The donee was not a party to the underlying lawsuit, such that the absence of his reply on the attachment does not compromise the process. The adversarial system was ensured and exercised by the appellant Luis Octávio himself, in his capacity as father to the minor and incompetent donee.

[…]

Absence of elements capable of scrapping the court convictions set out in the ruling denying a preliminary injunction, and given the agreement of the Hon. PGJ (Office of the Attorney General), it follows that the confirmation of the respectable decision appealed against is a measure that imposes itself as appropriate. It is also important to consider that the appellants' conduct, as described, is not consistent with the good faith that must be present in business relationships and the proceedings. Accordingly, a warning is given about the possibility that the penalties provided for in the procedural law may apply due to an action affronting the dignity of Justice, as set forth in article 772, section II, of the CPC/15 (Brazilian Code of Civil Procedure of 2015). In addition, the Public Prosecutors' Office, which follows the case, can also take further action if appropriate. Appeal denied with remarks.

22.     Aside from prevailing on a motion to replace a prior trustee, these motions, appeals and challenges were rejected and unsuccessful.  See orders discussed, supra.

### B. This Court's Recognition of the Foreign Main Proceeding and Laspro

23.     Laspro's predecessor in interest filed the petition for recognition under sections 1504, 1515 and 1517 of the Bankruptcy Code to obtain recognition of the Brazilian Extra-Judicial Liquidation Proceeding as a foreign main proceeding and seeking relief as of right under sections 1520 and 1521 of the Bankruptcy Code.  See Petition, (Main Case D.E. 1).

10

24.    This Court entered an order recognizing the Brazilian Extra-Judicial Liquidation Proceeding as a foreign main proceeding.  <u>See</u> Order Granting Recognition, (Main Case D.E. 16).

25.    This Court substituted Laspro as the Foreign Representative of BCSUL in the Chapter 15 Proceeding.  <u>See</u> Order Granting Omnibus Motion to Substitute Foreign Representative for Banco Cruzeiro do Sul A.A. and Notice of Subsequent Information (Main Case D.E. 29).

### C. Laspro's Suit Against Alinia and CPS

26.    Laspro subsequently sued Alinia Corporation ("Alinia") and 110 CPS, Inc. ("CPS") (collectively, "Defendants") under theories of fraudulent conveyance, aiding and abetting, and various Brazilian statutory claims, all based upon the same factual theory: Defendants' principals, Luis Felippe Indio da Costa ("Felippe") and Luis Octavio Indio da Costa ("Octavio") (collectively, the "Indio da Costas"), secreted funds of BCSUL as falsified dividends under a fake-salary-loan scheme and these funds were used to purchase real property and artwork for the benefit of the Defendants or that of their ultimate beneficial owners, the Indio da Costas.  <u>See</u> Amended Complaint, <u>passim</u>.

### D. Felippe and Alinia

27.    At all material times, Felippe was an indirect controlling shareholder of BCSUL, and a member of the board of directors of BCSUL.  <u>See</u> Depo. Tr. of Felippe, pp.: 40:17 – 41:8; Depo. Tr. of Octavio, pp.: 29:2 – 30:1.

28.    On July 9, 2008, Felippe purchased an apartment located at 60 East 55th St., Penthouse 2, in New York City, NY ("Penthouse 2") for $5,750,000.00 USD ("Penthouse 2 Funds").  <u>See</u> Amended Complaint, 19; Answer and Affirmative Defenses, 19; Alinia's Responses and Objections to First Set of Interrogatories, 1.

11

29.     Subsequently, Felippe created a trust called Correas Trust. Correas Trust is a British Virgin Islands trust of which Felippe is the settlor and sole beneficiary. The original trustee was Icaza, Gonzalez-Ruiz & Aleman (BVI) Trust Ltd.  <u>See</u> Amended Complaint, 20; Answer and Affirmative Defenses, 20.

30.     At all material times, Felippe was the sole officer and director of Alinia.  <u>See</u> Alinia's Responses and Objections to First Set of Interrogatories, 9 and 10.

31.     Felippe transferred Penthouse 2 to Alinia on May 4, 2011 as a shareholder contribution and without receiving payment of money from Alinia.  See Amended Complaint, 21; Answer and Affirmative Defenses, 21; Alinia's Responses and Objections to First Set of Interrogatories, 7 and 8.

32.     On or around the same time, Felippe transferred all shares of Alinia to Correas Trust such that Correas Trust became the sole shareholder of Alinia. <u>See</u> Amended Complaint, 23; Answer and Affirmative Defenses, 23; Alinia's Responses and Objections to First Set of Interrogatories, 11.

33.     Felippe remained as the sole director of Alinia. <u>See</u> Amended Complaint, 24; Answer and Affirmative Defenses, 24; Alinia's Responses and Objections to First Set of Interrogatories, 9.

34.     Felippe retained all benefits of the beneficial use of Penthouse 2 after the transfer of Penthouse 2 to Alinia and after the shares of Alinia were transferred to Correas Trust.  <u>See</u> Octavio Depo. Tr., pp.: 189:4:8.

35.     Subsequently, Alinia was transferred from Correas Trust back to Felippe.  <u>See id.</u>, pp.: 191:16 – 192:5.

***E. Transfers of Funds Related to the Purchase of PH2***

36.     Dividends were to be paid in the event BCSUL made a net profit and were to be in the amount of 25% of the net profit from 2007 through 2010.  <u>See</u> Octavio Depo. Tr., pp.: 35:24 – 36:4.

37.     One-hundred-percent (100%) of the funds used to purchase PH2 were from dividends declared by BCSUL on December 31, 2007.

    a.  During the relevant time period, Felippe, owned bank accounts at BCSUL ending in 1-1 ("LF #1-1") and 1-7 ("LF #1-7") and had purchased CD CCRUZMC635 issued by BCSUL.

    b.  Dividends payable of BRL 27,865,869.57 Reais ("BRL") to shareholders were approved at the March 12, 2008 Board Meeting based upon BCSUL's December 31, 2007 financial statements.[5]

    c.  On March 25, 2008, LF #1-1 received a deposit of BRL 14,536,780.33 from BCSul with reference to "Pago Juros S/Capital Proprio" or "Payment of interest on Net Equity".

    d.  These funds were transferred between accounts LF #1-1, LF #1-7 and Mar. 8-5, and also used to invest BRL 14,124,000.00 in CD CCRUZMC635 from BCSUL.

    e.  On May 30, 2008, Felippe made a partial redemption in the amount of R$1,000,901.52 from CCRUZMC635, which was deposited into LF #1-1 BRL 937,825 of this amount was used to purchase US $575,000.

    f.  This amount was wired on June 2, 2008 for the ten percent 10% deposit to purchase PH2.

    g.  On June 27, 2008, Octavio redeemed another BRL 6,789,031.12 from CCRUZMC635 and these funds were transferred to LF #1-1.

    h.    These funds were used to convert BRL 8,274,825.00 into USD $5,175,000.00 on June 27, 2008 through exchange contract n. 08/000003.

    i.    The amount of $5,175,000.00 was then transferred to purchase PH2 through that same contract.

<u>See</u> Octavio Depo. Tr., pp.: 216:24 – 242:22; composite Exhibit 6; Deposition Hommerding Depo. Tr., pp.: 52:16:23, 218:22 - 222:16, 287:24 – 289:15; Exhibit 2, pp.: 31 - 35.

### F. Octavio, Felippe and CPS

38.    At all material times, Octavio was an indirect controlling shareholder of BCSUL, and a member of the board of directors of BCSUL.  <u>See</u> Octavio Depo. Tr., pp.: 114:19 - 115:5.

39.    At all material times, Octavio was a majority shareholder of Star Investimentos e Participações.  <u>See</u> CPS's Responses and Objections to First Set of Interrogatories, 18.

40.    At all material times, Felippe was a minority shareholder of Star Investimentos e Participações SA.  <u>See</u> CPS's Responses and Objections to First Set of Interrogatories, 17; Alinia's Responses and Objections to First Set of Interrogatories, 18.

41.    At all material times, Star Investimentos e Participações SA, a Brazilian entity, was the owner of the shares of CPS.  <u>See</u> CPS's Responses and Objections to First Set of Interrogatories, 19.

42.    On June 9, 2010, CPS, by and through Octavio and/or Felippe purchased 170 shares of 110 Central Park South Corporation ("Apt. 6B Shares"), an apartment corporation (a co-op) that owns the building and land located at 110 Central Park South, New York, NY 10019 and a long-

---

[5] The BACEN Report established that KPMG's audits of the financial statements of BCSUL were improper and that KPMG, along with auditors, were administratively sanctioned.  <u>See</u> BACEN Report, pp.: 125 – 146.

term proprietary lease ("Apt. 6B Lease")[6] for the premises located at 110 Central Park South, Unit 6B, New York, NY 10019 ("Apt. 6B") for $5,217,500.00 ("Apt. 6B Funds").  See Depo. Tr. of Octavio, pp.: 190:6:19; 247:12 – 248:4; Ex. 7, Closing Statement for purchase of Apt. 6B.

43.    Octavio is an officer and/or director of CPS.  See CPS's Responses and Objections to First Set of Interrogatories, 12.

44.    Octavio retained the benefits of and use of the Apt. 6B Shares and the Apt. 6B Lease after their transfer to CPS.  See Amended Complaint, 33; Answer and Affirmative Defenses, 33.

### G. Transfers of Funds Related to the Purchase of Apt. 6B and the Artwork

45.    Thirty-nine percent (39%) of the funds used to purchase Apt. 6B and the Artwork were from dividends declared by BCSUL.

a.    During the relevant time period, Octavio, owned bank accounts at BCSUL ending in 25-2 ("LO #25-2") and 25-8 ("LO #25-8").  Star Investimentos e Participacões SA also had an account at BCSUL ending in 9-1 ("Star #9-1").  Octavio also had purchased various CDs, CCRUZMK856, CCRUZMP060, CCRUZMN389, CCRUZMM832, CCRUZMM038 and CCRUZMN108.

b.    Dividends payable of BRL 15,500,000.00 to shareholders were approved at the October 14, 2009 Board Meeting based upon BCSUL's then-existing 2009 financial statements[7], to be paid on October 27, 2009.  On October 27, 2009, LO# 25-2 received two deposits of BRL 3,159,747.68 and 36,634.13 from BCSul with

---

[6] Purchase of the shares gives the owner a right to the lease of the corresponding premises.

