# EXHIBIT "1"



# BANCO CENTRAL DO BRASIL

## FINAL REPORT
### (Article 43 of Law 6.024/1974)

## BANCO CRUZEIRO DO SUL S.A. – UNDER TEMPORARY SPECIAL ADMINISTRATION REGIME - TSAR



# BANCO CENTRAL DO BRASIL

## Content

1.    INTRODUCTION ........................................................................................ 4
2.    THE COMPANY ....................................................................................... 5
  **2.1    Creation of the Company and Alterations in the past 5 years** ....................... 5
  **2.2    Controllers** ................................................................................... 22
  **2.3    Administration** .............................................................................. 23
  **2.4    Powers-of-Attorney** ...................................................................... *31*
  **2.5    Management in the past five years prior to the decree of the Temporary Special Administration Regime – TSAR at Banco Cruzeiro do Sul** ..................... 58
  **2.6    Identification of the controllers and former administrators** .................... 62
3.    COMPANY CONNECTIONS AND INTER-CONNECTIONS .................................... 64
4.    TECHNICAL ACCOUNTING EXAMINATION ................................................. 68
  **4.1    Company Books** ............................................................................ 68
  **4.2    Analysis of Accounts** ..................................................................... 69
    **4.2.1    Inspection Reports** .................................................................. 69
    **4.2.2    Administrative Proceedings – Central Bank of Brazil** ........................ 86
    **4.2.3    Notifications to the Federal Prosecutor's Office** ........................... 89
    **4.2.4    Notification to the Federal Revenue Office – 8.12.2009** ................... 91
    **4.2.5    Administrative Proceedings - Securities and Exchange Commission** ... 91
  **4.3    Adjusted Net Equity** ...................................................................... 92
    **4.3.1 Explanatory Notes to the adjustments made by the CGF** .................... 94
5.    THE INDEPENDENT AUDIT ..................................................................... 125
  **5.1. Irregularities in the procedures conducted by KPMG** ............................... 127
    **5.1.1. Test of existence of credit contracts (external confirmation)** ............ 127
    **5.1.2. Analytical procedures** .............................................................. 135
    **5.1.3. Information technology audit procedures** ...................................... 137
  **5.2. Irregularities in the procedures conducted by Ernst & Young** .................... 143
    **5.2.1. Declarations from administration** ............................................... 143
  **5.3  Conclusions -  Audit** ..................................................................... 145
6.    IRREGULARITIES FOUND ....................................................................... 146
  **6.1 Mislead the regulatory authorities in regard to the amount attributed to the CRIF shares registered in its Balance Sheet.** ............................................ 147
    **6.1.1 Prosper Flex Portfolio – base date: 5.31.2012** ............................... 148
    **6.1.2 CRIF Multicred Portfolio – base date: 5.31.2012** ............................ 166
  **6.2  Make insufficient provisioning in its credit portfolio in the "middle market" segment, violating the criteria defined in Resolution 2.682/1999 (Arts. 2, 3 and 4)** ............................................................................................ 168
    **6.2.1 Adhonep – Associação dos Homens de Negócio do Evangelho Pleno** ... 169
    **6.2.2.Aloes – Indústria e Comércio Ltda.** ............................................ 170
    **6.2.3.Associação dos Músicos Militares do Brasil – AMBRA** ..................... 171
    **6.2.4 *Baldin Bioenergia S.A*** ........................................................... *172*
    **6.2.5 Brigada Promotora de Crédito e Vendas Ltda.** ............................... 173
    **6.2.6 Facility Tecnologia Ltda** .......................................................... 174
    **6.2.7 Amapá State Government** ......................................................... 175

# BANCO CENTRAL DO BRASIL

**6.2.8 Guilherme de Alvarez Otero Fernandes** ................................................. 176
***6.2.9 Industrial Page Ltda*** ............................................................................ *177*
**6.2.10 Rodolatina Logística S/A** ..................................................................... 178
**6.2.11 Promotora e Divulgadora Sudeste Line Ltda** ......................................... 179
***6.2.12 Wirex Cable S/A*** ................................................................................ *179*
**6.3  Not make a provision for the credit risk of the accommodation and guarantee portfolio, in spite of the provision in item III of the sole paragraph of Art. 2 of BC Circular Letter 3721, of 4.30.2009, combined with item XII of Art. 4 of the same regulation** .......................................................................................................... 180
**6.3.1 A.C. Burlamaqui Consultores S/C (CNPJ 28.711.539/0001-78)** ............... 181
**6.3.2 Aloes Indústria e Comércio Ltda. (CNPJ04.415.844/0001-54).** ................. 182
**6.3.3. Amadeu Simões Lopes de Azambuja** ................................................... 184
**6.3.4 Associação dos Músicos Militares do Brasil - Ambra** ............................. 185
**6.3.5 Brigada Promotora de Créditos e Vendas Ltda** .................................... 186
**6.3.6.Gallway Projetos e Energia do Brasil S/A (CNPJ 08.766.753/0001-14)** ..... 187
**6.3.7.Guilherme de Alvarez Otero Fernandes (CPF. 246.565.988-01)** ............... 188
**6.3.8. Promotora e Divulgadora Sudeste Line Ltda** ......................................... 189
**6.4. Provide a prohibited loan to a company controlled by the institution's administrators** ................................................................................................... 190
**6.5 Cause and/or contribute to causing illicit transfers of foreign currency from Brazil** ........................................................................................................194
**6.6 Fail to give notice of operations that contain evidence of money laundering** 194
**6.7 – Forge consigned personal loans to inflate asset values and profits / net equity of the financial institution** ................................................................................. 197
**6.7.1    Findings in the period prior to the decree of the TSAR.** ........................ 198
**6.7.2    Findings in the period after the decree of the TSAR** ........................... 206
**6.7.3    Conclusion: Invalid Operations** ......................................................... 213
**6.8    SUMMARY CHART - IRREGULARITIES** ................................................ 214
**7.   ERRORS AND HARMFUL OMISSIONS** ................................................... 215
**8.   EXISTENCE OF RECORDED PHONE CONVERSATIONS AT BANCO CRUZEIRO DO SUL** .......................................................................................................... 217
**9.   MORGAN STANLEY - CRUZEIRO DO SUL OPERATION** ............................ 218
**10.   CAUSES OF THE BANKRUPTCY** ........................................................... 221
**11.   LOSSES FOUND** ................................................................................... 221
**12.   AFFIRMATIONS BY CONTROLLERS AND FORMER ADMINISTRATORS** ........ 225
**12.1    SUMMARY OF THE CLAIMS** ............................................................... 226
**12.2    ANALYSIS OF THE CLAIMS** ................................................................ 234
**13.   LIST OF ASSETS OF CONTROLLERS AND EX-ADMINISTRATORS** ............. 244
**14.   CONCLUSION** ...................................................................................... 247



# BANCO CENTRAL DO BRASIL

## 1.    INTRODUCTION

### 1.1    Establishment of Temporary Special Administration Regime - TSAR

On 6.4.2012, in **PRESIDENTIAL ACT No. 1.217** (Official Gazette of 6.5.2012, section 1, pag 13) (pages 2/3), the President of the CENTRAL BANK OF BRAZIL, in the use of the powers conferred upon him by Art. 12, section XVII, of the Bylaws, based on Art. 4 of Law no. 9.447, of March 14, 1997, together with Art. 15, section I, lines "a" and "b", of Law no. 6.024, of March 13, 1974, in light of the provision in Decree-law no. 2.321, of February 25, 1987, decreed a Temporary Special Administration Regime, for a period of one hundred eighty (180) days, at **BANCO CRUZEIRO DO SUL S.A.** (CNPJ: 62.136.254/0001-99), with main offices in the city of São Paulo, state of São Paulo, at Rua Funchal no. 418 – 6, 7, 8 and 9 andares, Vila Olímpia, considering the compromised economic-financial situation and the serious violation of standards issued by the National Monetary Council and the Central Bank of Brazil, according to a decision by the Collegiate Board in a meeting held on June 4, 2012.

By this act, the Credit Guarantee Fund (CGF), CNPJ no. 00.954.288/0001-33, was appointed as the temporary special director, based on Art. 8 of Decree-law no. 2.321/1987.

On 6.4.2012, **NOTIFICATION NO. 22.585** was issued by the Extrajudicial Liquidation Department – DELIQ (pages 4/7), under which the Central Bank of Brazil informed the financial institutions and stock markets of the decree of a Temporary Special Administration Regime at **BANCO CRUZEIRO DO SUL S.A.**; the appointment of the respective temporary special director and the freeze on the assets of the indirect controller, Mr. **Luis Felippe Indio da Costa**, and on the assets of the following ex-directors and members of the board of directors: **Luis Felippe Indio da Costa, Charles Alexander Forbes, Fabio Caramuru Correa Meyer, Fabio Rocha do Amaral, Flavio Nunes Ferreira Rietmann, Horacio Martinho Lima, Jose Carlos Lima de Abreu, Luis Octavio Azeredo Lopes Indio da Costa, Maria Luisa Garcia de Mendonça, Progreso Vaño Puerto, Renato Alves Rabello, Roberto Vieira da Silva de Oliveira Costa and Sergio Marra Pereira Capella.**

On 9.14.2012, through **Presidential act no. 1.230**, published in the Official Gazette of 9.17.2012 (pages 31/32), the Extrajudicial Liquidation was ordered of **BANCO CRUZEIRO DO SUL S.A.**, based on the report of the special director of the CGF – Credit Guarantee Fund, which confirmed the compromised economic and financial situation and the serious violation by Banco Cruzeiro do Sul S.A. of the standards issued by the National Monetary Council and by the Central Bank of Brazil, attesting to the existence of uncovered liabilities and the unviability of normalizing the company's business. Mr. Sérgio Rodrigues Prates, CPF no. 025.281.770-20, was appointed as the liquidator and the start of the prebankruptcy period for the Extrajudicial Liquidation on April 5, 2012.



# BANCO CENTRAL DO BRASIL

**1.2      Investigation Commission**

Based on Article 41, paragraph 2, of Law no. 6.024/1974, the Investigation Commission was appointed by **DIRECTOR ACT No. 455**, of 6.18.2012 (Official Gazette of 6.20.2012, section 2, page 36), pages 8/9, issued by the Director of Organization of the Financial and Operations Control System of Rural Credit of the CENTRAL BANK OF BRAZIL, composed of the following members: CLÓVIS VIDAL POLETO - registration 2.160.560-2, as president; AUGUSTIN DAIHYUN SHIM - registration 1.455.157-8 and AMADEU JOÃO CAPARROZ - registration 0.649.610-5, as reporters; ALAN BRITO CANAL - registration 0.267.883-7 and MARIA APARECIDA PEREIRA - registration 6.828.824-7, as secretaries. The Commission was established to conduct its work at Rua Funchal, 418 - 7 andar, São Paulo (SP), according to the Minutes of Establishment, of 6.29.2012 (page 1).

On 7.2.2012, letters were sent to the Extrajudicial Liquidation Department - DELIQ (page 10); to the special CGF director - Credit Guarantee Fund (page 11); to the controllers/ex-directors of the Company (pages 12/28), notifying them of the installation of the Investigation Commission and asking the latter to comply with the content of Decree-law no. 2321, of 2.25.1987.

In addition, on 7.17.2012, the Federal Revenue Office in São Paulo was asked to provide a DECLARATION OF ASSETS AND RIGHTS and DEBTS AND REAL PROPERTY ENCUMBRANCES, relative to the Individual Income Tax returns for the fiscal year 2012 – Base Year 2011, of the indirect controller and ex-directors of this company, through official letter CI-CSBANCO-2012/019 (page 30).

The Organization Director of the Financial and Operations Control System of Rural Credit of the CENTRAL BANK OF BRAZIL, through **DIRECTOR ACT No. 464**, of 10.26.2012 (Official Gazette of 10.29.2012), extended for one hundred and twenty (120) days the deadline for conclusion of the investigation conducted at BANCO CRUZEIRO DO SUL S.A. (pages 33/34 and 619), beginning on 10.28.2012. The same Act appointed Paulo Cesar Fernandes da Silva, a civil servant at the Central Bank of Brazil, registration no. 8.075.928-9, to exercise the position of reporter.

# 2.      THE COMPANY

According to the documents received from the temporary special director of the Credit Guarantee Fund – CGF (pages 36/339), in response to record CI- CSBANCO-2012/022, of 7.30.2012 (page 35), we will now describe the creation and alterations of the company, and the definition of its Controllers and Administration.

**2.1      Creation of the Company and Alterations in the past 5 years**

According to the documents obtained by this Investigation Commission (pages 36/339), the company **Banco Cruzeiro do Sul S.A.** was created after corporate reorganizations, and its current name was attributed on 9.1.1989.

5



# BANCO CENTRAL DO BRASIL

Following is a list of the **most significant** alterations:

**ESM of 2.27.1989 (pages 40/47)**: Amendment of Bylaws, reorganizing the Company through the expansion of its company purpose, to operate with the portfolios: Commercial and Investments, and company name changed, from CRUZEIRO DISTRIBUIDORA DE TÍTULOS E VALORES MOBILIÁRIOS S/A, to BANCO CRUZEIRO S/A.

**ESM of 9.1.1989 (pages 52/57)**: Company name changed, from BANCO CRUZEIRO S/A, to BANCO CRUZEIRO DO SUL S/A.

**ESM of 12.10.1993 (pages 66/67)**: Election of LUIS FELIPPE INDIO DA COSTA and LUIS OCTAVIO AZEREDO LOPES INDIO DA COSTA as DIRECTORS of BANCO CRUZEIRO DO SUL S/A, with term until the Ordinary Shareholder Meeting - OSM of 1994.

As noted in the **Minutes of the Extraordinary Shareholder Meeting - ESM, of 1.23.2007** (pages 68/72), the following were approved:

1. The BANK became publicly traded
2. Admission of the shares issued by the Bank for negotiation on the Bovespa Stock Exchange, as well as listing at Level 1
3. The reform and consolidation of the Bank's Bylaws
4. Election of the following members of the Company's Board of Directors, with a term until the OSM of 2008: LUIS FELIPPE INDIO DA COSTA, LUIS OCTAVIO AZEREDO LOPES INDIO DA COSTA, FABIO ROCHA DO AMARAL, HORÁCIO MARTINHO LIMA; CHARLES ALEXANDER FORBES, and as independent director, Mr. PROGRESO VAÑO PUERTO
5. The public offer of distribution of preferred shares issued by the Bank

According to the Minutes of the aforementioned Extraordinary Shareholder Meeting - ESM, of **1.23.2007**, the consolidated Bylaws in question (pages 73/87) contain, among others, the following Articles:

## CHAPTER I – NAME, HEADQUARTERS AND JURISDICTION, PURPOSE AND DURATION

### Article 1
**BANCO CRUZEIRO DO SUL S/A,** is a corporation, which will be governed by these Bylaws and by the applicable legal and regulatory provisions.

**Sole Paragraph**- With the admission of the Company at Level 1 of Corporate Governance of the São Paulo Stock Exchange ("Level 1" and "BOVESPA", respectively), the Company, its shareholders and directors are also subject to the provisions in the Differentiated Corporate Governance Practices Regulation Level 1 ("Level 1 Regulation").

6



**BANCO CENTRAL DO BRASIL**

**Article 2**
The headquarters and jurisdiction of the Company is at Rua Funchal, 418, 7, 8, and 9 andares, in the city of São Paulo, state of São Paulo, and through a resolution of the Board, it may open offices anywhere in the country or abroad, subject to the legal requirements.

**Article 3**
The Company purpose is to conduct asset, accessory liability and service operations inherent to the respective authorized portfolios (commercial and investments), including foreign exchange operations, according to the legal and regulatory provisions in effect.

**Article 4**
The duration of the Company is undetermined, and its dissolution and liquidation will occur through a vote of shareholders that represent two thirds or more of the Capital Stock.

**CHAPTER II - CAPITAL STOCK AND SHARES**

**Article 5**
The Capital Stock is R$ 182,500,000.00 (one hundred, eighty-two million, five hundred thousand reais), divided into and represented by 14,898,420 (fourteen million, eight hundred ninety-eight thousand, four hundred twenty) shares, all not-to-bearer, book entry and without face value, of which 11,507,844 (eleven million, five hundred seven thousand, eight hundred forty-four) are common shares and 3,390,576 (three million, three hundred ninety thousand, five hundred seventy-six) are preferred shares.

**Paragraph One** - All Company shares are book entry shares and will be kept in a deposit account, in the names of their owners, at an authorized financial institution; certificates will not be issued. The depository institution may charge shareholders for the cost of the transfer and annotation service of ownership of the book entry shares, as well as for the cost of the services relative to the shares under deposit, subject to the maximum limits set by the Securities and Exchange Commission ("CVM").

**Paragraph Two** - The Company is prohibited from issuing profit-sharing bonds.

**Article 6**
Each common share will be entitled to one (1) vote in resolution of the Company's Shareholder Meetings.

**Article 7**
The preferred shares will not be entitled to vote for resolutions at Shareholder Meetings, and are assured the following preferences and advantages:

      a)      The right to a share of the profits distributed under equal conditions with the common shares;

      b)      Priority in reimbursement of the capital stock, without a premium; and



**BANCO CENTRAL DO BRASIL**

      c)        *The right to be included in a public offer as a result of Sale of Company Control or of the provision in Article 38, pursuant to the term of Chapter VIII of these Bylaws, at the same price per common share of the Control block.*

**Sole Paragraph**- *At any time, shareholders may convert common shares into preferred shares, at the ratio of one (1) common share to one (1) preferred share, provided that they have been paid in, and subject to the legal limit. Conversion requests shall be sent to the Board in writing. Conversion requests received and accepted by the Board shall be ratified at the first meeting of the Board of Directors that is held.*

### Article 8
*The Company is authorized to increase the Capital Stock up to the limit of R$1,000,000,000.00 (one billion reais), independent of changes to the Bylaws, without a requirement to maintain the proportion of the shares of each type, subject, in regard to the preferred shares, to the maximum limit established in the Law.*

**Paragraph One** – *The increase in the capital stock will be done through a resolution of the Board of Directors, which shall establish the conditions for the issue of shares, including, price, term and payment form. In the event of a capital increase resulting from the incorporation of reserves, according to standards issued by the National Monetary Council, or by the reassessment of fixed assets, represented by real estate for use and facilities, the authority will belong to the General Meeting, after hearing the Audit Committee, if there is one.*

**Paragraph Two** - *Within the limit of the authorized capital, the Company may issue shares and stock warrants.*

**Paragraph Three** - *At the discretion of the Board of Directors, the right of first refusal may be excluded, or the term for its exercise may be reduced, in issues of shares and profit-sharing bonds, which are placed through (i) sale on a stock market or a public stock subscription, or (ii) an exchange of shares, in a public offer of control acquisition, in accordance with the law, and within the limit of the authorized capital.*

### Article 9
*Subject to the legal limit, share transfers will be suspended as of the publication date of the first announcement until the date on which the respective Shareholder Meeting is held.*

      According to the documents examined by this Commission, the principal alterations that occurred at the Company in question are summarized below:

**MINUTES OF BOARD OF DIRECTORS MEETING OF 1.23.2007 (pages 88/92**)

1. Approval of the designation of Director LUIS FELIPPE INDIO DA COSTA for the position of President of the Board of Directors of the bank, and of



# BANCO CENTRAL DO BRASIL

Director LUIS OCTAVIO AZEREDO LOPES INDIO DA COSTA for the position of Vice-President of the Board of Directors of the Bank.

2. Approval of the designation of Director LUIS OCTAVIO AZEREDO LOPES INDIO DA COSTA for the position of CEO and of Director LUIS FELIPPE INDIO DA COSTA for the position of Director of Investor Relations.

3. Election to the Board of Directors of the Bank, of the following persons: JOSÉ CARLOS LIMA DE ABREU, MARIA LUISA GARCIA DE MENDONÇA, ERNANI FONSECA NETO, FABIO CARAMURU CORREA MEYER, JOÃO LARA DE SOUZA MEIRELLES FILHO, SERGIO MARRA PEREIRA CAPELLA and LUIZ WHATELY THOMPSON with a term until the OSM that examined the Bank's financial statements for the fiscal year ending on 12.31.2008.

**MINUTES OF THE EXTRAORDINARY SHAREHOLDER MEETING OF 3.12.2007 (pages 94/125)**

1. Approval of the capital increase, within the limit authorized in Article 8 of the Company Bylaws, approved by the Board of Directors, who met on March 12, 2003;

2. Approval of the split of all the shares issued by the Company, under which each existing common share and each existing preferred share will correspond to five (5) shares of the respective type. The split is based on the share position of the Bank on this date, therefore, the capital stock will be represented by 116,850,435 shares, all not-to-bearer, book entry and without face value, of which 99,897,555 are common shares and 16,952,880 are preferred shares;

Therefore, Article 5 of the Bank's Bylaws went into effect with the following wording:

*Article 5*
*The Capital Stock is R$ 329,500,000.00 (three hundred twenty-nine million, five hundred thousand reais), divided into and represented by 116,850,435 (one hundred sixteen million, eight hundred fifty thousand, four hundred thirty-five) shares, all not-to-bearer, book entry and without face value, of which 99,897,555 (ninety-nine million, eight hundred ninety-seven thousand, five hundred fifty-five) are common shares and 16,952,880 (sixteen million, nine hundred fifty-two thousand, eight hundred eighty) are preferred shares.*

**MINUTES OF THE EXTRAORDINARY SHAREHOLDER MEETING OF 3.22.2007 (pages 126/147)**

Among the most significant alterations made in this ESM, we note the alterations to the following Articles of the Bylaws:

*Article 3*

9



# BANCO CENTRAL DO BRASIL

*The Company purpose is to conduct asset, liability and accessory operations inherent to the respective authorized portfolios (commercial and investments), according to the legal and regulatory provisions in effect.*

**Article 5**
*The Capital Stock is R$ 329,500,000.00 (three hundred twenty-nine million, five hundred thousand reais), divided into and represented by 116,850,435 (one hundred sixteen million, eight hundred fifty thousand, four hundred thirty-five) shares, all not-to-bearer, book entry and without face value, of which 99,897,555 (ninety-nine million, eight hundred ninety-seven thousand, five hundred fifty-five) are common shares and 16,952,880 (sixteen million, nine hundred fifty-two thousand, eight hundred eighty) are preferred shares.*

**Paragraph One** - *All Company shares are book entry shares and will be kept in a deposit account, in the names of their owners, at Banco Bradesco S.A., an authorized financial institution; certificates will not be issued. The depository institution may charge shareholders for the cost of the transfer and annotation service of ownership of the book entry shares, as well as for the cost of the services relative to the shares under deposit, subject to the maximum limits set by the Securities and Exchange Commission ("CVM").*

**Paragraph Two** - *The Company is prohibited from issuing profit-sharing bonds.*

**Article 8**
*The Company is authorized to increase the Capital Stock up to the limit of R$1,000,000,000.00 (one billion reais), independent of changes to the Bylaws, without a requirement to maintain the proportion of the shares of each type, subject, in regard to the preferred shares, to the maximum limit established in the Law.*

**Paragraph One** - *The increase in the capital stock will be done through a resolution of the Board of Directors, which shall establish the conditions for the issue of shares, including, price, term and payment form. In the event of a capital increase resulting from the incorporation of reserves, according to standards issued by the National Monetary Council, the authority will belong to the General Meeting, after hearing the Audit Committee, if there is one.*

**Paragraph Two** - *Within the limit of the authorized capital, the Company may issue shares and stock warrants.*

**Paragraph Three** - *At the discretion of the Board of Directors, the right of first refusal may be excluded, or the term for its exercise may be reduced, in issues of shares and profit-sharing bonds, which are placed through (i) sale on a stock market or a public stock subscription, or (ii) an exchange of shares, in a public offer of control acquisition, in accordance with the law, and within the limit of the authorized capital.*

10



**BANCO CENTRAL DO BRASIL**

**Article 16**
The Board of Directors will meet when called to do so by their President or by his substitute, with notice of at least five (5) business days and with presentation of the agenda of topics to be covered.

**Paragraph One** - Board of Directors meetings will be opened with the presence of the majority of the members and will be presided over by the President and the person he indicates will serve as the Secretary, with resolutions passed by a majority of votes of the Directors present, and in the event of a tie, the vote of the President of the Board of Directors or of his substitute will break the tie.

**Paragraph Two** – Independent of the formalities established in this Article, a meeting of the Board of Directors shall be considered regular, if all members are present.

**Paragraph Three** - Board of Directors meeting will preferably be held at Company headquarters.

**Paragraph Four** – Minutes will be taken of Board of Directors meetings in a separate book, and those that contain a resolution intended to produce effects before third parties will be published.

**Article 22**
In the event that one of the Director positions is vacant, the Board will designate a temporary substitute until the next meeting of the Board of Directors, which will then deliberate to definitively fill the position. The substitute Director elected will serve until the end of the term of the person who is substituted.

**Article 23**
The Board will meet when called to do so by the CEO (or by his substitute) or by 2/3 (two thirds) of the Directors, in both cases with at least twenty-four (24) hours' notice.

**Paragraph One** – Board meetings will be opened with the presence of at least two Directors, and resolutions will be taken by a majority of votes of the Directors present, with the CEO's vote prevailing in the event of a tie.

**Paragraph Two** - Board of Directors meetings will preferably be held at Company headquarters.

**Paragraph Three** – Minutes of the Board of Directors meetings will be recorded in a separate book.

11



**BANCO CENTRAL DO BRASIL**

*Article 24*
*In order to achieve the company purpose, the Board shall have full powers, including the power to contract for obligations, purchase, sell and encumber real estate, provide guarantees in favor of third parties, transact, assign and waive rights, and, in addition to the legal obligations, shall:*

*a)     comply with and ensure compliance by others with the resolutions of the Shareholder Meeting, the Board of Directors and the provisions in these Bylaws;*

*b)     establish the Company's operating policies and business plan;*

*c)     deliberate on the creation of branches;*

*d)     represent the Company as a plaintiff and defendant, before the courts or extra-judicially; for this purpose, agents may be appointed; and*

*e)     examine the monthly balance sheets, authorizing their publication, with the signature of at least two Directors, order the preparation of semester and quarterly financial statements, and every year, submit the Administration Report and the Board's Accounts for the approval of the Board of Directors, accompanied by the independent auditors' report, as well as the proposal for use of profits earned in the preceding fiscal year.*

***Paragraph One*** *– The CEO shall, in addition to the provisions in the heading and other attributions that may be established: (i) direct the performance of activities related to general Company planning; (ii) call and preside over Board meetings; (iii) carry out general supervision of the attributions of the Board; and propose to the Board of Directors the number of members of the Board, indicating the names of the Directors for election.*

***Paragraph Two*** *- The Director of Investor Relations shall, in addition to the provisions in the heading and other responsibilities that may be established, represent the Company before the regulatory agencies and other institutions that act on the securities market, providing information to investors, to CVM, to the Central Bank of Brazil, to the stock markets where the Company has its shares for sale, and to other entities related to the activities conducted by the Company on the securities market, in Brazil and abroad.*

***Paragraph Three*** *– The other Directors shall, in addition to the provisions in the heading: (i) perform the functions assigned to them by the Board of Directors; and (ii) conduct Company business within the areas of activity they are appointed to, especially in regard to the coordination, supervision and development of activities.*

12



# BANCO CENTRAL DO BRASIL

*Paragraph Four* – *The Company may, through two of its Directors, appoint agents to represent it, within the limits of the powers granted in the respective mandates.*

*Paragraph Five* – *In order for the powers granted to the Board to be validly exercised, the signature will always be required of two Directors, or of one of them, accompanied by a representative with special powers, granted in accordance with Paragraph Four, or of two agents jointly, subject to the same rules for the grant of the mandates.*

**MINUTES OF BOARD OF DIRECTORS MEETING OF 10.31.2007 (pages 148/150)**: The resignation of Director ERNANI FONSECA NETO was deliberated on.

**MINUTES OF BOARD OF DIRECTORS MEETING OF 12.18.2007 (pages 151/153):** The election of Mr. ROBERTO VIEIRA DA SILVA DE OLIVEIRA COSTA to be a member of the Board of Directors was approved, with a term to run until the OSM that examined the Bank's financial statements of the fiscal year ending on 12.31.2008.

**MINUTES OF THE ORDINARY AND EXTRAORDINARY SHAREHOLDER MEETING OF 4.23.2008 (pages 154/174**)

Among the most significant changes that occurred at these meetings are the following:

- ✓ Partial amendment of the Bylaws, including among its purpose the authorization to conduct foreign exchange operations, with the following wording:

*Article 3*
*The Company purpose is to conduct asset, liability and accessory and service operations inherent to the respective authorized portfolios (commercial and investments), including foreign exchange operations, according to the applicable legal and regulatory provisions in effect.*

- ✓ Establishment of the Audit Committee and approval of GILBERTO BRAGA, MIGUEL VARGAS FRANCO NETTO and PAULO ROBERTO BARRAL to make up the respective Committee, pursuant to the following terms:

*Article 34*
*The Company shall have an Audit Committee, composed of three (3) members, with a one (1) year term, appointed and removed by the Board of Directors.*
*Sole Paragraph*- *In addition to the powers established in the law or regulations, the following will also be the responsibilities of the Audit Committee:*

*a) recommend to the Board of Directors the entity to be hired to provide the independent auditing services and the respective compensation, as well as its replacement;*
*b) review, before disclosing to the Market, the accounting statements, including explanatory notes, management reports and the independent auditor's opinion;*



# BANCO CENTRAL DO BRASIL

*c) evaluate the effectiveness of the independent and internal audits, including in regard to the verification of compliance with the legal and normative rules applicable to the Company, in addition to the internal regulations and codes;*

*d) evaluate compliance by the Company's Board, of the recommendations made by the independent or internal auditors, and recommend to the Board of Directors the solution for any conflicts between the external auditors and the Board;*

*e) establish and disclose procedures for receipt and handling of information on the breach of legal and normative provisions applicable to the Company, as well as internal regulations and codes, including determining specific procedures for protection of the provider of the information and confidentiality;*

*f) recommend to the Company Board the correction or improvement of policies, practices and procedures identified within the scope of its responsibilities;*

*g) meet, at least quarterly, with the Company's Board and independent and internal Auditors;*

*h) verify, at the time of its meetings, compliance with its recommendations and/or clarifications to its questions, including in regard to the planning of the respective audit works, formalizing the content of these meetings in Minutes;*

*i) establish the rules for its operation.*

**MINUTES OF BOARD OF DIRECTORS MEETING OF 10.31.2008 (pages 175/176):** The following were deliberated: i) the removal of João Lara de Souza Meireles from the position of Director and Member of the Company's Credit Committee, and ii) the resignation request of Luiz Whately Thompson from the position of Company Director.

**MINUTES OF BOARD OF DIRECTORS MEETING OF 12.3.2008 (pages 178/179):**
The election was approved of RENATO ALVES RABELLO as Company Director, without a specific designation, with a term until those elected at the 1st meeting of the Board of Directors that is held after the Ordinary Shareholder Meeting – OSM, of 2009, take office.

**MINUTES OF THE ORDINARY AND EXTRAORDINARY SHAREHOLDER MEETING OF 4.27.2009 (pages 180/196):** Among the most significant changes that occurred at these meetings are the following**:**

1. Re-election of the members of the Company's Board of Directors, for a term of two (2) years, LUIS FELIPPE INDIO DA COSTA, LUIS OCTAVIO AZEREDO LOPES INDIO DA COSTA, FABIO ROCHA DO AMARAL, HORÁCIO MARTINHO LIMA, CHARLES ALEXANDER FORBES, and as Independent Director, PROGRESO VAÑO PUERTO.

2. Amend Article 5 of the Bylaws, updating the representation of the Company's Capital Stock, as a result of the repurchase of shares during the 2008 fiscal year, with the cancellation of a total of 6,906,204 preferred shares, which were cancelled as a result of the share repurchase program. Thus, Article 5 of the Company Bylaws went into effect with the following wording:

14



# BANCO CENTRAL DO BRASIL

*Article 5*
*The Capital Stock is R$ 769,195,785.00 (seven hundred sixty-nine million, one hundred ninety-five thousand, seven hundred eighty-five reais), divided into and represented by 138,311,701 (one hundred thirty-eight million, three hundred eleven thousand, seven hundred one) shares, all not-to-bearer, book entry and without face value, of which 99,897,555 (ninety-nine million, eight hundred ninety-seven thousand, five hundred fifty-five) are common shares and 38,414,146 (thirty-eight million, four hundred fourteen thousand, one hundred forty-six) are preferred shares.*

**MINUTES OF BOARD OF DIRECTORS MEETING OF 7.16.2009 (pages 197/203**):
Among the most significant changes in this meeting are the following:

1. Designation of Director LUIS FELIPE INDIO DA COSTA for the position of President of the Company's Board of Directors and Director LUIS OCTAVIO AZEREDO LOPES INDIO DA COSTA for the position of Vice-President of the Board.

   2. Re-election of: FABIO CARAMURU CORREA MEYER, JOSÉ CARLOS LIMA DE ABREU, MARIA LUISA GARCIA DE MENDONÇA, RENATO ALVES RABELLO, ROBERTO VIEIRA DA SILVA DE OLIVEIRA COSTA, and SERGIO MARRA PEREIRA CAPELLA, as Directors, without a specific designation, and of LUIS FELIPPE INDIO DA COSTA as Director of Investor Relations and of LUIS OCTAVIO AZEREDO LOPES INDIO DA COSTA as CEO. All have terms that will run until those elected at the 1st Meeting of the Board of Directors, held after the 2011 Ordinary Shareholder Meeting are sworn into office.

3. Re-election of the Members of the Audit Committee, GILBERTO BRAGA (Committee Coordinator), MIGUEL VARGAS FRANCO NETTO and PAULO ROBERTO BARRAL, with terms until the 1st Meeting of the Board of Directors, held after the 2011 Ordinary Shareholder Meeting.

**MINUTES OF THE ORDINARY AND EXTRAORDINARY SHAREHOLDER MEETINGS OF 4.30.2010** (pages 204/267): **Among the most significant changes in this meeting are the following:**

✓ Ratification of repurchase of 2,944,223 preferred shares and cancellation of another 1,584,223 preferred shares. With this, Article 5 of the Bylaws will now go into effect with the following wording:

*Article 5*
*The Capital Stock is R$ 769,195,785.00 (seven hundred sixty-nine million, one hundred ninety-five thousand, seven hundred eighty-five reais), divided into and represented by 136,727,478 (one hundred thirty-six million, seven hundred twenty-seven thousand, four hundred seventy-eight) shares, all not-to-bearer, book entry and without face value, of which 99,897,555 (ninety-nine million, eight hundred, ninety-seven thousand, five hundred*

15



**BANCO CENTRAL DO BRASIL**

*fifty-five) are common shares and 36,829,923 (thirty-six million, eight hundred twenty-nine thousand, nine hundred twenty-three) are preferred shares.*

✓ Amendment of the Company By-laws, to expressly state, among the attributions of the Board of Directors, the authority to appoint, remove and substitute members of the Company's Audit Committee, as well as to pass resolutions on the distribution of the annual compensation of this Committee, containing the following wording:

***Article 17***

***[...]***

*m) appoint and remove members of the Audit Committee, indicate their replacements in cases of impediment, absence or vacancy;*
*n) deliberate on the distribution of the annual compensation set by the Shareholder Meeting among the members of the Audit Committee;*

✓ Adaptation of Chapter VII of the Company's Bylaws, which will now contain detailed criteria for appointment and removal of the members of the Audit Committee:

***Article 34***

*The Company will have an Audit Committee, composed of three (3) members, with a one (1) year term, appointed and removed by the Board of Directors, and one of the members will be designated as the Coordinator.*

***[...]***

***Article 37***

*In addition to the responsibilities established in the law or regulations, the following will also be the tasks of the Audit Committee:*

    *a) Recommend to the Board of Directors the entity to be hired to provide the independent auditing services and the respective compensation, as well as its replacement;*
    *b) Review, before disclosing to the Market, the accounting statements, including explanatory notes, management reports and the independent auditor's opinion;*
    *c) Evaluate the effectiveness of the independent and internal audits, including in regard to the verification of compliance with the legal and normative rules applicable to the Company, in addition to the internal regulations and codes;*
    *d) Evaluate compliance by the Company's Board, of the recommendations made by the independent or internal auditors, and recommend to the Board of Directors the solution for any conflicts between the external auditors and the Board;*

16



**BANCO CENTRAL DO BRASIL**

e) *Establish and disclose procedures for receipt and handling of information on the breach of legal and normative provisions applicable to the Company, as well as internal regulations and codes, including determining specific procedures for protection of the provider of the information and confidentiality;*

f) *Recommend to the Company Board, the correction or improvement of policies, practices and procedures identified within the scope of its responsibilities;*

g) *Meet, at least quarterly, with the Company's Board and independent and internal Auditors;*

h) *Verify, at the time of its meetings, compliance with its recommendations and/or clarifications to its questions, including in regard to the planning of the respective audit works, formalizing the content of these meetings in Minutes;*

i) *Establish the operating rules,,formalized in writing and made available to the respective shareholders, which shall be approved by the Board of Directors.*

**MINUTES OF BOARD OF DIRECTORS MEETING OF 5.7.2010 (pages 268/272):**
Among the most significant changes in this meeting are the following:

1. Ratification of the term of the Audit Committee, elected in the minutes of the Board of Directors meeting held on 7.16.2009,  to state that the mandate ends when those elected at the 1st Board of Directors meeting held after the 2010 Ordinary Shareholder Meeting take office.

2. Re-election of the members of the Audit Committee, with one-year terms: GILBERTO BRAGA (Audit Committee Coordinator), MIGUEL VARGAS FRANCO NETTO and PAULO ROBERTO BARRAL.

**MINUTES OF THE ORDINARY SHAREHOLDER MEETING OF 4.29.2011  (pages  273/288):**
Among the most significant changes that occurred at this meeting are the following:

1. Election of the members of the Board of Directors, with two-year terms: LUIS OCTAVIO AZEREDO LOPES INDIO DA COSTA (President), FABIO ROCHA DO AMARAL, HORÁCIO MARTINHO LIMA, CHARLES ALEXANDER FORBES (Vice-President), FLAVIO NUNES FERREIRA RIETMANN, and PROGRESO VAÑO PUERTO (Independent Director),  with terms until the Ordinary Shareholder Meeting that examines the financial statements of the fiscal year ending on 12.31.2012.

**MINUTES OF BOARD OF DIRECTORS MEETING OF 4.29.2011 (pages 289/294):**
Among the most significant changes in this meeting are the following:

17



# BANCO CENTRAL DO BRASIL

1. Designation for the positions of President and Vice-President of the Company's Board of Directors, respectively: LUIS OCTAVIO AZEREDO LOPES INDIO DA COSTA and CHARLES ALEXANDER FORBES.

2. Election of the members of the Company's Board of Directors, with two-year terms: FABIO CARAMURU CORREA MEYER, JOSÉ CARLOS LIMA DE ABREU, MARIA LUISA GARCIA DE MENDONÇA, RENATO ALVES RABELLO, ROBERTO VIEIRA DA SILVA DE OLIVEIRA COSTA, and SERGIO MARRA PEREIRA CAPELLA, as Directors, without a specific designation, of LUIS OCTAVIO AZEREDO LOPES INDIO DA COSTA as CEO and Director of Investor Relations, in charge of both positions.

3. Re-election of the members of the Audit Committee: GILBERTO BRAGA (Audit Committee Coordinator), MIGUEL VARGAS FRANCO NETTO and PAULO ROBERTO BARRAL, with a one-year term.

**MINUTES OF BOARD OF DIRECTORS MEETING OF 10.27.2011 (pages 295/296):**
Approved the resignation of Renato Alves Rabello from the position of Director.

**MINUTES OF BOARD OF DIRECTORS MEETING OF 3.1.2012 (pages 298/299):**
Approved the request for temporary leave without remuneration of Charles Alexander Forbes from the position of Vice President of the Board of Directors, for private reasons, for a period of 6 months.

**MINUTES OF THE ORDINARY AND EXTRAORDINARY SHAREHOLDER MEETING OF 4.30.2012 (pages 300/334):** Among the most significant changes that occurred at these meetings are the following:

1. **Ratify the acquisition of 88.7194% of the capital stock of Banco Prosper S/A, made in the fiscal year ending on December 31, 2011, approved in the Minutes of the Board of Directors Meeting held on December 26, 2011.**

2. Alteration of Sole Paragraph of Article 1 to adapt it to the new provisions in the Level 1 Corporate Governance Listing Regulation of BM&FBOVESPA S/A, Stock, Commodities and Futures Market, which will now go into effect with the following wording:

*Article 1*

*[...]*

*Paragraph One – With the Company's admission to the special listing segment called Level 1 Corporate Governance Listing Regulation of BM&FBOVESPA S/A – Stock, Commodities and Futures Market ("BM&FBOVESPA") the Company, its shareholders, Directors and members of the Audit Committee, when established, are subject to the*

18

**BANCO CENTRAL DO BRASIL**

*provisions of Level 1 Corporate Governance Listing Regulation of BM&FBOVESPA ("Level 1 Regulation").*

3. Alteration of Article 2 in order to extend the Company's headquarters, which will now go into effect with the following wording:

**Article 2**
*The headquarters and jurisdiction of the Company is at Rua Funchal, 418, 6, 7, 8, and 9 andares, in the city of São Paulo, state of São Paulo, and through a resolution of the Board, it may open offices anywhere in the country or abroad, subject to the legal requirements.*

4. Alteration of Article 11 in order to adapt it to the new provisions in the Level 1 Listing Regulation of Corporate Governance of BM&FBOVESPA SA – Stock, Commodities and Futures Market, which will now go into effect with the following wording:

**Article 11**
*In order for the members of the Board of Directors and the Management Board to take office, they must first sign the Director Consent Statement pursuant to the terms of the provision in the Level 1 Regulation, and comply with applicable legal requirements.*

5. Alteration of the heading of Article 13 to adapt it to the new provisions of Law 12.431, of June 24, 2011 that altered Law 6.404/1976, which will now go into effect with the following wording:

**Article 13**
*The Board of Directors will be composed of at least six (6) and at most nine (9) members, all elected and subject to removal by the Shareholder Meeting, with a unified term of two years; with re-election allowed.*

6. Alteration of line "m" and inclusion of lines "o" and "p" in Article 17 to adapt it to the provisions in CMN Resolution no. 3.921/2010, with the following wording:

**Article 17**
**(...)**

*m) appoint and remove members of the Audit Committee and the Compensation Committee, indicate their replacements in cases of impediment, absence or vacancy;*
        *...*
*o) ensure that members of the Compensation Committee comply with the requirements in the rules of the Central Bank of Brazil in effect;*
*p) supervise the planning, operation, control, and review of the compensation policy of the Company Directors, subject to the proposals of the Compensation Committee.*

19



**BANCO CENTRAL DO BRASIL**

7. Alteration of Article 33 to adapt it to the new provisions in Level 1 Corporate Governance Listing Regulation of BM&FBOVESPA S/A - Stock, Commodities and Futures, which will now go into effect with the following wording:

*Article 33*

*The Company and the directors shall, at least once a year, hold a public meeting with analysts and any other interested parties to disclose information in regard to their respective economic-financial situation projects and perspectives, and send to BM&FBOVESPA, with disclosure by December 10 of each year, an Annual Calendar for the following calendar year, containing at least the information required by the Level 1 Regulation.*

8. Alteration of paragraphs three and four of Article 38 to adapt them to the new provisions of the Level 1 Corporate Governance Listing Regulation of BM&FBOVESPA S/A - Stock, Commodities and Futures Market, with the following wording:

*Article 38*

*[...]*

*Paragraph Three – The Company shall not record any transfer of shares to the Purchaser, or to whomever may come to hold Control, until this/these shareholder(s) has/have signed the Controller Consent Statement referred to in the Level 1 Regulation, which shall be immediately sent to BM&FBOVESPA.*

*Paragraph Four – The Company shall not record any shareholder agreement that refers to the exercise of Control until its signatories have signed the Controller Consent Statement referred to in the Level 1 Regulation, which shall be immediately sent to BM&FBOVESPA.*

9. Alteration of Article 42 to reflect the new name of BOVESPA, which is now called BM&FBOVESPA, which will now go into effect with the following wording:

*Article 42*

*In the event that the shareholders at an Extraordinary Shareholder Meeting vote: (i) to discontinue the Differentiated Practices of Corporate Governance of Level 1 so that the Company shares are registered for negotiation outside Level 1, (ii) for company reorganization in which the resulting company would not be not admitted at Level 1, or (iii) for exclusion or limitation of the provision in Articles 7 (Line "c"), 13 (Paragraphs Three and Four), 38, 39, 40, 41, 42, 43, 44, and 45 of these Bylaws, which results in a loss for shareholders that do not have Control, except if said exclusion or limitation is the consequence of a legal or regulatory provision issued by BM&FBOVESPA, the Controlling Shareholder shall make a public offer for share purchase of the other shareholders of the Company, and the minimum price to be offered shall*

20



**BANCO CENTRAL DO BRASIL**

*correspond to the Economic Value, calculated in an assessment report referred to in Article 43 below, subject to the applicable legal and regulatory rules.*

***Sole Paragraph*** *– The controlling Shareholder is not required to make the public offer referred to in the heading of this Article 41, if the Company has discontinued the Differentiated Corporate Governance Level 1 Practices due to the signature of a participation contract by the Company in the special segment of BM&FBOVESPA called Level 2 or New Market.*

10. Alteration of Article 45 to adapt it to the new provisions in Level 1 Corporate Governance Listing Regulation of BM&FBOVESPA S/A - Stock, Commodities and Futures Market and Arbitration Regulation, which will now go into effect with the following wording:

***Article 45***
*The Company, its shareholders, Directors, and members of the Audit Committee (when existing), shall settle, through arbitration, any and all disputes or controversies that may arise between them, related to or originating from, in particular, the application, validity, effectiveness, interpretation, violation and its effects, of the provisions contained in the Corporations Act, in the Company's Bylaws, in the standards issued by the National Monetary Council, by the Central Bank of Brazil and by the CVM, as well as in the other standards applicable to the functioning of the capital market in general, as well as those rules listed in Level 1 Regulation, of the Arbitration Regulation, Level 1 Corporate Governance Differentiated Practices Contract.*

11. Inclusion of Chapter XIII directed to the Compensation Committee to comply with CMN Resolution no. 3921/2010, which will now go into effect with the following wording:

***CHAPTER XIII – COMPENSATION COMMITTEE***

***Article 49***
*The Company will have a Compensation Committee, which will act on behalf of all the Institutions that make up the Cruzeiro do Sul Conglomerate, as the leading Institution, to comply with the tasks and responsibilities, pursuant to the terms of the applicable legislation.*

***Article 50***
*The Compensation Committee will be comprised of at least three (3) members with a two (2) year term, appointed and subject to removal by the Board of Directors, at the 1st meeting held after the Ordinary Shareholder Meeting, with one of the members not a director. The position of member of the Compensation Committee is not remunerated when the member is on the Board of Directors or is a Company employee or an employee of the Sul Conglomerate. If the member does not meet these criteria, the Board of Directors will stipulate his/her compensation.*

***Paragraph One*** *– Members cannot remain on the Compensation Committee for a period greater than ten (10) years.*



# BANCO CENTRAL DO BRASIL

*Paragraph Two* – *The members of the Compensation Committee shall have the necessary qualifications and experience for the exercise of competent and independent judgment on the Company's compensation policy, including on the repercussions of this policy on risk management.*

*Paragraph Three* – *The removal of members of the Compensation Committee will require a resolution passed by a majority of the members of the Board of Directors.*

*Paragraph Four* – *The Compensation Committee will report directly to the Company's Board of Directors.*

### Article 51
*In addition to those set forth in rules or regulations, the Compensation Committee will have the following responsibilities:*

*a) establish operating rules;*
*b) prepare the compensation policy for Company directors, proposing to the Board of Directors the different types of fixed and variable compensation, as well as benefits and special recruitment and dismissal programs;*
*c) review annually the compensation policy for Company directors, recommending to the Board of Directors its correction or improvement;*
*d) propose to the Board of Directors the overall amount of compensation for directors to be submitted to the Shareholder Meeting, pursuant to Article 152 of Law 6.404 of 1976;*
*e) evaluate future scenarios, both internal and external, and their possible impacts on the compensation policy for directors;*
*f) analyze the compensation policy for Company directors in relation to market practices, in order to identify significant discrepancies in relation to similar companies, and proposing the necessary adjustments;*
*g) ensure that the compensation policy for directors is always compatible with the risk management policy, its goals and with the Company's current and forecasted financial situation, as well as with the legal provisions in effect;*
*h) each year, within ninety days relative to the base date of December 31, prepare the document called "Compensation Committee Report," containing, at a minimum, the provisions set forth in the rules in effect;*

**MINUTES OF BOARD OF DIRECTORS MEETING OF 5.11.2012 (pages 335/336**):
The removal was approved of JOSÉ CARLOS LIMA DE ABREU from the position of Director without a specific designation at the Company.

## 2.2    Controllers

Considering the period of coverage for the purpose of determining liability (*from 6.4.2007 to 6.4.2012*), and in accordance with information obtained on the Central Bank of Brazil Information System - Sisbacen (pages 340/373), BANCO



# BANCO CENTRAL DO BRASIL

CRUZEIRO DO SUL S.A. was controlled by Mr. Luis Felippe Indio da Costa until 3.28.2011.

It has also been found that since **3.29.2011**, **CRUZEIRO DO SUL HOLDING FINANCEIRA S/A** acquired 100% of the capital stock of Banco Cruzeiro do Sul (page 368), and became the direct controller of BCSul. From this date on, Mr. Luis Felippe Indio da Costa became the indirect controller of BCSul.

**2.3        Administration**

Chapter III of the Bylaws of 1.23.2007 (**pages 75/81**) states the following in regard to the Company's Administration:

*CHAPTER III - ADMINISTRATION - SECTION I – MISCELLANEOUS*

*Article 10*
*The Company will be administered by a Board of Directors and a Management Board, in accordance with the Law and these Bylaws.*

*Article 11*
*In order for the directors to take office, they must first sign the Director Consent Statement referred to in the Level 1 Regulation.  Immediately after taking office, directors shall notify BOVESPA of the number and characteristics of the securities issued by the Company that they own directly and indirectly, including derivative securities.*

*Article 12*
*The Ordinary Shareholder Meeting will determine the annual overall amount of compensation of the Company's Directors, and the Board of Directors shall deliberate on its distribution.*

*SECTION II - BOARD OF DIRECTORS*

*Article 13*
*The Board of Directors will be comprised of at least six (6) and at most nine (9) members, all shareholders of the Company, elected by the Shareholder Meeting, with a unified two-year term, and re-election will be allowed.*

*Paragraph One – At the first meeting of the Board of Directors that is held after the election of its members, said members shall designate from among those elected, through a favorable vote of the majority of the members, one (1) President and one (1) Vice-President.*

*Paragraph Two - A Shareholder Meeting will determine by an absolute majority vote, not counting empty votes, prior to their election, the number of positions on the*

23



**BANCO CENTRAL DO BRASIL**

*Board of Directors to be filled in each fiscal year, subject to a minimum of five members.*

*Paragraph Three – At least 20% of the members of the Board of Directors shall be Independent Directors, expressly declared to be such at the Shareholder Meeting that elects them. When the application of this percentage leads to a fractional number of Directors, said number will be rounded to the full number: (i) that is immediately higher, if the fraction is equal to or greater than 0.5; or (ii) immediately lower, if the fraction is lower than 0.5.*

*Paragraph Four – For the purpose of these Bylaws, an Independent Director shall be considered one who: (i) does not have any link to the Company, except for ownership of capital stock; (ii) is not a Controlling Shareholder, spouse or relative to the second degree of a Controlling Shareholder; is not and never has been, in the past three years, linked to the company or to an entity related to the Controlling Shareholder (persons linked to teaching and/or research institutions are excluded from this restriction); (iii) in the past three years, has not been an employee or director of the Company, or the Controlling Shareholder, or employee or director of a company controlled by the Company; (iv) is not a supplier or purchaser, directly or indirectly, of services or products provided by the Company, to such a degree that it would lead to the loss of independence; (v) is not an employee or director of the company or an entity that is offering or seeking services and/or products from the Company; (vi) is not a spouse or relative to the second degree of any director of the Company; or (vii) does not receive another compensation from the Company besides that of director (any money received as a result of possible share ownership is excluded from this restriction). An Independent Director is also considered to be one who is elected under the right set forth in paragraphs four and five of Article 141 of the Corporations Act.*

*Paragraph Five – Members of the Board of Directors shall take office through a statement prepared and signed in the Book of Minutes of the Board of Directors Meetings, pending homologation of the respective positions by the competent authorities. The members of the Board of Directors may be removed at any time by the Shareholder Meeting, and shall remain in the exercise of their respective positions until their successors take office.*

*Article 14*
*In the event of an impediment or temporary absence of the President of the Board of Directors, his functions will be assumed by the Vice-President, or, in the event of an impediment or temporary absence of the latter, by another member of the Board of Directors indicated by the President.*

*Article 15*
*In the event there is a vacancy in one of the positions on the Board of Directors, the remaining members will designate a temporary substitute until the first Shareholder Meeting, which will then deliberate to elect a substitute Director on a definitive basis. The elected substitute Director will serve until the end of the term of the person being replaced.*



# BANCO CENTRAL DO BRASIL

*Sole Paragraph- In the event that the majority of the positions on Board of Directors are vacant, a Shareholder Meeting shall be called immediately to elect new Directors.*

## Article 16
*The Board of Directors will meet when called to do so by their President or by his substitute, with notice of at least five (5) business days and with presentation of the agenda of topics to be covered.*

*Paragraph One - Board of Directors meetings will be opened with the presence of the majority of the members and will be presided over by the President and the person he indicates will serve as the Secretary, with resolutions passed by a majority of votes of the Directors present, and in the event of a tie, the vote of the President of the Board of Directors or of his substitute will break the tie.*

*Paragraph Two - Independent of the formalities established in this Article, a meeting of the Board of Directors shall be considered regular if all members are present.*

*Paragraph Three - Board of Directors meetings will preferably be held at Company headquarters. Meetings can be conducted by teleconference or videoconference and such participation will be considered as a personal presence at that meeting. The members of the Management Board that participate in the meeting remotely may affirm their votes in writing, through a letter or fax delivered to the President of the Board of Directors, on the meeting date, or by digitally certified email.*

*Paragraph Four – Minutes will be prepared of the Board of Directors meetings in a separate book, and those that contain a resolution intended to cause effects before third parties shall be published. The votes given by members who participated remotely in the Board of Directors meeting will be recorded in the Board of Directors' Meeting Minutes Book, and a copy of the letter, fax or email, as the case may be, will be added to the book right after the minutes are transcribed.*

## Article 17
*In addition to those established in the Law, the Board of Directors shall have the following responsibilities:*

*a)       determine the overall guidelines for the Company's business, and supervise its performance;*
*b)       elect and remove the Management Board and determine its responsibilities, subject to the provisions in these Bylaws;*
*c)       monitor the management work of the Management Board, examine at any time the Company's books and papers, request information on contracts executed or under execution, and carry out any other acts necessary for the exercise of its functions;*



## BANCO CENTRAL DO BRASIL

      *d)*          *comment on the Directors' Report and the accounts submitted by the Management Board, and on the financial statements of the fiscal year to be submitted to the Ordinary Shareholder Meeting;*

      *e)*          *distribute the overall compensation set by the Shareholder Meeting among the members of the Board of Directors and the Management Board;*

      *f)*          *deliberate on the issue, price and payment conditions of shares and profit-sharing bonds, within the limit of authorized capital;*

      *g)*          *submit to the Shareholder Meeting a proposal for capital increase above the limit of the authorized capital, as well as any amendments to the Bylaws;*

      *h)*          *approve the declaration of intermediary and alternating dividends, as well as interest on own capital;*

      *i)*          *propose that the Shareholder Meeting deliberate on the allocation to be given to the remaining balance of profits in each fiscal year;*

      *j)*          *authorize the purchase of shares issued by the Company for the purpose of cancellation or allowing them to remain in the treasury for later sale, subject to the rules in effect;*

      *k)*          *choose and remove the Company's independent auditors; and*

      *l)*          *present the triple list of the institutions specialized in economic evaluation of companies, for the purpose of assessing the Economic Value, as set forth in Articles 37 and 38 of these Bylaws.*

## SECTION III - MANAGEMENT BOARD

### Article 18
*The Company shall be managed by ten (10) Directors, at most, and by at least two (2) Directors, whether shareholders or not, residents in the country, and elected by the Board of Directors, of which there will be one CEO, one Director of Investor Relations and the others shall not have any special designation; Directors will be allowed to serve in more than one function.*

**Sole Paragraph**- *The members of the Board of Directors, up to a maximum of 1/3 (one-third), may be elected to the Management Board.*

### Article 19
*The term of members of the Management Board will be two (2) years, and re-election will be allowed.*

### Article 20
*Directors will assume office in a statement prepared and signed in the Book of Minutes of the Management Board Meetings, pending homologation of the respective positions by the competent authorities. The members of the Management Board may be removed at any time by the Board of Directors, and shall remain in the exercise of their respective positions until their successors take office.*

### Article 21



**BANCO CENTRAL DO BRASIL**

*In cases of impediment or temporary absence of any of the Directors, the remaining Directors shall choose, among themselves, a substitute to perform the functions of the person replaced, together with his or her own functions.*

### Article 22
*In the event there is a vacancy in one of the positions on the Management Board, the Board will designate a substitute, who will temporarily serve in the functions of the substitute until the first meeting of the Board of Directors, which will then elect a substitute Director on a definitive basis. The elected substitute Director will serve until the end of the term of the person being replaced.*

### Article 23
*The Management Board will meet when called to do so by the CEO (or his substitute) or by 2/3 (two thirds) of the Directors, in both cases with at least twenty-four hours' notice.*

*__Paragraph One__ – The Management Board meetings will be declared open with the presence of at least two Directors, and resolutions will be passed by a majority of the votes of the Directors present, with the vote of the CEO prevailing in the event of a tie.*

*__Paragraph Two__ - Board of Directors meetings will preferably be held at Company headquarters. Meetings can be conducted by teleconference or videoconference and such participation will be considered as a personal presence at that meeting. The members of the Management Board that participate in the meeting remotely may affirm their votes in writing, through a letter or fax delivered to the CEO, on the meeting date, or by digitally certified email.*

*__Paragraph Three__ – Minutes will be prepared of the Management Board meeting in a separate book. The votes given by members who participated in the Management Board meeting remotely will be recorded in the Management Board Meeting Minutes Book, and a copy of the letter, fax or email, as the case may be, will be added to the book right after the minutes are transcribed.*

### Article 24
*In order to achieve the Company's objectives, the Management Board shall be vested with full powers, including the power to assume obligations, purchase, sell, and encumber real estate, provide guarantees in favor of third parties, transact, assign and waive rights, and in addition to the legal obligations, shall:*

> *a)      deliberate on the creation of offices;*
> *b)      receive the monthly balance sheets, authorizing their publication through the signature of at least two Directors, order the preparation of semester and quarterly financial statements and every year, submit the Administration Report and the Management Board's Accounts for approval of the Board of Directors, accompanied by the independent auditors' report, as well as the proposal for use of profits earned in the preceding fiscal year.*



# BANCO CENTRAL DO BRASIL

*Paragraph One* – *The CEO shall, among other responsibilities that may be established: (i) direct the performance of activities related to general Company planning; (ii) call and preside over Board meetings; (iii) conduct general supervision tasks of the Board; and (iv) propose the number of Management Board members to the Board of Directors, indicating the names of the Directors for election.*

*Paragraph Two* – *The Director of Investor Relations shall, among other responsibilities that may be established, represent the Company before the regulatory agencies and other institutions that act on the securities market, and shall provide information to investors, to the CVM, to the Central Bank of Brazil, to the stock markets in which the Company's shares are sold, and to other agencies related to the activities conducted by the Company on securities markets, in Brazil and abroad.*

*Paragraph Three* – *The responsibilities of the other Directors will be set by the Board of Directors.*

*Paragraph Four* – *The Company, may, through two of its Directors, appoint agents to represent it, within the limits of the powers granted in the respective mandates.*

*Paragraph Five* – *For the valid exercise of powers conferred on the Management Board, the signature of two Directors will always be required, or of one of them, accompanied by an agent with special powers, established pursuant to Paragraph Four, or of two agents, jointly, subject to the same rules for granting of the mandates.*

## CHAPTER IV - SHAREHOLDER MEETINGS

### Article 25
The Shareholder Meeting will ordinarily be held within the first four (4) months of each year, and will be held on an extraordinary basis when company interests so requires, subject in term of its calling, opening and deliberations to the legal precepts and to the provisions in these Bylaws.

### Article 26
The Shareholder Meeting will be called, opened and presided over by the President of the Board of Directors, or, in his absence, by his substitute, who will choose one of the shareholders to serve as Secretary.

### Article 27
In order to participate in the Shareholder Meeting, shareholders must send to the Company headquarters, at least seventy-two (72) hours before the meeting, in addition to an ID card: (i) proof of their respective share ownership, issued by the financial institution that is the depository of the book entry shares, and (ii) instrument of mandate,



# BANCO CENTRAL DO BRASIL

*duly regularized in accordance with the Law, in the case of shareholder representation.*

Considering the coverage period for the determination of liability (*from 6.4.2007 to 6.4.2012*), the ex-directors and members of the Board of Directors of BANCO CRUZEIRO DO SUL S.A. are listed below:

## BOARD OF DIRECTORS

**Management period: From ESM of 1.23.2007 to OSM of 4.29.2011** *(pages 70/72; 180/183 and page273)*

| Name | CPF | Position |
|------|-----|----------|
| Luis Felippe Indio da Costa | 006.034.067-34 | Controller / President of the Board |
| Luis Octavio Azeredo Lopes Indio da Costa | 782.474.977-00 | Vice-President of the Board |
| Progresso Vaño Puerto | 410.915.908-34 | Independent Director |
| Fabio Rocha do Amaral | 076.593.208-31 | Director |
| Charles Alexander Forbes | 001.906.918-91 | Director |
| Horácio Martinho Lima | 745.862.547-37 | Director |

**Management period: From OSM of 4.29.2011 until 6.4.2012** *(pages 273/288)*

| Name | CPF | Position |
|------|-----|----------|
| Luis Octavio Azeredo Lopes Indio da Costa | 782.474.977-00 | President of the Board |
| Progresso Vaño Puerto | 410.915.908-34 | Independent Director |
| Fabio Rocha do Amaral | 076.593.208-31 | Director |
| Charles Alexander Forbes *(a)* | 001.906.918-91 | Vice-President of the Board |
| Horácio Martinho Lima | 745.862.547-37 | Director |
| Flavio Nunes Ferreira Rietmann | 913.629.627-91 | Director |

(a) Temporarily left on 3.1.2012, for personal reasons (medical treatment), without compensation, according to pages 297/299.

## MANAGEMENT BOARD

**Management period: Minutes of Board of Directors Meeting of 1.23.2007** *(pages 90/92)* **until** OSM of 4.27.2009 (*OSM that examined the Financial Statements ending on 12.31.2008, pages 180/198*), **in practice, 7.16.2009**

| Name | CPF | Position |
|------|-----|----------|
| Luis Octavio Azeredo Lopes Indio da Costa | 782.474.977-00 | CEO |
| Luis Felippe Indio da Costa | 006.034.067-34 | Controller / Director of Investor Relations |
| Ernani Fonseca Neto *(b)* | 625.936.257-91 | Director |
| Fabio Caramuru Correa Meyer | 715.168.917-91 | Director |
| João Lara de Souza Meirelles Filho *(c)* | 644.384.148-49 | Director |
| José Carlos Lima de Abreu | 385.584.168-34 | Director |
| Luiz Whately Thompson *(d)* | 029.335.198-87 | Director |

29



# BANCO CENTRAL DO BRASIL

| | | |
|---|---|---|
| Maria Luisa Garcia de Mendonça | 380.376.616-87 | Director |
| Sergio Marra Pereira Capella | 041.247.618-56 | Director |
| Roberto Vieira da Silva de Oliveira Costa *(e)* | 769.344.037-20 | Director |
| Renato Alves Rabello *(f)* | 527.747.408-00 | Director |

(b)     Resigned on 10.31.2007, according to Minutes of BDM of 10.31.2007 (pages 148/150).

(c)     Was **removed** on 10.31.2008, according to Minutes of BDM of 10.31.2008 (pages 175/176).

(d)     Resigned on 10.31.2008, according to Minutes of BDM of 10.31.2008 (pages 175/176).

(e)     Led the company during the period from the Minutes of Board of Directors Meeting of **12.18.2007** (pages 152/153) until the OSM of 4.27.2009 (OSM that examined the Financial Statements ending on 12.31.2008, pages 180/198), but which in practice was until **7.16.2009**.

(f)     Led the company during the period from the Minutes of Board of Directors Meeting of **12.3.2008 until 7.16.2009** (1st Meeting of the Board of Directors held after the 2009 OSM, pages 199/201).

**Management period: Minutes of Board of Directors Meeting of 7.16.2009** *(pages 199/201)* **until 4.29.2011** *(1st Meeting of the Board of Directors, after the OSM of 2011, pages 289/294)*

| Name | CPF | Position |
|---|---|---|
| Luis Octavio Azeredo Lopes Indio da Costa | 782.474.977-00 | CEO |
| Luis Felippe Indio da Costa | 006.034.067-34 | Controller / Director of Investor Relations |
| Roberto Vieira da Silva de Oliveira Costa | 769.344.037-20 | Director |
| Renato Alves Rabello | 527.747.408-00 | Director |
| Fabio Caramuru Correa Meyer | 715.168.917-91 | Director |
| José Carlos Lima de Abreu | 385.584.168-34 | Director |
| Maria Luisa Garcia de Mendonça | 380.376.616-87 | Director |
| Sergio Marra Pereira Capella | 041.247.618-56 | Director |

**Management period: Minutes of Board of Directors Meeting of 4.29.2011 until 6.4.2012** *(pages 289/294)*

| Name | CPF | Position |
|---|---|---|
| Luis Octavio Azeredo Lopes Indio da Costa | 782.474.977-00 | Director of Investor Relations and CEO |
| Roberto Vieira da Silva de Oliveira Costa | 769.344.037-20 | Director |
| Renato Alves Rabello *(g)* | 527.747.408-00 | Director |
| Fabio Caramuru Correa Meyer | 715.168.917-91 | Director |
| José Carlos Lima de Abreu *(h)* | 385.584.168-34 | Director |
| Maria Luisa Garcia de Mendonça | 380.376.616-87 | Director |
| Sergio Marra Pereira Capella | 041.247.618-56 | Director |

(g)     Resigned on 10.27.2011, according to Minutes of BDM of 10.27.2011 (pages 295/297).

(h)     Was **removed** on 5.11.2012, according to Minutes of BDM of 5.11.2012 (pages 335/336).



# BANCO CENTRAL DO BRASIL

## 2.4        Powers-of-Attorney

In response to the correspondence sent by this Investigation Commission, CI – CSBANCO – 2012/020, of 7.23.2012 (*page 374*), the Credit Guarantee Fund - CGF sent copies of the powers-of-attorneys granted by **BANCO CRUZEIRO DO SUL S.A.** inherent to the activities conducted within the scope of the São Paulo and Rio de Janeiro offices, in the period from 11.23.2006 to 12.31.2012.

The attorneys-in-fact appointed by **BANCO CRUZEIRO DO SUL S.A.**, whose powers-of-attorney were valid in the past five years (*pages 375/500*), are listed in the charts below:

### 2007

| BANCO CRUZEIRO DO SUL S/A | | |
|---|---|---|
| **POWER-OF-ATTORNEY GRANTED IN A PUBLIC INSTRUMENT** | | |
| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
| Flávio Nunes Ferreira Rietmann<br>Adolpho Eugênio Nardy Filho<br>Fabio Rocha do Amaral<br>Horácio Martinho Lima<br>Charles Alexandre Forbes<br>José Luiz Brunetto<br>Afonso Henrique Vieira da Silva<br>Ernani Fonseca Neto<br>Sergio Marra Pereira Capella<br>Maria Luisa Garcia de Mendonça | Represent the Bank at Financial Institutions, with the power to open and make transactions in current accounts, including Bacen, BNDES; sign deeds for the purchase and sale of real estate; give and receive release from debt; duplicate invoices and other credit instruments; sign letters of guarantee; sign contracts and agreements; represent the Bank at government offices, including the Federal Revenue Office; receive and give release; | 12.22.2006 to 12.31.2007 |
| Sebastião Teixeira de Assumpção | Open, and made transactions in current accounts, sign checks, payment orders, request checkbooks, Credit Order Documents, endorse checks; represent the Bank before other banks, including Banco do Brasil, Central Bank of Brazil, Banco Crédito Real and Banco Bradesco; | 12.22.2006 to 12.31.2007 |
| Almir ferreira dos Santos | Represent the Bank before Banco Bradesco in order to access the PAG-FOR Bradesco – Consigned Credit Services, open and make transactions in current accounts, sign checks, payment orders, request checkbooks, Credit Order Documents, endorse checks; represent the Bank before other banks, including Banco do Brasil, Central Bank of Brazil, Banco Crédito Real and Banco Bradesco; | 12.22.2006 to 12.31.2007 |
| Marcio Serra Dreher<br><br>Marcelo Xando Baptista | Represent the Bank before Financial Institutions and fund managers, with the power to sign contracts and agreements, declarations, comply with requirements and present documents, sign correspondence; | 12.22.2006 to 12.31.2007 |



# BANCO CENTRAL DO BRASIL

| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
|---|---|---|
| Flávio Nunes Ferreira Rietmann<br><br>José Luiz Brunetto<br><br>Roberto Augusto Valente<br><br>Mauricio Fonseca Menezes | Represent the Bank at Financial Institutions, with the power to open and make transactions in current accounts, including Bacen, BNDES; sign deeds for the purchase and sale of real estate; give and receive release from debt; endorse duplicate invoices and other credit instruments; sign letters of guarantee; sign contracts and agreements; represent the Bank at government offices, including the Federal Revenue Office; receive and give release; | 9.19.2007 to 12.31.2007 |
| Edilza Rodrigues Campos<br><br><br>Sebastião Teixeira de Assumpção | Represent the Bank at Financial Institutions, with the power to open and make transactions in current accounts, including Bacen, BNDES; sign deeds for the purchase and sale of real estate; give and receive release from debt; endorse duplicate invoices and other credit instruments; sign letters of guarantee; sign contracts and agreements; represent the Bank at government offices, including the Federal Revenue Office; receive and give release; represent the Bank before Banco Bradesco in order to access the PAG-FOR Bradesco – Consigned Credit Services, open and make transactions in current accounts, sign checks, payment orders, request checkbooks, Credit Order Documents, endorse checks; represent the Bank before other banks, including Banco do Brasil, Banco Central do Brasil, Banco Crédito Real and Banco Bradesco; | 9.19.2007 to 12.31.2007 |
| Marcio Serra Dreher<br><br>Marcelo Xando Baptista | Represent the Bank at Financial Institutions, with the power to open and make transactions in current accounts, including Bacen, BNDES; sign deeds for the purchase and sale of real estate; give and receive release from debt; endorse duplicate invoices and other credit instruments; sign letters of guarantee; sign contracts and agreements; represent the Bank at government offices, including the Federal Revenue Office; receive and give release; represent the Bank before Financial Institutions and fund managers, with the power to sign contracts and agreements, declarations, correspondence and present documents; | 9.19.2007 to 12.31.2007 |

32



# BANCO CENTRAL DO BRASIL

| POWER-OF-ATTORNEY GRANTED IN A PUBLIC INSTRUMENT | | |
|---|---|---|

| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
|---|---|---|
| Fabio Caramuru Correa Meyer<br><br>João Lara de Souza Meirelles Filho | Sign contracts and bank credit notes, as well as other instruments related to credit operations in the middle market modality, such as: admission of debt, discount of securities, guaranteed current account, and bank guarantee as release documents. | 11.23.2006 to 12.31.2007 |

| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
|---|---|---|
| Wanderley de Araujo Abreu<br>Roberto Augusto Valente<br>Cristiane Paciulli Capella<br>Guilherme Fausto Menezes<br>Sandra Maria Alves Rabah<br>Marta Valeria Honorio Dantas<br>Sergio Marra Pereira Capella<br>Marta Valeria Honorio Dantas<br>Francilene Matildes Santos<br>Fabiana Chagas de Paula<br>Ana Claudia de Oliveira Novaes<br>Marion Soares Rosa<br>Patricia Pita<br>Samuel da Silva Cabral Junior<br>Tatiana Nery da Costa<br>Izabel Chacharski<br>Denise Alves Soares dos Santos<br>Daniela Maria Amaral Figueiredo<br>Rosana Maria de Souza<br>Daniele dos Santos Ramos<br>Ronaldo de Freitas Correa<br>Ana Claudia da Silva Oliveira<br>Flaviane lima da Cruz<br>Jennifer Alvarenga<br>Francisco Eduardo da Costa Piquet | Sign Agreement Form for Personal Installment Credit with Payroll Consignment, Application Forms, Official letters addressed to municipal, state and federal government offices, specifically in regard to the request for codes for payroll consignment, authorization for annotation on contracts and annotation of renegotiations between civil servants and the Bank, sign release documents for civil servants. | 9.13.2007 to 12.31.2007 |

33



# BANCO CENTRAL DO BRASIL

| BANCO CRUZEIRO DO SUL S/A | | |
|---|---|---|
| | | |
| POWER-OF-ATTORNEY GRANTED IN A PUBLIC INSTRUMENT | | |
| | | |
| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
| Guilherme Fausto Menezes<br>Roberto Augusto Valente<br>Wanderley de Araujo Abreu<br>Ronaldo de Freitas Correa<br>Sergio Marra Pereira Capella<br>Rosana Maria de Souza<br>Samuel da Silva Cabral Junior | Represent the Bank at the Central Superintendence of Administration and Payment of Personnel of the Government of Minas Gerais to sign the field for the Signature of person responsible of Attachment II relative to Consignments. | 12.27.2007 to 12.31.2008 |
| | | |
| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
| Cristiane Paciuli Capella<br><br>Eduardo Eterovick<br><br>Fausto Vaz Guimarães<br><br>Flavio Nunes Ferreira Rietmann<br><br>Jose Luiz Brunetto<br><br>Marcelo Xando Baptista<br><br>Marcio Serra Dreher<br><br>Mauricio Fonseca Menezes<br><br>Ricardo Xavier Bartles<br><br>Roberto Augusto Valente<br><br>Roberto Jose Pereira Capalbo<br><br>Roberto Tuna Correia<br><br>Roberto Vieira da Silva de Oliveira Costa<br><br>Sergio Dias<br><br>Sebastião Teixeira de Assumpção<br><br>Waldemar Popov | Represent the Bank at Financial Institutions, with the power to open and make transactions in current accounts, including Bacen, BNDES; sign deeds for the purchase and sale of real estate; give and receive release from debt; duplicate invoices and other credit instruments; sign letters of guarantee; sign contracts and agreements; represent the Bank at government offices, including the Federal Revenue Office; receive and give release; releases and receive court summons, represent the Bank before Banco Bradesco in order to access the PAG-FOR BRADESCO – CONSIGNED CREDIT SERVICES for INSS beneficiaries, through data transmission; sign contracts and agreements; | 1.28.2008 ate 31.12.2008 |
| | | |
| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
| Jessica de Almeida Rodrigues<br>Francielene Matildes Santos<br>Vanessa Abreu de Souza | Make annotations on contracts at the Regional Labor Court 1st Region - RJ | 6.24.2008 to 12.31.2008 |

34



# BANCO CENTRAL DO BRASIL

| POWER-OF-ATTORNEY GRANTED IN A PUBLIC INSTRUMENT | | |
|---|---|---|
| **Attorneys-in-fact Appointed** | **Summary of Powers Granted** | **Period in Effect** |
| Wanderley de Araujo Abreu<br>Roberto Augusto Valente<br>Cristiane Paciulli Capella<br>Guilherme Fausto Menezes<br>Sandra Maria Alves Rabah<br>Marta Valeria Honorio Dantas<br>Paula Olivia Melo Portugal<br>Francilene Matildes Santos<br>Ana Claudia de Oliveira Novaes<br>Marion Soares Rosa<br>Patricia Pita<br>Samuel da Silva Cabral Junior<br>Tatiana Nery da Costa<br>Izabel Chacharski<br>Denise Alves Soares dos Santos<br>Daniela Maria Amaral Figueiredo<br>Rosana Maria de Souza<br>Daniele dos Santos Ramos<br>Ronaldo de Freitas Correa<br>Flaviane lima da Cruz<br>Karla de Carvalho Freitas<br>Luciana Carla Lima de Silva<br>Hozaneide Itamara de Souto<br>Flavia de Souza Costa<br>Francisca Glenaide Oliveira Loureto<br>Edilaine Cristina de Camargo Fourti Ferraz<br>Glaciele Ribeiro Franco<br>Carla Roberta Martins Santos<br>Tatiane Leme de Castro<br>Patricia Portela Aguiar<br>Kelli Cristina Oliberia de Abreu<br>Meryleide Munis de Oliviera<br>Francisco Eduardo da Costa Piquet<br>Carolina de Oliveira Lemos<br>Rubia do Nascimento Vieira de Oliveira<br>Ana Paula Sobral Pacifico<br>Eliana Aparecida Bartolini Nunes<br>Marcia Figueiredo Alonso<br>Carla da Silva Cabrera | Sign Agreement Form for Personal Installment Credit with Payroll Consignment, Application Forms, Official letters addressed to municipal, state and federal government offices, specifically in regard to the request for codes for payroll consignment, authorization for annotation on contracts and annotation of renegotiations between civil servants and the Bank, sign release documents for civil servants. | 1.02.2008 to 12.31.2008 |

| **Attorneys-in-fact Appointed** | **Summary of Powers Granted** | **Period in Effect** |
|---|---|---|
| Alfredo Michael Seegerer | Represent the bank at the Central Bank of Brazil in order to obtain information on and to examine proceeding 031204479. | 4.01.2008 to 4.01.2009 |

35



# BANCO CENTRAL DO BRASIL

## 2009

| BANCO CRUZEIRO DO SUL S/A |
|---|

| POWER-OF-ATTORNEY GRANTED IN A PUBLIC INSTRUMENT |
|---|

| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
|---|---|---|
| Alessandro Gonçalves de Oliveira<br>Cristiane Paciulli Capella<br>Emerson Del Re<br>Fausto Vaz Guimarães Neto<br>Flavio Nunes Ferreira Rietmann<br>Jose Luiz Brunetto<br>Marcelo de Almeida MArtins<br>Marcelo Xando Baptista<br>Marcio Serra Dreher<br>Mauricio Fonseca Menezes<br>Renato Alves Rabello<br>Ricardo Xavier Bartles<br>Roberto  Augusto  Valente<br>Roberto Jose Pereira Capalbo<br>Roberto Tuna Correia<br>Sergio Dias<br>Sebastião Teixeira de Assumpção<br>Waldemar Popov | Represent the Bank at Financial Institutions, with the power to open and make transactions in current accounts, including Bacen, BNDES; forms and documents of SELIC, CETIP and other settlement chambers pursuant to the SPB; sign deeds for the purchase and sale of real estate; give and receive release from debt; duplicate invoices and other credit instruments; sign letters of guarantee; sign contracts and agreements; represent the Bank at government offices, including the Federal Revenue Office;  receive and give release; releases and receive court summons, represent the Bank at financial institutions and fund managers; sign contracts and agreements; | 12.19.2008 to 12.31.2009 |

| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
|---|---|---|
| Fausto Vaz Guimarães Neto<br>Antonio Dominguez Regueiro<br>Solange Marques da Silva | Sign Foreign Exchange Contracts | 12.19.2008 to 12.31.2009 |

| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
|---|---|---|
| Jessica de Almeida Rodrigues<br>Francielene Matildes Santos<br>Vanessa Abreu de Souza | Make annotations on contracts at the Regional Labor Court 1st Region - RJ | 12.23.2008 to 12.31.2009 |

| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
|---|---|---|
| Guilherme Fausto Menezes<br>Roberto  Augusto  Valente<br>Wanderley de Araujo Abreu<br>Ronaldo de Freitas Correa<br>Sergio Marra Pereira Capella<br>Rosana Maria de Souza<br>Samuel da Silva Cabral Junior | Represent the Bank at the Central Superintendence of Administration and Payment of Personnel of the Government of Minas Gerais to sign the field for the Signature of the person responsible of Attachment II relative to Consignments. | 12.23.2008 to 12.31.2009 |

| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
|---|---|---|
| Antonio Dominguez Regueiro<br>Fausto Vaz Guimarães Neto<br>Galdino Alvim<br>Marco Antonio da Silva Araujo<br>Plauto Roberto Fraga de Sales<br>Renato Alves Rabello<br>Solange Marques da Silva<br>Vanderlei Aparecido Alves Arruda | Sign Foreign Exchange Contracts | 3.19.2009 to 12.31.2009 |

# CENTRAL BANK OF BRAZIL

| POWER-OF-ATTORNEY GRANTED IN A PRIVATE INSTRUMENT | | |
|---|---|---|
| **Attorneys-in-fact Appointed** | **Summary of Powers Granted** | **Period in Effect** |
| Adelia Sampaio Visgueiro Costa<br>Ana Claudia de Oliveira Novaes<br>Andreia Angeloni Toscano<br>Carla da Silva Cabrera<br>Carla Roberta Martins Santos<br>Carolina de Oliveira Lemos<br>Cecilia Bandeira de Medeiros Carneiro<br>Claudia Araujo Almeida de Oliveira<br>Cristiane Paciulli Capella<br>Daniele dos Santos Ramos<br>Denise Alves Soares dos Santos<br>Elisanne Maria Costa Silva<br>Flaviane lima da Cruz<br>Francilene Matildes Santos<br>Francisco Eduardo da Costa Piquet<br>Guilherme Fausto Menezes<br>Izabel Chacharski<br>Jessica Almeida Rodrigues<br>Luciana Coelho Leda<br>Ludmila Ribeiro Xavier de Castilho Souza<br>Karla de Carvalho Freitas<br>Marcia Figueiredo Alonso<br>Marion Soares Rosa<br>Marta Valeria Hon6rio Dantas<br>Meryleide Munis de Oliviera<br>Monica de Andrade Ramos<br>Patricia Gato Costa<br>Patricia Pita<br>Paula Olivia Melo Portugal<br>Rita de Kassia dos Santos Diniz<br>Roberto Augusto Valente<br>Ronaldo de Freitas Correa<br>Rosana Maria de Souza<br>Roseane Ximenes Silva<br>Samuel da Silva Cabral Junior<br>Sandra Mara Pacini<br>Sandra Maria Alves Rabah<br>Silvia Alves de Araujo<br>Tatiana Nery da Costa<br>Teyze Maria Monteiro de Moraes<br>Vanessa Abreu de Souza | Sign Agreement Form for Personal Installment Credit with Payroll Consignment, Application Forms, Official letters addressed to municipal, state and federal government offices, specifically in regard to the request for codes for payroll consignment, authorization for annotation on contracts and annotation of renegotiations between civil servants and the Bank, sign release documents for civil servants. | 12.17.2008 to 12.31.2009 |

| **Attorneys-in-fact Appointed** | **Summary of Powers Granted** | **Period in Effect** |
|---|---|---|
| Roberto Augusto Valente<br>Tatiana Nery da Costa<br>Barbara Cabral Bueno Brandao<br>Ana Claudia de Oliveira Novaes | Represent the Bank before the Central Bank of Brazil for the purpose of signing requests, official letters and correspondence. | 12.17.2008 to 12.31.2009 |

| **Attorneys-in-fact Appointed** | **Summary of Powers Granted** | **Period in Effect** |
|---|---|---|
| Ana Claudia de Almeida Figueiredo<br><br>Edilson Carnellossi | Sign labor contracts and other instruments related to labor contracts. | 12.17.2008 to 12.31.2009 |



# BANCO CENTRAL DO BRASIL

| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
|---|---|---|
| Adeila Sampaio Visgueiro Costa<br>Ana Claudia de Oliveira Novaes<br>Carla da Silva Cabrera<br>Carolina de Oliveira Lemos<br>Cecilia Bandeira de Medeiros Carneiro<br>Claudia Araujo Almeida de Oliveira<br>Cristiane Paciulli Capella<br>Daniele dos Santos Ramos<br>Denise Alves Soares dos Santos<br>Elisanne MAria Costa Silva<br>Flaviane Lima de Cruz<br>Francilene Matildes Santos<br>Francisco Eduardo da Costa Piquet<br>Guilherme Fausto Menezes<br>Izabel Chacharski<br>Jessica Almeida Rodrigues<br>Luciana Coelho Leda<br>Ludmila Ribeiro Xavier de Castilho Souza<br>Karla de Carvalho Freitas<br>Marcia Figueiredo Alonso<br>Marion Soares Rosa<br>Marta Valeria Honorio Dantas<br>Meryleide Munis de Oliviera<br>Monica de Andrade Ramos<br>Patirica Gato Costa<br>Patricia Pita<br>Paula Olivia Melo Portugal<br>Roberto Augusto Valente<br>Ronaldo de Freitas Correa<br>Rosana Maria de Souza<br>Roseane Ximenes Silva<br>Samuel da Silva Cabral Junior<br>Sandra Maria Pacini<br>Sandra Maria Alves Rabah<br>Tatiana Nery da Costa<br>Teyze Maria Monteiro de Moraes<br>Vanessa Abreu de Souza<br>Vitor Panzeri dos Santos | Sign Agreement Form for Personal Installment Credit with Payroll Consignment, Application Forms, Official letters addressed to municipal, state and federal government offices, specifically in regard to the request for codes for payroll consignment, authorization for annotation on contracts and annotation of renegotiations between civil servants and the Bank, sign release documents for civil servants. | 1.29.2009 to 12.31.2009 |

| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
|---|---|---|
| Renato Alves Rabello | Represent the Bank at the AGO of the Credit Guarantee Fund – FGC. | 3.09.2009 to 4.27.2009 |

| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
|---|---|---|
| Antonio Dominguez Regueiro<br>Renato Alves Rabello<br>Sebastião Teixeira de Assumpção<br>Vanderlei Aparecido Alves Arruda | Represent the Bank at the Department of Custody of the Central Bank of Brazil, for the specific purpose of deposit, transfer and removal of gold bars. | 3.11.2009 to 12.31.2009 |



# BANCO CENTRAL DO BRASIL

| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
|---|---|---|
| Antonio Dominguez Regueiro  Sebastião Teixeira de Assumpção  Vanderlei Aparecido Alves Arruda | Represent the Bank before Custodial Banks in general and the Company Brinks Segurança e Transporte de Valores, Ltda. for the specific purpose of deposit, transfer and removal of gold bars. | 4.08.2009 to 12.31.2009 |

| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
|---|---|---|
| Felipe Pereira Aragão  Daniel Barbosa de Souza Junior | Sign contracts and bank credit notes, as well as other instruments related to middle market credit operation, such as: admission of debt, discount of titles, guaranteed current account; bank guarantee and release document. | 7.27.2009 to 12.31.2009 |

## 2010

| BANCO CRUZEIRO DO SUL S/A |
|---|
| POWER-OF-ATTORNEY GRANTED IN A PUBLIC INSTRUMENT |

| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
|---|---|---|
| Alessandro Gonçalves de Oliveira  Cristiane Paciulli Capella  Emerson Del Re  Fausto Vaz Guimarães Neto  Flavio Nunes Ferreira Rietmann  Jose Luiz Brunetto  Marcelo de Almeida MArtins  Marcelo Xando Baptista  Marcio Serra Dreher  Mauricio Fonseca Menezes  Renato Alves Rabello  Guilherme Fausto Menezes  Roberto Augusto Valente  Roberto Jose Pereira Capalbo  Roberto Tuna Correia  Sergio Dias  Sebastião Teixeira de Assumpção  Waldemar Popov | Represent the Bank at Financial Institutions, with the power to open and make transactions in current accounts, including Bacen, BNDES; forms and documents of SELIC, CETIP and other settlement chambers pursuant to the SPB; sign deeds for the purchase and sale of real estate; give and receive release from debt; duplicate invoices and other credit instruments; sign letters of guarantee; sign contracts and agreements; represent the Bank at government offices, including the Federal Revenue Office; receive and give release; releases and receive court summons, represent the Bank at financial institutions and fund managers; sign contracts and agreements; | 12.21.2009 to 12.31.2010 |

| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
|---|---|---|
| Jessica de Almeida Rodrigues  Francielene Matildes Santos  Vanessa Abreu de Souza | Make annotations on contracts at the Regional Labor Court 1st Region - RJ | 12.21.2009 to 12.31.2010 |

39



# BANCO CENTRAL DO BRASIL

| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
|---|---|---|
| Guilherme Fausto Menezes<br>Roberto Augusto Valente<br>Sergio Maria Pereira Capella<br>Rosana Maria Souza<br><br>Samuel da Silva Cabral Junior | Represent the Bank at the Central Superintendence of Administration and Payment of Personnel of the Government of Minas Gerais to sign the field for the Signature of the person responsible of Attachment II relative to Consignments. | 12.21.2009 to 12.31.2010 |

| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
|---|---|---|
| Alberto Dwek<br>Fausto Vaz Guimarães Neto<br>Galdino Alvim<br>Marco Antonio da Silva Araujo<br>Plauto Roberto Fraga de Sales<br>Renato Alves Rabello<br>Solange Marques da Silva<br>Vanderlei Aparecido Alves Arruda | Sign Foreign Exchange Contracts | 12.21.2009 to 12.31.2010 |

| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
|---|---|---|
| Alessandro Gonçalves de Oliveira<br>Cristiane Paciulli Capella<br>Emerson Del Re<br>Fausto Vaz Guimarães Neto<br>Flavio Nunes Ferreira Rietmann<br>Jose Luiz Brunetto<br>Marcelo de Almeida MArtins<br>Marcelo Xando Baptista<br>Marcio Serra Dreher<br>Mauricio Fonseca Menezes<br>Renato Alves Rabello<br>Guilherme Fausto Menezes<br>Roberto Augusto Valente<br>Roberto Jose Pereira Capalbo<br>Roberto Tuna Correia<br>Sergio Dias<br>Sebastião Teixeira de Assumpção<br>Darlene Goldar Alvarez Fasolo | Represent the Bank at Financial Institutions, with the power to open and make transactions in current accounts, including Bacen, BNDES; forms and documents of SELIC, CETIP and other settlement chambers pursuant to the SPB; sign deeds for the purchase and sale of real estate; give and receive release from debt; duplicate invoices and other credit instruments; sign letters of guarantee; sign contracts and agreements; represent the Bank at government offices, including the Federal Revenue Office; receive and give release; releases and receive court summons, represent the Bank at financial institutions and fund managers; sign contracts and agreements; | 7.07.2010 to 12.31.2010 |

| POWER-OF-ATTORNEY GRANTED IN A PUBLIC INSTRUMENT | | |
|---|---|---|
| **Attorneys-in-fact Appointed** | **Summary of Powers Granted** | **Period in Effect** |
| Ana Claudia de Almeida Figueiredo<br><br>Edilson Carnellossi | Sign labor contracts and other instruments related to labor contracts. | 12.08.2009 to 12.31.2010 |



# BANCO CENTRAL DO BRASIL

| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
|---|---|---|
| Marcos Solano<br>Andre Pereira Antico | before all the Customs Units of the Federal Office of the 8th Fiscal Region/SP, to perform the activities established in article 1 of Decree no. 646/92 and be registered in the Integrated Foreign Trade System – Siscomex and Mantra; file for and sign statement of responsibility in guarantee of the tax obligation, request for return of improperly paid amounts, of compensation or abandonment of inspection; sign exemption forms for ICMS, request exemption, reduction, suspension, deferral or other form of exoneration of ICMS to the Regional Tax Authorities of the Litoral Area in Santos or in any other tax office in the state of São Paulo that may be necessary; represent the Bank before the Ministry of Agriculture, National Agency of Surveillance of the Ministry of Health (Ports, Airports, DAPS, IPAS and TRAS); receive and take cognizance of notifications, agree to or present answers on behalf of the Band to fiscal requirements and appeals at the appellate or special court levels, including the signing and processing of Transit Declarations and of abandonment of official inspections; represent the Bank before the Merchant Marine Department of the Ministry of Transportation, with the power to perform activities related to the release of Bills of Lading and collection of the Additional Charge for Renewal of the Merchant Marine – AFRMM, and may also sign Responsibility Statements in guarantee of their payment, sign requests, request for return of improperly paid amounts, pay AFRMM and penalties, register at the Electronic AFRMM – MERCHANT Payment System; | 12.10.2009 to 12.31.2010 |



# BANCO CENTRAL DO BRASIL

| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
|---|---|---|
| Felipe Pereira Aragão<br><br>Daniel Barbosa de Souza Junior | (i) Loan Contracts in general; (ii) Master Discount and Working Capital Contracts; (iii) Credit Initiation Contracts; (iv) Securities Discount Contracts; (v) Fiduciary Sale Guarantee Contracts; (vi) Fiduciary Assignment Contracts; (vii) Bank Credit Notes; (viii) Admission of Debt Instruments; (ix) Guarantee Contracts; (x) Letters of Guarantee; (xi) Commercial Pledge Contracts; (xii) Transaction Instruments, Notifications (Blocking of Domicile); | 12.16.2009 to 12.31.2010 |

| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
|---|---|---|
| Adeila Sampaio Visgueiro Costa<br>Adriana Soares de Athayde<br>Amanda da Luz Viegas<br>Ana Claudia de Oliveira Novaes<br>Carla da Silva Cabrera<br>Carolina de Oliveira Lemos<br>Cecilia Bandeira de Medeiros Carneiro<br>Cristiane Paciulli Capella<br>Daniele dos Santos Ramos<br>Denise Alves Soares dos Santos<br>Francilene Matildes Santos<br>Guilherme Fausto Menezes<br>Iranice Maciel Alcantara<br>Janaina Angelica Pereira Souza<br>Jessica Almeida Rodrigues<br>Ludmila Ribeiro Xavier de Castilho Souza<br>Marcia Figueiredo Alonso<br>Karla de Carvalho Freitas<br>Marion Soares Rosa<br>Marta Valeria Honorio Dantas<br>Maryleide Munis de Oliviera<br>Monica de Andrade Ramos<br>Patricia Pita<br>Paula Olivia Melo Portugal<br>Rafaela Graziane de Jusus Cambui<br>Risonia Silva de Oliveira<br>Roberto Augusto Valente<br>Ronaldo de Freitas Correa<br>Rosana Maria de Souza<br>Samuel da Silva Cabral Junior<br>Sandra Maria Pacini<br>Sandra Maria Alves Rabah<br>Suelen Rodrigues Vale Mazieiro<br>Tatiana Nery da Costa<br>Vanessa Abreu de Souza<br>Vitor Panzeri dos Santos | Sign Agreement Form for Personal Installment Credit with Payroll Consignment, Application Forms, Official letters addressed to municipal, state and federal government offices, specifically in regard to the request for codes for payroll consignment, authorization for annotation on contracts and annotation of renegotiations between civil servants and the Bank, sign release documents for civil servants. | 01.29.2009 to 12.31.2010 |



# BANCO CENTRAL DO BRASIL

| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
|---|---|---|
| Mirian Lourdes Gomes<br><br>Cristiano Sanches de Oliveira | Represent the bank before the Municipal Government of Belo Horizonte for the purpose of signing the APW – Authorization for Payroll Withholding. | 4.13.2010 to 12.31.2010 |
|  |  |  |

| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
|---|---|---|
| Rosana Maria de Souza<br>Francilene Matildes Santos | Represent the bank before the Municipal Government of Ribeirão das Neves – MG. | 6.29.2010 to 12.31.2010 |
|  |  |  |

| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
|---|---|---|
| Adeila Sampaio Visgueiro Costa<br>Adriana Soares de Athayde<br>Amanda da Luz Viegas<br>Ana Claudia de Oliveira Novaes<br>Ana Paula Pereira dos Santos<br>Carla da Silva Cabrera<br>Carolina de Oliveira Lemos<br>Cecilia Bandeira de Medeiros Carneiro<br>Cristiane Paciulli Capella<br>Daniele dos Santos Ramos<br>Denise Alves Soares dos Santos<br>Elissandra Vieira da Conceição<br>Francilene Matildes Santos<br>Guilherme Fausto Menezes<br>Iranice Maciel Alcantara<br>Karla de Carvalho Freitas<br>Karina Valeska Lagna<br>Kelly Loana do Nascimento<br>Janaina Angelica Pereira Souza<br>Jessica Almeida Rodrigues<br>Ludmila Ribeiro Xavier de Castilho Souza<br>Marcia Figueiredo Alonso<br>Maria Carolina de Oliveira<br>Marion Soares Rosa<br>Marta Valeria Honorio Dantas<br>Maryleide Munis de Oliviera<br>Nadia Tabosa Vas Dias<br>Patricia Pita<br>Paula Olivia Melo Portugal<br>Priscila Nogueira Melgar<br>Rafaela Graziane de Jusus Cambui<br>Risonia Silva de Oliveira<br>Roberto Augusto Valente<br>Ronaldo de Freitas Correa<br>Rosana Maria de Souza<br>Samuel da Silva Cabral Junior<br>Sandra Maria Pacini<br>Sandra Maria Alves Rabah<br>Suelen Rodrigues Vale Mazieiro<br>Tatiana Nery da Costa<br>Vanessa Abreu de Souza<br>Vitor Panzeri dos Santos<br>Wellington de Andrade Laurindo | Sign Agreement Form for Personal Installment Credit with Payroll Consignment, Application Forms, Official letters addressed to municipal, state and federal government offices, specifically in regard to the request for codes for payroll consignment, authorization for annotation on contracts and annotation of renegotiations between civil servants and the Bank, sign release documents for civil servants. | 8.16.2010 to 12.31.2010 |

43



# BANCO CENTRAL DO BRASIL

| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
|---|---|---|
| Adeila Sampaio Visgueiro Costa<br>Adriana Soares de Athayde<br>Amanda da Luz Viegas<br>Ana Claudia de Oliveira Novaes<br>Ana Paula Pereira dos Santos<br>Carla da Silva Cabrera<br>Carolina de Oliveira Lemos<br>Cecilia Bandeira de Medeiros Carneiro<br>Cristiane Paciulli Capella<br>Daniele dos Santos Ramos<br>Denise Alves Soares dos Santos<br>Elanie Cristina Rocha Pereira<br>Elissandra Vieira da Conceição<br>Elizete Almeida Silva<br>Francilene Matildes Santos<br>Guilherme Fausto Menezes<br>Iranice Maciel Alcantara<br>Karla de Carvalho Freitas<br>Karina Valeska Lagna<br>Kelly Loana do Nascimento<br>Janaina Angelica Pereira Souza<br>Jessica Almeida Rodrigues<br>Ludmila Ribeiro Xavier de Castilho Souza<br>Marcia Figueiredo Alonso<br>Maria Carolina de Oliveira<br>Marion Soares Rosa<br>Marta Valeria Honorio Dantas<br>Maryleide Munis de Oliviera<br>Nadia Tabosa Vas Dias<br>Patricia Pita<br>Paula Olivia Melo Portugal<br>Priscila Nogueira Melgar<br>Rafaela Graziane de Jusus Cambui<br>Risonia Silva de Oliveira<br>Roberto Augusto Valente<br>Ronaldo de Freitas Correa<br>Rosana Maria de Souza<br>Samuel da Silva Cabral Junior<br>Sandra Maria Pacini<br>Sandra Maria Alves Rabah<br>Suelen Rodrigues Vale Mazieiro<br>Tatiana Nery da Costa<br>Thais Oliveira Madruga<br>Vanessa Abreu de Souza<br>Vitor Panzeri dos Santos<br>Wellington de Andrade Laurindo | Sign Agreement Form for Personal Installment Credit with Payroll Consignment, Application Forms, Official letters addressed to municipal, state and federal government offices, specifically in regard to the request for codes for payroll consignment, authorization for annotation on contracts and annotation of renegotiations between civil servants and the Bank, sign release documents for civil servants. | 9.02.2010 to 12.31.2010 |

44



# BANCO CENTRAL DO BRASIL

| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
|---|---|---|
| Adeila Sampaio Visgueiro Costa<br>Adriana Soares de Athayde<br>Amanda da Luz Viegas<br>Ana Claudia de Oliveira Novaes<br>Ana Paula Pereira dos Santos<br>Carla da Silva Cabrera<br>Carolina de Oliveira Lemos<br>Cecilia Bandeira de Medeiros Carneiro<br>Cristiane Paciulli Capella<br>Daniele dos Santos Ramos<br>Denise Alves Soares dos Santos<br>Elissandra Vieira da Conceição<br>Francilene Matildes Santos<br>Guilherme Fausto Menezes<br>Iranice Maciel Alcantara<br>Karla de Carvalho Freitas<br>Karina Valeska Lagna<br>Kelly Loana do Nascimento<br>Janaina Angelica Pereira Souza<br>Jessica Almeida Rodrigues<br>Ludmila Ribeiro Xavier de Castilho Souza<br>Marcia Figueiredo Alonso<br>Maria Carolina de Oliveira<br>Marion Soares Rosa<br>Marta Valeria Honorio Dantas<br>Maryleide Munis de Oliviera<br>Nadia Tabosa Vas Dias<br>Nathalia Maria Jacob Baviera<br>Patricia Pita<br>Paula Olivia Melo Portugal<br>Priscila Nogueira Melgar<br>Rafaela Graziane de Jusus Cambui<br>Risonia Silva de Oliveira<br>Roberto Augusto Valente<br>Ronaldo de Freitas Correa<br>Rosana Maria de Souza<br>Samuel da Silva Cabral Junior<br>Sandra Maria Pacini<br>Sandra Maria Alves Rabah<br>Suelen Rodrigues Vale Mazieiro<br>Tatiana Nery da Costa<br>Thais Oliveira Madruga<br>Vanessa Abreu de Souza<br>Vitor Panzeri dos Santos<br>Wellington de Andrade Laurindo | Sign Agreement Form for Personal Installment Credit with Payroll Consignment, Application Forms, Official letters addressed to municipal, state and federal government offices, specifically in regard to the request for codes for payroll consignment, authorization for annotation on contracts and annotation of renegotiations between civil servants and the Bank, sign release documents for civil servants. | 11.01.2010 to 12.31.2010 |



# BANCO CENTRAL DO BRASIL

| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
|---|---|---|
| Adeila Sampaio Visgueiro Costa<br>Adriana Soares de Athayde<br>Amanda da Luz Viegas<br>Amanda Martins Braga<br>Ana Claudia de Oliveira Novaes<br>Ana Paula Pereira dos Santos<br>Carla da Silva Cabrera<br>Carolina de Oliveira Lemos<br>Cecilia Bandeira de Medeiros Carneiro<br>Cristiane Paciulli Capella<br>Daniele dos Santos Ramos<br>Denise Alves Soares dos Santos<br>Elissandra Vieira da Conceição<br>Francilene Matildes Santos<br>Guilherme Fausto Menezes<br>Iranice Maciel Alcantara<br>Karla de Carvalho Freitas<br>Karina Valeska Lagna<br>Kelly Loana do Nascimento<br>Janaina Angelica Pereira Souza<br>Jessica Almeida Rodrigues<br>Ludmila Ribeiro Xavier de Castilho Souza<br>Marcia Figueiredo Alonso<br>Maria Carolina de Oliveira<br>Marion Soares Rosa<br>Marta Valeria Honorio Dantas<br>Maryleide Munis de Oliviera<br>Nadia Tabosa Vas Dias<br>Patricia Pita<br>Paula Olivia Melo Portugal<br>Priscila Nogueira Melgar<br>Rafaela Graziane de Jusus Cambui<br>Risonia Silva de Oliveira<br>Roberto Augusto Valente<br>Ronaldo de Freitas Correa<br>Rosana Maria de Souza<br>Samuel da Silva Cabral Junior<br>Sandra Maria Pacini<br>Sandra Maria Alves Rabah<br>Suelen Rodrigues Vale Mazieiro<br>Tatiana Nery da Costa<br>Thais Oliveira Madruga<br>Vanessa Abreu de Souza<br>Vitor Panzeri dos Santos<br>Wellington de Andrade Laurindo | Sign Agreement Form for Personal Installment Credit with Payroll Consignment, Application Forms, Official letters addressed to municipal, state and federal government offices, specifically in regard to the request for codes for payroll consignment, authorization for annotation on contracts and annotation of renegotiations between civil servants and the Bank, sign release documents for civil servants. | 11.03.2010 to 12.31.2010 |



# BANCO CENTRAL DO BRASIL

| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
|---|---|---|
| Adeila Sampaio Visgueiro Costa<br>Adriana Soares de Athayde<br>Amanda da Luz Viegas<br>Amanda Martins Braga<br>Ana Claudia de Oliveira Novaes<br>Ana Paula Pereira dos Santos<br>Carla da Silva Cabrera<br>Carolina de Oliveira Lemos<br>Cecilia Bandeira de Medeiros Carneiro<br>Cristiane Paciulli Capella<br>Daniele dos Santos Ramos<br>Denise Alves Soares dos Santos<br>Elissandra Vieira da Conceição<br>Francilene Matildes Santos<br>Guilherme Fausto Menezes<br>Iranice Maciel Alcantara<br>Karla de Carvalho Freitas<br>Karina Valeska Lagna<br>Kelly Loana do Nascimento<br>Janaina Angelica Pereira Souza<br>Jessica Almeida Rodrigues<br>Ludmila Ribeiro Xavier de Castilho Souza<br>Marcia Figueiredo Alonso<br>Maria Carolina de Oliveira<br>Marion Soares Rosa<br>Marta Valeria Honorio Dantas<br>Maryleide Munis de Oliviera<br>Nadia Tabosa Vas Dias<br>Nathalia Maria Jacob Baviera<br>Patricia Pita<br>Paula Olivia Melo Portugal<br>Priscila Nogueira Melgar<br>Rafaela Graziane de Jusus Cambui<br>Risonia Silva de Oliveira<br>Roberto Augusto Valente<br>Ronaldo de Freitas Correa<br>Rosana Maria de Souza<br>Samuel da Silva Cabral Junior<br>Sandra Maria Pacini<br>Sandra Maria Alves Rabah<br>Suelen Rodrigues Vale Mazieiro<br>Tatiana Nery da Costa<br>Thais Oliveira Madruga<br>Vanessa Abreu de Souza<br>Vitor Panzeri dos Santos<br>Wellington de Andrade Laurindo | Sign Agreement Form for Personal Installment Credit with Payroll Consignment, Application Forms, Official letters addressed to municipal, state and federal government offices, specifically in regard to the request for codes for payroll consignment, authorization for annotation on contracts and annotation of renegotiations between civil servants and the Bank, sign release documents for civil servants. | 12.01.2010 to 12.31.2010 |

47



# BANCO CENTRAL DO BRASIL

## 2011

| BANCO CRUZEIRO DO SUL S/A |
| --- |

| POWER-OF-ATTORNEY GRANTED IN A PUBLIC INSTRUMENT |
| --- |

| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
| --- | --- | --- |
| Cristiane Paciulli Capella<br>Emerson Del Re<br>Fausto Vaz Guimarães Neto<br>Flavio Nunes Ferreira Rietmann<br>Marcelo de Almeida Martins<br>Marcelo Xando Baptista<br>Marcio Serra Dreher<br>Mauricio Fonseca Menezes<br>Guilherme Fausto Menezes<br>Roberto Augusto Valente<br>Roberto Tuna Correia<br>Darlene Goldar Alvarez Fasolo<br>Elaine Pereira Aguia<br>Rodrigo Jose Rodrigues<br>Alessandro Gonçãlves de Oliveira<br>Sebastião Teixeira de Assumpção | Represent the Bank at Financial Institutions, with the power to open and make transactions in current accounts, including Bacen, BNDES; forms and documents of SELIC, CETIP and other settlement chambers pursuant to the SPB; sign deeds for the purchase and sale of real estate; give and receive release from debt; duplicate invoices and other credit instruments; sign letters of guarantee; sign contracts and agreements; represent the Bank at government offices, including the Federal Revenue Office;  receive and give release; releases and receive court summons, represent the Bank at financial institutions and fund managers; sign contracts and agreements; | 12.23.2010 to 12.31.2010 |

| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
| --- | --- | --- |
| Alberto Dwek<br>Fausto Vaz Guimarães Neto<br>Galdino Alvim<br>Marco Antonio da Silva Araujo<br>Plauto Roberto Fraga de Sales<br>Solange Marques da Silva<br>Vanderlei Aparecido Alves Arruda | Sign Foreign Exchange Contracts | 12.23.2010 to 12.31.2010 |

| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
| --- | --- | --- |
| Sebastião Teixeira de Assumpção<br>Vanderlei Aparecido Alves Arruda<br>Carlos Eduardo Augusto<br>Jailson Crisostomo Lima | Represent the bank at the Federal Revenue Office for the purpose of releasing foreign currency resulting from foreign Exchange operations. | 12.23.2010 to 12.31.2010 |



# BANCO CENTRAL DO BRASIL

| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
|---|---|---|
| Marcos Solano<br><br>Andre Pereira Antico | before all the Customs Units of the Federal Office of the 8th Fiscal Region/SP, to perform the activities established in article 1 of Decree no. 646/92 and be registered in the Integrated Foreign Trade System – Siscomex and Mantra; file for and sign statement of responsibility in guarantee of the tax obligation, request for return of improperly paid amounts, of compensation or abandonment of inspection; sign exemption forms for ICMS, request exemption, reduction, suspension, deferral or other form of exoneration of ICMS to the Regional Tax Authorities of the Litoral Area in Santos or in any other tax office in the state of São Paulo. | 12.23.2010 to 12.31.2011 |
|  |  |  |

| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
|---|---|---|
| Guilherme Fausto Menezes<br>Roberto Augusto Valente<br>Vitor Panzeri dos Santos<br>Rosana Maria Souza<br>Samuel da Silva Cabral Junior | Represent the Bank at the Central Superintendence of Administration and Payment of Personnel of the Government of Minas Gerais to sign the field for the Signature of the person responsible of Attachment II relative to Consignments. | 1.26.2011 to 12.31.2011 |
|  |  |  |

| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
|---|---|---|
| Jessica de Almeida Rodrigues<br>Francielene Matildes Santos<br>Vanessa Abreu de Souza | Make annotations on contracts at the Regional Labor Court 1st Region - RJ | 1.26.2011 to 12.31.2011 |

49

# CENTRAL BANK OF BRAZIL

| POWER-OF-ATTORNEY GRANTED IN A PRIVATE INSTRUMENT | | |
|---|---|---|
| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
| Adela Sampaio Visgueiro Costa<br>Adriana Soares de Athayde<br>Ana Paula Pereira dos Santos<br>Amanda Martins Braga<br>Ana Claudia de Oliveira Novaes<br>Carla da Silva Cabrera<br>Cristiane Paciulli Capella<br>Cecilia Bandeira de Medeiros Carneiro<br>Denise Alves Soares dos Santos<br>Elissandra Vieira da Concei ao<br>Francilene Matildes Santos<br>Guilherme Fausto Menezes<br>Iranice Maciel Alcantara<br>Janafna Angelica Pereira Souza<br>Jessica Almeida Rodrigues<br>Karla de Carvalho Freitas<br>Ludmila Ribeiro Xavier de Castilho Souza<br>Marcia de Figueiredo Alonso<br>Maria Carolina de Oliveira<br>Kelly Loana do Nascimento<br>Natalia Maria Jacob Bavieira<br>Marion Soares Rosa<br>Marta Valerio Hon6rio Dantas<br>Maryleide Munis de Oliviera<br>Patricia Pita<br>Rosana dos Santos Ribeiro<br>Paula Olivia Melo Portuga l<br>Rafaela Graziane de Jusus Cambuf<br>Rosana Maria de Souza<br>Risonia Silva de Oliveira<br>Roberto Augusto Valente<br>Ronaldo de Freitas Correa<br>Samuel da Silva Cabral Junior<br>Sandra Maria Alves Rabah<br>Thais Oliveira Madruga<br>Suelen Rodrigues Vale Mazieiro<br>Tatiana Nery da Costa<br>Priscila Nogueira Melgar<br>Karina Valeska Lagana<br>Vanessa Abreu de Souza<br>Vitor Panzeri dos Santos<br>Wellington de Andrade Laurindo | Sign Agreement Form for Personal Installment Credit with Payroll Consignment, Application Forms, Official letters addressed to municipal, state and federal government offices, specifically in regard to the request for codes for payroll consignment, authorization for annotation on contracts and annotation of renegotiations between civil servants and the Bank, sign release documents for civil servants. | 12.23.2010 to 12.31.2011 |

| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
|---|---|---|
| Ana Claudia de Almeida Figueiredo<br>Edilson Carnellossi | Sign labor contracts and other instruments related to labor contracts. | 12.31.2010 to 12.31.2011 |

| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
|---|---|---|
| Neisa de Aguiar Souza | Sign requests to suspend or alter payroll withholding | 4.29.2011 to 12.31.2011 |



# BANCO CENTRAL DO BRASIL

| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
|---|---|---|
| Adeila Sampaio Visgueiro Costa<br>Amanda Cristina de Souza Santos<br>Alessandra Marques do Nascimento Amorim<br>Aline Cardoso Galeno<br>Paula Olivia Melo Portugal<br>Adriana Soares de Athayde<br>Ana Paula Pereira dos Santos<br>Amanda Martins Braga<br>Ana Claudia de Oliveira Novaes<br>Carla da Silva Cabrera<br>Carlos Alberto dos Santos<br>Cristiane Sanchez de Oliveira<br>Denise Alves Soares dos Santos<br>Dirlene de Marco Pessoa<br>Elissandra Vieira da Conceição<br>Francilene Matildes Santos<br>Guilherme Fausto Menezes<br>Iranice Maciel Alcantara<br>Joyce Rodrigues Alves<br>João Paulo Matt de Assis Figueiredo<br>João Cavalcanti Bezerra Santiago Neto<br>Karla de Carvalho Freitas<br>Ludmila Ribeiro Xavier de Castilho Souza<br>Marcia Figueiredo Alonso<br>Maria Antonia do Socorro Rabello Araujo<br>Marilla Gomes Dalla Chiesa Sato<br>Michele Laureano Belo<br>Mikaelle Almeida Soares<br>Monica Oliveira da Silva<br>Nathalia Maria Jacob Baviera<br>Mirian Lourdes Gomes<br>Marta Valeria Honorio Dantas<br>Maryleide Munis de Oliviera<br>Patricia Pita<br>Patricia Zenaide de Souza Bolfe<br>Rafaela Graziane de Jusus Cambui<br>Risonia Silva de Oliveira<br>Roberto Augusto Valente<br>Ronaldo de Freitas Correa<br>Samuel da Silva Cabral Junior<br>Sandra Maria Alves Rabah<br>Sidney Alvares<br>Tatiana Nery da Costa<br>Suelen Rodrigues Vale Mazieiro<br>Priscila Nogueira Melgar<br>Vanessa Abreu de Souza<br>Vitor Panzeri dos Santos<br>Wellington Ferreira da Silva<br>Wellington de Andrade Laurindo | Sign Agreement Form for Personal Installment Credit with Payroll Consignment, Application Forms, Official letters addressed to municipal, state and federal government offices, specifically in regard to the request for codes for payroll consignment, authorization for annotation on contracts and annotation of renegotiations between civil servants and the Bank, sign release documents for civil servants. | 6.14.2011 to 12.31.2011 |



# BANCO CENTRAL DO BRASIL

| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
|---|---|---|
| Adeila Sampaio Visgueiro Costa<br>Alessandra Marques do Nascimento Amorim<br>Aline Cardoso Galeno<br>Adriana Soares de Athayde<br>Ana Paula Pereira dos Santos<br>Amanda Martins Braga<br>Ana Claudia de Oliveira Novaes<br>Carla da Silva Cabrera<br>Carlos Alberto dos Santos<br>Cristiane Sanchez de Oliveira<br>Cristiano Sanchez de Oliveira<br>Denise Alves Soares dos Santos<br>Dirlene de Marco Pessoa<br>Elissandra Vieira da Conceição<br>Francilene Matildes Santos<br>Guilherme Fausto Menezes<br>Iranice Maciel Alcantara<br>Izabella de Almeida Baptista<br>João Paulo Matt de Assis Figueiredo<br>João Cavalcanti Bezerra Santiago Neto<br>Karla de Carvalho Freitas<br>Ludmila Ribeiro Xavier de Castilho Souza<br>Marcia de Figueiredo Alonso<br>Marta Valeria Honorio Dantas<br>Neisa de Aguiar Sousa<br>Mikaelle Almeida Soares<br>Monica Oliveira da Silva<br>Natalia Maria Jacob Baviera<br>Nicole Natalia Mora Orellana<br>Mirian Lourdes Gomes<br>Maryleide Munis de Oliviera<br>Patricia Pita<br>Patricia Zenaide de Souza Bolfe<br>Paula Olivia Melo Portugal<br>Rafaela Graziane de Jusus Cambui<br>Risonia Silva de Oliveira<br>Roberto Augusto Valente<br>Ronaldo de Freitas Correa<br>Samuel da Silva Cabral Junior<br>Sandra Maria Alves Rabah<br>Sidney Alvares<br>Tatiana Nery da Costa<br>Suelen Rodrigues Vale Mazieiro<br>Priscila Nogueira Melgar<br>Vanessa Abreu de Souza<br>Vitor Panzeri dos Santos<br>Wellington Ferreira da Silva<br>Wellington de Andrade Laurindo | Sign Agreement Form for Personal Installment Credit with Payroll Consignment, Application Forms, Official letters addressed to municipal, state and federal government offices, specifically in regard to the request for codes for payroll consignment, authorization for annotation on contracts and annotation of renegotiations between civil servants and the Bank, sign release documents for civil servants. | 8.8.2011 to 12.31.2011 |



# BANCO CENTRAL DO BRASIL

| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
|---|---|---|
| Adeila Sampaio Visgueiro Costa<br>Alessandra Marques do Nascimento Amorim<br>Aline Cardoso Galeno<br>Adriana Soares de Athayde<br>Amanda Martins Braga<br>Ana Claudia de Oliveira Novaes<br>Carla da Silva Cabrera<br>Carlos Alberto dos Santos<br>Cristiane Sanchez de Oliveira<br>Cristiano Sanchez de Oliveira<br>Denise Alves Soares dos Santos<br>Dirlene de Marco Pessoa<br>Elissandra Vieira da Conceição<br>Francilene Matildes Santos<br>Guilherme Fausto Menezes<br>Iranice Maciel Alcantara<br>Izabella de Almeida Baptista<br>João Paulo Matt de Assis Figueiredo<br>João Cavalcanti Bezerra Santiago Neto<br>Karla de Carvalho Freitas<br>Ludmila Ribeiro Xavier de Castilho Souza<br>Marcia de Figueiredo Alonso<br>Marta Valeria Honorio Dantas<br>Maria Antonia do Socorro Rabello Araujo<br>Neisa de Aguiar Sousa<br>Mikaelle Almeida Soares<br>Monica Oliveira da Silva<br>Natalia Maria Jacob Baviera<br>Nicole Natalia Mora Orellana<br>Mirian Lourdes Gomes<br>Maryleide Munis de Oliviera<br>Patricia Pita<br>Patricia Zenaide de Souza Bolfe<br>Paula Olivia Melo Portugal<br>Rafaela Graziane de Jusus Cambui<br>Risonia Silva de Oliveira<br>Roberto Augusto Valente<br>Ronaldo de Freitas Correa<br>Samuel da Silva Cabral Junior<br>Sandra Maria Alves Rabah<br>Sidney Alvares<br>Tatiana Nery da Costa<br>Suelen Rodrigues Vale Mazieiro<br>Priscila Nogueira Melgar<br>Vanessa Abreu de Souza<br>Vitor Panzeri dos Santos<br>Wellington Ferreira da Silva<br>Wellington de Andrade Laurindo | Sign Agreement Form for Personal Installment Credit with Payroll Consignment, Application Forms, Official letters addressed to municipal, state and federal government offices, specifically in regard to the request for codes for payroll consignment, authorization for annotation on contracts and annotation of renegotiations between civil servants and the Bank, sign release documents for civil servants. | 8.18.2011 to 12.31.2011 |



# BANCO CENTRAL DO BRASIL

| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
|---|---|---|
| Adeila Sampaio Visgueiro Costa<br>Alessandra Marques do Nascimento Amorim<br>Aline Cardoso Galeno<br>Adriana Soares de Athayde<br>Amanda Martins Braga<br>Ana Claudia de Oliveira Novaes<br>Carla da Silva Cabrera<br>Carlos Alberto dos Santos<br>Cristiane Sanchez de Oliveira<br>Cristiano Sanchez de Oliveira<br>Denise Alves Soares dos Santos<br>Dirlene de Marco Pessoa<br>Elissandra Vieira da Conceição<br>Francilene Matildes Santos<br>Guilherme Fausto Menezes<br>Iranice Maciel Alcantara<br>Izabella de Almeida Baptista<br>João Paulo Matt de Assis Figueiredo<br>João Cavalcanti Bezerra Santiago Neto<br>Karla de Carvalho Freitas<br>Ludmila Ribeiro Xavier de Castilho Souza<br>Marcia de Figueiredo Alonso<br>Marta Valeria Honorio Dantas<br>Maria Antonia do Socorro Rabello Araujo<br>Neisa de Aguiar Sousa<br>Mikaelle Almeida Soares<br>Monica Oliveira da Silva<br>Natalia Maria Jacob Baviera<br>Mirian Lourdes Gomes<br>Maryleide Munis de Oliviera<br>Patricia Pita<br>Patricia Zenaide de Souza Bolfe<br>Pricila Nogueira Melgar<br>Paula Olivia Melo Portugal<br>Rafaela Graziane de Jusus Cambui<br>Risonia Silva de Oliveira<br>Roberto Augusto Valente<br>Ronaldo de Freitas Correa<br>Samuel da Silva Cabral Junior<br>Sandra Maria Alves Rabah<br>Sidney Alvares<br>Tatiana Nery da Costa<br>Suelen Rodrigues Vale Mazieiro<br>Vanessa Abreu de Souza<br>Vitor Panzeri dos Santos<br>Wellington Ferreira da Silva<br>Wellington de Andrade Laurindo | Sign Agreement Form for Personal Installment Credit with Payroll Consignment, Application Forms, Official letters addressed to municipal, state and federal government offices, specifically in regard to the request for codes for payroll consignment, authorization for annotation on contracts and annotation of renegotiations between civil servants and the Bank, sign release documents for civil servants. | 9.26.2011 to 12.31.2011 |

54



# BANCO CENTRAL DO BRASIL

| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
|---|---|---|
| Adeila Sampaio Visgueiro Costa<br>Alessandra Marques do Nascimento Amorim<br>Aline Cardoso Galeno<br>Adriana Soares de Athayde<br>Amanda Martins Braga<br>Ana Claudia de Oliveira Novaes<br>Carla da Silva Cabrera<br>Carlos Alberto dos Santos<br>Cristiane Sanchez de Oliveira<br>Cristiano Sanchez de Oliveira<br>Denise Alves Soares dos Santos<br>Dirlene de Marco Pessoa<br>Elissandra Vieira da Conceição<br>Francilene Matildes Santos<br>Guilherme Fausto Menezes<br>Iranice Maciel Alcantara<br>Izabella de Almeida Baptista<br>João Cavalcanti Bezerra Santiago Neto<br>Karla de Carvalho Freitas<br>Ludmila Ribeiro Xavier de Castilho Souza<br>Marcia de Figueiredo Alonso<br>Marta Valeria Honorio Dantas<br>Maria Antonia do Socorro Rabello Araujo<br>Neisa de Aguiar Sousa<br>Mikaelle Almeida Soares<br>Monica Oliveira da Silva<br>Natalia Maria Jacob Baviera<br>Mirian Lourdes Gomes<br>Maryleide Munis de Oliviera<br>Patricia Pita<br>Patricia Zenaide de Souza Bolfe<br>Priscila Nogueira Melgar<br>Paula Olivia Melo Portugal<br>Rafaela Graziane de Jusus Cambui<br>Risonia Silva de Oliveira<br>Roberto Augusto Valente<br>Ronaldo de Freitas Correa<br>Samuel da Silva Cabral Junior<br>Sandra Maria Alves Rabah<br>Sidney Alvares<br>Tatiana Nery da Costa<br>Suelen Rodrigues Vale Mazieiro<br>Vanessa Abreu de Souza<br>Vitor Panzeri dos Santos<br>Wellington Ferreira da Silva<br>Wellington de Andrade Laurindo | Sign Agreement Form for Personal Installment Credit with Payroll Consignment, Application Forms, Official letters addressed to municipal, state and federal government offices, specifically in regard to the request for codes for payroll consignment, authorization for annotation on contracts and annotation of renegotiations between civil servants and the Bank, sign release documents for civil servants. | 10.03.2011 to 12.31.2011 |



# BANCO CENTRAL DO BRASIL

| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
|---|---|---|
| Adeila Sampaio Visgueiro Costa<br>Adriana Soares de Athayde<br>Alessandra Marques do Nascimento Amorim<br>Aline Cardoso Galeno<br>Amanda Martins Braga<br>Ana Claudia de Oliveira Novaes<br>Carla da Silva Cabrera<br>Natalia Maria Jacob Baviera<br>Carlos Alberto dos Santos<br>Cristiane Sanchez de Oliveira<br>Cristiano Sanchez de Oliveira<br>Denise Alves Soares dos Santos<br>Dirlene de Marco Pessoa<br>Elissandra Vieira da Conceição<br>Francilene Matildes Santos<br>Guilherme Fausto Menezes<br>Iranice Maciel Alcantara<br>Izabella de Almeida Baptista<br>João Cavalcanti Bezerra Santiago Neto<br>Karla de Carvalho Freitas<br>Ludmila Ribeiro Xavier de Castilho Souza<br>Marcia de Figueiredo Alonso<br>Maria Antonia do Socorro Rabello<br>Marta Valeria Honorio Dantas<br>Maryleide Munis de Oliviera<br>Mikaelle Almeida Soares<br>Mirian Lourdes Gomes<br>Monica Oliveira da Silva<br>Neisa de Aguiar Sousa<br>Patricia Pita<br>Patricia Zenaide de Souza Bolfe<br>Paula Olivia Melo Portugal<br>Rafaela Graziane de Jusus Cambui<br>Risonia Silva de Oliveira<br>Roberto Augusto Valente<br>Ronaldo de Freitas Correa<br>Samuel da Silva Cabral Junior<br>Sandra Maria Alves Rabah<br>Sidney Alvares<br>Suelen Rodrigues Vale Mazieiro<br>Tatiana Nery da Costa<br>Vanessa Abreu de Souza<br>Vitor Panzeri dos Santos<br>Wellington de Andrade Laurindo | Sign Agreement Form for Personal Installment Credit with Payroll Consignment, Application Forms, Official letters addressed to municipal, state and federal government offices, specifically in regard to the request for codes for payroll consignment, authorization for annotation on contracts and annotation of renegotiations between civil servants and the Bank, sign release documents for civil servants. | 11.16.2011 to 12.31.2011 |

| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
|---|---|---|
| Ana Claudia de Almeida Figueiredo<br>Aparecida Stabile<br>Edilson Carnellossi | Sign labor contracts and other instruments related to labor contracts | 12.12.2011 to 12.31.2011 |

56



# BANCO CENTRAL DO BRASIL

## 2012

| BANCO CRUZEIRO DO SUL S/A | | |
| --- | --- | --- |
| POWER-OF-ATTORNEY GRANTED IN A PUBLIC INSTRUMENT | | |
| | | |
| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
| Cristiane Paciulli Capella<br>Fausto Vaz Guimarães Neto<br>Flavio Nunes Ferreira Rietmann<br>Marcelo de Almeida Martins<br>Marcelo Xando Baptista<br>Marcio Serra Dreher<br>Henrique Nunes Brito Junior<br>Guilherme Fausto Menezes<br>Roberto Augusto Valente<br>Roberto Tuna Correia<br>Darlene Goldar Alvarez Fasolo<br>Alessandro Gonçalves de Oliveira<br>Elaine Pereira Aguia<br>Rodrigo Jose Rodrigues<br>Sebastião Teixeira de Assumpção | Represent the Bank at Financial Institutions, with the power to open and make transactions in current accounts, including Bacen, BNDES; forms and documents of SELIC, CETIP and other settlement chambers pursuant to the SPB; sign deeds for the purchase and sale of real estate; give and receive release from debt; duplicate invoices and other credit instruments; sign letters of guarantee; sign contracts and agreements; represent the Bank at government offices, including the Federal Revenue Office; receive and give releases; releases and receive court summons, represent the Bank at financial institutions and fund managers; sign contracts and agreements; | 12.16.2011 to 12.31.2012 |
| | | |
| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
| Sebastião Teixeira de Assumpção<br>Vanderlei Aparecido Alves Arruda<br>Carlos Eduardo Augusto<br>Jailson Crisostomo Lima | Represent the bank at the Federal Revenue Office for the purpose of releasing foreign currency resulting from foreign exchange operations. | 12.16.2011 to 12.31.2012 |
| | | |
| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
| Sebastião Teixeira de Assumpção<br>Vanderlei Aparecido Alves Arruda<br>Carlos Eduardo Augusto<br>Jailson Crisostomo Lima | Sign Foreign Exchange Contracts. | 12.16.2011 to 12.31.2012 |
| | | |
| Attorneys-in-fact Appointed | Summary of Powers Granted | Period in Effect |
| Elaine Masello de Araujo<br>Erika Basilio Khalili<br>Silva Abreu Barbosa Soares da Silva<br>Tamara Chaves de Oliveira<br>Igor Daniel Cadalaft Drimus<br>Amanda Costa Colaço | Receive summons, notices, and sign correspondence sent to regulatory agencies, including the Central Bank of Brazil, the Federal Revenue Service and Securities Commission. | 12.16.2011 to 12.31.2012 |

According to information gathered by this Commission, the Legal Department prepared and provided *(in a protected and sealed manner)* the Private Agency Instruments for the respective plaintiff areas (*Departments*), which were responsible for obtaining the signatures and the filing. Therefore, the powers-of-attorney provided without signatures are at the respective plaintiff Departments (*according to the email on page 376*).

Although powers-of-attorney were granted containing certain powers, **no evidence of management acts** by the agents in question were found for the period in question for defining liability were found (*from 6.4.2007 to 6.4.2012*).



# BANCO CENTRAL DO BRASIL

**2.5      Management during the past five years prior to the decree of the Temporary Special Administration Regime – TSAR at Banco Cruzeiro do Sul**

According to what is set forth in Article 43 of Law 6.024/1974, the period covered by the investigation is the last five (5) years prior to the date of the special regime.

Initially, it should be noted that each "Management group" is here understood to refer to a group of directors with joint and several liability, formed by the controlling shareholder, by the members of the Management Board and by the members of the Board of Directors of Banco Cruzeiro do Sul, with a mandate set for a specific period of time. Therefore, every time a member enters or leaves this group, there is a new Management group.

Therefore, after analyzing the documents involving the Ordinary and Extraordinary Shareholder Meetings and the Resignation Letters and Requests for temporary leave *(documents on pages 36/336)*, also considering the list presented by the CGF *(pages 337/339),* in the period from 6.4.2007 to 6.4.2012, and information from the Financial System Organization Department – DEORF (pages 1173/1179), **nine (9) management groups** were identified in the five years prior to the TSAR at Banco Cruzeiro do Sul, as shown chronologically below:

**1)**      Since those elected at the ESM and in the Minutes of the Board of Directors Meeting, both dated 1.07.23, only took office on **4.07.23**, the BCSul management team during that time was comprised as follows (pages 68/92):

| Name | CPF | Position | Management Period |
|---|---|---|---|
| Luis Felippe Indio da Costa | 006.034.067-34 | Controller / President of the Board / Director of Investor Relations | 4.07.23 to 10.31.07 |
| Luis Octavio Azeredo Lopes Indio da Costa | 782.474.977-00 | Vice-President of the Board / CEO | 4.07.23 to 10.31.07 |
| Progresso Vaño Puerto | 410.915.908-34 | Independent Director | 4.07.23 to 10.31.07 |
| Fabio Rocha do Amaral | 076.593.208-31 | Director | 4.07.23 to 10.31.07 |
| Charles Alexander Forbes | 001.906.918-91 | Director | 4.07.23 to 10.31.07 |
| Horácio Martinho Lima | 745.862.547-37 | Director | 4.07.23 to 10.31.07 |
| Ernani Fonseca Neto | 625.936.257-91 | Director | 4.07.23 to 10.31.07 |
| Fabio Caramuru Correa Meyer | 715.168.917-91 | Director | 4.07.23 to 10.31.07 |
| João Lara de Souza Meirelles Filho | 644.384.148-49 | Director | 4.07.23 to 10.31.07 |
| José Carlos Lima de Abreu | 385.584.168-34 | Director | 4.07.23 to 10.31.07 |
| Luiz Whately Thompson | 029.335.198-87 | Director | 4.07.23 to 10.31.07 |
| Maria Luisa Garcia de Mendonça | 380.376.616-87 | Director | 4.07.23 to 10.31.07 |
| Sergio Marra Pereira Capella | 041.247.618-56 | Director | 4.07.23 to 10.31.07 |

58



# BANCO CENTRAL DO BRASIL

**2)**        On 10.31.07, with the resignation of Mr. Ernani Fonseca Neto (pages 148/150), the new management team of Banco Cruzeiro do Sul was comprised as follows:

| Name | CPF | Position | Management Period |
|------|-----|----------|-------------------|
| Luis Felipe Indio da Costa | 006.034.067-34 | Controller / President of the Board / Director of Investor Relations | 10.31.07 to 3.7.08 |
| Luis Octavio Azeredo Lopes Indio da Costa | 782.474.977-00 | Vice President of the Board / CEO | 10.31.07 to 3.7.08 |
| Progresso Vaño Puerto | 410.915.908-34 | Independent Director | 10.31.07 to 3.7.08 |
| Fabio Rocha do Amaral | 076.593.208-31 | Director | 10.31.07 to 3.7.08 |
| Charles Alexander Forbes | 001.906.918-91 | Director | 10.31.07 to 3.7.08 |
| Horácio Martinho Lima | 745.862.547-37 | Director | 10.31.07 to 3.7.08 |
| Fabio Caramuru Correa Meyer | 715.168.917-91 | Director | 10.31.07 to 3.7.08 |
| João Lara de Souza Meirelles Filho | 644.384.148-49 | Director | 10.31.07 to 3.7.08 |
| José Carlos Lima de Abreu | 385.584.168-34 | Director | 10.31.07 to 3.7.08 |
| Luiz Whately Thompson | 029.335.198-87 | Director | 10.31.07 to 3.7.08 |
| Maria Luisa Garcia de Mendonça | 380.376.616-87 | Director | 10.31.07 to 3.7.08 |
| Sergio Marra Pereira Capella | 041.247.618-56 | Director | 10.31.07 to 3.7.08 |

**3)**    On 12.18.07, with the election of Mr. Roberto Vieira da Silva de Oliveira Costa (pages 151/153), **who only took office on 3.7.2008**, the new management of Banco Cruzeiro do Sul was comprised as follows:

| Name | CPF | Position | Management Period |
|------|-----|----------|-------------------|
| Luis Felipe Indio da Costa | 006.034.067-34 | Controller / President of the Board / Director of Investor Relations | 3.7.08 to 10.31.08 |
| Luis Octavio Azeredo Lopes Indio da Costa | 782.474.977-00 | Vice President of the Board / CEO | 3.7.08 to 10.31.08 |
| Progresso Vaño Puerto | 410.915.908-34 | Independent Director | 3.7.08 to 10.31.08 |
| Fabio Rocha do Amaral | 076.593.208-31 | Director | 3.7.08 to 10.31.08 |
| Charles Alexander Forbes | 001.906.918-91 | Director | 3.7.08 to 10.31.08 |
| Horácio Martinho Lima | 745.862.547-37 | Director | 3.7.08 to 10.31.08 |
| Fabio Caramuru Correa Meyer | 715.168.917-91 | Director | 3.7.08 to 10.31.08 |
| João Lara de Souza Meirelles Filho | 644.384.148-49 | Director | 3.7.08 to 10.31.08 |
| José Carlos Lima de Abreu | 385.584.168-34 | Director | 3.7.08 to 10.31.08 |
| Luiz Whately Thompson | 029.335.198-87 | Director | 3.7.08 to 10.31.08 |
| Maria Luisa Garcia de Mendonça | 380.376.616-87 | Director | 3.7.08 to 10.31.08 |
| Sergio Marra Pereira Capella | 041.247.618-56 | Director | 3.7.08 to 10.31.08 |
| Roberto Vieira da Silva de Oliveira Costa | 769.344.037-20 | Director | 3.7.08 to 10.31.08 |

# BANCO CENTRAL DO BRASIL

4)   On 10.31.08, after the removal of Mr. João Lara de Souza Meirelles Filho and the resignation of Mr. Luiz Whately Thompson (pages 175/176), the new management group of Banco Cruzeiro do Sul was comprised as follows:

| Name | CPF | Position | Management Period |
|------|-----|----------|-------------------|
| Luis Felipe Indio da Costa | 006.034.067-34 | Controller / President of the Board / Director of Investor Relations | 10.31.08 to 6.1.09 |
| Luis Octavio Azeredo Lopes Indio da Costa | 782.474.977-00 | Vice President of the Board / CEO | 10.31.08 to 6.1.09 |
| Progresso Vaño Puerto | 410.915.908-34 | Independent Director | 10.31.08 to 6.1.09 |
| Fabio Rocha do Amaral | 076.593.208-31 | Director | 10.31.08 to 6.1.09 |
| Charles Alexander Forbes | 001.906.918-91 | Director | 10.31.08 to 6.1.09 |
| Horácio Martinho Lima | 745.862.547-37 | Director | 10.31.08 to 6.1.09 |
| Fabio Caramuru Correa Meyer | 715.168.917-91 | Director | 10.31.08 to 6.1.09 |
| José Carlos Lima de Abreu | 385.584.168-34 | Director | 10.31.08 to 6.1.09 |
| Maria Luisa Garcia de Mendonça | 380.376.616-87 | Director | 10.31.08 to 6.1.09 |
| Sergio Marra Pereira Capella | 041.247.618-56 | Director | 10.31.08 to 6.1.09 |
| Roberto Vieira da Silva de Oliveira Costa | 769.344.037-20 | Director | 10.31.08 to 6.1.09 |

5)   On 12.3.08, with the election of Mr. Renato Alves Rabello (pages 178/179), **who only took office on 6.1.09**, the new management team of Banco Cruzeiro do Sul was comprised as follows:

| Name | CPF | Position | Management Period |
|------|-----|----------|-------------------|
| Luis Felipe Indio da Costa | 006.034.067-34 | Controller / President of the Board / Director of Investor Relations | 6.1.09 to 3.28.11 |
| Luis Octavio Azeredo Lopes Indio da Costa | 782.474.977-00 | Vice President of the Board / CEO | 6.1.09 to 3.28.11 |
| Progresso Vaño Puerto | 410.915.908-34 | Independent Director | 6.1.09 to 3.28.11 |
| Fabio Rocha do Amaral | 076.593.208-31 | Director | 6.1.09 to 3.28.11 |
| Charles Alexander Forbes | 001.906.918-91 | Director | 6.1.09 to 3.28.11 |
| Horácio Martinho Lima | 745.862.547-37 | Director | 6.1.09 to 3.28.11 |
| Fabio Caramuru Correa Meyer | 715.168.917-91 | Director | 6.1.09 to 3.28.11 |
| José Carlos Lima de Abreu | 385.584.168-34 | Director | 6.1.09 to 3.28.11 |
| Maria Luisa Garcia de Mendonça | 380.376.616-87 | Director | 6.1.09 to 3.28.11 |
| Sergio Marra Pereira Capella | 041.247.618-56 | Director | 6.1.09 to 3.28.11 |
| Roberto Vieira da Silva de Oliveira Costa | 769.344.037-20 | Director | 6.1.09 to 3.28.11 |
| Renato Alves Rabello | 527.747.408-00 | Director | 6.1.09 to 3.28.11 |

6)   On 3.29.11, **Cruzeiro do Sul Holding Financeira S/A** acquired100% of the capital stock of Banco Cruzeiro do Sul (page 368), becoming the direct controller of BCSul. Beginning on this date, Mr. Luis Felipe Indio da Costa became the indirect controller of BCSul. With this, the new management team Banco Cruzeiro do Sul was comprised as follows:

| Name | CPF/CNPJ | Position | Management Period |
|------|----------|----------|-------------------|
| Luis Felipe Indio da Costa | 006.034.067-34 | Controller / President of the Board / Director of Investor Relations | 3.28.11 to 10.27.11 |

60



# BANCO CENTRAL DO BRASIL

| | | | |
|---|---|---|---|
| Luis Octavio Azeredo Lopes Indio da Costa | 782.474.977-00 | Vice-President of the Board / CEO | 3.28.11 to 10.27.11 |
| Progresso Vaño Puerto | 410.915.908-34 | Independent Director | 3.28.11 to 10.27.11 |
| Fabio Rocha do Amaral | 076.593.208-31 | Director | 3.28.11 to 10.27.11 |
| Charles Alexander Forbes | 001.906.918-91 | Director | 3.28.11 to 10.27.11 |
| Horácio Martinho Lima | 745.862.547-37 | Director | 3.28.11 to 10.27.11 |
| Fabio Caramuru Correa Meyer | 715.168.917-91 | Director | 3.28.11 to 10.27.11 |
| José Carlos Lima de Abreu | 385.584.168-34 | Director | 3.28.11 to 10.27.11 |
| Maria Luisa Garcia de Mendonça | 380.376.616-87 | Director | 3.28.11 to 10.27.11 |
| Sergio Marra Pereira Capella | 041.247.618-56 | Director | 3.28.11 to 10.27.11 |
| Roberto Vieira da Silva de Oliveira Costa | 769.344.037-20 | Director | 3.28.11 to 10.27.11 |
| Renato Alves Rabello | 527.747.408-00 | Director | 3.28.11 to 10.27.11 |
| Cruzeiro do Sul Holding Financeira S/A | 13.211.256/0001-70 | Controller | 3.28.11 to 10.27.11 |

7)      On 10.27.2011, after the resignation of Mr. Renato Alves Rabello (*pages 295/297*), the new management team was comprised as follows:

| Name | CPF/CNPJ | Position | Management Period |
|---|---|---|---|
| Luis Felippe Indio da Costa | 006.034.067-34 | Controller / President of the Board / Director of Investor Relations | 10.27.11 to 1.10.12 |
| Luis Octavio Azeredo Lopes Indio da Costa | 782.474.977-00 | President of the Board / Director of Investor Relations and CEO | 10.27.11 to 1.10.12 |
| Progresso Vaño Puerto | 410.915.908-34 | Independent Director | 10.27.11 to 1.10.12 |
| Fabio Rocha do Amaral | 076.593.208-31 | Director | 10.27.11 to 1.10.12 |
| Charles Alexander Forbes | 001.906.918-91 | Vice-President of the Board | 10.27.11 to 1.10.12 |
| Horácio Martinho Lima | 745.862.547-37 | Director | 10.27.11 to 1.10.12 |
| Roberto Vieira da Silva de Oliveira Costa | 769.344.037-20 | Director | 10.27.11 to 1.10.12 |
| Fabio Caramuru Correa Meyer | 715.168.917-91 | Director | 10.27.11 to 1.10.12 |
| José Carlos Lima de Abreu | 385.584.168-34 | Director | 10.27.11 to 1.10.12 |
| Maria Luisa Garcia de Mendonça | 380.376.616-87 | Director | 10.27.11 to 1.10.12 |
| Sergio Marra Pereira Capella | 041.247.618-56 | Director | 10.27.11 to 1.10.12 |
| Cruzeiro do Sul Holding Financeira S/A | 13.211.256/0001-70 | Controller | 10.27.11 to 1.10.12 |

**Note:** *On 4.29.2011, it was found that Mr. Luis Felippe Indio da Costa was not re-elected as a member of the Management Board (pages 289/294), nor as a member of the Board of Directors (pages 273/288). However, his term only ended on 1.4.12. Nonetheless, **since he is the controller of Banco Cruzeiro do Sul, he is liable for the entire period analyzed by this Investigation Commission**.*

8)      Also on 4.29.2011 Mr. Flavio Nunes Ferreira Rietmann was elected as Director (*pages 273/288*), **taking office on 1.10.2012**. It should be noted that in spite of the existence of a request for temporary leave in the name of Mr. Charles Alexander Forbes, dated 3.1.2012 (*pages 298/299*), this Investigation Commission, considering the information obtained from Deorf/GTSPII, understood that this leave did not put an end to his mandate, since he did not resign. Therefore, the new management team was composed as follows:



# BANCO CENTRAL DO BRASIL

| Name | CPF/CNPJ | Position | Management Period |
|---|---|---|---|
| Luis Felipe Indio da Costa | 006.034.067-34 | Controller / President of the Board / Director of Investor Relations | 1.10.12 to 5.11.12 |
| Luis Octavio Azeredo Lopes Indio da Costa | 782.474.977-00 | President of the Board / Director of Investor Relations and CEO | 1.10.12 to 5.11.12 |
| Progresso Vaño Puerto | 410.915.908-34 | Independent Director | 1.10.12 to 5.11.12 |
| Fabio Rocha do Amaral | 076.593.208-31 | Director | 1.10.12 to 5.11.12 |
| Horácio Martinho Lima | 745.862.547-37 | Director | 1.10.12 to 5.11.12 |
| Roberto Vieira da Silva de Oliveira Costa | 769.344.037-20 | Director | 1.10.12 to 5.11.12 |
| Fabio Caramuru Correa Meyer | 715.168.917-91 | Director | 1.10.12 to 5.11.12 |
| José Carlos Lima de Abreu | 385.584.168-34 | Director | 1.10.12 to 5.11.12 |
| Maria Luisa Garcia de Mendonça | 380.376.616-87 | Director | 1.10.12 to 5.11.12 |
| Sergio Marra Pereira Capella | 041.247.618-56 | Director | 1.10.12 to 5.11.12 |
| Flavio Nunes Ferreira Rietmann | 913.629.627-91 | Director | 1.10.12 to 5.11.12 |
| Charles Alexander Forbes | 001.906.918-91 | Vice-President of the Board | 1.10.12 to 5.11.12 |
| Cruzeiro do Sul Holding Financeira S/A | 13.211.256/0001-70 | Controller | 1.10.12 to 5.11.12 |

**9)**      On 5.11.2012, with the removal of Mr. José Carlos Lima de Abreu (*pages 335/336*), the final management team identified was comprised as follows:

| Name | CPF/CNPJ | Position | Management Period |
|---|---|---|---|
| Luis Felipe Indio da Costa | 006.034.067-34 | Controller / President of the Board / Director of Investor Relations | 5.11.12 to 6.4.12 |
| Luis Octavio Azeredo Lopes Indio da Costa | 782.474.977-00 | President of the Board / Director of Investor Relations and CEO | 5.11.12 to 6.4.12 |
| Progresso Vaño Puerto | 410.915.908-34 | Independent Director | 5.11.12 to 6.4.12 |
| Fabio Rocha do Amaral | 076.593.208-31 | Director | 5.11.12 to 6.4.12 |
| Horácio Martinho Lima | 745.862.547-37 | Director | 5.11.12 to 6.4.12 |
| Roberto Vieira da Silva de Oliveira Costa | 769.344.037-20 | Director | 5.11.12 to 6.4.12 |
| Fabio Caramuru Correa Meyer | 715.168.917-91 | Director | 5.11.12 to 6.4.12 |
| Maria Luisa Garcia de Mendonça | 380.376.616-87 | Director | 5.11.12 to 6.4.12 |
| Sergio Marra Pereira Capella | 041.247.618-56 | Director | 5.11.12 to 6.4.12 |
| Flavio Nunes Ferreira Rietmann | 913.629.627-91 | Director | 5.11.12 to 6.4.12 |
| Charles Alexander Forbes | 001.906.918-91 | Vice-President of the Board | 5.11.12 to 6.4.12 |
| Cruzeiro do Sul Holding Financeira S/A | 13.211.256/0001-70 | Controller | 5.11.12 to 6.4.12 |

## 2.6      Identification of controllers and ex-directors



# BANCO CENTRAL DO BRASIL

Following are the names and identifications of the controller and ex-directors of BANCO CRUZEIRO DO SUL S.A., whose private assets are listed under Chapter 13 of this Report, pursuant to Art. 43 of Law 6.024/1974.

**Cruzeiro do Sul Holding Financeira S.A (CNPJ: 13.211.256/0001-70)**: Non-financial entity belonging to the Cruzeiro do Sul Group, with main offices located at Avenida Presidente Wilson, 231, 24° andar, sala 2403, Centro, Rio de Janeiro, RJ, CEP 20031-021, founded on **2.2.2011**, currently under a special extrajudicial liquidation regime, under the administration of liquidator **Mr. Sérgio Rodrigues Prates**.

**Luis Felippe Indio da Costa**: Brazilian, legally separated, attorney, ID Card RG 912.072-6-IFP/RJ, CPF 006.034.067-34, residing at Avenida Epitácio Pessoa, 300 – apt. 501, Ipanema CEP 22410-090, Rio de Janeiro (RJ)

**Luis Octavio Azeredo Lopes Indio da Costa**: Brazilian, legally separated, ID Card RG 044.524.34-6 –IFP/RJ, CPF 782.474.977-00, residing at Estrada do Embu, 1550 – Haras Guacan CEP 06713-100, Cotia (SP).

**Charles Alexander Forbes**: Brazilian, attorney, OAB number: 24.912, ID Card RG 2.249.539-3 SSP/SP, CPF 001.906.918-91, residing at Rua José Maria Lisboa, 1060 – apt. 31 CEP 01423-001 - São Paulo (SP)

**Fabio Caramuru Correa Meyer**: Brazilian, married, executive, ID Card IFP 05648566-7, CPF 715.168.917-91, residing at Rua Fonte da Saudade, 61 apt. 1.101 CEP 22471-210 - Lagoa, Rio de Janeiro (RJ).

**Fabio Rocha do Amaral**: Brazilian, married, business manager, ID Card RG 9.363.793-7, CPF 076.593.208-31, residing at Rua Ernesto Nazaré, 213 – Alto de Pinheiros CEP 05462-000 – São Paulo (SP).

**Flavio Nunes Ferreira Rietmann**: Brazilian, divorced, business manager, ID Card RG 10.295.069-6, CPF 913.629.627-91, residing at Alameda dos Jurupis, 701 – apt.152 CEP 04088-022 – São Paulo (SP).

**Horácio Martinho Lima**: Brazilian, single, engineer, ID Card RG 05213864-1, CPF 745.862.547-34, residing and domiciled at Rua Odílio Bacelar, 43, casa, Urca, CEP 22290-280, Rio de Janeiro (RJ), with the following address provided for correspondence: Av. Rio Branco, 110, 38° andar, Centro, CEP 20040- 001, Rio de Janeiro (RJ).

**José Carlos Lima de Abreu**: Brazilian, married, bank employee, ID Card RG 3.322.031-1, CPF 385.584.168-34, residing at Rua Antonio Serafim 162, Condominio Santa Margarida, Jd. Sta. Marcelina, Campinas, SP, CEP 13100-110.



**BANCO CENTRAL DO BRASIL**

**Maria Luisa Garcia de Mendonça**: Brazilian, married, economist, ID Card RG 20.039-5, CPF 380.376.616-87, residing at Av. Rainha Elizabeth da Bélgica, 664, apt. 101, Rio de Janeiro, RJ, CEP 22081-030.

**Progresso Vanõ Puerto**: Spanish, married, economist, RG W532825-3, CPF 410915908-34, residing at Tr. Vera de Oliveira Coutinho, 94, São Paulo, SP - CEP 04007-040.

**Renato Alves Rabello**: Brazilian, married, engineer, ID Card RG 3797473–SP, CPF 527.747.408-00, residing at Rua Aramanaí, 56, Vila Madalena, São Paulo, SP CEP 05450-030.

**Roberto Vieira da Silva de Oliveira Costa**: Brazilian, married, economist, ID Card RG 04882637-4 IFP-RJ, CPF 769.344.037-20, residing at Rua Joaquim Nabuco, 244/701 - CEP 22080-030, Copacabana, Rio de Janeiro, RJ.

**Sergio Marra Pereira Capella**: Brazilian, married, bank employee, ID Card RG 11.724.885, CPF 041.247.618-56, residing at Rua Canário, 130, apto 11 - Moema, São Paulo, SP CEP 04521-000.

**Ernani Fonseca Neto**: Brazilian, married, economist, ID Card RG 3.231.103 IFP/RJ, CPF 625.936.257-91, residing at Rua Almirante Gomes Pereira, 12 – apt. 201 – Urca, Rio de Janeiro, RJ.

**João Lara de Souza Meirelles Filho:** Brazilian, married, ID Card RG 4.905.000 – SSP/SP, CPF: 644.384.148-49, residing at Rua Renato Paes de Barros, 56 – apt. 32 - Itaim Bibi SP.

**Luiz Whately Thompson:** Brazilian, married, ID Card RG 244 929 MA/SP, CPF 029.335.198-87, residing at Rua Oquira, 226 – Alto dos Pinheiros, SP – CEP – 05467-030.

The preceding information related to the identification of the ex-directors was provided by each of them in correspondence sent to this Investigation Commission.

**3.        COMPANY CONNECTIONS AND INTER-CONNECTIONS**

In February 2011, the CRUZEIRO DO SUL Group created Cruzeiro do Sul Holding Financeira S/A, and grouped together the investments in the financial branch. From then on, it was composed as follows:



**BANCO CENTRAL DO BRASIL**



The other shareholders of Banco Cruzeiro do Sul hold shares negotiated on Stock Markets.

The companies emphasized in the corporate structure are the finance companies, consolidated in document 4040 (Cosif Document no. 4 - Accounting Plan for Institutions of the National Financial System, instituted by BCB Circular Letter n 1.273, of 12.29.1987: Consolidated Analytical Balance Sheet - Financial Conglomerate Operational Consolidation, including Offices and Corporate Ownership Abroad). These, together with the others, make up conglomerate 4050 (Cosif Document no 5: Economic-Financial Consolidated– Conef).

Following is a brief description of the specialization of the other companies in the conglomerate:

**Cruzeiro do Sul S.A Corretora de Valores e Mercadorias, CNPJ 04.169.504/0001-90:** The company purpose is to conduct the typical and reserved activities for securities and commodities brokers; that is, to negotiate or register operations with securities on stock, commodity and futures markets, whether organized or not[1].

---

[1] The following are typical attributions of securities and commodities brokers: a) Operate at a location or on a system maintained by a stock market; b) subscribe, separately or in a consortium with other authorized companies, issues of securities for resale; c) intermediate public offers and distribution of securities on the market; d) buy and sell securities for itself or on behalf of third parties, subject to the regulation issued by the Securities and Exchange Commission (CVM) and by the Central Bank of Brazil in their respective areas of

65



# BANCO CENTRAL DO BRASIL

**Cruzeiro do Sul S.A. DTVM, CNPJ 62.382.908/0001-64:** The company purpose is to act in the intermediation of securities, and on financial and capital markets, such as with shares, corporate bonds or commodities[2].

In addition to these, the group also contains the following non-finance companies:

**Cruzeiro do Sul Holding Financeira S.A., CNPJ 13.211.256/0001-70:** The company purpose is to own shares in financial institutions and other institutions authorized to operate by the Central Bank of Brazil.

**Cruzeiro do Sul S.A. Companhia Securitization company de Créditos Financeiros, CNPJ 06.227.606/0001-40:** The specific and exclusive company purpose is to receive, by assignment, credits resulting from operations conducted by multiple banks, commercial banks, investment banks, real estate credit companies, commercial leasing companies, mortgage companies, savings and loan associations and by Caixa Econômica Federal.

---

competence; e) carry out the administration and management of securities portfolios; f) be responsible for the subscription, transfer and authentication of endorsements, processing or guarantees, receipt and payment of redemptions, interest and other revenues from securities; g) perform fiduciary agent functions; h) institute, organize and manage funds and investment clubs; i) create investment companies – foreign capital and administer and manage the respective portfolio of securities; j) perform the functions of certificate issuer agent and provide book entry share maintenance services; l)[sic] issue share deposit certificates; m) intermediate foreign exchange operations; n) carry out operations on the floating exchange rate market; o) conduct margin account operations, pursuant to the regulations of the Securities Commission; p) carry out repurchase agreements; q) carry out operations of buying and selling precious metals, on the physical market, on its own behalf and on the behalf of third parties, pursuant to the terms of the regulations issued by the Central Bank of Brazil; r) operate on commodities and futures markets on its own behalf and on the behalf of third parties, subject to the regulations issued by the CVM and by the Central Bank of Brazil in their respective areas of authority; s) provide intermediation and advising services or technical assistance services, in operations and activities on the financial and capital markets; t) perform other activities expressly authorized jointly by the Central Bank of Brazil and by the CVM.

[2] The following are typical attributions of securities distributors: a) subscribe, separately or in a consortium with other authorized companies, issues of securities for resale; b) intermediate public offers and distribution of securities on the market; c) buy and sell securities for itself or on behalf of third parties, subject to the regulation issued by the Securities and Exchange Commission (CVM) and by the Central Bank of Brazil in their respective areas of competence; d) carry out the administration and management of securities portfolios; e) be responsible for the subscription, transfer and authentication of endorsements, processing or guarantees, receipt and payment of redemptions, interest and other revenues from securities; f) perform fiduciary agent functions; g) institute, organize and manage funds and investment clubs; h) create investment companies – foreign capital and administer the respective portfolio of securities; i) perform operations on the floating exchange rate market;  j) conduct margin account operations, pursuant to the regulations of the Securities and Exchange Commission; k) carry out repurchase agreements; l) carry out operations of buying and selling precious metals, on the physical market, on its own behalf and on the behalf of third parties, pursuant to the terms of the regulations issued by the Central Bank; m) operate on commodities and futures markets on its own behalf and on the behalf of third parties, subject to the regulations issued by the Central Bank and by the Securities and Exchange Commission in their respective areas of authority; n) provide intermediation and advising services or technical assistance services, in operations and activities on the financial and capital markets;  and o) perform other activities expressly authorized jointly by the Central Bank and by the Securities and Exchange Commission.

66



**BANCO CENTRAL DO BRASIL**

**BCS Seguros S.A., CNPJ 48.076.897/0001-63:** BCS Seguros S.A. is a privately held corporation and its company purpose is to operate in the grouping of life insurance and retirement savings and income plans within the field of open retirement plans, and it can be a member or shareholder of other companies, subject to the relevant provisions. Currently, BCS Seguros S.A. is only active in the area of DPVAT insurance.

BCS Seguros S.A., according to SUSEP/DECON/GAB no. letter 1.867 of December 27, 2005 is authorized to operate in the DPVAT insurance field. According to consortium instruments, Seguradora Líder dos Consórcios do Seguro DPVAT S.A. was founded on October 10, 2007, and BCS Seguros S.A. holds a defined percentage of the capital stock of this company.


BCS Seguros S.A. has direct ownership in Cia. Promotora de Vendas – Proveban, a company that provides services to its controller, Banco Cruzeiro do Sul S.A. There is no operational relationship between BCS Seguros S.A. and its controlled company, and the operating relationship with its controller is restricted to the intermediation of operations on the financial market.

**Companhia Promotora de Vendas – Proveban, CNPJ 03.562.511/0001-95:** Proveban basically performs administration, control and analysis of loans, consulting services in sales and information technology. Promotora de Vendas – Proveban is controlled operationally by the subsidiary of the Cruzeiro do Sul Group and the life insurance and private retirement sector of BCS Seguros S.A.

**Cruzeiro do Sul S.A. Comercial Importadora e Exportadora Ltda., CNPJ 02.169.598/0001-72:** The company purpose is ownership of other companies, as a member or shareholder, and may manage them, through the representative indicated; make investments related to the area of civil construction, and may purchase urban real estate in order to hold it as fixed assets or as investment; conduct operations on stock markets, or the sight market on its own benefit; trade, import and export of processed or raw agricultural products, textiles, livestock and "commodities;" and provision of consulting and business intermediation services.

The Investigation Commission found, based on inspection information from the Central Bank of Brazil, that **Verax Consultoria de Investimentos e Serviços Financeiros Ltda** (CNPJ: 05.697.624/0001-23) is another company that is a party in this conglomerate.

This company, which is owned by Mr. Marcelo Xandó Baptista (*Director da BCSul DTVM*), was one of the shareholders of BCSul Verax Serviços Financeiros Ltda (CNPJ: 05.917.347/0001-17).

67



**BANCO CENTRAL DO BRASIL**

It had the same address as the Bank (*Rua Leopoldo Couto de Magalhães*). Currently it is located in Santana de Parnaíba. Its managing partners are Marcelo Xandó Baptista (*Director da BCSul DTVM and Corretora*) and Marcio Serra Dreher (*Director of BSCul Verax*).

## 4.    TECHNICAL ACCOUNTING EXAMINATION

## 4.1    Company Books

According to the Report by the Temporary Special Administrator - TSAR, of 9.14.2012, in item *7.3 – Collection of books, assets and amounts*, all the books of an accounting, fiscal and corporate nature were properly identified, with registration in the proper Collection Book. Specifically for BANCO CRUZEIRO DO SUL S.A., the following books were collected (**page 639**):

- ✓ **Shareholder Meeting Minutes Book no. 1**

  - *with 50 pages with typed numbering from no. 01 to 50 pages;*
  - *registered at the Commercial Registry of the state of São Paulo, under no. 094150 on July 26, 1968;*
  - *last page used: page no. 50.*

- ✓ **Shareholder Meeting Minutes Book no. 2**

  - *with 100 pages with typed numbering from no. 01 to 100 pages;*
  - *registered at the Commercial Registry of the state of São Paulo, under no. 110483 on August 29, 1989;*
  - *last page used: page no. 63.*

- ✓ **Shareholder Meeting Minutes Book no. 03**

  - *with 100 numbered pages from no. 001 to 100;*
  - *registered at the Commercial Registry of São Paulo, under no. 5063 on March 3, 2008;*
  - *last page used: page no. 100.*

- ✓ **Shareholder Meeting Minutes Book no. 04**

  - *with 100 numbered pages from no. 001 to 100;*
  - *to be submitted for registration at the Commercial Registry of the state of São Paulo;*
  - *last page used: page no. 016.*



# BANCO CENTRAL DO BRASIL

**4.2**        **Account Analysis**

This Investigation Commission analyzed the evolution of the main accounting headings in the Balance Sheets from 6.30.2007 to 12.31.2011 *(details are presented on page 1180)*, as well as the Special Opening Balance Sheet, of 6.4.2012, prepared by CGF, which contributed to the losses of Net Equity of **BANCO CRUZEIRO DO SUL S.A.,** as presented in the chart below:

| 62.136.254 BCO CRUZEIRO DO SUL S.A. | 2007-12 | 2008-12 | 2009-12 | 2010-12 | 2011-12 | TSAR |
|---|---|---|---|---|---|---|
| 1.0.0.0.00-7 | CURRENT AND LONG TERM ASSETS | 4,095.89 | 5,872.00 | 6,930.47 | 9,066.28 | 11,262.49 | 9,315.72 |
| 2.0.0.0.00-4 | FIXED ASSETS | 214.74 | 232.01 | 204.22 | 210.07 | 237.96 | 166.05 |
| 4.0.0.0.00-8 | LONG TERM RECEIVABLES | 3,262.96 | 5,035.16 | 6,065.73 | 8,149.54 | 10,299.51 | 11,718.16 |
| 6.0.0.0.00-2 | NET EQUITY | 1,047.64 | 1,068.45 | 1,068.10 | 1,126.58 | 1,200.72 | (2,236.78) |

**4.2.1**        **Inspection Reports**

In regard to the Inspections, the Bank and Bank Conglomerates Supervision Department - Desup, of the Central Bank of Brazil, conducted the inspections in question, considering the conglomerate as a whole, with a focus on the lead institution.

Therefore, in the case of the Cruzeiro do Sul Conglomerate, this work was more focused on **Banco Cruzeiro do Sul**, as explained below:

The analysis of the monitoring of the economic-financial situation, of the principal monitoring reports, of the measures taken by the Central Bank of Brazil since 2004 and of the following accounting categories show the factors that contributed to the decree of the temporary administration regime (TSAR) on 6.4.2012 (**page 1181**), and later extrajudicial liquidation of the institution, according to Presidential Act No. 1.230, of 9.14.2012 (**page 1182**).

Banco Cruzeiro do Sul S.A. (BCSul), CNPJ 62.136.254/0001-99, a privately held national financial institution had operations concentrated in the branches in São Paulo (company headquarters) and in Rio de Janeiro, with authorized branches in Campinas, Salvador, Recife, Belém, Macapá and Palmas. Organized as a multiple bank, it was authorized to operate with a commercial and investment portfolio, as well as foreign exchange and repurchase agreements.

The company has been publicly traded since June 2007, and beginning on March 29, 2011, its share became controlled by Cruzeiro do Sul Holding Financeira S.A. (BCSul Holding), CNPJ 13.211.256/0001-70, a company totally controlled by Luís Felippe Índio da Costa (70%) and Luís Octávio Azeredo Lopes Índio da Costa (30%). BCSul Holding owns 100% of the common shares and 73.06% of the preferred shares of Banco Cruzeiro do Sul S.A.



**BANCO CENTRAL DO BRASIL**

BCSul is part of the Cruzeiro do Sul economic-financial group, composed of six other companies, all directly controlled by the institution: BCS Seguros S.A., CNPJ 48.076.897/0001-63 (99.92%), Cruzeiro do Sul S.A. Companhia Securitization company de Créditos Financeiros, CNPJ 06.227.606/0001-40 (100%), Cruzeiro do Sul S.A. Comercial Importadora e Exportadora Ltda., CNPJ 02.169.598/0001-72 (98.01%), Cruzeiro do Sul S.A Corretora de Valores e Mercadorias, CNPJ 04.169.504/0001-90 (100%), Cruzeiro do Sul S.A. DTVM, CNPJ 62.382.908/0001-64 (100%) and Companhia Promotora de Vendas – Proveban, CNPJ 03.562.511/0001-95 (99.89%). Among these companies, the following formed the Financial Conglomerate: Banco Cruzeiro do Sul S.A., Cruzeiro do Sul S.A Corretora de Valores e Mercadorias and Cruzeiro do Sul S.A. DTVM.

On 5.14.2004 an administrative proceeding was filed against Banco Cruzeiro do Sul S.A., and its statutory directors Luís Felippe Índio da Costa and Luís Octávio Azeredo Lopes Índio da Costa for sending correspondence to participants in the Check and other Paper Compensation Service (SCCOP), accompanied by a list of checks, falsely notifying them that the financial institution had been the victim of theft. This illicit act constitutes a violation of Circular Letter no. 772, of 4.8.1983 and Articles 5 and14 of Circular Letter 2.398, of 12.29.1993 (**pages 1183 to 1194**).

Through Decap/GTSPA-2007/33 Decision, of 3.12.2007 (**pages 1195 to 1202**), a warning was issued to Banco Cruzeiro do Sul S.A. and to Luís Felippe Índio da Costa and Luís Octávio Azeredo Lopes Índio da Costa, based on paragraph 1 of Article 44 of Law 4.595.

The National Financial System Appeals Council (CRSFN), when analyzing the appeals filed by Banco Cruzeiro do Sul S.A. and by Mr. Luis Felippe Índio da Costa and M r . Luís Octávio Azeredo Lopes Índio da Costa against the decision issued by the Central Bank of Brazil, did not overturn the decision under appeal in regard to the Financial Institution and granted the appeals filed by their controllers, which led to the punishment of warning given them being archived (**pages 1203 to 1249**).

An inspection was conducted in August 2008 (base date: June 2008), in order to assess the quality of the assets that made up the portfolios of the Credit Right Investment Funds (CRIFs), to verify the accounting procedures and the financial flow of the operations assigned, as well as the profitability of the subordinated quotas of the FDICs, as well as to study the management of results from the assignment of credits to the CRIFs and to financial institutions.

Assigned operations with co-obligations were found, which, although liquidated in advance, continued to be recorded under category 3.0.1.85.00-5 – Co-obligations in Credit Assignment, with the transfer of the funds to the assignees; in other words, the flow was maintained in spite of the advance liquidations of the credits. Another conclusion was the use of the CRIFs, principally of the largest, Multicred, as an instrument for managing the results of the Conglomerate.

In regard to the forecast for results for the second half of 2008, a trend was found of presentation of numbers that were significantly lower than those of the previous semester as a result of the low profitability of the main asset of the Conglomerate (subordinated shares



# BANCO CENTRAL DO BRASIL

of Multicred), except if the practice is maintained to advance the results via credit assignments at low rates. For the next fiscal year, a loss was predicted, aggravated by the advance liquidation of the credits assigned. Thus, this dependence was characteristic of Cruzeiro do Sul on credit assignments and on maintaining the volume of production to sustain satisfactory profitability levels.

Finally, credits listed in the portfolios of the funds violated provisions in the regulations referring to clients with a past record of breach at the Conglomerate that had negative credit records in periods prior to the execution of the contract assigned. In other words, some borrowers had their contracts written off for non-payment, and later, a new operation was conducted and assigned to the CRIF, a practice that is prohibited by the regulations governing the funds in the sample.

Several inspection letters, from October 2008 until January 2010 (**pages 1250 to 1260**), provided the facts indicated above to Banco Cruzeiro do Sul S.A., requesting clarifications on the occurrences, as well as correction measures, including in relation to the consequential accounting entries.

When accompanying the results presented by the Cruzeiro do Sul Conglomerate in the second semester of 2008, the Central Bank of Brazil inspectors detected credit right assignment operations whose objective was the artificial increase of accounting profits of the assignor during the period.

One of these operations took place on 10.27.2008 and involved the assignment of credit rights related to consigned credit cards issued by Banco Cruzeiro do Sul. On that date, the bank assigned to CRIF Aberto BCSul Verax CPP 120 flows with face value of R$ 1,154,928,128.51, which had until then been accounted for on its financial statements in the amount of R$ 222,775,606.89.

On this same date, this fund assigned the same flow to FDIC BCSul Verax Multicred Financeiro at the price of R$ 602,596,276.31, obtaining profits of R$ 379,820,206.69.

As determined by the nature of the FDICs, these profits were attributed to the subordinated quotas of the FDIC CPP120. Since FDIC Multicred is the principal holder of these shares, it is understood that its assets began to record this result on the date of the operation. In turn, the subordinate shareholder of FDIC Multicred is Banco Cruzeiro do Sul, the original assignor. Thus, the assigned flows ended up returning to the bank's accounting statements, but now overpriced and in the form of shares of CRIF Multicred. Since this fund is set up as a closed-end fund, taxes owed are only collected at the time of redemption or amortization of the quotas, as established in Article 14 of IN SRF 25, of 3.6.2001. Therefore, there was evidence that the purpose for filing the CRIF CPP 120 was to delay the collection of the taxes owed, since this possibility would not exist if the assignment had



**BANCO CENTRAL DO BRASIL**

been made directly between the bank and FDIC Multicred, which violates the provision in Article 273, section I of decree 3000, of 3.26.1999.

Therefore, the Federal Revenue Office of Brazil was notified of the evidence of fiscal irregularities found in the inspection work in the second semester of 2008, in Official Letter Desup/Gabin-2009/0037, of 8.12.2009 (**page 1261**), according to the detailed description in the "Brief Report on Occurrence" on **pages 1262 to 1263**.

On 10.1.2009, according to Opinion Desup/GTSP2/Cosup-03-2009/0005, of 1.10.2009 (**pages 1264 to 1282**), an administrative proceeding was opened against Banco Cruzeiro do Sul S.A., directors, members of the board of directors and members of the audit committee for improperly increasing the results on the financial statements sent to the Central Bank of Brazil, beginning with the 2008 fiscal year, through credit right assignments under artificial conditions to credit right investment funds (CRIFs) and to financial and non-financial entities, which constitutes a serious violation of Articles 31 and 44 of Law 4.595, of 12.31.1964 (legal entity), Article 44, paragraph 4, of Law 4.595, of 12.31.1964 (individual), Article 2, section III, of resolution 2.907, of 11.29.2011; and Article 2, sections I and II, of Resolution 3.673, of 12.26.2008.

According to Decision 0595/2012 – DIORF, of 5.4.2012 (**pages 1283 to 1335**), Banco Cruzeiro do Sul S.A., the directors: Luis Felippe Índio da Costa, Luis Octávio Azeredo Lopes Índio da Costa, Maria Luisa Garcia de Mendonça, Luiz Whately Thompson, José Carlos Lima de Abreu, Roberto Vieira da Silva de Oliveira Costa, Fábio Caramuru Corrêa Meyer, Sérgio Marra Pereira Capella, João Lara de Souza Meirelles Filho, the members of the board of directors, Fábio Rocha do Amaral, Charles Alexander Forbes, Progreso Vaño Puerto and Horácio Martinho Lima and the members of the audit committee, Gilberto Braga (identified member), Miguel Vargas Franco Netto and Paulo Roberto Barral, were notified to present their defenses in the administrative proceeding for the following irregularities, which subject them to the sanctions indicated in Art. 44 of Law 4.595, of December 31, 1964.

Irregularity "a" – Improperly increase the results of the financial statements sent to the Central Bank of Brazil, referring to the 2008 fiscal year and the 1st four months of 2009, through credit right assignments under artificial conditions to credit right investment funds (CRIFs) and to financial and non-financial entities, which constitutes a serious violation.

Applicable law: Arts. 31 and 44 of Law 4.595, of 1964 (legal entity); 44, § 4, of Law 4.595, of 1964 (individuals); Art. 2, section III, of Resolution 2.907, of November 29, 2001; and Art. 2, sections I and II, of Resolution 3.673, of December 26, 2008.

Irregularity "b" – Failure to comply with the statutory obligation to monitor the management of the Management Board, in conducing company business, by implementing procedures to improperly increase the results of the financial statements sent to the Central Bank of Brazil, referring to the 2008 fiscal year and the 1st four months of 2009,



# BANCO CENTRAL DO BRASIL

through credit right assignments made under artificial conditions to credit right investment funds (CRIFs) and to financial and non-financial entities, which constitutes a serious violation.

Applicable law: Arts. 31 and 44, § 4, of Law 4.595, of 1964.

Irregularity "c" - Preparing and releasing an Audit Committee Report without indicating the irregularities committed by Banco Cruzeiro do Sul S.A., by implementing procedures to improperly increase the results of the financial statements sent to the Central Bank of Brazil, referring to the 2008 fiscal year and the 1st four months of 2009, through credit right assignments made under artificial conditions to credit right investment funds (CRIFs) and to financial and non-financial entities, which constitutes a serious violation.

Applicable law: Art. 44, § 4, of Law 4.595, de 1964, and Art. 17, section V, and Art. 15, section VII, of the Regulation Attached to Resolution 3.198, of May 27, 2004.

*Having characterized the irregularities described, and considering the degree of participation and liability of each of those notified, as well as the seriousness of the acts indicated, the Management Board of the National Financial System Organization (DIORF) of the Central Bank of Brazil decided to:*

a) Levy a punishment of DISQUALIFICATION for the exercise of administrative or management positions in institutions in the inspection area of the Central Bank of Brazil, based on § 4 of Art. 44 of Law 4.595, of 1964, for the following periods:

a.1) ten (10) years to Luis Felippe Índio da Costa, Luis Octávio Azeredo Lopes Índio da Costa and Maria Luisa Garcia de Mendonça, for irregularity "a";

a.2) eight (8) years to Roberto Vieira da Silva de Oliveira Costa, for irregularity "a";

a.3) six (6) years to José Carlos Lima de Abreu, for irregularity "a"; and

a.4) four (4) years to Luiz Whately Thompson, Fábio Caramuru Corrêa Meyer and Sérgio Marra Pereira Capella, for irregularity "a", Fábio Rocha do Amaral, Charles Alexander Forbes, Progreso Vaño Puerto and Horácio Martinho Lima, for irregularity "b" and Gilberto Braga, Miguel Vargas Franco Netto and Paulo Roberto Barral, for irregularity "c";

b) levy a FINE of R$ 100,000.00 (one hundred thousand reais), on Banco Cruzeiro do Sul S.A., for irregularity "a", based on Art. 44, § 2, of Law 4.595, of 1964;

c) Dismiss the administrative proceeding in relation to Mr. João Lara de Souza Meirelles Filho, in light of the content of item 149, automatically appealing to the National Financial System Appeals Council.

*According to information on the National Financial System Appeals Council website (www.bcb.gov.br/crsfn), the proceeding is before the General Counsel to the National Treasury/CAF for preparation of an Opinion – MEMO no. 160/2012 – CRSFN –*

73



# BANCO CENTRAL DO BRASIL

*MF, of 8.13.2012 (**page 1336**).*

As a result, and in accordance with the provision in Administrative Ruling 43.834, of 4.1.2008, and in MSU 4.30.10.60.03, the Central Bank of Brazil notified the Federal Prosecutor's Office, in accordance with Opinion Desup/GTSP2/Cosup-03-2010/0001, of 1.4.2010 (**pages 1337 to 1341**), pursuant to the terms of Article 9 of Complementary Law 105, of the following facts, which in theory configure evidence of a crime against the National Financial System, committed by administrators and members of the Audit Committee of Banco Cruzeiro do Sul S.A.:

*a) Improperly increase the results of the financial statements sent to the Central Bank of Brazil, beginning with the 2008 fiscal year, through credit right assignments under artificial conditions to credit right investment funds (CRIFs) and to financial and non-financial entities.*

The Federal Prosecutor's Office was notified of this fact through Official Letter Desup/Gabin-2010/0019, of 3.17.2010 (**pages 1342 to 1346**), since, in theory, this is evidence of the crimes defined in Articles 4, 6 and 10 of Law no. 7.492, of 6.16.1986.

These facts, which theoretically characterized a failure to comply with Article 177, paragraph 3, of Law no 6.404, of 12.15.1976, item 1 of the Attachment to CVM Deliberation 29, of 2.5.1986, during the period in which it was in effect, and item 35 of the Attachment to CVM Deliberation 539, of 3.14.2008, were provided to the Securities and Exchange Commission (CVM) so that the appropriate measures could be taken, through Official letter Desup/Gabin-2010/0003, of 1.15.2010 (**pages 1347 to 1349**), in compliance with the provision in Article 9, paragraph 2, of Complementary Law 105, of 1.10.2001.

The Special Verification, base date: 9.30.2009, restricted to the verification of the effectiveness of internal controls on Prevention of Money Laundering (PLD) of Banco Cruzeiro do Sul S.A. based on the results of tests applied to the client data bases (total of 6,560 including individuals and legal entities) and /or representatives of the institution's active clients (total of 2,927), involving their respective bank transactions revealed important fragilities, as shown below:

*a) poor quality of record updating. More than 60% of its clients/ representatives either did not have their records updated in the past two (2) years or the most recent update had not been recorded;*

*b) existence of 416 client records that did not contain information on financial capacity (income/sales), which compromised, for these cases, at minimum the effectiveness of the selection/detection process of suspect operations, and at least, the processing speed for the analysis of suspect operations;*

*c) inadequate description of the economic activity of clients. Considering the 20 most commonly described activities in the data bases provided by the institution, 27% of the*

74



# BANCO CENTRAL DO BRASIL

*individual clients had poorly described activities. For legal entities, the situation was even worse, with this percentage reaching almost 43%; and*

*d) poor quality of the information contained in the documentation (reports) that supported the notifications to Coaf about cash operations greater than R$ 100,000, such as the lack of clear identification of the owner, person responsible, depositor/withdrawer and the failure to show in the reports that notice was given of the operations within the legal timeframe.*

As a result of the inspection, several pieces of correspondence were sent to Banco Cruzeiro do Sul S.A. (**pages 1350 to 1355**), informing it of the conclusions of the tests applied and requiring that measures be taken to improve the institution's PLD processes. The statements presented are not consistent, according to correspondence Desup/GTSP2/Cosup-03-2011/0049, of 1.27.2011 (**pages 1356 to 1357**).

The result of the inspections on the base dates 11.30.2009 and 2.28.2010 to examine the transactions made between Banco Cruzeiro do Sul S.A. and Associação do Músicos Militares do Brasil – Ambra, concluded that the level of risk attributed to them was inadequate. In addition, control deficiencies were seen in the granting of credit to this debtor.

This inspection also evaluated the sample of credit rights that were issued by Banco Cruzeiro do Sul S.A. to FDIC Aberto BCSul Verax CPP 120, on 10.17.2008. Of the sample of 100 reports requested, 63 physical documents, 31 recordings were sent, and for 6 cases, no proof of any request for the product were sent; phone conversations do not constitute an adequate and representative credit instrument under the terms of Resolution 1.559, of 12.22.1988, with wording given by Resolution 3.258, of 1.28.2005.

Correspondence Desup/GTSP2/Cosup-03-2010/0338, of 7.5.2010 (**pages 1358 to 1365**), Desup/GTSP2/Cosup-03-2010/0447, of 9.3.2010 (**pages 1366 to 1367**) and Desup/GTSP2/Cosup-03-2010/0665, of 10.17.2010 (**page 1368**), requested clarifications and corrective measures of Banco Cruzeiro do Sul S.A.; the responses given were considered to be partially sufficient.

The Special Verification, base date: 3.31.2010, for the purpose of verifying compliance by the internal controls and procedures of PLD/CFT of Banco Cruzeiro do Sul S.A. to the alterations introduced by Circular Letters 3.461/2009 and 3.462/09, indicated the following irregularities according to the CONCLU and IRRE report (**pages 1369 to 1371**), the object of correspondence Desup/GTSP2/Cosup-03-2010/0288, of 6.1.2010 (**pages 1372 to 1374**), as follows:

*a) failure to comply with the requirement to maintain a signed declaration on the purpose and nature of the business relationship of the institution in the record of its clients considered to be permanent (including for consigned personal credit);*
*b) partial failure to comply with the requirement to maintain the information in the record referred to in sections I and II of Article 2 of BC Circular Letter 3461/2009, in relation to consigned personal credit clients considered permanent by the institution,*

# BANCO CENTRAL DO BRASIL

*c) absence in the specific records of fund transfer operations of the CPF/CNPJ number of the issuer of checks deposited at Banco Cruzeiro do Sul S.A. (depository institution);*

*d) absence of the name of the person in charge of record updating for permanent clients.*

The following points that can be improved were also identified:

*a) lack of an item indicated in the PCLD Policy explaining the requirement to conduct a preliminary analysis of new products and services, from the viewpoint of the PCLD;*

*b) failure to implement in the bank's single client registry, (SD Bank system – except for consigned personal credit clients), of a specific field to register the type of client (whether permanent or occasional);*

*c) lack of description, in the Policies and/or Internal Bank Rules Manual, of the minimum information that will be required of the clients classified as occasional;*

*d) outdated registration manual; that is, a manual that partially complies with the new guidelines of the Registration Policy in effect; and*

*e) lack of formalization, in the Registration Policy or in the Registration Manual, of the activities and/or situations involving clients that will be considered as being of differentiated risk (for example, clients negatively portrayed in the media, located in border regions, for whom it is not possible to identify the final beneficiary, etc.).*

Verification of the actual implementation of the actions to correct the irregularities indicated in the different inspections done by the Central Bank of Brazil during 2009 and 2010 was the subject of ongoing monitoring of Banco Cruzeiro do Sul S.A., corresponding to the Annual Supervision Plan of 2011 and 2012, as presented below.

The principal and almost exclusive niche of activity of Banco Cruzeiro do Sul S.A. was the granting of consigned loans to civil servants and beneficiaries of the National Social Security Institute (INSS), through direct loans and consigned credit cards. Together, in 2011 these two portfolios represented approximately 97% of the total volume of its credit operations. BCSul also granted loans and financing to the small and middle market segment.

The method of operation of BCSul demonstrated a strong dependence on credit assignments to CRIFs, in some cases characterized as an alternative way to raise funds, and in others, as a management tool of accounting results, such as the situations indicated in the punitive administrative proceeding, filed against the institution and its



# BANCO CENTRAL DO BRASIL

administrators, according to Opinion Desup/GTSP2/Cosup-03-2009/0005, of 10.1.2009 (**pages 1264 to 1282**). The FDICs themselves, which on December 31, 2011 had Net Equity (NE) of R$ 9.997 billion, with 82% share of BCSul, are mostly administered by Cruzeiro do Sul S.A DTVM and managed by BCSul Verax Serviços Financeiros Ltda.

On the base date February 29, 2012, the information sent by BCSul indicated Reference Equity (RE) of R$ 1.683 billion, of which R$ 1.091 billion referred to Capital Level I and R$ 592 million to Capital Level II, with a broad Basel index of 12.6%. Its credit portfolio, net of provision, was R$ 2.398 billion, which, together with the portfolio assigned with a co-obligation of R$ 8.346 billion, represented a total credit risk for BCSul of R$ 10.744 billion. The following table represents the equity position of BCSul with a base date of February 2012.

**Equity position of Banco Cruzeiro do Sul S.A. in February 2012**
**Amounts in R$ billions**

| ASSETS | Value | % | LIABILITIES | Value | % |
|---|---|---|---|---|---|
| **Total Adjusted Assets** | **11.980** | **100.0%** | **Total Adjusted Liab. & OE** | **11.980** | **100.0%** |
| **Current and Long Term** | **11.831** | **98.8%** | **Liabilities** | **10.127** | **84.5%** |
| Credit Operations | 2.398 | 20.3% | Term Deposits | 6.229 | 61.5% |
| Securities | 8.687 | 73.4% | Securities abroad | 2.033 | 20.1% |
| Fund Shares | 8.346 | 96.1% | Tax and social security obligations | 289 | 2.9% |
| Fixed Income | 221 | 2.5% | Contingencies | 72 | 0.7% |
| Variable Income | 3 | 0.0% | Operations Obligations Linked to assignments | 568 | 5.6% |
| Guarantees provided | 74 | 0.9% | Misc. | 936 | 9.2% |
| Linked Operations | 43 | 0.5% | | | |
| Derivatives | 87 | 0.7% | | | |
| Inter-financial liquidity investments | 294 | 2.5% | | | |
| Misc. | 365 | 3.1% | | | |
| | | | **Subordinated debt to capital** | **710** | **6.0%** |
| **Fixed** | **149** | **1.2%** | **Results Future Years** | **2** | **0.0%** |
| | | | **Net Equity** | **1.141** | **9.5%** |

| RESULTS (*) | | | REFERENCE EQUITY | |
|---|---|---|---|---|
| Period | Prof | RSPLA | RE level 1 | 1.091 |
| **Semester – (Dec/2010)** | 76.2 | 7.1% | **RE level 2** | 592 |



# BANCO CENTRAL DO BRASIL

| RESULTS (*) | | | REFERENCE EQUITY | |
|---|---|---|---|---|
| Semester – (Jun/2011) | 81.5 | 4.7% | INDEXES (%) | |
| Semester – (Dec/2011) | 55.6 | 7.1% | Basel Index | 13.8% |
| Current (Jan-Feb/2012) | (61.0) | -0.5% | Basel Index (includes RBAN) | 12.6% |
| | | | Index of Fixed Liabilities | 8.5% |
| (*) Balance of the last 6 months | | | | |

**Source:** "Analyzer" Report, issued by Desig.

Since the issuance of Resolution n 3.692, of March 26, 2009, which created the Credit Guarantee Fund special guaranteed term deposit (DPGE), BCSul began to operate with a strong dependency on this type of funding, and it often used its entire limit, without additional encumbrance, for this type of funding. The data from May 8, 2012 revealed that the funds raised under the DPGE represented 98.1% of this limit, with volume raised of R$ 2.2278 billion, representing some 36% of the total amount of term deposits.

The ongoing and inspection work in the field done by the Central Bank of Brazil Inspectors in recent years (2011 and 2012) has indicated a deterioration of its liquidity and equity situations, which were the focus, among other actions, of Certificates of Attendance Desup/GTSP2-2011/0003, of May 12, 2011 (**page 1375 to 1382**), and Desup/GTSP2- 2011/0008, of August 18, 2011 (**pages 1383 to 1390**), in relation to which BCSul did not take measures capable of satisfactorily altering the situation found by the Agency.

In the second semester of 2011, an inspection was conducted to evaluate the feasibility of BCSul Conglomerate, with a focus on its equity situation and on its capacity to generate income, as well as on the analysis of the integrity of the accounting and financial information, especially on the mapping of financial flows, which:

a) proved the strong dependence of BCSul on the credit assignments to the CRIFs, since, taking advantage of the regulation in effect at that time, the Bank received revenues in advance in order to manage the results shown in the accounting documents, a situation that was no longer possible beginning in January 2012, when Resolution no. 3.533, of January 31, 2008 went into effect;

b) found that the true result obtained in the credit operations was conjured up through the advancement of revenue through assignments to the CRIFs; and

c) concluded that in spite of the expertise in the origination of the consigned credit, the institution faces funding and technological resource restrictions.

It should be noted that in spite of this unfavorable scenario, and based on results that were artificially inflated by the advance receipt of revenues in the credit assignments, BCSul had been routinely distributing profits, as dividends and interest on own capital, as shown in the following table (amounts in R$ thousand):



# BANCO CENTRAL DO BRASIL

| Base year | Net Profits | Dividends + Int. own Capital | |
|---|---|---|---|
| | | Amount distribut. | % on NP |
| 2008 | 178,915 | 94,935 | 53.1% |
| 2009 | 81,861 | 63,400 | 77.4% |
| 2010 | 151,533 | 93,140 | 61.5% |
| 2011, to Sep. | 105,546 | 49,500 | 46.9% |

In order to correct the equity imbalance that would result from the adjustments ordered, and to rebalance its liquidity, principally due to difficulties in raising funds and in the proximity of maturities of raised funds, in both the DPGE modality and in external lines, BCSul informed the Central Bank of Brazil that it had begun work to reach understandings with the Credit Guarantee Fund (CGF). On October 21, 2011, as a result of these understandings, an agreement was signed, which contained the following principal points:

a) acquisition by CGF of senior shares in an FDIC, which would be created with credits from BCSul, and a loan of R$ 25 million from the Fund to BCSul Holding, to replace the equity and preserve the Conglomerate's operating capacity;

b) disbursement by BCSul Holding of at least R$ 15 million of its own funds, to acquire at least R$ 40 million in credits from BCSul, which had undergone adjustments resulting from indications by the Central Bank;

c) recognition of the adjustments listed in Certificate of Attendance Desup/GTSP2-2011/0008, in the amount of R$ 270 million;

d) the commitment, by CGF, to acquire 80% of the senior shares of a new FDIC (FACB Financeiro), which would be created through BCSul credit operations in the amount of R$ 4.480 million;

e) alignment of the flow of payment of the fund shares with the maturities of the DPGE and the external funds raised by BCSul;

f) obligation of BCSul to not raise new funds under the DPGE modality, to not raise new external funds until January 2014, to not distribute the profits that it may obtain in the 2012 and 2013 fiscal years and to present a business plan that shows adaptation to the new equity reality.

Although the agreement with CGF has provided conditions to enable improvement in the economic-financial situation of BCSul, the conditions for making its operations profitable are still troubling, in light of the normative scenario (Resolution no. 3.533, of 2008, which covers accounting for credit assignment operations, Circular Letter no. 3.427, of December 19, 2008, and complementary rules, which establish the deduction for acquisitions of credit rights in compliance with compulsory payments), which established new



**BANCO CENTRAL DO BRASIL**

guidelines for the recognition of results, especially the prohibition on advance receipt of revenues, and for obtaining sources of financing for operations. Among the principal difficulties that remained are the following:

a) the perspective of deterioration of the economic-financial situation of BCSul, shown by its inability to consistently generate results;

b) the deficiencies in the Conglomerate's internal controls, noted by the Central Bank of Brazil during the aforementioned supervision work;

c) the high and dangerous oscillations of its levels of liquidity; and

d) the distribution in the last fiscal years of dividends and fees in amounts that are incompatible with the real results found.

Since these findings recommended the use of precautionary preventive measures, based on sections III, V and VIII of Art. 2 of Resolution no. 4.019, of September 29, 2011, in December 2011, the following measures were taken:

a) suspension of the increase in compensation for the administrators;
b) suspension of the payment of installments of variable compensation to administrators; and
c) suspension of the distribution of results in an amount higher than the minimum legal limits, even if made as payment of interest on own capital.

Notice of these measures was given to Banco Cruzeiro do Sul S.A., to Cruzeiro do Sul S.A. Corretora de Valores e Mercadorias and to Cruzeiro do Sul S.A. Distribuidora de Títulos e Valores Mobiliários, through Official letters 0505/2011-BCB/Desup/GTSP2/Cosup- 03, 0506/2011-BCB/Desup/GTSP2/Cosup-03 and 0507/2011-BCB/Desup/GTSP2/Cosup-03, all of 12.30.2011 (**pages 1391 to 1396**).

As a result of these measures, Certificate of Attendance Desup/GTSP2/Cosup-03-2012/0001, of January 9, 2012 (**pages 1397 to 1408**) was prepared, which ordered the presentation within thirty days of a plan to correct the situations that led to the adoption of the preventive precautionary measures, authenticated by the Management Board and by the Board of Directors, indicating  quantitative and qualitative goals to be reached, the consent of all parties involved in obtaining them and the establishment of a schedule for its performance, not greater than six months.

On February 8, 2012, BCSul sent a response presenting a partial plan, which covered Banco Cruzeiro do Sul S.A., Cruzeiro do Sul S.A. Corretora de Valores e Mercadorias and Cruzeiro do Sul S.A. Distribuidora de Títulos e Valores Mobiliários (**pages 1409 to 1425**). On February 27, 2012, a complement to the plan was presented, which included quantitative goals for 2012 (**pages 1426 to 1429**).



# BANCO CENTRAL DO BRASIL

As a result of a new study conducted using a specific data analysis technique, a new inspection at BCSul began in February 2012, with the base date: 12.31.2011, in order to ascertain the degree of consistency of the consigned personal installment operations (CPP), which showed signs of being invalid. During this work, the information systems were consulted, and samples of reports on the operations and tests of the data bases were conducted. The results can be summarized as follows:

a) credit contracts were identified that were registered in the CPP financial and accounting management system (Tools system), but which did not follow the normal credit processing system; in other words, they were not registered in the system used for credit analysis (Retaguarda system); and

b) among these operations, 99% were contracted by eight supposed bank correspondents; seven of them used the same CNPJ, which belongs to Associação dos Músicos Militares (Ambra), except for the company Javic Assessoria, whose CNPJ number has been suspended at the Federal Revenue Office of Brasil since the end of 2008.

These operations also showed several shared and suspicious characteristics, forming a standard profile, whose invalidity is characterize by the absence of proof of release of the funds to the alleged clients or intervening entity and of registration at the proper agency. Such proof was not found during consultations of the information available in the system, not even after repeated requests were made were the evidentiary documents presented to the Central Bank of Brazil.

In February 2012, the accounting balances for the operations that were characterized as invalid totaled R$ 1.249 billion, and were distributed among 320,001 contracts. Based on these new findings, BCSul was notified by Official letter 0355/2012-BCB/Desup/GTSP2/Cosup-03, of 5.11.2012 (**pages 1430 to 1432**), to provide the necessary clarifications, to perform the necessary accounting adjustments and to implement the appropriate correction measures.

As a result of the accounting adjustments ordered, due to the invalid entries in the operations referred to in the previous paragraphs, on the base date of February 29, 2012, BCSul was showing a deficiency of R$ 1.635 billion in comparison to the Reference Equity (RE) with the Required Reference Equity (RRE), as shown in the following chart:

| Banco Cruzeiro do Sul S.A. (in thousands of reais) | | | |
|---|---|---|---|
| **Base date: 2.29.2012** | **Level I** | **Level II** | **Total** |
| **Reference Equity (RE)** | **1,090,599** | **591,905** | **1,682,504** |
| (-) Regulatory Adjustments | -1,249,000 | 0 | -1.249.000 |
| (-) Deduction of Re-evaluation Reserves(i) | | -13,319 | -13,319 |



# BANCO CENTRAL DO BRASIL

| Banco Cruzeiro do Sul S.A. (in thousands of reais) | | | |
|---|---|---|---|
| **Base date: 29.2.29.2012** | **Level I** | **Level II** | **Total** |
| (-) Deduction of Subordinated Debt Instruments (ii) | | -545,300 | -545,300 |
| (-) Deduction of Level II Capital (iii) | | -33,287 | -33,287 |
| **(=) Adjusted RE** | **-158,401** | **0** | **-158,401** |
| (-) Deduction of excess Long Term Liab. (iv) | | | -143,586 |
| **(=) Adjusted RE for the purpose of the Basel limit (A)** | | | **-301,987** |
| | | | |
| **RRE – Required Reference Equity** | | | **1,470,610** |
| (-) Weighted adjustments at 100% x 0.11 | | | -137,390 |
| **(=) Adjusted RRE (v) (B)** | | | **1,333,220** |
| | | | |
| **Margin / Deficiency (A - B)** | | | **-1,635,207** |

| |
|---|
| (i) = Deduction referred to in section II of Art. 14 of Resolution no. 3.444, of 2.28.2007 (limited to 25% of Level I). |
| (ii) = Deduction referred to in section III of Art. 14 of Resolution no. 3.444, of 2007 (limited to 50% of Level I). |
| (iii) = Deduction referred to in section I of Art. 14 of Resolution no. 3.444, of 2007 (limited to 100% of Level I). |
| (iv)= Deduction referred to in Art. 5 of Resolution no. 3.444, de 2007, reflection of the adjustments made. |
| (v) = Required Reference Equity (RRE), established in the manner set forth in Resolution no. 3.490, of 8.29.2007, considering only the reflections of the regulatory adjustments in the presentations weighted by risk factors (PEPR), as per Circular Letters no. 3.360, of 9.12.2007, and no. 3.509, of 10.19.2010. |

It should be emphasized that the regulatory adjustments required by Official letter 0355/2012-BCB/Desup/GTSP2/Cosup3, of 5.11.2012 (**pages 1430 to 1432**), in the amount of R$ 1.249 billion for the BCSul NE of R$ 1.141 billion resulted in Uncovered Liabilities of R$ 108 million on February 29, 2012.

In a reply dated May 18, 2012 (**pages 1433 to 1438**), BCSul did not present arguments or new facts that could explain the irregularities indicated, not did it submit a recovery plan to deal with the serious equity deficiency, and a state of insolvency and serious violation of operating limits was thus demonatrated.

It should be added that BCSul had been struggling to honor all its commitments in the Reserve Transfer System (RTS), resulting in a situation that required corrective action of the Central Bank of Brazil.

Based on the foregoing, and especially considering the following:



# BANCO CENTRAL DO BRASIL

a) the seriously compromised economic-financial situation of the Conglomerate, characterized by Uncovered Liabilities of R$ 108 million;

b) the maintenance in BCSul assets of invalid credit operations, in an amount greater than its net equity;

c) the serious violation of the rules of the National Monetary Council and of the Central Bank of Brazil, characterized by providing this Agency with inaccurate accounting documents and financial information, resulting in hiding the real situation of the Conglomerate, in regard to its insolvency, leading the authority to err in its evaluation of the property and financial situation;

d) the lack of perspective for generating profits

e) in a sufficient amount to revert the situation described, especially the lack of equity and the failure to comply with operating limits;

f)  failure of the controlling shareholder to present a feasible plan to resolve the situation of the Conglomerate; and

g) the demonstrated incapacity of the controlling shareholder to inject funds into BCSul in the amount necessary to recompose its capital status, so that it can once again comply with operating limits, especially the Required Reference Property limit.

On 6.4.2012, the Credit Guarantee Fund (CGF) was attributed with temporary special administration at Banco Cruzeiro do Sul S.A., based on Art. 8 of Decree-Law no. 2.321, of 1987 and in Presidential Act no. 1.217, of 6.4.2012 (**page 1181**), the Temporary Special Administration Regime (TSAR) was decreed at Banco Cruzeiro do Sul S.A., CNPJ 62.136.254/0001-99, based on Art. 1, line "e", of Decree-Law n 2.321, of 1987, Art. 4 of Law n 9.447, of March 14, 1997, combined with Art. 15, section I, lines "a" and "b", of Law n 6.024, of March 13, 1974, considering the compromised economic-financial situation and the serious violation of the standards issued by the National Monetary Council and the Central Bank of Brazil, all in accordance with the decision of the Collegiate Management Board in a meeting held on June 4, 2012, and by extension, an identical regime was decreed through Presidential Acts 1.217, 1.218, 1.219, 1.220 and 1.221, all of 6.4.2012, for Holding Financeira S.A. (BCSul Holding), CNPJ 13.211.256/0001-70, the controller of Banco Cruzeiro do Sul S.A., and for the following companies controlled by the latter: Cruzeiro do Sul S.A. Companhia Securitization company de Créditos Financeiros, CNPJ 06.227.606/0001-40 (100%), Cruzeiro do Sul S.A Corretora de Valores e Mercadorias, CNPJ 04.169.504/0001-90 (100%) and Cruzeiro do Sul S.A. DTVM, CNPJ 62.382.908/0001-64 (100%), based on the connected interest shown by the exercise of control and by the existence of common administration, based on Art. 19 of Decree-Law n 2.321, of 1987, combined with Art. 51 of Law no. 6.024, of 1974, according to a decision of the Collegiate Management Board in a meeting on June 4, 2012.



# BANCO CENTRAL DO BRASIL

On 6.11.2012, through Opinion Desup/GTSP2/Cosup-03-2012/0047 (**pages 1439 to 1456),** an administrative proceeding was opened against Banco Cruzeiro do Sul S.A. – under Temporary Special Administration Regime (TSAR), its former directors, former board of directors members and former members of the audit committee for systematically and continuously adopting (period from May 2007 to March 2012), procedures for recording invalid liabilities of personal installment credit with payroll deduction, resulting in accounting statements that did not accurately and clearly reflect its real economic-financial situation, inducing clients, investors, the Central Bank of Brazil and the National Financial System in general to err which constitutes a violation of Article 31 of Law 4.595, of 12.31.1964, and of Cosif 1.1.2.3, 1.1.2.4, and 1.1.2.7 (Circular 1.273, of 12.29.1987).

The administrative proceeding is before the Punitive Administrative Proceeding Control and Analysis Department (DECAP) awaiting the filing of the defense by those notified.

On 6.12.2012, through Opinion Desup/GTSP2/Cosup-03-2012/0048 (**pages 1457 to 1458),** the Central Bank of Brazil notified the Federal Prosecutor's Office, pursuant to the terms of Article 9, paragraph 1, of Complementary Law 105, of 1.10.2001, of the irregularities found, since they theoretically constituted a crime; these were copied in the Brief Report on Occurrence (**pages 1459 to 1460**):

*I – DESCRIPTION OF THE FACTS*

*The Central Bank of Brazil, in an inspection conducted at Banco Cruzeiro do Sul S/A (CNPJ 62.136.254/0001-99), found invalid liabilities which, on December 31, 2011, represented the amount of R$ 1,123,500,000, an amount that is equivalent to 93.6% of the Net Equity of the financial institution on this date.*

*This agency ordered Banco Cruzeiro do Sul S/A to make a regulatory adjustment (to write off the invalid liabilities).*

*The regulatory adjustment of R$ 1,123,500,000 represents the amount of the invalid consigned credit operations recorded in the institution's accounting records, distributed among 283,363 contracts and reflected in the assets on its balance sheet of December 31, 2011. The invalid nature of these operations was characterized by the:*

*a) lack of proof of the release of any type of credit (to the client or the intervening entity) and the lack of annotation at the associated agency; and*

*b) analyses conducted by this Inspection office through consultation of the financial institution's information systems, exams of samples of lists of the exhaustive operations and tests conducted on the complete data base of the institution, which resulted in several characteristics common to these operations, forming a standard profile.*

*In addition, no financial flows were found from these operations, and in the reconciliation of the accounting flows, manual reclassifications were found for temporary accounts of transfers of the CRIFs (Credit Right Investment Funds), resulting in an artificial increase in the bank's assets and in the profitability of the funds.*



# BANCO CENTRAL DO BRASIL

*II – POSSIBLE CRIMINAL RESPONSIBILITY*

*Articles 4, 6 and 10 of Law no. 7.492, of June 16, 1986.*

The Federal Prosecutor's Office (MPF) was notified of these facts through Official Letter 0606/2012-Desup/Gabin, of 6.26.2012 (**pages 1461 to 1462**), since in theory, this configures evidence of the crimes defined in Articles 4, 6 and 10 of Law no. 7.492, of June 16, 1986.

In the exercise of its legal responsibilities, the Central Bank of Brazil found irregularities that occurred within the scope of Banco Cruzeiro do Sul S.A., consisting of the adoption, in a systematic and ongoing manner, of procedure to generate and record invalid Personal Installment Credit operations, which were assigned to Credit Right Investment Funds (CRIF), as described in the "Brief Report on Occurrence" on **pages 1464 to 1466**).

These facts were related to the provisions contained in sections I and II of Art. 14 of CVM Instruction no. 306, of May 5, 1999, in section I of Art. 38 of CVM Instruction no. 356, of December 17, 2001, in item 1 of the Attachment to CVM Deliberation no. 29, of February 5, 1986, of items 31 and 46 of the Attachment to CVM Deliberation no. 539, of March 14, 2008, and in Chapter 3 of the Basic Conceptual Ruling attached to Deliberation no. 675, of December 13, 2011, and the Securities and Exchange Commission (CVM) was notified of them for the adoption of the applicable measures, in Official letter 0695/2012- Desup/Gabin, of 7.23.2012 (**page 1463**), in compliance with the provision in Article 9, paragraph 2, of Complementary Law 105, of 1.10.2001, and in accordance with item 5.1 of the Agreement signed by the Central Bank of Brazil and the Securities and Exchange Commission (CVM) on October 28, 2010.

As a result of the inspection with a base date of 6.30.2011, whose purpose was to evaluate the viability of the  Banco Cruzeiro do Sul S.A. conglomerate, Official letter 0582/2012-BCB/Desup/GTSP2/Cosup-03 was issued on  6.19.2012 (**pages 1467 to 1478**), directed to the administrators of the institution, already under the Temporary Special Administration Regime, in which they were notified and details were presented of the occurrences found, with the order to immediately implement the adjustments indicated.

On 8.14.2012, the Credit Guarantee Fund (CGF) published a special opening balance sheet of the TSAR works, with a base date of June 4, 2012, which  corroborated and deepened the evaluation of the Central Bank of Brazil in relation to the compromised economic-financial situation of Banco Cruzeiro do Sul S.A.

The balance sheet prepared by the Credit Guarantee Fund (CGF) with assistance from PRICEWATERHOUSECOOPERS (*due diligence*), ratified the existence of invalid operations, previously indicated by the Agency, with an approximate value of R$

**BANCO CENTRAL DO BRASIL**

1.4 billion, in addition to having conducted accounting adjustments that led to negative Net Equity (NE) of R$ 2.2 billion.

The Credit Guarantee Fund (CGF), seeking a solution that would lead to an economic-financial improvement in the institution, dealing with the asset deficiencies found, without harming the creditors and other stakeholders, structured a financial operation that sought, after improving the financial situation of the entity, to sell its share control, through the following steps:

a) purchase at a discount, by the Credit Guarantee Fund (CGF), of credit rights against Banco Cruzeiro do Sul S.A.;

b) capitalization of the institution to an amount sufficient to lead its NE to zero; and

c) sale of Banco Cruzeiro do Sul S.A. to another financial institution that meets predetermined qualification criteria.

In spite of the fact that the purchase offer of credit rights was successful, there was no proposal for the purchase of share control and corporate reorganization of Banco Cruzeiro do Sul S.A., resulting in the failure of the financial recovery engineering formulated by the Credit Guarantee Fund (CGF).

Pursuant to Art. 5, *c*, of Decree-law no. 2.321, de 1987, combined with Art. 11, *c*, of Law no. 6.024, of 3.13.1974, the Credit Guarantee Fund (CGF) presented a report describing the economic-financial situation of the aforementioned institutions, proposing, based on Art. 11, *c*, of Decree-law no. 2.321, of 1987, that extrajudicial liquidation be ordered for the companies submitted to the TSAR.

In light of this situation, and considering the report of the temporary special administrator, which confirmed the compromised economic-financial situation and the serious violation of the standards issued by the CMN and by the Central Bank of Brazil, attesting to the existence of uncovered liabilities and the unfeasibility of normalizing the institution's business activities, extrajudicial liquidation was ordered of the companies submitted to the TSAR, based on Arts. 11, *c*, and 19 of Decree-law no. 2.321, of 1987, combined with Arts. 1, 15, section I, *a* and *b*, and 51 of Law no. 6.024, de 1974, executed through Presidential Acts 1.230, 1.231, 1.232, 1.233 and 1.234, all of 9.14.2012 (**pages 1479 a 1483**).

**4.2.2     Administrative Proceedings – Central Bank of Brazil**
**Administrative Proceeding – 14.5.2004**

On 5.14.2004 an administrative proceeding was filed against Banco Cruzeiro do Sul S.A., and its statutory directors Luís Felipe Índio da Costa and Luís Octávio Azeredo Lopes Índio da Costa for sending correspondence to participants in the Check and other Paper Compensation Service (SCCOP), accompanied by a list of checks, falsely notifying them that the financial institution had been the victim of theft. This illicit act constitutes a violation of Circular Letter no. 772, of 4.8.1983 and Articles 5 and 14 of Circular Letter 2.398, of 12.29.1993.



# BANCO CENTRAL DO BRASIL

Through Decap/GTSPA-2007/33 Decision, of 3.12.2007 (**pages 1195 to 1202**), a warning was issued to Banco Cruzeiro do Sul S.A. and to Luís Felippe Índio da Costa and Luís Octávio Azeredo Lopes Índio da Costa, based on paragraph 1 of Article 44 of Law 4.595.

The National Financial System Appeals Council (CRSFN), when analyzing the appeals filed by Banco Cruzeiro do Sul S.A. and by Mr. Luis Felippe Índio da Costa and Mr. Luís Octávio Azeredo Lopes Índio da Costa against the decision issued by the Central Bank of Brazil, did not overturn the decision under appeal in regard to the Financial Institution and granted the appeals filed by their controllers, which led to the punishment of warning given them being dismissed (**pages 1203 to 1249**).

### Administrative Proceeding – 10.1.2009

On 10.1.2009, according to Opinion Desup/GTSP2/Cosup-03-2009/0005, of 1.10.2009 (**pages 1264 to 1282**), an administrative proceeding was opened against Banco Cruzeiro do Sul S.A., directors, members of the board of directors and members of the audit committee for improperly increasing the results on the financial statements sent to the Central Bank of Brazil, beginning with the 2008 fiscal year, through credit right assignments under artificial conditions to credit right investment funds (CRIFs) and to financial and non-financial entities, which constitutes a serious violation of Articles 31 and 44 of Law 4.595, of 12.31.1964 (legal entity), Article 44, paragraph 4, of Law 4.595, of 12.31.1964 (individual), Article 2, section III, of resolution 2.907, of 11.29.2011; and Article 2, sections I and II, of Resolution 3.673, of 12.26.2008.

According to Decision 0595/2012 – DIORF, of 5.4.2012 (**pages 1283 to 1335**), Banco Cruzeiro do Sul S.A., the directors: Luis Felippe Índio da Costa, Luis Octávio Azeredo Lopes Índio da Costa, Maria Luisa Garcia de Mendonça, Luiz Whately Thompson, José Carlos Lima de Abreu, Roberto Vieira da Silva de Oliveira Costa, Fábio Caramuru Corrêa Meyer, Sérgio Marra Pereira Capella, João Lara de Souza Meirelles Filho, the members of the board of directors, Fábio Rocha do Amaral, Charles Alexander Forbes, Progreso Vaño Puerto and Horácio Martinho Lima and the members of the audit committee,  Gilberto Braga (identified member), Miguel Vargas Franco Netto and Paulo Roberto Barral, were notified to present their defenses in the administrative proceeding for the following irregularities, which subject them to the sanctions indicated in Art. 44 of Law 4.595, of December 31, 1964.

Irregularity "a" – Improperly increase the results of the financial statements sent to the Central Bank of Brazil, referring to the 2008 fiscal year and the 1st four months of 2009, through credit right assignments under artificial conditions to credit right investment funds (CRIFs) and to financial and non-financial entities, which constitutes a serious violation.

Applicable law: Arts. 31 and 44 of Law 4.595, of 1964 (legal entity); Art. 44, § 4, of Law 4.595, of 1964 (individuals); Art. 2, section III, of Resolution 2.907, of November 29, 2001; and Art. 2, sections I and II, of Resolution 3.673, of December 26, 2008.



# BANCO CENTRAL DO BRASIL

Irregularity "b" – Failure to comply with the statutory obligation to monitor the management of the Management Board, in conducing company business, by implementing procedures to improperly increase the results of the financial statements sent to the Central Bank of Brazil, referring to the 2008 fiscal year and the 1st four months of 2009, through credit right assignments made under artificial conditions to credit right investment funds (CRIFs) and to financial and non-financial entities, which constitutes a serious violation.

Applicable law: Arts. 31 and 44, § 4, of Law 4.595, of 1964.

Irregularity "c" – Preparing and releasing an Audit Committee Report without indicating the irregularities committed by Banco Cruzeiro do Sul S.A., by implementing procedures to improperly increase the results of the financial statements sent to the Central Bank of Brazil, referring to the 2008 fiscal year and the 1st four months of 2009, through credit right assignments made under artificial conditions to credit right investment funds (CRIFs) and to financial and non-financial entities, which constitutes a serious violation

Applicable law: Art. 44, § 4, of Law 4.595, of 1964, and Art. 17, section V, and Art. 15, section VII, of the Regulation Attached to Resolution 3.198, of May 27, 2004.

*Having characterized the irregularities described, and considering the degree of participation and liability of each of those notified, as well as the seriousness of the acts indicated, the Management Board of the National Financial System Organization (DIORF) of the Central Bank of Brazil decided to:*

a) Levy a punishment of DISQUALIFICATION for the exercise of administrative or management positions in institutions in the inspection area of the Central Bank of Brazil, based on § 4 of Art. 44 of Law 4.595, of 1964, for the following periods:

a.1) ten (10) years to Luis Felippe Índio da Costa, Luis Octávio Azeredo Lopes Índio da Costa and Maria Luisa Garcia de Mendonça, for irregularity "a";

a.2) eight (8) years to Roberto Vieira da Silva de Oliveira Costa, for irregularity "a";

a.3) six (6) years to José Carlos Lima de Abreu, for irregularity "a"; and

a.4) four (4) years to Luiz Whately Thompson, Fábio Caramuru Corrêa Meyer and Sérgio Marra Pereira Capella, for irregularity "a", Fábio Rocha do Amaral, Charles Alexander Forbes, Progreso Vaño Puerto and Horácio Martinho Lima, for irregularity "b"



# BANCO CENTRAL DO BRASIL

and Gilberto Braga, Miguel Vargas Franco Netto and Paulo Roberto Barral, for irregularity "c";

b) Levy a FINE of R$ 100,000.00 (one hundred thousand reais), on Banco Cruzeiro do Sul S.A., for irregularity "a", based on Art. 44, § 2, of Law 4.595, of 1964;

c) Dismiss the administrative proceeding in relation to Mr. João Lara de Souza Meirelles Filho, in light of the content of item 149, automatically appealing to the National Financial System Appeals Council.

According to information on the National Financial System Appeals Council website (www.bcb.gov.br/crsfn), the proceeding is before the General Counsel to the National Treasury/CAF for preparation of an Opinion – MEMO no. 160/2012 – CRSFN – MF, of 8.13.2012 (**page 1336**).

**Administrative Proceeding – 11.6.2012**

On 6.11.2012, through Opinion Desup/GTSP2/Cosup-03-2012/0047 (**pages 1439 to 1456),** an administrative proceeding was opened against Banco Cruzeiro do Sul S.A. – under Temporary Special Administration Regime (TSAR), its former directors, former board of directors members and former members of the audit committee for systematically and continuously adopting (period from May 2007 to March 2012), procedures for recording invalid liabilities of personal installment credit with payroll deduction, resulting in accounting statements that did not accurately and clearly reflect its real economic-financial situation, inducing clients, investors, the Central Bank of Brazil and the National Financial System in general to err, which constitutes a violation of Article 31 of Law 4.595, of 12.31.1964, and of Cosif 1.1.2.3, 1.1.2.4, and 1.1.2.7 (Circular 1.273, of 12.29.1987).

The administrative proceeding is at the Punitive Administrative Proceeding Control and Analysis Department (DECAP) awaiting the filing of the defense by those notified.

## 4.2.3    Notifications to the Federal Prosecutor's Office

### Notification to the Federal Prosecutor's Office – 3.17.2010

In accordance with the provision in Administrative Ruling 43.834, of 4.1.2008, and in MSU 4.30.10.60.03, the Central Bank of Brazil notified the Federal Prosecutor's Office, in accordance with Opinion Desup/GTSP2/Cosup-03- 2010/0001, of 1.4.2010 (**pages 1337 to 1341**), pursuant to the terms of Article 9 of Complementary Law 105, of the following facts, which in theory configure evidence of a crime against the National Financial System, committed by administrators and members of the Audit Committee of Banco Cruzeiro do Sul S.A.:



# BANCO CENTRAL DO BRASIL

a) *Improperly increase the results of the financial statements sent to the Central Bank of Brazil, beginning with the 2008 fiscal year, through credit right assignments under artificial conditions to credit right investment funds (CRIFs) and to financial and non-financial entities.*

The Federal Prosecutor's Office was notified of this fact through Official Letter Desup/Gabin-2010/0019, of 3.17.2010 (**pages 1342 to 1346**), since, in theory, this is evidence of the crimes defined in Articles 4, 6 and 10 of Law no. 7.492, of 6.16.1986.

**Notification of the Federal Prosecutor's Office – 6.26.2012**

On 6.12.2012, through Opinion Desup/GTSP2/Cosup-03-2012/0048 (**pages 1457 to 1458),** the Central Bank of Brazil notified the Federal Prosecutor's Office, pursuant to the terms of Article 9, paragraph 1, of Complementary Law 105, of 1.10.2001, of the irregularities found, since they theoretically constituted a crime; these were copied in the Brief Report on Occurrence (**pages 1459 to 1460**):

*I – DESCRIPTION OF THE FACTS*

*The Central Bank of Brazil, in an inspection conducted at Banco Cruzeiro do Sul S/A (CNPJ 62.136.254/0001-99), found invalid liabilities which, on December 31, 2011, represented the amount of R$ 1,123,500,000, an amount that is equivalent to 93.6% of the Net Equity of the financial institution on this date.*

*This agency ordered Banco Cruzeiro do Sul S/A to make a regulatory adjustment (to write off the invalid liabilities).*

*The regulatory adjustment of R$ 1,123,500,000 represents the amount of the invalid consigned credit operations recorded in the institution's accounting records, distributed among 283,363 contracts and reflected in the assets on its balance sheet of December 31, 2011. The invalid nature of these operations was characterized by the:*

*a) lack of proof of the release of any type of credit (to the client or the intervening entity) and the lack of annotation at the associated agency; and*

*b) analyses conducted by this Inspection office through consultation of the financial institution's information systems, exams of samples of lists of the exhaustive operations and tests conducted on the complete data base of the institution, which resulted in several characteristics common to these operations, forming a standard profile.*

*In addition, no financial flows were found from these operations, and in the reconciliation of the accounting flows, manual reclassifications were found for temporary accounts of transfers of the CRIFs (Credit Right Investment Funds), resulting in an artificial increase in the bank's assets and in the profitability of the funds.*



# BANCO CENTRAL DO BRASIL

*II – POSSIBLE CRIMINAL RESPONSIBILITY*

*Articles 4, 6 and 10 of Law no 7.492, of June 16, 1986.*

The Federal Prosecutor's Office (MPF) was notified of these facts through Official Letter 0606/2012-Desup/Gabin, of 6.26.2012 (**pages 1461 to 1462**), since in theory, this configures evidence of the crimes defined in Articles 4, 6 and 10 of Law no. 7.492, of June 16, 1986.

## 4.2.4    Notification of the Federal Revenue Office – 8.12.2009

The Federal Revenue Office of Brazil was notified of the evidence of irregularities of a fiscal nature found in the inspection work of the second semester of 2008, through Official Letter Desup/Gabin-2009/0037, of 8.12.2009 (**page 1261**), as per the detailed description in the document "Brief Report on Occurrence" on **pages 1262 to 1263**.

## 4.2.5    Administrative Proceedings - Securities and Exchange Commission

### Notification of CVM - 1.15.2010

In the exercise of its legal attributions, the Central Bank of Brazil found irregularities that occurred within the scope of Banco Cruzeiro do Sul S.A., consisting of the improper increase of the results of the financial statements sent to the agency, beginning in the 2008 fiscal year, through credit right assignments under artificial conditions to credit right investment funds (CRIFs) and to financial and non-financial entities.

These facts, which theoretically characterized a failure to comply with Article 177, paragraph 3, of Law no 6.404, of 12.15.1976, item 1 of the Attachment to CVM Deliberation 29, of 2.5.1986, during the period in which it was in effect, and item 35 of the Attachment to CVM Deliberation 539, of 3.14.2008, were delivered to the Securities and Exchange Commission (CVM) so that the appropriate measures could be taken, through Official letter Desup/Gabin-2010/0003, of 1.15.2010 (**pages 1347 to 1349**), in compliance with the provision in Article 9, paragraph 2, of Complementary Law 105, of 1.10.2001.

### Notification of CVM - 7.23.2012

In the exercise of its legal responsibilities, the Central Bank of Brazil found irregularities that occurred within the scope of Banco Cruzeiro do Sul S.A., consisting of the adoption, in a systematic and ongoing manner, of procedure to generate and record invalid Personal Installment Credit operations, which were assigned to Credit Right Investment Funds (CRIF), as described in the "Brief Report on Occurrence" on **pages 1464 to 1466**).

These facts are related to the provisions in sections I and II do Art. 14 of CVM Instruction no. 306, of May 5, 1999, in section I of Art. 38 of CVM Instruction no. 356, of December 17, 2001, in item 1 of the Attachment to CVM Deliberation no.



# BANCO CENTRAL DO BRASIL

29, of February 5, 1986, of items 31 and 46 of the Attachment to CVM Deliberation no. 539, of March 14, 2008, and in Chapter 3 of the Basic Conceptual Ruling attached to Deliberation no. 675, of December 13, 2011, and the Securities and Exchange Commission (CVM) was notified of them for the adoption of the applicable measures, in Official letter 0695/2012- Desup/Gabin, of 7.23.2012 (**page 1463**), in compliance with the provision in Article 9, paragraph 2, of Complementary Law 105, of 1.10.2001, and in accordance with item 5.1 of the Agreement signed by the Central Bank of Brazil and the Securities and Exchange Commission (CVM) on October 28, 2010.

## 4.3      Adjusted Net Equity

According to the special opening balance sheet of **BANCO CRUZEIRO DO SUL S.A.** on the date of the TSAR (6.4.2012), prepared by the temporary special administrator Credit Guarantee Fund – CGF (**pages 507/508**), Adjusted **Negative** Net Equity was found of **R$ 2,236,782,000**, presented in detail below:



# BANCO CENTRAL DO BRASIL

**Banco Cruzeiro do Sul S.A.**
C.N.P.J. nº 62.136.254/0001-99
Matriz: Rua Funchal nº 418 – 6º, 7º, 8º e 9º andares – São Paulo – CEP 04551-060
Filiais: Rio de Janeiro – RJ, Salvador – BA, Campinas – SP, Recife – PE, Palmas – TO, Macapá – AP

**BALANCETE PATRIMONIAL DE ABERTURA EM 04 DE JUNHO DE 2012**
**(Em milhares de reais)**

| A T I V O | Nota(s) | Saldo Antes dos Ajustes | Ajustes | Saldo Após Ajustes |
|---|---|---|---|---|
| CIRCULANTE E REALIZÁVEL A LONGO PRAZO...................... | | 11.463.658 | (2.147.936) | 9.315.722 |
| Disponibilidades.................................................................... | 22 | 19.286 | (520) | 18.766 |
| Aplicações Interfinanceiras de Liquidez................................. | | 357.530 | – | 357.530 |
| Aplicações Mercado Aberto.................................................... | | 205.518 | – | 205.518 |
| Aplicações em Depósitos Interfinanceiros............................. | | 152.012 | – | 152.012 |
| Títulos e Val Mobiliários e Instr. Financ. Derivativos............ | 1b, 3, 4, 6, 15, 16 | 7.681.325 | (1.553.535) | 6.127.790 |
| Carteira Própria.................................................................... | | 7.302.867 | (1.668.390) | 5.634.477 |
| Vinculados a Compromissos de Recompra............................. | | 42.250 | – | 42.250 |
| Instrumentos Financeiros Derivativos.................................... | 18 | 288.474 | 114.855 | 403.329 |
| Vinculados a Prestação de Garantias..................................... | | 47.734 | – | 47.734 |
| Relações Interfinanceiras...................................................... | | 8.276 | – | 8.276 |
| Recebimentos e Pagamentos a Liquidar................................. | | 3.720 | – | 3.720 |
| Créditos Vinculados – Depósitos no Banco Central................ | | 485 | – | 485 |
| Correspondentes................................................................... | | 4.071 | – | 4.071 |
| Operações de Crédito............................................................ | | 2.620.632 | (311.983) | 2.308.649 |
| Operações de Crédito – Setor Privado................................... | 1a, 5 | 2.810.431 | (249.024) | 2.561.407 |
| (Provisão para Oper de Crédito de Liquidação Duvidosa)......... | 8, 10 | (189.799) | (62.959) | (252.758) |
| Outros Créditos..................................................................... | | 674.343 | (281.898) | 392.445 |
| Carteira de Câmbio............................................................... | | 22.531 | – | 22.531 |
| Negociação e Intermediação de Valores................................. | 26 | 26 | – | 26 |
| Títulos e Créditos a Receber................................................. | | 138.935 | – | 138.935 |
| Diversos................................................................................ | 9, 14, 17 | 515.952 | (281.898) | 234.054 |
| (Provisão para Outros Créditos de Liquidação Duvidosa)......... | | (3.101) | – | (3.101) |
| Outros Valores e Bens.......................................................... | | 102.266 | – | 102.266 |
| Despesas Antecipadas.......................................................... | | 102.266 | – | 102.266 |
| | | | | |
| PERMANENTE........................................................................ | | 263.662 | (97.616) | 166.046 |
| Investimentos........................................................................ | | 192.870 | (76.389) | 116.481 |
| Participações em Controladas – No País................................ | 1c,2,12,13,20,21 | 192.863 | (76.389) | 116.474 |
| Outros Investimentos............................................................ | | 7 | – | 7 |
| Imobilizado de Uso................................................................ | | 36.067 | – | 36.067 |
| Outras Imobilizações de Uso................................................. | | 59.622 | – | 59.622 |
| (Depreciações Acumuladas).................................................. | | (23.555) | – | (23.555) |
| Diferido................................................................................. | | 4.673 | – | 4.673 |
| Gastos de Organização e Expansão....................................... | | 15.610 | – | 15.610 |
| (Amortização Acumulada)...................................................... | | (10.937) | – | (10.937) |
| Intangível.............................................................................. | | 30.052 | (21.227) | 8.825 |
| Ativos Intangíveis.................................................................. | 19 | 35.131 | (21.227) | 13.904 |
| (Amortização Acumulada de Ativos Intangíveis)..................... | | (5.079) | – | (5.079) |
| | | | | |
| TOTAL DO ATIVO .................................................................. | | 11.727.320 | (2.245.552) | 9.481.768 |

93



# BANCO CENTRAL DO BRASIL

| PASSIVO | Nota(s) | Saldo Antes dos Ajustes | Ajustes | Saldo Após Ajustes |
|---|---|---|---|---|
| CIRCULANTE E EXIGÍVEL A LONGO PRAZO........................... | | **10.852.815** | **865.345** | **11.718.160** |
| **Depósitos**........................................................................ | | **5.326.500** | **–** | **5.326.500** |
| Depósitos à Vista............................................................. | | 12.047 | – | 12.047 |
| Depósitos Interfinanceiros................................................ | | 210.260 | – | 210.260 |
| Depósitos a Prazo............................................................ | | 5.101.592 | – | 5.101.592 |
| Outros Depósitos............................................................. | | 2.601 | – | 2.601 |
| **Captações no Mercado Aberto**........................................ | | **236.863** | **–** | **236.863** |
| Carteira Própria............................................................... | | 42.241 | – | 42.241 |
| Carteira de Terceiros........................................................ | | 194.622 | – | 194.622 |
| **Recursos de Aceites e Emissão de Títulos**.......................... | | **2.533.094** | **–** | **2.533.094** |
| Recursos de Letras Imob, Hipotec, de Crédito e Similares........ | | 82.547 | – | 82.547 |
| Obrigações por Títulos e Valores Mobiliários no Exterior........... | | 2.450.547 | – | 2.450.547 |
| **Relações Interfinanceiras**............................................... | | **1.546** | **–** | **1.546** |
| Pagamentos e Recebimentos a Liquidar.............................. | | 1.546 | – | 1.546 |
| **Relações Interdependências**........................................... | | **104** | **–** | **104** |
| Recursos em transito de terceiros...................................... | | 104 | – | 104 |
| **Instrumentos Financeiros Derivativos**.............................. | | **83.728** | **–** | **83.728** |
| Instrumentos Financeiros Derivativos.................................. | | 83.728 | – | 83.728 |
| **Outras Obrigações**......................................................... | | **2.670.980** | **865.345** | **3.536.325** |
| Cobrança e Arrecadação de Tributos e Assemelhados............. | | 1.922 | – | 1.922 |
| Carteira de Câmbio.......................................................... | | 17.457 | – | 17.457 |
| Sociais e Estatutárias....................................................... | | – | – | – |
| Fiscais e Previdenciárias................................................... | | 124.613 | – | 124.613 |
| Negociação e Intermediação de Valores............................... | | 21.641 | – | 21.641 |
| Obrigação pela Venda ou Transf de Ativos Financeiros............. | 1d | 1.394.328 | 5 | 1.394.333 |
| Dívidas Subordinadas....................................................... | | 826.053 | – | 826.053 |
| Diversas........................................................................ | 7,11,23 a 26 | 284.966 | 865.340 | 1.150.306 |
| | | | | |
| **RESULTADOS DE EXERCÍCIOS FUTUROS**............................ | | **390** | **–** | **390** |
| Resultados de Exercícios Futuros....................................... | | 390 | – | 390 |
| | | | | |
| **PATRIMÔNIO LÍQUIDO**.................................................... | | **874.115** | **(3.110.897)** | **(2.236.782)** |
| Capital: | | | | |
| – De Domiciliados no País................................................ | | 769.196 | – | 769.196 |
| Reservas de Capital......................................................... | | 10.329 | – | 10.329 |
| Reservas de Reavaliação................................................... | | 13.319 | – | 13.319 |
| Reservas de Lucros.......................................................... | | 418.920 | – | 418.920 |
| Ajuste de Avaliação Patrimonial......................................... | | (2.366) | – | (2.366) |
| (Ações em Tesouraria)...................................................... | | (8.431) | – | (8.431) |
| Lucros ou prejuízos acumulados........................................ | | – | – | – |
| Resultado do Período........................................................ | | (326.852) | (3.110.897) | (3.437.749) |
| | | | | |
| **TOTAL DO PASSIVO** ...................................................... | | **11.727.320** | **(2.245.552)** | **9.481.768** |

## 4.3.1 Explanatory Notes of the adjustments made by the CGF

## 1 - Invalid Credit Operations Contracts

## Amount of Adjustment: R$ 1,388,362,000

This adjustment is composed of the following:

# BANCO CENTRAL DO BRASIL

- 1.a - R$ 111,320,000 in own portfolio, credit operations;
- 1.b - R$1,276,940,000, in a securities portfolio, corresponding to balance held in FDICs shares;
- 1.c - R$ 97,000 in credits assigned to a securitization company, and;
- 1.d - R$ 5,000 in credits assigned to another financial institution.

Description of the Adjustment:

Banco Cruzeiro do Sul S.A. (BCSul) systematically and continuously made false and non-existent, also called "invalid," accounting entries, with personal credit installments with payroll deduction (CPP), resulting in the disclosure of all the accounting statements, such as balance sheets, income statements, quarterly financial information, trial balance sheets, which did not reflect the real economic-financial situation of the institution, misleading clients, national and foreign investors, the Central Bank of Brazil and other monitoring agencies, and the National Financial System.

This practice was used during at least the ten years prior to the date on which the Temporary Special Administration Regime (TSAR) was decreed.

These invalid operations were found by the Central Bank of Brazil, during the period before the special administration regime, and later, by the Credit Guarantee Fund (CGF), by both its **own team (audit)** and by hired technology companies - "**BSI Consulting**" (formerly "ESM Projetos" [ESM Consultoria e Gestão de Projetos em Tecnologia da Informação Ltda. - EPP, CNPJ 05.696.932/0001-34], incorporated by BSI Tecnologia Ltda., CNPJ 53.690.392/0001-24) and "**IMS Technology and Services**" (IMS Tecnologia e Serviços Ltda., CNPJ 13.778.765/0001-07), and authenticated by a specific consultant, **PwC Brasil Independent auditors** (an associate of "PricewaterhouseCoopers International Limited"), through due diligence.

In an inspection conducted by the Central Bank of Brazil in five companies of the Cruzeiro do Sul financial conglomerate, when it was solvent, the amounts recorded in the accounting, relative to 320,001 "contracts", totaled R$1.249 billion, on the base-date of February 29, 2012.

In the inspection work done by the Central Bank of Brazil, prior to the decree of the special regime, a set of operations were identified that were considered invalid, which were registered in the consigned credit control system of this institution ("Tools"[3]) under the identification code H41, contracted with the intervention of the entities listed in the table below:

---

[3] Tools System: System used by BCSul for financial and accounting management of the contracts, which integrates client record data, accounting flows and information from contract assignments.



**BANCO CENTRAL DO BRASIL**

| Name (Tools) | CNPJ |
|---|---|
| Associação Balcão 24 | 30.504.617/0001-05 |
| Base Militar | 30.504.617/0001-05 |
| Comar | 30.504.617/0001-05 |
| Javic Assessoria | 01.143.363/0001-49 |
| Rezende | 30.504.617/0001-05 |
| Saúde | 30.504.617/0001-05 |
| Três Corações | 30.504.617/0001-05 |
| Unidade Centro | 30.504.617/0001-05 |
| AMBRA (Associação dos Músicos Militares do Brasil) | 30.504.617/0001-05 |

The evidence that corroborated the understanding of the Central Bank supervision regarding the illicit nature of the operations identified as "H41" came from the following sources:

I – From the analysis of the Cruzeiro do Sul information systems and data base:

a) None of these operations had previously passed through the Retaguarda system[4] and therefore, they were not previously submitted to a credit analysis, as is done with the other CPP operations of this institution.

b) The CNPJ number of intervening party Javic Assessoria had not been deactivated at the Brazilian Federal Revenue Office since 2008, in addition, its record was not updated at BCSul. The other intervening parties used the CNPJ of Associação dos Músicos Militares do Brasil (Ambra) and from what was identified, were associated with addresses of establishments of this Association;

c) 7,572 clients were identified with more than two active operations contracted in the period between May and August 2011, and each of them was linked to different associated entities, often located in different states in the Federation; and

d) The analysis of the accounting records for these operations, in 2011, demonstrated that there was no release of funds to the other parties mentioned in the CPP contracts or to the intervening parties, and even found the use of manual reclassification procedures.

II – From an analysis of the Reports (sample of 440 CPP operations, including real and fictitious operations):

In the case of the reports of false operations, in spite of repeated requests by the inspectors, copies were not attached of the personal documents of the client, of the payment stub proving the connection to the associated organ listed on the contract, and of proof of release of the funds to the client by the institution, all normal documentation for reports on real operations. The reports analyzed with code H41 (352 operations) were composed, without exception, of only the copy of the CPP contract and of a form partially filled out, authorizing the registration;

---

[4] Retaguarda System: System used by BCSul for registration and analysis of CPP operations, also called the "conveyor belt" of the CPP contract

96

# BANCO CENTRAL DO BRASIL

a) In the physical contracts, the professional information and bank data of clients were not filled in for the release of the funds;

b) The physical contracts only contained the signature of the other party receiving the funds. There is no signature for the representatives of this institution, nor are the contracts dated; and

c) In 93 fictitious contracts analyzed, the name of the branch recorded on them (which identified the affiliated organ) was different from the name of the branch registered in the Tools system.

CGF used a verification process conducted by three teams, which used different and independent methodologies:

a) **CGF's own audit team** concentrated on investigating people on the BCSul staff who participated in the procedures of placement in the system and control of the fictitious assets, and the reversal of these acts;

b) **BSI/ Information Center** identified the systemic logic of the false operations, called "invalid" operations, eliminating filters and incorrect procedures; and

c) **IMS** used the criterion of financial flow; that is, of replacing the write-offs (for payments), or their absence, after reconciling with cash movement and processing through a mirrored but independent system, of the Tools system.

The preliminary results of the work by each team were not known to the others, thus preserving a greater degree of independence between them. At the end, as published in the TSAR opening balance sheet for the base date of June 4, 2012, these false or non-existing operations represented an excess amount recorded in the institution's assets of R$1,388,362,000, corresponding to 682,647 contracts of this type.

On a parallel basis, **PwC** monitored the work of the different teams, filtering the methodologies and sought to reach its own conclusions on the amount of the false operations.

The premises of analysis of the CGF audit involved interviews with those responsible for placement of data from these operations in the bank's system, an examination of the details of the improper operation and measures for its exclusion from the data base, with the identification of a cryptographic script placed in the Tools system that generated different types of reports, hiding the effects of these operations, and its filters and internal procedures were eliminated from the system's data base.

With this strategy, 655,483 fictitious contracts were identified, whose codes or tables covered – in addition to those identified by the Central Bank inspectors as "H41" – the codes: 219, 225, 250, 285, 458, 742, 756, 799, 800, B81, F25, UU7 and XYZ; and another 27,164 contracts "created" from old contracts for operations that produced losses (known at BCSul as "product 64") which resulted in a total of 682,647 false operations.

BSI was hired by CGF to meet the need for technology of the new administration, and to verify the false operations. This company used

97



# BANCO CENTRAL DO BRASIL

the technology resources of Totvs S.A., CNPJ 53.113.791/0001-22, manager of the Tools system, and of specialized IT and data base resources (SQL) belonging to BCSul itself, to find a systemic logic in the fictitious operations, based on the analysis of the Bank's data. With this methodology, a set of characteristics and premises were identified that indicated the amount of R$ 1,388,362,000 in non-existing operations.

In regard to the company IMS, it was hired by the CGF to use its system called "Bank.net", which has the main function of management of receivables from financial institutions, to mirror the consigned credit portfolio managed in the Tools system, in order to conduct a reverse engineering of the transactions in the last quarter, in an attempt to identify invalid operations in this portfolio after the base date of June 30, 2012.

IMS processed the credit operations "on a parallel basis," substituting BCSul's standard systems, especially Tools, in the credit operation transactions, making it possible to check and validate only those contracts supported by real operations through financial flows, with release of the amount financed and payments of the monthly installments, in addition to registrations of the consigned credit operations at the respective organs. This methodology showed convergence of the amount of the adjustment of the fictitious portfolio.

PwC presented a report on the portfolio of non-existing assets based on the criteria used by the CGF team, but incorporating a relatively simple confirmation procedure, analyzing the lack of financial liquidation of operations after the data base close to the TSAR, through comparison with the installments table in the Tools system data base. Except for approximately 200 operations, which is an insignificant number, no write-offs were identified for installments that begin to mature in May 2012.

The PwC procedure indicated an amount of assets that did not exist (after discounting for provisions for doubtful credits) of R$ 1,331,558,000, or 99.49% of the net value of the adjustment, with this difference not being material.

## 2 – Provision for losses with bank credit notes / Evaluation of investments in the controlled company Cruzeiro do Sul S.A. DTVM[5]

**Adjustment Amount: R$ 20,382,000**

Description of the Adjustment:

Evaluation of investments using the equity method on the net equity of its subsidiary "Cruzeiro do Sul S.A. Distribuidora de Títulos e Valores Mobiliários" (DTVM), in which BCSul holds 99.99% of the capital, due to the establishment of a provision for losses with bank credit notes in the controlled company's balance sheet.

The Current Assets of the DTVM included four Bank Credit Notes (BCNs) issued by the company Allcred SPE S.A., CNPJ 10.691.646/0001-16, and Secred

---

[5] Documents on pages 4378/4402.

# BANCO CENTRAL DO BRASIL

SPE S.A., CNPJ 09.166.193/0001-20, specific purpose companies (SPEs) connected to Banco Morada S.A., CNPJ 32.504.094/0001-22, in the amount of R$ 20,345,000 with maturities in 2013 and 2014, as shown below:

| Issuer of the BCN | Maturity Date | Amount on 05/31/2012 |
|---|---|---|
| Allcred SPE S/A | 09/17/2014 | R$ 8,527,511.51 |
| Secred SPE S/A | 12/26/2013 | R$ 5,714,540.60 |
| Secred SPE S/A | 03/18/2014 | R$ 1,754,344.10 |
| Secred SPE S/A | 03/18/2014 | R$ 4,385,860.25 |

According to the record at Cetip S.A. Mercados Organizados, CNPJ 09.358.105/0001-91 (Cetip) these Notes should be guaranteed by credit rights resulting from consigned payroll loans, executed between Banco Morada and government civil servants or INSS retirees. In the description of the notes, it stated that they would have a total term of 60 months, with monthly payments. However, there was no amortization between their acquisition, in February 2012, and the date of the special balance sheet.

The Central Bank of Brazil ordered an intervention in Banco Morada on April 28, 2011, through Presidential Act no. 1.185, and its extrajudicial liquidation through Presidential Act no. 1.205, on October 25, 2011, with the prebankruptcy period of the extrajudicial liquidation beginning on February 27, 2011 (sixty days before the intervention was ordered).

The Cruzeiro do Sul Conglomerate does not have any information about the issuers, such as credit analysis, contracts, registry, etc. and there is no expectation for these instruments to be received.

On the DTVM's financial statements of 12/31/2011 and 3/31/2012, these Notes were classified under the category of "Negotiation Instruments", under the terms of Circular Letter no. 3.068 of the Central Bank of Brazil, to be evaluated at market value, with one of the parameters for evaluation of this amount being the credit risk of the issuer. In light of the absence of any expectation for receipt of these instruments, the DTVM constituted a provision of loss for the total amount.

**3 – Provision for losses with bank credit notes – Prosper Flex Fund** [6]

**4 Adjustment Amount: R$ 142,808,000**

Description of the Adjustment:

BCSul held subordinated shares of the "Fundo de Investimentos em Direitos Creditórios BCSul Verax Multicred Financeiro" (Fundo Multicred), CNPJ 07.766.151/0001-02, administered by Cruzeiro do Sul S.A. DTVM, which subscribed senior shares of

---

[6] Documentation on pages 1484/2021.



# BANCO CENTRAL DO BRASIL

"Prosper Flex  CRIF Multicedentes" (Fundo Prosper Flex), CNPJ 10.531.173/0001-90, administered by Banco Prosper S.A., CNPJ 33.876.475/0001-03, which, in turn, had Bank Credit Notes in its portfolio (BCN) issued by clients of BCSul/Banco Prosper with a record of non-payment, masked by successive renegotiations, a strategy known as "rolling over."

The issuers of the  BCNs  carried the funds obtained in the credit operations that backed them to purchase BCSul shares on the sight market and/or in installments or investment in Private Equity Investment Funds (PEIF) administered by the DTVM, which exclusively invested in corporate bonds issued by the company "Patrimonial Maragato S.A.", CNPJ 07.049.736/0001-01, belonging to the controllers of do BCSul; that is, operations without a prospective for producing economic results.

As a result, when the BCNs are not paid, the value of the senior shares of the Fundo Prosper  Flex will be reduced, with identical effects on the subordinated shares of Fundo Multicred, negatively impacting the Assets of BCSul.

The composition of the originating event for this provision, by BCN issuer, is:

| Clients | Product | Balance 05/31/2012 - R$ |
|---|---|---|
| Afonso Cesar Boabaid Burlamaqui | Fixed Wor. Cap. | 4,068,885.32 |
| Associação dos Músicos Militares do Brasil | Fixed Wor. Cap. | 19,507,668.82 |
| Brigada Promotora de Credt. E Vendas Ltda. | Fixed Wor. Cap. | 28,723,798.62 |
| Centro Oeste Prom. De Crédito Ltda. | Fixed Wor. Cap. | 2,320,063.16 |
| Neue Welt Comercio Ltda. | Fixed Wor. Cap. | 16,559,011.16 |
| Prevserv Operadora de Serviços Ltda. | Fixed Wor. Cap. | 25,879,893.66 |
| Promotora e Divulgadora Sudeste Line Ltda. | Fixed Wor. Cap. | 30,791,147.68 |

| | | |
|---|---|---|
| a) | Total  maturing | 127,850,468.42 |
| b) | Immaterial difference | 273,719.09 |
| c) | Total Op. maturing ( a+b) | 128,124,187.51 |
| d) | Overdue Operations | 29,169,029.27 |
| e) | Total maturing and overdue (d+c) | 157,293,216.78 |
| f) | Provision already created | -14,485,378.61 |
| g) | **Final Position ( e – f)** | **142,807,838.17** |

With this, the  FDIC  that carries this portfolio had its balance provisioned for an identical amount.

## 5 – Provision for losses with credit bank notes – Multicred Fund[7]

## 6 Adjustment Amount: R$ 11,611,000

Description of the Adjustment:

---

[7] Documentation on pages 2025/2032.



# BANCO CENTRAL DO BRASIL

On 5/31/2012, BCSul held subordinated shares of the "Fundo de Investimentos em Direitos Creditórios BCSul Verax Multicred Financeiro" (Fundo Multicred), CNPJ 07.766.151/0001-02, administered by Cruzeiro do Sul S.A. DTVM.

As indicated in the Daily Portfolio Report, the amount of the adjustment corresponds to the balance of 2 Bank Credit Notes (BCNs) on 5.31.2012, as indicated below:

| Client | Exposure (maturity) on 5.31.2012 | BCN | BCN Issue Date | BCN Gross amount |
|---|---|---|---|---|
| Brigada Promotora de Crédito e Vendas Ltda. | 5,760,606.06 | 9228 | 5.9.2011 | 5,355,086.58 |
| Amadeu Simões Lopes Azambuja | 5,851,027.08 | 9229 | 5.9.2011 | 5,439,142.39 |
| **Total** | **11,611,633.14** | | | |

These BCNs were issued by BCSul clients with a record of non-payment in other credit modalities. The loss in value will impact the Multicred Fund shares, and as a result, the Assets of BCSul, which subscribed to 100% of its subordinated shares.

## 7 – Reversal of profits with repurchases (2012) of credit operations assigned to FDICs[8]

## Adjustment Amount: R$ 137,702,000

Details of the Adjustment:

This is an adjustment intended to reverse the total amount recorded by the Bank with credit right assignment operations in 2011 that were later repurchased by the Bank (returning to the loan portfolio of the bank institution). This result should be have been reversed when the repurchase was made.

The purpose of this adjustment is to correct to the overvaluation of the credit rights resulting from their valuation by the repurchase rate (generally equal to the assignment rate), valuing them at the original rate of the credit rights, thus returning to the pre-assignment situation.

It should be remembered that the overvaluation is the result of the fact that the repurchase rate that applies to the expected financial flows of these credit rights is lower than the original rate of the credit rights (rate contracted with the client of the loan operation).

Thus, the asset represented by these repurchased credit rights that was recorded in the BCSul portfolio at the amount of R$ 886,617,000 – as a reflection

---

[8] Documents on pages 4403/4405.



**BANCO CENTRAL DO BRASIL**

of the application of a discount rate on the financial flows equivalent to the repurchase rate – was adjusted to R$ 748,915,000 to reflect its valuation at the original contractual rate of the operations.

The difference between these amounts, corresponding to R$ 137,702,000, is the amount of the adjustment made."

## 8 – Investments in the Tâmisa Fund / Portfolio of Box[9] Operations

## Adjustment Amount: R$ 72,417,000

Details of the Adjustment:

On the date of the special balance sheet, BCSul held shares of the Tâmisa Multimarket Investment Fund (Tâmisa Fund), CNPJ 05.878.450/0001-03, as sole shareholder, which, on the balance sheet of May 31, 2012 corresponded to R$ 335,660,927.83, as per the report issued by the administrator (BC Sul Verax Serviços Financeiros Ltda., CNPJ 05.917.347/0001-17), distributed as follows:

| Type of asset | Quantity | Net market value | Total assets (%) |
|---|---|---|---|
| Share-Telebras ON (TELB3) | 5,945,980 | 190,211,900.20 | 56.90% |
| Share-Telebrás PN (TELB4) | 5,871,400 | 65,585,400.00 | 19.32% |
| Future Call Index (FCI IBV) | 13,762 contracts | 11,133,006.00 | 3.33% |
| Future Put Index (FPI IBV) | 13,762 contracts | 64,916,410.00 | 19.43% |
| Other Assets | | 3,814,211.63 | 1.13% |
| Total Assets | | 335,660,927.83 | 100.00% |

The operations with derivatives (options - box flexível/ *future call index* - FCI IBV – 13,762 contracts, combined with *future put index* - FPI IBV – 13,762 contracts) were made feasible by a clause in the fund's Investment Policy, which establishes the possibility of investing up to 50% of its net equity (NE) in any assets or operating modalities under the responsibility of individuals or legal entities governed by private law, with restrictions only on financial institutions.

In these operations, the Tâmisa Fund played the role of financier; that is, it paid premiums to the other parties and structured the operations so that when they were exercised, they would produce the same result; that is, the other parties would have to pay an amount that is equivalent to the premiums and another amount, which would reflect an interest rate.

The other parties are two individuals (Amadeu Simões Lopes de Azambuja and Guilherme de Alvares Otero Fernandes) and a legal entity (Geribá Energia Participações Ltda.), which had a record of non-payment at BCSul in credit modalities, according to a specific topic of this Report.

---

[9] Documents on pages 4406/4546.



# BANCO CENTRAL DO BRASIL

These operations were rolled over several times in recent years; that is, at maturity and at the time the options were exercised, new similar operations were performed, which had the practical effect of extending the maturity, and as a result, characterize a freeze, showing that if they are not once again renegotiated, or "rolled over", to use the market's terms, they will inevitably go unpaid, as a large part of them already have been, which makes it possible to see the inconsistency of this asset.

BCSul failed to recognize the accounting effects in its financial statements of the virtual reduction in value of the shares of the Tâmisa Fund, resulting from the box operations conducted with its funds.

With the establishment of the TSAR, the carrying of these operations (rollover) was interrupted and the expected non-payment occurred, since none of the other parties paid the amounts that resulted from the exercise of the options.

Consequently, upon maturity of the last operation, there would be losses for the net equity of the Tâmisa Fund, and thus, for the same amount, in the shares owned by BCSul.

## 9 – Honored amounts - provisions corresponding to the "honored amounts" of assignments with shared liabilities Adjustment Amount: R$ 106,360,000[10]

Details of the Adjustment:

This refers to assigned credit operations that have not been paid and which were honored by BCSul to the assignees; these are amounts recorded in temporary accounts and which were not used to calculate the provision for doubtful debtors.

The BCSul business model was based above all on the creation and assignment of consigned credit operations on civil servant payrolls, a practice that enabled it to advance results through the immediate recognition of the positive difference between the present value, calculated at the assignment rate, and the book value (present value calculated at the rate contracted with the client). The contracts were written off the asset accounts through the assignment, which enabled BCSul to administer the level of minimum capital required by the Basel index.

Generally speaking, the assignments were made while retaining the credit risk, whether through shared liability assumed by BCSul at the assignor financial institutions or by acquisition of subordinated shares in the credit right investment funds (CRIFs); these are assignees that were managed and administered by companies related to the bank. Only credit assignments to the Securitization Company were made without retained risk through shared liability.

---

[10] Documents on pages 4547/4647.

103



# BANCO CENTRAL DO BRASIL

The accounting adjustment corresponds to the provisions not recognized by BCSul on contract installments that were not paid by the borrowers, and which, under the shared liability agreement with the assignees, were repurchased (honored) by BCSul.

The ex-administrators did not recognize these repurchases in the accounting category intended for the recording of credit operations, and since they were recorded under another temporary account, they were not re-implanted in the contract management system (Tools); thus, the fact that they refer to unpaid installments was hidden. Since the calculation of the provisions was based on the information contained in the Tools system, these unpaid installments were thus deliberately left out of the calculation.

## 10    – Complement to PDD – Consigned Credit Portfolio[11]

**Adjustment Amount: R$ 12,279,000**

Description of the Adjustment:

BCSul assigned installments or groups of installments from a single contract to different assignees, and did not consider the contract as a whole for the purpose of calculating the delay. Consequently, it used different percentages of provisioning for installments under the same contract, which is irregular under the terms of Article 3[12] of Resolution n 2.682 of the National Monetary Council.

The unpaid installments of a single unpaid credit contract were segmented into two large groups of installments: "overdue installments" and "maturing installments". The unpaid "overdue installments" were repurchased by BCSul from the assignees and received risk classification corresponding to the period in which each of them was individually overdue, as if each installment represented a different credit contract. In turn, the "maturing installments" were, for the most part, classified as credit risk "A", without a connection to the overdue installments.

The correct procedure would be to adopt a single risk classification for the contract as a whole, including overdue and maturing installments, and in this way, for the purpose of application of the provision percentages established by Resolution no. 2682/1999, consider the installment that is most overdue. This procedure is known on the market as "swooping in" or "bandwagon" effect. The classification of the credit operations for a single client should be the same.

The delay in payment of the installment is therefore principal condition for establishing the risk classification of an operation or contract, as established in section I of Art. 4 of the Resolution in question, which does not allow individual risk classifications that

---

[11] Documents on pages 4648/4655.
(12) Resolution no. 2682 of 1999, Article 3: The classification of credit operations of a single client or economic group should be defined by considering the one that presents the greatest risk, exceptionally allowing a different classification for a given operation, subject to the provision in Art. 2, section II.

# BANCO CENTRAL DO BRASIL

are different for installments of the same credit contract, even if they are assigned with retention of risk to different assignees.

**9 – Complement of provisions for other credits – Write-off in consigned credit contracts[13]**

**Adjustment Amount: R$ 30,763,000**

**Applicable law:** Resolution 2.682/1999 (Art. 4 - I g; Art. 6 VIII; Art. 14); Resolution 3.721/2009.

**Description of the Adjustment**

On May 31, 2012, BCSul had R$ 30,763,000 registered under asset account 1.8.8.92.30.0096-8 – Installments Receivable– CPP, referring to amounts that were debited from payroll accounts of the borrowers of the consigned credit contracts that had not been transferred to BCSul by the entities in question (INSS, Courts, etc.).

According to the analytical report taken from the institution's loan system (Tools System), these amounts have been owed since 2011, as shown below:

| Maturity of installment | Amount R$ |
|---|---|
| January/2011 | 650,000 |
| February/2011 | 24,635,000 |
| March/2011 | 2,451,000 |
| April/20 | 688,000 |
| May/20 | 2,339,000 |
| Total | 30,763,000 |

*Table totals are based on the analytic list of contracts open on 05/31/2012, extracted from the Tools system.*

Considering the period in which these amounts have remained unpaid, it is clear that payment is unlikely, since in a normal operating procedure, the withholding of the installments from the payroll and the transfer of the funds would only take a few days.

The amounts receivable refer to several entities, and the highest concentration of these are contracts with the INSS; this body usually transfers payroll deduction amounts. Therefore, it can be seen that the reason why the transfer was not made is principally related to operating problems.

| ENTITY | AMOUNT | % |
|---|---|---|
| GOV MA | 475,224.24 | 2% |
| CAM DEP DF | 506,086.41 | 2% |

---

[13] Document on page 4656



# BANCO CENTRAL DO BRASIL

| ENTITY | AMOUNT | % |
|--------|-------:|--:|
| GOV PB | 557,149.07 | 2% |
| GOV GO | 604,160.71 | 2% |
| GOV RN | 769,049.37 | 2% |
| FEDERAL SENATE | 830,251.37 | 3% |
| RIO DE JANEIRO MUNIC | 836,794.32 | 3% |
| GOV AC | 921,181.49 | 3% |
| GOV MS | 950,132.04 | 3% |
| SAO PAULO MUNIC | 990,126.67 | 3% |
| GOV RJ | 1,181,959.75 | 4% |
| BRAZILIAN NAVY | 1,404,268.42 | 5% |
| BRAZ. AIR FORCE | 1,464,004.15 | 5% |
| BRAZILIAN ARMY | 2,317,305.91 | 8% |
| INSS | 9,282,918.99 | 30% |
| OTHERS (*) | 7,672,891.64 | 25% |
| **TOTAL** | **30,763,504.55** | |

(*) all less than 1%

Resolution 2.682/1999 states that operations with the characteristics of credit concessions should be classified under an H rating when they present delays of 180 days, as shown below:

"*Art. 4 Classification of the operation at the risk levels referred to in Art. 1 should be reviewed at least:*
*I – monthly, at the time the balance sheets and trial balance sheets are prepared, as a result of delays in payment of the installment principal or of charges, subject to the following:*
*(...)*
*g) delays greater than 180 days: risk level H*"

An H *rating* corresponds to 100% provisioning:

"*Art. 6 The provision to deal with doubtful credits shall be set up monthly, and may not be less than the sum of the application of the following percentages, without prejudice to the liability of the administrators of the institutions to establish provisions in sufficient amounts to cover probable losses in the credits:*
*(...)*
*VIII - 100% (one hundred percent) of the amount of the operations classified as risk level H.*"

In spite of this not being characterized as a credit operation, these amounts receivable have an associated credit risk. Resolution 3.721/2009 states that the credit risk management structure for financial institutions should include (Art 4):

"*(...)*



# BANCO CENTRAL DO BRASIL

*III - estimation, based on consistent and prudent criteria, of the losses associated with the credit risk, as well as a comparison of the estimated amounts with the losses actually observed;*
*(…)"*

In light of the requirement established in the Resolution, it is appropriate to use the criteria in Resolution 2.682 in relation to the amounts receivable.

Considering the period in which the balances have been unpaid, and the past record of receiving these amounts, they should be provisioned for loss at 100%.

## 10 – Complement of provision for doubtful debts on the middle market portfolio[14]

## Adjustment Amount: R$ 50,680,000

Details of the Adjustment

The breakdown of the adjustment for this provision, by borrower, is presented in the following table:

| Client | Balance(R$) | PDD | PDD BCSul | PDD CGF (R$) | PDD BCSul (R$) | Adjustment PDD |
|---|---|---|---|---|---|---|
| ACEITO ADM CARTOES PREST SERV LTDA | 298,835.09 | 1.0 | 0.005 | 298,835.09 | 1,494.18 | 297,340.91 |
| ADHONEP | 556,054.79 | 1.0 | 0.005 | 556,054.79 | 2,780.27 | 553,274.52 |
| ALCANA USINA DE ALCOOL | 50,418.11 | 1.0 | 0.005 | 50,418.11 | 252.09 | 50,166.02 |
| ALCANA USINA DE ALCOOL | 1.34 | 1.0 | 0.000 | 1.34 | 0.01 | 1.33 |
| ALOES | 4,504,738.83 | 1.0 | 0.030 | 4,504,738.83 | 135,142.16 | 4,369,596.67 |
| ALOES | 135,171.47 | 1.0 | 0.030 | 135,171.47 | 4,055.14 | 131,116.33 |
| AMADEU SIMOES | 515.62 | 1.0 | 0.030 | 515.62 | 15.47 | 500.15 |
| AMBRA | 11,716,299.16 | 1.0 | 0.700 | 11,716,299.16 | 8,201,409.41 | 3,514,889.75 |
| ARIZONA USINA DE ALCOOL E ACUCAR | 50,688.05 | 1.0 | 0.030 | 50,688.05 | 1,520.64 | 49,167.41 |
| ARIZONA USINA DE ALCOOL E ACUCAR | 10.21 | 1.0 | 0.030 | 10.21 | 0.31 | 9.90 |
| BALDIN BIOENERGIA S/A | 10,012,633.20 | 1.0 | 0.010 | 10,012,633.20 | 100,126.33 | 9,912,506.87 |
| BRIGADA VENDAS | 6,207,329.27 | 1.0 | 0.030 | 6,207,329.27 | 186,219.88 | 6,021,109.39 |
| CAMAQUA S/A | 575,050.12 | 1.0 | 0.700 | 575,050.12 | 402,535.08 | 172,515.04 |
| ELCANA GOIAS USINA DE ALCOOL E AC | 46,729.89 | 1.0 | 0.005 | 46,729.89 | 233.65 | 46,496.24 |
| FACILITY TECNOLOGIA | 5,050,802.84 | 1.0 | 0.005 | 5,050,802.84 | 25,254.01 | 5,025,548.83 |
| FACILITY TECNOLOGIA | 261.89 | 1.0 | 0.005 | 261.89 | 1.31 | 260.58 |
| GOVERNMENT OF THE STATE OF AMAPA | 3,439,331.99 | 0.5 | 0.030 | 1,719,666.00 | 103,179.96 | 1,616,486.04 |
| GUILHERME FERNANDES | 13,405,923.23 | 1.0 | 0.005 | 13,405,923.23 | 67,029.62 | 13,338,893.61 |
| GUILHERME FERNANDES | 2,860.72 | 1.0 | 0.005 | 2,860.72 | 14.3 | 2,846.42 |
| INDUSTRIA RANGEL LTDA | 217,259.62 | 1.0 | 0.030 | 217,259.62 | 6,517.79 | 210,741.83 |
| INDUSTRIAL PAGE LTDA | 2,280,270.70 | 1.0 | 0.100 | 2,280,270.70 | 228,027.07 | 2,052,243.63 |
| MD CRED | 75,334.24 | 1.0 | 0.010 | 75,334.24 | 753.34 | 74,580.90 |
| PETROSAC IND COM IMP EXP DE EMB PLAST. | 174,817.37 | 1.0 | 0.500 | 174,817.37 | 87,408.69 | 87,408.68 |
| RODOLATINA LTDA | 6,343,615.44 | 0.5 | 0.300 | 3,171,807.72 | 1,903,084.63 | 1,268,709.23 |
| SUDESTE LINE | 298.05 | 1.0 | 0.030 | 298.05 | 8.94 | 289.11 |
| SUDESTE LINE | 1,209,364.21 | 1.0 | 0.030 | 1,209,364.21 | 36,280.93 | 1,173,083.28 |
| WIREX S/A | 1,043,888.27 | 1.0 | 0.500 | 1,043,888.27 | 521,944.14 | 521,944.13 |
| **TOTAL WITHOUT GUARANTEE** | **67,398,503.72** | | | **62,507,030.01** | **12,015,289.35** | **50,679,695.38** |

The Analyses done on clients with more relevant adjustments frequently indicate a lack of sufficient guarantees for the operations, outdated or insufficient records, successive rollovers without amortization, characterizing "rolling over" of

---

[14] Documentation on pages 2080/2467.

# BANCO CENTRAL DO BRASIL

debts, non-payment of installments after the TSAR, as well as other characteristics that require a larger volume of provision for risks with credit operations.

## 11 – Provision for credit risks with position of sureties and guarantees[15]

### Adjustment Amount: R$ 45,965,000

Details of the Adjustment

BCSul failed to make a provision for risk exposure of the accommodation and guarantee credit portfolio, in spite of the provision in item III of Sole Paragraph of Art. 2 of BC Circular Letter 3721, of 4.30.2009, together with item XII of Art. 4 of the same letter.

The composition of the adjustment of this provision for exposure (amount at risk) with each ensured party is illustrated in the following table:

| Client | Rating CGF | Prior rating | Portfolio Bal. - R$ (Exposure) | % PDD CGF | % Prior PDD | PDD Amount (R$) |
|---|---|---|---|---|---|---|
| A.C. Burlamaqui Consultores S/C | H | AA | 1,214,300.00 | 100 | 0 | 1,214,300.00 |
| Aloes Industria e Comercio Ltda | H | AA | 852,901.32 | 100 | 0 | 852,901.32 |
| Amadeu Simoes Lopes de Azambuja | H | AA | 4,380,000.00 | 100 | 0 | 4,380,000.00 |
| Associação dos Musicos Militares do Brasil - **Ambra** | H | AA | 15,550,000.00 | 100 | 0 | 15,550,000.00 |
| Brigada Promotora de Creditos e Vendas Ltda | H | AA | 8,300,000.00 | 100 | 0 | 8,300,000.00 |
| Gallway Projetos e Energia do Brasil S/A | H | AA | 2,025,000.00 | 100 | 0 | 2,025,000.00 |
| Guilherme de Alvares Otero Fernandes | H | AA | 180,000.00 | 100 | 0 | 180,000.00 |
| Mabel Santana Eguia | H | AA | 162,343.99 | 100 | 0 | 162,343.99 |
| Promotora e Divulgadora Sudeste Line Ltda | H | AA | 13,300,000.00 | 100 | 0 | 13,300,000.00 |
| **TOTAL PDD GUARANTEE** | | | 45,964,545.31 | | | 45,964,545.31 |

The beneficiaries of the guarantee letters are the Ministry of Finance – Attorney General's Office of the National Treasury – as guarantee for overdue tax installments, real estate administrators - as guarantee for lease contracts - and BM&F Bovespa S.A. – to serve as guarantee for stock market operations.

Of the total amount of guarantees issued, only R$ 2,025,000 were enforced by the stock market to liquidate operations of the client Gallway Projetos e Energia do Brasil S.A., CNPJ 08.766.753/0001-14.

The reclassification of the credit risk to level "H" was made based on the record of each client and/or guarantors of the operation with the institution and/or also on the failure to comply with the contractual conditions of the suretyship operation, as described under the item "Irregularities" in this report.

---

[15] Documentation on pages 2468/2601.

# BANCO CENTRAL DO BRASIL

**12 – Complement of provision for doubtful debtors on the margin account of Cruzeiro do Sul S/A Corretora – Operations in Stock Markets[16]**

**Adjustment Amount: R$ 38,348,000**

Description of the Adjustment:

This adjustment results from the use of the equity method on the net equity of Cruzeiro do Sul S/A Corretora de Valores e Mercadorias, in which BCSul holds 100% of the capital, due to the creation on the controlled company's balance sheet of a provision for this amount, as described below:

In the opening Balance Sheet of 6.4.2012 of the Brokerage House, an adjustment was made in the amount of R$38,341,000, relative to the provision for contingencies for non-payment risk of clients in stock operations, since the regulatory requirement to honor the margin calls and/or liquidate them belongs to the broker.

The stock market operations for clients of the brokerage firm have not yet matured. However, considering the relationship record of these clients with BCSul, it can be seen that these clients would not honor these payments when called upon.

Thus, the brokerage firm made a provision in a liability account of the amount set aside for these liquidations and margin calls, less the amount of the bank guarantees granted by BCSul (on whose balance sheet a provision was made for 100% of the amount of the guarantees).

The largest part of this amount, net of the existing guarantees (bank guarantees provided by BCSul to BM&F/Bovespa) – are the result of term and flexible box operations (share purchase and sale options) contracted by individuals and legal entities which, by coincidence, had been acting for a long time as parties to loan operations made by BCSul.

| Client | Advances to Depositors - balance on 7.23.2012 (1) | Value of bank guarantee (2) | Adjustment Amount (margin of guarantee) (1 - 2) |
|---|---|---|---|
| Amadeu Simões Lopes de Azambuja | 13,966,533.50 | 4,380,000 | 9,586,533.50 |
| Associação dos Músicos Militares do Brasil – Ambra | 21,106,754.08 | 15,550,000 | 5,556,754.08 |
| Brigada Promotora de Créditos e Vendas Ltda. | 9,337,155.13 | 8,300,000 | 1,037,155.13 |
| Prevserv Operadora de Serviços Ltda. | 15,840,060.05 | - | 15,840,060.05 |
| Promotora e Divulgadora Sudeste Line Ltda. | 17,851,349.84 | 13,300,000 | 4,551,349.84 |
| **Total** | **78,101,852.60** | **41,530,000** | **36,571,852.60** |

Source:   1) Data taken from Spreadsheet sent by TSAR Administrator (CGF);
2) Data backed in the report "Balances by analytic Accounting Group for specific dates – period from 7.23.2012 to 7.23.2012", issued by the system

**13 – Provision for risk of sale of Bank Credit Notes / Evaluation of Investment in the Insurance Company[17]**

---

[16] Documents on pages 4657/4674.

109

**BANCO CENTRAL DO BRASIL**

**Adjustment Amount: R$ 11,260,000**

Description of the Adjustment:

Evaluation of investments resulting from investment by the equity method on a provision of 100% of the value of the Bank Credit Notes (BCN) registered in the portfolio of the subsidiary of BCSul (in which it holds 99.93% of the capital), "BCS Seguros S.A.", assigned by Banco Prosper S.A. (now also under an extrajudicial liquidation regime) and issued, on 5.9.2012, in the amount of R$ 11,000,000, by the following companies:

- "Brigada Promotora de Créditos e Vendas Ltda.", CNPJ 04.698.766/0001-42,

- "Promotora e Divulgadora Sudeste Line Ltda.", CNPJ 04.816.268/0001-57, and

- "Prevserv Operadora de Serviços Ltda.", CNPJ 05.943.988/0001-46.

These BCNs were considered unlikely to be paid, since, although the maturity of the three BCNs was set for 11.5.2012, the issuers were in breach for other operations at BCSul.

The volume of ownership by BCSul in the company "BCS Seguros S.A." subjects this investment to the provisions in Cosif 1.11.2.1.a: "Investments in affiliated and controlled companies, in Brazil or abroad, must comply with the following rules: a) investments must be evaluated by the equity method in: II – controlled companies; b) a controlled company is a company in which the controller, either directly or through other controlled companies, has shareholder rights that guarantee it, on a permanent basis, a preponderance in the company deliberations and the power to elect the majority of the administrators".

**14 – Acquisition of Banco Prosper**

**15 Adjustment Amount: R$ 55,006,000**

**Description of the Adjustment**

On December 26, 2011, Banco Cruzeiro do Sul acquired Banco Prosper for the price of R$ 55,006,000 (**pages 936 to 975**). The trial balance sheet attached to the purchase contract signed by Banco Cruzeiro do Sul and the then controllers of Banco Prosper, Antônio Joaquim Peixoto de Castro Palhares and Paulo César Peixoto de Castro Palhares, presented Banco Prosper as having Net Equity of R$ 33,216,000 (**page 971**); in other words, the amount paid by BCSul included overpricing of R$ 21,790,000.

---

[17] Documents on pages 4675/4709.



# BANCO CENTRAL DO BRASIL

At that time, BCSul recorded the amount paid for Prosper in the asset account under Other Credits 1.8.8.92.10.0061-8 – Purchase of Banco Prosper, while awaiting the approval of the transaction by the Central Bank of Brazil, when the amount would then be recorded in the investment account, measured by the equity method.

On March 26, 2012, KPMG Transaction and Forensic Services Ltda. issued a due diligence report on Banco Prosper, referring to the base date of August 31, 2011 (**pages 978 to 1052**). This report indicated (**page 982**) a total of quantifiable corrections of between R$ 64,574,000 (minimum) and R$ 73,214,000 (maximum). This amount would lead to uncovered liabilities (negative Net Equity), considering the Net Equity of R$ 32,456,000, on August 31, 2011 (unaudited), of at least R$ 32,118,000.

The most recent accounting information on Banco Prosper, dated April 2012, shows negative net equity of R$ 90,442,000 (**page 5273**). If the equity method is used, the amount of the investment would be recorded as zero. In the state in which it was acquired by BCSul, Banco Prosper could not afford to continue operating, since it was outside all the operating limits, a situation that does not justify maintenance of the premium paid.

It should be noted that the Central Bank of Brazil did not approve the purchase of Banco Prosper and on September 14, 2012 it ordered the extrajudicial liquidation of the institution, in light of the compromised economic and financial situation, the existence of serious violations of the legal and regulatory rules that governed the activity of the institution and the occurrence of successive losses that had been subjecting unsecured creditors to abnormal risk levels (**Presidential Act 1.235 page 1053**).

In spite of the possibility of a reimbursement of the amounts paid to the controllers of Banco Prosper, it should be noted that part of the amount was delivered directly to the creditors of that Financial Institution: Credit Guarantee Fund, Cirrus Participações e Corretora Prosper.

In addition, the assets of Banco Prosper's controllers are frozen as a result of the extrajudicial liquidation of the institution; therefore, the likelihood that the amounts paid will be recovered is remote.

As a result of this situation, the amount paid by Banco Cruzeiro do Sul to purchase Banco Prosper, recorded in an account in the group of Other Credits, is not likely to be recovered, under the terms of CPC 01 (Reduction to Recoverable Value of assets), which states that *"...if there is clear evidence that assets are assessed at a value that will not be recoverable in the future, the entity should immediately recognize the loss of value by creating a provision for losses."*

## 16 – Investment in Verax IAA Fund

# BANCO CENTRAL DO BRASIL

**Adjustment Amount: R$ 39,364,000**

**Balance on 05/31/2012 - R$ 39,364,000** (**page 1092**)

**Balance on 12/31/2011 – R$ 36,963,000** (**page 1091**)

**Applicable law: Circular 3.068, of November 8, 2011 (Art 2 - I)**

**Description of the adjustment:**

On May 31, 2012, Banco Cruzeiro do Sul held 9.25 shares of the Fund VERAX IAA FUNDO DE INVESTIMENTO EM DIREITOS CREDITÓRIOS NÃO– PADRONIZADOS ("Verax IAA CRIF NP") or ("Fund") (**page 1123**), corresponding to a book value of R$ 39,364,000, including the acquisition cost (R$ 9,250,000) and the adjustment to market value (R$ 30,114,000).

This fund held a single asset in its portfolio, corresponding to Credit Rights from an indemnification action filed by Usina Bititinga against the Federal Government, in its capacity as the successor to Instituto Brasileiro do Açúcar e do Álcool, before the Federal Court of the Judicial Section of the Federal District, case No. 90.0001948-6 and related actions, in light of the order by the Union to pay indemnification for material damages found as a result of the setting of sugar and alcohol prices below its production cost (**page 1137**).

This asset is recorded in the fund on 05/31/2012 at the market value of R$ 120,837,700.49, and was purchased for R$ 43,237,107.82 in 5 tranches during the period between 04/29/2009 and 08/25/2009. The credit rights were acquired through credit assignments made with CP Negócios Imobiliários Ltda.

Between the dates of the acquisition by the fund and 05/31/2012, the asset was adjusted by the Selic rate (until 06/30/2011) and by the IPCA-E (since 07/01/2011), plus a 70% discount rate obtained from the difference between the acquisition price of each tranche and the updated amount on the acquisition date. The justification for the discount is the low degree of liquidity of this asset. (**pages 1069 to 1071 and 1134**)

The action on which the credit right is based has not yet become a federal court-issued government debt certificate, a situation that would make it more likely that the claimant would be paid. In addition, there are several points under discussion referring to the action, which leads to a considerable risk that this asset may not be paid, or that it be paid at an amount much lower than what is being sought, over an extremely long time period, according to the opinion issued by the Law Firm Mattos Filho, Veiga Filho, Marrey Jr and Quiroga, dated October 11, 2011 (**pages 1093 to 1020**):

*"Based on everything that has been presented, we caution that the operation to acquire these credits against the Union is evidently a risky operation, since the*



**BANCO CENTRAL DO BRASIL**

*credits may not be received or may be received at an amount much lower than what is expected."*

The reports by the independent auditors referring to the financial statements of August 2010 and 2011 also contain warnings about receipt of the assets, as indicated below:

August 31, 2010 (opinion issued in May 11, 2011) (**page 1157 and 1158**):

*"As mentioned in explanatory notes 3 and 6, the Fund's credit rights are being recorded at fair value, using a risk premium determined by the administration in accordance with the risk credit of the Fund asset of 30% and a term of 48 months. As a result of the lack of information we could use to prove the appropriateness of the rate and the term used, we were unable to conclude in regard to the respective fair value of the credit rights."*

August 31, 2011 (report issued on March 20, 2012) (**page 1127**):

*"The Fund's credit rights are the result of a lawsuit in which the position as plaintiff has not yet been transferred to the Fund and they are being priced according to the premises indicated in explanatory note no. 3. Due to the nature of the credit rights and the judgment involved in the definition of the premises used in the pricing model, principally in relation to the term and the discount rate, we note that there are uncertainties in relation to their conversion into court-issued government debt certificates and their respective value upon receipt. Therefore, when the credit rights are actually received, the amount may turn out to be substantially different from what was recorded on December 31, 2011."*

Circular Letter 3.068 of the Central Bank of Brazil states that investments in securities by financial institutions should be classified into one of the following three categories: (i) Negotiation Instruments; (ii) instruments available for sale and (iii) securities held until maturity.

The investment by BC Sul in the fund shares in question, according to the financial statements of the bank dated March 31, 2012 (**pages 1159 and 1160**), was classified under the category "Negotiation Instruments". According to Circular Letter 3.068, securities classified under this category are those that are acquired for the purpose of being actively and frequently traded. These instruments are measured at market value, with a counter-entry in the results account; in other words, all variations, both positive and negative in the fund's market value directly impact the results of the institution.

BCSul made a single investment in the fund, on May 27, 2011, in the amount of R$ 9,250,000 (**page 1.123**). On May 31, 2011, it calculated the market value of the shares, recording an adjustment to market value of R$ 24,158,000,



# BANCO CENTRAL DO BRASIL

totaling, at the end of the first month of investment, a book value of R$ 33,408,000 (increase in value of 261%).

Circular Letter 3.068 establishes the following parameters for calculation of market value (Art. 2, Paragraph 1):

*"I – the average sale price on the day in question, or when this information is not available, the average sale price on the previous day;*
*II – the probable net results obtained using a pricing technique or model;*
*III – the price of a similar financial instrument, taking into consideration at least the payment terms and maturity, the credit risk, the currency or index."*

The calculation method indicated in item I is appropriate for instruments with heavy sales volume, which is not the case for the credit rights in question.

In turn, item III does not apply, since the credit right that makes up the portfolio of the fund in which BCSul has shares has specific characteristics, since it is the result of a lawsuit, and it is not practical to compare it to other existing financial instruments.

Therefore, we are left with item II; however, as mentioned, since it is not possible to estimate the net value to be received of these funds, there is no likely net amount from the sale of the instrument.

In light of the high degree of uncertainty of receiving the amounts referring to the action that is the source of the credit rights, the extremely low liquidity of this asset and the absence of consistent bases for calculation of the market value recorded in the accounting statements of BCSul, a provision was made for 100% of the amounts of this investment.

## 16 – Investment in the Tâmisa Fund / Share Portfolio (Telebrás)[18]

## Adjustment Amount: R$ 125,250,000

Description of the Adjustment:

On June 4, 2012 BCSul held shares in the Tâmisa Multimarket Investment Fund (Tâmisa Fund), CNPJ 05.878.450/0001-03, as the sole shareholder, which corresponded to R$ 334,660,000 on the balance sheet of May 31, 2012, according to the report issued by the administrator (BC Sul Verax Serviços Financeiros Ltda., CNPJ 05.917.347/0001-17), distributed as follows:

---

[18] Documents on pages 4710/4724.

**BANCO CENTRAL DO BRASIL**

| Type of asset | Quantity | Net market value | % Total assets |
|---|---|---|---|
| Share - Telebras ON (TELB3) | 5,945,980 | 190,211,900.20 | 57.52% |
| Share - Telebrás PN (TELB4) | 5,871,400 | 64,585,400.00 | 19.53% |
| Future Call Index (FCI IBV) | 13,762 contracts | 11,133,007.72 | 3.37% |
| Future Put Index (FPI IBV) | 13,762 contracts | 60,916,411.86 | 18.42% |
| Other Assets | | 3,814,151.63 | 1.15% |
| Total Assets | | 334,660,871.41 | 100.00% |

The fund was administered and its portfolio was managed by BC Sul Verax Serviços Financeiros Ltda., with the consent of the administrators of BCSul, its only shareholder. The treasury, control and instrument and securities processing, the recordkeeping of share issue and redemption and custody of securities and other financial assets are performed, pursuant to Article 26 of the regulation, by the custodian Banco Bradesco S.A., CNPJ 60.746.948/0001-12.

Cruzeiro do Sul S.A. Distribuidora de Títulos e Valores Mobiliários, CNPJ/MF no. 62.382.908/0001-64, is only responsible for the distribution of shares, pursuant to Article 27.

On 05/31/2012 the portfolio of the Tâmisa Fund held 76% of its assets allocated in Telebrás shares, of which 5,945,980 were ON shares (TELB3), with a value of R$ 190,211,000, corresponding to 57.52% of the NE, and 5,871,400 PN shares (TELB4), recorded at R$ 64,585,000, equivalent to 19.53% of the NE, totaling R$ 254,797,000.

These shares, although they are marked at the daily most recent market price, measured by the custodian Bradesco, have a very small volume traded on the stock market, and later share prices indicate a much lower price that the one indicated on the May 2012 trial balance.

Consequently, in the event the total position was to be sold, its value would be less than what is reflected in the share price on 5.31.2012. According to an evaluation in July 2012, the share price is R$ 14.50 (Telebrás ON) and R$ 7.20 (Telebrás PN), compared to the R$ 31.99 and R$ 11.00, respectively, recorded in this trial balance. Pricing using the real value of the papers represents a total adjustment of R$ 126,365,000 in the position of the Tâmisa Fund shares, and, consequently, in the shares held by BCSul.

Based on the equivalence of amounts between the share price calculated and the date of the balance sheet, an adjustment was made in the amount of R$ 125,250,000.

Pursuant to the terms of Article 1 of Law no. 6.385, of December 7, 1976, with the wording given by Law no. 10.303, of October 31, 2001, which attributes authority to the Securities and Exchange Commission to monitor and issue rules governing investment funds and operations with shares, this Investigation Commission recommends that this report be sent to the CVM, so it can use its investigative authority.



# BANCO CENTRAL DO BRASIL

## 17 – Write-off of tax credits (Reversal)[19]

**Adjustment Amount: R$ 196,130,000**

Details of the Adjustment:

BCSul recorded in its records R$ 196,130,000 referring to a tax credit resulting from time differences. According to the standards of the National Monetary Council, among other requirements applicable, financial institutions can only keep tax credits recorded if there is an expectation that profits or future taxable revenues will be generated subject to income tax and social contribution tax, as the case may be, in subsequent periods, based on a technical study that shows the likelihood of future obligations for taxes and contributions that would enable the tax credit to be realized within ten years (Article 1, item II, of Resolution no. 3.059, of December 20, 2002, with the wording given by Article 1 of Resolution no. 3.355, of March 31, 2006).

Thus, in light of the lack of expectations for generating future taxable profits, BCSul wrote off the entire tax credit recorded in its assets.

The amounts, which were examined by the consulting company "PriceWaterhouseCoopers Contadores Públicos Ltda." were the following:

| IR (25%) | CS (9%) | CS (6%) | T o t a l |
|---|---|---|---|
| 116,990,602.01 | 47,483,380.41 | 31,655,586.95 | 196,129,569.37 |

## 18 - Adjustment to market value of swap operations (positive)

## 19 Adjustment Amount: R$ 114,855,000 (positive adjustment).

Description of the Adjustment:

On the balance sheet dated May 31, 2012, BCSul showed swap contracts in the amount of R$ 219 million, considering the difference receivable, as a hedge for fund raising operations abroad (short and medium term notes).

The difference to be received resulting from these swap contracts is indexed to the exchange rate variation (dollar) and the difference payable is indexed to the variation in the CDI-Cetip rate. A recalculation of the market value of these operations on May 31, 2012 identified an excess over these swap operations (dollar x CDI-Cetip) of R$ 106,255,000; additionally, the other open swap operations also showed an excess of R$ 8,599,000.

Consequently, a positive adjustment of R$114,855,000 was made, which refers to the  market value  of these  swap  operations, which  BCSul  held in

---

[19] Document on page 4725.



# BANCO CENTRAL DO BRASIL

its portfolio on the date of the special balance sheet, June 4, 2012, considering the original value plus accrued amounts.

These operations were also examined by the specific consultant hired by the Credit Guarantee Fund – CGF, the company "PWC Independent auditors" ("PriceWaterhouse&Coopers").

**19 – Write-off of Intangible Assets – Commission paid to Plural**

**Adjustment Amount: R$ 21,227,000**

**Applicable law: Resolution 3.642/2008.**

**Details of the Adjustment**

The adjustment of R$ 21,227,000 refers to the payment to Plural Capital Gestão de Recursos Ltda. relative to the provision of financial and strategic advising services in the acquisition of Banco Prosper by Banco Cruzeiro do Sul (**page 1161, 1162 and 1165**).

The amounts paid for services were recorded in the intangible account of the Financial Institution, instead of being recorded as an expense. The definition of intangible asset, according to Article 1, of Resolution 3.642/2008, of the National Monetary Council, is as follows:

> *"Intangible assets correspond to **vested rights** over incorporeal assets intended for the maintenance of the entity or used for this purpose, including those corresponding to the rendering of services of payment of salaries, wages, pay, remuneration, retirement, pensions and similar payments."*

In this case, payment of the advising services provided by Plural does not meet the definition of an intangible asset, since it does not refer to vested rights. The alleged benefit provided by Plural (acquisition of Banco Prosper) occurred in December 2011 (**pages 936 to 975**); therefore, the amounts should be recorded as an expense.

It should be noted that the amount paid by BCSul for control of Banco Prosper was R$ 55,006,000 (**page 940**), corresponding to 38.6% of the value of the operation under analysis.

It should also be noted, according to emails exchanged between the Board of BCSul's Controller and a representative of Plural, that of the amount paid, R$ 11 million was invested in BCSul as Bank Certificates of Deposit (BCD) (**page 1164**).

According to the terms of the contract executed by BCSul and Plural, the compensation to be paid would be calculated in a variable manner, as indicated below:



# BANCO CENTRAL DO BRASIL

*"At the end of the Operation, Plural Capital will be entitled to success fees corresponding to the lesser amount between (i) 1.5% (one point five percent) of the total amount of the funds raised by Cruzeiro do Sul and affiliates at CGF for the Operation, up to the limit of R$ 800,000,000.00 (eight hundred million reais) plus 1% (one percentage point) of the amount of the funds raised in excess of this limit, or (ii) 5% (five percent) of the present value of the gain of Cruzeiro do Sul and its affiliates in the Operation, a gain that should be calculated by joint agreement between Cruzeiro do Sul and Plural, noting that among the other factors to be mutually agreed upon by the Parties, the result of the difference between the fees charged by CGF and the funding fees of Cruzeiro do Sul, over the total amounts raised, adjusted to present value, subject to the term of the operations that are the result of the negotiations between CGF and Cruzeiro do Sul, any fiscal or tax benefits resulting from the operation to be used by Cruzeiro do Sul in potential gains related to the equity value of Banco Prosper, excluding the costs incurred by Cruzeiro do Sul in the Operation, in light of the total amount of funds raised with CGF."*

It can be seen that the basis for calculation was determined in very vague terms, even leaving items open "to be agreed to by the parties".

The Net Equity of Banco Prosper, on November 30, 2011, was R$ 33,216,000, an amount much lower than the R$ 800 million described in the contract as the basis for calculation of the remuneration (**page 1166 to 1172**).

Even if Banco Cruzeiro do Sul had acquired Banco Prosper using funds 100% from the Credit Guarantee Fund (CGF), the amount would not come close to the R$ 800 million.

This fact shows that the contract in question was not directly related to the acquisition of Banco Prosper. Additionally, the amount of R$ 21 million was only recorded in the bank's records in February 2012, the date of the financial liquidation.

If this amount had in fact been related to the purchase of Banco Prosper, this record should have been made in the month of December 2011, at which time the contract was executed, when the amounts would actually be owed to Plural due to the finalization of the sale, independent of actual payment, pursuant to the accrual basis, under which the financial effects of transactions and events are recognized in the periods in which they occur, whether or not they were received or paid.

Additionally, no reports were located regarding the provision of the service that was the purpose of this contract at the areas of BCSul.

Since the amounts paid to Plural as commission for assistance to BCSul in the purchase of Banco Prosper do not meet the definition of intangible assets, they were entered as expense (written off).

118



# BANCO CENTRAL DO BRASIL

**20 – Write-off of amounts receivable from ex-administrators – Evaluation of investment in the company "Cruzeiro do Sul Comercial, Importadora e Exportadora Ltda.", resulting from an adjustment on transactions for real estate without valid documentation.[20]**

**Adjustment Amount: R$ 3,800,000**

Description of the Adjustment:

This refers to the evaluation of investments resulting from the use of the equity method on the net equity of its subsidiary "Cruzeiro do Sul Comercial, Importadora e Exportadora Ltda." (CrSul Comercial), in which BCSul holds 98.66% of the capital, resulting from the elimination on the balance sheet of this affiliated company, of transactions with real estate without valid documentation.

Since April 2012 this company has had a private purchase contract for a house on a lot of land located at Bairro Morada da Serra Cataguense, MG, recorded at the Real Estate Registry under registration no. 8737, in which it has promised to acquire that real estate, free of any encumbrance, debt, attachments or restrictions, except the public mortgage 1992 from Previ - Caixa de Previdência dos Funcionários do Banco do Brasil, CNPJ 33.754.482/0001-24.

The price of the sale was R$ 1.3 million, and the company paid a deposit of R$ 1.1 million, recorded under the category "1.8.8.92.10.0027-4 - Fixed Assets to be Classified". The remaining balance of R$ 200,000 could be used by the promised buyer to pay the balance due at Previ, if the documents showing release and cancellation of the mortgage are not presented.

Since the final deed for the real property was not drawn up, and the instrument was not recorded at the Real Estate Registry, there is no certainty regarding the liquidity and sale of this asset.

In April 2011, BCSul, its controller, made a capital increase of R$ 2,700,000, concomitant with an identical entry in the account "Fixed Assets to be Classified". In June 2011 this amount was transferred to the "Amounts Receivable" account and began to be adjusted for inflation.

This amount of R$ 2,700,000 refers to a payment made on April 4, 2011 for a "Contract for Deed for Real Property" signed with the company "Marena Comercial Ltda.", CNPJ 40.021.177/0001-02, on March 24, 2011, for real property located at Rua Aramanaí, 56, Vila Madalena, São Paulo, SP (headquarters of the company Marena and residence of former administrator Renato Alves Rabello), in the amount of R$ 2,750,000.

The remaining amount, R$ 50,000, was supposed to be paid within one year after the contract was signed, when the final deed for the property would be prepared.

---

[20] Documents on pages 4726/4757.



# BANCO CENTRAL DO BRASIL

There is no assessment report for the real property. Due to a contractual provision, in the event the deed is not issued, Marena would return the funds within 72 hours, adjusted by the CDI rate, and the seller would retain possession of the real property until the end of the term for issuance of the final deed, at which time the real property would be vacated. None of this occurred. The amounts were still pending receipt as of the balance sheet of 5.31.2012. Since the final deed was not prepared and the instrument was not taken to the Real Estate Registry, there is uncertainty regarding the liquidity and receipt of this asset.

**21 – Write-off of investment in precious stones / Assessment of investment in the company Companhia Promotora de Vendas Proveban, resulting from an adjustment of assets represented by precious stones (emeralds) without commercial value.[21]**

**Adjustment Amount: R$ 2,501,000**

Details of the Adjustment:

This refers to the evaluation of investments using the equity method on the net equity of the subsidiary "Cia. Promotora de Vendas Proveban" (Proveban), of which BCSul holds 99.99% of the capital, resulting from the elimination, on the controlled company's balance sheet, of an investment in precious stones – emeralds without valid documentation.

Proveban's fixed assets contain an entry in the category "2.1.9.90.10.0010-3 - Precious stones", of 41,688 carats of uncut emeralds (not lapidated), at the purchase cost of R$2,501,000.

These assets are stored in two suitcases in the safe located in the entrance room of the Management Board of BCSul in the city of Rio de Janeiro, as described below:

- a suitcase containing emeralds, with seal numbers 062029/061344 and 061002/064899, with a custodial receipt signed by Luiz Octavio Azeredo Lopes Índio da Costa, that states that it contains 20,837 ct (carats) of uncut emeralds; and

- a suitcase containing emeralds, with seal numbers 061304/061998 and 061678/064886, with a custodial receipt signed by Luiz Octavio Azeredo Lopes Índio da Costa, which states that it contains 20,851 CT (carats) of uncut emeralds.

The receipt was prepared based on tax invoice no. 102, issued on 2.28.2000 by Cooperativa Garimpeira de Antonio Dias Ltda., CNPJ (cancelled) 25.591.330/0001-20, which was headquartered in the city of Antonio Dias, state of Minas Gerais, and a receipt issued by the same company in the amount of R$ 2,501,280.00.

---

[21] Documents on pages 4758/4774.



# BANCO CENTRAL DO BRASIL

The evaluation reports were issued by CMTG – Centro Multiplicador de Tecnologia Gemológica Ltda. ME, CNPJ 71.161.673/0001-71, headquartered in Ouro Preto, state of Minas Gerais, and were signed by Maurício de Barros, geologist, who indicated the possibility that they were false and also did not confirm their authenticity.

There is no official price quote for this type of item (uncut or not lapidated emeralds), and there is a high rate of falsifications and false appraisal reports.

## 22 – Write-off of difference in foreign currency[22]

**Adjustment Amount: R$ 520,000**

Details of the Adjustment:

In the physical count of balances in foreign currency, a difference of R$ 520,000 was found in the cash balance, configuring a treasury difference in foreign exchange operations.

The reconciliation work in the account "foreign currency held," for the currencies dollar (US$), euro (€) and pound (£), in the period from 6/26/2012 until 8/10/2012, indicated the following differences:

| Amount in currency | PTAX | Amount R$ |
|---|---|---|
| US$ 166,155.79 | 2.0904 | 347,000 |
| EUR 51,655.00 | 2.5990 | 134,000 |
| GBP 12,200.00 | 3.2405 | 39,000 |
| Sum | - | 520,000 |

The amounts in foreign currency available at the BCSul treasury and at the company Brink's Segurança e Transporte de Valores Ltda., CNPJ 60.860.087/0001-07, were compared to the accounting records, indicting the differences described, which were adjusted. In the other currencies in which BCSul operates – Argentine peso (ARS 670,313.00), Canadian dollar (CAD 200.00) and Chilean peso (CLP 2,536,000.00) – no differences were found.

## 23 – Provision for contingencies with Banco Prosper / Coverage of uncovered Banco Prosper liabilities

**Adjustment Amount: R$ 100,000,000**

**Description of the Adjustment**

---

[22] Documents on pages 4775/4810.



# BANCO CENTRAL DO BRASIL

On December 26, 2011, Banco Cruzeiro do Sul acquired Banco Prosper for the price of R$ 55,006,000 (**pages 936 to 975**). The trial balance sheet attached to the purchase contract signed by Banco Cruzeiro do Sul and the then controllers of Banco Prosper, Antônio Joaquim Peixoto de Castro Palhares and Paulo César Peixoto de Castro Palhares, presented Banco Prosper as having Net Equity of R$ 33,216,000 (**page 971**); in other words, the amount paid by BCSul included a premium of R$ 21,790,000

At that time, BCSul recorded the amount paid for Prosper in the asset account under Other Credits 1.8.8.92.10.0061-8 – Purchase of Banco Prosper, while awaiting the approval of the transaction by the Central Bank of Brazil, when the amount would then be recorded in the investment account, measured by the equity method.

On March 26, 2012, KPMG Transaction and Forensic Services Ltda. issued a due diligence report on Banco Prosper, referring to the base date of August 31, 2011 (**pages 978 to 1052**). This report indicated (**page 982**) a total of quantifiable corrections of between R$ 64,574,000 (minimum) and R$ 73,214,000 (maximum). This amount would lead to uncovered liabilities (negative Net Equity), considering the Net Equity of R$ 32,456,000, on August 31, 2011 (unaudited), of at least R$ 32,118,000.

The most recent accounting information on Banco Prosper, dated February 2012, shows negative net equity of R$ 90,442,000 (**page 5273**). If the equity method is used, the amount of the investment would be recorded as zero. In the state in which it was acquired by BCSul, Banco Prosper could not afford to continue operating, since it was outside all the operating limits, a situation that does not justify maintenance of the premium paid.

In addition to the quantified adjustments indicated above, the due diligence report prepared by KPMG detected a series of unquantified potential risks (**pages 997 to 1000, 1020 to 1024, 1039, and 1040**), which could increase the uncovered liabilities. Therefore, in addition to the write-off of the purchase amount of Banco Prosper, it would be necessary to create a provision in the amount of R$ 100,000,000 to cover a possible uncovered liability the bank invested in.

It should be noted that the Central Bank of Brazil did not approve the purchase of Banco Prosper and on September 14, 2012 it ordered the extrajudicial liquidation of the institution, in light of the compromised economic and financial situation, the existence of serious violations of the legal and regulatory rules that governed the activity of the institution and the occurrence of successive losses that had been subjecting unsecured creditors to abnormal risk levels (**Presidential Act 1.235 – page 1053**).

## 24 - Provision for Contingencies – Civil and Labor (Complement)[23]

---

[23] Documents on pages 4811/5085.

# BANCO CENTRAL DO BRASIL

**Adjustment Amount: R$ 75,853,000**

Details of the Adjustment

Complement to provision for civil and labor contingencies in lawsuits or administrative proceedings in which BCSul is a party, as a result of the evaluation prepared by the Law Firm Tozzini, Freire, Teixeira, e Silva Advogados (Tozzini Freire Advogados), CNPJ 48.109.110/0001-12.

The existing provision on the date of the balance sheet was R$ 20,957,000, for an amount assessed as "likely" risk of R$ 96,809,000, therefore, a complement to the provision in the amount of R$ 75,853,000 was necessary.

## 25 – Provision for Contingencies - Cofins[24] Adjustment

**Amount: R$ 82,161,000**

**26** Details of the Adjustment

This refers to a violation notice, with registration as overdue tax liability together with the tax foreclosure, which led to a provision for contingency for Cofins – Contribution Tax for Financing Social Security. Although there is a lawsuit with a final judgment that is favorable to BCSul, the Brazilian Federal Revenue Office understands that the basis on which this Judgment was rendered does not support the claim of the taxpayer (bank), and based on this interpretation, it issued the violation notice.

In regard to case 0045948-09.2009.403.6182, together with the registration as overdue tax liability no. 80.6.09.025743-00, and tax foreclosure no. 16327.001277/2007-91, referring to Cofins, in the amount of R$ 81,548,77.24, for the calendar years from 2003 to 2006, calculated over financial intermediation revenue, BCSul placed 9,100 shares of the Multicred Fund (Fundo de Investimento em Direitos Creditórios BCSul Verax Multicred Financeiro, CNPJ 07.766.151/0001-02), in the amount of R$ 4,805,244.17, as a guarantee for the enforcement; this case is awaiting judgment. The amount of the overdue tax liability is R$ 82,160,853.76.

The Law Firm Tozzini, Freire, Teixeira, e Silva Advogados, CNPJ 48.109.110/0001-12 (Tozzini Freire Advogados) considered the chance of loss "likely," in light of the fact that the final decision in case no. 1999.61.00.020.283-3 does not refer to the definition of invoicing, but instead, only to the unconstitutionality of paragraph 1, of Article 3, of Law 9.718/1998, and that financial intermediation revenue is part of the invoicing, since it configures rendering of services of financial institutions, which led to the provision of R$ 82,161,000.

---

[24] Documents on 4811/5085.

**BANCO CENTRAL DO BRASIL**

**27 – Provision for Contingencies – Notifications from the Brazilian Federal Revenue Office – Vila (against BCSul S.A. in its capacity as joint and several debtor for the company Vila Promotora de Créditos e Vendas Ltda.)**[25]

**Adjustment Amount: R$ 455,000,000**

Details of the Adjustment

This refers to three violation notices prepare by the Federal Revenue Service Office, relative to the taxes IRRF, IRPJ, CSLL, Pis/Pasep and Cofins.

To establish a provision for this contingency, the Administration based itself on an analysis of the documents and on the evaluation of the Law Firm Tozzini, Freire, Teixeira, e Silva Advogados, CNPJ 48.109.110/0001-12 (Tozzini Freire Advogados). Since the amount in the record is R$ 1,490,555,000, including principal, fine and interest, the Administration made a provision in the amount of R$ 455,000,000, which represents its best estimate of the risks involved with this contingency.

According to bank records, the members of the company "Vila Promotora de Créditos e Vendas Ltda.", CNPJ 04.696.350/0001-95, are Armando Carneiro da Silva and Alzenir Xavier Machado.

A consultation to the Federal Revenue Service Office site shows the record as "removed" due to "ineligibility," since 12.31.2008. According to the provision in Article 54 of Law no. 11.941, of May 27, 2009: "The registration at the National Registry of Legal Entities – CNPJ will be removed, pursuant to the terms and conditions defined by Brazilian Federal Revenue Office, for those legal entities that have been declared ineligible by the date of publication of this Law". The legal classification of the company as "ineligible" is found in Articles 81 and 82 of Law n 9.430, of December 27, 1996.

The tax cases that led to the adjustments are:

1) Case: 16832.000154/2008-12 (Referring to Vila Promotora de Créditos e Vendas Ltda., and BCSul with joint and several liability): Income Tax Withheld at the Source (IRRF), relative to the period from January 31 to December 31, 2002, in the amount of R$ 936,764,945.00.

2) Case: 16832.000155/2008-59 (Referring to Vila Promotora de Créditos e Vendas Ltda., and BCSul with joint and several liability): Corporate Income Tax (IRPJ), Social Contribution Tax on Net Profits (CSLL), Social Integration Program and Civil Servant Equity Formation Program (PIS/Pasep) and Contribution Tax for Financing Social Security (Cofins), for the period from January 31 to December 31, 2002, in the amount of R$ 357,581,238.89.

---

[25] Documents on pages 4811/5085.



# BANCO CENTRAL DO BRASIL

3) Case: 16832.000998/2009-36 (Referring to Vila Promotora de Créditos e Vendas Ltda., and BCSul with joint and several liability): IRRF, IRPJ, CSLL, PIS/Pasep and Cofins, relative to the period from January 1 to December 31, 2003, in the amount originally recorded of R$ 196,208,759.53.

## 4.4      Complementary Examinations

The Investigation Commission requested the DECIC – Department of Prevention of Financial Crimes and Response to Information Request for the Financial System of this agency to provide information contained in the Financial System Customer Records (CCS), relative to the controllers and ex-administrators of the company in question (page 29).

In its response on **pages 5342/5542**, that department informed us of the bank records, which enabled us to identify the financial institutions  with which the ex-administrators  and controllers had relationships, as well as the respective bank account numbers.

The Investigation Commission understood,  given the tight deadline for concluding the investigation, that it was not necessary to extend the examination to the statements and other account documents of the company's controllers and ex-administrators, since the documentation presented in the case record met their objectives.

## 5.      THE INDEPENDENT AUDIT

As detailed in this report, the administration of Banco Cruzeiro do Sul carried out irregular procedures of generating funds and invalid recording of assets (credit operations), therefore, the accounting statements did not reflect the institution's  real economic-financial situation.

During this period, the external audit company KPMG Independent auditors (KPMG) issued opinions / reports[26] without qualifications relative to the irregularities demonstrated over the course of the report, referring to the financial statements of June 30, 2007, 2008, 2009, 2010 and 2011 and of December 31, 2007, 2008, 2009, 2010 and 2011 (**pages 648 to 665**).

Article 20 of the Attached Regulation to Resolution 3.198, of May 27, 2004, issued by the National Monetary Council, states that independent auditors, in rendering their services, shall follow the audit standards and procedures established by the National Monetary Council and by the Central Bank of Brazil and, when not conflicting, by the Securities and Exchange Commission, by the Federal Accounting Council (CFC) and by the Institute of Independent Auditors of Brazil (Ibracon).

---

[26] For the fiscal years beginning on January 1, 2010, the nomenclature of the document through which the audit expresses its opinion on the accounting statements was changed from "Independent Auditors' Opinion" to "Independent Auditor's Report on Financial Statements" (Resolution CFC 1.231/2009), due to the adoption of the international standards on auditing (ISAs).



# BANCO CENTRAL DO BRASIL

Therefore, the responsibility of KPMG was to conduct the audit in accordance with professional standards, in order to be reasonably certain that the statements were free of relevant distortions caused by error or fraud.

For the fiscal years beginning on January 1, 2010, standards equivalent to the international audit standards were received by the Federal Accounting Council – CFC, through Resolutions, which determine the procedures to be followed by the independent auditors in carrying out their activities.

Through the fiscal year ending on December 31, 2009, another set of audit standards was in effect, which also determined audit procedures to be followed by the companies.

We identified the irregularities indicated in the item "Irregularities in procedures performed by KPMG", below, which led the company to not identify some of the occurrences listed in this report.

The objective of the independent auditor, according to NBC-TA 200 – General Objectives of the Independent Auditor (approved by CFC Resolution 1.203, of November 27, 2009) is:

*"11. When conducting audits of financial statements, the general objectives of the auditor are:*
*(a) To obtain reasonable certainty that the financial statements as a whole are free of relevant distortion, regardless of whether they were caused by fraud or error, thus allowing the auditor to express his opinion on whether the financial statements were prepared, in all relevant aspects, in accordance with the structure of the applicable financial report; and*

*(b) to present a report on the financial statements and to communicate as required by the NBC TAs, in accordance with the auditor's findings."*
*(emphasis added)*

Relative to the period ending on March 31, 2012, Ernst & Young Independent auditors (Ernst) conducted limited review procedures of the Quarterly Financial Information of Banco Cruzeiro do Sul, for which it issued an unqualified report referring to the irregularities found (**pages 666 and 667**).

The audit of the quarterly information has a reduced scope in comparison to the audit of the financial statements, and it was conducted in accordance with a specific standard, NBC TR 2410 – Review of Intermediary Information Conducted by Entity Auditor (approved by CFC Resolution 1.274 of January 22, 2010). The comments on the review conducted by Ernst are in the item "Irregularities in the procedures performed by Ernst".

**BANCO CENTRAL DO BRASIL**

**5.1. Irregularities in the procedures conducted by KPMG**

**5.1.1. Test of existence of credit contracts (external confirmation)**

**5.1.1.1. Fiscal years of June 30, 2011, December 31, 2010 and 2011**

BCSul had invalid credit operations recorded in its assets, according to a detailed description in chapters **4.3.1 item 1** and **6.7** of this report. NBC TA 315 – Identification and Evaluation of the Risks of Relevant Distortion through an Understanding of the Entity and its Environment (approved by CFC Resolution 1.212 of November 27, 2009) states, in paragraph 3 that:

> "*The auditor's objective is **to identify and evaluate the risks of relevant distortion, independent of whether they are caused by fraud or error, for Financial Statements and affirmations**, through an understanding of the entity and its environment, including of the internal control of the entity, thus providing a basis for planning and implementation of the responses to identified risks of relevant distortion*" *(emphasis added)*

One of the related affirmations in the same standard refers to the existence of the operations (paragraph A111):

> "*(...)* existence – *assets, liabilities and elements of net equity exist (...)*".

Thus, according to the audit standards, the auditor should have planned and performed appropriate procedures to be able to make statements on the existence of assets and liabilities on the audited base date, including the credit operations in the portfolio.

During the years under evaluation, KPMG conducted External Confirmation procedures (external confirmation) of the BCSul credit operations as a way to confirm the existence of the credit operations. However, the volume of external confirmation letters not answered was high in all the periods analyzed, as shown below:

| Base date of the Financial Statement | Base date of the external confirmation | Number externally confirmed | Returned by post office | Number not answered | Number answered with discrepancy | % not Answered or with discrepancy / Total externally confirmed | Evidence |
|---|---|---|---|---|---|---|---|
| 06/30/2007 | 05/31/2007 | 143 | 29 | 99 | 4 | 92.3% | **Pgs. 668 to 671** |
| 12/31/2007 | 10/31/2007 | 11 | - | 6 | 1 | 63.6% | **Page 672** |
| 06/30/2008 | 05/31/2008 | 29 | 2 | 26 | - | 96.6% | **Pgs. 673 & 674** |
| 12/31/2008 | 10/31/2008 | 26 | 2 | 21 | - | 88.5% | **Pgs. 675 & 676** |
| 06/30/2009 | 04/30/2009 | 88 | 17 | 58 | 5 | 90.9% | **Pgs. 677 to 679** |
| 12/31/2009 | 12/31/2009 | 122 | 21 | 97 | 3 | 99.2% | **Pgs. 680 to 682** |
| 06/30/2010 | 04/30/2010 | 84 | 15 | 64 | - | 94.0% | **Pgs. 683 to 685** |
| 12/31/2010 | 30/10/2010 | 232 | 33 | 179 | 10 | 95.7% | **Pgs. 686 to 690** |
| 06/30/2011 | 04/30/2011 | 47 | 11 | 35 | - | 97.9% | **Pgs. 691 to 693** |
| 12/31/2011 | 10/31/2011 | 73 | 11 | 59 | - | 95.9% | **Pgs. 694 to 696** |



**BANCO CENTRAL DO BRASIL**

It should be noted that although this section deals with the audits conducted during the periods 12.31.2010, 06.30.2011 and 12.31.2011, prior knowledge of the entity audited should be taken into consideration by the auditor in the evaluation of risks and in planning audit procedures, according to paragraph A12 of the aforementioned NBC TA 315, which is copied below:

*"A12. The auditor's prior experience at the entity and audit procedures conducted in previous audits can provide information to the auditor on topics such as:*

- *past distortions and whether they were timely corrected;*
- *nature of the entity, its environment and internal control of the entity (including deficiencies in the internal controls);*
- *significant changes that the entity or its operations may have undergone since the previous financial period, which can assist the auditor in obtaining sufficient understanding of the entity to identify and evaluate risks of relevant distortion.*

It can be seen that there was a high volume of responses that were not received in all the years (an exception occurred in the 2nd semester of 2007, in which the quantity that was externally confirmed was much lower than in previous years).

In spite of the high number of exceptions, no alterations were identified in the procedures conducted over the years, such as additional tests being conducted, etc.

Paragraph 12 of NBC TA 505 – External Confirmations (approved by CFC Resolution 1.219 of November 27, 2009) states:

*"12. For each response not received, the auditor shall perform alternative audit procedures to obtain relevant and reliable audit evidence."*

As an alternative test, when it did not receive a reply to the external confirmation letters, KPMG analyzed the contracts to verify the existence of the operations. This analysis was made through a request to BCSul administration for the physical contracts of the operations selected in the sample.

However, the volume of contracts not analyzed by the external auditor, due to said contracts not being delivered by the administration, is high, principally until the 1st semester of 2009, according to the following chart. After this date, the volume of undelivered contracts fell quite a bit; nonetheless, they contained a high rate of discrepancies, as shown in the chart.

| Base date of accounting statement | Total not responded to or with discrepancy | Contracts not analyzed | % Contracts not delivered |
|---|---|---|---|
| 06/30/2007 | 132 | 107 | 81.0% (a) (x) |
| 12/31/2007 | 7 | 7 | 100.0% (a) (x) |
| 06/30/2008 | 28 | 7 | 25.0% (a) (x) |

# BANCO CENTRAL DO BRASIL

| Base date of accounting statement | Total not responded to or with discrepancy | Contracts not analyzed | % Contracts not delivered |
|---|---|---|---|
| 12/31/2008 | 23 | 23 | 100.0% (a) (x) |
| 06/30/2009 | 80 | 79 | 98.8% (a) (x) |
| 12/31/2009 | 121 | 5 | 4.1% (a) (b) |
| 06/30/2010 | 79 | 5 | 6.3% (a) (c) |
| 12/31/2010 | 222 | 5 | 2.3% (a) (d) |
| 06/30/2011 | 46 | 7 | 15.2% (a) (e) |
| 12/31/2011 | 70 | 17 | 24.3% (a) (f) |

(a) for those operations for which the contracts were not delivered, only the screens of the credit systems were analyzed that demonstrated the operation and the write-off of the installments, which does not indicate the actual existence of the operations, nor the real financial liquidation of these installments;

(b) of the contracts analyzed, 56 (48.3%) did not have contract numbers; however, the audit concluded that they existed, in spite of the fact that it was not possible to link the physical contract presented to the accounting record;

(c) of the contracts analyzed, 21 did not have contract numbers; however, the audit concluded that they existed, in spite of the fact that it was not possible to link the physical contract presented to the accounting record, 1 did not have a signed adhesion statement, in other words 29.7% of the contracts analyzed contained some type of inconsistency. In 4 cases, only the voice recording was presented as proof of the operation.

(d) of the contracts analyzed, 156 did not have a contract number, however, the audit concluded that they existed and 1 contract was not signed, in other words 72.4% of the contracts analyzed contained some type of inconsistency. In 2 cases, only the voice recording was presented as proof of the operation.

(e) of the contracts analyzed, 27 (69.2%) contained contract numbers that were different from the contract number in the system, however, the audit concluded that they existed. In 2 cases, only the voice recording was presented as proof of the operation.

(f) of the contracts analyzed, 26 did not have a contract number, 7 had a discrepancy in the amount, 1 had a discrepancy in the name, 1 was not signed, in other words 66% of the contracts analyzed contained some type of inconsistency.

In addition to the discrepancies identified in the contracts, the audit documentation shows that the auditor only analyzed the contract, and not the documentation referring to the debtor (RG, CPF, receipts, etc.). Physical contracts not accompanied by client record data are proof of a weak audit, since they could be "forged."

In some cases, the only evidence obtained was the contract registration in the product system. We note that the base of selection for the externally confirmed operations

129



# BANCO CENTRAL DO BRASIL

was the analytic list of the contracts taken from this same system; in other words, the evidence was extracted from the same base that created the test sample, therefore, it is not adequate for concluding on the existence of  the contracts, since it does not guarantee the existence of the operation.

In relation to what is indicated in the preceding paragraph, we note that NBC TA 500 – Audit Evidence  (approved by CFC Resolution 1.217  of November 27, 2009), states that:

> *"4. The auditor's objective is to define and execute audit procedures that enable the auditor to **obtain appropriate and sufficient audit evidence** to enable him to reach reasonable conclusions on which to base his opinion" (emphasis added)*

KPMG itself considered the number of letters returned by the post office to be high, according to a comment in the external confirmation test formalization beginning in the 2nd semester of 2009:

Work papers: WP M.100 – 1 – External Confirmation Control CPP – 2nd semester of 2009 (**page 680**); WP I.100 – External Confirmation Control CPP – 1st semester of 2010 (**page 683**); WP I.200 – External Confirmation Control CPP 3533 – 1st semester of 2010 (**page 684**); WP I.100 – External Confirmation Control CPP – 2nd semester of 2010 (**page 688**); WP D.4.100 – External Confirmation Control CPP – 1st semester of 2011 (**page 691**); WP D.4.200 – External Confirmation Control CPP – 2nd semester of 2011 (**page 694**)

(The comment indicated below is identical in all the periods mentioned)

> *"We note that for these operations, the letters were returned by the post office due to insufficient information. We will report this as deficiency to the administration in a control letter."*

Beginning with the 1st semester of 2010, we identified a comment in the external test confirmation that indicated the auditor's concern in relation to the letters returned by the post office:

Work papers: WP I.100 – External Confirmation Control CPP – 1st semester of 2010 (**page 683**); WP I.200 – External Confirmation Control CPP 3533 – 1st semester of 2010 (**page 684**); – External Confirmation Control CPP  – 2nd semester of 2010 (**page 688**); WP D.4.100 – External Confirmation Control CPP – 1st semester of 2011 (**page 691**); WP D.4.200 – External Confirmation Control CPP – 2nd semester of 2011 (**page 694**);

(The comment indicated below is identical in all the periods mentioned)

> *"We consider the volume  of operations  returned by the post office to be high; however, we have repeatedly presented this deficiency to the Bank's administration in our control letters. In discussions with the Bank's administration, and based on their replies to our control letters, the explanation obtained was*



**BANCO CENTRAL DO BRASIL**

*that this was the result of the characteristic of the consigned credit operation for public entities, in which the relationship between the client and the bank occurs at the time the operation is contracted and the records are only updated later when the client contacts the institution."*

Article 2 of Circular Letter 3.461/2009, issued by the Central Bank of Brazil, states that financial institutions should collect and maintain updated client registration information. Paragraph 5 of this Article states that institutions *"should conduct verification tests, at least once a year, to ensure that their client records are adequate."*

The justification given by Banco Cruzeiro do Sul indicated clear failure to comply with the standard (updating only done when the client contacts the institution), nonetheless, KPMG did not consider this justification to be a risk factor in relation to the test; instead, it only reported the deficiency in a control letter, having always received the same justification.

In addition, for consigned credit card operations (CCC), in many cases, documentation signed by the client was not presented to prove the existence of the operations, only phone conversations, which according to the auditor himself, are not adequate documentation to prove the existence of the operations, as indicated below:

Work paper: WP I.400 – External Confirmation Control CCC – 2nd semester of 2010 (**page 690**); WP D.4.300 – External Confirmation Control 1.pdf – 1st semester of 2011 (**page 693**):

> *"We note that for these operations, we obtained as evidence a recording of the client requesting the operation. We reported this deficiency in a control letter."*

The volume of inconsistencies found in the external confirmation tests in all years indicated a related risk to the existence of the bank's credit portfolio. In this regard, NBC TA 505 – External Confirmations, paragraph A19, is clear in relation to the procedure to be followed:

> *"A19. The nature and scope of the alternative audit procedures are affected by the account and by the affirmation in question. **A reply that is not received to a confirmation request can indicate a risk of relevant distortion not previously identified.** In these situations, the auditor may need to **review the risk of relevant distortion**, evaluated in the level of affirmations, and **modify the planned audit procedures,** according to NBC TA 315, item 31. For example, **fewer responses than what was planned** or a large number of responses than what was planned **may indicate a risk factor for fraud not previously identified that requires an evaluation** according to NBC TA 240, item 24." (emphasis added)*



# BANCO CENTRAL DO BRASIL

As can be seen, the audit standard in effect stated that auditors should consider a low volume of responses to be a factor for fraud risk, even if this risk had not been detected in the planning stage.

In addition to this low volume of responses, KPMG was also faced with a series of inconsistencies between the accounting records and the contracts presented, as well as contracts that were not made available by the administration. In spite of this high volume of inconsistencies, this audit company concluded the external confirmation test as being effective, and did not modify the planned audit procedures, in violation of NBC TA 505.

In those cases in which the auditor did not obtain a response to the external confirmation letter (external evidence), he based himself on internal evidence (contracts and screens from the systems) to conclude in regard to the existence of the credit operations.

However, the high volume of inconsistencies, as demonstrated above, indicated the low degree of reliability of the evidence presented. In this regard, NBC TA – 500, in line with NBC TA 505, mentioned previously, state that the auditor should modify or expand his procedures in order to obtain more reliable evidence. See paragraph 11 of NBC TA 500:

> "*11. If:*
> (a) *audit evidence obtained from one source is inconsistent with evidence obtained from another; or*
> (b) **the auditor has doubts in regard to the reliability of the information to be used as audit evidence,** *he should determine which* **modifications or additions to the audit procedures** *are necessary to solve this matter and should consider the effect of this matter, if any, on other aspects of the audit (see item A57)" (emphasis added)*

Therefore, it can be seen that in relation to the test on the existence of the credit contracts, KPMG did not take into consideration, when defining the audit procedures, a series of indications that these contracts did not exist (a high volume of letters returned by the post office, or not responded to, contracts not delivered, inconsistency between the accounting records and the documentation delivered), as required by professional standards, and as a result, it did not adequately consider the risk of fraud, as emphasized in paragraph A19 of NBC TA 505.

Nonetheless, independent of evidence, the risk of fraud should be considered by the auditor in the performance of his audit procedures, according to paragraph 12 of NBC TA 240 - Responsibility of the Auditor in Relation to Fraud, within the Context of the Financial Statements Audit (approved by CFC Resolution 1.207 of November 27, 2009), the following:

> "*12. (...) the auditor should* **maintain a posture of professional skepticism** *during the audit,* **recognizing the possibility that there may be a relevant**



# BANCO CENTRAL DO BRASIL

*distortion resulting from fraud, in spite of the past experience of the auditor in relation to the honesty and integrity of the administration and those responsible for governing the entity." (emphasis added)*

In the works referring to the base dates of June 30, 2011 and December 31, 2011, KPMG based its audit on the financial statements, the collateral verification procedures for the credit operations assigned to the CRIFs made by KPMG itself, as the contractor of Deutsche Bank, the custodian of the CRIFs.

In this procedure, as in the external confirmation test, some 100 operations were selected in each of the funds in which BCSul had subordinated shares. For these operations, the contracts and the annotations were requested. In these cases, the percentage of delivery of the contracts was much higher than for the external confirmation test, as shown below:

|  | Evidence | Sample | Contracts Analyzed | Annotation delivered | Base date |
|---|---|---|---|---|---|
| CRIF CC | Pgs. 697 to 704 | 100 | 91 | 100 | 02/28/2011 |
| CPP 120 | Pgs. 705 to 712 | 99 | 96 | 99 | 02/28/2011 |
| CPP 180 | Pgs. 713 to 720 | 99 | 96 | 99 | 02/28/2011 |
| **Total** |  | **298** | **283** | **298** |  |
| CC II | Pgs. 721 to 728 | 100 | 99 | 100 | 05/31/2011 |
| CPP 120 | Pgs. 729 to 736 | 99 | 98 | 97 | 05/31/2011 |
| CPP 540 | Pgs. 737 to 743 | 100 | 88 | 88 | 05/31/2011 |
| Maxcred II | Pgs. 744 to 751 | 100 | 99 | 100 | 05/31/2011 |
| Multicred | Pgs. 752 to 759 | 100 | 100 | 99 | 05/31/2011 |
| Verax 180 | Pgs. 760 to 766 | 100 | 96 | 99 | 05/31/2011 |
| Verax CPP 360 | Pgs. 767 to 775 | 100 | 99 | 100 | 05/31/2011 |
| Prosper Flex | Pgs. 776 to 783 | 100 | 100 | 98 | 05/31/2011 |
| **Total** |  | **799** | **779** | **781** |  |
| CC II | Pgs. 784 to 789 | 99 | 79 | 99 | 08/31/2011 |
| CPP 120 | Pgs. 790 to 795 | 100 | 90 | 98 | 08/31/2011 |
| CPP 180 | Pgs. 796 to 801 | 100 | 95 | 99 | 08/31/2011 |
| CPP 360 | Pgs. 802 to 807 | 99 | 93 | 99 | 08/31/2011 |
| Maxcred II | Pgs. 808 to 813 | 91 | 87 | 90 | 08/31/2011 |
| Multicred | Pgs. 814 to 819 | 100 | 87 | 99 | 08/31/2011 |
| Prosper Flex | Pgs. 820 to 825 | 100 | 99 | 97 | 08/31/2011 |
| RPPS | Pgs. 826 to 831 | 99 | 98 | 97 | 08/31/2011 |
| **Total** |  | **788** | **728** | **778** |  |
| CPP 180 | Pgs. 832 to 839 | 100 | 90 | 100 | 11/30/2011 |
| CPP 360 | Pgs. 840 to 847 | 100 | 97 | 97 | 11/30/2011 |
| CPP 540 | Pgs. 848 to 855 | 100 | 100 | 100 | 11/18/2011 |
| Maxcred II | Pgs. 856 to 862 | 75 | 64 | 73 | 11/18/2011 |
| Multicred | Pgs. 863 to 870 | 100 | 51 | 99 | 11/30/2011 |
| Verax CC II | Pgs. 871 to 878 | 100 | 98 | 100 | 11/30/2011 |
| Prosper Flex | Pgs. 879 to 886 | 100 | 100 | 100 | 11/30/2011 |
| **Total** |  | **675** | **600** | **669** |  |
| **Grand Total** |  | **2560** | **2390** | **2526** |  |

133



**BANCO CENTRAL DO BRASIL**

We note that the auditors responsible for conducing these tests are not the same as those who make up the Banco Cruzeiro do Sul audit team.

Considering that the portfolio that makes up the CRIF is formed by credit operations generated by Banco Cruzeiro do Sul, it was expected that verification of the contracts in the CRIFs would lead to the same findings as those in the external confirmation test, principally because this is a fairly well dispersed portfolio, but this did not occur.

Once again, the discrepancy in results in similar procedures applied to operations of the same origin, according to the standard, should have led the auditor to question the evidence obtained by one or the other team, according to paragraph 11 of NBC TA 500, once again copied below:

> "*11. If:*
> **(a) *audit evidence obtained from one source is inconsistent with evidence obtained from another; or***
> (b) *the auditor has doubts in regard to the reliability of the information to be used as audit evidence, he should determine which* **modifications or additions to the audit procedures** *are necessary to solve this matter and should consider the effect of this matter, if any, on other aspects of the audit (see item A57)" (emphasis added)*

It should be noted that the personal documents of clients were also not verified in this test, only the record information, contract and authorization for payroll withholding; these documents, by themselves, do not provide the necessary comfort for the audit on the existence of the operations.

**5.1.1.2. Fiscal years of June 30, 2007, 2008, 2009, and 2012 and December 31, 2007, 2008 and 2009**

During this period, another set of audit standards was in effect, the majority of which were revoked by the adoption of the set of international standards by the CFC in 2009, in effect beginning on January 1, 2010.

In relation to the existence of invalid liabilities, when carrying out procedures, according to NBC T 11 - Independent Audit Standards of Financial Statements (approved by CFC Resolution 820 of December 17, 1997), auditors had the following duty:

> "*11.1.4.3 – The primary responsibility in the prevention and identification of fraud and errors belongs to the administration of the entity, through the implementation and maintenance of an adequate accounting and internal control system. However, the*



# BANCO CENTRAL DO BRASIL

*auditor should plan his work so as to detect fraud and errors* that lead to relevant effects on the financial statements." *(emphasis added)*

This same standard also states that auditors should seek to conclude on the existence of property items on a given base date (paragraph 11.2.6.7 letter "a"). For large balances, such as those of the institution's credit operations, the standard clearly establishes the need for external confirmation procedures, as emphasized below:

*"11.2.6.7 – When the amount involved is substantial in relation to the asset and financial position and to the result of the operations, auditors should:*
a) ***Confirm the amounts of the accounts receivable and payable, by directly notifying the third parties involved;*** *and*
b) *Accompany the physical inventory conducted by the entity, performing the physical counting tests and applicable complementary procedures."(emphasis added)*

With the knowledge accumulated in relation to the low rate of responses to the external confirmation letters, in addition to the fact that the bank does not deliver the credit contracts, even if he had not observed this situation when planning the first set of works, the independent auditor should have re-evaluated the scope of the tests, according to NBC T 11.4 – Audit Planning (approved by CFC Resolution 1.035 of August 26, 2005):

*"11.4.1.16. Much of the information that makes up the final planning of a given period is confirmed during the field work, which makes it **necessary for the independent auditor to review and adjust it as the work is done**." (emphasis added)*

The same standard establishes the alteration in procedures planned as a result of circumstances observed over the course of the work:

*"11.4.4.12. Audit planning and programs should be reviewed on an ongoing basis, as a way for independent auditors to evaluate the changes in circumstances and their reflections on the scope, timeliness and nature of the audit procedures to be applied."*

## 5.1.2. Analytical procedures

## 5.1.2.1. Fiscal years ending on June 30, 2011 and December 31, 2010 and 2011

During the fiscal years listed above KPMG carried out analytical procedures in relation to the credit operations of Banco Cruzeiro do Sul.

The analytical procedure on the CPP portfolio consisted of:
- Calculating the average balance of the credit operations;
- Applying the "average portfolio rate" to this average balance;



# BANCO CENTRAL DO BRASIL

- Comparing the revenue obtained in this calculation with the actual revenue.

In relation to the calculation of the average rate, we note the following:

- on June 30, 2010, the average rate was obtained "from managerial information" (**page 887**);
- on December 31, 2010, the average rate was obtained from the "average production of the past 3 years," without presenting details on the origin of the data (**page 888**);
- on June 30, 2011, the caption associated with the average rate of the portfolio contained the following information: "according to the average portfolio rate," without specifying the methodology of calculation and the source of the information (**page 889**);
- on December 31, 2011, the average rate was obtained "according to management information obtained from the accounting records" (**page 890**);

In all the periods, the auditor identified significant distortions in the test, without adequate justification, as shown below:

In R$ thousand

| Period | 3rd quart. 2010 (page 887) | 4th quart. 2010 (page 888) | 1st quart. 2011 (page 889) | 2nd quart. 2011 (page 889) | 3rd quart. 2011 (page 890) | 4th quart. 2011 (page 890) |
|---|---|---|---|---|---|---|
| Ave. CPP balance | 758,056 | 1,475,512 | 1,631,165 | 1,379,771 | 1,502,078 | 1,597,442 |
| Ave. rate (a) | 5.25% | 4.80% | 5.42% | 5.21% | 5.15% | 5.15% |
| Expected Rev. | 39,851 | 70,955 | 88,405 | 71,886 | 50,506 | 164,536 |
| Revenue | 42,108 | 60,701 | 61,193 | 93,351 | 77,357 | 27,874 |
| **Difference** | **(2,257)** | **10,254** | **27,215** | **(21,465)** | **26,851** | **136,662** |
| % difference | 5.36% | 16.89% | 44.47% | 22.99% | 34.71% | 491.8% |
| Note | | **(b)** | (c) | (c) | (d) | (d) |

(a) the average rate refers to the rate for three months;
(b) in relation to this difference, KPMG formalized it as if it were immaterial.
   The materiality for the quarter indicated in the same work paper is R$ 9,595,000; in other words, the difference identified was greater. KPMG justified the difference as the new portfolio yielding 1%, while the old portfolio yielded 1.8%, leading to lower revenue than expected. The origin of this information was not presented, and there were no validation procedures.
(c) KPMG did not present any comment or justification in relation to these differences.
(d) In relation to this difference, KPMG justified the variation by noting that Banco Cruzeiro do Sul began to charge part of the interest rate as a bank fee, so that the difference presented is compensated by the increase in the revenues from bank fees. This practice is not in line with accounting standards, since it advances interest revenue as fee revenue, in violation of the principle of competence. No indication / qualification was made in regard to this matter.

136



**BANCO CENTRAL DO BRASIL**

According to NBC TA 520 – Analytical Procedures (approved by CFC Resolution 1.221, of November 27, 2009):

"4. (...) *analytical procedure means evaluations of accounting information through analysis of the **plausible relations between financial and non-financial data.** Analytical procedures also include the **necessary examination of fluctuations or relations identified that are inconsistent with other relevant information or that significantly differ from the expected values.**" (emphasis added)*

We note that KPMG identified significant discrepancies in relation to the expected values, situations that would require additional examinations, according to the following section of the same standard:

"7. *If the analytical procedures performed in accordance with this Standard identify **fluctuations or relations that are inconsistent with other relevant information or that significantly differ from the amounts expected,** the auditor should examine these differences through:*
   (a) *Questioning the administration and obtaining evidence of an appropriate and relevant audit for the responses of the administration; and*
   (b) *Applying of other audit procedures, as necessary under the circumstances."* *(emphasis added)*

The justification of KPMG that the difference presented in the 1st quarter of 2011 was immaterial is also in disagreement with the standard, since the acceptable difference should be defined based on materiality, but it is not acceptable that it be materiality itself, in light of the possibility that smaller differences in several items could become a relevant distortion. See paragraph A16, below:

"A16. *The ruling of the auditor on the amount of the difference between the expectation that can be accepted without additional investigation **is influenced by materiality** (NBC TA 320 – Materiality in Planning and Performance of the Audit, item A13) and consistency with the level of security desired, **taking into consideration the possibility that a distortion, individually or together with other distortions, could lead the financial statements to contain relevant distortions.** (...)"* *(emphasis added)*

**5.1.3. Information technology audit procedures**

We identified that KPMG indicated the existence of generic users in the Bank's system, including the Tools system, which is the system in which the invalid operations were implemented (**pages 891 to 895**):

**"Control of access to the systems network environment by individual users (Bank, Corretora and DTVM)**



# BANCO CENTRAL DO BRASIL

*We noted the existence of access policies for the network environment and systems that state that users have unique, personal and non-transferable identification. However, we identified the existence of generic users, as described below:*

*Network environment: we identified 159 generic users (12/31/2011)*
*Network environment: we identified 116 generic users (06/30/2011)*
*Network environment: we identified 116 generic users (12/31/2010)*
*Matera System: we identified 9 generic users (06/30/2011)*
*Matera System: we identified 9 generic users (12/31/2010)*
***Tools System: we identified 1 generic user (06/30/2011)***
***Tools System: we identified 1 generic user (12/31/2010)***

*The use of generic users makes it impossible to identify possible deviations, whether intentional or accidental. In addition, it enables the accounts to be used by unauthorized persons, thus leading to **improper access to the information or even fraud,** principally in cases in which such access is obtained through accounts with privileged accesses. We recommend that the Administration evaluate the need to allow generic users, and if necessary, to implement a control, that activates or deactivates these employees at the time of their use, thus making it possible, if there is a problem, to identify the person responsible for the actions taken within the environment and in the systems.*

***Comment from administration on 06/30/2011:***
*There may be some users who are not employees, but they are necessary for some services to be provided." (emphasis added)*

This recurring audit point shows fragility in the bank's operating systems. In addition, the institution's response shows that the situation will not be corrected. Generic users allow operations to be conducted without the ability to associate the transaction to the person responsible. In the evaluation of IT risk, documented in the work papers referring to the base date of June 30, 2011 - December 31, 2011, we identified the following comments related to deficiencies within the IT environment at BCSul (WP 2.6.10 "Understanding IT" – **pages 924 to 925**):

*"(...)*
*There is no control to assist with the granting of access to the systems, according to the responsibilities of the employees and the rules defined for the separation of functions.*
*(...)*
*The invalidation of logical access to the systems environment is not done at the appropriate time.*
*(...)*
*Access controls to the network environment and to the systems are not made using safe password-protected policies.*



# BANCO CENTRAL DO BRASIL

*Lack of periodic review of users and system access profiles, which are approved by those responsible.*
*(...)*
*Users with administrative privileges in the network environment and in the systems are not restricted to employees in the IT department, and activities conducted by these users are not monitored.*
*(...)"*

In spite of the fragilities identified by the auditor, in the same work paper, he considered that there were no significant IT risks that could impact the financial statements. Paragraph 17 of NBC TA 330 – Response of Auditor to Risks Assessed (approved by CFC Resolution 1.214, of November 27, 2009), states that:

"*17. When deviations are detected in the controls that the auditor intends to rely on, the auditor should ask specific questions to understand these matters and their potential consequences, and should determine whether:*

*(a)   The control tests performed provide an appropriate basis for trusting the controls;*
*(b)   Additional control tests are necessary; or*
*(c)   The potential risks of distortion need to be dealt with using substantive procedures (see item A41).*

The inadequate evaluation of risk by the auditor in relation to the IT control environment of BCSul led him not to extend the scope of substantive procedures, and contributed to the failure to detect the invalid operations in the bank's portfolio.

## 5.1.4. Amounts Receivable from associated entities

BCSul has a balance of R$ 32,078,000 recorded in asset account 1.8.8.92.30.0096 – CPP Installments Receivable on December 31, 2011. These amounts, according to an adjustment indicated in **chapter 4.3.1 item 9**, referring to installments receivable from entities associated with BCSul (INSS, Courts, etc.), which had been deducted from the payroll of borrowers of consigned loans, but which had not been passed on to the Bank.

NBC TA 520 – Analytical procedures, states that the analytical procedures (which include an analysis of fluctuation made by KPMG in relation to this account), should include:

"*the necessary exam of **fluctuations or relations identified that are inconsistent with other relevant information** or that significantly differ from the expected values.*" *(emphasis added)*

139



**BANCO CENTRAL DO BRASIL**

The Amounts Receivable in the asset are expected to actually be received, since otherwise, a provision would be necessary due to the limited likelihood of recovery.

KPMG evaluated the variation in this account. In the period from June to December 2011, the amount was always around R$ 30 million. The absence of variation in the account may indicate two factors: (i) the amounts in the previous periods were in fact received, or the balance presented in the month under analysis refers to new contracts; or (ii) the asset amounts are not being received and the balances for the months basically refer to the same contacts.

The following comment was made in regard to this account:

*"This refers to amounts that were deducted from the beneficiaries and that were not transferred by the other parties to BCSul. We found that there were no significant fluctuations in the period and that the balance corresponds to around 2% of the Bank's total CPP portfolio."*

In the first semester of 2011, the balances fluctuated between R$ 10 and 45 million (**page 927**). In the financial statement audit work of June 30, 2011, only the following comment was made about the account (**page 928**):

*"We found that the fluctuations referring to category 1.8.8.92.30.00.96 (CPP installments receivable), refer to credit operation contracts written off without funds due to reasons such as death or fraud."*

This comment makes it clear that the balance in question was not likely to be received. Contracts not received for death or fraud represent an expense for the bank and should not be recorded in asset accounts.

In the second semester of 2011, the same observation was made in relation to the account, and no additional test was conducted (**pages 929 to 931**).

In spite of the evidence, appropriate audit procedures were not followed in relation to the account (verification of financial liquidity, reconciliation with an analytical list of contracts, etc.).

The failure to conduct these procedures was a contributing factor for KPMG not identifying this relevant distortion in the financial statements.

## 5.1.4. Declarations from the administration

NBC TA 580 – Formal declarations (approved by Resolution CFC 1.227 of November 27, 2009), states that auditors should obtain formal declarations (written statements) from the administration, and, when appropriate, from those responsible or governance, stating that they have complied with their responsibilities for the preparation of the financial statements and for the integrity of the bank information provided to the auditor (paragraphs 1 and 6).



# BANCO CENTRAL DO BRASIL

The date of the formal declarations should be as close as it is practically possible, but no later than the date of the auditor's report on the financial statements. Receipt of the administration declaration letter is an important stage in the audit process, since this letter provides the audit with a declaration by the administration that the data contained in the financial statements are correct, in addition to other affirmations, as shown below (attachment 2 of NBC TA 580 – Example of declaration letter):

> *"(...)*
>
> *We are disclosing to you all information relative to fraud or suspicion of fraud that we are aware of, and which affects the entity and involves:*
> - *the administration;*
> - *employees with significant internal control functions; or*
> - *others in which the fraud could have a relevant effect on the financial statements (NBC TA 240).*
>
> *We are disclosing to you all information relative to allegations of fraud or suspicion of fraud that affect the entity's financial statements, communicated by employees, former employees, analysts, regulators or others (NBC TA 240).*
>
> *We are disclosing to you all known cases of non-compliance or suspicion of non-compliance with laws and regulations, whose effects should be taken into consideration in the preparation of the financial statements (NBC TA 250)." (emphasis added)*

This fact, by itself, already represents a violation of a professional standard. In addition, NBC TA 580, paragraph 19, states that if an auditor does not receive a letter of declaration, he should:

> *"(...)*
>
> *(b) Reassess the integrity of the administration and evaluate the effect that this can have on the reliability of the declarations (verbal or written) and of the audit evidence in general;*
>
> *(c) take appropriate actions, including determining the possible effect on his opinion in the audit report, in accordance with NBC TA 705 considering the requirement in item 20 of this Standard;*
>
> *(...)" (emphasis added)*

In addition to the re-assessment of the auditor's risk perception, NBC TA 580 is clear on the relevance of the representation by the administration on the auditor's perception

141



**BANCO CENTRAL DO BRASIL**

of risk for the entity, since the issuance of the opinion is conditioned upon the presentation of these declarations, as shown below (paragraph 20):

> *"20. The auditor should refrain from issuing an opinion on the financial statements report in accordance with NBC TA 705 (see A26 and A27) if:*
> *(a) the auditor concludes that there is sufficient doubt in regard to the administration's integrity such that the formal declarations required by items 10 and 11 are not reliable; or*
> *(b) the administration does not provide the formal declarations required by items 10 and 11." (emphasis added)*

On the base dates of June 30, 2011 and December 31, 2010 and 2011, the administration's declaration letters were not obtained (**according to the forwarding letter on page 926**). However, the auditor did not refrain from issuing an opinion on the financial statements.

In the Audit documentation referring to the periods of June 30, 2011 and December 31, 2011; in other words, in which there had already been a situation of failure to deliver a declaration letter (December 31, 2010), KPMG did not make any alteration to the risk evaluation and to the audit procedures used due to this fact, once again violating NBC TA 580.

The following comments were identified in the audit documentation (WP 2.5.3 – Other Risk Assessment Procedures):

Base date June 30, 2011 (**page 932**):

> *"We did not identify any topic that could present risk at the level of the financial statements resulting from other works."*

Base date December 31, 2011 (**page 933**):

> *"No risk was identified during the acceptance / continuity of the client. **No significant risks were identified during our audit of the previous year** and our current audit, beyond the risk of error in the recording of the credit operations, their respective incomes and the recording of incomes from structured operations, during our review of the financial statements." (emphasis added)*

Based on the foregoing, KPMG did not comply with professional standards when it issued its report on the financial statements without having received the declarations from the administration.

### 5.1.5.  Audit documentation prepared after the deadline

NBC TA 230 – Audit documentation (approved by Resolution CFC 1.206 of November 27, 2009) states that the Audit documentation should be prepared in a



# BANCO CENTRAL DO BRASIL

timely fashion. The same standard (paragraph A21) states: "*An appropriate time limit to conclude setting up the final audit report will generally not exceed 60 days after the auditor's report date.*"

The auditor's report referring to base date of December 31, 2011 was issued on March 16, 2012, and the 60-day period ended on May 15, 2012. There are work papers in the Audit documentation with alterations after this date, as per the following example:

- Work paper 2.12.1 – KPMG Specialists - IRM (evaluation of the need to use specialists, for example, in taxes, information technology, etc.). **Date of last alteration June 26, 2012 (102 days after the report date) (page 934)**

- Work paper 2.14 Risk Assessment and Planning Discussion (documentation on evaluation of the entity risk's risk and planning the work). **Date of last alteration: June 18, 2012 (94 days after the report date) (page 935)**

It is not possible to identify which alterations were made in the Audit documentation that led to a new review after the period stipulated by the standard.

## 5.2. Irregularities in the procedures performed by Ernst & Young

### 5.2.1. Declarations from administration

NBC TR 2410 states that the auditor responsible for reviewing an entity's intermediary information shall obtain Formal declarations from the administration (written declarations) in relation to the items emphasized below (paragraph 34 of the standard):

"*(a) it recognizes its responsibility for planning and implementation of internal controls to avoid and detect fraud and errors;*
*(b) the intermediary information was prepared and presented in accordance with the structure of the applicable financial report;*
*(c) it believes that the effect of the uncorrected distortions identified by the auditor during the review are irrelevant, both individually and together, for the intermediary information taken as a whole. The summary of these items is included in the formal declarations or attached to them;*
*(d) it disclosed to the auditor all significant facts related to any fraud or suspected fraud which the administration is aware of, and that may have affected the entity;*
*(e) it disclosed to the auditor the results of its evaluation of the risk that the intermediary information may present a relevant distortion as the result of fraud. The nature, scope and frequency of this evaluation varies from entity to entity and the administration may*

143



**BANCO CENTRAL DO BRASIL**

*conduct a detailed evaluation annually or as a part of ongoing monitoring. In this manner, this declaration, insofar as it is related to the intermediary information, is custom-made for the specific circumstances of the entity;*

*(f) it disclosed to the auditor all real or possible failures to comply with laws and regulations, whose effects should be considered in the preparation of the intermediary information; and*

*(g) it disclosed to the auditor all significant events that occurred after the date of the balance sheet until the date of the review report that could require an adjustment to the intermediary information or to its disclosure.*" *(emphasis added)*

The audit firm Ernst & Young did not receive the Administration's declaration referring to the Quarterly Financial Information that it reviewed (this document was not included in the Audit documentation delivered by the company and the fact that it was not received was confirmed in a meeting held on July 18, 2012, with Eduardo Perdigão, Flávio Serpejante Peppe and Idésio da Silva Coelho Júnior, of E&Y, and the members of the Investigation Commission. Below, once again, is the content of NBC TA 580 that refers to what should be done if the Administration's declaration is not received:

*"(...)*
*(a) **Reassess the integrity of the administration** and evaluate the effect that this can have on the reliability of the declarations (verbal or written) and of the audit evidence in general;*

*(b)*

*(...)*" *(emphasis added)*

*"20. The auditor should refrain from issuing an opinion on the financial statements report in accordance with NBC TA 705 (see A26 and A27) if:*
*(a) the auditor concludes that there is sufficient doubt in regard to the administration's integrity such that the formal declarations required by items 10 and 11 are not reliable; or*
*(b) the administration does not provide the formal declarations required by items 10 and 11."* *(emphasis added)*

It should also be noted that Ernst reviewed KPMG's work papers referring to the previous year's audit, and these papers did not contain the Administration's declaration letter. In spite of the fact that the scope of a review was limited to that of an audit, auditors should still consider the possibility of the existence of relevant distortions, and should plan their procedures taking this possibility into account:

*"6. Auditors should plan and perform the review with professional skepticism, **recognizing that circumstances may exist that could lead the intermediary information to require a relevant adjustment** so that it is prepared, in all relevant aspects, in accordance with the structure of the applicable financial report.*



# BANCO CENTRAL DO BRASIL

*An attitude of professional skepticism means that **the auditor makes a critical evaluation, with a questioning posture, of the validity of the evidence obtained and is attentive to evidence that contradicts or places in doubt the reliability of the entity's documents or administration declarations.**"(emphasis added)*

### 5.3 Conclusions - Audit

Thus, we conclude that KPMG failed to comply with audit standards in a relevant manner, violating the provision in Article 29 of the Regulation attached to Resolution 3.198. These violations caused KPMG to fail to identify a relevant distortion resulting from invalid operations, issuing an opinion without qualifications and misleading users of the information in the statements of June 30, 2007, 2008, 2009, 2010, and 2011 and December 31, 2007, 2008, 2009, 2010, and 2011.

In relation to the financial information of March 31, 2012, Ernst & Young also failed to comply with Article 29 of the Regulation attached to Resolution 3.198, by not complying with a mandatory stage of the audit procedure referring to receipt of the administration's formal declaration.

**Persons responsible - KPMG**
**06/30/2007; 12/31/2007; 06/30/2008; 12/31/2008**
Ricardo Anhesini Souza
Silbert Christo Sasdelli Júnior
**06/30/2009; 12/31/2009; 06/30/2010; 12/31/2010**
Silbert Christo Sasdelli Júnior
**06/30/2011; 12/31/2011**
Francesco Luigi Celso

**Person responsible – Ernst**
**31/03/2012**
Eduardo Braga Perdigão

In light of the foregoing, the Investigation Commission suggests that this matter be sent to the competent sector of this agency to assess the feasibility of opening an Administrative Proceeding against the independent auditors.

### 6. AUDIT COMMITTEE

Resolution 3.198/2004 establishes the attributions of the Audit Committee (Art. 15 of the Attached Regulation):

*"The attributions of the Audit Committee are:*
*(...)*
*IV – to assess the effectiveness of the independent and internal audits, including in regard to the verification of compliance with the legal and normative provisions applicable to the institution, in addition to internal codes and regulations;*

145



**BANCO CENTRAL DO BRASIL**

*V – evaluate the compliance, by the institution's administration, of the recommendations made by the independent or internal auditors;*
*(...)"*

An analysis of the Audit Committee Reports issued on March 20, 2009 (**pages 918 and 919**), February 8, 2010 (**pages 896 to 905**), August 13, 2010 (**pages 910 to 913**), March 30, 2011 (**pages 914 to 917**), August 15, 2011 (**pages 920 to 923**) and March 16, 2012 (**pages 906 to 909**), showed that the monitoring done by the Audit Committee was limited to meetings with representatives of the independent auditors, analysis of the official reports delivered and evaluation of the audit schedule, which represents an indirect monitoring of this work, and not an evaluation of the effectiveness of the independent audit, as established by the Resolution.

**Members of the audit committee:**

Gilberto Braga
Miguel Vargas Franco Netto
Paulo Roberto Barral

In light of the foregoing, the Investigation Commission suggests that this matter be sent to the competent sector of this agency to assess the feasibility of opening an Administrative Proceeding against the independent auditors.

## 6.    IRREGULARITIES FOUND

In the credit portfolios of "Prosper Flex CRIF Multicedentes" (CNPJ: 10.531.173/0001-90), of "CRIF BCSul Verax Multicred Financeiro" (CNPJ: 07.766.151/0001-02), of the "middle market" (wholesale) and of sureties and guarantees of Banco Cruzeiro do Sul S.A. (BCSul), on the base date 5.31.2012, there were credit operations assigned to a group of clients without proven economic capacity and/or without an economic basis for granting the operations.

The bank institution used these clients as "intermediaries" to simulate the granting of loans —preponderantly formalized in Bank Credit Notes (BCNs)— using the resulting funds for one or more purposes:

**a** – Investing funds in Private Equity Investment Funds (PEIFs), administered by Cruzeiro do Sul DTVM; these funds used the money invested in them to purchase corporate bonds issued by a non-financial company; that is, Patrimonial Maragato S/A, belonging to Luís Octávio de Azeredo Lopes Indio da Costa and Luís Felipe Indio da Costa, then controllers of BCSul;

146



# BANCO CENTRAL DO BRASIL

**b** – Liquidate previous credit operations, a process known as "rolling over" credit operations.  After the TSAR was decreed on  6.4.2012,  the "existing" loans were no longer "liquidated;" and

**c** – Assignment of the BCNs to Credit Right Investment Funds (CRIFs) administered by Cruzeiro do Sul DTVM and/or in a CRIF in which it held almost all the shares (Prosper Flex CRIF).

Following is a Diagram showing the flow of these funds:



Thus, conduct by the managers of the institution is evidence of the crimes defined in Articles 4, 6, 7, 10, and 17, all set forth in Law 7.492/1986 and Article 34, of Law 4.595/1964.

## 6.1 Mislead the regulatory authorities in regard to the amount attributed to the CRIF shares registered in its Balance Sheet.

The adjustments made, referring to items "3" and "4" of the Opening Balance Sheet of 6.4.2012, result from the insufficiency of the provision for doubtful debtors attributed to the credit portfolios of  Prosper Flex CRIF Multicedentes (hereinafter called CRIF Prosper Flex) and CRIF BCSul Verax Multicred Financeiro (hereinafter called CRIF



# BANCO CENTRAL DO BRASIL

Multicred), with an indirect impact on the value of the shares of these funds, recorded in BCSul assets.

From the credit portfolios, which are segregated by client and by operation, credit is granted to clients without financial capacity, and artifices are used to "rollover the loans" through payment of prior loans with funds from new loan operations, hiding the real risk classification of the credit for these operations, with a direct impact on the respective provisions for doubtful debtors.

Applicable law: Circular BC 1273, of 12.29.1987, Accounting Plan for Institutions of the National Financial System – Cosif 1-2-5, combined with Art. 7, § 1, section II, line d, of Resolution CFC n 750/1993, of 12.29.1993, with the new wording given by Resolution CFC no. 1.282, of 5.28.2012.

## 6.1.1 Prosper Flex Portfolio – base date: 5.31.2012[27]

Exposure by client

| ISSUER | TOTAL BALANCE (Exposure) – R$ | PDD | Provision Created before TSAR– R$ | Adjustment PDD in BS of 6.4.2012– |
|---|---|---|---|---|
| ASSOCIAÇÃO DOS MÚSICOS MILITARES DO BRASIL – AMBRA | 19,536,898.15 | 10.0% | 1,953,689.82 | 17,583,208.33 |
| CENTRO OESTE PROMOTORA DE CREDITO LTDA | 2,739,354.99 | 0.5% | 13,696.77 | 2,725,658.22 |
| BRIGADA PROMOTORA DE CREDITOS E VENDAS LTDA | 30,541,678.88 | 3.0% | 916,250.37 | 29,625,428.51 |
| PROMOTORA E DIVULGADORA SUDESTE LINE | 30,716,887.26 | 1.0% | 307,168.87 | 30,409,718.39 |
| PREVSERV OPERADORA DE SERVIÇOS LTDA | 25,843,728.16 | 1.0% | 258,437.28 | 25,585,290.88 |
| FAZENDA MONDESIR LTDA | 700,931.38 | 0.5% | 3,504.66 | 697,426.72 |
| NEUE WELT COMERCIO LTDA | 16,543,873.68 | 1.0% | 165,438.74 | 16,378,434.94 |
| AFONSO CESAR BOABAID BURLAMAQUI | 4,060,113.83 | 0.5% | 20,300.57 | 4,039,813.26 |
| JULIO LUTERBACH | 26,609,750.38 | 40.8% | 10,846,891.53 | 15,762,858.85 |
| **TOTAL** | **157,293,216.71** | **N/D** | **14,485,378.61** | **142,807,838.10** |

Source: Data from the report sent by CGF – Administrator of the TSAR- page 1486.

Except for the clients Fazenda Mondesir and Júlio Luterbach, all the other exposures came from credits assigned by BCSul to Prosper Flex CRIF[28].

For these other exposures, BCSul was still responsible for collection and transfer of payment flows of existing credits owed by these clients to Prosper Flex CRIF, in addition to having the entire records for the real performance

[27] Documentation relative to this portfolio is on pages 1484/2021. Copy of the statement of shareholder CRIF BCSUL Multicred Financeiro in Prosper Flex CRIF Multicredentes, relative to the period 12.30.2011 to 06.29.2012, is on page 2021.
[28] See email of 10.10.2012, sent by Mr. Elcio Leopoldino, fund processing manager at Cruzeiro do Sul S.A DTVM, which states that the two clients mentioned are exclusive to the Prosper (page 1502).



# BANCO CENTRAL DO BRASIL

of these clients. Therefore, it had all the information to establish the real risk of the operations and to adjust the value of the CRIF shares on its Balance Sheet.

**Analysis by borrower**:

## 6.1.1.1 - Associação dos Músicos Militares do Brasil – Ambra – CNPJ/MF: 30.504.617/0001-05[29]

| BCN | Face value of BCN– R$ | Date BCN | Maturity BCN | Situation(Source: SD Emp – 12.20.2012) |
|---|---|---|---|---|
| 6820 | 4,076,495.44 | 06.26.2009 | 06.26.2012 | Overdue since 6.26.2012 |
| 7570 | 240,626.47 | 12.28.2009 | 06.27.2012 | Overdue since 6.27.2012 |
| 7571 | 240,626.47 | 12.28.2009 | 07.27.2012 | Overdue since 7.27.2012 |
| 7572 | 240,626.47 | 12.28.2009 | 08.27.2012 | Overdue since 8.27.2012 |
| 7573 | 240,626.47 | 12.28.2009 | 09.27.2012 | Overdue since 9.27.2012 |
| 7574 | 240,626.47 | 12.28.2009 | 10.29.2012 | Overdue since 10.29.2012 |
| 7575 | 240,626.47 | 12.28.2009 | 11.27.2012 | Overdue since 11.27.2012 |
| 7577 | 240,626.51 | 12.28.2009 | 12.28.2012 | Normal |
| 8677 | 7,008,344.18 | 01.24.2011 | 10.24.2013 | Installment of 7.24.2012 late Amortization in 8 installments, with 1st on 1.24.2012 |
| 9149 | 13,380,360.84 | 07.18.2011 | 07.18.2013 | Normal |
| 9422 | 4,500,000.00 | 12.21.2011 | 12.23.2013 | Normal |

Source: Report "Portfolio Position" – base date 5.31.2012- issued by the System Middle Market and "Simplified Account Statement" reports issued by the SD Emp system on 12.20.2012.

BCNs 6820, 7570, 7571, 7572, 7573, 7574, 7575, and 7577 do not contain the issuer's signature.

- ***Contract 8677***: Gross amount: R$ 7,008,344.18 and Net Amount: R$ 6,876,832.60 – Date: 1.24.2011.

a. Amortization Schedule:  in 8 quarterly installments, with the following payment flow until 10.18.2012:

| Installment | Maturity | Date of payment | Original Amount (R$) | Amount paid (R$) |
|---|---|---|---|---|
| 1 | 01.24.2012 | 09.23.2011 | 1,089,257.49 | 1,559,934.42 |
| 2 | 04.24.2012 | 09.23.2011 | 922,034.01 | 876,043.02 |
| 3 | 07.24.2012 | | 915,463.87 | |
| 4 | 10.24.2012 | | 909,256.09 | |
| 5 | 01.24.2013 | | 902,613.47 | |
| 6 | 04.24.2013 | | 895,536.04 | |
| 7 | 07.24.2013 | | 889,183.30 | |
| 8 | 10.24.2013 | | 882,685.65 | |

Source: Report "Simplified Contract Statement" issued by the SD Emp system – date: 12.20.2012

---

[29] Documents on pages 1503/1569. Copies of record document for client "Ambra," extracted from internal system "CDOC" are on pages 2826/2896.

149

# BANCO CENTRAL DO BRASIL

As of 12.20.2012,  payment has not been made for  installments "3" and "4," which are already due. There was also no early payment of the maturing installments.

- **_Contract 9149_**: Gross amount:  R$  13,380,360.84  and Net Amount:  R$  13,142,353.21 – Date: 7.18.2011.

a. Amortization Schedule:  in 18 monthly installments, with the following payment flow until 10.18.2012[30].

| Installment | Maturity | Payment date | Original amount(R$) | Amount paid (R$) |
|---|---|---|---|---|
| 1 | 02.22.2012 | 09.23.2011 | 986,129.98 | 1,114,263.51 |
| 2 | 03.22.2012 | 09.23.2011 | 773,479.54 | 743,353.38 |
| 3 | 04.23.2012 | 09.23.2011 | 774,644.44 | 743,353.38 |
| 4 | 05.22.2012 | 09.23.2011 | 769,935.29 | 743,353.38 |
| 5 | 06.22.2012 | 09.23.2011 | 769,876.36 | 743,353.38 |
| 6 | 07.23.2012 | 12.08.2011 | 767,981.86 | 1,019,194.32 |
| 7 | 08.22.2012 | 12.08.2011 | 765,353.10 | 743,353.38 |
| 8 | 09.24.2012 | 12.08.2011 | 765,539.17 | 743,353.38 |
| 9 | 10.22.2012 | 12.08.2011 | 760,462.87 | 743,353.38 |
| 10 | 11.22.2012 | 12.08.2011 | 760,403.86 | 743,353.38 |
| 11 | 12.24.2012 | 12.08.2011 | 758,998.91 | 743,353.38 |
| 12 | 01.22.2013 | 12.08.2011 | 755,758.27 | 743,353.38 |
| 13 | 02.22.2013 | 12.08.2011 | 754,720.37 | 743,353.38 |
| 14 | 03.22.2013 | 12.08.2011 | 751,908.12 | 743,353.38 |
| 15 | 04.22.2013 | 12.08.2011 | 750,931.37 | 743,353.38 |
| 16 | 05.22.2013 | 12.08.2011 | 748,853.31 | 743,353.38 |
| 17 | 06.24.2013 | | 747,387.16 | |
| 18 | 07.18.2013 | | 744,819.67 | |

Source: Report "Simplified Contract Statement" issued by the SD Emp system – date: 12.20.2012

The installments for this contract were paid **in advance**, with only two remaining, with maturity on 06.24.2013 and 07.18.2013, respectively. Installments "1" to "5" were paid on 09.23.2011 (total amount paid - R$ 4,087,677.03) and installments "6" to "16" were paid on 12.08.2011 (total amount paid - R$ 8,452,728.12).

According to the SD EMP system on 12.20.2012, on the same date on which these loans were released, on 7.18.2011, there were payments for loan installments previously taken out by **"Ambra,"** relative to contracts 6819, 7556, 7557, 7558, 8101, 8102, 8103, and 8726, which totaled practically the same amount released in contract 9149, as shown in the following table:

| Contract | Date of Issue | Gross contract amount– R$ | Amount paid on 7.18.2011– R$ |
|---|---|---|---|
| 6819 | 6.26.2009 | 4,076,495.44 | 4,974,520.86 |

---

[30] Report "Simplified Contract Statement", issued by the SD Emp system on 10.18.2012.



# BANCO CENTRAL DO BRASIL

| Contract | Date of Issue | Gross amount of contract– R$ | Amount paid on 7.18.2011– R$ |
|---|---|---|---|
| 7556 | 12.28.2009 | 240,626.47 | 280,436.83 |
| 7557 | 12.28.2009 | 240,626.47 | 280,436.82 |
| 7558 | 12.28.2009 | 240,626.47 | 280,436.62 |
| 8101 | 05.31.2010 | 1,178,026.01 | 1,325,632.32 |
| 8102 | 05.31.2010 | 1,036,206.13 | 1,166,042.45 |
| 8103 | 05.31.2010 | 518,224.48 | 583,157.85 |
| 8726 | 05.14.2012 | 13,437,600.44 | 4,251,687.44 |
| Total | | | 13,142,351.19 |

Source: "Simplified Contract Statement" Report, issued on 12.20.2012 – SD Emp system

The total amount liquidated on 12.8.2011 refers to installments 6 to 16 of contract 9149. This amount, R$ 8,452,730.12, is exactly the same net amount of loan contract no. 9.404 executed with the company Prevserv Operadora de Serviços Ltda. (CNPJ. 05.943.988/0001-46):

| Contract | Date of Issue | Other party | Gross Amount – R$ | Net Amount – R$ |
|---|---|---|---|---|
| 9404 | 12.08.2011 | Prevserv Operadora de Serviços Ltda. | 8,486,368.08 | 8,452,728.12 |

Source: "Simplified Contract Statement" Report, issued on 12.20.2012 –SD Emp System

- **_Contract 9422_**: Gross amount: R$ 4,500,000.00 and Net Amount: R$ 4,415,557.50 – Date: 12.12.2011.

a. Amortization Schedule: in 12 monthly installments, with the first due on 1.21.2013 and the last on 12.23.2013. No early payments are recorded, according to the "Simplified Contract Statement" report issued on 12.20.2012.

Therefore, it can be seen that at no time has the client "Ambra" shown willingness to actually pay the loans borrowed with its own resources, nor has the Bank demanded payment of these loans.

The contract installments that were paid, at their maturities or in advance, used the institution's own funds, whether through the approval of a new loan to "Ambra" or to a third party ("Prevserv"), which characterizes a direct or disguised rollover of the debt.

After the TSAR was decreed on 6.4.2012, the contracts, in a single installment or not, that fell due after this date were not liquidated; in other words, the process of rolling over loans was suspended, leading to non-payment of the installments that fell due after that date.



# BANCO CENTRAL DO BRASIL

## 6.1.1.2 Centro-Oeste Promotora de Créditos Ltda.(CNPJ04.816.272/0001-15)[31]

| BCN | Face value of BCN– R$ | BCN Date | Maturity BCN | Current Status (12.20.2012) |
|------|------------------------|-----------|---------------|------------------------------|
| 9301 | 2,100,000.00 | 09.30.2011 | | Normal (1st due on 09.30.2015) |

Source: "Simplified Contract Statement" Report issued by the SD Emp system – date: 12.20.2012

BCN no. 9301 does not contain the issuer's signature.

a. <u>Amortization Schedule</u>: in 4 installments, with the following flow of payments until 10.18.2012.

| Install. | Maturity | Payment date | Original value (R$) | Amount paid (R$) |
|----------|-----------|---------------|----------------------|-------------------|
| 1 | 09.30.2015 | | 1,370,488.53 | |
| 2 | 09.29.2017 | | 1,370,488.53 | |
| 3 | 09.30.2019 | | 1,370,488.53 | |
| 4 | 09.30.2021 | | 1,370,488.54 | |

Source: "Simplified Contract Statement" Report issued by the SD Emp system – date: 12.20.2012

The most recent credit limit proposal (CLP) of the client, "filed" under the internal digitalized system called CDOC, dated 08.25.2011, attributes an "F" credit risk classification to the client and is valid until 2.21.2012.

There is no record of any guarantees – "BCN without guarantee." Nor are there updated financial statements in the institution's record that would support this classification. The most recent Balance Sheet shows a base date of 12.31.2007, indicating capital stock of R$ 10,000. The client's record dates back to 2003.

Considering the preceding information, associated with the abnormal loan amortization term, it was reclassified to an "H" (100% provision) credit risk level, with negative effects on the Balance Sheet of 6.4.2012.

Copies of client record documents, taken from the CDOC system of Banco Cruzeiro do Sul, are on pages 1576/1600.

## 6.1.1.3 Brigada Promotora de Crédito e Vendas Ltda. (CNPJ04.698.766/0001-42)[32]

The document "Opinion on Client - Legal Entity," dated 3.11.2011, states that it refers to a client with an account at the institution since 1.23.2001, for which the company purpose is the rendering of services to banks with credit portfolios, in addition to credit analysis services and records.

The client's records, kept at the institution's system (CDOC system), also indicate that the company's capital, which is R$ 16,000,

---

[31] Documents on pages 1570/1600.
[32] Documents on pages 1601/1718.



# BANCO CENTRAL DO BRASIL

was subscribed by members Augusto Pinto de Souza Filho (R$ 14,400), CPF number 016.770.718-34, and Vera Maria Soares de Souza (R$ 1,600), CPF number 634.789.947-72.

The record contains a power-of-attorney, dated 2.14.2011, in which member Augusto Pinto de Souza Filho appoints as his attorneys-in-fact Afonso Cesar Boabaid Burlamaqui and Armando Cesar de Araújo Pereira Burlamaqui to manage and administer "Brigada." The power-of-attorney is valid for one year.

There is a balance sheet dated 12.31.2010, with capital stock of R$ 16,000. The balance sheet was not audited, and only contains the signature of an accounting technician.

The record also contains a copy of private share subscription instrument no. 2129, date 03.25.2011, formalizing the paying-in of a total of R$ 5 million in shares in PEIF BCSul Verax Equity, administered by the Cruzeiro do Sul Group, which invests the funds in corporate bonds of the company Patrimonial Maragato S/A (CNPJ 07.049.736/0001-01), belonging to Luís Octávio Azeredo Lopes Indio da Costa and Luís Felippe Indio da Costa.

There is also a credit analysis report, with the base date of 8.26.2011, stating that this is a net investor of the institution's funds.

| BCN | Face value of BCN– R$ | BCN Date | Maturity BCN | Current Status (12.20.2012) |
|---|---|---|---|---|
| 8676 | 4,000,000.00 | 1.21.2011 | Last quarterly installment on 9.23.2013 | Installments due on 5.23.2012 and later are overdue. |
| 9146 | 4,687,353.70 | 7.18.2011 | Last installment on 7.18.2013 | Installments due 5.22.2012 and later are overdue. |
| 9216 | 1,605,008.17 | 8.29.2011 | Last installment on 12.31.2012 | Installments due 5.30.2012 and later are overdue. |
| 9302 | 9,400,000.00 | 9.30.2011 | Last bi-annual installment on 9.30.2021 | Normal. 1st installment only due on 9.30.2015. |
| 9421 | 4,600,000.00 | 12.21.2011 | 12 monthly installments | Normal. 1st installment only due on 1.21.2013 |
| 9571 | 5,344,364.99 | 3.30.2012 | 04.01.2013 | Normal. Single installment due on 4.1.2013. |
| 9603 | 430,768.82 | 4.30.2012 | Two monthly installments | Normal. 1st installment due on 1.30.2014 and the second on 2.28.2014. |

Source: "Portfolio Position" Report – base date 5.31.2012- issued by the Middle Market system, "Simplified Account Statement" reports issued by the SD EMP system on 12.20.2012 and 1.21.2013 and copy of the BCNs .

• ***Contract 8676***: Gross amount: R$ 4,000,000.00 and Net Amount: R$ 3,932,381.50 – Date: 1.21.2011.

153



# BANCO CENTRAL DO BRASIL

a. <u>Amortization Schedule</u>:  in  8 quarterly  installments, due on the following dates: 05.23.2011, 09.23.2011, 01.23.2012, 05.23.2012, 09.24.2012, 01.23.2013, 05.23.2013, 09.23.2013.

The  "Simplified  Contract  Statement"  report  taken  from  the  SD Emp system  on 12.20.2012,  shows  that  the  installments  falling  due  on  5.23.2011,  12.05.2011  and 01.23.2012,  with  original  amounts  of  R$540,269.96,  R$535,526.50  and  R$530,202.47 were only liquidated on 7.18.2011, 12.5.2011 and 3.30.2012, respectively.

The following installment, due on 5.23.2012, was not liquidated according to this report. The remaining installments were also not liquidated.

- *<u>Contract 9146</u>*: Gross amount: R$ 4,687,353.70 and Net Amount: R$ 4,603,975.83 – Date: 7.18.2011.

a. <u>Amortization Schedule</u>:   in 18 monthly installments, with the first due on 2.22.2012 and the last due on 7.18.2013.

The  "Simplified  Contract  Statement"  report  taken  from  the  SD Emp system  on 12.20.2012,  states  that  the  installments  falling  due  on  22.22.2012,  3.23.2012  and 4.23.2012, with principal amounts of R$345,457.04, R$270,962.20 and R$271,370.29 were only paid on 3.30.2012, 3.30.2012 and 4.30.2012, respectively.

This  report  does  not  contain  any  payment  record  for  the  following  monthly installments (May 2012 on): the client has been in breach since the decree of the TSAR.

- *<u>Contract 9216</u>*:  Gross amount:  R$ 1,605,008.17  and Net Amount:  R$ 1,582,111.23 – Date: 8.29.2011.

a. <u>Amortization Schedule</u>:   in 15 monthly installments, with the first maturing on 10.31.2011 and the last on 12.31.2012.

The  "Simplified  Contract  Statement"  report  of  the  SD Emp  system  on 12.20.2012, states that the six (6) first installments, with maturities between 10.31.2011 and 04.02.2012,  were  liquidated. The  last  payment,  according  to  this  report,  took  place  on 4.30.2012.

This  report  does  not  contain  any  payment  record  for  the  following  monthly installments (May  2012  on): the client has been in breach since the decree of the TSAR.

- *<u>Contract 9302</u>*: Gross amount: R$ 9,400,000.00 and Net Amount: R$ 9,223,609.00 – Date: 9.30.2011.

# BANCO CENTRAL DO BRASIL

a. Amortization Schedule: in 4 installments, maturing on the following dates: 9.30.2015, 9.29.2017, 9.30.2019, and 9.30.2021

In the case of this loan, the amortization period is long, given the client's profile, and is not in line with good banking practices on the Brazilian market.

The reclassification of the credit risk to level "H" (100% provision, according to Resolution 2.682 of the National Monetary Council) was done on the Balance Sheet of 6.4.2012.

## 6.1.1.4 Promotora e Divulgadora Sudeste Line Ltda. (CNPJ04.816.268/0001-57)[33]

According to information obtained from the document "Opinion on Client - Legal Entity," dated 3.6.2009, this company was founded in December/2001, has been a client since 3.28.2002, and its company purpose is to offer financing for financial institutions.

According to the 1st amendment to the Articles of Organization dated 12.23.2010, the company's capital stock, R$ 15,000, is divided between members Mário Costa (R$13,500), CPF no. 039.083.487-49 and Lilian Soares Pinto de Souza Ribeiro (R$ 1,500), CPF no. 634.804.097-68.

In addition to being a service provider, the records indicate that the company borrows funds and invests in the BMF and Bovespa and is a shareholder in investment funds.

There is a copy of a private instrument of investment in shares of the PEIF Platinum V in the amount of R$ 6 million, dated 4.30.2012, and a copy of a similar instrument, of an investment corresponding to R$ 5 million in shares of the PEIF Equity 1, dated 3.25.2011.

According to the unaudited financial statements of 12.31.2010, the company's capital stock is R$ 15,000.

Copies of client registry documents, taken from Banco Cruzeiro do Sul's CDOC system, are on pages 1771/1831.

| BCN | Face value of BCN– R$ | BCN Date | Maturity BCN | Current Status (12.20.2012) |
|-----|----------------------|----------|--------------|------------------------------|
| 8678 | 5,431,135.57 | 01.24.2011 | 8 quarterly installments, 1st due on 1.24.2012 | Installments due in 07/2012 and later were not paid |
| 9150 | 2,359,377.00 | 07.18.2011 | 18 monthly installments, 1st due on 2.22.2012 | Installments due in 07/2012 and later were not paid |

---

[33] Documents on pages 1719/1831.



# BANCO CENTRAL DO BRASIL

| BCN | Face value of BCN– R$ | BCN Date | Maturity BCN | Current Status (12.20.2012) |
|------|------|------|------|------|
| 9262 | 14,000,000.00 | 09.23.2011 | 28 monthly installments, 1st due on 10.24.2011 | Installments due in May and later were not paid |
| 9395 | 1,336,300.35 | 12.07.2011 | 6 monthly installments, 1st due on 1.9.2012 | Installments due in May and later were not paid |
| 9573 | 4,898,385.88 | 03.30.2012 | 04.01.2013 | Normal. |
| 9605 | 7,350,284.33 | 04.30.2012 | 24 installments, 1st due on 12.30.2013 and last on 11.30.2015 | Normal. |

Source: "Portfolio Position" Report – base date 5.31.2012- issued by the Middle Market system, "Simplified Account Statement" reports issued by the SD EMP system on 12.20.2012 and copy of the BCNs.

- **_Contract 8678_**: Gross amount: R$ 5,431,135.57 and Net Amount: R$ 5,329,220.31 – Date: 1.24.2011.

a. Use of funds: According to the SD Emp system records, the net value of the loan was released as "cash." In the "Report of Payments Made," base date 1.24.2011, this amount was used to pay installments for other loan contracts borrowed by "Sudeste Line Ltda.," which were overdue (BCNs 8005, 8091 and 8150).

b. Amortization Schedule: in 8 quarterly installments, due on the following dates: 01.24.2012, 04.24.2012, 07.24.2012, 10.24.2012, 01.24.2013, 04.24.2013, 07.24.2013 and 10.24.2013.

In the "Simplified Contract Statement" report on this contract, issued by the SD Emp system on 12.20.2012, there is no record of payment of the following quarterly installments (July/2012 and October/2012 already due and the other not due): the client has been in breach since July/2012, already under the TSAR.

According to the reports issued by the SD Emp system on 12.20.2012, on the same date as the funds for these loans were released, 1.24.2012, there were payments of loans previously borrowed by the client relative to contracts 8005, 8091 and 8150, for exactly the same amount as the net amount released under contract 8678:

| Contract | Date of Issue | Gross amount of contract– R$ | Amount paid on 1.24.2012– R$ |
|------|------|------|------|
| 8005 | 04.29.2010 | 3,441,081.35 | 1,885,454.24 |
| 8091 | 05.31.2010 | 3,440,510.69 | 1,908,233.42 |
| 8150 | 06.28.2010 | 2,732,510.04 | 1,535,532.65 |
| **Total** | | | **5,329,220.31** |

Source: "Simplified Contract Statement" Reports, issued on 12.20.2012 – SD Emp system

156

# BANCO CENTRAL DO BRASIL

- ***Contract 9150***: Gross amount: R$ 2,359,377.00 and Net Amount: R$ 2,317,408.80 – Date: 7.18.2011.

a. Amortization Schedule: in 18 monthly installments, due on the following dates: 02.22.2012, 03.22.2012, 04.23.2012, 05.22.2012, 06.22.2012, 07.23.2012, 08.22.2012, 09.24.2012, 10.22.2012, 11.22.2012, 12.24.2012, 01.22.2013, 02.22.2013, 03.22.2013, 04.22.2013, 05.22.2013, 06.24.2013, 07.18.2013.

In the "Simplified Contract Statement" report on this contract, issued by the SD Emp system on 12.20.2012, there is no record of payment of the installments falling due on 5.22.2012 and afterwards. The client has been in breach since June/2012, already under the TSAR.

In the reports issued by the SD Emp system on 12.21.2012, on the same date as the funds for these loans were released, 7.18.2011, there were payments of loans previously borrowed by the client relative to contracts 8091, 8150, 8270, and 8948, the amount of which is practically the same as the net amount released under contract 9150:

| Contract | Date of Issue | Gross amount of contract– R$ | Amount paid on 7.18.2011– R$ |
|----------|---------------|------------------------------|------------------------------|
| 8091 | 05.31.2010 | 3,440,510.69 | 362,606.09 |
| 8150 | 06.28.2010 | 2,732,510.04 | 576,988.16 |
| 8270 | 07.30.2010 | 443,320.47 | 469,009.20 |
| 8948 | 04.25.2011 | 15,418,330.36 | 908,804.48 |
| **Total** | | | **2,317,407.93** |

Source: "Simplified Contract Statement" Reports, issued on 12.21.2012 – SD Emp system

- ***Contract 9262***: Gross amount: R$ 14,000,000.00 and Net Amount: R$ 13,769,003.50 –

Date: 09.23.2011

- Amortization Schedule: in 28 monthly installments, due on the following dates: 10.24.2011, 11.23.2011, 12.23.2011, 02.23.2012, 03.23.2012, 05.23.2012, 06.25.2012, 08.24.2012, 09.24.2012, 11.23.2012, 12.24.2012, 02.25.2013, 03.25.2013, 05.24.2013, 06.24.2013, 08.26.2013, 09.23.2013, 11.25.2013, 12.23.2013, 01.23.2014, 02.24.2014, 03.24.2014, 04.23.2014, 05.23.2014, 06.23.2014, 07.23.2014, 08.25.2014, 09.23.2014.

In the "Simplified Contract Statement" report on this contract, issued by the SD Emp system on 12.20.2012, there is no record of payment of the installments falling due on 5.23.2012 and afterwards. The client has been in breach since then, practically coinciding with the start of the TSAR.

- ***Contract 9395***: Gross amount: $ 1,336,300.35 and Net Amount: R$ 1,325,323.53 – Date: 12.07.2011

**BANCO CENTRAL DO BRASIL**

a.Amortization Schedule: in 6 monthly installments, due on the following dates: 01.09.2012, 02.07.2012, 03.07.2012, 04.09.2012, 05.07.2012, and 06.08.2012.

In the "Simplified Contract Statement" report on this contract, issued by the SD Emp system on 12.20.2012, there is no record of liquidation of the installments that were due in May and June/2012. The client has been in breach since then.

- **_Contract 9573_**: Gross amount: R$ 4,898,385.88 and Net Amount: R$ 4,806,467.67– Date: 3.30.2012

a. Amortization Schedule: in one installment due on 4.1.2013

The "Simplified Contract Statement" reports issued by the SD Emp system on 12.21.2012, show that on the same date as the funds for these loans were released, 03.30.2012, there were payments of loans previously borrowed by the client relative to contracts 8678, 9150, 9262, and 9395, for exactly the same amount as the net amount released under contract 9573:

| Contract | Date of Issue | Gross amount of contract– R$ | Amount paid on 03.30.2012– R$ |
|---|---|---|---|
| 8678 | 01.24.2011 | 5,431,135.57 | 1,510,534.45 |
| 9150 | 07.18.2011 | 2,359,377.00 | 490,925.18 |
| 9262 | 09.23.2011 | 14,000,000.00 | 2,085,496.09 |
| 9395 | 07.12.2011 | 1,336,300.35 | 719,511.95 |
| **Total** | | | **4,806,467.67** |

Source: "Simplified Contract Statement" Reports, issued on 12.21.2012 – SD Emp system

- **_Contract 9605_**: Gross amount: R$ 7,350,284.33 and Net Amount: R$ 7,212,356.24 – Date: 4.30.2012

a.Amortization Schedule: Single installment with maturity on 4.1.2013.

As can be seen, when the operations contracted with Promotora e Divulgadora Sudeste Line Ltda. were liquidated, they were paid with funds from new loans and/or debts contracted with BCSul, characterizing a process of "rollover;" in other words, the loans were not being liquidated normally. The reclassification was made to credit risk level "H" (corresponding to 100% provision).

After the decree of the TSAR, the rollover process was interrupted and the loan installments maturing since then were no longer "liquidated."



# BANCO CENTRAL DO BRASIL

## 6.1.1.5 Prevserv Operadora de Serviços Ltda. (CNPJ 05.943.988/0001-46)[34]

The document "Opinion on Client - Legal Entity," dated 4.10.2012, states that this is a business management consulting and service company, and has had a relationship with BCSul since 2003.

It also stated that it was opening an account at "Cruzeiro do Sul Corretora" to conduct operations on the markets administered by BM&F Bovespa. In the same type of document, dated 6.6.2005, there is information that BCSul contracted its services to carry out collection of the loans to INSS retirees and pensioners.

On the client's record, signed on 7.31.2006, the members of the company are listed as Mr. Armando José Andrade de Carvalho (former manager of the fundraising area at BCSul), CPF 004.537.817-72 and Mr. Luiz Fernando Pinheiro G. de Carvalho, CPF 949.762.797-15, each of who holds the same percentage of shares in the company's capital.

However, on the client's record signed on 4.10.2012, the company's members are listed as Orlando Paulo Confalonieri, CPF 267.126.527-15 and Divino Vicente Cordeiro, CPF 082.759.121-72, owners of 75% and 25% of the company's capital, respectively.

There are records in the CDOC system stating that it is also a "BMF" and "Bovespa" client and a shareholder in the investment fund.

There are no updated financial statements in its record. The most recent Balance Sheet, which is not audited, has its base date as 12.31.2006, and the amount of R$ 200,000 is listed as the capital stock.

There is a copy of two private share subscription instruments in PEIFS administered by a company in the Cruzeiro do Sul Group. The first refers to a share subscription in the amount of R$ 2,467,000 made on 4.30.2012 in PEIF BCSul Verax Platinum V. The second document refers to a share subscription in the amount of R$2,966,000 made on 5.9.2012 in PEIF BCSul Verax Equity 1.

| BCN | Face value of BCN– R$ | BCN Date | Maturity BCN | Current Status (12.20.2012) |
|------|------|------|------|------|
| 9155 | 974,250.40 | 7.21.2011 | 7.22.2013 | Normal |
| 9263 | 3,100,000.00 | 9.23.2011 | 31 monthly installments, 1st due on 10.24.2011 | Installments due in 05/2012 and later were not paid. |
| 9397 | 274,147.18 | 12.07.2011 | 6 monthly installments, 1st due on 01.09.2012 | Installments due in 05/2012 and later were not paid. |

---

[34] Documents on pages 1832/1926.

# BANCO CENTRAL DO BRASIL

| BCN | Face value of BCN– R$ | BCN Date | Maturity BCN | Current Status (12.20.2012) |
|------|------------------------|-----------|---------------|------------------------------|
| 9572 | 9,733,107.16 | 3.30.2012 | 4.1.2013 | Normal |
| 9606 | 12,201,125.18 | 4.30.2012 | 24 monthly installments, 1st due on 5.30.2014 | Normal |

Source: Report "Simplified Contract Statement" issued by the SD Emp system – Date: 12.20.2012

• ***Contract 9155***: Gross amount: R$ 974,250.40 and Net Amount: R$ 955,968.59 – Date: 7.21.2011.

a. Amortization Schedule: in one installment with maturity on 7.22.2013.

Worth noting in this contract is the two-year amortization period, granted by the institution to a client with insufficient information in its record, and with insignificant capital stock and/or net equity. This goes against good market practices.

• ***Contract 9263***: Gross amount: R$ 3,100,000.00 and Net Amount: R$ 3,050,044.90 – Date: 9.23.2011.

a. Amortization Schedule: in 31 monthly installments, with maturity on the following dates

10.24.2011, 11.23.2011, 23.12.2011, 01.23.2012, 02.23.2012, 03.23.2012, 04.23.2012, 05.23.2012, 06.25.2012, 07.23.2012, 08.23.2012, 09.24.2012, 08.10.2012, 11.23.2012, 12.24.2012, 01.23.2013, 02.25.2013, 03.25.2013, 04.23.2013, 05.23.2013, 06.24.2013, 07.23.2013, 08.23.2013, 09.23.2013, 08.10.2013, 11.25.2013, 12.23.2013, 01.23.2014, 02.24.2014, 03.24.2014, and 04.24.2014.

In the "Simplified Contract Statement" report on this contract, issued by the SD Emp system on 12.26.2012, there is no record of payment of the installments due on 5.23.2012 and afterwards; in other words, the client has been in breach since then.

• ***Contract 9397***: Gross amount: R$ 274,147.18 and Net Amount: R$ 271,895.24 – Date: 12.7.2011.

a. Amortization Schedule: in 6 installments with maturity on the following dates: 01.09.2012, 02.07.2012, 03.07.2012, 04.09.2012, 05.07.2012, 06.08.2012.

In the "Simplified Contract Statement" report on this contract, issued by the SD Emp system on 12.26.2012, there is no record of payment of the installments with maturities on 5.7.2012 and 6.8.2012, in other words, the client has been in breach since then.

The "Simplified Contract Statement" report, issued by the SD EMP system on 12.26.2012, shows that on the same date on which the funds for this loan were released, 12.7.2012, there is a record of payment in the same total amount, of two



# BANCO CENTRAL DO BRASIL

installments relative to loan contract no. 9263 (installments due on 10.24 and 11.23.2011), characterizing "rollover of the installments":

| Contract | Date of Issue | Gross amount of contract– R$ | Amount paid on 12.07.2011– R$ |
|---|---|---|---|
| 9263 | 09.23.2011 | 3,100,000.00 | 271,895.24 |

Source: "Simplified Contract Statement" Report, issued on 12.26.2012 – SD Emp system

- **_Contract 9572_**: Gross amount: R$ 9,733,107.16 and Net Amount: R$ 9,550,465.40 – Date: 3.30.2012.

a. Amortization Schedule: Single installment with maturity on 4.1.2013.

The "Simplified Contract Statement" report, issued by the SD Emp system on 12.26.2012 shows that on the same date as the funds for these loans were released, 3.30.2012, there is a record of liquidation, in the same total amount, of loan no. 9404 and of overdue installments relative to loans 9263 and 9397, all signed with the same party, characterizing rollover of previously contracted obligations:

| Contract | Date of Issue | Gross amount of contract– R$ | Amount paid on 03.30.2012– R$ |
|---|---|---|---|
| 9404 | 08.12.2011 | 8,486,368.08 | 8,871,756.19 |
| 9263 | 09.23.2011 | 3,100,000.00 | 531,098.57 |
| 9397 | 12.07.2011 | 274,147.18 | 147,610.64 |
| **Total** | | | **9,550,465.40** |

Source: "Simplified Contract Statement" Reports, issued on 12.26 and 12.27.2012 – SD Emp system

**It is important to note the following:** BCN no. 9404 was issued on 8.12.8.2011, with gross value of R$8,486,368.08 and net value of R$8,452,728.12. On the same date, 11 installments of BCN no. 9149 were liquidated, issued by the client "Ambra," representing a rollover of loans contracted from BCSul, demonstrating the _modus operandi_ of "rolling over loans" used by the Bank's Administration:

| Contract | Date of Issue | Gross amount of contract– R$ | Amount paid on 12.8.2011– R$ |
|---|---|---|---|
| 9149 | 07.18.2011 | 13,380,360.84 | 8,452,728.12 |

Source: "Simplified Contract Statement" Report, issued on 12.27.2012 – SD Emp system

- **_Contract 9606_**: Gross amount: R$ 12,201,125.18 and Net Amount: R$11,972,171.07 – Date: 4.30.2012.

a. Amortization Schedule:  in 24 monthly installments of R$ 580,380.21, with maturity on the following dates: 5.30.2014, 6.30.2014, 7.30.2014, 9.1.2014, 9.30.2014, 10.30.2014,   12.1.2014,     12.30.2014,   1.30.2015,   3.2.2015,   3.30.2015,   4.30.2015,



# BANCO CENTRAL DO BRASIL

6.1.2015, 6.30.2015, 7.30.2015, 8.31.2015, 9.30.2015, 10.30.2015, 11.30.2015, 12.30.2015, 2.1.2016, 2.29.2016, 3.30.2016, and 5.2.2016.

The "Simplified Contract Statement" report, issued by the SD Emp system on 12.27.2012, shows that on the same date as the funds for these loans were released, 4.30.2012, there is a record of liquidation of installments of contracts 9263 and 9397, since these installments were liquidated with funds from a new loan.

| Contract | Date of Issue | Gross amount of contract– R$ | Amount paid on 04.30.2012 – R$ |
|----------|---------------|------------------------------|-------------------------------|
| 9263 | 09.23.2011 | 3,100,000.00 | 124,644.88 |
| 9397 | 12.07.2011 | 274,147.18 | 47,526.19 |
| **Total** | | | **172,171.07** |

Source: "Simplified Contract Statement" Reports issued on 12.26 and 12.27.2012 – SD Emp System

In light of the foregoing, it can be seen that the operations contracted with Prevserv Operadora de Serviços Ltda, when liquidated, were paid with funds from new loans and/or debts contracted with BCSul, characterizing a process of "rollover."

The loans were not being normally liquidated. The credit risk level was reclassified to "H" (corresponding to 100% provision). The available information on the client's record also indicates insufficient economic-financial capacity of the client to pay this obligation.

After the decree of the TSAR, the rollover process was interrupted and the loan installments maturing since then were no longer "liquidated."

## 6.1.1.6 Neue Welt Comércio Ltda. (CNPJ 03.559.468/0001-09)[35]

The company's record is not up-to-date. The record was signed on 1.12.2005 and the document "Opinion on the Client" is from 7.16.2002. The most recent Balance Sheet available in the CDOC system has a base date of 12.31.2007 (capital stock of R$ 5 million).

There are records in the CDOC system indicating that this is a "Bovespa" client and a club and investment fund shareholder.

On 4.30.2012 the client subscribed shares of PEIF BCSul Verax Platinum V in the amount of R$ 11,750,000 according to a private PEIF share subscription instrument filed in the CDOC system.

Copies of client registry documents, taken from Banco Cruzeiro do Sul's CDOC system, are on pages 1956/1976.

---

[35] Documents on pages 1927/1976.



# BANCO CENTRAL DO BRASIL

| BCN | Face value of BCN– R$ | BCN Date | Maturity BCN | Status |
|------|------------------------|-----------|---------------|---------|
| 9154 | 854,700,94 | 07.21.2011 | 07.22.2013 | Normal |
| 9264 | 3,194,541.17 | 09.23.2011 | 31 monthly installments, 1st due on 10.24.2011 | Installments with maturities due on and after 05/2012 were not liquidated. |
| 9398 | 282,507.87 | 12.7.2011 | 6 monthly installments, 1st due on 1.9.2012 | The two most recent installments, due on 5.7 and 6.8.2012 were not yet liquidated. |
| 9575 | 712,783.26 | 3.30.2012 | 4.1.2013 | Normal |
| 9.604 | 12,155,520.12 | 4.30.2012 | 24 monthly installments, 1st due on 5.30.2014 | Normal |

Source: "Portfolio Position" Report – base date 5.31.2012- issued by the Middle Market System reports " Simplified Account Statement" issued by the SD EMP system on 12.20.2012 and copy of the BCNs

- **_Contract 9154_**: Gross amount: R$ 854,700.94 and Net Amount: R$ 838,662.48 – Date: 7.21.2011.

a. Amortization Schedule: in one installment due on 7.22.2013.

      The amortization period is 2 years, granted by the institution to a client with insufficient and outdated market practices, which goes against good market practices.

- **_Contract 9264_**: Gross amount: R$ 3,194,541.17 and Net Amount: R$ 3,143,062.58 – Date: 9.23.2011.

a. Amortization Schedule: In 31 monthly installments with maturity on the following dates: 10.24.2011, 11.23.2011, 12.23.2011,1.23.2012,2.23.2012, .23.2012, 4.23.2012, 5.23.2012, 6.25.2012, 7.23.2012, 8.23.2012, 9.24.2012, 10.23.2012, 11.23.2012, 12.24.2012, 1.23.2013, 2.25.2013, 3.25.2013, 4.23.2013, 5.23.2013, 4.26.2013, 7.23.2013, 8.23.2013, 9.23.2013, 10.23.2013, 11.25.2013, 12.23.2013, 1.23.2014, 2.24.2014, 3.24.2014, and 4.24.2014.

      In this contract's "Simplified Contract Statement" report, issued by the SD Emp system on 12.27.2012, there is no record of payment of the installments maturing in May 2012 (inclusive) and later, in other words, the client has been in breach since then.

- **_Contract 9398_**: Gross amount: R$ 282,507.87 and Net Amount: R$ 280,187.26 – Date: 12.7.2011.

      BCN no. 9398 was not signed by the issuer.



# BANCO CENTRAL DO BRASIL

a.Amortization Schedule:  in  6  installments  due on the following  dates: 1.9.2012, 2.7.2012, 3.7.2012, 4.9.2012, 5.7.2012, and 6.8.2012.

In the "Simplified Contract Statement" report on this contract, issued by the SD Emp system on 12.27.2012, there is no record of liquidation of the last two installments, due on 5.7 and 6.8.2012; in other words, the client has been in breach since then.

The "Simplified Contract Statement" report issued by the SD Emp system on 12.27.2012, shows that on the same date as the funds for these loans were released, 4.30.2012, there is a record of liquidation, in the same total amount, of two installments of contract 9264 (due on 10.24 and 11.23.2011), in other words, they were liquidated with funds from the new loan operation.

| Contract | Date of Issue | Gross amount of contract– R$ | Amount paid on 12.7.2011– R$ |
|---|---|---|---|
| 9264 | 09.23.2011 | 3,194,541,17 | 280,187,26 |

Source: "Simplified Contract Statement" Report, issued on 12.27.2012 – SD Emp system

• ***Contract 9575***: Gross amount: R$ 712,783.26 and Net Amount:  R$ 699,407.88  – Date: 3.30.2012.

a.Amortization Schedule: Single installment with maturity on 4.1.2013.

The "Simplified Contract Statement" report, issued by the SD Emp system on 03.30.2012, shows that on the same date as the funds for these loans were released, 3.30.2012, there is a record of liquidation, in the same total amount, of installments of contracts 9264 and 9398, executed with the same party; in other words, they were liquidated with funds from the new loan operation.

| Contract | Date of Issue | Gross amount of contract– R$ | Amount paid on 03.30.2012– R$ |
|---|---|---|---|
| 9264 | 09.23.2011 | 3,194,541.17 | 547,295.55 |
| 9398 | 12.07.2011 | 282,507.87 | 152,112.33 |
| Total | | | 699,407.88 |

Source: "Simplified Contract Statement" Report, issued on 12.27.2012 SD Emp System

• ***Contract 9604***: Gross amount:  R$  12,155,520.12  and Net Amount:  R$ 11,927,421.78  – Date: 4.30.2012.

a.  Amortization Schedule: Single installment with maturity on 4.1.2013.

The "Simplified Contract Statement" report, issued by the SD Emp system on 12.27.2012, shows that on the same date as the funds for these loans were released, 4.30.2012, there is a record of liquidation, in the same total amount, of installments of contracts 9264 and 9398, executed with the same party; in other words, they were liquidated with funds from the new loan operation.

164



# BANCO CENTRAL DO BRASIL

| Contract | Date of Issue | Gross amount of contract– R$ | Amount paid on 04.30.2012– R$ |
|---|---|---|---|
| 9264 | 09.23.2011 | 3,194,541.17 | 128,446.20 |
| 9398 | 12.07.2011 | 282,507.87 | 48,975.58 |
| Total | | | 177,421.78 |

Source: "Simplified Contract Statement" Report, issued on 12.27.2012 – SD Emp system

Once again, we see that new loans were used to liquidate installments of previous loans, and loans were granted in amounts and terms that are incompatible with good market practices this was also worsened by the insufficiency of updated and reliable information in the client's record.

The client's operations were reclassified to risk level "H" (100% provision) as established in Resolution 2.682/1999.

## 6.1.1.7 Afonso Cesar Boabaid Burlamaqui – CPF. 022.938.467-68[36]

The CDOC system indicates that this client is a borrower and investor in the "Bovespa" product, and shareholder in the investment club.

According to the information in the record, dated 4.11.2012, he is listed as a shareholder of the company "A.C. Burlamaqui Consultores."

According to the document "Opinion on the Client," dated 4.16.2012, he is an attorney and partner in the law firm that provides services to the BCSul Conglomerate. He is also listed as being registered at the brokerage house since July/2010.

Copies of client registry documents, taken from Banco Cruzeiro do Sul's CDOC system are on pages 1988/2018.

| BCN | Face value of BCN– R$ | Date BCN | Maturity BCN | Status |
|---|---|---|---|---|
| 9618 | 4,038.236/98 | 5.15.2012 | 8.13.2012 | Normal |

Source: Middle System – Report Base date 5.31.2012

• ***Contract 9618***: Gross amount: R$ 4,038,236.98 and Net Amount: R$ 3,998,177.67 – Date: 15.5.2012.

a. Amortization Schedule: Single installment with maturity on 4.1.2013.

The "Simplified Contract Statement" report issued by the SD Emp system on 12.27.2012, shows that on the same date as the funds for these loans were released, 5.15.2012, there is a record of liquidation of contract 9.576:

---

[36] Documents on pages 1977/2018.



# BANCO CENTRAL DO BRASIL

| Contract | Date of Issue | Gross amount of contract– R$ | Amount paid on 15.05.2012– R$ |
|---|---|---|---|
| 9576 | 03.30.2012 | 8,083,457.28 | 8,198,177.67 |

Source: "Simplified Contract Statement" Report, issued on 12.27.2012– SD Emp system

Contract 9.618 was also liquidated on 13.8.2012.

## 6.1.2 CRIF Multicred Portfolio – base date: 5.31.2012[37]

| Client | Exposure (not due) as of 5.31.2012 – R$ | BCN | Issue Date BCN | Gross amount BCN– R$ |
|---|---|---|---|---|
| Brigada Promotora de Crédito e Vendas Ltda. | 5,760,606.06 | 9228 | 9.5.2011 | 5,355,086.58 |
| Amadeu Simões Lopes Azambuja | 5,851,027.08 | 9229 | 9.5.2011 | 5,439,142.39 |
| **Total** | **11,611,633.14** | | | |

Sources: i) Spreadsheet sent by CGF – TSAR Administrator – Exposures without provisions; ii) Daily Portfolio Report– position on 5/31/2012 (Deutsche Bank) – Pages 2033/2037.

For these exposures (not due as of base date 5.31.2012), BCSul was still responsible for collection and transfer of the clients' payments to the CRIF Multicred, and also had all the records on the real performance of these clients.

Therefore, it had all the information necessary to evaluate the real risk of the operations and to adjust the value of the CRIF shares on its Balance Sheet.

## 6.1.2.1 Contract 9228 – Issuer: Brigada Promotora de Crédito e Vendas Ltda. (CNPJ 04.698.766/0001-42)[38]

- Gross amount: R$ 5,355,086.58 and Net Amount: R$ 5,254,598.38 – Date: 9.5/2011.

a. Amortization Schedule: Single installment with maturity on 9.4.2012.

In the "Simplified Contract Statement" report on this contract, issued by the SD Emp system on 12.27.2012, there is no record of liquidation of the loan; in other words, the client has been in breach since its maturity (9.4.2012).

The "Simplified Contract Statement" report, issued by the SD Emp system on 12.27.2012, shows that on the same date as the funds for these loans were released, 9.5.2011, there is a record of liquidation of contract 9223 in the same amount; in other words, "rollover" of this operation.

---

[37] Documentation relative to this portfolio is on pages 2033/2079. Copy of statement of transactions of shareholder Banco Cruzeiro do Sul S.A in CRIF BCSULVerax Multicred Financeiro, relative to the period from 12.30.2011 to 06.29.2012 is on page 2025/2032.
[38] Documents on 2041/2053.

166



# BANCO CENTRAL DO BRASIL

| Contract | Date of Issue | Gross contract amount – R$ | Amount paid on 09.05.2011 – R$ |
|----------|---------------|----------------------------|-------------------------------|
| 9223 | 08.31.2011 | 5,246,065.29 | 5,254,598.38 |

Source: "Simplified Contract Statement" Report, issued on 12.27.2012 – SD Emp system

The profile of this client's operations was outlined at the time the PDD adjustment to the "CRIF Prosper Flex" portfolio was established. This operation also served to rollover a previous loan.

The credit risk of this operation was reclassified to level "H," in line with the provision in Resolution 2.682/1999.

## 6.1.2.2  Contract 9229 Issuer: Amadeu Simões Lopes de Azambuja (CPF 007.042.887-53)[39]

- Gross amount: R$ 5,439,142.39 and Net Amount: R$ 5,255,680.12 – Date: 9.5.2011

a. Amortization Schedule: Single installment with maturity on 9.4.2012.

In the "Simplified Contract Statement" report on this contract, issued by the SD Emp system on 12.27.2012, there is no record of liquidation of the loan; in other words, the client has been in breach since the maturity (9.4.2012).

The "Simplified Contract Statement" report, issued by the SD Emp system on 12.27.2012, shows that on the same date as the funds for these loans were released, 9.5.2011, there is a record of liquidation of contract 9222 in an identical amount, indicating "rollover" of this operation.

| Contract | Date of Issue | Gross amount of contract – R$ | Amount paid on 09.05.2011 – R$ |
|----------|---------------|-------------------------------|-------------------------------|
| 9222 | 08.31.2011 | 5,247,145.28 | 5,255,680.12 |

Source: "Simplified Contract Statement" Report, issued on 12.27.2012 – SD Emp system

Information from client's record obtained through consultation of the institution's CDOC system:

- In addition to being a borrower, the client also operated with the brokerage firm of Cruzeiro do Sul Group in the Bovespa and BM&F segments;

- The client's record signed on 4.26.2011 states that he is the CEO of a company called Dolfim Engenharia S/A.

Copies of client registry documents, taken from Banco Cruzeiro do Sul's CDOC system are on pages 2064/2078.

---

[39] Documents on pages 2054/2079.



# BANCO CENTRAL DO BRASIL

The credit risk for this operation was reclassified to level "H," in accordance with the provisions of Resolution 2.682/1999.

## 6.2 Make insufficient provisioning in its credit portfolio in the "middle market" segment, violating the criteria defined in Resolution 2.682/1999 (Arts. 2, 3 and 4)[40]

The composition of the adjustment for this provision, by borrower, is illustrated in the following table:

| Client | Exposure 5.31.2012– R$ | PDD CGF(%) | PDD BCSul(%) | PDD CGF (A) – R$ | PDD BCSul (B) – R$ | Adjustment PDD (A-B) – R$ |
|---|---|---|---|---|---|---|
| ACEITO ADM CARTOES PREST SERV LTDA | 298,835.09 | 100 | 0.5 | 298,835.09 | 1,494.18 | 297,340.91 |
| ADHONEP | 556,054.79 | 100 | 0.5 | 556,054.79 | 2,780.27 | 553,274.52 |
| ALCANA USINA DE ALCOOL | 50,418.11 | 100 | 0.5 | 50,418.11 | 252.09 | 50,166.02 |
| ALOES | 4,504,738.83 | 100 | 3 | 4,504,738.83 | 135,142.16 | 4,369,596.67 |
| ALOES | 135,171.47 | 100 | 3 | 135,171.47 | 4,055.14 | 131,116.33 |
| AMADEU SIMOES | 515.62 | 100 | 3 | 515.62 | 15.47 | 500.15 |
| AMBRA | 11,716,299.16 | 100 | 70 | 11,716,299.16 | 8,201,409.41 | 3,514,889.75 |
| ARIZONA USINA DE ALCOOL E ACUCAR | 50,688.05 | 100 | 3 | 50,688.05 | 1,520.64 | 49,167.41 |
| ARIZONA USINA DE ALCOOL E ACUCAR | 10.21 | 100 | 3 | 10.21 | 0.31 | 9.9 |
| BALDIN BIOENERGIA S/A | 10,012,633.20 | 100 | 1 | 10,012,633.20 | 100,126.33 | 9,912,506.87 |
| BRIGADA VENDAS | 6,207,329.27 | 100 | 3 | 6,207,329.27 | 186,219.88 | 6,021,109.39 |
| CAMAQUA S/A | 575,050.12 | 100 | 70 | 575,050.12 | 402,535.08 | 172,515.04 |
| ELCANA GOIAS USINA DE ALCOOL E AC | 46,729.89 | 100 | 0.5 | 46,729.89 | 233.65 | 46,496.24 |
| FACILITY TECNOLOGIA | 5,050,802.84 | 100 | 0.5 | 5,050,802.84 | 25,254.01 | 5,025,548.83 |
| FACILITY TECNOLOGIA | 261.89 | 100 | 0.5 | 261.89 | 1.31 | 260.58 |
| GALLWAY S/A | 9,364.31 | 100 | 0.5 | 9,364.31 | 0 | 9,364.31 |
| AMAPA STATE GOVERNMENT | 3,439,331.99 | 50 | 3 | 1,719,666.00 | 103,179.96 | 1,616,486.04 |
| GUILHERME FERNANDES | 13,405,923.23 | 100 | 0.5 | 13,405,923.23 | 67,029,62 | 13,338,893.61 |
| GUILHERME FERNANDES | 2,860.72 | 100 | 0.5 | 2,860.72 | 14.3 | 2,846.42 |
| INDUSTRIA RANGEL LTDA | 217,259.62 | 100 | 3 | 217,259.62 | 6,517.79 | 210,741.83 |
| INDUSTRIAL PAGE LTDA | 2,280,270.70 | 100 | 10 | 2,280,270.70 | 228,027.07 | 2,052,243.63 |
| MD CRED | 75,334.24 | 100 | 1 | 75,334.24 | 753.34 | 74,580.90 |
| PETROSAC IND COM IMP EXP DE EMB PLASTICA | 174,817.37 | 100 | 50 | 174,817.37 | 87,408.69 | 87,408.68 |
| OFRA BARUQUE | 178,590.46 | 100 | 0 | 178,590.46 | 0 | 178,590.46 |
| RODOLATINA LTDA | 6,343,615.44 | 50 | 30 | 3,171,807.72 | 1,903,084.63 | 1,268,723.09 |
| SUDESTE LINE | 298.05 | 100 | 3 | 298.05 | 8.94 | 289.11 |
| SUDESTE LINE | 1,209,364.21 | 100 | 3 | 1,209,364.21 | 36,280.93 | 1,173,083.28 |
| WIREX S/A | 1,043,888.27 | 100 | 50 | 1,043,888.27 | 521,944.14 | 521,944.13 |
| **TOTAL W/O GUARANTEE** | | | | **62,694,983.44** | **12,015,289.34** | **50,679,694.10** |

Source: Spreadsheet sent by CGF – TSAR Administrator

---

[40] The documentation relative to this portfolio is on pages 2080/2467.



# BANCO CENTRAL DO BRASIL

Many of the provision adjustment amounts are insignificant, in light of the total amount of around R$ 50.6 million. Following is a list of clients with PDD to be adjusted in amounts greater than R$ 500,000:

- Adhonep – Associação dos Homens de Negócio do Evangelho Pleno (CNPJ 27.775.642/0001-19)
- Aloes Indústria e Comércio Ltda. (CNPJ 68.626.183/0001-99)
- Associação dos Músicos Militares do Brasil – Ambra (CNPJ 30.504.617/0001-05)
- Baldin Bioenergia S/A (CNPJ 54.844.360/0001-07)
- Brigada Promotora de Créditos e Vendas Ltda. (CNPJ 04.698.766/0001-42)
- Facility Tecnologia Ltda. (CNPJ 04.704.424/0001-98)
- Amapá State Government (CNPJ 00.394.577/0001-25)
- Guilherme de Alvarez Otero Fernandes (CPF/MF. 246.565.988-01)
- Industrial Page Ltda. (CNPJ 82.563.321/0001-69)
- Rodolatina Logística Ltda. (CNPJ 02.144.858/0001-55)
- Promotora e Divulgadora Sudeste Line Ltda. (CNPJ 04.816.268/0001-57)
- Wirex Cable S/A (CNPJ 66.007.857/0001-41)

Applicable law: Articles 2, 3 and 4 of Resolution 2.682, of 12.21.1999.

## 6.2.1 Adhonep – Associação dos Homens de Negócio do Evangelho Pleno[41]

| Client | Balance– R$ | PDD CGF (%) | PDD BCSul (%) | PDD CGF– R$ | PDD BCSul– R$ | Adjustment PDD– R$ |
|--------|-------------|-------------|---------------|-------------|---------------|--------------------|
| ADHONEP | 556,054.79 | 100 | 0.5 | 556,054.79 | 2,780.27 | 553,274.52 |

Based on the SD Middle internal system records, following is a report on the client's position on the base date 5.31.2012:

| Product | Contract | Status | Start Date | Maturity Date | Limit – R$ | Risk – R$ |
|---------|----------|--------|------------|---------------|------------|-----------|
| Guaranteed Account | 099/11 | SD Account | 12.21.2011 | 6.18.2012 | 600,000.00 | 556,054.79 |

The operation is formalized in BCN 099/11 and has the following guarantees:
- Accommodation placed on BCN by Altomir Regis da Cunha (CPF/MF. 272.918.127-04);

- 100% of the amount in third party financial investments, which are: i) 209,513 shares of PEIF BCSul Platinum owned by the following Church - Igreja Católica Apostólica Cristã da Barra da Tijuca (CNPJ07.492.381/0001-12), corresponding to 70% of the face value of the BCN and; ii) 91,224

---

[41] Documents on pages 2119/2136.



# BANCO CENTRAL DO BRASIL

shares of the PEIF owned by Adhonep Associação dos Homens de Negócio do Evangelho (CNPJ27.775.642/0001-19), corresponding to 30% of the face value of the BCN.

The guarantees are formed by financial investments in shares of PEIFs, which invest all their funds in corporate bonds of the company Patrimonial Maragatto S/A, which belongs to the controllers of BCSul.

And given the nature of the guarantees offered, it can be seen that they will be unlikely to be received, which required that the operation's credit risk be reclassified to level "H," corresponding to 100% of the amount at risk.

Finally, it should be noted that according to the report entitled "Report on Alterations in Guaranteed Accounts," issued by the current account system (SD Account), dated 2.1.0.2012 [sic], the next restructuring of the contract was scheduled for 6.18.2012.

And, according to the report called "Balances by analytic accounting group on specific dates," taken from the current account system (SD Account), the company had a total balance due of R$ 594,085.75 on base date 12.27.2012, classified as an advance to depositors, indicating that this loan was not liquidated.

## 6.2.2. Aloes – Indústria e Comércio Ltda.[42]

| Client | Balance– R$ | PDD CGF (%) | PDD BCSul (%) | PDD CGF– R$ | PDD BCSul– R$ | Adjustment PDD– R$ |
|---|---|---|---|---|---|---|
| ALOES INDÚSTRIA | 4,504,738.83 | 100 | 3 | 4,504,738.83 | 135,142.16 | 4,369,596.67 |
| ALOES INDÚSTRIA | 135,171.47 | 100 | 3 | 135,171.47 | 4,055.14 | 131,116.33 |

Based on the SD Middle internal system records, following is a report on the client's position on the base date 5.31.2012:

| Product | Contract | Status | Start Date | Maturity Date | Limit – R$ | Risk – R$ |
|---|---|---|---|---|---|---|
| Guaranteed Account | 006/12 | SD Account | 1.30.2012 | 7.30.2012 | 4,500,000.00 | 4,639,910.30 |

The operation is formalized in BCN 006/12, issued on 1.30.2012, and has the following guarantees:

• Accommodation placed on BCN by Altomir Regis da Cunha (CPF/MF. 272.918.127-04) and by Rozane Rangel da Cunha (CPF/MF. 012.903.597-17);

---

[42] Documents on pages 2137/2154.



# BANCO CENTRAL DO BRASIL

- 77% of the face value of the BCN in third party financial investments: i) 876,520 shares of PEIF BCSul Platinum owned by Aloes Ind. e Com. Ltda., corresponding to 38.5% of the face value of the BCN, and; ii) 91,224 shares of PEIF BCSul Platinum owned by Rozane Rangel da Cunha, corresponding to 38.5% of the face value of the BCN.

According to the provision in BCN 006/12, the total outstanding balance of the credit line, plus financial charges, must be paid by 7.30.2012.

And, according to the report called "Balances by analytic accounting group on specific dates," taken from the current account system (SD Account), the company had a total debit balance in the current account of R$4,637,439.96 on base date 12.27.2012, indicating that this loan had not been liquidated.

Independent of the information in the client's record, the client's credit risk was reclassified from "C" (3% provision) to "H" (100% provision), due to the predictable difficulty in cases like this of obtaining payment of the balance owed at maturity (7.30.2012), when the client holds credits at the institution and/or an affiliated company. In general, situations like this tend to be defined in the courts, after a long battle.

### 6.2.3. Associação dos Músicos Militares do Brasil – AMBRA[43]

| Client | Balance– R$ | PDD CGF (%) | PDD BCSul (%) | PDD CGF– R$ | PDD BCSul– R$ | Adjustment PDD– R$ |
|--------|-------------|-------------|---------------|-------------|---------------|---------------------|
| AMBRA | 11,716,299.16 | 100 | 70 | 11,716,299.16 | 8,201,409.41 | 3,514,889.75 |

Based on the SD Middle internal system records, following is a report on the client's position on the base date 5.31.2012:

| Product | Contract | Status | Start Date | Maturity Date | Limit – R$ | Risk – R$ |
|---------|----------|--------|------------|---------------|------------|-----------|
| Guaranteed Account | 034/12 | SD Account | 5.16.2012 | 5.15.2013 | 4,700,000.00 | 4,314,496.56 |
| Guaranteed Account | 066/11 | SD Account | 8.25.2011 | 8.20.2012 | 8,600,000.00 | 7,401,802.60 |

The operations formalized in BCNs 034/12 and 066/11 are guaranteed by a fiduciary assignment contract executed between "Ambra" (borrower) and BCSul (creditor) dated 15.5.2012. The borrower owns the credit rights assigned.

The reclassification of the client's risk level was from "G" (provision of 70%) to "H" (provision of 100%).

---

[43] Documents on pages 2155/2181.



# BANCO CENTRAL DO BRASIL

Corroborating the correct reclassification made is the fact that according to the "Balances by analytic accounting group on specific dates" report, taken from the current account system (SD Account), the company had a total debit balance in the current account of R$34,210,781.38 on base date 12.27.2012, distributed in two current accounts, indicating that these loans had not been liquidated as of that date.

Copies of client registry documents, taken from Banco Cruzeiro do Sul's CDOC system are on pages 2826/2896.

## 6.2.4 Baldin Bioenergia S.A.[44]

| Client | Balance– R$ | PDD CGF (%) | PDD BCSul (%) | PDD CGF– R$ | PDD BCSul– R$ | Adjustment PDD– R$ |
|---|---|---|---|---|---|---|
| BALDIN BIOENERGIA S/A | 10,012,633.20 | 100 | 1 | 10,012,633.20 | 100,126.33 | 9,912,506.87 |

Based on the SD Middle internal system records, following is a report on the client's position on the base date 5.31.2012:

| Product | BCN | Value BCN (R$) | Status | Start Date | Date of 1st Maturity | Last Maturity | Risk – R$ |
|---|---|---|---|---|---|---|---|
| Work. Cap. | 8520 | 4,480,000 | Late | 11.9.2010 | 12.9.2010 | 5.9.2011 | 4,544,878.48 |
| Work. Cap. | 8553 | 2,980,000 | Late | 11.23.2010 | 12.23.2010 | 1.24.2011 | 3,006,277.95 |
| Work. Cap. | 9211 | 483,000 | Late | 8.26.2011 | 9.26.2011 | 12.23.2011 | 486,546.75 |
| Work. Cap. | 9439 | 539,500 | Late | 12.26.2011 | 1.25.2012 | 4.24.2012 | 541,658.72 |
| Work. Cap. | 9463 | 340,000 | Late | 1.5.2012 | 2.2.2012 | 7.3.2012 | 539,500.00 |
| Work. Cap. | 9488 | 646,000 | Late | 1.25.2012 | 2.24.2012 | 7.23.2012 | 648,584.87 |
| Work. Cap. | 9563 | 455,000 | Late | 3.23.2012 | 4.23.2012 | 9.18.2012 | 458,531.07 |

Data from the original contracts. The first three had amendments that altered the maturity date.

- **Contract 8520**: Liquidation in 6 installments, the first five of which refer to interest and the last to amortization of the principal and interest.

- Amendment no. 01 altered the final maturity date of the BCN from 5.9.2011 to 11.07.2011.
- Amendment no. 03 altered the final maturity date of the BCN from 11.7.2011 to 3.6.2012.
- Amendment no. 05 altered the final maturity date of the BCN from 3.6.2012 to 8.31.2012.

- **Contract 8553**: Liquidation in 6 installments, the first five of which refer to interest and the last to amortization of the principal and interest.

- Amendment no. 01 altered the final maturity date of the BCN from 5.9.2011 to 11.07.2011.
- Amendment no. 03 altered the final maturity date of the BCN from 11.7.2011 to 3.6.2012.
- Amendment no. 05 altered the final maturity date of the BCN from 3.6.2012 to 9.12.2012

---

[44] Documents on pages 2182/2328.

# BANCO CENTRAL DO BRASIL

- **Contract 9211**: Liquidation in 4 installments, the first three of which refer to interest and the last to amortization of the principal and interest.

- Amendment no. 01 altered the final maturity date of the BCN from 12.23.2011 to 4.20.2012.
- Amendment no. 03 altered the final maturity date of the BCN from 11.7.2011 to 3.6.2012.

- **Contract 9439**: Liquidation in 6 installments, the first five of which refer to interest and the last to amortization of the principal and interest.

- Amendment no. 01, of 4.24.2012, altered the final maturity date of the BCN from 4.24.2012 to 10.19.2012.

Guarantees

Contract no. 51, and amendments to it, established a fiduciary sale in guarantee of the bank credit notes (BCNs) listed in the preceding table. This contract provides sacks of sugar worth about R$ 5 million to guarantee the loans, which represents approximately half of the debt in question.

There are additional guarantees provided for the contracts formalized in BCNs 8520, 8553, 9211, and 9439, as a guarantee of duplicate invoices issued "Baldin" against Dulcini S.A. BCNs 9463/12, 9488/12 and 9563/12 also have an accommodation from the owners of the borrower.

Payments Made

By the date on which the TSAR was decreed, 6.4.2012, only the interest installments for BCNs 8520, 8553, 9211, and 9439 were being paid by the debtor. Independent of the guarantees offered, the principal was being successively renegotiated, which in the market is known as the "freezing" of the principal; in other words, the institution's client was constantly rolling over the loans borrowed.

There is a loan granted in 2010, with maturity on 9.5.9.2011, therefore, more than one year ago, which is being constantly rolled over. The client's risk level was reclassified as "H," corresponding to a 100% provision.

Finally, it should be noted that according to the "Simplified Contract Statement" report, issued by the SD Emp system on 1.11.2013, the installments for all the loans with maturities after the TSAR are still pending payment.

## 6.2.5 Brigada Promotora de Crédito e Vendas Ltda.[45]

| Client | Balance– R$ | PDD CGF (%) | PDD BCSul (%) | PDD CGF– R$ | PDD BCSul– R$ | Adjustment PDD– R$ |
|---|---|---|---|---|---|---|
| | | | | | | |

---

[45] Documents on pages 2329/2344.



# BANCO CENTRAL DO BRASIL

| Client | Balance– R$ | PDD CGF (%) | PDD BCSul (%) | PDD CGF– R$ | PDD BCSul– R$ | Adjustment PDD– R$ |
|---|---|---|---|---|---|---|
| BRIGADA VENDAS | 6,207.329/27 | 100 | 3 | 6,207,329.27 | 186,219.88 | 6,021,109.39 |

Based on the SD Middle internal system records, following is a report on the client's position on the base date 5.31.2012:

| Product | Contract | Status | Start Date | Maturity Date | Limit – R$ | Risk – R$ |
|---|---|---|---|---|---|---|
| Guaranteed Account | 067/11 | SD Account | 8.25.2011 | 8.20.2012 | 6,600,000.00 | 6,207,329.27 |

As formally recorded, this BCN resulted from the opening of a revolving credit product.

It is guaranteed by a fiduciary assignment contract executed between "Brigada" (borrower) and BCSul (creditor), dated 8.25.2011. The rights assigned are "shares owned by the Borrower."

The client's risk level was reclassified from "C" (provision of 3%) to "H" (provision of 100%).

There is no evidence that the operation has been paid by the client, and based on the report called "Balances by analytic accounting group on specific dates," taken from the current account system (SD Account), the company had a total debit balance in the current account of R$ 16,179,173.15 on base date 12.27.2012.

## 6.2.6 Facility Tecnologia Ltda[46]

| Client | Balance– R$ | PDD CGF (%) | PDD BCSul (%) | PDD CGF– R$ | PDD BCSul– R$ | Adjustment PDD– R$ |
|---|---|---|---|---|---|---|
| FACILITY TECNOLOGIA | 5,050,802.84 | 100 | 0.5 | 5,050,802.84 | 25,254.01 | 5,025,548/83 |
| FACILITY TECNOLOGIA | 261.89 | 100 | 0.5 | 261.89 | 1.31 | 260/58 |

Based on the SD Middle internal system records, following is a report on the client's position on the base date 5.31.2012:

| Product | Contract | Status | Start Date | Maturity Date | Limit – R$ | Risk – R$ |
|---|---|---|---|---|---|---|
| Guaranteed Account | 013/12 | SD Account | 2.23.2012 | 8.20.2012 | 5,000,000.00 | 5,051,064.73 |

The operation is formalized in BCN 013/12, issued on 2.22.2012, and has the following guarantees:

---

[46] Documents on pages 2345/2357.



# BANCO CENTRAL DO BRASIL

- Accommodation placed on BCN by Arthur Cesar de Menezes Soares Filho (CPF/MF. 597.590.207-00);

- Fiduciary assignment contract signed by BCSul and the company "KB Participações," in the same group as the company "Facility." Based on these instruments, "KB Participações" made a fiduciary assignment to BCSul of the following securities: 1,298,033 shares of the PEIF BCSul Platinum corresponding to 50% of the face value of the BCN.

Independent of the information in the client's record, the client's credit risk was reclassified from A (0.5% provision) to H (100% provision), due to the predictable difficulty in cases like this of obtaining payment of the balance owed at maturity (8.20.2012), when the client holds credits at the institution and/or an affiliated company. In general, situations like this tend to be defined in the courts, after a long battle.

There is no evidence that the operation has been paid by the client, based on the report called "Balances by analytic accounting group on specific dates," taken from the current account system (SD Account); the company had a total debit balance in the current account of R$ 5,186,894.85 on base date 12.27.2012.

## 6.2.7 Amapá State Government[47]

| Client | Balance– R$ | PDD CGF (%) | PDD BCSul (%) | PDD CGF– R$ | PDD BCSul– R$ | Adjustment PDD– R$ |
|---|---|---|---|---|---|---|
| AMAPA STATE GOVERN. | 3,439,331.99 | 50 | 3 | 1,719,666.00 | 103,179.96 | 1,616,486.04 |

Based on the SD Middle internal system records, following is a report on the client's position on the base date 5.31.2012:

| Product | Contract | Status | Start Date | Maturity Date | Limit – R$ | Risk – R$ |
|---|---|---|---|---|---|---|
| Debt admission | 9051 | Normal | 5.31.2011 | 5.15.2013 | 0.00 | 3,439,331.99 |

The debt admission contract indicates that the debt owed by this public entity, assessed at R$ 6,878,663.99, results from not transferring to BCSul the total amounts of monthly installments of consigned loans, contracted by the civil servants at that public entity with the financial institution, noting that these amounts were withheld from the respective payrolls.

---

[47] Documents on pages 2358/2364.



# BANCO CENTRAL DO BRASIL

According to this contract, these are monthly installments referring to the following months: April/2009, February/2010, March/2010, April/2010, June/2010, July/2010, August/2010, September/2010, October/2010, November2010, December/2010, and January/2011.

The debt admission contract established that this debt was to be paid in 24 monthly installments of R$ 286,611.00, with the first due on 6.15.2011 and the last on 5.15.2013.

According to records in the SD Emp system, the monthly installments are being paid on time, following the established schedule, even after the decree of the TSAR.

The debt was reclassified from risk level "C" (3% provision), to "F" (50% provision), in light of the fact that although the debt admission contract was only signed on 5.31.2011, the largest part of the contractual amount of the debt originated from overdue installments in 2009 and 2010 – therefore, six (6) months or more before this date, independent of the fact that the debtor is paying the debt in accordance with the terms of the contract.

## 6.2.8 Guilherme de Alvarez Otero Fernandes[48]

| Client | Balance– R$ | PDD CGF (%) | PDD BCSul (%) | PDD CGF– R$ | PDD BCSul– R$ | Adjustment PDD– R$ |
|---|---|---|---|---|---|---|
| GUILHERME FERNANDES | 13,405,923.23 | 100 | 0.5 | 13,405,923.23 | 67,029.62 | 13,338,893.61 |
| GUILHERME FERNANDES | 2,860.72 | 100 | 0.5 | 2,860.72 | 14.3 | 2,846.42 |

Based on the SD Middle internal system records, following is a report on the client's position on the base date 5.31.2012:

| Product | Contract | Status | Start Date | Maturity Date | Limit – R$ | Risk– R$ |
|---|---|---|---|---|---|---|
| Guaranteed Account | 037/12 | SD Account | 05.30.2012 | 11.26.2012 | 13,500,000.00 | 13,408,783.95 |

In the "back-office" area of the "middle market" segment, in the operating report, there is a copy of BCN 037/12, which was not signed by the parties. The information relative to the interest rate for the operation was not indicated; however, the contract is 100% guaranteed by shares owned by the borrower.

According to the CBLC statement, on 5.31.2012 Mr. Guilherme Fernandes owned 2,999,300 shares in Banco Cruzeiro do Sul. At the quoted price of R$10.09, this represents a total value of R$30,262.937.

---

[48] Documents on pages 2365/2377.



# BANCO CENTRAL DO BRASIL

Independent of the client's financial capacity, it borrowed funds from the institution to purchase shares issued by the institution itself, offering them in guarantee for payment of the loan, thus constituting an operation without financial grounds. The provision was 100% of the value of the operation.

There is no evidence that the operation has been paid by the client, based on the report called "Balances by analytic accounting group on specific dates," taken from the current account system (SD Account), the client had a total debit balance in the current account of R$ 13,752,281.84 on base date 12.27.2012.

Copies of client registry documents, taken from Banco Cruzeiro do Sul's CDOC system are on pages 2912/2972.

## 6.2.9 Industrial Page Ltda[49]

| Client | | Balance– R$ | PDD CGF (%) | PDD BCSul (%) | PDD CGF– R$ | PDD BCSul– R$ | Adjustment PDD– R$ |
|---|---|---|---|---|---|---|---|
| INDUSTRIAL | PAGE LTDA | 2,280,270.70 | 100 | 10 | 2,280,270.70 | 228,027.07 | 2,052,243.63 |

Based on the SD Middle internal system records, following is a report on the client's position on the base date 5.31.2012:

| Product | Contract | Status | Start Date | Maturity Date | Limit – R$ | Risk – R$ |
|---|---|---|---|---|---|---|
| Guaranteed Account | 093/11 | SD Account | 12.27.2011 | 12.20.2012 | 2,580,231.27 | 22,80,270.70 |

The operation is formalized in BCN 093/11, issued on 12.20.2011, resulting from the opening of a revolving credit operation for a 360- day period. It has the following guarantees:

• Guarantee recorded at BCN by Marconi Leonardo Pascoali (CPF/MF. 490.194.659-53) and Angela Fátima Pascoali Boeira (CPF/MF. 290.109.509-72);

• Fiduciary assignment contract relative to guarantee of duplicate invoices against third parties, issued by the client, corresponding to 15% of the credit; and

• Fiduciary sale contract involving thin steel plates, with a total value corresponding to 100% of the credit used.

There is evidence that funds from this contract helped to pay installments from previous contracts, since the "simplified contract statement" document

---

[49] Documents on 2378/2398.



# BANCO CENTRAL DO BRASIL

relative to operations 8905 and 8919, states that the principal amounts were paid, on 12.26.2011, in the amount of R$ 2,748,000.

It was found that the client did not make the guarantees available to BCSul in the manner set forth in the contract, which led to reclassification of the client's credit risk level, increasing the provision from 10% to 100% of the balance owed.

The client did not provide the contractually determined guarantees to BCSul, which led to reclassification of the client's credit risk level, increasing the provision from 10% to 100% of the balance owed.

There is no evidence that the operation has been paid by the client, based on the report called "Balances by analytic accounting group on specific dates," taken from the current account system (SD Account), the client had a total debit balance in the current account of R$ 2,547,806.36 on base date 12.27.2012.

## 6.2.10 Rodolatina Logística S/A[50]

| Client | Balance– R$ | PDD CGF (%) | PDD BCSul (%) | PDD CGF– R$ | PDD BCSul– R$ | Adjustment PDD– R$ |
|---|---|---|---|---|---|---|
| RODOLATINA LTDA | 6,343,615.44 | 50 | 30 | 3,171,807.72 | 1,903,084.63 | 1,268,723.09 |

Based on the SD Middle internal system records, following is a report on the client's position on the base date 5.31.2012:

| Product | Contract | Start Date | Maturity Date | Limit – R$ | Risk – R$ |
|---|---|---|---|---|---|
| Debt admission | 093/11 | 10.06.2011 | 10.07.2013 | 0,00 | 2,280,270.70 |

The debt admission contract consolidated the remaining balances due for eight credit operations in which the client was in breach, establishing a new amortization schedule for the consolidated debt owed, in 24 monthly installments, with the first due on 11.07.2011 and the last on 10.7.2013.

According to a consultation made on 10.15.2012 in the records of the SD Emp system, only those installments that matured until March/2012 were liquidated (the last was paid on 6.4.2012). The client has had overdue installments since 4.9.2012 (maturity date of the 6th installment).

This is a debt admission contract that formalized the renegotiation of previous credit operations that were overdue, and the client is already in breach of this new contract– with operations overdue since 4.9.2012. The credit risk for this operation was reclassified from level "E" (30% provision) to level "F" (50% provision).

---

[50] Documents on pages 2399/2432.



**BANCO CENTRAL DO BRASIL**

## 6.2.11 Promotora e Divulgadora Sudeste Line Ltda[51]

| Client | Balance– R$ | PDD CGF | PDD BCSul | PDD CGF– R$ | PDD BCSul– R$ | Adjustment PDD– R$ |
|---|---|---|---|---|---|---|
| SUDESTE LINE | 298.05 | 1.0 | 0.03 | 298.05 | 8.94 | 289.11 |
| SUDESTE LINE | 1,209,364.21 | 1.0 | 0.03 | 1,209,364.21 | 36,280.93 | 1,173,083.28 |

Based on the SD Middle internal system records, following is a report on the client's position on the base date 5.31.2012:

| Product | Contract | Status | Start Date | Maturity Date | Limit – R$ | Risk – R$ |
|---|---|---|---|---|---|---|
| Guaranteed Account | 036/12 | SD Account | 5.30.2012 | 5.29.2013 | 1,200,000.00 | 1,209,662.26 |

The operation formalized in BCN 036/12, has as guarantee a fiduciary assignment contract executed between this client (borrower) and BCSul (creditor) dated 5.29.2012. The credit rights assigned are shares owned by the borrower.

There is no evidence that the operation has been paid by the client, based on the report called "Balances by analytic accounting group on specific dates," taken from the current account system (SD Account), the client had a total debit balance in the current account of R$ 19,186,000 on base date 12.27.2012.

The client's risk level was reclassified from "C" (provision of 3.0%) to "H" (provision of 100%), based in what has already been presented in this report in relation to the client.

## 6.2.12 Wirex Cable S/A[52]

| Client | Balance– R$ | PDD CGF | PDD BCSul | PDD CGF– R$ | PDD BCSul– R$ | Adjustment PDD– R$ |
|---|---|---|---|---|---|---|
| WIREX S/A | 1,043,888.27 | 1.0 | 0.5 | 1,043,888.27 | 521,944.14 | 521,944.13 |

Using the records of the internal system SD Middle, following is the report on the client's position on the base date 5.31.2012:

| Product | Contract | Status | Start Date | Maturity Date | Limit – R$ | Risk – R$ |
|---|---|---|---|---|---|---|
| Working capital – fixed | 9408 | Late | 12.13.2011 | 12.12.2012 | 0.00 | 1,043,888.27 |

[51] Documents on pages 2432/2447.

[52] Documents on pages 2448/2467.



# BANCO CENTRAL DO BRASIL

The operation is formalized in BCN 9408/11, issued on 12.12.2011, in the amount of R$ 2 million, with maturity in 12 monthly installments, with the first due on 1.12.2012 and the last on 12.12.2012. It has the following guarantees:

- Accommodation placed on the BCN by Sérgio Aredes Piedade Gonçalves (CPF/MF. 559.777.318-68) and Fernando Antonio Nogueira Berardo (CPF/MF. 225.932.198-40);

- Fiduciary assignment contract through a guarantee based on duplicate invoices corresponding to 50% of the credit used; and

- Fiduciary sale contract involving the merchandise "copper rods," representing the amount of R$ 2,071,984.48.

As investigated, the client did not provide guarantees to BCSul in the manner set forth in the contract, which led to reclassification of its credit risk level, increasing the provision from 50% to 100% of the balance owed.

Independent of the information in the client's record, the client's credit risk level was reclassified from "F" (50% provision) to "H" (100% provision), considering that:

i) The monthly installments falling due since July/2012 were not liquidated; and

ii) The client failed to comply with the contractual guarantee requirements.

Finally, it should be noted that according to the "Simplified Contract Statement" report, issued by the SD Emp system on 1.23.2013, the loan installments falling due after 06/2012 are still pending payment.

## 6.3 Not make a provision for the credit risk of the accommodation and guarantee portfolio, in spite of the provision in item III of the sole paragraph of Art. 2 of BC Circular Letter 3721, of 4.30.2009, combined with item XII of Art. 4 of the same regulation[53]

The composition of the adjustment for this provision for exposure (amount at risk) with each borrower is illustrated in the following table. The columns "CGF Rating" and "Prior Rating" indicate the risk level according to what is established in Resolution 2.682/1999:

| Client | CGF Rating | Prior Rating | Portfolio Balance - R$ (Exposure) | % PDD CGF | % Prior PDD | Value of PDD– R$ |
|---|---|---|---|---|---|---|
| | | | | | | |

---

[53] Documentation relative to this portfolio is on pages 2468/2601



# BANCO CENTRAL DO BRASIL

| | | | | | | |
|---|---|---|---|---|---|---|
| A.C. BURLAMAQUI CONSULTORES S/C | H | AA | 1,214,300.00 | 100 | 0 | 1,214,300.00 |
| ALOES INDUSTRIA E COMERCIO LTDA | H | AA | 852,901.32 | 100 | 0 | 852,901.32 |
| AMADEU SIMOES LOPES DE AZAMBUJA | H | AA | 4,380,000.00 | 100 | 0 | 4,380,000.00 |
| ASSOCIACAO DOS MUSICOS MILITARES DO BRASIL-AMBRA | H | AA | 15,550,000.00 | 100 | 0 | 15,550,000.00 |
| BRIGADA PROMOTORA DE CREDITOS E VENDAS LTDA | H | AA | 8,300,000.00 | 100 | 0 | 8,300,000.00 |
| GALLWAY PROJETOS E ENERGIA DO BRASIL S/A | H | AA | 2,025,000.00 | 100 | 0 | 2,025,000.00 |
| GUILHERME DE ALVARES OTERO FERNANDES | H | AA | 180,000.00 | 100 | 0 | 180,000.00 |
| MABEL SANTANA EGUIA | H | AA | 162,343.99 | 100 | 0 | 162,343.99 |
| PROMOTORA E DIVULGADORA SUDESTE LINE LTDA | H | AA | 13,300,000.00 | 100 | 0 | 13,300,000.00 |
| **TOTAL PDD GUARANTEE** | | | **45,964,545.31** | | | **45,964,545.31** |

Source: Spreadsheet sent by TSAR Administrator – base date: 05.31.2012[54]

## 6.3.1 A.C. Burlamaqui Consultores S/C (CNPJ 28.711.539/0001-78)[55]

| Client | Rating CGF | Prior Rating | Portfolio Balance- R$ | % PDD CGF | % Prior PDD | Value of PDD– R$ |
|---|---|---|---|---|---|---|
| A.C. BURLAMAQUI CONSULTORES S/C | H | AA | 1,214,300.00 | 100 | 0 | 1,214,300.00 |

Based on the SD Middle internal system records, following is a report on the client's position on the base date 5.31.2012:

| Product | Contract | Status | Start Date | Maturity Date | Limit – R$ | Risk – R$ |
|---|---|---|---|---|---|---|
| Financial Surety | 5210 | NO (normal) | 05.20.2008 | 04.24.2013 | 0.00 | 1,200,000.00 |
| Guarantee | 9621 | NO (normal) | 05.17.2012 | 04.30.2013 | 0.00 | 14,300.00 |

The beneficiary of guarantee letter 5.210 is the Ministry of the Treasury – Attorney General's Office to the National Treasury, and it was required as a result of a renegotiation of the guaranteed debt registered as overdue tax liability of the Union.

The beneficiary of guarantee letter 9.621 is the company "Consuplan Administradora de Imóveis Ltda," which was required as a result of a real estate lease.

---

[54] Pages 2468/2469.
[55] Documents on pages 2470-2470-A /2513.

# BANCO CENTRAL DO BRASIL

Guarantees / Guarantors

The Bank signed compensation contracts for the provision of bank guarantee services to the borrowers, establishing obligations in them to be fulfilled by the borrower in the event the Bank is called on by the beneficiary of the guarantee to honor it. And to ensure compliance with these obligations, the borrower issued two promissory notes, on 5.20.2008, in the amount of R$1,200,000 and on 5.17.2012, in the amount of R$14,300 - with accommodations from owners Armando César de Araújo Pereira Burlamaqui (CPF/MF. 025.253.417-40) and Afonso Cesar Boabaid Burlamaqui (CPF/MF. 022.938.467- 68).

Mr. Afonso Cesar Boabaid Burlamaqui has a record of a relationship with the institution, with emphasis on atypical borrowing operations to invest the funds in shares of PEIFs administered by a company in the Cruzeiro do Sul Group, as will be mentioned later in this report.

According to the CBLC statement, dated 5.31.2012, Afonso César Boabaid Burlamaqui had a balance of 982,670 BCSul shares, corresponding to R$9,915,140.30.[56]

In turn, Armando César de Araújo Pereira Burlamaqui, also has a record of borrowing from BCSul to make atypical investments in PEIFs administered by a company in the Cruzeiro do Sul Group, as will be commented on later in this report.

According to the CBLC statement, on 5.31.2012, Armando Burlamaqui had a balance of 1,044,500 shares of BCSul, corresponding to R$ 10,539,005.00.[57]

The financial relationship of the two guarantors with the institution shows that they acted as "intermediaries," for the purpose of disguising the movements of funds belonging to the institution itself to meet cash needs of the Conglomerate's PEIFs, which invested the funds in corporate bonds of a company that belongs to the controllers of the Bank.

In light of the atypical relationship between the guarantors of the bank guarantee operation with the financial institution, the credit risk of the operation was reclassified from "AA" (0% provision) to "H" (100% provision).

## 6.3.2 Aloes Indústria e Comércio Ltda. (CNPJ04.415.844/0001-54).[58]

| Client | Rating CGF | Prior Rating | Portfolio Balance - R$ | % PDD CGF | Prior % PDD | Value of PDD– R$ |
|--------|-----------|--------------|------------------------|-----------|-------------|------------------|
| ALOES INDÚSTRIA E COMERCIO LTDA | H | AA | 852,901.32 | 100 | 0 | 852,901.32 |

[56] Page 2476.
[57] Page 2477.
[58] Documents on pages 2514 /2531.



# BANCO CENTRAL DO BRASIL

Based on the SD Middle internal system records, following is a report on the client's position on the base date 5.31.2012:

| Product | Contract | Status | Start Date | Maturity Date | Limit – R$ | Risk – R$ |
|---------|----------|--------|------------|---------------|------------|-----------|
| Financial Surety | 4854 | NO (normal) | 03.17.2008 | 01.16.2013 | 0.00 | 210,000.00 |
| Financial Surety | 9156 | NO (normal) | 07.21.2011 | 07.21.2012 | 0.00 | 642,901.32 |

The beneficiary of guarantee letter 4.8540 is the Ministry of the Treasury – Attorney General's Office to the National Treasury, and it was required to guarantee possible obligations resulting from tax foreclosure.

The beneficiary of guarantee letter 9.156/11 is the company "Autonomy Investimentos S/A", and it was required to guarantee payment of rent and other charges resulting from a real estate lease.

Guarantees / Guarantors

In exchange for granting Guarantee Letter no. 4.854/08, the Bank signed a compensation contract with the borrower for the provision of bank guarantee services, establishing obligations to be fulfilled by the borrower in the event the Bank is called on by the beneficiary of the guarantee to honor it.

And to ensure compliance with these obligations, the borrower issued a promissory note, on 3.17.2008, in the amount of R$252,000, with an accommodation from the owners Altomir Regis da Cunha and Rozane Rangel da Cunha. Also as a guarantee, in a fiduciary assignment instrument, they assigned, 80,731 shares of PEIF BCSul Verax Platinum owned by the borrower, which covered, at that time, at least 50% of the credit used.

In exchange for granting guarantee letter no. 9.156, the Bank signed a compensation contract with the borrower for the provision of bank guarantee services, establishing obligations to be fulfilled by the borrower in the event the Bank is called on by the beneficiary of the guarantee to honor it.

And to ensure compliance with these obligations, the borrower issued a promissory note, on 7.21.2011, in the amount of R$ 642,901.32, with an accommodation from the owners Altomir Regis da Cunha and Rozane Rangel da Cunha. Also as a guarantee, in a fiduciary assignment instrument, they assigned, 215,500 shares of PEIF BCSul Verax Equity I owned by the borrower, which covered, at that time, at least de 60% of the credit used.

Independent of the information in the client's record, the client's credit risk was reclassified from AA (0% provision) to H (100% provision), due to the predictable difficulty in cases like this of obtaining compliance from the client with his obligations if the Bank were called on to honor the guarantee letters, when the client holds credits at the institution and/or an affiliated company. In general, situations like this tend to be defined in the courts, after a long battle.



**BANCO CENTRAL DO BRASIL**

### 6.3.3. Amadeu Simões Lopes de Azambuja[59]

| Client | Rating CGF | Prior Rating | Portfolio Balance - R$ | % PDD CGF | Prior % PDD | Value of PDD– R$ |
|---|---|---|---|---|---|---|
| AMADEU SIMOES LOPES DE AZAMBUJA | H | AA | 4,380,000.00 | 100.00 | 0.00% | 4,380,000.00 |

Based on the SD Middle internal system records, following is a report on the client's position on the base date 5.31.2012:

| Product | Contract | Status | Start Date | Maturity Date | Limit – R$ | Risk – R$ |
|---|---|---|---|---|---|---|
| Financial Surety | 9601 | Liquidated | 04.27.2012 | 24.10.2012 | 0.00 | 2,990,000.00 |
| Financial Surety | 9623 | Liquidated | 05.18.2012 | 24.10.2012 | 0.00 | 1,390,000.00 |

Note: The status of "liquidated" reflects the status on the issue date of the report (10.2.2012) and not the base date.

The beneficiary of guarantee letters 9.601/12 and 9.623/12 is BM&F Bovespa S.A., and they guarantee stock market operations of the principal.

Guaranteed stock market operations

The client conducted term operations on the stock market involving shares of this institution.

A copy of the report "Statement of Term Operations" lists the client's position in this modality on 5.31.2012.

Guarantees / Guarantors

The Bank signed compensation contracts for the provision of bank guarantee services to the borrowers, establishing obligations in them to be fulfilled by the borrower in the event the Bank is called on by the beneficiary of the guarantee to honor it. And to ensure compliance with these obligations, the borrower issued two promissory notes - no. 9.601/12, in the amount of R$ 2,990,000 and no. 9623/12 in the amount of R$1,390,000.

After the TSAR was decreed, the guarantee letters were returned by BM&F Bovespa, with the liquidation of the client's operations made with funds from BCSul, which became the creditor of these amounts.

The credit risk was reclassified to level "H" given the client's record with the institution, according to the PDD adjustment in the CRIF Multicred portfolio.

---

[59] Documents on pages 2532 /2544.



# BANCO CENTRAL DO BRASIL

Amadeu Simões Lopes de Azambuja has a record of a relationship with the institution, with emphasis on atypical borrowing operations to invest the funds in shares of PEIFs administered by a company in the Cruzeiro do Sul Group, as will be mentioned later in this report.

Mr. Azambuja also invested funds obtained from Banco Cruzeiro do Sul. In this regard, according to the CBLC statement, on 31.5.2012, Mr. Azambuja had a balance of 369,900 shares of BCSul, corresponding to R$3,732,291.00.[60]

## 6.3.4 Associação dos Músicos Militares do Brasil - Ambra[61]

| Client | Rating CGF | Prior Rating | Portfolio Balance R$ | % PDD CGF | % Prior PDD | Value of PDD– R$ |
|---|---|---|---|---|---|---|
| ASSOCIACAO DOS MUSICOS MILITARES DO BRASIL-AMBRA | H | AA | 15,550,000.00 | 100 | 0 | 15,550,000.00 |

Based on the SD Middle internal system records, following is a report on the client's position on the base date 5.31.2012:

| Product | Contract | Status | Start Date | Maturity Date | Limit – R$ | Risk – R$ |
|---|---|---|---|---|---|---|
| Financial Surety | 9287 | Liquidated | 09.30.2011 | 07.02.2012 | 0.00 | 15,550,000.00 |

The status of "liquidated" reflects the status on the issue date of the report (10.2.2012) and not the base date.

The beneficiary of guarantee letter 9.287/11 is BM&F Bovespa S.A.: the letters serve to guarantee stock operations of the borrower.

Guaranteed stock market operations

The client operated on the Stock Market under the orders of the former administration of BCSul, which financed its operations. On 5.31.2012, the client held a term position in shares in Vale and Petrobrás.

Guarantees / Guarantors

The Bank signed compensation contracts for the provision of bank guarantee services to the borrowers, establishing obligations in them to be fulfilled by the borrower in the event the Bank is called on by the beneficiary of the guarantee to honor it.  And to ensure compliance with these obligations, the borrower issued promissory note no. 9.287/11, of 9.30.2011, in the amount of R$ 15,550,000, with maturity at sight.

---

[60] Page 2544.
[61] Documents on pages 2545 /2554.

185



# BANCO CENTRAL DO BRASIL

The guarantee letter was returned by BM&F Bovespa, after the TSAR was decreed, with the liquidation of the client's operations made with funds from BCSul, which became the creditor of these amounts.

The credit risk for this operation was changed to level "H", given the client's record with the institution, already commented in this report.

The client also invested funds in shares issued by Banco Cruzeiro do Sul. In this regard, according to the CBLC statement, on 5.31.2012, the client had a balance of 1,816,700 BCSul shares, corresponding to R$18,330,503.00.[62]

## 6.3.5 Brigada Promotora de Créditos e Vendas Ltda[63]

| Client | Rating CGF | Prior Rating | Portfolio Balance - R$ | % PDD CGF | % Prior PDD | Value of PDD– R$ |
|---|---|---|---|---|---|---|
| BRIGADA PROMOTORA DE CREDITOS E VENDAS LTDA | H | AA | 8,300,000.00 | 100 | 0 | 8,300.000/00 |

Based on the SD Middle internal system records, following is a report on the client's position on the base date 5.31.2012:

| Product | Contract | Status | Start Date | Maturity Date | Limit – R$ | Risk – R$ |
|---|---|---|---|---|---|---|
| Financial Surety | 9288 | Liquidated | 09.30.2011 | 07.02.2012 | 0.00 | 2,800,000.00 |
| Financial Surety | 9289 | Liquidated | 09.30.2011 | 07.02.2012 | 0.00 | 5,500,000.00 |

Note: The status of "liquidated" reflects the status on the issue date of the report (10.2.2012) and not the base date.

The beneficiary of guarantee letters no. 9.288/11 and no. 9.289/11 is BM&F Bovespa S.A., serving to guarantee stock market operations of the borrower.

Guaranteed stock market operations

The client operated on the Stock Market under the orders of the former administration of BCSul, which financed its operations. On 5.31.2012 the client held a term position in shares in Vale and Petrobrás.

The client also invested funds in shares issued by Banco Cruzeiro do Sul. In this regard, according to the CBLC statement, on 31.5.2012, the client had a balance of 1,838,300 shares of BCSul, corresponding to R$18,548,447.00.[64]

Guarantees / Guarantors

---

[62] Page 2554.
[63] Documents on pages 2555/2568.
[64] Page 2568.



# BANCO CENTRAL DO BRASIL

The Bank signed compensation contracts for the provision of bank guarantee services to the borrowers, establishing obligations in them to be fulfilled by the borrower in the event the Bank is called on by the beneficiary of the guarantee to honor it. And to ensure compliance with these obligations, the borrower issued two promissory notes, no. 9.288/11, in the amount of R$ 2,800,000 and no. 9289/11 in the amount of R$ 5,500,000.

After the TSAR was decreed, the guarantee letters were returned by BM&F Bovespa, with the liquidation of the client's operations made with funds from BCSul, which became the creditor of these amounts.

The credit risk was reclassified to level "H", given the client's record with the institution, according to the PDD adjustment of the "middle market" portfolio.

## 6.3.6. Gallway Projetos e Energia do Brasil S/A (CNPJ 08.766.753/0001-14)[65]

| Client | Rating CGF | Prior Rating | Portfolio Balance - R$ | % PDD CGF | % Prior PDD | Value of PDD– R$ |
|---|---|---|---|---|---|---|
| GALLWAY PROJETOS E ENERGIA DO BRASIL S/A | H | AA | 2,025,000.00 | 100 | 0 | 2,025,000.00 |

Based on the SD Middle internal system records, following is a report on the client's position on the base date 5.31.2012:

| Product | Contract | Status | Start Date | Maturity Date | Limit – R$ | Risk – R$ |
|---|---|---|---|---|---|---|
| Financial Surety | 9523 | Liquidated | 02.17.2012 | 06.18.2012 | 0,00 | 2,025,000.00 |

The status of "liquidated" reflects the status on the issue date of the report (10.2.2012) and not the base date.

The beneficiary of guarantee letter no. 9.523/12 is BM&F Bovespa S.A.; the letter serves to guarantee stock operations of the borrower.

Guarantees / Guarantors

The Bank signed compensation contracts for the provision of bank guarantee services to the borrowers, establishing obligations in them to be fulfilled by the borrower in the event the Bank is called on by the beneficiary of the guarantee to honor it. And to ensure compliance with these obligations, the borrower issued promissory note no. 9.287/11, of 9.30.2011, in the amount of R$ 2,025,000, with maturity at sight.

---

[65] Documents on pages 2569/2578.



# BANCO CENTRAL DO BRASIL

Even before the maturity of the guarantee, the institution was called on by BM&F Bovespa to honor the obligations of its borrower, resulting in the enforcement of the guarantee on 6.12.2012 and the consequential return of the guarantee letter to the Bank, after payment to BM&F Bovespa. The promissory note that was offered in guarantee was found to be in the process of enforcement / collection.

The institution's technical credit area took a position against renewal of the guarantee on February/2012, when it concluded that the client did not have the capacity to pay, according to the credit analysis report dated 2.17.2012 sent by the TSAR Administrator.

The client's credit risk was reclassified to level "H" (100% provision).

### 6.3.7. Guilherme de Alvarez Otero Fernandes (CPF. 246.565.988-01)[66]

| Client | Rating CGF | Prior Rating | Balance Portfolio - | % PDD CGF | Prior % PDD | Valor da PDD– R$ |
|---|---|---|---|---|---|---|
| GUILHERME DE ALVARES OTERO FERNANDES | H | AA | 180,000.00 | 100 | 0 | 180,000.00 |

Based on the SD Middle internal system records, following is a report on the client's position on the base date 5.31.2012:

| Product | Contract | Status | Start Date | Maturity Date | Limit – R$ | Risk – R$ |
|---|---|---|---|---|---|---|
| Financial Surety | 9586 | Liquidated | 04.05.2012 | 10.02.2012 | 0.00 | 180,000.00 |

The status of "liquidated" reflects the status on the issue date of the report (10.2.2012) and not the base date.

The beneficiary of guarantee letter no. 9.586/12 is BM&F Bovespa S.A. the letter serves to guarantee stock operations of the borrower.

Guarantees / Guarantors

The Bank signed compensation contracts for the provision of bank guarantee services to the borrowers, establishing obligations in them to be fulfilled by the borrower in the event the Bank is called on by the beneficiary of the guarantee to honor it. And to ensure compliance with these obligations, the borrower issued promissory note no.9.586/12, of 04.05.2012, in the amount of R$ 180,000, with maturity at sight.

---

[66] Documents on pages 2579 /2587.



# BANCO CENTRAL DO BRASIL

After the TSAR was decreed, the guarantee letter was returned by BM&F Bovespa, with the liquidation of the client's operations made with funds from BCSul, which became the creditor of these amounts.

The credit risk was reclassified to level "H," given the client's record with the institution, according to the PDD adjustment of the "middle market" portfolio

The client also invested funds in shares issued by Banco Cruzeiro do Sul. In this regard, according to the CBLC statement, on 31.5.2012, the client had a balance of 2,999,300 shares of BCSul, corresponding to R$30,262,937.00.[67]

## 6.3.8. Promotora e Divulgadora Sudeste Line Ltda[68]

| Client | Rating CGF | Prior Rating | Portfolio Balance | % PDD CGF | % Prior PDD | Value of PDD– R$ |
|---|---|---|---|---|---|---|
| PROMOTORA E DIVULGADORA SUDESTE LINE LTDA | H | AA | 13,300,000.00 | 100 | 0 | 13,300,000.00 |

Based on the SD Middle internal system records, following is a report on the client's position on the base date 5.31.2012:

| Product | Contract | Status | Start Date | Maturity Date | Limit – R$ | Risk – R$ |
|---|---|---|---|---|---|---|
| Financial Surety | 9293 | Liquidated | 09.30.2011 | 07.02.2012 | 0.00 | 3,000,000.00 |
| Financial Surety | 9294 | Liquidated | 09.30.2011 | 07.02.2012 | 0.00 | 5,500,000.00 |
| Financial Surety | 9590 | Liquidated | 04.10.2012 | 04.10.2013 | 0.00 | 4,800,000.00 |

The status of "liquidated" reflects the status on the issue date of the report (10.2.2012) and not the base date.

The beneficiary of the guarantee letters is BM&F Bovespa S.A.; the letter serves to guarantee stock operations of the borrower.

Guarantees / Guarantors

The Bank signed compensation contracts for the provision of bank guarantee services to the borrowers, establishing obligations in them to be fulfilled by the borrower in the event the Bank is called on by the beneficiary of the guarantee to honor it. And to ensure compliance with these obligations, the borrower issued promissory notes 9.293/11 and 9.294/11, both dated 09.30.2011, and no. 9.590/12, dated

---

[67] Page 2587.
[68] Documents on pages 2588 /2601.

189



# BANCO CENTRAL DO BRASIL

04.10.2012, all due at sight (in the amounts of R$ 3 million and R$ 5.5 million, respectively).

After the TSAR was decreed, the guarantee letters were returned by BM&F Bovespa, with the liquidation of the client's operations made with funds from BCSul, which became the creditor of these amounts.

According to the report "Statement of Term Operations," base date 6.4.2012, sent by Cruzeiro do Sul CVM, the client had term operations at "Cruzeiro do Sul," "Vale" and "Petrobrás."

The credit risk was reclassified to level "H," given the client's record with the institution, according to the PDD adjustment of the "Prosper Flex CRIF" portfolio.

The client also invested funds in shares issued by Banco Cruzeiro do Sul. In this regard, according to the CBLC statement, on 31.5.2012, the client had a balance of 1,234,000 shares do BCSul, corresponding to R$12,451,060.00.[69]

## 6.4. Provide a prohibited loan to a company controlled by the institution's administrators[70]

Article 34, Section V, of Law 4595 of 12.31.1964, expressly states that financial institutions are prohibited from granting loans or advances "*to legal entities in which more than 10% (ten percent) of the capital is owned by any of the directors or administrators of the financial institution itself, as well as their spouses and respective relatives, to the 2nd degree.*"

This conduct is also defined in Article 17 of Law 7.492, of 6.16.1986.

Nevertheless, reliable evidence was found that the Cruzeiro do Sul Conglomerate had the habitual practice of providing cash to PEIF BCSul Verax Cinco Platinum (CNPJ/MF. 07.115.038/0001-59) and PEIF BCSul Verax Equity 1 (CNPJ/MF. 07.115.026/0001-24), both administered by BCSul Verax Serviços Financeiros Ltda. (CNPJ/MF.05.917.347/0001-17) - directly with funds invested by Cruzeiro do Sul Corretora and by Cruzeiro do Sul DTVM and, indirectly, with funds loaned by Banco Cruzeiro do Sul to intermediaries that invested the amounts received directly in the aforementioned PEIFs.

In turn, the funds invested in the PEIFs were directed into investments in corporate bonds issued by the Company Patrimonial Maragato S/A, whose only shareholders were Luís Felippe Indio da Costa and Luís Octávio Azeredo Lopes Indio da Costa, the controllers of Banco Cruzeiro do Sul.

---

[69] Page 2601.
[70] Documents on 2602/2777.

190



# BANCO CENTRAL DO BRASIL

The regulations governing the PEIFs are on pages 2603/2621. Proof of investment of the PEIF funds in corporate bonds issued by Patrimonial Maragato S.A. is in the documents on pages 2671/2686. Proof of participation by the aforementioned controllers of Banco Cruzeiro do Sul S.A. in this company is in the documents on pages 2622/2670, which were extracted from the institution's CDOC system.

We note that of the two shareholders in question of Maragato Patrimonial S.A., Mr. Luís Felipe Índio da Costa also owned shares in Cruzeiro do Sul Corretora de Valores e Mercadorias S.A. and in Cruzeiro do Sul DTVM S.A.

And to supposedly disguise the conduct described, he used the following strategies:

a. At the end of every month, the investors/shareholders of the PEIFs "Cruzeiro do Sul DTVM" and "Cruzeiro do Sul CVM" were "replaced" by intermediaries, controlled by Banco Cruzeiro do Sul. In this case, this means that these controlled financial institutions sold their PEIF shares (since daily redemption was not allowed) and the intermediaries bought these shares. At the start of the next month, they generally went back to the previous situation; and

b. the intermediaries that purchased shares of the PEIFs, normally at the end of the month, did so with funds loaned by Banco Cruzeiro do Sul, formalizing these operations through the issue of BCNs. At the beginning of the month, these people sold their shares and "liquidated" the loans at Banco Cruzeiro do Sul.

The description of this "modus operandis" is based on:

- corporate emails exchanged between Élcio Leopoldino (DTVM employee) with other employees of Banco Cruzeiro do Sul, responsible for the preparation and processing of the BCNs (pages 2687/2711).

- Spreadsheet on page 2712. This spreadsheet was prepared based on the information in the emails referred to in the previous item and are supported by reports issued by the SD Emp system of Banco Cruzeiro do Sul and the Shareholder System of BCSul Verax Serviços Financeiros, which show the position as shareholder in the PEIFs for a given period (pages 2713/2775).

As an example, we are showing in the following table the situations indicated in these emails in which it was proven that the Bank used intermediaries (clients of the institution) by pretending to issue loans to these persons, to fill the cash needs of the PEIFs at the end of the month to zero out the positions held in them by Cruzeiro do Sul CVM and/or Cruzeiro do Sul DTVM:

191



# BANCO CENTRAL DO BRASIL

| Borrower from Bank / Investor in PEIFs | BCN no. | Date of Issue | Net Amount | Liquid. Date | Liquid. Amount (I) | Amount invested in PEIFs (same issue date as BCN | Net amount redeemed PEIFs (II) – on same liquid. date as BCN | Result of ops. (II - I) |
|---|---|---|---|---|---|---|---|---|
| Amadeu Simões Lopes Azambuja | 8265 | 7.30.2010 | 10,000,000.00 | 8.3.2010 | 10,049,470.10 | 10,000,000.00 | 10,007,556.79 | -41,913.31 |
| Afonso César Boabaid Burlamaqui | 8266 | 7.30.2010 | 16,000,000.00 | 8.2.2010 | 16,070,743.92 | 16,000,000.00 | 16,006,004.57 | -64,739.35 |
| Armando César de Araújo Burlamaqui | 8267 | 7.30.2010 | 6,000,000.00 | 8.4.2010 | 6,032,834.20 | 6,000,000.00 | 6,006,725.93 | -26,108.27 |
| Álvaro Luiz Alves de Lima Alvarez Otero | 8271 | 7.30.2010 | **15,006,322.43** | 8.2.2010 | 15,066,322.43 | **11,740,000.00** | 11,755,299.32 | |
| Armando José de Andrade Carvalho | 8272 | 7.30.2010 | 10,000,000.00 | 8.4.2010 | 10,054,723.67 | 10,000,000.00 | 10,011,209.88 | -43,513.79 |
| | | | | | | | | |
| Afonso César Boabaid Burlamaqui | 8692 | 1.31.2011 | 7,800,000.00 | 2.2.2011 | 7,838,277.57 | 7,800,000.00 | 7,806,097.96 | -32,179.61 |
| Álvaro Luiz Alves de Lima Alvarez Otero | 8693 | 1.31.2011 | 16,000,000.00 | 2.2.2011 | 16,078,518.89 | 16,000,000.00 | 16,012,489.64 | -66,029.25 |
| | | | | | | | | |
| Álvaro Luiz Alves de Lima Alvarez Otero | 8873 | 3.31.2011 | 11,400,000.00 | 4.4.2011 | 11,457,401.95 | 11,400,000.00 | 11,409,254.46 | -48,147,49 |
| | | | | | | | | |
| Amadeu Simões Lopes Azambuja | 8959 | 4.29.2011 | 10,000,000.00 | 5.3.2011 | 10,052,213.23 | 10,284,000.00 | 10,290,859.47 | |
| Afonso César Boabaid Burlamaqui | 8958 | 4.29.2011 | 10,000,000.00 | 5.3.2011 | 10,052,213.23 | 10,000,000.00 | 10,008,336.07 | -43,877.16 |
| Armando César de Araújo Burlamaqui | 8960 | 4.29.2011 | **12,200,000.00** | 5.3.2011 | 12,263,700.14 | **14,622,000.00** | 14,631,752.95 | |
| | | | | | | | | |
| Afonso César Boabaid Burlamaqui | 9045 | 5.31.2011 | 10,000,000.00 | 6.2.2011 | 10,050,536.20 | 10,000,000.00 | 10,008,321.74 | -42,214.46 |
| Armando César de Araújo Burlamaqui | 9044 | 5.31.2011 | 12,200,000.00 | 6.2.2011 | 12,261,654.81 | 12,200,000.00 | 12,210,152.52 | -51,502.29 |
| | | | | | | | | |
| Amadeu Simões Lopes Azambuja | 9130 | 6.30.2011 | 3,000,000.00 | 7.4.2011 | 3,015,726.74 | 3,000,000.00 | 3,002,558.48 | -13,168.26 |
| Afonso César Boabaid Burlamaqui | 9131 | 6.30.2011 | 4,000,000.00 | 7.4.2011 | 4,020,968.99 | 4,000,000.00 | 4,003,404.41 | -17,564.58 |
| Armando César de Araújo Burlamaqui | 9132 | 6.30.2011 | 6,000,000.00 | 7.4.2011 | 6,031,453.50 | 6,000,000.00 | 6,005,106.61 | -26,346.89 |
| Álvaro Luiz Alves de Lima Alvarez Otero | 9133 | 6.30.2011 | 9,800,000.00 | 7.4.2011 | 9,851,374.05 | 9,800,000.00 | 9,808,340.78 | -43,033.27 |
| | | | | | | | | |
| Amadeu Simões Lopes Azambuja | 9171 | 7.29.2011 | 3,590,000.00 | 8.3.2011 | 3,611,204.35 | 3,590,000.00 | 3,594,685.74 | -16,518.61 |
| Afonso César Boabaid Burlamaqui | 9172 | 7.29.2011 | 4,790,000.00 | 8.3.2011 | 4,818,292.16 | 4,790,000.00 | 4,796,242.23 | -22,049.93 |
| Armando César de Araújo Burlamaqui | 9173 | 7.29.2011 | 7,180,000.00 | 8.3.2011 | 7,222,408.71 | 7,180,000.00 | 7,189,356.83 | -33,051.88 |
| Álvaro Luiz Alves de Lima Alvarez Otero | 9174 | 7.29.2011 | 11,740,000.00 | 8.3.2011 | 11,809,342.38 | 11,740,000.00 | 11,755,299.32 | -54,043.06 |
| | | | | | | | | |
| Amadeu Simões Lopes Azambuja | 9222 | 8.31.2011 | 5,225,054.80 | 9.5.2011 | 5,255,680.12 | 5,225,054.80 | | |
| Brigada Promotora de Créditos e Vendas | 9223 | 8.31.2011 | 5,225,054.80 | 9.5.2011 | 5,254,597.63 | 5,225,054.80 | | |

Note: The investments in the PEIFs were made on the same dates on which the loans were granted. The redemptions of the PEIFs also took place on the same dates, except for three cases, in which there was a delay of just one day.

It should be noted that in the cases in question, the supposed clients suffered losses, since the yields from the investments in the PEIFs were lower than the interest rates on the



# BANCO CENTRAL DO BRASIL

loans taken out, which reinforces, even though this has already been clearly shown, the disguised nature of these loans and the use of these persons as intermediaries of Banco Cruzeiro do Sul, used to hide the financing of the PEIFs by Banco Cruzeiro do Sul and also by its controlled financial companies.

Also in regard to this matter, in a statement given to this Commission on 1.18.2013 (pages 2776/2777), Mr. Élcio Leopoldino indicated that:

a. He held the position of manager at Cruzeiro do Sul S.A. DTVM, which was the company responsible for custody of the assets and controllership over the aforementioned PEIFs;

b. He formally reported to Mr. Marcelo Xandó in the structure of Cruzeiro do Sul DTVM and informally reported to Mr. Luis Felippe Indio da Costa, the controller of Banco Cruzeiro do Sul S.A, for matters related to the PEIFs.

c. One of his responsibilities was to inform, at the end of every month, the position of the non-bank financial companies of the Cruzeiro do Sul Conglomerate in these PEIFs. This order was verbally transmitted by Mr. Luís Felipe Índio da Costa. This position reflected the "need to add funds" to the PEIFs due to redemptions by shareholders, including Cruzeiro do Sul S.A DTVM and Cruzeiro do Sul CVM S.A.

d. This information was then transmitted in an email to the wholesale Operations Processing Area of Banco Cruzeiro do Sul, which returned with the information on the shareholders and the respective investments to be made in the PEIFs to cover the scheduled redemptions at the end of the month by the shareholders, including Cruzeiro do Sul S.A. DTVM and Cruzeiro do Sul CVM S.A.

e. Most of the time, the emails sent to the Operations Processing Area were "copied" to Maria Luísa Garcia de Mendonça.

f. This operational procedure enabled the creation of a secondary market to the shareholders of the PEIFs, given the need for liquidity of the Funds;

g. The daily transactions by shareholders in these PEIFs were monitored and conducted by Mr. Luis Felippe Indio da Costa, which encouraged the commercial managers of Banco Cruzeiro do Sul to sell shares in these PEIFs.

Therefore, it is clear that flows of funds originating from the companies in the Cruzeiro do Sul Financial Conglomerate were "loaned" to the company Patrimonial Maragato S.A., characterizing a violation of the aforementioned legal provisions.

Applicable law: Article 34, Section V, of Law 4595/1964, with the punishment established in Article 44 of that of Law and Article17 of Law 7.492/1986.



# BANCO CENTRAL DO BRASIL

**6.5 Cause and/or contribute to causing illicit transfers of foreign currency from Brazil[71]**

 On 7.8.2011, MCB Administração e Participações Ltda. (CNPJ 3.684.974/0001-87) liquidated a foreign exchange operation contracted with BCSul, as a transfer of funds abroad (foreign exchange operation type "3"), referring to loans to residents abroad – direct loans (nature-fact code of operation no. 65.007).

 This foreign exchange operation, in the amount of Eur$ 860,000 / R$ 1,926,400.00, is registered at Sisbacen under no. 11/20804. Contracted on 7.7.2011, the counter-entry in reais was liquidated on 7.8.2011. According to the Sisbacen record (pages 2778/2781), the party that received the foreign currency abroad was the company S.A.S J.N.Holding (France).

 The origin of the funds for liquidation of the exchange operation is a loan granted by BCSul on 7.8.2011 to this client in the net amount of R$ 1,989,858.00, with maturity on 8.8.2011, according to the "Simplified Contract Statement" report issued by the SD Emp system (page 2782).

 The lack of proper care by BCSul in the verification and analysis of the client's records contributed to promoting the illicit transfer of foreign currency from Brazil, since:

- According to documents in the company's record at the institution (pages 2783/2797), "MCB" was a recently founded company (5.5.2011), with capital stock of R$ 10,000 subscribed by owners Marc Gilbert Marie Fernand Rolande (CPF 966.531.837-34) and Afonso César Boabaid Burlamaqui (CPF 022.938.467-68);

- The application for a current account at the institution was signed on 7.6.2011, at the time the operation was contracted. Even without showing financial capacity, it immediately received a loan of R$ 2 million to purchase foreign currency and send it abroad; and

Applicable law: Art. 22, Sole Paragraph of Law 7.492/1986.

**6.6 Fail to give notice of operations that contain evidence of money laundering[72]**

 Section I of Article 13 of BC Circular Letter 3461/2009, which regulates Article 11, of Law 9.613/1998, establishes rules governing notification of operations to the Financial Activity Control Council:

*"Art.13. the institutions referred to in Art. 1 shall notify the Coaf, in the manner determined by the Central Bank of Brazil:*

*I- operations performed or services rendered in an amount equal to or greater than R$ 10,000.00 (ten thousand reais), which, considering the parties involved,*

---

[71] Documents on pages 2778/2797.
[72] Documents on pages 2798/3025.



# BANCO CENTRAL DO BRASIL

*the amounts, the manners in which they are conducted, the instruments used, or the lack of economic or legal grounds, could configure the existence of evidence of the crimes established in Law no. 9.613, of 1998."*

Nonetheless, it can be seen that Banco Cruzeiro do Sul did not give notice of operations with clients considered to be atypical, whether as a result of the parties involved (without financial capacity), the manner in which they are carried out, the instruments used or the lack of economic or legal grounds. The exception refers to a notice regarding the company "Neue Welt" (referring to an occurrence in August/2005) and another regarding the company "Prevserv" (relative to the occurrence in October/2010). The evidence of the exposure degree is in the reports on pages 2798/2807, taken from the SISCOAF system.

This conduct constitutes a violation of Article 11, Sections I and II-b, of Law 9.613/1998, regulated by the Central Bank's Circular Letter 3461/2009, which subjects it to the penalty established in Article 12 of the same Law.

Following is chart presenting some of these operations conducted by the clients listed in sub-items 7.1.1, 7.1.2, 7.2, and 7.3:

| Client | CPF/CNPJ | Type of Operation | Justification for notice |
|---|---|---|---|
| Associação dos Músicos Militares do Brasil – Ambra | 30.504.617/0001-05 | 107 Loan/bank guarantee operations in the amount of R$ 410,552,000 between May 2007 and May 2012 | Amount of operations incompatible with economic-financial capacity; operations without economic basis. |
| Centro-Oeste Promotora de Créditos Ltda. | 04.816.272/0001-15 | 4 loan operations in the amount of R$ 16,656,000 between May 2007 and May 2012 | Loan for R$ 2.1 million, of 9.30.2011, Incompatible with capital stock of R$ 10,000. Report not updated (last Balance Sheet dates from 12.31.2007). |
| Brigada Promotora de Crédito e Vendas Ltda. | 04.698.766/0001-42 | 81 loan/bank guarantee operations in the amount of R$ 215,165,000 between May 2007 and May 2012 | Volume of operations incompatible with economic-financial capacity (capital stock of R$ 16,000 according to unaudited Balance Sheet of 12.31.2010). Operations without economic basis. |
| Promotora e Divulgadora Sudeste Line Ltda. | 04.816.268/0001-57 | 42 loan/bank guarantee operations in the amount of R$ 207,204,000 between May 2007 and May 2012 | Volume of operations incompatible with economic-financial capacity (capital stock of R$ 15,000 according to unaudited Balance Sheet of 12.31.2010). Operations without economic basis. |

195



# BANCO CENTRAL DO BRASIL

| Client | CPF/CNPJ | Type of Operation | Justification for notice |
|---|---|---|---|
| Prevserv Operadora de Serviços Ltda. | 05.943.988/0001-46 | 7 loan/bank guarantee operations in the amount of R$ 38,560,000 between May 2007 and May 2012 | Volume of operations incompatible with economic-financial capacity (capital stock of R$ 200,000 according to unaudited Balance Sheet of 12.31.2006). Operations without economic basis. Record not updated. |
| Neue Welt Comércio Ltda. | 03.559.468/0001-09 | 5 loan/bank guarantee operations in the amount of R$ 17,200,000 between May 2007 and May 2012 | Volume of operations incompatible with economic-financial capacity (capital stock of R$ 5 million according to unaudited Balance Sheet of 12.31.2007). Operations without economic basis. Record not updated. |
| Afonso César Boabaid Burlamaqui | 022.938.467-98 | 58 loan/bank guarantee operations in the amount of R$ 199,305,000 between May 2007 and May 2012 | Volume of operations apparently incompatible with economic-financial capacity. Operations without economic basis. |
| Amadeu Simões Lopes Azambuja | 007.042.887-53 | 17 loan/bank guarantee operations in the amount of R$ 129,696,000 between May 2007 and May 2012 | Volume of operations apparently incompatible with economic-financial capacity. Operations without economic basis. |
| Armando César de Araújo Pereira Burlamaqui | 025.253.417-40 | 19 loan/bank guarantee operations in the amount of R$ 133,034,000 between May 2007 and May 2012 | High volume of credit operations without apparent economic basis. |
| MCB Administração e Participações Ltda. | 13.684.974/0001-87 | Foreign exchange operation type 3, no. 11/20804, of 7.8.2011, in the amount of Eur$ 860,000. | Amount of operation transferred abroad is not compatible with the economic capacity of the company. |

Source: The data on the volume of operations was taken from a report extracted from the SD Emp system, called the Synthetic Operations Report (pages 2808/2822).

It should be noted that the volume of loan operations in the period from May 2007 to May 2012 is listed in the periodic synthetic report issued by the SD Emp system (loan system of Banco Cruzeiro do Sul). This report only covers the loan operations and bank guarantees recorded in the SD Emp system.

The loan operations in the "guaranteed account" modality are not considered, since they are recorded in another system that does not issue a periodic synthetic report such as the SD Emp system. It means that the amount of credit borrowed by the majority of the parties in the chart above would be even higher if we were to consider loan operations in the "guaranteed account" modality.

196



# BANCO CENTRAL DO BRASIL

It should also be noted that many of the operations refer to refinancing and/or renegotiation of previous operations. It means that there was no actual cash that left the institution for all the operations listed in the report. In practice, for several of them, there was a mere roll over of the originally stipulated deadlines.

During the course of the work by this Investigation Commission, it was noted that there were operations of these clients guaranteed by "shares of the borrower." In fact, these were shares issued by Banco Cruzeiro do Sul that were acquired by these clients, probably with funds from loans from the Bank (simulated operations), acting as intermediaries with it.

To demonstrate this, attached to the record (pages 2823/2824) is an exchange of emails between employees of the institution in the period from July to September in 2011, among them the Director of the Controller's Office Maria Luísa Garcia de Mendonça, informing the freeze on VIS CRZS4 shares in the names of the following clients:

- Associação dos Músicos Militares do Brasil - Ambra
- Brigada Promotora de Crédito e Vendas Ltda.
- Promotora e Divulgadora Sudeste Line Ltda.
- Afonso César Boabaid Burlamaqui
- Armando César de Araújo Pereira Burlamaqui
- Alvaro Luiz Alves de Lima Alvarez Otero
- Guilherme de Alvarez Otero Fernandes

## 6.7 – Forge consigned personal loans to inflate asset values and profits / net equity of the financial institution

**Applicable law:**
- Article 31 of Law 4.595, of 12.31.1964[73];
- Cosif 1.1.2.3, 1.1.2.4 and 1.1.2.7 (Circular 1.273, of 12.29.1987)[74];
- Articles 3, 4, 6, 7, 9, and 10 of Law no. 7.492, of June 16, 1986[75];

---

[73] Law no. 4.595, of December 31, 1964, Article 31: Financial institutions must calculate general balance sheets on June 30, and December 31, of each year, complying with the accounting rules set forth by the National Monetary Council.

[74] Circular BCB n 1.273, of December 29, 1987 – Cosif 1.1.2.3 – General Principles –Recordkeeping must be complete, maintaining all the administrative acts and facts that modify or could come to modify, immediately or not, its equity composition. / Cosif 1.1.2.4 – General Principles – A simple accounting record does not constitute sufficient evidence, and the recordkeeping must be based on proof that is capable of proving full validity of administrative acts and events. / Cosif 1.1.2.7 – General Principles – The provision of inaccurate information, absence or delay in accounting conciliation and recordkeeping delayed for more than fifteen (15) days, after the end of each month, or which is not processed in compliance with the standards established in this Accounting Plan will subject the institution, its administrators, managers, members of the board of directors, audit committee and similar entities to the applicable penalties, pursuant to the terms of the law.

[75] Law no. 7.492, of June 16, 1986:



# BANCO CENTRAL DO BRASIL

**Description of the Irregularity:**

As explained in the item "Explanatory Notes – 01," BCSul systematically and continuously made false and non-existent, also called "invalid" accounting entries, through personal credit installments with payroll deduction (CPP), resulting in the disclosure of all the accounting statements, such as balance sheets, income statements, quarterly financial information, trial balance sheets, which did not reflect the real economic-financial situation of the institution, which led to misleading clients, national and foreign investors, the Central Bank of Brazil and other monitoring agencies, and the National Financial System.

## 6.7.1    Findings in the period prior to the decree of the TSAR.

In the Supervision work done by the Central Bank of Brazil, before the decree of the special regime to which the financial institution was submitted, a set of operations was identified that had common characteristics and that were identified in an internal table of the "Tools" system, used by BCSul in the management of all the CPP contracts, with a registry code called "H41."

The accounting procedures of BCSul for assets that do not exist, called "invalid," created financial statements that do not represent its real economic and financial situation. As a result, the Central Bank ordered a regulatory adjustment of R$1.249 billion, for the base date of February 29, 2012, according to Official letter 0355/2012-BCB/Desup/GTSP2/Cosup-03, of 5.11.2012.

The amount of this adjustment represents the value of the non-existing consigned credit operations, called CPP, registered in the accounting and distributed among 320,001 contracts, according to the trial balance of February 2012. These operations are characterized by:

---

- Art 3 Disclosing false or harmfully incomplete information on a financial institution: Punishment: imprisonment, from two to six years, and fine.
- Art 4 Fraudulently manage a financial institution: Punishment: Imprisonment, from three to twelve years, and fine. / Sole paragraph: If the management is done recklessly: Punishment: Imprisonment, from two to eight years, and fine.
- Art 6 Mislead or continue deceiving a shareholder, investor or competent government office, relative to the operation or financial situation, hiding information or falsely providing it: Punishment: Imprisonment, from two to six years, and fine.
- Art 7 Issue, offer or negotiate, in any manner, securities that are: I - false or falsified; II – without prior record of issue at the competent authority, under conditions other than those in the record, or which are irregularly recorded; III – without sufficient backing or guarantees, pursuant to the terms of the legislation; IV – without prior authorization of the competent authority, when legally required: Punishment: imprisonment, from two to eight years, and fine.
- Art 9 Defraud inspectors or investors, placing or causing to be placed a false declaration or a declaration different than the one that should be included, in a document that serves as evidence for investment in securities: Punishment: imprisonment, from one to five years, and fine.
- Art 10. Place a false element or omit an element required by the legislation, in accounting statements of the financial institution, insurance company or institution that is part of the securities distribution system: Punishment: imprisonment, from one to five years, and fine.



# BANCO CENTRAL DO BRASIL

a) Absence of financial flow for payment or receipt, with only accounting transactions recorded, with manual reclassifications to temporary accounts, including transfers to the CRIFs, which enables hiding of transactions, resulting in an artificial increase of assets and of the bank's net equity, and the profitability of the funds;

b) Absence of release of credit of any type, to either the client or the intervening entity, and absence of annotation at the partner government entity;

c) Existence of common characteristics (standard profile) among the fictitious contracts.

Of a sample of 440 CPP contracts originating in 2011 and recorded in the Tools System, the following were found:

✓ 170 operations with "clients" whose respective CPFs had the status of "CPF not recorded/ not in the SRF base;" and

✓ 202 operations with clients that had at least three active CPP operations, each one linked to a different partner government entity.

A mass analysis was prepared based on the BCSul database, using the PL/SQL[76] tool, without predefined layout, in order to cover the largest possible universe of data.

For all the tests made, the following files in the databases were used:

- Contracts recorded in the Tools System up to 4.5.2012;

- Contracts recorded in the Retaguarda System up to 4.5.2012;

- Updated record of clients up to 4.5.2012; and

- Accounting balance of the operations registered in the Tools System, base date up to 2.29.2012.

A cross-check was made between the data on the operations registered in the Tools System with the data in the operations recorded in the Retaguarda System (credit workflow), in order to verify the existence of credit operations that did not pass through this system.

Since some operations were not recorded in the Retaguarda System, for plausible reasons, a filter was used, before crossing the data,

---

[76] PL/SQL is the acronym for the English expression Procedural Language / Structured Query Language), which is an extension of the standard language SQL for SGBD Oracle (Data Base Management System of Oracle Corporation). It is a procedural language of Oracle that extends the SQL language; in other words, a programming language based on monographic options of editing, composed of three layers: definition, editing and conclusion.



# BANCO CENTRAL DO BRASIL

to avoid generating incorrect findings, to exclude from the databases analyzed the following operations: (a) cancelled; (b) for products that are not registered in the Retaguarda System (*such as consigned credit cards and those acquired from the Prosper Group*); and (c) contracted prior to the implementation of this system.

To facilitate understanding of the structure of the Institution's systems, attached are excerpts from an inspection report of the Central Bank, prepared in the second semester of 2011, such as the documentation *Architecture of the Application Systems of BCSul* on pages 3026 to 3042, *Data Structure of the Application Systems – Tools System* on 3043 a 3052 and *Conciliation between the Tools System and 4040* (Accounting Document) on pages 3053 to 3061. This latter document supports the conclusion, which was also ratified in meetings with the staff of Cruzeiro do Sul, that the Tools System directly reflects the Bank's accounting systems and, as a result, its accounting documents.

The operations that resulted from this cross-check, especially those contracted in 2011, were the object of analysis that presented at the end, characteristics of "non-existence," and which had in common a field in the Tools System called "TAB" filled in with the initials "H41."

None of these operations had previously passed through the Retaguarda System (*the system that records and analyzes CPP operations, also called the "credit workflow" of the CPP contract*) and therefore, there is no record of them having been previously submitted to a regular credit analysis, as occurs with the other CPP operations of BCSul.

All the operations had their origin in eight intermediaries, beginning on 6.28.2010, and through these same eight "stores," in addition to the banking correspondent Ambra, in the previous fiscal years (2007, 2008, 2009, and up to 6.28.2010).

Operations of this type, contracted in the fiscal year 2011, totaled 118,213 CPP contracts in the amount of R$ 512,467,436.51. Notable is the **uniform distribution** of the operations among the eight intermediaries recorded in the Tools System, with each one responsible for around 12 to 13%, or one-eighth (1/8) of the origin of these operations, which is highly unlikely from a statistical perspective.

| Intervening Party | No. Contracts | Value % | Amount Contracted (R$) |
|---|---|---|---|
| Associação Balcão 24 | 15,276 | 12.9 | 66,184,776.31 |
| Base Militar | 14,092 | 11.9 | 61,186,110.05 |
| Comar | 14,854 | 12.6 | 64,394,120.95 |
| Javic Assessoria | 13,572 | 11.5 | 58,882,560.55 |
| Rezende | 15,420 | 13.0 | 66,787,300.21 |
| Saúde | 15,369 | 13.0 | 66,559,707.54 |
| Três Corações | 15,235 | 12.9 | 66,009,701.78 |



# BANCO CENTRAL DO BRASIL

| Intervening Party | No. Contracts | Value % | Amount Contracted (R$) |
|---|---|---|---|
| Unidade Centro | 14,395 | 12.2 | 62,463,159.12 |
| **Totals** | **118,213** | **100.0** | **512,467,436.51** |

In addition, of the list of the eight intermediaries, only the name "Javic Assessoria" (*Javic Assessoria e Consultoria Empresarial Ltda.*) had a different legal entity number at the national registry (*CNPJ 01.143.363/0001-49*) and, according to the Brazilian Federal Revenue Office (*RFB*) website, on 3.23.2012[77], its record was listed as "removed," since 12.31.2008, for the reason of "ineligibility" (Law 11.941/2009, Art. 54[78]).

In the CDOC system (*digital registry of the institution*), the most recent updates to the "Javic" record were in 2006, and this company is not on the list of entities related to the indirect code informed by BCSul, according to an email sent on 4.2.2012.

The other seven names of intermediaries recorded in the Tools System, under the field "Store," have the same CNPJ (legal entity registration number), (*CNPJ 30.504.617/0001-05*), as the company Ambra – Associação dos Músicos Militares do Brasil.

On the Ambra website, five of the seven names are associated with addresses of the branches and headquarters:

- Ambra Matriz: Rua Sete de September, 71, 7 Andar, <u>Centro</u>, Rio de Janeiro – RJ;
- Ambra <u>Vila Militar</u>: Rua Mariaca, 2 - <u>Vila Militar</u>, Rio de Janeiro – RJ;
- Ambra <u>Resende</u>: Av. Presidente Vargas, 263, Campos Elíseos, <u>Resende </u> – RJ;
- Ambra EsSA: Rua Sete de September, 628, Centro, <u>Três Corações </u> – MG; e
- Ambra Taubaté: Av. São Pedro, 1.215, Bosque da <u>Saúde</u>, Taubaté – SP.

There are also 7,572 clients with three or more active operations contracted in sequence, one per month, in the period between May and August 2011, each one linked to a different affiliated government entity, which are sometimes located in different states, and always in amounts close to R$ 4 million, which were not indicated to the SCR (*Central Bank Credit Risk Service*) at the time.

There was no regular accounting flow or operationalization of the H41 operations; however, there were manual reclassifications of CPP releases, and, in addition to the accounting entries made by the system (*for real operations*), the internal category "Various Domestic Creditors -

---

[77] Information taken from the Proof or Registration and Record Status issued on 3.23.2012.
[78] Law no. 11.941, of May 27, 2009, Art. 54. The registration on the National Registry of Legal Entities – CNPJ, will be removed for those legal entities that have been declared to be ineligible as of the publication date of this Law, pursuant to the terms and conditions defined by the Brazilian Federal Revenue Office.

# BANCO CENTRAL DO BRASIL

- Release of CPP" was also affected by manual entries (MAN), under the category "CPP BCSul Release."

In the corresponding accounting forms, these entries corresponded to temporary CRIF transfer accounts, instead of the category of BCSul bank reserves.

Until July 2011, the manual accounting reclassifications in the temporary accounts of the CRIFs and of Prosper S.A. Companhia Securitizadora de Créditos Financeiros ("Prosper Securitization Company"), CNPJ 10.546.739/0001-57, were entered under the category "Payment install. CPP," and beginning in August of 2011 under the category "Payment CPP – Name of Assignee / CRIF."

The consolidation of the amounts manually reclassified, according to the data obtained from the Institution's Accounting Form Reports from 01/2011 to 12/2011 on pages 3062 to 3491, with the monthly origination of the H41 contracts shows that the amounts coincided, as shown in the tables below:

**Table A**

| Account. Categor. | 4.9.9.92.10.008-2 CPP Release | 4.9.9.92.20.0035-9 Transfers of Receipts Fundo Multicred | 4.9.9.92.20.0050-8 Transfers Prosper Cia. Securitizadora | 4.9.9.92.20.0028-9 Transfers of Receipts Verax CPP 360 | 4.9.9.92.20.0031-3 Transfers of Receipts Verax CC2 | 4.9.9.92.20.0044-7 Transfers of Receipts Fundo Maxcred II |
|---|---|---|---|---|---|---|
| System | Manual | Manual | Manual | Manual | Manual | Manual |
| January | -58,552,930.63 | 24,958,074.11 | 9,561,372.98 | 3,705,675.60 | 15,448,035.55 | 1,544,479.18 |
| February | -34,350,187.36 | 15,795,495.79 | 5,415,024.18 | 2,133,444.75 | 7,915,851.16 | 1,186,686.39 |
| March | -34,876,138.48 | 15,094,640.65 | 6,828,836.35 | 2,018,543.33 | 7,916,351.84 | 1,186,924.31 |
| April | -35,514,514.90 | 20,241,017.29 | 8,138,671.51 | 3,192,668.39 | 76,648.40 | 2,902,044.06 |
| May | -36,538,559.32 | 19,838,942.35 | 9,557,262.88 | 3,191,975.34 | 76,880.04 | 2,908,426.12 |
| June | -37,444,117.81 | 20,850,116.81 | 9,473,789.19 | 3,182,477.73 | 76,726.71 | 2,898,303.78 |
| July | -38,392,702.95 | 20,405,281.11 | 10,879,767.22 | 3,161,985.95 | 76,789.78 | 2,891,046.28 |
| August | -39,211,664.20 | 21,059,380.74 | 11,102,269.75 | 3,144,925.77 | 76,802.83 | 2,881,359.57 |
| September | -46,733,653.82 | 29,082,785.21 | 11,055,671.75 | 3,141,195.79 | 76,843.74 | 2,873,272.61 |
| October | -40,607,365.82 | 22,973,982.09 | 11,044,971.54 | 3,146,628.60 | 76,632.32 | 2,877,925.46 |
| November | - | | | - | | - |
| December | -111,095,432.01 | 78,987,788.91 | 22,392,831.55 | 8,169,491.52 | 153,846.30 | - |
| Total 2011 | -513,317,267.30 | 289,287,505.06 | 115,450,468.90 | 38,189,012.77 | 31,971,408.67 | 24,150,467.76 |
| % | 99% | 56% | 22% | 7% | 6% | 5% |

**Source: BCSul Accounting System and Manual Entry Accounting Forms**



# BANCO CENTRAL DO BRASIL

## Table B

| Account. Category | 4.9.9.92.20.0032-2 **Transfers of Receipts Fundo Maxcred** | 4.9.9.92.20.0025-2 **Transfers of Receipts Verax CPP 60** | 4.9.9.92.20.0026-1 **Transfers of Receipts Verax CPP 120** | 4.9.9.92.20.0027-0 **Transfers of Receipts Verax CPP 180** | 1.8.8.92.10.0012-2 **Payment of CPP** |
|---|---|---|---|---|---|
| **System** | Manual | Manual | Manual | Manual | Manual |
| **January** | 2,549,915.87 | 345,069.77 | 243,262.46 | 197,045.11 | - |
| **February** | 1,442,213.23 | 194,617.48 | 138,651.36 | 128,203.02 | - |
| **March** | 1,398,938.48 | 177,126.17 | 126,524.62 | 128,252.73 | - |
| **Abril** | - | 482,231.76 | 459,836.21 | 21,397.28 | - |
| **May** | - | 483,657.56 | 459,953.09 | 21,461.94 | - |
| **June** | - | 482,301.67 | 458,982.05 | 21,419.87 | - |
| **July** | - | 480,223.21 | 457,384.23 | 21,446.02 | 18,779.15 |
| **August** | - | 472,092.98 | - | 21,438.84 | 453,393.72 |
| **September** | - | 482,420.76 | - | 21,463.96 | - |
| **October** | - | 465,777.21 | - | 21,448.60 | - |
| **November** | - | - | - | - | - |
| **December** | - | 1,185,430.95 | - | 198,085.58 | 4,098.85 |
| **Total 2011** | 5,391,067.58 | 5,250,949.52 | 2,344,594.02 | 801,662.95 | 476,271.72 |
| **%** | 1% | 1% | 0% | 0% | 0% |

Source: BCSul Accounting System and Manual Entry Accounting Forms

## Table C

| Account. Category | 4.9.9.92.20.0033-1 **Transfers of Receipts - Bradesco w/guarantee** | 4.9.9.92.20.0029-8 **Transfers of Receipts Securitization company** | 4.9.9.92.20.0060-5 **Transfers of Receipts - Fundo F-ACB** | 4.9.9.92.20.0007-6 **Transfers of Receipts Rical Securitiza.** | **TOTAL** |
|---|---|---|---|---|---|
| **System** | Manual | Manual | Manual | Manual | |
| **January** | - | - | - | - | 58,552,930.63 |
| **February** | - | - | - | - | 34,350,187.36 |
| **March** | - | - | - | - | 34,876,138.48 |
| **Abril** | - | - | - | - | 35,514,514.90 |
| **May** | - | - | - | - | 36,538,559.32 |
| **June** | - | - | - | - | 37,444,117.81 |
| **July** | - | - | - | - | 38,392,702.95 |
| **August** | - | - | - | - | 39,211,664.20 |
| **September** | - | - | - | - | 46,733,653.82 |
| **October** | - | - | - | - | 40,607,365.82 |
| **November** | - | - | - | - | - |
| **December** | 1,570.52 | 1,310.05 | 585.15 | 392.63 | 111,095,432.01 |
| **Total 2011** | 1,570.52 | 1,310.05 | 585.15 | 392.63 | 513,317,267.30 |
| **%** | 0% | 0% | 0% | 0% | 100% |



# BANCO CENTRAL DO BRASIL

**Source: BCSul Accounting System and Manual Entry Accounting Forms**

## Consolidated Entries of Tables A, B and C:

| MONTH | Contracts H41 Amount of Release | Manual Reclassifications Release of CPP | Difference | Total Dif. % |
|-------|-------------------------------|----------------------------------------|------------|--------------|
| January | 58,552,930.63 | -58,552,930.63 | | |
| February | 34,350,187.36 | -34,350,187.36 | | |
| March | 34,026,307.69 | -34,876,138.48 | -849,830.79 | |
| April | 35,514,514.90 | -35,514,514.90 | | |
| May | 36,538,559.32 | -36,538,559.32 | | |
| June | 37,444,117.81 | -37,444,117.81 | | |
| July | 38,392,702.95 | -38,392,702.95 | | |
| August | 39,211,664.20 | -39,211,664.20 | | |
| September | 46,733,653.82 | -46,733,653.82 | | |
| October | 40,607,365.82 | -40,607,365.82 | | |
| November | 0 | 0 | | |
| December | 111,095,432.01 | -111,095,432.01 | | |
| Total 2011 | 512,467,436.51 | -513,317,267.30 | -849,830.79 | 0.17 % |

The manual accounting reclassifications preponderantly correspond to funds that should have been released to the final clients, but which were manually transferred to temporary CRIF transfer accounts.

In addition, on pages 3492/3496 is an example of accounting aspects, in the form of small ledger entries, of the effects of the entries involving the fictitious operations.

The false, "invalid" operations (H41), were under two CNPJs of intermediaries – "Ambra" and "Javic," and the latter had been removed from the Federal Revenue Office since the end of 2008.

"Ambra's" financial position in 2011, the flow of receipt of funds from the Armed Forces, would support an average portfolio of R$200 million in the fiscal year— value substantially less than the portfolio of H41 contracts. The credits made by BCSul to "Ambra" under the category of "CPP Release" fell over the course of 2011 and were much lower than the amounts corresponding to the H41 contracts.

Two corresponding entries, with indirect codes "Aspa" and "FAP," did not have transactions compatible with cash flows resulting from the H41 contracts in the 2011 fiscal year. "Aspa" had a negative balance of R$ 2,817,249.18, on 4.14.2012, and the only financial transactions since the start of 2011 were debits for interest and IOF tax. There are no financial transactions for "FAP."



# BANCO CENTRAL DO BRASIL

The non-existing contracts, which had the identification field of table "H41":

- Did not have attached the proof of annotation of the operations at the associated public entity and of the release of funds to the borrowers;
- Had reports composed (*only*) of a copy of the CPP contract and a copy of the authorization form for annotation of the contract;
- Did not have the fields for registration of the client's professional and bank records filled out (*these are for release of the funds*);
- Did not contain the signature of representatives of the Institution, or the contact data record, only the data of the other party, the "borrower" of the funds;
- Had a "branch" name recorded on the physical contract (*which identifies the affiliated government entity*) different from what was recorded in the Tools System;
- Had the names of the "store" recorded (*several*) (*which identifies the company that holds the indirect code*) in a physical contract that was different from the one listed in the annotation authorization form;
- Had the annotation authorization forms (*which made up the reports*) printed or in the name of Ambra, Aspa or FAP, respectively Associação dos Músicos Militares do Brasil (*CNPJ 30.504.617/0001-05*), Associação Serv. Públicos e Autárquicos (*CNPJ 37.880.010/0001-05*) and Associação Assistencial ao Funcionalismo Público (*CNPJ 70.372.131/0001-85*).

Fictitious consigned loans were found to have been recorded under different associations with government entities, contracted using the same CPF number, as were discrepancies in information between the physical documents of the contract and the annotation authorization when compared to what was recorded in the bank's systems (*such as the state of origin of the CPF's holder that was different from what was listed in the associated government entity*) The physical documentation was analyzed for 350 false operations, of which we attached 20 cases on pages 3510 to 3566, for example. It should be noted that the complete names of fictitious contracts can be found in item 6.7.2 and other information and details on these fictitious operations can be seen from consulting the Institution's database.

Official letter 0355/2012-BCB/Desup/GTSP2/Cosup-03, of 5.11.2012 (pages 3497/3499) delivered to BCSul, represented by its CEO, Mr. Luis Octavio Índio da Costa, presented detailed evidence of "invalid items" out of a set of 320,000 (supposed) contracts of consigned credit operations at public entities, for the base date 2.29.2012.

Upon request by the BCSul, on 5.15.2012, a meeting to clarify matters was held between the Central Bank of Brazil / Desup, and the Director of the Controller's Office, Maria Luisa Garcia de Mendonça, in regard to details of the operations and calculation of the amount involved, and on 5.21.2012 (according to the email on pages 3500/3502), a list was sent of each of the 320,001 "invalid" operations. It should be noted that a more complete list of fictitious contracts is referenced in item 6.7.2. Likewise, other information and details of these fictitious operations can be seen by consulting the database of the company Cruzeiro do Sul.



**BANCO CENTRAL DO BRASIL**

In a reply to the Official Letter, dated 5.8.2012 (pages 3503/3508), BCSul did not present any new facts or arguments that could explain the situation indicated by the Banking Supervision, as it's also stated in Official Letter 0523/2012-BCB/Desup/GTSP2/Cosup-03 (page 3509).

**6.7.2      Findings in the period after the decree of the TSAR**

After the TSAR was decreed, the Credit Guarantee Fund (CGF) adopted the strategy of working with three different and independent teams, in order to conduct a more detailed verification of the so-called "invalid items," in order to obtain the final number with a high degree of certainty.

These teams were composed of the own auditors[79] of the TSAR Administrator and from the following contracted companies: "BSI Consulting" (formerly "ESM Projetos" [ESM Consultoria e Gestão de Projetos em Tecnologia da Informação Ltda. - EPP, CNPJ 05.696.932/0001-34], incorporated by BSI Tecnologia Ltda., CNPJ 53.690.392/0001-24), under the responsibility of Mr. Carlos de Almeida; together with a team of BCSul employees from the information technology area - TI, which was called the "Information Center," and "IMS Technology and Services" (IMS Tecnologia e Serviços Ltda., CNPJ 13.778.765/0001-07); in addition to the consulting area of PWC Independent auditors (PriceWaterhouseCoopers) - PwC Brasil Independent auditors (associate of "PricewaterhouseCoopers International Limited").

These teams worked in the following manner:

a) The CGF audit concentrated on identifying the people on the BCSul staff who participated in the process of placing the fictitious assets in the system and controlling them;

b) The "Information Center" and BSI Consulting identified a systematic logic in the "invalid" operations; and

c) IMS used the financial criterion, recomposing the write-offs after reconciling the cash transactions.

The calculation methods used by CGF, BSI and IMS audits were independent, and one team did not interfere with the work of another.

Based on the information of the existence of a false operations portfolio, called "invalid," and of the characteristics of these operations, the main reason for the decree of the TSAR, the audit confirmed in the consigned credit portfolio, an estimated value of R$ 1,290,000 – base date 5.31.2012, composed of consigned credits that had not been formalized, released and received.

---

[79] The audit was composed of two teams: one dealt with "insubsistencies" and evidence of fraud and the other was responsible for the opening balance sheet of the regime, consolidating accounting adjustments and provisions.



# BANCO CENTRAL DO BRASIL

The results obtained are based on principles and analyses that do not coincide with the work of the Central Bank of Brazil, such as interviews with those responsible for placement in the data systems of the "non-existing" operation, verification of details of improper operation and measures for their exclusion from the database, identification of a hidden script[80] in the Tools System, which generated different types of reports, hiding the effects of the "invalid" operations, and elimination of internal procedures and filters from the system database.

Through these procedures, a universe of fictitious operations was identified that were previously unknown, representing 655,483 false operations, whose code or table included, in addition to H41, the codes 219, 225, 250, 285, 458, 742, 756, 799, 800, B81, F25, H41, UU7, and XYZ.

Besides these, another 27,164 operations were "created" based on operations written off as losses (*breached contracts, cases in which the borrower died, etc.*), known at BCSul as "product 64," table BVN, and recorded at the Securitization company. Thus, the fictitious operations totaled 682,647 false contracts.

The final adjustment adopted by the administrator for the "invalid" operations in the opening balance of the TSAR, which was R\$1,388,362,000, was composed of the following amounts: R\$1,276,940,000 in the securities portfolio, R\$ 111,320,000 in the company's own portfolio, R\$ 97,000 in the operations of the Securitization company and a smaller amount of R\$ 5,000 assigned to another financial institution.

To identify the procedures for removing these fictitious operations, which simulated a flow of installment payments, the systemic operationalization of a set of contracts was mapped out and it was found that these procedures were concentrated in the Operations and Credit Processing Area–Operational Control.

By crossreferencing the database of the Retaguarda System and the support of the credit workflow for regular operations, it was found that there were a large number of write-offs without backing or counter-entry in the BCSul accounting or financial systems.

Attached is a table prepared by Rodrigo Almas before the TSAR and sent to Upper Management (Luis Felippe Indio da Costa, Horacio Martinho Lima with a copy to Roberto Augusto Valente and Luis Octavio Azeredo Lopes Indio Da Costa) on March 20, 2012, with a future balance of the installments without assignment of R\$ 1,817,613,000 on pages 3567 to 3571 and a table prepared by Mr. Alan Roda, at the request of CGF, on July 10, 2012, of the fictitious balances at that time, of R\$ 1,259,596,000, (**OBS: not including product 64),** on pages 3572 to 3573.

---

[80]  Scripts are followed by computer systems and present information that is processed and transformed into actions Taken by a principal program.



# BANCO CENTRAL DO BRASIL

The supervisor of credit processing[81] would send a file to the employees, containing a list of fictitious contract installments for manual removal, outside the system. The process of removing these installments from the Tools System was made operational by a batch system,[82] which affected the Annotation and Production Support Systems, through the receipt of files, without reconciling it with the financial department (declaration on pages 3574/3575).

The inclusion of new operations directly in the Tools System was done through the "Assistance Module." Entry using this module replaced data entry in the BCSulCred system (standard system for recording proposals and operations) and allowed the information to be directly placed in the Tools base, without the invalid operations going through the Retaguarda System Base or Credit Workflow, where the credit release controls and controls for contract formalization and support documentation were located.

The operations of this fictitious portfolio were provided in magnetic format by Luís Felipe Índio da Costa and/or by Horácio Martinho de Lima. The files contained in these media were imported into the Tools base, using the Assistance Module,[83] and after the importing, the magnetic media were returned to the senders.

The maintenance and periodic write-offs of this portfolio were requested directly by Luís Felipe Índio da Costa or Horácio Martinho de Lima through magnetic format that contained operations to be removed. The files in the magnetic format were loaded in a network directory, and sent by email for removal of the installments in the "Operations Processing" area. Documentation prepared by Mr. Alan Roda at the request of CGF: "Step by Step –Receipt by Nature Report," which presents the filter criteria in the base and the result obtained of R$ 1,259,000 on pages 3576 to 3585.

BSI Consulting was contracted by CGF principally to meet the technology needs of the new administration, and adopted the following immediate actions:

• Recommendation of procedures to guarantee the availability of evidence that would make it possible to evaluate the problems found at BCSul;

• Definition and performance of risk control and mitigation measures in the bank's production, since the operation would be under the management of CGF executives;

• Guarantee operational and business continuity of BCSul, in order to make the bank attractive to potential buyers.

---

[81] Mr. Rodrigo Almas, Supervisor of Operational Control.
[82] Batch system or lot file program is a computer resource used to automate tasks; in other words, a set of commands that are run sequentially.
[83] This module was not known to the Bank's technology area and was not listed in the area's documentation as "Flows – Relationship Entity Model" in the Tools System.



**BANCO CENTRAL DO BRASIL**

After performing these first measures, BSI focused on support for the audit; coordination of the "Information Center" in the investigation of the "invalid" assets and other demands; information security procedures; change management; and preparation of the "Data Room" for potential investors.

The "Information Center" was created to calculate the "invalid" contracts, for determining and validating the calculation of the present and future value of these; for compiling requests and generating information for the PWC and IMS audits; the comparative analysis of the data presented by the audits; the composition of the GMUD Table to accelerate the process of approval of changes; and response to needs of the other CGF teams that were acting in the audits.

BSI and the "Information Center" each independently looked for a systemic logic in the fictitious operations, based on analyses of the BCSul database, and obtained a set of characteristics and principles that allowed the identification of these contracts on 7.2.2012, which came to the same number (R$ 1,388,362,000) of "invalid" operations.

To identify these contracts, they used a copy of the production database (*which feeds the data from the accounting balance of the conglomerate via the Tools System*) with the following criteria for contract filters:

- Identify whether the entry occurred through the Assistance Module <u>or</u>
- Through the function "bcsul_f_filter return 0" (*which, theoretically, would mean that the entry did not occur through the Annotation System, which makes the forecast of receipt with the associated government entity*) <u>or</u>
- Verification that they do not exist in the Retaguarda database (*not having been part of the credit workflow*) <u>and</u> are not voucher paper *(because this type of contract enters the Tools base directly, without going through the credit workflow*) <u>and</u>
- When they do not belong to securitization companies (companies/stores 36 and 84)
- <u>and</u>
- The product is not Consigcard (product 63) <u>and</u>
- If they are active contracts (status "0-open" and "1-re-opened")
- <u>and</u>
  If they do not belong to the company 62-Bancred (accounting closed) <u>and</u>
  If they do not belong to the store 0008-Employees.

The data structuring language *procedure query/script* of PL/SQL and the respective resulting table (without the portfolio of product 64), pages 3586 to 3588, were prepared and performed by the Information Center of the BCSul, and constituted the basis for the accounting adjustment.

These fictitious operations, also called "invalid," are indicated as such in the database of BCSul, from where the complete list of identifiers (numbers) was taken for the 682,647 contracts, pages 3589 to 4364.



**BANCO CENTRAL DO BRASIL**

Likewise, other information and details on these fictitious operations can be obtained by consulting this same database belonging to the Institution.

Some product 64 contracts in the 2008 fiscal year were "invalid." Since the filters used in the previous analysis did not return these contracts, they were obtained through the following criteria:

- Check if they are active contracts status "0-open" and "1-re-opened" <u>and</u>
- If it is product 64.

| Type of Contract | Qty |
|---|---|
| **"Invalid" contracts** | 655,637 |
| **"Invalid" contracts – product 64** | 27,010 |
| TOTAL | 682,647 |

The analysis of the database ratified the concentration of the origin of the fictitious operations in a few stores or intermediaries (named the "group of the 11 stores").

Following are graphs of the balances that make up the amount of the adjustment of the "false" operations by financing table and by year of origin:

- Contract balances by financing table and store (five largest tables)



Note: Table BVN was used to rename "product 64" operations.

210

**BANCO CENTRAL DO BRASIL**

- Balances of the false contracts that made up the adjustment[84] amount, stratified by year of origin:



   "IMS Technology and Services" was contracted by CGF to use its system called Bank.net, which principal functions are the management of receivables of the financial institutions, to mirror the consigned credit portfolio of BCSul, currently managed in the Tools System, in order to perform "reverse reengineering" of the transactions in the last quarter to identify "invalid" operations in this portfolio, beginning with the base date June 30, 2012.

   Among the independent work activities performed by IMS are:
- Loading the general record of operations
- Recreating the transactions of April, May and June/2012
- Re-updating the transactions of April, May and June/2012
- Producing portfolio positions according to this update
- Comparing the re-updated data and operating information issued by the issuing entity
- Comparing the data found and the financial information recorded at the bank and in the transaction accounts
- Cross-referencing the transaction operations with the recovered operations
- Implementing the Bank.net network for independent capture of transactions, thus allowing monitoring of receipts from assignees.

   IMS conducted a "parallel" proceeding of the credit operations, replacing the BCSul standard systems, especially the Tools System, from the credit operation

---

[84] The false contracts were reflected in the bank's accounting and therefore also had accounting flow of write-offs installments simulating a real operation, however, they did not have financial flow, as detailed in the Central Bank inspection report in the period prior to the TSAR.



# BANCO CENTRAL DO BRASIL

transactions making it possible to check and validate only those contracts based on real operations, through financial flows, as release of the amount financed and payments of the monthly installments, in addition to the annotations of the consigned credit operations at the respective entities.

It was necessary to remove "false positive," cases, such as the effects of non-payment and late payments in the months studied, in addition to other exceptions that were justified.

Although this is an independent methodology and is based on different premises, the result is close to that found by the other teams, and the amounts converge. Pages 4365/4377 contain the "Investigation and Non-Existing Portfolio Identification Proceeding" on the consolidation between the methodologies.

In the PwC Consultoria report, the portfolio of "invalid" assets was based on the criteria used by the CGF audit, but which incorporated some situations that were understood to be more appropriate, principally in regard to confirmation of the lack of financial liquidation during the post-TSAR period, through a comparison of the "invalid" assets with the table of installments from the Tools System database.

The basic premise of the consultation is based on relatively simple logic, which is that the fictitious operations would no longer be artificially "written off" from the portfolio through accounting maneuvers that simulated a payment flow of installments, during the period after the Regime was decreed.

No write-offs were found for installments maturing beginning in May 2012, except for some product 64 operations (*approximately 200*); the criteria used to access the database were the following:

• Operations that originated in the Assistance Module (*script found by CGF*) or
• Operations whose origin did not go through the Annotation System (*no expectation of receipt from client*) or

• Operations whose origin did not go through the Retaguarda System (*did not originate in the credit workflow*) and that are not paper vouchers (*since this type of operation enters directly in the Tools System, without going through the credit workflow*) and

• Operations whose product is not Consigcard and

• Active operations (*status: 0 - open and 1 - re-opened*) and

• Operations that do not belong to store 0008-Employees.

Identification of reopened operations for contracts already in the system for product 64:



# BANCO CENTRAL DO BRASIL

• Active operations (*status: 0 - open and 1 - re-opened*), and

• Operations whose product is 64.

In this manner, PwC indicated an amount of "invalid" assets, less provisions for doubtful credits, of R$ 1,331,558,000, which is approximately 99.9% of the net value of the adjustment, with the remaining amount being immaterial.

### 6.7.3    Conclusion: Invalid Operations

The adjustment presented in the entity's opening balance sheet, that is, R$1,388,362,000 total, is composed of R$1,276,940,000 in the securities portfolio, (*investments in subordinated shares of CRIFs*), R$ 111,320,000 in its own credit operations portfolio, R$ 97,000 in operations assigned to the securitization company and R$ 5,000 assigned to another financial institution.

In light of everything that has been shown, the existence of these fictitious operations in the financial institution's accounting records has been demonstrated, and proven, given the methodologies used to examine and measure them.



# BANCO CENTRAL DO BRASIL

## 6.8        SUMMARY CHART - IRREGULARITIES

Pursuant to the aforementioned terms, evidence was found of the following administrative and/or criminal violations:

| Acts | Administrative Irregularity | Criminal Irregularity | Chapter |
|------|------------------------------|------------------------|---------|
| Mislead the regulatory authorities relative to the value attributed to the shares of the CRIFs recorded in its Balance Sheet. | Circular Letter 1.273/1987, Cosif 1-2-5, cc Art. 7, § 1, section II, line "d," of CFC n 750/1993 | Arts 6 and 10, of Law 7.492/1986 | 6.1 |
| Issue BCN without backing<br><br>Make insufficient provisioning in its credit portfolio in the "middle market" segment, violating the criteria defined in Resolution 2.682/1999 (Arts. 2, 3 and 4). | Arts. 2, 3 and 4 of Res. 2.682/1999 | Arts 6, 7 and 10, of Law 7.492/1986 | 6.2 |
| Not make provisions for exposure to credit risk of the portfolio of accommodations and guarantees, in violation of the provision in item III of the sole paragraph of Art. 2 of BC Circular Letter 3721, of 4.30.2009, combined with item XII of Art. 4 of the same Circular Letter. | Art. 2 sole paragraph, combined with Art. 4, XII, both of BC Circular Letter 3721 | Arts 6 and 10, of Law 7.492/1986 | 6.3 |
| Provide a prohibited loan to a company controlled by the institution's administrators. | Art. 34, section V, of Law 4.595/1964 | Art 17 of Law 7.492/1986 | 6.4 |
| Cause and/or contribute to cause illicit transfer of foreign currency from Brazil. | | Art 22, Sole Paragraph of Law 7.492/1986 | 6.5 |
| Not give notice of operations, with evidence of money laundering. | Arts. 11, sections I and II-b and 12, of Law 9.613/1998, regulated by Circular BC 3.461/2009 | | 6.6 |
| Forge consigned personal loans to inflate asset values and profits / net equity of the financial institution. | Art. 31 of Law 4.595/1964, COSIF 1.1.2.3, 1.1.2.7 (Circular 1.273/1987) | Arts 3, 4, 6, 7, 9 and 10 of Law 7.492/1986 | 6.7 |
| Fraudulently manage a financial institution | | Art. 4 of Law 7.492/1986 | |



# BANCO CENTRAL DO BRASIL

Therefore, in regard to the evidence of administrative irregularities, the Investigation Commission suggests that this case be sent to the competent sector of this Agency, in order to evaluate the feasibility of filing an Administrative Proceeding against those responsible.

In regard to the evidence that crimes were committed, it should be noted that an investigation was already conducted by the Federal Police about these same facts, in case record IPL no. 196/2012-11 (Case no. 0006640-61.2012.403.6181 – 2nd Federal Criminal Court of São Paulo/SP), in which a charge was filed by the Federal Prosecutor's Office.

Therefore, this Investigation Commission also suggests that this case be sent to the 2nd Federal Criminal Court of São Paulo/SP, to support the investigation of the facts and of those responsible.

## 7.    ERRORS AND HARMFUL OMISSIONS

On May 27, 2011, Banco Cruzeiro do Sul acquired 9.25 shares of VERAX IAA FUNDO DE INVESTIMENTO EM DIREITOS CREDITÓRIOS NÃO – PADRONIZADOS ("Verax IAA CRIF NP"), for the price of R$ 9,250 000 (**page 1123**). As emphasized in **Note no. 15 – Investments in the Verax IAA Fund**, this fund held a single asset in its portfolio, corresponding to Credit Rights from an indemnification action filed by Usina Bititinga against the Federal Government, in its capacity as the successor to Instituto Brasileiro do Açúcar e do Álcool, before the Federal Court of the Judicial Section of the Federal District, case No. 90.0001948-6 and related actions, in light of the order by the Union to pay indemnification for material damages found as a result of the setting of sugar and alcohol prices below its production cost (**page 1137**).

As also emphasized in **Note no. 15 – Investments in the Verax IAA Fund**, the likelihood of receipt of this asset is very doubtful, as is the timeframe of such receipt, since the lawsuit related to the credit right is facing a series of events that make it unlikely that the credit will actually be received. The fund's own regulation states that shares in Funds and Investments in Credit Rights have low levels of liquidity, as follows:

> "*SECONDARY MARKET RISKS: The FUND is established as a closed-end fund, therefore, the Shares can only be redeemed at the end of the term of each issue; for this reason, if for any reason, before the end of this period, the investor decides to sell his Shares, he will have to sell them on the **secondary market for investment fund shares, a market that is highly illiquid in Brazil, which could lead to difficulty in selling these Shares and/or cause them to be sold at a price that could represent a loss to the investor.**" (page 1071)*

In addition to the fact that credit right fund shares are not very liquid on the market, due to the existence of a lawsuit involving several attachments, the specific credit rights of this fund are in an even more delicate situation in regard to liquidity.



# BANCO CENTRAL DO BRASIL

In spite of this characteristic, when Banco Cruzeiro do Sul acquired these shares, it classified them under the category "Negotiation Instruments," pursuant to the terms of Circular Letter 3.068, of November 8, 2011, issued by the Central Bank of Brazil. Securities classified in this category, according to the Circular Letter, are those that were "acquired for the purpose of being actively and frequently traded." It is not reasonable to classify the acquisition of a security for which illiquidity is an intrinsic characteristic as a "Security for Trading," since it is not possible to speak of active and frequent trading for a security for which there is no active market.

The adjustments to market value of the securities classified in this category are recorded as counter-entries to the result for the period; in other words, they generate revenues (in the event of an increase in market value) or expenses (in the event of a decrease). BCSul made a single investment in the fund, on May 27, 2011, in the amount of R$ 9,250,000. On May 31, 2011, it calculated the market value of the shares, recording an adjustment to market value of R$ 24,158,000, totaling, at the end of the first month of investment, book value of R$ 33,408,000 (valuation of 261%).

In spite of the discussion on the market value of the shares, considering that it is not possible to intent to actively and frequently trade a security for which the secondary market is practically non-existent, the most appropriate classification for the share would be the category "Available for Sale," under the terms of Circular Letter 3.068. In this category, increases in the security's market value are recorded against the Net Equity account, and the actual result only occurs at the time of maturity or sale of the security. In this case, these valuations are not the basis for distribution of dividends.

Just for the record, the third and final classification allowed under Circular Letter 3.068 is the category "Held until maturity." In this category, the securities are not measured at market value, since given that the intention is to hold them in the portfolio until the final deadline, the market value fluctuations should not affect the institution's financial position. In this particular case, this category could also be used, under its regulation, since it has an estimated maturity.

BCSul's pretax result in the second quarter of 2011 was R$ 79,108,000, according to the financial statements dated June 30, 2011; in other words, 30.5% of the bank's results came from the valuation of this asset. It should be pointed out that this valuation is a result that does not have a corresponding cash entry, and this result was the basis for the payment of dividends in the period.

In 2011, based on the financial statement dated December 31, the institution had profits of R$ 137,203,000, of which R$ 60,500,000 was distributed as dividends and interest on shareholder's equity (ISE); in other words, 44% of the profits. If revenues from the operation (net of taxes) were ignored, and the same percentage of distribution of dividends and ISE were maintained, the amount distributed would be R$ 52,510,000,000; in other words, there would be a reduction of R$ 7,989,000. Adding to this payment the

216



# BANCO CENTRAL DO BRASIL

investment in the fund (R$ 9,250,000), it can be seen that the operation led to a cash disbursement of R$17,239,000, without a reasonable perspective of actual cash receipt, a practice that does not follow the precepts of proper liquidity management for financial institutions.

Based on these facts, it has been demonstrated that the investment in shares of the Verax II Investment Fund, a low liquidity investment, associated with its classification in an incorrect category, was done to generate revenue for the institution, increasing its revenue in the period, and, as a result, the dividend distribution base.

## 8. EXISTENCE OF PHONE CONVERSATIONS RECORDED AT BANCO CRUZEIRO DO SUL

When analyzing the provisions and adjustments made in the opening Balance Sheet presented by the then Temporary Special Administrator, the Credit Guarantee Fund, this Investigation Commission requested the recordings made at the operating table of Cruzeiro do Sul S.A. Corretora de Valores e Mercadorias, due to the existence of box operations at the Tâmisa Fund, which had Banco Cruzeiro do Sul as its sole shareholder.

The intention of the Investigation Commission was to verify box operations made at Cruzeiro do Sul S.A. Corretora de Valores e Mercadorias for which provisions were made, since under the rules of the Securities and Exchange Commission, all operation orders were to be recorded.

During the course of the work, recordings were found that do not refer to Box operations, including recordings of phone conversations of members of this Investigation Commission, in the exercise of its functions, an extremely serious fact, which could compromise the investigations and the determination of the liability of the administrators of the aforementioned institutions, in addition to configuring a breach of confidentiality of the operations investigated.

Recordings were also found that indicate monitoring by the administrators of the institutions undergoing extrajudicial liquidation of the activities of the inspection teams of the Central Bank of Brazil that were supervising the institutions prior to the decree of the TSAR.

These facts were brought to the attention of the Federal Prosecutor's Office, in Official Letter CI-CSBANCO-2012/032 (**page 620**). It should also be noted that the President of the Investigation Commission presented a statement to the Federal Police regarding these same facts in Police Investigation record 196/2012-11.



# BANCO CENTRAL DO BRASIL

**9.    MORGAN STANLEY - CRUZEIRO DO SUL OPERATION[85]**

This was an operation to comply with free float requirements, according to Notices to the Market issued by Banco Cruzeiro do Sul (public access documents), of May 17 and 18, 2012, which was questioned by this Investigation Commission, leading to the following analysis:

**Operation Structure**

The purpose of the operation was to guarantee that Banco Cruzeiro do Sul S.A. complied with the Differentiated Corporate Governance Practices Regulation Level 1 of BM&FBovespa, the Minimum Percentage of Shares in Circulation of 25% (*free float*). The Institution was not in compliance since May 2010 and due to the violation in the previous period, the bank was ordered to pay a fine and received a warning of a possible suspension of trading of its shares.

The operation's structure consisted of the purchase and sale of 8,939,882 shares of Banco Cruzeiro do Sul S.A. on the sight market auction of BM&FBovespa (Market Notice dated 5.17.2012, sale on 5.18.2012 and financial liquidation at D+3, or 5.23.2012).

These shares belonged to the controllers of Banco Cruzeiro do Sul (Luis Felippe and Luis Octavio Índio da Costa) and the sale was operationalized through the Hudson and Missouri Funds, whose only shareholders were the controllers themselves. The purchase was made by the Caieiras Fund, whose only shareholder is Banco Morgan Stanley, at the price of R$12.79 per share. The total amount of the operation was R$ 114,341,091.60.

Next, the controllers of Cruzeiro do Sul performed a Share Derivative Operation with Morgan Stanley, through each of the Hudson and Missouri Funds, which consisted of the grant of two options with the same date and strike price: Option 1, or Purchase Option, given to the controllers' fund, to receive the positive difference, if any, between the closing price of the shares on the Date of Exercise of the Option and the artificially established Strike Price (R$ 15.39); and Option 2, or Sales Option, given to Morgan Stanley Bank, to receive the positive difference, if any, between the previously established Strike Price (R$ 15.39) and the closing price of the shares at the time the Option was Exercised[86].

These two options, contracted at the same time, removed the exposure from Morgan Stanley Bank to the positive or negative effects of the

---

[85] Documents on pages 5086/5248.

[86] The derivative operation of each Hudson and Missouri fund, consisted in joining (*Synthetic Forward)* a purchase option (*call*) and a sale option (*put*), with all having the same maturity date and the same strike price (*strike*) of R$15.39 per share. The premiums of the options were established at amount that annul each other; thus, none of the parties had to disburse any amounts, as payment of the premium.



**BANCO CENTRAL DO BRASIL**

variation in price of the 8,939,882 preferred shares issued by Banco Cruzeiro do Sul, acquired by the Caieiras Fund.

The funds from the sale of the shares were entirely converted into BCDs issued by Morgan Stanley Bank to the Hudson and Missouri funds, and immediately thereafter, these same BCDs were the object of a fiduciary sale to guarantee the derivative operations, on 5.23.2012. The BCDs were issued for the term of 501 business days, at an annual rate[87] of 8.28% for a year of 252 business days.

If, on the date the options are exercised, the shares were quoted below the price previously established by the contracting parties, the difference would be paid by the controllers' funds to Morgan Bank for the exercise of the sale option. On the other hand, if the shares were quoted at a price higher than the pre-established amount, Morgan Bank to would pay this difference to the funds of the controllers of Banco Cruzeiro do Sul, for the purchase exercise.

The Global Derivative Contracts for these operations were signed on 5.15.2012 and the Confirmations of the Derivatives Operations on 5.18.2012, with maturity on 5.20.2014.

Morgan Stanley Bank S.A., in its capacity as Calculating Agent, established in the Global Derivative Contract, after the TSAR was decreed and with share trading suspended, understood that an Interruption / Instability – Interruption of Trading Event had occurred and determined early maturity of the derivatives, on 6.6.2012, under the same liquidation conditions as the original derivatives, defining the Early Maturity Value of R$ 117,112,454.20, and, at its discretion, in light of the lack of a market price on that date, adopted the amount of R$ 0.00 per share as the reference value.

Thus, the purchase options completely lost their value, and there was nothing to be paid to the Missouri and Hudson funds. For the sale options, the original strike price of R$15.39 was discounted to present value, at the annual discount rate of 8.65%, resulting in an adjusted strike price of R$13.10 per share, which, multiplied by the total number of shares, resulted in the aforementioned Payment Amount.[88]

The principles used by Morgan Stanley Bank reduced to zero the value of the purchase options held by the controllers' funds against Morgan and represent the total value of the sales options of Morgan Stanley Bank against the controllers' funds.

---

[87] The pre-established BCD rate takes its redemption value, after two years, to the amount equivalent to the multiplication of the number of shares by the strike value of the options.

[88] The foreclosure on the guarantees will be made at the value of the BCDs, which is not sufficient to cover the Payment Value previously calculated by Morgan Stanley Bank, generating a total balance due of R$3,063,780.75, which, among other actions, was contested by the Temporary Special Administrator.



# BANCO CENTRAL DO BRASIL

Thus, the structure of this operation meant that funds in the amount of R$ 114,341,091.60 left the Caieiras Fund to purchase the shares; these funds returned in the form of investments in BCD of Morgan Stanley Bank, which guaranteed the derivatives operation; this left the Caieiras Fund, controlled by Morgan, with the shares acquired in the auction; and the controllers and their funds were left without any assets.

The decree of the TSAR, on 6.4.2012 led to the contractual rescission, after only 11 business days of life for the operation, whose original maturity was 5.20.2014.

However, there is no evidence that this was due to the affirmed prior knowledge by Morgan Stanley Bank, of the imminence of the decree that established the TSAR, given the confidential character of legal acts of this nature, particularly when ordered by the Central Bank of Brazil.

However, the same cannot be said of the controllers of Banco Cruzeiro do Sul, since the Official Letter sent by the Central Bank, which refers to the invalid operations, was received by Mr. Luis Octavio Indio da Costa on 5.11.2012.

From the standpoint of the legality of the contracts, they were signed by institutions belonging to the financial system; therefore, these were qualified parties that understand how the market functions; in addition, they agreed to specific declaratory clauses related to the independence of the parties, knowledge of contract terms and appropriateness of the investment profile (Suitability), among others.

The Global Derivatives Contract (GDC) followed the standardized GDC contract model used by the market and available on the site of the Brazilian Federation of Banks (Febraban), on the Internet. No arbitration tribunal or judge was chosen, but the courts of the capital city of the state of São Paulo were selected to settle any discrepancies between the parties in relation to the contractual clauses.

The structure of the operation, as well as the dates and the manner in which it was conducted, show that the basic raw material was the auction of the shares that would be conducted by Banco Cruzeiro do Sul to comply with the BM&FBovespa regulations.

All acts performed, from the Global Derivatives Contract to the fiduciary sale of the BCDs given in guarantee, are directly related to the auction of the shares. However, only the supervision and regulation entities of this market have the authority to evaluate whether there were any irregularities in this auction.

The discrepancies between the parties, such as those related to the interpretation of the contractual clauses, the consequences of the suspension of the sale of the Banco Cruzeiro do Sul shares on the BM&FBovespa and to the calculation of the liquidation values of the derivatives are part of the commercial relationship and can only be discussed at the proper venue, and are thus outside the sphere of activity of this Investigation Commission.



# BANCO CENTRAL DO BRASIL

In light of the foregoing, we suggest that this report be sent to the Securities and Exchange Commission, for investigation of matters under its authority.

## 10.    CAUSES OF THE BANKRUPTCY

The decree of the Temporary Special Administration Regime – TSAR of **BANCO CRUZEIRO DO SUL S.A.** resulted from its compromised economic and financial situation and the serious violation of the rules issued by the National Monetary Council and the Central Bank of Brazil.

According to what was found by this Investigation Commission, the cause of the bankruptcy of BANCO CRUZEIRO DO SUL was principally the result of the adjustments indicated in **Chapter 4.3 –ADJUSTED NET EQUITY** (**4.3.1 - Explanatory Notes of the adjustments made by the CGF, notes from  1 to  26**) and the irregularities  described in **Chapter 6 – IRREGULARITIES FOUND**.

## 11.    LOSSES FOUND

In order to calculate the amount or to reach an estimate of the losses caused to third parties, established  in Article 43, of Law no. 6.024/1974, the analysis of the operations in the last five (5) years and the balance sheet of **BANCO CRUZEIRO DO SUL S.A.** calculated by the CGF, on the date of the TSAR (6.4.2012) were used.

According to the Adjusted Equity Situation on 6.4.2012, losses for third parties were calculated (Art. 43 of Law no. 6.024/1974) at the estimated amount of **R$ 2,236,782,000** as described in item **4.3 – Adjusted Net Equity** of this report, for which liability was jointly and severally assigned, pursuant to the terms of Art. 40, of Law 6.024/1974, among the controllers and former shareholders/administrators of **BANCO CRUZEIRO DO SUL S.A** who made up the following management periods, according to summary charts 1 and 2 and the other subsequent charts, prepared in accordance with the criteria  described on  **pages 5543/5607**:

### SUMMARY CHART 1

In reais

| Management Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| Trial Balance /Base Date | Oct/2007 | Feb/2008 | Oct/2008 | May/2009 | Mar/2011 | Oct/2011 | Dec/2011 | Apr/2012 | 06/04/2012 |
| NE | 866,246,000 | 1,017,075,000 | 1,136,202,000 | 1,049,695,000 | 1,121,105,000 | 1,155,887,000 | 1,145,068,000 | 1,201,283,000 | |
| CREDIT TO PROFIT ACCOUNT | 574,503,000 | 280,908,000 | 1,026,846,000 | 889,318,000 | 699,032,000 | 2,076,021,000 | 2,941,001,000 | 6642,448,000 | |
| DEBIT TO PROFIT ACCOUNT | 452,613,000 | 241,812,000 | 1,042,981,000 | 907,873,000 | 699,002,000 | 2,051,256,000 | 2,885,344,000 | 802,979,000 | |
| ANE | 988,136,000 | 1,056,171,000 | 1,120,066,000 | 1,031,140,000 | 1,151,134,000 | 1,180,653,000 | 1,200,725,000 | 1,040,753,000 | 874,115,000 |

In reais

| Management Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| Total Adjustments | 1,011,403,000 | 7,482,000 | 79,323,000 | 87,335,000 | 513,547,000 | 406,563,000 | 122,655,000 | 527,667,000 | 354,922,000 |
| Accumulated Adjustments | 1,011,403,000 | 1,018,885,000 | 1,098,208,000 | 1,185,543,000 | 1,699,090,000 | 2,105,653,000 | 2,228,308,000 | 2,755,975,000 | 3,110,897,000 |

221



# BANCO CENTRAL DO BRASIL

**SUMMARY CHART 2**

In R$

| PERIOD | PLA | ACCUMULATED ADJUSTMENT | PLA AFTER ADJUST. | LOSS IN PERIOD |
|--------|-----|------------------------|-------------------|----------------|
| 1 | 988,136,000 | 1,011,403,000 | (23,267,000) | **(23,267,000)** |
| 2 | 1,056,171,000 | 1,018,885,000 | 37,286,000 | - |
| 3 | 1,120,066,000 | 1,098,208,000 | 21,858,000 | - |
| 4 | 1,031,140,000 | 1,185,543,000 | (154,403,000) | **(154,403,000)** |
| 5 | 1,151,134,000 | 1,699,090,000 | (547,956,000) | **(393,553,000)** |
| 6 | 1,180,653,000 | 2,105,653,000 | (925,000,000) | **(377,044,000)** |
| 7 | 1,200,725,000 | 2,228,308,000 | (1,027,583,000) | **(102,584,000)** |
| 8 | 1,040,753,000 | 2,755,975,000 | (1,715,222,000) | **(687,639,000)** |
| 9 | 874,115,000 | 3,110,897,000 | (2,236,782,000) | **(521,560,000)** |

## Management Team 1 => Loss of R$ 23,267,000

| Name | CPF | Position | Management Period |
|------|-----|----------|-------------------|
| Luis Felipe Indio da Costa | 006.034.067-34 | Controller / President of the Board / Director of Investor Relations | 4.23.07 to 10.31.07 |
| Luis Octavio Azeredo Lopes Indio da Costa | 782.474.977-00 | Vice President of the Board / CEO | 4.23.07 to 10.31.07 |
| Progresso Vaño Puerto | 410.915.908-34 | Independent Director | 4.23.07 to 10.31.07 |
| Fabio Rocha do Amaral | 076.593.208-31 | Director | 4.23.07 to 10.31.07 |
| Charles Alexander Forbes | 001.906.918-91 | Director | 4.23.07 to 10.31.07 |
| Horácio Martinho Lima | 745.862.547-37 | Director | 4.23.07 to 10.31.07 |
| Ernani Fonseca Neto | 625.936.257-91 | Director | 4.23.07 to 10.31.07 |
| Fabio Caramuru Correa Meyer | 715.168.917-91 | Director | 4.23.07 to 10.31.07 |
| João Lara de Souza Meirelles Filho | 644.384.148-49 | Director | 4.23.07 to 10.31.07 |
| José Carlos Lima de Abreu | 385.584.168-34 | Director | 4.23.07 to 10.31.07 |
| Luiz Whately Thompson | 029.335.198-87 | Director | 4.23.07 to 10.31.07 |
| Maria Luisa Garcia de Mendonça | 380.376.616-87 | Director | 4.23.07 to 10.31.07 |
| Sergio Marra Pereira Capella | 041.247.618-56 | Director | 4.23.07 to 10.31.07 |

## Management Team 4 => Loss of R$ 154,403,000

| Name | CPF | Position | Management Period |
|------|-----|----------|-------------------|
| Luis Felipe Indio da Costa | 006.034.067-34 | Controller / President of the Board / Director of Investor Relations | 10.31.08 to 6.1.09 |
| Luis Octavio Azeredo Lopes Indio da Costa | 782.474.977-00 | Vice Presidente of the Board / CEO | 10.31.08 to 6.1.09 |
| Progresso Vaño Puerto | 410.915.908-34 | Independent Director | 10.31.08 to 6.1.09 |
| Fabio Rocha do Amaral | 076.593.208-31 | Director | 10.31.08 to 6.1.09 |
| Charles Alexander Forbes | 001.906.918-91 | Director | 10.31.08 to 6.1.09 |
| Horácio Martinho Lima | 745.862.547-37 | Director | 10.31.08 to 6.1.09 |



**BANCO CENTRAL DO BRASIL**

| | | | |
|---|---|---|---|
| Fabio Caramuru Correa Meyer | 715.168.917-91 | Director | 10.31.08 to 6.1.09 |
| José Carlos Lima de Abreu | 385.584.168-34 | Director | 10.31.08 to 6.1.09 |
| Maria Luisa Garcia de Mendonça | 380.376.616-87 | Director | 10.31.08 to 6.1.09 |
| Sergio Marra Pereira Capella | 041.247.618-56 | Director | 10.31.08 to 6.1.09 |
| Roberto Vieira da Silva de Oliveira Costa | 769.344.037-20 | Director | 10.31.08 to 6.1.09 |

### Management Team 5 => Loss of R$ 393,553,000

| Name | CPF | Position | Management Period |
|---|---|---|---|
| Luis Felippe Indio da Costa | 006.034.067-34 | Controller / President of the Board / Director of Investor Relations | 6.1.09 to 3.28.11 |
| Luis Octavio Azeredo Lopes Indio da Costa | 782.474.977-00 | Vice President of the Board / CEO | 6.1.09 to 3.28.11 |
| Progresso Vaño Puerto | 410.915.908-34 | Independent Director | 6.1.09 to 3.28.11 |
| Fabio Rocha do Amaral | 076.593.208-31 | Director | 6.1.09 to 3.28.11 |
| Charles Alexander Forbes | 001.906.918-91 | Director | 6.1.09 to 3.28.11 |
| Horácio Martinho Lima | 745.862.547-37 | Director | 6.1.09 to 3.28.11 |
| Fabio Caramuru Correa Meyer | 715.168.917-91 | Director | 6.1.09 to 3.28.11 |
| José Carlos Lima de Abreu | 385.584.168-34 | Director | 6.1.09 to 3.28.11 |
| Maria Luisa Garcia de Mendonça | 380.376.616-87 | Director | 6.1.09 to 3.28.11 |
| Sergio Marra Pereira Capella | 041.247.618-56 | Director | 6.1.09 to 3.28.11 |
| Roberto Vieira da Silva de Oliveira Costa | 769.344.037-20 | Director | 6.1.09 to 3.28.11 |
| Renato Alves Rabello | 527.747.408-00 | Director | 6.1.09 to 3.28.11 |

### Management Team 6 => Loss of R$ 377,044,000

| Name | CPF/CNPJ | Position | Management Period |
|---|---|---|---|
| Luis Felippe Indio da Costa | 006.034.067-34 | Controller / President of the Board / Director of Investor Relations | 3.28.11 to 10.27.11 |
| Luis Octavio Azeredo Lopes Indio da Costa | 782.474.977-00 | Vice-President of the Board / CEO | 3.28.11 to 10.27.11 |
| Progresso Vaño Puerto | 410.915.908-34 | Independent Director | 3.28.11 to 10.27.11 |
| Fabio Rocha do Amaral | 076.593.208-31 | Director | 3.28.11 to 10.27.11 |
| Charles Alexander Forbes | 001.906.918-91 | Director | 3.28.11 to 10.27.11 |
| Horácio Martinho Lima | 745.862.547-37 | Director | 3.28.11 to 10.27.11 |
| Fabio Caramuru Correa Meyer | 715.168.917-91 | Director | 3.28.11 to 10.27.11 |
| José Carlos Lima de Abreu | 385.584.168-34 | Director | 3.28.11 to 10.27.11 |
| Maria Luisa Garcia de Mendonça | 380.376.616-87 | Director | 3.28.11 to 10.27.11 |
| Sergio Marra Pereira Capella | 041.247.618-56 | Director | 3.28.11 to 10.27.11 |
| Roberto Vieira da Silva de Oliveira Costa | 769.344.037-20 | Director | 3.28.11 to 10.27.11 |
| Renato Alves Rabello | 527.747.408-00 | Director | 3.28.11 to 10.27.11 |
| Cruzeiro do Sul Holding Financeira S/A | 13.211.256/0001-70 | Controller | 3.28.11 to 10.27.11 |



# BANCO CENTRAL DO BRASIL

### Management Team 7 => Loss of R$ 102,584,000

| Name | CPF/CNPJ | Position | Management Period |
|---|---|---|---|
| Luis Felipe Indio da Costa | 006.034.067-34 | Controller / President of the Board / Director of Investor Relations | 10.27.11 to 1.10.12 |
| Luis Octavio Azeredo Lopes Indio da Costa | 782.474.977-00 | President of the Board / Director of Investor Relations and CEO | 10.27.11 to 1.10.12 |
| Progresso Vaño Puerto | 410.915.908-34 | Independent Director | 10.27.11 to 1.10.12 |
| Fabio Rocha do Amaral | 076.593.208-31 | Director | 10.27.11 to 1.10.12 |
| Charles Alexander Forbes | 001.906.918-91 | Vice-President of the Board | 10.27.11 to 1.10.12 |
| Horácio Martinho Lima | 745.862.547-37 | Director | 10.27.11 to 1.10.12 |
| Roberto Vieira da Silva de Oliveira Costa | 769.344.037-20 | Director | 10.27.11 to 1.10.12 |
| Fabio Caramuru Correa Meyer | 715.168.917-91 | Director | 10.27.11 to 1.10.12 |
| José Carlos Lima de Abreu | 385.584.168-34 | Director | 10.27.11 to 1.10.12 |
| Maria Luisa Garcia de Mendonça | 380.376.616-87 | Director | 10.27.11 to 1.10.12 |
| Sergio Marra Pereira Capella | 041.247.618-56 | Director | 10.27.11 to 1.10.12 |
| Cruzeiro do Sul Holding Financeira S/A | 13.211.256/0001-70 | Controller | 10.27.11 to 1.10.12 |

### Management Team 8 => Loss of R$ 687,639,000

| Name | CPF/CNPJ | Position | Management Period |
|---|---|---|---|
| Luis Felipe Indio da Costa | 006.034.067-34 | Controller President of the Board / Director of Investor Relations | 1.10.12 to 5.11.12 |
| Luis Octavio Azeredo Lopes Indio da Costa | 782.474.977-00 | President of the Board / Director of Investor Relations and CEO | 1.10.12 to 5.11.12 |
| Progresso Vaño Puerto | 410.915.908-34 | Independent Director | 1.10.12 to 5.11.12 |
| Fabio Rocha do Amaral | 076.593.208-31 | Director | 1.10.12 to 5.11.12 |
| Horácio Martinho Lima | 745.862.547-37 | Director | 1.10.12 to 5.11.12 |
| Roberto Vieira da Silva de Oliveira Costa | 769.344.037-20 | Director | 1.10.12 to 5.11.12 |
| Fabio Caramuru Correa Meyer | 715.168.917-91 | Director | 1.10.12 to 5.11.12 |
| José Carlos Lima de Abreu | 385.584.168-34 | Director | 1.10.12 to 5.11.12 |
| Maria Luisa Garcia de Mendonça | 380.376.616-87 | Director | 1.10.12 to 5.11.12 |
| Sergio Marra Pereira Capella | 041.247.618-56 | Director | 1.10.12 to 5.11.12 |
| Flavio Nunes Ferreira Rietmann | 913.629.627-91 | Director | 1.10.12 to 5.11.12 |
| Charles Alexander Forbes | 001.906.918-91 | Vice-President of the Board | 1.10.12 to 5.11.12 |
| Cruzeiro do Sul Holding Financeira S/A | 13.211.256/0001-70 | Controller | 1.10.12 to 5.11.12 |



# BANCO CENTRAL DO BRASIL

**Management Team 9 => Loss of R$ 521,560,000**

| Name | CPF/CNPJ | Position | Management Period |
|---|---|---|---|
| Luis Felippe Indio da Costa | 006.034.067-34 | Controller / President of the Board / Director of Investor Relations | 5.11.12 to 6.4.12 |
| Luis Octavio Azeredo Lopes Indio da Costa | 782.474.977-00 | President of the Board / Director of Investor Relations and CEO | 5.11.12 to 6.4.12 |
| Progresso Vaño Puerto | 410.915.908-34 | Independent Director | 5.11.12 to 6.4.12 |
| Fabio Rocha do Amaral | 076.593.208-31 | Director | 5.11.12 to 6.4.12 |
| Horácio Martinho Lima | 745.862.547-37 | Director | 5.11.12 to 6.4.12 |
| Roberto Vieira da Silva de Oliveira Costa | 769.344.037-20 | Director | 5.11.12 to 6.4.12 |
| Fabio Caramuru Correa Meyer | 715.168.917-91 | Director | 5.11.12 to 6.4.12 |
| Maria Luisa Garcia de Mendonça | 380.376.616-87 | Director | 5.11.12 to 6.4.12 |
| Sergio Marra Pereira Capella | 041.247.618-56 | Director | 5.11.12 to 6.4.12 |
| Flavio Nunes Ferreira Rietmann | 913.629.627-91 | Director | 5.11.12 to 6.4.12 |
| Charles Alexander Forbes | 001.906.918-91 | Vice-President of the Board | 5.11.12 to 6.4.12 |
| Cruzeiro do Sul Holding Financeira S/A | 13.211.256/0001-70 | Controller | 5.11.12 to 6.4.12 |

The value of the Adjusted Negative Net Equity (*uncovered liabilities*), estimated at **R$ 2,236,782,000** may be altered over the course of the current extrajudicial liquidation procedure.

## 12.        AFFIRMATIONS OF CONTROLLERS AND EX-ADMINISTRATORS

The controllers and ex-administrators of Banco Cruzeiro do Sul, covered by the joint and several liability referred to in Article 40 of Law no. 6.024/1974, combined with Article 15, of Decree-Law n 2.321/1987, identified in item 2.6 of this report, were asked to present their affirmations and explanations, within the same five-day period for everyone, pursuant to the terms of Article 42 of that law (proof of notice on pages 5833/5871).

Contact was attempted for all the ex-administrators and/or controllers at the addresses indicated at the start of this Investigation Commission's work. However, some were not found when the notice of the conclusion of the work was sent, to invite them to comment (see documents attached to the respective correspondence, on pages 5833/5871). For this reason, a notice was published in the Official Gazette of the Union on February 13, 2013 (page 5872) and in a widely distributed newspaper *Valor Econômico* on February 14, 2013 (pages 5873/5875).

Luis Felippe Indio da Costa, Luiz Octávio Azeredo Lopes Indio da Costa, Charles Alexander Forbes, Fábio Rocha do Amaral, Flávio Nunes Ferreira Rietmann, Progresso Vaño Puerto, Sérgio Marra Pereira Capella, and João Lara de Souza Meirelles Filho, personally or through a representative, signed the Acknowledgment



**BANCO CENTRAL DO BRASIL**

in the investigation record on pages 5876/5897, and submitted their affirmations. The following persons also submitted their affirmations: Ernani Fonseca Neto, Fábio Caramuru Correa Meyer, José Carlos Lima de Abreu, Luiz Whately Thompson, Maria Luisa Garcia de Mendonça, Roberto Vieira da Silva de Oliveira Costa, and Renato Alves Rabello, for which summaries, of all the affirmations received, will be presented later. However, Horácio Martinho de Lima and Sérgio Rodrigues Prates, the current representatives of Cruzeiro do Sul Holding Financeira S.A., in their capacity as extrajudicial liquidator appointed in Presidential Act no. 1.231, of 9.14.2012, did not present statements. All interested parties who so requested were provided a copy of the "Report of Findings" (pages 5876/5897).

## 12.1    SUMMARY OF THE CLAIMS

**CHARLES ALEXANDRE FORBES** essentially affirms the following (page 5898):

i.  Since he understands that the period determined in Article 42, of Law no. 6.024/1974 to make a statement is extremely limited, he did not comment on the Report of Findings, and reserves the right to make a statement in court.

**CRUZEIRO DO SUL HOLDING FINANCEIRA S/A** did not submit a statement.

**ERNANI FONSECA NETO** essentially affirms the following (pages 5899/5911):

i.  He listed the financial institutions where he worked and described the functions he performed at Banco Cruzeiro do Sul; that is, raising funds in Rio de Janeiro and adapting and implementing administrative and technological procedures for the BPS – Brazilian Payment System; and

ii.  In regard to the operations described in the Report of Findings, he stated that he had either already left the bank when they occurred, or he did not participate in them, affirming that "he totally and absolutely did not know of the existence of the operations cited;"

**FABIO CARAMURU CORREA  MEYER** essentially affirms the following: (pages 5912/5957):

i.  He described the profile of the position he held and the functions he exercised at the institution, explaining that he was responsible for the commercial credit area for legal entities (wholesale credit);

226



# BANCO CENTRAL DO BRASIL

ii.  In regard to the operations listed in the report, he claims total ignorance and denies participation in them. He also claims that these operations were outside the proper functions and attributions of the Management Board that he was part of at the institution; and

iii.  Finally, he affirms that he was held to be liable for the losses calculated during his management tenure at the Financial Institution without proof that he acted with fault or criminal intent.

**FABIO ROCHA DO AMARAL** essentially affirms the following (page 5958):

i.  As one of the members of the Board of Directors (BD) of Banco Cruzeiro do Sul S.A., beginning in 2007, his focus was to monitor the Marketing, Products and Accounts Payable areas; the persons responsible for these areas were part of the institution's staff. In the performance of their functions, they were to follow the internal audit reports, the work of the external audit companies and any statements by the Securities and Exchange Commission and by the Central Bank of Brazil on the numbers presented. He affirms that there was never any evidence or signs that any irregularities may have occurred at that institution.

**FLAVIO NUNES FERREIRA RIETMANN** essentially affirms the following (page 5959):

i.  On a preliminary basis, he noted that in spite of the fact that the analysis of the Investigation Commission covered a period of five years, from 6.4.2007 to 6.4.2012, as indicated in the report by this Commission, he only participated in one management period, of approximately five months, in the function of board member of Banco Cruzeiro do Sul S.A;

ii.  In regard to the summary chart of the administrative and/or criminal violations indicated in the Investigation Commission's Report of Findings, he claims that his participation was not mentioned in any of them;

iii.  He also argues that he had no knowledge whatsoever of the irregularities indicated in the Report of Findings of the Investigation Commission; and

iv.  In regard to the rest, he is not commenting at this time, in light of the impossibility of more carefully analyzing all the points raised in the Report of Findings, due to the very short response period.

**HORÁCIO MARTINHO LIMA** did not submit a statement.

**JOÃO LARA DE SOUZA MEIRELLES FILHO** (pages 5960/6045), noting that his response is limited to the losses and irregularities indicated in the



# BANCO CENTRAL DO BRASIL

Findings Report relative to the period from 4.23.2007 to 10.31.2007, which corresponds to the Management Team "1," since in regard to Management Teams "2" (10.31.2007 to 3.7.2008) and "3" (3.7.2008 to 10.31.2008), in which he also participated, no losses were found, essentially affirms the following:

i.   The fact that he was considered liable for the loss calculated during his management period at the Financial Institution, without proof that he acted with fault or criminal intent;

ii.  In relation to item I, Explanatory Notes and item 6.7, irregularities, which refer to the fictitious credit contract operations, he affirmed that he cannot be considered responsible for approving financial statements that recorded these assets and did not accurately reflect the real economic-financial situation of the financial institution, since: 1) in his capacity as the director responsible for the "Middle Market – São Paulo Platform" segment he did not participate in the preparation of the financial statements relative to the 2007 fiscal year; 2) these financial statements were submitted to the Board of Directors for its review in a meeting held on 4.7.2008, and his signature was not on the list of those present at the meeting, according to the document now presented; 3) the document that was submitted to the Board of Directors to serve as support for the statement by this entity on the financial statements contained only the signatures of Mr. Luís Felippe Indio da Costa (Director of Investor Relations since 1.23.2007), of Mr. Luís Octávio Azeredo Lopes Indio da Costa (CEO since 1.23.2007) and of Mr. Antonio Kanô Neto (Accountant). In this regard, he affirms that the absence of his name from this document fully shows that he did not participate in the preparation of these financial statements;

iii. Also, in regard to the same item, he claims that he did not have knowledge of the irregularities found by the Central Bank, since he did not have access to the information on the personal credit installment with payroll deduction product, precisely because he was responsible for management of a completely different product portfolio. He also noted that these financial statements received a favorable opinion from the independent auditors;

iv.  In relation to item 7 of the Explanatory Notes (Honras) – which refer to the accounting adjustment corresponding to the provisions not recognized relative to consigned installment credit contracts that were not paid by the borrowers and that had been assigned with retention of the credit risk, he argued that it would not have been possible for him to learn of the irregularities, since he did not have access to information on consigned credit given that he worked in a totally different product segment;

v.   The same justification as in the previous line was given to deny responsibility for the adjustment in item 21 of the Explanatory Notes (write-off of investments in precious stones);

vi.  In regard to the adjustments cited in items 25 and 26 of the explanatory notes – relative to the complementing of a provision for tax proceedings (lawsuits and administrative proceedings), with the first referring to a contingency for Cofins tax, and the second, for a provision involving the company "Vila Promotora de Créditos e Vendas Ltda.," in which Banco Cruzeiro do Sul is indicated as having joint and several liability,



# BANCO CENTRAL DO BRASIL

he claims that except for tax foreclosure no. 16327.001277/2007-91 (referring to the adjustment cited in item 25), all the other proceedings were assigned after the period of Management Team 1 (4.23.2007 to 10.31.2007). Therefore, the complement to the provision in those cases, excluding the exception mentioned, would be outside the scope of his liability, since, in his reasoning, the obligation to make a provision would arise after the assignment of the case;

vii. In addition, he claims that in regard to the proceedings involved in adjustment 25 – 16832.000154/2008-12, 16832.000155/2008-59 and 16832.000998/2009-36, the evaluation made by the law firm Tozzini, Freire, Teixeira e Silva Advogados, which was used by this Investigation Commission as one of the bases for the requirement to complement the provision, evaluated the chance of loss as remote or inconclusive, which would justifiy not making a provision for these amounts;

viii. Also in regard to the adjustments described in items 25 and 26 of the explanatory notes, he claims that since he is not responsible for the accounting and legal areas, which are the departments involved in the provision of each proceeding, the obligation to increase the provision in all the cases should not have been required of him, since he did not have access to the information on which the provision in the processes was based;

ix. In regard to item 10 of the explanatory notes, together with item 6.2 of the irregularities (complement to provision for doubtful debtors on the middle market portfolio), and to item 11 of the explanatory notes, together with item 6.3 of the irregularities (provision for credit risks with the position of accommodations and guarantees), he notes that these are operations of the Middle Market area and the Accommodation and Guarantee segment, conducted after Management Team 1 and after his management period, which by itself would exempt him from liability;

x. Finally he requests his exclusion from the management period in which he is being held liable for the loss found.

**JOSÉ CARLOS LIMA DE ABREU** (pages 6046/6051) essentially affirms the following:

i. He acted as a director of the Financial Institution and never decided, participated in, helped or observed the irregularities indicated in items 6 and 7 of this Commission's report.

ii. In regard to item 8, he declared his total repudiation against the facts mentioned and total innocence of these acts;

iii. He does not deny having signed the Profit Statements and other Banco Cruzeiro do Sul documents, but he declared that he did not participate in any of the illicit activities indicated, affirming that "it would be very difficult to perceive irregularities of this type;" and

iv. Finally, he attached the defense he presented in the sanctioning administrative proceeding filed by the Central Bank of Brazil, in case 1201558576, of June 11, 2012.



# BANCO CENTRAL DO BRASIL

**LUIS FELIPPE INDIO DA COSTA** (pages 6052/6064), transcribing the citations he prepared for the investigation record conducted at Cruzeiro do Sul Holding Financeira S.A, essentially affirms the following:

i. The Investigation is null and void, in light of the limitation on the right of defense, the right to the adversarial proceeding and due legal process, given the difficulty in accessing the investigation record;

ii. He claimed that "this Commission acted with negligence, deliberate malice and constant partiality, committing illegal acts that cast a shadow on the quality and impartiality of its work, and for this very reason, this work should be considered and recognized as null and void by operation of law by this same Commission *(sic)*;"

iii. He also affirms that in relation to the invitation to examine the work done by the Investigation Commission and the possibility of making a statement, he learned of this through the public notices, in both the Official Gazette of the Union and in a widely circulated newspaper, asking him to submit his affirmations, and that on several occasions he personally offered to receive the letter, which was found and communicated personally on 2.14.2013;

iv. He claimed that this Commission did not make the final report presented by CGF available to him when he requested it on November 1, 2012, and in fact, did not even respond to his request;

v. He also affirms that this Commission did not present him with the list and inventory statement of all books, documents, money, and other assets of the companies in the Cruzeiro do Sul Group, so that they could be analyzed and signed by the former administrators, mentioning as the legal base Article 9 of the "bank liquidation law" with Art. 5, line c, of Decree-Law no. 2.321/1987;

vi. He argued that "the failure to present these documents characterizes a clear limitation on the right to defense in all legal areas, whether administrative, investigative or procedural," citing as the legal basis for this argument Article 6 of Decree-Law no. 2.321/1987, Article 13 of the "bank liquidation law" and Article 5, section XIV, of the Federal Constitution;

vii. He notes that he had access to the record on 11.23.2012, and made copies of pages 1 to 89, but "on the date on which the copies in the record were made available there were materially relevant documents prior to the date of this access that were deliberately hidden" *(sic)*, and cites as an example;

viii. He mentions the subsidiary ledger of an accounting category at Cruzeiro do Sul Holding Financeira S.A., which records operations made with Afonso Burlamarqui and Armando Burlamarqui, basically showing that the debtors gave as payment more than two million not-to-bearer preferred shares of BCSul, and that "by a stroke of magic, the twenty-seven million reais disappeared from the Company's assets and the shares received in payment were not recorded in its assets *(sic)*...."



# BANCO CENTRAL DO BRASIL

**LUIS OCTAVIO AZEREDO LOPES INDIO DA COSTA** (pages 6065/6104) essentially affirms the following:

i.  The Investigation is null and void, and was begun through a "flagrant and undeniable limitation on the right to defense, violation of the principles of due legal process, broad defense, and the adversarial proceeding," citing Article 5, Sections XXXIII and LV of the Federal Constitution, since "all the procedural acts were carried out without his presence, including the hearing of witnesses, from whom questioning would have been essential to better clarify the facts *(sic)*;"

ii. He also protested against the tern of five days established in the law for the former administrators to make any statements, and against the absence of a letter inviting him to examine the record, and comment on it, if he so chose, noting that the published notification hindered his preparation of a clarification.

**LUIZ WHATELY THOMPSON** (pages 6105/6134), in response to the Report of Findings, attached a copy of the defense submitted in Administrative Proceeding no. 1201558576, filed against him by the Central Bank of Brazil in 2012.

**MARIA LUISA GARCIA DE MENDONÇA** (pages 6135/6138) essentially affirms the following:

i.  "The investigation opened by the Central Bank of Brazil is null and void due to the flagrant and undeniable limitation on the right to defense–violation of the principles of due legal process, broad defense and the adversarial proceeding – Art. 5, XXXIII and LV of the Federal Constitution *(sic)*."

**PROGRESO VAÑO PUERTO** (page 6139) essentially affirms the following:

i.  He reserves the right to make a statement in court, as he understands that the period established for statements in Article 42, of Law no. 6.024/1974, is extremely limited.

**RENATO ALVES RABELLO** (pages 6140/6149) essentially affirms the following:

i.  He argues that he must not be held liable, since he affirms that he did not commit any illicit acts, such as those listed in the report;

ii. Finally, he affirms that he was considered liable for the loss calculated during his management period at the Financial Institution, without proof that he acted with fault or criminal intent.

231



**BANCO CENTRAL DO BRASIL**

**ROBERTO VIEIRA DA SILVA DE OLIVEIRA COSTA** (pages 6150/6167) essentially affirms the following:

i. He affirms the absence of a formal and individualized accusation against each former administrator, which makes it difficult for people to defend themselves "when they do not know what they are being accused of *(sic)*;"

ii. He affirms that he was not "given the opportunity to make a statement, to be heard personally, to present evidence, indicate witnesses, and to confront the evidence presented by the inspectors (confrontation and cross-examination) *(sic)*," citing doctrine and jurisprudence that he understands refers to the matters in question;

iii. He implies that he is exempt from liability, noting that he was responsible "as the director of the fund raising area, solely and exclusively, for monitoring the mangers, visiting clients, ensure fund raising and new visits to prospective clients *(sic)*," and that the irregularities occurred in the operation processing area, an area with which he was not connected, and that these irregularities began even before he was appointed as a director;

iv. He alluded to the external audit works, which did not indicate any exception in regard to his "explanatory notes," therefore, he did not suspect that the financial statements were not an accurate reflection of reality;

v. He mentioned the "Theory of Subjective Liability," citing legal scholars who understand that it is applicable, inferring that "there is no proof in the report of a finding of a causal link between the actions of the defendant and the violations indicated *(sic)*;"

vi. He asks that the report be declared null and void "in light of the flagrant violation of the constitutional principles of ample defense and the adversarial system," and that the investigation be dismissed in relation to him, and requests the "urgent removal of the restriction on his assets."

**SÉRGIO MARRA PEREIRA CAPELLA** (pages 6168/6235) essentially affirms the following:

i. He did not have responsibility for management in the areas in which the irregularities were found, but instead, only worked in the retail commercial area (consigned credit) for CPP and Cards (he performed his work in São Paulo and never acted in the Bank's back office, including the credit processing area, or in the activities related to the credit assignments and BCNs, outside his scope of authority);

232



**BANCO CENTRAL DO BRASIL**

ii.   The powers of management were principally concentrated in the Board of Directors (BD), which, in addition to the powers set forth in the law, such as guidance of business activities and appointment and monitoring of the Directors, was also responsible for the election of the members of all the committees of the Bank, and that, in addition to the Board of Directors, the goals and strategic direction of the Bank would be overseen by the Management Committee (MC), whose decisions "*have executive force from the date on which they are approved*," according to its Bylaws, chapters 1 and 8, and whose members (of the MC), elected by the BD, were practically the same as the BD: Luis Felippe Indio da Costa, Luis Octavio Indio da Costa, Charles A. Forbes, Fábio Rocha Amaral, Flávio Rietmann and Horácio Lima;

iii.  He affirms that he was considered liable for the loss calculated during his management period at the Financial Institution, without proof that he acted with fault or criminal intent;

iv.   In his capacity as commercial director, and in accordance with the document "Corporate and Product Systems Access Policy," of Banco Cruzeiro do Sul, he only had access to the "BCSul Cred," "Retaguarda" and "Production Support" systems, in which invalid operations were not identified, adding that the irregularity indicated does not refer to any of the contracts related to his activities;

v.    Not even renowned audit companies, KPMG and Ernst & Young, contracted specifically to prepare opinions on the Bank's accounting data were successful in detecting the fictitious operations that led to the accounting adjustments and that the other adjustments do not refer directly to his attributions in the CPP and cards commercial area, and he spoke of the impossibility of detecting any inconsistencies within a consolidated balance sheet containing financial statements of the Conglomerate, with a variety of separations of accounting records and without actual access to the data;

vi.   Since he worked in the commercial area, it was not his job to prepare the accounting record, and since his variable compensation (bonus) was exclusively related to the performance of production, and was not based on the Bank's general balance sheet, he would not receive any benefit from financial statements that were artificially inflated;

vii.  Documents from this Investigation and in the Report of Findings indicate that the "routinely" created artificial operations and their implementation (in addition to the irregularities referring to the BCNs and others) "were purposefully designed so that only some people at the Bank were aware of what was actually occurring," and that he was not among them;

viii. Finally, he affirmed that "the different operations detected by the CGF and that led to the adjustments to net equity were conducted over the course of several years (as calculated by this Investigation Commission, over more than 10 years), therefore, the value of the adjustment, which would seem to be very evident, when distributed throughout the period in which the defendant acted, and compared to the level of production, which reached an annual approximate amount of R$ 4 billion, was not noticeable



# BANCO CENTRAL DO BRASIL

within the total financial statements of Banco Cruzeiro do Sul, especially when these were approved by serious independent audits *(sic)*."

12.2      ANALYSIS OF THE CLAIMS

All the former administrators as well as the shareholder controllers (Luis Felippe Indio da Costa and Luis Octávio de Azeredo Lopes Indio da Costa) were invited to present their "affirmations and explanations" and did so, except for Horácio Martinho Lima and Cruzeiro do Sul Holding Financeira S/A. It should also be noted that Charles Alexander Forbes, Fábio Rocha do Amaral and Roberto Vieira da Silva de Oliveira Costa, presented their statements after the deadline established in Article 42, of Law no. 6.024/1974; however, these were analyzed by the Investigation Commission.

Initially, in regard to the affirmation of limitation of the right to defense, the right to the adversarial system and to due legal process, based on the affirmed difficulty in accessing the investigation record, some clarifications are in order.

All the former administrators and controllers of Banco Cruzeiro do Sul were informed of the opening and start of the work by the Investigation Commission and of the address where it would be done; that is, the headquarters of this Financial Institution in the city of São Paulo, located at Rua Funchal, no. 418, 7 andar. The same correspondence informs that pursuant to Law no. 6.024/1974, interested parties could monitor the work and indicate measures that they may understand to be applicable (pages 12/28).

Regarding the affirmations of the indirect controller and the former administrators, during the entire period of its activity, this Investigation Commission always respected the procedure set forth in the law and the guidelines of the Federal Constitution, as indicated in subsequent items.

On September 28, 2012, this Investigation Commission received Dr. Stefan Lourenço de Lima, a member of the law firm representing Luis Felippe Indio da Costa and Luis Octavio Azeredo Lopes Indio da Costa (see page 6098). At that time, it must be noted, the work was underway and there was not yet any record to be consulted. There was a large number of documents being examined and others that were awaiting analysis.

On October 18, 2012, a request signed by Luis Octavio Azeredo Lopes Indio da Costa was received, asking to examine the documents added to the records for all the investigations conducted in the companies of the Cruzeiro do Sul Conglomerate (pages 631/632).

The request was promptly granted, according to an Official Letter sent to his residential address (pages 633/634), on November 8, 2012, with the clarification that the documentation that had been added to the investigation record was

234



# BANCO CENTRAL DO BRASIL

available for examination and for copy requests.  It was stated that as of that date, no statements had been taken. It was also stated that pursuant to the terms of Article 42, of Law 6.024/1974, after the conclusion of the investigation and preparation of the Investigative Reports on the companies of the Cruzeiro do Sul Group submitted to the special  regime, an invitation would be extended to present affirmations and explanations, at which time the record could be examined and copies requested.

In this matter, it is important to remember that on October 22, 2012, at the beginning of the week after this request was submitted,  Mr. Luis Octavio Azeredo Lopes Indio da Costa was arrested due to an order for his pretrial detention, issued by the judge of the 2nd Federal Criminal Court of São Paulo. At the same time, Mr. Luis Felippe Indio da Costa was also arrested, however, he was placed under house arrest.

At the beginning of November 2012, Dr. Stefan Lourenço de Lima contacted this Investigation Commission, requesting access to the documentation that had already been added to the investigation reports, and indicating the existence of an extrajudicial notification sent to both the Commission and the Liquidator of the companies in the Cruzeiro do Sul Conglomerate,  as a result of the lack of response about the request made by Mr. Luis Octavio Azeredo Lopes Indio da Costa (pages 6075/6079).

At the same time, the Investigation Commission promptly responded to the request, and the documents added to the record were available for examination and to make copies.

The reason that the response to the request made Mr. Luis Octavio Azeredo Lopes Indio da Costa was not known, according to his attorney, Dr. Stefan Lourenço de Lima, was because the ex-controller signed the request and the response was sent to his residence. Since the pretrial detention lasted until November 9, 2012, this information only reached him after the aforementioned extrajudicial notification was sent.

Thus, having made the necessary clarifications, on November 23, 2012 the counsel to the controllers and ex-administrators of Banco Cruzeiro do Sul had access to all the records of the investigations conducted at the companies in the  Cruzeiro do Sul Group that were submitted to the Temporary Special Administration Regime, and requested copies of the documents that had been added in the record (pages 640/646).

In this regard, it is important to note that the work of the Commission was underway, and that a large number of documents  were still being analyzed, including some with dates prior to the date on which the examination was granted. Nonetheless, this does not indicate any attitude taken in order to hinder any understanding by the interested parties, but instead, was due to the complexity of the work.

It is also important to emphasize that all the documentation added to the record, which supports the Report of Findings was made available to all interested parties, including with the provision of copies to those who requested them (pages 5876/5897), notably Luis Octavio Azeredo Lopes Indio da Costa, Luis Felippe Indio da Costa, Sérgio Marra Capella, João Lara de Souza Meirelles Filho, and Charles Alexandre Forbes.



# BANCO CENTRAL DO BRASIL

Therefore, there was no obstacle to allowing access to any of the documents that served as the basis for the work of this Investigation Commission.

Finally, it should be noted that the Report of Findings was digitalized by this Investigation Commission and sent electronically to all interested parties that requested it, as was a physical copy, when so requested; all for the purpose of facilitating its prompt delivery and to give notice of its conclusions, including to persons who reside outside the city of São Paulo.

Also in regard to the claim of difficulty in accessing the investigation record, we should explain the claims made by the controllers and former administrators, in regard to the affirmed lack of response by the Investigation Commission to the request to examine the record at the end of January 2013.

In a phone call, the attorney for Luis Octavio Azeredo Lopes Indio da Costa and Luis Felippe Indio da Costa, Dr. Stefan Lourenço de Lima, on January 30, 2013, asked about the lack of a reply to the email sent to the Commission the previous week, and asked to examine and make copies of the investigation records.

When asked which email address the request had been sent to, he indicated that it was an email belonging to the Commission with an address at Banco Cruzeiro do Sul. After this information was provided, this attorney was informed that all the members of the Investigation Commission, including the president, only answer and learn of requests through electronic means, when they receive them at the email of the Government Agency, and that in fact, this information is widely known, since, previously, the representative of the controllers and former administrators had already sent and received messages from this Investigation Commission, messages that were received and sent through the functional email provided the Central Bank of Brazil.

Therefore, as a result of the incorrect [email] sent by the controllers and former administrators, this Commission did not receive the request. After the proper explanations were given, the attorney asked to examine the record and obtain copies of the requests.

At that time, he was told that the work of the Investigation Commission was being concluded and that an enormous number of documents were being organized and filed in the investigation record on the Cruzeiro do Sul Conglomerate, which would prevent him from examining the record at that time. However, he was also told that as soon as the work of organizing and finalizing the Report of Findings was concluded, any interested party would immediately be allowed to examine the record and obtain copies.

And this is what occurred. On February 6, 2013, seven days after the phone contact in question, this Commission contacted the attorney, informing him of the conclusion of the work and of the possibility of examining and obtaining copies of all the documentation in the respective reports.

On February 8, 2013, the counsel to the controllers and former administrators, Dr. Stefan Lourenço de Lima, had access to all the investigations conducted at the

236



# BANCO CENTRAL DO BRASIL

Cruzeiro do Sul Conglomerate: BANCO CRUZEIRO DO SUL S.A., CRUZEIRO DO SUL HOLDING FINANCEIRA S.A., CRUZEIRO DO SUL S.A. CORRETORA DE VALORES E MERCADORIAS, CRUZEIRO DO SUL S.A. DTVM and CRUZEIRO DO SUL COMPANHIA SECURITIZADORA DE CRÉDITOS FINANCEIROS, as per the acknowledgment in the record (pages 5884/5890). At that same time, he submitted a request to examine the record, presenting similar affirmations to those already made, that is, difficulty in accessing the documents in the investigation proceedings (pages 6341/6342).

It should also be noted that, as indicated above, the possibility was mentioned of obtaining copies of the Report of Findings prepared at Banco Cruzeiro do Sul by electronic means, as well as a full copy of the Investigation Record made at Cruzeiro do Sul Holding Financeira S/A, given that it could be prepared in digital format due to the fact that the volume of documents was relatively small (two volumes – 206 pages); all of this was done to facilitate the knowledge of the work done. When these documents were requested by electronic means, the request was promptly granted by this Commission (pages 6278/6340).

In this regard, it is important to note that the controllers had known of Report of Findings on Banco Cruzeiro do Sul, since **February 8, 2013**, and had also known of the full record of the Investigation of Cruzeiro do Sul Holding Financeira S/A, and they were invited to make a statement, pursuant to the terms of Article 42, of Law no. 6.024/1974, with the period for this beginning on **February 15, 2013**.

In relation to the affirmation made by Mr. Luis Felippe Indio da Costa, that this Investigation Commission did not make available the final report presented by the Credit Guarantee Fund, or the list and inventory statement of all books, documents, money, and other assets of the companies in the Cruzeiro do Sul Group, it should be noted that in regard to the Credit Guarantee Fund Report, prepared during the Temporary Special Administration period, this is a document that is not addressed to the Investigation Commission, but rather, to the Central Bank of Brazil, according to Article 11 of Decree-Law no. 2.321/1987, therefore, this Investigation Commission does not have any legal authority to make it available to any interested party.

The same can be said in relation to the list and inventory statement of all books, documents, money, and other assets of the companies in the Cruzeiro do Sul Group. This is the exclusive function of the intervening party and/or liquidator, pursuant to the terms of Articles 9 and 20, both of Law no. 6.024/1974, and this Investigation Commission does not have any legal authority to make the aforementioned available to any interested party.

In regard to the procedure adopted by the Investigation Commission, according to the provision in Law no. 6.024/1974, some clarifications are necessary, even if only for didactic purposes, given the recurring claim of limitation on the right to defense, violation of the adversarial system and due legal process, and the affirmed difficulty in accessing the case record and the documentation that was added to it.



# BANCO CENTRAL DO BRASIL

The principal mission of the Investigation Commission is to investigate the causes that led the Financial Institution to submit to the Temporary Special Administration Regime, to calculate the losses caused, and the liability of its directors. The term for it to conclude this work is one hundred twenty days, which can be renewed, as occurred, for an equal period of time, pursuant to the terms of § 2, Article 41, of Law n 6.024/1974, for a total of two hundred forty days.

Within this timeframe, the investigation work does not have a phase in which documents are added or a phase in which witnesses will be questioned. There is also no legal provision for notifying interested parties to accompany any specific questioning of any person who has knowledge of the facts that are being investigated, or the possibility of any interested party participating in any questions that may be asked.

The procedure established in Law no. 6.024/1974 has no relation to the phases of a lawsuit. Its purpose is to obtain elements that could serve as the basis for a liability lawsuit, to be filed by the Prosecutor's Office.

It is also important to note that around the time a Report of Findings is prepared, it is normal for the number of documents added to increase, since there is then a selection of the evidence obtained, relating it to the text of the Report.

It should be remembered that the documental evidence added to the record is not new for the controllers and former administrators, since they were the ones who produced it. These are minutes from meetings in which they participated, operations that they approved and contracts that they signed, as well as the statement from an employee who worked under their orders, and which had already been given in the police investigation report that led to the criminal action in which they are defendants, on September 21, 2012, according to documentation added by ex-administrator Sérgio Marra Capella (pages 6168/6235).

In regard to the claim that the investigation is null and void due to the publication of the notice to invite some ex-administrators and/or controllers, there is no reason for anything to be invalid. They were all properly contacted to learn of the findings, and, if they wished, to present explanations, all pursuant to the terms of the law (pages 5833/5875).

The notice was published, once in the Official Gazette of the Union (February 13, 2013 – page 5872) and once in a widely circulated newspaper, *Valor Econômico* (February 14, 2013). The reason for the publication was that the persons mentioned in the notice had not been located at the addresses that they had given when the Investigation Commission began its work, according to information added to the respective correspondence (pages 5833/5871).

It should also be remembered that until February 14, 2013, date of publication of the notice in a widely circulated newspaper, attempts were made to deliver the correspondence, and that Luis Felipe Indio da Costa, Maria Luiza Garcia de Mendonça, Renato Alves Rabello, and Roberto Vieira da Silva de Oliveira Costa also received the correspondence personally.



# BANCO CENTRAL DO BRASIL

Therefore, all the interested parties were invited on a timely basis, and were provided full copies of the Report of Findings, not for the purpose of presenting a defense, since this is not the expression used by lawmakers, but for the presentation of affirmations and explanations, since the existence of the affirmed adversarial system and broad defense requires the existence of an accusation, pursuant to the terms of the Federal Constitution, and there is no reason to speak of an accusation in this investigation.

It is necessary to once again emphasize: the objective of this investigation, pursuant to the terms of Law no. 6.024/1974, is to provide elements for the filing of a civil liability lawsuit, as established in Article 45, to determine the existence of loss, such as in this case. This is because in the event that no loss is found, the investigation will be sent to the archives, pursuant to Article 44. In this case, there is no need for the former administrators and/or controllers to make statements, in light of the evident absence of a legal interest to file charges.

The purpose of the work done by this Investigation Commission is not to gather evidence that could result in the imposition, during the course of the investigation itself, of any type of sanction, whether of a disciplinary, administrative, criminal or even corporate or civil nature.

What Article 43, of Law n 6.024/1974 clearly states is that "the investigation will end with a Report that will basically present the situation of the entity it examines, the causes for its bankruptcy, the name, identification and list of private assets that the company managed in the past five years, and the amount or estimate of the losses calculated in each management period."

As can be seen, the work of this Commission always focused on gathering the necessary elements to provide this information. This is why the Report of Findings does not contain any formalized accusation, nor could it, since this is not its purpose.

For these same reasons, Article 42 of Law no. 6.024/1974 refers to the "presentation of the affirmations and explanations," and not to the defense, a term improperly used by some former administrators and/or controllers, since the purpose of the work done is not to impose a punishment.

And no matter how strong the evidence is in regard to the materiality and the perpetration of illicit acts indicated in the Report, whether in the disciplinary, administrative, criminal, corporate or civil spheres, if the institution submitted to the special regime does not have negative net equity (uncovered liabilities), it will be summarily sent to the archives, based on the provision in Article 44 of the same law. This circumstance in and of itself demonstrates the nature of the investigation conducted at Banco Cruzeiro do Sul S/A.

The conclusion in this situation is intuitive, and does not require further considerations.



# BANCO CENTRAL DO BRASIL

Given the existence of evidence of illicit acts of this size, in the area of disciplinary liability, the Central Bank of Brazil will open an administrative proceeding, and accusations will be duly formalized in the opening document.

In the criminal area, this may lead to charges being filed by the Prosecutor's Office, beginning a criminal lawsuit, which in this case is already underway before the 2nd Federal Criminal Court of São Paulo.

In regard to civil liability  (corporate or not), this will be up to those with the standing to file the appropriate action.

As has been demonstrated, it is not an attribution of the investigation to make accusations, and for this reason, at no time have they been made. Its responsibility was to examine the facts that should be included in the Final Report,  according to Article  43,  of Law no.  6.024/1974,  and which will serve as support so that the Prosecutor's Office can file a lawsuit for liability.

What we see here is that the explanations and affirmations of the former administrators and/or controllers would serve to correct any errors that may have been committed in the investigation phase of the losses by management period, of the periods of these management teams, of the net equity of Banco Cruzeiro do Sul S/A, the names of the former administrators and/or controllers, identifications, etc.

The doubt raised by João  Lara  de  Souza Meirelles Filho and the claim made by several former administrators,  to the effect that it is necessary to prove that the activity at the Financial Institution was conducted with fault or criminal intent in order for each person to be held liable for the losses found during his or her management team will now be examined.

In regard to the claim by Mr. João Lara de Souza Meirelles Filho, in relation to the adjustments resulting from explanatory notes 10 and 11, at no time did the Report of Findings of this Investigation Commission attribute liability to him.

A consultation of the chart on pages 5544/5545 shows the responsibility of each Management Team by explanatory note. In the specific case of explanatory note 10, the adjustment for the provision was indicated as being under the responsibility of Management Teams 5, 6, 7, 8, and 9. And in regard to explanatory note 11, the adjustment for the  provision  was attributed to the responsibility of  Management Teams 3, 6, 8, and 9. Mr. João Lara belongs to Management Team 1.

Still, in regard to the affirmations made by Mr. João  Lara, specifically to the point that refers to the provision made due to the likely debits to be attributed to the Financial Institution, it should be noted that the proper time to record economic events, including taxes, is defined in the Accounting Plan for Institutions of the National Financial System (Cosif), created



# BANCO CENTRAL DO BRASIL

by Circular Letter no. 1.273/1987, items 1-2-3[89] and 1-2-5-b[90], which states that recordkeeping must be complete, maintaining all the facts that modify or could come to modify the equity composition of the institution in permanent records.

The principle of competence, one of the "Fundamental Accounting Principles (PFC)," instituted by Resolution CFC no. 750/1993, determines that the effects of transactions and other events be recognized in the periods they refer to, independent of receipt of payment.

This definition is also in line with the provisions in Articles 113 et seq of the National Tax Code, which stipulates that the principal tax obligation arises with the occurrence of the taxable event (situation defined in the law as necessary and sufficient for its occurrence), and its object is payment of a tax or monetary penalty. Likewise, it considers both the taxable event and its effects to have occurred and exist, in a *de facto* situation, from the time the material circumstances necessary to produce the effects that normally happen with it are verified to exist. In regard to a legal situation, it is from the moment in which it is definitively created, under the terms of the applicable law.

Consequently, a tax, or even a tax-related monetary penalty, should be recorded at the instant in which the obligation becomes owed, with the occurrence of the taxable event; independent of whether it is described in a violation notice or a tax foreclosure action.

In regard to adjustment 25, described in the Report of Findings of this Investigation Commission, whose evidence documents are on pages 4811 to 5085, it expressly states that the Provision for Contingencies – Cofins, in the amount of R$ 82,161,000, refers to a violation notice that is registered as overdue tax liability together with a tax foreclosure.

The Law Firm Tozzini Freire Advogados stated, quote: "Chance of loss is likely, given the fact that the *res judicata* in proceeding no. 1999.61.00.020.283-3 does not refer to the definition of invoicing, but instead, only to the unconstitutionality of paragraph 1 of Article 3 of Law 9.718/1998, and that revenue from financial intermediation is part of the same, therefore, it configures the rendering of services by financial institutions," stating at the end that: "Our evaluation does not coincide with the evaluation of the attorneys who worked on this case, according to whom the chances of loss are remote."

In agreement, the work of PwC PricewaterhouseCoopers Contadores Públicos Ltda., "Price," CRC.2SP023173/O-4, pages 5249 to 5341, specifically on this matter,

---

[89] Cosif 1-2-3: Recordkeeping must be complete, maintaining all the administrative acts and facts that modify or could come to modify, immediately or not, its equity composition.

[90] Cosif 1-2-5-b: In line with the legal provisions and the specific regulations governing recordkeeping, also in line with the fundamental principles of accounting, institutions shall: record revenues and expenses in the period in which they occur, and not on the date of actual receipt or disbursement, in keeping with the accrual basis;



# BANCO CENTRAL DO BRASIL

in the topic "2 Summary of the amounts quantified relative to the tax area," item "2.3 Other Violation Notices," clarifies: "BCS is the defendant in tax foreclosure case no. 16327.001277/2007-91, registered as overdue tax liability under no. 80 6 09 025743-00, due to the failure to tax revenues of financial intermediation in determining the taxable base for Cofins in the period from 2003 to 2006. In the following chart we show the composition of the risk involved, as well as the evaluation of the legal advisors involved in the due diligence process regarding the likelihood of loss attributed to it:"

| Object | Principal | Fine | Interest & mandatory charges | Total as of Aug/12*** | Probability of loss * |
|--------|-----------|------|------------------------------|-----------------------|----------------------|
| COFINS | 35,176 | 7,035 | 40,506 | 82,717 | Likely |

\* According to the evaluation by the legal advisors
\*\*\*According to information on the PGFN site

In light of the convergent statements by these specialized companies, contracted by CGF to verify the real values of the assets and liabilities of the company now being liquidated, that the probability is "likely," and as a result of the legal rules governing the accounting for contingencies of this type, such as Resolution no. 3.823, of December 16, 2009, combined with Technical Ruling CPC 25 (Provisions and contingent assets and liabilities) issued by the Accounting Ruling Committee, on April 29, 2009, this Commission understood the realization of the stipulated adjustment to be plausible. The attorneys in this case issued the only evaluation stating that the probability of loss was "remote," which may have confused the former administrator.

In regard to the affirmation made by Mr. Luis Felippe Indio da Costa, on the absence of an entry for the shares received in payment, this matter refers to the accounting records of Cruzeiro do Sul Holding Financeira S.A., and not to Banco Cruzeiro do Sul S.A., which is the object of this Report. Nevertheless, this Investigation Commission is also analyzing this affirmation.

In the Investigation Commission Report relative to Cruzeiro do Sul Holding Financeira S.A. page 97 contains the "Subsidiary ledger" covering the period from "01/01/2012 to 09/30/2012," relative to the internal accounting record for the entity "1.8.8.80.10.0003-9 Acquisition of credit," which is equivalent to Cosif account "1.8.8.80.10-2 Credit Instruments Receivable / With Credit Assignment Characteristic," the function of which is to "Record the amounts receivable represented by credit instruments, promissory notes or contracts, which are not characterized as credit operations or accommodations and guarantees honored or other operations for which there is a specific account."

The entry in question refers to the liquidation of the BCNs belonging to Armando Burlamarqui and Afonso Burlamarqui, recorded as "deed of transfer in payment and other agreement," of 3.29.2012, in the amounts of R$ 15,879,675.16 and R$ 11,486,928.16, respectively, totaling R$ 27,366,603.32, amounts credited to this account.



# BANCO CENTRAL DO BRASIL

The opposing entry, which is known to the party, since this was done when he administered the Holding, prior to the decree of the special regime to which it was submitted, was in the internal account "1.8.8.92.10.00.46-9 Transitory SDEMP," and the amounts were immediately debited to the internal category "2.1.2.10.05.0010-8 BCSul S.A.," an account equivalent to Cosif "2.1.2.10.05-1 Shares owned in Affiliated and Controlled Companies / Authorized to Operate by the Central Bank MEP," the purpose of which is to "Record permanent share ownership in the capital stock of domestic affiliated and controlled companies."

The entry recorded in this category is: "increase in share ownership in BCSul with 2,027,170 CZRS4 PN shares, quoted at 13.50, given in payment for debt owed by Afonso and Armando Burlamarqui at BCNs Cruz Holding RJ."

Consequently, the opposing entry in reais received for these shares given in payment, resulting from the operation in question, was recorded under the account that already contained the amount corresponding to the share ownership held by Holding in BCSul, increasing the respective accounting balance.

On 6.4.2012, the date of the special regime, and as indicated in a specific topic, the categories of Fixed Assets that held these shares reflected the following amounts: Investments: R$ 662,472,000; Negative premium: R$ 567,093,000 and Premium: R$ 10,453,000. These balances, which came to net R$ 105,832,000, were adjusted in the Holding's balance sheet as a result of those recorded, on the same date, on BCSul's balance sheet, since the subsidiary began to show an uncovered liability of R$ 2,236,782,000.

Therefore, this amount was recorded in the category "shares owned in affiliated/controlled companies. On 6.4.2012 – Date of the Special Opening Balance Sheet, CGF correctly used the equity method, and considering that the Holding company, which is the controller of BCSUL, presented negative NE on that date, by equivalence, this category was "zeroed." This explains the "write-off" of the amounts previously recorded under that category.

Therefore, all the entries were made on March 29, 2012, the date on which, as noted, Mr. Luis Felippe still managed the Holding, and should have had control and knowledge of all economic-financial facts of the company; therefore, the affirmation made does not make sense.

In regard to the affirmation of a need to prove that the conduct of each director during the period of his management was conducted with criminal intent or fault, some considerations should be made.

From the standpoint of Law no. 6.024/1974, the civil liability of the ex-administrators is joint and several, limited to the amount of losses caused to third parties, during the respective management period, and represented by the uncovered liabilities, pursuant to the terms of Article 40 (*Administrators of financial institutions have joint and*



**BANCO CENTRAL DO BRASIL**

*several liability for the obligations they assumed during their management term, until they have been paid).* The conclusion is the same in Article 15 (*After a temporary special administration regime has been decreed, the individuals or legal entities that had a relationship of control over it, independent of a finding of criminal intent or fault, will have joint and several liability with the ex-administrators of the institution for the obligations assumed by the latter*), of Decree-Law no. 2.321/1987, which governs the Temporary Special Administration Regime.

By express legal provision, the liability of the ex-administrators will be determined in a separate action, in which they will certainly be assured the ample defense guaranteed by the Constitution and due legal process. This is the system used by Brazilian Law in regard to the liability of ex-administrators at financial institutions, pursuant to the terms of Law no. 6.024/1974.

Nonetheless, it is not appropriate to discuss, within the scope of this investigation, the legal nature of the liability that the law established for the ex-administrators of the Financial Institution, in this case, Banco Cruzeiro do Sul S/A, in regards to whether it refers to strict liability or not. For some of the ex-administrators, subjective liability is of greater interest, since they affirm that they did not perform any harmful acts that contributed to the bankruptcy of the institution, while others affirm other positions, which are generally compatible with their respective interests.

The legal matters relative to civil liability, both in regard to the bankruptcy and to the harm caused, will certainly be examined more closely by the Judiciary, which, of course, has the authority to decide. It is not the responsibility of the Investigation Commission to confront and decide on these matters, since it does not have the jurisdictional authority to solve conflicts of interest and ensure social peace.

In light of the foregoing and certain that due legal process applicable to this case, which is that expressly determined by Law 6.024/1974, duly received by the Federal Constitution of 1988, was faithfully followed, this is what remained to be explained in regard to the affirmations presented.

## 13. LIST OF ASSETS BELONGING TO CONTROLLERS AND EX-ADMINISTRATORS

Through correspondence CI-CSBANCO-2012/004, CI-CSBANCO- 2012/005, CI-CSBANCO-2012/006, CI-CSBANCO-2012/007, CI-CSBANCO-2012/008, CI-CSBANCO-2012/009, CI-CSBANCO-2012/010, CI-CSBANCO-2012/011, CI-CSBANCO-2012/012, CI-CSBANCO-2012/013, CI-CSBANCO-2012/014, CI-CSBANCO-2012/015, CI-CSBANCO-2012/016, CI-CSBANCO-2012/018, and CI-CSBANCO-2012/021, sent to the controllers and ex-administrators of the company (**pages 12/28**), whose assets were frozen by **NOTIFICATION No. 22.585,** of the Extrajudicial Liquidation Department – DELIQ (**pages 4/7**), this Commission requested a list of their private assets, shareholdings in companies and information on identification, in order to comply with Article 43 of Law 6.024/1974.



# BANCO CENTRAL DO BRASIL

All the controllers and ex-administrators whose assets were frozen by **NOTIFICATION No. 22.585** responded to the request of the Investigation Commission, according to the correspondence presented on pages 6236/6276.

Nonetheless, correspondence was sent to the Federal Revenue Service Office in São Paulo CI-CSBANCO-2012/019, of 7.17.2012, (**page 30**), requesting a copy of the declaration of assets for the fiscal year 2012 – base year 2011 of the controllers and ex-administrators of **BANCO CRUZEIRO DO SUL S.A.,** whose assets were frozen under this NOTIFICATION.

The Federal Revenue Office did not respond to our requests as of the date on which this report was closed. That said, in order to comply with Article 43 of Law 6.024/1974, the assets indicated by the ex-administrators listed below are included on pages 6236/6277.

- Charles Alexander Forbes, CPF. 001.906.918-1

- Ernani Fonseca Neto, CPF. 625.936.257-91[91]

- Fabio Caramuru Correa Meyer, CPF. 715.168.917-91

- Fabio Rocha do Amaral, CPF. 076.593.208-31

- Flavio Nunes Ferreira Rietmann, CPF. 913.629.627-91

- Horácio Martinho Lima, CPF. 745.862.547-37

- João Lara de Souza Meirelles Filho, CPF. 644.384.148-49[89]

- José Carlos Lima de Abreu, CPF. 385.584.168-34

- Luis Felippe Indio da Costa, CPF. 006.034.067-34

- Luis Octavio Azeredo Lopes Indio da Costa, CPF. 782.474.977-00

- Luiz Whately Thompson, CPF. 029.335.198-87[89]

- Maria Luisa Garcia de Mendonça, CPF. 380.376.616-87

- Progresso Vaño Puerto, CPF. 410.915.908-34

- Renato Alves Rabello, CPF. 527.747.408-00

- Roberto Vieira da Silva de Oliveira Costa, CPF. 769.344.037-20

---

[91] Ex-administrators whose assets were not frozen by Notification 22.585.



# BANCO CENTRAL DO BRASIL

- Sergio Marra Pereira Capella, CPF. 041.247.618-56

- Cruzeiro do Sul Holding Financeira S/A., CNPJ.13.211.256/0001-70

We emphasize that the assets of **Ernani Fonseca Neto, João Lara de Souza Meirelles Filho** and **Luiz Whately Thompson** were not frozen by this NOTIFICATION, since these ex-administrators did not manage BANCO CRUZEIRO DO SUL during the final 12 months before the temporary special administration regime.

However, since they were considered in prior management periods (*taking into account the fact that the investigation period covers the five (5) years before the TSAR was decreed*), upon receiving the invitation for examination and presentation of possible affirmations, this Investigation Commission asked them to also present the list of their private assets, shares owned in companies and information regarding their identification, in order to comply with Article 43 of Law 6.024/1974, according to the correspondence of 2.4.2013, on pages 5868/5870.

In response to this request, **Ernani Fonseca Neto, João Lara de Souza Meirelles Filho** and **Luiz Whately Thompson** presented a list of their assets, pursuant to the documents on pages 6239/6241, 6251 and 6259/6266.



# BANCO CENTRAL DO BRASIL

**14.      CONCLUSION**

In light of the foregoing, based on the evidence of irregularities found, this Investigation Commission recommends that the matter be sent to the competent section of this Agency, to evaluate the feasibility of opening an Administrative Proceeding against the independent auditors,  and that this report be sent to the  Securities and Exchange Commission, to the Federal Prosecutor's Office and to the Judge of the 2nd Federal Criminal Court of São Paulo/SP, where Criminal Action 0006640-61.2012.403.6181, referring to the events in the Cruzeiro do Sul Conglomerate is being tried.

In light of the losses calculated (R$ 2,236,782,000), the investigation case is being sent to the Department of Extrajudicial Liquidations, with the recommendation that it be sent to the Judiciary, for the purposes established in Art. 45 et seq. of Law no. 6024/1974.


São Paulo, February 22, 2013


**CLÓVIS VIDAL POLETO**          **PAULO CESAR F. DA SILVA**
**President**                                  **Reporter**


**AUGUSTIN DAIHYUN SHIM**      **AMADEU JOÃO CAPARROZ**
**Reporter**                                  **Reporter**


**ALAN BRITO CANAL**                  **MARIA APARECIDA PEREIRA**
**Secretary**                                 **Secretary**

247