# EXHIBIT "5"

**BANCO CENTRAL DO BRASIL**

DECISION 331/2016-DIORF OF DECEMBER 12, 2016

Administrative process - former directors of Banco Cruzeiro do Sul SA - in Bankruptcy - Pt 1401592272.

The following persons Mr. Fabio Caramuru Correa Meyer, Mr.Luis Felippe Indio da Costa, Mr. Luis Octavio Azeredo Lopes Indio da Costa, Mr . Roberto Viera da Silva de Oliveira Costa and Mr. Sergio Marra Pereira Capella and Ms. Maria Luisa Garcia de Mendonca, former directors of Banco Cruzeiro do Sul SA- in Bankruptcy (BCSul), were summoned in the present administrative proceeding, to present defense, given the irregularities described below, which subject them to the sanctions set forth in art. 44 of no. 4.595 of December 31, 1964.

1.1 Irregularity "a": granting and / or renewing credit operations without observing the principles of selectivity, guarantee and liquidity, failing to constitute due provision and adjustments in the assets involved.

1.1.1 Capitulation

- clause IX, items "a" and "b", of Resolution no. 1.559 of December 22, 1998, with the wording given by art. 1 of Resolution no. 3.258, dated January 28, 2005;
- arts. 1,2 and 6 of Resolution no. 2.682 of 21 December 1999;
-arts. 2, paragraph one, item III, and 4, items III, VI, and XII, of Resolution no. 3.721, out of 30
April 2009;
- Circular no. 1,273 of December 29, 1987 (item 1.1.2.5 of the Accounting Plan of the Institutions of the National Financial System - Cosif), combined with art. 7, paragraph 1, subparagraph II, letter "d", of Resolution CFC no. 750 of December 29, 1993, as amended by CFC Resolution no. 1,282 of May 28, 2010.

1.1.2 Description of occurrence:

- from January 2010 to May 2012, BCSul's former directors granted and renewed credit and bank guarantee operations without observing the principles of selectivity, guarantee and liquidity, failing to constitute adequate provisions and adjustments in the assets involved;

- the occurrences related to the clients indicated in Table 1, with whom BCSul contracted operations that resulted in exposure of the institution to risk in the amount of R $ 202.1 million:

**Table 1- Indicated customers and respective exposure** **R$ Millions**

In the opening balance sheet dated 4.6.2012, prepared by the director of the Temporary Special Administrative System (Raet) in the BCSul, several were carried out and the ones treated here relate exclusively to the eight clients, whose (illegible) reached R $ 190.1 million (date -base: 31.5.2012), as per Table 2:

**Table 2-Adjustments updated by Raet Director** **R$ Millions**

| Raet Adjustments | Amount |
|---|---|
| Prosper Flex Shares | 126.3 |
| Multicred Shares | 11.6. |
| Proprietary portfolio | 10.7 |
| Bank guarantee | 41.5 |
| Total | 190.1 |

-The adjustments refer to the provision for losses with (illegible) Bank Certificates (CCBs) issued by these eight clients that were in the Flexible FIDC Multicedentes Fund (Prosper Flex) and FIDC BCSul Verax Multicred Financial (Multicred ), with the consequent effect on the shares of the fund, as well as on the Bank's own illegible. They also include the provision for credit risk with bank guarantees (illegible) to some of these clients.

-Relatively the operations ceded to the FIDCs, it was verified that the BCSul adopted (illegible) to cede operations as soon as it was contracting, and in many cases, (illegible), contracting of the operation as its cessation occurred on the same date. It should be noted (illegible) that even after the transfer of operations, BCSul remained responsible for the (illegible) transfer of payment flows from credits to funds, so that the (illegible) financial was knowledgeable of clients and their history of performance;

- BCSul, on 31.5.2012, held 85.92% of the Multicred fund, which in turn (illegible) 98.75% of the Prosper Flex fund, the amounts of which were reflected in the balance sheet of the financial institution;

- the operations with these eight clients were carried out with the objective of masking (illegible) the situation of the credits, which presented insufficient provisions and which, in a (illegible) way, had the following characteristics: (i) the use of resources relating to new CCB issues for the payment of installments of previous CCBs ('freezing'); (ii) the absence (illegible) of guarantees; and (iii) the termination of all or part of the transactions to the FIDCs Prosper

1.2 Irregularity "b" similar credit operations with interposed persons.

1.2.1 Capitulation:

- art. 44, paragraph 4, of Law no. 4.595, 1964;

-art. 4 of Resolution no. 2.554 of September 24, 1998.

1.2.2 description of the occurrence

- from January 28, 2010 to April 30, 2012, BCSul carried out 68 simulated credit operations with interposed persons in the amount of R $ 716.2 million

- these operations involved the issuance of CCBs, always at the end of each month, whose resources were invested in shares of Investment Funds in Participations (FIP) and redeemed at the beginning of the following month;

- this practice shows that BCSul's former directors failed to promote high standards of ethics and integrity in the Financial Institution.

- the simulation of credit operations was evidenced by the following facts:

a) in testimony given to the Committee of Inquiry for the extrajudicial liquidation of BCSul, on 01.18.2013, the Fund Processing manager of Cruzeiro do Sul SA DTVM (Cruzeiro do Sul DTVM), Mr. Elcio Leopoldino, described the following *modus operandi* involving such operations;

i) Cruzeiro do Sul DTVM was responsible for the custody of the assets and control of FIP BCSul Verax Cinco Platinum and FIP BCSul Verax Equity 1 (FIPs)

ii) these funds were closed, so that the applications would be redeemed by customers only when the expiration of each FIP, and there is no possibility of daily redemption;

iii) a system was implemented to allow share holders to exit before the maturity dates, through a "secondary market", consisting of the entry of new investors who bought shares of applicators participating in the funds;

iv) this "secondary market" was put into practice through the purchase of shares by Patrimonial Maragato SA, and subsequently by Cruzeiro do Sul DTVM and Cruzeiro do Sul SA CVM;

v) Mr. Elcio Leopoldino was ordered by Mr. Luis Felippe Indio da Costa, to transmit the position of Cruzeiro do Sul DTVM and Cruzeiro do Sul CVM at the end of the month in said FIPs;

vi) also by order of Mr. Luis Felippe Indio da Costa to Cruzeiro do Sul DTVM and Cruzeiro do Sul CVM could not remain as share holders of the FIPs on the last day of each month;

vii) the positions were transmitted by electronic messages addressed to the person responsible for the wholesale operations processing area of BCSul;

(viii) in return for his messages, Mr. Elcio Leopoldino received information about the clients (people interposed) that would make "applications" in the FIPs and the respective values;

ix) The credit operations granted to the persons involved corresponded to the "cash requirement" resulting from the "exit" of shareholders, as well as Cruzeiro do Sul DTVM and Cruzeiro do Sul CVM.

b) the electronic messages gathered in these proceedings and the dates of the credits, the applications in the FIPs and the redemptions confirm the facts described in the testimony of Mr. Elcio Leopoldino.

c) it was verified that, on the same date and in the same current account in which the released funds were credited, one or more debts were transferred for the transfer of funds to the FIPs, and in all cases the amount debited coincides exactly with the net value released in each operation;

d) the simulated credit operations, as well as the applications in the FIPs, were always carried out at the end of each month, and in 65 of the cases it was verified that, at the beginning of the subsequent month, the inverse flow was made, returning the values to proceed with the settlement of CCBs;

e) CCBs were issued with a maturity of a few days (term between 1 and 3 working days), a fact not usual in the financial market;

f) the operations were devoid of economic grounds, since they invariably generated losses for interposed persons, since the income obtained was lower than the loan charges;

g) 45 of the 68 CCBs are without the issuer's signature, characterizing non-compliance with the essential requirement for its validity, as required by current legislation (art. 29, of Law no. 10.931, issued August 2, 2004).

The simulated credit operations were carried out with Brigade Promotora de Credito e Vendas Ltda., Promotora and Discloser Sudeste Line Ltda., Amadeus Simoes Lopes de Azambuja, Afonso Cesar Boabaid Burlamaqui, Centro Oeste Promotora de Credito Ltda., Alvaro Luiz Alves de Lima Alvares Otero, Armando Cesar de Araujo Pereira Burlamaqui and Armando Jose Andrade de Carvalho.

1.3 Irregularity "c": failure to communicate to the competent authorities' operations with indications of a crime provided for in Law no. 9.613 of 3 March 1998.

1.3.1 Capitulation: art. 11, items I and II-b of Law No. 9,613 of 1998, combined with art. 13, item L, of Circular no. 3.461 of July 24, 2009.

    1.3.2 description of the occurrence from January 2010 to March 2012, the BCSul failed to notify the Financial Activities Control Council (Coaf) of 68

credit operations without economic basis, in the amount of R$716,173,525.00, whose holders had financial capacity incompatible with the value of the operations, and whose credit instruments were not signed.

2. According to the initial intimations, the indicators are responsible for the irregularities as described in Table 1.

**Table 1- Irregularities charged to Each Indicated.**

| Name | CPF | Position | Management period | Irregularities | | |
|---|---|---|---|---|---|---|
| | | | | a | b | c |
| Luis Felipe Indio da Coasta | 006.034.067-34 | Director of Investor Relations | 4.23.2007 to 1.4.2012 | x | x | x |
| | | Director of Credit Risks | 10.30.2009 to 1.31.2011 | x | x | x |
| Maria luisa Garcia de Mendonca | 380.376.616-87 | Chief Accounting, Registration and Operational Risk Officer | 4.23.2007 to 6.4.2012 | x | x | x |
| | | Director of Credit Risk | 1.31.2011 to 6.4.2012 | x | x | x |
| Luis Octavio Azeredo Lopes Indio da Costa | 782.474.977-00 | Superintendent Director | 4.23.2007 to 6.4.2012 | x | x | |
| | | Director of Investor relations | 1.10.2012 to 6.4.2012 | x | x | |
| | | Vice chairman of the Board | 4.23.2007 to 1.4.2012 | x | x | |
| | | Chairman of the Board | 1.10.2012 to 6.4.2012 | x | x | |
| | | Director of Risk | 4.23.2007 to 6.4.2012 | x | x | |
| | | Director of the Commercial Portfolio | 4.23.2007 to 6.4.2012 | x | x | |
| | | Director of Investments | 1.31.2011 to 6.4.2012 | x | x | |
| Fabio Caramuru Correa Meyer | 715.168.917-91 | Director | 4.23.2007 to 6.4.2012 | x | x | |
| Roberto Vieira da Silva de Oliveira Costa | 769.344.037-20 | Director | 3.7.2008 to 6.4.2012 | x | x | |
| Sergio Marra Pereira Capella | 041.247.618-56 | Director | 4.23.2007 to 6.4.2012 | x | x | |

3. Regularly summoned, the accused presented timely defenses (pgs 5.359-5.617, 5.618-5.976, 5.977-6.075, 6.081-6.103, 6.104-6.207, 6.214-6.222, 6.223-7.026, 7,030-7,073, 7,115-7,133, 7,149-7,171, and 7,172-7,176, except for Mr. Fabio Caramuru Correa Meyer, who presented it untimely (pg. 7,134-7,148). The allegations are summarized below.

3.1 Mr. Fabio Caramuru Correa Meyer, Mr.  Luis Felippe Indio da Costa, Mr.  Luis Octavio Aeredo Lopes Indio da Costa and Mr. Roberto Viera da Silva de Oliveira Costa and Ms. Maria Luisa Garcia de Mendonca:

- CCBs attached to the non-signed records are mere copies, without legal value, intended for internal control of BCSul:

- all such banknotes issued by clients were signed by the respective issuers registered with the Custody and Settlement Chamber (Cetip) and were not located because of the incompetence of the representatives of the Central Bank of Brazil, as director of the BCSul system, which would be corroborated by the copies of the CCBs, signed by Mr. Armadeu Simoes Lopes de Azambuja and Mr. Armando Jose de Carvalho, obtained from the issuers themselves by Mr. Luis Felippe Indio da Costa and joined in his defense (fls. 5,869-5,920);

- the channels signed were lost as a result of poor management of the financial institution's documents by a company hired for that purpose on the occasion of the Raet and the extrajudicial liquidation.

3.2 Mr. Luis Felippe Indio da Costa, Mr.  Luis Octavio Azeredo Lopes Indio da Costa, Mr. Roberto Vieira da Silva de Oliveira Costa and Mr.  Sergio Marra Pereira Capella and Ms. Maria Luisa Garcia de Mendonca: BCSul was an organized bank that constituted a structure for the analysis of credit of its clients, composed of commercial credit area, credit analysis, credit committee and operational processing area, which were audited by KPMG Auditores Independentes (KPMG) and by this Banco Central do Brasil, which have never indicated any indication of violation of the principles of selectivity, guarantee and liquidity, as well as the lack of an appropriate title representing the debt.

3.3 Mr. Fabio Caramuru Correa Meyer, Mr.  Luis Felippe Indio da Costa and Mr.  Luis Octavio Azeredo Lopes Indio da Costa and Ms.  Maria Luisa Garcia de Mendonca: the mere granting of guarantees does not characterize the existence of credit and the Banco Central do Brasil is mistaken in stating that BCSul should have provisioned the letters of guarantee issued, since they do not provision themselves, except when honored, and none of the guarantees offered to any of the eight clients analyzed was honored.

3.4 Mr. Fabio Caramuru Correa Meyer, Mr.  Luis Felippe Indio da Costa, Mr.  Roberto Vieira da Silva de Oliveira Costa and Mr. Sergio Marra Pereira Capella: the accusations made do not establish enough links between the accused and the irregularity of simulating credit transactions with people interposed, since the only one reference to the alleged participation of the defendants in said infringement was made in the testimony given by Mr. Elcio Leopoldino.

3.5 Mr. Luis Felippe Indio da Costa, Mr. Luis Octavio Azeredo Lopes Indio da Costa, Mr. Roberto Vieira da Silva de Oliveira Costa and Mr. Sergio Marra Pereira Capella and Ms. Maria Luisa Garcia de Mendonca:

- the mentioned clients had long-standing operations with BCSul, either as investors, borrowers or shareholders, as well as clients of Cruzeiro do Sul CVM and Cruzeiro do Sul SA DTVM and had no history of default;

According to its credit policy, the FIDC administration and totally segregated from BCSul (*Chinese wall)* management.

- BCSul made provisioning of the credit risk in the percentages determined by this Banco Central do Brasil;

- the losses indicated were borne by the issuing customers of the CCBs themselves and not by BCSul.

3.6 Mr. Fabio Caramuru Correa Meyer and Mr. Luis Felippe Indio da Costa and Ms. Maria Luisa Garcia de Mendonca: BCSul, under the management of the Credit Guarantor Fund (FGC), contracted credit operations with the same clients mentioned in the indictment, so that if there are irregularities not operations indicated in the summons, there is also in the contracted operations within the scope of Raet.

3.7 Mr. Fabio Caramuru Correa Meyer and Mr. Luis Octavio Azeredo Lopes Indio da Costa and Ms. Maria Luisa Garcia de Mendonca: the accusation is generic and therefore prevents the exercise of ample defense.  The last two defendants were specific in stating that the accusation is based on the indeterminate concept of "serious misconduct" and faces the principle of legality, thus, all accusations based on art.44 paragraph 4 of Law No. 4,595 of 1964 should be disregarded insofar as it does not contain any type of conduct, as well as the allegations of breaches of non-statutory standards not authorized by said legal provision and should be disregarded.

3.8 Mr. Luis Felippe Indio da Costa and Mr. Luis Octavio Azeredo Lopes Indio da Costa and Ms. Maria Luisa Garcia de Mendonca:

- the FGC does not have technical qualification and independence to effect the adjustments described in the Opening Balance of the Raet,  nor competence for the conduct of this special system.

- this Banco Central do Brasil could not effect provisioning in respect of FIDCs, in the meanwhile BCSul did not even have the status of shareholder of such funds and, consequently, neither the defendants can be imputed any responsibility for any lack of provisioning ;

- Cruzeiro do Sul DTVM management was responsible for FIDC BCSul Verax Multicred Financiero and Banco Prosper SA for Prosper Flex FIDC Multicedentes, which contracted Deutsche Bank SA for treasury, custody, and bookkeeping services and control of assets and liabilities;

- in relation to the accusation that the operations were devoid of economic foundation, they did not have access to the accounts of the clients to conclude what result they generated.

3.9 Mr. Luis Octavio Azeredo Lopes Indio da Costa and Ms. Maria Luisa Garcia de Mendonca:

- the administrative procedure is null and void for not having individualized the conduct of the accused, simply limiting to capitulate the alleged transgressions in which they would have incurred;

- BCSul carried out the operations, following a rigorous process of credit analysis and approval, which were instrumented by CCBs, an adequate means for the constitution and representation of the debts:

- the *rating* structure at level H, given by this Banco Central do Brasil and FGC *Middle Market* operations, is wrong;

- the required adjustments are a tiny percentage of the total *Middle Market portfolio;*

Ms. Maria Luisa Garcia de Mendonca was not a member of BCSul's Credit Committee, nor was she responsible for the supervision of that board, nor of the board responsible for the issuance of CCBs (Area of Wholesale Credit), as well as having not subordinated to her the areas of Analysis of Credit and Credit Processing, so that no liability can be imputed for the alleged simulation of credit operations.

3.10 Mr. Roberto Vieira da Silva de Oliveira Costa and Mr. Sergio Marra Pereira Capella:

- It was up to the BCSul Credit Committee to define credit analysis policies, so that if a certain operation did not have the guarantees and was still recommended by the specialists of the credit analysis department, it was because other variables guaranteed it the necessary level of security, or at least it was legitimate for the said colleague to agree that this was the case, since it was not up to them to gather new documents or information;

- trusted that the guidelines established by the Credit Committee were followed by credit management when preparing analyzes and recommendations;

- performed their duties with loyalty, good faith and a high standard of diligence, not being able to be imputed to the irregularity related to the granting of credit without observance of the principles of selectivity, guarantee and liquidity;

- have not benefited from credit operations now tainted with irregularities.

3.11 Mr. Luis Felippe Indio da Costa and Ms. Maria Luisa Garcia de Mendonca: they had no obligation to provide Coaf with the information that Law no. 9.613, of 1998,  At the time of the facts, the mentioned law contained a list of previous crimes necessary for the characterization of money laundering and, during their stay in office, they never witnessed any crime or eventual suspicions of any of the conducts then listed in the legislation as passive of communication to the aforementioned Council, besides the rule requiring the communication of the existence of "serious indications" of crime of money laundering or values obtained with the previous crimes.

3.12 Mr. Fabio Caramuru Correa Meyer:

- all the acts that he practiced in the exercise of his position were correct, legitimate and legal;

- the accusation that BCSul would have carried out simulated operations does not proceed because, if they were operations, they could not be simulated, since it is not simulated what is or what exists;

**BANCO CENTRAL DO BRASIL**

- the allegations that BCSul had granted credit through unsecured operations are false;

- The jurisprudence of the Board of Appeals of the National Financial System - CRSFN points to the subjective responsibility in the scope of the norms protected by the Banco Central do Brasil.

-  It held the position of Wholesale Credit Commercial Director and his autonomy was limited to bureaucratic acts proper to his function, which did not include any type of jurisdiction referring to credit transactions, and every transaction of this type needed to be previously approved by the Credit Committee.

3.13 Mr. Luis Felippe Indio da Costa:

-  Banco Central do Brasil is suspected and impeded from acting in the present administrative proceeding, since it acts as an assistant of accusation in legal proceedings in progress in the Federal Court;

- there was no delay in the payment of any of the indicated CCBs, so that it was not necessary to provide 100%, which, if carried out, would cause BCSul to suffer a reduction in equity;

- only FIDC directors could make adjustments and provisions, so BCSul and its former directors can not be penalized for not doing what they were not supposed to do.

3.14 Ms. Maria Luisa Garcia de Mendonca:

  - gathered documents consisting of meeting minutes, presentation slides, certificates and attendance lists in courses and events related to the prevention of money laundering, considerations about the charge of not communicating, competent authorities, operations with indications of crime provided for in Law no. 9.613, of 1998, in addition to an internal audit report;

-in the above mentioned documentation (tables, fl 6.230), there is proof that its performance as responsible for the implementation of measures established by Circular No. 6.230 is not possible. 3.461 in 2009, commenced on 04.29.2011 and ended in March 2012, unlike the period alleged by the indictment, which would have started in January 2010.

3.15 Mr.  Roberto Vieira da Silva de Oliveira Costa:

- the financial administration has undergone a process of specialization of functions in the last decades, so that the mere circumstance of being a statutory director does not make that person responsible for any irregularity that occurred in the respective institution, being therefore necessary to analyze the functions attributed to such director.

-was responsible for leading BCSul's fundraising department, with the sole task of monitoring the managers, visiting clients, collecting funds and making visits to prospective clients;

- the authorizations of the Credit Committee were carried out by e-mail and only manifested itself after analysis and approval of the operations by credit analysts;

- the Credit Committee designed a credit approval procedure that guaranteed access to all relevant information for decision making, including the commercial area proposal and the robust analysis of credit risk prepared by the specialized department;

- the so-called rolling of credit operations is common practice in the market and, taken in isolation, has nothing irregular;

- it did not have access to the indications indicated by the accusation, so, for the purposes of his responsibility, it was as if nothing existed, for it is not to be expected of the omnipresence or omniscience administrator;

- there is no fraud or simulation without the knowledge and the will to achieve this result, so the accusation needs to demonstrate that it deliberately and willfully involved in the practice of the wrongful act.

3.16 Mr. Sérgio Marra Pereira Capella:

- he never worked in areas related to the aforementioned operations and his participation in the Credit Committee was solely due to the need for that collegiate to have a member of the commercial area;

- there is no electronic approval of the defender in relation to the aforementioned operations;

- the Credit Committee did not have the task of monitoring the financial releases or the allocation of their resources;

- the provisioning and adjustment of assets was not part of the scope of its functions.

3.17 On 7.12.2015, Mr. Luis Felipe Índio da Costa joined documents reiterating the arguments set out previously regarding the conduct of the FGC (fls. 7,182-7,186).

3.18 On the same date. Maria Luisa Garcia de Mendonça presented a statement, opinion and documents reiterating the arguments previously set forth in her defense (pp. 7,187-7,220). In addition, on 26.8.2016, the undersigned filed an opinion issued by Fábio Ulhoa Coelho, dated 9.9.2007 (fls. 7,315-7,361), which deals with the validity of the electronic registration of the titles of credit made in Cetip. In the absence of such an opinion, the author states, in summary, that, when registered in the aforementioned custody chamber, the CCB is supported electronically, so that the role that served as a documentary basis (and that may possibly return to this condition) should be kept simply (in this case, with the lender). Ms. Maria Luisa Garcia de Mendonça presented on 31.10.2016 new documentation (fls. 7.389-7.395) seeking to support such an understanding.

3.19 On 7.11.2016, Mr. Luis Octávio Azeredo Lopes Índio da Costa and Ms. Maria Luisa Garcia de Mendonça required (fl. 7406): (i) that this Banco Central do Brasil officially authorized Cetip to provide a copy of the records of CCBs not located at the time of

Raet report which led to the initiation of the present proceedings; and (ii) the granting of a thirty-day period, after the required action has been taken, for the submission of final allegations.

4. In addition, the indicators required the following: i) Messrs. Luis Felippe Índio da Costa, Luis Octávio Azeredo Lopes Índio da Costa, Maria Luisa Garcia de Mendonça, Roberto Vieira da Silva de Oliveira Costa and Sérgio Marra Pereira Capella: testimony of witnesses; (ii) Fábio Caramuru Corrêa Meyer and Luis Felippe Índio da Costa: that they be summoned in person to make final submissions as soon as the investigation phase of this case is exhausted, since Law No. 9.784, of January 29, 1999, provides for the possibility of make final submissions immediately prior to the decision of the adjudicating authority; and iii) Mr. Fábio Caramuru Corrêa Meyer: that this Central Bank of Brazil officiates the liquidator to provide clarifications on the operations, due to the provisions in item 3.6.

4.1 Once the requests for production of testimonial evidence have been granted, Messrs. Sérgio Marra Pereira Capella, Roberto Vieira da Silva de Oliveira Costa, Luis Felippe Índio da Costa and Luiz Octávio Azeredo Lopes Índio da Costa and Ms. Maria Luisa Garcia de Mendonça presented testimonies, reduced to term, of their witnesses (pp. 7,237-7,240, 7,737-7,240, 7,271-7,314, 7,373-7,385 and 7,396-7,400), in which the following statements are summarized:

4.1.1 Witnesses of Mr. Sérgio Marra Pereira Capella:

-Mr. José Carlos Lima de Abreu: Mr. Sérgio Marra Pereira Capella worked in the payroll-deductible credit area of BCSul, with exclusively commercial functions, being part of the Credit Committee of the financial institution, in which he presented proposals involving correspondents that operated BCSul's direct codes;

Mrs. Gislei Aparecida Santos: Mr. Sérgio Marra Pereira Capella was called to the Credit Committee of the financial institution when there were proposals in his area.

4.1.2 Witnesses of Roberto Vieira da Silva de Oliveira Costa:

-Mrs. Sylvia Christina Alves dos Santos: Mr. Roberto Vieira da Silva de Oliveira Costa had as sole function to support the managers of the Funding Board area, with a unique focus on prospecting new clients for BCSul, implementing meritocracy policies and having participated in the Credit and Prevention and Combat Committees Money Laundering;

-Mr. Joselito Feijó de Melo Junior: Mr. Roberto Vieira da Silva de Oliveira Costa was very knowledgeable about the financial market, constantly worried about keeping all managers informed about the results of the financial institution, never having shown an attitude that could raise doubts as to his professional profile.

4.1.3 Witnesses of Mr. Luis Felippe Índio da Costa:

-Mr. Eduardo Felix Bianchini:

**BANCO CENTRAL DO BRASIL**

Among the nine clients in the fl. 7,275, to which guarantees were provided by BCSul in the form of a surety, only one had such honorable guarantee, which was not mentioned in the present case;

- on 11,25.2013, as liquidator of BCSul, it was not possible to meet the request for copies of instruments of payroll-deductible loan agreements, made by Ms. Maria Luisa Garcia de Mendonça (pp. 7,247-7,282), in view of the operational difficulties generated by the substitution of the contracted company for the custody, control and registration of the documentation produced / received during the regular operation of the financial institution, a replacement during the Raet period;

- as regards the area in which the computer equipment owned by BCSul by IMS Tecnologia e Serviços Ltda was returned, all eleven servers, 196 of a total of 230 computers and the two notebooks were formatted and, in addition, three computers have added defects in their hard disks;

- There were no credit instruments, contracts and / or banknotes made during the Raet, related to the clients Amadeu Simões Lopes de Azambuja, Brigada Promotora de Creditos e Vendas Ltda., Promotora e Divulgadora Sudeste Line Ltda., Preserv Operadora de Servicos Ltda. and Associacao dos Musicos Militares do Brasil (Ambra)

-in relation to the CCB 9659, issued by Afonso Cesar Boabaid Burlamaqui must: (i) not assigned classification for the level of risk determined by resolution mo 2,682, 1999, before the transfer of the respective contract, in 08.13.2012, The FIDC BCSul Verax Multircred Financier; (ii) during the period of validity of the CCB in screen-13.8.2012 to 9.10.2012 (date on which the customer has made the payment of the claim, which would arrive in 15.10.2012), assigned to the same to the same level of risk "to"; (iii) the BCSul did not provide complementary to already made for this CCB; (iv) there was no transfer payment flows of ballot in comment to the financial institution, as this was already in extrajudicial liquidation in 9.10.2012;

- Mr Jair Camilo:

- the G5 Prestacao de Servicos de Treinamento Empresarial Ltda. (G5), a company to which it is a partner, carried out three training sessions with the BCSul team on 28.3.2008, 14.6.2010 and 22.12.2011, all dealing with the prevention of crimes of laundering and / or hiding of assets, rights and values, provided for in Law 9,613 of 1998;

- in the training given, the following points were highlighted: (i) contextualization of the theme of money laundering; (ii) criminal aspects of money laundering; (iii) procedural aspects of money laundering; (iv) intelligence and research; (v) international legal cooperation; (vi) Law 9,613 of 1998, Complementary Law no. 105 of January 10, 2001, and regulations of the Banco Central do Brasil relating to the subject;

- G5 also provided two consulting services in December 2009 and August 2010 for the development and implementation of " ACL Scripts" to include / change the rules for monitoring the prevention of money laundering;

- in the advisory services, the basic criteria emphasized for the communication of evidence to Coaf were: (i) the rules establish indicators and criteria of evidence, which, after analysis by the financial institution, is at the discretion of the latter, whether or not the Coaf ; (ii) the criteria for establishing whether or not to treat a clue are merely subjective; (iii) the Autark's own rule provides that, in case of doubt, the client should be placed under closer monitoring, and the financial institution should not promote evidence communications without concrete and tangible data;

- the G5 conducted the training always based on laws and rules, highlighting to participants the main risks of signs of money laundering, the need for communications and the responsibilities defined by law;

- in the assembly of the monitoring reports, the G5 implemented criteria aiming to highlight alerts of possible processes to be analyzed by the competent areas;

- for G5, at the time of providing training and consulting services (2008 to 2011), BCSul complied with the rules of preventive monitoring, within the framework of internal decisions.

