UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:

MASSA FALIDA DO BANCO
CRUZEIRO DO SUL S.A.,                          CASE NO.:14-22974 – LMI
                                               CHAPTER 15
Debtor in a Foreign Proceeding
_____/
LASPRO CONSULTORES LTDA.,
a Brazilian Sociedade Limitada,

        Plaintiff
v.

                                               ADV. CASE NO. 16-1315-LMI

ALINIA CORPORATION, a British
Virgin Islands Company Limited by Shares,
110 CPS, INC., a British Virgin Islands
Company Limited by Shares,

        Defendants.
_____/

**DEFENDANTS' 110 CPS, INC. AND ALINIA CORPORATION MOTION TO ABATE
OR STAY AND FOR PARTIAL SUMMARY JUDGMENT**

        Defendants, 110 CPS, Inc. ("CPS") and Alinia Corporation ("Alinia") (collectively, the

"Defendants"), by and through undersigned counsel and pursuant to Rule 56, Fed. R. Civ. P.,

hereby move the Court to grant partial summary judgment in their favor and against Plaintiff,

Laspro Consultores, Ltda. (the "Plaintiff") on Counts I, II, III, IV, V, XIII, XIV, XV, XVI, XVII, ,

XXV, XXVI, XXVII, XXVIII, XXIX, (the "U.S Avoidance Claims"), on Counts, VI, VII, VIII,

XVIII, XIX, XX, XXX, XXXI and XXXII (the "BVI Aiding and Abetting Claims"), on all claims

relating to the Artwork; and to stay or abate Counts IX, X, XI, XII, XXI, XXII, XXIII, XXIV,

XXXIII, XXXIV, XXXV and XXXVI (the "Brazilian Claims") of Plaintiff's Amended Complaint,

and as grounds therefor say:

## A.    MOTION TO ABATE OR STAY

1.      This cause should be stayed or abated pending the completion of the parallel litigation pending before the Brazilian Bankruptcy Court.  To resolve the issues presented by the allegations of Laspro's Amended Complaint, this Court would have to determine, *inter alia* (a) whether the Debtor's assets were exaggerated by the creation of fake salary loans, rendering the Debtor insolvent; (b) whether  the fake salary loans resulted in the payment of undeserved dividends to Luis Felippe and Luis Octavio Indio da Costa; and (c) whether, if so, these improperly paid dividends can be traced to the purchase of the apartments and art owned by the Defendants herein.

2.      There is no need for this Court to shoulder this task.  More comprehensive parallel claims are pending in the Brazilian Bankruptcy Court (the "Brazilian Litigation") designed to determine, a broad range of complex issues, including but not limited to; (a) whether the Debtor was insolvent at the time it was intervened in June 2012; (b)whether the Debtor's portfolio contained any fake salary loans; (c) whether if so, they were material enough to render the Debtor  insolvent; (d) whether if fake loans existed, Luis Felippe and Luis Octavio Indio da Costa (collectively the "Indio da Costas") were complicit in their creation; or (e) whether, on the other hand, the Debtor's insolvency was caused by the Fundo Garantidor de Creditos (the "FGC") and its executives who served as directors of the Debtor during the Special Temporary Administration of the Debtor which commenced on June 4, 2012; (f) whether the FGC's examination of the Debtor, carried out by IMS complied with Brazilian law and regulation; (g) whether if fake salary loans existed, this resulted in the payment of undeserved dividends to the Indio da Costas; (h) whether the Indio da Costas and the other former officers and directors of the Debtor  are liable for the Debtor's losses; or (i) whether, on the other hand, the FGC and its executives should be held responsible for BCSUL's losses.

3.      Principles of comity require this Court to stay or abate the Brazilian Claims asserted in this instant case, until such time as the Brazilian Bankruptcy Court has completed its adjudication

of the Brazilian Litigation. This will allow the Brazilian Bankruptcy Court to decide issues which accrued in Brazil, pursuant to Brazilian law which are important to the Brazilian system of bank regulation, without the risk of inconsistent rulings from this Court. Until the Brazilian Bankruptcy Court has finally adjudicated the issues presented in the Brazilian Litigation, there will be no final judgment to which this Court can accord comity.

4.      Laspro's Florida case is based on the BACEN Report which is nothing more than an administrative investigation, similar to a police report or an indictment. The BACEN Report is not a final adjudication of the personal liability of the Indio da Costas and, as Laspro's own expert has admitted, remains subject to collateral attack.

5.      As discussed in more detail below, the Brazilian Bankruptcy Court has consolidated the claims brought by the Indio da Costas against the FGC with the Public Prosecutor actions against the Indio da Costas. It is expected that the Brazilian Bankruptcy Court will appoint an independent forensic accounting expert to review the entire situation, including whether or not there were fake loans and whether the equity of the Debtor should have been reduced. The independent expert will make a report on these and other issues to the Brazilian Bankruptcy Court.

6.      In the event that the Indio da Costas are found liable by the Brazilian Bankruptcy Court, it will likely order the forfeiture of their assets to pay creditors of the Debtor's estate. The Indio da Costas' assets would necessarily include the shares they own in the BVI corporations that are the Defendants to the instant action. This will achieve the same object as Laspro seeks in the instant case. At that time, if necessary, the Court can issue any appropriate order to assist the Brazilian Bankruptcy Court in enforcing its final judgment.

7.      Given the identity, and indeed the greater breadth and depth of the issues in the Brazilian Litigation, there is no need for this Court to duplicate the work of the Brazilian Bankruptcy Court. The adjudication of the instant action would be a waste of judicial resources and

cause the parties unnecessary expense. Virtually all of the documentary evidence will have to come from Brazil and is in the Portuguese language, requiring translation at great expense to the parties. In addition, most of the witnesses reside in Brazil and would have to travel here to attend trial. Many of these witnesses are not fluent in English and interpreters would have to be provided to translate their testimony. Experts would have to testify on issues of Brazilian law, unfamiliar to this Court. There is no need for the parties or the Court to go to this trouble and expense when all of the issues will be better resolved by the broader and more comprehensive Brazilian Litigation pending before the Bankruptcy Court in Brazil.

### B.     MOTION FOR PARTIAL SUMMARY JUDGMENT

8.     Defendants are entitled to partial summary judgment on the U. S. Claims since all of them are New York statutory or common law avoidance actions designed to avoid the title of the Defendants to the apartments and artwork that re the subject of the instant case.  A Chapter 15 foreign trustee is specifically prohibited by 11 U.S. C. §1521(a)(7) from obtaining relief available under 11 U.S.C. §§ 522, 544, 545, 548, 550 and 724(a).