[7] The BACEN Report established that KPMG's audits of the financial statements of BCSUL were improper and that KPMG, along with auditors, were administratively sanctioned.  See BACEN Report, pp.: 125 – 146.

reference to "Pago Juros S/Capital Proprio" or "Payment of interest on Net Equity". A portion of these funds were transferred to a current account for CD CCRUZMK856 and later redeemed and deposited back into LO#25-2 in the amount of BRL 2,442,148.89.

c. Dividends payable of BRL 15,500,000.00 to shareholders were approved at the January 29, 2010 Board Meeting based upon BCSUL's then-existing 2009 financial statements[8], to be paid on February 22, 2010.  On February 22, 2010, LO #25-2 received two deposits of BRL 3,159,747.68 and 36,634.13 as "Pagto Juros S/Capital Proprio" or payment of interest on net equity from BCSul.  A portion of these funds were transferred to a current account for CD CCRUZMM832 and later redeemed and deposited back into LO#25-2 in the amount of BRL 3,107,170.28.

d. Subsequently, on March 26, 2010, Octavio invested BRL 1,300,000.00, from LO# 25-2 in CD CCRUZMN389 issued by BCSUL and on July 20, 2010, partially redeemed the gross amount of BRL 458,017.37, which was transferred to investment account LO# 25-8 and then to LO# 25-2 in the net amount of BRL 454,863.58.

e. On July 2, 2010 Octavio received a further deposit into LO#25-2 from BCSUL of BRL 870,775.66 as "Pagto Juros S/Capital Proprio" or payment of interest on net equity from BCSul.  From this balance, he invested BRL 700,000.00 in CD - CCRUZMP038 on July 13, 2010 and on July 20, 2010, he made a partial

---

[8] The BACEN Report established that KPMG's audits of the financial statements of BCSUL were improper and that KPMG, along with auditors, were administratively sanctioned.  See BACEN Report, pp.: 125 – 146.

redemption in the net value of BRL 120,047.10 which was transferred into LO# 25-8 and then transferred to LO# 25-2.

f.   Dividends payable of BRL 15,840,000.00 Reias ("BRL") to shareholders were approved at the June 30, 2010 Board Meeting based upon BCSUL's then-existing 2010 financial statements, to be paid on July 14, 2010.  On July 14, 2010, LO #25-2 received two deposits of BRL 2,980,820.73 and 285,675.26 as "Pagto Juros S/Capital Proprio" or payment of interest on net equity from BCSul.  A portion of these funds were transferred to a current account for CD CCRUZMP060 and later redeemed and deposited back into LO#25-2 in the amount of BRL 2,745,717.94.

g.   All of these funds described above, were in turn transferred to Star #9-1 during the course of 2010.  A portion of these amounts was used to purchase US $525,000 for BRL 966,000 on June 4, 2010 pursuant to exchange contract n. 10/14760 between Star and BCSUL.  This amount was then transferred to pay for the ten percent 10% deposit to purchase Apt. 6B and the Artwork.

h.   All of these funds were also subsequently used to purchase Exchange contract n. 10/020035 on July 21, 2010 in the amount of $5,000,000 for BRL 8,965,000.00 and Exchange contract n. 10/020167 on July 21, 2010 in the amount of $81,000 for BRL 145,233.00, which amounts were then transferred to purchase Apt. 6B and the Artwork.

See Octavio Depo. Tr., pp.: 189:25 – 190:12; 258:19 – 294:15; composite Exhibit 7; Hommerding Depo. Tr., pp.: 52:16:23, 218:22 - 222:16, 287:24 – 289:15; Exhibit 2, pp.: 24 – 31, 85.

## ARGUMENT

## I. Summary Judgment Standard

46.     Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

47.     An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." Miccosukee Tribe of Indians of Fla. v. United States, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)).  A fact is material if it "might affect the outcome of the suit under the governing law." Id. (quoting Anderson, 477 U.S. at 247-48).

48.     The moving party shoulders the initial burden of showing the absence of a genuine issue of material fact. Shiver v. Chertoff, 549 F.3d 1342, 1343 (11th Cir. 2008).  Once the moving party satisfies this burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

49.     According to the plain language of Rule 56(e), the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading," but instead must come forward with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 587.  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990).  If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted).

## II. The Court Looks to Federal Law to Determine Whether or Not to Grant Comity

50. Before determining whether to give preclusive effect to the judgment of a foreign court, the reviewing U.S. court must first decide whether it will recognize the judgment under the doctrine of comity.  In re Ortega T., 573 B.R. 284, 291 (Bankr. S.D. Fla. 2017).

51. This Court and the majority of federal courts generally apply U.S. federal law in determining whether to recognize a foreign judgment.  See id., at 292 (citing Diorinou v. Mezitis, 237 F.3d 133, 139–40 (2d Cir. 2001); Alfadda v. Fenn, 966 F. Supp. 1317, 1329 (S.D.N.Y. 1997) (reviewing conflicting cases and concluding that a federal court should normally apply U.S. law to determine the preclusive effect of a foreign judgment).

52. Thus, federal law applies to determine whether this Court should grant comity to the Brazilian Insolvency Proceeding decisions.

### III. This Court Should Grant Comity to the Brazilian Insolvency Orders

#### A. The Standard for Providing Comity to a Foreign Judgment

53. "Comity is a common law rule by which courts in the United States give deference to foreign judgments."  In re Neves, 570 B.R. 420 (Bankr. S.D. Fla. 2017).

54. When determining whether it is appropriate to give comity to a foreign judgment, the U.S. court "must evaluate: (1) whether the foreign court was competent and used proceedings consistent with civilized jurisprudence; (2) whether the judgment was rendered by fraud; (3) whether the foreign judgment was prejudicial because it violated American public policy notions of what is decent and just; and (4) whether to respect the judgment of a foreign tribunal or to defer to parallel foreign proceedings."  Id. at 426 (quoting Ungaro–Benages v. Dresdner Bank AG, 379 F.3d 1227, 1238 (11th Cir. 2004)).

19

55.     Courts also consider whether the central issue in dispute is a matter of foreign law and whether there is a prospect of conflicting judgments.  See Turner Entm't Co. v. Degeto Film GmbH, 25 F.3d 1512, 1521 (11th Cir. 1994).

56.     When the foreign judiciary is respected and where the rule on which the finding sought to be given preclusive effect is based does not offend a strong U.S. policy, federal courts should defer to that finding.  In re Ortega T., 573 B.R. at 291.

57.     Additionally, in the context of Chapter 15 cases, the Bankruptcy Code requires that if the court grants recognition under § 1517, it "shall grant comity or cooperation to the foreign representative." 11 U.S.C. § 1509(b)(3).  "A central tenet of chapter 15 is the importance of comity in cross-border insolvency proceedings."  In re Rede Energia S.A., 515 B.R. 69 (S.D.N.Y. 2014) (citing In re Cozumel Caribe S.A. de C.V., 482 B.R. 96, 114-15 (Bankr. S.D.N.Y. 2012)).

58.     Comity is "neither as a matter of absolute obligation, on the one hand, nor of mere courtesy and good will upon the other but it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws."  Talisman Capital Alternative Investments Fund, Ltd. v. Mouttet, 493 B.R. 640 (Bankr. S.D. Fla. 2013) (citing Hilton v. Guyot, 159 U.S. at 163, 164, 16 S.Ct. 139).

59.     In Hilton, the Court stated:

… we are satisfied that where there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it was sitting, or fraud in procuring the judgment, or any other special reason why the comity of this nation should not allow it full effect, the merits of the case should

20

not, in an action brought in this country upon the judgment, be tried afresh, as on a
new trial or an appeal, upon the mere assertion of the party that the judgment was
erroneous in law or in fact. The defendants, therefore, cannot be permitted, upon
that general ground, to contest the validity or the effect of the judgment sued on.

Hilton v. Guyot, 159 U.S. 113, 202–03 (1895).

60.     "The Hilton standard permits federal courts to grant comity to foreign judgments
where there has been an opportunity for a full and fair trial in a foreign court of competent
jurisdiction after proper service or voluntary appearance by the defendant and under a judicial
system which does not violate U.S. public policy." Hurst, 474 F.Supp.2d at 34 (citing Tahan v.
Hodgson, 662 F.2d 862, 864 (D.C. Cir. 1981)).

61.     In determining whether or not to extend comity, "a U.S. bankruptcy court is not
required to make an independent determination about the propriety of individual acts of a foreign
court." Id. (citing In re Bd. of Dirs. of Multicanal S.A., 307 B.R. 384, 391 (Bankr. S.D.N.Y.2004)
(holding that a U.S. bankruptcy court "is not required to make an independent determination about
the propriety of individual acts of a foreign court.").

62.     Instead, the Court looks only to whether the foreign laws at issue in general comport
with due process and not whether the specific individual proceeding afforded due process. See
SNP Boat Serv. S.A. v. Hotel Le St. James, 483 B.R. 776, 786 (S.D. Fla. 2012) (analyzing French
insolvency law); Cunard Steamship Co. v. Salen Reefer Servs. A.B., 773 F.2d 452 (2d Cir.1985)
(analyzing Swedish bankruptcy law to determine whether the foreign bankruptcy proceeding
should be accorded comity).

63.     The crucial conclusion is that the U.S. bankruptcy court determines that the
procedures used in the foreign proceeding meet the U.S.'s fundamental standards of what is fair.
See SNP Boat Serv. S.A., 483 B.R. at 786. "[I]t is not the role of a United States Court to review
the factual findings of a foreign court. It is the process leading to a judgment or order, not the facts

leading to a judgment or order, that dictates the comity determination." Neves, 570 B.R. at 428 (citing In re Fisher Island Investments, Inc., 2011 WL 6962755 (Bankr. S.D. Fla. 2011) (internal citation omitted).

64.    This is because inquiry into a specific foreign proceeding is inefficient and a waste of judicial resources, undermines the equitable and orderly distribution of a debtor's property by transforming a domestic court into a foreign appellate court where creditors are always afforded the proverbial "second bite at the apple", and violates Chapter 15's directive that courts be guided by principles of comity. See SNP Boat Serv. S.A., 483 B.R. at 786.