-Mr. Eliseu Martins:

- the subordinated shares of the FIDCs may be characterized as financial instruments, not as loans and receivables;

- with regard to the aspect of the allowance for doubtful accounts, carried out by the FIDC, should be adjusted, otherwise, there is a double counting of credit risk;

- the change in provisions of 4.6.2012 (date of the special opening balance sheet drawn up by the FGC) and 31.7.2012 shows that during this period the Raet director himself acknowledged that the volume of expectations of losses was excessive, that the adjustment, less than sixty days later, was much lower (R $ 4.8 million) than originally proposed (R $ 142.8 million);

- Unless new facts arose between 5.6.2012 and 31.7.2012, it can be stated that there was an error in the provisioning made, which was subsequently reversed;

Everything seems to indicate the existence of a deliberate intention to increase the negative value of the equity of the financial institution, rather than the application of accounting principles that produce unbiased and non-misleading information.

4.1.4 Witnesses of Mr. Luis Octávio Azeredo Lopes Índio da Costa and Ms. Maria Luisa Garcia de Mendonça:

-Mr. Denis Ruiz:

- was hired by Cruzeiro do Sul DTVM as Asset Back Office Analyst, was directly responsible to Mr. Elcio Leopoldino and the directors of Verax.

**BANCO CENTRAL DO BRASIL**

Messrs. Marcio Dreher and Marcelo Xandó, and was never subordinate to Mrs. Maria Luisa Garcia de Mendonça, and has never seen her dealing with matters related to funds;

- the decisions related to FIDCs and FIPs were taken Verax in São Paulo (never in Rio de Janeiro)

Ms. Maria Isabel Copello da Silveira:

- worked at the Accounting Department of BCSul, from 05.16.1994 to 10.10.2013, as an accounting analyst. Maria Luisa Garcia de Mendonça and that, in the said period, was responsible for Messrs. Antonio Kanô and Airton Salviano;

- the indication of the risk level of the clients of the *Middle Market* portfolio was not attributed to the said department, but to the Department of Credit Analysis (totally segregated, therefore, in the management of Ms. Maria Luisa Garcia de Mendonça), which provided information to the Accounting Department, which, in turn, made the respective accounting records.

-Mr. Ismael Machado de Carvalho Junior:

- worked at BCSul from July 2007 to October 2012, in the role of Coordinator of Prevention and Combating Money Laundering (PCLD) Maria Luisa Garcia de Mendonça, which encouraged him to carry out various training programs promoted by several institutions, such as Febraban, Aberj and G5 Consultoria, and attended by representatives of Coaf, Public Ministry, Banco Central do Brasil, Banco do Brasil, Itaú and Bradesco ;

- after the training sessions, he / she passed on to his / her superior and to the PClD Committee of BCSul the guidelines received, having always received an incentive to change the procedures in the direction suggested in the aforementioned training, changes materialized in the PDLD Policy and approved by said committee, that the financial institution's control structure was very similar to that of large banks;

- in the training on screen, it was stressed the importance of carrying out analyzes of the operations of the clients in order to avoid "clog" the Coaf with information without utility;

- in the BCSul, the ACL tool was used to monitor all the systems of the bank and the operations that did not go through the previously parameterized filters were analyzed and reported to the PCLD Committee, which also performed analysis and decided, most of the communication approved in committee, having always demonstrated diligent posture, carefully attended to the standards in force, concerned and committed to working properly;

- the audits carried out by this Autarchy for the purpose of reviewing the policies of the PCLD approved the procedures developed by BCSul, since the

completion of the verification did not point out irregularities, but only suggestions for improvement.

4.1.5 Witnesses of Mr. Luis Octávio Azeredo Lopes Índio da Costa:

-Mr. Claudio Amadeo Rodriguez:

- in his testimony rendered in the scope of criminal proceedings 0000162-03.2013.4.3.6181, which is processed before the 2nd Federal Criminal Court, provided clarifications to the Public Prosecutor's Office and to the court, regarding the duties of the administrator, manager and custodian of FIDC, which are not necessarily exercised by the same person;

- the director implements the rules described in regulation, while the manager makes the management decisions and the custodian is responsible for the ballast and for taking care of the receivables involved in the fund;

- the formation of FIDC is the healthy way to raise funds - especially for small banks in Brazil, which (as well as companies) have difficulty accessing capital - because, when creating a fund and transferring the receivables, it is organized the history of these, being submitted to the audit, so that, in case it needs a loan, the assignor of the referred receivables uses such fund as ballast;

- the high interest of the subordinated shareholder in FIDC is a guarantee to the senior shareholder;

- the risk level of credit operations, reflected in the FIDC financial statements as a provision for doubtful accounts, is calculated by the fund manager, and the assignor does not have such responsibility.

4.2 Mr. Luis Octávio Azeredo Lopes Índio da Costa and Ms. Maria Luisa Garcia de Mendonça listed as a witness, yet, Mr. Thiago Figueira Rodrigues who, in testimony given in the premises of this Autarchy, on November 7, 2016 (lying on the pgs.. 7,401 / 7,402), stated, in summary, that:

- joined BCSul in 2004 in the Legal Department; in 2006, worked in the credit area and, from 2007 to 2012, in the area of internal controls, always in the Rio de Janeiro branch;

- after requesting credit from the customer, the credit analysis management carried out the examination of indicators and documentation. Approved by this management, the request went to the Credit Committee and, after evaluation of this, the contract was formalized in the legal area of BCSul, after which the release of the resource was given;

- when the credit was transferred, the CCB was registered at Cetip and is audited by Cetip on a monthly basis, mainly in relation to the black endorsement and, from the moment of the assignment, it is understood that BCSul's liability was not of the credit holder;

-the physical route of the CCB, after registering at Cetip. Returned to the Legal Department of BCSu for scanning and permanent filing;

**BANCO CENTRAL DO BRASIL**

- the lender of the title itself accompanied the CCB, including Cetip, and the Banco Central do Brasil, if necessary, requested copies of the respective documents, within the scope of the inspection procedures;

- the provisioning of risk in relation to letters of guarantee was only made at the time they were executed, in accordance with current regulations;

-Ms. Maria Luisa Garcia de Mendonça did not participate in the *Middle Market* credit concession. Ana Pregnolato (Manager of the Department of Credit Analysis) and Messrs. Roberto Vieira da Silva de Oliveira Costa, Fábio Caramuru Correa Meyer, Luis Felippe Índio da Costa and Luis Octávio Azeredo Lopes Índio da Costa;

- In the BCSul, the ACL system gathered all the information of the other bank systems, generating reports with the atypical operations, which would be analyzed individually, with with the exception of those previously analyzed by the relevant area (such as CCB loan operations) and, when necessary, additional information from the client was requested from the corresponding manager;

- atypical situations expressly provided for in the legislation were immediately communicated to the Coaf, and fractional operations were also analyzed, which could be indicative of mockery;

- all the analyzes generated minutes that were sent to a group of PCLD - formed by Messrs. André Carvalho, Ismael Carvalho, Celso Oliveira, Alexandre Guida, Miguel Burlamaqui and Ms. Eliane Águia - which was then reviewed and then submitted to the PCLD Committee, which was responsible for evaluating and deciding which cases were notifiable to the Coaf and which included Ms. Maria Luisa Garcia de Mendonça and Eliane Água, and Messrs. Roberto Vieira da Silva de Oliveira Costa, Fábio Caramuru Correa Meyer and Flávio Rietmann, having as Secretaries Messrs. Ismael Carvalho and André Carvalho;

- The *modus operandi* of BCSul in relation to the PCLD followed the norms related to the subject and the good practices with participation of the functional body in diverse trainings in several organs (Febraban, Aberj, ABBC, among others) and in lectures related to the subject;

- Verax Serviços Financeiros and BCSul, although they operated in the same building, were distinct legal entities with different partners and used different systems and human resources, with Verax Serviços Financeiros being the administrator of BCSul investment funds;

- it does not remember any irregularities found in the audits carried out by this Banco Central do Brasil, and there were no pending documents or information that may be requested by this Autarchy.

5. Preliminarily, with regard to the presentation of final allegations, note that art. 38 of Law No. 9.784 of 1999, provides that the interested party may, at the preliminary stage and prior to the decision-making, attach documents and opinions, request diligence and expertise, and make claims related to the subject-matter of the proceedings.

**BANCO CENTRAL DO BRASIL**

6. Therefore, as a result of the legal provision, the accused may, at any time and independently of a summons, offer demonstrations, as long as the decision has not yet been rendered. In the case in point, it is verified that they have manifested themselves in different opportunities, which included, even, the eighth of Mr. Eduardo Felix Bianchini, ex-liquidator of BCSul, as witness.

7. With regard to the argument that the initial is based on the indeterminate concept of serious misconduct, which would face the principle of legality, art. 44, paragraph 4, of Law No. 4,595, of 1964, has a nature of open classification, a kind similar to the blank punitive rules, differing from this class of rules, however, because it does not seek the complement in another norm, since its integration it falls within the discretionary power of the judging authority.

8. It is appropriate to note that it is for the agent of the public authority to assess whether or not a particular conduct involves the definition of a serious offense and, secondly, that it is the responsibility of the applicator to define it, provided that the general principles of law and indispensable presupposition to the configuration of the offense sanctioned by art. 44, paragraph 4, of the said legal document, that is, the degree of lesivity of the censored procedure, which may be such an injury, both effective and potential.

9. At the same time, the allegation that this authority is suspected and prevented from acting in these proceedings, as an assistant prosecutor in proceedings pending before the Federal Court, does not succeed, since, independently of the performance of this authority within the scope of the Judiciary, Art. 10, beginning IX, of Law No. 4,595 of 1964, establishes that it is the exclusive responsibility of this Central Bank of Brazil to exercise the supervision of financial institutions and to apply the penalties provided for when irregularities are detected, which occurs through an administrative sanctioning process. In addition, the assistance of this Autarchy in criminal proceedings pending before the Federal Court is provided for in art. 26, sole paragraph, of Law No. 7,492 of June 16, 1986.

10. Nor is the defense of the understanding that the FGC would not have technical and accounting qualification and independence to effect the adjustments described in the Opening Balance of the Raet, nor competence to conduct the special regime, since the said fund acted after the designation of the supervisory authority, which, in the exercise of its competence, issued Ato-Presi no. 1,217, of 6.4.2012 (pg. 124) based on art. 8 of Decree Law No. 2,321 of February 25, 1987.

11. Incidentally, any transactions that BCSul has performed at the time it was under FGC administration are not included in the calculation of this fact, so that the documents appended by Mr. Luis Felippe Índio da Costa, on 29.1.2015 (pgs. 7,074-7,112), and the testimony to that effect provided by Mr. Eduardo Felix Bianchini (pgs. 7,272-7,274 / 7,287-7,292), a witness registered by the indicted defendant, do not help, since they refer to operations contracted by BCSul under Raet.

12. With regard to the subjective responsibility evoked by the defendants, it is recorded that this, among others, is inserted in the principles followed by this Autarchy in the conduct of punitive administrative procedures. Thus, the accused are subject to individual responsibility, either because they have contributed to its implementation.

**BANCO CENTRAL DO BRASIL**

13. The allegations that (i) this administrative proceeding is void because it did not identify the conduct of the accused - would have been limited to capitulating the alleged offenses committed by the accused - and (ii) the accusation is and prevents the exercise of ample defense. This is because the content of the process explicitly spells out the supposedly irregular conduct attributed to it in the exercise of its mandates and indicates the pertinent documentation. It is also worth noting that the defendants were granted a copy of the present case (cf. 5,235, 5,252, 5,355, 6,080, 6,209, 6,111, 7,029 and 7,133).

14 It should be noted that the fact that this Autarchy and independent audit firms did not point out irregularities in previous inspection and audit work does not elude the characterization of administrative misconduct detected and consigned as an inaugural piece and that it is documented. It should also be noted in this respect that the supervision process is continued and that the performance of financial institution administrators is not challenged in auditing or supervisory procedures carried out and at any given moment does not establish any safeguard that prevents possible accountability when authority to commit unlawful acts.

15. In terms of merit, regarding the irregularity "a", it is verified that, at the time of hiring, according to the registration forms of the Commercial Board of the State of Rio de Janeiro (Jucerja): i) the Brigada Promotora de Credito e Vendas Ltda.  had a share capital of R $ 16 million (pgs. 399/400); ii) Promotora e Divulgadora Sudeste Line Ltda. It had a share capital of R $15  million (pgs. 407/408); and iii) to Centro Oeste Promotora de Crédito Ltda. It had the share capital of RS10 million (fls. 401/402).

16.       It should be noted, however, that BCSul, in September 2011, approved PLCs (i) (illegible) Brigada Promotora de Credito e Vendas Ltda, in the amount of R $ 15,600,000.00 (pgs. 3224); (ii) (illegible) Promotora e Divulgadora Sudeste Line Lta, in the amount of R $ 30,490,000.00 (pages. 4242); and (iii) (unreadable) Centro Oeste Promotora de Crédito Ltda., in the amount of R$2,100,000.00 (pg. 3.754).

17 It should also be noted that; i) from August 2011 to April 2012, the Brigada Promotora de Credito e Vendas Ltda , carried out credit operations in the net amount of R $ 7,248,875 (CCBs 9216 (pgs. 3,396-3,401 / 3,420), 9571 (pgs. 3,513-3,518 / 3,538) and 9,603 (cpgs 3.54 (unreadable) 3.550 / 3.559)); (ii) from January 2011 to April 2012, Promotora e Discrepanza Sudeste Line Ltda., entered into credit operations in the amount of R $ 36,154,403.00 (CCBs 8678 (4,431-4,436 / 4,441), 8948 (fl. 4,458), 9,150 (fs, 4,508-4,513 / 4,519), 9395 (fs. 4.5 (unreadable) 4,559 / 4,568), 9573 (fs. 4,621-4,625 / 4,632) and 9,605 (cf. 4,644-4,650 / 4,658)); and iii) in September 2011, Centro Oeste Promotora de Crédito Ltda. It carried out a credit operation in the net amount of R $ 2,029,140.00 (CCB 009/10, fl 3,764). Therefore, the incompatibility between the borrowers' capital stock and the Amounts of the PLCs and the contracting parties shows that on-screen transactions were executed in breach of the principle of selectivity.

18. It should be noted that the fact that the customers involved in the operations mentioned in the accusations do not have a history of default or have long (illegible) observations with BCSul, whether as investors or borrowers or shareholders (illegible ) Institution, does not have the power to dismiss the administrative wrongs described in the subpoenas, (illegible) given that the antecedents evoked do not release the defendants from compliance with the rules in force at the time of the contracting that led to the initiation of this process.

**BANCO CENTRAL DO BRASIL**

19. Notes also that the CCBs 8579, 8618, 8676, 9146, 9216, 9394, 9571 and 9603 (issued by Brigada Promotora de Credito e Vendas Ltda.), 7894, 8005, 8091, 8150, 8270, 8678, 8948, 9150, 9262, 9395, 9573 and 9605 (issued by the Promotora e Divulgadora Sudeste Line Ltda.), 009/10 and 9301 (issued by Centro Oeste Promotora e Divulgadora Ltda.) 9222 and 9229 (issued by Amadeu Simoes Lopes Azambuja)8101,8102,8103,8237,8238,.8239, 8240, 8241.8242, 8243, 8244, 8245, 8726, 9149 and 9422 (issued by the Associacao dos Musicos Militares do Brasil – Ambra), 9155, 9263.9397, 9404, 9572 and 9606 (issued by Preserv Operadora de Servicos Ltda.), and 9154, 9264, 9398, 9575 and 9604 (issued by the Neue Welt Comércio Ltda.), in own field reserved for the appointment of the guarantee is the annotation of the expression ' there is no "getting therefore characterized the failure to observe the principle of guarantee and away the allegations of defendentes.

20. The information contained in Tables 3 to 9 also showed that several CCBs issued by the clients presented in Table 1 were settled from resources derived from new CCB emissions, evidencing the freezing of operations.

**Tables 3 - Brigada Promotora de Crédito e Vendas Ltda. - Liquidated / Amortized Operations from CCBs 9216, 9571 and 9603**

| Operation Released | | | | Liquidated / Amortized Operation | | | |
|---|---|---|---|---|---|---|---|
| CCB | Date | Page | Amount | CCB | Date | Page | Amount |
| 9216 | 29.8.2011 | 3,396-3.401 3,420 | 1,582,111.23 | 8579 | 29.8.2011 | 3,278-3,283 / 3,422 | 556,684.90 |
| | | | | 8618 | 29.8.2011 | 3,306-3,311 / 3,422 | 1.025.426,33 |
| | | | | **Total** | | | 1,582,111.23 |
| 9571 | 30.3.2012 | 3.513-3.518/3 | 5.244.077.98 | 8579 | 30.3.2012 | 3,278-3,283 / 3,539 | 2,108,624.24 |
| | | | | 8618 | 30.3.2012 | 3,306-3,311 / 3,539 | 497,841.75 |
| | | | | 8676 | 30.3.2012 | 3,338-3,333 / 3,539 | 652,350.75 |
| | | | | 9146 | 30.3.2012 | 3,347-3,352 / 3,539 | 975,316.77 |
| | | | | 9216 | 30.3.2012 | 3,396-3.401 / 3.539 | 368.942,12 |
| | | | | 9394 | 30.3.2012 | 3,477-3,482 / 3,539 | 641,942.12 |
| | | | | Total | | | 5,244,077.98 |
| 9603 | 30.4.2012 | 3.545-3.550 / 3. | 433,685.44 | 9146 | 30.4.2012 | 3,347-3,352 / 3,560 | 303,580.88 |
| | | | | 9216 | 30.4.2012 | 3,560 / 3,396-3.401 | 119,104.56 |
| | | | | Total | | | 422,685.44 |
| Total | | | 7,248,874.65 | | | | |

**Table 4 - Promotora e Divulgadora Sudeste Line Ltda. - Liquidated / Amortized Operations from CCBs 8678, 9150, 9395, 9573 and 9605**

| Operation Released | | | | Liquidated / Amortized Operation | | | |
|---|---|---|---|---|---|---|---|
| CCB | Date | Page | Amount | CCB | Date | Page | Amount |
| 8678 | 24.1.2011 | 4.431-4.436 / 4,441 | 5,329,220.31 | 8005 | 24.1.2011 | 4,303-4.308 / 4.457 | 1,885,454.24 |
| | | | | 8091 | 24.1.2011 | 4,338-4,343 / 4,457 | 1,908,233.42 |
| | | | | 8150 | 24.1.2011 | 4.508-4.503 / 4.523 | 1,535,532.65 |
| | | | | **Total** | | | 5,329,220.31 |
| **9150** | **18.7.2011** | **4.508-4.513 / 4.** | **2,317,408.80** | 8091 | 18.7.2011 | 4,338-4,343 / 4,523 | 362.606,09 |
| | | | | 8150 | 18.7.2011 | 4,394-4,354 / 4,523 | 576,988.16 |
| | | | | 8270 | 18.7.2011 | 4,384-4,389 / 4,523 | 469,009.20 |
| | | | | 8948 | 18.7.2011 | 4,458-4,463 / 4,523 | 908,804.48 |
| | | | | Total | | | 2,317,407.93 |

**BANCO CENTRAL DO BRASIL**

| Operation Released | | | | Liquidated/ Amortized Operation | | | |
|---|---|---|---|---|---|---|---|
| CCB | Date | Page | Amount | CCB | Date | Page | Amount |
| 9395 | 7.12.2011 | 4,554-4,559 / 4,568 | 1,325,323.53 | 9262 | 7.12.2011 | 4,525-4,530 / 4,561 | 1,325,323.53 |
| 9573 | 30.3.2012 | 4.621-4.625 / 4.632 | 4,806,467.67 | 8678 | 30.3.2012 | 4.431-4.436 / 4.633 | 1,510,534.45 |
| | | | | 9150 | 30.3.2012 | 4.508-4.513 / 4.633 | 490,925.18 |
| | | | | 9262 | 30.3.2012 | 4.525-4.530 / 4.633 | 2,085,496.09 |
| | | | | 9395 | 30.3.2012 | 4.554-4.559 / 4.633 | 719,511.95 |
| | | | | Total | | | 4,806,467.67 |
| 9605 | 30.4.2012 | 4,644-4,650 / 4,658 | 7.212.356,24 | 8678 | 30.4.2012 | 4,431-4,436 / 4,661 | 827,887.75 |
| | | | | 9150 | 30.4.2012 | 4.508-4.513 / 4.661 | 152,807.29 |
| | | | | 9395 | 30.4.2012 | 4,554-4,559 / 4,661 | 231,660.21 |
| | | | | Total | | | 1,212,355.25 [1/] |
| Total | | | 20,990,776.55 | | | | 14,990,775.69 [1/] |

[1/] The difference of R $ 6,000,000.00 was applied to the FIP BCSul Verax Cinco Platinum fund.

**Table 5 - Amadeu Simões Lopes Azambuja - Operations Originated from CCB 9229**

| Operation Released | | | | Cleared / Amortized Operation | | | |
|---|---|---|---|---|---|---|---|
| CCB | Date | Page | Amount | CCB | Date | Page | Amount |
| 9229 | 5.9.2011 | 1,892-1,897 /1.909 | 5,255,680.12 | 9222 | 5.9.2011 | 1.908 / 2.126-2.131 | 5,255,680.12 |
| Total | | | 5,255,680.12 | | | | 5,255,680.12 |

**Table 6 - Mr. Afonso Cesar Boabaid Burlamaqui - Liquidated / Amortized Operations from CCBs 8629, 9576 and 96181 / and Transfer to Account 1817-4**

| Operation Released | | | | Liquidated / Amortized Operation | | | |
|---|---|---|---|---|---|---|---|
| CCB | Date | Page | Amount | CCB | Date | Page | Amount |
| 8629 | 28.12.2010 | 736-742 / 784 | 1,540,000.00 | 8268 | 28.12.2010 | 1.016 / 1.402-1.407 | 1,254,672.25 |
| 9576 | 30.3.2012 | 1,611 | 7,852,108.73 | 8615 | 30.3.2012 | 707-712 / 1607 1.005 | 3,575,244.61 |
| | | | | 9152 | 30.3.2012 | | 4,276,864.12 |
| | | | | Total | | | 7,852,108.73 |
| 9618 [1/] | 15.5.2012). 15.5.2012). | 1.313-1.323 1323 | 3,998,177.67 4,200,000.00 | 9576 | 15.5.2012). | 1.323 / 1.611 | 8,198,177.67 |
| Total | | | 8,198,177.67 | | | | |
| Total | | | 17,590,286.40 | | | | 17,304,958.65 |

[1/] Transfer to current account 1817-4

**Table 7 – Associacao dos Musicos Militares do Brasil - Ambra - Liquidated / Amortized Operations from CCBs 8237, 8238, 8239, 8240, 8242, 8342, 8243, 8244, 8245, 9149 and 9422**

| Operation Released | | | | Liquidated / Amortized Operation | | | |
|---|---|---|---|---|---|---|---|
| CCB | Date | Page | Amount | CCB | Date | Page | Amount |
| 8237 | 28.7.2010 | 2,738-2,742 | 1,003,676.53 | | 28.7.2010 | 3.073 / 3.074 / 3.11( | 4,929,897.78 |
| 8238 | 28.7.2010 | 2,743-2,748 | 1,003,676.43 | | | | |
| 8239 | 28.7.2010 | 2,749-2,754 | 1,003,676.53 | | | | |
| 8240 | 28.7.2010 | 2,755-2,759 | 500,000.00 | | | | |
| 8241 | 28.7.2010 | 2,760-2,765 | 501,838.27 | | | | |
| 8242 | 28.7.2010 | 2,766-2,771 | 401,471.62 | | | | |
| 8243 | 28.7.2010 | 2,772-2,776 | 300,000.00 | | | | |
| 8244 | 28.7.2010 | 2,777-2,781 | 200,000 | | | | |
| 8235 | 28.7.2010 | 2,782-2,786 | 100,000.00 | | | | |
| Total | | | 5,0 | | | | 4,929,897.78 |

**BANCO CENTRAL DO BRASIL**

| Operation Released | | | | Liquidated / Amortized Operation | | | |
|---|---|---|---|---|---|---|---|
| CCB | Date | Page | Amount | CCB | Date | Page | Amount |
| 9149 | 18.7.2011 | 13,142,353.21 | 1,582,111.23 | 6819 | 18.7.2011 | 2,852 | 4,974.86 |
| | | | | 7556 | 18.7.2011 | 2,852 | 280.436,83 |
| | | | | 7557 | 18.7.2011 | 2,852 | 280,436.62 |
| | | | | 8101 | 18.7.2011 | 2,723-2,727 / 2,852 | 1,325,632.32 |
| | | | | 8102 | 18.7.2011 | 2,728-2,732 / 2,852 | 1,166,042.45 |
| | | | | 8103 | 18.7.2011 | 2,733-2,737 / 2,852 | 583,157.85 |
| | | | | 8726 | 18.7.2011 | 2,827-2,832 / 2,852 | 4,251,687.44 |
| | | | | Total | | | 13,142,351.19 |
| 9422 | 21.12.2011 | 2,892 (2,897) 2,906 | 4,415,557.50 | 2 | 21.12.2011 | 2,908 | 4,415,557.50 |
| Total | | | 22,572,250.09 | | | | 22,487,806.47 |

[1/] The released credit was used to write off the outstanding balance of Account 2188-4

[2/] / The released credit was used to write off the outstanding balance of Account 1910-3

**Table 8 - Preserv Operadora de Serviços Ltda. - Operations liquidated / amortized from CCBs 9155,9397,9572 and 9606.**

| Operation Released | | | | Liquidated/ Amortized Operation | | | |
|---|---|---|---|---|---|---|---|
| CCB | Date | Page | Amount | CCB | Date | Page | Amount |
| 9155 | 21.7.2011 | 4,063-4,067 / 4,074 | 955,968.59 | 1/ | 21.7.2011 | 3.881-3.885 / 3.894 | 838,662.48 |
| 9397 | 7.12.2011 | 4.103-4.108 / 4.117 | 271,895.24 | 9263 | 7.12.2011 | 4.082-4.087 / 4.119 | 271,895.24 |
| 9572 | 30.3.2012 | 4.139-4.143 / 4,150 | 9,550,465.40 | 9263<br>9397<br>9404 | 30.3.2012<br>30.3.2012<br>30.3.2012 | 4.082-4.087 / 4.151<br>4.013-4.108 / 4.151<br>4.122-4.127 / 4.151 | 531,098.57<br>147,610.64<br>8,871,756.19 |
| | | | | Total | | | 9,550,465.40 |
| 9606 | 30.4.2012 | 4.159-4.165 / 4,172 | 11,972,171.07 | 9263<br>9397 | 30.4.2012<br>30.4.2012 | 4,082-4,087 / 4,174<br>4.103-4.108 / 4.174 | 124,644.88<br>47,526.19 |
| | | | | Total | | | 172,171.07 [2/] |
| Total | | | 22,750,500.30 | | | | 10,950,500.30 |

1 / The released credit was used to cover the outstanding balance of Account 5021-3

2 / Of the difference of R $ 11,800,000.00, the amount of R $ 11,750,000.00 was applied in the FIP BCSul Verax Five Platinum and FIP BCSul Verax Equity1 (pg.4,174

**Table 9 - Neue Welt Comércio Ltda - Liquidated / Amortized Operations from Transfer of Account 7600-0 and CCBs 9398, 9575 and 9604 [1/]**

| Operation Released | | | | Liquidated / Amortized Operation | | | |
|---|---|---|---|---|---|---|---|
| CCB | Date | Page | Amount | CCB | Date | Page | Amount |
| 9154 | 21.7.2011 | 3,881-3,885 / 3,894 | 838,662.48 | 1/ | 21.7.2011 | 3.881-3.885 / 3.894 | 838,662.48 |
| 9575 | 30.3.2012 | 3,923-3,927 / 3,940 | 699.407,88 | 9264<br>9398 | 30.3.2012<br>30.3.2012 | 3,889-3,894 / 3,932<br>3,920-3,925 / 3.32 | 547.295,55<br>152,112.33 |
| | | | | Total | | | 699.407,88 |
| 9604 | 30.4.2012 | 3,942-3,948 / (3,958) | 11,927,421.78 | 9264<br>9398 | 30.4.2012<br>30.4.2012 | 3,889-3,894 / 3,952<br>3,920-3,925 / 3,952 | 128,446.20<br>48,975.58 |
| | | | | Total | | | 177,421.78 [2] |
| Total | | | 13,465,492.14 | | | | 1,715,492.14 |

[1/] The released credit was used to cover the outstanding balance of Account 7600-0

[2/] The difference of R $ 11,750,000.00 was applied to the FIP BCSul Verax Cinco Platinum fund (pg.3,952)

21. In this regard, the defense's argument that the so-called "credit operations" is a common practice in the market is irrelevant and, when considered separately, nothing

**BANCO CENTRAL DO BRASIL**

It has to be irregular. Resolution No. 1,559 of 1988 prohibits financial institutions from carrying out operations that do not comply with the principle of liquidity and the constant contracting of operations with the purpose of liquidating previous businesses, the responsibility of the same client, maintaining the borrower's borrowing situations of the credits, constitutes the financial exposure of the Institution and violates the aforementioned principle.