9.     The Defendants are also entitled to partial summary judgment on the BVI Claims, which allege that the Defendant, British Virgin Islands corporations aided and abetted Luis Felippe Indio da Costa and Luis Octavio Indio da Costa (collectively the "Indio da Costas"), to convert the Debtor's assets, to commit fraud against the Debtor and to breach their fiduciary duties to the Debtor.  As Andrew Thorp, the Plaintiff's expert on BVI law admitted in deposition, civil claims of aiding and abetting are not recognized by BVI or English law. [1]

---

[1] In the event the Court declines to grant partial summary judgment on the U.S. and BVI Claims, those should be stayed as well until a final judgment, not subject to further appeal has been entered with regard to the Brazilian Litigation.

10.     Defendants are also entitled to a partial summary judgment concerning the artwork since the Plaintiff cannot trace the funds used to purchase it to any BCSUL dividends received by Luis Felippe or Luis Octavio Indio da Costa.

WHEREFORE, Defendants request the Court to stay or abate the Brazilian Claims, until the completion of the Brazilian Litigation; grant partial summary judgment as to the U.S. Claims, the BVI Claims and all claims against the artwork; together with such other and further relief as the Court deems appropriate under the circumstances.

## MEMORANDUM OF LAW

Defendants submit their Memorandum of Law in Support of their Motion for Partial Summary Judgment and to Abate or Stay and in support thereof say:

## I.      INTRODUCTION

The claims asserted in the instant action arise from the management and operations of the Debtor, Banco Cruzeiro do Sul (the "Debtor or "BCSUL"), a Brazilian bank with no presence in the United States, all of which took place in Brazil, subject to Brazilian law and bank regulation. The Brazilian Litigation, designed to determine the causes of and responsibility for the insolvency of BCSUL, is pending in the Second Bankruptcy and Reorganization Court for the State of Sao Paulo (the "Brazilian Bankruptcy Court").  The resolution of the Brazilian Litigation will almost certainly be dispositive of the issues pending in the instant case.  The Brazilian Bankruptcy Court is best positioned to and has the most interest in resolving claims concerning the Debtor, a Brazilian bank, pursuant to Brazilian law and bank regulation, and should be allowed free rein to do so.  Principles of international comity and cooperation, embedded in Chapter 15 of the Bankruptcy Code, require this Court to stand back and await a ruling from the Brazilian Bankruptcy Court.  This will ensure that there is no possibility of inconsistent rulings,

and will allow the Brazilian Bankruptcy Court to resolve issues that are entirely Brazilian in nature.

Many of the claims asserted by Laspro are unavailable anyway as a matter of law. Chapter 15 does not permit a foreign trustee to bring avoidance claims based on United States law. Summary judgment should be entered in favor of the Defendants and against Laspro on the New York avoidance claims, without prejudice to the Plaintiff later bringing appropriate claims based on the ruling of the Brazilian Bankruptcy Court in the Brazilian Litigation.

The Court should also summarily dispose of Laspro's BVI Claims which allege that the Defendant corporations somehow aided and abetted their owners to convert the Debtor's funds, breach their fiduciary duty to the Debtor and commit fraud. As Laspro's own expert admits, these causes of action are not recognized by English or British Virgin Islands law and therefore, fail to state a claim.

Laspro's forensic accounting expert has admitted he has no evidence tracing dividends received by the Indio da Costas to the purchase of the artwork. Since there are no issues of fact to be resolved on this aspect of the case, partial summary judgment should be granted on all claims related to the artwork.

Litigation of the remaining issues in this Court will be a waste of this Court's judicial resources. In order to resolve this case, the court will have to determine whether fake salary loans artificially inflated BCSUL's balance sheet, leading to the payment of undeserved dividends, which must then be traced to the purchase of the New York apartments and artwork. These issues are complex and will require the importation of witnesses and evidence from Brazil. There is not a single party or fact witness who resides in Florida and virtually all of the documentation necessary to prove the issues is in the Portuguese language, located in Brazil and will have to be translated at great expense before being admissible at trial. To add to the

confusion, the Court will have to grapple with unfamiliar concepts of Brazilian law and bank regulation. Why should this Court bother with this when there are broader actions, more inclusive of all the issues currently pending in Brazil? These practical concerns centering on judicial economy, fairness to the parties and deference to the Brazilian Bankruptcy Court, require the Court to stay or abate the remainder of the case until after the Brazilian court has finished its work. Laspro's foray into this Court risks inconsistent results and is a waste of resources for all involved, including the Brazilian Bankruptcy Estate. It would be best to wait and allow the Brazilian Bankruptcy Court to sort this out before taking any further steps in this case.[2]

## II    STATEMENT OF MATERIAL FACTS

### A.    The Players

1.      Plaintiff, "Laspro Consultores Ltda. represented by Oreste Nestor de Souza Laspro ("Laspro" or the "Plaintiff") is the authorized foreign trustee of Brazilian Debtor, Massa Falida de Banco Cruzeiro do Sul." Amended Complaint ¶1 (hereinafter the "Complaint").

2.      Banco Cruzeiro do Sul ("BCSUL" or the "Debtor") was a Brazilian Bank established in 1989. Complaint ¶7.

3.      Defendant, Alinia is a British Virgin Islands corporation. Complaint ¶5.

4.      Defendant, CPS is a British Virgin Islands corporation. Complaint ¶6.

5.      Luis Felippe Indio da Costa ("Luis Felippe") is an individual, resident in Rio de Janeiro, Brazil, and was the majority owner of BCSUL. Luis Felippe is the indirect owner of Alinia.

---

[2] Laspro is hopelessly conflicted and is straddling the issues. Since filing this action, Laspro has joined the Debtor and the Indio da Costas as a plaintiff in the FGC Case, a part of the Brazilian Litigation, which alleges that the FGC and its executives who acted as directors of the Debtor following BACEN's June 2012 intervention of the Debtor, are responsible for the Debtor's losses. Laspro Depo. p.93:9-18. This is totally at odds with Laspro's allegations in the instant case and in the Public Prosecutor actions pending in Brazil, in which Laspro is now the plaintiff, which attempt to place the blame on the Indio da Costas.

6.      Luis Octavio Indio da Costa ("Luis Octavio") is an individual who resides in Sao Paulo, Brazil.  Luis Octavio was a minority owner of BCSUL, is the son of Luis Felippe and is the indirect owner of CPS.