65.    U.S. courts have frequently granted comity to foreign orders and judgments in cases involving foreign insolvency proceedings in Latin America, including Brazilian insolvency proceedings. See, e.g., Finanz AG Zurich v. Banco Economico S.A., 192 F.3d at 246 (Brazil); In re Petroforte Brasileiro de Petroleo Ltda., 542 B.R. 899, 909, 912 (2015) (Brazil); In re OAS S.A. 533 B.R. 83 (Bankr. S.D.N.Y. 2015) (Brazil); In re Rede Energia S.A., 515 B.R. 69, 104-05 (2014) (Brazil) (A court should "not decline to extend comity and grant additional relief simply because Brazilian bankruptcy law is not identical to U.S. bankruptcy law.") (citing Ackermann v. Levine, 788 F.2d 830, 842 (2d Cir. 1986)); In re Aerovias Nacionales De Colombia S.A. Avianca, 345 B.R. 120 (S.D.N.Y. Bankr. 2006) (Colombia); Ecoban Fin. Ltd. v. Grupo Acerero del Norte, S.A. de C.V., 108 F. Supp. 2d 349, 352–53 (S.D.N.Y. 2000), aff'd, 2 Fed. Appx. 80 (2d Cir. 2001), cert. denied, 534 U.S. 814, 122 S. Ct. 39, 151 L.Ed.2d 12 (2001) (Mexico).

### B. Procedure for Requesting Comity to Be Applied to a Foreign Judgment

66.    Procedurally, the proponent of comity has the initial burden to prove that the court that issued the underlying judgment was competent and used the proceedings consistent with civilized jurisprudence. See In re Neves, 570 B.R. at 427.

67.     The burden then shifts to the party opposing comity to prove that the order "violates American public policy notions of what is decent and just."  Id. (citing Bank Melli Iran v. Pahlavi, 58 F.3d 1406, 1409 (9th Cir. 1995)).  "[T]his public policy exception is narrowly construed."  In re Metcalfe & Mansfield Alternative Investments, 421 B.R. 685, 697 (2010) (citing In re Ephedra Prods. Liab. Litig., 349 B.R. 333 (S.D.N.Y. 2006)); Ackermann v. Levine, 788 F.2d 830, 842 (2d Cir. 1986).

### C. This Court Should Recognize the Brazilian Insolvency Proceedings Orders

68.     Laspro seeks to have this Court recognize the Brazilian Insolvency Proceedings Orders described, supra, in this Adversary Proceeding, under the basis of comity.[9]  Each of the Brazilian Insolvency Proceedings Orders was rendered by a competent body that conducts proceedings in a manner that is consistent with civilized jurisprudence and satisfies American public policy notions of fairness and justice.

69.     Specifically, BACEN operates as the banking regulatory body in Brazil.  See Law N.º 6.024: Art. 13.

70.     The BACEN Report and its conclusions were adjudicated along with the conclusions of the intervention procedure, the issue of the financial status of BCSUL, as well as the scheme perpetrated by the Indio da Costas.  See id. ("The decisions of the intervener shall be subject to appeal, without stay, within ten days of the respective notice, to the Central Bank of Brazil, in a single instance.").

71.     According to Law N.º 6.024: Art. 13, Paragraph 1, once the appellate deadline has elapsed without the filing of an appeal, the decision is definitive.  See id.

---

[9] In granting Foreign Main Recognition, this Court already recognized the Temporary Special Administration ("TSAR/RAET").

72.     BCSUL, while still under the control of the Indio da Costas, had notice of the investigation that culminated in the BACEN Report and an opportunity to controvert the findings of the BACEN Report.  However, the Indio da Costas, on behalf of BCSUL, failed to challenge the conclusions of the intervention procedure which are reflected in the BACEN Report.

73.     Thus, the BACEN Report is final.

74.     In reliance upon the BACEN Report, BACEN then rendered the 2015 BACEN Bankruptcy Decision, in which BACEN decreed the bankruptcy of BCSUL based upon, among other things, the bankruptcy crimes and fraud.  The Indio da Costas, challenged this decree, and lost.

75.     Next, the Brazilian Bankruptcy Court, based upon the same set of facts, decreed the bankruptcy of BCSUL and ordered full judicial bankruptcy proceedings of BCSUL.

76.     Subsequently, the Indio da Costas, on behalf of BCSUL, subsequently appealed the 2015 BACEN Bankruptcy Decision to the Brazilian Appeals Court and the Brazilian Appeals Court affirmed the decree in the Conversion and Appointment Order Affirmance because of the overwhelming evidence of the bankruptcy crimes.

77.     Thus, there is a stronger basis to grant comity to the Brazilian Insolvency Proceeding Orders than in other cases that granted comity to *ex parte* foreign orders.  BACEN, the Brazilian Bankruptcy Court and the Brazilian Appeals Court were competent and used proceedings consistent with civilized jurisprudence.  The Indio da Costas, on behalf of themselves and when still acting on behalf of BCSUL before these Courts, not only had notice and an opportunity for hearing, but litigated the issues of the occurrence of the bankruptcy crimes and fraud to finality and lost after their arguments were considered and rejected.

78.     Defendants have attacked the Brazilian Insolvency Proceedings by vague and incredulous assertions the same were procured by a conspiracy by BACEN and other Brazilian entities and government officials to divest BCSUL from the Indio da Costas, but do not assert and have not asserted that they were denied notice or prevented from contesting the assertions of the occurrence of the bankruptcy crimes and fraud.

79.     Such unsubstantiated and nebulous assertions are not sufficient grounds to avoid granting comity to the Brazilian Insolvency Proceedings Orders, since Defendants cannot use this Court as a super-appellate court to challenge decisions rendered by the Courts of Brazil.  See In re Neves, 570 B.R. at 429 - 431 ("Moreover, while it is not appropriate for me, in making a determination of comity, to review the factual findings of a foreign court … "); ("… I will not act as a parallel proceeding and that the Italian Court, or higher courts will adjudicate the appropriateness of the Sequestration Order. My consideration is limited solely to whether I should give comity to that order."); ("But, even if there was, as Plaintiffs allege, fraud in the settlement process, or in the Italian Court's review of the Settlement Agreement, that is an issue for the Italian courts."); Mercandino v. Devoe & Raynolds, Inc., 181 N.J. Super. 105, 109, 436 A.2d 942, 944 (App. Div. 1981) ("In addition, while a judgment of a foreign nation may be impeached for fraud, that fraud must not relate to matter which could have been litigated, but rather must be fraud which prevented the defendant from obtaining a fair hearing before the foreign court.").

80.     Therefore, granting comity to each of the Brazilian Insolvency Proceeding Orders is just and appropriate under the circumstances.

**IV. The Brazilian Insolvency Proceeding Orders Establish the Occurrence of the Fake Salary Loan Scheme and the Non-Profitability of the Bank under Collateral Estoppel/Issue Preclusion.**

### A. Preclusive Effect of Foreign Judgments

25

81.     "Several federal courts have permitted parties to use foreign judgments to preclude litigation on an issue if the requirements of both comity and collateral estoppel are satisfied." SAS Institute Inc. v. World Programming Ltd., 64 F.Supp.3d 755 (E.D.N.C. 2014) (citing Diorinou, 237 F.3d at 140; Phillips USA, Inc. v. Allflex USA, Inc., 77 F.3d 354, 361 (10th Cir. 1996); Pony Express Records, Inc. v. Springsteen, 163 F.Supp.2d 465, 473 (D.N.J. 2001)). See also Metcalfe & Mansfield, 421 B.R. at 699 (citing Diorinou, 237 F.3d at 143 ("U.S. courts may give *res judicata* effect to foreign judgments on the basis of comity."); Paramedics Electromedicina Comercial, Ltda v. GE Medical Sys. Info. Techs., Inc., 369 F.3d 645, 654 (2d Cir. 2004); In re Parmalat Sec. Litig., 493 F.Supp.2d 723, 737 n. 74 (S.D.N.Y. 2007); In re Telecom Argentina S.A., No. 06 Civ. 2352, 2006 WL 3378687, at *5 (S.D.N.Y. Nov. 20, 2006)).

82.     "The standards for issue preclusion and recognition of a foreign judgment share the same underlying principles and concerns." Hurst, 474 F.Supp.2d at 34. If a foreign judgment "should be given comity, then *res judicata* and collateral estoppel resolve all those claims addressed in or directly dependent on, the allegations resolved by the [underlying foreign] trial court." In re Mouttet, 493 B.R. 640, 656 (S.D. Fla. Bankr. 2013).

83.     Federal courts generally apply U.S. law in determining the preclusive effect of a judgment of a foreign nation. See Diorinou v. Mezitis, 237 F.3d 133, 139–40 (2d Cir. 2001); Alfadda v. Fenn, 966 F.Supp. 1317, 1329 (S.D.N.Y. 1997) (reviewing conflicting cases and concluding that a federal court should normally apply U.S. law to determine the preclusive effect of a foreign judgment); Hurst v. Socialist People's Libyan Arab Jamahiriya, 474 F.Supp.2d 19, 33 (D.C. Cir. 2007) (agreeing with the majority of U.S. courts that have addressed the issue and concluding that it is appropriate to apply federal standards in determining whether and to what extent to give preclusive effect to a judgment of the United Kingdom).

26

### B. The Standard for Offensive Nonmutual Collateral Estoppel

#### 1. Collateral Estoppel

81.    "Under the judicially-developed doctrine of collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision is conclusive in a subsequent suit based on a different cause of action involving a party to the prior litigation." United States v. Mendoza, 464 U.S. 154, 158–59, 104 S. Ct. 568, 571, 78 L. Ed. 2d 379 (1984) (citing Montana v. United States, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979)).

82.    This doctrine "relieve[s] parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." Allen v. McCurry, 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980).  In order to further those policies, the Supreme Court has broadened the scope of the doctrine of collateral estoppel by abandoning the requirement of mutuality of parties and conditionally approving the "offensive" use of collateral estoppel by a non-party to a prior lawsuit.  See Mendoza, 464 U.S. at 159 (citing Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971); Parklane Hosiery Co. v. Shore, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979).

83.    "Federal collateral estoppel law applies where: '(1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits.'" Ortega, 573 B.R. at 292-293 (citing In re PCH Associates, 949 F.2d 585, 593 (2d Cir. 1991)).