22. It should be noted that BCSul ceded a large part of the CCBs specified in Tables 3 to 9 for Prosper Flex and Multicred funds (pp.298-318) shortly after hiring, remaining, on the other hand, responsible for collecting and passing on the payment of credits to FIDCs. By the way, the Institution held 85.92% of the shares of the Multicred powder fund which, in turn, held 98.75% of the Prosper Flex fund stocks (fls. 4,866-4,908), so that said transfer of securities reveals a mechanism used by BCSul in order to make it difficult to identify the real situation of the credits.

23. Consequently, the allegations that the administration of each FDIC were totally segregated from the administration of the Institution ( *chinise wall* ) - allegations made by Mr Claudio Amadeo Rodriguez, witness related by Mr. Luis Octávio Azeredo Lopes Índio da Costa and Mr. Thiago Figueira Rodrigues, witness related by the same indicted and Mrs. Maria Luisa Garcia Mendonça - and that only that administration could implement the adjustments determined by this Central Bank of Brazil.

24. For the same reason, Mr Felippe Indio da Costa or the other defendants are not assisted by Mr Assistive Eliseu Martins, a witness mentioned by the aforementioned defendant, that the subordinated shares of the FIDCs are characterized as financial instruments and that the provision made by the management of the said fund is the one that must be adjusted, under penalty of double counting risk.

25. It should be pointed out that the statement made by the accusations to FIDCs did not represent criticism of the constitution in general of the aforementioned fund. In this way, Mr. Claudio Amadeo Rodriguez \ in the sense that the constitution of FIDC is a healthy way to raise funds does not help those indicted.

26. It should be noted that credit operations on the screen contributed to the deterioration of BCSul's economic and financial situation, which resulted in Raet's statement to the Institution on 4.6.2012 (Ato-Presi no. 1,217). By the way, the opening balance of the mentioned regime brought adjustments in the amount of R $ 190.1 million, corresponding to the constitution of provision for losses with the CCBs, which were in the Prosper Flex and Multicred funds - with the consequent effect on their stocks - and in BCSul's own portfolio, as well as a provision for credit risk with bank guarantees provided and some of the eight clients mentioned in the tables above (fls. 298/316/318/330/331). Therefore, the assertion made by the defendants that BCSul made the provisioning of credit risk in the percentages determined by this Autarchy is unfounded

27. In that regard, the considerations made by Mr Eliseu Martins concerning the adjustments mentioned in the previous topic - in which the corresponding Amounts were said to be excessive - are not apt to de-characterize the irregularity on the screen, since even though the provisions determined at the time of Raet's decree are related to restlessness, this is set independently of the amount of those.

# BANCO CENTRAL DO BRASIL

28. It should be noted that BCSul provided bank guarantees to customers listed in Tables 3 to 9 - namely, Promotora e Disclosure Sudeste Line Ltda. Amadeu Simões Lopes Azambuja, Afonseo Cesar Boabaid Burlamaqui and Associacao dos Musicos Militares do Brasil (Ambra) (pgs. 4,950 / 4,951), - these guarantees whose *ratings* were reviewed (with the respective provision for losses) by the Raet's management from "AA" to "H", due to the symmetrical set presented by said clients, as recorded in previous topics . In this sense, the analysis already carried out allows us to affirm that the granting of the bank guarantees in question did not observe the principles of selectivity and guarantee, and did not use the statements of Mr. Eduardo Felix Bianchini that none of the guarantees given to the aforementioned clients was honored.

29. The defendants' contention that the mere granting of guarantees did not characterize the existence of credit and that there was no need to provide for the Amount of the letters of guarantee issued - the latter being reinforced by Mr Thiago Figueira Rodrigues - does not prosper since, in the present case, the secured clients presented an economic-financial situation indicating that there was a probability of (i) the guarantee being honored; and (ii) it is not possible for the financial institution to refund the amount secured to the client. As an example, it should be noted that Promotora e Divulgadora Sudeste Line Ltda. It had share capital of R $ 15 million pgs. 407/408), while it was granted a guarantee in the amount of R $ 13.3 million (pg. 4951)

30. There is no argument that the amount of adjustments required by this Authority was the smallest percentage when compared to the total portfolio *Middle Market,* as these adjustments, carried out by the Raet's administrator, contributed to the deterioration of the financial institution's already compromised economic and financial situation, which resulted in the issuance of an out-of-court settlement on 14.9.2012 (Ato Presi n ° 1,230) .

31. The defenses do not help, as does the claim that the rating framework given by this Central Bank of Brazil and the FGC to the operations of the aforementioned portfolio is mistaken. As explained above, the operations explained in Tables 3 to 9, in view of the provisions of Resolution No. 2682 of 1999, and regardless of the rating classification, have affected the principles of selectivity, guarantee and liquidity

32. Thus, the irregularity "a" is characterized, which is of a serious nature, since credit operations on the screen contributed to the deterioration of BCSul's economic and financial situation, causing damage to its health, which resulted in the Raet at the Institution.

33. With respect to irregularity "b", Tables 10 to 17 indicate the issuing customers of 63 CCBs with the following characteristics: issue in the last days of the month; application in FIPs; settlement at the beginning of the following month; and absence of the issuers' signature in most of the title. It is recalled that the indictments listed five CCBs (7753 and 9223, issued by Brigada Promotora de Credito e Vendas Ltda., 7754, issued by Promotora e Disclosure Sudeste Line Ltda., 9222, issued by Amadeu Simões Lopes de Azambuja, and 8268 , issued by Afonso Cesar Boabaid Burlamaqui) not included in the aforementioned tables, since there were insufficient documentation for the analysis as to the origin of the imputation.

# BANCO CENTRAL DO BRASIL

**Table 10-CCBs on behalf of the Brigada Promotora de Crédito e Vendas Ltda.**

BRL R$

| CCB [1/] | Date of credit and transfer to FIPs | Amount | Page | Date of redemption and settlement of CCB | Amount redeemed from FIPS | CCB settlement Amount | Page |
|---|---|---|---|---|---|---|---|
| 7658 | 28.1.2010 | 4.400.000,00 | 3.564-3.569 / 3.694 | 2.2.2010 | 4,404,059.99 | 4,422,482.39 | 3,694 |
| 7660 | 28.1.2010 | 12,850,000.00 | 3,581-3,585 / 3,694 | 2.2.2010 | 12,861,676.07 | 12,915,658.79 | 3,694 |
| 7921 | 31.3.2010 | 17,800,000.00 | 3,602-3.606 / 3.694 | 5.4.2010 | 17,810,877.56 | 17,884,444.80 | 3.695 |
| 8014 | 30.4.2010 | 15.000.000,00 | 3,615-3,619 / 3,695 | 4.5.2010 | 15,009,895.01 | 15,071,506.75 | 3.695 |
| 8086 | 31.5.2010 | 15.000.000,00 | 3,633-3,637 / 3,696 | 2.6.2010 | 15,009,888.54 | 15,070,254.02 | 3,696 |
| Total | | 65,050,000.00 | | | 65,096,390.17 | 65,364,346.75 | |

1 / None of the CCBs was signed by the issuer

**Table 11-CCBs in Name of the Promotora e Divulgadora Sudeste Line Ltda.**

BRL R$

| CCB [1/] | Date of credit and transfer to FIPs | Amount | Page | Date of redemption and settlement of CCB | Amount redeemed from FIPS | CCB settlement Amount | Page |
|---|---|---|---|---|---|---|---|
| 7659 | 28.1.2010 | 14,050,000.00 | 4,706-4,711 / 4,820 | 2.2.2010 | 14,062,766.45 | 14,121,790.36 | (4,820) |
| 7915 | 31.3.2010 | 14,900,000.00 | 4,739-4,744 / 4,820 | 5.4.2010 | 14,909,105.37 | 14,970,686.94 | (4,820) |
| 8015 | 30.4.2010 | 12,200,000.00 | 4,755-4.759 / 4,820 | 4.5.2010 | 12.208.137,46 | 12,258,158.83 | (4,820) |
| 8087 | 31.5.2010 | 14,500,000.00 | 4,773-4,777 / 4,820 | 2.6.2010 | 14,509,559.00 | 14,567,912.22 | (4,820) |
| | | | | | | | 4.821 |
| Total | | 55,650,000.00 | | | 55,689,568.28 | 55,918,548.35 | |

1 / None of the CCBs was signed by the issuer

**Table 12-CCBs on behalf of Amadeu Simões Lopes de Azambuja**

BRL R$

| CCB | Date of credit and transfer to FIPs | Amount | Page | Date of redemption and settlement of CCB | Amount redeemed from FIPS | CCB settlement Amount | Page |
|---|---|---|---|---|---|---|---|
| 7923 [1/] | 31.3.2010 | 9,100,000.00 | 1.938-1.942 / 2.161 | 5.4.2010 | 9,105,483.14 | 9,143,171.21 | 2,161 |
| 8017 [1/] | 30.4.2010 | 10,284,000.00 | 1.950-1.954 / 2.161 | 4.5.2010 | 10,290,859.47 | 10,333,025.02 | 2,162 |
| 8088 [1/] | 31.5.2010 | 10,000,000 | 1,966-1,970 / 2,162 | 2.6.2010 | 10,006,661.53 | 10,046,836.02 | 2,162 |
| 8265 [1/] | 30.7.2010 | 10,000,000 | 1.978-1.981 / 2.162 | 3.8.2010 | 10,007,556.69 | 10,049,470.10 | 2,162 2,163 |
| 8349 [1/] | 31.8.2010 | 10,000,000 | 1,996-2,000 / 2,163 | 2.9.2010 | 10,007,462.27 | 10,048,634.20 | 2,163 |
| 8413 [1/] | 30.9.2010 | 11.000.000,00 | 2.011-2.015 / 2.163 | 4.10.2010 | 11,008,303.99 | 11.054.402.74 | 2.164 |
| 8491 [1/] | 29.10.2010 | 11.000.000,00 | 1.026-2.030 / 2.164 | 3.11.2010 | 11,008,210.77 | 11,054,872.16 | 2.164 |

## BANCO CENTRAL DO BRASIL

| CCB | Date of credit and transfer to FIPs | Credit Amount | Page | Date of redemption and settlement of CCB | Amount redeemed from FIPs | CCB settlement Amount | Page |
|---|---|---|---|---|---|---|---|
| 8571 [1/] | 30.11.2010 | 10,000,000 | 2.046-2.050 / 2.164 | 2.12.2010 | 10,007,466.66 | 10,048,642.83 | 2.164 |
| | 30.12.2010 | 10,000,000 | 2.061-2.065 / 2.165 | 3.1.2011 | 10,007,470.10 | 10,049,470.10 | 2.165 |
| 8638 [1/] | 29.4.2011 | 10,000,000 | 2.079-2.083 / 2.169 | 3.5.2011 | 10,052,213.23 | 10,052,213.23 | 2.169 |
| 8959 | 30.6.2011 | 3,000,000.00 | 2.094-2.098 / 2.171 | 4.7.2011 | 3,015,726.74 | 3,015,726.74 | 2,171 |
| 9130 | 29.7.2011 | 3,590,000.00 | 2.110-2.114 / 2.172 | 3.8.2011 | 3,611,204.35 | 3,611,204.35 | 2.172 |
| 9171 | 30.3.2012 | 6,200,000.00 | 2.143-2.147 / 2.179 | 3.4.2012 | 6,230,737.90 | 6,230,737.90 | 2,179 |
| 9578 | | | | | | | 2,180 |
| Total | | 114,174,000.00 | | | 114.259.349,82 | 114,738,406.60 | |

1 / Not signed by the issuer

**Table 13-CCBs in the Name of Afonso Cesar Boabaid Burlamaqui** **BRL R$**

| CCB | Date of credit and transfer to FIPs | Amount | Page | Date of redemption and settlement of CCB | Amount redeemed from FIPs | CCB settlement Amount | Page |
|---|---|---|---|---|---|---|---|
| 7922 [1/] | 31.3.2010 | 8,900,000.00 | 1.335-1.341 / 1.587 | 5.4.2010 | 8,905,362.63 | 8,942,222.40 | 1,587 |
| 8012 [1/] | 30.4.2010 | 16,400,000.00 | 1.348-1.354 / 1.587 | 4.5.2010 | 16,410,818.55 | 16,478,180.71 | 1,587 |
| 8089 [1/] | 31.5.2010 | 10,500,000.00 | 1,366-1,372 / 1,587 | 2.6.2010 | 10,507,003.39 | 10,549,177.81 | 1,587 |
| 8266 [1/] | 30.7.2010 | 16,000,000.00 | 1,388-1,394 / 1,587 | 2.8.2010 | 16.006.004,67 | 16,070,743.92 | 1,588 |
| 8350 [1/] | 31.8.2010 | 16,850,000.00 | 1.414-1.420 / 1.588 | 1.9.2010 | 16,856,355.15 | 16,923,109.03 | 1,588 |
| 8414 [1/] | 30.9.2010 | 15.000.000,00 | 1.430-1.436 / 1.588 | 1.10.2010 | 15,005,582.77 | 15,065,069.27 | 1,588 |
| 8639 | 30.12.2010 | 7.530.000,00 | 1.445-1.451 / 1.590 | 4.1.2011 | 7,538,501.23 | 7,571,206.92 | 1.590 |
| 8692 | 31.1.2011 | 7,800,000.00 | 1.459-1.451 / 1.591 | 2.2.2011 | 7,806,097.00 | 7,838,277.95 | 1,591<br>1.592 |
| 87701 | 28.2.2011 | 7,800,000.00 | 1,474-1,480 / 1,593 | 2.3.2011 | 7,805,820.00 | 7,838,287.90 | 1.593 |
| 8958 | 29.4.2011 | 10,000,000 | 1,492-1,498 / 1,595 | 3.5.2011 | 10,008,336.07 | 10,052,213.23 | 1,595 |
| 9045 | 31.5.2011 | 10,000,000 | 1.507-1.513 / 1.596 | 2.6.2011 | 10,008,321.74 | 10,050,536.72 | 1,596 |
| 9131 | 30.6.2011 | 4,000,000.00 | 1.526-1.532 / 1.597 | 7.7.2011 | 4,003,404.41 | 4,020,968.99 | 1,598 |
| 9172 | 29.7.2011 | 4,790,000.00 | 1.542-1.548 / 1.599 | 3.8.2011 | 4,796,242.23 | 4,818,292.16 | 1,599 |
| Total | | 135,570,000.00 | | | 135.657.850,04 | 136,218,287.01 | |

[1/] Not signed by the issuer

## BANCO CENTRAL DO BRASIL

**Table 14-CCBs in Name of the Centro Oeste Promotora de Crédito Ltda.**

BRL R$

| CCB [1/] | Date of credit and transfer to FIPs | Amount | Page | Date of redemption and settlement of CCB | Amount redeemed from Fips | CCB settlement Amount | Page |
|---|---|---|---|---|---|---|---|
| 7919 | 31.3.2010 | 3,500,000.00 | 3.799-3.804 / 3.818 | 5.4.2010 | 3,502,138.86 | 3,516,604.31 | 3,818 |
| 7920 | 31.3.2010 | 10,500,000.00 | 3,808-3813 / 3,818 | 5.4.2010 | 10,506,326.70 | 10,549,812.94 | 3,818 |
| Total | | 14.000.000,00 | | | 14,008,465.56 | 14,066,417.25 | |

1 / None of the CCBs was signed by the issuer

**Table 15-CCBs in the Name of Álvaro Luiz Alves de Lima Alvares Otero**

BRL R$

| CCB | Date of credit and transfer to FIPs | Amount | Page | Date of redemption and settlement of CCB | Amount redeemed from Fips | CCB settlement Amount | Page |
|---|---|---|---|---|---|---|---|
| 8271 [1/] | 30.7.2010 | 15.000.000,00 | 1,679-1,685 / 1,848 | 2.8.2010 | 15,005,597.43 | 15,066,322.43 | 1,849 |
| 8352 [1/] | 31.8.2010 | 15,845,000.00 | 1,694-1,699 / 1,849 | 1.9.2010 | 15,850,911.41 | 15,913,748.52 | 1,849 |
| 8416 [1/] | 30.9.2010 | 16,000,000.00 | 1.708-1.713 / 1.849 | 1.10.2010 | 16,005,954.96 | 16,069,407.23 | 1,849 |
| 8493 [1/] | 29.10.2010 | 16,000,000.00 | 1,723-1,728 / 1,849 | 3.11.2010 | 16,011,942.93 | 16,079,814.05 | 1.850 |
| 8573 [1/] | 30.11.2010 | 16,000,000.00 | 1,735-1,740 / 1,850 | 2.12.2010 | 16,011,946.64 | 16,077,828.53 | 1.850 |
| 8641 ) | 30.12.2010 | 16,000,000.00 | 1,756-1,761 / 1,850 | 3.1.2011 | 16,011,954.99 | 16,079,152.15 | 1.850 |
| 8693 [1/] | 31.1.2011 | 16,000,000.00 | 1,769-1,774 / 1,852 | 2.2.1011 | 16,012,487.57 | 16,078,518.89 | 1.85 |
| 8773 [1/] | 28.2.2011 | 13,650,000.00 | 1,785-1,790 / 1,853 | 2.3.2011 | 13,660,174,45 | 13,717,003.83 | 1.85 |
| 8873 | 31.3.2011 | 11,400,000.00 | 1,799-1804 / 1,854 | 4.4.2011 | 11,409,254.46 | 11,457,401.95 | 1.85 |
| 9133 | 30.6.2011 | 9,800,000.00 | 1.817-1.822 / 1.857 | 4.7.2011 | 9,808,340.78 | 9,851,374.05 | 1.85 |
| (9174) | 29.7.2011 | 11,740,000.00 | 1.834-1.839 / 1.858 | 3.8.2011 | 11,755,299.32 | 11,809,342.38 | 1.85 |
| Total | | 55,650,000.00 | | | 157.543.864,94 | 158.199.914,01 | |

1 / None of the CCBs was signed by the issuer

**Table 16 - CCBs in the Name of Armando Cesar de Araujo Pereira Burlamaqui**

BRL R$

| CCB | Date of credit and transfer to FIPs | Amount | Page | Date of redemption and settlement of CCB | Amount redeemed from Fips | CCB settlement Amount | Page |
|---|---|---|---|---|---|---|---|
| 7917 [1/] | 31.3.2010 | 7,300,000.00 | 2,229-2,234 / 2,439 | 5.4.2010 | 7,304,398.57 | 7,334,631.85 | Illegible |
| 8013 [1/] | 30.4.2010 | 14,622,000.00 | 2.239-2.244 / 2.439 | 4.5.2010 | 14,631,752.95 | 14,691,704.78 | Illegible |
| 8084 [1/] | 31.5.2010 | 3,440,000.00 | 2,257-2,262 / 2,440 | 2.6.2010 | 3,442,267.78 | 3,456,111.58 | Illegible |
| 8267 [1/] | 30.7.2010 | 6,000,000.00 | 2.277-2.283 / 2.440 | 4.8.2010 | 6,006,725.93 | 6,032,834.20 | Illegible |

| CCB | Date of credit and transfer to FIPs | Amount | Page | Date of redemption and settlement of CCB | Amount redeemed from FIPs | CCB settlement Amount | Page |
|---|---|---|---|---|---|---|---|
| 8351 1/ | 31.8.2010 | 6,000,000.00 | 2.291-2.296 / 2.440 | 3.9.2010 | 6,006,717.94 | 6,032,329.72 | 2,440 |
| 8415 1/ | 30.9.2010 | 8.000.000,00 | 2.303-2.308 / 2.42 | 5.10.2010 | 8,009,036.71 | 8,043,768.49 | 2,441 |
| 8492 1/ | 29.10.2010 | 8.500.000,00 | 2.318-2.323 / 2.441 | 4.11.2010 | 8,509,520.72 | 8,546,866.94 | 2,441 |
| 8572 1/ | 30.11.2010 | 10,390,000.00 | 2,331-2,336 / 2,441 | 3.12.2010 | 10,401,645.73 | 10,445,997.87 | 2,441 |
| 8640 ) | 30.12.2010 | 10,500,000.00 | 2,345-2,350 / 2,442 | 4.1.2011 | 10,511,769.47 | 10,557,459.85 | 2.442 |
| 8960 | 29.4.2011 | 12,200,000.00 | 2,358-2,378 / 2,445 | 3.5.2011 | 12,210,170.00 | 12,263,700.14 | 2,445 |
| 9044 | 31.5.2011 | 12,200,000.00 | 2,373-2,378 / 2,446 | 2.6.2011 | 12,210,170.00 | 12,261,654.81 | 2,446 |
| 9132 | 30.6.2011 | 6,000,000.00 | 2,392-2,397 / 2,448 | 4.7.2011 | 12,210,152.52 | 6,031,453.50 | 2,448 |
| (9173) | 29.7.2011 | 7.180.000,00 | 2.407-2.412 / 2.449 | 3.8.2011 | 6,005,106.61 | 7,222,408, 71 | 2,449 |
| Total | | 112.332.00,00 | | | 112,438,621.76 | 112,920,922.44 | |

1 / Not signed by the issuer

**Table 17-CCBs in the Name of Armando José Andrade de Carvalho** **BRL R$**

| CCB 1/ | Date of credit and transfer to FIPs | Amount | Page | Date of redemption and settlement of CCB | Amount redeemed from FIPs | CCB settlement Amount | Page |
|---|---|---|---|---|---|---|---|
| 8272 | 30.7.2010 | 10,000,000 | 2.468-2473 / 2.501 | 4.8.2010 | 10,011,209.88 | 10,054,723.67 | 2,501 |
| 8353 | 31.8.2010 | 10,000,000 | 2.487-2.492 / 2.501 | 3.9.2010 | 10,011,196.55 | 10,058,882.88 | 1,501 |
| Total | | 20,000,000 | | | 20,022,406.43 | 20,108,605.55 | |

1/ None of the CCBs were signed by the issuer

34. The information in Tables 10 to 17 goes to Mr. Élcio Leopoldino to the Inquiry Committee referring to the out-of-court liquidation of BCSul, which reveals the existence of a "secondary market" for the purchase and sale of shares of the FIP BCSul Verax Five Platinum and FIP BCSul Verax Equity 1 funds. Due to the impossibility of hiring the investments before the maturity of the fund, this secondary market was implemented, in order to allow the withdrawal of quotaholders and the entry of new investors before said deadline.

35. The systematic mention was made through the acquisition of stocks of the FIPs by Cruzeiro do Sul DTVM and Cruzeiro do Sul CVM, which bought / sold the aforementioned stocks from / to investors who wanted to sell / buy them. Still according to the aforementioned affidavit, by determination of Mr. Luis Felippe Indio da Costa, no FIPs subsidiary could be held by Cruzeiro do Sul DTVM or Cruzeiro do Sul CVM on the last day of each month.

36. Due to this determination, Mr. Leopoldino transmitted, at the end of each month, an electronic message addressed to BCSul's wholesale operations area with information on the status of stocks held by Cruzeiro do Sul DTVM and Cruzeiro the CVM. Based on such information, the "applicators" (the issuers of the CCBs listed in Tables 10 to 17) who would "buy" those stocks (with resources from those CCBs) and their Amounts, were defined. At the beginning of the following month the inverse flow was verified, that is, the stocks were "sold" by those "applicators", who used the Amounts obtained to settle the CCBs.

37. CCB 8014, issued on behalf of the Brigada Promotora de Crédito e Vendas Ltda. On 30.4.2010, in the amount of R $ 15,000,000.00 (Table 10), is taken as an example: they are identified several electronic messages as subject "FIPs- need for resource contribution (04/30/2010)" (pgs.. 3,627-3,630) in which issues are dealt with regarding the total stocks of the FIPs held by Cruzeiro do Sul DTVM and Cruzeiro do Sul CVM (pg 3,630) and "applicators" (issuers of CCBs) - among them, the Brigada Promotora de Crédito e Vendas Ltda. (pg.3,629) - that would meet the need for them not to appear as quota holders of the funds on the last day of April 2010.

38 It should be noted that the transactions on screen were devoid of economic grounds, as they generated losses for the "applicators" - Brigada Promotora de Crédito e Vendas Ltda. It obtained, only in the operation reported, a loss of R $ 61,611.74. In this sense, Table 18 shows the negative results obtained by the "applicators" of the FIPs:

Table 18 - Statement of Customer Loss [1/]

| Client | Quantity Policies and Procedures | Total Amount of operations (R $) | Loss R$ |
|---|---|---|---|
| Brigada Promotora de Crédito e Vendas Ltda | 5 | 65,050,000.00 | 267,956.58 |
| Promotora e Divulgadora Sudeste Line Ltda. | 4 | 55,650,000.00 | 228,980.70 |
| Amadeu Simão Lopes Azambuja | 13 | 114,174,000.00 | 479,056.78 |
| Afonso César boabaid Burlamaqui | 13 | 135,570,000.00 | 560,436.97 |
| Centro Oeste Promotora de Crédito Ltda. | 2 | 14.000.000,00 | 57.951,69 |
| Álvaro Luiz Alves de Lima Alvares Otero | 11 | 157,435,000.00 | 656,049.00 |
| Armando César de Araújo Pereira Burlamaqui | 13 | 112.232.000,00 | 482,300.68 |
| Armando José Andrade de Carvalho | 2 | 20,000,000 | 86,199.12 |

1 / Loss resulting from the difference between the settlement Amount of the credit operations contracted by each client and the amount redeemed from the funds.

39. In addition, it should be noted that the CCBs in question had a very short maturity (from one to three days, from one issue), which is not usual in the financial market, to the Commission of Inquiry of BCSul by Mr Elcio Leopoldino. As a result, the simulation of credit operations with people filed has been set up, the defendants' claims that they did not have access to the accounts of the clients in order to conclude what result would result from the business are unfounded.

40. As regards the argument put forward by Mr Fábio Caramuru Corrêa Meyer that the BCSul did not carry out simulated operations because "it is not simulated what is, nor what exists", it is worth remembering the legal concept of simulation, contained in art. 167, paragraph 1, of the Civil Code, that there is simulation in legal transactions when they appear to confer or transmit rights to persons other than those to whom they are actually conferred or transmitted. In the present case, the

Simulation was proven by the demonstration that the "applicators" had no objective objective to take credit from the financial institution, nor to make investments in FIP, but only served as interposed persons, in order to meet the needs of Cruzeiro do Sul DTVM and Cruzeiro do South CVM.

41. It should be noted that the defense claim that there was no delay in payment of any of the CCBs listed in Tables 10 to 17 does not remove the imputed irregularity, since the accusation does not relate to any default of the securities, but with respect to their use to instrumentalize operations.