**B.      The Indio da Costas, BCSUL and CC Loans**

7.      BCSUL was purchased by Luis Felippe and his son, Luis Octavio (collectively, the "Indio da Costas") in 1993.  Complaint ¶¶7, 8.

8.      For many years, BCSUL specialized in making consigned credit loans ("CC Loans").  CC Loans are loans to employees of Brazilian federal, state, local and municipal governments and to military and civil pensioners which are repaid by installment payments directly deducted from the borrowers' salaries by the Brazilian institutions that employ or pay them.  Luis Octavio Depo. p. 60:19-20.  CC Loans are regarded as being low risk loans since it is very difficult for Brazilian public servants to lose their jobs.  Luis Felippe Depo p.28:15-20.[3]

9.      BCSUL did not have branches and therefore, was not in a position to originate CC Loans itself.  Almost all of the CC Loans were originated by intermediaries, such as military clubs, civic organizations, banks and other associations in all parts of Brazil.  Luis Felippe testified that BCSUL worked with approximately 400 intermediary institutions across Brazil and had an average of 2.5 million CC Loans in its portfolio.  Luis Felippe Depo. p.20:19-21:5 According to the testimony of Luis Octavio, BCSUL made loans in approximately 2000 Brazilian cities. Luis Octavio Depo. p.93:11-12.  Almost all of these loans were originated by the third party intermediaries.  Luis Felippe Depo. p.39:14-18.

10.      Generally BCSUL performed no individual analysis of the borrowers.  Instead, BCSUL analyzed the public institution that employed the borrower.  Luis Felippe Depo. p. 23:22-24:4, to confirm that the borrower was actually employed by the public entity.  Luis

---

[3] Copies of the deposition transcripts cited to in this Motion and Memorandum have been filed with the Court.

Felippe Depo. p. 25:13-22.  Because many of the intermediaries which generated the loans did not have up to date technology allowing them to access BCSUL's Retaguarda system, the loans generated by these intermediaries did not go through Retaguarda system but were manually inputted into the BCSUL's system by BCSUL employees.  Luis Octavio Depo. p. 93:6-21.

      **C.**      **The Special Temporary Administration**

11.      On June 4, 2012 BCSUL the Central Bank of Brazil ("BACEN") placed BCSUL under the special temporary administration of the Fundo Garantidor de Creditos (the "FGC"). Complaint ¶41.

12.      On June 1, 2012, the FGC hired IMS Tecnologia e Servicos Ltda. to review BCSUL's CC Loan portfolio.  IMS was owned by Felipe Cesarini, a former business partner of Celso Antunes, one of the FGC executives acting as a director of BCSUL during the Special Temporary Administration.

13.      In July 2012, IMS issued its report stating that the assets of BCSUL and various of its funds should be reduced in the amount of R\$1,388,363,016.77.  IMS Report p. 8.  The IMS Report is undated, largely incomprehensible, is not signed and has no (evidentiary) value under Brazilian law.  Luis Octavio Depo. p. 83:6-25.  An English translation of the IMS Report is attached hereto as Exhibit 1.

      **D.**      **The BACEN Report**

13.      The BACEN Report, issued in early 2013, states that: "the results obtained (through the IMS Report) are based on principles and analyses **that do not coincide with the work of the Central Bank of Brazil**.  BACEN Report at 207 (emphasis added).  Nevertheless, the BACEN Report concluded, without any further explanation, that "through these procedures a universe of fictitious operations was identified that were previously unknown, representing 655,483 false operations…"  The Report goes on stating: "Besides these, another 27,164

operations were created based on operations written off as losses…Thus the fictitious operations totaled 682,647 false contracts."  BACEN Report at 207.  The BACEN Report does not explain the method through which the number of allegedly fake loans was determined.

14.     On August 14, 2012 the FGC special temporary administrators published a special opening balance sheet as of June 4, 2012, for BCSUL which stated mainly as a result of the allegedly fake CC Loans BCSUL had negative net equity of R$2.2 billion.  Complaint ¶ 13.

15.     The BACEN Report is an administrative investigatory report, not a final adjudication of personal liability. As Roberto Oliveira, Laspro's expert on Brazilian law conceded, the BACEN Report is subject to collateral attack.  Oliveira Depo. p. 55:7-19

### E.    Liquidation and Bankruptcy

11.     On September 24, 2012, BACEN placed BCSUL into extra-judicial liquidation and appointed Sergio Rodrigues Prates ("Prates") as its liquidator.  Complaint ¶42.

12.     Eduardo Felix Bianchini ("Bianchini") was appointed as liquidator of BCSUL to replace Prates on May 25, 2013.  Complaint ¶43.  Soon after he was appointed, Bianchini fired IMS.  Neither Bianchini, nor his successor, Laspro has been able to locate the originals of the allegedly fake loan contracts.  Luis Octavio Depo. p. 56:2-57:3; 67:5-9.  In fact, former liquidator, Bianchini admitted this in letters sent to the former administrators of BCSUL.  Copies of the letters and English translations thereof are attached hereto as Composite Exhibit 2.

13.     In addition, IMS had used two hundred and thirty of BCSUL's computers and eleven of its servers in its work.  When he fired IMS, Bianchini asked IMS to return the computers and servers.  When the equipment was returned all of the servers and most of the computers had been "reformatted" with all data erased.  Luis Octavio Depo. p. 80:6-81:4. Bianchini has admitted this in a letter which is attached hereto as Exhibit 3.

14.     On February 5, 2015, Bianchini responded to a letter from the Sao Paulo Region of the Federal Police Department which had inquired into the activities of IMS at BCSUL.   In this letter Bianchini explained that IMS had been paid R\$63,075,000.00 for its work[4], but the only work product it had produced was the undated, unsigned IMS Report consisting of a few pages.   An English translation of Bianchini's letter of February 5, 2015 is attached hereto as Exhibit 4.   Subsequently, on July 17, 2018, Laspro confirmed that he had been unable to find an original version of the IMS Report.   An English translation of the July 17 letter is attached hereto as Exhibit 5.

15.     On August 12, 2015, the Brazilian Bankruptcy Court decreed the bankruptcy of BCSUL    Complaint ¶44.   The Brazilian Bankruptcy Court is the forum of the Foreign Main Proceeding.