84.    The identity of issues requirement is strictly applied in cases of offensive and defensive collateral estoppel such that the issue must be exactly the same and not merely similar

SEQUOR LAW, P.A.

in nature and close in time.  See Matter of McWhorter, 887 F.2d 1564 (11th Cir. 1989) (citing Rufenacht v. Iowa Beef Processors, 656 F.2d 198 (5th Cir. 1981), cert. denied, 455 U.S. 921, 102 S.Ct. 1279, 71 L.Ed.2d 462 (1982)).  See also Pleming v. Universal–Rundle Corp., 142 F.3d 1354, 1359 (11th Cir. 1998).

### 2.  *Offensive Non-Mutual Collateral Estoppel*

85.     Now "there is no requirement of mutuality of parties for collateral estoppel to apply." Parris v. Taft, 630 Fed. Appx. 895, 900 (11th Cir. 2015) (citing Hercules Carriers, Inc. v. Claimant State of Fla., Dep't of Transp., 768 F.2d 1558, 1578 (11th Cir. 1985)).  "[A] litigant who was not a party to a federal case [may] use collateral estoppel 'offensively' in a new federal suit against the party who lost on the decided issue in the first case." Insituform Technologies, Inc. v. AMerik Supplies, Inc., 850 F.Supp.2d 1336, 1361 (N.D. Ga. 2012) (citing Allen, 449 U.S. at 95). Trial courts are granted broad discretion to determine when offensive collateral estoppel applies. See Parklane Hosiery, 439 U.S. at 331.

86.     "[T]he requirement of determining whether the party against whom an estoppel is asserted had a full and fair opportunity to litigate is a most significant safeguard." Id. at 328 (citing Blonder-Tongue Laboratories, 402 U.S. at 329.).   "Procedural differences, by themselves, however, do not defeat issue preclusion.  Equity courts used different procedures than did law courts, but that did not bar issue preclusion." B & B Hardware, Inc. v. Hargis Industries, Inc., 135 S.Ct. 1293, 1309 (2015) (citing Parklane Hosiery, 439 U.S. at 333).

87.     "Rather than focusing on whether procedural differences exist—they often will—the correct inquiry is whether the procedures used in the first proceeding were fundamentally poor, cursory, or unfair." Id. (citing Montana, 440 U.S. at 164, n. 11).

SEQUOR LAW, P.A.

88.    If "there is no categorical 'reason to doubt the quality, extensiveness, or fairness'" of the court that rendered the underlying judgment, then issue preclusion is proper. Id. at 1298.

### 3. *Offensive Nonmutual Collateral Estoppel Applies Between Closely Held Companies and Their Owners under the Doctrine of Privity*

89.    This is a case requiring the application of offensive non-mutual collateral estoppel. The offensive aspect is required because Laspro is seeking to offensively prevent Defendants from re-litigating the issue of whether or not the Indio da Costas perpetrated the bankruptcy crimes and fraud based on the findings of fact by the Brazilian Appeals Court and the Brazilian Bankruptcy Court (collectively, the "Brazilian Courts") in the Brazilian Insolvency Proceedings Orders.

90.    The non-mutual aspect of the doctrine applies because Laspro is suing Defendants rather than the Defendants' principals, the Indio da Costas, who were the parties at issue in the Brazilian Insolvency Proceedings.   Laspro is seeking relief against the Defendants because they are the principals' closely held, wholly owned companies that, based on subsequent transfers, now own and control the property at issue, Penthouse 2, the Apt. 6B Shares, Apt. 6B Lease and the Artwork.

91.    "As the Supreme Court has recognized, a variety of pre-existing substantive legal relationships operate to justify non-party preclusion." Baloco v. Drummond Co., Inc., 7:09-CV-00557-RDP, 2012 WL 4009432, at *8 (N.D. Ala. Sept. 12, 2012), aff'd, 767 F.3d 1229 (11th Cir. 2014) (citing Taylor v. Sturgell, 553 U.S. 880, 894 and n. 8, 128 S.Ct. 2161, 171 L.Ed.2d 155 (2008).

92.    "Such substantive legal relationships are sometimes collectively referred to as 'privity.'" Id. "The doctrine of privity, which extends the *res judicata* effect of a prior judgment to nonparties who are in privity with the parties to the first action, is to be applied with flexibility."

29

Amalgamated Sugar Co. v. NL Industries, Inc., 825 F.2d 634 (2d Cir. 1987) (citing United States v. ITT Rayonier, Inc., 627 F.2d 996, 1003 (9th Cir. 1980)).

93.     "[W]here corporate relationships are sufficiently close to establish substantial identity of interests, privity is generally found."  In re JNC Companies, 996 F.2d 1225 (9th Cir. 1993) (affirming dismissal of claims by subsidiaries of plaintiffs in original suit); In re Gottheiner, 703 F.2d at 1139 (barring owner of company from contesting non-dischargeability suit by government where government had prevailed in earlier suit against owner's company); Robinson v. National Cash Register Co., 808 F.2d 1119, 1124 (5th Cir. 1987) (affirming dismissal of suit by corporation formed by individual sublessees, alleging that sublessor breached sublease by allowing poisonous substances to infect building, where individual sublessees previously sued sublessor based on negligence, nuisance and breach of warranty of habitability).

94.     To be in privity, the relationship between the corporation and the shareholder in the context of the litigation must be sufficiently close and the interests of the nonparty must have been adequately represented.  See Amalgamated Sugar, 825 F.2d at 641.  See also Griswold v. County of Hillsborough, 598 F.3d 1289 (11th Cir. 2010) ("The doctrine of virtual representation provides in essence that 'a person may be bound by a judgment even though not a party if one of the parties to the suit is so closely aligned with his interests as to be his virtual representative.'").

95.     "Courts have frequently found privity to exist between a corporation and its controlling owner, particularly where the controlling owner has participated extensively in the litigation ... Some courts have gone so far as to presume privity between a close corporation and its controlling stockholder, on the assumption that in litigation involving the corporation, the stockholder's interest is sufficiently common to that of the corporation."  Pacetti v. U.S., 50 Fed. Cl. 239, 246 (2001) (finding privity between a corporation and its president where the president

was also a major stockholder and controlled the earlier law suit).  See also Sparks Nugget, Inc. v. Comm'r, 458 F.2d 631, 639 (9th Cir. 1972) (barring challenge by owner of corporation on collateral estoppel grounds based upon tax court's prior determination as to corporation); Nichols v. Alker, 126 F.Supp. 679, 682–83 (E.D.N.Y. 1954) (finding privity between corporation and its directors, officers, and agents in fraud lawsuit where the fraud occurred during their employment with the corporation), aff'd, 231 F.2d 68 (2d Cir. 1956).

96.     This is because "the public policies underlying the doctrine of collateral estoppel, 'as a bar to repetitious litigation, would support a finding of privity between a close corporation and its sole or controlling stockholder.'"  See In re Gottheiner, 703 F.2d 1136, 1137 (9th Cir. 1983).

97.     "When a person owns most or all of the shares in a corporation and controls the affairs of the corporation, it is presumed that in any litigation involving that corporation the individual has sufficient commonality of interest."  Id. at 1140.  See also Griswold, 598 F.3d at 1293 (affirming summary judgment against owner of closely held business where the owner had control over the prior suit as president and shareholder); In re Horne, 44 B.R. 796 (Bankr. S.D. Fla. 1984) (holding that the debtor was collaterally estopped from re-litigating issues which had been litigated by his corporation against the defendant in a prior adversary proceeding)[10].

---

[10] Cohen v. United States, 924 F. Supp. 1164 (S.D. Fla. 1996) (ruling that collateral estoppel barred re-litigation of the issue as to whether corporation's owner was liable for tax penalty for making false statements in violation of abusive tax shelters statute where the prior court determined that the corporation, through statements and actions of owner, violated the tax shelter statute and the owner fully participated in prior action by controlling pretrial litigation on behalf of his companies and determining issues advanced at trial and appellate level); Warnecke v. Laclede Gas Co., 455 F. Supp. 444, 446 (E.D. Mo. 1978), aff'd sub nom. Laclede Gas Co. v. G. W. Warnecke Corp., 604 F.2d 561 (8th Cir. 1979) ("There is sufficient identity of parties for collateral estoppel purposes because the defendant in the first suit, Warnecke Corporation, was the denominated agent of Warnecke.  Both the claims in this suit and the counterclaim in the first suit assert the same cause of action under the same agreement.  Warnecke was the sole shareholder of

98.     More specifically, a closely-held corporation may be bound by a prior adverse ruling against the individual owner under the doctrine of privity.  See, e.g., Warford Corp. v. Bryan Screw Machine Products Co., 44 F.2d 713, 715 (6th Cir 1930) (holding that company was bound by result in prior suit naming its superintendent and factory manager as the defendant where the company was a real party in interest in the prior suit); Twin City Pipe Trades Serv. Ass'n, Inc. v. Wenner Quality Services, Inc., 869 F.3d 672, 676 (8th Cir. 2017)  ("A closely held corporation is in privity with its shareholder, see Restatement (Second) of Judgments § 59(3)(b) & cmt. e (1982), and WQS conceded at oral argument that it is in privity with Shawn Wenner, who was a party in the S&S Litigation.  Shawn Wenner, in turn, was also in privity with S&S, another party in the first case. As such, WQS can be bound by the prior judgment."); Berger v. Mook, 184 N.Y.S.2d 911, 914 (N.Y. Sup.Ct. 1959) ("For cases in which 'all the owners of a closed corporation have appeared and participated in a prior action they will not be permitted to use the corporate cloak as a means to avoid the finality of the earlier adjudication' and the company will be bound by the prior judgment even though the corporation did not appear in the prior proceeding."); Drier v. Tarpon Oil Co., 522 F.2d 199, 200 (5th Cir. 1975) ("Here it is clear that Evans was in privity with Tarpon because he was the president and major stockholder of the corporation and he admitted by deposition that he made the "ultimate decisions."  In addition he was the only witness for Tarpon in the Louisiana suit. It is apparent, therefore, that Evans controlled the earlier suit and had his interests represented therein.").

---

Warnecke Corporation.  A judgment against a corporation is binding on the holder of its ownership."); Restatement (Second) of Judgments § 59 (1982) ("The judgment in an action by or against the holder of ownership in the corporation is conclusive upon the corporation except when re-litigation of the issue is justified in order to protect the interest of another owner or a creditor of the corporation.").