42. The defendants' assertions that they did not benefit from the operations indicated in the notice and that the losses were borne by the customers themselves, and not by BCSul, also do not have the power to de-characterize the infraction in question, since the simulation of credit with interposed persons is not defined by the identification of potential beneficiaries of irregular hirings or of those who suffered losses from them.

43. At the outset, it should be pointed out that the defense allegations and the statements made by Mr Thiago Figueira Fernandes that the CCBs were registered in Cetip (in this sense, see, for example, the documentation related to CCB 8641, at 1,756-1,762) and that there were difficulties in the management of documents and computer equipment after Raet's decision in the Financial Institution, as can be seen, even in Mr. Eduardo Felix Bianchini (fl. 7,283-7,286).

44. These aspects, together with the complementary documentation presented (pp. 7,320-7,361, 7,389-7,395), allow us to conclude that the allegation regarding non-compliance with art. 29 of Law 10.931, of 2004, and thus the period of February was eroded by Mr. Luis Octávio Azeredo Lopes Índio da Cosra and Ms. Maria Luisa Garcia de Mendonça so that the Municipality offers to Cetip. However, the aforementioned removal of imputation does not elude the characterization of the irregularity in comment, in view of the grounds already discussed.

45      like that It is characterized the irregularity "b", which is of a serious nature, as the accused contributed to generate indiscipline in the financial market and affected the regular functioning of the National Financial System.

46. With respect to irregularity "c", it is recorded that, under the terms of article 13, item I, of Circular N 3,461, of 2009, it was the duty of BCSul to make the communication to the Coaf regarding operations performed or services provided whose Amount was equal to or greater than R $ 10,000.00 and that, considering the parties involved, the Amounts, the forms of realization, the instruments used or the lack of economic or legal grounds, could constitute the existence of indications of the crimes foreseen in Law 9,613, of 1998.

47. In this sense, it is noted that the hirings indicated in irregularity "b", in the total amount of R $ 674,211,000.00, had sufficient elements to motivate the aforementioned communication, since, as already emphasized in the analysis of were in excess of R $ 10,000.00 and, in addition, they had at least one of the following characteristics: (a) lack of economic foundation; or (b) the financial capacity of the borrower that is incompatible with the Amount of the operation (characteristics "a" are present in all operations listed in Tables 10 to 17 and characteristic "b" is present in operations

Related to the Brigada Promotora de Creditos e Vendas Ltda, Promotora e Divulgadora Sudeste Line Ltda,. And the Centro Oeste Promotora de Credito Ltda. Ltda, Tables 10, 11 and 14, respectively).

48. It was found, however, that despite the above characteristics, the operations in question were not reported to the Coaf, as shown by the consultations with the Coaf. 5,069-5,078).

49. It should be noted that, at the time of the events, Law 9,613 of 1998 contemplated crimes against the National Financial System between the antecedents previously necessary to characterize the crime of money laundering, so that the allegations of the Ms. Maria Luisa Garcia de Mendonça and Mr. Luís Felippe Índio da Costa that they had no obligation to report such operations to Coaf. In addition, article 13, item I, of Circular 3,461 of 2009, requires only the indication of crime as a criterion to provide communication to the Coaf in a different way from what the defendants seek to assert, which support the need for unequivocal characterization of crime for such purpose end.

50. Do not take advantage of Mr. Luis Felippe Indio da Costa the statements made by Mr. Jair Camilo, because his testimony brings only specifications of the consulting services provided by the company of which he is a partner. Notwithstanding the provision of the aforementioned training and consulting services, the infraction consists in not reporting the operations specified in item 47 to the Coaf is duly demonstrated.

51. It should be pointed out that the conduct of the accused should be directed primarily by the terms of the law and should not refer to the statements of the G5 to rule out the characterization of the offense on the screen, especially as regards (i) criterion of the defending communication, or not, to Coaf; (ii) the criteria for establishing whether or not an indication is merely subjective; and (iii) the fact that the financial institution only promoted operations communications in the existence of data "very concrete and palpable"

52. Lastly, it should be noted that it is incumbent upon the accused in a punitive administrative proceeding to defend himself against the facts attributed to him and not his legal qualification, not including the applicable sanction. Thus, the accused must present his answer about the irregular facts narrated in the initial piece and, finding themselves properly described despite the absence, in the initial piece of art. 12 of Law 9,613, of 1998, (illegible) regarding the payment of the penalty due to irregularity "c", which was properly capitulated in the same law.

53. Therefore, the irregularity "c" is characterized as being of a serious nature, in the case of systematic practice and withdrawal and in view of the aspects involved in the operations, especially as regards (i) the amounts involved; (ii) lack of economic fundamentals; and (iii) the incompatibility between the financial capacity of the holders of the transactions and their Amount; These aspects demanded special attention from the accused, with a view to (illegible) that the operations be used for the illicit activities provided for in Law 9.613 of 1998.

54. From the comparison between the records of this Autarchy and the reasons presented, considering the respective terms of office, according to extrajudicial information of the systems of this Banco Central do Brasil, the following is stated:

54.1 Mr. Luis Felippe Índio da Costa: Investor Relations Officer, from 04.23.2007 to 4.1.2012, Director responsible for Credit Risk Management, from October 30, 2009 to January 31, 2011, and Director responsible for implementation and compliance with the measures established in the Circular No. 3,461, of 2009, from 24.7.2009 to 30.1.2011 (fls. 4,953-4,956):

- of operations relating to irregularity "a", approved CCB 9422 (fl. 2,903) and, in addition, all the transactions explained in Tables 3 to 10 occurred during the period in which he held the position of Officer responsible for Credit Risk Management;

- During the same period, 52 of the 63 hirings broken down were the "b" irregularity;

- Regarding irregularity "c", it is verified that his mandate as Officer responsible for implementing and complying with the measures established in Circular No. 3,461 of 2009, extended for the period corresponding to that in which 44 of the 63 operations indicated in the item 47, in the total amount of R $ 506,861,000.00;

- hence his responsibility for irregularities "a", "b" and "c" is characterized.

54.2 Ms. Maria Luisa Garcia de Mendonça: Director, from 04.23.2007 to 4.6.2012, and responsible, in the same period, for Accounting, Customer Registry of the National Financial System and for Operational Risk Management, in addition to having been responsible for Managing Credit Risk (fl. 4,960) and for compliance with the measures established in Circular No. 3,461, of 2009, from 31.1.2011 to 4.6.2012:

- Of the 92 credit operations related to irregularity "a", 76 were carried out in the period in which the accused held the position of Director responsible for Credit Risk Management. Thus, the testimony of Mrs. Maria Isabel Copello da Silveira, because the deponent, with the purpose of dismissing the responsibility of Mrs. Maria Luisa Garcia de Mendonça in the infraction on the screen, considered that the petitioner held a management position exclusively in the BCSul accounting area;

- Regarding irregularity "b", the defender approved the three operations implemented by CCBs 7658, 7659 and 7660 (fls. 3,570, 3,572, 3,589, 3,601, 4,713 and 4,718), and therefore its claim that it can not be held responsible for any transaction and the statement made by Mr Thiago Figueira Rodrigues in his testimony, according to which Mrs. Maria Luisa Garcia de Mendonça did not participate in the granting of *Middle market* ;

- in relation to irregularity "c", it should be noted that her mandate as the Director responsible for implementing and complying with the measures established in Circular No. 3,461 of 2009, extended for the period corresponding to that in which 19 of the 63 operations indicated in the item 47, in the total amount of R $ 167,350,000.00;

- it should be noted that the statements made by Mr Denis Ruiz, a witness listed by the summons, only relates to the alleged fact that Ms. Maria Luisa Garcia de Mendonça has never dealt with matters related to funds, so that the aforementioned testimony does not help her, since the characterization of her responsibility does not depend on the participation of the defendant in decisions and controls related to FIDCs and FIPs;

- the testimonies of Messrs. Ismael Machado de Carvalho Junior and Thiago Figueira Rodrigues, regarding the irregularity "c", in view of the fact that they only consider the policy of PCLD adopted by BCSul and seek to emphasize its supposed quality. In fact, the imputation is not related to procedures, in theory, carried out by the financial institution with regard to the provisions of Circular No. 3,461 of 2009, but the concrete fact that the lack of communication of 66 transactions with indications of crime provided for in Law 9,613 of 1998;

- the supplementary documentation added by the defendant to fl. 6,230 (documentation which, in its opinion, would contain evidence that, only on April 29, 2011, the period in which it was responsible for the implementation of measures established by Circular No. 3,461, of 2009, began), consists of a table without indication of authorship, containing information on operations and clients, without reference to the defendant on screen, and therefore not liable to dismiss responsibility for the irregularity "c" assigned to it;

- other documents gathered by the accused - consisting of meeting minutes, presentation slides, certificates and attendance lists in courses and events related to money laundering prevention and internal authorship reports (pp. 6.223-7.026) - do not assist it, since they are not related to the occurrences described in the accusatory piece;

- in this way, its responsibility for irregularities "a", "b" and "c" is characterized.

54.3 Mr. Luis Octávio Azeredo Índio da Costa: Chief Executive Officer, from April 23, 2007 to May 4, 2012, Investor Relations Officer, from 10.1.2012 to 4.6.2012, Vice-Chairman of the Board of Directors, from April 23, 2007 to 4.1. 2012, Director Responsible for Risk Management, from April 23, 2007 to May 6, 2012, by the Commercial Portfolio, from April 23, 2007 to May 4, 2012, and by the Investment Portfolio, from January 31, 2011 to April 20, 2012 (fa. 4,957-4,959):

- during the period in which he served in management positions, he approved seven PLCs related to clients named in irregularity "a" (fls. 1,887, 1,924, 2,548, 2,959, 3,224, 3,754 and 4,242);

- being director responsible for Risk Management by the Commercial Portfolio during the period of irregularity "b", which lasted for more than two years, involving significant amounts, could not fail to be aware of the simulated operations described;

- as a consequence, Mr Luis Octávio Azeredo Índio da Costa for the irregularities "a" and "b".

54.4 Mr. Fábio Caramuru Corrêa Meyer: Director, 23.4.2007 to 4.6.2012 (fl. 4,961

- approved 25 PLCs for customers specified in irregularities "a" and "b" (fls. 1.644, 1.647, 1.647, 1.648, 1.650, 1.651, 1.652, 1.653, 1.887, 1.888, 1.889, 1.890, 1.924, 2.548, 2.621, 2.625, 2.959, 3.224, 3.754, 3.854, 4.242, 4.243, 4.244, and 4.245) ;

- approved the operations relating to CCBs 8005, 8726, 9154, 9155, 9216, 9228, 9229, 9262, 9263, 9264, 9301, 9394, 9395, 9397, 9404, 9571, 9572, 9573, 9575, and 9603 (cf. 754, 757, 766, 777, 1,898, 1,902, 2,834, 3,403, 3,404, 3,430, 3,435, 3,485, 3,519, 3,521, 3,555, 3,792, 3,886, 3,912, 3,928, 3,936, 4,068, 4,096, 4,133, 4,128, 4,129, 4,144, 4,146, 4,310, 4,532, 4,564, 4,626 and 4,629) subject to irregularity "a";

- also approved the operations pertaining to CCBs 8265, 8267, 8271, 8272, 8352, 8629, 8692, 8683, 8770, 8773, 9044, 9045, 9578 (fs. 1,406, 1,466, 1,766, 1,976, 1,985, 1,987, 2,150, 2,159, 2,382, 2,475 and 2,476), related to irregularity "b";

- their responsibility for irregularities "a" and "b" is thus characterized.


54.5 Mr. Roberto Vieira da Silva de Oliveira Costa: Director, from 7.3.2008 to 4.6.2012 (page. 4.962):


- approved 25 customer PLCs specified in irregularities "a" and "b" (pages. 1.644, 1.647, 1.647, 1.648, 1.650, 1.651, 1.652, 1.653, 1.887, 1.888, 1.889, 1.890, 1.924, 2.548, 2.621, 2.625, 2.959, 3.224, 3.754, 3.854, 4.242, 4.243, 4.244, and 4.245) ;

- approved the operations implemented by CCVs 8005, 8726, 9146, 9149, 9150, 9152, 9154, 9155, 9216, 9262, 9263, 9264, 9301, 9394, 9395, 9397, 9404, 9571, 9572, 9573, 9575 and 9603 (cf. 754, 757, 766, 777, 1,898, 1,902, 2,834, 3,403, 3,404, 3,430, 3,435, 3,485, 3,519, 3,521, 3,555, 3,792, 3,886,912,939,936, 4,068,0,096,913,133,1428, 4,144, 4,146, 4,310, 4,532, 4,564, 4,626 and 4,629), related to irregularity "a";

- has also approved the contracting of CCBs 8350, 8352, 8692, 8693, 8773, 8873, 8958, 8959, 8960, 9044, 9045, 9130, 9131, 9132, 9133, 9171, 9172, 9173, 9174 and 9578 (fls. 1424, 1467, 1488, 1499, 1500, 1514, 1518, 1536, 1551, 1703, 1776, 1798, 1806, 1827, 1841, 2086, 2087, 2104, 2119, 2135, 2158, 2365, 2366, 2380, 2382, 2402, 2415 and 3,650), related to irregularity "b";

- dismiss the allegation that it acted in an area that did not allow it to be aware of the transactions referred to in this case, and its responsibility for irregularities "a" and "b" was characterized.


54.6 Mr. Sergio Marra Pereira Capella: Director, 23.4.2007 to 4.6.2012 (page. 4,963)


-approved fifteen PLCs referring to customers specified in irregularities "a" (fls. 1,889, 1,888, 1,889, 1,890, 2,548, 2,621, 2,625, 2,959, 3,224, 3,754, 3,854, 4,244, 4,243, 4,243, 4,244 and 4,245), which distorts its claims that it acted in an area outside the operations related to said irregularity and that it was not approved in the operations subject to the accusation;

- on the other hand, considering that it was not a specific director responsible for any area related to the irregularity "b" and that there is no evidence that it participated in the occurrences relating to that irregularity, its responsibility for the second irregularity should be removed;

- characterized, therefore, its responsibility for the "a" irregularity.


55. It should be noted that, as a result of the analysis made, the argument that the attributions of the aforementioned directors would not be related to the operations indicated at the initial stage or that they were limited to the definition of guidelines,

Interference in the execution of specific businesses, or even that they have never had access to any evidence of irregularity.

56. The demonstration of the participation of each indicated in the conclusion of the operations also removes the argument common to several of them in the sense that, as members of the Credit Committee, they believed that the guidelines of said collegiate body were followed by the operational areas. In fact, as it is extracted from the documentation attached to the defenses, this committee had a policy of analysis and approval, which should be followed by the operational areas of BCSul. However, it has been proven that the members of the committee do not care for the effective compliance with the established criteria and approved the irregular operations.

57. With regard to Messrs. Luis Felipe Indio da Costa, Roberto Vieira da Silva de Oliveira Costa, Sérgio Marra Pereira Capella and Fábio Caramuru Côrrea Meyer that the only reference to their participation in irregularity "b" was made in the testimony given by the official Élcio Leopoldino, it should be emphasized that The responsibility attributed to the defendants does not derive exclusively from the aforementioned testimony, but from the proof of what was disclosed therein, from the individual approval of the operations and from the responsibility resulting from the exercise of management position at the BCSul, which implies a duty of supervision over the transactions carried out within the scope of the managed financial institution.

58. It should also be pointed out that the testimony brought by the witnesses listed by Messrs. Roberto Vieira da Silva de Oliveira Costa and Sérgio Marra Pereira Capella are not able to exclude the characterization of the responsibility of the initiates, since they only mention their personal qualities - related to the suitability and vast knowledge of the financial market

- and repeat the allegations made in the defenses, in the sense that they occupied positions with attributions not related to the operations that are the object of this achievement, allegations which, as already stated, were unfounded.

59. In the face of all the above, and autos in good order and assigned the granting and/or renewal of credit operations without compliance with the principles of selectivity, guarantee and liquidity, failing to provide the proper provisioning and adjustments assets involved (irregularity "a"); the simulation of credit operations with people brought (irregularity "b"); and the lack of communication to the competent authorities with evidence of crime set forth in law no. 9,613, 1998 (irregularity "c"); and identified those responsible for the Commission of the administrative the treaties in this illicit done, considering the degree of participation and responsibility of each of the enjoined in the Commission of the failures pointed out, as well as the seriousness of the illicit, that contributed to the extrajudicial liquidation of Banco Cruzeiro do Sul S.A., subsequently ceased due to the Declaration of bankruptcy of a financial institution, DECIDED:

- apply cumulatively to Mr Luis Felipe Índio da Costa, the penalties of:

- NON-QUALIFICATION for the exercise of management positions in the administration or management in institutions authorized to operate by the Banco Central do Brasil for a period of 20 (twenty) years, of which 14 (fourteen) years are due to irregularities "a" and "b" in art. 44, paragraph 4, of Law no. 4,595, of 1964, and 6 (six) years for irregularity "c", based on art. 12, subsection III, paragraph 3 of Law 9,613 of 1998; and

- FINE of five million, sixty-eight thousand and six hundred and ten reals (R $ 5,068,610.00), corresponding to 1% of the value of irregular operations, as presented in item 54.1, due to irregularity "c", based on art. . 12, item II, combined with the provisions of item IV of the paragraph 2 of the same article of Law 9,613, of 1998;

- apply, cumulatively. Maria Luisa Garcia de Mendonça, the pains of:

-NON-QUALIFICATION for the exercise of management positions in the administration or management in institutions authorized to operate by the Banco Central do Brasil for a period of 20 (twenty) years, of which 14 (fourteen) years are due to irregularities "a" and "b" in art. 44, paragraph 4, of Law no. 4,595, of 1964, and 6 (six) years for irregularity "c", based on art. 12, subsection III, paragraph 3 of Law 9,613 of 1998; and

- FINE of one million, six hundred and seventy-three thousand, five hundred reais (R$1,673,500.00), corresponding to 1% of the value of irregular operations, as presented in item 54.2, due to irregularity "c", based on art. 12, item II, combined with the provisions of item IV of the paragraph 2 of the same article of Law 9,613, of 1998;

- apply a penalty of NON-QUALIFICATION for the exercise of management positions in the administration or management in institutions authorized to operate by the Central Bank of Brazil, with a paragraph 4 of art. 44 of Law No. 4,595 of 1964, for the following periods:

- 14 (fourteen) years to Messrs. Fábio Caramuru Corrêa Meyer, Luis Octávio Azeredo Lopes Índio da Costa and Roberto Vieira da Silva de Oliveira Costa, for the irregularities "a" and "b";

- 7 (seven) years to Mr. Sérgio Marra Pereira Capella, for committing the irregularity "a";

- FILE the administrative procedure for Mr Sérgio Marra Pereira Capella, in relation to irregularity "b", in view of the one contained in item 54.6.

60. The decision shall be communicated to the accused persons, with a penalty of payment of the fine due, within a period of 15 (fifteen) days, counting from the science, except for all the right to appeal to the Board of Appeals of the National Financial System, period.

Sidney Côrrea Marques

Director



DECISÃO 331/2016–DIORF, DE 12 DE DEZEMBRO DE 2016

Processo administrativo – ex-diretores do Banco Cruzeiro do Sul S.A. – Em Falência – Pt 1401592272.

Os Srs. Fábio Caramuru Corrêa Meyer, Luis Felippe Índio da Costa, Luis Octávio Azeredo Lopes Índio da Costa, Roberto Vieira da Silva de Oliveira Costa e Sérgio Marra Pereira Capella e a Sra. Maria Luisa Garcia de Mendonça, ex-diretores do Banco Cruzeiro do Sul S.A. – Em Falência (BCSul), foram intimados no presente processo administrativo, a apresentar defesa, em face das irregularidades a seguir descritas, que os sujeitam às sanções previstas no art. 44 da Lei nº 4.595, de 31 de dezembro de 1964.

1.1 Irregularidade "a": conceder e/ou renovar operações de crédito sem observância dos princípios de seletividade, garantia e liquidez, deixando de constituir os devidos provisionamentos e ajustes nos ativos envolvidos.

1.1.1 Capitulação:

- inciso IX, alíneas "a" e "b", da Resolução nº 1.559, de 22 de dezembro de 1988, com a redação dada pelo art. 1º da Resolução nº 3.258, de 28 de janeiro de 2005;
- arts. 1º, 2º e 6º da Resolução nº 2.682, de 21 de dezembro de 1999;
- arts. 2º, parágrafo único, inciso III, e 4º, incisos III, VI e XII, da Resolução nº 3.721, de 30 de abril de 2009;
- Circular nº 1.273, de 29 de dezembro de 1987 (item 1.1.2.5 do Plano Contábil das Instituições do Sistema Financeiro Nacional – Cosif), combinada com o art. 7º, § 1º, inciso II, alínea "d", da Resolução CFC nº 750, de 29 de dezembro de 1993, com nova redação dada pela Resolução CFC nº 1.282, de 28 de maio de 2010.

1.1.2 Descrição da ocorrência:

- de janeiro de 2010 a maio de 2012, os ex-administradores do BCSul concederam e renovaram operações de crédito e fiança bancária sem observância dos princípios de seletividade, garantia e liquidez, deixando de constituir os devidos provisionamentos e ajustes nos ativos envolvidos;
- destacam-se as ocorrências relativas aos clientes indicados na Tabela 1, com quem o BCSul contratou operações que resultaram em exposição da Instituição a risco no montante de R$202,1 milhões:



**Tabela 1 – Clientes Indicados e Respectiva Exposição** R$ milhões

| Cliente | Exposição na data-base de 31.5.2012 |
|---|---|
| Brigada Promotora de Crédito e Vendas Ltda. | 50,8 |
| Promotora e Divulgadora Sudeste Line Ltda. | 45,2 |
| Amadeu Simões Lopes de Azambuja | 10,2 |
| Afonso Cesar Boabaid Burlamaqui | 4,1 |
| Centro Oeste Promotora de Crédito Ltda. | 2,7 |
| Associação dos Músicos Militares do Brasil – Ambra | 46,8 |
| Prevserv Operadora de Serviços Ltda. | 25,8 |
| Neue Welt Comércio Ltda. | 16,5 |
| Total | 202,1 |

– no balanço de abertura, de 4.6.2012, elaborado pelo administrador do Regime Administração Especial Temporária (Raet) no BCSul, foram realizados diversos ajust sendo que os aqui tratados dizem respeito exclusivamente aos oito clientes, cujo montan alcançou R$190,1 milhões (data-base: 31.5.2012), conforme Tabela 2:

**Tabela 2 – Ajustes Realizados pelo Administrador do Raet** R$ milhões

| Ajustes Raet | Valor |
|---|---|
| Cotas Prosper Flex | 126,3 |
| Cotas Multicred | 11,6 |
| Carteira Própria | 10,7 |
| Fiança Bancária | 41,5 |
| Total | 190,1 |

– os ajustes referem-se à constituição de provisão para perdas com Cédulas de Crédi Bancário (CCBs) de emissão desses oito clientes que se encontravam no Fundo Prosp Flex FIDC Multicedentes (Prosper Flex) e no FIDC BCSul Verax Multicred Financei (Multicred), com o consequente efeito nas cotas dos fundos, bem como na própria cartei do Banco. Incluem, ainda, a provisão para risco de crédito com fianças bancárias prestad a alguns desses clientes;

– relativamente às operações cedidas aos FIDCs, verificou-se que o BCSul adotou a práti de ceder operações logo após sua contratação, sendo que, em muitos dos casos, tanto contratação da operação como sua cessão ocorreram na mesma data. Destaque-se, aind que mesmo após a cessão das operações, o BCSul permaneceu responsável pela cobrança repasse dos fluxos de pagamentos dos créditos aos fundos, de forma que a instituiçã financeira era conhecedora dos clientes e de seus históricos de desempenho;

– o BCSul, em 31.5.2012, detinha 85,92% do fundo Multicred, o qual, por sua vez, detinh participação de 98,75% do fundo Prosper Flex, sendo que os valores dessas participaçõe estavam refletidos no balanço patrimonial da instituição financeira;

– as operações com esses oito clientes foram realizadas com o objetivo de mascarar a rea situação dos créditos, que apresentavam insuficientes provisões e que, de modo geral tinham as seguintes características: i) utilização dos recursos relativos a novas emissões d CCBs para pagamento de parcelas de CCBs anteriores ("congelamento"); ii) ausência d garantias; e iii) cessão de todas ou de parte das operações para os FIDCs Prosper Flex e Multicred, permanecendo o BCSul responsável pela cobrança e repasse dos recursos aos fundos.



Fls-397

BANCO CENTRAL DO BRASIL

Decap/Gabin Denise 2.388.380-4 | rubrica | Fl. 7445

4039

1.2 Irregularidade "b": simular operações de crédito com pessoas interpostas.

1.2.1 Capitulação:

- art. 44, § 4º, da Lei nº 4.595, de 1964;
- art. 4º da Resolução nº 2.554, de 24 de setembro de 1998.

1.2.2 Descrição da ocorrência:

- de 28.1.2010 a 30.4.2012, o BCSul realizou 68 operações de crédito simuladas com pessoas interpostas no montante de R$716,2 milhões;
- essas operações envolveram a emissão de CCBs, sempre ao final de cada mês, cujos recursos eram aplicados em cotas de Fundos de Investimento em Participações (FIP) e resgatados no início do mês seguinte;
- tal prática revela que os ex-administradores do BCSul deixaram de promover elevados padrões éticos e de integridade na Instituição Financeira;
- a simulação das operações de crédito ficou evidenciada pelos seguintes fatos:

a) em depoimento prestado à Comissão de Inquérito referente à liquidação extrajudicial do BCSul, em 18.1.2013, o gerente de Processamento de Fundos da Cruzeiro do Sul S.A. DTVM (Cruzeiro do Sul DTVM), Sr. Élcio Leopoldino, descreveu o seguinte *modus operandi* envolvendo tais operações:

i) a Cruzeiro do Sul DTVM era responsável pela custódia dos ativos e controladoria dos fundos FIP BCSul Verax Cinco Platinum e FIP BCSul Verax Equity 1 (FIPs);

ii) referidos fundos eram fechados, de forma que as aplicações seriam resgatadas pelos clientes somente quando do vencimento de cada FIP, não havendo possibilidade de resgate diário;

iii) foi implementada uma sistemática visando a permitir a saída dos cotistas antes das datas de vencimento, por meio de um "mercado secundário", consistente na entrada de novos aplicadores que compravam cotas de aplicadores participantes dos fundos;

iv) esse "mercado secundário" foi colocado em prática por meio da compra de cotas pela empresa Patrimonial Maragato S.A. e, posteriormente, pela Cruzeiro do Sul DTVM e pela Cruzeiro do Sul S.A. CVM (Cruzeiro do Sul CVM);

v) o Sr. Élcio Leopoldino recebia ordens do Sr. Luis Felippe Índio da Costa para, todo final de mês, transmitir a posição da Cruzeiro do Sul DTVM e da Cruzeiro do Sul CVM nos citados FIPs;

vi) também por ordem do Sr. Luis Felippe Índio da Costa a Cruzeiro do Sul DTVM e a Cruzeiro do Sul CVM não poderiam permanecer como cotistas dos FIPs no último dia de cada mês;

  

BANCO CENTRAL DO BRASIL

vii) as posições eram transmitidas por mensagens eletrônicas endereçadas ao responsável pela área de processamento de operações no atacado do BCSul;

viii) em retorno às suas mensagens, o Sr. Élcio Leopoldino recebia informações sobre os clientes (pessoas interpostas) que fariam "aplicações" nos FIPs e os respectivos valores;

ix) os valores das operações de crédito concedidas às pessoas interpostas correspondiam à "necessidade de caixa" decorrente da "saída" de cotistas, bem como da Cruzeiro do Sul DTVM e da Cruzeiro do Sul CVM.

b) as mensagens eletrônicas juntadas nestes autos e as datas dos créditos, das aplicações nos FIPs e dos resgates confirmam os fatos descritos no depoimento do Sr. Élcio Leopoldino;

c) verificou-se que, na mesma data e na mesma conta corrente em que eram creditados os recursos liberados, foram efetivados um ou mais débitos para transferência de recursos para os FIPs, sendo que em todos os casos o montante debitado coincide exatamente com o valor líquido liberado em cada operação;

d) as operações de crédito simuladas, bem como as aplicações nos FIPs, eram realizadas sempre ao final de cada mês, e em 65 dos casos verificou-se que, no início do mês subsequente, fez-se o fluxo inverso, retornando os valores para que se procedesse à liquidação das CCBs;

e) as CCBs foram emitidas com prazo de vencimento de poucos dias (prazo entre 1 e 3 dias úteis), fato não usual no mercado financeiro;

f) as operações eram destituídas de fundamento econômico, pois invariavelmente geraram perdas para as interpostas pessoas, tendo em vista que os rendimentos obtidos eram inferiores aos encargos dos empréstimos;

g) 45 das 68 CCBs encontram-se sem assinatura do emitente, caracterizando inobservância a requisito essencial para sua validade, exigido pela legislação vigente (art. 29 da Lei nº 10.931, de 2 de agosto de 2004).