### F.     The Brazilian Litigation

16.     The Brazilian Litigation, pending in the Brazilian Bankruptcy Court, consists of the following actions: (1) *In Re the Extrajudicial Liquidation of Cruzeiro do Sul Holding Financeira, S. A; Public Prosecutor's Office of the State of Sao Paulo v. Luis Felippe Indio da Costa, Luis Octavio Indio da Costa et al.* Case No. 0031093-21.2013.8.26.01; (2) *In Re the Extrajudicial Liquidation of Banco Cruzeiro do Sul; Public Prosecutor's office of the State of Sao Paulo v. Cruzeiro do Sul Holding Financeira, S.A., Luis Felippe Indio da Costa, Luis Octavio Indio da Costa, et al.* Case No. 0031335-77.2013.8.26.0100   (collectively the "Public Prosecutor Actions"); and (3) the Indio da Costas action against the FGC and the individuals appointed as Special Temporary Administrators of BCSUL, styled: *Luis Felippe Indio da Costa and Luis Octavio Indio da Costa v. Fundo Garantidor de Credito, Celso Antunes, Jose Alfredo Lattaro, Fabio Mentone and Sergio Rodrigues Prates,* Case No. 1117507.8.26.0100.   (the "FGC

---

[4] At the time, this was the equivalent of approximately US\$30 million.

Action"). The Declaration of Rafael Barud Casqueira Pimenta concerning the Brazilian Litigation is attached hereto as Exhibit 6. Copies of the Public Prosecutor Actions and the FGC Action's English translations thereof are attached as exhibits to the Declaration of Rafael Pimenta[5].

17.    The Public Prosecutor Actions were filed in 2013, while the FGC Action was filed in 2015. The Public Prosecutor Actions and the FGC Action have been consolidated for discovery and trial and are pending before the Second Bankruptcy and Reorganization Court of Sao Paulo. See Declaration of Rafael Barud Casqueira Pimenta.

18.    The Brazilian Litigation is designed to determine who is responsible for the insolvency of BCSUL and its holding company. The Public Prosecutor Actions allege that the Indio da Costas and the other former officers and directors of BCSUL and its holding company are liable, while the FGC Action alleges that the FGC and Celso Antunes, Jose Alfredo Lattaro, Fabio Mentone and Sergio Rodrigues Prates, the individuals from the FGC who temporarily administered the Bank are to blame for BCSUL's insolvency. See Declaration of Rafael Barud Casqueira Pimenta and exhibits thereto.

19.    In 2017, the Indio da Costas filed another civil action against the FGC and IMS styled: *Luis Felipe Indio da Costa and Luis Octavio Indio da Costa, v. Fundo Garantidor de Credito and IMS Tecnologie Servicios, Ltda, and IMS Cobranca e Servicios, Ltda.,* Case No 1068262-83.2017.8.26.0100 (the "IMS Action"). The IMS Action is also pending in the Brazilian Bankruptcy Court, but has not been consolidated with the Public Prosecutor Actions and the FGC Action. A copy of the IMS Action's English translation thereof is attached to the Declaration of Rafael Barud Casqueira Pimenta hereto as an exhibit. The IMS Action seeks the

---

[5] Laspro as trustee is now the Plaintiff in the Public Prosecutor Actions.

rescission of the contract retaining IMS to investigate BCSUL's CC Loan portfolio and the return of the approximately R$ 63,000,000.00 it was paid for its "work".

### G. Expert Opinions on Brazilian and BVI Law.

20.      **Andrew Thorp**, Laspro's expert on the law of the British Virgin Islands admitted in deposition that aiding and abetting is not recognized as a civil tort under the law of the British Virgin Islands or under English law.  Thorpe Depo. p. 43:23-15- 45:6-13.

21.      **Roberto Oliveira**[6], Laspro's expert on Brazilian law testified in deposition that the BACEN Report was an administrative adjudication that was presumed valid but was subject to collateral attack at a later time.  Oliveira Depo. p. 55:7-19.  Mr. Oliveira took the position that the Indio da Costas as controlling shareholders of BCSUL were strictly liable for the losses of BCSUL.  Oliveira Depo. p. 79:1-7.   However, Mr. Oliveira later retreated from this position, admitting that under the Brazilian Constitution, nobody "can be deprived of its (sic) property…without due process."  Oliveira Depo. p.93:19-22.  Oliveira conceded that the Public Prosecutor Actions were necessary to prove the conduct of the Indio da Costas was the cause of BCSUL's insolvency.  Oliveira Depo. p. 99:14-19; 100:17-21-101:1.  Mr. Oliveira stated that the shareholders of BCSUL could defend against the Public Prosecutor claims by showing that there were no fake loans.  Oliveira Depo p. 83:1-10.  Mr. Oliveira testified that the Public Prosecutor Actions and the FGC Action, now consolidated before the Brazilian Bankruptcy Court, would, when resolved, decide the issue of causation.  Oliveira Depo. p. 104:19-105:3; 106:6-22.

22.      **Wallace Corbo**, the Defendants' expert on Brazilian law disagreed with some of Mr. Oliveira's opinions.  Mr. Corbo opined that the controlling shareholders of a bankrupt bank were not strictly liable.  Corbo Depo. p. 140: 16-20.  Mr. Corbo opined that instead, the law in

---

[6] Mr. Oliveira is a transactional attorney, specializing in mergers and acquisitions.  Mr. Oliveira has not practiced as a litigation lawyer for many years, has never represented a trustee in bankruptcy, has never represented a bank and has had only one case in bankruptcy court, when he represented a creditor in the Oi Bankruptcy several years ago. Oliveira Depo. p. 140: 15-142:12; 143:23-144:13

question, Article 15 of Law No. 2.321 will hold controlling shareholders jointly and severally liable with the bank's officers and directors only if the officers and directors are found liable. Articles 39 and 40 of law 6.024 require the liability of the officers and directors to be proved on a subjective basis.  Corbo Depo. p. 141:24-142:1.  Mr. Corbo explained that the subjective standard of liability requires proof of "guilt", meaning proof of culpability such as intentional or negligent conduct which caused the damages.  Corbo Depo. p.142:16-24.  Mr. Corbo pointed out that where a statute is silent as to whether it is subject to subjective or objective liability, a Brazilian rule of construction assumes that subjective liability is required.  Corbo Depo. p. 152:2-11.  Mr. Corbo stated that even if a standard of objective liability is applied, it is not strict liability since it is always necessary to show causation, that is, the damages were caused by the conduct of the officers and directors.  Corbo Depo. p. 143:13-19.