99.     Similarly, a parent corporation and its controlling shareholders are bound by a judgment against the parent corporation's subsidiary.  See Astron Indus. Assocs., Inc. v. Chrysler Motors Corp., 405 F.2d 958 (5th Cir. 1968) (affirming dismissal of subsidiary's suit where the officer of the parent corporation operated the subsidiary, the parent's board of directors authorized the suit by the subsidiary against third corporation).

### C. Defendants Are Collaterally Estopped from Challenging the Occurrence of the Bankruptcy Crimes by the Indio da Costas Including the Occurrence of the Fake Salary Loan Scheme and from Challenging the Bank's Non-Profitability During Years 2007, 2009 and 2010.

84.     Here, Laspro is seeking to have this Court apply collateral estoppel to issues that are identical to issues adjudicated in the Brazilian Insolvency Orders by the Brazilian Courts. Specifically, the adjudication by the Brazilian Courts that the Fake Salary Loan Scheme occurred, which resulted in the diversion/secretion of funds from BCSUL, and that BCSUL failed to make a profit during years 2007, 2009 and 2010, such that the dividends declared that were used to purchase the apartments were improperly declared.

85.     These **exact** issues were actually decided by the Brazilian Courts because there were express findings in each of the Brazilian Insolvency Orders necessary to support the valid and final judgment on the merits for the Brazilian Insolvency Orders.

86.     Defendants' principals, the Indio da Costas, fully participated in the Brazilian Insolvency Proceedings (having been given notice and opportunity to be heard), litigated the issues to finality, and lost.  In fact, the Indio da Costas even appealed the determination unsuccessfully because the Brazilian Appeals Court upheld the 2015 BACEN Bankruptcy Decision by finding that the bankruptcy crimes and fraud, including the Fake Salary Loan Scheme, occurred, and that BCSUL was insolvent.

SEQUOR LAW, P.A.

87.     These issues were central issues in the Brazilian Insolvency Proceedings, as these were the basis for the determinations in the Brazilian Insolvency Proceedings Orders and for having Felippe and Octávio administratively sanctioned by BACEN.  These issues are also central issues in this adversary proceeding.

88.     The Indio da Costas had notice and opportunity to be heard in the Brazilian Insolvency Proceedings.  They litigated the issues of the occurrence of the bankruptcy crimes and fraud to finality in a final judgment on the merits and through numerous filings as detailed, supra, including a subsequent, unsuccessful appeal.

89.     More specifically, they had an opportunity to challenge the findings of the BACEN Report and failed to successfully challenge these findings.   They were represented in the proceedings that culminated in the 2015 BACEN Bankruptcy Decision and in the judgment made by BACEN on the punitive administrative proceeding to sanction Felippe and Octávio, and litigated the issues of the occurrence of the bankruptcy crimes and fraud, but lost.   They subsequently challenged the 2015 BACEN Bankruptcy Decision by filing an appeal, but the Brazilian Appellate Court affirmed the 2015 BACEN Bankruptcy Decision (in the Conversion and Appointment Order Affirmance). The same happened on the punitive administrative proceeding, since they filed an appeal to the Counsel of Appeals for the Federal Financial System and the judgment was affirmed.

90.     Even though Defendants were not parties to the Brazilian Insolvency Proceedings, they are bound by the Brazilian Insolvency Orders.  The Indio da Costas are, by Defendants' own admission, Defendants' controlling shareholders and principals.  Based on the uncontroverted and close relationship, the Defendants are in privity with the Indio da Costas for purposes of collateral estoppel/issue preclusion.

34

91.      Therefore, Defendants' privity with their principals, in conjunction with the comity granted and satisfaction of all other factors of collateral estoppel/issue preclusion, precludes the Defendants from re-litigating before this Court the issue of whether a fraud was perpetrated by the Indio da Costas as affirmatively decided by the Brazilian Courts and Defendants are bound by the Brazilian Insolvency Orders' determination of the occurrence of the bankruptcy crimes and fraud.

92.      In sum: (1) the issues in both the Brazilian Insolvency Proceedings and this adversary proceeding are identical; (2) these issues were actually litigated and actually decided in the Brazilian Insolvency Proceedings, (3) there was full and fair opportunity to litigate in the Brazilian Insolvency Proceedings, and (4) the issues previously litigated were necessary to support valid and final orders on the merits in the Brazilian Insolvency Proceedings.

## V. Laspro Is Entitled to Final Summary Judgment on Counts I, XI, XIII, XXIII, XXV and XXXV in the Amended Complaint, Whether or Not Brazil or New York Law Applies.

### A. Conflict of Laws Analysis

93.      Laspro raised New York claims of constructive trust, and fraudulent conveyance, and Brazilian claims of fraudulent transfer, unjust enrichment and another statutory claim.  Laspro also raised aiding and abetting claims (which are tort claims), and this Court previously indicated that BVI Law may apply to these claims.  See Memorandum Opinion and Order Granting in Part and Denying in Part Defendants' Motion to Dismiss (D.E. 55).  The Court indicated that Florida choice of law rules governed and that sections 6 and 145 of the Restatement (Second) of Conflicts of Law applied.  Id.

94.      When the laws of the competing jurisdictions are substantially similar, the court should avoid the conflicts question and simply decide the issue under the law of each of the interested jurisdictions or the court could simply apply the law of one of the states.  See Fioretti v. Massachusetts Gen. Life Ins. Co., 53 F.3d 1228, 1234 (11th Cir. 1995).

SEQUOR LAW, P.A.

95.     The New York claim of constructive trust and the Brazilian law claim of unjust enrichment are analogous to each other, and contain the same elements which are satisfied by the same facts:  that Alinia and CPS were unjustly enriched through dividends that should not have been declared that were used as part of the purchase price of PH2, Apt. 6B Shares and the Artwork, at the expense of BCSUL.  See Article 884 of the Brazilian Civil Code[11]; Expert Report of Roberto Oliveira, pp.: 11 – 12; Oliveira Depo. Tr., pp.: 47:1 - 51:6; Deposition Transcript of Wallace de Almeida Corbo, pp.: 107:4 – 109:4; Counihan v. Allstate Ins. Co., 194 F.3d357, 362 (2d Cir. 1999) ("What the New York courts do insist upon is a showing that property is held under circumstances that render unconscionable and inequitable the continued holding of the property and that the remedy is essential to prevent unjust enrichment.") (a constructive trust is an equitable remedy to prevent unjust enrichment); In re Wedtech Sec. Litig., 161 B.R. 345, 348 (S.D.N.Y. 1993) ("To recover on a theory of unjust enrichment under New York law, a party must establish not only that there was enrichment, but that the enrichment was at the plaintiff's expense, and that the circumstances dictate that, in equity and good conscience, the defendant should be required to turn over its money to the plaintiff.").  Whether Brazil Law or New York law governs, the outcome will be the same.

**B. Laspro Is Entitled to Judgment as a Matter of Law on These Claims as to Alinia and CPS.**

96.     The uncontroverted facts establish that dividends were improperly paid by BCSUL during years 2007, 2009 and 2010 to the Indio da Costas as shareholders.  Regardless of who was responsible or culpable for the shortfall in BCSUL's profits due to the bankruptcy crimes and Fake

---

[11] "Whoever that, without basis, is enriched at the expense of another is under the obligation to restitute what was unjustly received, including inflation accounting.  If the enrichment consists of a determined object, whoever received it is obliged to restitution and, if the object no longer exists, restitution shall correspond to the value of the object at the time it was demanded".

Salary Loan Scheme, BCSUL was not profitable during these time periods as determined by the Insolvency Proceedings Orders and dividends to shareholders should not have been paid.

97.     The uncontroverted facts also establish that a portion of the purchase price of PH2, the Apt. 6B Shares and the Artwork were purchased by these improperly-declared dividends.

98.     Specifically, it is uncontroverted that PH2 was purchased using these dividends by Felippe.  PH2 was then transferred to Alinia, which continues to own PH2.  Thus, Alinia has been unjustly enriched as to BCSUL, such that BCSUL is entitled to constructive trust as to PH2.

99.     It is also uncontroverted that the Apt. 6B Shares and the Artwork were purchased in the name of CPS using these dividends.  Thus, CPS has been unjustly enriched as to BCSUL, such that BCSUL is entitled to an equitable lien against the Apt. 6B Shares and the Artwork of 39% of the current fair market value of the Apt. 6B Shares and the Artwork.

**VI. Laspro Is Entitled to Final Summary Judgment on Counts II – IV, XIV – XVI, and XXVI - XXVIII in the Amended Complaint, Since New York Law Applies to these Claims.**

> ### A. Conflict of Laws Analysis

100.     As to the claims of fraudulent conveyance under New York Law and the Brazil Law claim under Article 130 of the Brazilian Bankruptcy and Judicial Reorganization Law (Law N. 11.101/2005),  these claims are distinct from each other to the extent that some of the New York fraudulent conveyance claims do not require a showing of intent (see NY DCL §§273, 274, and 275) while the Article 130 Claim *does* require a showing of proof of the fraudulent collusion between the bankrupt debtor and third party.  See Article 130; Oliveira Depo. Tr., pp.: 47:1 - 51:6; Expert Report of Roberto Oliveira, p.: 26.

101.     Courts generally treat fraudulent conveyance claims as torts for choice of law purposes.  In re Palm Beach Fin. Partners, L.P., 09-36379-BKC-PGH, 2014 WL 12498025, at *5

SEQUOR LAW, P.A.

(Bankr. S.D. Fla. Dec. 10, 2014).  This means that the Court determines the applicable law under the analysis contained in Restatement sections 6 and 145.

102.    New York law should govern these claims under sections 6, 145 and 222 of the Restatement.

103.    Restatement (Second) of Conflict of Laws § 222 (1971) states as follows:

The interests of the parties in a thing are determined, depending upon the circumstances, either by the "law" or by the "local law" of the state which, with respect to the particular issue, has the most significant relationship to the thing and the parties under the principles stated in § 6.

104.    Restatement (Second) of Conflict of Laws § 6 (1971) states, as follows:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the law to be applied.