– as operações de crédito simuladas foram realizadas com Brigada Promotora de Crédito e Vendas Ltda., Promotora e Divulgadora Sudeste Line Ltda., Amadeu Simões Lopes de Azambuja, Afonso Cesar Boabaid Burlamaqui, Centro Oeste Promotora de Crédito Ltda., Álvaro Luiz Alves de Lima Alvares Otero, Armando Cesar de Araújo Pereira Burlamaqui e Armando José Andrade de Carvalho.

1.3 Irregularidade "c": deixar de comunicar às autoridades competentes operações com indícios de crime previsto na Lei nº 9.613, de 3 de março de 1998.

1.3.1 Capitulação: art. 11, incisos I e II-b, da Lei nº 9.613, de 1998, combinado com o art. 13, inciso I, da Circular nº 3.461, de 24 de julho 2009.

1.3.2 Descrição da ocorrência: de janeiro de 2010 a março de 2012, o BCSul deixou de comunicar ao Conselho de Controle de Atividades Financeiras (Coaf) a realização de 68

Fls. 3970

Decap/Gabin Denise 2.388.380-4 | rubrica | Fl 7446

4040

BANCO CENTRAL DO BRASIL

operações de crédito sem fundamento econômico, no montante de R$716.173.525,00, cujos titulares possuíam capacidade financeira incompatível com o valor das operações, e cujos instrumentos de crédito não foram assinados.

2. De acordo com as intimações iniciais, os indiciados respondem pelas irregularidades conforme o descrito no Quadro 1:

**Quadro 1 – Irregularidades Imputadas a cada Indiciado**

| Nome | CPF | Cargo | Período de Gestão | Irregularidade | | |
|---|---|---|---|---|---|---|
| | | | | a | b | c |
| Luis Felippe Índio da Costa | 006.034.067-34 | Diretor de Relações com Investidores | 23.4.2007 a 4.1.2012 | x | x | x |
| | | Diretor de Risco de Crédito | 30.10.2009 a 31.1.2011 | x | x | x |
| Maria Luisa Garcia de Mendonça | 380.376.616-87 | Diretora Contábil, de Cadastro e de Risco Operacional | 23.4.2007 a 4.6.2012 | x | x | x |
| | | Diretora de Risco de Crédito | 31.1.2011 a 4.6.2012 | x | x | x |
| Luis Octávio Azeredo Lopes Índio da Costa | 782.474.977-00 | Diretor Superintendente | 23.4.2007 a 4.6.2012 | x | x | |
| | | Diretor de Relações com Investidores | 10.1.2012 a 4.6.2012 | x | x | |
| | | Vice Presidente do Conselho de Administração | 23.4.2007 a 4.1.2012 | x | x | |
| | | Presidente do Conselho de Administração | 10.1.2012 a 4.6.2012 | x | x | |
| | | Diretor de Risco | 23.4.2007 a 4.6.2012 | x | x | |
| | | Diretor da Carteira Comercial | 23.4.2007 4.6.2012 | x | x | |
| | | Diretor de Investimento | 31.1.2011 a 4.6.2012 | x | x | |
| Fábio Caramuru Corrêa Meyer | 715.168.917-91 | Diretor | 23.4.2007 a 4.6.2012 | x | x | |
| Roberto Vieira da Silva de Oliveira Costa | 769.344.037-20 | Diretor | 7.3.2008 a 4.6.2012 | x | x | |
| Sérgio Marra Pereira Capella | 041.247.618-56 | Diretor | 23.4.2007 a 4.6.2012 | x | x | |

3. Regularmente intimados, os acusados apresentaram defesas tempestivas (fls. 5.359–5.617, 5.618–5.976, 5.977–6.075, 6.081–6.103, 6.104–6.207, 6.214–6.222, 6.223–7.026, 7.030–7.073, 7.115–7.133, 7.149–7.171 e 7.172–7.176), exceto o Sr. Fábio Caramuru Corrêa Meyer, que a apresentou intempestivamente (fls. 7.134–7.148). As alegações encontram-se a seguir sintetizadas:

3.1 Srs. Fábio Caramuru Corrêa Meyer, Luis Felippe Índio da Costa, Luis Octávio Azeredo Lopes Índio da Costa e Roberto Vieira da Silva de Oliveira Costa e Sra. Maria Luisa Garcia de Mendonça:

- as CCBs acostadas aos autos sem assinatura são meras cópias, sem valor legal, destinadas a controle interno do BCSul;
- todas as cédulas do tipo, emitidas pelos clientes, foram assinadas pelos respectivos emitentes, registradas junto à Câmara de Custódia e Liquidação (Cetip) e não foram localizadas em razão da incompetência dos prepostos desse Banco Central do Brasil, na qualidade de administrador do regime interventivo do BCSul, o que seria corroborado pelas cópias das CCBs assinadas pelos Srs. Amadeu Simões Lopes de Azambuja e Armando José Andrade de Carvalho, obtidas junto aos próprios emitentes pelo Sr. Luis Felippe Índio da Costa e juntadas em sua defesa (fls. 5.869–5.920);
- as vias assinadas extraviaram-se em razão da má gestão dos documentos da instituição financeira por parte da empresa contratada para tal fim, por ocasião do Raet e da liquidação extrajudicial.

3.2 Srs. Luis Felippe Índio da Costa, Luis Octávio Azeredo Lopes Índio da Costa, Roberto Vieira da Silva de Oliveira Costa e Sérgio Marra Pereira Capella e Sra. Maria Luisa Garcia de Mendonça: o BCSul era um banco organizado que constituiu estrutura para análise de crédito de seus clientes, composta por área comercial de crédito, análise de crédito, comitê de crédito e área de processamento operacional, as quais foram auditadas pela KPMG Auditores Independentes (KPMG) e por esse Banco Central do Brasil, que jamais apontaram qualquer indício de violação aos princípios da seletividade, garantia e liquidez, bem como falta de constituição de título adequado representativo da dívida.

3.3 Srs. Fábio Caramuru Corrêa Meyer, Luis Felippe Índio da Costa e Luis Octávio Azeredo Lopes Índio da Costa e Sra. Maria Luisa Garcia de Mendonça: a simples concessão de fiança não caracteriza a existência de crédito e esse Banco Central do Brasil engana-se ao afirmar que o BCSul deveria ter provisionado as cartas de fiança emitidas, pois estas não se provisionam, exceto quando honradas, e nenhuma das fianças oferecidas a quaisquer dos oito clientes analisados foi honrada.

3.4 Srs. Fábio Caramuru Corrêa Meyer, Luis Felippe Índio da Costa, Roberto Vieira da Silva de Oliveira Costa e Sérgio Marra Pereira Capella: as acusações feitas não estabelecem suficientes vínculos entre os indiciados e a irregularidade consistente em simular operações de crédito com pessoas interpostas, pois a única referência à suposta participação dos defendentes na referida infração foi feita no depoimento prestado pelo Sr. Élcio Leopoldino.

3.5 Srs. Luis Felippe Índio da Costa, Luis Octávio Azeredo Lopes Índio da Costa e Roberto Vieira da Silva de Oliveira Costa e Sra. Maria Luisa Garcia de Mendonça:

- os clientes mencionados mantinham operações de longa data com o BCSul, seja na qualidade de investidores, tomadores de crédito ou acionistas, bem como clientes da Cruzeiro do Sul CVM e Cruzeiro do Sul S.A. DTVM e não possuíam histórico de inadimplência;

Fls-3970
Decap/Gabin Denise 2.388.380-4 | rubrica | Fl. 7447
4041

BANCO CENTRAL DO BRASIL

- conforme sua política de crédito, a administração dos FIDCs é totalmente segregada da administração do BCSul (*chinese wall*);
- o BCSul efetuou o provisionamento do risco de crédito nos percentuais determinados por esse Banco Central do Brasil;
- os prejuízos indicados foram suportados pelos próprios clientes emitentes das CCBs e não pelo BCSul.

3.6 Srs. Fábio Caramuru Corrêa Meyer e Luis Felippe Índio da Costa e Sra. Maria Luisa Garcia de Mendonça: o BCSul, sob a administração do Fundo Garantidor de Crédito (FGC), contratou operações de crédito com os mesmos clientes mencionados na acusação, de sorte que se há irregularidades nas operações indicadas na intimação, igualmente há nas operações contratadas no âmbito do Raet.

3.7 Srs. Fábio Caramuru Corrêa Meyer e Luis Octávio Azeredo Lopes Índio da Costa e Sra. Maria Luisa Garcia de Mendonça: a acusação é genérica e, portanto, impede o exercício da ampla defesa. Os dois últimos indiciados foram específicos ao afirmar que a acusação é baseada no conceito indeterminado de "falta grave" e afronta o princípio da legalidade, logo, todas as acusações embasadas no art. 44, § 4º, da Lei nº 4.595, de 1964, devem ser desconsideradas, na medida em que não contêm qualquer tipificação de conduta, bem como devem ser desconsideradas as imputações de violações a normas infralegais, não autorizadas pelo citado dispositivo legal.

3.8 Srs. Luis Felippe Índio da Costa e Luis Octávio Azeredo Lopes Índio da Costa e Sra. Maria Luisa Garcia de Mendonça:

- o FGC não tem habilitação técnica contábil e independência para efetivar os ajustes descritos no Balanço de Abertura do Raet, tampouco competência para a condução desse regime especial;
- esse Banco Central do Brasil não poderia efetivar provisionamento no tocante aos FIDCs, na medida em que o BCSul nem mesmo possuía a qualidade de cotista de tais fundos e, por consequência, tampouco aos defendentes pode ser imputada qualquer responsabilidade relativa a eventual falta de provisionamento;
- a administração cabia à Cruzeiro do Sul DTVM, no tocante ao FIDC BCSul Verax Multicred Financeiro, e ao Banco Prosper S.A., quanto ao Prosper Flex FIDC Multicedentes, os quais contrataram o Deutsche Bank S.A. para os serviços de tesouraria, custódia, escrituração de cotas e controle de ativos e passivos;
- em relação à acusação de que as operações eram destituídas de fundamento econômico, não tinham acesso à contabilidade dos clientes para concluir qual resultado geravam.

3.9 Sr. Luis Octávio Azeredo Lopes Índio da Costa e Sra. Maria Luisa Garcia de Mendonça:

- o processo administrativo é nulo por não ter individualizado a conduta dos indiciados, limitando-se, simplesmente, a capitular as supostas transgressões em que teriam incorrido;

- o BCSul realizou as operações, cumprindo rigoroso processo de análise e aprovação de crédito, as quais foram instrumentalizadas por CCBs, meio adequado para constituição e representação das dívidas;

- o enquadramento de *rating* em nível H, dado por esse Banco Central do Brasil e pelo FGC às operações de *Middle Market*, está equivocado;

- os ajustes exigidos são em percentagem ínfima em relação ao total da carteira de *Middle Market*;

- a Sra. Maria Luisa Garcia de Mendonça não integrava o Comitê de Crédito do BCSul nem cabia a ela a fiscalização daquele colegiado, tampouco da diretoria responsável pela emissão de CCBs (área de Crédito Atacado), assim como não tinha subordinadas a ela as áreas de Análise de Crédito e de Processamento de Crédito, de modo que não lhe pode ser imputada qualquer responsabilidade por suposta simulação de operações creditícias.

3.10 Srs. Roberto Vieira da Silva de Oliveira Costa e Sérgio Marra Pereira Capella:

- cabia ao Comitê de Crédito do BCSul a definição de políticas de análise de crédito, de sorte que, se determinada operação não contava com as garantias e ainda assim era recomendada pelos especialistas do departamento de análise de crédito, era porque outras variáveis garantiam-lhe o necessário nível de segurança, ou ao menos era legítimo ao citado colegiado acreditar que esse era o caso, pois não lhe competia reunir novos documentos ou informações;

- confiavam que as diretrizes estabelecidas pelo Comitê de Crédito eram seguidas pela gerência de crédito, quando da elaboração de análises e recomendações;

- desempenharam suas funções com lealdade, boa-fé e alto padrão de diligência, não lhes podendo ser imputada a irregularidade atinente à concessão de crédito sem observância dos princípios da seletividade, garantia e liquidez;

- não se beneficiaram das operações de crédito ora inquinadas de irregulares.

3.11 Sr. Luis Felippe Índio da Costa e Sra. Maria Luisa Garcia de Mendonça: não tinham a obrigação de prestar ao Coaf as informações de que trata a Lei nº 9.613, de 1998, pois, à época dos fatos, a citada lei continha rol taxativo dos crimes antecedentes necessários à caracterização da lavagem de capitais e, durante sua permanência no cargo, jamais testemunharam qualquer crime ou eventuais suspeitas de indícios de quaisquer das condutas então elencadas na legislação como passíveis de comunicação ao citado Conselho, além de a norma exigir a comunicação de existência de “sérios indícios” de crime de lavagem de bens ou valores obtidos com os crimes antecedentes.

3.12 Sr. Fábio Caramuru Corrêa Meyer:

- todos os atos que praticou no exercício do cargo foram escorreitos, legítimos e legais;

- a acusação de que o BCSul teria realizado operações simuladas não procede porque, se eram operações, não poderiam ser simuladas, já que não se simula o que é, nem o que existe;

Fls. 397

Decap/Gabin Denise 2.388.380-4 | rubrica | Fl. 7448

4042

BANCO CENTRAL DO BRASIL

- são falsas as afirmações de que o BCSul teria concedido crédito por meio de operações sem garantia;

- a jurisprudência do Conselho de Recursos do Sistema Financeiro Nacional - CRSFN aponta para a responsabilidade subjetiva no âmbito das normas tuteladas por esse Banco Central do Brasil;

- exerceu o cargo de Diretor Comercial de Crédito Atacado e sua autonomia limitava-se a atos burocráticos próprios da sua função, que não compreendia nenhum tipo de alçada referente a operações de crédito, sendo que toda operação desse tipo necessitava ser aprovada, previamente, pelo Comitê de Crédito.

3.13 Sr. Luis Felipe Índio da Costa:

- esse Banco Central do Brasil é suspeito e impedido de atuar no presente processo administrativo, pois atua como assistente de acusação em processos judiciais em trâmite na Justiça Federal;

- não houve atraso no pagamento de qualquer das CCBs indicadas, de modo que não era necessária a provisão de 100% que, se realizada, levaria o BCSul a sofrer redução patrimonial;

- somente os administradores dos FIDCs poderiam fazer os ajustes e provisões, de modo que o BCSul e seus ex-administradores não podem ser penalizados por não terem feito o que não lhes competia fazer.

3.14 Sra. Maria Luisa Garcia de Mendonça:

- juntou documentos compostos por atas de reunião, *slides* de apresentações, certificados e listas de presença em cursos e eventos relacionados à prevenção à lavagem de dinheiro, considerações acerca da acusação de deixar de comunicar, às autoridades competentes, operações com indícios de existência de crime previsto na Lei nº 9.613, de 1998, além de relatório da auditoria interna;

- na documentação acima citada (tabela, fl. 6.230), há prova de que sua atuação como responsável pelo implemento de medidas estabelecidas pela Circular nº 3.461, de 2009, teve início em 29.4.2011 e término em março de 2012, diferentemente do período alegado pela acusação, que teria início em janeiro de 2010.

3.15 Sr. Roberto Vieira da Silva de Oliveira Costa:

- a administração de instituições financeiras sofreu processo de especialização de funções nas últimas décadas, de sorte que a mera circunstância de alguém ser diretor estatutário não faz dessa pessoa responsável por toda e qualquer irregularidade ocorrida na respectiva instituição, sendo necessário, portanto, análise das funções atribuídas a tal diretor;

- cabia-lhe chefiar a diretoria de captações do BCSul com a incumbência apenas de fazer acompanhamento dos gerentes, visitar clientes, cobrar captação e realizar visitas a clientes prospectivos;



BANCO CENTRAL DO BRASIL

- as autorizações do Comitê de Crédito eram realizadas por e-mail e apenas se manifestou após análise e aprovação das operações por analistas da área de crédito;

- o Comitê de Crédito desenhou um procedimento de aprovação de crédito que lhe garantia o acesso a todas as informações relevantes para a tomada de decisão, aí incluídas a proposta da área comercial e a robusta análise de risco de crédito elaborada pelo departamento especializado;

- o chamado rolamento de operações de crédito é prática comum no mercado e, isoladamente considerada, nada tem de irregular;

- não tinha acesso aos indícios apontados pela acusação, logo, para fins de sua responsabilidade, era como se nada existisse, pois não é de se esperar do administrador onipresença ou onisciência;

- não há fraude ou simulação sem o conhecimento e a vontade de se atingir esse resultado, logo a acusação necessita demonstrar que deliberada e dolosamente concorreu para a prática do ato ilícito.

3.16 Sr. Sérgio Marra Pereira Capella:

- nunca atuou em áreas ligadas às operações mencionadas e sua participação no Comitê de Crédito decorreu, apenas, da necessidade de aquele colegiado contar com membro da área comercial;

- não há aprovação eletrônica do defendente em relação às operações mencionadas;

- o Comitê de Crédito não tinha como função acompanhar as liberações financeiras ou a destinação dos recursos delas;

- o provisionamento e ajuste de ativos não fazia parte do escopo das suas funções.

3.17 Em 7.12.2015, o Sr. Luis Felippe Índio da Costa juntou documentos reiterando os argumentos expostos anteriormente em relação à conduta do FGC (fls. 7.182–7.186).

3.18 Na mesma data, a Sra. Maria Luisa Garcia de Mendonça apresentou manifestação, parecer e documentos reiterando os argumentos anteriormente expostos em sua defesa (fls. 7.187–7.220). Referida intimada apresentou, ainda, em 26.8.2016, parecer emitido por Fábio Ulhoa Coelho, de 14.9.2007 (fls. 7.315–7.361), o qual trata da validade do registro eletrônico dos títulos de crédito realizados na Cetip. No aludido parecer, o autor afirma, em síntese, que, quando registrado na mencionada câmara de custódia, a CCB está suportada eletronicamente, de forma que o papel que lhe servia de base documental (e que, eventualmente, pode voltar a essa condição) deve ficar simplesmente guardado (no caso, com o credor). A Sra. Maria Luisa Garcia de Mendonça apresentou, em 31.10.2016, nova documentação (fls. 7.389–7.395) buscando suportar tal entendimento.

3.19 Em 7.11.2016, o Sr. Luis Octávio Azeredo Lopes Índio da Costa e a Sra. Maria Luisa Garcia de Mendonça requereram (fl. 7.406): (i) que este Banco Central do Brasil oficiasse à Cetip para que esta fornecesse cópia dos registros de CCBs não localizados por ocasião do



Fls. 397

Decap/Gabin Denise 2.388.380-4 rubrica Fl. 7449

4043

BANCO CENTRAL DO BRASIL

relatório do Raet que ensejou a instauração do presente processo; e (ii) a concessão do prazo de trinta dias, após realizada a providência requerida, para a apresentação de alegações finais.

4. Ademais, os indiciados requereram o seguinte: i) Srs. Luis Felippe Índio da Costa, Luis Octávio Azeredo Lopes Índio da Costa, Maria Luisa Garcia de Mendonça, Roberto Vieira da Silva de Oliveira Costa e Sérgio Marra Pereira Capella: oitiva de testemunhas; ii) Srs. Fábio Caramuru Corrêa Meyer e Luis Felippe Índio da Costa: que sejam intimados, pessoalmente, para apresentarem alegações finais tão logo esgotada a fase de instrução deste processo, uma vez que a Lei nº 9.784, de 29 de janeiro de 1999, prevê a possibilidade de apresentarem alegações finais imediatamente antes da decisão da autoridade julgadora; e iii) Sr. Fábio Caramuru Corrêa Meyer: que este Banco Central do Brasil oficie o liquidante para prestar esclarecimentos acerca das operações, em razão do disposto no item 3.6.

4.1 Deferidos os pedidos de produção de prova testemunhal, os Srs. Sérgio Marra Pereira Capella, Roberto Vieira da Silva de Oliveira Costa, Luis Felippe Índio da Costa e Luis Octávio Azeredo Lopes Índio da Costa e a Sra. Maria Luisa Garcia de Mendonça apresentaram depoimentos, reduzidos a termo, de suas testemunhas (fls. 7.225–7.227, 7.237–7.240, 7.271–7.314, 7.373–7.385 e 7.396–7.400), nos quais se encontram, em síntese, as seguintes declarações:

4.1.1 Testemunhas do Sr. Sérgio Marra Pereira Capella:

– Sr. José Carlos Lima de Abreu: o Sr. Sérgio Marra Pereira Capella atuava na área de crédito consignado do BCSul, com funções exclusivamente comerciais, sendo que fazia parte do Comitê de Crédito da instituição financeira, no qual apresentava propostas envolvendo correspondentes que operavam os códigos diretos do BCSul;

– Sra. Gislei Aparecida Santos: o Sr. Sérgio Marra Pereira Capella era chamado ao Comitê de Crédito da instituição financeira quando havia propostas em sua área.

4.1.2 Testemunhas do Sr. Roberto Vieira da Silva de Oliveira Costa:

– Sra. Sylvia Christina Alves dos Santos: o Sr. Roberto Vieira da Silva de Oliveira Costa tinha como função exclusiva dar suporte aos gerentes da área da Diretoria de Captação, com foco único na prospecção de novos clientes para o BCSul, implantando políticas de meritocracia e tendo participado dos Comitês de Crédito e de Prevenção e Combate a Lavagem de Dinheiro;

– Sr. Joselito Feijó de Melo Junior: o Sr. Roberto Vieira da Silva de Oliveira Costa demonstrava possuir vasto conhecimento sobre o mercado financeiro, constantemente preocupado em manter todos os gerentes informados a respeito dos resultados da instituição financeira, nunca tendo mostrado atitude que pudesse levantar dúvidas quanto ao seu perfil profissional idôneo.

4.1.3 Testemunhas do Sr. Luis Felippe Índio da Costa:

– Sr. Eduardo Felix Bianchini:

- dentre os nove clientes apontados no documento de fl. 7.275, aos quais foram prestadas garantias pelo BCSul sob a forma de fiança, somente um teve tal garantia honrada, cliente este que não foi mencionado no presente processo;

- em 25.11.2013, na qualidade de liquidante do BCSul, não lhe foi possível atender à solicitação de cópias de instrumentos de contratos de crédito consignado, feita pela Sra. Maria Luisa Garcia de Mendonça (fls. 7.277–7.282), em vista de dificuldades operacionais geradas pela substituição da empresa contratada para a guarda, controle e registro da documentação produzida/recebida durante o funcionamento regular da instituição financeira, substituição esta ocorrida no período do Raet;

- no que concerne ao estado em que foram devolvidos os equipamentos de informática de propriedade do BCSul pela empresa IMS Tecnologia e Serviços Ltda., todos os onze servidores, 196 de um total de 230 computadores e os dois notebooks foram formatados e, além disso, três computadores apresentaram defeitos nos respectivos discos rígidos;

- não se localizaram instrumentos de crédito, contratos e/ou cédulas bancárias efetivados durante o Raet, relativos aos clientes Amadeu Simões Lopes de Azambuja, Brigada Promotora de Créditos e Vendas Ltda., Promotora e Divulgadora Sudeste Line Ltda., Preserv Operadora de Serviços Ltda. e Associação dos Músicos Militares do Brasil (Ambra);

- em relação à CCB 9659, emitida por Afonso Cesar Boabaid Burlamaqui, tem-se que: (i) não se atribuiu classificação para o nível de risco determinado pela Resolução nº 2.682, de 1999, ante a cessão do respectivo contrato, em 13.8.2012, ao FIDC BCSul Verax Multicred Financeiro; (ii) durante o período de vigência da CCB em tela – 13.8.2012 a 9.10.2012 (data em que o cliente efetuou o pagamento antecipado do crédito, cujo vencimento dar-se-ia em 15.10.2012) –, atribuiu-se à mesma nível de risco "A"; (iii) o BCSul não realizou provisão complementar à já feita para a referida CCB; (iv) não houve repasse dos fluxos de pagamento da cédula em comento à instituição financeira, pois esta já se encontrava em liquidação extrajudicial em 9.10.2012;

- Sr. Jair Camilo:

  - a G5 Prestação de Serviços de Treinamento Empresarial Ltda. (G5), empresa da qual é sócio, realizou três treinamentos junto à equipe do BCSul, em 28.3.2008, 14.6.2010 e 22.12.2011, todos versando a respeito de prevenção contra crimes de lavagem e/ou ocultação de bens, direitos e valores, previstos na Lei nº 9.613, de 1998;

  - nos treinamentos ministrados, destacaram-se os seguintes pontos: (i) contextualização do tema lavagem de dinheiro; (ii) aspectos penais da lavagem de dinheiro; (iii) aspectos processuais da lavagem de dinheiro; (iv) inteligência e investigação; (v) cooperação jurídica internacional; (vi) Lei nº 9.613, de 1998, Lei Complementar nº 105, de 10 de janeiro de 2001, e normatizações desse Banco Central do Brasil relativas ao tema;

  - a G5 prestou, ainda, dois serviços de consultoria, em dezembro de 2009 e agosto de 2010, para desenvolvimento e implantação de "Scripts ACL" para inclusão/alteração de regras de monitoramento de prevenção à lavagem de dinheiro;



Decap/Gabin Denise 2.388.360-4 rubrica Fl 7450 4044

BANCO CENTRAL DO BRASIL

– nos serviços de consultoria, os critérios básicos enfatizados para a comunicação de indícios ao Coaf foram: (i) as regras estabelecem indicadores e critérios de indícios, que, após análises da instituição financeira, fica a critério desta a comunicação, ou não, ao Coaf; (ii) os critérios para se estabelecer o tratamento, ou não, de um indício são meramente subjetivos; (iii) a própria norma desta Autarquia prevê que, em eventual dúvida, o cliente deverá ser colocado em monitoramento reforçado, não devendo a instituição financeira promover comunicações de indícios sem dados bem concretos e palpáveis;

– a G5 realizou os treinamentos sempre baseados nas leis e regras, destacando aos participantes os principais riscos de indícios de lavagem de dinheiro, a necessidade das comunicações e as responsabilidades definidas em lei;

– na montagem dos relatórios de monitoramento, a G5 implantou critérios visando destacar alertas de eventuais processos a serem analisados pelas áreas competentes;

– para a G5, à época da prestação dos serviços de treinamento e consultoria (2008 a 2011), o BCSul cumpriu as regras de monitoramento preventivo, dentro do padrão de decisões internas.

– Sr. Eliseu Martins:

– as cotas subordinadas dos FIDCs podem ser caracterizadas como instrumentos financeiros, e não como empréstimos e recebíveis;

– no tocante ao aspecto da provisão para liquidação duvidosa, a realizada pelo FIDC deve ser ajustada, pois, caso contrário, há incidência de dupla contagem do risco de crédito;

– a variação nas provisões de 4.6.2012 (data do balanço especial de abertura, elaborado pelo FGC) e 31.7.2012 revela que, nesse período, o próprio administrador do Raet reconheceu que o volume de expectativas de perdas era excessivo, de tal sorte que o ajuste, menos de sessenta dias após, foi muito menor (R$4,8 milhões) do que o originalmente proposto (R$142,8 milhões);

– a menos que se comprovem fatos novos surgidos entre 5.6.2012 e 31.7.2012, pode-se afirmar que houve erro no provisionamento efetuado, rapidamente revertido posteriormente;

– tudo parece indicar a existência de deliberada intenção de aumento do valor negativo do patrimônio líquido da instituição financeira, e não a aplicação princípios contábeis que produzem informações não viesadas e não enganosas.