23.    Mr. Corbo also addressed whether the Brazilian Bankruptcy Court has jurisdiction over property sought by a Brazilian trustee located outside Brazil, such as the New York apartments and art.  Corbo opined that provided the elements for the application of Article 130 (the Brazilian claw back law) were satisfied, the Brazilian Bankruptcy Court could "issue a decision affirming or ordering the claw back of such assets.  And then the trustee could bring that decision to an American court to seek decision of the assets and the selling of the assets."  Corbo Depo. p. 248:6-17.  Corbo also stated that pursuant to the "universal jurisdiction" of the Brazilian Bankruptcy Court explained in his Report, the Brazilian Bankruptcy Court, not the Florida Bankruptcy Court, should be allowed to decide the question of whether title to the Apartments and Art should be avoided and vested in the Trustee.  Corbo Depo. p.262:2-263:21.

### III.    DISCUSSION

### A.    MOTION TO STAY OR ABATE

### 1.    The Role of a Chapter 15 Court:

This adversary action stems from a Chapter 15 proceeding in which the Foreign Main Proceeding is pending in the Brazilian Bankruptcy Court in Sao Paulo, Brazil. On July 14, 2014, this Court recognized the then pending Brazilian BCSUL liquidation proceedings as a foreign main proceeding and appointed the then liquidator of the Debtor, Eduardo Bianchini as BCSUL's Foreign Representative pursuant to Section 101 of the U.S. Bankruptcy Code (Main Case ECF No. 16)[7] .

Chapter 15 contains no definition of the term "estate" and no estate is created in a Chapter 15 case. In a Chapter 15 case, the U.S. bankruptcy court acts "only in an ancillary role. The goal of the United States Court is to assist the objectives of the foreign proceeding." *In re British American Ins. Co., Ltd.,* 488 B.R. 205 (Bankr. S.D. Fla. 2013). Id. The U.S. court "shall cooperate to the maximum extent possible with a foreign court either directly or through the trustee." 11 U.S.C. §1525(a); and "the court is entitled to communicate directly with or to request information or assistance directly from, a foreign court or a foreign representative…" 11 U.S.C. §1525(b).

Chapter 15 is designed to provide U.S. Courts with "broad flexible rules to fashion relief that is appropriate to effectuate the objectives of the Chapter in accordance with comity." *In re Rede Energia, S.A.* 515 B.R. 69, 91 (Bankr. S.D.N.Y. 2014) ( citing *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.* 351 B.R. 325, 333-4 (S.D.N.Y 2008). As the House Judiciary Committee stated in its report on Chapter 15, "comity is raised to the

---

[7] Since then, BCSUL has been placed in judicial bankruptcy before the Brazilian Bankruptcy Court and Laspro appointed as its trustee. On May 24, 2016, this Court entered an order substituting Laspro as the foreign representative of BCSUL (Main case ECF no. 29).

introductory language to make it clear that it is the central concept to be addressed." H.R. Rep. No. 109-31 pt. 1 at 109; as reprinted in 2005 USCAAN 88, 172.

Chapter 15 allows U.S. bankruptcy courts to handle ancillary cases consistent with principles of international comity and respect for the laws and judgments of other nations. *In re SPhinX, Ltd.* 389 B.R. 103, 112 (Bankr. S.D.N.Y. 2006). As the court stated in *Victrix S.S. Co., v. Salen Dry Cargo, A.B.,* 825 F.2d 709, 713 (2nd Cir. 1987) "American Courts have long recognized that the need to extend comity to foreign bankruptcy proceedings…because the equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding…" In *In re Atlas Shipping,* 404 B.R. 726, 738 (S.D.N.Y 2009), the court stated: "Once a case is recognized as a foreign main proceeding, Chapter 15 specifically contemplates that the court will exercise its discretion consistent with principles of comity." The Court continued stating: "There is a logical reason for this. Deference to foreign insolvency proceedings will often facilitate the distribution of the debtor's assets in an equitable, orderly efficient manner, rather than in a haphazard, erratic of piecemeal fashion." Id. See also, *In re OI, S.A.* 587 B.R. 253 (Bankr. S.D.N.Y. 2018).

In other words, a U.S. bankruptcy court in a Chapter 15 proceeding is an adjunct to and ancillary to the foreign court which is the forum of the foreign main proceeding. The U.S. Court is required to act with respect for and deference to the court of the foreign main proceeding. As the court stated in, *In re OI, supra.,* comity "is the central concept to be addressed…and "the (US) court shall cooperate to the maximum extent possible with a foreign court…" Id at 264. "The goal of the United States court is to assist the objectives of the foreign proceeding…" *British American Insurance, supra.* at 222. In the instant case, Laspro, the Foreign Representative is asking this Court to depart from these principles by appropriating issues pending before the Brazilian Bankruptcy Court.

**2.      This Adversary Action Should be Stayed or Abated to Allow the
<u>Brazilian Bankruptcy Court to Resolve the Issues:</u>**

This Court should apply comity to and defer the Brazilian Bankruptcy Court.  There is no dispute that the Brazilian Litigation is pending in the Brazilian Bankruptcy Court.  The issues that the Brazilian Bankruptcy Court will have to decide are broader and more comprehensive than those in the instant case.  The allegations of the cases that make up the Brazilian Litigation present divergent versions of the causes of and responsibility for the insolvency of BCSUL.  The Public Prosecutor Actions (now headed by Laspro) cast the blame on the Indio da Costas and the other officers and directors of BCSUL; and also blame KPMG for its allegedly faulty audits of BCSUL's financial statements from 2007 to 2011 which showed that the bank was profitable and possessed robust assets.  The Public Prosecutor Actions blame the Indio da Costas and allege that the BCSUL's insolvency was caused by "various schemes centered on the creation of false and non-existent salary loans".  Pimenta Declaration at ¶10 and Exhibits thereto.  By contrast, the FGC action, consolidated with the Public Prosecutor Actions, all now in the discovery phase and headed towards trial, allege that BCSUL was solvent at the time it was intervened and that "the insolvency was caused by the actions of the FGC and the individuals appointed as Special Temporary Administrators of BCSUL."  Pimenta Declaration ¶12.  Likewise the IMS Action "seeks the rescission of the FGC's retention of IMS to investigate BCSUL's CC Loan portfolio and the return of the approximately US$30,000,000.00 it was paid for its 'work'."  Pimenta Declaration at 9.  See also Exhibit 6 hereto.