105.    Restatement (Second) of Conflict of Laws § 145 (1971) states, as follows:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,
(b) the place where the conduct causing the injury occurred,
(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

106.    Restatement (Second) of Conflict of Laws § 235 (1971) states, as follows:

(1) The existence and extent of an equitable interest in land are determined by the law that would be applied by the courts of the situs.
(2) These courts would usually apply their own local law in determining such questions.

107.    The majority of courts, when considering what law governs a fraudulent-transfer claim under the Restatement, agree that the law of the place where the transfer occurred controls. Canon Latin Am., Inc. v. Lantech, S.A., 08-21518-CIV, 2011 WL 13101029, at *11 (S.D. Fla. July 26, 2011) (ruling that Costa Rica law applied to fraudulent transfer claim where all transferred assets were located in Costa Rica and almost all of the injury-causing conduct happened in Costa Rica).  The place where the injury occurred is less important in fraud claims.  See id. at *10.

108.    Additionally, when the fraudulent transfer/conveyance involves real property, Courts frequently determine that the law of the situs of the real property is determinative.  See, e.g., In re Grandote Country Club Co., Ltd., 252 F.3d 1146, 1151 (10th Cir. 2001) (holding that Colorado law applied to fraudulent transfer claims brought by a Japanese Trustee for a transfer of real property located in Colorado by a Japanese debtor where, among other things, the transfers of the real property occurred in Colorado, concerned Colorado property tax issues, and most of the agreements related to the property were executed in Colorado); In re O'Day Corp., 126 B.R. 370, 390, 391 (D. Mass. Bkrtcy. Ct. 1991) (holding that Massachusetts law applied, since Massachusetts had the most significant relationship to the incident in that the assets involved in the allegedly fraudulent transfer were located in Massachusetts, as were the debtor's plant and its employees) ("Although the site of the conveyed property will not always and necessarily be the state with the

most significant relationship to a fraudulent conveyance action, it often will be, just by the nature of the cause of action. The authorities accordingly have shown a preference for applying the law of the site of the conveyed property … The assets involved in the allegedly fraudulent transfer are located in Massachusetts, which alone weighs heavily in favor of using Massachusetts law."); In re Kaiser Steel Corporation, 87 B.R. 154, 159 (Bankr.D.Colo.1988) ("Under Section 244 [of the Restatement (Second) of Conflicts ], the law of the courts of the site of the property will usually apply to resolve questions of fraud and the validity of the conveyance at issue."); In re Morse Tool, Inc., 108 B.R. 384 (Bankr.D.Mass.1989) ("[t]he authorities ... have shown a preference for applying the law of the site of the conveyed property."); Kunstsammlungen Zu Weimar v. Elicofon, 536 F.Supp. 829, 846 (E.D.N.Y. 1981) (holding that New York law applied to a claim by an East German museum against the owner of portraits that were transferred to the defendant from ex-US serviceman who appeared to have absconded with the paintings after occupying a German castle during World War II because New York that was the state where the serviceman transferred the property to the defendant and which had the most significant interest in preserving the integrity of transactions occurring within the state); 4 Collier on Bankruptcy par. 544.02, at 544–13 to 544–14 and fn. 17 (15th ed. 1989) ("The tendency of the courts is to treat the law of the site of property at the commencement of the case as governing to the extent that § 544(a) refers to non-bankruptcy law.").[12]

---

[12] These cases follow the rationale that, in a case involving real property, the situs of the property is frequently determinative of which law applies. See, e.g., Bascunan v. Elsaca, 874 F.3d 806, 822-824 (2nd Cir. 2017) (holding that domestic law, rather than Chilean law applied to a civil RICO claim by a Chilean citizen for misappropriation of trust funds in a US bank account under the restatement's significant relationships test since the injuries involved tangible property within the US); LaFarge Corp. v. Travelers Indem. Co., 118 F.3d 1511, 1515 (11th Cir. 1997) (applying significant relationships test to determine that a case involving a dispute regarding an insurance contract providing coverage for cleanup of hazardous waste at location of a parcel of real property would apply Florida law, since the real property was located in Florida, even though contracts

109.    Here, the transfers in question as to the respective defendants were made in New York.  The assets which are the subject of the transfers, are also located in New York.  PH2 is real property.  Apt. 6B is a co-op and the actual property owned consists of the Apt. 6B Shares, which are shares in the co-op, which gives the owner rights to a lease of Apt. 6B, which is a real property interest.  While nominally a personal property interest, the Apt. 6B Shares function as a real property interest.  The Artwork is personal property and is located within Apt. 6B.

110.    While the defendants are BVI entities and certain entities through which Felippe and Octavio owned the defendants are Brazilian and/or BVI (Star Investimentos e Participacoes SA and Correas Trust), the uncontroverted facts establish that the flow of funds used to purchase the property went from Brazil to New York, through escrow agents/attorneys located in New York, pursuant to New York-executed contracts.  Additionally, the transfer of PH2 from Felippe to Alinia occurred in New York.

111.    While the initial fraudulent scheme and diversion of the dividends occurred in Brazil, and Brazil certainly has an interest in seeing funds diverted from a Brazilian bank returned to the bank's bankruptcy estate, these facts are not enough under the interpreting case law discussed above to establish a greater interest of Brazil than New York.  Also, while the harm

---

were executed in Texas); B A Properties, Inc. v. Aetna Cas. & Sur. Co., 273 F.Supp.2d 673, 679, 681 (D.V.I. 2003) (holding that BVI law applied to a claim for breach of contract related to failure to pay hurricane claims to real property located in BVI, even though most of properties covered by insurance were located in California and the insured was based in California because application of California law to question involving insured interests in Virgin Islands real property would disrupt interstate commerce, would run counter to parties' expectations, and would complicate judicial administration of choice-of-law rules); Seth v. Seth, 694 S.W.2d 459, 462-464 (Tex. App. 1985) (holding that Texas law applied rather than foreign or Sharia law, to determine validity of a marriage since, among other things, the husband and second wife had acquired real property in Texas); Matter of Estate of Wimbush, 587 P.2d 796, 798 (Colo. App. 1978) (holding that, under restatement section 222, the rule of *lex situs* applied to a dispute regarding whether or not a testator's marriage subsequent to executing the will revoked the will by operation of law because the decedent owned real property in Colorado).

occurred in Brazil, as set forth above, this factor is not prioritized in determining choice of law for fraudulent conveyance claims.

112.    The conduct causing the harm also occurred in New York, as the ultimate transfers which deprived the bankruptcy estate of its assets—and continue to deprive the bankruptcy estate of them—occurred in New York.  As described in the above case law, New York also has an interest in the validity of transactions occurring within its borders, especially with regard to real property.

113.    A determination that the law of the jurisdiction where the assets are located also best serves the other concerns of the Restatement, as it provides uniformity and predictability, as well as ease in the determination and application of the law to be applied.

### B. Laspro Is Entitled to Judgment as a Matter of Law on These Claims as to Alinia and CPS.

114.    NY DCL §273 states:

Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

115.    NY DCL §274 states:

Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.

116.    NY DCL §275 states:

Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.

117.    Here, the facts are uncontroverted that BCSUL was insolvent, and unable to pay legitimate dividends during the time periods in question to shareholders due to the occurrence of the bankruptcy crimes and the fake salary-loan scheme, among other issues.    Nevertheless, dividends were paid during this time that were used to ultimately purchase the property described herein which was ultimately conveyed to the defendants.    No consideration was provided to BCSUL in exchange for the payment of these dividends.

118.    Alternatively, as to section 274, these facts also establish that BCSUL engaged in a transaction (here, the payment of dividends during the relevant time periods) when the property remaining with it was unreasonably small (here, nonexistent).

119.    Alternatively, as to section 275, these facts also establish that BCSUL's payment of dividends while was made at a time when BCSUL would incur (and intended or believed it would incur) debts beyond its ability to pay as such debts matured.

**VII. Laspro Is Entitled to Summary Judgment as to Counts X – XII, XXI – XXIV, and XXXIV – XXXVII (the Remaining Brazilian Law Claims) Based upon the Brazilian Insolvency Orders and the Effect of Brazilian Statues Regarding Shareholder Liability.**

120.    Laspro is entitled to summary judgment as to the Remaining Brazilian Law Claims because: (1) Brazilian law establishes that controlling shareholders of financial institutions are strictly liable for harm done to the financial institution[13]; (2) the Brazilian Insolvency Orders establish the causation and damages by the Indio da Costas; (3), the Indio da Costas cannot defend the civil suits in Brazil based upon arguments already rejected in the

---

[13] See Oliveira Depo. Tr., pp.: 47:1:14, 60:1:14; 90:19 – 101:1; 104:19:23; Expert Report of Roberto Oliveira, ¶¶ 11 – 28, 58 – 64.  Rebuttal Expert Report of Roberto Oliveira, ¶¶40 – 46, 57 - 65.  Strict liability means here, culpability, in other words the intent element of a claim.  See id.  Thus, for any claim which contains an intent element, that element is established as a matter of law.

SEQUOR LAW, P.A.

proceedings from which the Brazilian Insolvency Orders emanated; (4) Defendants arguments and positions taken in this suit *are* precisely those positions, and; (5) and Defendants are in privity with the Indio da Costas for purposes of collateral estoppel.

### A. Defendants, as Closely-Held Corporations of the Indio da Costa Are Strictly Liable (Culpable).

121.    Counts X, XII, XXII, XXIV, XXXIV and XXXVI are Brazilian Law claims that contain an intent element. Laspro is entitled to judgment as a matter of law on the intent element of these claims by the operation of Brazilian Law and the effect of the Brazilian Insolvency Orders.

122.    Law #6,404/1976, Art. 116 of the Brazilian Corporate Code states[14], in pertinent part, as follows:

> A controlling shareholder is defined as an individual or a legal entity, or a group of individuals or legal entities by a voting agreement or under common control, which:
>
> (a) possesses rights which permanently assure it a majority of votes in resolutions of general meetings and the power to elect a majority of the corporation officers; and
>
> (b) in practice uses its power to direct the corporate activities and to guide the operations of the departments of the corporation.

123.    Law #6,404/1976, Art. 117 of the Brazilian Corporate Code[15] states, in pertinent part, as follows:

> A controlling shareholder shall be liable for any damage caused by acts performed by the abuse of its power.
>
> Paragraph 1. An abuse of power may take any of the following forms:

---

[14] See **Exhibit "6"**, attached hereto.