4.1.4 Testemunhas do Sr. Luis Octávio Azeredo Lopes Índio da Costa e da Sra. Maria Luisa Garcia de Mendonça:

– Sr. Denis Ruiz:

– foi contratado pela Cruzeiro do Sul DTVM para a função de Analista de Back Office de Asset, subordinava-se diretamente ao Sr. Elcio Leopoldino e aos diretores da Verax,

Srs. Marcio Dreher e Marcelo Xandó, e nunca esteve subordinado à Sra. Maria Luisa Garcia de Mendonça, sendo que nunca a viu tratando de assuntos relacionados a fundos;

– as decisões relacionadas aos FIDCs e FIPs eram tomadas pela Verax em São Paulo (nunca no Rio de Janeiro).

– Sra. Maria Isabel Copello da Silveira:

– trabalhou no Departamento de Contabilidade do BCSul, de 16.5.1994 a 24.10.2013, na função de analista contábil, departamento este ligado à Sra. Maria Luisa Garcia de Mendonça e que, no referido período, teve como responsáveis os Srs. Antonio Kanô e Airton Salviano;

– a indicação do nível de risco dos clientes da carteira de *Middle Market* não era atribuição do mencionado departamento, mas do Departamento de Análise de Crédito (totalmente segregado, portanto, da gestão da Sra. Maria Luisa Garcia de Mendonça), o qual fornecia informações ao Departamento de Contabilidade, que, por sua vez, efetuava os respectivos registros contábeis.

– Sr. Ismael Machado de Carvalho Junior:

– trabalhou no BCSul, de julho de 2007 a outubro de 2012, na função de Coordenador de Prevenção e Combate à Lavagem de Dinheiro (PCLD), tendo como superiora a Sra. Maria Luisa Garcia de Mendonça, a qual o incentivou a realizar diversos treinamentos promovidos por diversas instituições, tais como Febraban, Aberj e G5Consultoria, e ministrados por representantes do Coaf, Ministério Público, Banco Central do Brasil, Banco do Brasil, Itaú e Bradesco;

– após os treinamentos, repassava a sua superiora e ao Comitê de PCLD do BCSul as orientações recebidas, tendo sempre recebido incentivo para alterar os procedimentos na direção sugerida nos aludidos treinamentos, alterações estas materializadas na Política de PCLD e aprovadas pelo mencionado comitê, de forma que a estrutura de controles da instituição financeira era muito parecida com a dos grandes bancos;

– nos treinamentos em tela, ressaltava-se a importância de se realizarem análises das operações dos clientes de forma a evitar "entupir" o Coaf com informações sem utilidade;

– no BCSul, utilizava-se a ferramenta ACL para monitorar todos os sistemas do banco e as operações que não passavam pelos filtros previamente parametrizados eram analisadas e reportadas ao Comitê de PCLD, que também realizava análise e decidia, por maioria, a comunicação ao Coaf, sendo que a Sra. Maria Luisa Garcia de Mendonça nunca obstou a citada comunicação aprovada em comitê, tendo sempre demonstrado postura diligente, atendido com esmero as normas em vigor, preocupada e comprometida em trabalhar corretamente;

– as fiscalizações realizadas por essa Autarquia com o objetivo de revisar as políticas de PCLD aprovaram os procedimentos desenvolvidos pelo BCSul, pois a carta de



conclusão da verificação não apontou irregularidades, mas somente sugestões de melhoria.

4.1.5 Testemunha do Sr. Luis Octávio Azeredo Lopes Índio da Costa:

Sr. Claudio Amadeo Rodriguez:

- em seu depoimento prestado no âmbito do processo criminal 0000162-03.2013.4.3.6181, que tramita perante a 2ª Vara Federal Criminal, prestou esclarecimentos ao Ministério Público e ao Juízo, no que se refere às funções do administrador, do gestor e do custodiante do FIDC, as quais não necessariamente são exercidas pela mesma pessoa;
- o administrador implementa as normas descritas em regulamento, ao passo que o gestor toma as decisões de gestão e o custodiante é o responsável pelo lastro e por cuidar dos recebíveis envolvidos no fundo;
- a formação de FIDC é modo saudável de captar recursos – especialmente para bancos pequenos no Brasil, os quais (assim como as empresas) têm dificuldade de acesso a capital – pois, ao se criar um fundo e ceder os recebíveis, organiza-se o histórico destes, submetendo-se aquele a auditoria, de modo que, caso necessite de empréstimo, o cedente dos aludidos recebíveis utiliza tal fundo como lastro;
- a participação elevada do cotista subordinado no FIDC é uma garantia ao cotista sênior;
- o nível de risco das operações de crédito, refletido nas demonstrações financeiras do FIDC como provisão para devedores duvidosos, é calculado pelo gestor do fundo, não cabendo ao cedente tal responsabilidade.

4.2 O Sr. Luis Octávio Azeredo Lopes Índio da Costa e a Sra. Maria Luisa Garcia de Mendonça arrolaram como testemunha, ainda, o Sr. Thiago Figueira Rodrigues que, em depoimento prestado nas dependências desta Autarquia, em 7.11.2016 (acostado às fls. 7.401/7.402), declarou, em síntese, que:

- ingressou no BCSul em 2004, no Departamento Jurídico; em 2006, atuou na área de crédito e, de 2007 a 2012, na área de controles internos, sempre na filial do Rio de Janeiro;
- após a solicitação de crédito por parte do cliente, a gerência de análise de crédito procedia ao exame de indicadores e documentação. Aprovada por essa gerência, a solicitação seguia para o Comitê de Crédito e, após aprovação deste, formalizava-se o contrato na área jurídica do BCSul, após o qual se dava a liberação do recurso;
- quando havia cessão do crédito, a CCB era registrada na Cetip e por esta auditada mensalmente em relação, principalmente, ao endosso em preto e, a partir do momento da cessão, é de se entender que não subsistia a responsabilidade do BCSul, mas do titular do crédito;
- a via física da CCB, após o registro na Cetip, retornava ao Departamento Jurídico do BCSul para digitalização e arquivo permanente;



BANCO CENTRAL DO BRASIL

- o próprio credor do título acompanhava a CCB, inclusive junto à Cetip, e esse Banco Central do Brasil, eventualmente, solicitava cópias dos documentos respectivos, no âmbito dos procedimentos de fiscalização;

- o provisionamento do risco em relação às cartas de fiança somente era feito no momento em que viessem a ser executadas, segundo as normas vigentes;

- a Sra. Maria Luisa Garcia de Mendonça não participava da concessão de crédito *Middle Market*, sendo os responsáveis para tal a Sra. Ana Pregnolato (gerente do Departamento de Análise de Crédito) e os Srs. Roberto Vieira da Silva de Oliveira Costa, Fábio Caramuru Correa Meyer, Luis Felippe Índio da Costa e Luis Octávio Azeredo Lopes Índio da Costa;

- efetuou diretamente análise relativa a PCLD, no âmbito de controles internos, no período de aproximadamente um ano. No BCSul, o sistema ACL reunia todas as informações dos demais sistemas do banco, gerando relatórios com as operações atípicas, que seriam analisadas individualmente, com exceção daquelas já analisadas anteriormente pela área pertinente (tais como operações de empréstimo por meio de CCB) e, quando necessárias, solicitavam-se informações adicionais do cliente junto ao gerente correspondente;

- situações atípicas expressamente previstas na legislação eram imediatamente comunicadas ao Coaf, sendo também analisadas operações fracionadas, as quais poderiam ser indicativo de burla;

- todas as análises geravam atas que eram encaminhadas para um grupo de PCLD – formado pelos Srs. André Carvalho, Ismael Carvalho, Celso Oliveira, Alexandre Guida, Miguel Burlamaqui e pela Sra. Eliane Águia – que efetuava nova análise e, em seguida, submetia ao Comitê de PCLD, ao qual cabia avaliar e decidir quais casos eram passíveis de comunicação ao Coaf e do qual faziam parte as Sras. Maria Luisa Garcia de Mendonça e Eliane Águia, e os Srs. Roberto Vieira da Silva de Oliveira Costa, Fábio Caramuru Correa Meyer e Flávio Rietmann, tendo como secretários os Srs. Ismael Carvalho e André Carvalho;

- o *modus operandi* do BCSul em relação ao PCLD seguia as normas relativas ao tema e as boas práticas, com participação do corpo funcional em diversos treinamentos em vários órgãos (Febraban, Aberj, ABBC, entre outros) e em palestras ligadas ao tema;

- a empresa Verax Serviços Financeiros e o BCSul, embora funcionassem no mesmo prédio, eram pessoas jurídicas distintas, com sócios diversos e usavam sistemas e recursos humanos diferentes, sendo a Verax Serviços Financeiros a administradora de fundos de investimento do BCSul;

- não se recorda de irregularidade alguma encontrada nas auditorias realizadas por esse Banco Central do Brasil, não tendo restado pendências em relação a documentos ou informações eventualmente solicitadas por esta Autarquia.

5. Preliminarmente, no tocante à apresentação de alegações finais, registre-se que o art. 38 da Lei nº 9.784, de 1999, dispõe que o interessado poderá, na fase instrutória e antes da tomada da decisão, juntar documentos e pareceres, requerer diligências e perícias, bem como aduzir alegações referentes à matéria objeto do processo.



Fls-397

Decap/Gabin Denise 2.388.380-4 | rubrica | Fl. 7452

4046

BANCO CENTRAL DO BRASIL

6. Portanto, em decorrência da previsão legal, os indiciados podem, a qualquer momento e independentemente de intimação, oferecer manifestações, desde que ainda não proferida a decisão. No caso concreto, verifica-se que se manifestaram em diferentes oportunidades, as quais incluíram, inclusive, a oitiva do Sr. Eduardo Felix Bianchini, ex-liquidante do BCSul, como testemunha.

7. No tocante ao argumento de que a inicial é baseada no conceito indeterminado de falta grave, o que afrontaria o princípio da legalidade, o art. 44, § 4º, da Lei nº 4.595, de 1964, apresenta a natureza de tipificação aberta, espécie assemelhada às normas punitivas em branco, diferindo dessa classe de regras, todavia, por não buscar o complemento em outra norma, visto que sua integração insere-se no poder discricionário da autoridade julgadora.

8. É oportuno anotar que cabe ao agente do poder público avaliar se determinada conduta comporta ou não a conceituação de infração grave e, de outro lado, é atribuição do aplicador da sanção defini-la, desde que presentes os princípios gerais de direito e o pressuposto indispensável à configuração do ilícito sancionado pelo art. 44, § 4º, do referido diploma legal, qual seja, o grau de lesividade do procedimento censurado, podendo ser tal lesão tanto efetiva quanto potencial.

9. No mesmo diapasão, não prospera a alegação de que esta autoridade é suspeita e impedida de atuar nestes autos, por figurar como assistente de acusação em processos em trâmite na Justiça Federal, pois, independentemente da atuação desta Autarquia no âmbito do Poder Judiciário, o art. 10, inciso IX, da Lei nº 4.595, de 1964, determina que compete privativamente a este Banco Central do Brasil exercer a fiscalização das instituições financeiras e aplicar as penalidades previstas, quando constatada a ocorrência de irregularidades, o que se dá por meio de um processo administrativo sancionador. Ademais, a assistência desta Autarquia em processos criminais em trâmite na Justiça Federal é prevista no art. 26, parágrafo único, da Lei nº 7.492, de 16 de junho de 1986.

10. Também não assiste razão à defesa o entendimento de que o FGC não teria habilitação técnico-contábil e independência para efetivar os ajustes descritos no Balanço de Abertura do Raet, tampouco competência para a condução do regime especial, haja vista que o citado fundo atuou após a designação da autoridade fiscalizadora, que, no uso de sua competência, emitiu o Ato-Presi nº 1.217, de 4.6.2012 (fl. 124), com fundamento no art. 8º do Decreto-Lei nº 2.321, de 25 de fevereiro de 1987.

11. A propósito, não se inserem no universo de apuração deste feito eventuais operações que o BCSul tenha realizado à época em que estava sob administração do FGC, de forma que os documentos anexados pelo Sr. Luis Felipe Índio da Costa, em 29.1.2015 (fls. 7.074–7.112), e o depoimento nesse sentido prestado pelo Sr. Eduardo Felix Bianchini (fls. 7.272–7.274/7.287–7.292), testemunha arrolada pelo indiciado em tela, não o socorrem, pois se referem a operações contratadas pelo BCSul no âmbito do Raet.

12. Com relação à responsabilidade subjetiva evocada pelos defendentes, registre-se que esta, dentre outros, insere-se nos princípios seguidos por esta Autarquia na condução dos processos administrativos punitivos. Assim, os indiciados sujeitam-se à responsabilização individual, apurada no decorrer da análise processual, seja pela prática direta dos atos irregulares, seja por terem concorrido para sua concretização.



BANCO CENTRAL DO BRASIL

13. Não procedem, ainda, as alegações de que (i) o presente processo administrativo é nulo por não ter individualizado a conduta dos indiciados – pois ter-se-ia limitado a capitular as supostas transgressões praticadas pelos acusados – e (ii) a acusação é genérica e impede o exercício da ampla defesa. Isso porque o conteúdo do processo explicita, de maneira pormenorizada, as condutas supostamente irregulares atribuídas aos indiciados no exercício de seus mandatos e aponta a documentação pertinente. Cabe ressaltar, também, que aos defendentes foi facultada vista e cópia do presente processo (fls. 5.235, 5.352, 5.355, 6.080, 6.209, 6.211, 7.029 e 7.113).

14. Consigne-se que o fato de esta Autarquia e empresas de auditoria independente não terem apontado irregularidades em trabalhos de inspeção e de auditoria realizados anteriormente não elide a caracterização dos ilícitos administrativos detectados e consignados na peça inaugural e que se encontram documentados. Acresce notar, a esse respeito, que o processo de supervisão é continuado e a circunstância de a atuação dos administradores de instituição financeira não ser contestada em procedimentos de auditoria ou de fiscalização realizados em determinado momento não estabelece nenhuma salvaguarda que impeça eventuais responsabilizações, quando da ciência, por parte da autoridade, da prática de atos ilícitos.

15. No mérito, relativamente à irregularidade "a", verifica-se que, à época das contratações, de acordo com as fichas cadastrais da Junta Comercial do Estado do Rio de Janeiro (Jucerja): i) a Brigada Promotora de Crédito e Vendas Ltda. possuía capital social de R$16 mil (fls. 399/400); ii) a Promotora e Divulgadora Sudeste Line Ltda. possuía capital social de R$15 mil (fls. 407/408); e iii) a Centro Oeste Promotora de Crédito Ltda. possuía capital social de R$10 mil (fls. 401/402).

16. Nota-se, no entanto, que o BCSul, em setembro de 2011, aprovou PLCs (i) à Brigada Promotora de Crédito e Vendas Ltda., no valor de R$15.600.000,00 (fl. 3.224); (ii) à Promotora e Divulgadora Sudeste Line Ltda., no valor de R$30.490.000,00 (fl. 4.242); e (iii) à Centro Oeste Promotora de Crédito Ltda., no valor de R$2.100.000,00 (fl. 3.754).

17. Observa-se, ainda, que: i) de agosto de 2011 a abril de 2012, a Brigada Promotora de Crédito e Vendas Ltda. realizou operações de crédito no valor líquido de R$7.248.875,00 (CCBs 9216 (fls. 3.396–3.401/3.420), 9571 (fls. 3.513–3.518/3.538) e 9603 (fls. 3.545– 3.550/3.559)); ii) de janeiro de 2011 a abril de 2012, a Promotora e Divulgadora Sudeste Line Ltda. celebrou operações de crédito no montante líquido de R$36.154.403,00 (CCBs 8678 (fls. 4.431–4.436/4.441), 8948 (fl. 4.458), 9150 (fls. 4.508–4.513/4.519), 9395 (fls. 4.554– 4.559/4.568), 9573 (fls. 4.621–4.625/4.632) e 9605 (fls. 4.644–4.650/4.658)); e iii) em setembro de 2011, a Centro Oeste Promotora de Crédito Ltda. realizou operação de crédito no valor líquido de R$2.029.140,00 (CCB 009/10, fl. 3.764). Portanto, a incompatibilidade entre o capital social dos tomadores de crédito e os valores das PLCs e das contratações demonstra que as operações em tela foram celebradas em inobservância ao princípio da seletividade.

18. Consigne-se que o fato de os clientes envolvidos nas operações apontadas nas peças acusatórias não possuírem histórico de inadimplência ou terem operações de longa data com o BCSul, seja na qualidade de investidores, seja na de tomadores de crédito ou acionistas da Instituição, não tem o condão de afastar os ilícitos administrativos descritos nas intimações, haja vista que os antecedentes evocados não desobrigam os indiciados do cumprimento das normas vigentes à época da realização das contratações que ensejaram a instauração deste processo.

Fls-397

Decap/Gabin Denise 2.388.380-4 | rubrica | Fl. 7453

**BANCO CENTRAL DO BRASIL**

4047

19. Constata-se, também, que nas CCBs 8579, 8618, 8676, 9146, 9216, 9394, 9571 e 9603 (emitidas pela Brigada Promotora de Crédito e Vendas Ltda.),7894, 8005, 8091, 8150, 8270, 8678, 8948, 9150, 9262, 9395, 9573 e 9605 (emitidas pela Promotora e Divulgadora Sudeste Line Ltda.), 009/10 e 9301 (emitidas pela Centro Oeste Promotora de Crédito Ltda.), 9222 e 9229 (emitidas por Amadeu Simões Lopes Azambuja), 8101, 8102, 8103, 8237, 8238, 8239, 8240, 8241, 8242, 8243, 8244, 8245, 8726, 9149 e 9422 (emitidas pela Associação dos Músicos Militares do Brasil – Ambra), 9155, 9263, 9397, 9404, 9572 e 9606 (emitidas pela Prevserv Operadora de Serviços Ltda.), e 9154, 9264, 9398, 9575 e 9604 (emitidas pela Neue Welt Comércio Ltda.), no campo próprio reservado ao apontamento da garantia, consta a anotação da expressão "não há", ficando, pois, caracterizada a inobservância ao princípio da garantia e afastadas as alegações dos defendentes em sentido contrário.

20. As informações contidas nas Tabelas 3 a 9 demonstram ainda que diversas CCBs emitidas pelos clientes apresentados na Tabela 1 foram liquidadas a partir de recursos oriundos de novas emissões de CCBs, evidenciando o congelamento de operações.

**Tabela 3 – Brigada Promotora de Crédito e Vendas Ltda. – Operações Liquidadas/Amortizadas a partir das CCBs 9216, 9571 e 9603**

R$

| Operação Liberada | | | | Operação Liquidada/Amortizada | | | |
|---|---|---|---|---|---|---|---|
| CCB | Data | Fls. | Valor | CCB | Data | Fls. | Valor |
| 9216 | 29.8.2011 | 3.396–3.401/ 3.420 | 1.582.111,23 | 8579 | 29.8.2011 | 3.278–3.283/3.422 | 556.684,90 |
| | | | | 8618 | 29.8.2011 | 3.306–3.311/3.422 | 1.025.426,33 |
| | | | | Total | | | 1.582.111,23 |
| 9571 | 30.3.2012 | 3.513–3.518/ 3.538 | 5.244.077,98 | 8579 | 30.3.2012 | 3.278–3.283/3.539 | 2.108.624,24 |
| | | | | 8618 | 30.3.2012 | 3.306–3.311/3.539 | 497.841,75 |
| | | | | 8676 | 30.3.2012 | 3.328–3.333/3.539 | 652.350,75 |
| | | | | 9146 | 30.3.2012 | 3.347–3.352/3.539 | 975.316,77 |
| | | | | 9216 | 30.3.2012 | 3.396–3.401/3.539 | 368.002,35 |
| | | | | 9394 | 30.3.2012 | 3.477–3.482/3.539 | 641.942,12 |
| | | | | Total | | | 5.244.077,98 |
| 9603 | 30.4.2012 | 3.545–3.550/ 3.559 | 422.685,44 | 9146 | 30.4.2012 | 3.347–3.352/3.560 | 303.580,88 |
| | | | | 9216 | 30.4.2012 | 3.560/3.396–3.401 | 119.104,56 |
| | | | | Total | | | 422.685,44 |
| Total | | | 7.248.874,65 | | | | 7.248.874,65 |

**Tabela 4 – Promotora e Divulgadora Sudeste Line Ltda. – Operações Liquidadas/Amortizadas a partir das CCBs 8678, 9150, 9395, 9573 e 9605**

R$

| Operação Liberada | | | | Operação Liquidada/Amortizada | | | |
|---|---|---|---|---|---|---|---|
| CCB | Data | Fls. | Valor | CCB | Data | Fls. | Valor |
| 8678 | 24.1.2011 | 4.431–4.436/ 4.441 | 5.329.220,31 | 8005 | 24.1.2011 | 4.303–4.308/4.457 | 1.885.454,24 |
| | | | | 8091 | 24.1.2011 | 4.338–4.343/4.457 | 1.908.233,42 |
| | | | | 8150 | 24.1.2011 | 4.508–4.503/4.457 | 1.535.532,65 |
| | | | | Total | | | 5.329.220,31 |
| 9150 | 18.7.2011 | 4.508–4.513/ 4.519 | 2.317.408,80 | 8091 | 18.7.2011 | 4.338–4.343/4.523 | 362.606,09 |
| | | | | 8150 | 18.7.2011 | 4.349–4.354/4.523 | 576.988,16 |
| | | | | 8270 | 18.7.2011 | 4.384–4.389/4.523 | 469.009,20 |
| | | | | 8948 | 18.7.2011 | 4.458–4.463/4.523 | 908.804,48 |
| | | | | Total | | | 2.317.407,93 |



BANCO CENTRAL DO BRASIL

| Operação Liberada | | | | Operação Liquidada/Amortizada | | | |
|---|---|---|---|---|---|---|---|
| CCB | Data | Fls. | Valor | CCB | Data | Fls. | Valor |
| 9395 | 7.12.2011 | 4.554–4.559/ 4.568 | 1.325.323,53 | 9262 | 7.12.2011 | 4.525–4.530/4.561 | 1.325.323,53 |
| 9573 | 30.3.2012 | 4.621–4.625/ 4.632 | 4.806.467,67 | 8678 | 30.3.2012 | 4.431–4.436/4.633 | 1.510.534,45 |
| | | | | 9150 | 30.3.2012 | 4.508–4.513/4.633 | 490.925,18 |
| | | | | 9262 | 30.3.2012 | 4.525–4.530/4.633 | 2.085.496,09 |
| | | | | 9395 | 30.3.2012 | 4.554–4.559/4.633 | 719.511,95 |
| | | | | Total | | | 4.806.467,67 |
| 9605 | 30.4.2012 | 4.644–4.650/ 4.658 | 7.212.356,24 | 8678 | 30.4.2012 | 4.431–4.436/4.661 | 827.887,75 |
| | | | | 9150 | 30.4.2012 | 4.508–4.513/4.661 | 152.807,29 |
| | | | | 9395 | 30.4.2012 | 4.554–4.559/4.661 | 231.660,21 |
| | | | | Total | | | 1.212.355,25 1/ |
| Total | | | 20.990.776,55 | | | | 14.990.775,69 1/ |

1/ A diferença de R$6.000.000,00 foi aplicada no fundo FIP BCSul Verax Cinco Platinum.

**Tabela 5 – Amadeu Simões Lopes Azambuja – Operações Originadas a partir da CCB 9229**

R$

| Operação Liberada | | | | Operação Liquidada | | | |
|---|---|---|---|---|---|---|---|
| CCB | Data | Fls. | Valor | CCB | Data | Fls. | Valor |
| 9229 | 5.9.2011 | 1.892–1.897/ 1.909 | 5.255.680,12 | 9222 | 5.9.2011 | 1.908/2.126–2.131 | 5.255.680,12 |
| Total | | | 5.255.680,12 | | | | 5.255.680,12 |

**Tabela 6 – Sr. Afonso Cesar Boabaid Burlamaqui – Operações Liquidadas/Amortizadas a partir das CCBs 8629, 9576 e 9618[1/] e de Transferência para a Conta 1817-4**

R$

| Operação Liberada | | | | Operação Liquidada/Amortizada | | | |
|---|---|---|---|---|---|---|---|
| CCB | Data | Fls. | Valor | CCB | Data | Fls. | Valor |
| 8629 | 28.12.2010 | 736–742/ 784 | 1.540.000,00 | 8268 | 28.12.2010 | 1.016/1.402–1.407 | 1.254.672,25 |
| 9576 | 30.3.2012 | 1.611 | 7.852.108,73 | 8615 | 30.3.2012 | 707–712/1.607 | 3.575.244,61 |
| | | | | 9152 | 30.3.2012 | 1.005 | 4.276.864,12 |
| | | | | Total | | | 7.852.108,73 |
| 9618 1/ | 15.5.2012 | 1.313–1.323 | 3.998.177,67 | 9576 | 15.5.2012 | 1.323/1.611 | 8.198.177,67 |
| | 15.5.2012 | 1.323 | 4.200.000,00 | | | | |
| Total | | | 8.198.177,67 | | | | |
| Total | | | 17.590.286,40 | | | | 17.304.958,65 |

1/ Transferência para a conta corrente 1817-4

**Tabela 7 – Associação dos Músicos Militares do Brasil – Ambra – Operações Liquidadas/Amortizadas a partir de das CCBs 8237, 8238, 8239, 8240, 8241, 8242, 8243, 8244, 8245, 9149 e 9422**

R$

| Operação Liberada | | | | Operação Liquidada/Amortizada | | | |
|---|---|---|---|---|---|---|---|
| CCB | Data | Fls. | Valor | CCB | Data | Fls. | Valor |
| 8237 | 28.7.2010 | 2.738–2.742 | 1.003.676,53 | 1/ | 28.7.2010 | 3.073/3.074/3.116 | 4.929.897,78 |
| 8238 | 28.7.2010 | 2.743–2.748 | 1.003.676,43 | | | | |
| 8239 | 28.7.2010 | 2.749–2.754 | 1.003.676,53 | | | | |
| 8240 | 28.7.2010 | 2.755–2.759 | 500.000,00 | | | | |
| 8241 | 28.7.2010 | 2.760–2.765 | 501.838,27 | | | | |
| 8242 | 28.7.2010 | 2.766–2.771 | 401.471,62 | | | | |
| 8243 | 28.7.2010 | 2.772–2.776 | 300.000,00 | | | | |
| 8244 | 28.7.2010 | 2.777–2.781 | 200.000,00 | | | | |
| 8245 | 28.7.2010 | 2.782–2.786 | 100.000,00 | | | | |
| Total | | | 5.014.339,38 | | | | 4.929.897,78 |

Decap/Gabin Denise 2.388.380-4 | rubrica | Fl. 7454

BANCO CENTRAL DO BRASIL

| Operação Liberada | | | | Operação Liquidada/Amortizada | | | |
|---|---|---|---|---|---|---|---|
| CCB | Data | Fls. | Valor | CCB | Data | Fls. | Valor |
| 9149 | 18.7.2011 | 2.844–2.849/2.859 | 13.142.353,21 | 6819 | 18.7.2011 | 2.852 | 4.974.520,86 |
| | | | | 7556 | 18.7.2011 | 2.852 | 280.436,83 |
| | | | | 7557 | 18.7.2011 | 2.852 | 280.436,82 |
| | | | | 7558 | 18.7.2011 | 2.852 | 280.436,62 |
| | | | | 8101 | 18.7.2011 | 2.723–2.727/2.852 | 1.325.632,32 |
| | | | | 8102 | 18.7.2011 | 2.728–2.732/2.852 | 1.166.042,45 |
| | | | | 8103 | 18.7.2011 | 2.733–2.737/2.852 | 583.157,85 |
| | | | | 8726 | 18.7.2011 | 2.827–2.832/2.852 | 4.251.687,44 |
| | | | | Total | | | 13.142.351,19 |
| 9422 | 21.12.2011 | 2.892–2.897/2.906 | 4.415.557,50 | 2/ | 21.12.2011 | 2.908 | 4.415.557,50 |
| Total | | | 22.572.250,09 | | | | 22.487.806,47 |

1/ O crédito liberado foi utilizado para abater o saldo devedor da Conta 2188-4

2/ O crédito liberado foi utilizado para cobrir o saldo devedor da Conta 1910-3

**Tabela 8 – Prevserv Operadora de Serviços Ltda. – Operações Liquidadas/Amortizadas a partir das CCBs 9155, 9397, 9572 e 9606**

R$

| Operação Liberada | | | | Operação Liquidada/Amortizada | | | |
|---|---|---|---|---|---|---|---|
| CCB | Data | Fls. | Valor | CCB | Data | Fls. | Valor |
| 9155 | 21.7.2011 | 4.063–4.067/4.074 | 955.968,59 | 1/ | 21.7.2011 | 4.183 | 955.968,59 |
| 9397 | 7.12.2011 | 4.103–4.108/4.117 | 271.895,24 | 9263 | 7.12.2011 | 4.082–4.087/4.119 | 271.895,24 |
| 9572 | 30.3.2012 | 4.139–4.143/4.150 | 9.550.465,40 | 9263 | 30.3.2012 | 4.082–4.087/4.151 | 531.098,57 |
| | | | | 9397 | 30.3.2012 | 4.103–4.108/4.151 | 147.610,64 |
| | | | | 9404 | 30.3.2012 | 4.122–4.127/4.151 | 8.871.756,19 |
| | | | | Total | | | 9.550.465,40 |
| 9606 | 30.4.2012 | 4.159–4.165/4.172 | 11.972.171,07 | 9263 | 30.4.2012 | 4.082–4.087/4.174 | 124.644,88 |
| | | | | 9397 | 30.4.2012 | 4.103–4.108/4.174 | 47.526,19 |
| | | | | Total | | | 172.171,07 2/ |
| Total | | | 22.750.500,30 | | | | 10.950.500,30 |

1/ O crédito liberado foi utilizado para cobrir o saldo devedor da Conta 5021-3

2/ Da diferença de R$11.800.000,00, a importância de R$11.750.000,00 foi aplicada nos fundos FIP BCSul Verax Cinco Platinum e FIP BCSul Verax Equity 1 (fl. 4.174)

**Tabela 9 – Neue Welt Comércio Ltda. – Operações Liquidadas/Amortizadas a Partir de Transferência da Conta 7600-0 e das CCBs 9398, 9575 e 9604 1/**

R$

| Operação Liberada | | | | Operação Liquidada/Amortizada | | | |
|---|---|---|---|---|---|---|---|
| CCB | Data | Fls. | Valor | CCB | Data | Fls. | Valor |
| 9154 | 21.7.2011 | 3.881–3.885/3.894 | 838.662,48 | 1/ | 21.7.2011 | 3.881–3.885/3.894 | 838.662,48 |
| 9575 | 30.3.2012 | 3.923–3.927/3.940 | 699.407,88 | 9264 | 30.3.2012 | 3.889–3.894/3.932 | 547.295,55 |
| | | | | 9398 | 30.3.2012 | 3.920–3.925/3.932 | 152.112,33 |
| | | | | Total | | | 699.407,88 |
| 9604 | 30.4.2012 | 3.942–3.948/3.958 | 11.927.421,78 | 9264 | 30.4.2012 | 3.889–3.894/3.952 | 128.446,20 |
| | | | | 9398 | 30.4.2012 | 3.920–3.925/3.952 | 48.975,58 |
| | | | | Total | | | 177.421,78 2/ |
| Total | | | 13.465.492,14 | | | | 1.715.492,14 |

1/ O crédito liberado foi utilizado para cobrir o saldo devedor da Conta 7600-0

2/ A diferença de R$11.750.000,00 foi aplicada no fundo FIP BCSul Verax Cinco Platinum (fl. 3.952)

21. A respeito, é improcedente o argumento da defesa de que o chamado "rolamento de operações de crédito" é prática comum no mercado e, quando isoladamente considerado, nada



BANCO CENTRAL DO BRASIL

tem de irregular. A Resolução nº 1.559, de 1988, veda às instituições financeiras a realização de operações que não atendam ao princípio da liquidez e a constante contratação de operações com objetivo de liquidar negócios anteriores, de responsabilidade do mesmo cliente, mantendo a situação de endividamento do tomador dos créditos, configura a exposição financeira da Instituição e fere o mencionado princípio.