To add to the complexity, the Public Prosecutor Actions allege that the liability of the Indio da Costas and the other officers and directors should be proven on an objective standard, meaning that culpability will be assumed with only causation to be proven.  This is opposed by the Indio da Costas who argue that liability must be proven on a subjective standard, meaning

that the plaintiff must prove the defendants are culpable in that they acted intentionally or negligently and that their conduct caused the insolvency. The objective standard is not familiar to U.S courts. Nor are the Brazilian legal theories alleged in the Brazilian Litigation and in the instant case. The Brazilian Bankruptcy Court is in the best position to resolve these issues of Brazilian law and should be allowed to do so.

Ample case law supports the notion that this Court should stay or abate this case pending a resolution by the Brazilian Bankruptcy Court. In *Finanz AG Zurich v. Banco Economico S.A.,* 192 F.3d 240 (2nd Cir. 1999), the New York District Court, applying principles of comity had dismissed a case brought against a Brazilian bank, which that at the time was in liquidation proceedings in Brazil. In affirming the ruling, the Second Circuit held that the extension of comity is particularly appropriate in connection with foreign bankruptcy proceedings. The Court observed that provided the foreign proceedings do not violate the laws or public policy of the United States, American courts will regularly defer to proceedings in foreign bankruptcy courts. Id. at 246. See also, *The Ensign-Bickford Co., v. ICI Explosives USA Inc.,* 817 F.Supp. 1018 (D. Conn. 1993) (principles of comity required dismissal of U.S action in favor of substantially identical action pending in Canada, to avoid the possibility of inconsistent results and since the interest of Canada in resolving the case outweighed that of the U.S).

In *Ungaro-Benages v. Dresdner Bank AG,* 379 F.3d 1227 (11th Cir. 2004), the Eleventh Circuit outlined the principles that should guide a court in its comity analysis, observing: "The doctrine of international comity can be applied retrospectively or prospectively. When applied prospectively, domestic courts consider whether to dismiss or stay a domestic action based on the interests of our government, the foreign government and the international community in resolving the dispute in a foreign forum." Id at 1238 (citations omitted). The court went on,

stating: "courts also consider whether the central issue in a dispute is a matter of foreign law and whether there is a prospect of conflicting judgments."  Id.

In *Mujica v. AirScan Inc.,* 771 F.3d 580 (9th Cir. 2014), the Ninth Circuit, building on the *Ungaro-Benages* opinion, engaged in an in depth study and analysis of what it termed "adjudicative comity" which it described as the "discretion of a national court to decline to exercise jurisdiction over a case before it when that case is pending in a foreign court with proper jurisdiction."  Id at 599.  Quoting *JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.,* 412 F.3d 418, 423 (2nd Cir. 2005).

In *Mujica* the Ninth Circuit held that in considering whether to grant adjudicative comity, a court should consider factors including "the strength of the United States' interest in using a foreign forum; the strength of the foreign government's interests, and the adequacy of the foreign forum."  Id at 603.  The Court articulated U.S. interests as including: "the location of the conduct in question, (2) the nationality of the parties, (3) the character of the conduct in question, (4) the foreign policy interests of the United States, and (5) any public policy interests."  Id at 604.

The application of this analysis to the facts of the instant case points firmly in the direction of staying this action in deference to the Brazilian Litigation pending in the Brazilian Bankruptcy Court.  No United States citizens are parties to the instant case.  No United States foreign policy issues are implicated.  There are no U.S public policy interests at stake.  The United States has little interest in determining whether or not BCSUL's portfolio was infected with thousands of fake CC Loans, whether this resulted in the payment of dividends not due the shareholders; or whether this should justify the avoidance of the titles to the apartments and art. On the other hand, Brazil has a much greater interest in resolving this matter.  There are parallel proceedings pending in the Brazilian Bankruptcy Court based in Brazilian law.  The Brazilian Litigation is more comprehensive, and the causes of and responsibility for the bankruptcy of a

Brazilian Bank with no operations outside Brazil is of far more interest to Brazil than to the United States. With two courts on a parallel path towards the resolution of these issues there is a real risk that there will be inconsistent and conflicting judgments. The Brazilian Bankruptcy Court is adequate and has been handling the issues of the BCSUL insolvency since 2012. This Court should refrain from intervening in this matter. The Brazilian Bankruptcy Court It should be allowed to resolve the issues without the potential for an inconsistent ruling from this Court.

As noted above, comity based deference is particularly applicable to foreign bankruptcy proceedings. In *J.P. Morgan, supra* a U.S bank filed suit in District Court seeking a declaration whether funds in its possession, collected on behalf of a bankrupt Mexican steel company, belonged to the bank which was a creditor of the Mexican debtor. The debtor moved to dismiss citing the ongoing bankruptcy proceedings in Mexico. The court stated that the Second Circuit has "repeatedly held that U.S courts should ordinarily decline to adjudicate creditor claims that are the subject of a foreign bankruptcy proceeding." Id at 424. See also *In re Atlas Shipping A/S,* 404 B.R. 726, 733 (Bankr. S.D.N.Y 2009).

In addition, courts should examine the motivation of plaintiffs who try to litigate foreign matters in U.S. courts. *In J.P. Morgan, supra*., the court was skeptical of the of the plaintiff bank's motives in asserting claims in the U.S. The court expressed the view that the bank had brought the case to avoid the certain consequences of the Mexican bankruptcy. The court stated: "This is precisely the sort of end run around a parallel foreign bankruptcy proceeding of which we have repeatedly disapproved." Id at 427. See also *In re National Bank of Anguilla (Private Banking Trust) Ltd.* 580 B.R. 64 (Bankr. S.D.N.Y. 2018).

Here, given the availability of the Brazilian forum, it seems likely that Laspro, acting as a creditor on behalf of all creditors of the BCSUL Estate, was concerned about the Indio da Costa's defenses to the Public Prosecutor Actions and the allegations of the FGC and IMS cases

and decided to shift the litigation to this Court where the Indio da Costas would be disadvantaged due to their lack of funds (their assets having been frozen), and the logistical issues of presenting their case in a distant forum, far from home in a language with which they and their witnesses are not familiar. The Court should not be tolerant of this sort of forum shopping, especially when the Plaintiff is a party to cases with almost identical issues in his home jurisdiction.

Finally, the Defendants emphasize they are not asking this Court to dismiss the entire case. Instead, Defendants only ask the Court to stay or abate the Brazilian Claims alleged herein until such time as the Brazilian Bankruptcy Court has had an opportunity to try the issues, common to both cases, including whether or not the former administrators of BCSUL exaggerated its assets by schemes centering on the creation of hundreds of thousands of fake CC Loans; or whether on the other hand, the fake loans were fabricated by the FGC administration as a pretext allowing them to liquidate BCSUL so they could help themselves to its assets.