[15] See id.

44

(a) to guide a corporation towards an objective other than in accordance with its corporate purposes clause or harmful to national interest, or to induce it to favor another Brazilian or foreign corporation to the detriment of the z shareholders' interest in the profits or assets of the corporation or of the Brazilian economy;

124.    Decree-Law #2,321/1987, Art. 15[16] states:

Once a temporary special administration regime is declared, individuals and entities who have a relation of control are jointly liable with the former administrators of the entity regardless of the examination of intent or fault.

125.    Law #9,447/1997, Art. 1[17], states:

Joint liability of the controlling shareholders of financial entities provided on article 15 of Decree-Law #2,321, dated February 25, 1987, is also applicable to the intervention and extrajudicial liquidation regimes regulated by Law #6,024, dated March 13, 1974.

126.    Civil Code of 2002, Art. 1.009[18], states, as follows:

Payment of illegitimate or of inexistent profits implicates on joint liability of the administrators who make the payments and of the shareholders who received them, in case they are aware or should be aware of its illegitimacy.

127.    In Special Appeal 962.265/SP, High Court of Justice, Fourth Panel, Reporting Judge Justice João Otávio de Noronha, ruled on June 14, 2011, the Court stated:

4. Once a Temporary Special Administration Regime is initiated, art. 15 of the Decree-Law #2,321/1987 provides for <u>strict liability of controlling shareholders</u> who are jointly liable along with the former administrators of the entity for the obligations assumed up to the limit of the uncovered liabilities calculated on a balance sheet which shall take as reference the day TSAR commenced.

128.    In one of the initial petitions brought by the Public Prosecutors against the Indio da Costas (case no.: N.2 0027878-37.2013.8.26.0100), attached hereto as **Exhibit "10"**, pp.: 6 – 7, the Prosecutor stated as follows:

---

[16] See <u>id.</u>

[17] See <u>id.</u>

[18] See <u>id.</u>

### 3.1. CIVIL RESPONSIBILITY OBJECTIVE OF THE CONTROLLER.

The controlling shareholder of a company liquidated by extension to the liquidation of Banco Cruzeiro do Sul S.A., with which it had an interest, characterized by the exercise of the power of control and the existence of common management, is objectively liable for losses caused to the company and third parties. Thus, pursuant to the provisions of article 1.9 of Law 9.447/97, "the joint liability of controllers of financial institutions established in art. 15 of Decree-Law n. 92.321, of February 25, 1987, also applies to the intervention and extrajudicial liquidation regimes referred to in Law No. 6.024 of March 13, 1974." In turn, Article 15 Decree-Law 2.321/74 establishes that:

"Once the temporary special administration regime has been decreed, the individuals or legal entities that maintain a bond of control with the institution, regardless of the ascertainment of willful misconduct or fault, are jointly liable with the former administrators of the institution, for the obligations assumed by the institution."

The application of objective liability is thus invoked; nevertheless, reference has been made both to wrongful acts and to fraudulent and willful acts of the defendants.

129.    This is further reinforced by Article 927 of the Brazilian Civil Code of 2002[19],

sole paragraph, which makes an exception to the general rule of civil liability provided for by

the rest of art. 927 that links it to the concept of a wrongdoing as provided for by art. 186, and

states (emphasis added):

"In the cases so provided for by Law, or when an activity usually undertaken by the person who caused the damages implies risks for the rights of someone else by its own nature, **there will be an obligation to compensate the damages regardless of fault."** This legal provision

130.    As for the effect of the Brazilian Insolvency Orders:

Even though it is not binding on the discussion of the matter in Judiciary, it is interesting to say that the investigation is for the obtention of the guiding premises that function as the grounds for establishing the facts and to prepare for taking measures for having the damages compensated.

It is very important to realize that strict liability may be determined on that specific management period, based on art. 46, sole paragraph, of Law n.

---

[19] See Exhibit 7.

6,024/74, in what concerns the deadline, having its legal basis on art. 36 of the same statute.

Reviewing the matter, the Court of Appeals for the State of São Paulo had the opportunity to emphasize some circumstances related to determining the liability of former administrators, considering as valid the service made by public notice and favoring an anticipated judgment as the issues involved were just points of Law, highlighting:

"Extrajudicial Liquidation – Financial entity – Claim for compensation of damages against former administrators ruled in favor of the plaintiff – Equivalation to administrator under the provisions of section a of § 2nd of art. 36 of Law 6,024, of 1974 – Lack of evidence of direct (actions or omissions) or joint (same administration) liability for two of them, in the Central Bank's inquiry and on the action – Wideness of the determination of liabilities on aforementioned statute – Only the appeals filed by the administrators not made liable have been granted" (Civil Appeal 5.342-4-SP, ruled on May, 9, 1996, JTJSP, Ed. Lex, 194:89-93)."

This way, the strict nature depicted by the inherent relation between the damage caused and its subordination to the management period is concurrent to the reality revealed by the practice of wrongdoings in the administration and the consequent liability of the administrator, serving the report drafted up on the administrative inquiry performed by the Central Bank as a thermometer for that.

See ABRÃO, Nelson. Direito Bancário. 17ª Ed. rev. atual. e ampl. São Paulo: Saraiva, 2018, p. 355-356).

131.    Here, the Brazilian Insolvency Orders establish the bankruptcy crimes and schemes, including the Fake Salary Loan Scheme.  See supra.  Thus, by operation of Brazilian Statutes and the Brazilian Insolvency Orders (and incorporating by reference the arguments related to non-mutual offensive collateral estoppel made, supra), Defendants are strictly liable (read: culpable) for the claims Laspro asserts against them and the intent elements of the claims in Counts X, XII, XXII, XXIV, XXXIV and XXXVI are established as a matter of law.

**B. Laspro Is Entitled to Judgment as a Matter of Law on all Remaining Brazilian Claims in the Amended Complaint.**

47

132.    With culpability established as a matter of law, the Indio da Costas, as controlling shareholders, can still  challenge the causation and damages elements in the actions brought by the Brazilian prosecutor, so long as  those challenges are different from those previously  made and rejected by the entry of  the Brazilian Insolvency Orders .  See Oliveira Depo. Tr., pp.: 47:1:14, 60:1:14; 90:19 – 101:1; 104:19:23; Expert Report of Roberto Oliveira, ¶¶ 11 – 28, 58 – 64; Rebuttal Expert Report of Roberto Oliveira, ¶¶22 – 41, 66 - 70.

133.    Here, none of the challenges made by Defendants are different  than those the Indio da Costas previously made and rejected by the entry of the Brazilian Insolvency Orders.

134.    Regarding the bankruptcy crimes in general, and the Fake Salary Loan Scheme in particular, committed against BCSUL that ultimately caused its insolvency, all the factual grounds necessary to determine the existence of damages and causation are fully set out in the final report drafted by BACEN, incorporated into the other Brazilian Insolvency Orders, which also include judgments and orders in punitive administrative proceedings where sanctions have been imposed on the Indio da Costas for their role and responsibility in these schemes.

135.    In the 2015 BACEN Decision made by the Central Bank of Brazil, the Indio da Costas were sanctioned for several wrongdoings committed against BCSul such as: (1) granting and/or renewing credit transactions without the required principles of selectivity, guarantee and liquidity, and for not making up appropriate provisions and adjustments on the assets involved; (2) creating fake salary loans; (3) creating sham credit transactions using intermediary legal entities and strawmen, and; (4) failing to notify regulatory authorities about the occurrence of acts under the suspect of money laundering crimes.

136.    BACEN and the Brazilian Bankruptcy Court established causation to the Indio da Costas based on their capacity as Directors of Relations with Investors, Director responsible

for Risk of Credit Administration, Director responsible for the implementation and compliance with the measures determined by the Circular Letter #3,461, Superintendent Director, Director Vice-President of the Board of Directors, Chairman of the Board of Directors, Director responsible for the Commercial and for the Investment Portfolios, since those offices are person(s) who exercise their respective functions and special duties of care, particularly where the company is a bank.  See BACEN Report and Brazilian Insolvency Orders.

137.    The BACEN Report specifies in more detail the schemes against BCSUL and the Indio da Costas' roles in them.  The BACEN Report specifically attributes the causes for BCSUL's insolvency to the negative adjustments to BCSUL's financial statements, which were caused by the various schemes of the Indio da Costas, including the Fake Salary Loan Scheme.  See id.

138.    The Indio da Costas can challenge the conclusions of the Brazilian Insolvency Orders in the liability claims brought against them, but to do so, they must bring in new evidence that would cause a reasonable doubt that is different than arguments the Indio da Costas previously brought and rejected by the entry of the Brazilian Insolvency Orders, otherwise the liability proceedings against them will result in a summary disposition.  See, e.g., Brazilian Civil Procedure Code, Articles 355 and 356; MEDINA, José Miguel Garcia. Novo Código de Processo Civil Comentado. 4ª Ed. rev. atual. E ampl. São Paulo: Revista dos Tribunais, 2016. p. 627[20]; Civil Appeal n. 0328439-36.2009.8.26.0000, Court of Appeals for

---

[20]

Fundamentally, judgment must be immediately made when there is no necessity of producing evidences in a hearing […]. That may be the case not only when there are only points of law […] but also when, being points of law and matters of fact, no facts are disputed […] Scheduling an unnecessary hearing for producing evidences, unduly delaying the ending of a case, offends the principle of procedural economy, as well as the constitutional provision ensuring the parties reasonable

the State of São Paulo, 7th Chamber of Private Law, Reporting Judge Appellate Judge Ramon Mateo Júnior, ruled on March, 12, 2014.

139.    In Civil Appeal n. 0328439-36.2009.8.26.0000, the Court confronted this issue, and determined that the rebuttal expert report and arguments proffered by the former controlling shareholder and administrators were not sufficient to overcome the BACEN Report in that case (emphasis added):

> CLASS ACTION. Claim filed by the Public Prosecutor's Office seeking the former administrators and the former controlling shareholder to be made liable to compensate the damages caused to Banco Empresarial S/A, then under extrajudicial liquidation, being put into bankruptcy in the course of the ongoing proceeding. Relief granted. Judgment affirmed. Rejection of the preliminary legal issues raised. **Acceptancy of the evidences produced during the administrative phase only. Possibility. Accounting expert report produced at Court that is vague and deprived of the same technical perfectness. Existence of other elements that give the extrajudicial evidence higher level of truthfulness. Controversy that loses its relevancy tough since robust commissive and omissive acts that caused the entity's liquidation and later bankruptcy have been demonstrated. Report made by the Central Bank's Inquiry Commission that is awarded a _iuris tantum_ presumption. It's attributed to the administrators the burden of infirming its conclusions,** what has not happened in this case and cannot be attributed to disregarding the accounting expert report produced. Precedents of the High Court of Justice and of this Court. Appeals denied.