22. É de se notar que o BCSul cedeu grande parte das CCBs especificadas nas Tabelas 3 a 9 para os fundos Prosper Flex e Multicred (fls. 298–318) logo após a contratação, permanecendo, por outro lado, como responsável pela cobrança e repasse dos fluxos de pagamento dos créditos aos FIDCs. A propósito, a Instituição era detentora de 85,92% das cotas do fundo Multicred, o qual, por sua vez, possuía 98,75% das cotas do fundo Prosper Flex (fls. 4.866–4.908), de forma que referida cessão dos títulos revela mecanismo utilizado pelo BCSul com o objetivo de dificultar a identificação da real situação dos créditos.

23. Em consequência, não prosperam as alegações de que a administração de cada FDIC era totalmente segregada da administração da Instituição (*chinese wall*) – alegações estas reforçadas pelo Sr. Claudio Amadeo Rodriguez, testemunha relacionada pelo Sr. Luis Octávio Azeredo Lopes Índio da Costa, e pelo Sr. Thiago Figueira Rodrigues, testemunha relacionada pelo mesmo indiciado e pela Sra. Maria Luisa Garcia de Mendonça – e de que somente aquela administração poderia implementar os ajustes determinados por este Banco Central do Brasil.

24. Pelo mesmo motivo, não socorrem o Sr. Luis Felippe Índio da Costa ou os demais indiciados as assertivas do Sr. Eliseu Martins, testemunha arrolada pelo mencionado defendente, de que as cotas subordinadas dos FIDCs caracterizam-se como instrumentos financeiros e de que a provisão realizada pela administração do aludido fundo é a que deve ser ajustada, sob pena de incidência de dupla contagem do risco.

25. Por oportuno, saliente-se que o apontamento a FIDCs feito pelas acusações não representou críticas à constituição, em geral, do aludido fundo. Dessa forma, a declaração do Sr. Claudio Amadeo Rodriguez no sentido de que a constituição de FIDC é modo saudável de captar recursos não auxilia os indiciados.

26. Releva observar que as operações de crédito em tela contribuíram para a deterioração da situação econômico-financeira do BCSul, que redundou na decretação do Raet na Instituição, em 4.6.2012 (Ato-Presi nº 1.217). A propósito, o balanço de abertura do aludido regime trouxe ajustes no montante de R$190,1 milhões, correspondentes à constituição de provisão para perdas com as CCBs, que se encontravam nos fundos Prosper Flex e Multicred – com o consequente efeito nas cotas destes – e na própria carteira do BCSul, além de provisão para risco de crédito com fianças bancárias prestadas a alguns dentre os oito clientes apontados nas tabelas supramencionadas (fls. 298/316/318/330/331). Portanto, é improcedente a afirmação feita pelos defendentes de que o BCSul efetuou o provisionamento do risco de crédito nos percentuais determinados por esta Autarquia.

27. A esse respeito, as considerações feitas pelo Sr. Eliseu Martins concernentes aos ajustes mencionados no tópico precedente – nas quais se afirma que os valores correspondentes foram excessivos – não se mostram aptas a descaracterizar a irregularidade em tela, pois, ainda que as provisões determinadas por ocasião da decretação do Raet estejam relacionadas à infração, esta se configura independentemente do montante daquelas.

Decap/Gabin Denise 2.388.380-4 | rubrica | Fl. 7455

BANCO CENTRAL DO BRASIL

28. Saliente-se que o BCSul concedeu fianças bancárias a clientes listados nas Tabelas 3 a 9 – a saber, Promotora e Divulgadora Sudeste Line Ltda., Amadeu Simões Lopes Azambuja, Afonso Cesar Boabaid Burlamaqui e Associação dos Músicos Militares do Brasil (Ambra) (fls. 4.950/4.951) –, fianças estas cujos *ratings* tiveram revisão (com a respectiva provisão para perdas) por parte do administrador do Raet de "AA" para "H", em razão do conjunto fático apresentado pelos citados clientes, conforme consignado nos tópicos anteriores. Nesse sentido, a análise já realizada permite afirmar que a concessão das fianças bancárias em comento inobservaram os princípios da seletividade e garantia, não aproveitando aos indiciados a afirmação do Sr. Eduardo Felix Bianchini de que nenhuma das fianças concedidas aos clientes supramencionados foi honrada.

29. O debate pretendido pelos defendentes de que a simples concessão de fiança não caracteriza a existência de crédito e de que não haveria necessidade de serem provisionados os valores das cartas de garantias emitidas – sendo este último aspecto reforçado pelo Sr. Thiago Figueira Rodrigues – não prospera, uma vez que, no presente caso, os clientes afiançados apresentavam situação econômico-financeira a indicar que havia alta probabilidade de (i) a fiança ser honrada; e (ii) não ser possível à instituição financeira restituir o valor afiançado junto ao cliente. A título de exemplo, note-se que a Promotora e Divulgadora Sudeste Line Ltda. possuía capital social de R$15 mil (fls. 407/408), ao passo que lhe foi concedida fiança no valor de R$13,3 milhões (fl. 4.951).

30. Não procede o argumento de que o montante dos ajustes exigidos por esta Autarquia correspondia a porcentagem ínfima, quando comparado ao total da carteira de *Middle Market*, pois referidos ajustes, levados a termo pelo administrador do Raet, contribuíram, inclusive, para a piora da já comprometida situação econômico-financeira da instituição financeira, a qual resultou na decretação de sua liquidação extrajudicial, em 14.9.2012 (Ato-Presi nº 1.230).

31. Não auxilia as defesas, ainda, a alegação de que o enquadramento de *rating* H dado por este Banco Central do Brasil e pelo FGC às operações da supramencionada carteira é equivocado. Conforme já exposto, as operações explicitadas nas Tabelas 3 a 9, à vista das disposições da Resolução nº 2.682, de 1999, e independentemente da classificação de *rating* efetuada, infringiram aos princípios da seletividade, da garantia e da liquidez.

32. Assim, fica caracterizada a irregularidade "a", que é de natureza grave, uma vez que as operações de crédito em tela contribuíram para a deterioração da situação econômico-financeira do BCSul, causando danos à sua higidez, que redundou na decretação do Raet na Instituição.

33. No que se refere à irregularidade "b", as Tabelas 10 a 17 indicam os clientes emitentes de 63 CCBs com as seguintes características: emissão nos últimos dias do mês; aplicação em FIPs; liquidação no início do mês seguinte; e ausência de assinatura dos emitentes na maioria dos títulos. Frise-se que as peças acusatórias apontaram cinco CCBs (7753 e 9223, emitidas por Brigada Promotora de Créditos e Vendas Ltda., 7754, emitida por Promotora e Divulgadora Sudeste Line Ltda., 9222, emitida por Amadeu Simões Lopes de Azambuja, e 8268, emitida por Afonso Cesar Boabaid Burlamaqui) não incluídas nas mencionadas tabelas, em razão de não constarem documentações suficientes para a análise quanto à procedência da imputação.



BANCO CENTRAL DO BRASIL

**Tabela 10 – CCBs em Nome da Brigada Promotora de Crédito e Vendas Ltda.**

R$

| CCB[1/] | Data do crédito e da transferência para FIPs | Valor | Fls. | Data do resgate e da liquidação da CCB | Valor resgatado dos FIPs | Valor de liquidação da CCB | Fl. |
|---|---|---|---|---|---|---|---|
| 7658 | 28.1.2010 | 4.400.000,00 | 3.564–3.569/3.694 | 2.2.2010 | 4.404.052,99 | 4.422.482,39 | 3.694 |
| 7660 | 28.1.2010 | 12.850.000,00 | 3.581–3.585/3.694 | 2.2.2010 | 12.861.676,07 | 12.915.658,79 | 3.694 |
| 7921 | 31.3.2010 | 17.800.000,00 | 3.602–3.606/3.694 | 5.4.2010 | 17.810.877,56 | 17.884.444,80 | 3.695 |
| 8014 | 30.4.2010 | 15.000.000,00 | 3.615–3.619/3.695 | 4.5.2010 | 15.009.895,01 | 15.071.506,75 | 3.695 |
| 8086 | 31.5.2010 | 15.000.000,00 | 3.633–3.637/3.696 | 2.6.2010 | 15.009.888,54 | 15.070.254,02 | 3.696 |
| Total | | 65.050.000,00 | | | 65.096.390,17 | 65.364.346,75 | |

[1/] Nenhuma das CCBs foi assinada pelo emitente

**Tabela 11 – CCBs em Nome da Promotora e Divulgadora Sudeste Line Ltda.**

R$

| CCB[1/] | Data do crédito e da transferência para FIPs | Valor | Fls. | Data do resgate e da liquidação da CCB | Valor resgatado dos FIPs | Valor de liquidação da CCB | Fls. |
|---|---|---|---|---|---|---|---|
| 7659 | 28.1.2010 | 14.050.000,00 | 4.706–4.711/4.820 | 2.2.2010 | 14.062.766,45 | 14.121.790,36 | 4.820 |
| 7915 | 31.3.2010 | 14.900.000,00 | 4.739–4.744/4.820 | 5.4.2010 | 14.909.105,37 | 14.970.686,94 | 4.820 |
| 8015 | 30.4.2010 | 12.200.000,00 | 4.755–4.759/4.820 | 4.5.2010 | 12.208.137,46 | 12.258.158,83 | 4.820 |
| 8087 | 31.5.2010 | 14.500.000,00 | 4.773–4.777/4.820 | 2.6.2010 | 14.509.559,00 | 14.567.912,22 | 4.820/ 4.821 |
| Total | | 55.650.000,00 | | | 55.689.568,28 | 55.918.548,35 | |

[1/] Nenhuma das CCBs foi assinada pelo emitente

**Tabela 12 – CCBs em Nome de Amadeu Simões Lopes de Azambuja**

R$

| CCB | Data do crédito e da transferência para FIPs | Valor do crédito | Fls. | Data do resgate e da liquidação da CCB | Valor resgatado dos FIPs | Valor de liquidação da CCB | Fls. |
|---|---|---|---|---|---|---|---|
| 7923[1/] | 31.3.2010 | 9.100.000,00 | 1.938–1.942/2.161 | 5.4.2010 | 9.105.483,14 | 9.143.171,21 | 2.161 |
| 8017[1/] | 30.4.2010 | 10.284.000,00 | 1.950–1.954/2.161 | 4.5.2010 | 10.290.859,47 | 10.333.025,02 | 2.162 |
| 8088[1/] | 31.5.2010 | 10.000.000,00 | 1.966–1.970/2.162 | 2.6.2010 | 10.006.661,53 | 10.046.836,02 | 2.162 |
| 8265[1/] | 30.7.2010 | 10.000.000,00 | 1.978–1.982/2.162 | 3.8.2010 | 10.007.556,69 | 10.049.470,10 | 2.162/ 2.163 |
| 8349[1/] | 31.8.2010 | 10.000.000,00 | 1.996–2.000/2.163 | 2.9.2010 | 10.007.462,27 | 10.048.634,20 | 2.163 |
| 8413[1/] | 30.9.2010 | 11.000.000,00 | 2.011–2.015/2.163 | 4.10.2010 | 11.008.303,99 | 11.054.402,74 | 2.164 |
| 8491[1/] | 29.10.2010 | 11.000.000,00 | 2.026–2.030/2.164 | 3.11.2010 | 11.008.210,77 | 11.054.872,16 | 2.164 |

Fls-397

Decap/Gabin
Denise
2.388.380-4
rubrica
Fl. 7456

# BANCO CENTRAL DO BRASIL

405

| CCB | Data do crédito e da transfe-rência para FIPs | Valor do crédito | Fls. | Data do resgate e da liquidação da CCB | Valor resgatado dos FIPs | Valor de liquidação da CCB | Fls. |
|---|---|---|---|---|---|---|---|
| 8571[1] | 30.11.2010 | 10.000.000,00 | 2.046–2.050/2.164 | 2.12.2010 | 10.007.466,66 | 10.048.642,83 | 2.164 |
| 8638[1] | 30.12.2010 | 10.000.000,00 | 2.061–2.065/2.165 | 3.1.2011 | 10.007.471,87 | 10.049.470,10 | 2.165 |
| 8959 | 29.4.2011 | 10.000.000,00 | 2.079–2.083/2.169 | 3.5.2011 | 10.008.423,99 | 10.052.213,23 | 2.169 |
| 9130 | 30.6.2011 | 3.000.000,00 | 2.094–2.098/2.171 | 4.7.2011 | 3.002.558,48 | 3.015.726,74 | 2.171 |
| 9171 | 29.7.2011 | 3.590.000,00 | 2.110–2.114/2.172 | 3.8.2011 | 3.594.685,74 | 3.611.204,35 | 2.172 |
| 9578 | 30.3.2012 | 6.200.000,00 | 2.143–2.147/2.179 | 3.4.2012 | 6.204.205,22 | 6.230.737,90 | 2.179/ 2.180 |
| Total | | 114.174.000,00 | | | 114.259.349,82 | 114.738.406,60 | |

[1] Não foi assinada pelo emitente

**Tabela 13 – CCBs em Nome de Afonso Cesar Boabaid Burlamaqui**

R$

| CCB | Data do crédito e da transfe-rência para FIPs | Valor | Fls. | Data do resgate e da liquidação da CCB | Valor resgatado dos FIPs | Valor de liquidação da CCB | Fls. |
|---|---|---|---|---|---|---|---|
| 7922[1] | 31.3.2010 | 8.900.000,00 | 1.335–1.341/1.587 | 5.4.2010 | 8.905.362,63 | 8.942.222,40 | 1.587 |
| 8012[1] | 30.4.2010 | 16.400.000,00 | 1.348–1.354/1.587 | 4.5.2010 | 16.410.818,55 | 16.478.180,71 | 1.587 |
| 8089[1] | 31.5.2010 | 10.500.000,00 | 1.366–1.372/1.587 | 2.6.2010 | 10.507.003,39 | 10.549.177,81 | 1.587 |
| 8266[1] | 30.7.2010 | 16.000.000,00 | 1.388–1.394/1.587 | 2.8.2010 | 16.006.004,67 | 16.070.743,92 | 1.588 |
| 8350[1] | 31.8.2010 | 16.850.000,00 | 1.414–1.420/1.588 | 1.9.2010 | 16.856.355,15 | 16.923.109,03 | 1.588 |
| 8414[1] | 30.9.2010 | 15.000.000,00 | 1.430–1.436/1.588 | 1.10.2010 | 15.005.582,77 | 15.065.069,27 | 1.588 |
| 8639 | 30.12.2010 | 7.530.000,00 | 1.445–1.451/1.590 | 4.1.2011 | 7.538.501,23 | 7.571.206,92 | 1.590 |
| 8692 | 31.1.2011 | 7.800.000,00 | 1.459–1.465/1.591 | 2.2.2011 | 7.806.097,00 | 7.838.277,95 | 1.591/ 1.592 |
| 8770[1] | 28.2.2011 | 7.800.000,00 | 1.474–1.480/1.593 | 2.3.2011 | 7.805.820,20 | 7.838.287,90 | 1.593 |
| 8958 | 29.4.2011 | 10.000.000,00 | 1.492–1.498/1.595 | 3.5.2011 | 10.008.336,07 | 10.052.213,23 | 1.595 |
| 9045 | 31.5.2011 | 10.000.000,00 | 1.507–1.513/1.596 | 2.6.2011 | 10.008.321,74 | 10.050.536,72 | 1.596 |
| 9131 | 30.6.2011 | 4.000.000,00 | 1.526–1.532/1.597 | 7.7.2011 | 4.003.404,41 | 4.020.968,99 | 1.598 |
| 9172 | 29.7.2011 | 4.790.000,00 | 1.542–1.548/1.599 | 3.8.2011 | 4.796.242,23 | 4.818.292,16 | 1.599 |
| Total | | 135.570.000,00 | | | 135.657.850,04 | 136.218.287,01 | |

[1] Não foi assinada pelo emitente



BANCO CENTRAL DO BRASIL

Tabela 14 – CCBs em Nome da Centro Oeste Promotora de Crédito Ltda.

R$

| CCB[1/] | Data do crédito e da transfe-rência para FIPs | Valor | Fls. | Data do resgate e da liquidação da CCB | Valor resgatado dos FIPs | Valor de liquidação da CCB | Fls. |
|---|---|---|---|---|---|---|---|
| 7919 | 31.3.2010 | 3.500.000,00 | 3.799–3.804/3.818 | 5.4.2010 | 3.502.138,86 | 3.516.604,31 | 3.818 |
| 7920 | 31.3.2010 | 10.500.000,00 | 3.808–3.813/3.818 | 5.4.2010 | 10.506.326,70 | 10.549.812,94 | 3.818 |
| Total | | 14.000.000,00 | | | 14.008.465,56 | 14.066.417,25 | |

[1/] Nenhuma das CCBs foi assinada pelo emitente

Tabela 15 – CCBs em Nome de Álvaro Luiz Alves de Lima Alvares Otero

R$

| CCB | Data do crédito e da transfe-rência para FIPs | Valor | Fls. | Data do resgate e da liquidação da CCB | Valor resgatado dos FIPs | Valor de liquidação da CCB | Fls. |
|---|---|---|---|---|---|---|---|
| 8271[1/] | 30.7.2010 | 15.000.000,00 | 1.679–1.685/1.848 | 2.8.2010 | 15.005.597,43 | 15.066.322,43 | 1.849 |
| 8352[1/] | 31.8.2010 | 15.845.000,00 | 1.694–1.699/1.849 | 1.9.2010 | 15.850.911,41 | 15.913.748,52 | 1.849 |
| 8416[1/] | 30.9.2010 | 16.000.000,00 | 1.708–1.713/1.849 | 1.10.2010 | 16.005.954,96 | 16.069.407,23 | 1.849 |
| 8493[1/] | 29.10.2010 | 16.000.000,00 | 1.723–1.728/1.849 | 3.11.2010 | 16.011.942,93 | 16.079.814,05 | 1.850 |
| 8573[1/] | 30.11.2010 | 16.000.000,00 | 1.735–1.740/1.850 | 2.12.2010 | 16.011.946,64 | 16.077.828,53 | 1.850 |
| 8641 | 30.12.2010 | 16.000.000,00 | 1.756–1.761/1.850 | 3.1.2011 | 16.011.954,99 | 16.079.152,15 | 1.850 |
| 8693[1/] | 31.1.2011 | 16.000.000,00 | 1.769–1.774/1.852 | 2.2.2011 | 16.012.487,57 | 16.078.518,89 | 1.852 |
| 8773[1/] | 28.2.2011 | 13.650.000,00 | 1.785–1.790/1.853 | 2.3.2011 | 13.660.174,45 | 13.717.003,83 | 1.853 |
| 8873 | 31.3.2011 | 11.400.000,00 | 1.799–1.804/1.854 | 4.4.2011 | 11.409.254,46 | 11.457.401,95 | 1.854 |
| 9133 | 30.6.2011 | 9.800.000,00 | 1.817–1.822/1.857 | 4.7.2011 | 9.808.340,78 | 9.851.374,05 | 1.857 |
| 9174 | 29.7.2011 | 11.740.000,00 | 1.834–1.839/1.858 | 3.8.2011 | 11.755.299,32 | 11.809.342,38 | 1.858 |
| Total | | 157.435.000,00 | | | 157.543.864,94 | 158.199.914,01 | |

[1/] Não foi assinada pelo emitente

Tabela 16 – CCBs em Nome de Armando Cesar de Araujo Pereira Burlamaqui

R$

| CCB | Data do crédito e da transfe-rência para FIPs | Valor | Fls. | Data do resgate e da liquidação da CCB | Valor resgatado dos FIPs | Valor de liquidação da CCB | Fls. |
|---|---|---|---|---|---|---|---|
| 7917[1/] | 31.3.2010 | 7.300.000,00 | 2.229–2.234/2.439 | 5.4.2010 | 7.304.398,57 | 7.334.631,85 | 2.439 |
| 8013[1/] | 30.4.2010 | 14.622.000,00 | 2.239–2.244/2.439 | 4.5.2010 | 14.631.752,95 | 14.691.704,78 | 2.439 |
| 8084[1/] | 31.5.2010 | 3.440.000,00 | 2.257–2.262/2.440 | 2.6.2010 | 3.442.267,78 | 3.456.111,58 | 2.440 |
| 8267[1/] | 30.7.2010 | 6.000.000,00 | 2.277–2.283/2.440 | 4.8.2010 | 6.006.725,93 | 6.032.834,20 | 2.440 |

Decap/Gabin Denise 2.388.380-4 rubrica Fl. 7457

BANCO CENTRAL DO BRASIL

| CCB | Data do crédito e da transferência para FIPs | Valor | Fls. | Data do resgate e da liquidação da CCB | Valor resgatado dos FIPs | Valor de liquidação da CCB | Fls. |
|---|---|---|---|---|---|---|---|
| 8351[1] | 31.8.2010 | 6.000.000,00 | 2.291–2.296/2.440 | 3.9.2010 | 6.006.717,94 | 6.032.329,72 | 2.440 |
| 8415[1] | 30.9.2010 | 8.000.000,00 | 2.303–2.308/2.441 | 5.10.2010 | 8.009.036,71 | 8.043.768,49 | 2.441 |
| 8492[1] | 29.10.2010 | 8.500.000,00 | 2.318–2.323/2.441 | 4.11.2010 | 8.509.520,72 | 8.546.866,94 | 2.441 |
| 8572[1] | 30.11.2010 | 10.390.000,00 | 2.331–2.336/2.441 | 3.12.2010 | 10.401.645,73 | 10.445.997,87 | 2.441 |
| 8640 | 30.12.2010 | 10.500.000,00 | 2.345–2.350/2.442 | 4.1.2011 | 10.511.769,47 | 10.557.459,85 | 2.442 |
| 8960 | 29.4.2011 | 12.200.000,00 | 2.358–2.363/2.445 | 3.5.2011 | 12.210.170,00 | 12.263.700,14 | 2.445 |
| 9044 | 31.5.2011 | 12.200.000,00 | 2.373–2.378/2.446 | 2.6.2011 | 12.210.152,52 | 12.261.654,81 | 2.446 |
| 9132 | 30.6.2011 | 6.000.000,00 | 2.392–2.397/2.448 | 4.7.2011 | 6.005.106,61 | 6.031.453,50 | 2.448 |
| 9173 | 29.7.2011 | 7.180.000,00 | 2.407–2.412/2.449 | 3.8.2011 | 7.189.356,83 | 7.222.408,71 | 2.449 |
| Total | | 112.332.000,00 | | | 112.438.621,76 | 112.920.922,44 | |

[1] Não foi assinada pelo emitente

**Tabela 17 – CCBs em Nome de Armando José Andrade de Carvalho**

R$

| CCB[1] | Data do crédito e da transferência para FIPs | Valor | Fls. | Data do resgate e da liquidação da CCB | Valor resgatado dos FIPs | Valor de liquidação da CCB | Fls. |
|---|---|---|---|---|---|---|---|
| 8272 | 30.7.2010 | 10.000.000,00 | 2.468–2.473/2.501 | 4.8.2010 | 10.011.209,88 | 10.054.723,67 | 2.501 |
| 8353 | 31.8.2010 | 10.000.000,00 | 2.487–2.492/2.501 | 3.9.2010 | 10.011.196,55 | 10.053.882,88 | 2.501 |
| Total | | 20.000.000,00 | | | 20.022.406,43 | 20.108.605,55 | |

[1] Nenhuma das CCBs foi assinada pelo emitente

34. As informações contidas nas Tabelas 10 a 17 vão ao encontro do depoimento do Sr. Élcio Leopoldino à Comissão de Inquérito referente à liquidação extrajudicial do BCSul, no qual se revela a existência de um "mercado secundário" de compra e venda de cotas dos fundos FIP BCSul Verax Cinco Platinum e FIP BCSul Verax Equity 1. Com efeito, em razão da impossibilidade de resgate das aplicações antes do vencimento do fundo, implementou-se o referido mercado secundário, visando a possibilitar a saída de cotistas e a entrada de novos aplicadores antes do aludido prazo.

35. A mencionada sistemática foi operacionalizada por meio da aquisição de cotas dos FIPs pela Cruzeiro do Sul DTVM e pela Cruzeiro do Sul CVM, as quais compravam/vendiam as citadas cotas dos/para investidores que desejavam vendê-las/comprá-las. Ainda de acordo com o depoimento supracitado, por determinação do Sr. Luis Felipe Índio da Costa, nenhuma cota dos FIPs podia estar em poder da Cruzeiro do Sul DTVM ou da Cruzeiro do Sul CVM no último dia de cada mês.