The concept of a stay to allow the court of the foreign main proceeding to complete its work is well illustrated by *In re Neves,* 570 B.R. 420 (S.D. Bankr. 2017) In *Neves,* the issue was whether the court should stay a collection action against Neves in this country in deference to a sequestration order issued by an Italian bankruptcy court which had sequestered the assets of the plaintiffs seeking to collect judgments from Neves. Among the assets sequestered were the judgments against Neves that were the subject of the collection action. This Court cogently explained the principles of comity which should be applied between this Court and the Italian bankruptcy court. At first, while the validity of the sequestration order was being litigated in Italy, this Court, although it temporarily abated the collection proceedings, refused to entertain any proceedings relating to the validity of the sequestration order, stating: "I cautioned the parties that to the extent the validity of the Sequestration Order was being litigated in Italy I was not going to be conducting a parallel proceeding here." Id at 425. Later, after it was clear that

the Sequestration Order had survived the Italian litigation, the Court with a strong focus on the issues at hand, declined to plunge deeper into the issues before the Italian Bankruptcy Court, stating that in considering Neves' motion to accord comity to the order, "I will not act as a parallel proceeding...my consideration is limited solely to whether I should give comity to that order." Id at 429.

Alinia and CPS ask this Court to do no more than it did in *Neves*. The Defendants request the Court to stay or abate this action pending a final decision in the Brazilian Litigation by the Brazilian Bankruptcy Court, which has a much greater interest in resolving the central issues which will have a decisive influence on both this case and the Brazilian Litigation. If the Indio da Costas are successful in the Brazilian Litigation, the Court should grant comity to the result and issue judgment in favor of the Defendants that conforms to the result in Brazil. If Laspro wins the day in Brazil, this will likely resolve the issues in the instant case, since the Indio da Costas' assets, including their shares in the Defendants will likely be forfeit. If necessary, this Court can grant comity to that result and fashion an appropriate remedy based on the judgment of the Brazilian Bankruptcy Court. In the meantime, the Brazilian Claims alleged herein case should be stayed or abated to allow the Brazilian Bankruptcy Court free rein to resolve the Brazilian Litigation.

B.    MOTION FOR PARTIAL SUMMARY JUDGMENT

### A.    Standard for Summary Judgment

Rule 56(a), Fed. R. Civ. P. allows a party to:

> move for summary judgment, identifying each claim or defense-or the part of each claim or defense-on which summary judgment is sought. The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitles to judgment as a matter of law.

The party seeking summary judgment must identify those portions of the pleadings, depositions, answers to interrogatories, admissions, and affidavits which demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party must then go beyond the pleadings and by either affidavits or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

It is not sufficient for the non-moving party to show the "mere existence of a scintilla of evidence" in support of its position. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Additionally, mere speculation or conjecture as to the true nature of the facts is not sufficient to overcome a motion for summary judgment. *Knight v. U.S. Fine Insurance Co.*, 804 F.2d 9, 12 (2nd Cir. 1986), *cert. denied*, 480 U.S. 932 (1987).

In order to prevail on a motion for summary judgment, the movant must meet the criteria set forth in Federal Rule of Civil Procedure 56, made applicable to bankruptcy adversary proceedings by Federal Rule of Bankruptcy Procedure 7056. A Plaintiff is entitled to summary final judgment if there are no genuine issues of material fact and the court can rule as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *In re Caserta*, 182 B.R. 599 (Bankr. S.D. Fla. 1995).

In the instant case, no genuine issue of material fact exists with respect to the U.S Avoidance Claims. Instead, Defendants are entitled to judgment as a matter of law. Avoidance claims based in U.S. law, are by statute are specifically unavailable to a foreign representative in a Chapter 15 based adversary action.

Also, there is no issue of material fact with regard to the artwork. As explained in more detail below, there is no evidence which shows that the funds used to purchase the artwork were derived from dividends paid to Luis Felippe or Luis Octavio.

Finally, Defendants are entitled to summary judgment on the BVI aiding and abetting counts which do not state a claim.  Laspro's BVI legal expert has confirmed that as a matter of law, the BVI does not recognize civil claims for aiding and abetting.

### B.    Chapter 15 Does not Permit a Foreign Trustee to Assert Avoidance Claims Based in U.S. Law

As the Defendants have pointed out before, a Chapter 15 foreign representative is precluded by 11 U.S.C. §1521(a)(7) from bringing avoidance actions based on U.S. state or Federal law.  See, *In re Condor Insurance Ltd.* 601 F.3d 319, 323-4 (5th Cir. 2010); *Atlas Shipping, supra.* at 742-3; *In re Hellas Communications (Luxembourg) II SCA* 524 B.R. 488 (Bankr. S.D.N.Y. 2015); *In re Tarricone, Inc.,* 80 B.R. 21 (Bankr. S.D.N.Y. 1987) (Under former section 301 a foreign trustee may not bring an avoidance action under U.S. law because he is not a trustee under U.S. law).  See also, *In re Inversora Electrica de Buenos Aires, S.A.,* 500 B.R. 650 (Bankr. S.D.N.Y. 2016).  The Defendants request the Court to grant partial summary judgment in their favor and against Laspro on the U.S. Avoidance Claims.

### C.    Summary Judgment Should be Granted to Defendants on All Claims Relating to the Artwork

Laspro disclosed a so-called "Forensic Accounting Analysis Report" prepared by a team from Correa Porto, a Brazilian law firm headed by Brazilian lawyer, Jorge Zaninetti (the "Zaninetti Report").   Alvin Hommerding, the American accountant chosen as the English speaking spokesman for the Zaninetti Report was deposed on May 31, 2019.  The Hommerding deposition revealed that Hommerding had done little work on the Report and was generally ignorant of its details.  The Zaninetti Report suffered from many defects, the most prominent of which were its slavish devotion to the BACEN Report (which included quoting lengthy sections

verbatim) and the Zaninetti team's failure to perform any procedures to verify that there were over 682,000 fake CC Loans in BCSUL's portfolio.[8]

The Zaninetti Report does not even attempt to trace the purchase of the artwork to BCSUL dividends.  When questioned about this, Hommerding testified as follows:

> Q….Is there any way to trace the funds which were used to buy the artwork which is to be found in one of the apartments?
> A. What do you mean is there?
> Q. Well we know the dates the apartments were purchased.
> A. Yes.
> Q. So at least your team had an end point.
> A. Yes
> Q. –to work back from, but we don't know the date that the art was purchased.
>
> ***
>
> Q.    All right, do you know the date in which the art was purchased?
> A. I think we know that the artworks here--its clear to me that they were all artworks which has, or have at any time been between-- okay.  No, that's between January 1st 2007.  But the exact date, I'm looking here.
> Q. I don't think you are going to find any reference here to the date the art was purchased.
> A. Yeah.  No, I don't think we-okay.