140.    Here, the Indio da Costas raise the same arguments and same issues in opposition to the BACEN Report's analysis that were rejected by the Courts in Brazil.  See Depo. Tr. of Jose Vidal, _passim;_ Expert Report of Lopes Machado (which is essentially wholly based upon analyses conducted in 2015 previously rejected in the Courts in Brazil); BACEN Report, pp.: 230 and 231; Brazilian Insolvency Orders.  Additionally, the Indio da Costas

---

duration of the proceeding [...]. It is not a 'faculty' of the judge: having no need for production of evidences in a hearing, it is mandatory to the judge to rule the case immediately.

SEQUOR LAW, P.A.

raised similar arguments and issues in the liability suits brought against them by the Public Prosecutor where they were also rejected.  See Brazilian Civil Liability Case Appeal.

141.    Accordingly, Laspro is entitled to judgment as a matter of law regarding all Remaining Brazilian Claims.

**IX. New York Law Should Apply to Counts VI, VII, VIII, XVIII, XIX, XX, XXX, XXXI and XXXII, the Aiding and Abetting Claims, Except the Issue of Separate Identity, Which Should Be Decided under BVI Law under the Doctrine of Dépeçage.**

142.    Courts that address choice of law issues applicable to claims for aiding and abetting have applied the law of the state with the greatest interest in the claims, rather than mechanically applying the law of the state of incorporation to such claims because aiding and abetting claims raised against third parties do not involve the determination of internal corporate governance or relationships between directors/officers and the entities.  See, e.g., In re Adelphia Commc'n Corp., 365 B.R. 24, 39, 40 (S.D.N.Y. 2011) ("… the aiding and abetting issues do not involve determination of internal corporate governance matters themselves, as a primary violation of a fiduciary duty obligation has been taken as given."); Norlin Corp. v. Rooney, Pace Inc., 744 F. 2d 255, 263 (2d Cir. 1984) (rejecting defendant's contention that the court should follow an internal affairs choice-of-law rule under Restatement § 309 and select the law of Panama, the state of incorporation, because New York had a substantial interest in the litigation, while Panama, the place of incorporation, had none).

143.    In In re Allou Distributors, Inc., 387 B.R. 365, 396 (E.D.N.Y 2008), the court applied New York law—the law of the state with the greatest interest in the aiding and abetting claims instead of Delaware, the law of the state of incorporation. The Court reasoned: (1) the claim is asserted against defendants who are not officers/directors of Allou [the debtor], "and the claim does not involve 'matters peculiar to the relationships among or between the

corporation and its current officers, directors, and shareholders'"; (2) "the acts giving rise to the claim are alleged to have taken place, 'in whole or in large part, in New York'"; and (3) "the alleged fraudulent transfers were made by Allou from its headquarters in New York." Id. See also In re Norstan Apparel Shops, Inc., 367 B.R. 68, 81 (E.D.N.Y. 2007) ("[T]he internal affairs doctrine does not always control when the claims asserted belong to 'third parties external to the corporation' . . . . In that instance, New York law dictates that the court conduct an 'interest analysis' and apply the law of the state which has the greatest interest in the claim."); Solow v. Stone, 994 F. Supp. 173, 177 (S.D.N.Y. 1998), aff'd, 163 F.3d 151 (2d Cir. 1998) (holding that the law of the place of incorporation governed claims of breach of directors' fiduciary duties of loyalty and care, but did *not* "apply to plaintiff's remaining claims for aiding and abetting the breach of fiduciary duty" because such claims were not directed against the administrators in their capacity as directors/officers of the corporation, but rather as independent actors, and the "claims raise[ed] garden-variety tort issues," and "[i]n tort cases, New York courts apply the law of the jurisdiction with the greatest interest in the dispute.").

144.    Additionally, Florida courts may make a separate choice of law determination with respect to different issues under consideration under Restatement § 145 under the doctrine of dépeçage. See Restatement (Second) Conflicts § 145 (1971) ("(1) The rights and liabilities of the parties with respect to an **issue** in tort … ") (emphasis added). See also Trumpet Vine Investments, N.V. v. Union Capital Partners I, Inc., 92 F.3d 1110, 1115 (11th Cir. 1996) (holding that New York law applied to the breach of fiduciary relationship claim because New York is where the conduct giving rise to the injury occurred, where there was an alleged betrayal of confidences, and where the parties' relationship was created, as opposed to law of Florida, which is where injury was sustained); Feldkamp v. Long Bay Partners, LLC, 773 F.

Supp. 2d 1273, 1279 (M.D. Fla. 2011), aff'd, 453 App'x. 929 (11th Cir. 2012) "Under Florida law, a court makes a separate choice of law determination with respect to each particular issue under consideration."); Estate of Miller ex. Rel. Miller v. Thrifty Rent-A-Car System, Inc., 609 F. Supp 2d 1235, 1251 (M.D. Fla. 2009) ("Choice of law is decided on an issue by issue basis … It would be inappropriate for the Court to prospectively declare that South African law applies to each and every issue in this case …."); Babcock v. Jackson, 12 N.Y.2d 473, 484 ( 1963) ("[T]here is no reason why all issues arising out of a tort claim must be resolved by reference to the law of the same jurisdiction."); Foster v. United States, 768 F.2d 1278, 1281 (11th Cir. 1985) ("[D]ifferent substantive issues in a single case may have to be resolved under the laws of different states where the choices influencing decisions differ."); Zimmerman v. Novartis Pharm. Corp., 889 F.Supp.2d 757, 761 (D. Md. 2012) ("The 'significant relationship' approach allows for dépeçage,' such that a court can apply different state laws to different issues in a single case—i.e., liability, compensatory damages, and punitive damages.").

145.    Courts in other states have also employed this doctrine.  See, e.g., Babin v. Caddo East Estates I, Ltd., 496 B.R. 804, 810 (E.D. La. 2013), reh'g granted, 517 B.R. 649 (E.D. La. 2014) ("[I]n light of the system of dépeçage, and the fact that the internal affairs doctrine does not by its terms apply to claims affecting the rights of third parties (and could produce inequity if it did), on reconsideration, the Court concluded "that the internal affairs doctrine should not control the choice of law governing" the aiding and abetting claims, and that the law of Texas, where most of the actions pertaining to the complaint took place, should govern the trustee's aiding and abetting claims).

146.    Here, the wrongs committed by the Indio da Costas in aiding the defendants do not implicate the internal affairs doctrine of BVI.  Since this case primarily raises issues of

SEQUOR LAW, P.A.

secondary liability, as established in the Restatement, this Court should not apply BVI law to the entire tort claims.  Instead, this Court should look to BVI law solely on the issue of whether a BVI company has sufficient separate identity from its sole director to be liable for aiding and abetting.   According to the only expert in BVI Law proffered in this case, Andrew Thorp, a BVI entity *does* have such sufficient separate identity.[21]  See Depo. Tr. of Andrew Thorp, pp.: 3:24 – 4:8; 16:10 – 26:15; 29:24 – 34:4; Expert Report of Andrew Thorp, pp.:  2, 13 – 19; Affidavit of Andrew Thorp, pp.: 11 - 17.

147.    Similar to the analysis as to the fraudulent conveyance claims, the conduct related to the aiding and abetting occurred in New York.  The assets, which are mostly comprised of real property, were purchased in New York.  The personal property—the Artwork—was purchased with the Apt. 6B Shares and remains in New York.  While the defendants are BVI entities and certain entities through which Felippe and Octavio owned the defendants are Brazilian and/or BVI (Star Investimentos e Participacoes SA and Correas Trust), the flow of funds used to purchase the property went from Brazil to New York, through escrow agents/attorneys located in New York, pursuant to contracts executed in New York.  Additionally, the transfer of PH2 from Felippe to Alinia occurred in New York.  The substantial assistance  of the defendants in receiving the transfers of the assets, maintaining ownership of them, and doing so with the actual knowledge of the source of the funds, also occurred wholly in New York.

148.    While the initial fraudulent scheme and diversion of the dividends occurred in Brazil by Brazilian shareholders of a Brazilian bank, and Brazil certainly has an interest in seeing funds diverted from a Brazilian bank returned to the bank's bankruptcy estate, these facts are insufficient under the authorities discussed above to establish a greater interest of Brazil than New

---

[21] Under Fed. R. Civ. P. 44.1, the Court determines foreign law.

York's interest in the validity of transactions occurring within its borders, especially regarding real property. As discussed, <u>supra</u>, the law of the *situs* of real property is frequently determinative.

149. Applying the law of the jurisdiction where the assets are located also best serves the other concerns of the Restatement, as it provides uniformity, predictability, and ease in application.

WHEREFORE, Laspro requests this Court grant this motion, enter final summary judgment against Defendants and enter final judgment for Laspro as set forth herein, or, alternatively, enters partial summary judgment as set forth herein. Laspro requests any other relief this Court deems appropriate.

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent via e-mail to ALINIA CORPORATION, 110 CPS, INC., c/o Jeremy J Hart, jhart@bastamron.com, mdesvergunat@bastamron.com, dtimpone@bastamron.com, jmiranda@bastamron.com on July 15, 2019.

Date: July 15, 2019

Respectfully submitted,
SEQUOR LAW, P.A.
1001 Brickell Bay Drive, 9th Floor
Miami, Florida 33131
Telephone (305) 372-8282
Facsimile (305) 372-8202

By: */s/ Daniel M. Coyle*
    Edward H. Davis
    Fla. Bar No. 704539
    edavis@sequorlaw.com
    Gregory S. Grossman
    Florida Bar No. 896667
    ggrossman@sequorlaw.com
    Daniel M. Coyle
    Fla. Bar No. 055576
    dcoyle@sequorlaw.com