36. Em razão de tal determinação, o Sr. Élcio Leopoldino transmitia, ao final de cada mês, mensagem eletrônica endereçada à área de processamento de operações no atacado do BCSul com informações a respeito da situação das cotas detidas pela Cruzeiro do Sul DTVM e pela Cruzeiro do Sul CVM. Com base em tais informações, definiam-se os "aplicadores" (os emitentes das CCBs enumeradas nas Tabelas 10 a 17) que "comprariam" aquelas cotas (com recursos provenientes daquelas CCBs) e os respectivos valores. No início do mês seguinte, verificava-se o fluxo inverso, qual seja, as cotas eram "vendidas" por aqueles "aplicadores", os quais utilizavam os valores obtidos para liquidar as CCBs.

37. Tome-se, a título de exemplo, a CCB 8014, emitida em nome da Brigada Promotora de Crédito e Vendas Ltda., em 30.4.2010, no valor de R$15.000.000,00 (Tabela 10): identificam-se diversas mensagens eletrônicas com o assunto "FIP's – necessidade de aporte de recursos (30/04/2010)" (fls. 3.627–3.630) em que são tratadas questões a respeito do total de cotas dos FIPs detidas pela Cruzeiro do Sul DTVM e pela Cruzeiro do Sul CVM (fl. 3.630) e os "aplicadores" (emitentes de CCBs) – entre eles, a Brigada Promotora de Crédito e Vendas Ltda. (fl. 3.629) – que atenderiam à necessidade de aquelas não constarem como cotistas dos fundos no último dia de abril de 2010.

38. Cumpre salientar que as operações em tela eram destituídas de fundamento econômico, pois geraram perdas para os "aplicadores" – a Brigada Promotora de Crédito e Vendas Ltda. obteve, somente na operação relatada, prejuízo de R$61.611,74. Nesse sentido, apresentam-se, na Tabela 18, os resultados negativos obtidos pelos "aplicadores" dos FIPs:

**Tabela 18 – Demonstração do Prejuízo por Cliente[1/]**

R$

| Cliente | Quantidade de operações | Valor total das operações (R$) | Prejuízo (R$) |
|---|---|---|---|
| Brigada Promotora de Crédito e Vendas. Ltda. | 5 | 65.050.000,00 | 267.956,58 |
| Promotora e Divulgadora Sudeste Line Ltda. | 4 | 55.650.000,00 | 228.980,70 |
| Amadeu Simões Lopes Azambuja | 13 | 114.174.000,00 | 479.056,78 |
| Afonso César Boabaid Burlamaqui | 13 | 135.570.000,00 | 560.436,97 |
| Centro Oeste Promotora de Crédito Ltda. | 2 | 14.000.000,00 | 57.951,69 |
| Álvaro Luiz Alves de Lima Alvares Otero | 11 | 157.435.000,00 | 656.049,07 |
| Armando César de Araújo Pereira Burlamaqui | 13 | 112.332.000,00 | 482.300,68 |
| Armando José Andrade de Carvalho | 2 | 20.000.000,00 | 86.199,12 |

[1/]Prejuízo resultante da diferença entre o valor de liquidação das operações de crédito contratadas por cada cliente e o valor resgatado dos fundos

39. Além disso, é de se ressaltar que as CCBs em comento possuíam prazo de vencimento destacadamente curto (de um a três dias úteis, contados de sua emissão), o que não é usual no mercado financeiro, consistindo em elemento que se alia à falta de fundamento econômico das operações (conforme analisado no item precedente) a dar suporte aos fatos trazidos à Comissão de Inquérito do BCSul pelo Sr. Élcio Leopoldino. Em consequência, configurada a simulação de operações de crédito com pessoas interpostas, são improcedentes as alegações dos defendentes de que não tinham acesso à contabilidade dos clientes para poderem concluir qual resultado decorreria do negócio.

40. No tocante ao argumento do Sr. Fábio Caramuru Corrêa Meyer de que o BCSul não realizou operações simuladas porque "não se simula o que é, nem o que existe", cabe lembrar o conceito jurídico de simulação, contido no art. 167, § 1°, do Código Civil, de que há simulação nos negócios jurídicos quando estes aparentarem conferir ou transmitir direitos a pessoas diversas daquelas às quais realmente se conferem ou transmitem. No presente caso, a



BANCO CENTRAL DO BRASIL

simulação ficou comprovada pela demonstração de que os "aplicadores" não tinham como objetivo tomar crédito da instituição financeira, tampouco realizar investimentos em FIP, mas serviram somente como pessoas interpostas, com intuito de atender às necessidades da Cruzeiro do Sul DTVM e da Cruzeiro do Sul CVM.

41. Consigne-se que a alegação defensória de que não houve atraso no pagamento de nenhuma das CCBs enumeradas nas Tabelas 10 a 17 não afasta a irregularidade imputada, pois a acusação não versa sobre eventual inadimplemento dos títulos, mas a respeito do uso destes para instrumentalizar operações simuladas.

42. As afirmações dos defendentes de que não se beneficiaram das operações apontadas na intimação e de que os prejuízos foram suportados pelos próprios clientes, e não pelo BCSul, também não têm o condão de descaracterizar a infração em comento, pois a simulação de operações de crédito com pessoas interpostas não se configura pela identificação dos eventuais beneficiários das contratações irregulares ou dos que sofreram perdas advindas destas.

43. Por oportuno, frise-se que procedem as alegações defensórias e as declarações feitas pelo Sr. Thiago Figueira Fernandes de que as CCBs encontravam-se registradas na Cetip (nesse sentido, vide, por exemplo, a documentação relativa à CCB 8641, às fls. 1.756–1.762) e de que houve dificuldades na gestão de documentos e de equipamentos de informática após a decretação do Raet na Instituição Financeira, conforme se pode notar, inclusive, do depoimento do Sr. Eduardo Felix Bianchini (fls. 7.283–7.286).

44. Tais aspectos, aliados à documentação complementar apresentada (fls. 7.320–7.361, 7.389–7.395), permitem concluir que se deve afastar a imputação relativa à inobservância ao art. 29 da Lei nº 10.931, de 2004, ficando, assim, prejudicado o pedido feito pelo Sr. Luis Octávio Azeredo Lopes Índio da Costa e pela Sra. Maria Luisa Garcia de Mendonça para que esta Autarquia oficie à Cetip. No entanto, mencionado afastamento de imputação não elide a caracterização da irregularidade em comento, em vista dos fundamentos já expostos.

45. Assim, fica caracterizada a irregularidade "b", que é de natureza grave, pois os indiciados contribuíram para gerar indisciplina no mercado financeiro e afetaram o regular funcionamento do Sistema Financeiro Nacional.

46. Com relação à irregularidade "c", registre-se que, nos termos do art. 13, inciso I, da Circular nº 3.461, de 2009, era dever do BCSul realizar a comunicação ao Coaf relativa a operações realizadas ou serviços prestados cujo valor fosse igual ou superior a R$10.000,00 e que, considerando as partes envolvidas, os valores, as formas de realização, os instrumentos utilizados ou a falta de fundamento econômico ou legal, pudessem configurar a existência de indícios dos crimes previstos na Lei nº 9.613, de 1998.

47. Nesse sentido, note-se que as contratações apontadas na irregularidade "b", no valor total de R$674.211.000,00, revestiam-se de elementos suficientes a motivar a comunicação supramencionada, vez que, conforme já salientado na análise da aludida infração, tinham valor superior a R$10.000,00 e, além disso, apresentavam pelo menos uma das seguintes características: (a) carência de fundamento econômico; ou (b) capacidade financeira do tomador do crédito incompatível com o valor da operação (a característica "a" está presente em todas as operações constantes das Tabelas 10 a 17 e a característica "b" está presente nas operações



BANCO CENTRAL DO BRASIL

relacionadas à Brigada Promotora de Créditos e Vendas Ltda., à Promotora e Divulgadora Sudeste Line Ltda. e à Centro Oeste Promotora de Crédito Ltda., Tabelas 10, 11 e 14, respectivamente).

48. Verificou-se, no entanto, que, a despeito de apresentarem as apontadas características, as operações em questão não foram comunicadas ao Coaf, conforme demonstram as consultas ao referido conselho (fls. 5.069–5.078).

49. Destaque-se que, à época dos fatos, a Lei nº 9.613, de 1998, contemplava os crimes contra o Sistema Financeiro Nacional entre os antecedentes até então necessários à caracterização do delito de lavagem de dinheiro, de forma que não prosperam as alegações da Sra. Maria Luisa Garcia de Mendonça e do Sr. Luis Felippe Índio da Costa de que não tinham a obrigação de comunicar essas operações ao Coaf. Além disso, o art. 13, inciso I, da Circular nº 3.461, de 2009, exige somente o indício de crime como critério a ensejar comunicação ao Coaf, diversamente do que buscam fazer valer os defendentes, que sustentam a necessidade da caracterização inequívoca de crime para tal fim.

50. Não aproveitam ao Sr. Luis Felippe Índio da Costa as afirmações trazidas pelo Sr. Jair Camilo, pois seu testemunho traz unicamente a especificação dos serviços de treinamento e consultoria prestados pela empresa da qual é sócio. A despeito da prestação dos mencionados serviços de treinamento e consultoria, a infração consistente na não comunicação das operações especificadas no item 47 ao Coaf está devidamente demonstrada.

51. Cumpre salientar que a conduta do indiciado deve dirigir-se primariamente pelos termos da lei e não lhe cabe reportar-se às afirmativas da G5 para afastar a caracterização do ilícito em tela, especialmente no que tange (i) à possibilidade de ficar a critério do defendente a comunicação, ou não, ao Coaf; (ii) aos critérios para se estabelecer o tratamento, ou não, de um indício serem meramente subjetivos; e (iii) ao fato de a instituição financeira somente promover comunicações de operações na existência de dados "bem concretos e palpáveis".

52. Observe-se, por fim, que cabe ao indiciado em processo administrativo punitivo se defender dos fatos que lhe são imputados e não da respectiva qualificação jurídica, nela incluída a sanção aplicável. Assim, deve o acusado apresentar sua contestação acerca dos fatos considerados irregulares narrados na peça inicial e, encontrando-se esses adequadamente descritos não há que se falar em qualquer prejuízo ao direito de exercício da ampla defesa pelos intimados, não obstante a ausência, na peça inicial, do art. 12 da Lei nº 9.613, de 1998, em relação à cominação da pena decorrente da irregularidade "c", a qual foi adequadamente capitulada na mesma lei.

53. Portanto, fica caraterizada a irregularidade "c", que é de natureza grave, tratando-se de prática sistemática e reiterada e tendo em vista os aspectos que envolveram as operações, especialmente no que concerne (i) aos valores envolvidos; (ii) à ausência de fundamento econômico; e (iii) à incompatibilidade entre a capacidade financeira dos titulares das transações e o valor destas; aspectos estes que exigiam especial atenção dos indiciados, com vistas a evitar que as operações fossem utilizadas para os ilícitos previstos na Lei nº 9.613, de 1998.

54. Do cotejo entre os registros desta Autarquia e as razões apresentadas pelos indiciados, considerando os respectivos períodos de mandatos, conforme informações extraídas dos sistemas deste Banco Central do Brasil, constata-se o seguinte:

Decap/Gabin Denise 2.388.380-4 | rubrica | Fl. 7459

BANCO CENTRAL DO BRASIL

54.1 Sr. Luis Felippe Índio da Costa: Diretor de Relações com Investidores, de 23.4.2007 a 4.1.2012, Diretor responsável pelo Gerenciamento de Risco de Crédito, de 30.10.2009 a 31.1.2011, e Diretor responsável pela implementação e cumprimento das medidas estabelecidas na Circular nº 3.461, de 2009, de 24.7.2009 a 30.1.2011 (fls. 4.953–4.956):

- das operações relativas à irregularidade "a", aprovou a CCB 9422 (fl. 2.903) e, além disso, todas as operações explicitadas nas Tabelas 3 a 10 ocorreram no período em que ocupava o cargo de Diretor responsável pelo Gerenciamento de Risco de Crédito;
- durante esse mesmo período, ocorreram 52 das 63 contratações discriminadas na irregularidade "b";
- no tocante à irregularidade "c", verifica-se que seu mandato como Diretor responsável pela implementação e cumprimento das medidas estabelecidas na Circular nº 3.461, de 2009, estendeu-se pelo período correspondente àquele em que foram celebradas 44 das 63 operações indicadas no item 47, no valor total de R$506.861.000,00;
- destarte, fica caracterizada a sua responsabilidade pelas irregularidades "a", "b" e "c".

54.2 Sra. Maria Luisa Garcia de Mendonça: Diretora, de 23.4.2007 a 4.6.2012, e responsável, nesse mesmo período, pela Contabilidade, pelo Cadastro de Clientes do Sistema Financeiro Nacional e pelo Gerenciamento de Risco Operacional, além de ter sido responsável pelo Gerenciamento de Risco de Crédito (fl. 4.960) e pelo cumprimento das medidas estabelecidas na Circular nº 3.461, de 2009, de 31.1.2011 a 4.6.2012:

- das 92 operações de crédito relativas à irregularidade "a", 76 foram levadas a termo no período em que a indiciada ocupava o cargo de Diretora responsável pelo Gerenciamento de Risco de Crédito. Assim, não aproveita à defendente o testemunho da Sra. Maria Isabel Copello da Silveira, pois a depoente, com o objetivo de afastar a responsabilidade da Sra. Maria Luisa Garcia de Mendonça na infração em tela, considerou que a intimada exerceu cargo de diretoria exclusivamente na área de contabilidade do BCSul;
- no tocante à irregularidade "b", a defendente aprovou as três operações instrumentadas pelas CCBs 7658, 7659 e 7660 (fls. 3.570, 3.572, 3.589, 3.601, 4.713 e 4.718), ficando afastadas, portanto, sua alegação de que não pode ser imputada a ela a responsabilidade por qualquer operação, bem como a declaração feita pelo Sr. Thiago Figueira Rodrigues em seu depoimento, segundo o qual a Sra. Maria Luisa Garcia de Mendonça não participava da concessão de crédito *Middle Market*;
- em relação à irregularidade "c", destaque-se que seu mandato como Diretora responsável pela implementação e cumprimento das medidas estabelecidas na Circular nº 3.461, de 2009, estendeu-se pelo período correspondente àquele em que foram celebradas 19 das 63 operações indicadas no item 47, no valor total de R$167.350.000,00;
- note-se que as declarações feitas pelo Sr. Denis Ruiz, testemunha arrolada pela intimada, versam somente a respeito do suposto fato de a Sra. Maria Luisa Garcia de Mendonça jamais ter tratado de assuntos relacionados a fundos, de forma que o aludido testemunho não a socorre, pois a caracterização de sua responsabilidade independe da participação da defendente em decisões e controles relativos a FIDCs e FIPs;



BANCO CENTRAL DO BRASIL

- também não aproveitam à indiciada os testemunhos dos Srs. Ismael Machado de Carvalho Junior e Thiago Figueira Rodrigues, no tocante à irregularidade "c", em vista de somente tecerem considerações a respeito da política de PCLD adotada pelo BCSul e buscarem ressaltar sua suposta qualidade. De fato, a imputação feita não se relaciona a procedimentos, em tese, levados a termo pela instituição financeira no que se refere às previsões da Circular nº 3.461, de 2009, mas a fato concreto em que se apurou a falta de comunicação de 66 operações com indícios de crime previsto na Lei nº 9.613, de 1998;

- a documentação complementar juntada pela indiciada à fl. 6.230 (documentação esta que, no seu entender, conteria prova de que, somente em 29.4.2011, ter-se-ia iniciado o período em que foi responsável pela implementação de medidas estabelecidas pela Circular nº 3.461, de 2009), consiste em tabela sem indicação de autoria, contendo informações de operações e clientes, sem referência alguma à defendente em tela, não se prestando, pois, a afastar a responsabilidade pela irregularidade "c" a ela atribuída;

- os demais documentos juntados pela acusada – compostos por atas de reunião, slides de apresentações, certificados e listas de presença em cursos e eventos relacionados à prevenção à lavagem de dinheiro e relatórios da auditoria interna (fls. 6.223–7.026) – não a socorrem, porquanto não estão relacionados com as ocorrências descritas na peça acusatória;

- dessa forma, está caracterizada a sua responsabilidade nas irregularidades "a", "b" e "c".

54.3 Sr. Luis Octávio Azeredo Índio da Costa: Diretor Superintendente, de 23.4.2007 a 4.6.2012, Diretor de Relações com Investidores, de 10.1.2012 a 4.6.2012, Diretor Vice-Presidente do Conselho de Administração, de 23.4.2007 a 4.1.2012, Presidente do Conselho de Administração, de 10.1.2012 a 4.6.2012, Diretor responsável pelo Gerenciamento de Risco, de 23.4.2007 a 4.6.2012, pela Carteira Comercial, de 23.4.2007 a 4.6.2012, e pela Carteira de Investimento, de 31.1.2011 a 4.6.2012 (fls. 4.957–4.959):

- no período em que atuou em cargos de direção, aprovou sete PLCs relativas aos clientes apontados na irregularidade "a" (fls. 1.887, 1.924, 2.548, 2.959, 3.224, 3.754 e 4.242);

- sendo diretor responsável pelo Gerenciamento de Risco e pela Carteira Comercial no período da irregularidade "b", que se estendeu por mais de dois anos, envolvendo valores expressivos, não poderia deixar de ter ciência das operações simuladas descritas;

- em consequência, fica caracterizada a responsabilidade do Sr. Luis Octávio Azeredo Índio da Costa pelas irregularidades "a" e "b".

54.4 Sr. Fábio Caramuru Corrêa Meyer: Diretor, de 23.4.2007 a 4.6.2012 (fl. 4.961):

- aprovou 25 PLCs atinentes aos clientes especificados nas irregularidades "a" e "b" (fls. 1.644, 1.646, 1.647, 1.648, 1.649, 1.650, 1.651, 1.652, 1.653, 1.887, 1.888, 1.889, 1.890, 1.924, 2.548, 2.621, 2.625, 2.959, 3.224, 3.754, 3.854, 4.242, 4.243, 4.244 e 4.245);

- aprovou as operações relativas às CCBs 8005, 8726, 9154, 9155, 9216, 9228, 9229, 9262, 9263, 9264, 9301, 9394, 9395, 9397, 9404, 9571, 9572, 9573, 9575 e 9603 (fls. 754, 757, 766, 777, 1.898, 1.902, 2.834, 3.403, 3.404, 3.430, 3.435, 3.485, 3.519, 3.521, 3.555,

Ducap/Gabin Denise 2.388.380-4 rubrica Fl 7460

BANCO CENTRAL DO BRASIL

3.792, 3.886, 3.912, 3.928, 3.936, 4.068, 4.096, 4.113, 4.128, 4.129, 4.144, 4.146, 4.310, 4.532, 4.564, 4.626 e 4.629), objeto da irregularidade "a";

- aprovou também as operações pertinentes às CCBs 8265, 8268, 8271, 8272, 8352, 8629, 8692, 8693, 8770, 8773, 9044, 9045, 9578 (fls. 1.409, 1.411, 1.466, 1.467, 1.481, 1.486, 1.518, 1.686, 1.688, 1.703, 1.775, 1.776, 1.791, 1.796, 1.985, 1.987, 2.150, 2.159, 2.382, 2.475 e 2.476), relacionadas à irregularidade "b";

- fica caracterizada, assim, a sua responsabilidade pelas irregularidades "a" e "b".

54.5 Sr. Roberto Vieira da Silva de Oliveira Costa: Diretor, de 7.3.2008 a 4.6.2012 (fl. 4.962):

- aprovou 25 PLCs relativas aos clientes especificados nas irregularidades "a" e "b" (fls. 1.644, 1.646, 1.647, 1.648, 1.649, 1.650, 1.651, 1.652, 1.653, 1.887, 1.888, 1.889, 1.890, 1.924, 2.548, 2.621, 2.625, 2.959, 3.224, 3.754, 3.854, 4.242, 4.243, 4.244 e 4.245);

- aprovou as operações instrumentadas pelas CCBs 8005, 8726, 9146, 9149, 9150, 9152, 9154, 9155, 9216, 9262, 9263, 9264, 9301, 9394, 9395, 9397, 9404, 9571, 9572, 9573, 9575 e 9603 (fls. 754, 757, 766, 777, 1.898, 1.902, 2.834, 3.403, 3.404, 3.430, 3.435, 3.485, 3.519, 3.521, 3.555, 3.792, 3.886, 3.912, 3.928, 3.936, 4.068, 4.096, 4.113, 4.128, 4.129, 4.144, 4.146, 4.310, 4.532, 4.564, 4.626 e 4.629), relacionadas à irregularidade "a";

- aprovou também as contratações concernentes às CCBs 8350, 8352, 8692, 8693, 8770, 8773, 8873, 8958, 8959, 8960, 9044, 9045, 9130, 9131, 9132, 9133, 9171, 9172, 9173, 9174 e 9578 (fls. 1.424, 1.467, 1.488, 1.499, 1.500, 1.514, 1.518, 1.536, 1.551, 1.703, 1.776, 1.798, 1.806, 1.827, 1.841, 2.086, 2.087, 2.104, 2.119, 2.135, 2.158, 2.365, 2.366, 2.380, 2.382, 2.402, 2.415 e 3.650), pertinentes à irregularidade "b";

- improcedente, pois, a alegação de que atuava em área que não lhe permitia ter conhecimento das operações referidas neste processo, ficando caracterizada sua responsabilidade pelas irregularidades "a" e "b".

54.6 Sr. Sérgio Marra Pereira Capella: Diretor, de 23.4.2007 a 4.6.2012 (fl. 4.963):

- aprovou quinze PLCs referentes aos clientes especificados nas irregularidades "a" (fls. 1.887, 1.888, 1.889, 1.890, 2.548, 2.621, 2.625, 2.959, 3.224, 3.754, 3.854, 4.242, 4.243, 4.244 e 4.245), o que afasta suas alegações de que atuava em área alheia às operações relativas à mencionada irregularidade e de que não houve a sua aprovação nas operações objeto da acusação;

- por outro lado, considerando que não era diretor específico responsável por qualquer área relacionada à irregularidade "b" e que não existe comprovação de que tenha participado das ocorrências relativas a essa irregularidade, deve ser afastada a sua responsabilização no tocante a segunda irregularidade;

- caracterizada, pois, a sua responsabilidade pela irregularidade "a".

55. Consigne-se que, em consequência da análise feita, ficam afastadas as argumentações no sentido de que as atribuições dos diretores supracitados não seriam correlatas às operações apontadas na inicial ou de que lhes cabia apenas a definição de diretrizes, sem

BANCO CENTRAL DO BRASIL

ingerência na concretização de negócios específicos, ou, ainda, de que jamais tiveram acesso a qualquer indício de irregularidade.

56. A demonstração da participação de cada indiciado na celebração das operações também afasta o argumento comum a vários deles no sentido de que, como membros do Comitê de Crédito, acreditavam que as diretrizes do referido órgão colegiado eram seguidas pelas áreas operacionais. De fato, conforme se extrai da documentação anexa às defesas, o referido comitê possuía política de análise e aprovação, que deveria ser seguida pelas áreas operacionais do BCSul. No entanto, ficou comprovado que os próprios membros do comitê não zelaram pelo efetivo respeito aos critérios fixados e aprovaram as operações irregulares.

57. No tocante à alegação dos Srs. Luis Felippe Índio da Costa, Roberto Vieira da Silva de Oliveira Costa, Sérgio Marra Pereira Capella e Fábio Caramuru Corrêa Meyer de que a única referência às suas participações na irregularidade "b" foi feita no depoimento prestado pelo funcionário Élcio Leopoldino, cabe ressaltar que a responsabilidade atribuída aos defendentes não decorre exclusivamente do mencionado depoimento, mas da comprovação do que nele foi revelado, da aprovação individual das operações e da responsabilidade decorrente do exercício de cargo de direção no BCSul, o que implica dever de vigilância sobre as operações realizadas no âmbito da instituição financeira administrada.

58. Saliente-se, ainda, que os depoimentos trazidos pelas testemunhas arroladas pelos Srs. Roberto Vieira da Silva de Oliveira Costa e Sérgio Marra Pereira Capella não são aptos a afastar a caracterização da responsabilidade dos indiciados, pois somente mencionam qualidades pessoais dos mesmos – relacionadas à idoneidade e vasto conhecimento do mercado financeiro – e repisam alegações feitas nas defesas, no sentido de que ocupavam cargos com atribuições não ligadas às operações objeto deste feito, alegações estas que, conforme já exposto, revelaram-se improcedentes.

59. Diante de todo o exposto, estando os autos em boa ordem e caracterizadas a concessão e/ou renovação de operações de crédito sem observância dos princípios de seletividade, garantia e liquidez, deixando de constituir os devidos provisionamentos e ajustes nos ativos envolvidos (irregularidade "a"); a simulação de operações de crédito com pessoas interpostas (irregularidade "b"); e a falta de comunicação às autoridades competentes de operações com indícios de crime previsto na Lei nº 9.613, de 1998 (irregularidade "c"); e identificados os responsáveis pelo cometimento dos ilícitos administrativos tratados neste feito, considerando o grau de participação e a responsabilidade de cada um dos intimados no cometimento das falhas apontadas, bem como a gravidade dos ilícitos, que contribuíram para a liquidação extrajudicial do Banco Cruzeiro do Sul S.A., cessada posteriormente em decorrência da decretação da falência da instituição financeira, DECIDO:

– aplicar, cumulativamente, ao Sr. Luis Felippe Índio da Costa, as penas de:

  – INABILITAÇÃO para o exercício de cargos de direção na administração ou gerência em instituições autorizadas a funcionar pelo Banco Central do Brasil pelo prazo de 20 (vinte) anos, sendo 14 (catorze) anos pelas irregularidades "a" e "b", com fundamento no art. 44, § 4º, da Lei nº 4.595, de 1964, e 6 (seis) anos pela irregularidade "c", com fundamento no art. 12, inciso III, § 3º, da Lei nº 9.613, de 1998; e







– MULTA de R$5.068.610,00 (cinco milhões, sessenta e oito mil e seiscentos e dez reais), correspondentes a 1% do valor das operações irregulares, conforme apresentado no item 54.1, pela irregularidade "c", com fundamento no art. 12, inciso II, combinado com o disposto no inciso IV do § 2º do mesmo artigo da Lei nº 9.613, de 1998;

– aplicar, cumulativamente, à Sra. Maria Luisa Garcia de Mendonça, as penas de:

– INABILITAÇÃO para o exercício de cargos de direção na administração ou gerência em instituições autorizadas a funcionar pelo Banco Central do Brasil pelo prazo de 20 (vinte) anos, sendo 14 (catorze) anos pelas irregularidades "a" e "b", com fundamento no art. 44, § 4º, da Lei nº 4.595, de 1964, e 6 (seis) anos pela irregularidade "c", com fundamento no art. 12, inciso III, § 3º, da Lei nº 9.613, de 1998; e

– MULTA de R$1.673.500,00 (um milhão, seiscentos e setenta e três mil e quinhentos reais), correspondentes a 1% do valor das operações irregulares, conforme apresentado no item 54.2, pela irregularidade "c", com fundamento no art. 12, inciso II, combinado com o disposto no inciso IV do § 2º do mesmo artigo da Lei nº 9.613, de 1998;

– aplicar a pena de INABILITAÇÃO para o exercício de cargos de direção na administração ou gerência em instituições autorizadas a funcionar pelo Banco Central do Brasil, com fulcro no § 4º do art. 44 da Lei nº 4.595, de 1964, pelos seguintes prazos:

– 14 (catorze) anos aos Srs. Fábio Caramuru Corrêa Meyer, Luis Octávio Azeredo Lopes Índio da Costa e Roberto Vieira da Silva de Oliveira Costa, pelas irregularidades "a" e "b";

– 7 (sete) anos ao Sr. Sérgio Marra Pereira Capella, pelo cometimento da irregularidade "a";

– ARQUIVAR o processo administrativo para o Sr. Sérgio Marra Pereira Capella, em relação à irregularidade "b", tendo em vista o contido no item 54.6.

60. Comunique-se a decisão aos indiciados, intimando aqueles apenados com multa ao recolhimento devido, no prazo de 15 (quinze) dias, contado da ciência, ressalvado a todos o direito de recurso ao Conselho de Recursos do Sistema Financeiro Nacional, no mesmo período.

Sidnei Corrêa Marques
Diretor