The Zaninetti Report does not trace the purchase of the artwork to BCSUL dividends received by Luis Felippe or Luis Octavio, and draws no conclusions as to whether the art was purchased with funds allegedly fraudulently transferred from BCSUL.   Under these circumstances, there are no genuine issues of material fact as to whether the artwork was purchased with fraudulently transferred funds, and partial summary judgment on this issue should be granted in favor of Defendants and against Laspro.[9]

---

[8] The Defendants have prepared a *Daubert* Motion to Exclude Expert Report and Testimony of Alvin Hommerding, which will be filed contemporaneously herewith.

[9] The Indio da Costas had ample assets not derived from BCSUL dividends which could have been used to purchase not just the art but the apartments too.

**D.**     **Neither English nor BVI Law Recognizes a Cause of Action for Aiding and Abetting**

In Counts, VI, VII, VIII, XVIII, XIX, XX, XXX, XXXI and XXXII of the Amended Complaint, Laspro alleges the improbable theory that the Defendant corporations aided and abetted the Indio da Costas in breaching their fiduciary duty to BCSUL; converting BCSUL's assets; and in their commission of fraud against BCSUL. These three aiding and abetting counts are each directed at the Penthouse Apartment owned by Alinia; the Central Park South Apartment owned by CPS and the artwork, making nine aiding and abetting claims in all.

On March 23, 2017 the Court issued its Memorandum Opinion and Order Granting in Part and Denying in Part Defendants' Motion to Dismiss Amended Complaint (the "Order on Motion to Dismiss") (ECF No. 55). The Court, applying conflict of law analysis under both Florida and Federal law, concluded that the law of the British Virgin Islands applied, but did not make a final ruling on the question of whether the claims should be dismissed, stating only: "As the laws of BVI **appear to recognize** the aiding and abetting claims asserted in the Amended Complaint, **dismissal at this stage** is not appropriate" (emphasis added). Order on Motion to Dismiss at 21.

Andrew Thorp an English lawyer, who has practiced law in the British Virgin Islands for many years, served as Laspro's expert on the law of the BVI. Mr. Thorp's deposition was taken on May 23, 2019. During the deposition Mr. Thorp testified that English law is: "Highly persuasive (on the law of the BVI) depending on exactly which court it comes from and what point of law it is on of course. If for example, on English common law points, which by the common law is exactly the same as the BVI… then it will be as good as binding." Thorp Depo. p. 18:6-12. When questioned on whether BVI or English law recognized the civil tort of aiding and abetting, Mr. Thorp confirmed they did not, testifying:

> Q. And I believe, based on reading your opinion, BVI law does not
> recognize aiding and abetting"?
> A. No.  It's a criminal theory in English law.
> Thorpe Depo. p. 43:23-25.

English case law confirms this.    In *Credit Lyonnaise Nederland, N.V. v. Exports Guarantee Dept.* 2 WLR 540 (1999), the House of Lords,[10] then the highest court of England and Wales, confirmed that English law does not recognize the tort of aiding and abetting.  The court stated:

> It was submitted that knowingly to facilitate the commission of a
> crime amounted to the crime of aiding and abetting and should
> therefore also amount to a tort. … In my judgment to seek to draw
> analogy between the criminal and civil law in this area is
> unhelpful. The criminal law historically developed separately.
> ***
> The answer to Mr. Sumption's submissions is independent of the
> position under the criminal law. The tort upon which he seeks to
> rely is unsupported by authority. The authority which does exist
> strongly suggests that there is no such tort. The only purpose for
> establishing its existence is to make E.C.G.D. vicariously liable for
> Mr. Pillai's conduct. This is not a justification for the recognition
> of the new tort.  Id. [11]

## CONCLUSION

This Court should stay or abate this case until the Brazilian Bankruptcy Court has had a chance to complete its adjudication of the Brazilian Litigation.  The issues before the Brazilian Bankruptcy Court are more comprehensive than those in the instant case.   The Brazilian Bankruptcy Court is the court of the Foreign Main Proceeding and has a far greater interest in resolving these predominantly Brazilian issues, involving a bankrupt Brazilian bank, Brazilian

---

[10]    The Lords of Appeal in Ordinary commonly known as the **Law Lords**, were judges appointed under the Appellate Jurisdiction Act 1876 to the British House of Lords in order to exercise its judicial functions, which included acting as the highest court of appeal for most domestic matters. The House of Lords lost its judicial functions upon the establishment of the Supreme Court of the United Kingdom in October 2009;[1] Lords of Appeal in Ordinary then in office automatically became Justices of the Supreme Court of the United Kingdom,[2] and those Supreme Court justices that have seats in the House of Lords lost their right to speak and vote there until their retirement as justices of the new court.  Wikipedia.

[11] A copy of *Credit Lyonnaise* is attached hereto as Exhibit 7 for the Court's convenience.

bank regulation, Brazilian individuals and conduct which took place entirely in Brazil, than this Court. The Brazilian Bankruptcy Court should be allowed to complete its work without the risk of any inconsistent rulings by this Court.

The Court should also grant the Defendants' Motion for Partial Summary Judgment as to the U.S. Claims, the Aiding and Abetting Claims and the claims relating to the art, together with such other relief as the Court deems appropriate.

Respectfully submitted:

BAST AMRON LLP
*Counsel for the Defendants*
SunTrust International Center
One Southeast Third Avenue, Suite 1400
Miami, Florida 33131
Telephone: (305) 379-7904
Facsimile: (305) 379-7905
Email: bamron@bastamron.com
Email: jhart@bastamron.com

By: */s/ Jeremy J. Hart*
        Brett M. Amron, Esq. (FBN 0148342)
        Jeremy J. Hart, Esq. (FBN 510645)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served electronically CM/ECF, as indicated on the attached service list on this 15th day of July, 2019.

By: */s/ Jeremy J. Hart*
        Jeremy J. Hart

## SERVICE LIST

### VIA CM/ECF

- Daniel M Coyle     dcoyle@sequorlaw.com, ngonzalez@sequorlaw.com