# EXHIBIT 6

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:

MASSA FALIDA DO BANCO
CRUZEIRO DO SUL S.A.,                    CASE NO.:14-22974 – LMI
                                         CHAPTER 15
Debtor in a Foreign Proceeding
_____/
LASPRO CONSULTORES LTDA.,
a Brazilian Sociedade Limitada,

        Plaintiff
v.
                                         ADV. CASE NO. 16-1315-LMI
ALINIA CORPORATION, a British
Virgin Islands Company Limited by Shares,
110 CPS, INC., a British Virgin Islands
Company Limited by Shares,

        Defendants.
_____/

## DECLARATION OF RAFAEL BARUD CASQUEIRA PIMENTA

REPUBLIC OF BRAZIL           )
                             ) SS
STATE OF RIO DE JANEIRO      )

        RAFAEL BARUD CASQUEIRA PIMENTA declares and states as follows:

        1.      Declarant is over the age of 18, sui juris and has personal knowledge of the
matters attested to herein; or has derived knowledge from documents he has reviewed in
connection with the above captioned case and in connection with those cases pending in the
Second Bankruptcy and Reorganization Court of Sao Paulo, which are more fully described
below (collectively the "Brazilian Litigation").

        3.      Declarant is licensed as an attorney at law in Brazil and in the States of Rio de
Janeiro and Sao Paulo.  Declarant is an equity partner in the law firm of Galdino Coelho.

4.      Galdino Coelho has, at all times material hereto, represented Luis Felippe Indio da Costa and Luis Octavio Indio da Costa ("collectively the "Indio da Costas").  Declarant is the attorney at Galdino Coelho primarily responsible for the representation of the Indio da Costas in the Brazilian Litigation.

5.      The Brazilian Litigation consists of the following actions: (1) *In Re the Extrajudicial Liquidation of Cruzeiro do Sul Holding Financeira, S. A;  Public Prosecutor's Office of the State of Sao Paulo v. Luis Felippe Indio da Costa, Luis Octavio Indio da Costa et al.* Case No. 0031093-21.2013.8.26.0100; (2) *In Re the Extrajudicial Liquidation of Banco Cruzeiro do Sul; Public Prosecutor's office of the State of Sao Paulo v. Cruzeiro do Sol Holding Financeira, S.A., Luis Felippe Indio da Costa, Luis Octavio Indio da Costa, et al.* Case No. 0031335-77.2013.8.26.0100  (collectively the "Public Prosecutor Actions"); and (3) *Luis Felippe Indio da Costa and Luis Octavio Indio da Costa v. Fundo Garantidor de Credito, Celso Antunes, Jose Alfredo Lattaro, Fabio Mentone and Sergio Rodrigues Prates,* Case No. 1117505-64.2015.8.26.0100  (the "FGC Action"). Copies of the Public Prosecutor Actions and English translations thereof are attached hereto as Exhibits 1 and 2 respectively[1].  The FGC Action English translation thereof is attached hereto as Exhibit 3.

6.      The Public Prosecutor Actions were filed in 2013, the FGC Action was filed in 2015 and the IMS Action (discussed below) was filed in 2017.

7.      The Public Prosecutor Actions and the FGC Action have been consolidated for discovery and trial and are pending before the Second Bankruptcy and Reorganization Court of Sao Paulo (the "Brazilian Bankruptcy Court").  The Order of Consolidation and an English translation thereof are attached hereto as Exhibit 4.

8.      The Brazilian Litigation is designed to determine who is responsible for the insolvency of Banco Cruzeiro do Sul ("BCSUL") and its holding company, Cruzeiro do Sul

---

[1] Laspro as trustee is now the Plaintiff in the Public Prosecutor Actions.

Holding Financeira ("BCSUL Holding"), and the extent of the liability of such persons.  The Public Prosecutor Actions allege that the Indio da Costas and the other former officers and directors of BCSUL and BCSUL Holding are responsible and liable for the BCSUL's losses, while the FGC Action alleges that (1) the FGC and Celso Antunes, Jose Alfredo Lattaro, Fabio Mentone and Sergio Rodrigues Prates, the individuals from the FGC who administered the Bank are to blame for BCSUL's insolvency and should be found liable for the losses of BCSUL, (2) there was no cause for intervention/liquidation before FGC took over the administration of the Bank, and (3) the "findings" and "conclusions" of FGC during the *Special Temporary Administration Regime* are baseless and/or false

9.      The Indio da Costas have filed another civil action against the FGC and IMS in that action styled: *Luis Felippe Indio da Costa and Luis Octavio Indio da Costa, v. Fundo Garantidor de Credito and IMS Tecnologie Servicios, Ltda, and IMS Cobranca e Servicios, Ltda.,* Case No 1068262-83.2017.8.26.0100 (the "IMS Action").  The IMS Action is also pending in the Brazilian Bankruptcy Court, but has not been consolidated with the Public Prosecutor Actions and the FGC Action.  A copy of the IMS Action English translation thereof is attached hereto as Exhibit 5.  The IMS Action seeks the rescission of the FGC's retention of IMS to investigate BCSUL's CC Loan portfolio and the return of the approximately US$30,000,000.00 it was paid for its "work".  See Exhibit 5.

10.      The Pubic Prosecutor Actions allege that the Indio da Costas and the other officers and directors of BCSUL caused the insolvency of BCSUL by various schemes centered on the creation of false and non-existent salary loans (the "Fake CC Loans").  On the other hand, the Indio da Costas allege in the FGC Action, that BCSUL was solvent and profitable at the time the FGC was appointed Special Temporary Administrator of BCSUL in June 2012, and that it was the FGC and its employees acting as the Special Temporary Administrators which caused

the insolvency of BCSUL by conducting a scheme which fabricated evidence of the Fake CC Loans to allow BCSUL to be placed under their control allowing them to steal and otherwise dissipate its assets.

11.    Declarant is familiar with the above captioned action, filed in 2016, which primarily seeks to avoid the Defendants' title to apartments in New York City.  In order to resolve the above captioned action, the Bankruptcy Court for the Southern District of Florida (the "Florida Court") will have to adjudicate many of the same issues that exist in the parallel Brazilian Litigation, currently pending in the Brazilian Bankruptcy Court.  Specifically, the Florida Court will have to determine whether the Indio da Costas and the other officers and directors of BCSUL engaged in schemes, including the creation of Fake CC Loans which artificially inflated the assets of BCSUL, allowing the Indio da Costas to be paid dividends not due them, which were then used to purchase the New York apartments and art owned by the British Virgin Islands Corporations which are the Defendants to the instant action.

10.    In order to adjudicate the Brazilian Litigation, the Brazilian Bankruptcy Court will have to determine whether the insolvency of BCSUL was caused by schemes including the creation of Fake CC Loans by the Indio da Costas and other officers and directors of BCSUL; or whether on the other hand, the insolvency was caused by the actions of the FGC and the individuals appointed as Special Temporary Administrators of BCSUL.

11.    Declarant  is concerned that if the Florida Court proceeds to adjudicate the issues in the instant case before the resolution of the Brazilian Litigation, there is a possibility of inconsistent adjudication which will complicate the Brazilian Litigation and invade the jurisdiction of the Brazilian Bankruptcy Court.

FURTHER DECLARANT SAYETH NAUGHT.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 11º day of July, 2019

_____
RAFAEL BARUD CASQUEIRA PIMENTA

# DECLARATION EXHIBIT 1

**URGENTE**  02



MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

EXCELENTÍSSIMO SENHOR DOUTOR JUIZ DE DIREITO DA 2.ª
VARA DE FALÊNCIAS E DE RECUPERAÇÕES JUDICIAIS DE SÃO
PAULO.

Distribuição por Dependência
Inquérito do Banco Central do Brasil
**N.º 0027878-37.2013.8.26.0100**
Liquidação Extrajudicial de:
**CRUZEIRO DO SUL HOLDING FINANCEIRA S.A.**

O **MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO**,
por seus Promotores de Justiça ao final assinado, vem, respeitosamente,
perante Vossa Excelência, com base no incluso Inquérito elaborado pela
Comissão de Inquérito nomeada pelo Banco Central do Brasil promover

### AÇÃO DE RESPONSABILIDADE CIVIL

com fundamento nos artigos 39,  40, 45 e 46 da Lei 6.024/74, artigo 15 do
Decreto-lei nº 2.321/87 c.c. artigos 1º da Lei 9.447/97; parágrafo único do artigo
927 do Código Civil e artigo 127, "caput", da Constituição Federal, em face de:

1/21



 MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

## 1. DEMANDADOS

1) **Luís Felippe Indio da Costa**: Brasileiro, separado consensualmente, advogado, RG 912.072-6-IFP/RJ, CPF 006.034.067-34, residente à Avenida Epitácio Pessoa, 300 – apto 501, Ipanema, Rio de Janeiro/RJ, CEP 22410-090.

2) **Luís Octavio Azeredo Lopes Indio da Costa**: Brasileiro, separado consensualmente, RG 044.524.34-6 –IFP/RJ, CPF 782.474.977-00, residente à Estrada do Embu, 1550 – Haras Guacan, Cotia/SP, CEP 06713-100.

3) **Charles Alexander Forbes**: Brasileiro, advogado, RG 2.249.539-3 SSP/SP, CPF 001.906.918-91, residente à Rua José Maria Lisboa, 1060, apto. 31, São Paulo/SP, CEP 01423-001.

4) **Fabio Rocha do Amaral**: Brasileiro, casado, administrador de empresas, RG 9.363.793-7, CPF 076.593.208-31, residente à Rua Ernesto Nazaré, 213 – Alto de Pinheiros, São Paulo/SP, CEP 05462-000.

5) **Flavio Nunes Ferreira Rietmann**: Brasileiro, divorciado, administrador de empresas, RG 10.295.069-6, CPF 913.629.627-91, residente à Alameda dos Jurupis, 701 – apto. 152, São Paulo/SP, CEP 04088-022.

6) **Horácio Martinho Lima**: Brasileiro, solteiro, engenheiro, RG 05213864-1, CPF 745.862.547-34, residente e domiciliado na Rua Odílio Bacelar, 43, Urca, Rio de Janeiro/RJ, CEP 22290-280, com o seguinte endereço informado para correspondência: Av. Rio Branco, 110, 38° andar, Centro, Rio de Janeiro/RJ, CEP 20040-001.



2/21





MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

## 2. FATOS

### 2.1. A SOCIEDADE LIQÜIDADA.

#### 2.1.1. Constituição da Sociedade e alterações nos últimos 5 anos.

A Cruzeiro do Sul Holding Financeira S.A. é uma entidade não financeira, pertencente ao Grupo Cruzeiro do Sul, e não está sujeita à supervisão do Banco Central do Brasil.

De acordo com a Ata de Constituição (fls. 25/26), a instituição foi constituída em 2.2.2011, ocasião em que se reuníram os acionistas fundadores Srs. Luis Felipe Indio da Costa, Luis Octavio Azeredo Lopes Indio da Costa, Charles Alexander Forbes e Fabio Rocha do Amaral.

Em seguida também foram eleitos os membros do Conselho de Administração, para o período de 2.2.2011 à 2.2.2012, tendo sido aprovados os seguintes nomes: Luis Felipe Indio da Costa, Charles Alexander Forbes e Fabio Rocha do Amaral.

### 2.2. CONTROLE DA SOCIEDADE LIQÜIDADA.

Considerando o período de abrangência para fins de levantamento de responsabilidades (de 4.6.2007 à 4.6.2012), e de acordo com informações obtidas no Sistema de Informações do Banco Central do Brasil – Sisbacen (fls. 62/63), e com base no livro de registro de ações da instituição (fls. 58/61), a **CRUZEIRO DO SUL HOLDING FINANCEIRA S.A** foi controlada pelo Sr. Luis Felippe Indio da Costa.

### 2.3. ADMINISTRAÇÃO DA SOCIEDADE LIQUIDADA.

Considerando o período de abrangência para fins de levantamento de responsabilidades (de 4.6.2007 à 4.6.2012), o controlador direto da CRUZEIRO DO SUL HOLDING FINANCEIRA S.A. foi o Sr. Luis Felippe





 MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

Indio da Costa (fl. 6) e os ex- administradores da referida instituição se encontram listados a seguir:

### 2.3.1. ADMINISTRAÇÃO

**Periodo de gestão:** 02/02/11 À 16/03/2011

| Nome | CPF | Cargo |
|------|-----|-------|
| Luis Felippe Indio da Costa | 006.034.067-34 | Conselheiro |
| Luis Octavio Azeredo Lopes Indio da Costa | 782.474.977-00 | Acionista Fundador |
| Fabio Rocha do Amaral | 076.593.208-31 | Conselheiro |
| Charles Alexander Forbes | 001.906.918-91 | Conselheiro |

**Periodo de gestão:** 16/03/2011 à 04/06/2012 (*)

| Nome | CPF | Cargo |
|------|-----|-------|
| Luis Octavio Azeredo Lopes Indio da Costa | 782.474.977-00 | Conselheiro/vice-presidente do conselho de administração/diretor |
| Luis Felippe Indio da Costa | 006.034.067-34 | Conselheiro/Presidente do conselho de administração/diretor |
| Fabio Rocha do Amaral | 076.593.208-31 | Conselheiro |
| Charles Alexander Forbes | 001.906.918-91 | Conselheiro |
| Horácio Martinho Lima | 745.862.547-37 | Conselheiro |
| Flavio Nunes Ferreira Rietmann | 913.629.627-91 | Conselheiro |

(*) O Artigo 150, da Lei 6.404/76, em seu § 4º, determina que o prazo de gestão do conselho de administração ou da diretoria se estende até a investidura dos novos administradores eleitos. Assim, tendo em vista que não houve mais assembléias após 2.2.2012, consideramos que esta gestão vigorou até 4.6.2012 (data do RAET).



4/21





MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

## 2.4. INTERVENÇÃO E LIQÜIDAÇÃO DO BANCO CENTRAL DO BRASIL.

### 2.4.1. Da Decretação do Regime de Administração Especial Temporária - RAET

Em 4.6.2012, por meio do ATO-PRESI N° 1.218 (D.O.U. de 5.6.2012, seção 1, pág. 13) (fls. 2/3), o Sr. Presidente do BANCO CENTRAL DO BRASIL, no uso das atribuições que lhe confere o art. 12, inciso XVII, do Regimento Interno, com fundamento no art. 19 do Decreto-lei nº 2.321, de 25.2.1987, combinado com o art. 51 da Lei n° 6.024, de 13.3.1974, decretou, por extensão, Regime de Administração Especial Temporária, pelo prazo de 180 (cento e oitenta) dias, na CRUZEIRO DO SUL HOLDING FINANCEIRA S.A. (CNPJ: 13.225.116/0001-70), com sede na Cidade do Rio de Janeiro, Estado do Rio de Janeiro, na Avenida Presidente Wilson, 231, 24° andar, sala 2403, Centro, considerando haver decretado naquela data, Regime de Administração Especial Temporária no Banco Cruzeiro do Sul S.A. (CNPJ 62.136.254/0001-99), com o qual a empresa mantinha vínculo de interesse, caracterizado pelo exercício do poder de controle e pela existência de administração comum, de acordo com decisão da Diretoria Colegiada, em reunião de 4 de junho de 2012.

Pelo ato acima referido, foi nomeado administrador especial temporário, com fundamento no art. 8º do Decreto-lei nº 2.321/1987, o Fundo Garantidor de Créditos (FGC), CNPJ nº 00.954.288/0001-33.

Em 4.6.2012, foi divulgado o COMUNICADO Nº 22.585, do Departamento de Liquidações Extrajudiciais – DELIQ (fls. 4/7), pelo qual o Banco Central do Brasil informou às instituições financeiras e bolsas de valores, a decretação do Regime de Administração Especial Temporária na CRUZEIRO DO SUL HOLDING FINANCEIRA S.A.; a nomeação do respectivo administrador especial temporário e a incidência da indisponibilidade dos bens do controlador direto/ex-administrador, Sr. Luis Felippe Indio da Costa, e do ex- administrador Sr. Luis Octávio Azeredo Lopes Indio da Costa.

Em 14.9.2012, por meio do Ato Presi nº 1.231, publicado no D.O.U. de 17.9.2012 (fls. 19/20), foi decretado, por extensão, o regime de Liquidação Extrajudicial na instituição CRUZEIRO DO SUL HOLDING FINANCEIRA S.A., tendo em vista ter sido decretada, nessa mesma data, a Liquidação Extrajudicial do Banco Cruzeiro do Sul S.A., com o qual a empresa

5/22





MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

mantinha vínculo de interesse, caracterizado pelo exercício do poder de controle e pela existência de administração comum, de acordo com decisão da Diretoria Colegiada, em reunião de 14 de setembro de 2012, quando foi nomeado liquidante o Senhor Sérgio Rodrigues Prates, sendo o termo legal da liquidação extrajudicial o dia 5 de abril de 2012.

## 2.5. O PASSIVO A DESCOBERTO POR GESTÃO DE ADMINISTRADOR.

Para se apurar o montante ou a estimativa dos prejuízos causados a terceiros, estabelecidos no artigo 43, da Lei n° 6.024/1974, tomou-se por base a análise das opera- ções dos últimos 5 (cinco) anos e do balanço da **CRUZEIRO DO SUL HOLDING FINANCEIRA S.A.** levantado pelo FGC, na data do RAET (4.6.2012).

De acordo com a Situação Patrimonial Ajustada em 4.6.2012, foram apurados prejuízos a terceiros (art. 43 da Lei n° 6.024/1974) no montante estimado de R$ 4.862 mil conforme descrito no item 4.3 – Patrimônio Líquido Ajustado deste Relatório, cuja responsabilidade foi solidariamente distribuída, nos termos do art. 40, da Lei 6.024/1974, entre os controladores e ex-sócios/administradores da HOLDING que compuseram o segundo período de gestão, conforme quadro a seguir:

Gestão de 16/03/2011 à 04/06/2012=> Prejuízo apurado de R$ 4.862 mil

| Nome | CPF | Cargo |
|---|---|---|
| Luis Felippe Indio da Costa | 006.094.067-34 | Controlador / Conselheiro / Presidente do Conselho de Administração/ Diretor |
| Luis Octavio Azeredo Lopes Indio da Costa | 782.474.977-00 | Conselheiro / Vice Presidente do Conselho de Administração / Diretor |
| Fabio Rocha do Amaral | 076.593.208-31 | Conselheiro |
| Charles Alexander Forbes | 001.906.918-91 | Conselheiro |
| Horácio Martinho Lima | 745.862.547-37 | Conselheiro |
| Flavio Nunes Ferreira Rietmann | 913.629.627-91 | Conselheiro |

Ressalta-se que o valor do Patrimônio Líquido Ajustado Negativo (passivo a descoberto), estimado em

### R$ 4.862.000,00

(quatro milhões, oitocentos e sessenta e dois mil reais)

pode sofrer alterações no decorrer do processo atual de liquidação extrajudicial.

6/21







MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

Esta demanda de responsabilidade civil postula a reparação dos prejuízos sofridos por terceiros – depositantes e credores em geral da empresa liquidada extrajudicialmente, dentro dos objetivos estabelecidos pela Lei 6.024/74.

Exige a lei que se faça a "estimativa dos prejuízos apurados em cada gestão" (art. 43), e isso foi feito pela comissão de inquérito, com a observação de que no caso vertente houve apenas um período de gestão.

### 2.6. DAS IRREGULARIDADES APURADAS (fls. 344/345)

O ajuste no Balanço Especial de Abertura de 4.6.2012, da "Provisão para Risco de Realização de Cédulas de Crédito Bancário", no valor de R$ 14.622 mil, refere-se a aplicações em Cédulas de Crédito Bancário no montante de R$ 8.531 mil (fl. 96), emitidas pela empresa Promotora e Divulgadora Sudeste Line Ltda., CNPJ 04.816.268/0001-57 (fl. 88 e fls. 92/127). Tais CCB´s foram consideradas de difícil realização, pois, embora o vencimento estivesse pactuado para 5.11.2012, a emitente se en- contra inadimplente em outras operações no BCSul.

O ajuste de R$ 745 mil (fls. 132/134) refere-se a adiantamento feito em 14.5.2012 para o Sr. Alvaro Luiz Alves de Lima Alvares Otero, sem suporte documental adequado.

### 2.7. CAUSAS DA QUEDA (fls. 345)

A decretação do Regime de Administração Especial Temporária – RAET da CRUZEIRO DO SUL HOLDING FINANCEIRA S.A. decorreu da decretação, por extensão, deste mesmo regime especial no BANCO

7/21







MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

CRUZEIRO DO SUL S.A., com o qual a empresa mantinha vínculo de interesse, caracterizado pelo exercício do poder de controle e pela existência de administração comum.

A causa da queda CRUZEIRO DO SUL HOLDING FINANCEIRA S.A decorreu, principalmente, dos ajustes relatados no Capítulo 4.3 – PATRIMÔNIO LÍQUIDO AJUSTADO, Notas Explicativas dos ajustes efetuados pelo FGC, de 1 à 3, resumidos a seguir:

- Provisão para Risco de Realização de Cédulas de Crédito Bancário, que gerou um ajuste de R$ **14.622 mil**;

- Provisão para Risco de Realização com Adiantamento Concedido, que gerou um ajuste de **R$ 745 mil**; e

- Baixa de Investimentos que a empresa mantinha no Banco Cruzeiro do Sul S/A, que gerou um ajuste de **R$ 105.832 mil**.

## 3. DIREITO

### 3.1. RESPONSABILIDADE CIVIL OBJETIVA DO CONTROLADOR.

O controlador de sociedade liquidada por extensão à liquidação do Banco Cruzeiro do Sul S.A., com o qual mantinha vínculo de interesse, caracterizado pelo exercício do poder de controle e pela existência de administração comum, responde objetivamente pelos prejuízos causados à sociedade e a terceiros. Assim, nos termos do disposto no artigo 1.º da Lei 9.447/97,

"a responsabilidade solidária dos controladores de instituições financeiras estabelecida no art. 15 do Decreto-lei n.º 2.321, de 25 de fevereiro de 1.987, aplica-se também, aos regimes de intervenção e liquidação extrajudicial de que trata a Lei n.º 6.024, de 13 de março de 1974".





 MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

Por sua vez, o artigo 15 Decreto-lei 2.321/74 estabelece que:

"Decretado o regime de administração especial temporária, respondem solidariamente com os ex-administradores da instituição, pelas obrigações por esta assumidas, as pessoas naturais ou jurídicas que com ela mantenham vínculo de controle, **independentemente da apuração de dolo ou culpa**".

Invoca-se, pois, a aplicação da responsabilidade objetiva; não obstante, fez-se referência tanto a atos culposos como a atos dolosos e fraudulentos dos réus.

### 3.2. RESPONSABILIDADE CIVIL OBJETIVA DOS MEMBROS DO CONSELHO DE ADMINISTRAÇÃO DA ENTIDADE LIQUIDADA POR EXTENSÃO À LIQUIDAÇÃO DE INSTITUIÇÃO FINANCEIRA.

Os integrantes do Conselho de Administração também são considerados por lei como administradores[1], a eles se aplicando o mesmo regime de responsabilidade civil, com o acréscimo da seguinte particularidade: por ser órgão colegiado, a administração dos conselheiros é coletiva[2]. Como há entre eles solidariedade[3], todos são objetivamente responsáveis pelo passivo a descoberto.

### 3.3. RESPONSABILIDADE CIVIL OBJETIVA DOS ADMINISTRADORES DA ENTIDADE LIQUIDADA POR EXTENSÃO À LIQUIDAÇÃO DE INSTITUIÇÃO FINANCEIRA. ARTIGOS 39 E 40 DA LEI 6.024/74.

Estabelecia o artigo 2.º da Lei n.º 1.808, de 7 de janeiro de 1953:

"Respondem solidariamente pelas obrigações assumidas pelos bancos e casas bancárias, durante a sua gestão e até que

---

[1]. Artigos 138 e 145 da Lei 6.404/76. De acordo com o artigo 9.º do estatuto social do Banco Santos , "A companhia será *administrada* por um Conselho de Administração e por uma Diretoria, na forma estabelecida neste Estatuto" (sem grifo no original).

[2]. Nesse sentido, Paulo Fernando Campos Salles de Toledo, *O conselho de administração na sociedade anônima*, n. 2.7.8. e 2.7.9, p. 74-75.

[3]. Artigo 40 da Lei 6.024/74.





MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

elas se cumpram, os diretores e gerentes que procederem com **culpa ou dolo**, ainda que se trate de sociedade por ações, ou de sociedade por cotas de responsabilidade limitada".

Em razão disso, ainda que com discussão, entendeu-se que estava firmada a responsabilidade civil subjetiva dos administradores de instituição financeira.

A esse dispositivo foi dada nova redação pelo artigo 42 da Lei 4.595/64:

"Os diretores e gerentes das instituições financeiras respondem solidariamente pelas obrigações assumidas pelas mesmas durante sua gestão, até que elas se cumpram. Parágrafo único – Havendo prejuízos, a responsabilidade solidária se circunscreverá ao respectivo montante".

Foi expressamente revogada a Lei 1.808/53, pelo artigo 57 da Lei 6.024/74, que passou a cuidar da responsabilidade civil dos administradores de instituição financeira, disciplinando-a em dois dispositivos, a saber:

Estabelece o artigo 39 que:

"Os administradores e membros do Conselho Fiscal de instituições financeiras responderão, a qualquer tempo, salvo prescrição extintiva, pelos atos que tiverem praticado ou omissões em que houverem incorrido".

E o artigo 40, por seu turno, estende a responsabilidade pois:

"Os administradores de instituições financeiras respondem solidariamente pelas obrigações por elas assumidas durante sua gestão, até que se cumpram". Parágrafo único. A responsabilidade solidária se circunscreverá ao montante dos prejuízos causados".

Desapareceu, como se percebe do confronto entre as três leis, a de 1953, de 1965 e a de 1974, a referência a **dolo ou culpa**. Deixou

10/21







MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

de ser exigência, por expressa vontade da lei, o elemento anímico da responsabilidade civil.

Daí a orientação doutrinária e jurisprudencial no sentido de que a responsabilidade civil dos administradores de instituição financeira é objetiva.

O Tribunal de Justiça de São Paulo há muito tempo, sufraga essa tese, como pode ser visto em diversos acórdãos[4] [5]. No mesmo sentido são as decisões do Tribunal de Justiça do Rio de Janeiro[6] e do Tribunal de Justiça do Rio Grande do Sul[7].

O Superior Tribunal de Justiça também se orienta pela aplicação da responsabilidade civil objetiva, como, mais de uma vez, deixou assentado[8].

---

[4] .TJSP, RT 775/240; RT 645/66; JTJ 266/40; 194/89. Outros casos mais antigos: **1)** MS 71.818-1, 5ª Câm.Civ., j.28.8.86, Rel.Des. Silva Costa; **2)** MS.71.456-1, 5ª Câm.Civ., j.2.10.86, Rel.Des. Ralpho Waldo; **3)** MS 71.603-1, 5ª Câm.,Civ., j.11.6.87, Rel.Des. Ruy Camilo; **4)** AI.79.767-1, 3ª Cam.Civ., j.2.12.86, Rel. Des. Flávio Pinheiro; **5)** Ap.Civ. 85.426-1, 5ª Cam.Civ., j.10.12.87, Rel.Des. Márcio Bonilha; **6)** AI 89.632-1, 2ª Câm. Civ.,, j.18.12.87, Rel.Des. Silva Ferreira; **7)** Ap.Civ.107.649-1, 4ª Câm.Civ., j.20.4.89, Rel. De. Ney Almada; **8)** AI 113.783-1, 3ª Câm.Civ., j.28.02.89, Rel. Des. Flávio Pinheiro,  entre diversos outros.

[5] . "Destarte, os administradores das instituições financeiras estão adstritos a responderem pelos atos que pratiquem ou omissões, reprise-se, independentemente da idéia de culpa ou dolo.    Por outro lado, como as normas enunciadas sobre os administradores das instituições financeiras obrigam a reparação dos prejuízos sem culpa ou dolo, em face do caráter excepcional dessa espécie de responsabilidade civil, esta não se elide sob a argumentação de que eventuais bens foram adquiridos ántes ou logo após o início da gestão do ex-administrador na instituição financeira liquidanda." (TJSP, Ap.Civ.195.317-1/O, Caso Banco da Lavoura, j.19.8.93, Rel.Des. Melo Colombi). No mérito, a responsabilidade objetiva dos administradores em se tratando de instituição financeira é ex vi legis, porque administradores do dinheiro alheio (art.40 da Lei 6.024/74). (TJSP, 3ª C.Civ., Ap.228.538-1/1, j.8.8.95, Rel.Des. Mattos Faria).

[6] . Ap. 5.384/2000, da 9.ª Câmara Cível, j. 10/10/2000, rel. Des. Laerson Mauro; antes, no mesmo sentido, acórdão publicado na RJTJRJ, v.35, p. 57.

[7] . Ap. 595059023, da 10.ª Câmara Cível, j.11/11/2004, rel. Des. Paulo Antonio Kretzmann. Esse julgado relata a existência de outro acórdão do mesmo Tribunal, que é a Apelação Cível da 3.ª Câmara Cível, rel. Des. Galeno Vellinho de Lacerda).

[8] . RESP 21245, 4ª Turma, j.4.10.94, publicado no DJU de 31.10.94, p.29500, Rel.Min.RUY ROSADO DE AGUIAR JUNIOR. No mesmo sentido, RESP 172736, j. 10/6/2003, publicado no DJ 22/9/2003 e na RSTJ 174/223, relator o Ministro Francisco Peçanha Martins.





 MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

Quando o Supremo Tribunal Federal examinava a temática, também reconheceu a responsabilidade civil objetiva, deixando de aplicar a Lei das Sociedades Anônimas na espécie[9].

Irrelevante, pois, perquirir sobre dolo ou culpa[10], pois a responsabilidade solidária incide mesmo nos atos de administração normal[11].

Irrelevante, também, qual seja o diretor que tenha praticado ou participado do ato prejudicial aos credores; todos os administradores respondem pelas obrigações danosas. "Pouco importa", diz Trajano de Miranda Valverde, "para os efeitos da solidariedade, que, pelos estatutos, essas obrigações ou deveres não caibam a todos os diretores"[12].

É tranquila a orientação jurisprudencial no sentido de que, nos crimes societários, de rigor maior na descrição do dolo, está dispensada a pormenorização de condutas na denúncia. Com mais razão tal proceder deve ser admitido em relação à ação civil de responsabilidade, que não causa restrição à liberdade, mas grava o patrimônio.

Pouco importa, pois, a conduta individual dos administradores e controladores ou a graduação da culpa de cada um na prática de atos lesivos à sociedade. Como todos e cada um têm poderes legais e estatutários para impedir a prática de ilegalidades, cabe-lhes incontestável responsabilidade objetiva pelos prejuízos apurados na sociedade.

Resta aos administradores e controladores perseguidos judicialmente pela responsabilidade objetiva, o ajuizamento de ação própria contra os maiores culpados pelos prejuízos. Aliás, porque participantes de cada um dos atos da empresa, terão facilidade de comprovar a graduação da responsabilidade subjetiva na referida via processual.

---

[9] STF, 2ª Turma, Rec.Extr. nº 93.416-2, São Paulo, Caso Fivap,  j.7.8.81, Rel.Min.Decio Miranda. RTJ, vol. 99, p. 891

[10]. Wilson do Egito Coelho, *Da Responsabilidade dos Administradores das Sociedades por Ações em face da nova Lei e da Lei 6.024/74*, p.44. RDM 40. No mesmo sentido: de Gian Maria Tosetti,  RDM, 41/89.

[11]. Carlos Alberto Bittar, comentando o tema da responsabilidade dos administradores de instituições financeiras(Direito Empresarial, Revista de Direito Civil, RT., ed.1.977, pag.90).

[12]. Sociedades por ações, v. II, n. 640, p. 338.

12/21



MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

O que é preciso apurar, além do prejuízo, para o ajuizamento da demanda civil pública de responsabilidade, então, é a identidade dos administradores e controladores da instituição financeira em liquidação extrajudicial. E nada mais.    A qualidade de administrador ou controlador no período em que se apurou prejuízo é o que basta para o reconhecimento da responsabilidade.

### 3.4. RESPONSABILIDADE CIVIL OBJETIVA DOS ADMINISTRADORES DA ENTIDADE LIQUIDADA POR EXTENSÃO À LIQUIDAÇÃO DE INSTITUIÇÃO FINANCEIRA. PARÁGRAFO ÚNICO DO ARTIGO 927 DO CÓDIGO CIVIL BRASILEIRO.

Nos termos da lei de regência, pois, que é a Lei 6.024/74, há responsabilidade civil objetiva também dos administradores de sociedade liquidada por extensão à liquidação do Banco Cruzeiro do Sul S.A., com o qual mantinha vínculo de interesse, caracterizado pelo exercício do poder de controle e pela existência de administração comum, que leva à dispensa da descrição de condutas, culposa ou dolosa, como acima exposto.

Caso V. Exa. entenda que não é caso de se reconhecer a responsabilidade civil objetiva presente na lei especial, o que se admite para argumentação, invoca esta Promotoria de Justiça norma mais genérica, que é a do parágrafo único do artigo 927 do Novo Código Civil brasileiro:

"Haverá obrigação de reparar o dano, **independentemente de culpa**, nos casos especificados em lei, ou quando a **atividade normalmente desenvolvida** pelo autor do dano implicar, **por sua natureza, risco para os direitos de outrem**".

Ora, não é preciso maiores considerações para se chegar à conclusão de que a atividade desenvolvida pelos bancos, por meio dos seus administradores, segundo as orientações estabelecidas pelo controlador, pela própria natureza, de captação de dinheiro do povo, contempla alta dose de "risco para os direitos de outrem". Não é à toa que os maiores passivos em casos de quebra são os de instituição financeira.

13/21







MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

Aplicável, pois, da mesma forma, o disposto no artigo 927 do Código Civil de 2002, acima referido, para se reconhecer a responsabilidade objetiva. A própria Lei 6.024/74, no artigo 15, I, "c", faz referência ao cabimento da liquidação extrajudicial "quando a instituição sofrer prejuízo que sujeite a **risco anormal** seus credores quirografários".

### 3.5. *RESPONSABILIDADE CIVIL OBJETIVA DOS ADMINISTRADORES DA ENTIDADE LIQUIDADA POR EXTENSÃO À LIQUIDAÇÃO DE INSTITUIÇÃO FINANCEIRA. EVENTUAL APLICAÇÃO DA LEI 6.404/76.*

A responsabilidade civil objetiva de administradores sociedade liquidada por extensão à liquidação do Banco Cruzeiro do Sul S.A., com o qual mantinha vínculo de interesse, caracterizado pelo exercício do poder de controle e pela existência de administração comum, é disciplinada por lei própria, especial, Lei 6.024/74, que dispensa qualquer invocação da Lei das Sociedades Anônimas.

Mas, mesmo que se procure trazer à aplicação a Lei 6.404/76, fica clara a responsabilidade civil dos réus.

Por diversas vezes, e por diversos modos, acima indicados, os administradores do Banco Cruzeiro do Sul, que no presente caso era a Cruzeiro do Sul Holding Financeira S.A., violaram a lei na atuação à frente dessa instituição financeira, a fazer recair sobre eles a responsabilidade civil objetiva, estampada no artigo 158, II, da Lei 6.404/76[13].

Quem não praticou os atos acima relacionados, foi com eles conivente; os administradores tinham conhecimento, mas deixaram de agir para impedir a sua prática, a incidir, da mesma forma, na responsabilidade civil objetiva.

Como se sabe, há certa divergência, especialmente doutrinária, sobre o fundamento em que se assenta a responsabilidade dos administradores de

---

[13]. Diz-se que o disposto no artigo 158, II, da Lei 6.404/76 encerra caso de responsabilidade civil objetiva.

14/21





 MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

instituição financeira. Há autores que admitem a *presunção de culpa*, e mesmo os que defendem a aplicação da teoria da culpa subjetiva clássica[14].

### 3.6. RESPONSABILIDADE CIVIL DOS ADMINISTRADORES DE INSTITUIÇÃO FINANCEIRA POR CULPA PRESUMIDA.

Na hipótese de se acolher a tese da culpa presumida[15], o que se admite para argumentação, incumbe aos réus ora demandados provar que não participaram dos atos lesivos apurados pela Comissão de Inquérito. Há **inversão do ônus da prova**, de sorte que os réus devem dizer o que se passava, enfim, o que for de seu interesse para afastar a presunção de culpa, pois se "considerou ser mais fácil ao administrador fazer a prova de sua inocência do que à sociedade comprovar a culpa dos seus gestores"[16].

### 4. PEDIDOS

### 4.1. ANTECIPAÇÃO DE TUTELA.

A antecipação de tutela é postulada dada a existência de prova inequívoca da probabilidade do direito dos credores. Não bastasse a legitimidade presumida de que se reveste a investigação levada a efeito pelo Banco Central do Brasil, tem-se, no caso, o reconhecimento de alguns réus na fase administrativa, das fraudes praticadas, e mesmo de prejuízos causados.

---

[14] Nesse sentido, e praticamente isolado, Fábio Ulhoa Coelho.

[15] Escreve Arnoldo Wald que "...tendo agravado a responsabilidade dos administradores dos bancos em virtude de ser presumida a sua culpa, conforme a melhor doutrina, ou mesmo de se ter criado no caso uma responsabilidade objetiva de caráter solidário em virtude da qual os diretores devem responder pelas obrigações da instituição financeira insolvente..." (verbete liquidação extrajudicial, na Enciclopédia Saraiva de Direito, v. 38, p. 336).

[16] Arnoldo Wald, A culpa e o risco como fundamentos da responsabilidade pessoal de diretor de bancos, n. 72, p. 108 com citação de Wenger, referindo-se além de 1937. Artigo publicado na revista Justitia, 45/108, 98-108, 1986.





MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

Aplicável o § 6.º do artigo 273 do CPC, verbis: "A tutela antecipada também poderá ser concedida quando um ou mais dos pedidos cumulados, ou parcela deles, mostrar-se incontroverso". No caso dos autos, não há necessidade de se aguardar a contestação dos réus para proferir o decreto de antecipação; que permitirá a imediata execução provisória, ou adiantada, da decisão.

O direito à indenização é inquestionável; o valor já foi apurado por técnicos do Banco Central do Brasil.

É inequívoca a prova da probabilidade do direito à indenização, pois o Banco Central do Brasil apurou o valor da dívida; e o ato dos agentes da autarquia federal goza de presunção de legitimidade.

É caso, assim, de antecipação da tutela, para que se dê início, desde já, à satisfação do direito dos credores.

### 4.2. ARRESTO CAUTELAR E FUNGIBILIDADE.

A lei 6024/74 prevê arresto cautelar típico e determina que o Ministério Público promova-a no prazo de 8 dias. Todavia, a notável evolução do processo civil brasileiro nos últimos anos fez estampar o princípio da fungibilidade entre a antecipação de tutela e a cautelar.

O Ministério Público sempre propôs ação cautelar de arresto, seguida da ação principal, de indenização. Isso envolve a duplicidade de autuação, de citação, enfim a duplicidade de atos processuais. Certos assuntos

16/21






MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

acabam por ser discutidos tanto na cautelar como na ação principal. O requerimento de provas vem nas duas demandas.

Há um desperdício enorme de atividades que conspira contra a efetividade do processo.

Assim, e com base no disposto no artigo 273, § 7.º, do CPC17, requer-se, se não deferida a antecipação de tutela, o deferimento do arresto dos bens dos réus, tantos quantos bastem para o pagamento do valor da indenização, aplicando-se o princípio da fungibilidade da cautelar com a antecipação de tutela.

Com efeito, e na autorizada doutrina de Cândido Rangel Dinamarco, "O novo texto não deve ser lido somente como portador da autorização a conceder uma medida cautelar quando pedida a antecipação de tutela. Também o contrário está autorizado, isto é: também quando feito um pedido a título de medida cautelar, o juiz estará autorizado a conceder a medida a título de antecipação de tutela, se esse for seu entendimento e os pressupostos estiverem satisfeitos. Não há fungibilidade em uma só mão de direção"18.

---

17 Artigo 273, § 7.º: Se o autor, a título de antecipação de tutela, requerer providência de natureza cautelar, poderá o juiz, quando presentes os respectivos pressupostos, deferir a medida cautelar em caráter incidental do processo ajuizado"
18 - A reforma da reforma, 2.ª ed. n. 48, 9. 92. São Paulo: Malheiros, 2002, sem grifo no original).





 MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

Que fique bem claro: Postula-se, por primeiro, a antecipação de tutela; senão, e na eventualidade, o arresto cautelar. Poderá V. Exa. entretanto, deferir, em relação a alguns réus, a antecipação de tutela, e em relação a outros, o arresto cautelar, na medida da convicção acerca da pretensão exposta.

Para justificar o cabimento do arresto, é de se dizer ser indispensável, agora, colocar ditos bens sob depósito e responsabilidade do liqüidante (depositário legal), a fim de que este, na sua posse, tenha possibilidade de guardá-los e administrá-los sem vícios, desaparecimento ou dilapidação, no interesse da coletividade de credores (art. 45, § 2.º, da Lei n.º 6.024/74); evidenciado, destarte, o periculum in mora.

Os bens das empresas prestadoras de serviços de auditoria de fato não estão indisponíveis; e a medida acautelatória deve ser estendida a todos os responsáveis por força da lei.

Anote-se que, nos termos da orientação do Superior Tribunal de Justiça[19],

"o arresto de bens previsto no art. 45 da Lei 6.024/74 pode incidir sobre os que já estavam indisponíveis (art. 36)"

Está a exigir, ainda, a decretação liminar do arresto, a prática de alguns dos réus, já efetivada e consumada, de subtrair os bens ao natural destino de garantia dos credores, com a diminuição do patrimônio do

---

[19] - RESP 185796, j. 17/12/99, rel. Min. Ruy Rosado de Aguiar. Existem diversos outros precedentes do Tribunal de Justiça de São Paulo.





 MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

banco É dizer: a conduta dos réus desaconselha, pela lesividade já engendrada, que com eles se mantenha patrimônio que, em última análise, pertence aos credores. Não são recomendados na gestão do patrimônio alheio;

Atente-se, ainda, que a ação cautelar de arresto em questão é, praticamente, imposição legal. Com a finalidade de assegurar ao máximo os interesses dos credores, na tutela do sistema de crédito, que é matéria de ordem pública, o legislador exige que os bens dos administradores e controladores submetam-se à cautela do arresto.

Quanto ao fumus boni iuris, tem-se, de um lado, a inescapável responsabilidade objetiva dos réus, com solidariedade e, de outro, o demonstrado prejuízo, elevadíssimo, apurado no curso do procedimento instaurado pelo Banco Central do Brasil; o banco está quebrado há muito tempo.

### 4.3. CITAÇÃO, CONDENAÇÃO E REQUERIMENTOS.

Requer o Ministério Público do Estado de São Paulo:

a. citação dos réus, para responderem ao pedido, sob pena de sofrerem os efeitos da revelia;

b. benefícios do disposto no artigo 172 do CPC;

c. condenação do réu Luiz Felippe Indio da Costa ao pagamento da quantia de R$ 4.862 mil (quatro milhões, oitocentos e sessenta e dois mil reais).

d. condenação solidária dos demais réus para pagarem a quantia apontada nas tabelas insertas

19/21






$\frac{21}{8}$

 MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

no item 2.5 desta inicial (fls. 346 dos autos do inquérito), sendo a mesma importância apurada em sua totalidade porque houve somente um período de gestão que apresentou prejuízo.

e. confirmação da antecipação de tutela e/ou do arresto acima pleiteado, para que os bens, tantos quantos bastem, sejam penhorados e praceados. No segundo (II) volume dos autos do inquérito do Banco Central do Brasil estão arrolados, às fls. 305/310), os bens dos ex-administradores e controladores, sobre os quais deve incidir o arresto.

f. incidência de correção monetária e de juros.

g. não se faça arresto ou penhora sobre bem considerado bem de família, quando devidamente comprovada essa qualidade.

h. Intimação do senhor liquidante, Sérgio Rodrigues Prates, para acompanhar os termos desta.

i. Expedição de ofícios:

1. Para Associação dos Registradores Imobiliários do Estado de São Paulo – ARISP, sita na Rua Maria Paula, 123, 1º andar, Bela Vista, São Paulo/SP, CEP 01319-001, solicitado informações sobre a

20/21

22
D

 MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

existência de imóveis em nome dos réus no Estado de São Paulo.

2.      Para o Instituto de Registro Imobiliário do Brasil – IRIB, sito na Avenida Paulista, 2073, Horsa I, coj. 1201 e 1202, Cerqueira Cesar, São Paulo/SP, CEP 01311-300, solicitado informações sobre a existência de imóveis em nome dos réus no Brasil.

3.      Para Corregedoria Geral da Justiça do Estado do Rio de Janeiro, sita na Avenida Erasmo Braga, 115, 7º andar, Lâmina I, Centro, Rio de Janeiro/RJ, CEP 20020-903, solicitado informações sobre a existência de imóveis em nome dos réus no Estado do Rio de Janeiro.

Protesta pela produção de todos os meios de prova em direito permitidos, como juntada de documentos (especialmente de correspondência eletrônica impressa), oitiva de pessoas, perícias, depoimento pessoal dos réus sob pena de confissão.

Dá-se à causa o valor de **R$ 4.862** (quatro milhões, oitocentos e sessenta e dois mil reais).

São Paulo, 30 de abril de 2013.

Eronides A. Rodrigues dos Santos
Promotor de Justiça

Joel Bortolon Júnior
Promotor de Justiça

21/21

 PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

HONORABLE JUDGE OF THE 2ND BANKRUPTCY AND COURT-SUPERVISED REORGANIZATION COURT OF SÃO PAULO.

Distribution by Dependence
Inquiry by the Central Bank of Brazil
No.  **0027878-37.2013.8.26.0100**
Extrajudicial Liquidation of:
**CRUZEIRO DO SUL HOLDING FINANCEIRA S.A.**

　　　　THE **PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO**, through its undersigned Prosecutors, respectfully files before Your Honor, based on the inquiry included, prepared by the Inquiry Commission appointed by the Central Bank of Brazil, this

## CIVIL LIABILITY ACTION

based on articles 39, 40, 45 e 46 of Law 6.024/74, article 15 of Decree-Law No. 2.321/87 combined with articles 1 of Law 9.447/97; sole paragraph of article 927 of the Civil Code and article 127, caption, of the Federal Constitution, against:



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

## 1. DEFENDANTS

1) **Luís Felippe Indio da Costa**: Brazilian, consensually separated, lawyer, ID RG 912.072-6-IFP/RJ, taxpayer identification number CPF 006.034.067-34, residing at Avenida Epitácio Pessoa, 300 - apto 501, Ipanema, Rio de Janeiro/RJ, CEP [Postal Code] 22410-090.

2) **Luís Octávio Azeredo Lopes Indio da Costa**: Brazilian, consensually separated, ID RG 044.524.34-6 - IFP/RJ, CPF 782.474.977-00, residing at Estrada do Embu, 1550 - Haras Guacan, Cotia/SP, CEP 06713-100.

3) **Charles Alexander Forbes**: Brazilian, lawyer, ID RG 2.249.539-3 SSP/SP, CPF 001.906.918-91, residing at Rua José Maria Lisboa, 1060, apto. 31, São Paulo/SP, CEP 01423-001.

4) **Fabio Rocha do Amaral**: Brazilian, married, business administrator, ID RG 19.363.793-7, CPF 076.593.208-31, residing at Rua Ernesto Nazaré, 213 - Alto de Pinheiros, São Paulo/SP, CEP 05462-000.

5) **Flavio Nunes Ferreira Rietmann**: Brazilian, divorced, business administrator, ID RG 10.295.069-6, CPF 913.629.627-91, residing at Alameda dos Jurupis, 701 - apto. 152, São Paulo/SP, CEP 04088-022.

6) **Horácio Martinho Lima**: Brazilian, single, engineer, ID RG 05213864-1, CPF 745.862.547-34, residing and domiciled at Rua Odílio Bacelar, 43, Urca, Rio de Janeiro/RJ, CEP 22290-280, with the following correspondence address: Av. Rio Branco, 110, 38° andar, Centro, Rio de Janeiro/RJ, CEP 20040-001.

 PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

## 2. FACTS

### 2.1. LIQUIDATED COMPANY

2.1.1. Organization of Company and alterations in the past 5 years.

Cruzeiro do Sul Holding Financeira S.A. is a non-financial entity, belonging to Grupo Cruzeiro do Sul, and is not subject to supervision by the Central Bank of Brazil.

According to the Minutes of Organization (pages 25/26), the institution was organized on 2.2.2011, when the founding shareholders Messrs. Luis Felipe Indio da Costa, Luis Octavio Azeredo Lopes Indio da Costa, Charles Alexander Forbes and Fabio Rocha do Amaral met.

Afterwards, the members of the Board of Directors were elected for the period 2.2.2011 to 2.2.2012, the following names having been approved: Luis Felipe índio da Costa, Charles Alexander Forbes and Fabio Rocha do Amaral.

### 2.2. CONTROL OF THE LIQUIDATED COMPANY

Considering of coverage for purposes of ascertaining liability (from 6.4.2007 to 6.4.2012), and according to information obtained from the Central Bank of Brazil's Information System - Sisbacen (pages 62/63), and based on the record of shares of the institution (pages. 58/51), **CRUZEIRO DO SUL HOLDING FINANCEIRA S.A**. was controlled by Mr. Luis Felippe índio da Costa.

### 2.3. ADMINISTRATION OF THE LIQUIDATED COMPANY

Considering the period of coverage for purposes of ascertaining liability (from 6.4.2007 to 6.4.2012), the direct controller of **CRUZEIRO DO SUL HOLDING FINANCEIRA S.A.** was Mr. Luis Felippe Indio da Costa (page 6) and the ex- administrators of said institution are listed below:

 PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

### 2.3.1. ADMINISTRATION

Management period: 02/02/11 to 03/16/2011

| Name | CPF | Title |
|------|-----|-------|
| Luis Felippe Indio da Costa | 006.034.067-34 | Director |
| Luis Octavio Azeredo Lopes índio da Costa | 782.474.977-00 | Founding Shareholder |
| Fabio Rocha do Amaral | 076.593.208-31 | Director |
| Charles Alexander Forbes | 001.906.918-91 | Director |

Management period: 03/16/2011 to 06/04/2012 (*)

| Name | CPF | Title |
|------|-----|-------|
| Luis Octávio Azeredo Lopes Indio da Costa | 782.474.977-00 | Director/Vice-chairman of the board of directors/officer |
| Luis Felippe Indio da Costa | 006.034.067 34 | Director/Chairman of the board of directors /officer |
| Fabio Rocha do Amaral | 076.593.208-31 | Director |
| Charles Alexander Forbes | 001.906.918-91 | Director |
| Horácio Martinho Lima | 745.862.547-37 | Director |
| Flavio Nunes Ferreira Rietmann | 913.629.627-91 | Director |

(*) Article 150 of Law 6.404/76, in its § 4 states that the term of management of the board of directors or of the executive board extends until the investiture of the new elected administrators. Thus, having in view that there were no meetings after 2.2.2012, we considered that this management was effective until 6.4.2012 (date of RAET [Temporary Special Administration Regime).

## 2.4. INTERVENTION AND LIQUIDATION OF THE CENTRAL BANK OF BRAZIL

### 2.4.1. Decree of the Temporary Special Administration Regime – RAET

On 6.4.2012, through ACT-PRESI No. 1.218 (Union Gazette/D.O.U. of 6.5.2012, section 1, page 13) (pages 2/3), the Chairman of the CENTRAL BANK OF BRAZIL, by the powers vested in him by article 12, item XVII, of the Internal Regime, based on article  19 of Decree-law No. 2.321, of 2.25.1987. combined with article 51 of Law no. 6.024, of 3.13.1974, decrees by extension, the Temporary Special Administration Regime, for the term of 180 (one hundred and eighty) days, at CRUZEIRO DO SUL HOLDING FINANCEIRA S.A. (Taxpayer Identification Number CNPJ: 13 225.116/0001-70), with registered office in the City of Rio de Janeiro, State of Rio de Janeiro, at Avenida Presidente Wilson, 231, 24° andar, sala 2403, Centro, considering having decreed on that date, the Temporary Special Administration Regime



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

at Banco Cruzeiro do Sul S.A. (CNPJ 62.136.254/0001-99), with which the company held a relationship of interest, characterized by the controlling power of the Collegiate Executive Board, at the meeting of June 4, 2012.

In view of the aforementioned act, a temporary special administrator was appointed, based on art. 8 of Decree-law No. 2.321/1987, the Credit Guarantor Fund (FGC), CNPJ No. 00.954.288/0001-33.

On 4.6.2012, COMMUNICATION No. 22 585, of the Extrajudicial Liquidations Department - DELIQ (pages. 4/7), by which the Central Bank of Brazil informed the financial institutions and stock exchanges, that the decree of the Temporary Special Administration of CRUZEIRO DO SUL HOLDING FINANCEIRA S.A.; the appointment of the relevant temporary special administrator and the incidence of unavailability of the property of the Direct controller/ex-administrator, Mr. Luis Felippe Indio da Costa, and of the ex-administrator Mr. Luis Octávio Azeredo Lopes Indio da Costa.

On 9.14.2012, through Act Presi No. 1.231, published in the D.O.U of 9.17.2012 (pages 19/20), it was decreed, by extension, the Extrajudicial Liquidation regime in the institution CRUZEIRO DO SUL HOLDING FINANCEIRA S.A., having in view that it was decreed, on the same date, the Extrajudicial Liquidation of Banco Cruzeiro do Sul S.A., with which the Company held relationship of interest, characterized by the exercise of the controlling power and the existence of common administration, in accordance with the decision of the Collegiate Executive Board, at a meeting of September 14, 2012, when the liquidator, Mr. Sérgio Rodrigues Prates, was appointed, the legal term of the extrajudicial liquidation being April 5, 2012.

### 2.5. THE OUTSTANDING LIABILITY BY MANAGEMENT OF ADMINISTRATOR

To ascertain the amount or estimate of the losses caused to third parties, established in article 43, of Law No. 6.024/1974, this was based on the analysis of the transactions in the past 5 (five) years and of the balance sheet of **CRUZEIRO DO SUL HOLDING FINANCEIRA S.A.** drawn up by the FGC, on the date of the RAET (6.4.2012).

According to the Adjusted Equity Situation on 6.4.2012, losses to third parties were verified (article 43 of Law No. 6.024/1974) in the estimated amount of R$ 4,862 thousand as described in m 4.3 – Adjusted Shareholders' Equity of the report, whose liability was jointly and severally distributed, pursuant to the terms of article 40, of Law 6.024/1974, among the controllers and ex-members/administrators of the HOLDING which made up the second management period, in accordance with the table below:



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

**Management from 03/16/2011 to 06/04/2012=> Liabilities verified of R$ 4,862 thousand**

| Name | CPF | Title |
|---|---|---|
| Luis Felippe Indio da Costa | 006.034.067 34 | Controller/Director/Chairman of the Board of Directors/Officer |
| Luis Octávio Azeredo Lopes Indio da Costa | 782.474.977-00 | Director/Vice-chairman of the Board of Directors /Officer |
| Fabio Rocha do Amaral | 076.593.208-31 | Director |
| Charles Alexander Forbes | 001.906.918-91 | Director |
| Horácio Martinho Lima | 745.862.547-37 | Director |
| Flavio Nunes Ferreira Rietmann | 913.629.627-91 | Director |

It is emphasized that the Negative Adjusted Shareholders' Equity value (outstanding liabilities), estimated at

R$ 4,862,000.00

(four million, eight hundred and sixty-two thousand reais) <u>may suffer alterations in the course of the current extrajudicial liquidation process</u>.

This civil liability action postulates reparation of losses sustained by third parties – depositors and creditors in general of the extra-judicially liquidated company, within the objectives established by Law 6.024/74.

The law requires that an "estimate of the losses verified in each management be made" (article 43), and this was made by the inquiry commission, with the note that in the case in question there was only one management period.

*2.6. IRREGULARITIES FOUND (pages 344/345)*

The adjustment in the Special Opening Balance Sheet of 6.4.2012, of the "Provision for Risk of Realization of Bank Credit Notes", in the amount of R$ 14,622 thousand, refers to investments in Bank Credit Notes in the amount of R$ 8,531 thousand (page 96), issued by the company Promotora e Divulgadora Sudeste Line Ltda., taxpayer identification number CNPJ 04.816.268/3001-57 (page 88 and pages 92/127). Such CCB's were considered as of difficult realization, as, although the maturity were covenanted for 11.5.2012, the issuer is defaulting in other transactions of BCSul.

The adjustment of R$ 745 thousand (pages 132/134) refers to an advance made on 5.14.2012 to Mr. Alvaro Luiz Alves de Lima Alvares Otero, without adequate documentary support.

*2.7. CAUSES OF THE FALL (pages 345)*

The decree of the Temporary Special Administration Regime - RAET of

 PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

CRUZEIRO DO SUL HOLDING FINANCEIRA S.A. resulted from the decree, by extension of this same special regime in BANCO CRUZEIRO DO SUL S.A., with which the company had a relationship of interest, characterized by the exercise of controlling power and by the existence of common administration.

The cause of the fall of CRUZEIRO DO SUL HOLDING FINANCEIRA S.A resulted, mainly, from the adjustments reported in Chapter 4.3 – ADJUSTED NET EQUITY, Explanatory Notes of the adjustments made by the FGC [Credit Guarantor Fund], from 1 to 3, summarized below:

• Provision for Risk of Realization of Bank Credit Notes, which generated an adjustment of R$ 14,622 thousand;
• Provision for Risk of Realization with Advance Granted, which generated an adjustment of R$ 745 thousand; and
• Write-off of investments which the Company held at Banco Cruzeiro do Sul S/A, which generated an adjustment of R$ 105,832 thousand.


## 3. THE LAW

### 3.1. OBJECTIVE CIVIL LIABILITY OF THE CONTROLLER

The controller of a liquidated company by extension to the liquidation of Banco Cruzeiro do Sul S.A., with which it maintained a relationship of interest, characterized by the exercise of controlling power and by the existence of a common administration, answers objectively for the losses caused to the Company and third parties. Thus, pursuant to the terms of the provisions of article 1 of Law 9.447/97,

"the joint and several liability of the controllers of financial institutions established in article 15 of Decree-law No. 92.321, of February 25, 1987, also applies to the regimes of intervention and extrajudicial liquidation covered by Law No. 6.024, of March 13, 1974."

In turn, article 15 of Decree-law 2.321/74 establishes that:
"The temporary administration regime having been decreed, the ex-administrators of the institution answer jointly and severally for the obligations assumed by the latter, the natural persons or legal entities which kept a relationship of control, **regardless of verification of willful misconduct or negligence.**"



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

It is invoked, therefore, the application of the objective liability; notwithstanding, reference was made both to negligent acts and malicious and fraudulent acts of the defendants.

### 3.2. OBJECTIVE CIVIL LIABILITY OF THE MEMBERS OF THE BOARD OF DIRECTORS OF THE ENTITY LIQUIDATED BY EXTENSION TO THE LIQUIDATION OF FINANCIAL INSTITUTION

The members of the Board of Directors are also considered by law as administrators[1]; there applying to them the same civil liability regime, with the accretion of the following particularity: because it is a collegiate body, the administration of the directors is collective[2]. As there is joint and several liability among them[3], all are objectively responsible for the outstanding liabilities.

### 3.3. OBJECTIVE CIVIL LIABILITY OF THE ADMINISTRATORS OF THE ENTITY LIQUIDATED BY EXTENSION OF THE FINANCIAL INSTITUTION. ARTICLES 39 AND 40 OF LAW 6.024/74

Article 2 of Law No. 1.808, of January 7, 1953 stated:

"The officers and managers who acts with negligence or malice, even if in the case of a joint stock company and or companies by membership interest units of limited liability answer jointly and severally for the obligations assumed by the banks and banking institutions, during their management and until they are complied with".

As a result, even if with a discussion, it was understood that the subjective civil liability by the administrators of financial institution was established.

The new wording of article 42 of Law was given by Law 4.595/64:

"The officers and managers of the financial institutions are jointly and severally liable for the obligations assumed by the same during their management, until they are complied with. Sole paragraph – If there are losses, the joint and several liability will be restricted to the respective amount".

---

[1] Articles 138 and 145 of Law 6.404/76. According to article 9 of the bylaws of Banco Santos, "The company shall be administered by a Board of Directors and by an Executive Board, as established in these Bylaws " (no emphasis added in the original).

[2] To this effect, Paulo Fernando Campos Salles de Toledo, O conselho de administração na sociedade anônima, No. 2.7.8. e 2.7.9, p. 74-75.

[3] Article 40 of Law 6.024/74.



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

Law 1.808/53 was expressly revoked by article 57 of Law 6.024/74, which took care of the civil liability of the administrators of the financial institution, disciplining it in two provisions, namely:

Article 39 establishes that:

"The administrators and members of the Audit Committee of financial institutions shall be liable, at any time, except for extinctive provision, for the acts which they have committed or omissions incurred."

And article 40, in turn, extends the liability, as:

"The administrators of financial institutions will be liable for the obligations assumed by them during their management, until they are complied with". Sole paragraph. Joint and several liability shall be restricted to the amount of losses caused."

Reference to willful misconduct or negligence disappeared, as one notices from confronting the three laws, that of 1953, 1965 and that of 1974. The animic element of civil liability stopped being a requirement.

Hence, the guidance of doctrine and case law to the effect that the civil liability of the administrators of a financial institution is objective.

The Court of Justice of São Paulo has long supported this thesis, as it can be seen in several court decisions[45]. To the same effect are the decisions of the

---

[4] TJSP, RT 775/240; RT 645/66; JTJ 266/40; 194/89. Other former: 1) Writ of Mandamus MS 71.818-1, 5th Civil Chamber, j.8.28.86, Rapporteur Associate Justice Silva Costa; 2) MS.71.456-1, 5th Civil Chamber, j.10.2.86, Rap. Associate Justice Ralpho Waldo; 3) MS 71.603-1 5th Civil Chamber,.Civ., j.6.11.87, Rap. Associate Justice Ruy Camilo; 4) Al.79.767-1, 3rd Civil Chamber, j. 12.2.86, Rap. Associate Justice Flávio Pinheiro; 5) Civil Appeal 85.426-1, 5th Civil Chamber, j. 12.10.87, Rap. Associate Justice Márcio Bonilha; 6) Interlocutory Appeal Al 89.632-1, 2nd Civil Chamber, j. 12.18.87, Rap. Associate Justice Silva Ferreira; 7) Civil Appeal 107.649-1, 4th Civil Chamber, j. 4.20.89, Rap. Associate Justice Ney Almada; 8) Al 113.783-1, 3rd Civil Chamber, j. 02.28.89, Rap. Associate Justice Flávio Pinheiro, among several others.

[5] "Thus, the administrators of the financial institutions are restricted to answering for the acts that they commit or omissions incurred, let it be repeated, regardless of the idea of negligence of willful misconduct. On the other hand, as the standards enunciated on the administrators of the financial institutions make reparation of losses without negligence of willful misconduct mandatory, in view of the exceptional nature of this type of civil liability, the latter is not elided under the argument that assets were acquired before or shortly afterwards the beginning of the management of the ex-administrator in the financial institution being liquidated." (TJSP [Court of Justice of São Paulo], Civil Appeal.195.317-1/0, Banco da Lavoura Case, j. 8.19.93, Rap. Associate Justice Melo Colombi). On the merits, the objective liability of the administrators in dealing with a financial institution is *ex vi legis*, because administrators of other people's money (art.40 da Lei 6.024/74). (TJSP, 3rd Civil Chamber, Appeal 228.538-1/1, j.8.8.95, Rap. Associate Justice Mattos Faria).



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

Court of Justice of Rio de Janeiro[6] and the Court of Justice of Rio Grande do Sul[7].

The Superior Court of Justice is also guided by the application of objective civil liability, as it established more than once[8].

When the Federal Supreme Court examined the subject, it also recognized objective civil liability, failing to apply Brazilian Corporate Law [Lei das Sociedades Anônimas] on the subject[9].

It is, thus, irrelevant, to inquire into willful misconduct or negligence[10], as the joint and several liability is incurred even on acts of normal administration[11].

It is also irrelevant which is the officer who has committed or participated in an act detrimental to the creditors; all the administrators are liable for the damaging obligations. "It matters little", says Trajano de Miranda Valverde, "for purposes of joint and several liability, that, by the bylaws, all the officers are not responsible for these obligations or duties."[12]

The guidance of case law is settled to the effect that, in corporate crimes, wherein there is more rigor in the description of willful misconduct, detailing the conducts in accusation is waived. It should be admitted, with more reason, in relation to civil liability, which does not cause restriction to freedom, but encumbers the equity.

It matters little, then, the individual conduct of the administrators and controllers or the gradation of the negligence of each in the commitment of acts damaging to the company. As all and every person has legal and statutory powers to prevent the practice of illegalities, they have unchallengeable objectively liability for the losses verified in the company.

---

[6] Appeal 5.384/2000, of the 9th Civil Chamber, j. 10/10/2000, rap. Associate Justice Laerson Mauro; before, to the same effect, court decision published in RJTJRJ, v.35, p. 57.

[7] Appeal 595059023, of the 10th Civil Chamber, j.11/11/2004, rap. Associate Justice Paulo Antonio Kretzmann. This judgment reports the existence of another court decision of the same court, which is Civil Appeal, rap. Associate Justice Galeno Vellinho de Lacerda).

[8] ESP 21245, 4th Panel, j. 10.4.94, published in DJU of 10.31.94, p. 29500, Rapporteur Justice RUY ROSADO DE AGUIAR JÚNIOR. **To the same effect,** RESP 172736, j. 6/10/2003, published in the Official Gazette DJ 9/22/2003 and in RSTJ 174/223, Rapporteur Justice Francisco Peçanha Martins.

[9] STF, 2nd Panel, Extraordinary Appeal No. 93.416-2, São Paulo, Fivap Case, j.8.7.81, Rapporteur Justice Décio Miranda. RTJ, vol. 99, p. 891

[10] Wilson do Egito Coelho, Da Responsabilidade dos Administradores das Sociedades por Ações em face da nova Law e da Law 6.024/74, p.44. RDM 40. To the same effect: de Gian Maria Tosetti, RDM, 41/89.

[11] Carlos Alberto Bittar, commenting on the subject of liability of the administrators of financial institutions (Direito Empresarial, Revista de Direito Civil, RT., ed. 1.977, pag.90).

[12] Sociedades por ações, v. II, n. 640, p.338



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

The administrators and controllers legally persecuted by objective liability can only file of a proper action against those more guilty for the losses. In fact, because participants in each of the Company's acts will find it easy to evidence the gradation of subjective liability in said procedural course.

What is necessary to assess, in addition to the loss, for filing a public liability civil action then is the identity of the administrators and controllers of a financial institution in extrajudicial liquidation. No more. The quality of the administrator or controller in the period in which loss was verified suffices to recognize liability.

### 3.4. CIVIL OBJECTIVE LIABILITY OF THE ADMINISTRATORS OF THE ENTITY LIQUUIDATED BY EXTENSION TO THE LIQUIDATION OF A FINANCIAL INSTITUTION. SOLE PARAGRAPH OF ARTICLE 927 OF THE BRAZILIAN CIVIL CODE

According to the terms of the governing law, thus, which is Law 6.024/74, there is objective civil liability also by the administrators of a company liquidated by extension to the liquidation of Banco Cruzeiro do Sul S.A., with which it maintained a relationship of interest, characterized by the exercise of controlling power and by the existence of a common administration, which leads to the fact that description of conducts, negligent or malicious, as stated above is not required.

If you consider that it is not the case of recognizing the objective civil liability present in the special law, what one admits only for argument's sake, this Prosecutor's Office invokes a more generic rule, which is that of the sole paragraph of article 927 of the 9th Brazilian Civil Code:

"There shall be the obligation to repair the damage, regardless of negligence, in the cases specified in the law, or when the activity normally developed by plaintiff no longer entails, through its nature, risk for another's rights ".

Now, further considerations are not required to reach the conclusion that the activities pursued by the banks, through their administrators, according to the guidance established by the controller. Through the very nature of obtaining funding from the people, it contemplates a high dose of "risk to another's rights". It is not by chance that the greatest liabilities in cases of breach are those of the financial institution.

Thus, likewise, the provisions of article 927 of the Civil Code of 2002, mentioned above, apply, to recognize the objective liability. Law 6.024/74 itself, in article 15, I, "c", makes reference to the applicability of extrajudicial liquidation" when the institution suffers loss which subjects it to the abnormal risk of its unsecured creditors".



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

### 3.5. OBJECTIVE CIVIL LIABILITY OF THE ADMINISTRATORS OF THE ENTITY LIQUIDATED BY EXTENSION TO THE LIQUIDATION OF A FINANCIAL INSTITUTION. EVENTUAL APPLICATION OF LAW 6.404/76

The objective civil liability of the administrators of the company liquidated by extension to the liquidation of Banco Cruzeiro do Sul S.A., with which it maintained a relationship of interest, characterized by the exercise of controlling power and by the existence of common administration, is governed by its own special law, Law 6.024/74, which does away with any invoking of Brazilian Corporate Law [Lei das S.A.]

But, even if one seeks to bring to application Law 6.404/76, the civil liability of the defendants is clear.

Several times, and in various ways, as indicated above, the administrators of Banco Cruzeiro do Sul, who, in this case, was Cruzeiro do Sul Holding Financeira S.A., violated the law in their performance at the head of this financial institution, so as to let the objective civil liability, displayed in article 157, II, of Law 6.404/76 fall on them[13].

Those who did not commit the acts listed above, connived with them; the administrators knew, but did not fail to act to prevent their practice, which would be incurred, likewise, in objective civil liability.

As it is known, there is a certain difference, especially of doctrine, on the foundation on which the liability of the administrators of a financial institution is established. There are authors who admit presumption of guilt, and even those who defend the application of the classical theory of subjective guilt.[14]

### 3.6. CIVIL LIABILITY OF THE ADMINISTRATORS OF A FINANCIAL INSTITUTION FOR PRESUMED GUILT

In the assumption of accepting the theory of presumed guilt[15], which is admitted for argument's sake, the present defendants shall evidence that they did not participate in the damaging acts verified by the Inquiry Commission. There is inversion of the burden of proof, so that the defendants must say what was happening, whatever is in their

---

[13] It is said that article 158, II, of Law 6.404/76 closes the case of objective civil liability.

[14] To this effect, and practically isolated, Fábio Ulhoa Coelho

[15] Arnoldo Wald writes that "...the liability of bank administrators having aggravated as their negligence is assumed, according to the best doctrine, or even in the case of objective liability of a joint and several nature having been created by virtue of which the officers must answer for the obligations of the insolvent financial institution ..." (term extrajudicial liquidation, in Enciclopédia Saraiva de Direito, v. 50, p. 155).



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

interest to remove the presumption of guilt, as it was "considered easier for the administrator to submit evidence of his innocence than for the Company to evidence the guilt of its managers"[16]

## 4. REQUESTS

### 4.1. PRIOR RELIEF

Prior relief is postulated given the existence of unequivocal evidence of the probability of the right of creditors. Were the assumed legitimacy that covers the investigation taken to effect by the Central Bank of Brazil not enough, in the case, some defendants recognize in the administrative phase, the frauds perpetrated, and even the losses caused.

Paragraph 6 of article 273 of the Code of Civil Procedure - CPC, verbatim: "Prior relief may also be granted when one or more of the requests cumulated, or part of them, proves uncontroversial". In the case in the records, there is no need to wait for the defendants to challenge to render the decree of prior relief; which will enable provisional in advance, performance of the decision.

The right to indemnity is unquestionable; the value has already been calculated by technicians of the Central Bank of Brazil.

The evidence of the probability of the right to indemnification is unequivocal, as the Central Bank of Brazil calculated the value of the debt; and the act that the agents of the federal agency enjoy assumption of legitimacy.

It is the case, thus, of prior relief, to begin, herewith, satisfaction of the rights of the creditors.

### 4.2. PROVISIONAL ATTACHMENT AND FUNGIBILITY

Law 6024/74 sets forth provisional attachment and determines that the Public Prosecutor's Office promote it within 8 days. However, the notable evolution of Brazilian civil procedure in the last years caused the principle of fungibility between prior relief and provisional remedy to be stamped.

---

[16] Arnoldo Wald, The negligence and risk as foundations of the personal liability of bank officers, No. 72 p. 109, with quotation of Mezger, mentioning a 1937 German law. Article published in the periodical Justitia, 45(120): 93-109, 1983.



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

The Public Prosecutor's Office has always proposed a provisional remedy of attachment, followed by the main action, of indemnification. This involves duplicity of performance, summons; finally duplicity of procedural acts. Certain subjects end up being discussed both in the provisional remedy and in the main action. The request of evidence occurs in both claims.

There is a huge waste of activities which conspires against the effectiveness of the case.

Thus, and based on the provisions of article 273, § 7[17], of CPC17, it is requested, if not granted, prior relief, the granting of attachment of the property of the defendants, as many as suffice for the payment of the value of the indemnification, the principle of fungibility of the provisional remedy with prior relief applying.

In effect, and in the authorized doctrine of Cândido Rangel Dinamarco, "The new text must be read only as holding the authorization to grant a provisional remedy when prior relief is requested. The contrary is also authorized, that is: also when a request is made on account of a provisional remedy, the judge will be authorized to grant the measure as prior relief, if its understanding and presuppositions are satisfied. There is no one-way fungibility. "[18]

Let it be quite clear It is postulated, first, prior relief; otherwise, and in the possibility, provisional attachment. Your Honor may, however, grant, in relation to others, provisional attachment, to the extent of the conviction on the claim stated.

To justify the applicability of attachment, it is indispensable, now, to put said assets under deposit and the liability of the liquidator (legal trustee), so that it, in their possession, has the possibility of keeping them and administering them without defects, disappearance or dilapidation, in the interest of the collectivity of creditors (article 45, § 2, of Law No. 6.024/74); thus, evidencing, *periculum in mora*.

The assets of the audit service providers in fact are not unavailable; and the provisional measure must be extended to all those responsible by force of law.

Note that, pursuant to the terms of the guidance of the Superior Court of Justice[19],

---

[17] Article 273, § 7º: If the plaintiff, on account of prior relief, provides the provisional remedy, the judge may, when the relevant prerequisites are present, grant the provisional remedy incidentally of the case filed."

[18] A reforma da reforma, 2.ª ed. N. 48.9.92 São Paulo: Malheiros, 2002, emphasis added).

[19] HESP 185796, j. 17/12/99, rap. Justice Rosado de Aguiar. There are several other precedents by the Court of Justice of São Paulo.



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

"the attachment of assets set forth in article 45 of Law 6.024/74 can incide on those which were already unavailable (art. 36)"

It is also requiring, the injunctive decree of attachment, the Practice by some of the defendants, already effectuated and consummated, which subtracts the assets from the natural destination of guarantee of the creditors, with reduction in the bank's equity. That is to say: the conduct of the defendants advises against, due to the harm already engendered, that equity be kept, which, in the final analysis, belongs to the creditors. They are not recommended in the management of another's property;

Attention should also be paid to the fact that the provisional action of attachment in question is, practically, a legal imposition. In order to ensure to the utmost the interests of the creditors, in the protection of the credit system, that it is a matter of a public order, the legislator requires that the property of the administrators and controllers be submitted to the caution of the attachment.

Regarding the *fumus boni iuris*, on the one hand, the defendants' objective liability is inescapable, with joint and several liability and, on the other, the loss having been demonstrated, which is very high, verified in the course of the procedure brought by the Central Bank of Brazil; the bank has long been bankrupt.

### 4.3. SUMMONS, CONVICTION AND REQUESTS

The Public Prosecutor's Office of the State of São Paulo requests:

a.   summoning the defendants, to answer to the request, under penalty of sustaining the effects of default;
b.   benefits of the provisions of article 172 of the CPC;
c. conviction of defendant Luiz Felippe Indio da Costa to pay R$ 4,862 thousand (four million, eight hundred and sixty-two thousand reais).
d.   joint and several conviction of the other defendants to pay the sum indicated on the tables of item 2.5 of this complaint (page 346 of the records of the inquiry), the same sum being calculated in full because there was only a management period when losses were posted.
e.   confirmation of prior relief and/or of attachment above that pleaded, so that the assets, as many as there suffice, be pledged and auctioned. In the second II) volume of the records of the inquiry of the Central Bank of Brazil are listed, on pages 305/310), the property of the ex-administrators and controllers, on which the attachment shall



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

accrue.

f.    incidence of monetary indexation and interest.

g.    family property, when duly evidenced as such, shall not be attached or pledged.

h.    Summons of the liquidator, Sérgio Rodrigues Prates, to follow up on the terms hereof.

i. Issuance of official letters:

1. To the Association of Real Estate Registrars of the State of São Paulo [*Associação dos Registradores Imobiliários do Estado de São Paulo*] - ARISP, located at Rua Maria Paula, 123, 1º andar, Bela Vista, São Paulo/SP, CEP 01319-001, requesting information on the existence of real estate in the name of the defendants in the State of São Paulo.
2.    To the Brazilian Real Estate Registration Institute *[Instituto de Registro Imobiliário do Brasil]*- IRIB; located at Avenida Paulista, 2073, Horsa I, conj. 1201 e 1202, Cerqueira Cesar, São Paulo/SP, CEP 01311-300, requesting information on the existence of real property in the name of the defendants in Brazil.
3.    To Magistracy General of the State of Rio de Janeiro, located at Avenida Erasmo Braga, 115, 75 andar, Lâmina I, Centro, Rio de Janeiro/RJ, CEP 20020-903, requesting information on the existence of real property in the name of the defendants in the State of Rio de Janeiro.

Protests for the production of all the means of evidence admitted in the law, such as the attachment of documents (especially of printed emails), hearing of persons, personal deposition by the defendants under penalty of confession.

The amount in controversy is R$ 4,862 (four million, eight hundred and sixty-two thousand reais).

São Paulo, April 30, 2013.

[signature]                                      [signature]
Eronides A. Rodrigues dos Santos              Joel Bortolon Júnior
Public Prosecutor                              Public Prosecutor

# DECLARATION EXHIBIT 2

# MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

### EXCELENTÍSSIMO SENHOR DOUTOR JUIZ DE DIREITO DA 2.ª VARA DE FALÊNCIAS E DE RECUPERAÇÕES JUDICIAIS DE SÃO PAULO.

> Distribuição por Dependência
> Inquérito do Banco Central do Brasil
> N.º 0027885-29.2013.8.26.0100
> Liquidação Extrajudicial de:
> **BANCO CRUZEIRO DO SUL S.A.**

O **MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO**, por seus Promotores de Justiça ao final assinado, vem, respeitosamente, perante Vossa Excelência, com base no incluso Inquérito elaborado pela Comissão de Inquérito nomeada pelo Banco Central do Brasil promover

1/66





 MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

## AÇÃO DE RESPONSABILIDADE CIVIL

com fundamento nos artigos 39, 40, 45 e 46 da Lei 6.024/74, artigo 15 do Decreto-lei nº 2.321/87 c.c. artigos 1º e 3º, parágrafo único da Lei 9.447/97; parágrafo único do artigo 927 do Código Civil e artigo 127, "caput", da Constituição Federal, em face de:

## 1. DEMANDADOS

1) **Cruzeiro do Sul Holding Financeira S.A (CNPJ: 13.225.116/0001-70)**: Entidade não financeira, pertencente ao Grupo Cruzeiro do Sul, com sede na Avenida Presidente Wilson, 231, 24° andar, sala 2403, Centro, Rio de Janeiro, RJ, CEP 20031-021, constituída em **2.2.2011**, atualmente em regime especial de liquidação extrajudicial, administrada pelo liquidante **Sérgio Rodrigues Prates**, endereço para citação, na Rua Funchal n°418 – 6°, 7°, 8° e 9° andares, Vila Olímpia, São Paulo, Capital, CEP04551-060.

2) **Luís Felippe Indio da Costa**: Brasileiro, separado consensualmente, advogado, RG 912.072-6-IFP/RJ, CPF 006.034.067-34, residente à Avenida Epitácio Pessoa, 300 – apto 501, Ipanema, Rio de Janeiro/RJ, CEP 22410-090.

3) **Luís Octavio Azeredo Lopes Indio da Costa**: Brasileiro, separado consensualmente, RG 044.524.34-6 –IFP/RJ, CPF 782.474.977-00, residente à Estrada do Embu, 1550 – Haras Guacan, Cotia/SP, CEP 06713-100.

4) **Charles Alexander Forbes**: Brasileiro, advogado, RG 2.249.539-3 SSP/SP, CPF 001.906.918-91, residente à Rua José Maria Lisboa, 1060, apto. 31, São Paulo/SP, CEP 01423-001. 

5) **Fabio Caramuru Correa Meyer**: Brasileiro, casado, executivo, portador da cédula de identidade IFP 05648566-7, CPF 715.168.917-91, residente à Rua Fonte da Saudade, 61, apto. 1.101, Lagoa, Rio de Janeiro/RJ, CEP 22471-210.







 MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

6) **Fabio Rocha do Amaral**: Brasileiro, casado, administrador de empresas, RG 9.363.793-7, CPF 076.593.208-31, residente à Rua Ernesto Nazaré, 213 – Alto de Pinheiros, São Paulo/SP, CEP 05462-000.

7) **Flavio Nunes Ferreira Rietmann**: Brasileiro, divorciado, administrador de empresas, RG 10.295.069-6, CPF 913.629.627-91, residente à Alameda dos Jurupis, 701 – apto. 152, São Paulo/SP, CEP 04088-022.

8) **Horácio Martinho Lima**: Brasileiro, solteiro, engenheiro, RG 05213864-1, CPF 745.862.547-34, residente e domiciliado na Rua Odílio Bacelar, 43, Urca, Rio de Janeiro/RJ, CEP 22290-280, com o seguinte endereço informado para correspondência: Av. Rio Branco, 110, 38° andar, Centro, Rio de Janeiro/RJ, CEP 20040-001.

9) **José Carlos Lima de Abreu**: Brasileiro, casado, bancário, RG 3.322.031-1, CPF 385.584.168-34, residente à Rua Antônio Serafim 162, Condomínio Santa Margarida, Jd. Sta. Marcelina, Campinas/SP, CEP 13100-110.

10) **Maria Luísa Garcia de Mendonça**: Brasileira, casada, economista, RG 20.039-5, CPF 380.376.616-87, residente à Av. Rainha Elizabeth da Bélgica, 664, apartamento 101, Rio de Janeiro/RJ, CEP 22081-030.

11) **Progresso Vanő Puerto**: Espanhol, Casado, economista, RG W532825-3, CPF 410915908-34, residente à Tr. Vera de Oliveira Coutinho, 94, São Paulo/SP, CEP 04007-040.

12) **Renato Alves Rabello**: Brasileira, casado, engenheiro, RG 3797473–SP, CPF 527.747.408-00, residente à Rua Aramanaí, 56, Vila Madalena, São Paulo/SP, CEP 05450-030.

13) **Roberto Vieira da Silva de Oliveira Costa**: Brasileiro, casado, economista, RG 04882637-4 IFP-RJ, CPF 769.344.037-20, residente na Rua Joaquim Nabuco, 244/701, Copacabana, Rio de Janeiro/RJ, CEP 22080-030.

14) **Sergio Marra Pereira Capella**: Brasileiro, casado, bancário, RG 11.724.885, CPF 041.247.618-56, residente à Rua Canário, 130, apto 11 - Moema, São Paulo/SP, CEP 04521-000.







MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO



15) **Luiz Whately Thompson:** Brasileiro, casado, RG 244 929 MA/SP, CPF 029.335.198-87, residente à Rua Oquira, 226 – Alto dos Pinheiros, São Paulo/SP, CEP – 05467-030.

16) **KPMG Auditores Independentes (KPMG):** CNPJ 57.755.217/0001-29, CRC no. 2SP014428/O-6, sita na Rua Dr. Renato Paes de Barros, 33 – Mooca, São Paulo/SP – CEP 04530-904, devendo a citação ser feita pessoa responsável estatutariamente conforme informação obtida na Rede Infoseg (doc. Anexo), Sr. Pedro Augusto de Melo, sócio-administrador.

17) **ERNST & YOUNG TERCO Auditores Independentes S.S. (Ernest & Young):** CNPJ 61.366.936/0001-25, CRC no. 2SP015199/O-6, sita no Condomínio São Luiz, na Avenida Presidente Juscelino Kubitscheck, 1830, Torre I – 8 andar, Itaim Bibi, São Paulo/SP – CEP 04543-900, devendo a citação ser feita pessoa responsável estatutariamente conforme informação obtida na Rede Infoseg (doc. Anexo), Sr. Fernando Alberto Schwartz de Magalhães, sócio-administrador.

## 2. FATOS

### 2.1. A SOCIEDADE LIQÜIDADA.

2.1.1. Constituição da Sociedade e alterações nos últimos 5 anos.

A sociedade Banco Cruzeiro do Sul S.A. surgiu através de reorganizações societárias, sendo que a partir de 1º/09/1989 passou a ter sua atual denominação (fls. 36/339).

Dentre as alterações contratuais realizadas, destaca-se:

✓ AGE de 27.2.1989 (fls. 40/47): Reforma do Estatuto Social, reorganizando a Sociedade mediante a ampliação do seu objeto social, visando a operar com as carteiras: Comercial e de Investimentos, e a mudança da denominação social, de Cruzeiro

4/66









MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

Distribuidora de Títulos e Valores Mobiliários S/A, para BANCO CRUZEIRO S/A.

✓ AGE de 1.9.1989 (fls. 52/57): Mudança da denominação social, de Banco Cruzeiro S/A, para BANCO CRUZEIRO DO SUL S/A.

✓ AGE de 10.12.1993 (fls. 66/67): Eleição dos Srs. Luís Felippe Indio da Costa e Luís Octavio Azeredo Lopes Indio da Costa como Diretores do Banco Cruzeiro do Sul S/A, com mandato até a Assembleia Geral Ordinária - AGO de 1994.

Na Assembleia Geral Extraordinária - AGE, de 23.1.2007 (fls. 68/72), foi aprovado:

a) A abertura de capital do BANCO.
b) A admissão das ações de emissão do Banco à negociação na Bovespa, bem como listagem no Nível 1.
c) A reforma e consolidação do Estatuto Social do Banco.
d) Eleição dos membros do Conselho de Administração da Companhia, com mandato até a AGO de 2008, os Srs.: Luís Felippe Indio Da Costa, Luís Octavio Azeredo Lopes Indio Da Costa, Fabio Rocha Do Amaral, Horácio Martinho Lima; Charles Alexander Forbes e como conselheiro independente, o Sr. Progreso Vaño Puerto.
e) A realização de oferta pública de distribuição de ações preferenciais de emissão do Banco.

Ainda de acordo com a Ata da Assembleia Geral Extraordinária - AGE, de 23.1.2007, o Estatuto Social foi consolidado (fls. 73/87).


## 2.2. CONTROLE DA SOCIEDADE LIQÜIDADA.

Considerando o período de abrangência para fins de levantamento de responsabilidades (de 04/06/2007 à 04/06/2012), e de acordo com informações obtidas no Sistema de Informações do Banco Central do Brasil

5/66





MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

- Sisbacen (fls. 340/373), o Banco Cruzeiro do Sul S.A. foi controlado por **Luís Felippe Indio da Costa** até 28/03/2011.

Apurou-se ainda que em 29/03/2011, a **Cruzeiro do Sul Holding Financeira** S/A adquiriu 100% do capital do Banco Cruzeiro do Sul (fl. 368), passando a ser controladora direta do Banco Cruzeiro do Sul.

A partir desta data, **Luís Felippe Indio da Costa** passou a ser o seu **controlador indireto**.

## 2.3. ADMINISTRAÇÃO DA SOCIEDADE LIQUIDADA.

Considerando o período de abrangência para fins de levantamento de responsabilidades (de 4.6.2007 à 4.6.2012), os ex-administradores e membros do Conselho de Administração do BANCO CRUZEIRO DO SUL S.A. se encontram listados abaixo:

### 2.3.1. CONSELHO DE ADMINISTRAÇÃO

**Período de gestão:** Da AGE de 23.1.2007 à AGO de 29.4.2011 *(fls. 70/72; 180/183 e fls. 273).*

| Nome | CPF | Cargo |
|---|---|---|
| Luis Felippe Indio da Costa | 006.034.067-34 | Controlador / Presidente do Conselho |
| Luis Octavio Azeredo Lopes Indio da Costa | 782.474.977-00 | Vice Presidente do Conselho |
| Progresso Vaño Puerto | 410.915.908-34 | Conselheiro Independente |
| Fabio Rocha do Amaral | 076.593.208-31 | Conselheiro |
| Charles Alexander Forbes | 001.906.918-91 | Conselheiro |
| Horácio Martinho Lima | 745.862.547-37 | Conselheiro |

 MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO



**Período de gestão:** Da AGO de 29.4.2011 até 4.6.2012 *(fls. 273/288).*

| Nome | CPF | Cargo |
|------|-----|-------|
| Luis Octavio Azeredo Lopes Indio da Costa | 782.474.977-00 | Presidente do Conselho |
| Progresso Vaño Puerto | 410.915.908-34 | Conselheiro Independente |
| Fabio Rocha do Amaral | 076.593.208-31 | Conselheiro |
| Charles Alexander Forbes (a) | 001.906.918-91 | Vice Presidente do Conselho |
| Horácio Martinho Lima | 745.862.547-37 | Conselheiro |
| Flavio Nunes Ferreira Rietmann | 913.629.627-91 | Conselheiro |

> (a)    Afastou-se temporariamente em 1.3.2012, por motivos particulares (tratamento médico), sem remuneração, conforme fls. 297/299.

### 2.3.2. DIRETORIA

**Período de gestão:** Ata da Reunião do Conselho de Administração de 23.1.2007 (fls. 90/92) até a AGO de 27.4.2009 (AGO que examinou as Demonstrações Financeiras encerradas em 31.12.2008, fls. 180/198), sendo na prática até 16.7.2009.

| Nome | CPF | Cargo |
|------|-----|-------|
| Luis Octavio Azeredo Lopes Indio da Costa | 782.474.977-00 | Diretor Superintendente |
| Luis Felippe Indio da Costa | 006.034.067-34 | Controlador / Diretor de Relação com Investidores |
| Ernani Fonseca Neto (b) | 625.936.257-91 | Diretor |
| Fabio Caramuru Correa Meyer | 715.168.917-91 | Diretor |
| João Lara de Souza Meirelles Filho (c) | 644.384.148-49 | Diretor |
| José Carlos Lima de Abreu | 385.584.168-34 | Diretor |
| Luiz Whately Thompson (d) | 029.335.198-87 | Diretor |
| Maria Luisa Garcia de Mendonça | 380.376.616-87 | Diretora |
| Sergio Marra Pereira Capella | 041.247.618-56 | Diretor |
| Roberto Vieira da Silva de Oliveira Costa (e) | 769.344.037-20 | Diretor |
| Renato Alves Rabello (f) | 527.747.408-00 | Diretor |



 MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

b)    *Renunciou em 31.10.2007, conforme Ata da RCA de 31.10.2007 (fls. 148/150).*

c)    *Foi destituído em 31.10.2008, conforme Ata da RCA de 31.10.2008 (fls. 175/176).*
d)    *Renunciou em 31.10.2008, conforme Ata da RCA de 31.10.2008 (fls. 175/176).*

e)    *Dirigiu a sociedade no período de gestão que vai da Ata da Reunião do Conselho de Administração de 18.12.2007 (fls. 152/153) até a AGO de 27.4.2009 (AGO que examinou as Demonstrações Financeiras encerradas em 31.12.2008, fls. 180/198), mas na prática foi até 16.7.2009.*
f)    *Dirigiu a sociedade no período de gestão que vai da Ata da Reunião do Conselho de Administração de 3.12.2008 até 16.7.2009 (1ª Reunião do Conselho de Administração realizada após a AGO de 2009, fls. 199/201).*

**Período de gestão:** Ata da Reunião do Conselho de Administração de 16.7.2009 *(fls. 199/201) até 29.4.2011 (1ª Reunião do Conselho de Administração, que sucedeu a AGO de 2011, fls. 289/294).*

| Nome | CPF | Cargo |
|---|---|---|
| Luis Octavio Azeredo Lopes Indio da Costa | 782.474.977-00 | Diretor Superintendente |
| Luis Felippe Indio da Costa | 006.034.067-34 | Controlador / Diretor de Relação com Investidores |
| Roberto Vieira da Silva de Oliveira Costa | 769.344.037-20 | Diretor |
| Fabio Caramuru Correa Meyer | 715.168.917-91 | Diretor |
| Renato Alves Rabello | 527.747.408-00 | Diretor |
| José Carlos Lima de Abreu | 385.584.168-34 | Diretor |
| Maria Luisa Garcia de Mendonça | 380.376.616-87 | Diretora |
| Sergio Marra Pereira Capella | 041.247.618-56 | Diretor |

**Período de gestão:** Ata da Reunião do Conselho de Administração de 29.4.2011 até 4.6.2012 *(fls. 289/294).*

| Nome | CPF | Cargo |
|---|---|---|
| Luis Octavio Azeredo Lopes Indio da Costa | 782.474.977-00 | Diretor Superintendente |
| Roberto Vieira da Silva de Oliveira Costa | 769.344.037-20 | Diretor |
| Fabio Caramuru Correa Meyer | 715.168.917-91 | Diretor |
| Renato Alves Rabello (g) | 527.747.408-00 | Diretor |
| José Carlos Lima de Abreu (h) | 385.584.168-34 | Diretor |
| Maria Luisa Garcia de Mendonça | 380.376.616-87 | Diretora |
| Sergio Marra Pereira Capella | 041.247.618-56 | Diretor |

(g) *Renunciou em 27.10.2011, conforme Ata da RCA de 27.10.2011 (fls. 295/297).*
(h) *Foi **destituído** em 11.5.2012, conforme Ata da RCA de 11.5.2012 (fls. 335/336).*

8/66






MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

## 2.4. INTERVENÇÃO E LIQÜIDAÇÃO DO BANCO CENTRAL DO BRASIL.

### 2.4.1. Da Decretação do Regime de Administração Especial Temporária - RAET

Em 4.6.2012, por meio do Ato-Presi N° 1.217 (D.O.U. de 5.6.2012, seção 1, pág. 13) (fls. 2/3), o Presidente do BANCO CENTRAL DO BRASIL, no uso das atribuições que lhe confere o art. 12, inciso XVII, do Regimento Interno, com fundamento no art. 4° da Lei n° 9.447, de 14 de março de 1997, combinado com o art. 15, inciso I, alíneas "a" e "b", da Lei n° 6.024, de 13 de março de 1974, tendo em vista o disposto no Decreto-lei n° 2.321, de 25 de fevereiro de 1987, decretou Regime de Administração Especial Temporária, pelo prazo de 180 (cento e oitenta) dias, no **BANCO CRUZEIRO DO SUL S.A.** (CNPJ: 62.136.254/0001-99), com sede na Cidade de São Paulo, Estado de São Paulo, na Rua Funchal n°418 – 6°, 7°, 8° e 9° andares, Vila Olímpia, considerando o comprometimento da situação econômico-financeira e a grave violação das normas emanadas do Conselho Monetário Nacional e do Banco Central do Brasil, de acordo com decisão da Diretoria Colegiada, em reunião de 4 de junho de 2012.

Pelo ato acima referido, foi nomeado administrador especial temporário, com fundamento no art. 8º do Decreto-lei nº 2.321/1987, o Fundo Garantidor de Créditos (FGC), CNPJ nº 00.954.288/0001-33.

Em 4.6.2012, foi divulgado o **COMUNICADO Nº 22.585**, do Departamento de Liquidações Extrajudiciais – DELIQ (fls. 4/7), pelo qual o Banco Central do Brasil informou às instituições financeiras e bolsas de valores, a decretação do Regime de Administração Especial Temporária no BANCO CRUZEIRO DO SUL S.A.; a nomeação do respectivo administrador especial temporário e a incidência da indisponibilidade dos bens do controlador indireto, Luis Felippe Indio da Costa, e dos ex-administradores e membros do conselho de administração a seguir relacionados: Luis Felippe Indio da Costa,

9/66






 MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

Charles Alexander Forbes, Fabio Caramuru Correa Meyer, Fabio Rocha do Amaral, Flavio Nunes Ferreira Rietmann, Horacio Martinho Lima, Jose Carlos Lima de Abreu, Luis Octavio Azeredo Lopes Indio da Costa, Maria Luisa Garcia de Mendonça, Progreso Vaño Puerto, Renato Alves Rabello, Roberto Vieira da Silva de Oliveira Costa e Sergio Marra Pereira Capella.

Em 14.9.2012, por meio do **Ato Presi nº 1.230**, publicado no D.O.U. de 17.9.2012 (fls. 31/32), foi decretada a **Liquidação Extrajudicial** do **BANCO CRUZEIRO DO SUL S.A.**, com base no relatório do administrador especial FGC – Fundo Garantidor de Crédito, que confirmou o comprometimento da situação econômico-financeira e a grave violação das normas emanadas do Conselho Monetário Nacional e do Banco Central do Brasil pelo Banco Cruzeiro do Sul S.A., atestando a existência de passivo a descoberto e a inviabilidade de normalização dos negócios da empresa. Foi nomeado liquidante o Senhor Sérgio Rodrigues Prates, CPF n° 025.281.770-20, sendo o termo legal da Liquidação Extrajudicial o dia 5 de abril de 2012.

## 2.5. O PASSIVO A DESCOBERTO POR GESTÃO DE ADMINISTRADOR.

Para se apurar o montante ou a estimativa dos prejuízos causados a terceiros, estabelecidos no artigo 43, da Lei n° 6.024/1974, tomou-se por base a análise das operações dos últimos 5 (cinco) anos e do balanço do BANCO CRUZEIRO DO SUL S.A. levantado pelo FGC, na data do RAET (4.6.2012).

De acordo com a Situação Patrimonial Ajustada em 4.6.2012, foram apurados prejuízos a terceiros (art. 43 da Lei n° 6.024/1974) no montante estimado de **R$ 2.236.782 mil** conforme descrito no relatório da Comissão de Inquérito no item 4.3 – Patrimônio Líquido Ajustado e notas explicativas de fls. 6435/6468, cuja responsabilidade foi solidariamente distribuída, nos termos do art. 40, da Lei 6.024/1974, entre os controladores e ex-sócios/administradores do BANCO CRUZEIRO DO SUL S.A que compuseram

10/66



 

# MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

os seguintes períodos de gestão, conforme os quadros resumos 1 e 2 e os demais quadros subsequentes, elaborados conforme os critérios descritos nas fls. 5543/5607:

## QUADRO RESUMO 1

BASE UTILIZADA PARA DISTRIBUIÇÃO DOS PREJUÍZOS

Em milhares reais

| GESTÃO | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| BALANCETE/DATA BASE | out/2007 | fev/2008 | out/2008 | mai/2009 | mar/2011 | out/2011 | dez/2011 | abr/2012 | 04/06/2012 |
| PL | 966.246 | 1.017.076 | 1.136.202 | 1.049.996 | 1.121.105 | 1.155.887 | 1.148.068 | 1.201.282 | |
| CONTA RESULTADO CREDORA | 574.503 | 280.905 | 1.026.846 | 889.318 | 699.032 | 2.076.021 | 2.941.001 | 642.446 | |
| CONTA RESULTADO DEVEDORA | 452.613 | 241.812 | 1.042.981 | 807.873 | 669.002 | 2.051.256 | 2.885.344 | 802.979 | |
| PLA | 988.136 | 1.056.171 | 1.120.066 | 1.031.140 | 1.151.134 | 1.180.653 | 1.200.725 | 1.040.753 | 874.115 |

Em milhares reais

| GESTÃO | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| TOTAL DE AJUSTES | 1.011.403 | 7.482 | 79.323 | 87.335 | 513.547 | 406.583 | 122.655 | 527.667 | 354.922 |
| AJUSTES ACUMULADOS | 1.011.403 | 1.018.885 | 1.098.208 | 1.185.543 | 1.699.090 | 2.105.653 | 2.228.308 | 2.755.975 | 3.110.897 |

## QUADRO RESUMO 2

| GESTÃO | PLA | AJUSTE ACUMULADO | PLA APÓS | PREJUÍZO NA |
|---|---|---|---|---|
| 1 | 988.136 | 1.011.403 | (23.267) | (23.267) |
| 2 | 1.056.171 | 1.018.885 | 37.286 | |
| 3 | 1.120.066 | 1.098.208 | 21.858 | |
| 4 | 1.031.140 | 1.185.543 | (154.403) | (154.403) |
| 5 | 1.151.134 | 1.699.090 | (547.956) | (393.553) |
| 6 | 1.180.653 | 2.105.653 | (925.000) | (377.044) |
| 7 | 1.200.725 | 2.228.308 | (1.027.583) | (102.584) |
| 8 | 1.040.753 | 2.755.975 | (1.715.222) | (687.639) |
| 9 | 874.115 | 3.110.897 | (2.236.782) | (521.560) |

imprensaoficial

MP 41



 MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

## Gestão 1 => Prejuízo apurado de R$ 23.267 mil

| Nome | CPF | Cargo | Período de Gestão |
|---|---|---|---|
| Luis Felippe Indio da Costa | 006.034.067-34 | Controlador / Presidente do Conselho / Diretor de Relação com Investidores | De 23.4.07 à 31.10.07 |
| Luis Octavio Azeredo Lopes Indio da | 782.474.977-00 | Vice Presidente do Conselho / | De 23.4.07 à 31.10.07 |
| Progresso Vaño Puerto | 410.915.908-34 | Conselheiro Independente | De 23.4.07 à 31.10.07 |
| Fabio Rocha do Amaral | 076.593.208-31 | Conselheiro | De 23.4.07 à 31.10.07 |
| Charles Alexander Forbes | 001.906.918-91 | Conselheiro | De 23.4.07 à 31.10.07 |
| Horácio Martinho Lima | 745.862.547-37 | Conselheiro | De 23.4.07 à 31.10.07 |
| Ernani Fonseca Neto | 625.936.257-91 | Diretor | De 23.4.07 à 31.10.07 |
| Fabio Caramuru Correa Meyer | 715.168.917-91 | Diretor | De 23.4.07 à 31.10.07 |
| João Lara de Souza Meirelles Filho | 644.384.148-49 | Diretor | De 23.4.07 à 31.10.07 |
| José Carlos Lima de Abreu | 385.584.168-34 | Diretor | De 23.4.07 à 31.10.07 |
| Luiz Whately Thompson | 029.335.198-87 | Diretor | De 23.4.07 à 31.10.07 |
| Maria Luisa Garcia de Mendonça | 380.376.616-87 | Diretor | De 23.4.07 à 31.10.07 |
| Sergio Marra Pereira Capella | 041.247.618-56 | Diretor | De 23.4.07 à 31.10.07 |

## Gestão 4 => Prejuízo apurado de R$ 154.403 mil

| Nome | CPF | Cargo | Período de Gestão |
|---|---|---|---|
| Luis Felippe Indio da Costa | 006.034.067-34 | Controlador / Presidente do Conselho / Diretor de Relação com Investidores | De 31.10.08 à 1.6.09 |
| Luis Octavio Azeredo Lopes Indio da | 782.474.977-00 | Vice Presidente do Conselho / | De 31.10.08 à 1.6.09 |
| Progresso Vaño Puerto | 410.915.908-34 | Conselheiro Independente | De 31.10.08 à 1.6.09 |
| Fabio Rocha do Amaral | 076.593.208-31 | Conselheiro | De 31.10.08 à 1.6.09 |
| Charles Alexander Forbes | 001.906.918-91 | Conselheiro | De 31.10.08 à 1.6.09 |
| Horácio Martinho Lima | 745.862.547-37 | Conselheiro | De 31.10.08 à 1.6.09 |
| Fabio Caramuru Correa Meyer | 715.168.917-91 | Diretor | De 31.10.08 à 1.6.09 |
| José Carlos Lima de Abreu | 385.584.168-34 | Diretor | De 31.10.08 à 1.6.09 |
| Maria Luisa Garcia de Mendonça | 380.376.616-87 | Diretor | De 31.10.08 à 1.6.09 |
| Sergio Marra Pereira Capella | 041.247.618-56 | Diretor | De 31.10.08 à 1.6.09 |
| Roberto Vieira da Silva de Oliveira Costa | 769.344.037-20 | Diretor | De 31.10.08 à 1.6.09 |





imprensa oficial

MF 41



# MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

## Gestão 5 => Prejuízo apurado de R$ 393.553 mil

| Nome | CPF | Cargo | Período de Gestão |
|---|---|---|---|
| Luis Felippe Indio da Costa | 006.034.067-34 | Controlador / Presidente do Conselho / Diretor de Relação com Investidores | De 1.6.09 à 28.3.11 |
| Luis Octavio Azeredo Lopes Indio da | 782.474.977-00 | Vice Presidente do Conselho / | De 1.6.09 à 28.3.11 |
| Progresso Vaño Puerto | 410.915.908-34 | Conselheiro Independente | De 1.6.09 à 28.3.11 |
| Fabio Rocha do Amaral | 076.593.208-31 | Conselheiro | De 1.6.09 à 28.3.11 |
| Charles Alexander Forbes | 001.906.918-91 | Conselheiro | De 1.6.09 à 28.3.11 |
| Horácio Martinho Lima | 745.862.547-37 | Conselheiro | De 1.6.09 à 28.3.11 |
| Fabio Caramuru Correa Meyer | 715.168.917-91 | Diretor | De 1.6.09 à 28.3.11 |
| José Carlos Lima de Abreu | 385.584.168-34 | Diretor | De 1.6.09 à 28.3.11 |
| Maria Luisa Garcia de Mendonça | 380.376.616-87 | Diretor | De 1.6.09 à 28.3.11 |
| Sergio Marra Pereira Capella | 041.247.618-56 | Diretor | De 1.6.09 à 28.3.11 |
| Roberto Vieira da Silva de Oliveira Costa | 769.344.037-20 | Diretor | De 1.6.09 à 28.3.11 |
| Renato Alves Rabello | 527.747.408-00 | Diretor | De 1.6.09 à 28.3.11 |

## Gestão 6 => Prejuízo apurado de R$ 377.044 mil

| Nome | CPF/CNPJ | Cargo | Período de Gestão |
|---|---|---|---|
| Luis Felippe Indio da Costa | 006.034.067-34 | Controlador / Presidente do Conselho / Diretor de Relação com | De 28.3.11 à 27.10.11 |
| Luis Octavio Azeredo Lopes Indio da Costa | 782.474.977-00 | Vice Presidente Conselho / Diretor | De 28.3.11 à 27.10.11 |
| Progresso Vaño Puerto | 410.915.908-34 | Conselheiro | De 28.3.11 à 27.10.11 |
| Fabio Rocha do Amaral | 076.593.208-31 | Conselheiro | De 28.3.11 à 27.10.11 |
| Charles Alexander Forbes | 001.906.918-91 | Conselheiro | De 28.3.11 à 27.10.11 |
| Horácio Martinho Lima | 745.862.547-37 | Conselheiro | De 28.3.11 à 27.10.11 |
| Fabio Caramuru Correa Meyer | 715.168.917-91 | Diretor | De 28.3.11 à 27.10.11 |
| José Carlos Lima de Abreu | 385.584.168-34 | Diretor | De 28.3.11 à 27.10.11 |
| Maria Luisa Garcia de Mendonça | 380.376.616-87 | Diretor | De 28.3.11 à 27.10.11 |
| Sergio Marra Pereira Capella | 041.247.618-56 | Diretor | De 28.3.11 à 27.10.11 |
| Roberto Vieira da Silva de Oliveira | 769.344.037-20 | Diretor | De 28.3.11 à 27.10.11 |
| Renato Alves Rabello | 527.747.408-00 | Diretor | De 28.3.11 à 27.10.11 |

13/66





# MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO



| | | | |
|---|---|---|---|
| Cruzeiro do Sul Holding Financeira | 13.225.116/0001- | Controlador | De 28.3.11 à 27.10.11 |

## Gestão 7 => Prejuízo apurado de R$ 102.584 mil

| Nome | CPF/CNPJ | Cargo | Período de Gestão |
|---|---|---|---|
| Luis Felippe Indio da Costa | 006.034.067-34 | Controlador / Presidente do Conselho / Diretor de Relação com Investidores | De 27.10.11 à 10.1.12 |
| Luis Octavio Azeredo Lopes Indio da Costa | 782.474.977-00 | Presidente do Conselho / Diretor de Relações c/ Investidores e Diretor Superintendente | De 27.10.11 à 10.1.12 |
| Progresso Vaño Puerto | 410.915.908-34 | Conselheiro Independente | De 27.10.11 à 10.1.12 |
| Fabio Rocha do Amaral | 076.593.208-31 | Conselheiro | De 27.10.11 à 10.1.12 |
| Charles Alexander Forbes | 001.906.918-91 | Vice Presidente Conselho | De 27.10.11 à 10.1.12 |
| Horácio Martinho Lima | 745.862.547-37 | Conselheiro | De 27.10.11 à 10.1.12 |
| Roberto Vieira da Silva de Oliveira Costa | 769.344.037-20 | Diretor | De 27.10.11 à 10.1.12 |
| Fabio Caramuru Correa Meyer | 715.168.917-91 | Diretor | De 27.10.11 à 10.1.12 |
| José Carlos Lima de Abreu | 385.584.168-34 | Diretor | De 27.10.11 à 10.1.12 |
| Maria Luisa Garcia de Mendonça | 380.376.616-87 | Diretor | De 27.10.11 à 10.1.12 |
| Sergio Marra Pereira Capella | 041.247.618-56 | Diretor | De 27.10.11 à 10.1.12 |
| Cruzeiro do Sul Holding Financeira S/A | 13.225.116/0001-70 | Controlador | De 27.10.11 à 10.1.12 |

## Gestão 8 => Prejuízo apurado de R$ 687.639 mil

| Nome | CPF/CNPJ | Cargo | Período de Gestão |
|---|---|---|---|

 **MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO**



| | | | |
|---|---|---|---|
| Luis Felippe Indio da Costa | 006.034.067-34 | Controlador / Presidente do Conselho / Diretor de Relação com Investidores | De 10.1.12 à 11.5.12 |
| Luis Octavio Azeredo Lopes Indio da Costa | 782.474.977-00 | Presidente do Conselho / Diretor de Relações c/ Investidores e Diretor Superintendente | De 10.1.12 à 11.5.12 |
| Progresso Vaño Puerto | 410.915.908-34 | Conselheiro Independente | De 10.1.12 à 11.5.12 |
| Fabio Rocha do Amaral | 076.593.208-31 | Conselheiro | De 10.1.12 à 11.5.12 |
| Horácio Martinho Lima | 745.862.547-37 | Conselheiro | De 10.1.12 à 11.5.12 |
| Roberto Vieira da Silva de Oliveira Costa | 769.344.037-20 | Diretor | De 10.1.12 à 11.5.12 |
| Fabio Caramuru Correa Meyer | 715.168.917-91 | Diretor | De 10.1.12 à 11.5.12 |
| José Carlos Lima de Abreu | 385.584.168-34 | Diretor | De 10.1.12 à 11.5.12 |
| Maria Luisa Garcia de Mendonça | 380.376.616-87 | Diretor | De 10.1.12 à 11.5.12 |
| Sergio Marra Pereira Capella | 041.247.618-56 | Diretor | De 10.1.12 à 11.5.12 |
| Flavio Nunes Ferreira Rietmann | 913.629.627-91 | Conselheiro | De 10.1.12 à 11.5.12 |
| Charles Alexander Forbes | 001.906.918-91 | Vice Presidente Conselho | De 10.1.12 à 11.5.12 |
| Cruzeiro do Sul Holding Financeira S/A | 13.225.116/0001-70 | Controlador | De 10.1.12 à 11.5.12 |

## Gestão 9 => Prejuízo apurado de R$ 521.560 mi

| Nome | CPF/CNPJ | Cargo | Período de Gestão |
|---|---|---|---|
| Luis Felippe Indio da Costa | 006.034.067-34 | Controlador / Presidente do Conselho / Diretor de Relação com Investidores | De 11.5.12 à 4.6.12 |
| Luis Octavio Azeredo Lopes Indio da Costa | 782.474.977-00 | Presidente do Conselho / Diretor de Relações c/ Investidores e Diretor Superintendente | De 11.5.12 à 4.6.12 |
| Progresso Vaño Puerto | 410.915.908-34 | Conselheiro Independente | De 11.5.12 à 4.6.12 |
| Fabio Rocha do Amaral | 076.593.208-31 | Conselheiro | De 11.5.12 à 4.6.12 |
| Horácio Martinho Lima | 745.862.547-37 | Conselheiro | De 11.5.12 à 4.6.12 |

15/66







MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

| | | | |
|---|---|---|---|
| Roberto Vieira da Silva de Oliveira Costa | 769.344.037-20 | Diretor | De 11.5.12 à 4.6.12 |
| Fabio Caramuru Correa Meyer | 715.168.917-91 | Diretor | De 11.5.12 à 4.6.12 |
| Maria Luisa Garcia de Mendonça | 380.376.616-87 | Diretor | De 11.5.12 à 4.6.12 |
| Sergio Marra Pereira Capella | 041.247.618-56 | Diretor | De 11.5.12 à 4.6.12 |
| Flavio Nunes Ferreira Rietmann | 913.629.627-91 | Conselheiro | De 11.5.12 à 4.6.12 |
| Charles Alexander Forbes | 001.906.918-91 | Vice Presidente Conselho | De 11.5.12 à 4.6.12 |
| Cruzeiro do Sul Holding Financeira S/A | 13.225.116/0001-70 | Controlador | De 11.5.12 à 4.6.12 |

Ressalta-se que o valor do Patrimônio Líquido Ajustado Negativo (passivo a descoberto), estimado em

### R$ 2.236.782.000,00

**(dois bilhões, duzentos e trinta e seis milhões, setecentos e oitenta e dois mil reais)**
**pode sofrer alterações no decorrer do processo atual de liquidação extrajudicial.**

Esta demanda de responsabilidade civil postula a reparação dos prejuízos sofridos por terceiros – depositantes e credores em geral do banco, dentro dos objetivos estabelecidos pela Lei 6.024/74.

Exige a lei que se faça a "estimativa dos prejuízos apurados em cada gestão" (art. 43), e isso foi feito pela comissão de inquérito. Apurado o prejuízo experimentado em cada gestão, foi ele atribuído aos respectivos integrantes, segundo o critério levado a efeito, de considerar alterada a gestão cada vez que um membro da administração era afastado e/ou substituído. É claro que o administrador que permaneceu em diversas gestões causou mais prejuízos.

Neste caso, e apenas neste caso, dados os valores envolvidos, esta Promotoria de Justiça pede a condenação dos réus administradores no pagamento dos prejuízos por gestão, tal como apurado pelo Banco Central do Brasil.

16/66







MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

### 2.6. DAS IRREGULARIDADES APURADAS (fls. 6489/6556)

Nas carteiras de crédito do "Prosper Flex FIDC Multicedentes" (CNPJ: 10.531.173/0001-90), do "FIDC BCSul Verax Multicred Financeiro" (CNPJ: 07.766.151/0001-02), de "middle market" (atacado) e de avais e fianças do Banco Cruzeiro do Sul S.A. (BCSul), na data-base 31.5.2012, existem operações de crédito concedidas a um grupo de clientes sem capacidade econômica comprovada e/ou sem fundamentação econômica.

A instituição bancária usava esses clientes como "pessoas interpostas" para simular a concessão de empréstimos – formalizados preponderantemente em Cédulas de Crédito Bancário (CCBs) -, destinando os recursos deles decorrentes para uma ou mais das seguintes finalidades:

**a** - Aplicar recursos em Fundos de Investimentos em Participações (FIPs), administrados pela Cruzeiro do Sul DTVM, sendo que tais fundos destinavam os recursos neles aplicados para aquisição de debêntures emitidas por empresa não financeira – vale dizer, a Patrimonial Maragato S/A -, pertencente aos Srs. Luís Octávio de Azeredo Lopes Indio da Costa e Luís Felippe Indio da Costa, então controladores do BCSul;

**b** - Liquidar operações de crédito anteriores, processo conhecido como "rolagem" de operações de crédito. Após a decretação do RAET, em 4.6.2012, os empréstimos "em ser" deixaram de ser "liquidados"; e

**c** - Cessão das CCBs para Fundos de Investimento em Direito Creditórios (FIDCs) administrados pela Cruzeiro do Sul DTVM e/ou em FIDC em que detinha quase a totalidade das cotas (Prosper Flex FIDC).

17/66

imprensaoficial

MP 41





MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

Abaixo segue o Diagrama demonstrando o fluxo desses recursos:





MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

Referida conduta dos gestores da instituição constitui indícios dos crimes tipificados nos artigos 4º, 6º, 7º, 10 e 17, todos previstos na Lei 7.492/1986 e artigo 34, da Lei 4.595/1964.

As irregularidades apuradas pela comissão de inquérito foram exaustivamente relatadas no "Relatório Final", nos itens 6.1 a 6.7 (fls. 6490/6556), cujo inteiro teor passa a fazer parte integrante da presente inicial.

Em resumo, podem-se constatar as seguintes irregularidades administrativas e penais:

| Atos | Irregularidade Administrativa | Irregularidade Penal | Capítulo |
|---|---|---|---|
| Induzir em erro as autoridades reguladoras relativamente ao valor atribuído às cotas de FIDCs registradas em seu Balanço Patrimonial. | Circular 1.273/1987, Cosif 1-2-5, cc art. 7º, § 1º, inciso II, alínea "d", do CFC nº 750/1993 | Art's 6° e 10, da Lei 7.492/1986 | 6.1 |
| Emissão de CCB sem lastro<br><br>Realizar aprovisionamento insuficiente em sua carteira de crédito do segmento "middle market", violando os critérios definidos na Resolução 2.682/1999 (arts. 2º, 3º e 4º). | Arts. 2º, 3º e 4º da Res. 2.682/1999 | Art's 6°, 7° e 10, da Lei 7.492/198 6 | 6.2 |
| Não aprovisionar a exposição ao risco de crédito da carteira de avais e fianças, a despeito do disposto no item III do par. único do art. 2º da Circular BC 3721, de 30.4.2009, combinado com o item XII do art. 4º do mesmo diploma regulamentar. | Art. 2º parágrafo único, combinado com art. 4º, XII, ambos da Circular BC 3721 | Art's 6° e 10, da Lei 7.492/1986 | 6.3 |
| Realizar empréstimo vedado para empresa controlada por administradores da instituição. | Art. 34, inciso V, da Lei 4.595/1964 | Art° 17 da Lei | 6.4 |
| Promover e/ou concorrer para promover a evasão de divisas do País. | | Art° 22, parágrafo único da Lei 7.492/1986 | 6.5 |
| Não comunicar operações com indícios de lavagem de dinheiro. | Arts. 11, incisos I e II-b e 12, da Lei 9.613/1998, regulamentado pela Circular BC 3.461/2009 | | 6.6 |



 MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

| Forjar empréstimos pessoais consignados para inflar os valores do ativo e do resultado / patrimônio da instituição financeira. | Art. 31 da Lei 4.595/1964, COSIF 1.1.2.3, 1.1.2.7 (Circular 1.273/1987) | Art's 3°,4°,6°,7°,9° e 10 da Lei 7.492/1986 | 6.7 |
|---|---|---|---|
| Gerir fraudulentamente instituição financeira | | Art. 4° da Lei 7.492/1986 | |

## 2.7. DOS ERROS E OMISSÕES DANOSAS

### (fls. 6558/6563)

#### 2.7.1. APLICAÇÕES NO FUNDO VERAX IAA.

Em 27 de maio de 2011, o Banco Cruzeiro do Sul adquiriu 9,25 cotas do VERAX IAA FUNDO DE INVESTIMENTO EM DIREITOS CREDITÓRIOS NÃO – PADRONIZADOS ("Verax IAA FIDC NP"), pelo valor de R$ 9.250 mil (**fl. 1123**). Conforme destacado na **Nota n° 15 – Aplicações no Fundo Verax IAA**, este fundo possui em sua carteira um único ativo, correspondente a Direitos Creditórios provenientes de ação indenizatória proposta pela Usina Bititinga contra a União Federal, na qualidade de sucessora do Instituto Brasileiro do Açúcar e do Álcool, em trâmite perante a 15ª Vara Federal da Seção Judiciária do Distrito Federal, processo No. 90.0001948-6 e ações correlatas, visando à condenação da União ao pagamento de indenização pelos danos materiais verificados em decorrência da fixação de preços do açúcar e do álcool abaixo do seu custo de produção (**fl. 1137**).

Também como destacado na **Nota n° 15 – Aplicações no Fundo Verax IAA**, este ativo possui um grau elevado de dúvida em relação ao seu valor de realização e, ainda, do prazo de uma eventual realização, uma vez que a ação judicial relacionada ao direito creditório possui uma série de eventos que dificultam a perspectiva de realização efetiva do crédito. O próprio fundo, em seu regulamento, salienta que as cotas de Fundos e Investimentos em direitos Creditórios possuem baixa liquidez, conforme abaixo:

*"RISCOS DO MERCADO SECUNDÁRIO: O FUNDO é constituído sob a forma de condomínio fechado, assim, o resgate das Cotas só poderá ser feito ao término do prazo de duração de cada emissão, razão pela qual se, por qualquer motivo, antes de findo tal prazo, o investidor resolva desfazer-se de suas Cotas, ele terá que aliená-las no **mercado secundário de cotas de fundos de investimento, mercado esse que, no Brasil, não apresenta liquidez, o que pode acarretar dificuldades***

20/66

21
D

 MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

*na alienação dessas Cotas e/ou ocasionar a obtenção de um preço de venda que cause perda patrimonial ao investidor." (fl. 1071)*

Além da cota de fundo em direito creditório ter baixa liquidez no mercado, também o direito creditório específico deste fundo, baseado em uma ação judicial com diversos embargos atrelados, confere as cotas deste fundo uma situação mais delicada em relação à liquidez.

A despeito desta característica, o Banco Cruzeiro do Sul, ao adquirir estas cotas, classificou-as na categoria "Títulos para Negociação", nos termos da Circular 3.068, de 8 de novembro de 2011, do Banco Central de Brasil. Títulos classificados nesta categoria, conforme a citada Circular, são aqueles "adquiridos com o propósito de serem ativa e freqüentemente negociados". Não é razoável classificar a aquisição de um título cuja falta de liquidez é uma característica intrínseca como "Título para Negociação", uma vez que não há que se falar em propósito de ativa e freqüente negociação de um título para o qual não há mercado ativo.

Os ajustes a valor de mercado dos títulos classificados nesta categoria são lançados em contrapartida ao resultado do período, ou seja, geram receita (em caso de valorização no valor do mercado) ou despesa (em caso de desvalorização). O BCSul efetuou uma única aplicação no fundo, em 27 de maio de 2011, no valor de R$ 9.250 mil. Em 31 de maio de 2011, procedeu apuração do valor de mercado das cotas, registrando um ajuste a valor de mercado de R$ 24.158 mil, totalizando, no final do primeiro mês de aplicação, valor contábil de R$ 33.408 mil (valorização de 261%).

A despeito da discussão sobre o valor de mercado das cotas, considerando que não é possível ter intuito negociar ativa e freqüentemente um título cujo mercado secundário é praticamente inexistente, a classificação mais adequada para a cota seria a categoria "Disponível para Venda", nos termos da Circular 3.068. Nesta categoria, as valorizações no valor de mercado do título são registrados em contrapartida a conta de Patrimônio Líquido, e o resultado efetivo só ocorre quando do vencimento ou alienação do título. Nesta hipótese, estas valorizações não são base para distribuição de dividendos.

Apenas para registro, a terceira e última classificação permitida pela Circular 3.068 é a categoria "Mantidos até o vencimento". Nesta categoria, os títulos não são mensurados pelo valor de mercado, uma vez que, como o intuito é mantê-los em carteira

21/66

imprensaoficial

MP 41



### MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

até o prazo final, as oscilações do valor de mercado não devem afetar a posição financeira da instituição. No caso em questão, esta categoria também poderia ser utilizada, uma vez que o fundo, conforme seu regulamento possui vencimento estimado.

O resultado do segundo trimestre de 2011 do BCSul, antes dos impostos, foi de R$ 79.108 mil, conforme demonstrações financeiras de 30 de junho de 2011, ou seja, 30,5% do resultado do banco foi oriundo da valorização deste ativo. Destaca-se que esta valorização é um resultado que não tem contrapartida em caixa. Este resultado foi base para pagamento de dividendos no período.

No ano de 2011, com base na demonstração financeira de 31 de dezembro, a instituição apurou um lucro de R$ 137.203 mil, sendo que distribuiu R$ 60.500 mil entre dividendos e juros sobre o capital próprio (JCP), ou seja, 44% do lucro. Se fosse desconsiderada a receita oriunda da operação (líquida dos impostos), e mantido o mesmo percentual de distribuição de dividendos e JCP , o valor distribuído seria de R$ 52.510 mil, ou seja, haveria uma redução de R$ 7.989 mil. Somando-se este pagamento à aplicação no fundo (R$ 9.250 mil), têm-se que esta operação gerou um desembolso de caixa de R$ 17.239 mil, sem a perspectiva razoável de efetiva entrada de caixa, prática esta que se afasta dos preceitos de uma adequada gestão de liquidez de instituições financeiras.

Com base nos fatos expostos, fica comprovada que a aplicação nas cotas do Fundo de Investimento Verax II, sendo este um investimento de baixa liquidez, associada a sua classificação em categoria inadequada, teve como intuito gerar receitas para a instituição, aumentando seu resultado no período e, por consequência, a base de distribuição de dividendos.

### 2.7.2. OUTROS FATOS GRAVES APURADOS PELA COMISSÃO DE INQUÉRITO.

#### 2.7.2.1. Gravações telefônicas ilegais

A Comissão de Inquérito, com o fim de analisar os provisionamentos e ajustes efetuados no Balanço de Abertura apresentado pelo então Administrador Especial Temporário, Fundo Garantidor de Créditos, requisitou as gravações da mesa de operações da Cruzeiro do Sul S.A. Corretora de Valores e Mercadorias, em razão da existência de operações de Box junto ao Fundo Tâmisa, cujo único cotista é o Banco Cruzeiro do Sul.



MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

No decorrer do trabalho, foram encontradas gravações das ligações telefônicas efetuadas pelos membros da Comissão de Inquérito no exercício de suas funções, o que revelou que os administradores monitoravam os trabalhos desenvolvidos para apuração das responsabilidades, fato de extrema gravidade e que configura crime de quebra do sigilo das operações investigadas pelas equipes de fiscalização do Banco Central do Brasil.

Os fatos acima narrados foram levados ao conhecimento do Ministério Público Federal, conforme Ofício CI-CSBANCO-2012/032 **(fl. 620)**, havendo Inquérito Policial aberto para apuração dos fatos na Polícia Federal, I.P. n. 196/2012-11.

### 2.7.2.2. Operação Morgan Stanley - Cruzeiro Do Sul[1]

Tratou-se de uma operação de adequação ao *free float*, segundo os Comunicados ao Mercado do Banco Cruzeiro do Sul (documentos de acesso público), de 17 e 18 de maio de 2012, que foi motivo de questionamento junto a esta Comissão de Inquérito, gerando a análise a seguir exposta.

### Estrutura da Operação

A operação teve por objetivo garantir o enquadramento do Banco Cruzeiro do Sul S.A. no Regulamento de Práticas Diferenciadas de Governança Corporativa Nível 1 da BM&FBovespa, de Percentual Mínimo de Ações em Circulação de 25% (*free float*). A Instituição estava desenquadrada desde maio de 2010 e consta que, pelo descumprimento de prazo anterior, recebeu multa e advertência de possível suspensão das negociações de suas ações.

A estrutura da operação consistiu na Compra e venda de 8.939.882 ações do Banco Cruzeiro do Sul S.A. em leilão no mercado à vista da BM&FBovespa (Comunicado ao Mercado em 17.5.2012, realização em 18.5.2012 e liquidação financeira em D+3, ou 23.5.2012).

Estas ações eram de propriedade dos controladores do Banco Cruzeiro do Sul (Luis Felipe e Luis Octavio

---

[1] Documentos acostados às fls. 5086/5248.





MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO



Índio da Costa) e sua venda foi operacionalizada por meio dos Fundos Hudson e Missouri, cujos únicos cotistas eram os próprios controladores. A compra foi efetuada pelo Fundo Caieiras, cujo único cotista é o Banco Morgan Stanley, pelo valor de R$12,79 por ação. O montante da operação alcançou R$ 114.341.091,60.

Em seguida, os controladores do Cruzeiro do Sul realizaram com o Banco Morgan Stanley, por meio de cada um dos Fundos Hudson e Missouri, uma Operação de Derivativo de Ações, que consistiu na outorga de duas opções com a mesma data e preço de exercício: Opção 1, ou Opção de Compra, conferida aos fundos dos controladores, de receber a diferença positiva, caso existente, entre o preço de fechamento das ações na Data de Exercício da Opção e o Preço de Exercício previamente estabelecido (R$ 15,39); e Opção 2, ou Opção de Venda, conferida ao Banco Morgan Stanley, de receber a diferença positiva, caso existente, entre o Preço de Exercício previamente estabelecido (R$ 15,39) e o preço de fechamento das ações na ata de Exercício da Opção[2].

Estas duas opções, contratadas simultaneamente, retiravam do Banco Morgan Stanley a exposição aos efeitos patrimoniais positivos ou negativos decorrentes da oscilação de preço das 8.939.882 ações preferenciais de emissão do Banco Cruzeiro do Sul, adquiridas pelo Fundo Caieiras.

Os recursos provenientes da venda das ações foram integralmente convertidos em CDBs de emissão do Banco Morgan Stanley aos fundos Hudson e Missouri e, ato contínuo, houve a alienação fiduciária desses mesmos CDBs, em garantia das operações de derivativos, em 23.5.2012. Os CDBs foram emitidos pelo prazo de 501 dias úteis, à taxa[3] de 8,28% ao ano de 252 dias úteis.

Caso, na data de exercício das opções, as ações estivessem cotadas abaixo do valor pré-estabelecido pelas partes contratantes, a diferença a menor seria paga pelos fundos dos controladores ao Banco Morgan pelo exercício da opção de venda. Por outro lado, caso as ações estivessem cotadas

---

[2] A operação de derivativo, de cada fundo Hudson e Missouri, consistia na junção (Forward Sintético) de uma opção de compra (call) e uma opção de venda (put), tendo todas, a mesma data de vencimento e o mesmo preço de exercício (strike) de R$15,39 por ação. Os prêmios das opções foram estabelecidos em valores que se anulam entre si, não havendo, pois, desembolso de nenhuma das partes, a título de pagamento de prêmio.
[3] A taxa pré do CDB leva o seu valor de resgate, após os dois anos, para o montante equivalente à multiplicação a quantidade de ações pelo valor de strike das opções.

24/66





 MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

acima do valor pré-estabelecido, a diferença a maior seria paga pelo Banco Morgan aos fundos dos controladores do Banco Cruzeiro do Sul, pelo exercício de compra.

Os Contratos Globais de Derivativos dessas operações foram assinados em 15.5.2012 e as Confirmações das Operações de Derivativos em 18.5.2012, com vencimento em 20.5.2014.

O Banco Morgan Stanley S.A., na qualidade de Agente de Cálculo, estabelecido no Contrato Global de Derivativo, após a decretação do RAET e com a suspensão das negociações das ações, entendeu que ocorreu um Evento de Interrupção / Instabilidade – Interrupção de Negociação e adotou o vencimento antecipado dos derivativos, em 6.6.2012, nas mesmas condições de liquidação dos derivativos originais, obtendo o Valor de Vencimento Antecipado de R$ 117.112.454, 20 e, segundo seu critério, dada ausência de preço de mercado na referida data, adotou o valor de R$ 0,00 por ação para o preço de referência.

Assim, as opções de compra perderam completamente o valor, não havendo nada a ser pago aos fundos Missouri e Hudson. Já, para as opções de venda, o preço de exercício original de R$15,39 foi descontado a valor presente, à taxa de desconto de 8,65% a.a., resultando num preço de exercício atualizado de R$13,10, por ação, o que, multiplicado pela quantidade total de ações, resultou no Valor de Pagamento já mencionado[4].

As premissas utilizadas pelo Banco Morgan reduzem a zero o valor das opções de compra dos fundos dos controladores contra o Morgan e representam o valor total das opções de venda do Banco Morgan Stanley contra os fundos dos controladores.

Dessa forma, a estrutura da operação resultou que os recursos de R$ 114.341.091,60 saíram do Fundo Caieiras para compra das ações; retornaram na forma de investimentos em CDB do Banco Morgan Stanley, que garantiam a operação de derivativos; ficando o Fundo Caieiras, controlado pelo Banco Morgan, com as ações adquiridas no leilão; e restando os fundos dos controladores e os controladores sem nenhum ativo.

A decretação do RAET, em 4.6.2012, desencadeou o processo de rescisão contratual, com apenas 11 dias úteis de vida da operação, cujo vencimento original era 20.5.2014.

---

[4] A excussão das garantias seria feita pelo valor dos CDBs, insuficiente para cobrir o Valor de Pagamento anteriormente calculado pelo Banco Morgan, gerando um saldo devedor total de R$3.063.780,75, o qual sofreu, entre outros fatos, contestação do Administrador Especial Temporário.

25/66



MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

Não há indícios, porém, de que este fato seja devido a um suposto conhecimento prévio, por parte do Banco Morgan Stanley, da iminência do decreto que estabeleceu o RAET, dado o caráter sigiloso que reveste atos jurídicos dessa natureza, particularmente quando determinados pelo Banco Central do Brasil.

Já não se pode afirmar o mesmo no caso dos controladores do Banco Cruzeiro do Sul, uma vez que o Ofício do Banco Central, de que trata das operações insubsistentes, foi recepcionada pelo Sr. Luis Octavio Indio da Costa em 11.5.2012.

Do ponto de vista da legalidade dos contratos, estes foram firmados entre instituições do sistema financeiro, portanto, entre partes qualificadas conhecedoras do funcionamento do mercado e que, além do mais, acordaram cláusulas declaratórias específicas relacionadas à independência de iniciativa das partes, conhecimento dos termos dos contratos e adequação do perfil de investimento (Suitability), entre outras.

O Contrato Global de Derivativos (CGD) seguiu o modelo padronizado de CGD utilizado pelo mercado e disponível no sítio da Federação Brasileira de Bancos (Febraban), na internet. Não foi escolhido juiz ou câmara arbitral, porém, foi eleito o Foro da Capital do Estado de São Paulo para dirimir eventuais divergências entre as partes em relação às cláusulas contratuais.

A estrutura da operação, assim como as datas e a forma como foi realizada, evidencia que a matéria-prima básica foi o leilão de ações que seria realizada pelo Banco Cruzeiro do Sul para atender ao regulamento da BM&FBovespa.

Todos os atos praticados, desde o Contrato Global de Derivativos até a alienação fiduciária dos CDBs dados em garantia, têm relação direta com o leilão de ações. Compete, no entanto, somente aos órgãos de supervisão e regulação desse mercado avaliar se houve irregularidade relacionada ao referido leilão.

As divergências entre as partes, tais como as relacionadas à interpretação das cláusulas contratuais, às conseqüências da suspensão das negociações das ações do Banco Cruzeiro do Sul na BM&FBovespa e ao cálculo dos valores de liquidação dos derivativos são próprias da relação comercial e só podem ser discutidas no foro adequado, razão pela qual a Comissão de Valores Mobiliários foi devidamente comunicada dos fatos.

26/66



MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

### 2.8.    Das    Irregularidades    nos Procedimentos Executados pela KPMG (fls. 127/143)

2.8.1. Teste de existência dos contratos de crédito (circularização)

2.8.1.1. Exercícios de 30 de junho de 2011 e 31 de dezembro de 2010 e 2011

O BCSul possuía registrado em seus ativos operações de crédito insubsistentes, conforme descrição detalhada constante nos capítulos **4.3.1 item 1** e **6.7** deste relatório. A NBC TA 315 – Identificação e Avaliação dos Riscos de Distorção Relevante por meio do Entendimento da Entidade e do seu Ambiente (aprovada pela Resolução CFC 1.212 de 27 de novembro de 2009) preveem, em seu parágrafo 3 que:

*"O objetivo do auditor é **identificar e avaliar os riscos de distorção relevante independentemente se causada por fraude ou erro, nos níveis de demonstração contábil e afirmações,** por meio do entendimento da entidade e do seu ambiente, inclusive do controle interno da entidade, proporcionando assim uma base para o planejamento e a implementação das respostas aos riscos identificados de distorção relevante". (grifo nosso).*

Uma das afirmações relacionadas na mesma norma refere-se à existência das operações (parágrafo A111):

*"(...) existência - ativos, passivos e elementos do patrimônio líquido existem (...)".*

De acordo com as normas de auditoria, portanto, o auditor deveria ter planejado e realizado procedimentos adequados para poder afirmar sobre a existência dos ativos e passivos na data-base auditada, incluindo as operações de crédito da carteira.

A KPMG realizou, nos anos avaliados, procedimentos de confirmações externas (circularização) das operações de crédito do BCSul como forma de atestar a existência das operações de crédito. Entretanto, o volume de cartas de circularização não respondidas mostrou-se elevado em todos os períodos analisados, conforme abaixo:

27/66



MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

| Data-base da Demonstraç ão Contábil | Data-base da circulariz ação | Quantida de de circulariz ad a | Devolvid as pelo correio | Quantida de de não respondi da | Quantida de respondi da com divergên cia | % não respondid o ou com divergênci a / Total Circulariza do | Evidências |
|---|---|---|---|---|---|---|---|
| 30/06/2007 | 31/05/2007 | 1 | 2 | 9 | 4 | 92,3% | Fls. 668 a |
| 31/12/2007 | 31/10/2007 | 1 | - | 6 | 1 | 63,6% | Fls. 672 |
| 30/06/2008 | 31/05/2008 | 2 | 2 | 2 | - | 96,6% | Fls. 673 e |
| 31/12/2008 | 31/10/2008 | 2 | 2 | 2 | - | 88,5% | Fls. 675 e |
| 30/06/2009 | 30/04/2009 | 8 | 1 | 5 | 5 | 90,9% | Fls. 677 a |
| 31/12/2009 | 31/12/2009 | 1 | 2 | 9 | 3 | 99,2% | Fls. 680 a |
| 30/06/2010 | 30/04/2010 | 8 | 1 | 6 | - | 94,0% | Fls. 683 a |
| 31/12/2010 | 30/10/2010 | 2 | 3 | 1 | 10 | 95,7% | Fls. 686 a |
| 30/06/2011 | 30/04/2011 | 4 | 1 | 3 | - | 97,9% | Fls. 691 a |
| 31/12/2011 | 31/10/2011 | 7 | 1 | 5 | - | 95,9% | Fls. 694 a |

Convém notar que, apesar desta seção tratar das auditorias realizadas nos períodos de 31.12.2010, 30.06.2011 e 31.12.2011, destaca-se que o conhecimento prévio sobre a entidade auditada deve ser levado em consideração pelo auditor na avaliação de riscos e no planejamento dos procedimentos de auditoria, conforme parágrafo A12 da já citada NBC TA 315, abaixo reproduzido:

"A12. A experiência prévia do auditor junto à entidade e procedimentos de auditoria executados em auditorias anteriores podem fornecer ao auditor informações sobre assuntos como:

- distorções passadas e se elas foram corrigidas tempestivamente;
- natureza da entidade, do seu ambiente e o controle interno da entidade (incluindo deficiências nos controles internos);
mudanças significativas que a entidade ou suas operações possam ter sofrido desde o período financeiro anterior, que possam auxiliar o auditor na obtenção de entendimento suficiente da entidade para identificar e avaliar riscos de distorção relevante.

Pode-se perceber o alto volume de respostas não recebidas em todos os anos (exceção no 2º semestre de 2007, em que a quantidade circularizada foi muito reduzida em relação aos demais anos). Apesar do elevado número de exceções, não foram identificadas alterações nos procedimentos realizados ao longo dos anos, tais como a realização de testes adicionais, etc.

A NBC TA 505 – Confirmações Externas (aprovada pela Resolução CFC 1.219 de 27 de novembro de 2009) prevê, em seu parágrafo 12:



MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

29
D

"12. Para cada resposta não recebida, o auditor deve executar procedimentos alternativos de auditoria para obter evidência de auditoria relevante e confiável."

A KPMG adotou como teste alternativo ao não recebimento das respostas às cartas de circularização, a análise dos contratos, a fim de verificar a existência das operações. Esta análise foi feita a partir da solicitação, à administração do BCSul, dos contratos físicos das operações selecionadas na amostra.

Entretanto, o volume de contratos não analisados pela auditoria externa, por não terem sido os mesmos entregues pela administração, é elevado, principalmente até o 1º semestre de 2009, conforme quadro abaixo. Após esta data, o volume de contratos não entregues reduziu-se bastante, entretanto, os mesmos apresentavam alto índice de divergências, conforme detalhado nas legendas.

| Data-base da Demonstração Contábil | Total não respondido ou com divergência | Contratos não analisados | % Contratos não entregues |
|---|---|---|---|
| 30/06/2007 | 132 | 107 | 81,0% (a) (x) |
| 31/12/2007 | 7 | 7 | 100,0% (a) (x) |
| 30/06/2008 | 28 | 7 | 25,0% (a) (x) |
| 31/12/2008 | 23 | 23 | 100,0% (a) (x) |
| 30/06/2009 | 80 | 79 | 98,8% (a) (x) |
| 31/12/2009 | 121 | 5 | 4,1% (a) (b) |
| 30/06/2010 | 79 | 5 | 6,3% (a) (c) |
| 31/12/2010 | 222 | 5 | 2,3% (a) (d) |
| 30/06/2011 | 46 | 7 | 15,2% (a) (e) |
| 31/12/2011 | 70 | 17 | 24,3% (a) (f) |

(a) Para as operações cujos contratos não foram entregues, foram analisadas apenas as telas dos sistemas de crédito demonstrando a operação e a baixa das parcelas, o que não indica a existência efetiva das operações, tampouco a liquidação financeira real destas parcelas;

(b) dos contratos analisados, 56 (48,3%) estavam sem numeração de contrato, porém, a auditoria concluiu pela existência dos mesmos, apesar de não ser possível relacionar o contrato físico apresentado com o registro contábil;

(c) dos contratos analisados, 21 estavam sem numeração de contrato, porém, a auditoria concluiu pela existência dos mesmos, apesar de não ser possível relacionar o contrato físico apresentado com o registro contábil, 1 não possuía o termo de adesão assinado, ou seja 29,7% dos contratos analisados apresentavam algum tipo de inconsistência. Em 4 casos, foi apresentada apenas a gravação de voz como comprovação da operação.

29/66



Imprensa Oficial

MP 41





MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

(d) dos contratos analisados, 156 estavam sem numeração de contrato, porém, a auditoria concluiu pela existência dos mesmos e 1 contrato estava sem assinatura, ou seja 72,4%% dos contratos analisados apresentavam algum tipo de inconsistência. Em 2 casos, foi apresentada apenas a gravação de voz como comprovação da operação.

(e) dos contratos analisados, 27 (69,2%) estavam com a numeração do contrato apresentado diferente da numeração do contrato no sistema, porém, a auditoria concluiu pela existência dos mesmos. Em 2 casos, foi apresentada apenas a gravação de voz como comprovação da operação.

(f) dos contratos analisados, 26 estavam sem a numeração do contrato, 7 apresentavam divergência no valor, 1 apresentava divergência no nome, 1 estava sem assinatura, ou seja 66% dos contratos analisados apresentavam algum tipo de inconsistência.

Além das divergências identificadas nos contratos, na documentação de auditoria consta que o auditor analisou apenas o contrato, e não a documentação referente ao devedor (RG, CPF, comprovantes, etc). Contratos físicos desacompanhados de documentação cadastral dos clientes são prova de auditoria frágil, uma vez que podem ser "forjados".

Em alguns casos, a única evidência obtida pela auditoria foi o registro do contrato nos sistemas-produto. Destaca-se que a base de seleção para as operações circularizadas foi a relação analítica dos contratos extraída deste mesmo sistema, ou seja, a evidência foi extraída da mesma base que gerou a amostra para o teste, de forma que não é adequada para conclusão sobre a existência dos contratos uma vez que não garante a existência da operação.

Em relação ao apontado no parágrafo acima, destaca-se que a NBC TA 500 – Evidência de Auditoria (aprovada pela Resolução CFC 1.217 de 27 de novembro de 2009), define que:

> *"4. O objetivo do auditor é definir e executar procedimentos de auditoria que permitam ao auditor **conseguir evidência de auditoria apropriada e suficiente** que lhe possibilitem obter conclusões razoáveis para fundamentar a sua opinião" (grifo nosso)*

A própria KPMG considerou elevado o número de cartas devolvidas pelo correio, conforme comentário encontrado nas formalizações do teste de circularização a partir do 2º semestre de 2009: Papéis de trabalho: WP M.100 – 1 – Controle de Circularização CPP –

30/66







MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO



2º semestre de 2009 (**fl. 680**); WP I.100 – Controle de Circularização CPP – 1º semestre de 2010 (**fl. 683**); WP I.200 – Controle de Circularização CPP 3533 – 1º semestre de 2010 (**fl. 684**); WP I.100 – Controle de Circularização CPP – 2º semestre de 2010 (**fl. 688**); WP D.4.100 – Controle de Circularização CPP – 1º semestre de 2011 (**fl. 691**); WP D.4.200 – Controle de Circularização CPP – 2º semestre de 2011 (**fl. 694**).

(o comentário destacado abaixo é idêntico em todos os períodos citados)

> *"Observamos que para estas operações as cartas foram devolvidas pelo correio em função de insuficiência de informações. Reportaremos essa deficiência para a administração em carta de controle."*

A partir do 1º semestre de 2010, identificamos um comentário na formalização do teste de circularização que acentuava a preocupação do auditor em relação às cartas devolvidas pelo correio: Papéis de trabalho: WP I.100 – Controle de Circularização CPP – 1º semestre de 2010 (**fl. 683**); WP I.200 – Controle de Circularização CPP 3533 – 1º semestre de 2010 (**fl. 684**); I.100 – Controle de Circularização CPP – 2º semestre de 2010 (**fl. 688**); WP D.4.100 – Controle de Circularização CPP – 1º semestre de 2011 (**fl. 691**); WP D.4.200 – Controle de Circularização CPP – 2º semestre de 2011 (**fl. 694**);

(o comentário destacado abaixo é idêntico em todos os períodos citados)

> *"Consideramos que o volume de operações devolvidas pelo correio é elevado, entretanto, apresentamos recorrentemente essa deficiência à administração do Banco por meio de nossas cartas de controle. Em discussão com a administração do Banco e por suas respostas a nossas cartas de controle, a explicação obtida foi de que isso decorre a característica da operação de crédito consignado para órgãos públicos, na qual o relacionamento entre cliente e banco ocorre no ato da contratação da operação e posteriormente a atualização do cadastro é feita apenas quando o cliente entra em contato com a instituição."*

Destaca-se que o artigo 2º, da Circular 3.461/2009, expedida pelo Banco Central do Brasil, prevê que as instituições financeiras devem coletar e manter atualizadas as informações cadastrais dos clientes. O § 5º deste artigo prevê que as instituições "devem realizar testes de verificação, com periodicidade máxima de um ano, que assegurem a adequação dos dados cadastrais de seus clientes".






 MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

A justificativa do Banco Cruzeiro do Sul apontava um claro descumprimento à norma (atualização feita apenas quando o cliente entra em contato com a instituição), entretanto, a KPMG não considerou esta justificativa como um fator de risco em relação ao teste, apenas reportou a deficiência em carta de controle, tendo recebido sempre a mesma justificativa.

Além disso, para as operações de cartão de crédito consignado (CCC), em muitos casos não foi entregue documentação assinada pelo cliente para comprovar a existência das operações, apenas gravações telefônicas, as quais, segundo o próprio auditor, não seriam documentação adequada para comprovar a existência das operações, conforme abaixo: Papel de trabalho: WP I.400 – Controle de Circularização CCC – 2º semestre de 2010 (**fl. 690**); WP D.4.300 – Controle de Circularização 1.pdf – 1º semestre de 2011 (**fl. 693**):

> *"Observamos que para estas operações obtivemos como evidência a gravação do cliente solicitando a operação. Reportaremos essa deficiência em carta de controle."*

O volume de inconsistências encontrado nos testes de circularização em todos os anos indicava um risco de relacionado à existência da carteira de crédito do banco. Neste sentido, a NBC TA 505 – Confirmações Externas, parágrafo A19, é clara em relação ao procedimento a ser seguido:

> *"A19. A natureza e extensão dos procedimentos alternativos de auditoria são afetadas pela conta e pela afirmação em questão. **Uma resposta não recebida a uma solicitação de confirmação pode indicar um risco de distorção relevante não identificado anteriormente**. Nessas situações, o auditor pode necessitar **revisar o risco de distorção relevante**, avaliado no nível de afirmações, e **modificar os procedimentos de auditoria planejados**, de acordo com a NBC TA 315, item 31. Por exemplo, **menos respostas do que o previsto** ou um número maior de respostas do que o previsto **pode indicar um fator de risco de fraude não identificado anteriormente que requer uma avaliação** de acordo com a NBC TA 240, item 24." (grifos nossos).*

Como se vê, a norma de auditoria vigente previa que o auditor considerasse o baixo volume de respostas como um fator de risco de fraude, mesmo que esse risco não tivesse sido detectado na etapa de planejamento.

| imprensaoficial

MP.41

 



33
J

 MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

Além desse baixo volume de respostas, a KPMG ainda deparou-se com uma série de inconsistências entre os registros contábeis e os contratos apresentados, bem como contratos não disponibilizados pela administração. A despeito deste elevado volume de inconsistências, a referida empresa de auditoria concluiu o teste de circularização como efetivo e não modificou os procedimentos de auditoria planejados, em descumprimento à NBC TA 505.

Nos casos em que o auditor não obteve a resposta à carta de circularização (evidência externa), baseou-se em evidências internas (contratos e telas dos sistemas) para concluir sobre a existência das operações de crédito.

Entretanto, o elevado volume de inconsistências, conforme demonstrado acima, indicava a baixa confiabilidade das evidências apresentadas. A esse respeito, a NBC TA – 500, em linha com a NBC TA 505, citada anteriormente, prevê que o auditor modifique os seus procedimentos ou os amplie, de forma a obter evidência mais confiável. Vide parágrafo 11 da NBC TA 500:

> "11. Se:
> (a)      a evidência de auditoria obtida em uma fonte é inconsistente com a obtida em outra; ou
> (b)      **o auditor tem dúvidas quanto à confiabilidade das informações a serem utilizadas como evidência de auditoria,** ele deve determinar quais **modificações ou acréscimos aos procedimentos de auditoria** são necessários para solucionar o assunto e deve considerar o efeito desse assunto, se houver, sobre outros aspectos da auditoria (ver item A57)" (grifos nossos).

Portanto, verifica-se que a KPMG, em relação ao teste de existência dos contratos de crédito, não levou em consideração, na definição de procedimentos de auditoria, uma série de indícios de inexistência dos mesmos (elevado volume de cartas devolvidas pelo correio ou não respondidas, contratos não entregues, inconsistência entre os registros contábeis e a documentação entregue), conforme determinado pelas normas da profissão, e, com isso, não considerou adequadamente o risco de fraude, conforme destacado no parágrafo A19 da NBC TA 505.

Não obstante, o risco de fraude, independente de indício, deve ser considerado pelo auditor na execução dos seus procedimentos de auditoria, conforme parágrafo 12 da NBC TA 240 - Responsabilidade do Auditor  em Relação a Fraude, no Contexto da



imprensaoficial

MP 41





MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

Auditoria de Demonstrações Contábeis (aprovada pela Resolução CFC 1.207 de 27 de novembro de 2009), o seguinte:

> "12. (...) o auditor deve **manter postura de ceticismo profissional** durante a auditoria, **reconhecendo a possibilidade de existir distorção relevante decorrente de fraude**, não obstante a experiência passada do auditor em relação à honestidade e integridade da administração e dos responsáveis pela governança da entidade." (grifos nossos)

Nos trabalhos referentes às datas-base de 30 de junho de 2011 e 31 de dezembro de 2011, a KPMG utilizou em sua auditoria das demonstrações financeiras, os procedimentos de verificação de lastros das operações de crédito cedidas aos FIDC's realizados pela própria KPMG, na qualidade de contratada pelo Deutsche Bank, custodiante dos FIDC's.

Neste procedimento, a exemplo do teste de circularização, foram selecionadas cerca de 100 operações em cada um dos fundos dos quais o BCSul possuía cotas subordinadas. Para estas operações, foram solicitados os contratos e as averbações. Nestes casos, o percentual de entrega de contratos foi muito superior ao teste de circularização, conforme abaixo:

| | Evidências | Amostra | Contratos Analisados | Averbação entregue | Data-base |
|---|---|---|---|---|---|
| FIDC CC | Fls. 697 a 704 | 100 | 91 | 100 | 28/02/2011 |
| CPP 120 | Fls. 705 a 712 | 99 | 96 | 99 | 28/02/2011 |
| CPP 180 | Fls. 713/720 | 99 | 96 | 99 | 28/02/2011 |
| Total | | 298 | 283 | 298 | |
| CC II | Fls. 721/728 | 100 | 99 | 100 | 31/05/2011 |
| CPP 120 | Fls. 729/736 | 99 | 98 | 97 | 31/05/2011 |
| CPP 540 | Fls. 737/743 | 100 | 88 | 88 | 31/05/2011 |
| Maxcred II | Fls. 744/751 | 100 | 99 | 100 | 31/05/2011 |
| Multicred | Fls. 752/759 | 100 | 100 | 99 | 31/05/2011 |

34/66





 MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

| | | | | | |
|---|---|---|---|---|---|
| Verax 180 | Fls. 760/766 | 100 | 96 | 99 | 31/05/2011 |
| Verax CPP 360 | Fls. 767/775 | 100 | 99 | 100 | 31/05/2011 |
| Prosper Flex | Fls. 776/783 | 100 | 100 | 98 | 31/05/2011 |
| **Total** | | **799** | **779** | **781** | |
| CC II | Fls. 784/789 | 99 | 79 | 99 | 31/08/2011 |
| CPP 120 | Fls. 790/795 | 100 | 90 | 98 | 31/08/2011 |
| CPP 180 | Fls. 796/801 | 100 | 95 | 99 | 31/08/2011 |
| CPP 360 | Fls. 802/807 | 99 | 93 | 99 | 31/08/2011 |
| Maxcred II | Fls. 808/813 | 91 | 87 | 90 | 31/08/2011 |
| Multicred | Fls. 814/819 | 100 | 87 | 99 | 31/08/2011 |
| Prosper Flex | Fls. 820/825 | 100 | 99 | 97 | 31/08/2011 |
| RPPS | Fls. 826/831 | 99 | 98 | 97 | 31/08/2011 |
| **Total** | | **788** | **728** | **778** | |
| CPP 180 | Fls. 832/839 | 100 | 90 | 100 | 30/11/2011 |
| CPP 360 | Fls. 840/847 | 100 | 97 | 97 | 30/11/2011 |
| CPP 540 | Fls. 848/855 | 100 | 100 | 100 | 18/11/2011 |
| Maxcred II | Fls. 856/862 | 75 | 64 | 73 | 18/11/2011 |
| Multicred | Fls. 863/870 | 100 | 51 | 99 | 30/11/2011 |
| Verax CC II | Fls. 871/878 | 100 | 98 | 100 | 30/11/2011 |
| Prosper Flex | Fls. 879/886 | 100 | 100 | 100 | 30/11/2011 |
| **Total** | | **675** | **600** | **669** | |



 MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

| TOTAL GERAL | | 2560 | 2390 | 2526 | |
|---|---|---|---|---|---|

Observamos que os auditores responsáveis pela realização destes testes não são os mesmos integrantes da equipe de auditoria do Banco Cruzeiro do Sul.

Considerando que a carteira que compõe o FIDC é formada por operações de crédito geradas pelo Banco Cruzeiro do Sul, era esperado que o resultado de uma verificação de contratos nos FIDCs gerasse os mesmos apontamentos relacionados no teste de circularização, principalmente por tratar-se de uma carteira bastante pulverizada, o que não ocorreu.

Novamente, a discrepância de resultados em procedimentos semelhantes aplicados a operações de mesma origem, segundo a norma, deveria ter levado o auditor a questionar as evidências obtidas por uma ou outra equipe, conforme parágrafo 11 da NBC TA 500, novamente reproduzido:

*"11. Se:*

*(a) a evidência de auditoria obtida em uma fonte é inconsistente com a obtida em outra; ou*

*(b) o auditor tem dúvidas quanto à confiabilidade das informações a serem utilizadas como evidência de auditoria, ele deve determinar quais **modificações ou acréscimos aos procedimentos de auditoria** são necessários para solucionar o assunto e deve considerar o efeito desse assunto, se houver, sobre outros aspectos da auditoria (ver item A57)" (grifos nossos)*

Destaca-se que, neste teste, também não foi verificada a documentação pessoal do cliente, apenas ficha cadastral, contrato e autorização para desconto em folha, documentos que, sozinhos, não trazem conforto de auditoria sobre a existência das operações.

**2.8.1.2. Exercícios de 30 de junho de 2007, 2008, 2009 e 2012 e 31 de dezembro de 2007, 2008 e 2009.**







 MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

Neste período, outro conjunto de normas de auditoria estava vigente, as quais foram revogadas, em sua maioria, pela adoção do conjunto de normas internacionais, realizada pelo CFC em 2009, com vigência a partir de 01 de janeiro de 2010.

Em relação à existência de ativos insubsistentes, o auditor, na condução de seus procedimentos, conforme a NBC T 11 - Normas de Auditoria Independente das Demonstrações Contábeis (aprovada pela Resolução CFC 820 de 17 de dezembro de 1997), tinha o seguinte dever:

> *"11.1.4.3 – A responsabilidade primária na prevenção e identificação de fraudes e erros é da administração da entidade, através da implementação e manutenção de adequado sistema contábil e de controle interno. Entretanto, **o auditor deve planejar seu trabalho de forma a detectar fraudes e erros** que impliquem efeitos relevantes nas demonstrações contábeis." (grifo nosso)*

Esta mesma norma também prevê que o auditor deve objetivar concluir sobre a existência dos itens patrimoniais em determinada data-base (parágrafo 11.2.6.7 letra "a"). Para saldos expressivos, como os das operações de crédito da instituição, a norma é clara ao prever procedimentos de confirmação externa, conforme destacado abaixo:

> *"11.2.6.7 – Quando o valor envolvido for expressivo em relação à posição patrimonial e financeira e ao resultado das operações, o auditor deve:*
> *a) confirmar os valores das contas a receber e a pagar, através de comunicação direta com os terceiros envolvidos; e*
> *b) acompanhar o inventário físico realizado pela entidade, executando os testes de contagem física e procedimentos complementares aplicáveis."(grifos nossos)*

Com o conhecimento acumulado em relação ao baixo índice de respostas às cartas de circularização, além do fato de o banco não entregar os contratos de crédito, o auditor independente, mesmo que não tivesse observado essa situação no planejamento do primeiro conjunto de trabalhos, deveria ter reavaliado o escopo dos testes, de acordo com a NBC T 11.4 – Planejamento de Auditoria (aprovada pela Resolução CFC 1.035 de 26 e agosto de 2005):



 MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

*"11.4.1.16. Muitas informações que compõem o planejamento definitivo para determinado período são confirmadas durante os trabalhos de campo, o que implica a **necessidade de o auditor independente revisá-lo e ajustá-lo à medida que for executando os trabalhos.**" (grifo nosso)*

Na mesma norma é prevista a alteração nos procedimentos planejados em virtude de circunstâncias observadas ao longo do curso dos trabalhos:

*"11.4.4.12. O planejamento e os programas de auditoria devem ser revisados permanentemente, como forma de o auditor independente avaliar as modificações nas circunstâncias e os seus reflexos na extensão, na oportunidade e na natureza dos procedimentos de auditoria a serem aplicados"*

### 2.8.1.3. Procedimentos analíticos (Exercícios de 30 de junho de 2011 e 31 de dezembro de 2010 e 2011).

A KPMG efetuou, nos exercícios listados acima, procedimentos analíticos em relação aos saldos das operações de crédito do Banco Cruzeiro do Sul.

O procedimento analítico realizado em relação à carteira de CPP consistiu em:

- ✓ apurar o saldo médio das operações de crédito;

- ✓ aplicar a "taxa média da carteira" a este saldo médio;

- ✓ comparar a receita obtida neste cálculo com a receita efetiva.

Em relação ao cálculo da taxa média, destaca-se o seguinte:

- ✓ em 30 de junho de 2010, a taxa média foi obtida "conforme informação gerencial" (fl. 887);





MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO



   ✓ em 31 de dezembro de 2010, a taxa média foi obtida pela "média de produção dos últimos 3 anos", sem detalhar a origem dos dados (fl. 888);

   ✓ em 30 de junho de 2011, a legenda associada à taxa média da carteira traz a seguinte informação "conforme taxa média da carteira", sem especificar a metodologia de cálculo e a fonte das informações (fl. 889);

   ✓ em 31 de dezembro de 2011, a taxa média foi obtida "conforme informações gerenciais obtidas com a contabilidade" (fl. 890);

              Em todos os períodos, o auditor identificou distorções significativas no teste, sem apresentar justificativa adequada, conforme abaixo:

Em R$ mil

| Período | 3° trim. 2010 (fl. 887) | 4° trim de 2010 (fl. 888) | 1° trim 2011 (fl. 889) | 2° trim 2011 (fl. 889) | 3° trim. 2011 (fl. 890) | 4° trim de 2011 (fl. 890) |
|---|---|---|---|---|---|---|
| Saldo médio CPP | 758.056 | 1.475.512 | 1.631.165 | 1.379.771 | 1.502.078 | 1.597.442 |
| Taxa média (a) | 5,25% | 4,80% | 5,42% | 5,21% | 5,15% | 5,15% |
| Receita Esperada | 39.851 | 70.955 | 88.405 | 71.886 | 50.506 | 164.536 |
| Receita | 42.108 | 60.701 | 61.193 | 93.351 | 77.357 | 27.874 |
| Diferença | (2.257) | 10.254 | 27.215 | (21.465) | 26.851 | 136.662 |
| % diferença | 5,36% | 16,89% | 44,47% | 22,99% | 34,71% | 491,8% |
| Observação | | (b) | (c) | (c) | (d) | (d) |

   a) A taxa média refere-se a taxa para três meses;

   b) Em relação a esta diferença, a KPMG formalizou como se a mesma fosse imaterial.
     A materialidade do trimestre indicada no mesmo papel de trabalho é de R$ 9.595 mil, ou seja, a diferença identificada foi maior. A KPMG justificou a diferença como a nova carteira rendendo a 1%, ao passo que a carteira antiga rendia 1,8%, ocasionando receita menor que a esperada. Não foi formalizada a origem desta informação, tampouco os procedimentos para validação.

   c) Em relação a estas diferenças, a KPMG não apresentou nenhum comentário ou justificativa.

   d) Em relação a esta diferença, a KPMG justificou a variação destacando que o Banco Cruzeiro do Sul passou a cobrar parte da taxa de juros sob a forma de tarifa bancaria,

39/66



 MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

de modo que a diferença apresentada é compensada pelo aumento na receita de tarifas bancárias. Esta prática está em desacordo com a norma contábil, uma vez que antecipa receita de juros na forma de receitas de tarifas, ferindo o princípio da competência. Não foi feito nenhum apontamento / ressalva em relação ao assunto.

Assim dispõe a NBC TA 520 – Procedimentos Analíticos (aprovada pela Resolução CFC 1.221, de 27 de novembro de 2009):

*"4. (...) procedimento analítico significa avaliações de informações contábeis por meio de análise das **relações plausíveis entre dados financeiros e não financeiros.** Procedimentos analíticos compreendem, também, o **exame necessário de flutuações ou relações identificadas que são inconsistentes com outras informações relevantes ou que diferem significativamente dos valores esperados."**(grifo nosso)*

Destacamos que a KPMG identificou divergências significativas em relação aos valores esperados, situações que exigiria exames adicionais, conforme trecho abaixo da mesma norma:

*"7. Se os procedimentos analíticos executados de acordo com esta Norma identificam **flutuações ou relações que são inconsistentes com outras informações relevantes ou que diferem dos valores esperados de maneira significativa,** o auditor deve examinar essas diferenças por meio de:*

*(a) indagação à administração e obtenção de evidência de auditoria apropriada e relevante para as respostas da administração; e*

*(b) aplicação de outros procedimentos de auditoria conforme necessário nas circunstâncias." (grifo nosso)*

A justificativa da KPMG de que a diferença apresentada no 1º trimestre de 2011 seria imaterial também está em desacordo com a norma, visto que a diferença aceitável deve ser definida com base na materialidade, mas não é aceitável que seja a própria materialidade, haja vista a possibilidade de diferenças menores em vários itens se tornarem uma distorção relevante. Vide parágrafo A16, abaixo:

*"A16. A determinação do auditor sobre o valor da diferença entre a expectativa que pode ser aceita sem investigação adicional*

40/66





MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

*é influenciada pela materialidade (NBC TA 320 – Materialidade no Planejamento e na Execução da Auditoria, item A13) e consistência com o nível de segurança desejado, **levando em consideração a possibilidade de que uma distorção, individualmente ou em conjunto com outras distorções, pode fazer com que as demonstrações contábeis apresentem distorções relevantes. (...)" (grifos nossos)*

### 2.8.1.4. Procedimentos de auditoria de tecnologia de informação

Identificamos que a KPMG efetuou apontamentos sobre a existência de usuários genéricos nos sistemas do Banco, inclusive no sistema Tools, sistema no qual foram implantadas as operações insubsistentes (**fls. 891 a 895**):

**"O controle de acesso ao ambiente de rede dos sistemas realizado por meio de usuários individuais (Banco, Corretora e DTVM).**

Observamos a existência de políticas de acesso ao ambiente de rede e sistemas que descrevem que os usuários possuem identificação única, de uso pessoal e intransferível. Entretanto, identificamos a existência de usuários genéricos, conforme descrito abaixo:

*Ambiente de rede: identificamos 159 usuários genéricos (31/12/2011)*
*Ambiente de rede: identificamos 116 usuários genéricos (30/06/2011)*
*Ambiente de rede: identificamos 116 usuários genéricos (31/12/2010)*
*Sistema Matera: identificamos 9 usuários genéricos (30/06/2011) Sistema Matera: identificamos 9 usuários genéricos (31/12/2010) **Sistema Tools: identificamos 1 usuário genérico (30/06/2011) Sistema Tools: identificamos 1 usuário genérico (31/12/2010)***

*A utilização de usuários genéricos não permite a identificação de possíveis desvios, sejam eles intencionais ou acidentais. Além disso, possibilita que as contas sejam utilizadas por pessoas indevidas, acarretando, assim, **acessos indevidos às informações ou até mesmo fraude,** principalmente nos casos em que tais acessos forem executados por meio de contas com acessos privilegiados. Recomendamos que a Administração avalie a necessidade de*

MP 41



 MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

*utilização de usuários genéricos e, caso seja necessário, implemente um controle, no qual ative ou desative estes funcionários no momento de sua utilização, permitindo assim que, caso ocorra algum problema, seja possível identificar o responsável pelas ações tomadas no ambiente e nos sistemas.*

**Comentário da administração em 30/06/2011:**

*Podem existir alguns usuários que não estão associados aos colaboradores, mas que são necessários para o funcionamento de alguns serviços." (grifos nossos)*

Este ponto de auditoria recorrente demonstra fragilidade nos sistemas operacionais do banco. Além disso, a resposta da instituição indica que a situação não seria corrigida. Usuários genéricos permitem a realização de operações sem que se possa associar a transação a seu responsável. Na avaliação de risco de TI, documentada nos papéis de trabalho referentes a data-base de 30 de junho de 2011, 31 de dezembro de 2011, identificamos os seguintes comentários relacionados a deficiências no ambiente de TI do BCSul (WP 2.6.10 "Understanding of IT" – **fls. 924 a 925**):

*"(...)*
*Não há um controle que auxilie na concessão de acessos aos sistemas, de acordo com as responsabilidades dos funcionários e regras definidas para segregação de funções.*
*(...)*
*A revogação de acesso lógico ao ambiente de sistemas não é realizada em tempo apropriado.*
*(...)*
*Os controles de acesso ao ambiente de rede e aos sistemas não são realizados por meio de políticas seguras de senha.*
*Ausência de revisão periódica dos usuários e perfis de acesso aos sistemas, bem como aprovados pelo responsável.*
*(...)*
*Os usuários com privilégios administrativos no ambiente de rede e nos sistemas não são restritos a funcionários do departamento de TI, bem como ausência de monitoramento das atividades realizadas por estes usuários.*
*(...)"*

Apesar das fragilidades identificadas pelo auditor, o mesmo considerou, no mesmo papel de trabalho, que não existiam riscos significativos de TI que pudessem impactar as demonstrações financeiras. O parágrafo 17 da NBC TA 330 –

42/66





MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

Resposta do Auditor aos Riscos Avaliados (aprovada pela Resolução CFC 1.214, de 27 de novembro de 2009), prevê que:

"*17.    Quando    são    detectados    desvios    de controles    nos    quais    o    auditor    pretende    confiar,    o    auditor    deve    fazer indagações    específicas    para    entender    esses    assuntos    e    suas    potenciais consequências e deve determinar se:*

*(a)    os testes de controle executados fornecem uma base apropriada para se confiar nos controles;*
*(b)    são necessários testes adicionais de controle; ou*
*(c)    os    riscos    potenciais    de    distorção    precisam    ser    tratados    usando procedimentos substantivos (ver item A41).*

A inadequada avaliação do risco do auditor em relação ao ambiente de controles de TI do BCSul levou-o a não ampliar o escopo de procedimentos substantivos, e contribuiu para que não detectasse as operações insubsistentes existentes na carteira do banco.

### 2.8.1.5. Valores a receber dos órgãos conveniados

O BCSul possuía um saldo de R$ 32.078 mil registrado na conta de ativo 1.8.8.92.30.0096 – Parcelas a Receber CPP em 31 de dezembro de 2011. Estes valores, conforme ajuste relatado no **capítulo 4.3.1 item 9**, eram referentes a parcelas a receber dos órgãos conveniados do BCSul (INSS, Tribunais, etc.), os quais haviam sido descontados em folha de pagamento dos clientes detentores de empréstimos consignados, porém não repassados ao Banco.

A NBC TA 520 – Procedimentos analíticos, prevê que os procedimentos analíticos (dentre os quais se enquadra a análise de flutuação realizada pela KPMG em relação a esta conta), devem compreender:

"*o    exame    necessário    de    **flutuações    ou relações    identificadas    que    são    inconsistentes    com    outras informações relevantes** ou que diferem significativamente dos valores esperados.*" (grifos nossos)

É esperado que valores a receber no ativo sejam de fato recebidos, pois, do contrário, mostra-se necessária provisão por conta da baixa probabilidade de recuperação.

43/66





MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

A KPMG avaliou a oscilação desta conta. No período de junho a dezembro de 2011, o montante ficou sempre na ordem de R$ 30 milhões. A falta de oscilação na conta pode indicar dois fatores: (i) os valores dos períodos anteriores foram de fato recebidos e o saldo apresentado no mês em análise refere-se a novos contratos; ou (ii) os valores do ativo não estão sendo recebidos e os saldos dos meses referem-se basicamente aos mesmos contatos.

Sobre esta conta, foi inserido o seguinte comentário:

> Refere-se a valores que foram descontados dos beneficiários e que não foram repassados pelos convênios ao BCSul. Verificamos que não houve oscilações significativas no período e que o saldo corresponde a cerca de 2% do total da carteira de CPP do Banco."

No primeiro semestre de 2011, os saldos apresentaram oscilação, entre R$ 10 e 45 milhões (**fl. 927**). Nos trabalhos de auditoria da demonstração financeira de 30 de junho de 2011, apenas o seguinte comentário foi inserido em relação à conta (**fl. 928**):

> "Verificamos que as oscilações referente a rubrica 1.8.8.92.30.00.96 (parcelas a receber de CPP), trata-se de contratos de operações de créditos baixados sem recursos sem financeiro por motivos como morte ou fraude."

Este comentário deixa claro que o saldo em questão possuía uma alta probabilidade de não recebimento. Contratos não recebidos por morte ou fraude correspondem à despesa do banco e não deveriam ser registrados em contas de ativo.

No segundo semestre de 2011, a mesma observação foi feita em relação á conta e nenhum teste adicional foi realizado (**fls. 929 a 931**).

A despeito das evidências, não foram realizados procedimentos adequados de auditoria em relação à conta (verificação da liquidação financeira, conciliação com relação analítica de contratos, etc).

A não realização destes procedimentos contribuiu para que a KPMG não identificasse esta distorção relevante nas demonstrações financeiras.

**2.8.1.6. Representações da administração.**

44/66



## MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

A NBC TA 580 – Representações formais (aprovada pela Resolução CFC 1.227 de 27 de novembro de 2009), prevê que o auditor deve obter representações formais da administração (declaração por escrito) e, quando apropriado, dos responsáveis pela governança, de que eles cumpriram com suas responsabilidades pela elaboração das demonstrações contábeis e pela integridade das informações fornecidas ao auditor (parágrafos 1 e 6).

A data das representações formais deve ser tão próxima quanto praticável, mas não posterior à data do relatório do auditor sobre as demonstrações contábeis. O recebimento da carta de representação da administração é uma etapa importante do processo de auditoria, pois, por meio desta carta, o auditor obtém a declaração da administração de que os dados constantes das demonstrações financeiras estão corretos, além de outras afirmações, conforme abaixo (apêndice 2 da NBC TA 580 – Exemplo de carta de representação):

*"(...)*

**Divulgamos a V. Sas. todas as informações relativas à fraude ou suspeita de fraude de que** temos conhecimento e que afetem a entidade e envolvam:

- administração;
- empregados com funções significativas no controle interno; ou
- outros em que a fraude poderia ter efeito relevante sobre as demonstrações contábeis (NBC TA 240).

**Divulgamos a V. Sas. todas as informações relativas a alegações de fraude ou suspeita de fraude que afetem as demonstrações contábeis da entidade,** comunicadas por empregados, antigos empregados, analistas, reguladores ou outros (NBC TA 240).

**Divulgamos a V. Sas. todos os casos conhecidos de não conformidade** ou suspeita de não conformidade com leis e regulamentos,

45/66



 MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

cujos efeitos devem ser considerados na elaboração de demonstrações contábeis (NBC TA 250)." (grifos nossos)

Este fato, isoladamente, já corresponde a um descumprimento da norma da profissão. Além disso, a NBC TA 580, parágrafo 19, prevê que, ao não receber a carta de representação o auditor deve:

(...)

(b) *reavaliar a integridade da administração* e avaliar o efeito que isso pode ter sobre a confiabilidade das representações (verbais ou escritas) e da evidência de auditoria em geral;
(c) tomar ações apropriadas, inclusive determinar o possível efeito sobre a sua opinião no relatório de auditoria, em conformidade com a NBC TA 705 considerando a exigência do item 20 desta Norma;
(...)" (grifos nossos)

Além da reavaliação da percepção de risco do auditor, a NBC TA 580 é clara sobre a relevância da representação da administração sobre a percepção de risco do auditor sobre a entidade, uma vez que condiciona a emissão de opinião à entrega destas representações, conforme abaixo (parágrafo 20):

"20. O auditor deve abster-se de emitir opinião no relatório sobre as demonstrações contábeis em conformidade com a NBC TA 705 se (ver A26 e A27):
(a) o auditor concluir que há dúvida suficiente a respeito da integridade da administração, de tal modo que as representações formais exigidas pelos itens 10 e 11 não sejam confiáveis; ou
(b) a administração não fornecer as representações formais exigidas pelos itens 10 e 11." (grifos nossos)

Nas datas-bases de 30 de junho e 2011 e 31 de dezembro de 2010 e 2011, não foram obtidas as cartas de representação da administração (**conforme carta de encaminhamento à fl. 926**). Entretanto, o auditor não se absteve de emitir opinião sobre as demonstrações contábeis.





MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

Na documentação de auditoria referente aos períodos de 30 de junho de 2011 e 31 de dezembro de 2011, ou seja, nos quais já havia ocorrido uma situação de não entrega da carta de representação (31 de dezembro de 2010), a KPMG não efetuou nenhuma alteração na avaliação de riscos e nos procedimentos de auditoria realizados por conta deste fato, descumprindo, novamente, a NBC TA 580.

Na documentação de auditoria (WP 2.5.3 – Other Risk Assessment Procedures) foram identificados os seguintes comentários:

Data-base 30 de junho de 2011 (fl. 932):

*"Não identificamos nenhum assunto que pudesse apresentar risco no nível das demonstrações financeiras oriundos de outros trabalhos."*

Data-base 31 de dezembro de 2011 (fl. 933):

*"Não foram identificados risco (sic) durante a aceitação / continuidade do cliente. **Não foram identificados riscos significativos durante nossa auditoria do ano anterior** e nossa auditoria atual, além do risco de erro na contabilização das operações de crédito, suas respectivas rendas e a contabilização de rendas de operações estruturadas, durante nossa revisão das demonstrações financeiras." (grifos nossos)*

Com base no exposto, a KPMG descumpriu as normas da profissão ao emitir relatório sobre as demonstrações contábeis sem o recebimento das representações da administração.

### 2.8.1.7. Documentação de auditoria realizada após o prazo

A NBC TA 230 – Documentação de auditoria (aprovada pela Resolução CFC 1.206 de 27 de novembro de 2009) prevê que a documentação de auditoria deve ser preparada tempestivamente. A mesma norma (parágrafo A21) prevê que "Um limite de tempo apropriado para concluir a montagem do arquivo final de auditoria geralmente não ultrapassa 60 dias após a data do relatório do auditor".

O relatório do auditor referente à data-base de 31 de dezembro de 2011 foi emitido em 16 de março de 2012, sendo que o prazo de 60 dias findava em 15 de maio de 2012. Na documentação de auditoria existem papéis de trabalho com alteração posterior a esta data, conforme exemplo abaixo:

47/66



 MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

- Papel de trabalho 2.12.1 – KPMG Specialists - IRM (avaliação da necessidade de utilização de especialistas, por exemplo, em impostos, tecnologia da informação, etc). **Data da última alteração 26 de junho de 2012 (102 dias após a data do relatório) (fl. 934)**
- Papel de trabalho 2.14 Risk Assessment and Planning Discussion (documentação de avaliação de riscos da entidade e planejamento dos trabalhos). **Data da última alteração: 18 de junho de 2012 (94 dias após a data do relatório) (fl. 935)**

Não é possível identificar quais as alterações foram realizadas na documentação de auditoria que ensejou nova revisão após o prazo estipulado pela norma.

### 2.8.1.8. Conclusões

Conclui-se, portanto, que a KPMG apresentou descumprimento relevante das normas de auditoria, ferindo o disposto no artigo 29, do Regulamento Anexo à Resolução 3.198. Estes descumprimentos levaram a KPMG a não identificar distorção relevante oriunda de operações insubsistentes, emitindo parecer sem ressalvas e induzindo a erro os usuários das informações nas demonstrações de 30 de junho 2007, 2008, 2009, 2010 e 2011 e 31 de dezembro de 2007, 2008, 2009, 2010 e 2011.

### 2.9. Das irregularidades nos procedimentos executados pela ERNST & YOUNG (fls. 6486/6488)

#### 2.9.1. Representações da administração

A NBC TR 2410 prevê que o auditor responsável pela revisão de informações intermediárias de uma entidade deve obter representações formais da administração (declarações por escrito) em relação aos itens destacados abaixo (parágrafo 34 da norma):

a) *ela reconhece sua responsabilidade pelo planejamento e implementação do controle interno para evitar e detectar fraude e erro;*

b) *as informações intermediárias foram elaboradas e apresentadas de acordo com a estrutura de relatório financeiro aplicável;*

c) *ela acredita que o efeito das distorções não corrigidas identificadas pelo auditor durante a revisão são irrelevantes, tanto individualmente como no agregado, para*







## MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

*as informações intermediárias tomadas em conjunto. O resumo desses itens é incluído nas representações formais ou anexo a elas;*

**d)** *ela divulgou para o auditor todos os fatos significativos relacionados com quaisquer fraudes ou suspeitas de fraude de conhecimento da administração que possam ter afetado a entidade;*

**e)** *ela divulgou para o auditor os resultados de sua avaliação dos riscos de que as informações intermediárias podem apresentar distorção relevante como resultado de fraude. A natureza, a extensão e a frequência dessa avaliação varia de entidade para entidade e que a administração pode fazer uma avaliação detalhada anualmente ou como parte de monitoramento contínuo. Dessa forma, essa representação, à medida que ela se relaciona com as informações intermediárias, é feita sob medida para as circunstâncias específicas da entidade;*

**f)** *ela divulgou para o auditor todo o não cumprimento real ou possível das leis e regulamentações, cujos efeitos devem ser considerados na elaboração das informações intermediárias; e*

**g)** *ela divulgou para o auditor todos os eventos significativos que ocorreram após a data do balanço patrimonial até a data do relatório de revisão que podem exigir ajuste das informações intermediárias ou sua divulgação." (grifos nossos)*

A empresa de auditoria Ernst & Young não recebeu a representação da administração referente às Informações Financeiras Trimestrais revisadas por ela (referido documento não constava na documentação de auditoria entregue pela empresa e o seu não recebimento foi confirmado em reunião realizada em 18 de julho de 2012, com os Srs Eduardo Perdigão, Flávio Serpejante Peppe e Idésio da Silva Coelho Júnior, da E&Y, e os membros da Comissão de Inquérito. Reproduz-se, novamente, o conteúdo da NBC TA 580 que trata do não recebimento da representação da administração:

*"(...)*

*(a) reavaliar a integridade da administração e avaliar o efeito que isso pode ter sobre a confiabilidade das representações (verbais ou escritas) e da evidência de auditoria em geral*
*(...)" (grifos nossos)*

*"20. O auditor deve abster-se de emitir opinião no relatório sobre as demonstrações contábeis em conformidade com a NBC TA 705 se (ver A26 e A27):*

*(a) o auditor concluir que há dúvida suficiente a respeito da integridade da administração, de tal modo que as representações formais exigidas pelos itens 10 e 11 não sejam confiáveis; ou*

*(b) a administração não fornecer as representações formais exigidas pelos itens 10 e 11." (grifos nossos)*

49/66



 MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

Destaca-se, também, que a Ernst efetuou uma revisão dos papéis de trabalho da KPMG referentes à auditoria do ano anterior, papéis estes que não continham a carta de representação da administração. Apesar do escopo da revisão ser reduzido em relação a uma auditoria, ainda assim o auditor deve considerar a possibilidade de existência de distorções relevantes, e planejar seus procedimentos levando em consideração esta possibilidade:

> *"6. O auditor deve planejar e executar a revisão com atitude de ceticismo profissional, **reconhecendo que podem existir circunstâncias que fazem com que as informações intermediárias requeiram ajuste relevante** para que elas sejam elaboradas, em todos os aspectos relevantes, de acordo com a estrutura de relatório financeiro aplicável.*
>
> *Uma atitude de ceticismo profissional significa que **o auditor faz uma avaliação crítica, com postura questionadora, da validade da evidência obtida e está atento às evidências que contradizem ou colocam em dúvida a confiabilidade dos documentos ou representações da administração da entidade."**(grifos nossos)*

### 2.9.2. Conclusões

A empresa Ernst & Young, em relação às informações financeiras de 31 de março de 2012, também descumpriu o artigo 29 do Regulamento Anexo à Resolução 3.198, ao não cumprir etapa obrigatória do procedimento de auditoria referente ao recebimento da representação formal da administração.

## 3. DIREITO

### 3.1. RESPONSABILIDADE CIVIL OBJETIVA DO CONTROLADOR.

O controlador de sociedade bancária responde objetivamente pelos prejuízos causados à sociedade e a terceiros. Assim, nos termos do disposto no artigo 1.º da Lei 9.447/97,

> "a responsabilidade solidária dos controladores de instituições financeiras estabelecida no art. 15 do Decreto-lei n.º 2.321, de 25 de fevereiro de 1.987, aplica-se também, aos regimes de intervenção e liquidação extrajudicial de que trata a Lei n.º 6.024, de 13 de março de 1974".






 MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

Por sua vez, o artigo 15 Decreto-lei 2.321/74 estabelece que:

"Decretado o regime de administração especial temporária, respondem solidariamente com os ex-administradores da instituição, pelas obrigações por esta assumidas, as pessoas naturais ou jurídicas que com ela mantenham vínculo de controle, **independentemente da apuração de dolo ou culpa**".

Invoca-se, pois, a aplicação da responsabilidade objetiva; não obstante, fez-se referência tanto a atos culposos como a atos dolosos e fraudulentos dos réus.

### 3.2. RESPONSABILIDADE CIVIL OBJETIVA DOS MEMBROS DO CONSELHO DE ADMINISTRAÇÃO DE INSTITUIÇÃO FINANCEIRA.

Os integrantes do Conselho de Administração também são considerados por lei como administradores[5], a eles se aplicando o mesmo regime de responsabilidade civil, com o acréscimo da seguinte particularidade: por ser órgão colegiado, a administração dos conselheiros é coletiva[6]. Como há entre eles solidariedade[7], todos são objetivamente responsáveis pelo passivo a descoberto.

### 3.3. RESPONSABILIDADE CIVIL OBJETIVA DOS ADMINISTRADORES DE INSTITUIÇÃO FINANCEIRA. ARTIGOS 39 E 40 DA LEI 6.024/74.

Estabelecia o artigo 2.º da Lei n.º 1.808, de 7 de janeiro de 1953:

"Respondem solidariamente pelas obrigações assumidas pelos bancos e casas bancárias, durante a sua gestão e até que

---

[5]. Artigos 138 e 145 da Lei 6.404/76. De acordo com o artigo 9.º do estatuto social do Banco Santos , "A companhia será *administrada* por um Conselho de Administração e por uma Diretoria, na forma estabelecida neste Estatuto" (sem grifo no original).

[6]. Nesse sentido, Paulo Fernando Campos Salles de Toledo, *O conselho de administração na sociedade anônima*, n. 2.7.8. e 2.7.9, p. 74-75.

[7]. Artigo 40 da Lei 6.024/74.



 MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

elas se cumpram, os diretores e gerentes que procederem com **culpa ou dolo**, ainda que se trate de sociedade por ações, ou de sociedade por cotas de responsabilidade limitada".

Em razão disso, ainda que com discussão, entendeu-se que estava firmada a responsabilidade civil subjetiva dos administradores de instituição financeira.

A esse dispositivo foi dada nova redação pelo artigo 42 da Lei 4.595/64:

"Os diretores e gerentes das instituições financeiras respondem solidariamente pelas obrigações assumidas pelas mesmas durante sua gestão, até que elas se cumpram. Parágrafo único – Havendo prejuízos, a responsabilidade solidária se circunscreverá ao respectivo montante".

Foi expressamente revogada a Lei 1.808/53, pelo artigo 57 da Lei 6.024/74, que passou a cuidar da responsabilidade civil dos administradores de instituição financeira, disciplinando-a em dois dispositivos, a saber:

Estabelece o artigo 39 que:

"Os administradores e membros do Conselho Fiscal de instituições financeiras responderão, a qualquer tempo, salvo prescrição extintiva, pelos atos que tiverem praticado ou omissões em que houverem incorrido".

E o artigo 40, por seu turno, estende a responsabilidade pois:

"Os administradores de instituições financeiras respondem solidariamente pelas obrigações por elas assumidas durante sua gestão, até que se cumpram". Parágrafo único. A responsabilidade solidária se circunscreverá ao montante dos prejuízos causados".

Desapareceu, como se percebe do confronto entre as três leis, de 1953, de 1965 e de 1974, a referência a **dolo ou culpa**. Deixou

52/66





 MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

**de ser exigência**, por expressa vontade da lei, o elemento anímico da responsabilidade civil.

Daí a orientação doutrinária e jurisprudencial no sentido de que a responsabilidade civil dos administradores de instituição financeira é objetiva.

O Tribunal de Justiça de São Paulo há muito tempo, sufraga essa tese, como pode ser visto em diversos acórdãos[8] [9]. No mesmo sentido são as decisões do Tribunal de Justiça do Rio de Janeiro[10] e do Tribunal de Justiça do Rio Grande do Sul[11].

---

[8] .TJSP, RT 775/240; RT 645/66; JTJ 266/40; 194/89. Outros casos mais antigos: **1)** MS 71.818-1, 5ª Câm.Civ., j.28.8.86, Rel.Des. Silva Costa; **2)** MS.71.456-1, 5ª Câm.Civ., j.2.10.86, Rel.Des. Ralpho Waldo; **3)** MS 71.603-1, 5ª Câm,.Civ., j.11.6.87, Rel.Des. Ruy Camilo; **4)** AI.79.767-1, 3ª Cam.Civ., j.2.12.86, Rel. Des. Flávio Pinheiro; **5)** Ap.Civ. 85.426-1, 5ª Cam.Civ., j.10.12.87, Rel.Des. Márcio Bonilha; **6)** AI 89.632-1, 2ª Câm. Civ.,, j.18.12.87, Rel.Des. Silva Ferreira; **7)** Ap.Civ.107.649-1, 4ª Câm.Civ., j.20.4.89, Rel. De. Ney Almada; **8)** AI 113.783-1, 3ª Câm.Civ., j.28.02.89, Rel. Des. Flávio Pinheiro, entre diversos outros.

9 . "Destarte, os administradores das instituições financeiras estão adstritos a responderem pelos atos que pratiquem ou omissões, reprise-se, independentemente da idéia de culpa ou dolo.    Por outro lado, como as normas enunciadas sobre os administradores das instituições financeiras obrigam a reparação dos prejuízos sem culpa ou dolo, em face do caráter excepcional dessa espécie de responsabilidade civil, esta não se elide sob a argumentação de que eventuais bens foram adquiridos antes ou logo após o início da gestão do ex-administrador na instituição financeira liquidanda." (TJSP, Ap.Civ.195.317-1/O, Caso Banco da Lavoura, j.19.8.93, Rel.Des. Melo Colombi). No mérito, a responsabilidade objetiva dos administradores em se tratando de instituição financeira é ex vi legis, porque administradores do dinheiro alheio (art.40 da Lei 6.024/74). (TJSP, 3ª C.Civ., Ap.228.538-1/1, j.8.8.95, Rel.Des. Mattos Faria).

[10] . Ap. 5.384/2000, da 9.ª Câmara Cível, j. 10/10/2000, rel. Des. Laerson Mauro; antes, no mesmo sentido, acórdão publicado na RJTJRJ, v.35, p. 57.

[11] . Ap. 595059023, da 10.ª Câmara Cível, j.11/11/2004, rel. Des. Paulo Antonio Kretzmann. Esse julgado relata a existência de outro acórdão do mesmo Tribunal, que é a Apelação Cível da 3.ª Câmara Cível, rel. Des. Galeno Vellinho de Lacerda).




MP 41

54/
/b

 MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

O Superior Tribunal de Justiça também se orienta pela aplicação da responsabilidade civil objetiva, como, mais de uma vez, deixou assentado[12].

Quando o Supremo Tribunal Federal examinava a temática, também reconheceu a responsabilidade civil objetiva, deixando de aplicar a Lei das Sociedades Anônimas na espécie[13].

Irrelevante, pois, perquirir sobre dolo ou culpa[14], pois a responsabilidade solidária incide mesmo nos atos de administração normal[15].

Irrelevante, também, qual seja o diretor que tenha praticado ou participado do ato prejudicial aos credores; todos os administradores respondem pelas obrigações danosas. "Pouco importa", diz Trajano de Miranda Valverde, "para os efeitos da solidariedade, que, pelos estatutos, essas obrigações ou deveres não caibam a todos os diretores"[16].

É tranquila a orientação jurisprudencial no sentido de que, nos crimes societários, de rigor maior na descrição do dolo, está dispensada a pormenorização de condutas na denúncia. Com mais razão tal proceder deve ser admitido em relação à ação civil de responsabilidade, que não causa restrição à liberdade, mas grava o patrimônio.

Pouco importa, pois, a conduta individual dos administradores e controladores ou a graduação da culpa de cada um na prática de atos lesivos à sociedade. Como todos e cada um têm poderes legais e estatutários para impedir a prática de ilegalidades, cabe-lhes incontestável responsabilidade objetiva pelos prejuízos apurados na sociedade.

———————

[12] RESP 21245, 4ª Turma, j.4.10.94, publicado no DJU de 31.10.94, p.29500, Rel.Min.RUY ROSADO DE AGUIAR JUNIOR. No mesmo sentido, RESP 172736, j. 10/6/2003, publicado no DJ 22/9/2003 e na RSTJ 174/223, relator o Ministro Francisco Peçanha Martins.

[13] STF, 2ª Turma, Rec.Extr. nº 93.416-2, São Paulo, Caso Fivap, j.7.8.81, Rel.Min.Decio Miranda. RTJ, vol. 99, p. 891

[14]. Wilson do Egito Coelho, *Da Responsabilidade dos Administradores das Sociedades por Ações em face da nova Lei e da Lei 6.024/74*, p.44. RDM 40. No mesmo sentido: de Gian Maria Tosetti, RDM, 41/89.

[15]. Carlos Alberto Bittar, comentando o tema da responsabilidade dos administradores de instituições financeiras(Direito Empresarial, Revista de Direito Civil, RT., ed.1.977, pag.90).

[16]. Sociedades por ações, v. II, n. 640, p. 338.

MP 41



  MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

Resta aos administradores e controladores perseguidos judicialmente pela responsabilidade objetiva, o ajuizamento de ação própria contra os maiores culpados pelos prejuízos.    Aliás, porque participantes de cada um dos atos da empresa, terão facilidade de comprovar a graduação da responsabilidade subjetiva na referida via processual.

O que é preciso apurar, além do prejuízo, para o ajuizamento da demanda civil pública de responsabilidade, então, é a identidade dos administradores e controladores da instituição financeira em liquidação extrajudicial.  E nada mais.    A qualidade de administrador ou controlador no período em que se apurou prejuízo é o que basta para o reconhecimento da responsabilidade.

## 3.4. RESPONSABILIDADE CIVIL OBJETIVA DOS ADMINISTRADORES DE INSTITUIÇÃO FINANCEIRA. PARÁGRAFO ÚNICO DO ARTIGO 927 DO CÓDIGO CIVIL BRASILEIRO.

Nos termos da lei de regência, pois, que é a Lei 6.024/74, há responsabilidade civil objetiva também dos administradores de instituição financeira, que leva, à dispensa da descrição de condutas, culposa ou dolosa, como acima exposto.

Caso V. Exa. entenda que não é caso de se reconhecer a responsabilidade civil objetiva presente na lei especial, o que se admite para argumentação, invoca esta Promotoria de Justiça norma mais genérica, que é a do parágrafo único do artigo 927 do Novo Código Civil brasileiro:

"Haverá obrigação de reparar o dano, **independentemente de culpa,** nos casos especificados em lei, ou quando **a atividade normalmente desenvolvida** pelo autor do dano implicar, **por sua natureza, risco para os direitos de outrem".**

Ora, não é preciso maiores considerações para se chegar à conclusão de que a atividade desenvolvida pelos bancos, por meio dos seus administradores, segundo as orientações estabelecidas pelo controlador, pela própria natureza, de captação de dinheiro do povo, contempla alta dose de



MP 41



 MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

"risco para os direitos de outrem". Não é à toa que os maiores passivos em casos de quebra são os de instituição financeira.

Aplicável, pois, da mesma forma, o disposto no artigo 927 do Código Civil de 2002, acima referido, para se reconhecer a responsabilidade objetiva. A própria Lei 6.024/74, no artigo 15, I, "c", faz referência ao cabimento da liquidação extrajudicial "quando a instituição sofrer prejuízo que sujeite a **risco anormal** seus credores quirografários".

### 3.5. *RESPONSABILIDADE CIVIL OBJETIVA DOS ADMINISTRADORES DE INSTITUIÇÃO FINANCEIRA. EVENTUAL APLICAÇÃO DA LEI 6.404/76.*

A responsabilidade civil objetiva de administradores de instituição financeira é disciplinada por lei própria, especial, Lei 6.024/74, que dispensa qualquer invocação da Lei das Sociedades Anônimas.

Mas, mesmo que se procure trazer à aplicação a Lei 6.404/76, fica clara a responsabilidade civil dos réus.

Por diversas vezes, e por diversos modos, acima indicados, os administradores do Banco Cruzeiro do Sul violaram a lei na atuação à frente dessa instituição financeira, a fazer recair sobre eles a responsabilidade civil objetiva, estampada no artigo 158, II, da Lei 6.404/76[17].

Quem não praticou os atos acima relacionados, foi com eles conivente; os administradores tinham conhecimento, mas deixaram de agir para impedir a sua prática, a incidir, da mesma forma, na responsabilidade civil objetiva.

Como se sabe, há certa divergência, especialmente doutrinária, sobre o fundamento em que se assenta a responsabilidade dos administradores de instituição financeira. Há autores que admitem a *presunção de culpa*, e mesmo os que defendem a aplicação da teoria da culpa subjetiva clássica[18].

---

[17] . Diz-se que o disposto no artigo 158, II, da Lei 6.404/76 encerra caso de responsabilidade civil objetiva.

[18] . Nesse sentido, e praticamente isolado, Fábio Ulhoa Coelho


56/66



MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

57/
D

### 3.6. RESPONSABILIDADE CIVIL DOS ADMINISTRADORES DE INSTITUIÇÃO FINANCEIRA POR CULPA PRESUMIDA.

Na hipótese de se acolher a tese da culpa presumida[19], o que se admite para argumentação, incumbe aos réus ora demandados provar que não participaram dos atos lesivos apurados pela Comissão de Inquérito. **Há inversão do ônus da prova**, de sorte que os réus devem dizer o que se passava, enfim, o que for de seu interesse para afastar a presunção de culpa, pois se "considerou ser mais fácil ao administrador fazer a prova de sua inocência do que à sociedade comprovar a culpa dos seus gestores"[20].

### 3.7. DA RESPONSABILIDADE DAS EMPRESAS PRESTADORAS DE SERVIÇOS DE AUDITORIA .

A *American Accouting Association*, citada por Alexandres Demetrius Pereira, no livro "Auditoria das Demonstrações Contábeis – Uma Abordagem Jurídica e Contábil"[21], define *auditoria* como:

> "Um processo sistemático de obtenção objetiva de avaliação de evidências concernentes a afirmações sobre ações econômicas e eventos, para verificar o grau de

---

[19] . Escreve Arnoldo Wald que "...tendo agravado a responsabilidade dos administradores dos bancos em virtude de ser presumida a sua culpa, conforme a melhor doutrina, ou mesmo de se ter criado no caso uma responsabilidade objetiva de caráter solidário em virtude da qual os diretores devem responder pelas obrigações da instituição financeira insolvente..." (verbete liquidação extrajudicial, na Enciclopédia Saraiva de Direito, v. 50, p. 155).

[20] Arnoldo Wald, *A culpa e o risco como fundamentos da responsabilidade pessoal de diretor de banco*, n. 72, p. 109, com citação de Mezger, referindo lei alemã de 1937. Artigo publicado na revista *Justitia*, 45(120): 93-109, 1983.

[21] Pereira, Alexandre Demetrius, Auditoria das Demonstrações Contábeis – Uma Abordagem Jurídica e Contábil, editora Atlas, 2011, p. 11/13.





 MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

correspondência entre essas assertivas e os critérios estabelecidos, bem como os aspectos de comunicação dos resultados aos usuários interessados."

Assim, tem-se que "a auditoria externa de demonstrações contábeis é um dos instrumentos mais importantes para o desenvolvimento do mercado, pelo fato de adicionar credibilidade e segurança às informações financeiras prestadas pelos agentes econômicos que buscam captar recursos junto ao público investidor.[22]"

De fundamental importância, a auditoria externa confere transparência na administração das empresas e nos meios por ela utilizados para a redução da assimetria informacional existente entre aqueles que geram a informação e aqueles que a utilizam (stakeholders).

A conduta omissiva das empresas prestadoras de serviço de auditoria (KPMG e ERNEST & YOUNG), consistente no descumprimento das normas de auditoria, levaram a erro os usuários (aqui considerados os investidores e os agentes de fiscalização) das informações estampadas nas demonstrações financeiras no período de 30 de junho de 2007 a 31 de março de 2012, o que permitiu a prática de atos lesivos que culminaram com a decretação do regime de liquidação extrajudicial do Banco Cruzeiro do Sul e prejuízo estimado de R$ 2.236.782 mil.

---

[22] Op.cit. (contracapa).



MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

Assim, devem ser responsabilizadas civilmente pelos prejuízos apurados.

De acordo com o Código Civil, o profissional contábil assume a responsabilidade solidária juntamente com seu cliente, bem como o encargo dos seus atos ilícitos cometidos por sua gestão na empresa tanto na esfera civil quanto na criminal.

O profissional de contabilidade é tratado[23] "(...) como preposto do sócio numa sociedade e responde à empresa ou ao empresário pelos atos praticados com culpa, ou seja, quando não há intenção de provocar o dano no exercício de sua atividade, mas o provoca por imperícia, negligência ou imprudência, ou com dolo, quando o profissional praticar atos com intenção ou assumindo o risco de danos, denominado doloso."

Desta forma, as empresas prestadoras de serviço de auditoria devem exercer suas funções com zelo e diligência, sob pena de responder civilmente pelo dano causado a outrem (art. 186 do Código Civil).

Nesse mesmo sentido é a Lei n. 6.385/76, que no seu artigo 26, § 2º, dispõe que: "as empresas de auditoria contábil ou auditores contábeis independentes responderão, civilmente, pelos prejuízos que

---

[23] OLIVEIRA, C. M. Responsabilidade civil e penal do profissional de contabilidade. São Paulo: IOB-Thomson, 2005.



59/66



 MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

causarem a terceiros em virtude de culpa ou dolo no exercício das funções previstas neste artigo."

Essa é a regra estabelecida na Lei n. 9.447/97, que no seu artigo 3º prescreve que: "O inquérito de que trata o art. 41 da Lei n. 6.024, de 1974, compreende também a apuração dos atos praticados ou das omissões incorridas pelas pessoas naturais ou jurídicas prestadoras de serviços de auditoria independente às instituições submetidas aos regimes de intervenção, liquidação extrajudicial ou administração especial temporária", acrescentando no parágrafo único que: "Concluindo o inquérito que houve culpa ou dolo na atuação das pessoas de que trata o `caput`, aplicar-se-a o disposto na parte final do `caput` do artigo 45 da Lei n. 6024, de 1974."

## 4. PEDIDOS

### 4.1. ANTECIPAÇÃO DE TUTELA.

A antecipação de tutela é postulada dada a existência de prova inequívoca da probabilidade do direito dos credores. Não bastasse a legitimidade presumida de que se reveste a investigação levada a efeito pelo Banco Central do Brasil, tem-se, no caso, o reconhecimento de alguns réus na fase administrativa, das fraudes praticadas, e mesmo de prejuízos causados.

Aplicável o § 6.º do artigo 273 do CPC, verbis: "A tutela antecipada também poderá ser concedida quando um ou mais dos pedidos cumulados, ou parcela deles, mostrar-se incontroverso". No caso dos autos, não há necessidade de se aguardar a contestação dos réus para proferir o decreto





 MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

de antecipação; que permitirá a imediata execução provisória, ou adiantada, da decisão.

O direito à indenização é inquestionável; o valor já foi apurado por técnicos do Banco Central do Brasil.

É inequívoca a prova da probabilidade do direito à indenização, pois o Banco Central do Brasil apurou o valor da dívida; e o ato dos agentes da autarquia federal goza de presunção de legitimidade.

É caso, assim, de antecipação da tutela, para que se dê início, desde já, à satisfação do direito dos credores.

## 4.2. ARRESTO CAUTELAR E FUNGIBILIDADE.

A lei 6024/74 prevê arresto cautelar típico e determina que o Ministério Público promova-a no prazo de 8 dias. Todavia, a notável evolução do processo civil brasileiro nos últimos anos fez estampar o princípio da fungibilidade entre a antecipação de tutela e a cautelar.

O Ministério Público sempre propôs ação cautelar de arresto, seguida da ação principal, de indenização. Isso envolve a duplicidade de autuação, de citação, enfim a duplicidade de atos processuais. Certos assuntos acabam por ser discutidos tanto na cautelar como na ação principal. O requerimento de provas vem nas duas demandas.

Há um desperdício enorme de atividades que conspira contra a efetividade do processo.

MP-41



 MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

Assim, e com base no disposto no artigo 273, § 7.º, do CPC24, requer-se, se não deferida a antecipação de tutela, o deferimento do arresto dos bens dos réus, tantos quantos bastem para o pagamento do valor da indenização, aplicando-se o princípio da fungibilidade da cautelar com a antecipação de tutela.

Com efeito, e na autorizada doutrina de Cândido Rangel Dinamarco, "O novo texto não deve ser lido somente como portador da autorização a conceder uma medida cautelar quando pedida a antecipação de tutela. Também o contrário está autorizado, isto é: também quando feito um pedido a título de medida cautelar, o juiz estará autorizado a conceder a medida a título de antecipação de tutela, se esse for seu entendimento e os pressupostos estiverem satisfeitos. Não há fungibilidade em uma só mão de direção"25.

Que fique bem claro: Postula-se, por primeiro, a antecipação de tutela; senão, e na eventualidade, o arresto cautelar. Poderá V. Exa. entretanto, deferir, em relação a alguns réus, a antecipação de tutela, e em relação a outros, o arresto cautelar, na medida da convicção acerca da pretensão exposta.

Para justificar o cabimento do arresto, é de se dizer ser indispensável, agora, colocar ditos bens sob depósito e responsabilidade do

---

24 Artigo 273, § 7.º: Se o autor, a título de antecipação de tutela, requerer providência de natureza cautelar, poderá o juiz, quando presentes os respectivos pressupostos, deferir a medida cautelar em caráter incidental do processo ajuizado"
25 . A reforma da reforma, 2.ª ed. n. 48, 9. 92. São Paulo: Malheiros, 2002, sem grifo no original).



 MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

liqüidante (depositário legal), a fim de que este, na sua posse, tenha possibilidade de guardá-los e administrá-los sem vícios, desaparecimento ou dilapidação, no interesse da coletividade de credores (art. 45, § 2.º, da Lei n.º 6.024/74); evidenciado, destarte, o periculum in mora.

Os bens das empresas prestadoras de serviços de auditoria de fato não estão indisponíveis; e a medida acautelatória deve ser estendida a todos os responsáveis por força da lei.

Anote-se que, nos termos da orientação do Superior Tribunal de Justiça[26],

"o arresto de bens previsto no art. 45 da Lei 6.024/74 pode incidir sobre os que já estavam indisponíveis (art. 36)"

Está a exigir, ainda, a decretação liminar do arresto, a prática de alguns dos réus, já efetivada e consumada, de subtrair os bens ao natural destino de garantia dos credores, com a diminuição do patrimônio do banco É dizer: a conduta dos réus desaconselha, pela lesividade já engendrada, que com eles se mantenha patrimônio que, em última análise, pertence aos credores. Não são recomendados na gestão do patrimônio alheio;

Atente-se, ainda, que a ação cautelar de arresto em questão é, praticamente, imposição legal. Com a finalidade de assegurar ao máximo os interesses dos credores, na tutela do sistema de crédito, que é

---

[26] . RESP 185796, j. 17/12/99, rel. Min. Ruy Rosado de Aguiar. Existem diversos outros precedentes do Tribunal de Justiça de São Paulo.

63/66



 MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

matéria de ordem pública, o legislador exige que os bens dos administradores e controladores submetam-se à cautela do arresto.

Quanto ao fumus boni iuris, tem-se, de um lado, a inescapável responsabilidade objetiva dos réus, com solidariedade e, de outro, o demonstrado prejuízo, elevadíssimo, apurado no curso do procedimento instaurado pelo Banco Central do Brasil; o banco está quebrado há muito tempo.

## 4.3. CITAÇÃO, CONDENAÇÃO E REQUERIMENTOS.

Requer o Ministério Público do Estado de São Paulo:

a. citação dos réus, para responderem ao pedido, sob pena de sofrerem os efeitos da revelia;
b. benefícios do disposto no artigo 172 do CPC;
c. condenação solidária dos réus Luiz Felippe Indio da Costa e Cruzeiro do Sul Holding Financeira S/A ao pagamento da quantia de R$ 2.236.782 mil (dois bilhões, duzentos e trinta e seis milhões, setecentos e oitenta e dois mil reais). Esse valor, para os controladores, não é dividido por gestão, de sorte que assumem a responsabilidade pela totalidade do passivo para com os credores do Banco Cruzeiro do Sul S/A.

d. condenação solidária dos demais réus para pagarem a quantia apontada nas tabelas insertas no item 2.5 desta inicial (fls. 6565/6568 dos autos do inquérito), somando-se o valor devido em cada



MP 41





MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

gestão, pelo valor remanescente, até alcançar a importância de **R$ 2.236,782 mil** (dois bilhões, duzentos e trinta e seis milhões e setecentos e oitenta e dois mil reais).

e. confirmação da antecipação de tutela e/ou do arresto acima pleiteado, para que os bens, tantos quantos bastem, sejam penhorados e praceados. No quadragésimo segundo (XLII) volume dos autos do inquérito do Banco Central do Brasil estão arrolados, às fls. 6236/6277), os bens dos ex-administradores e controladores, sobre os quais deve incidir o arresto.

Ressalte-se que os bens da correquerida **Cruzeiro do Sul Holding Financeira S.A,** não foram declarados indisponíveis e devem sobre os mesmos incidir o arresto.

Também devem ser arrestados os bens das empresas prestadoras de serviço de auditoria, **KPMG** e **Ernest & Young**, que não tiveram seus bens declarados indisponíveis.

Requer-se que a digna serventia faça constar do mandado de arresto a relação de bens a serem arrestados (fls. 6236/6277).

f. incidência de correção monetária e de juros.

g. não se faça arresto ou penhora sobre bem considerado bem de família, quando devidamente comprovada essa qualidade.

h. Intimação do senhor liquidante, Sérgio Rodrigues Prates, para acompanhar os termos desta.

i. Expedição de ofícios:

1. Para Associação dos Registradores Imobiliários do Estado de São Paulo – ARISP, sita na Rua Maria



65/66

66
D

 MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO

Paula, 123, 1º andar, Bela Vista, São Paulo/SP, CEP 01319-001, solicitado informações sobre a existência de imóveis em nome dos réus no Estado de São Paulo.

2.       Para o Instituto de Registro Imobiliário do Brasil – IRIB, sito na Avenida Paulista, 2073, Horsa I, coj. 1201 e 1202, Cerqueira Cesar, São Paulo/SP, CEP 01311-300, solicitado informações sobre a existência de imóveis em nome dos réus no Brasil.

3.       Para Corregedoria Geral da Justiça do Estado do Rio de Janeiro, sita na Avenida Erasmo Braga, 115, 7º andar, Lâmina I, Centro, Rio de Janeiro/RJ, CEP 20020-903, solicitado informações sobre a existência de imóveis em nome dos réus no Estado do Rio de Janeiro.

Protesta pela produção de todos os meios de prova em direito permitidos, como juntada de documentos (especialmente de correspondência eletrônica impressa), oitiva de pessoas, perícias, depoimento pessoal dos réus e dos representantes legais da empresas prestadoras de serviço de auditoria (KPMG e Ernest & Young), sob pena de confissão.

Dá-se à causa o valor de R$ 2.236,782 mil (dois bilhões, duzentos e trinta e seis milhões e setecentos e oitenta e dois mil reais).

São Paulo, 30 de abril de 2013.

**Eronides A. Rodrigues dos Santos**
Promotor de Justiça

**Joel Bortolon Júnior**
Promotor de Justiça

MP 41

 PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

HONORABLE JUDGE OF THE 2ND BANKRUPTCY AND COURT-SUPERVISED REORGANIZATION COURT OF SÃO PAULO.

Distribution by Dependence
Inquiry by the Central Bank of Brazil
No. 0027885-29.2013.8.26.0100
Extrajudicial Liquidation of:
BANCO CRUZEIRO DO SUL S.A.

**THE PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO**, by its undersigned Prosecutors, files, respectfully, to Your Honor, based on the Inquiry included, prepared by the Inquiry Commission, appointed by the Central Bank of Brazil



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

## CIVIL LIABILITY ACTION

Based on articles 39, 40, 45 and 46 of Law 6.024/74, article 15 of Decree-Law No. 2.323/87 combined with articles 1 and 3, sole paragraph of Law 9.447/97; sole paragraph of article 927 of the Civil Code and article 127, caption, of the Federal Constitution, against:

### 1. DEFENDANTS

1) **Cruzeiro do Sul Holding Financeira S.A.** (taxpayer identification number CNPJ: 13.225.116/0001-70): a non-financial entity, belonging to Grupo Cruzeiro do Sul, with registered office at Avenida Presidente Wilson, 231, 24° andar, sala 2403, Centro, Rio de Janeiro, RJ, CEP 20031-021, organized on 2.2.2011, currently in the special extrajudicial liquidation regime, administered by the liquidator Sérgio Rodrigues Prates, address for service of process, at Rua Funchal n° 418 - 6°, 7°, 8° e 9° andares, Vila Olímpia, São Paulo, Capital, CEP 04551-060.

2) **Luís Felippe Índio da Costa**: Brazilian, consensually separated, lawyer, RG 912.072-6-IFP/RJ, CPF 006.034.067-34, residing at Avenida Epitácio Pessoa, 300 - apto 501, Ipanema, Rio de Janeiro/RJ, CEP 22410-090.

3) **Luís Octávio Azeredo Lopes Índio da Costa**: Brazilian, consensually separated, ID RG 044.524.34-6 IFP/RJ, taxpayer identification number CPF 782.474.977-00, residing at Estrada do Embu, 1550 - Haras Guacan, Cotia/SP, CEP 06713-100.

4) **Charles Alexander Forbes**: Brazilian, lawyer, ID RG 2.249.539-3 SSP/SP, CPF 001.906.918-91, residing at Rua José Maria Lisboa, 1060, apto, 31, São Paulo/SP, CEP [Postal Code] 01423-001.

5) **Fabio Caramuru Correa Meyer**: Brazilian, married, executive, holder of ID IFP 05648566-7, CPF 715.168.917-91, residing at Rua Fonte da Saudade, 61, apto. 1.101, Lagoa, Rio de Janeiro/RJ, CEP 22471-210.

6) **Fabio Rocha do Amaral**: Brazilian, married, business administrator, ID RG 9.363.793-7, CPF 076.593.208-31, residing at Rua Ernesto Nazaré, 213 - Alto de Pinheiros, São Paulo/SP, CEP 05462-000.

7) **Flavio Nunes Ferreira Rietmann**: Brazilian, divorced, business administrator, ID RG 10.295.069-6, CPF 913.629.627-91, residing at Alameda dos Jurupis, 701 - apto. 152, São Paulo/SP, CEP 04088-022.

8) **Horácio Martinho Lima**: Brazilian, single, engineer, ID RG 05213864-1, CPF 745.862.547-34, residing and domiciled at Rua Odílio Bacelar, 43, Urca, Rio de Janeiro/RJ, CEP 22290-280, with the following correspondence address: Av. Rio Branco, 110, 38° andar, Centro, Rio de Janeiro/RJ, CEP 20040-001.



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

9) **José Carlos Lima de Abreu**: Brazilian, married, banker, ID RG 3.322.031-1, CPF 385.584.168-34, residing at Rua Antônio Serafim 162, Condomínio Santa Margarida, Jd. Sta. Marcelina, Campinas/SP, CEP 13100-110.

10) **Maria Luísa Garcia de Mendonça**: Brazilian, married, economist, ID RG 20.039-5, CPF 380.376.616-87, residing at Av. Rainha Elizabeth da Bélgica, 664, apartamento 101, Rio de Janeiro/RJ, CEP 22081-030.

11) **Progresso Vanõ Puerto**: Spanish, married, economist, ID RG W532825-3, CPF 410915908-34, residing at Tr. Vera de Oliveira Coutinho, 94, São Paulo/SP, CEP 04007-040.

12) **Renato Alves Rabello**: Brazilian, married, engineer, ID RG 3797473-SP, CPF 527.747.408-00, residing at Rua Aramanal, 56, Vila Madalena, São Paulo/SP, CEP 05450-030.

13) **Roberto Vieira da Silva de Oliveira Costa**: Brazilian, married, economist, ID RG 04882637-4 IFP-RJ, CPF 769.344.037-20, residing at Rua Joaquim Nabuco, 244/701, Copacabana, Rio de Janeiro/RJ, CEP 22080-030.

14) **Sergio Marra Pereira Capella**: Brazilian, married, banker, RG 11.724.885, CPF 041.247.618-56, residing at Rua Canário, 130, apto 11 - Moema, São Paulo/SP. CEP 04521-000.

15) **Luiz Whately Thompson**: Brazilian, married, RG 244 929 MA/SP, CPF 029.335.198-87, residing at Rua Oquira, 226 - Alto dos Pinheiros, São Paulo/SP, CEP - 05467-030.

16) **KPMG Auditores Independentes (KPMG)**: CNPJ 57.755.217/0001-29, CRC [Regional Accounting Council] no. 2SP014428/O-6, located at Rua Dr. Renato Paes de Barros, 33 - Mooca, São Paulo/SP - CEP 04530-904, the summons shall be made by a person statutorily responsible in accordance with the information obtained at Rede Infoseg (doc. attached), Mr. Pedro Augusto de Melo, partner-administrator.

17) **ERNST & YOUNG TERCO Auditores Independentes S.S. (Ernest & Young)**: taxpayer identification number CNPJ 61.366.936/0001-25, CRC no. 2SP015199/O-6, located at Condominio São Luiz, at Avenida Presidente Juscelino Kubitscheck, 1830, Torre I – 8o andar, Itaim Bibi, São Paulo/SP - CEP 04543-900, service of process shall be made by the person statutorily responsible in accordance with the information obtained at Rede Infoseg (doc. attached), Sr. Fernando Alberto Schwartz de Magalhães, partner-administrator.

## 2. FACTS

### 2.1. THE LIQUIDATED COMPANY

2.1.1. Organization of the Company and alterations in the last 5 years.

The company Banco Cruzeiro do Sul S.A. was created from corporate reorganizations, whereas from 09/01/1989 it started to have its current name (pages 36/339).
Among the contractual amendments made, the following are highlighted:



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

✓ AGE ["Assembleia Geral Extraordinária" - Special General Meeting] of 2.27.1989 (pages 40/47): Reform of the Bylaws, reorganizing the Company by expansion of its corporate purpose, aimed at it operating with portfolios: Commercial and Investments and change of corporate name, from Cruzeiro Distribuidora de Títulos e Valores Mobiliários S/A, to BANCO CRUZEIRO S/A.

✓ AGE of 9.1.1989 (pages 52/51): Change of corporate name, from Banco Cruzeiro S/A, to BANCO CRUZEIRO DO SUL S/A.

✓ AGE of 12.10.1993 (pages 52/57): Election of Messrs. Luís Felippe Índio da Costa and Luís Octávio Azeredo Lopes Índio da Costa as Officers of Banco Cruzeiro do Sul S/A, with term of office until the Annual General Meeting - AGO of 1994.

At the Special General Meeting - AGE, of 1.23.2007 (pages 68/72), the following was approved:

a)      Opening of the capital of the BANK.

b)      Admission of shares issued by the Bank to be traded at Bovespa [São Paulo Stock Exchange], as well as listing at Level 1.

c)      Reform and restatement of the Bank's Bylaws.

d)      Election of the members of the Board of Directors of the Company, with term of office until the AGO of 2008, Messrs.: Luís Felíppe Índio da Costa, Luís Octávio Azeredo Lopes Índio da Costa, Fabio Rocha do Amaral, Horácio Martinho Lima; Charles Alexander Forbes and as independent director, Mr. Progreso Vafío Puerto.

e)      Holding of public offering of distribution of preferred shares issued by the Bank.

Still, according to the Minutes of Special General Meeting - AGE, of 1.23.2007, the Bylaws was restated (page 73/87).

## 2.2. CONTROL OF THE LIQUIDATED COMPANY

Considering the coverage period for purposes of survey of responsibilities (from 06/04/2007 to 06/04/2012), and in accordance with the information obtained from the Central Bank of Brazil Information System - Sisbacen (pages 340/373), Banco Cruzeiro do Sul S.A. was controlled by Luís Felippe Índio da Costa to 03/28/2011.

It was also found that on 03/29/2011, Cruzeiro do Sul Holding Financeira S/A acquired 100% of the capital of Banco Cruzeiro do Sul (page 368), starting to be a direct controller of Banco Cruzeiro do Sul.

From this date, Luís Felippe índio da Costa became its indirect controller.

 PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

## 2.3. *ADMINISTRATION OF THE LIQUIDATED COMPANY*

Considering the period of coverage for purposes of survey of responsibilities (from 6.4.2007 to 6.4.2012), the ex-administrators and members of the Board of Directors of BANCO CRUZEIRO DO SUL S.A. are listed below:

### 2.3.1. BOARD OF DIRECTORS

**Management period:** From the AGE of 1. 23.2007 to the AGO of 4.29.2011 *(pages 70/72; 180/183 and page. 273).*

| Name | CPF | Title |
|------|-----|-------|
| Luis Felippe índio da Costa | 006.034.067-34 | Controller / Chairman of the Board |
| Luis Octávio Vafio  Lopes índio da Costa | 782.474.977-00 | Vice-Chairman of the Board |
| Progresso Vafio Puerto | 410.915.908-34 | Independent Director |
| Fabío Rocha do Amaral | 076.593.208-31 | Director |
| Charles Alexander Forbes | 001.906.918-91 | Director |
| Horácio Martinho Lima | 745.862.547-37 | Director |

**Management period:** from AGO dated 4.29.2011 until 6.4.2012 *(pages 273/288).*

| Name | CPF | Title |
|------|-----|-------|
| Luis Octávio Azeredo  Lopes índio da Costa | 782.474.977-00 | Chairman of the Board |
| Progresso Vafto Puerto | 410.915.908-34 | Independent Director |
| Fabio Rocha do Amaral | 076.593.208-31 | Director |
| Charles Alexander Forbes (a) | 001.906.918-91 | Vice-Chairman of the Board |
| Horácio Martinho Lima | 745.862.547-37 | Director |
| Flávio Nunes Ferreira Rietmann | 913.629.627-91 | Director |

(a) He was temporarily removed on 3.1.2012, for private reasons (medical treatment), without remuneration, in accordance with pages 297/299.

### 2.3.2. EXECUTIVE BOARD

**Management period:** Minutes of the Board of Directors Meeting of 1.23.2007 (pages 90/92) until the AGO of 4.27.2009 (AGO which examined the Financial Statements ended on 12.31.2008, pages 180/198), which in practice was 7.16.2009.

| Name | CPF | Title |
|------|-----|-------|
| Luis Octávio Azeredo Lopes índio da Costa | 782.474.977-00 | Officer Superintendent |
| Luis Felippe Índio da Costa | 006.034.067-34 | Controller /  Investors Relations Officer |
| Ernani Fonseca Neto *(b)* | 625.936.257-91 | Officer |
| Fabio Caramuru Correa Meyer | 715.168.917-91 | Officer |
| João Lara de Souza Meirelles Filho *(c)* | 644.384.148-49 | Officer |
| José Carlos Lima de Abreu | 385.584.168-34 | Officer |
| Luiz Whately Thompson *(d)* | 029.335.198-87 | Officer |



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

| | | |
|---|---|---|
| Maria Luisa Garcia de Mendonça | 380.376.616-87 | Officer |
| Sergio Marra Pereira Capella | 041.247.618-56 | Officer |
| Roberto Vieira da Silva de Oliveira Costa *(e)* | 769.344.037-20 | Officer |
| Renato Alves Rabello *(f)* | 527.747.408-00 | Officer |

b)      Resigned on 10.31.2007, according to the Minutes of the RCA ["Reunião do Conselho de Administração" - Board of Directors Meeting] of 10.31.2007 (pages 148/150).

c)      Was removed on 10.31.2008, according to Minutes of RCA of 10.31.2008 (pages 175/176).

d)      Resigned on 10. 31.2008, according to Minutes of RCA of 10.31.2008 (pages 175/176).

e)      Directed the company in the management period which spans from the Board of Directors Meeting of 12.18.2007 (pages 152/153) until the Annual General Meeting [AGO "Assembleia Geral Ordinária"] of 4. 27.2009 (AGO which examined the Financial Statements ended on 12.31. 2008, pages 180/198), but in practice it went to 7.16.2009.

f)      Directed the company in the management period which spans from Minutes of the Board of Directors Meeting from 12.3.2008 to 7.16.2009 (1st Board of Directors Meeting held after the AGO of 2009, pages 199/201).

Management period: Minutes of the Board of Directors Meeting of 7.16.2009 (pages 199/201) to 4.29.2011 (1st Board of Directors Meeting, which succeeded the AGO of 2011, pages 289/294).

| Name | CPF | Title |
|---|---|---|
| Luis Octávio Azeredo Lopes índio da Costa | 782.474.977-00 | Officer Superintendent |
| Luis Felippe Índio da Costa | 006.034,067-34 | Controller / Investors Relations Officer |
| Roberto Vieira da Silva de Oliveira Costa | 769.344.037-20 | Officer |
| Fabio Caramuru Correa Meyer | 715.168.917-91 | Officer |
| Renato Alves Rabello | 527.747.408-00 | Officer |
| José Carlos Lima de Abreu | 385.584.168-34 | Officer |
| Maria Luisa Garcia de Mendonça | 380.376.616-87 | Officer |
| Sergio Marra Pereira Capella | 041247.618-56 | Officer |

Management period: Minutes of the Board of Directors Meeting from 4.29.2011 to 6.4.2012 (pages289/294).

| Name | CPF | Title |
|---|---|---|
| Luis Octávio Azeredo Lopes índio da Costa | 782.474.977-00 | Officer Superintendent |
| Roberto Vieira da Silva de Oliveira Costa | 769.344.037-20 | Officer |
| Fabio Caramuru Correa Meyer | 715.168.917-91 | Officer |
| Renato Alves Rabello (g) | 527.747.408-00 | Officer |
| José Carlos Lima de Abreu (h) | 385.584.168-34 | Officer |
| Maria Luisa Garcia de Mendonça | 380.376.616-87 | Officer |
| Sergio Marra Pereira Capella | 041.247.618-56 | Officer |

*(g) Resigned on 10.27.2011, according to Minutes of RCA of 10.27.2011 (pages 295/297).*
*(h) Was removed on 5.11.2012, according to Minutes of RCA of 5.11.2012 (pages 335/336).*



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

**2.4. *INTERVENTION AND LIQUIDATION OF THE CENTRAL BANK OF BRAZIL***

**2.4.1. Decree of the Special Temporary Administration Regime – RAET**

On 6.4.2012, through Act-Presi No. 1.217 (Federal Gazette [D.O.U.] of 6.5.2012, section 1, Page 13) (pages. 2/3), the President of the CENTRAL BANK OF BRAZIL, by the powers bested in him by article 12, item XVII, of the Internal Regime, based on article 4 of Law No. 9.447, of March 14, 1997, combined with article 15, item I, letters "a" and "b", of Law No. 6.024, of March 13, 1974, having in view the provisions of Decree-Law No. 2.321, of February 25, 1987, decreed the Special Temporary Administration Regime, for the term of 180 (one hundred and eighty) days, at BANCO CRUZEIRO DO SUL S.A. (taxpayer identification number CNPJ: 62.136,254/0001-99), with registered office in the City of São Paulo, State of São Paulo, at Rua Funchal n°418 - 6º, 7º, 8º e 9º andares, Vila Olímpia, considering the compromising economic-financial situation and the serious breach of the rules issued by the National Monetary Council and the Central Bank of Brazil, according to a decision by the Collegiate Executive Board, at meeting of June 4, 2012.

By the aforementioned act, the special temporary administration was appointed, based on article 89 of Decree-Law No. 2.323/1987, the Credits Guarantor Fund (FGC), CNPJ No. 00.954.288/3001-33.

On 6.4.2012, COMMUNICATION No. 22.585, of the Extrajudicial Liquidations Department was published - DELIQ (pages 4/7), by which the Central Bank of Brazil informed to the financial institutions and stock exchanges, the decree of Special Temporary Administration Regime at BANCO CRUZEIRO DO SUL S.A.; the appointment of the relevant special temporary administrator and the incidence of the unavailability of the assets of indirect controller Luis Felippe índio da Costa, and of the ex-administrators and members of the board of directors listed below: Luis Felippe índio da Costa, Charles Alexander Forbes, Fabio Caramuru Correa Meyer, Fabio Rocha do Amaral, Flávio Nunes Ferreira Rietmann, Horácio Martinho Lima, Jose Carlos Lima de Abreu, Luis Octávio Azeredo Lopes índio da Costa, Maria Luisa Garcia de Mendonça, Progreso Vano Puerto, Renato Alves Rabello, Roberto Vieira da Silva de Oliveira Costa and Sergio Marra Pereira Capella.

On 9.14.2012, through Act Presi No. 1.230, published in the Federal Gazette D.O.U. of 9.17.2012 (pages 31/32), the Extrajudicial Liquidation of BANCO CRUZEIRO DO SUL S.A. was decreed, based on the report of the special administrator FGC - Credit Guarantor Fund, which confirmed the compromising of the economic-financial situation and serious breach of the standards issued by the National Monetary Council and the Central Bank of Brazil by Banco Cruzeiro do Sul S.A., attesting to the existence of outstanding liabilities and the lack of feasibility of the normalization of the Company's business. Mr. Sérgio Rodrigues Prates, taxpayer identification number CPF 025.281.770-20 was appointed as liquidator, April 5, 2012 being the legal term of the Extrajudicial Liquidation.



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

### 2.5. THE OUSTANDING LIABILITIES BY THE MANAGEMENT OF THE ADMINISTRATOR

To verify the amount or estimate of the losses caused to third parties, established in article 43, of Law No. 6.024/1974, was based on the analysis of the transactions of the last 5 (five) years and of the balance sheet of BANCO CRUZEIRO DO SUL S.A. drawn up by the FGC, on the date of the RAET (6.4.2012).

According to the Equity Situation Adjusted on 6.4.2012, losses to third parties were verified (article 43 of Law No. 6.024/1974) in the estimated amount of R$ 2,236,782 thousand as described in the Inquiry Commission Report in item 4.3 – Adjusted Shareholders' Equity and explanatory notes of pages 6435/6468, whose responsibility was jointly and severally distributed, according to the terms of article 40, of Law 6.024/1974, among the controllers and ex-members/administrators of BANCO CRUZEIRO DO SUL S.A who served the following management periods, according to summary tables 1 and 2 and the other subsequent tables, prepared in accordance with the criteria described on pages 5543/5607:

### SUMMARY TABLE 1

BASE USED FOR DISTRIBUTION OF THE LOSSES

In thousands of reais

| MANAGEMENT | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| TRIAL BALANCE/BASE DATE | Oct/2007 | Feb/2008 | Oct/2006 | May/2009 | Mar/2011 | Oct/2011 | Dec/2011 | Apr/2012 | 06/04/2012 |
| Shareholders' Equity | 866.246 | 1.017.076 | 1.136 232 | 1.049.895 | 1.121.105 | 1.166.897 | 1.143.068 | 1.201.283 | |
| CREDITOR INCOME ACCOUNT | 574.503 | 280.906 | 1.026.846 | 689.318 | 699.032 | 2.076 021 | 2.941.001 | 642.446 | |
| DEBTOR INCOME ACCOUNT | 452.613 | 241.812 | 1.042.981 | 807.873 | 669.002 | 2.051.256 | 2.885.344 | 802.979 | |
| PLA | 988.136 | 1.056.171 | 1.120.066 | 1.831.140 | 1.151.134 | 1.180 653 | 1.200.725 | 1.040.753 | 874.115 |

In thousands of reais

| MANAGEMENT | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| TOTAL ADJUSTMENTS | 1.011.403 | 7.482 | 79.323 | 87.335 | 513.547 | 406.583 | 122.655 | 527.667 | 354.922 |
| ACCUMULATED ADJUSTMENTS | 1.011.403 | 1.018.885 | 1.098.208 | 1.183.543 | 1.699.090 | 2.105.653 | 2.228.308 | 2.755.975 | 3.110.897 |

### SUMMARY TABLE 2

| MANAGEMENT | PLA [Adjusted Shareholders' Equity] | ACCUMULATED ADJUSTMENT | PLA AFTER | LOSS IN |
|---|---|---|---|---|
| 1 | 988.136 | 1.011.403 | (23.267) | **(23.267)** |
| 2 | 1,056,171 | 1.018.885 | 37.286 | - |



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

| 3 | 1.120.066 | 1.098.208 | 21.858 | - |
|---|---|---|---|---|
| 4 | 1.031.140 | 1.185.543 | (154.403) | **(154.403)** |
| 5 | 1.151.134 | 1.699.090 | (547.956) | **(393.553)** |
| 6 | 1.180.653 | 2.105.653 | (925.000) | **(377.044)** |
| 7 | 1.200.725 | 2.228.308 | (1.027.583) | **(102.584)** |
| 8 | 1.040.753 | 2.755.975 | (1.715.222) | **(687.639)** |
| 9 | 874.115 | 3.110.897 | (2.236.782) | **(521.560)** |

## Management 1 => Loss verified of R$ 23,267 thousand

| Name | CPF | Title | Management Period |
|---|---|---|---|
| Luis Felipe Índio da Costa | 006.034.067-34 | Controller / Chairman of the Board  /  Investors Relations Officer | From 4.23.07 to 10.31.07 |
| Luis Octávio Azeredo Lopes índio da | 782.474.977-00 | Vice Chairman of the Board / | From 4.23.07 à 10.31.07 |
| Progresso Vario Puerto | 410.915.908-34 | Independent Director | From 4.23.07 to 10.31.07 |
| Fabio Rocha do Amaral | 076.593.208-31 | Director | From 4.23.07 to 10.31.07 |
| Charles Alexander Forbes | 001.906.918-91 | Director | From 4.23.07 to 10.31.07 |
| Horácio Martinho Lima | 745.862.547-37 | Director | From 4.23.07 to 10.31.07 |
| Ernani Fonseca Neto | 625.936.257-91 | Officer | From 4.23.07 to 10.31.07 |
| Fabio Caramuru Correa Meyer | 715.168.917-91 | Officer | From 4.23.07 to 10.31.07 |
| João Lara de Souza Meirelles Filho | 644.384.148-49 | Officer | From 4.23.07 to 10.31.07 |
| José Carlos Lima de Abreu | 385.584.168-34 | Officer | From 4.23.07 to 10.31.07 |
| Luiz Whately Thompson | 029.335.198-87 | Officer | From 4.23.07 to 10.31.07 |
| Maria Luisa Garcia de Mendonça | 380.376.616-87 | Officer | From 4.23.07 to 10.31.07 |
| Sergio Marra Pereira Capella | 041.247.618-56 | Officer | From 4.23.07 to 10.31.07 |

## Management 4 => Loss verified of R$ 154,403 thousand

| Name | CPF | Title | Management Period |
|---|---|---|---|
| Luis Felipe Índio da Costa | 006.034.067-34 | Controller / Chairman of the Board /  Investors Relations Officer | From 10.31.08 to 6.1.09 |
| Luis Octávio Azeredo Lopes índio da | 782.474.977-00 | Vice Chairman of the Board / | De 10.31.08 to 6.1.09 |
| Progresso Vario Puerto | 410.915.908-34 | Independent Director | De 10.31.08 to 6.1.09 |
| Fabio Rocha do Amaral | 076.593.208-31 | Director | De 10.31.08 to 6.1.09 |
| Charles Alexander Forbes | 001.906.918-91 | Director | De 10.31.08 to 6.1.09 |
| Horácio Martinho Lima | 745.862.547-37 | Director | De 10.31.08 to 6.1.09 |
| Fabio Caramuru Correa Meyer | 715.168.917-91 | Officer | De 10.31.08 to 6.1.09 |
| José Carlos Lima de Abreu | 385.584.168-34 | Officer | De 10.31.08 to 6.1.09 |
| Maria Luisa Garcia de Mendonça | 380.376.616-87 | Officer | De 10.31.08 to 6.1.09 |
| Sergio Marra Pereira Capella | 041.247.618-56 | Officer | De 10.31.08 to 6.1.09 |
| Roberto Vieira da Silva de Oliveira Costa | 769.344.037-20 | Officer | De 10.31.08 to 6.1.09 |



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

### Management 5 => Loss verified of R$ 393.553 thousand

| Name | CPF | Title | Management Period |
|---|---|---|---|
| Luis Felippe Índio da Costa | 006.034.067-34 | Controller / Chairman of the Board / Investors Relations Officer | From 6.1.09 to 3.28.11 |
| Luis Octávio Azeredo Lopes índio da | 782.474.977-00 | Vice Chairman of the Board / | From 6.1.09 to 3.28.11 |
| Progresso Vario Puerto | 410.915.908-34 | Independent Director | From 6.1.09 á 28.3.11 |
| Fabio Rocha do Amaral | 076.593.208-31 | Director | From 6.1.09 to 3.28.11 |
| Charles Alexander Forbes | 001.906.918-91 | Director | From 6.1.09 á 28.3.11 |
| Horácio Martinho Lima | 745.862.547-37 | Director | From 6.1.09 to 3.28.11 |
| Fabio Caramuru Correa Meyer | 715.168.917-91 | Officer | From 6.1.09 á 28.3.11 |
| José Carlos Lima de Abreu | 385.584.168-34 | Officer | From 6.1.09 to 3.28.11 |
| Maria Luisa Garcia de Mendonça | 380.376.616-87 | Officer | From 6.1.09 to 3.28.11 |
| Sergio Marra Pereira Capella | 041.247.618-56 | Officer | From 6.1.09 to 3.28.11 |
| Roberto Vieira da Silva de Oliveira Costa | 769.344.037-20 | Officer | From 6.1.09 to 3.28.11 |
| Renato Alves Rabello | 527.747.408-00 | Officer | From 6.1.09 to 3.28.11 |

### Management 6 => Loss verified of R$ 377.044 thousand

| Name | CPF/CNPJ | Title | Management Period |
|---|---|---|---|
| Luis Felippe Índio da Costa | 006.034.067-34 | Controller / Chairman of the Board / Investors Relations Officer | From 3.28.11 to 10.27.11 |
| Luis Octávio Azeredo Lopes índio da Costa | 782.474.977-00 | Vice- President of the Board / Officer | From 3.28.11to 10.27.11 |
| Progresso Vaño Puerto | 410.915.908-34 | Director | From 3.28.11 to 10.27.11 |
| Fabio Rocha do Amaral | 076.593.208-31 | Director | From 3.28.11 to 10.27.11 |
| Charles Alexander Forbes | 001.906.918-91 | Director | From 3.28.11 to 10.27.11 |
| Horácio Martinho Lima | 745.862.547-37 | Director | From 3.28.11 to 10.27.11 |
| Fabio Caramuru Correa Meyer | 715.168.917-91 | Officer | From 3.28.11 to 10.27.11 |
| José Carlos Lima de Abreu | 385.584.168-34 | Officer | From 3.28.11 to 10.27.11 |
| Maria Luisa Garcia de Mendonça | 380.376.616-87 | Officer | From 3.28.11 to 10.27.11 |
| Sergio Marra Pereira Capella | 041.247.618-56 | Officer | From 3.28.11 to 10.27.11 |
| Roberto Vieira da Silva de Oliveira | 769.344.037-20 | Officer | From 3.28.11to 10.27.11 |
| Renato Alves Rabello | 527.747.408-00 | Officer | From 3.28.11 to 10.27.11 |
| Cruzeiro do Sul Holding Financeira | 13.225.116/0001- | Controller | From 3.28.11 to 10.27.11 |



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

### Management 7 => Loss verified of R$ 102.584 thousand

| Name | CPF/CNPJ | Title | Management Period |
|---|---|---|---|
| Luis Felippe Índio da Costa | 006.034.067-34 | Controller / Chairman of the Board / Investors Relations Officer | From 10.27.11 to 1.10.12 |
| Luis Octávio Azeredo Lopes Índio da Costa | 782.474.977-00 | Chairman of the Board *i* Investors Relations Officer  and Officer Superintendent | From 10.27.11 to 1.10.12 |
| Progresso Vaño Puerto | 410.915.908-34 | Independent Director | From 10.27.11 to 1.10.12 |
| Fabio Rocha do Amaral | 076.593.208-31 | Director | From 10.27.11to 1.10.12 |
| Charles Alexander Forbes | 001.906.918-91 | Vice Chairman of the Board of Directors | From 10.27.11 to 1.10.12 |
| Horácio Martinho Lima | 745.862.547-37 | Director | From 10.27.11 to 1.10.12 |
| Roberto Vieira da Silva de Oliveira Costa | 769.344.037-20 | Officer | From 10.27.11 to 1.10.12 |
| Fabio Caramuru Correa Meyer | 715.168.917-91 | Officer | From 10.27.11 to 1.10.12 |
| José Carlos Lima de Abreu | 385.584.168-34 | Officer | From 10.27.11 to 1.10.12 |
| Maria Luisa Garcia de Mendonça | 380.376.616-87 | Officer | From 10.27.11 to 1.10.12 |
| Sergio Marra Pereira Capella | 041.247.618-56 | Officer | From 10.27.11 to 1.10.12 |
| Cruzeiro do Sul Holding Financeira S/A | 13.225.116/0001-70 | Controller | From 10.27.11 to 1.10.12 |

### Management 8 => Loss verified of R$ 687.639 thousand

| Name | CPF/CNPJ | Title | Management Period |
|---|---|---|---|
| Luis Felippe Índio da Costa | 006.034.067-34 | Controller / Chairman of the Board / Investors Relations Officer | From 1.10.12 to 5.11.12 |
| Luis Octávio Azeredo Lopes Índio da Costa | 782.474.977-00 | Chairman of the Board / Investors Relations Officers and Officer Superintendent | From 1.10.12 to 5.11.12 |
| Progresso Vario Puerto | 410.915.808-34 | Independent Director | From 1.10.12 to 5.11.12 |
| Fabio Rocha do Amaral | 076.593.208-31 | Director | From 1.10.12 to 5.11.12 |
| Horácio Martinho Lima | 745.862.547-37 | Director | From 1.10.12 to 5.11.12 |
| Roberto Vieira da Silva de Oliveira Costa | 769.344.037-20 | Officer | From 1.10.12 to 5.11.12 |
| Fabio Caramuru Correa Meyer | 715.168.917-91 | Officer | From 1.10.12 to 5.11.12 |
| José Carlos Lima de Abreu | 385.584.168-34 | Officer | From 1.10.12 to 5.11.12 |
| Maria Luisa Garcia de Mendonça | 380.376.616-87 | Officer | From 1.10.12 to 5.11.12 |
| Sergio Marra Pereira Capella | 041.247.618-59 | Officer | From 1.10.12 to 5.11.12 |
| Flávio Nunes Ferreira Rietmann | 913.629.627-91 | Director | From 1.10.12 to 5.11.12 |
| Charles Alexander Forbes | 001.906.918-91 | Vice   Presidente Conselho | From 1.10.12 to 5.11.12 |
| Cruzeiro do Sul Holding Financeira S/A | 13.225.116/0001-70 | Controller | From 1.10.12 to 5.11.12 |



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

**Management 9 => Loss verified of R$ 521.560 thousand**

| Name | CPF/CNPJ | Title | Management Period |
|------|----------|-------|-------------------|
| Luis Felippe índio da Costa | 006.034.067-34 | Controller / Chairman of the Board / Investors Relations Officer | From 5.11.12 to 6.4.12 |
| Luis Octávio Azeredo Lopes índio da Costa | 782.474.977-00 | Chairman of the Board / Investors Relations Officer and Officer Superintendent | From 5.11.12 to 6.4.12 |
| Progresso Vaño Puerto | 410.915.908-34 | Independent Director | From 5.11.12 to 6.4.12 |
| Fabio Rocha do Amaral | 076.593.208-31 | Director | From 5.11.12 to 6.4.12 |
| Horácio Martinho Lima | 745.862.547-37 | Director | From 5.11.12 to 6.4.12 |
| Roberto Vieira da Silva de Oliveira Costa | 769.344.037-20 | Officer | From 5.11.12 to 6.4.12 |
| Fabio Caramuru Correa Meyer | 715.168.917-91 | Officer | From 5.11.12 to 6.4.12 |
| Maria Luisa Garcia de Mendonça | 380.376.616-87 | Officer | From 5.11.12 to 6.4.12 |
| Sergio Marra Pereira Capella | 041.247.618-56 | Officer | De 11,5.12 to 6.4.12 |
| Flávio Nunes Ferreira Rietmann | 913.629.627-91 | Director | From 5.11.12 to 6.4.12 |
| Charles Alexander Forbes | 001.906.918-91 | Vice   Presidente Conselho | From 5.11.12 à 4.6.12 |
| Cruzeiro do Sul Holding Financeira S/A | 13.225.116/0001-70 | Controller | From 5.11.12 to 6.4.12 |

It is emphasized that the value of the Negative Adjusted Shareholders' Equity (outstanding liabilities), estimated at

**R$ 2,236,782,000.00**

(two billion, two hundred and thirty-six million, seven hundred and eighty-two thousand reais) <u>may suffer alterations in the course of the current process of extrajudicial liquidation.</u>

This civil liability action postulates the reparation of losses sustained by third parties – depositors and creditors of the bank in general, within the objectives established by Law No. 6.024/74.

The law requires that that an "estimate of the losses verified under each management" be made (article 43), and this was done by the inquiry commission. The loss experienced under each management having been verified, it was attributed to the respective members, according to the criterion taken to effect of considering the management changed every time that a member of the administration was removed and/or replaced. It is clear that the administrator which remained in several managements caused more losses.

Only in this case, given the values involved, this Prosecution requests that the defendants administrators be ordered to pay the losses for the management, as calculated by the Central Bank of Brazil.



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

### 2.6. THE IRREGULARITIES VERIFIED (pages 6489/6556)

In the credit portfolios of "Prosper Flex FIDC Multicedentes" (CNPJ: 10.531.173/0001-90), of "FIDC BCSul Verax Multicred Financeiro" (CNPJ: 07.766.151/0001-02), of "middle market (wholesale) and of surety and guarantees of Banco Cruzeiro do Sul S.A. (BCSul), on the base date 5.31.2012, there are credit transactions granted to a group of clients without evidenced economic capacity and/or without economic substantiation.

The banking institution used these clients as "interposed persons" to simulate the concession of loans formalized preponderantly in Bank Credit Notes (CCBs) -, allocating the funds originating from them to one or more of the following purposes:

a – To apply funds in Funds of Investment in Participations (FIPs), managed by Cruzeiro do Sul DTVM, whereas such funds allocated the financial resources invested in them to acquire debentures issued by non-financial companies – it should be said, Patrimonial Maragato S/A -, belonging to Messrs. Luis Octávio de Azeredo Lopes índio da Costa and Luis Felipe índio da Costa, then controllers of BCSul;

b – To settle previous credit transactions, process known as "rollover" of credit transactions. After the decree of RAET, on 6.4.2012, the "current" loans stopped being liquidated; and

c – Assignment of the CCBs to Investment Funds in Credit Rights (FIDCs – Fundos de Investimento em Direitos Creditórios) managed by Cruzeiro do Sul DTVM and/or in FIDC in which it held almost all the units (Prosper Flex FIDC).

The Diagram below demonstrates the flow of these funds:



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO



Said conduct by the managers of the institution constitutes signs of the crimes typified in articles 49, 6e, 75,10 and 17, all set forth in Law 7.492/1986 and article 34, of Law 4.595/1964.

The irregularities verified by the inquiry commission were exhaustively reported in the "Final Report", in items 6.1 to 6.7 (pages 6490/6556), whose entire content becomes an integral part of this complaint.

In short, the following administrative and criminal irregularities can be found:



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

| Acts | Administrative Irregularity | Penalty Irregularity | Chapter |
|------|------|------|------|
| Lead into error the regulating authorities relatively to the value attributed to the FIDCs units recorded in its Balance Sheet. | Circular 1.273/1987, Cosif 1-2-5, combined with article 7, § 1, item II, letter "d", of CFC No. 750/1993 | Article 6 and 10, of Law 7.492/1986 | 6.1 |
| Issuance of CCB without hedge<br><br>Make insufficient provision in its credit portfolio the "middle market" segment, violating the criteria defined in Resolution 2.682/1999 (arts. 2, 3 and 4). | Arts. 2, 3 and 4 of Res. 2.682/1999 | Arts. 6, 7 and 10, of Law 7.492/1986 | 6.2 |
| Not provision the credit risk exposure of the portfolio of surety and guarantees, despite the provisions of Item III of sole paragraph of article 2 of Circular BC 3721, of 4.30.2009, combined with item XII of article 4 of the same regulatory document. | Art. 2 sole paragraph, combined with article 4, XII, both of Circular BC 3721 | Arts. 6 and 10, of Law 7.492/1986 | 6.3 |
| Make a prohibited loan to the company controlled by administrators of the institution. | Art. 34, item V, of Law 4.595/1964 | Art. 17 of Law | 6.4 |
| Promote and/or concur to promote evasion of currency from Brazil. | | Art. 22, sole paragraph of Law 7.492/1986 | 6.5 |
| Not communicate transactions with signs of money laundering. | Arts. 11, Items I and II-b and 12, of Law 9.613/1998, Regulated by Circular BC 3.461/2009 | | 6.6 |
| Forge consigned personal loans to inflate the values of the asset and income/equity of the financial institution. | Art. 31 of Law 4.595/1964, COSIF 1.1.2.3, 1.1.2.7 (Circular 1.273/1987) | Arts. 3, 4, 6, 7, 9 and 10 of Law 7.492/1986 | 6.7 |
| Manage financial institution fraudulently | | Art. 4 of Law 7.492/1986 | |

## 2.7. DAMAGING ERRORS AND OMISSIONS (pages 6558/6563)

### 2.7.1. INVESTMENTS IN FUND VERAX IAA

On May 27, 2011, Banco Cruzeiro do Sul acquired 9.25 units of VERAX IAA FUNDO DE INVESTIMENTO EM DIREITOS CREDITÓRIOS NÃO - PADRONIZADOS ("Verax IAA F1DC NP"), for R$ 9,250 thousand (page 1123). As highlighted in Note No. 15 – Investments in Fund Verax IAA, this fund has in its portfolio a single asset, corresponding to Credit Rights from indemnification action filed by Usina Bititinga against the Federal



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

Government, in the capacity of successor of the Brazilian Sugar and Alcohol Institution, being processed at the 15th Federal Court of the Judicial Section of the Federal District, case No. 90.0001948-6 and related actions, aimed at ordering the Federal Government to pay indemnification for the material damages verified as a result of price fixing of sugar alcohol below their production cost (page 1137).

Also as highlighted in Note No. 15 – Investments in Fund Verax IAA, this asset has a high degree of doubt in relation to its realization values and, also, of the term of eventual realization, as the lawsuit related to the credit right has a number of events which make the perspective of effective realization of the credit difficult. The fund itself, its regulation, emphasizes that the units of Funds and Investments in Credit Rights have low liquidity, as follows:

> "**SECONDARY MARKET RISKS**: *THE FUND is organized as a closely-held condominium; thus, the redemption of Units can only be made at upon expiry of the duration of each issue, which is why if, for any reason, before the end of such term, the investor decides to relinquish his Units, he/it will have to dispose of them* **in the secondary market of investment fund units, which market, in Brail, does not present liquidity, which may entail difficulties in the disposal of these Units and/or cause it to obtain a sale price which causes property loss to the investor.**" *(page 1071)*

In addition to the unit of the credit right funds being of low liquidity in the market, the specific credit right of this fund, based on a lawsuit with several stays tied, confers to the units of this fund a more delicate situation in relation to liquidity.

Despite this characteristic, upon acquiring these units, Banco Cruzeiro do Sul, classified in the category "Securities to Trade ", according to the terms of Circular 3.068, of November 8, 2011, of the Central Bank of Brazil. Securities classified in this category, according to said Circular, are those "acquired in order to be actively and frequently traded". It is not reasonable to classify the acquisition of a financial instrument whose lack of liquidity is an intrinsic characteristic such as "Security for Trading", as it should not considered the purpose of active and frequent trading of a security for which there is no active market.

Adjustments at market value of securities classified in this category are posted in consideration for the period's income; i.e., they do not generate revenue (in the case of appreciation in market value) or expense (in the case of depreciation). BCSul made a single investment in the fund, on May 27, 2011, in the amount of R$ 9,250 thousand. On May 31, 2011, it calculated the market value of the units, recording an adjustment at market value of R$ 24,158 thousand, totaling, at the end of the first month of investment, a book value of R$ 33,408 thousand (261% appreciation).

In spite of the discussion on the market value of the units, considering that it is not possible to have the purpose of trading actively and frequently a security whose secondary market value of the units in practically inexistent, the most adequate classification for the unit would be the category "Available for Sale", according to the terms of Circular 3.068. In this category, appreciations in market value of the security are recorded as consideration to the



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

Shareholders' Equity account, and the effective result only happens upon maturity or disposal of the security. In this case, these valuations are not base for distribution of dividends.

Only for information, the third and last classification permitted by Circular 3.068 is the category "Held to maturity". In this category, the securities are not measured by their market value since, as the purpose is to keep them in the portfolio until the final term, market value oscillations shall not affect the financial position of the institution. In the case in question, this category could also be used, as the fund, according to its regulation has estimated maturity.

The income from the second quarter of 2011 of BCSul, before taxes, was R$ 79,108 thousand, according to the financial statements of June 30, 2011; i.e., 30.5% of the bank's income came from the appreciation of this asset. It is highlighted that this appreciation is income without consideration in cash. This income was the basis for the payment of dividends in the period.

In 2011, based on the financial statement of December 31, the institution posted profits of R$ 137,203 thousand, whereas it distributed R$ 60.500 thousand between dividends and interest on shareholders' equity (JCP); i.e., 44% of the profits. If the revenue from the transaction (net of taxes) were disregarded, and the same percentage of distribution of dividends and JCP maintained, the value distributed would be R$ 52,510 thousand; i.e., there would be a reduction of R$ 7,989 thousand. Adding to this payment investment in the fund (R$ 9,250 thousand), this transaction generated a cash disbursement of R$ 17,239 thousand, without the reasonable perspective of effective cash inflow, a practice which is removed from the precepts of a proper management of liquidity of financial institutions.

Based on the facts stated, it is evidenced that the investment in the units of Fundo de Investimento Verax II, this being a low liquidity investment associated to its classification in an inappropriate category, its purpose was to generate revenues for the institution, increasing its income in the period and, consequently, the dividends distribution.

### 2.7.2. OTHER SERIOUS FACTS INVESTIGATED BY THE INQUIRY COMMISSION

#### 2.7.2.1. Illegal telephone recordings

The Inquiry Commission, in order to analyze the provisioning and adjustments made in the Opening Balance Sheet presented by the then Special Temporary Administrator, Credits Guarantor Fund, requested the recordings of the operations desk of Cruzeiro do Sul S,A, Corretora de Valores e Mercadorias [Securities Broker], as a result of the existence of Box transactions with Fundo Tâmisa, whose only member is Banco Cruzeiro do Sul.

During the work, recordings of telephone calls made by the members of the Inquiry Commission while discharging its duties were found, which revealed that the administrators monitored the works pursued for investigation of responsibilities, an extremely serious fact which characterizes crime of breach of secrecy of the transactions investigated by the inspection teams of the Central Bank of Brazil.



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

The above narrated facts were informed to the Federal Prosecutor's Office, in accordance with Official Letter CI-CSBANCO-2012/032 (page 620), and a Police Inquiry was started to investigate the facts at the Federal Police, LP No. 196/2012-11.

### 2.7.2.2. Operation Morgan Stanley - Cruzeiro Do Sul[1]

This was an operation of adjustment to free float, according to Communications to the Market by Banco Cruzeiro do Sul (public access documents), of May 17 and 18, 2012, which was a reason for questioning with this Inquiry Commission, generating the following one shown below:

Structure of the Operation

The purpose of the operation was to guarantee the classification of Banco Cruzeiro do Sul S.A. in the Differentiated Corporate Governance Level 1 Practices Regulation of BM&FBovespa, of Minimum Percentage of Outstanding Shares of 25% (free float). The Institution was not according to the Regulation since May 2010 and the record is that, for noncompliance with a prior term, it received a fine and warning of possible suspension from trading of its shares.

The structure of the operation consisted in the Purchase and Sale of 8,939,882 shares of Banco Cruzeiro do Sul S.A. in an auction in the spot market of BM&FBovespa (Communication to the Market on 5.17.2012, performance on.5.18.2012 and financial liquidation in D+3, or 5.23.2012).

These shares were the property of the controllers of Banco Cruzeiro do Sul (Luis Felippe and Luis Octávio Índio da Costa) and their sale was managed by Funds Hudson and Missouri, whose only members were the controllers themselves. The purchase was made by Fundo Caieiras, whose only member is the Morgan Stanley Bank, for R$12.79 per share. The amount of the transaction reached R$ 114,341,091.60.

Afterwards, the controllers of Cruzeiro do Sul made with bank Morgan Stanley, by each of the Funds Hudson and Missouri, A Shares Derivative Transaction, which consisted in the concession of two options with the same date and at the same strike price: Option 1 or Call Option, conferred to the controllers' funds, of receiving the positive difference, if any, between the closing price of the shares on the Exercise Date of the Option and the previously established Exercise Price (R$ 15.39); and Option 2, or Put Option, conferred to bank Morgan Stanley, of receiving the positive difference, if any, between the previously established Exercise Price (R$ 15.39) and the closing price of the shares in the minutes of Exercise of the Option[2].

---

[1] Documents attached to pages 5086/5248.

[2] The derivative transaction, of each fund Hudson and Missouri, consisted in the junction (Forward Synthetic)of a call option and a put option, all having the same maturity date and strike price of R$15.39 per share. The option premiums were established at values which annul each other, as, disbursement of none of the parties, on account of the payment of premium.



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

These two options, simultaneously contracted, took away from bank Morgan Stanley exposure to the positive or negative property effects resulting from the price oscillation of 8,939.82 preferred shares issued by Banco Cruzeiro do Sul, acquired by the Caieiras fund.

The funds arising from the sale of the shares were fully converted into CDBs [Bank Deposit Certificates] issued by bank Morgan Stanley to funds Hudson and Missouri and, subsequently, there was a chattel mortgage of these same CDBs, as guarantee for the derivative transactions, on 5.23.2012. The CDBs were issued for 501 business days, at the rate[3] of 8.28% per annum of 252 business days.

If, on the date of exercise of options, the shares were quoted below the value pre-established by the contracting parties, the difference for less would be paid by the funds of the controllers of bank Morgan for the exercise of the put option. On the other hand, if the shares had been quoted above the pre-established value, the difference for more would be paid by Bank Morgan to the funds of the controllers of Banco Cruzeiro do Sul, for the strike price of purchase.

The Global Derivatives Contracts of these transactions were signed on 5.15.2012 and the Confirmations of the Derivatives Transactions on 5.18.2012, due on 5.20.2014.

Banco Morgan Stanley S.A., as Calculation Agent established I the Derivative Global Contracts, after the decree of RAET and with the suspension in the trading of shares, considered that there was an Event of Interruption of Trading and adopted the early maturity of the derivatives on 6.6.2012, in the same conditions as the liquidation of the original derivatives, obtaining the Early Maturity Value of R$ 117.112.454, 20 and, according to its criteria, given the absence of market price on said date, adopted the value of R$ 0.00 per share for the transfer price.

Accordingly, the call options have lost their value completely; there is nothing to be paid to the Missouri and Hudson funds. On the other hand, for put options, the original strike price of R$15.39 was deducted at present value, at the rate of 8.65% p.a., resulting in a restated strike price of R$13.10, per share, which, multiplied by the total number of shares, resulted in the Payment Amount already mentioned[4].

The assumptions used by Banco Morgan reduce to zero the value of the call options of the funds of the controllers against Morgan and represent the total value of the put options of Banco Morgan Stanley against the controllers' funds.

Thus, the structure of the transaction resulted in that the funds R$ 114,341,091.60 left Fundo Caieiras for the purchase of shares; they returned in the form of

---

[3] The pre-rate of the CDB takes its redemption value, after two years to the amount equivalent to the multiplication of the number of shares by the strike value of the options.

[4] The foreclosure of guarantees would be made by the value of the CDBs, insufficient to cover the Payment Value previously calculated by Banco Morgan, generating an outstanding balance of R$3,063,780.75, which suffered, among other facts, a challenge by the Special Temporary Administrator.



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

investments in CDB of Banco Morgan Stanley, which guarantee the derivatives transaction; Fundo Caieiras continuing to be controlled by Banco Morgan, with the shares acquired in the auction; and the controllers' funds and the controllers remaining without any asset.

The decree of RAET, on 6.4.2012, triggered the process of contractual termination, with only 11 business days of life of the transaction, whose original maturity was 5.20.2014.

There are no signs, however, that this is due to an alleged prior knowledge, by Banco Morgan Stanley, of the imminence of the decree which established RAET, given the confidential nature of legal acts of this nature, particularly when determined by the Central Bank of Brazil.

On the other hand, the same cannot be affirmed in the case of the controllers of Banco Cruzeiro do Sul, as the Official Letter of the Central Bank of Brazil, contemplated in the insignificant transactions, was received by Mr. Luis Octávio Índio da Costa on 5.11.2012.

From the viewpoint of lawfulness of the contracts, these were executed between institutions of the financial system; therefore, between the qualified parties, which knew how the market worked and which, therefore, additionally, agreed on specific declaratory clauses related to the independence of initiative of the parties, knowledge of the terms of the contracts and suitability of the investment profile, among others.

The Global Derivatives Contract (CGD) followed the standardized model of the CGD used by the market and available on the website of the Brazilian Banks Federation/ *Federação Brasileira de Bancos (*Febraban). No judge or arbitration channel was chosen, however the Venue of the Capital of the State of São Paulo was elected to settle eventual differences among the parties in relation to contractual clauses.

The structure of the transaction, as well as the dates and manner how it was made, evidences that the basic raw material was the shares auction which would be held by Banco Cruzeiro do Sul to meet the regulation of BM&FBovespa.

All the acts performed, from the Global Derivatives Contract to the chatter mortgage of the CDBs given as guarantee, bear a direct relationship to the shares auction. Therefore, it is incumbent only on the oversight and regulation bodies of this market to assess if there was irregularity related to said auction.

The differences among the parties, such as those related to the interpretation of the contractual clauses, to the consequences of suspension of trading of the shares of Banco Cruzeiro do Sul at BM&FBovespa and to the calculation of the liquidation values of the derivatives are proper to the commercial relationship and can only be discussed in the adequate venue, which is why the Securities & Exchange Commission was duly informed of the facts.



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

**2.8. The Irregularities in the Procedures Performed by KPMG (pages 127/143)**

**2.8.1. Test of existence of credit contracts (circularization)**

**2.8.1.1. Fiscal years June 30, 2011 and December 31, 2010 and 2011**

BCSul had recorded in its assets insignificant credit transactions, according to the detailed description set forth in chapters 4.3.1 item 1 and 6.7 of this report. NBC TA 315 – Identification and Evaluation of Risks of Significant Distortion of the Understanding of the entity and its Environment (approved by CFC Resolution No. 1.212 of November 27, 2009) provides in paragraph 3 that:

"***The auditor's objective is to identify and evaluate the risks of significant misstatement regardless if caused by fraud or error, at the levels of accounting demonstration and affirmations***, *through an understanding of the entity and its environment, including of internal control of the entity, providing thus a basis for the planning and implementation of the answers to the identified risks of significant misstatement.*" (emphasis added).

One of the affirmations listed in the same rule refers to the existence of transactions (paragraph A111):

"(...) existence – assets, liabilities and elements of the shareholders' equity exist (...)".

According to audit standards, the auditor should have planned and conducted appropriate procedures to be able to affirm on the existence of assets and liabilities on the base date audited, including portfolio credit transactions.

KPMG conducted, in the years evaluated, external confirmation procedures (circularization) of credit transactions of BCSul as a way of attesting to the existence of credit transactions. However, the volume of circularization letters not answered proved high in all the periods analyzed, as follows:



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

| Base date of the Financial Statement | Base date of the circularization | Quantity circularized | Returned by mail | Quantity not replied | Quantity replied to with divergence | % not replied to with divergence Total Circularized | Evidence |
|---|---|---|---|---|---|---|---|
| 06/30/2007 | 5/31/02007 | 1 | 2 | 9 | 4 | 92,3% | Page(s) 668 to |
| 12/31/2007 | 10/31/2007 | 1 | - | 6 | 1 | 63,6% | Page(s) 672 |
| 06/30/2008 | 05/31/2008 | 2 | 2 | 2 | - | 96,6% | Page(s) 673 and |
| 12/31/2008 | 10/31/2008 | 2 | 2 | 2 | - | 88,5% | Page(s) 675 and |
| 06/30/2009 | 04/30/2009 | 8 | 1 | 5 | 5 | 90,9% | Page(s) 677 to |
| 12/31/2009 | 12/31/2009 | 1 | 2 | 9 | 3 | 99,2% | Page(s) 680 to |
| 06/30/2010 | 04/30/2010 | 8 | 1 | 6 | - | 94,0% | Page(s) 683 to |
| 12/31/2010 | 30/10/2010 | 2 | 3 | 1 | 10 | 95,7% | Page(s) 686 to |
| 06/30/2011 | 04/30/2011 | 4 | 1 | 3 | - | 97,9% | Page(s) 691 to |
| 12/31/2011 | 10/31/2011 | 7 | 1 | 5 | - | 95,9% | Page(s) 694 to |

It is convenient to note that, although this section deals with the audits performed in the periods from 12.31.2010, 06.30.2011 and 12.31.2011, it is highlighted that prior knowledge of the audited entity must be taken into consideration by the auditor in the assessment of risks and in the planning of audit procedures, according to paragraph A12 of the already mentioned NBC TA 315, reproduced below:

*"A12. The auditor's previous experience with the entity and audit procedures executed in previous audits may furnish to the auditor information on subjects such as:*

*•     past misstatements and if they were timely corrected;*
*•     nature of the entity, its environment and the internal control of the entity, including deficiencies in the internal controls);*
*Significant changes which the entity or its transactions may have sustained since the previous financial period, which may help the auditor achieve sufficient understanding of the entity to identify and assess significant risks of misstatement.*

It can be noticed the high volume of replies not received in all years (except in the 2nd semester of 2007, in which the quantity circularized was much reduced in relation to the other years). In spite of the high number of exceptions, alterations in the procedures made during the years, such as the performance of additional tests, etc., they were not identified.



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

NBC TA 505 – Extreme Confirmations (approved by Resolution CFC 1.219 of November 27, 2009) provides, in paragraph 12:

*"12. For each reply not received, the auditor must execute alternative audit procedures to obtain evidence of relevant and reliable audit."*

KPMG adopted as a test alternative to non-receipt of the answers to the circularization letters, analysis of the contracts, in order to verify the existence of the transactions. This analysis was made based on the request, to the administration of BCSul, of the physical contracts of the transactions selected in the sample.

However, the volume of contracts not analyzed by the external audit, because they were not the same delivered by the administration, is high, especially until the 1st semester of 2009, according to the table below. After this date, the volume of contracts not delivered were much reduced, however, the same presented a high index of divergences, as detailed in the captions.

| Base date of the Financial Statement | Total not answered or with divergence | Contracts not analyzed | % Contracts not delivered |
|---|---|---|---|
| 06/30/2007 | 132 | 107 | 81,0% (a) (x) |
| 12/31/2007 | 7 | 7 | 100,0% (a) (x) |
| 06/30/2008 | 28 | 7 | 25,0% (a) (x) |
| 12/31/2008 | 23 | 23 | 100,0% (a) (x) |
| 06/30/2009 | 80 | 79 | 98,8% (a) (x) |
| 12/31/2009 | 121 | 5 | 4,1% (a) (b) |
| 06/30/2010 | 79 | 5 | 6,3% (a) (c) |
| 12/31/2010 | 222 | 5 | 2,3% (a) (d) |
| 06/30/2011 | 46 | 7 | 15,2% (a) (e) |
| 12/31/2011 | 70 | 17 | 24,3% (a) (f) |

(a) For the transactions whose contracts were not delivered, only the views of the credit systems demonstrating the transaction and the write-off of installments were analyzed, which does not indicate the effective existence of the transactions, nor the actual financial liquidation of these tranches;

(b) from the contracts analyzed, 56 (48.3%) were without numbering of the contract; however, the audit concluded in favor of the existence of the same, although it was not possible to list the physical contract submitted with the book record;



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

(c) from the contracts analyzed, 21 were without numbering of contract; however, the audit concluded for the existence of same, although it is not possible to list the physical contract submitted with the book record, 1 did not have the joinder agreement signed; i.e., 29.7% of the contracts analyzed presented some inconsistency. In four cases, only the voice recording was presented as evidence of the transaction.

(d) from the contracts analyzed, 156 were without the contract number; however, the audit concluded for the existence of the same and 1 contract was not signed; i.e., 72.4%% of the contracts analyzed presented inconsistency. In 2 cases, only the voice recording was presented as evidence of the transaction.

(e) from the contracts analyzed, 27 (69.2%) had no contract number presented different from the contract number in the system; however, the audit concluded for the existence of the same. In 2 cases, only the voice recording was presented as evidence of the transaction.

(f) from the contracts analyzed, 26 were without contract number, 7 presented a difference in value, 1 presented a difference in the name, 1 was not signed; i.e., 66% of the contracts analyzed presented some inconsistency.

In addition to the differences identified in the contracts, it is set forth in the audit documentation that the auditor analyzed only the contract, not the documentation relative to the debtor (ID RG, taxpayer identification number CPF, statements, etc.). Physical contracts not accompanied by registration documentation of the clients are evidence of the weak audit, as they may be "forged".

In some cases, the only evidence obtained by the audit was the registration of the contracts in the product-systems. It is highlighted that the selection base for the circularized transactions was the analytical relationship of the contracts extracted from the same system; i.e., the evidence was extracted from the same base which generated the sample for the test, so that is not adequate for the conclusion on the existence of contracts, as it does not guarantee the existence of the transaction.

In relation to the provisions of the paragraph above, it is emphasized that NBC TA 500 – Audit Evidence (approved by Resolution CFC 1.217 of November 27, 2009), defines that:

> "4. *The auditor's objective is to define and execute audit procedures which allow it **to obtain evidence of appropriate and sufficient audit evidence** which enable it to obtain reasonable conclusions to substantiate its opinion"* (emphasis added)

KPMG itself considered the high number of letters returned by post in accordance with the comment found in the circularization tests formalizations from the 2nd semester of 2009: Work papers: WP M.100 - 1 – CPP Circularization Control – 2nd semester of 2009 (page 680); WP 1.100 - CPP Circularization Control - 1st semester 2010 (page 683); WP 1.200 - CPP Circularization Control 3533 - 1st semester de 2010 (page 684); WP 1.100 - CPP Circularization Control – 2nd semester 2010 (page 688); WP D,4.100 - CPP Circularization Control - 1st semester 2011 (page 691); WP D.4.200 - CPP Circularization Control – 2nd semester 2011 (page 694).



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

(the comment highlighted below is identical in all periods mentioned)

> *"We noted that for these transactions the letters were returned by the post in function of insufficient information. We will report this deficiency to the administration in a control letter."*

From the 1st semester 2010, we identified a comment in the circularization test formalization which accentuated the auditor's concern in relation to the letters returned by the post: Work Papers: WP 1.100 - CPP Circularization Control – 1st semester 2010 (page 683); WP I.200 - CPP Circularization Control 3533 – 1st semester 2010 (page 684); 1.100 - CPP Circularization Control – 2º semester de 2010 (page 688); WP D.4.100 - CPP Circularization Control – 1st semester 2011 (page 691); WP D.4.200 -CPP Circularization Control – 2nd semester 2011 (page 694);

(the comment highlighted below is identical in all the periods mentioned)

> *"We considered that the volume of transactions returned by the post is high; however, we present recurrently this deficiency to the Bank's administration and by answers to our control letters, the explanation obtained was that it results from this the characteristic of the consigned credit transaction for public bodies, in which the relationship between the customer and the bank upon the act of contracting of the transaction and, subsequently, the updating of the register is made only when the customer contacts the institution."*

It is highlighted that article 2, of Circular 3.461/2009, issued by the Central Bank of Brazil, provides that financial institutions must collect and maintain up-to-date the customers registration information. § 5 of this article provides that the institutions "must conduct verification tests, with maximum periodicity of one year, which ensure the suitability of the registration data of its customers ".

The justification of Banco Cruzeiro do Sul indicated clear noncompliance with the standard (update made only when the customer contacts the institution); however, KPMG did not consider this justification as a risk factor in relation to the test; it only reported the deficiency in the control letter, having always received the same justification.

Additionally, for consigned credit card (CCC) transactions, in many cases the documentation was not delivered signed by the customer, to evidence the existence of the transactions; only telephone recordings, which, according to the auditor itself, would not be adequately documented, only telephone recordings which, according to the auditor, would not be adequately documented to evidence the existence of the transactions, as follows: Work Paper: WP 1.400 - CCC Circularization Control- 2nd semester 2010 (page 690); WP D.4.300 - Controle de Circularização 1.pdf - 1st semester 2011 (page 693):



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

*"We noted that for these transactions we obtained as evidence the customer's recording requesting the transaction. We will report this deficiency in a control letter."*

The volume of inconsistencies found in the circularization tests in all years indicated a risk related to the existence of the bank's portfolio letter. To this effect, NBC TA 505 – according to External Confirmations, paragraph A19, it is clear in relation to the procedure to be followed:

*"A19. The nature and extension of the alternative audit procedures are affected by account and by the affirmation in question. **An answer not received a confirmation request can indicate a risk of significant misstatement not previously identified**. In these situations, the auditor may require to review the bank's significant misstatement, at the level of affirmations, and **modify the planed audit procedures**, according to NBC TA as 315, item 31. Example, fewer answers than estimated or a greater number of answers **may indicate a fraud risk factor not identified before, which requires assessment, according to** NBC TA 240, item 24." (emphasis added).*

As seen, the audit standard in force provided that the auditor considered the low volume of answers as a risk factor of fraud, even this risk had not been detected at the planning stage.

In addition to this low volume of answers, KPMG still faced a series of inconsistencies among the accounting records and the contracts presented, as well as contracts not made available by the administration. In spite of this high volume of inconsistencies, said audit company concluded the circularization test as effective and did not modify the audit procedures planned, not complying with NBC TA 505.

In the cases where the auditor did not obtain an answer to the circularization letter (external evidence), it based itself on internal evidence (contracts and screens of the system) to conclude on the existence of credit transactions.

However, the high volume of inconsistencies, as demonstrated above, indicated the low reliability of the evidence presented. In this respect, NBC TA - 500, in line with NBC TA 505, previously mentioned, sets forth that the auditor modify or expand its procedures, in order to obtain more reliable evidence. See paragraph 11 of NBC TA 500:

*"11. If:*
*(a) the audit evidence obtained from a source is inconsistent with that obtained from another; or*
*(b) **the auditor has doubts as to the reliability of the information to be used as audit evidence, it must determine which modifications or accretions to the audit procedures are** necessary to resolve the issue and must consider the effect of this subject, if any, on other aspects of the audit (see item A57)" (emphasis added).*

Therefore, it is found that KPMG, in relation to the test of existence of credit contracts, did not take into consideration in the definition of audit procedures a series of



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

signs of inexistence of the same (great volume of letters returned through the post or not answered, contracts not delivered, inconsistency between the accounting records and the documentation delivered), as determined by the standards of the profession, and, thus, it did not properly consider the risk of fraud, as highlighted in paragraph A19 of NBC TA 505.

Notwithstanding the risk of fraud, regardless of sign, the auditor must consider in the execution of its audit procedures, according to paragraph 12 of NBC TA 240 – Responsibility of the Auditor in Relation to Fraud, in the Context of the Audit of Financial Statements (approved by Resolution CFC 1.207 of November 27, 2009), the following:

> **"12.** *(...) the auditor must keep a skeptical professional attitude during the audit, recognizing the possibility that there is significant misstatement resulting from fraud, notwithstanding the auditor's past experience in relation to the honesty and integrity6 of the administration and those responsible for the entity's governance."* (emphasis added)

In the works relative to the base dates of June 30, 2011 and December 31, 2011, KPMG used in its audit of the financial statements, the procedures of verification of hedge of the credit transactions assigned to the FIDCs conducted by KPMG, as contractor of Deutsche Bank, custodian of the FIDCs.

In this procedure, like the circularization test, approximately 100 transactions were selected in each of the funds in which BCSul owned subordinated units. For these transactions, the contracts and registrations were requested. In these cases, the percentage of delivery of contracts was much greater than the circularization test, as follows:

|  | Evidence | Sample | Contracts Analyzed | Registration delivered | Base Date |
|---|---|---|---|---|---|
| FIDC CC | Page(s) 697 a 704 | 100 | 91 | 100 | 02/28/2011 |
| CPP 120 | Page(s) 705 a 712 | 99 | 96 | 99 | 02/28/2011 |
| CPP 180 | Page(s) 713/720 | 99 | 96 | 99 | 02/28/2011 |
| Total |  | 298 | 283 | 298 |  |
| CC II | Page(s) 721/728 | 100 | 99 | 100 | 05/31/2011 |
| CPP 120 | Page(s) 729/736 | 99 | 98 | 97 | 05/31/2011 |
| CPP 540 | Page(s) 737/743 | 100 | 88 | 88 | 05/31/2011 |
| Maxcred II | Page(s) 744/751 | 100 | 99 | 100 | 05/31/2011 |
| Multicred | Page(s) 752/759 | 100 | 100 | 99 | 05/31/2011 |
| Verax 180 | Pages 760/766 | 100 | 96 | 99 | 05/31/2011 |
| Verax CPP 360 | Pages 767/775 | 100 | 99 | 100 | 05/31/2011 |
| Prosper Flex | Pages 776/783 | 100 | 100 | 98 | 05/31/2011 |
| Total |  | 799 | 779 | 781 |  |
| CC II | Pages 784/789 | 99 | 79 | 99 | 08/31/2011 |
| CPP 120 | Pages 790/795 | 100 | 90 | 98 | 08/31/2011 |
| CPP 180 | Pages 796/801 | 100 | 95 | 99 | 08/31/2011 |
| CPP 360 | Pages 802/807 | 99 | 93 | 99 | 08/31/2011 |
| Maxcred II | Pages 808/813 | 91 | 87 | 90 | 08/31/2011 |
| Multicred | Pages 814/819 | 100 | 87 | 99 | 08/31/2011 |



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

| | | | | | |
|---|---|---|---|---|---|
| Prosper Flex | Pages 820/825 | 100 | 99 | 97 | 08/31/2011 |
| RPPS | Pages 826/831 | 99 | 98 | 97 | 08/31/2011 |
| Total | | 788 | 728 | 778 | |
| CPP180 | Pages 832/839 | 100 | 90 | 100 | 30/11/2011 |
| CPP 360 | Pages 840/847 | 100 | 97 | 97 | 30/11/2011 |
| CPP 540 | Pages 848/855 | 100 | 100 | 100 | 18/11/2011 |
| Maxcred II | Pages 856/862 | 75 | 64 | 73 | 18/11/2011 |
| Multicred | Pages 863/870 | 100 | 51 | 99 | 30/11/2011 |
| Verax CC II | Pages 871/878 | 100 | 98 | 100 | 30/11/2011 |
| Prosper Flex | Pages 879/886 | 100 | 100 | 100 | 30/11/2011 |
| Total | | 675 | 600 | 669 | |
| **GRAND TOTAL** | | **2560** | **2390** | **2526** | |

We noted that the auditors responsible for conducting these tests are not the same members of the audit team of Banco Cruzeiro do Sul.

Considering that the portfolio which makes up FIDC is formed by credit transactions generated by Banco Cruzeiro do Sul, it was expected that the outcome of verification of contracts in the FIDCs would generate the same notes listed in the circularization test, especially because it was quite a pulverized portfolio, which did not occur.

Again, the discrepancy of results in similar procedures applied to transactions with the same origin, according to the standard, should have led the auditor to question the evidence obtained by one or another team, according to paragraph 11 of NBC TA 500, reproduced one more time:

"11. *If:*

*(a) the audit evidence obtained from a source is inconsistent with that obtained from another; or*

*(b) the auditor has doubts as to the reliability of information to be used as audit evidence, it must determine* **which modifications or accretions to the audit procedures** *are necessary to resolve the subject and must consider the effect of the subject, if any, on other aspects of the audit (see item A57)"* (emphasis added)

It is highlighted that, in this test, the personal documentation of the customer was also not checked, only the registration card, contract and the authorization for deduction from payroll, documents which, alone, do not bring audit comfort on the existence of the transactions.

2.8.1.2. Fiscal years June 30, 2007, 2008, 2009 and 2012 and December 31, 2007, 2008 and 2009.

In this period, another set of audit standards was in force, which was revoked, mostly, by the adoption of the set of international standards, made by CFC in 2009, effective from January 01, 2010.



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

In relation to the existence of not enough asset, the auditor, in conducting its procedures, according to NBC T 11 – Independent Audit Standards of the Financial Statements (approved by Resolution CFC 820 of December 17, 1997), had the following duty:

*"11.1.4.3 – The primary responsibility in the prevention and identification of frauds and errors is of the entity's administration, through the implementation and maintenance of an adequate accounting and internal control system. However, **the auditor must plan its work so as to detect frauds and errors which entail significant effects in the financial statements.**" (emphasis added)*

This same standard also provides that the auditor must aim at concluding on the existence of the property items on a certain base date (paragraph 11.2.6.7 letter "a"). For expressive balances, such as those of the credit operations of the institution, the standard is clear by providing external confirmation procedures, as highlighted below:

*"11.2.6.7 – When the amount involved is expressive in relation to the equity and financial position and to the income from transactions, the auditor must:*
*a)    confirm the values of accounts receivable and payable, through direct communication with the third parties involved; and*
*b)    follow up on the physical inventory prepared by the entity, conducting the applicable physical counting tests and complementary procedures." (emphasis added)*

With the accumulated knowledge in relation to the low index of answers to the circularization letters, in addition to the fact that the bank does not deliver the credit contracts, the independent auditor, even if it had not noted this situation in the planning of the first set of works, would have reassessed the scope of the tests, in accordance with NBC T 11.4 – Audit Planning (approved by Resolution CFC 1.035 of August 26, 2005):

*"11.4.1.16. A lot of information which comprises the final planning for a certain period is confirmed during the field works, which entails the **need for the independent auditor to review and adjust it as he is performing the works.**" (emphasis added)*

The same standard provides alteration in the procedures planned by virtue of circumstances noted during the course of the works:

*"11.4.4.12. The audit planning and programs must be permanently reviewed, as a way for the independent auditor to assess the changes in circumstances and their reflexes in the extent, opportunity and nature of the audit procedures to be applied."*

2.8.1.3. Analytical procedures (Fiscal years June 30, 2011 and December 31, 2010 and 2011).



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

KPMG conducted, in the fiscal years listed above, analytical procedures in relation to the balances of the credit transactions of Banco Cruzeiro do Sul.

The analytical procedure conducted in relation to the CPP portfolio consisted in:

✓ calculating the average balance of the credit transactions;

✓ applying the "average rate of the portfolio" to this average balance;

✓ comparing the revenue obtained in this calculation with the effective revenue.

In relation to the calculation of the average rate, the following is highlighted:

✓ on June 30, 2010, the average rate was obtained "in accordance with management information " (page 887);
✓ on December 31, 2010, the average rate was obtained by the "average production of the last 3 years ", without detailing the origin of the data (page 888);
✓ on June 30, 2011, the caption associated to the average rate of the portfolio brings the following information "according to the average rate of the portfolio ", without specifying the calculation methodology and the source of the information (page 889);
✓ on December 31, 2011, the average rate was obtained "according to management information obtained from the accounts. " (page 890);

In all the periods, the auditor identified significant misstatements in the test, without presenting adequate justification, as follows:

In R$ thousand

| Period | 3rd quarter 2010 (page 887) | 4th quarter 2010 (page 888) | 1st quarter 2011 (page 889) | 2nd quarter 2011 (page 889) | 3rd quarter 2011 (page 890) | 4th quarter 2011 (page 890) |
|---|---|---|---|---|---|---|
| Average balance CPP | 758.056 | 1.475.512 | 1.631.165 | 1.379.771 | 1.502.078 | 1.597.442 |
| Average rate (a) | 5.25% | 4.80% | 5,42% | 5,21% | 5,15% | 5,15% |
| Expected revenue | 39.851 | 70.955 | 88.405 | 71.886 | 50.506 | 164.536 |
| Revenue | 42.108 | 60,701 | 61.193 | 93,351 | 77.357 | 27.874 |
| Difference | (2.257) | 10.254 | 27.215 | (21.465) | 26.851 | 136.662 |
| % difference | 5,36% | 16,89% | 44,47% | 22,99% | 34,71% | 491,8% |
| Note | | (b) | (c) | (c) | (d) | (d) |



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

a)      The average rate refers to the rate for three months;
b)      In relation to this difference, KPMG formalized as if the same were immaterial.
The materiality of the quarter indicated in the same work paper is R$ 9,595 thousand; i.e., the difference identified was greater. KPMG justified the difference with the new portfolio yielding 1%, where the former portfolio yielded 1.8%, causing revenue lower than expected. The origin of this information was not formalized, nor the validation procedures.
c)      In relation to these differences, KPMG did not present any comment or justification.
d)      In relation to this difference, KPMG justified the variation highlighting that Banco Cruzeiro do Sul started to collect part of the interest rate as a bank tariff, so that the difference presented is offset by the increase in the revenue of bank tariffs. This practice is not according to the accounting standard, as it estimates interest revenue according to revenue from tariffs, going against the competition principle. No note/qualification in relation to the subject was made.

NBC TA 520 provides as follows- Analytical Procedures (approved by Resolution CFC 1.221, of November 27, 2009):

"*4. (...) analytical procedure means assessments of accounting information by analysis of **plausible relations among financial and non-financial data**. Analytical procedures also comprise **the necessary examination of fluctuations or relationships identified which are inconsistent with other significant information or which differ significantly from the expected values.**" (emphasis added)*

We highlight that KPMG identified significant differences in relation to expected values, situations which would require additional examination, in accordance with the excerpt below of the same standard:

"*7. If the analytical procedures conducted according to this Standard identify **fluctuations or relations which are inconsistent with other significant information or which differ from expected values significantly**, the auditor must examine these differences by*:

(a)      *questioning the administration and obtaining appropriate and relevant audit evidence for the administration's answers; and*
(b)      *applying other audit procedures as necessary in the circumstances.* (emphasis added)

KPMG's justification that the difference presented in the 1st quarter of 2011 would be immaterial is also not according to the standard, given that the acceptable difference must be defined based on materiality, but it is not acceptable that it be the materiality itself, given the possibility of smaller differences in several items becoming a significant misstatement. See paragraph A16, below:

"*A16. The auditor's determination on the value of the difference between the expectation which may be accepted without additional investigation **is influenced by materiality** (NBC TA 320 – Materiality in the Audit Planning and Execution, item A13) and*



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

*consistency with the desired safety level, **taking into consideration the possibility that a misstatement or in a set with other misstatements can cause the financial statements to present significant misstatements. (...)**"* (emphasis added)

2.8.1.4. Audit procedures of information technology

We identified that KPMG made notes on the existence of generic users in the Bank's systems, including in the Tools system, system in which non-subsistent operations were implemented (Pages 891 to 895):

**"The control of access to the environment of the systems network made by individual users (Bank, Broker and DTVM).**

We noted the existence of policies of access to the network environment and systems which describe that the users have unique identification, of personal use and non-transferable. However, we identified the existence of generic users, as described below:

Network environment: we identified 159 generic users (12/31/2011)
Network environment: we identified 116 generic users (06/30/2011)
Network environment: we identified 116 generic users (12/31/2010)
Matera System: we identified 9 generic users (06/30/2011) Matera System: we identified 9 generic users (12/31/2010) Tools System: we identified 1 generic user (06/30/2011) Tools System: we identified 1 generic user (12/31/2010)

*Use by generic users does not allow the identification of possible deviations, whether they are intentional or accidental. Additionally, it enables the accounts to be used by improper persons, entailing thus, **improper accesses to information or even fraud**, especially in the cases in which such accesses are made by accounts with privileged access. We recommend that the Administration assess the need to use generic users and, if necessary, implement control, in which it activates or disables these employees at the time of their use, enabling thus, if any issue occurs, that it be possible to identify the person responsible for the actions taken in the environment and systems.*

**Comment by the administration on 06/30/2011:**

*There may be certain users who are not associated to the collaborators, but who are necessary for operation of some services.*"(emphasis added)

This recurrent audit point demonstrates weakness in the bank's operating systems. Additionally, the answer from the institution indicates that the situation would not be corrected. Generic users permit the performance of operations without one being able to associate the transaction back to the person or entity responsible for it. In the IT risk assessment, documented in the work papers relative to base date June 30, 2011, December 31, 2011, we identified the following comments related to deficiencies in the IT environment of BCSul (WP 2.6.10 "Understanding of IT" - Page(s) 924 to 925):

"(...)



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

*There is no control which helps in the concession of accesses to the systems according to the responsibilities of the employees and rules defined for segregati8on of functions.*
*(...)*
*Revocation of logical access to the systems environment is not conducted in the appropriate time.*
*(...)*
*Controls of access to the network environment and to the systems are not performed by means of secure password policies.*
*Absence of periodical review of users and profiles of access to the systems, as well as approved by the person responsible.*
*(...)*
*Users with administrative privileges in the network environment and in the systems are not restricted to the IT department employees, and the absence of monitoring of activities performed by these users.*
*(...)"*

Despite the weaknesses identified by the auditor, the same considered in the same work, that there were no significant IT risks which could impact the financial statements. Paragraph 17 of NBC TA 330 – Auditor's Answer to the Risks Assessed (approved by Resolution CFC 1.214, of November 27, 2009), sets forth that:

*"17. When deviations in the controls in which the auditor intends to rely are detected, it must ask specific questions to understand these subjects and their potential consequences and it must be determined if:*

*(a)      the control tests executed supply a suitable basis to rely on the controls;*
*(b)      additional control tests are necessary; or*
*(c)      the potential risks of misstatement need to be treated using substantive procedures (see item A41).*

The inadequate assessment of the auditor's risk in relation to the environment of IT controls of BCSul led it not to expand the scope of substantive procedures and contributed so that non-subsistent operations existing in the bank's portfolio were not detected.

2.8.1.5. Values receivable from non-covenanted bodies

BCSul had a balance of R$ 32,078 thousand recorded in asset account 1.8.8.92.30.0096 – CPP installments receivable on December 31, 2011. These values, according to the adjustment reported in chapter 4.3.1, item 9, referred to installments receivable from the covenanted bodies of BCSul (INSS, Courts, etc.), which had been deducted on payroll of the customers that had consigned loans, however not transferred to the Bank.



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

NBC TA 520 – Analytical procedures, provides that the analytical procedures (among which is the fluctuation analysis conducted by KPMG in relation to this account), must comprise:

"*the necessary examination of **fluctuations or relationships identified which are inconsistent with other significant information** or which differ significantly from the expected values.*" (emphasis added)

It is expected that values receivable in the assets be in fact received, as, otherwise, a provision by account not likely to be recovered proves necessary.

KPMG assessed the oscillation of this account. In the period from June to December 2011, the amount was always in the order of R$ 30 million. The absence of oscillation in the account may indicate two factors: (i) the values of previous periods were in fact received and the balance presented in the month being analyzed refers to new contracts; or (ii) the values of the assets are not being received and the balances of the months refer basically to the same contracts.

The following comment was inserted in this account:

*It refers to values which were deducted from the beneficiaries and which were not transferred by the covenants to BCSul. We found that there were no significant oscillations in the period and that the balance corresponds to approximately 2% of the total CPP portfolio of the Bank.*"

In the first semester of 2011, the balances presented oscillation between R$ 10 and 45 million (page 927). In the audit works of the financial statement of June 30, 2011, only the following comment was inserted in relation to the account (page 928):

"*We found that the oscillations relative to item 1.8.8.92.30.00.96 (installments receivable from CPP) deals with contracts of credit transactions written off without funds due to reasons of death or fraud.*"

This comment makes clear that the balance in question was very likely not to be received. Contracts not received due to death or fraud correspond to the bank's expense and should not be recorded in asset accounts.

In the second semester of 2011, the same observation was made in relation to the account and no additional test was conducted (Pages 929 to 931).

In spite of the evidence, adequate audit procedures in relation to the account were not conducted (verification of the financial liquidation, reconciliation with analytical contracts relationship, etc.).

The failure of these procedures contributed so that KPMG did not identify this significant misstatement in the financial statements.

2.8.1.6. Representations of the administration



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

NBC TA 580 – Formal representations (approved by Resolution CFC 1.227 of November 27, 2009), sets forth that the auditor must obtain representations from the administration (written representation) and, when appropriate, from those responsible for the governance, that they have complied with their responsibilities for the preparation of the financial statements and for the integrity of information furnished to the auditor (paragraphs 1 and 6).

The date of formal representations must be as close as practicable, but not subsequent to the date of the auditor's report on the financial statements. The receipt of the letter of representation from the administration is an important stage of the audit processes, by means of this letter, the auditor obtains the representation from the administration that the data set forth in the financial statements are correct, in addition to other affirmations, as follows (appendix 2 of NBC TA 580 – Example of representation letter):

"(...)

We disclose to you all the information relative to fraud or suspicion of fraud which we are aware of and which affect the entity and involve:

• administration;
• employees with significant functions in internal control; or
• others in which the fraud could have a significant effect on the financial statements (NBC TA 240).

We disclose to you all the information relative to allegations of fraud or suspicion of fraud which affect the entity's financial statements, informed by employees, former employees, analysts, regulators or others (NBC TA 240).

**We disclose to you all the known cases of noncompliance or suspicion of noncompliance** with laws and regulations, whose effects must be considered in the preparation of financial statements (NBC TA 250)" (emphasis added).

This fact, alone, already corresponds to noncompliance with the rule of the profession. Additionally, NBC TA 580, paragraph 19, sets forth that, by not receiving the representation letter, the auditor must:

(...)

(b)      *reassess the integrity of the administration and assess the effect that this can have on the reliability of the representations (oral or written) and of the audit evidence in general*;
(c)      take appropriate actions, including determine the possible effect on its opinion in the audit report, in conformity with NBC TA 705 considering the requirement of item 20 of this Standard;
(...)" (emphasis added)



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

In addition to the reassessment of the perception of the auditor's risk, NBC TA 580 is clear about the relevance of the representation of the administration on the perception of the auditor's risk on the entity, as it conditions the issuance of the opinion to the delivery of these representations, as follows (paragraph20):

"*20. The auditor must abstain from issuing an opinion on the report on the financial statements in conformity with NBC TA 705 if (see A26 and A27):*
*(a)   the auditor concludes that there is sufficient doubt with respect to the integrity of the administration, so that the formal representations required by items 10 and 11 are not reliable; or*
*(b)   the administration does not furnish the formal representations required by items 10 and 11.*" *(emphasis added)*

On the base dates June 30, 2011 and December 31, 2010 and 2011, letters of representation were not obtained from the administration (in accordance with the referral letter on page 926). However, the auditor did not abstain from issuing an opinion on the financial statements.

In the audit documentation relative to the periods June 30, 2011 and December 31, 2011; i.e., in which there had occurred a situation of non-delivery of a letter of representation (December 31, 2010), KPMG did not make any alteration in the risks assessment and in the audit procedures conducted on account of this fact, not complying again with NBC TA 580.

In the audit documentation (WP 2.5.3 - Other Risk Assessment Procedures) the following comments were identified:

Base date June 30, 2011 (page 932):

"*We did not identify any subject which could present risk in the level of the financial statements arising out of other works.*"

Base date December 31, 2011 (page 933):

"*Risks were not identified during the acceptance / continuity of the customer. **Significant risks were not identified during our previous year audit** and our current risk audit, in addition to the risk of error in the accounting of credit transactions, their respective income and accounting of income from structured transactions, during out review of the financial statements.*" *(emphasis added)*

Based on the above, KPMG did not comply with the standards of the profession by issuing a report on the financial statements without receipt of the representations of the administration.

2.8.1.7. Audit documentation conducted after the term



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

NBC TA 230 – Audit documentation approved by Resolution CFC 1.206 of November 27, 2009) sets forth that the audit documentation must be prepared timely. The same standard (paragraph A21) sets forth that "An appropriate time limit to conclude on the assembly of the final audit file generally does not exceed 60 days after the date of the auditor's report ".

The auditor's report relative to the base date December 31, 2011 was issued on March 16, 2012, whereas the term of 60 days ended on May 15, 2012. In the audit documentation, there are work papers with alteration subsequent to this date, like the example below:

- Work paper 2.12.1 - KPMG Specialists - IRM (assessment of the need to use specialists; for instance, in taxes, information technology, etc.). **Date of the last amendment June 26, 2012 (102 days after the date of the report) (page 934)**.
- Work paper 2.14 Risk Assessment and Planning Discussion (risk assessment documentation of the entity and planning of the works). Date of the last amendment: June 18, 2012 (94 days after the date of the report) (page 935);

It is not possible to identify which alterations were made to the audit documentation which entailed a new review after the term stipulated by the standard.

2.8.1.8. Conclusions

It was concluded, therefore, that KPMG did not comply significantly with the audit standards, going against the provisions of article 29, of the Regulation attached to Resolution 3.198. These events of noncompliance led KPMG not to identify significant misstatement arising out of non-subsistent transactions, issuing an opinion without qualification and leading into error the users of the information in the statements of June 30, 2007, 2008, 2009, 2010 and 2011 and December 31, 2007, 2008, 2009, 2010 and 2011.

**2.9. Irregularities in the procedures executed by ERNST & YOUNG (Pages 6486/6488)**

**2.9.1. Representations of the administration**

NBC TR 2410 sets forth that the auditor responsible for the review of interim information of an entity must obtain formal representations by the administration (written representations) in relation to the items highlighted below (paragraph 34 of the standard):

a)      *it recognizes its responsibility for the planning and implementation of internal control to prevent and detect fraud and error*;
b)      the interim information was prepared and presented according to the structure of the applicable financial report;
c)      *it believes that the effect of the misstatements not corrected, identified by the auditor during the review are irrelevant, both individually and in the aggregate, for the interim information taken as a whole. The summary of these items is included in the formal representations or attached to them*;



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

d)      *it disclosed to the auditor all the significant facts related to any fraud or suspected of fraud known by the administration which may have affected the entity;*
e)      *it disclosed to the auditor the results of its assessment that the risks of the interim information may present significant distortion as a result of fraud. The nature, extent and frequency of this assessment varies from entity to entity and that the administration may conduct a detailed assessment annually or as part of the continuous monitoring. Thus, this representation, to the extent that it is related to the interim information, is made to order for the specific circumstances of the entity;*
f)      *it disclosed to the auditor all the actual or possible noncompliance with such laws and regulations, whose effects must be considered in the preparation of the interim information; and*
g)      *it disclosed to the auditor all the significant events which occurred after the date of the balance sheet until the date of the review report which may require adjustment of the interim information or its disclosure." (emphasis added)*

The audit firm Ernst & Young did not receive the representation of the administration relative to the Quarterly Financial Information reviewed by it (said audit document was not contained in the audit documentation delivered to the Company and non-receipt thereof was confirmed at a meeting held on July 18, 2012, with Messrs. Eduardo Perdigão, Flávio Serpejante Peppe and Idésio da Silva Coelho Júnior, of E&Y, and the members of the Inquiry Commission. One reproduces again the content of NBC TA 580, which covers the non-receipt of the administration's representation:

"(...)

(a) *reassessing the integrity of the administration and assessing the effect that this may have on the reliability of the representations (oral or written) and of the audit evidence in general (...)" (emphasis added)*

*"20. The auditor must abstain from issuing an opinion on the financial statements in conformity with NBC TA 705 if (see A26 and A27):*
   *(a)      the auditor conclude that there is sufficient doubt with respect to the integrity of the administration, so that the formal representations required by items 10 and 11 are not reliable; or*
   *(b)      the administration does not deliver the formal representations required by items 10 and 11." (emphasis added)*

It is also stressed that Ernst conducted a review of the work papers of KPMG relative the previous year's audit, which papers did not contain the representation letter of the administration. Although the scope of review is reduced in relation to an audit, even so the auditor must consider the possibility that there may be significant misstatements, and plan its procedures taking this possibility into consideration:

*"6. The auditor must plan and carry out the review with a skeptical professional attitude, **recognizing that there may be circumstances which make the interim information require relevant adjustment** so that they are prepared, in all relevant aspects, according to the structure of the applicable financial report.*



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

*A skeptical professional attitude means that the **auditor makes a critical assessment, with a questioning attitude, with respect to the validity of the evidence obtained and pays attention to the evidence that contradicts or puts into doubt the reliability of the documents or representations of the entity's administration.***"*(emphasis added)*

### 2.9.2. Conclusions

The firm Ernst & Young, in relation to the financial information of March 31, 2012, has also not complied with article 29 of the Regulation Attached to Resolution 3.198, by not complying with the mandatory stage of the audit procedure relative to receipt of the formal representation of the administration.

## 3. THE LAW

### 3.1. *OBJECTIVE CIVIL LIABILITY OF THE CONTROLLER*

The controller of the banking institution is objectively liable for the losses caused to the company and third parties. Thus, according to the terms of the provisions of article 1 of Law 9.447/97,

"the joint and several liability of the controllers of financial institutions established in article 15 of Decree-Law No. 2.321, of February 25, 1987, it also applies to the intervention and extrajudicial liquidation regimes contemplated by Law No. 6.024, of March 13, 1974."

In turn, article 15 Decree-Law 2.323/74 establishes that:

"The special temporary administration regime having been decreed, there are jointly and severally liable with the ex-administrators of the institution, for the obligations assumed by the latter, natural persons or legal entities which/who have a control relationship with it, regardless of verification of willful misconduct or negligence."

Thus, the application of objective liability is invoked; notwithstanding, reference was made both to negligent and fraudulent acts of the defendants.

### 3.2. *OBJECTIVE CIVIL LIABILITY OF THE MEMBERS OF THE BOARD OF DIRECTORS OF THE FINANCIAL INSTITUTION*

The members of the Board of Directors are also considered by law as administrators[5], the same civil liability regime applies to them, with the accretion of the following

---

[5] Articles 138 and 145 of Law 5.404/76. According to article 9 of the bylaws of Banco Santos, "The company shall be administered by a Board of Directors and an Executive Board, as established in these Bylaws" (no emphasis added in the original).



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

particularity: because it is a collegiate body, the administration of the directors is collective[6]. As there is joint and several liability among them[7], all are objectively liable for the outstanding liabilities.

3.3.    ***OBJECTIVE CIVIL LIABILITY OF THE ADMINISTRATORS OF THE FINANCIAL INSTITUTION. ARTICLES 39 AND 40 OF LAW 6.024/74***

Article 2 of Law No. 1.808, of January 7, 1953 established:

"The officers and managers which act with negligence or willful misconduct, even in the event of a joint stock company, or company by units of limited liability answer jointly and severally for the obligations assumed by the banks and banking institutions, during their management and until they are complied with."

Therefore, even if with discussion, it was understood that the subjective civil liability of the administrators of a financial institution was established.

A new wording was given to this provision by article 42 of Law 4.595/54:

"The officers and managers of financial institutions are jointly and severally liable for the obligations assumed by the same during their management, until they are complied with. Sole paragraph – If there are losses, the joint and several liability shall be restricted to the relevant amount."

Law 1.808/53 was expressly revoked by article 57 of Law 6.024/74, which started to cover civil liability by administrators of a financial institution, governing it in two provisions, namely:

Article 39 establishes that:

"The administrators and members of the Audit Committee of financial institutions shall be liable, at any time, except if time barred, for the acts which they have committed or omissions which they incurred."

And article 40, in turn, extends the liability, as:

"The administrators of financial institutions are jointly and severally liable for obligations assumed by them during their management, until the obligations are complied with". Sole paragraph. The joint and several liability shall be restricted to the amounts of losses caused."

It has disappeared, as one notices from confronting the three laws, that of 1953, 1965 and that of 1974, reference to willful misconduct or negligence. The animic element of civil liability has stopped being a requirement, by express will of the law.

---

[6] To this effect, , Paulo Fernando Campos Salles de Toledo, *O conselho de administração na sociedade anônima*, n. 2.7.8. e 2.7.9, p, 74-75.
[7] Article 40 of Law 6.024/74.



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

Hence, the guidance of doctrine and case law to the effect that the civil liability of the administrators of a financial institution is objective.

The Court of Justice of São Paulo has long supported this theory, as it can been in several court decisions[89]. To the same effect the decisions of the Court of Justice of Rio de Janeiro[10] and of the Court of Justice of Rio Grande do Sul[11].

The O Superior Court of Justice is also guided by the application of objective civil liability, as it established more than once[12].

When the Federal Supreme Court examined the topic, it also recognized the objective civil liability, and did not apply Brazilian Corporate Law [Lei das S.A.,] on the type[13].

So, it is irrelevant, to examine in detail willful misconduct or negligence[14], as joint and several liability is incurred even in acts of normal administration[15].

---

[8] TJSP, RT 775/240; RT 645/66; JTJ 266/40; 194/89. Other older cases: 1) Writ of Mandamus MS 71.818-1, 5th Civil Chamber, j. 8.28.86, Rap. Associate Justice Silva Costa; 2) MS.71.456-1, 55th Civil Chamber, j.10.2.86, Rap. Associate Justice Ralpho Waldo; 3) MS 71.603-1, 5th Civil Chamber, j. 6.11.87, Rap. Associate Justice Ruy Camilo; 4) Interlocutory Appeal Al.79.767-1, 3rd Civil Chamber, j. 12.2.86, Rap. Associate Justice Flávio Pinheiro; 5) Civil Appeal 85.426-1, 5th Civil Chamber j. 12.10.87, Rap. Associate Justice Márcio Bonilha; 6) AI 89.632-1, 2nd Civil Chamber. j. 12.18.87, Rap. Associate Justice Silva Ferreira; 7) Civil Appeal 107.649-1, 4th Civil Chamber, j.4.20.89, Rap. Associate Justice. Ney Almada; 8) AI 113.783-1, 3rd Civil Chamber, j. 02.28.89, Rap. Associate Justice Flávio Pinheiro, among several others.

[9] "Thus, the administrators of financial institutions are restricted to answering for acts that they commit or omissions, let one repeat, regardless of the idea of negligence or willful misconduct. On the other hand, as the standards mentioned on the administrators of financial institutions make reparation of losses without negligence or willful misconduct mandatory, in view of the exceptional nature of the type of civil liability, the latter is not elided under the argument that eventual assets were acquired before or shortly after the beginning of the management of the ex-administrator of the financial institution under liquidation." (TJSP [Court of Justice of São Paulo], Civ.Appeal 195.317-1/0, Case Banco da Lavoura, j. 8.19.93, Rap. Associate Justice Melo Colombi). On the merits, the objective liability of the administrators in dealing with a financial institution is *ex vi legis*, because the administrators of another's money (article 40 of Law 6.024/74). (TJSP, 3rd Civil Chamber, Appeal.228.538-1/1, j.8.8.95, Rap. Associate Justice Mattos Faria).

[10] Appeal. 5.384/2000, of the 9th Civil Chamber, j. 10/10/2000, rap. Associate Justice Laerson Mauro; before, to the same effect, court decision published in RJTJRJ [Court of Justice of Rio de Janeiro], see 35, p. 57.

[11] Appeal 595059023, of the 10th Civil Chamber, j.11/11/2004, rap. Associate Justice Paulo Antonio Kretzmann. This judgment reports the existence of another court decision by the same Court, which is Civil Appeal of the 3rd Civil Chamber, rap. Associate Justice Galeno Vellinho de Lacerda).

[12] Special Appeal RESP 21245, 4th Panel, j.10.4.94, published in the Federal Gazette DJU of 10.31.94, p.29500, Rap.Justice RUY ROSADO DE AGUIAR JÚNIOR. To the same effect, RESP 172736, j. 6/10/2003, published in the Official Gazette DJ 9/22/2003 and in RSTJ174/223, rapporteur Justice Francisco Peçanha Martins.

[13] STF [Federal Supreme Court], 2nd Panel. Extraordinary Appeal No. 93.416-2, São Paulo, Fivap Case, j.8.7.81, Rap. Justice Decio Miranda. RTJ, vol. 99, p. 891

[14] Wilson do Egito Coelho, Da Responsabilidade dos Administradores das Sociedades por Ações em face da nova Lei e da Lei 6,024/74, p.44. RDM 40. To the same effect: de Cian Maria Tosetti, RDM, 41/89.

[15] Carlos Alberto Bittar, commenting on the topic of liability of the administrators of financial institutions.Direito Empresarial, Revista de Direito Civil, RT., ed.1.977, pag.90).



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

It is also irrelevant what the officer is who has committed or participated in the act detrimental to the creditors; all the administrators answer for the damaging obligations. "It is of little importance ", says Trajano de Miranda Valverde, "for the purposes of joint and several liability, which, by the bylaws, these obligations or duties are not incumbent on all the officers"[16].

The guidance of case law is settled to the effect that, in corporate crimes, more strictly in the description of willful misconduct, detail of the conducts in the complaint is waived. With more justification such act must be admitted in relation to the civil liability action, which does not cause restriction to freedom, but encumbers property.

The individual conduct of the administrators and controllers or the gradation of the guilt of each in committing acts that cause damage to the company matters little. As all and every one of them has legal and statutory powers to prevent the commitment of illegalities, they are objectively liable in an unchallengeable way for the losses verified in the company.

There remains for the administrators and controllers pursued judicially for objective liability, filing of a proper action against the most guilty parties for the losses, In fact, because participants in each of the company's acts shall find it easy to evidence the gradation of the subjective liability in said procedural course.

What is necessary it to verify, in addition to the loss, for filing of the public civil action of liability, then, is the identity of the administrators and controllers of the financial institution under extrajudicial liquidation. Nothing else. The capacity of the administrator or controller in the period when the loss was verified suffices to recognize the liability.

### 3.4.    OBJECTIVE *CIVIL LIABILITY OF THE ADMINISTRATORS OF A FINANCIAL INSTITUTION. SOLE PARAGRAPH OF ARTICLE 927 OF THE BRAZILIAN CIVIL CODE*

According to the terms of the governing law, thus, which is Law 6.024/74, there is objective civil liability also of the administrators of a financial institution, which leads, to waiver of the description of conducts, negligent or malicious, as stated above.

If Your Honor considers that it is not the case of recognizing the objective civil liability, present in the special law, which one admits only for argument's sake, this Prosecution also invokes a more generic standard, which is that of the sole paragraph of article 927 of the new Brazilian Civil Code:

"There will be the obligation to repair the damage, regardless of negligence, in the cases specified in the law, or when the activity pursued by the author of the damage entails, by its nature, risk for another's rights."

---

[16] Sociedades por ações, v. II, n. 640, p. 338.



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

Now, it is not necessary to make greater considerations to reach the conclusion that the activity pursued by the banks, through their administrators, according to the guidance established by the controller, by the very nature of funding of the people's money contemplates a high dose of "risk to another's rights". It is not for nothing that greater liabilities in cases of breach are those of financial institution.

Thus, likewise, the provisions of article 927 of the Civil Code of 2002, mentioned above, apply, to recognize objective liability. Law 6.024/74 itself, in article 15, I, "c", makes reference to the applicability of extrajudicial liquidation "when the institution suffers losses which subject it to the abnormal risk of its unsecured creditors."

## 3.5. *OBJECTIVE CIVIL LIABILITY OF THE ADMINISTRATORS OF A FINANCIAL INSTITUTION. EVENTUAL APPLICATION OF LAW 6.404/76*

The objective civil liability of administrators of a financial institution is governed by its own law, especially, Law 6.024/74, which waives any invoking of Brazilian Corporate Law [Lei das S.A.].

But, even if one seeks to bring to application Law 6.404/76, the civil liability of the defendants is clear.

Several times, and in several ways, indicated above, the administrators of Banco Cruzeiro do Sul violated the law in the activity at the head of this financial institution, making fall on them the objective civil liability stamped on article 158, II, of Law 6.404/76[17].

Who did not commit the acts listed above connived with them, the administrators knew, but did not act to prevent their practice, incurring in the same way in objective civil liability.

As it is known, there is a certain divergence, especially in doctrine, over the foundation on which the liability of the administrators of the financial institution is based. There are authors who admit the assumption of negligence, there are even some who admit the application of the classical theory of subjective guilt [18].

## 3.6. *CIVIL LIABILITY OF THE ADMINISTRATORS OF A FINANCIAL INSTITUTION FOR ASSUMED GUILT*

In the assumption of the theory of assumed guilt being accepted[19], which is admitted only for argument's sake, the defendants shall prove that they did not participate in any of the damaging acts verified by the Inquiry Commission. There is reversal of the burden of

---

[17] It is said of the provisions of article 158, II, of Law 6.404/76 that it contains the case of objective civil liability.

[18] To this effect, and practically isolated, Fábio Ulhoa Coelho

[19] Arnoldo Wald writes that "...the liability of administrators of banks having aggravated by virtue of their negligence being assumed, according to the best doctrine, or even of there having been created in the case joint and several liability, by virtue of which the officers must answer for the obligations of the insolvent financial institution..." (term extrajudicial liquidation, in Enciclopédia Saraiva de Direito, v. 50, p. 155).



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

proof, so that the defendants must say what happened, finally, what is in their interest to remove the assumption of guilt/negligence, as it was "considered easier for the administrator to prove his innocence than for the company to evidence the guilt of its managers"[20].

### 3.7. *LIABILITY OF THE COMPANIES PROVIDERS OF AUDIT SERVICES*

The American Accounting Association, mentioned by Alexandres Demetrius Pereira, in the book "Auditoria das Demonstrações Contábeis – A Legal and Accounting Approach "[21], defines audit as:

> "A systematic process of objectively obtaining evidence concerning affirmations on economic actions and events, to verify the degree of correspondence between assertions and criteria established, as well as the communication aspects of results to the interested users."

Accordingly, we have "the external audit of financial statements is one of the most important instruments for the development of the market, due to the fact of adding credibility and safety to the financial information provided by the economic agents who seek to obtain funds from public of investors.[22]"

It is fundamentally important that external audit confers transparency in the administration of companies and in the means used by it to reduce the asymmetry of information existing among those who generate information and those who use it (the stakeholders).

The conduct of omission of companies providing audit services (KPMG and ERNEST & YOUNG), consisting in noncompliance with audit rule led users into error (considered here as investors and supervision agents) of the information stamped on the financial statements in the period from June 30, 2007 to March 31, 2012, which allowed the practice of damaging acts, which culminated in the decree of the extrajudicial liquidation regime of Banco Cruzeiro do Sul and estimated loss of R$ 2,236,782 thousand.

Thus, they must be held civilly liable for the losses verified.

According to the Civil Code, the accounting professional assumes joint and several liability together with his client, as well as the charge of his unlawful acts committed by his management in the company both in the civil and criminal sphere.

---

[20] Arnoldo Wald, *A culpa e o risco como fundamentos da responsabilidade pessoal de diretor de banco*, n. 72, p. 109, with quote by Mezger, mentioning the 1937 German law. Article published in the magazine Justitia, 45(120): 93-109, 1983.

[21] Pereira, Alexandre Demétrius, Auditoria das Demonstrações Contábeis - Uma Abordagem jurídica e Contábil, editora Atlas, 2011, p. 11/13.

[22] Op.cit. (inside cover).



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

The accounting professional is treated[23] "(...) as an agent of the member in a company and answers to the company or to the entrepreneur for the acts committed with negligence; i.e., when there is no intention to cause the damage in the performance of his activity, but provokes it by malpractice, negligence or recklessness, when the professional commits acts with the intention or assuming the risk of damage, referred to as aggravated."

Thus, the companies providing audit service must perform their functions with care and diligence, under penalty of being civilly liable for the damage caused to another (article 186 of the Civil Code).

To this same effect is Law No. 6.385/76, which, in its article 26, § 2, provides that: "accounting audit companies or independent accounting auditors shall answer, civilly, for the losses that they cause to third parties by virtue of negligence or willful misconduct in the performance of their duties set forth in this article."

This is the rule established in Law No. 9.447/97, which, in its article 3, prescribes that: "The inquiry contemplated in article 41 of Law No. 6.024, of 1974, comprises also investigation of the acts committed or of the omissions incurred by natural persons or legal entities providers of independent audit services to the institutions submitted to intervention regimes, extrajudicial liquidation of special temporary administration", adding in the sole paragraph that: "If the inquiry concludes that there was negligence or willful misconduct in the activity of the persons covered in the 'caput', the provisions in the final part of the 'caput' (main section) of article 45 of Law No. 6024, of 1974."


## 4. REQUESTS

### 4.1. *PRIOR RELIEF*

Prior relief is postulated given the existence of unequivocal evidence of the probability of the right of creditors. If the assumed legitimacy contained in the investigation taken to effect by the Central Bank of the Brazil, were not enough; in this case, o recognition by some defendants in the administrative phase, of the frauds committed, and even of losses caused.

§ 6.2 of article 273 of the Code of Civil Procedure/ CPC, verbatim: "Prior relief may also be granted when one or more of the cumulated requests, or part of them proves uncontroversial ". In the case in the records, there is no need to wait for the challenge by the defendants to render the decree of prior relief; which will enable the immediate provisional, or advance, enforcement of the decision.

The right to indemnity is unquestionable, the value has already been verified by technicians of the Central Bank of Brazil.

---

[23] OLIVEIRA, C. M, Responsabilidade civil e penal do profissional de contabilidade. São Paulo: IOB-Thomson, 2005.



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

The evidence of probability of the right to indemnification is unequivocal, as the Central Bank of Brazil calculated the value of the debt; and the act of the agents of the federal agency enjoys the assumption of legitimacy.

It is the case, thus, of prior relief, herewith, to satisfy the right of the creditors.

## 4.2. *PROVISIONAL ATTACHMENT AND FUNGIBILITY*

Law 6024/74 sets forth typical provisional attachment and determines that the Public Prosecution Office promote it within 8 days. However, the notable evolution of Brazilian civil procedure in the last years caused the principle of fungibility between prior relief and provisional relief to be stamped.

The Public Prosecution Office has always filed a provisional action of attachment, followed by the main action of indemnification. This involves duplicity of activity, summons, finally, duplicity of procedural acts. Certain subjects end up by being discussed both in the provisional remedy and in the main action. The request for evidence is present in both claims.

There is a huge waste of activities which conspires against the effectiveness of the proceedings.

Thus, and based on the provision of article 273, § 7[24], of the CPC24, it is requested, if the prior relief I,s not granted, deferment of the attachment of the property of the defendants, as many as suffice for the payment of the value of the indemnification, applying the principle of fungibility of the provisional remedy with prior relief.

In effect, and in the authorized doctrine of Cândido Rangel Dinamarco, "The new text must not be read only as bearing an authorization and granting a provisional remedy when prior relief is requested. The contrary is also authorized, that is: also when a request is made on account of provisional remedy, the judge shall be authorized to grant the measure on account of prior relief, if this were his understanding and the perquisites are met. There is no fungibility in a one-way street"[25].

Let it be quite clear: It is postulated, first, prior relief; otherwise, and occasionally, provisional attachment. Your Honor may, however, grant, in relation to prior relief, and in relation to others, provisional attachment, to the extent of the conviction on the claim stated.

To justify the applicability of the attachment, it should be said that it is indispensable, now, to put said property under deposit and responsibility of the liquidator (legal trustee), so that he, in its possession, have the possibility of keeping it and administering it

---

[24] Article 273, § 7: If plaintiff, on account of prior relief, requests a provisional remedy, the judge may, when the relevant prerequisites are present, grant the incidental provisional remedy of the case filed "

[25] *A reforma da reforma*, 2.ª ed. n. 48,9. 92. São Paulo: Malheiros, 2002, no emphasis added in the original).



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

without defects disappearance or dilapidation, in the interest of the collectivity of creditors (article 45, § 2., of Law No. 6.024/74); the *periculum in mora* being thus evidenced.

The property of the companies which provide audit services in fact are b not unavailable; and the provisional remedy must be extended to all those responsible by force of law.

Note that, according to the terms of the guidance of the Superior Court of Justice[26],

> **"the attachment of property set forth in article 45 of Law 6.022/74 can accrue on property which was already unavailable (article 36)"**

It is also requesting the injunctive decree of attachment, the practice by some of the defendants already effectuated and consummated, of subtracting the property to the destination of guarantee of the creditors, with the reduction of the bank's property. That is to say: the conduct of the defendants advises against, due to the damage already engendered, that equity be kept with them which, ultimately, belongs to the creditors. In the management of another's equity the following is not recommended;

Pay attention, also, that the provisional remedy of attachment in question is practically a legal imposition. With this purpose of ensuring to the utmost the interests of the creditors, in the protection of the credit system, which a public matter, the legislator demands that the property of the administrators and controllers be submitted to the caution of attachment.

With respect to the *fumus boni iuris*, on the one hand, one has the inescapable objective liability of the defendants, with joint and several liability; and, on the other, the demonstrated, very high, loss verified in the course of the procedure initiated by the Central Bank of Brazil. The bank has been long bankrupt.

### 4.3. *SUMMONS, CONVICTION AND REQUESTS*

The Public Prosecutor's Office of the State of São Paulo:

a. summons of the defendants, to answer to the request, under penalty of sustaining the effects of default;
b. benefits of the provisions of article 172 of the CPC;
c. joint and several conviction of defendants Luiz Felippe Índio da Costa e Cruzeiro do Sul Holding Financeira S/A to pay R$ 2,236,782 thousand (two billion, two hundred and thirty-six million, seven hundred and eighty-two thousand reais). This sum, for the controllers, is not divided by management, so that

---

[26] RESP 185796, j. 12/17/99, rap. Justice Ruy Rosado de Aguiar. There are several other precedents by the Court of Justice of São Paulo.



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

they assume responsibility for all the liabilities toward the creditors of Banco Cruzeiro do Sul S/A.

d.    joint and several conviction of the other defendants to pay the sum indicated on the tables inserted in item 2.5 of this complaint (Pages 6565/6568 of the records of the inquiry), added to the sum due in each management, for the remaining amount, until it reaches the sum of R$ 2,236,782 thousand (two billion, two hundred and thirty-six million, seven hundred and eighty-two thousand reais).

e.    confirmation of prior relief and/or of the attachment claimed above, so that the assets, as many as suffice, be pledged and auctioned. In the fortieth-second (XLII) volume of the records of the inquiry of the Central Bank of Brazil there are listed, on Pages 6236/6277), the property from the ex- administrators and controllers, on which the attachment shall apply.

It is emphasized that the property of the codefendant **Cruzeiro do Sul Holding Financeira S.A,** not be declared unavailable on and the same shall be subjected to attachment.

Also should be attached the property of the companies providing of audit services, KPMG and Ernest & Young, which did not have their property declared unavailable.

It is requested that the worthy service include in the writ of attachment the list of property to be attached (Pages 6236/6277).

f.    incidence of monetary indexation and interest.

g.    no attachment or pledge be made on the property considered as family property, when it is duly proven that the property is family property.

h.    Summons of the liquidator, Sérgio Rodrigues Prates, to follow up on the terms hereof.

i.    Issuance of official letters:

1. To Associação dos Registradores Imobiliários do Estado de São Paulo - ARISP, located at Rua Maria Paula, 123, 1º andar, Bela Vista, São Paulo/SP, CEP 01319-001, requesting information on the existence of real property in the name of the defendants in the State of São Paulo.

2.    To Instituto de Registro Imobiliário do Brasil - IRIB, located at Avenida Paulista, 2073, Horsa I, coj. 1201 e 1202, Cerqueira Cesar, São Paulo/SP, CEP 01311-300, requesting information on the existence of real property in the name of the defendants in Brazil.

3.    To the Magistrate-General's Office [*Corregedoria Geral da Justiça]* of the State of Rio de Janeiro, located at Avenida Erasmo Braga, 115, 79 andar, Lâmina I, Centro, Rio de Janeiro/RJ, CEP 20020-903, requesting information on the existence of real property in the name of the defendants in the State of Rio de Janeiro.



PUBLIC PROSECUTOR'S OFFICE OF THE STATE OF SÃO PAULO

Protests for the production of all means of evidence permitted in the law, such as attachment of documents (especially of printed electronic correspondence), hearing of witnesses, expert examination, personal deposition of the defendants and legal representatives of the companies providing audit services (KPMG and Ernest & Young), under penalty of confession.

The amount in controversy is R$ 2,236,782 thousand (two billion, two hundred and thirty-six million, seven hundred and eighty-two thousand reais)

São Paulo, April 30, 2013.

[signature]                                                    [signature]
**Eronides A. Rodrigues dos Santos**              **Joel Bortolon Júnior**
Public Prosecutor                                          Public Prosecutor

# DECLARATION EXHIBIT 3

Fls. 1

## *Galdino • Coelho • Mendes*

Flavio Galdino
Sergio Coelho
João Mendes de O. Castro
Rodrigo Candido de Oliveira
Eduardo Takemi Kataoka
Cristina Biancastelli
Gustavo Salgueiro
Rafael Pimenta
Isabel Picot França
Marcelo Atherino

Marta Alves
Filipe Guimarães
Fabrízio Pires Pereira
Cláudia Maziteli Trindade
Gabriel Rocha Barreto
Pedro C. da Veiga Murgel
Miguel Mana
Felipe Brandão
Danilo Palinkas
Milene Pimentel Moreno

Pedro Mota
Laura Mine Nagai
Adrianna Chambô Eiger
Lia Stephanie S. Pompili
Mauro Teixeira de Faria
Julianne Zanconato
Rodrigo Garcia
Wallace de Almeida Corbo
Carlos Brantes
Vanessa F. F. Rodrigues

Isabela Rampini Esteves
Renato Alves
Annita Gurman
André Furquim Werneck
Ivana Harter
Bruno Duarte Santos
Maria Carolina Bichara
Tassia de Oliveira Ruschel

HONORABLE JUDGE OF THE 2ND COURTS OF COURT-SUPERVISED REORGANIZATION AND BANRUPTCY OF THE JUDICIAL DISTRICT OF SÃO PAULO, SP

**REQUEST FOR FREE LEGAL AID**

Distribution by prevention to the records of bankruptcy No. 1071548-40.2015.8.26.0100

BANCO CRUZEIRO DO SUL S.A., taxpayer identification number CNPJ/MF 62.136.254/0001-99, with registered office at Alameda Santos, No. 2.335, Cerqueira Cesar, São Paulo, SP ("Banco Cruzeiro do Sul", "Bankrupt Party" or simply, the "Bank"); LUIS FELIPPE ÍNDIO DA COSTA, Brazilian, consensually separated, lawyer, holder of ID No. 912.072-6-IFP/RJ, taxpayer identification number CPF/MF 006.034.067-34, residing at Estrada da Gávea, No. 127, Gávea, Rio de Janeiro, RJ ("Luis Felippe"); and LUIS OCTÁVIO AZEREDO LOPES ÍNDIO DA COSTA, Brazilian, consensually separated, holder of ID No. 4.452.434-6, issued by IFP/RJ, CPF/MF No. 782.474.977-00, residing at Estrada do Embú, 155, Jardim Torino, Cotia, SP ("Luis Octávio") files to Your Honor, through its lawyers (Doc. 1 a Doc. 6) based on article 82, Paragraphs 1 and 2, of Law No. 11.101/05, by the ordinary rite, this

## CIVIL LIABILITY ACTION

against (1) FUNDO GARANTIDOR DE CRÉDITO ("FGC"), a non-profit association, taxpayer identification number CNPJ/MF00.954.288/0001-33, created by Resolution No. 2.197/1995, of the Central Bank of Brazil ("BACEN"), and currently

This document was filed on 14/11/2015 at 00:24, is a copy of the original digitally signed Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA. To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case 1117507.8.26.0100 and code 17896B8

Rio de Janeiro
Av. Rio Branco 138 / 11º andar
20040 002 / Centro
Rio de Janeiro / RJ
t+55 21 3195 0240

São Paulo
Av. Brig. Faria Lima 3900 / IP andar
04538 132 / Itaim Bibi
São Paulo / SP
t+55 11 3041 1500

Brasília
SAUS Sul / quadra 05
bloco K / 17 / salas 501-507
70070 050/ Brasília / DF
t+55 61 3323 3865

Fls. 2



regulated by BACEN Resolution No. 4.222/2013, with registered office at Av. Brigadeiro Faria Lima, 201, 12° andar, Pinheiros, 05426-100; (2) CELSO ANTUNES, Brazilian, , married, business administrator, holder of ID RG No. 10.676.151, issued by SSP/SP, CPF/MF No. 192.959.956-00, residing and domiciled at Rua dos Holandeses, 31, apartment 21, 01329-020, Bela Vista, São Paulo, SP; (3) JOSÉ ALFREDO LATTARO, Brazilian, married, business administrator, holder of ID No. 9090463-SSP/SP, CPF/MF No. 863.458.778-91, with address at Alameda Joaquim Eugenio de Lima,711, Jardim Paulista, CEP 01403001, São Paulo, SP; (4) FABIO MENTONE, Brazilian, CPF/MF No. 065.313.998-56, with address at Alameda Itu,563, apartment 1701, Cerqueira César, CEP 01421000, São Paulo, SP; and (5) SERGIO RODRIGUES PRATES, Brazilian, married, lawyer, holder of ID No. 09004430352 SSP/RS, CPF/MF No. 025.281.770-20, with address at Avenida Salvador Leão, 216, 301, Sarandi, CEP [Postal Code] 91130-700, Porto Alegre, RS; for having contributed, each in its own way, but all in a determinant way, to the serious damage caused to Banco Cruzeiro do Sul and consequently to the state of bankruptcy in which it finds itself; all due to the factual reasons and legal grounds stated below.

*     *     *

São Paulo, November 13, 2015

JOÃO MENDES DE OLIVEIRA CASTRO                    RAFAEL PIMENTA
OAB/SP N° 346.829                                         OAB/RJ N° 142.307

ANDRÉ COATES FURQUIM WERNECK
OAB/RJ N° 189.152

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA. To check the original, access the website http://esaj.tjsp.jus.br/esaj, inform the case1117507.8.26.0100 and code17896B8

GCM

Galdino . Coelho . Mendes
Advogados

## SUMMARY

SITUATION OF THE PROBLEM: SCOPE AND STRUCTURE OF THIS ACTION ..........5

PLAN (I) SORDID PLOT FOR TAKEOVER......................................................10

  - *FGC proposes to reduce its exposure in guaranteed deposits-*....................................10

  - *And saw in this a window for takeover of the Bank-* ....................................................12

  - Premeditation: certain perplexities in the plot designed by FGC ................................14

PLAN (II) PIXULECO VERSION 2.0. ...............................................................20

  - *Hiring friends of friends.*.................................................................................20

  - *Technical report of a backyard Company* .....................................................24

PLAN (III) FINANCIAL MELTDOWN AND OTHER OUTRAGES ......................................29

  - *Said balance opening balance sheet was not audited: why?-.* ....................................30

  - *First equivocated "adjustment": issuing of provisions of controlled Companies as if they were of the Bank; gross violation of separation of entities*.............................................34

  - *Second equivocated "adjustment": senseless provisions of losses -.* ..........................35

  - *Third equivocated "adjustment": reversal of the profit in securities repurchase -*.........36

  - *Fourth equivocated "adjustment": provision with sureties and guarantees.*.................36

  - *Fifth equivocated "adjustment": write-offs for the acquisition of Prosper -* ...................37

  - *Sixth equivocated "adjustment": provision for tax contingency -.*................................39

  - *Subordinated debt posted without any qualification?* ..................................................41

  - *Conclusion: evident fraud; unequivocal liability-.* ........................................................41

PLAN (IV) – FGC LEAVES, ITS *LONGA MANUS [EXECUTOR OF A CRIME PREMEDITATED BY ANOTHER]* JOINS, BUT THE BLEEDING CONTINUES...............42

  - *The inexplicable deterioration of the assets —*...........................................................45

  - *Incompetence in raw state: three months without receiving -* ......................................45

  - *Willful misconduct in raw state: the inexplicable sale of the credit card portfolio -*.......48

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case1117507.8.26.0100 and code17896B8

3

CONCLUSION ..................................................................................................55

 - Legal Grounds to convict the defendants - ..................................................55

 - The damage- ................................................................................................56

REQUESTS .....................................................................................................59

LIST OF DOCUMENTS WHICH SUPPORT THE ACTION ..............................61

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA. To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case1117507.8.26.0100 and code17896B8

Fls. 5

GCM

Galdino . Coelho . Mendes
Advogados

## SITUATION OF THE PROBLEM: SCOPE AND STRUCTURE OF THIS ACTION

1.      This action contains, in essence, a claim for indemnity, so that the defendants are sentenced to reimburse to plaintiffs the losses caused when they were commanding the head of the administration of Banco Cruzeiro do Sul (formally between 06.04.2012 and 09.14.2012, but *ad hoc*[1] even before 06.04.2012 and also after 09.14.2012, through its *longa manus*, the fourth defendant).

2.      In the normative plan, the defendants' liability for the damage caused to the Bankrupted Party (and its creditors] results from the union of three legislative microsystems.

3.      The first is that of civil law, that is, liability for an illegal act *stricto sensu*, and is extracted from articles 186, 187, 927 and 942 of the Civil Code. By this legislative archetype, one has it that FGC and its officers, in the exercise of a legal obligation to manage a financial institution submitted to a special temporary administration, by specific delegation of the monetary authority, committed innumerable illegal acts, if there resulted from these illegal acts (as in fact there did, in an appropriate causality judgment) damage to the institution and its creditors, they must be ordered to reimburse them.

4.      The second is that of Brazilian Corporation Law [*Lei das S.A.*], set forth in articles 154, 155 158, caput, I and II, Paragraphs 1, 2 and 5. By this system, one has it that FGC and its officers, while managing Banco Cruzeiro do Sul, committed acts which violated the law and the bylaws of the institution (item II); and, from this illegal activity, damage to the bankrupt institution and to its own creditors occurred, they, who are today the ex-administrators, must reimburse them, including with their personal equity (caption).

---

[1] That is, by other instruments, not only mere delegation of powers by the Central Bank of Brazil.

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA
To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case117507.8.26.0100 and code17896B8

Fls. 6



5. The third, and most relevant regulatory microsystem, is that of bankruptcy law. Its vertex being article 82 of law 11.101/05, it established that "the <u>personal liability</u> of the limited liability members, the controllers and <u>the administrators of the bankrupt Company, established in the relevant laws</u> [civil and corporate law], shall be ascertained in the bankruptcy judgment itself". And, in the relevant §2, it establishes a specific statutory limitations period of two years for exercise of the indemnity claim, counting from the sentence of termination of the bankruptcy.

6. In the <u>factual plane</u>, the illegal acts committed by FGC may be classified, for exposition purposes, into four types.

7. The first, and perhaps the most serious of them, is in the fraud used to force the bank to be led to the temporary special administration regime ("RAET"), on 06.04.2012. This because, as one shall demonstrate in the following topics, with greater richness of detail, at the time the RAET was decreed, FGC and Banco Cruzeiro do Sul were members of a credit rights fund, FACB, conceived and structured to permit gradual substitution of exposure to both forward deposits with guarantee ("DPGEs") and the issue of the bank's external debt.

8. The idea was that Banco Cruzeiro do Sul contributed only once a credits portfolio to the fund and FGC, two-monthly, a cash value, which would be used by the bank (by redemption of units) for settlement of the DPGEs and of the external debt. Days before the decree of RAET, without any plausible explanation, FGC stopped contributing approximately R$ 200 million, leading the Bank to the alleged (and invented) situation of lack of liquidity, which would be used as a pretext to decreeing the RAET.

9. The reason for this maneuver was quite obvious. Sometime before the decree of the RAET, FGC already knew that it would be appointed administrator of the bank for that special system.

This document was filed on 14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA. To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case 1117507.8.26.0100 and code1789BB8



10.    The second illegal act is more abject and is substantiated in a management fraud. It consists in the sources used by FGC for the preparation of the "adjustments" in the balance sheet. Disregarding the accounting rules and standards, FGC published the bank's "adjusted" balance sheet, based on a report containing insubstantialities (?!), prepared by a firm referred to as IMS, which does not have a record of external auditor, which did not have in its purpose, when the report was produced, the accounting or financial audit activity and which produced a report not signed by a qualified accountant – to tell the truth, not signed by anyone, which is a notorious example of an apocryphal document.

11.    In this plane there are also unveiled dirty tricks involving the very hiring of IMS to produce such insubstantialities report and also manage and collect the consigned credits portfolio of Banco Cruzeiro do Sul. In a fanciful plot, hiring said Company, linked to the ex-partners of the then FGC administration, is in the root of a problem which became endemic in contemporary Brazil: the diversions of money by Companies conceived from service agreements.

12.    In a story not very different from those which have led to the jailed big shots of the Republic, hiring and remunerating IMS (which reached the astronomical threshold of R$ 13 million per month) are the cherry in the cake in this incompetent, condemnable and execrable fraud devised by FGC and its executives, Celso Antunes, José Lattaro, Fabio Mentone and also by Mr. Sergio Prates, to make Banco Cruzeiro do Sul go bankrupt.

13.    The third illegal act consists of an accounting fraud which was used to justify decreeing the RAET and corroborating the takeover of the bank's administration by FGC. As such are the offenses verified at the time of the implementation of "adjustments" which culminated in the publication of a new balance sheet on 08.15.2012, referred to as the opening balance sheet (Doc. 7).

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA
To check the original, access the website http://esaj.tjsp.jus.br/esaj, inform the case117507.8.26.0100 and code17896B8

14.    The "adjustments" were made during two months, in which FGC was at the head of the administration and the formalities required by accounting science were not followed. The crass errors in turning the positive shareholders' equity of the Bank, in the order of R$ 874,115,000.00 before RAET, to a negative shareholders' equity of R$ 2,236,782,000.00 on 08.15.2012 (allegedly reflecting the situation in the book on 06.04.2012): read, the accounting manipulation made the "new" balance sheet of the bank present an expressive loss of R$ 3,110,897,000.00[2]. And this was enough not only to endorse the decree of the RAET, but also to push the bank into out-of-court liquidation.

15.    In the fourth and last plane are the no less weird conduct of the then new administrator, Sergio Prates, acting as *longa manus* of FGC, who, as a good supported and protected person, return to his supporters the favor of his appointment to the office, empowering the Bank's attorneys-in-fact, with full and unrestricted administration powers. This topic includes the finding of the absurd deterioration of assets in the course of FGC's management; the bungling by the trustee in not receiving for three months values from the Bank's customers simply because no attention was paid to the fact that it need to keep the bank accounts active for this purpose, and the odious, premeditated and repulsive non domino sale of the consigned credit cards portfolio, without appraisal, audit, methodology and at a clear vile price.

16.    Altogether, an in a relatively simple calculation, the fact is that FGC and its proselytes, Celso Antunes, José Lattaro, Fabio Mentone and Sergio Prates caused immeasurable damage to the Bank, having contributed decisively to the institution of the RAET, acted in an determinant way for its extrajudicial liquidation (in both cases, with omission and commitment] and took advantage of this situation to gain advantage for himself and third parties.

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA
To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case117507.8.26.0100 and code1789GB8

---

[2]    Considering the difference between the positive shareholders' equity of the Bank before the RAET (R$ 874,115,000.00) and negative shareholders' equity verified on 08.15.2012 by FGC (R$ 2,236,782,000.00).

17.    Each of these offenses, and their legal consequences, shall be dealt with below, but not before we allow ourselves a brief digression.

18.    Perhaps contemporary Brazil is witnessing a meeting with itself and its darker past. Day-to-day schemes and ordinary shady transactions which had already established themselves as an indelible part of national culture— to the point of being internationally labeled as a characteristic trait of being Brazilian in character and nature[3] — are today, little by little, found repugnant.

19.    Perhaps, we are reaching, even if very late, a type of puberty of civilization, in which the law, only the law and no longer private interests, will start to guide our collective ethos.

20.    Without wanting to transform it into a parody of grandiloquent irruptions, this action intends to be, as far as appropriate to it, a small artifice of this new influx. In it, one intends to deconstruct the rooted belief that liquidations of financial institutions and the like constitute an environment where the empire of the law does not find a place. And, for such, one trusts that the Judiciary, historically the noblest of the branches of the Republic, will take the reins of its own destiny to call to responsibility those who one day believed they were above the law.

---

[3] For an excellent technical analysis on the sourness of the "Jeitinho" [knack – sometimes illegal means to find simpler ways to get things done circumventing rules and social conventions], as seen by a foreigner, cf. ROSENN, Keith: The Jeito: Brazil's Institutional Bypass of the Formal legal System and Its Developmental Implications, The American Journal of Comparative Law, Vol. 19, No 3, pp. 514-549: "*Curiously, the jeito has not been considered a topic worthy of serious scholarly inquiry. As with the related institution of corruption, research on the jeito has been taboo for lawyers and social scientists. Part of the explanation lies in the basis of the Brazilian law schools (which until fairly recently included the social sciences) against empirical research and in favor of classical exegesis of the legal texts. Perhaps even more important is the difficulty in carrying out such research. Since the jeito is an extralegal transaction, people are less than candid in describing what has transpired. And the written record, at least on its face, usually appears entirely legal. In addition, there is the problem of what Gunnar Myrdal has characterized as "diplomacy in research." The jeito is so entwined with problems of corruption that it may be far more politic to pretend that legal rules correspond to what is done than run the risk of embarrassing friends by calling attention to the disparities*".

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case1117507.8.26.0100 and code17896B8

Fls. 10

GCM

*Galdino . Coelho . Mendes*
*Advogados*

## PLANE (I) – SORDID PLOT FOR ASSUMPTION OF CONTROL

### - FGC proposes to reduce its exposition in guaranteed deposits -

21.     The relationship between FGC and Grupo Cruzeiro do Sul started on 10.21.2011. On that date, by pressure of FGC itself, the Bank executed with the fund a contract referred to as a Private Instrument of Reciprocal Assumption of Obligations and Other Covenants (Doc. 8), through which the parties, Bank and FGC, undertook to constitute a <u>fund of credit rights</u>, FACB, formed, as it has already been said above, from the assignment of a consigned credit portfolio of the Bank for the fund and, at the same time, from two-monthly subscriptions, in <u>cash</u>, of senior units by FGC.

22.     The ratio behind that contract was to allow the Bank to use the money from the subscriptions made by FGC to redeem its own units (paid up from the assignment of the credits portfolio) and use the redemption amount to settle its obligations expressed in forward deposits securities with special guarantee (the so-called "DPGEs"[4]) and the external debt securities.

23.     The total value of the senior units which would be issued for the benefit of FGC was R$ 3,583,000,000.00 (three billion five hundred and eighty-three million reais], exactly the same amount the Bank had to pay on account of DPGEs and the external debt. At the end of the subscription and paying up period, set forth to occur by 12.01.2013, the Bank should have settled its entire outstanding balance of DPGEs.

---

[4] "The DPGE ['depósito a prazo com garantia especial"] is a fixed income security which represents a forward deposit created to help financial institutions; commercial, multiple, development and investment banks; in addition to credit, financial and investment institutions, as well as small and medium sized saving banks to raise fund. Thus it confers to their holders a credit right against he issuer ".
Available on: https://www.cetip.com.br/captacao-bancaria/dpge#sthash.UgIqeUA4.dpuf

This document was filed on 14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA. To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case 117507.8.26.0100 and code17896B8

> Note: the transaction was a graciousness of FGC toward the Bank. It is that, as the DPGEs were deposits guaranteed by FGC up to the limit of R$ 20,000,000.00 (twenty million reais)[5], by encouraging and stimulating the settlement of the DPGEs in exchange for senior units of a FIDC, FGC was, at the end, benefiting: it left a position in which it figured as mere insurer of deposits to become a member of a fund, holding a credits portfolio of more than four billion reais. In other word, it stopped being an insurer to become a senior member holder of units of a fund with an expressively profitable credit portfolio.

24.    It was in that context and with that purpose that, towards the end of 2011, FACB was created, an acronym which corresponded to the initials of then executive officer of FGC, Antônio Carlos Bueno, i.e., were the tragedy itself not enough, it was necessary to serve it with the garnish of humiliation.

25.    Well, the Bank's credits contributed to FACB were previously selected and audited by FGC. Thus, after this audit was made and the credits selected, in November 2011, FACB issued 436,620 senior units, fully subscribed by FGC. The paying up, in turn, would occur upon two-monthly contributions, in accordance with the schedule stipulated in the constitution contract. The first of these contributions, made by FGC to FACB was of R$ 438,895,813.02, in cash.

26.    Simultaneously, FACB issued subordinated units, which were fully subscribed by Banco Cruzeiro do Sul, which, in exchange, contributed to FACB, upon the assignment of part of its credits portfolio, R$ 4.480 billion (in accordance with Clause 2.1.1 of the Contract).

---

[5] BACEN Resolution No. 3.692/2009, article 2."The total credits of each person against the same institution associated to FGC, or against all the associated institutions of the same financial conglomerate, relative to the forward deposits with special guarantee of FGC, covered by article 1, will be guaranteed up to the maximum amount of R$20,000,000.00 (twenty million reais) (emphasis added).

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA. To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case117507.8.26.0100 and code1789GB8

GCM
Galdino . Coelho . Mendes
Advogados

27.    As mentioned, from that date, the schedule indicated as Exhibit B to the Contract established subscription/paying every two months by FGC, on the following dates and values:



FGC – 111702
ANEXO B
FLUXO DE INTEGRALIZAÇÃO DAS COTAS SENIORES PELO FGC

| DATA | (R$) |
|---|---|
| 15/10/11 | 436.595.886,92 |
| 15/12/11 | 188.779.060,19 |
| 01/02/12 | 291.294.951,46 |
| 01/04/12 | 193.236.349,12 |
| 01/06/12 | 190.675.021,02 |
| 01/08/12 | 599.702.488,94 |
| 01/10/12 | 134.408.179,95 |
| 01/12/12 | 117.176.614,02 |
| 01/02/13 | 119.963.476,71 |
| 01/04/13 | 179.140.010,33 |
| 01/06/13 | 762.949.878,09 |
| 01/08/13 | 136.890.414,45 |
| 01/10/13 | 143.599.166,47 |
| 01/12/13 | 88.588.502,32 |
| TOTAL | 3.583.000.000,00 |

28.    In December 2011, FGC subscribed 189,260 units, substantiating a contribution of R$ 191,754,062.41. In April 2012, a new subscription of R$ 506,734,343.26 is made by FGC, covering the subscription obligations of February and April[6]-[7].

*- And it saw in this a window to assume the control of the Bank.*

29.    On 06.01.2012, date on which a significant portion of the senior units should have been paid up by FGC, in the amount of R$ 190,675,021.02, in accordance with the schedule stipulated by the parties, the Bank received, by email (cf. Doc. 9), a communication by FGC affirming that it would not pay that portion, given that the audit conducted by FGC through KPMG to the FACB fund has not been concluded(?!).

[6] All the values available on www.sistemas.cvm.gov.br/, contained in the monthly information sent by the administrator of FACB to CVM [the Brazilian Securities & Exchange Commission].

[7] The small differences between the par values and the effectively subscribed value result from interest applied to each of the subscriptions.

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA. To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case117507.8.26.0100 and code17896B8

Fls. 13

30.    Notice the incongruence: <u>the receivables contributed by the Bank to FACB had already been chosen (and audited!) by FGC</u>. And, even if the Contract set forth in Clause 2.2.4 that [the] subscriptions and paying up will always be preceded by external audit by KPMG Auditores Independentes, which should provide a report attesting to the full amount of Receivables one business day after having affirmed not having received the report, <u>FGC effectively subscribed the units, in the amount of R$ 202,343,292.70</u> (Doc. 10).

31.    It's one of two cases: either the report has already been delivered and FGC forged the reasons which led it to default on its obligation, or such report had never been delivered and was used only as a pretext for FGC not to honor its obligation, but essentially to <u>seat in the chair of administrator of Cruzeiro do Sul</u> as, in fact, it occurred.

32.    In either scenario, the responsibility of FGC and its officers glitters and sparkles. For this very reason, the Bank, jointly with its former shareholder, Luis Felippe Índio da Costa, filed a provisional remedy of exhibition of documents (Case No. 1111305-41.2015.8.26.0100, currently in progress at the 36th Civil Court of this judicial district (Doc. 11), so that both FGC and KPMG are forced to file such audit report in Court, whose alleged delay in delivery would have made FGC not honor the relevant obligation to pay up.

33.    Still in the initial phase, said measure was not challenged and the document in question not even submitted by the defendants.

This document was filed on 14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA
To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case 1117507.8.26.0100 and code 1789BB8

Fls. 14



*Premeditation: some perplexities in the plot outlined by FGC*

34.     It was not yet informed to this Court, but 06.01.2012, "D" day in the history of Cruzeiro do Sul, was a <u>Friday</u>. On that day, the Bank and its administrators received the news that FGC would not make the contribution of approximately R$ 200 million, which, as contractually covenanted, would be used by the Bank to amortize its liabilities in DPGEs and in the external debt.

35.     It was also not said that, one day after this news (pretext?), they received a call: they were called in a hurry to FGC and as soon as they were informed that, already by Monday, the Bank would open under one of the intervention systems of the Central Bank of Brazil.

36.     With the then owners of the Bank morally knocked out by the two successive pieces of tragic news, it was the propitious time for the extortion. And it happened on that eerie Saturday as an "offer": the directors of the controlling holding company of the Bank (read, Luis Octávio and Luis Felipe Índio da Costa) would grant, there and then, a power of attorney to FGC so that it could sell the Bank at any price and <u>FGC would obtain the decree of the Special Temporary Administration Regime from the Central Bank of Brazil, instead of the extrajudicial liquidation, whose intervention is much more aggressive[8] , being subsequently appointed trustee.</u>

---

[8] The special temporary administration system (RAET – "Regime de Administração Especial Temporária")) is a kind of intervention that does not interrupt or suspend the regular activities of the Company, its main effect being the loss of the power of attorney of the directors of the institution and their substitution by a steering committee appointed by the Central Bank of Brazil, with full management powers. It also has limited duration in time and its main aim is the adoption of measures whose objective is to resume the regular activities of the institution. When this is not possible, it may be transformed intervention or extrajudicial liquidation. Extrajudicial liquidation is the most serious and final measure. It is intended to promote the Company's winding up when there are signs of irrecoverable insolvency or when there are serious violations of the rules that regulate the institution's activity. Its aim is to promote the sale of the existing assets to pay the creditors, reimbursing eventual surplus to the controllers or holding them liable for the outstanding liabilities.

In:  http://www.bcb.gov.br/htms/livrosfn.asp?idpai=ARTREGESP

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA. To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case1117507.8.26.0100 and code17896B8

Fls. 15

GCM

Galdino . Coelho . Mendes
Advogados

37.    This is then the first perplexity which one sees in this convoluted plot created by FGC. Why did it so want to sell the Bank? And at any price? Why, to sell it, was it necessary that it, FGC, became the administrator of the institution? Why especially it FGC, which had never – repeating, <u>NEVER</u> administrated a financial institution throughout its history, even less o one in a special admission system...

38.    Would it not suffice for it to execute a new contract, according to which the directors would commit themselves to grant a power of attorney to a first class international institution, specialized in purchase and sale transactions of financial institutions, so that the Bank were formally put up for sale?

39.    Even greater perplexity is to conceive that, for the purpose aimed at (to obtain a power of attorney), FGC still had the nerve to negotiate with the protection of the public interest. It can be explained, by affirming that, if the power of attorney were granted, it would obtain the decree of the *Special Temporary Administration Regime* from the Central Bank of Brazil, FGC had incurred in an offense characterized as traffic of influence:" to r*equest, <u>require</u>, demand or obtain, <u>for itself</u> or another, <u>advantage or promise of advantage, under the pretext of influencing an act committed by a public agent  performing his duties</u>*"(CP – Criminal Code -  Article 332).

40.    If the Bank was in one of the situations described in article 1 of Decree 2.321/87, it was mandatory that BACEN decreed the RAET; if it were in one of the situations described in article 15 of Law 6.024/74, it was mandatory that extrajudicial liquidation were decreed to it. What one cannot admit is for a flock of middlemen (forgive the tone, but this is actually what they are) placed themselves between an administrative authority and those with competence to make the administrative authority the subject of a repugnant trade.

41.    Give me this or that and I will get the administrative authority to alleviate your side.... Unfortunate epitome of Brazil.

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA
To check the original, access the website http://esaj.tjsp.jus.br/esaj, inform the case117507.8.26.0100 and code17896B8

Fls. 16



42.     Forced, the administrators granted such power of attorney (Doc. 12) and, on Monday, the Bank had already opened under the RAET, with FGC as administrator (Doc. 13).

43.     We then reach the second perplexity in this plot which as sordid as it is invented. Already, in the capacity of administrator, FGC contributes to FACB the tranche of R$ 202,343,292.70 (as already mentioned, see Doc. 10). That same tranche which, one business day before, it had affirmed it would not pay up because of the absence of an audit report attesting to the quality of the credits. If the credits were good enough to permit the contribution (with or without an audit report) why then was it not done on the appropriate date?

44.     The answer to this question does not seem to be other than that, in the degenerated plan of takeover of the Bank, it was necessary to create a factoid to justify and confer some degree of credibility to justify decreeing the RAET.

45.     The history closes with evidence of the premeditation of the plan by FGC. One day before informing the then controllers of the Bank that it would not make the contribution of approximately R$ 200 million, more precisely, on 05.31.2012, FGC had received from the Office of the Procurator of the Central Bank of Brazil an opinion to the effect that [...] *FGC can be validly appointed by the Central Bank of Brazil to lead a RAET imposed on the institution insured by it* (Doc. 14).

46.     The conclusion reached by the Officer of the Procurator of the Central Bank of Brazil is more than questionable, especially in light of the sole Paragraph of article 1 of the Bylaws of the fund, according to which *FGC does not perform any public duty, including by delegation* (emphasis added); which provision, conveniently, was not the subject of analysis by the honorable procurator of BACEN, who made a huge hermeneutic effort, on the other hand, to demonstrate that, in spite of being forbidden by statutory regulation from performing a public function, including by delegation, FGC fulfilled the requirement of specialization in the area, set forth in article 8 of Decree-Law 2.321/87 to be appointed temporary administrator. The noble procurator said the following:

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA
To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case117507.8.26.0100 and code17896B8

GCM

Galdino · Coelho · Mendes
Advogados

"[..] To meet its obligations as deposits guarantor, the entity has significant funds [...] its financial assets being invested in several financial instruments, such as committed transactions, investment fund units, securities, debt instruments issued by financial institutions, etc. [...] To this effect, the management of FGC's portfolio has to be conducted professionally, according to its own investment strategies, which permit the appropriate allocation and handling of assets which make it up.

[...]

In view of these facts, I deduce that FGC has enough technical capacity to manage a company submitted to the RAET [...].

47.    And the opinion writer goes further. In two paragraphs that do not make sense, it concludes that FGS would have the necessary "specialization in the area to be appointed as temporary trustee:

"Additionally, one cannot say that FGC does not know the attributions of a trustee or conservator [?!], which are somewhat symmetrical to those of the person in charge of the RAET [no symmetry, permit the addendum, as, in one, there is liquidation, that is, the sale of assets, whereas, in the other, there is continuation of business]. Actually, the responsibilities of these agents are specifically listed in the law, powerful knowledge or special techniques not being required for its performance. The "specialization of the area" to which the decree refers does not say anything else with respect to conducting the ordinary business of the Company than expertise in cases of insolvency [note: words of the procurator himself].

In any case, I think that, given its professional staff and the current participation in innumerable extrajudicial liquidations and bankruptcies of insured institutions, FGC also fulfils the second requirement mentioned in item 8, above, i.e., it is able to conduct activities typical of an insolvency proceedings administrator".

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA. To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case1117507.8.26.0100 and code17896B8



48.    Reviewing said opinion, one deduces that FGC is a legal entity specialized in the area, as it has many financial assets, because its staff is very professional (the young procurator probably did not know the second and third defendants at the time of the opinion...) and have current participation in liquidation proceedings.

49.    By applying these (false) assumptions, one can deduce, with equal internal verisimilitude, that Petrobras, Vale or Nestlé could assume the management of the RAET of Cruzeiro do Sul. The three companies with an absolutely professional technical body administer financial assets in the order of billions of reais (in debentures, shares, subscription bonus, CDBs, swaps, among other more or less sophisticated securities) and, with more or less frequency, participate as creditors in insolvency proceedings of their suppliers and/or customers.

50.    To deduce that any of these three Companies could administer Banco Cruzeiro do Sul during the RAET, based on the assumptions above, it is as relevant as admitting that FGC could do so...

51.    More than that, to admit that FGC would have the specialization in the arear of bank administration (loans to third parties) only because it is an association with insurance purposes to insure the deposit of holders of bank accounts is the same as recognizing in an insurance company that insures cars the appropriate management capacity to administer a maker of vehicles; or a home and apartments insurer as having the expertise to work as a builder.

52.    The reasoning is completely wrong. And also without grounds.

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA
To check the original, access the website http://esaj.tjsp.jus.br/esaj, inform the case1117507.8.26.0100 and code1789GB8

Fls. 19



This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA
To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case117507.8.26.0100 and code17896B8

53.    It was evident that FGC did not have, as in fact it never had, the necessary technical specialization required by laws to administer Bank. Greater evidence than this is that, soon in the first balance sheet disclosed by the third defendant, Sergio Prates, when he assumed the function of trustee of the Bank, substituting FGC at the head of the institution, there was a "deterioration of assets in the order of R$ 1.415 billion, exactly in the period when FGC was at the head of the Bank – in whose management Mr. Prates participated actively.

54.    What one intends to make clear here is that, if the opinion was issued on 05.31.2012, his recruitment by that administrative authority had already been arranged for some time. In other words, FGC had long been articulating to be appointed as temporary trustee of Banco Cruzeiro do Sul. It was only a question of time, of finding the right pretext and the appropriate window.

55.    In short, the active performance of FGC to the force its own assumption of the administration of an institution for whose management it did not have experience nor the adequate technical staff is more than evident. It starts with the constitution of FACB, it included the maneuver with that administrative authority so that the legal paths to such appointment were open and it culminated with two total lies and extortion: forging the reasons why it, FGC, did not contribute R$ 200 million on 06.01.2012; the threat to obtain a power of attorney to sell the Bank on 06.02.2012; the appointment as the new trustee on 06.04.2012 and the consequent contribution of R$ 200 million, held on before, on the same date 06.04.2012.

56.    To increase the sadism contained in this mockery, it should be recorded that, on 06.05.2015, in a lecture recorded to investors (and whose audio was duly transcribed- Doc. 15), FGC stated the following "[...] *we have a FIDC, already made with the bank [...] where we have portfolio of receivables from the bank in FIDC, which has already been audited by the fund, therefore, this FIDC consists of quality assets within the regular market standards".*

19

GCM

Galdino . Coelho . Mendes
Adrogados

57.    Yes, four days after making the bank go bust, defaulting on the subscription of R$ 200 million based on alleged fault in the auditing of the receivables, FGC goes to the public "this *FIDC [sic] consists of quality assets within the regular market standards".* Very well, then, who needs enemies when one has FGC next to one?

58.    If this plot were not enough to characterize FGC's decisive participation in the financial collapse of Banco Cruzeiro do Sul, one must wonder then what it would be... And, unfortunately, the answer to the question is in the following topic. Not satisfied in setting up a trap for the Bank's administration to fall into its lap, FGC started to administer it as if it were the backyard. It put inflated prices on service agreements, delivered the management and collection of the credits portfolio to some accomplices, manipulated balance sheets… in short, it did incredible things in the administration of the Bank, transforming the life of its ex-controllers into a living hell.

59.    It is, therefore, each of these outrages that we will now discuss.

PLAN (II) - PIXULECO VERSION 2.0

*- Hiring friends of friends*

60.    In addition to the accounting fraud committed at the time of publication of the balance sheet, FGC and its officers went further. They used even craftier means (however, to the misfortune of all of us, no less trivial) to absorb funds from Banco Cruzeiro do Sul: they hired accomplices (ex-partners) as service providers, at obviously inflated prices, to lend an air of legality to the fraud. The "means" are the same which have been unveiled today in criminal proceedings which are in the agenda of national politics (the so-called operations Zelotes and Lava-jato [Carwash]).

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA

To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case117507.8.26.0100 and code17896B8



61.    These are the facts.

62.    As stated above, on <u>06.01.2012</u> on the same date on which it informed to the ex-controllers of Banco Cruzeiro do Sul that it would not subscribe the R$ 200 million which it had undertaken to do in accordance with the contract for the organization of FACB, and <u>days before</u> the decree of the RAET, FGC, on behalf of Banco Cruzeiro do Sul, hired a company <u>which was then called M7 Cobrança Ltda. ME</u> (Doc. 18). The purpose that was hired were "services of (i) <u>management of financial assets</u>, involving the procedures of supply of technological infrastructure and data processing; and (iii) [sic, (ii)] <u>license of use and maintenance of software specialized in the management of financial assets</u> ("*Services*")" (emphasis added)

63.    Some perplexities derive from this fact which, on a first approach, would be apparently simple. The first of them is that, before the RAET was decreed and before being appointed an administrator of Banco Cruzeiro do Sul, FGC, arrogating to itself a premature, premonitory and <u>illegal</u> function of trustee of the Bank (?!), executed (even without powers for such) a contract in the name of the Bank:

64.    The second is that, by acting notoriously *ultra vires*, FGC represented then by its officers Celso Antunes and Fabio Mentone, who would come later (you may guess) being invested as officers of the Bank, they hired a <u>recently-built</u> small business, <u>without employees</u>, <u>with capital stock of R$ 1,000.00, with no expertise in the market</u>, to manage a credit portfolio of billions of reais from a Bank with more than fifteen years of operation and thousands of contracts in the market.

> <u>Note:</u> the mere execution of this contract, alone, would be enough to entail personal responsibility by Celso Antunes and Fabio Mentone. But it would not be necessary to say, it would suffice this fact for both to answer to the bank, their creditors and shareholders.

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA
To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case1117507.8.26.0100 and code1789BB8

Fls. 22

65.    The third perplexity that equally sheds light on the illegality of the FGC's attitude, is that, at the time of the hiring, the Company engaged was called M7 Cobrança Ltda. ME ("M7"), but curiously the contract makes reference to the Company IMS Tecnologia e Serviços Ltda. ME ("IMS").

66.    That is to say, even before the members of M7 resolved to change names (cf. Doc. 19), FGC already knew the "new name" of its contractor. How was it possible for FGC to know what the new name of the Company would be? The answer is here, where it can be reputed as the fourth perplexity derived from said engagement: the Company IMS belonged to an ex-partner of one of the executive officers of FGC, Celso Antunes da Costa – precisely who was signing in the name of the Bank (even without having powers for such) the engagement of the Company.

67.    Before joining FGC, Celso had been a member of Felipe Cesarini in the Company Interbank. As, shortly after M7 changed name to IMS, Cesarini (ex-partner of Antunes) joined IMS.

68.    The fifth perplexity is that, to hire said Company, the new management of Banco Cruzeiro do Sul (read, Celso Antunes and company) resolved only on 06.07.2012. In other words, although it had already hired IMS (without a bid and without any competition!) on 06.01.2012, only on 06.07.2012, the Bank "resolves" to hire said Company...

69.    The sixth perplexity (do not lose count) is that, while other service providers (law firms, audit and financial advisory firms) they were chosen through minimally competitive processes, among names of weight in the national and international market, IMS was hired before the decree of RAET, without a bid, without a competitive process and without considering any well-known names in the industry.

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA. To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case117507.8.26.0100 and code17896B8

22

70.    See the glaring difference among the minutes in which the hiring of PwC and IMS were approved (Doc. 20 and Doc. 21 attached):

"Description:
Choice and engagement of the audit Company to validate the adjustments to be made in the Opening Balance Sheet.
Points discussed and Comments:
Identification of the audit Companies which may perform the work. Considering that KPMG was an audit of the Bank until December 2011 and that Ernest Young is the current auditor, there remained as an alternative PriceWaterhouseCoopers-PwC and Deloitte.
Definition:
Having in view the fact that the two of the four largest audit firms were involved with Banco Cruzeiro do Sul (Ernest Young and KPMG) and the recent involvement of Deloitte in episode of Banco Panamericano, there remained as an alternative PwC. This alternative is healthy having in view the experience of PwC, in the validation of the adjustments verified in that Bank, one chose to hire it to develop the work, under the coordination of Mr. Edson Arisa, even though he is a professional who coordinated the works performed in Banco Panamericano.
Celso Antunes will arrange a contact and the contract engagement" (emphasis added).

* * *

"Definition:

Two work fronts were approved, one under the coordination of Mr. Lattaro to promote the internal surveys and the second, through the Company IMS to conduct the survey by reverse engineering.
The coordination of the works of the two teams shall be performed by an external Projects office to be hired.
José Lattaro shall provide the engagement of the Companies who will work in the process (emphasis added).

This document was filed on 14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA. To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case 1117507.8.26.0100 and code 17896B8

Fls. 24

71.    See, PwC is hired, as a result of the "*two largest audit firms being involved with Banco Cruzeiro do Sul (Ernest Young and KPMG) and the recent involvement of Deloitte in the episode of Banco Panamericano, PwC remained as an alternative. This alternative is healthy <u>having in view PwC's experience</u>, in the validation of the adjustments verified in that Bank [...].*

72.    It would be even a caricature to imagine which would be the justification of hiring IMS, if there was one. It would be something like: considering that it is a Company without experience in the field, considering that it was a small business with capital stock of R$ 1,000.00, without employees, but which relies on an ex-member of the Bank's trustee, the fact is that it is the best to perform the service, therefore, eventual competition proceedings would not be necessary...

73.    The situation was so unusual that, from a request for information formulated by Federal Deputy Rubens Bueno, the Minister of Finance answered to the following effect: "*In view of the technical report presented, said officer of this Government Agency issued the following order on March 31, 2014, in which he considered reproachable and deserving censure the conduct of Mr. Celso Antunes <u>[...] for omitting or disregarding a situation, which, even though restricted to past facts, of a private nature, could lead to the perception of conflict of interests</u>* (cf. Doc. 22).

74.    Worse than that, during the management of FGC/IMS, Banco Cruzeiro do Sul, as recognized by the very liquidations office of BACEN (Sidnei Marques Doc. 23), saw treble the number of complaints from customers against the institution. In other words, IMS (hired by FGC) recklessly managed the credits portfolio.

*- Technical report of a backyard company*

75.    Were the entire fake put up by the new administration not enough, its apex was yet to come. As one already mentioned above, IMS had been hired with a scope of limited action: (i) to manage the credits portfolio; and (ii) supply a license of use and maintenance of software specialized in the management of financial assets.

This document was filed on 14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA
To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case1117507.8.26.0100 and code17896B8



76.    However, finally, this backyard company issued a report referred to as "*Valuation/Insubstantialities/ Banco Cruzeiro do Sul Consigned Credit Portfolio Report*" (Doc. 24), in which it would have "attested" to the insubstantiality of R$ 1,388,363,016.77 in credits of the Bank.

77.    Amazing: a small business, without a qualified technical staff, establishes months before the hiring, without registration of external auditor with the *Comissão de Valores Mobiliários*, hired for a specific scope of performance, ended up stating that approximately R$ 1.3 billion in credits of the Bank would, in fact, be worthless credits.

78.    Be amazed again: such report of insubstantialities used by BACEN as a foundation for decreeing the extrajudicial liquidation of the Bank, is just not signed. It is utterly apocryphal!

79.    What is the experience of IMS in identifying and verifying "frauds" in credits portfolios? What is the qualification and what are the credentials of who would have produced the report? How could it be possible for IMS to issue a report of insubstantialities of credits, suggesting that it undergo risk rating, without having the corresponding record of the external auditor registration at CVM?

80.    In fact, and in this respect, BACEN Resolution 2.682/99 itself, which covers the criteria and procedures for its credit risk rating in the scope of the financial market, establishes, in article 12, that "[the] *independent auditor must prepare a detailed report of revision of the criteria adopted by the institution with respect to its rating at the levels of risk and evaluation of provisioning recorded in the financial statements*".

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA. To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case117507.8.26.0100 and code17896B8

Fls. 26

GCM

Galdino . Coelho . Mendes
Advogados

81.    Let it be repeated, how can IMS, a small business, without a registered external auditor under the applicable regulation, issue an opinion (opinion?) on the insubstantiality of credits held by Banco Cruzeiro do Sul. That is, how could it claim for itself the task of producing what the same referred to as "*Banco Cruzeiro do Sul consigned credit portfolio valuation report*" in which "the main objective of the work would be the identification of insubstantial transactions.

82.    One does not know the answer to all these questions, simply because there is no plausible answer.

83.    Worse than that. When it concluded its work (again, what it had not been hired to do), IMS, read, the ex-partner of Celso Antunes insisted on deleting the memory of all the computers of the Bank which recorded the data which had been "analyzed" by it...

84.    Yes, Your Honor, were the suspicious contracting not enough, the performance of a work without experience and adequate technical qualification, the issuance of the apocryphal report, deleted the entire database of Banco Cruzeiro do Sul, preventing one from being able to audit the material which had been "analyzed" by it. Check if, in this respect, the letter sent on 06.26.2014 by the ex-controller of the Bank, Mr. Luis Felippe Índio da Costa, to the then trustee, Mr. Eduardo Bianchini (Doc. 25), and the answer, attesting to the malicious attitude of said front Company (Doc. 27):

> "Dear Sir,
> Having received your answer on my request for information relative the quantity of and quality of information contained in computers at the time of their return by IMS Tecnologia e Serviços Ltda., which request contained in my letter of April 9, last, I ask you kindly to clarify if the equipment which were returned were formatted, that is, if they came without the information found at the time of their delivery to said IMS

This document was filed on 14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA
To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case1117507.8.26.0100 and code17896B8



This information is necessary as a complement to the clarifications requested. Truly yours,

Luis Felipe Indio da Costa" (emphasis added).

* * *

"Honorable Mr. LUIS FELIPPE INDIO DA COSTA

Dear Sir,

We refer to your letter of 6. 26.2014, in which you request to us clarifications about the computing equipment, which, being the property of this Party in Extrajudicial Liquidation, were the subject of return by the Company IMS TECENOLOCIA E SERVICOS LTDA, we have to inform the following:

a)    With respect to the Servers considering a total of 11 (eleven) equipment, such items were returned totally formatted;

b)    As for the Computers (PCs) considering a total of 230 (two hundred and thirty) pieces of equipment, it was found that 196 (one hundred and ninety-six) were returned total formatted and 03 (three) presented faults in the relevant HDs, when they were returned;

c) As for "Note Books" - considering a total of 02 (two) pieces of equipment, such items were returned totally formatted.

Truly yours" (emphasis added).

85.    In short, it does not suffice to commit an offense; it is necessary to commit an offense and delete the product of the offense...

86.    What is absurd, however, goes beyond the horizon. In addition to destroying the property of the Bank, deleting its IT records and registers, FGC "lost" control of the physical files, as, *"the physical transfer of the documents and relevant records and controls was not made [...] adequately and completely, resulting, at least, in loss of the controls and records and, as a consequence, in the unreliability of the documents which are not held in custody."* (cf. Doc. 28).

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA. To check the original, access the website http://esaj.tjsp.jus.br/esaj, inform the case117507.8.26.0100 and code17896B8

Fls. 28



87.    Sometime later came the confirmation that the record had been lost (surprise!) in the period of the RAET, read, during the administration of FGC (Doc. 29):

"We refer to your letter of 8. 28.2014, and amending the official letter LIQ/BCSUL/300-2013, of 11.25.2013, <u>we inform that, according to the surveys prepared, the contracted Company had been replaced for the custody, control and record of the documents, which make up the collection of this Liquidating Party occurred during the period when this Company found itself in the Temporary Special Administration System</u>" (emphasis added).

88.    This is right, the computers were returned with their memories and files fully deleted. <u>It is worthy of note that the registration data, simply deleted by IMS, were part of the assets of the Bank and were incinerated by the Company</u>.

89.    And do not think, Your Honor, that it stopped at that.

90.    In response to an official letter of the Federal Police on the services effectively provided by IMS, the then trustee, Eduardo Bianchini, informed categorically that there was no provision of service, but solely such apocryphal report of insubstantialities (Doc. 26):

"THE WORKS PERFORMED AND THE VIOLATION WITH BCSUL
About the works performed by IMS, and after a research conducted in the collection of BCSul, <u>we inform that, as evidence, a document referred to as "Report of Valuation of the Consigned Credit Portfolio of Banco Cruzeiro do Sul made by IMS Technology and Services from June 25, 2012"</u> (Exhibit IX), prepared by force of the contract executed on 6.01.2012 (v. item 2.a, above)" (emphasis added).

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA
To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case117507.8.26.0100 and code17896B8



91.    Now, add this information (about the inexistence of provision of services) to this one here: when RAET was converted in extrajudicial liquidation, <u>the monthly amount paid to IMS at the expense of Banco Cruzeiro do Sul became something around R$ 13 million per month</u>. The business seemed so good that the son of another executive of FGC, Rafael Lattaro (the son of José Lattaro who, for these and other reasons, is the defendant in this action), ended up being hired by IMS to provide the services also.

92.    Is it or is it not the pixuleco version 2.0?

93.    It is not a coincidence that the contracting and performance of IMS are the subject of investigation by Federal Police, being news on the police pages of (cf. IPL No. 0379/2014-11-SR/DPF/SP Doc. 30 exhibit; and Article of the periodical *Revista Época* - Doc. 31 exhibit).

<u>PLAN (III)    ACCOUNTING AND OTHER DISASTERS</u>

94.    As I have already said above, although I was formally invested as an administrator since 06.04.2012, FGC, only published the so-called "opening balance sheet" RAET more than two months later, on 08.15.2012 (Doc. 7). This balance sheet appeared from what FGC nicknamed 26 adjustments promoted by it when he was formally at the head of the Bank's administration.

95.    Given the specificity of the matter, the opinion of Prof. <u>Eliseu Martins</u> on the materials which had been produced by FGC was requested. Emeritus professor of the College of Economic, Administration and Accounting of USP (where he one also completed his BA, Doctorate and his title of Associate Professor), professor Eliseu was director of CVM, inspection officer of BACEN, representative of Brazil at the UN for matters of accounting and disclosure of information, head of the Brazilian Accounting Institute and director of the National Association of Executives of Finances, Administration and Accounting. It is, without any favor, possibly the greatest specialist in accounting science in Brazil.

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA
To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case1117507.8.26.0100 and code17896B8



96.    Very well, it was this thinking head that wholly disqualified the opening balance sheet prepared by FGC on 08.15.2012, affirming in short the following (Doc. 16):

> "Based on our analyses considering that an extremely significant part of the adjustments made by FGC in the Special Opening Balance Sheet of Banco Cruzeiro do Sul, drawn up on 06.04.2012, refers to <u>provisions prepared based on accounting errors and absurdly excessive conservatism, which goes against the quality characteristics of accounting information</u>.
> Thus, <u>we are obliged to opine for the most relevant quantity of items of this balance sheet with material values which allow one to intuit with respect to the accounting invalidity of this balance sheet</u>. Balance sheet which, in fact, did not give this so relevant information such as that of the subordinated debt enforceable only before the final reimbursement of the capital to the shareholders" (emphasis added).

97.    Prof. Eliseu separates his analysis in eight plans and we, with view to make the understanding of the Court on each of the disasters committed by FGC, we will try, herein this petition, the same script follows.

*- Said opening balance sheet was not audited: why?*

98.    The first incongruence worthy of emphasis, as very well indicated in the exhibit attached is that *"this* [opening] *balance sheet" <u>was no more than an independent traditional process of external audit</u> and precisely for this reason the auditors' report is not [to be found] in the balance sheet".* Even so, that is*,* <u>even so without due audit process,</u> this balance sheet was published.

99.    Now, now. The Bank was then a publicly held Company, subject to the rules of CVM and, especially, to Law No. 6.404/76, especially that of article 177, Paragraph 3, according to which "[the] *financial statements of the Companies will also observe the standards issued by the Comissão de Valores Mobiliários [Brazilian Securities & Exchange Commission] and <u>shall be mandatorily submitted to audit by independent auditors registered with it".</u>* The RAET did not elide this obligation set forth in the Law. And, obviously set forth in the law. And, obviously, it would not have the power to do so.

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA
To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case117507.8.26.0100 and code17896B8

GCM

Galdino . Coelho . Mendes
Advogados

100.   Now, if FGC was formally the trustee of a public limited company, and one integrates to the list of responsibilities and duties of the trustee of a public limited company the publication of the audited balance sheet, reflecting the exact proper and accounting reality of the institution, the question remains: why did FGC not observe the law?

101.   See that, even though the fund, let one insist on the fact that it had hired PriceWaterHouseCoopers ("PwC") to assisting in the due diligence process[9]9 that FGC was conducting in the Bank, it is undeniable that the scope of PwC's activity, in fact, as set forth in its letter-proposal, attached to its diligence report (Doc. 17), it was not of external audit of the financial statements: *[...] we shall not issue an opinion or any type of* assurance *on the financial statements.*" (emphasis added).

102.   More than that, it is not necessary to have a specialization in the area to know that a scope of due diligence is not at all related to the external audit, as, in fact, PwC itself stressed in item 2 of its proposals, when it recorded that [the work report], whether in the form of draft or final, or part of it (including our oral comments), *must not be associated to the Group's financial statements.*" (emphasis added)

103.   Even so, FGC indicated in the balance sheet, basically, the same "adjustments" indicated by PwC in its report, which leads us to a schizophrenic tautology: FGC furnishes the assumptions for PwC to conduct a process of due diligence in the Bank; after this process has been completed, FGC appropriates those numbers processed, and which had been generated by FGC, as if they were the result of an audit work of PwC and discloses them to the market as an audited work....

---

[9] In fact a subject very well noted by Prof. Eliseu Martins in his opinion: "Notice and repeat: the due diligence process belongs to FGC, in accordance with the words of PwC! The latter did an advisory work for"

This document was filed on 14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case1117507.8.26.0100 and code17898B8

Fls. 32

GCM
Galdino · Coelho · Mendes
Advogados

104.    The question which remains (one more) is: why did one not have the diligence to audit the balance sheet opening balance sheet service work? If the balance sheet was (as it still is) so relevant to the point of determining if the RAET should have been extended, raised or converted into ordinary or extraordinary liquidation, why did one not have the care to submit it to this validity test by an audit firm?

105.    The answer is that one does not know for sure; the only certainty is that, by acting thus FGC, in the capacity of trustee of the Bank, <u>recklessly and consciously violated the provisions of article 177, §3, of corporate law, which obliges publicly held Company to publish balance sheets duly audited by external audits with respect to the provisions of articles 153 and 154, also of Brazilian corporate law</u>, which impose on it the duty to "*employ, in the exercise of its functions, the care and diligence that every active man of integrity normally uses in the administration of his own business",* acting to satisfy *"the requirements of the public good and the Company's social function".*

106.    Based on this regulatory archetype, the doctrine has built some beacons to identify when a trustee fails his duty of diligence. In essence, one has it a sufficiently diligent behavior that of the trustee, who: (i) qualifies for the position he holds, (ii) administers well, (iii) as well as being informed about the purpose of his administration, (iv) investigates, and (v) watches[10].

---

[10]  EIZIRIK, Nelson. *A Lei das S.A. Comentada*, Vol. 2, São Paulo: Quartier Latin, 2011, p. 353.

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA. To check the original, access the website http://esaj.tpsp.jus.br/esaj, inform the case1117507.8.26.0100 and code17896B8

Fls. 33



107.   Submitting the case in question to these boundaries, the conclusion can be no other than FGC (and its agents, it is always good to emphasize) did not act diligently and with at the head of Banco Cruzeiro do Sul. First, because, as seen above, he was not qualified for the position he held (cf. Paragraphs 47 to 53 above. Second, because, in the course of its administration, FGC effectively violated the cogent and direct rule, which obliged it to audit the Bank's balance sheet disclosed to the market and, what is more, because there resulted visible damages to the Bank, its shareholders and creditors from its administration.

108.   Third, because, as Celso Antunes, second defendant in this action, properly stressed in checking the results of 06.05.2015 (Doc. 15): *"we arrived yesterday in the bank and we are going to conduct the works of examining to <u>know what the actual situation of the institution's equity [...] is"</u>*, and he was accompanied by Gelson Moura: "*at this moment we do not yet have the exact understanding in what these active insubstantialities consist of*".

109.   Now, somebody who does not have safe information on the institution which he administers and decides, unexpectedly, to delegate the function of verifying this information to a third party, equally without experience and without the technical capacity to this work, cannot, in any event, be considered as an administrator who fulfills his duty to be well informed.

110.   And, for the same reasons, one cannot call as an administrator who fulfills, in the standards required by the law, his duty to investigate and watch he who, in view of all these circumstances, understands that it is applicable to publish a balance sheet without due review by an external auditor. A review which is of utter importance, not only because it is a legal requirement, but especially to check the relevance for the accounts of information which would be being made available to the market.

This document was filed on 14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA
To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case 1117507.8.26.0100 and code 17896B8

Fls. 34



111.   As recorded by Prof. Eliseu, "it seems to *us that, as analyzed in this Opinion, the adjustments would the others, if they had been submitted to the analysis of externa auditors"*.

*- First, equivocated adjustment: the posting of provisions of controlled companies as if they were from the Bank, a gross violation of separation of entities.*

112.   The first "adjustment" which does not pass the test of accounting validity is that which brings together the provision for loss in the amount of R$ 69,990,000.00. This amount would be the fruit of three types of provision: (i) provision for loss with Bank Credit Notes, held by Cruzeiro do Sul Distribuidora de Títulos e Valores Mobiliários ("<u>CS DTVM</u>") of R$ 20,382,000.00; (ii) a complement for provision for doubtful debtors on margin account of Cruzeiro do Sul Corretora de Valores e Mercadorias ("CS Broker"), of R$ 38,348,000.00; and (iii) provision for risk of realization of bank credit notes of BCS Seguros S.A., of R$ 11,260,000.00.

113.   All of them were unexpectedly posted by FGC in the Bank's account, as reducing the account of investments, which affronts the law directly (Decree-Law No. 1.581/76, article 21]; the national financial system plan of accounts ("COSIF"): and Technical Pronouncement CPC 18. In the words of Prof. Eliseu:

> "Imagine, for instance, a situation such as the following: the investor is a holding company, whose sole asset is an investment in controlled and associated companies. And it resolves to recognize, in its own balance sheet, in its own balance sheet, inventory losses, losses in accounts receivable from customers and losses in property, plant and equipment not recognized in its investees. <u>The point is</u>, <u>it does not have account receivable, inventories nor property, plant and equipment. How does one recognize these losses? It is simply ridiculous. But then, probably from that the administration would realize the technical impossibility of this record</u>" (emphasis added).

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA. To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case1117507:8.26.0100 and code1789BB8

*- Second equivocated "adjustment": meaningless provisions of losses.*

114.   In addition to this lack of care, which the highest Brazilian authority in accounting science insisted on referring to as "*ridicule*", FGC still posted a provision of R$ 391,450,000.00 as probable loss in assets. As emphasized in the opinion of Prof. Eliseu, these provisions were fully reversed on 06.29.2012; when new provisions were then made in the total amount of R$ 154,356,000.00; these were also fully reversed on 07.30.2012, resulting in a new provision, substantially less on 07.31.2012, when R$ 81,338,000.00 started to be provisioned as opposed to the figure that was on the special opening balance sheet whose base date was 06.04.2012, but which was only disclosed on 08.15.2012. This opening balance sheet, as it sounds evident, should have taken into consideration the evolution of the provisions, especially because subsequent reversals "*demonstrate that the adjustment originally proposed was made with an excess of conservatism, undervaluing too much the shareholders' equity of BC Sul by at least R$310,112,000.00[11]*".

115.   And the honorable expert adds that the excess conservatism is not a valid option of the accounting auditor:

"It should be stressed that the figure of conservatism, in its sense of deliberate reduction of assets and increase of liabilities, there is no in the Conceptual Structure for the Preparation and Disclosure of Accounting-Financial Report, the Basic Conceptual Pronouncement CPC (R1), which in fact was in force at the time of preparation and disclosure of the Special Opening Balance Sheet of Banco Cruzeiro do Sul. In accordance with this Pronouncement, the financial statements must worthily represent the economic-financial position of the entity. And, in order for this representation to be faithful, the accounting information cannot be biased: they must be neutral" (emphasis added).

---

[11] Result of the difference between the amount indicated as provisioned in the opening balance sheet (R$ 391,450,000.00] and that indicated as a provision on 07.31.2012 (R$ 81,338,000.00].

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA
To check the original, access the website http://esaj.tjsp.jus.br/esaj, inform the case117507.8.26.0100 and code17896B8

Fls. 36

GCM
Galdino . Coelho . Mendes
Advogados

116.    Adding to the first and second adjustment, one finds already in the start, and without great theoretical effort, that R$ 380,102,000.00 were unduly reduced from the assets of Banco Cruzeiro do Sul in such special opening balance sheet.

117.    But there is more. Much more.

  - *Third equivocated "adjustment": profit reversal in the repurchase of securities.*

118.    The opinion also deems insubstantial a reversal of R$ 137,702,000.00 of profit in the repurchase of securities. According to the opinion:

> "In the Special Opening Balance Sheet being commented on, the income previously recorded at the time of repurchase of financial instruments which had originally been assigned to third parties was reversed.
> We emphasize that we are not aware, and the consultants of our contracting party (LMACB) also state the same, of any accounting requirement by the regulating body, i.e., by COSIF, about such book procedure (profit reversal from the assignment of credits upon the repurchase of these same credits)" (emphasis added).

119.    In short, one more expressive write-off (of R$ 137 million) made not based on accounting standards or procedures.

  - *Fourth equivocated "adjustment": provision with surety and bail -*

120.    In the opening balance sheet, FGC posted as a provision to cover eventual losses with surety and bail granted by Banco Cruzeiro do Sul the value of R$ 45,965,000.00. This provision was reversed on 06. 29.2012 and, after this, no other provision on this account was made. Again, in the words of Prof. Eliseu again, because the exposition is very didactic:

> "We reinforce: the provision was fully reverted 25 days after the date of the opening balance sheet! What new facts arose in this period from June 05 to June 29,which did not exist on June 04, to show that the estimates and risks changed? This movement of the provision seems to us to reveal that it was made exclusively to appear on the Special Opening Balance Sheet, revealing a still possible abuse of conservatism, against any healthy accounting principle as already extensively discussed in the previous item. Subsequent facts, especially the letter of November 25, 2013 by the trustee to the Executive Board of BCSul, demonstrated that during all this period only one letter of guarantee was honored, and for the amount of R$ 2,025. Note: more than one year later, only this loss."

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA. To check the original, access the website http://esaj.tjsp.jus.br/esaj, inform the case117507.8.26.0100 and code1789BB8

GCM
Galdino . Coelho . Mendes
Adrogados

121.   And the professor continues, by stating the following:

"[...] the provision is only recorded if the exit of funds from the entity is expected.
[...]
In other words, the provision for risks with sureties and guarantees can only be made if there is evidence that it is more likely that not (more than 50% probability) that the institution would be obliged to honor such commitments.
<u>It is obvious that to constitute a provision for the entire portfolio of these contracts was an incorrect accounting attitude. The history of BCSUL with these contracts was not very likely verified, this effective probability greater than 50% of future disbursement was not evidenced. It was considered that BCSul would have to honor, we repeat, all the contracts because they would not be honored by the customers</u>". (emphasis added).

*- Fifth equivocated "adjustment": the write-offs for the acquisition of Prosper -*

122.   In this point, the "adjustment" promoted by FGC was R$ 155,006,000.00, of which R$ 100 million represent a provision for losses as a result of the acquisition of Bank Prosper; and R$ 55,066,000,00 account write-off of the price paid in the acquisition of Prosper by Banco Cruzeiro do Sul.

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA.
To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case1117507.8.26.0100 and code1789BB8

123.   On the provisioning of the first tranche, that of R$ 100 million, there are two equivocations. The first of them is that, again, FGC posed in the controller the value of the provision which, if and when it were due, should be posted in the controlling entity, that is, Banco Prosper. However, and this is the second equivocation, BACEN never approved the purchase of Prosper by Cruzeiro do Sul, in other words, formally and legally, it did not become the controller of Banco Cruzeiro do Sul of Prosper and it would not make any sense, therefore, to post in its balance sheet provisions of losses related to that institution:

> "The fundamental assumption of this provision recorded in the accounts is that Banco Cruzeiro do Sul already has the control of Bank Prosper, consequently it would have already assumed full control of the assets and liabilities of Prosper. However, this is not true. While the Central Bank of Brazil has not been authorized to acquire (and did not do so at a consequent time), there is no genuine assumption of control by the acquirer. Therefore, Banco Cruzeiro do Sul is not liable for the estimated losses of Prosper's assets or any other contractual liability (recorded in the books or not). Also, because it does not have the control of Prosper, the provision is improper, in addition to the fact that the credits are in the entity in the process of acquisition, and not in the potential acquirer. It is important to emphasize that the process of purchase had not yet been approved by the Central Bank of Brazil, as, in fact, it was evidenced in explanatory note number 14, prepared by FGC: "acquisition of Banco Prosper, which is still pending approval by the Central Bank of Brazil".
> Therefore it is a fact that FGC knew about the failure that Banco Cruzeiro do Sul did not control Bank Prosper on the Special Opening Balance Sheet Date, consequently that the provision for losses was not relevant."

124.   It really knew, for the provision was subsequent reversed. That renders even more clear the enticement, which the preparation of the special outstanding balance sheet was.

125.   On the second subject, that of write-off of the acquisition value in the accounts, Prof. Eliseu explains that it is equally improper, as:

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA
To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case1117507.8.26.0100 and code17896B8

GCM

Galdino . Coelho . Mendes
Advogados

"When one acquires a company whose book shareholders' equity is negative, and this is not rarely so, the amount equivalent to the negative shareholders' equity corresponds to part of the goodwill to be recorded in the acquirer, and not as loss. Does somebody pay for the purchase of a Company already with the idea that it is having a loss? See the Corporate Accounting Manual FIPECAFI (one of those that sign this Opinion is the co-plaintiff), Ed. Atlas, 2a. Ed., item 11.14).

An invested value, whether in an entity as positive or negative shareholders' equity, can only considered as loss if [there are] specific reasons which show, after the acquisition, that this value is not recoverable.

However, it seems to us that there was no in-depth study that the amount invested could be recovered in the future. In other words, there was no study on the possible impairment of the cost invested in the acquisition of bank. This lack of in-depth study on the recoverability of the investment is also more evident as a result of the fact that the LMACB report contains information that there would have been secured guarantees set forth in the contract of acquisition of Prosper, which, by the explanatory notes, were not taken in consideration. Therefore, the full write-off of the price paid in the acquisition by Bank Prosper has all the characteristics of having been arbitrary." (emphasis added).

*- 6th equivocated "adjustment": provision for tax contingency-*

126.   Finally, the last adjustment concerns the provision for tax contingency in the amount of R$ 455,000,000.00, which results from two assessments against the Company Vila Promotora de Créditos e Vendas Ltda. In its opinion, Prof. Eliseu emphasizes that the law firms consulted on the chances of loss for the respective proceedings (Tozzini&Freire, consulted by FGC; and Mattos Filho by the controllers of the Bank) stated that the chances of loss were, respectively, REMOTE and POSSIBLE:

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA. To check the original, access the website http://esaj.tjsp.jus.br/esaj, inform the case117507.8.26.0100 and code17896B8

GCM
Galdino . Coelho . Mendes
Advogados

"Now, if both legal consultants consider, in the last instance, as remote the chances of loss of the case which was the subject of the provision, as far as the accounts are concerned, it does not make sense to make this provision unless the administration of the Company has other reasons and, therefore, considers the chances as probable (more changes of occurring than not). Apart from this, at the most, the contingency should be explained in notes, but should not be recorded as a liability provision. Again, if it were so, it should be necessarily supported by in-depth studies, if it were so, it should necessarily be supported by in-depth studies with respect to the merits (basically discarded by both legal consultants) and with respect to the value (measurement of the provision)"

[...]

Now, on provisions: it is not a question of choice; they are a question of evaluation, of measuring risks and judgment of the facts and with respect to information, based on the best possible information. In the specific case of provisions, if there is no consistent and reliable basis when one measures the provision, the fact must be recorded only in a note. What FGC did was different from that prescribed in accounting standards. Thus, in our opinion, everything indicates the existence of error in such provisioning".

127.   By adding the value of all these "adjustments" (we will continue to call them adjustments, dully quoted, even though the name of what was done in the Bank's balance sheet is actually fraud), one has it that R$ 1,255,113,000,00 of liabilities and provisions should have been merely purged from the special opening balance sheet. One billion and two hundred million reais fraudulently grafted to a balance sheet published without being audited by independent external auditors.

128.   Frankly, if Brazil were a serious country and those responsible for this disaster, this cowardice, this fraud, were answering fully for their acts...

129.   But it does not stop there. Unfortunately, it doesn't.

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA. To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case1117507.8.26.0100 and code1789BB8



*- Subordinated debt posted without any qualification?? -*

130.   FGC", specialized in the area posted in the balance sheet R$826,053,000.00 of subordinated debt as if it were an unsecured debt. That is it simply posted in the balance sheet without any qualification with respect to its special qualification that the creditors, who have this type of debt, only receive their credits if there is positive balance in the institution's shareholders' equity. In other terms, the subordinated debt could <u>NEVER</u> be used for purposes of calculation of the institution's shareholders' equity. The value of this shareholders' equity must be calculated <u>independently</u> from the subordinated debt.

*- Conclusion: evident fraud, unequivocal liability -*

131.   Adding to the R$ 1,255,113,000,00 in liabilities and provisions which should not even have included in the balance sheet of the Bank to the R$ 826,053,000.00 of the subordinated debt posted as if were an unsecured debt, only with these adjustments, the <u>opening balance sheet was defrauded by FGC in R$ 2,081,166,000.00.</u>

132.   As emphasized in § 14 above, the accounting manipulation in the accounts undertaken by FGC caused the opening balance sheet to present a loss of R$ 3,110,897,000.00 in relation to the Bank's last balance sheet before the RAET. Deducting from this amount the sum of R$ 2,081,166,000.00, demonstrated above as having been irregularly inserted in the balance sheet, as well as the shareholders' equity of the Bank before the RAET, if as much that, the balance sheet would record negative shareholder' equity of R$ 155,616,000.00, i.e., a reduction of 93% in relation to that total amount considered as due by FGC.

133.   <u>This discrepancy, alone, is more than enough to characterize the fraud committed by FGC at the time of the preparation of said opening balance sheet</u>. This is called fraud, with due respect, there is a time when the error – so basic, profuse and evident that they are, can no longer be classified as "errors" (as in this case, they would presuppose some level of justification) to fall under the domain of willful misconduct and fraud.

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA. To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case117507.8.26.0100 and code17896B8

Fls. 42

134.   In any case, and as very well pointed out by Prof. Eliseu in the conclusions of his opinion, said opening balance sheet, the main produced during the management of FGC - is blatantly invalid and useless from an accounting viewpoint: "*Thus, we are obliged to issue an opinion about the very significant quantity of items with material values that allow us to induce that the accounts presented in this balance sheet are invalid*.

135.   Now, if an administrator publishes an invalid balance sheet, permeated with gross errors, without taking the necessary caution to be sure – in a reasonably informed judgment with respect to the risks and consequences of his acts – that his attitude in accordance with the law and serves the best interests of the Company, it is unequivocal that he is committing an offense.

136.   And if damage to third parties results from this offense, as it happened in the case in question not only to the Bank, but to all of its creditors, it is even more unequivocal that this administrator must answer, personally, for the damages caused.

### PLAN (IV) LEAVES FGC, HIS *LONGA MANUS* COMES IN, BUT THE BLEEDING CONTINUES

137.   It has already been stated above that, at the time of FGC's management, Mr. Sergio Prates participated in that administration as an executive with full powers of decision on how the business of the Bank was conducted. Examples of this activity are the minutes of administration of the Bank, all of them signed by Mr. Sergio Prates (in addition to the minutes already indicated above, Doc. 20 and Doc. 21, see also the others produced when FGC was in charge of the administration (Doc. 32 to Doc. 47).

This document was filed on 14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA. To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case1117507.8.26.0100 and code17896B8

Fls. 43



138.   But the clear proof that Sergio Prates was, indeed, an executive during the period when FGC was administrator and remained in charge of the Bank's administration, being raised to the position of "trustee" from 09.14.2012 is the final report of the RAET produced by the Central Bank of Brazil itself ("Report 742/2014 DELIQ/GABIN, of January 23, 2014"):

> "IV, Sérgio Rodrigues Prates was hired as a legal entity (Prates S/C Advogados Associados) on June 4, 2012, to provide advisory and consulting services in the legal and accounting areas and for auditing in the administration of the Raet, with monthly remuneration of R$ 25,000.00. From September 14, 2012, with the decree of of the extrajudicial liquidation, he was appointed trustee of the institution" (emphasis added).

139.   Additionally, see the irony, already in the period of liquidation, Mr. Sergio Prates (trustee or front man of FGC?) continued to send and receive emails from the following address: sergio.fgc@bcsul.com.br. Need one say anything else?

140.   Very well. At the end of FGC's administration, Mr. Sergio Prates, the same person who integrated the administration headed by FGC, is then appointed trustee of Banco Cruzeiro do Sul (Doc. 48).

141.   And as one who returns a favor to who had placed him there, the sponsored Sergio Prates, acting as the true *longa manus* of FGC, returns to it the powers of management of the Bank, which had been temporarily interrupted with the decree of extrajudicial liquidation, upon the concession of a public power of attorney with very broad powers to its former partners in the administration, José Alfredo Lattaro, Ivan Dumont Silva and João Alberto Magro (Doc. 49):

> "[...] to whom he grants powers to acting together with two attorneys-in-fact, or any one of the attorneys-in-fact together with Mr. Sérgio Rodrigues Prates, regardless of the order of

This document was filed on 14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA
To check the original, access the website http://esaj.tjsp.jus.br/esaj, inform the case1117507.8.26.0100 and code17898B8

43

appointment, to represent the Grantor before Financial Institutions, including Banco do Brasil S.A., the Central Bank of Brazil, Banco Bradesco S.A., Banco Nacional de Desenvolvimento Econômico e Social [National Bank for Economic and Social Development] - BNDES - Banco Nacional de Desenvolvimento Econômico e Social, ABBC - Associação Brasileira de Bancos [Brazilian Association of Banks], FEBRABAN - Federação Brasileira das Associações de Bancos [Brazilian Federation of Associations of Banks and SERASA - Centralização dos serviços de Bancos S.A. [a Credit Protection Agency], <u>being able to operate checking accounts, sign checks, money orders, request checkbooks, DOCS [Credit Order Documents], endorse and sign checks to deposit at Grantor's</u>, forms and documents of SELIC Sistema Especial de Liquidação e Custódia [Special Settlement and Custody System], CETIP Central de Liquidação e Custódia de Títulos Privados [Center of Settlement and Custody of Private Securities] and other credit instruments for collection in favor of Grantor in Banks, <u>sign correspondence, letters of guarantee, approve the blocking of shares, and sign all the documents that are necessary to comply with this power of attorney</u>, with joint stock companies, also being able to sign any contracts and covenants, represent Grantor with Federal, State and Municipal Public Government Agencies, Private Authorities, State-run companies, Entities, the Brazilian Federal Revenue Service, Municipal Governments, Board of Trade and receive clearance certificates, sign whatever is necessary, request, appeal, promote, also being able to represent it with CAIXA ECONÔMICA FEDERAL – CEF [the Federal Savings Bank], sign all that is necessary and relative to the FGTS [Fund of Guarantee for Time of Service] and PIS - *Programa de Integração Social* [Social Integration Program]; sign correspondence, fulfill requirements, file and obtain necessary documents, make statements, pay taxes and charges and claim their reimbursement, sign order and other documents, represent Grantor before managers of funds, being able, for such, to sign contracts and correspondence. The attorneys-in-fact may also perform all the relevant and necessary acts to comply faithfully with this power of attorney, subrogation being prohibited.

[...]

142.  A new power of attorney is granted on 12.18.2012 [Doc. 50]. The persons contemplated this time were Fausto Vaz Guimarães Neto and, again, Ivan Dumont and João Alberto Magro. The same powers of management were granted, demonstrating, clearly and unequivocally, that FGC continued to lead the Bank and manage its business for the entire period and Sergio Prates acted as trustee.

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA. To check the original, access the website http://esaj.tjsp.jus.br/esaj, inform the case117507.8.26.0100 and code1789bB8

143.  It is therefore undeniable that even though it had formally left the Bank's administration, FGC remained there through its *longa manus*, Sergio Prates – ex-member of the administration when he was working for FGC which, making the distinction even more blurred, appointed as attorneys-in-fact of the Bank the executives of FGC. It is, thus, during the management of the *longa manus* that other administrative blunders are committed.

*- The unexplainable deterioration of the assets -*

144.  The first of them, actually, was becoming sure of the incompetence of the twosome FGC-IMS in the three months from 06.04.2012 to 09.14.2012. We are referring to the fact that, shortly after the beginning of the liquidation, Mr. Sergio Prates published a new balance sheet in which, differently from the opening one published by FGC on 08.15.2012 (but with base date of 06.04.2012), negative shareholders' equity of R$ 3.652 billion was verified (Doc. 51).

145.  As seen above, in the opening balance sheet, with all the stains, defects and frauds, already detected above, the negative shareholders' equity verified was R$ 2.237 billion. In other words, in less than three, a leak in the Bank's balance sheet in the additional amount of R$ 1.415 billion was created.

146.  As recognized by the trustee, such adjustments were necessary as a result of the degeneration of assets. Now, if the assets degenerated under the administration of FGC, it is fact that it (and those who spoke for it in the course of this reckless management, including, obviously, Mr. Sergio Prates) is who must answer for this billionaire portion, of R$ 1.415 billon.

*- Incompetence in raw state: three months without receiving -*

147.  It would have been better if it had been just this. Under the direction of Mr. Sergio Prates, in co-management with FGC, the Bank was three months without receiving the tranches of the consigned credits, as the then administrators were not in the least diligent to keep open the bank accounts in which such loans were paid monthly.

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA
To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case1117507.8.26.0100 and code17896B8

148.  <u>Three months, at that point, with an average monthly inflow R$ 250 million, they meant, for this simple reason, approximately R$ 750 million in losses to the Bank</u>. In fact, the last trustee of the Bank requested on pages 130/133 of the bankruptcy proceedings an authorization to keep the accounts of the Bank open, and to justify his request, he referred expressly to what occurred in the liquidation period (Doc. 52):

> It should be recorded that, as a result of the decree of the extrajudicial liquidation regime (14.9.12), and as a result of the cancellation of this Bank Reserve account at the Central Bank of Brazil/SPB, <u>BCSul did not receive any amount for approximately 3 (three) months, whereas a considerable part the bodies returned the amounts withheld from the relevant employees owing, so that the competent authorities did not did not incur in embezzlement</u>.

149.  And the damage here does not consist only of the three months when the Bank did not receive. By maliciously preventing the customers from paying the installments of their contracts, the *longa manus* of FGC directly impacted the accounting of the provisions of these contracts, since BACEN Resolution 2.682/99, as amended from time to time, and which deals with the classification of the provisions for doubtful debtors, establishes that default on a tranche of the contract contaminates the classification of the entire contract, polluting the Bank's balance sheet, unduly and without ballast in reality.

150.  Thus, for instance, as in the case in question, if only one tranche was not paid for three months exclusively due to the incompetence of the trustee of FGC, this default forced the Bank <u>to provision 30% on the total value of the contracts</u>. In a simple calculation, 30% of R$ 750 million represent R$ 250 million.... This is the amount that the Bank was obliged to start to provision due to the exclusive incompetence (willful misconduct?) of the *longa manus* of FGC, Mr. Sergio Prates.

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA. To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case117507.8.26.0100 and code17896B8

GCM

Galdino . Coelho . Mendes
Advogados

151.   Worse than that: after three months without allowing the customers to settle two tranches, possibly they, the customers, gave up making up-to-date payments. In other words, the damage in ricochet caused by the irresponsibility of Mr. Sergio Prates (acting as puppet of FGC), by simply preventing receipt of the portfolio, it obliged the Bank to start to provision almost the entire portfolio...

152.   All of that is without talking about the potential collateral damage with the cancellation of the contracts with the paying sources (the so-called margin deregistration). The topic is particularly specific to the management of consigned credit portfolio. When one makes a consigned credit, the regulation allows only a certain discount margin per customer. Suppose it were 5% of the value received on payroll per customer. When a contract is annotated or registered on the "margin" of that customer, the relevant lending bank starts to occupy that space, that is, it fills the margin.

153.   As in the principle of classical mechanics that two bodies cannot occupy the same space at the same time, in consigned credit, two contracts cannot fill the same margin at the same time. Once the margin has been occupied, this prevents another bank from occupying it.

154.   Very well, the margins, therefore, are a very valuable asset of the consigned credit market. To have a deregistered margin means to denature the consigned credit contract (whose plus value lies in the robustness of the paying source and in the certainty that it will pay the wage/pension of that employee/customer of the bank) to convert it into simple personal credit, devoid of any guarantee. More than this: to have a deregistered margin means to generate a vacuum which, through its own nature, shall be inexorably filled by a competitor.

This document was filed on 14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA.
To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case 1117507-8.26.0100 and code1789BB8



155.   In short, with just one mess up, Mr. Sergio Prates prevented the receipt of R$ 750,000,000.00 by the Bank; possibly, obliged it to provision a huge part of its credits portfolio which before was clean; and, also, certainly generates innumerable losses margin of customers of the Bank.

156.   The damage is enormous and shall be quantified so that the defendants answer for it jointly.

157.   If only this were all, Your Honor.

*- Willful misconduct in raw state: the unexplainable sale of the credit card portfolio -*

158.   Not one of so many unexplainable acts, which generated damage to Banco Cruzeiro do Sul, one is worth of special emphasis by the boldness used to accomplish it. Not that the previous ones were not performed without total fearlessness of the law and of the activity of the police authorities, but what will report here makes even Camorra blush...

159.   In 2013, Mr. Sergio Prates, moved God knows why by which incentives, decided to dispose of the most valuable asset of the Bank its consigned credit card. He expressed his idea in an official letter addressed to the Central Bank of Brazil on 03.27.2013, where he requested an authorization to sell the portfolio, recording that [the] minimum value to be required in the auction is R$ 350 million. He uses as justification of the sale the fact that, "*as a result of the process of liquidation of Banco Cruzeiro do Sul, this portfolio has been deteriorating daily, by an increase in default*" [?!], lack of reciprocity and market action by other financial institutions" (emphasis added) (Doc. 53 attached).

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA
To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case1117507.8.26.0100 and code17896B8

Fls. 49

GCM

Galdino . Coelho . Mendes
Advogados

160.   On 04.22.2013, the ex-controllers of the Bank, Luis Octávio and Luis Felippe, having become aware by the press about the auction to sell the portfolio, requested some clarifications to the then trustee (Doc. 54). Among which the most relevant were the following:

1. Which elements led to the decision to dispose of said portfolio?

2. What is the present value of the portfolio to be auctioned, indicating the criteria and information used for said pricing?

3. Was the participation of the independent auditor in the pricing of the portfolio to be auctioned? If so:

3.1 Who would be the auditor have been?

3.2.What would the reason why the same was chosen (among others who worked in the same market?)

3.3. What would the technical requirements for the choice of the auditor have been?

4. What was the "economic rationale" to define the value of offers from R$ 350,000,000.00?"

161.   The answers to these questions came the following day 04.23.2013, and could not be more cynical. On that occasion, the trustee affirmed (Doc. 55):

"What led us to dispose of the "Consigned Credit Portfolio" was compliance with the Law of Extrajudicial liquidations - Law 6024/74 which aims [at] realizing assets to pay for liabilities. Additionally we will have a reduction in the operating cost of the bankrupt estate with extinction of the costs administrated relative to the portfolio of consigned credit portfolio.

[...]

The present value of the portfolio to be auctioned was based on the current "good" portfolio both as own portfolio and as FIDCs, which amounts to R$ 231.4 million [where he came up with this figure from nobody knows]

[...]

There was no participation by an independent auditor, there are no auditors hired by Banco Cruzeiro do Sul – In Extrajudicial Liquidation, having in view the precarious economic-financial condition of the Company with outstanding liabilities R$ 3.5 billion.

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA. To check the original, access the website http://esaj.tjsp.jus.br/esaj, inform the case117507.8.26.0100 and code17896B8

GCM

Galdino _ Coelho _ Mendes
Adrogados

[...]

The "economic rationale" to define the value of offers from R$ 350,000,000.00 was the sum of the "good" portfolio, mentioned above part of the portfolio comprised of "unpayable" assets of the defaulters, the register of inactive and active intangible assets without any intrinsic value for the bankrupt estate, but which can generate market value for the acquirer by means of strong market effort to recover these customers. Note that the trend observed in the last months of superlative escape of customers, motivated by offer by the other players, including, political initiatives to block consignments on payroll" (emphasis added).

162. In other terms, basically what the trustee said was: I'm selling because I want to and because it seems goof to me and for a price which, without any technical basis, seems to me to the best price. All of this, coupled with the confession that the portfolio has been badly managed (!!). Now, how badly managed, if since the RAET, the administration of the collection was under the responsibility of IMS, which was receiving around R$ 13 million per month for this? How badly managed if he was the trustee, with FGC and IMS, was responsible for this management?!?

163.   With these unbelievable "explanations", the consigned credit card portfolio is the sold for R$ 351,000,000.00 – only one million above the minimum price established - to Banco Pan Americano S.A. (Doc. 56].

164. Here, though in a brief note, one should (also) mention a smell of burning in this abrupt, unexpected and hasty decision to sell the asset, without audit, without a technical evaluation of adequate pricing methodology. By investigating the corporate records of a collection firm called Pancor Prestadora de Serviços Ltda. ("Pancor") one sees that, on 03.31.2011, Banco Panamericano S.A. was its only member. In its contractual amendment (Doc. 57), one can note, without any surprise, that who signs for Banco Panamericano, as attorney-in-fact, are Messrs. Celso Antunes and José Alfredo Lattaro:

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA
To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case1117507.8.26.0100 and code1789G8

Fls. 51

GCM

Galdino · Coelho · Mendes
Advogados

São Paulo, 31 de março de 2011.

Sócias retirantes:

*KARLA FARIAS DE LIMA*

Sócio ingressante:

BANCO PANAMERICANO S.A.
P. Celso Antunes da Costa
P. José Alfredo Lattaro

165. As the act dates back to 03. 31.2011, doubtless it should be confirmed in the current records if the list between Banco Panamericano, on the one hand, and Celso Antunes and José Alfredo Lattaro, on the other, remains. Well, a quick visit to the website of the Brazilian Federal Revenue Service allows one to confirm that, at least, to the tax authority, Mr. Celso Antunes still figures as the administrator of Panamericano (Doc. 58):

**Consulta Quadro de Sócios e Administradores - QSA**

CNPJ:                13.319.218/0001-55
NOME EMPRESARIAL: PANCOR PRESTADORA DE SERVICOS LTDA.
CAPITAL SOCIAL:      R$ 1.000,00 (Hum mil reais)

O Quadro de Sócios e Administradores(QSA) constante da base de dados do Cadastro Nacional da Pessoa Jurídica (CNPJ) é o seguinte:

| Nome/Nome Empresarial: | BANCO PAN S.A. | Qualif. Rep. Legal: | 05-Administrador |
|---|---|---|---|
| Qualificação: | 22-Sócio | Nome do Repres. Legal: | CELSO ANTUNES DA COSTA |

166. Now, Your Honor allows us, we will briefly recapitulate the story so as not to get lost in the train of thought:

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA
To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case1117507.8.26.0100 and code1789GB8

51

Fls. 52



(a)    Celso Antunes was the administrator of Banco Cruzeiro do Sul, at least formally until 09.14.2012;

(b)    He had shared this function, for three fateful months (from 06.04.2012 to 09.14.2012), with José Lattaro and Sergio Prates.

(c)    With them, he authorized, to hire the then small business IMS, whose partners were Felipe Cesarini and José Marcelo Brandão;

(d)    Cesarini had been the partner of Antunes in a Company called Interbank Soluções Tecnologia e Serviços Ltda ME;

(e)    Cesarini is still today a partner of said company;

(f)    Interbank and IMS, in addition to being the common partner (Cesarini), are still today in the same address in the same building in São Paulo: Av. Queiroz Filho, 1.700, Vila Hamburguesa, São Paulo, SP;

(g)    José Marcelo Brandão, before founding Interbank (whoops, IMS) had been the boss of the collection sector of Banco Panamericano (cf. Doc. 59 attached);

(h)    Celso Antunes has been since 2011 and is still today an administrator of Banco Panamericano, at least in matters related to a controlled company of that bank Pancor;

(i)    José Lattaro was also, at least during 2011, administrator of Banco Panamericano in matters related to Pancor;

(j)    As soon as IMS increased its fees against Cruzeiro do Sul, Lattaro's son started to work at the Company;

(k)    From 09.14.2012, with the decree of the liquidation of Banco Cruzeiro do Sul, Antunes and Lattaro left the Bank's administration, which started to be run by Sergio Prates;

(l)    For a little while, it is true that, five days later, on 09.19.2012, Prates appoints his very loyal friends and companions from FGC, Lattaro, Ivan Dumont and João Alberto as attorneys-in-fact, granting them powers to "[...] *operate checking accounts, sign checks, money orders, request checkbooks, DOCS [Credit Order Documents], endorse and sign checks to deposit in Grantor [...] sign correspondence, letters of guarantee, approve the blocking of shares, and sign all the documents necessary to fulfill said power of attorney*".

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA
To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case1117507.8.26.0100 and code17896B8

Fls. 53



(m)  In April 2013, Prates sells the portfolio of credit card consigned to the Banco Panamericano for an amount at least R$ 736 million below its actual valuation, without audit, without anything and with a very small premium of R$ 1 million on the amount offered.

(n)  The 2nd liquidator, Mr. Eduardo Bianchini, declares to the Federal Police that IMS had received a total of R$ 63,075,000.53 without evidence of an effective installment of the services, except for an apocryphal, damned insubstantiality report, which IMS did not have the necessary legal or technical qualification to prepare.

167.   Does it seem little? Well, there is more. There is always more...

168.   It has not been said yet, but in addition to selling the portfolio for a vile price, hastily, unexpectedly, without valuation and audit, Mr. Sergio Prates sold, as trustee of the Bank, a portfolio, a large part of which did not belong to the Bank, but instead to the FACB fund, the assignee of those credits in the scope of the ill-fated contract of organization of the fund in October 2011.

169.   Yes, the trustee sold in the Bank's name what no longer belonged to the Bank for some time. The situation generated more than mere embarrassment. After the bank's portfolio had been sold (together with an extensive amount of property – covenants, contracts, software, trademarks, cards and, also, loans already made, i.e., credit rights of the transactions in progress), FACB stopped receiving the flow of payments of those credits. Consequence? He started to provision part of a very significant portfolio that had been assigned to it, that is, it started to treat it as portfolio or worthless credits, which, as one know, is not true!

This document was filed on 14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA
To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case1117507.8.26.0100 and code1789BB8

Fls. 54



170.   More than that, after the third party property was sold, it was necessary to give them a word of explanation. And the ingenious way out already contemplated by the new trustee of Banco Cruzeiro do Sul, Mr. Eduardo Bianchini, was to close a large transaction between FACB, the fund manager, BEM DTVM, the custodian, Bank Bradesco S.A., FGC and Banco Cruzeiro do Sul (Doc. 60).

171.   The transaction consisted basically, on one side, of a resolution to assign the credits previously assigned by the Bank to FACB, which would generate a credit in favor of the Bank in the order of R$ 1,012,839,778.07; and, on the other, a request for redemption of quotas of the Bank at FACB with the consequent obligation that the Bank pad to the fund the amount of R$ 1,012,839,778.07. Credit and debit concentrated in the same periods, the amounts were cleared. And, as a consequence, the Bank was authorized to appropriate the product of the sale made to Panamericano proportionately to the credits, which would belong to FACB, i.e., in the amount of R$ 276,549,727.72 (cf. clause 1.3 of said transaction).

172.   Now, see Your Honor, the mathematics of the absurdity. The Bank exchanged a portfolio which was recorded in the accounts for R$ 1,012,839,778.07 into FACB for a credit of R$ 276,549,727.72. The negative balance of this account (R$ 736,290,050.35), as one can suppose, the Bank's loss...

173.   This value, it is good for one to say, represents only 80% of the values contained in the consigned credit card portfolio (those held by FACB). Using the same "logic" for the other 20% (with view to consider the 100% of credit rights which made up the portfolio), R$ 184,072,512.50 are added to this account.

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA
To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case117507.8.26.0100 and code17896B8

GCM

*Galdino . Coelho . Mendes*
*Advogados*

174.   And all of this, it is essential to repeat, considering <u>only</u> the credit rights. That is, without taking into account the entire monetary value corresponding to the structure of generation of wealth, to the set of organized property which would allow entering into new loan transactions, making profit possible... All of this, let one insist, was filched by the magic performed by Mr. Sergio Prates, as FGC's front man and trustee of Banco Cruzeiro do Sul.

CONCLUSION

*- Legal foundations to convict the defendants -*

175.   In view of all that was said above, and a lot was said, it seems undeniable that FGC, as trustee, and its agents, Celso Antunes, José Lattaro, Fabio Mentone and Sergio Prates, acted, now together now individually, in notorious violation and fragrant abuse of the law; with unequivocal conflict of interests; and, always, in order to obtain advantage for itself or another, at the cost of the shareholders' equity of Banco Cruzeiro do Sul.

176.   These acts, seen separately or together, characterize constant acting on the margin of the law, whether civil law (CC, articles 186, 187, 927 and 942), corporate law (articles 154, 155 158, caption, I and II, Paragraphs 1, 2 and 5) and reveal the purpose at times malicious at others negligent of looking after the interests of the institution, it being clear that all of them, to a greater or smaller extent, <u>substantiate the true cause of bankruptcy</u> and, for such reason, all the defendants, presently appointed, must answer jointly and severally for the losses caused to the Bank.

177.   As mentioned above, these two microsystems of liability, civil and corporate, fuse with each other in the vertex by article 82 of bankruptcy law. And it is precisely on this vertex that this action is supported.

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA.
To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case1117507.8.26.0100 and code17896B8

Fls. 56



*- Damages -*

178.   Only for the sake of reference, <u>the actual damages caused by the defendants can reach the full amount of the credits defaulted on by the Bank and which are present in the relationship between the creditors in the records of the bankruptcy proceedings</u>, as it was they, and only they, who were directly responsible for the acts which, in a relationship of adequate and direct causality, caused the bankruptcy of the Bank and of the other institutions associated to it.

179.   In any case, these actual damages shall not be smaller than the added amount of the (i) deterioration of the assets during the management of FGC and its agents (R$ 1,415,000,000.00); (ii) the amount paid to IMS in the course of the management of the defendants (R$ 63,075,000.53); and (iii) of the value of the loss verified as a result of the irregular sale or the portfolio of credits card (R$ 920,362,562.85). All these values are indicated here in historic figures, and there should be added to them the corresponding legal adjustments (default interest and monetary indexation).

180.   All this without prejudice to sentencing the ex-controllers to reimburse the Bank the loss of profits caused as a result of bankruptcy to be calculated in liquidation of sentence or, if this learned court deems it more convenient, in the course of production of evidence. And also without prejudice to ordering them to pay moral damages caused both to the Bank (damage to objective honor) and the ex-controllers, for having damaged their lives and destroyed, almost irreparably, their personal and business reputation.

<u>FREE LEGAL AID</u>

181.   As one knows, plaintiffs are now experiencing the worst moment in their history, which is similar in nothing to the might of former times. With the accumulation of almost endless creditors, debts to pay and frozen assets, the Bankrupted Party has its hands tied today even to pay for the cost of legal proceedings, even though this measure is critical to its future survival. Because of this, it is absolutely essential that it be granted free legal aid, pursuant to the terms set forth in articles 2, Sole Paragraph and Paragraph 4 of Law No. 1.060/1950.

This document was filed on 14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA. To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case1117507.8.26.0100 and code17896B8



182.   On the subject, this venerable Court of Justice of the State of São Paulo has already recorded that companies evidence that they are in a situation of bankruptcy, that they have no funds to bear legal costs and the emoluments, being entitled to free legal aid:

> "LEGAL ASSISTANCE – Legal entity – Bankrupt Estate - Concession - Admissibility <u>Bankrupt that, by its condition, it does not have economic-financial resources to bear with expenses of this nature, in addition to acting in the interest of the creditors, not only to its own advantage</u> – Appeal granted"[12]

> "Interlocutory appeal – legal assistance – individual entrepreneur - decree of bankruptcy – decision appealed that does not recognize the condition of bankrupt - documents attached non officially, however, gathered to other elements brought to this instrument, submit circumstantial evidence of what was alleged – <u>possibility of granting the benefit – Appeal granted</u>"[13].

183.   Thus, the Bankrupted Party trusts that Your Honor, recognizing the calamitous situation in which it lives today, plaintiffs, much in function of the facts reported above – shall defer the request for free legal aid, so that they do not have their fundamental right of access to justice usurped as a result of their current financial incapacity.

---

[12] AI 0339521-64.2009.8.26.0000, 7th Private Law Chamber, Reporter Associate Justice Alvaro Passos; j. 07.15.2009; DJe. 07.21.200 – emphasis added.

[13] AI 0066253-58.2009.8.26.0000, 24th Private Law Chamber, Reporter Associate Justice Castro Figliolia, j. 09.03.2009, DJe. 21.09.2009 – emphasis added.

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA To check the original, access the website http://esaj.trsp.ius.br/esaj, inform the case1117507.8.26.0100 and code1789688

184.   Secondarily, if not understood thus, what one contemplates only as an assumption, hereby requests that the amount due on account of legal costs be collected in a deferred way, only when the merits of the lawsuit are judged, based on article, II and the sole Paragraph of state law 11.608/2003. This deferment is, in fact, fully authorized by the case law of this venerable Court, of which the following precedents are highlighted:

"LEGAL COSTS – PROCEDURAL EXPENSES – Collection by the bankrupt party – Claim to defer free legal aid or deferred collection – Alternative request recognized – <u>Payment of judicial fee by appellant, if it comes out bankrupt in claim, after the assets are realized as a charge of bankrupt estate</u> (article 84 IV of Act 11.101/2005) –

Appeal granted for that" (emphasis added)

* * *

"Free legal aid – Debtor's motion to stay execution – In which case one infers from the documents attached that the appellant is, temporarily, in an economic situation which does not allow it to bear immediate collection of the judicial fee - Art. 5, IV, of State Law 11.608/2003 – <u>Collection of the judicial fee is deferred to the end of the lawsuit, if claimant is defeated</u> – Appeal partly granted" (emphasis added).

185.   Finally, even if one understands that even the deferment of payment does not apply to the case, an assumption put forward for argument's sake, the bankrupt party requests that ADJUD, the bankruptcy trustee, be summoned[14] to bear the costs of this lawsuit, <u>given that the results to be achieved in an eventual success shall be reverted to the bankrupt estate and its creditors</u>.

---

[14] The trustee is represented by Mr. Vânio César Pickler Aguiar and the address for service of process is Rua Araújo, No. 70, Conjunto 121, República, São Paulo, SP.

This document was filed on 14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case1117507.8.26.0100 and code17898B58

Fls. 59



## REQUESTS

186.   In view of all of the above, Banco Cruzeiro do Sul ask this learned Court to:

(a)   grant the benefit of free legal aid, pursuant to the terms above; or, if it does not consider it this way, the benefit to collect legal costs at the end, if this lawsuit is deemed groundless; or, to summon the learned bankruptcy trustee, ADJUD, in the person of its partner, Mr. Vânio César Pickler Aguiar, with address at Rua Araújo, No. 70, Conjunto 121, República, São Paulo, SP, to bear the strength of the bankrupt estate with the legal costs of this action, given that the results to be reached in eventual defeat will be reverted to the bankrupt estate and its creditors;

(b)   The summons of the defendants so that they come to the records to confess authorship and materiality of the facts narrated herein or, if they want to, to challenge the requests made herein;

(c)   On the merits, full acceptance of the lawsuit so that the defendants are, jointly and severally, sentenced to reimburse the damages caused to plaintiffs, indicated during this petition (especially indicated in Paragraph 178 to 180 above); which value may be adjusted (for more or less) in the course of the production of evidence or, if the Judge understands that it is more convenient, in an incident of liquidation of sentence, pursuant to article 475-A and subsequent of the Code of Civil Procedure; and which shall be paid, in the portion relative to the actual damages, by deposit at the disposal of the Judge of the bankruptcy to, if there are credits to be paid in the bankruptcy proceedings, that such funds be reverted directly to the creditors of Banco Cruzeiro do Sul, reverting only to plaintiffs

This document was filed on 14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA. To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case1117507.8.26.0100 and code17896B8

Fls. 60



(i)    that which is left over after all its creditors are paid, on account of reimbursement for actual damages; and (ii) the part of loss of profits  and moral damages to be arbitrated by this learned Court.

187.    Plaintiff protests for all the evidence admitted in the law.

188.   Plaintiff finally requests, observing article 39, I of the Civil Procedure, that all the summons relative to this action be made on behalf of the lawyer <u>JOÃO MENDES DE OLIVEIRA CASTRO</u>, registered at OAB/SP [Brazilian Bar Association/São Paulo section] under No. 346.829, with professional address at Av. Brigadeiro Faria Lima, No. 3900, 11º andar, Itaim Bibi, São Paulo, SP, under penalty of nullity (CPC, article 236, Paragraph 1).

The amount in controversy is R$ 2,405,362,562.85 for tax purposes.

\* \* \*

It is all that is stated and what is requested.

São Paulo, November 13, 2015

JOAO MENDES DE OLIVEIRA CASTRO                    RAFAEL PIMENTA
OAB/SP Nº 346.829                                             OAB/RJ Nº 142.307

ANDRÉ COATES FURQUIM WERNECK
OAB/RJ Nº 189.152

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA
To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case1117507.8.26.0100 and code17896B8

Fls. 61



Doc. 1    Power of attorney of the Bank granting powers to its lawyers.

Doc. 2    Incorporation documents of the Bank.

Doc. 3    Power of attorney of Luis Felippe Índio da Costa granting powers to his lawyers.

Doc. 4    Identity document of Luis Felippe Índio da Costa.

Doc. 5    Power of attorney of Luis Octávio Índio da Costa granting powers to his lawyers.

Doc. 6    Identity document of Luis Octávio Índio da Costa.

Doc. 7    Opening balance sheet of the RAET, published on 08.15.2012, but reflecting an alleged accounting situation 06.04.2012.

Doc. 8    Private instrument of Reciprocal of Obligations and Other Covenants, executed between FGC and Banco Cruzeiro do Sul.

Doc. 9    Email of FGC to Banco Cruzeiro do Sul, informing that it would not make the contribution as a result of the audit report.

Doc. 10    Evidence of TED for subscription of senior units of FACB.

Doc. 11    Complaint of provisional remedy of presentation of documents No. 1111305-41.2015.8.26.0100, currently in progress at the 36th Civil Court of this judicial court.

Doc. 12    Power of attorney granted to FGC on 06.02.2012.

Doc. 13    Material Fact informing the publication of Act PRESI No. 1.217, of 06.04.2012, decreeing the RAET and appointing the temporary trustee of FGC.

Doc. 14    Opinion PBGC No. 146/2012, opining on the possibility of FGC being appointed temporary administrator of the RAET.

Doc. 15    Transcription of the audio of the lecture, with the information that the credits assigned to FACB had been duly audited.

Doc. 16    Opinion of Prof. Eliseu Martins on the opening balance sheet prepared by FGC.

Doc. 17    Due diligence report of PwC at the time of administration of FGC.

This document was filed on 14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA. To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case1117507.8.26.0100 and code17896B8

Fls. 62



Doc. 18    Service Agreement executed between IMS Tecnologia e Serviços Ltda. ME and Banco Cruzeiro do Sul on 06.01.2012.

Doc. 19    Private Instrument of the 2nd Contractual Amendment of M7 Cobrança Ltda. ME.

Doc. 20    Minutes No. 01/2012 of Banco Cruzeiro do Sul, under the administration of FGC, on which one decided to hire PwC.

Doc. 21    Minutes No. 03/2012 of Banco Cruzeiro do Sul, under the administration of FGC, where one took as a consummated fact the hiring of IMS.

Doc. 22    Request for information to Federal Deputy Rubens Bueno and the answer of the Ministry of Finance reprimanding the conduct of Mr. Celso Antunes.

Doc. 23    Statement made by the BACEN's liquidations officer, Sidnei Marques, attesting to the growth of complaints in the period of management of the FGC/IMS management.

Doc. 24    Evaluation Report / Insubstantialities / Consigned Credit Portfolio Banco Cruzeiro do Sul, issued by IMS in July 2012.

Doc. 25    Letter of Luis Felipe Índio da Costa to the Trustee, Mr. Eduardo Bianchini, on 06.26.2014, asking for clarifications on the equipment returned by IMS.

Doc. 26    Official Letter LIQ/BCSul 0018/2015, of 02.05.2015, in which the then trustee, Eduardo Bianchini, affirms that there were no documents evidencing provision of services by IMS, only such apocryphal insubstantialities report.

Doc. 27    Answer of Mr. Eduardo Bianchini to Mr. Luis Felipe Índio da Costa, affirming that the computers were returned "formatted" (read, with the relevant deleted memories).

Doc. 28    Official Letter LIQ/BCSul-300/2013, of 11.25.2013, in which Mr. Eduardo Bianchini affirms that, during the RAET, the exchange of the security Company caused the "loss" of control of the physical records and documents of the Bank.

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA. To check the original, access the website http://esaj.tjsp.jus.br/esaj, inform the case1117507.8.26.0100 and code17896B8

Fls. 63

GCM

Galdino . Coelho . Mendes
Adrogados

| Doc. 29 | Official Letter BCSul/229-2014, of 09.04.2014, in which Mr. Eduardo Bianchini confirms that the "loss" of the entire control of the physical records and documents of the Bank occurred during the administration of FGC. |
|---|---|
| Doc. 30 | Copy of the opening ordinance of IPL No. 0379/2014-11-SR/DPF/SP. |
| Doc. 31 | Copy of the article of the periodical Revista Época on the hiring and activity of IMS. |
| Doc. 32 | Minutes No. 02/2012 of Banco Cruzeiro do Sul, of 06.05.2012. |
| Doc. 33 | Minutes No. 04/2012 of Banco Cruzeiro do Sul, of 06.07.2012. |
| Doc. 34 | Minutes No. 05/2012 of Banco Cruzeiro do Sul, of 06.11.2012. |
| Doc. 35 | Minutes No. 06/2012 of Banco Cruzeiro do Sul, of 06.11.2012. |
| Doc. 36 | Minutes No. 07/2012 of Banco Cruzeiro do Sul, of 06.11.2012. |
| Doc. 37 | Minutes No. 08/2012 of Banco Cruzeiro do Sul, of 06.04.2012. |
| Doc. 38 | Minutes No. 09/2012 of Banco Cruzeiro do Sul, of 06.05.2012. |
| Doc. 39 | Minutes No. 10/2012 of Banco Cruzeiro do Sul, of 06.06.2012. |
| Doc. 40 | Minutes No. 11/2012 of Banco Cruzeiro do Sul, of 06.06.2012. |
| Doc. 41 | Minutes No. 12/2012 of Banco Cruzeiro do Sul, of 06.06.2012. |
| Doc. 42 | Minutes No. 13/2012 of Banco Cruzeiro do Sul, of 06.11.2012. |
| Doc. 43 | Minutes No. 14/2012 of Banco Cruzeiro do Sul, of 06.12.2012. |
| Doc. 44 | Minutes No. 15/2012 of Banco Cruzeiro do Sul, of 06.18.2012. |
| Doc. 45 | Minutes No. 16/2012 of Banco Cruzeiro do Sul, of 07.16.2012. |
| Doc. 46 | Minutes No. 17/2012 of Banco Cruzeiro do Sul, of 08.10.2012. |
| Doc. 47 | Minutes No. 18/2012 of Banco Cruzeiro do Sul, of 07.09.2012. |
| Doc. 48 | Acts PRESI No. 1.230, 1.231, 1.232, 1.233, 1.234 and 1.235, of 09.14.2012, by which Mr. Sergio Prates was appointed trustee of the Bank. |
| Doc.49 | Power of attorney of Sergio Prates to the executives of FGC, of 09.19.2012. |
| Doc. 50 | Power of attorney of Sergio Prates to the other executives of FGC of 12.18.2012. |
| Doc. 51 | Balance sheet published by the trustee Sergio Prates, pointing to outstanding liabilities of R$ 3.652 billion. |
| Doc. 52 | Petition of the Trustee on pages 130/133 of the bankruptcy records. |

This document was filed on14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA. To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case1117507.8.26.0100 and code17896B8



Doc. 53    Official Letter LIQ/BCSUL 141/2013, of 03.27.2013, in which the trustee requests authorization to dispose of the credits card portfolio of the Bank.

Doc. 54    Letter of the ex-controllers of the Bank, Luis Octávio and Luis Felippe, requesting clarifications on the sale of the portfolio of the consigned credit card portfolio, sent on 04.22.2013.

Doc. 55    Official Letter LIQ/BCSUL 147/2013, of 04.23.2013, with the answers to the questions formulated by Luis Octávio and Luis Felippe.

Doc. 56    Official Letter LIQ/BCSUL 148/2013, of 05.03.2013, in which the trustee informs to BACEN the result from the sale of the consigned credit card portfolio.

Doc. 57    Instrument of contractual alteration of Pancor, of 03.31.2011.

Doc. 58    Taxpayer identification number card CNPJ with the indication of the trustees of Pancor and its members.

Doc. 59    Articles of Revista Época, of 08.16.2013, "The new scandal in the bankruptcy of Banco Cruzeiro do Sul".

Doc. 60    Instrument of Transaction between FACB, the trustee of the fund, BEM DTVM, the custodian, Bank Bradesco S.A., FGC and Banco Cruzeiro do Sul on the sale of the consigned credit card portfolio.

* * *

This document was filed on 14/11/2015 at 00:24, it is a copy of the original digitally signed by the Court of Justice of São Paulo and RAFAEL BARUD CASQUEIRAPIMENTA. To check the original, access the website http://esaj.trsp.jus.br/esaj, inform the case1117507.8.26.0100 and code17896B8

# DECLARATION EXHIBIT 4

**TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO**
COMARCA DE SÃO PAULO
FORO CENTRAL CÍVEL
2ª VARA DE FALÊNCIAS E RECUPERAÇÕES JUDICIAIS
Praça João Mendes s/nº, Salas 1813/1815 - 18º andar, Centro - CEP 01501-900,
Fone: (11) 2171-6506, São Paulo-SP - E-mail: sp2falencias@tjsp.jus.br

---

**CONCLUSÃO**

Em 05 de fevereiro de 2019 faço estes autos conclusos ao MM.
Juiz de Direito da 2ª Vara de Falências e Recuperações Judiciais, Dr. PAULO FURTADO DE
OLIVEIRA FILHO. Eu, Helena Mendes Vieira, Assistente Judiciário, *subscrevi*.

**DECISÃO**

---

Processo nº:          **1117505-64.2015.8.26.0100**
Classe - Assunto      **Procedimento Comum - Responsabilidade Civil**
Requerente:           **Banco Cruzeiro do Sul S/A**
Requerido:            **Fundo Garantidor de Crédito - Fgc e outros**

Juiz(a) de Direito: Dr(a). **PAULO FURTADO DE OLIVEIRA FILHO**

Vistos.

**1 - Fls. 2274/2293**: O autor requer reunião deste processo com outras 2
ações de responsabilidade ajuizadas pelo Ministério Público, nº
0031335-77.2013.8.26.0100 e 0031093-21.2013.8.26.0100, respectivamente contra os ex-
controladores do Banco Cruzeiro do Sul e do Cruzeiro do Sul Holding Financeira S/A.
Trata-se, a seu ver, de ações conexas, que recomenda instrução probatória una e decisão
conjunta, para evitar conflito de decisões isoladas. Anota que, nos autos do processo
0031335-77.2013.8.26.0100, tal pedido havia sido indeferido, principalmente porque este
processo estava ainda em fase inicial, mas que, atualmente, todos os processos encontram-
se em fase instrutória. Além disso, naqueles autos já foi determinada a realização de
perícia contábil, podendo a mesma prova ser aqui utilizada, sem mais ônus financeiro ao
falido ou à massa.

O administrador judicial já havia se manifestado nos seguintes termos, no
processo n. nº 0031335-77.2013.8.26.0100:



Processo nº 1117505-64.2015.8.26.0100 - p. 1

site documento é cópia do original, assinado digitalmente por PAULO FURTADO DE OLIVEIRA FILHO, liberado nos autos em 18/02/2019 às 10:00 .



**TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO**
COMARCA DE SÃO PAULO
FORO CENTRAL CÍVEL
2ª VARA DE FALÊNCIAS E RECUPERAÇÕES JUDICIAIS
Praça João Mendes s/nº, Salas 1813/1815 - 18º andar, Centro - CEP 01501-900,
Fone: (11) 2171-6506, São Paulo-SP - E-mail: sp2falencias@tjsp.jus.br

"É cediço que existem 3 (três) Ações de Responsabilidade Civil que envolvem os ex-diretores e administradores da Massa Falida:

" A presente Ação de Responsabilidade Civil nº 0031335-77.2013.8.26.0100, proposta pelo Ministério Público em face dos falidos, a qual tem como objetivo a condenação dos réus ao pagamento dos prejuízos apurados em regular inquérito, por atos danosos praticados na gestão da sociedade, considerando o período de abrangência de 04/06/2007 à 04/06/2012.

" Ação de Responsabilidade Civil nº 1117505-64.2015.8.26.0100, proposta pelos falidos em face do Fundo Garantidor de Crédito e Outros, a qual tem como objetivo a condenação dos réus em ressarcir em prol da massa falida os prejuízos causados quando estiveram à frente da administração do Banco Cruzeiro do Sul (período entre 04/06/2012 e 14/09/2012) .

" Ação de Responsabilidade Civil nº 0031093- 21.2016.8.26.0100, proposta pelo Ministério Público em face dos falidos, a qual tem como objetivo a condenação dos réus ao pagamento dos prejuízos decorrentes dos atos danosos praticados na gestão da sociedade, considerando o período de abrangência de 04/06/2007 à 04/06/2012.

O objeto dessas 3 ações é auferir a responsabilidade pelos prejuízos e danos causados à Massa e a terceiros, no período em que os ex-diretores e administradores estiveram à frente da administração do Banco. Para tanto, muito embora os períodos de administração em que os atos ilícitos/fraudes sejam distintos, o intuito de cada processo é comprovar através dos atos dos - até então -, responsáveis pelo Banco Cruzeiro do Sul, as ilicitudes perpetradas, bem como a parcela de culpa de cada um. Desta forma, sob este ângulo, vê-se que não há óbices para deferir a perícia conjunta das ações de modo a buscar a redução de custo..."

De fato, nas três demandas há o mesmo pedido de responsabilização de ex-controladores e ex-administradores, estatutários ou nomeados na fase do RAET e da liquidação extrajudicial. Embora os pedidos de indenização sejam relativos a períodos distintos de gestão, a perícia que foi deferida na outra ação e que deverá ser realizada neste

ste documento é cópia do original, assinado digitalmente por PAULO FURTADO DE OLIVEIRA FILHO, liberado nos autos em 18/02/2019 às 10:00 .

**Processo nº 1117505-64.2015.8.26.0100 - p. 2**

**TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO**
COMARCA DE SÃO PAULO
FORO CENTRAL CÍVEL
2ª VARA DE FALÊNCIAS E RECUPERAÇÕES JUDICIAIS
Praça João Mendes s/nº, Salas 1813/1815 - 18º andar, Centro - CEP 01501-900,
Fone: (11) 2171-6506, São Paulo-SP - E-mail: sp2falencias@tjsp.jus.br

processo impõe-se seja realizada por mesmo profissional, evitando-se duplicidade de custos. Além disso, a análise por um único julgador permitirá a formação de um convencimento abrangente e uniforme a respeito das questões litigiosas, evitando-se decisões contraditórias. Há risco de que em uma outra ação atribua-se responsabilidade exclusivamente a ex-diretores, enquanto nesta ação poderá ser decidido que eles não foram responsáveis pois os fatos atribuídos aos réus desta ação é que levaram o banco à falência. As inconsistências contábeis que se alegam nesta ação, por sua vez, também constituem ponto controvertido da outra ação, em que se apura o prejuízo, tudo a recomendar a instrução e o julgamento por um único juiz.

Pelo exposto, acolho o pedido do autor e determino a reunião deste processo com outras 2 ações de responsabilidade ajuizadas pelo Ministério Público, nº 0031335-77.2013.8.26.0100 e 0031093-21.2013.8.26.0100, respectivamente contra os ex-controladores do Banco Cruzeiro do Sul e do Cruzeiro do Sul Holding Financeira.

2 - **Fls. 2443/2454 e 2545/2556**: Os embargos de declaração serão apreciados após o cumprimento do item 1.

Int.

São Paulo, 05 de fevereiro de 2019.

DOCUMENTO ASSINADO DIGITALMENTE NOS TERMOS DA LEI 11.419/2006, CONFORME IMPRESSÃO À MARGEM DIREITA

ste documento é cópia do original, assinado digitalmente por PAULO FURTADO DE OLIVEIRA FILHO, liberado nos autos em 18/02/2019 às 10:00 .

**TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO**
(Justice Court of the State of São Paulo)
COMARCA DE SÃO PAULO
(District Court of São Paulo)
FORO CENTRAL CÍVEL
(Central Civil Courts)
2ª VARA DE FALÊNCIAS E RECUPERAÇÕES JUDICIAIS
(2nd Court of Bankruptcy and Judicial Recovery)
Address: Praça João Mendes s/nº, Salas 1813/1815 - 18º andar, Centro - CEP 01501-900,
Tel.: (11) 2171-6506, São Paulo-SP - E-mail: sp2falencias@tjsp.jus.br

---

**CONCLUSION**

On February 5, 2019 I am submitting these complete records to the Hon. Judge of the 2nd Court of

Bankruptcy and Judicial Recovery JUDGE PAULO FURTADO DE

OLIVEIRA FILHO.

I, Helena Mendes Vieira, Assistant Court Clerk, have signed it

**DECISION**

---

Case no.:                          **1117505-64.2015.8.26.0100**
Class – Subject             **Normal Procedures – Civil Liability**
Plaintiff:                          **Banco Cruzeiro do Sul S/A**
Defendant:                      **Fundo Garantidor de Crédito - Fgc and others**

The Honorable Judge: Dr. **PAULO FURTADO DE OLIVEIRA FILHO**


Case records examined.


**1 - Pp 2274/2293**: The plaintiff requests to have this suit joined to 2 other civil liability suits filed by the Public Prosecution Office and numbered 0031335-77.2013.8.26.0100 and 0031093-21.2013.8.26.0100, respectively, against the former controlling shareholders of Banco Cruzeiro do Sul and of Cruzeiro do Sul Holding Financeira S/A. The plaintiff claims there is a link between these suits and, therefore, a single evidentiary hearing and a joint decision is advisable, in order to prevent conflicts that may arise from separate rulings. It states that on the records of case 0031335-77.2013.8.26.0100 this request was denied, mainly because said suit was still in its initial phase; currently, however, all cases have reached the evidentiary phase. Moreover, on said records an expert accounting report has already been determined and said evidence may be used here without further financial burden being incurred by the bankrupt party or the bankruptcy estate.

Case number 1117505-64.2015.8.26.0100 - p. 1

9

The appointed bankruptcy trustee had already issued a statement on the records of case no. 0031335-77.2013.8.26.0100, as follows:

"It is well known that there are three (3) Civil Liability Suits involving the former directors and managers of the bankruptcy estate:

" This present Civil Liability Suit no. 0031335-77.2013.8.26.0100, filed by the Public Prosecution Office against the bankrupt parties, which claims the defendants must be sentenced to pay for the losses, assessed in a regular investigation, resulting from civil torts committed while they were managing the corporation, considering the period between June 4, 2007 to June 4, 2012.

" Civil Liability Suit no. 1117505-64.2015.8.26.0100, filed by the bankrupt parties against Fundo Garantidor de Crédito (Credit Guarantee Fund) and Others, claiming, on behalf of the bankrupt estate, reimbursement by the defendants of the loses they have caused while heading the management of Banco Cruzeiro do Sul (period between June 4, 2012 and September 14, 2012) .

" Civil Liability Suit no. 0031093- 21.2016.8.26.0100, filed by the Public Prosecution Office on behalf of the bankrupt parties, claiming payment by the defendants of the losses arising out of the civil torts committed while the defendants were managing the corporation, considering the period June 4, 2007 to June 4, 2012.

The object of these suits is the assignment of liability for the losses and damages inflicted to the Bankrupt Estate and third parties in the period the former directors and managers were heading the Management of the Bank. To this end, despite the fact that the management periods in which the unlawful acts/frauds were committed are distinct, the objective of each suit is to prove the unlawful deeds perpetrated on grounds of the actions of the parties that were then answering for Banco Cruzeiro do Sul, as well as the assessment of the share of guilt of each one. Hence, from this viewpoint, there are no impediments to the acceptance of a joint expert report for the suits with the purpose of minimizing costs..."

In effect, the three suits contain the same the same claim that the former controlling shareholders and managers, whether by statute or appointed in the RAET (Special and Temporary Management Regime – Regime de Administração Especial Temporária) and extrajudicial liquidation phase, must be found liable. Although the indemnification claims are related to distinct management periods, the expert report granted in the other suit, and which should also be carried out in this suit must be performed by the same expert thus avoiding overlapping costs. Furthermore, assessment by a single expert will enable the establishment of comprehensive and uniform assumptions on the litigation issues, thus preventing contradictory decisions. The risk exists that in one of the other suits the liability may be solely assigned to the former directors, while in this suit it may be decided that they are not liable, once the facts for which the defendants of this suit are charged have actually led the bank to bankruptcy. On their turn, the accounting inconsistencies claimed in this suit constitute a subject of controversy in the other suit where losses are assessed point to the need to have a single judge presiding over the discovery and the trial phases.

For the reasons presented above, I accept the request submitted by the plaintiff and order this suit to be joined to the other 2 liability suits filed by the Public Prosecution Office and numbered 0031335-77.2013.8.26.0100 and 0031093-21.2013.8.26.0100, respectively, against the former controlling shareholders of Banco Cruzeiro do Sul and Cruzeiro do Sul Holding Financeira.

Case number 1117505-64.2015.8.26.0100 - p. 1

2 - **Pp. 2443/2454 and 2545/2556**: The motions for clarification shall be examined once the requirements of item 1 are complied with.

Notify

São Paulo February 5, 2019.

| DOCUMENT DIGITALLY SIGNED UNDER PROVISIONS OF LAW 11.419/2006, AS STATED ON THE RIGHT MARGIN |
|---|

[Right margin]

This document is a copy of the original, digitally signed by PAULO FURTADO DE OLIVEIRA FILHO, released on the records on February 2, 2019 at 10:00 am.

To check the original, you should access https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, enter case number 1117505-64.2015.8.26.0100 and code 67B7F94.

# DECLARATION EXHIBIT 5

fls.1

*Galdino Coelho Mendes*

| | | | |
|---|---|---|---|
| Flavio Galdino | Diogo Rezende de Almeida | Vanessa F. F. Rodrigues | Bruno Duarte Santos |
| Sergio Coelho | Renata Jordão Natacci | Renato Alves | Luiza Nasser S. Rodrigues |
| João Mendes de O. Castro | José Eduardo G. Barros | Gabriela Matta Ristow | Tomás de S. G. Martins Costa |
| Rodrigo Candido de Oliveira | Danilo Palinkas | Diogo Vinicius Moriki Silva | Júlia Leal Danziger |
| Eduardo Takemi Kataoka | Felipe Brandão | Carlos Brantes | Jéssica Simões de Toledo |
| Cristina Biancastelli | Adrianna Chambô Eiger | Milene Pimentel Moreno | João Paulo Accioly Novello |
| Gustavo Salgueiro | Lia Stephanie S. Pompili | Ivana Harter | Flávio de Mello A. Ferreira |
| Rafael Pimenta | Mauro Teixeira de Faria | Maria Carolina Bichara | Maria Luiza de Souza |
| Isabel Picot França | André Furquim Werneck | Aline da Silva Gomes | Jacques Felipe A. Rubens |
| Marcelo Atherino | Wallace Corbo | Fernanda Rocha David | Camila Silva de Almeida |
| Marta Alves | Isadora A. R. de Almeida | Amanda Torres Hollerbach | Maria Eduarda Gamborgi |
| Cláudia Maziteli Trindade | Gustavo Klein Soares | Maria Flávia J. F. Macarini | |
| Pedro C. da Veiga Murgel | Julianne Zanconato | Camilla Carvalho de Oliveira | |
| Gabriel Rocha Barreto | Rodrigo Saraiva P. Garcia | Isabela Rampini Esteves | |

**HONORABLE JUDGE OF THE 2ⁿᵈ COURT OF COURT-SUPERVISED REORGANIZATION AND BANRKUPTCY OF THE CENTRAL CIVIL VENUE OF THE JUDICIAL DISTRICT OF THE CAPITAL OF THE STATE OF SÃO PAULO**


Distribution by dependence:

Case No. 1071548-40.2015.8.26.0100

       **LUIS FELIPPE ÍNDIO DA COSTA** ("**Luis Felippe**"). Brazilian, consensually separated, lawyer, holder of ID Card No. 912.072-6-IFP/RJ, taxpayer identification number CPF/MF 006.034.067-34, residing at Estrada da Gávea, No. 127, Gávea, Rio de Janeiro, RJ; and **LUIS OCTÁVIO AZEREDO LOPES ÍNDIO DA COSTA ("Luis Octávio")**, Brazilian, consensually separate, holder of ID Card 4.452.434-6, issued by IFP/RJ, CPF/MF No. 782.474.977-00, residing at Estrada do Embú, 1550, Jardim Torino, Cotia, SP, come before Your Honor, through their undersigned lawyers, to file, based on articles 130 and subsequent of Law No. 11.101/2005, this


**BANRKUPTCY REVOCATION ACTION**

against (1) **FUNDO GARANTIDOR DE CRÉDITO** ("**FGC**"), a non-profit association, taxpayer identification number CNPJ/MF 00.954.288/0001-33, created by Resolution No. 2.197/1995, of the Central Bank of Brazil ("BACEN"), and currently regulated by BACEN Resolution No. 4.222/2013, with registered office at Av. Brigadeiro Faria

This document is a copy of the original, digitally signed by JOAO MENDES DE OLIVEIRA CASTRO and Court of Justice of the State of São Paulo, recorded on 12/07/2017 at 21:11, under No. 10682628320178260100. To check the original, access the website http://esaj.tjsp.jus.br/pastadigital/pg/abrirconferenciaDocumento.do, inform Case No. 1068262-83.2017.8.26.0100 and code No. 3417EBB

fls.2

Lima, 201, 12° andar, Pinheiros, 05426-100; (2) **IMS TECNOLOGIA E SERVIÇOS LTDA.**, a limited business company, taxpayer identification number CNPJ/MF 3.778.765/0001-07 and (3) **IMS COBRANÇA E SERVIÇOS LTDA.**, a limited business company, CNPJ/MF No. 10.694.146/0001-38 (both referred to collectively as "IMS"), both with registered office at Av. Queiroz Filho, No. 1700, 5°-A, Conjunto 504/505, São Paulo, SP, because the first defendant, in the capacity of manager of Banco Cruzeiro do Sul S.A. ("Bank" or "Bankrupt Party"), engaged IMS, which, through a succession of frauds, caused damage amounting to hundreds of millions reais to the Bank. Plaintiffs also request the summons of the BANKRUPT ESTATE OF BANCO CRUZEIRO DO SUL S.A. ("Bankrupt Estate"), in the person of his trustee, Oreste Nestor de Souza Laspro, registered at OAB/SP [Brazilian Bar Association – São Paulo Section] under No.; 98.628, with address at Rua Major Quedinho, 111, 18° andar, andar, Consolação, São Paulo, SP, CEP 01050-030, to, it wishes to do so, submit a challenged, or, as it is expected, join this action as Plaintiff in this claim, as assistant joint party.

* * *

This document is a copy of the original, digitally signed by JOAO MENDES DE OLIVEIRA CASTRO and Court of Justice of the State of São Paulo, recorded on 12/07/2017 at 21:11, under No. 10682628320178260100. To check the original, access the website http://esaj.tjsp.jus.br/pastadigital/pg/abrirconferenciaDocumento.do, inform Case No. 1068262-83.2017.8.26.0100 and code No. 3417EBB.

fls.3

## TABLE OF CONTENTS

THIS LAWSUIT IN A PARAGRAPH.................................................................................................4

UNEQUIVOCAL APPLICABILITY AND LEGITIMACY.................................................................4

PLANNED FRAUD .........................................................................................................................6

IMS AND ITS AWKWARD ORIGIN .............................................................................................12

PROFESSIONAL LARCENY BY FRAUD ....................................................................................16

SUPPRESSING THE EVIDENCE OF THE CRIME .....................................................................21

FORCED CONFUSION OF PROPERTY .....................................................................................24

URGENT PRESENTATION...........................................................................................................25

FREE LEGAL AID.........................................................................................................................27

CONCLUSION AND REQUESTS ................................................................................................27

LIST OF DOCUMENTS SUPPORTING THE ACTION ...............................................................30

* * *

This document is a copy of the original, digitally signed by JOAO MENDES DE OLIVEIRA CASTRO and Court of Justice of the State of São Paulo, recorded on 12/07/2017 at 21:11, under No. 1068262832017826010.0. To check the original, access the website http://esaj.tjsp.jus.br/pastadigital/pg/abrirconferenciaDocumento.do, inform Case No. 1068262-83.2017.8.26.0100 and code No. 3417EBB



fls.4

### THIS LAWSUIT IN A PARAGRAPH

1.      This lawsuit has three core objectives. <u>First,</u> render ineffective in relation to the bankrupt estate and its creditors hiring IMS to provide services of management of portfolio of credits and supply of software license to Bank Cruzeiro do Sul still in the period of RAET. <u>Second,</u> render ineffective om relation to the bankrupt estate and its creditors the legal acts performed by IMS in the core of said contracting, especially said report stating that the consigned credit contracts do not subsist, whose issuance was a determinant factor for the subsequent decree of bankruptcy of the institution. And, <u>third,</u> to obtain from all those who participated, directly or indirectly, in retaining IMS and the fraudulent services "provided" by it, the corresponding indemnity for the losses sustained by the Bank as a result of that malicious activity.

### UNEQUIVOCAL APPLICABILITY AND LEGITIMACY

2.      This action is filed based on article 130 of Law 11.101/2005. The provision states that *"are revocable the acts performed with the intention of causing damage to the creditors, evidencing the <u>fraudulent collusion</u> between the <u>debtor and the third party</u> who contracts with it <u>and the effective loss </u>sustained by the bankrupt estate".*

3.      The case covered herein and now addressed contains an academic example of the type of fraud which the law seeks to see reversed with the revocation suit. That is, administrators of the Bank hired a dummy corporation, led by an ex-partner of those administrators, to provide "a service" which was later found never to have been provided. Thereby, <u>the Bank's cash has lost almost R$ 100 million</u>.

4.      There was a hiring, the subjective element *(consilium fraudis)* was present and there was unequivocal damage to the bankrupt estate, calculated both based on what was effectively paid by the Bank to IMS and on what one effectively suffered as a result of filing for bankruptcy without purpose or justification.

This document is a copy of the original, digitally signed by JOAO MENDES DE OLIVEIRA CASTRO and Court of Justice of the State of São Paulo, recorded on 12/07/2017 at 21:11, under No. 106826283201782601100. To check the original, access the website http://esaj.tjsp.jus.br/pastadigital/pg/abrirconferenciaDocumento.do, inform Case No. 1068262-83.2017.8.26.0100 and code No. 3417EBB

fls.5

5        Therefore, it is unchallengeable that revocation action in the case is appropriate.

6        In addition to the legal measure being appropriate, plaintiffs are absolutely legitimate parties to file it. In effect, article 132 of the Bankruptcy Law establishes that the trustee, any creditor – without distinction of class or nature of the credit – and the Federal Prosecutor's plaintiffs are legitimate parties to file this type of action. It is, therefore, by exercising this option that plaintiffs come to court, as both are creditors of the Bankrupt Estate, in the class of subordinated credits (cf. Doc. 1).

7. Not only plaintiffs have ex *vi legis* legitimacy to file this action, but all the defendants participated, even if in different ways, in the acts and facts which fall under the legal assumptions of deeds liable to be revoked -0 it being established also that this action is filed within the triennial term counted from the decree, as provided by article 132.

8. By the way, talking about term, not only is the action filed within the statutory limitation period, but also the facts denounced herein and whose declaration of ineffectiveness is required justify processing of the action. This is because, precisely, in order to prevent the consolidation of damages arising out of fraud, the legislator did not restrict the scope of the revocation action to a certain period prior to the bankruptcy. To this effect:

> "Here, it is irrelevant when it was committed, close or far from the decree of bankruptcy, it sufficing for ineffectiveness in connection with the bankrupt estate to demonstrate that the bankrupt party or the legal representative of the bankrupt Company and the third contracting party committed fraud, with the intention of causing loss to the creditors or frustrating the objectives of the bankruptcy."[1]

9        These are cases provided in article 133 of the Bankruptcy Law, which, clearly, allows for filing the revocation action against: (i) those who figured in the act or who, by effect thereof were paid, guaranteed or who benefited from it; (ii) the acquiring third parties, if they were aware, when creating the right, of the debtor's intention to cause loss to the creditors; and (iii) against the heirs and legatees of the persons who fall under the two assumptions above.

---

[1] FÁBIO ULHOA COELHO, Comentários à Lei de Falências, Saraiva, 2011, p.470.

This document is a copy of the original, digitally signed by JOAO MENDES DE OLIVEIRA CASTRO and Court of Justice of the State of São Paulo, recorded on 12/07/2017 at 21:11, under No. 10682628320178260100. To check the original, access the website http://esaj.tjsp.jus.br/pastadigital/pg/abrirconferenciaDocumento.do, inform Case No. 1068262-83.2017.8.26.0100 and code No. 3417EBB

10      Very well. Although the involvement of each of the defendants in question will be described in greater detail in the following pages, it suffices to say, to allow for a perfunctory analysis of the passive legitimacy of each of them, that the first five defendant were the administrators of the Bank responsible for hiring the sixth defendant, vehicle of the promotion of fraud  conducted by the last five defendants, who were direct beneficiaries of stratagem denounced herein.

11.      Therefore, the appropriateness of this revocation action and of the legitimacy of plaintiffs to file and of the defendants to answer it is unequivocal.

### PLANNED FRAUD

12.      The facts described in these pages can be traced back to the period from 2011 to 2015. They begin in the second semester of 2011, when Banco Cruzeiro do Sul still functioned without external interventions, fully enjoying its financial and operating capacities. At that time, the Bank and the first defendant, FGC, had, in addition to the natural insurance relationship that the fund had with all the national financial institutions, a contractual relationship.

13.      This is because, on 10.21.2011, as a result of pressure by FGC [ "Fundo Garantidor de Crédito" – Credit Guarantee Fund], the Bank executed with the fund, a contract referred to as Private Instrument of Reciprocal Assumption of Obligations and Other Covenants (cf. Doc. 2), through which the parties, the Bank and FGC, undertook to constitute a fund of credit rights, FACB, formed from the assignment of a consigned credit portfolio of the Bank to the fund and at the same time, from bimonthly subscriptions, in cash, of senior units by FGC.

This document is a copy of the original, digitally signed by JOAO MENDES DE OLIVEIRA CASTRO and Court of Justice of the State of São Paulo, recorded on 12/07/2017 at 21:11, under No. 10682628320178260100. To check the original, access the website http://esaj.tjsp.jus.br/pastadigital/pg/abrirconferenciaDocumento.do, inform Case No. 1068262-83.2017.8.26.0100 and code No. 3417EBB

fls.7

14      The reason, which permeated the legal business was to allow the Bank to use the money of the subscriptions made by FGC to redeem its own units (paid up with the assignment of the credits portfolio) and use the redemption value to settle its obligations expressed in forward deposit bonds with special guarantee – the so-called "DPGEs"2 ["Depósito a Prazo com Garantia Especial" – Term Deposit with Special Guarantee] – and external debt bonds.

15.     The total value of the senior units which would be issued for the benefit of FGC was R$ 3,583,000,000.00 (three billion, five hundred and eighty-three million reais), exactly the same value that the Bank had to pay on account of DPGE and external debt. At the end of the subscription and paying up period, set forth to occur by 12.01.2013, the Bank should have liquidated all of its outstanding balance of DPGEs.

16.     Open brackets here to emphasize that the transaction was not a graciousness of FGC toward the Bank. It is that, as the DPGEs were deposits guaranteed by FGC up to the limit of R$ 20,000,000.00 (twenty million reais)3, by encouraging and stimulating the settlement of the DPGEs into an exchange for senior units of FIDC, FGC was, at the end, benefiting: it left a position in which it figured as mere insurer of deposits to become a member of a fund that held a portfolio of credits plus four billion reais. In other words, it stopped being its insurer to become a senior member of a fund with an expressively profitable credit portfolio.

17.     It was in that context and with that purpose that, towards the end of 2011, FACB was constituted, an acronym which corresponded to the initials of the then executive officer of FGC, A̲ntônio C̲arlos B̲ueno.

---

2 " The DPGE is a fixed income security which represents a forward deposit created to help financial institutions – commercial banks; multiple, development and investment banks; in addition to credit, financing and investment companies, as well as saving banks – of small and medium size to raise funds. Thus, it grants to its holder a credit right against the issuer". Available at: https://www.cetip.com.br/captacao-bancaria/dpge#sthash.UgIqeUA4.dpuf

3 BACEN Resolution No. 3.692/2009, article 2: "The total credits of each person against the same institution associated to FGC, or against all the associated institutions of the same financial conglomerate, relative to the forward deposits with special guarantee of FGC, contemplated in article 1, will be guaranteed up to the maximum value of R$20,000,000.00 (twenty million reais)" (emphasis added).

This document is a copy of the original, digitally signed by JOAO MENDES DE OLIVEIRA CASTRO and Court of Justice of the State of São Paulo, recorded on 12/07/2017 at 21:11, under No. 1068262832017826010. To check the original, access the website http://esaj.tjsp.jus.br/pastadigital/pg/abrirconferenciaDocumento.do, inform Case No. 1068262-83.2017.8.26.0100 and code No. 3417EBB

fls.8

18.      Very well, <u>the Bank's credits subscribed in FACB were duly selected and audited by FGC</u>. Thus, this audit having been conducted and the credits selected, in November 2011, FACB issued 436,620 units, fully subscribed by FGC. The paying up, in turn, would occur in two-monthly subscriptions, in accordance with the schedule stipulated in the contract of constitution itself. The first of these subscriptions, made by FGC to FACB was of R$ 438,895,813.02, in cash.

19.      At the same time, FACB issued subordinated units, which were fully subscribed by Bank Cruzeiro do Sul which, in exchange, contributed to FACB, upon assignment of part of its credits portfolio, <u>R$ 4.480 billion</u> (in accordance with Clause 2.1.1 of the Contract. As mentioned, from that date, the schedule indicated as Exhibit B to the Contract established a subscription/paying up every two months by FGC, on the following dates and values:



20.      In December 2011, FGC subscribed 189,260 units, substantiating a subscription of R$ 191,754,062.41. In April, 2012, a new subscription of R$ 506,734,343.26 is made by FGC, covering the subscription obligations of February and April [4]-[5].

21.      But, on <u>06.01.2012</u>, on which date a significant portion of senior units should have been paid up by FGC, of <u>R$ 190,675,021.02</u>, in accordance with the schedule stipulated by the parties, the Bank received, by email (cf. Doc. 3), communication from FGC affirming that it would not pay that portion, given that the audit conducted by FGC — through KPMG — in the FACB Fund had not been concluded (?!).

22.      See the incongruence: <u>the receivables contributed by the Bank to FACB had already been chosen (and audited) by FGC</u>. And, even if the Contract provided in its Clause 2.2.4 that "[the] *subscriptions and paying in shall always be preceded by external audit by KPMG Independent Auditors, that it shall provide a report attesting to the facts that the Receivable had been paid in full*", it is fact that one <u>business day after</u> having affirmed it had not received said report, FGC effectively subscribed the units, in the amount of R$ 202,343,292.70 (cf. Doc. 4).

---

[4] All the values are available on www.sistemas.cvm.gov.br/, contained in the monthly information sent by the manager of FACB to CVM [the Brazilian Securities and Exchange Commission].

[5] The small differences between the par values and the values effectively subscribed result from the interest applied to each of the subscriptions.

This document is a copy of the original, digitally signed by JOAO MENDES DE OLIVEIRA CASTRO and Court of Justice of the State of São Paulo, recorded on 12/07/2017 at 21:11, under No. 1068262832017826100.
To check the original, access the website http://esaj.tjsp.jus.br/pastadigital/pg/abrirconferenciaDocumento.do, inform Case No. 1068262-83.2017.8.26.0100 and code No. 3417EBB

fls.9

23.    Unfortunately, what before was an unpleasant suspicion, became reality with the result of the provisional remedy to display documents No. 1111305-41.2015.8.26.0100, in which KPMG and, to one's amazement, FGC itself confessed that such audit report rejecting the Bank's credits effectively never existed (cf. Doc. 5 and Doc. 6).

24.    As soon as it informed the Bank on Friday, 06.01.2012, that it would not make the contribution incumbent upon it, on account of such report – which had never existed —, FGC called the plaintiffs on the following day, at the time the controller of Cruzeiro do Sul, at its registered office. There, it advised that as early as the following Monday, the Bank would open it under one of the intervention systems of the Central Bank of Brazil.

This document is a copy of the original, digitally signed by JOAO MENDES DE OLIVEIRA CASTRO and Court of Justice of the State of São Paulo, recorded on 12/07/2017 at 21:11, under No. 106826283201178260100. To check the original, access the website http://esaj.tjsp.jus.br/pastadigital/pg/abrirconferenciaDocumento.do, inform Case No. 1068262-83.2017.8.26.0100 and code No. 3417EBB



fls.10

25.     With the then owners of the Bank morally knocked out by the two successive items of tragic news, it was the propitious time for the extortion. And it happened on that eerie Saturday in the form an "offer": the directors of the Holding Company that controlled the Bank (in other words, the plaintiffs) would give, there and then, a power of attorney to FGC so that it could sell the Bank at any price, and <u>FGC would obtain the decree of the Special Temporary Administration System from the Central Bank of Brazil, instead of the out-of-court liquidation — which intervention is much more aggressive[6] —, being afterwards appointed trustee</u>.

26.     Forced, the administrators, granted such power of attorney (cf. <u>Doc. 7</u>) and, on the following Monday, the Bank opened already under the RAET system, with FGC as administrator (cf. Doc. 8).

27.     Already as administrator, FGC contributes to FACB the tranche of <u>R$ 202,343,292.70</u> (and already mentioned, cf. Doc. 4). That same tranche, which, one business day before, he had already affirmed that he would not pay up as a result of the absence of an audit report attesting to the quality of the credits — which report, it was later found out, never existed.

28.     If the credit were good enough to permit the contribution (with or without an audit report) why then was this not done on the appropriate date?

---

[6] "The temporary special administration (RAET – "Regime de Administração Temporária") is a type of intervention, which does not interrupt nor suspend the Company's regular activities, its main effect being the loss of the power of attorney of the directors of the institution and their substitution by steering committee appointed by the Central Bank of Brazil, with full powers of management. It also has limited duration in time and its chief objective is to take measures aimed at resumption of the institution's regular activities. When this is not possible, it can be transformed into out-of-court intervention or liquidation.

Out-of-court liquidation is a more serious and final measure. It is intended to promote the Company's winding up when there are signs of irrecoverable insolvency or when violations of the standards that regulate the institution's activity are committed. Its aim is to promote the sale of the existing assets to pay creditors, with the return of eventual surplus to the controllers or its liability for the outstanding liabilities".

In: http://www.bcb.gov.br/htms/livrosfn.asp?idpai=ARTREGESP

This document is a copy of the original, digitally signed by JOAO MENDES DE OLIVEIRA CASTRO and Court of Justice of the State of São Paulo, recorded on 12/07/2017 at 21:11, under No. 10682628320178260100. To check the original, access the website http://esaj.tjsp.jus.br/pastadigital/ng/abrirconferenciaDocumento.do, inform Case No. 1068262-83.2017.8.26.0100 and code No. 3417EBB

29.      The answer to this question does not seem to be other than that, in the depraved plan of taking of the Bank, it was necessary to create a factoid to justify and confer some degree of credibility to the justification for the decree of RAET.

30.      The history closes with the evidence of premeditation of the plan by FGC. One day before informing the then controllers of the Bank that it would not make the contribution of approximately R$ 200 million, more precisely on 05.31.2012, FGC had already received from the Office of the Procurator of the Central Bank of Brazil an opinion to the effect that *"[...] FGC can be validly appointed by the Central Bank of Brazil to conduct the RAET imposed on the institution insured by it*". (cf. Doc. 9).

31.      To increase the sadism contained in this mockery, it should be recorded that, on 06.05.2015, in a lecture recorded to investors (and whose audio was duly transcribed — cf. Doc. 10), FGC affirmed the following: "[...] *we have a FIDC, already prepared with the bank* [...] *where we have a portfolio received from the bank in this FIDC, which has already been audited by the Fund; therefore, this FIDC consists of quality assets within the regular market standards*".

32.      Yes, four days after the Bank went bankrupt, defaulting on the contribution of R$ 200 million based on an alleged lack of audit of the receivables, FGC goes to the public to say that "*this FIDC* [sic] *consists of quality assets within the regular market standards*".

33.      Thus, who needs enemies when one has FGC next to one?

34.      In addition to the fraud engendered to assume the management of the Bank, FGC and its officers also hired accomplices (ex-partners) as service providers, at obviously inflated prices, to confer some air of legality to the "*tunga*" [robery]. The "technology" is the same that today has been unveiled in criminal proceedings which are in the agenda of national politics (the so-called operations *Zelotes*, Carwash and *Calicute*).

This document is a copy of the original, digitally signed by JOAO MENDES DE OLIVEIRA CASTRO and Court of Justice of the State of São Paulo, recorded on 12/07/2017 at 21:11, under No. 10682628320178260100.
To check the original, access the website http://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, inform Case No. 1068262-83.2017.8.26.0100 and code No. 3417EBB

## IMS AND ITS AWKWARD ORIGIN

35.    It was then, in this scenario, as with FGC at the front of the Bank, that the sixth defendant appears. Better, in fact, it was already prepared to serve as a vehicle to accomplish the fraud well before FGC took the Bank's administration. In fact, see the curious sequence of events put in the timeline below, so that even before plaintiffs had made comments about it, the reader could draw its own conclusions:

| DATE | FACT |
|------|------|
| 06.01.2012 | FGC, attributing to itself the role of administrator of Bank Cruzeiro do Sul, executes a contract with a company referred to as IMS TECNOLOGIA E SERVIÇOS LTDA. so that it provides services to the Bank (cf. Doc. 11) There sign, for the Bank, Fabio Mentone and Celso Antunes, officers of FGC. |
| 06.04.2012 | Four days after execution of the contract, BACEN decrees the intervention in Banco Cruzeiro do Sul, in the form of RAET, and appoints FGC to administrate it (cf. Doc. 8). |
| 06.01.2012 | Eleven days after the execution of the contract, a company called until then M7 Cobrança Ltda. changes its corporate name to IMS TECNOLOGIA E SERVIÇOS LTDA. (cf. Doc. 12). |

36.    Although the table above is self-explanatory, these are the facts that demonstrate how the Bank's life — unfortunately — was affected by the sixth defendant, IMS.

37.    On 06.01.2012 — on the same date on which it informed the ex-controllers of Banco Cruzeiro do Sul that it would not contribute the R$ 200 million which it had committed to do in accordance with the contract for organization of FACB, and days before the decree of RAET —, FGC, on behalf of Bank Cruzeiro do Sul, had engaged a company which was then called M7 Cobrança Ltda. – ME. The purpose of the contract were *"services of (i) management of financial assets, involving the procedures of supply of technological infrastructure and data processing; and (iii)* [sic, (ii)] *of license of use and maintenance of software specialized in the management of financial assets ("Services")"* (emphasis added).

This document is a copy of the original, digitally signed by JOAO MENDES DE OLIVEIRA CASTRO and Court of Justice of the State of São Paulo, recorded on 12/07/2017 at 21:11, under No. 1068262832017826100. To check the original, access the website http://esaj.tjsp.jus.br/pastadigital/pg/abrirconferenciaDocumento.do, inform Case No. 1068262-83.2017.8.26.0100 and code No. 3417EBB



38.     A few bewilderments come from this fact, which, in a first approach, would be apparently simple. The first of them is that, before RAET was decreed and before it was appointed manager of Banco Cruzeiro do Sul, FGC, claiming a premature, premonitory and <u>illegal</u> function of administrator of the Bank (?!), executed (even without powers to do so) a contract in the name of the Bank.

39.     The second is that, by acting notoriously *ultra vires*, FGC — represented then by its officers Celso Antunes and Fabio Mentone, who would come later (guess) to be invested as officers of the Bank —hired a <u>recently organized</u> small business, <u>without employees</u>, <u>with capital stock of R$1,000.00,</u><u>with no expertise or experience in the market</u>, to manage a credit portfolio of billions of reais from a Bank with more than fifteen years operation and thousands of contracts in the market.

40.     The third bewilderment, which equally reveals the illegality of FGC's attitude is that, at the time of the contracting, the Company hired was still called M7 Cobrança Ltda. ("<u>M7</u>"), but curiously the contract makes reference to the Company IMS Tecnologia e Serviços Ltda.

41.     <u>That is to say, even before the partners of M7 decided on the change of name (cf. Doc. 12), FGC already knew the "new name" of its contractor</u>. Was it possible for FGC to know what the new name of the Company would be? The answer is here, where it can be deemed the fourth bewilderment derived from said contracting: <u>the Company IMS belonged to an ex-partner of one of the executive officers of FGC, Celso Antunes</u> — precisely one of those who were signing in the name of Bank (even without having powers to do so) to hire the Company.

42.     Before joining FGC, Celso had been a partner of Felipe Cesarini in the Company Interbank. It is not a coincidence that, <u>shortly after M7 changed its name to IMS, Cesarini (ex-partner of Antunes) joins IMS</u>.

This document is a copy of the original, digitally signed by JOAO MENDES DE OLIVEIRA CASTRO and Court of Justice of the State of São Paulo, recorded on 12/07/2017 at 21:11, under No. 10682628320178260100. To check the original, access the website http://esaj.tjsp.jus.br/pastadigital/pg/abrirconferenciaDocumento.do, inform Case No. 1068262-83.2017.8.26.0100 and code No. 3417EBB

43.    The fifth bewilderment is that, to hire said Company, the new management of Bank Cruzeiro do Sul (read Celso Antunes, Lattaro and Mentone) decided only on <u>06.07.2012</u>. In other words, although it had already hired IMS (<u>without a bid and without any type of competition</u>!) on 06.01.2012, only on 06.07.2012 did the Bank "resolves" on hiring said Company...

44.    The sixth bewilderment (not to lose counting) is that while other service providers (law offices, audit firms and firms that provided financial advisory services) were chosen through minimally competitive services, among names of weight in the national and international market, IMS was hired <u>before the decree of RAET</u>, <u>without a bid, without a competitive process, and without any names of weight in the sector being considered</u>.

45.    See the great difference between the minutes in which the contracting of PwC and IMS (cf. Doc. 13 e Doc. 14) were approved:

> "<u>Description</u>:
> Choice and contracting of the audit Company to validate the adjustments to be made in the Opening Balance Sheet.
> <u>Points discussed and Comments</u>:
> Identification of the audit companies which could perform the work.
> Considering that KPMG was an audit of the Bank until December 2011 and that Ernest Young is the current audit firm, there remained as an alternative PriceWaterhouseCoopers – PwC and Deloitte.
>
> <u>Definition</u>:
> <u>Having in view the fact that two of the largest audit firms were involved with Banco Cruzeiro do Sul (ErnestYoung and KPMG) and the recent involvement of Deloitte in the episode of Banco Panamericano, the alternative was PwC</u>. This alternative is healthy having in view PwC's experience, it the validation of the adjustments made in that Bank, one chose to hire it to develop the work, under the coordination of Mr. Edson Arisa, even though he was a professional who coordinated the works performed in Banco Panamericano.
> <u>Celso Antunes will provide a contact and the contracting</u>" (emphasis added).

This document is a copy of the original, digitally signed by JOAO MENDES DE OLIVEIRA CASTRO and Court of Justice of the State of São Paulo, recorded on 12/07/2017 at 21:11, under No. 10682628320178260100. To check the original, access the website http://esaj.tjsp.jus.br/pastadigital/pg/abrirconferenciaDocumento.do, inform Case No. 1068262-83.2017.8.26.0100 and code No. 3417EBB

fls.15

GCM

* * *

Definition:
The two work fronts were approved, one being under the coordination of Mr. Lattaro to promote the internal surveys and the second of the Company IMS to perform the survey by reverse engineering.
The coordination of the works of the two teams shall be exercised by an external Projects office to be hired.
José Lattaro shall provide the hiring of the Companies who will work in the process" (emphasis added).

46.    See, PwC is hired for other internal accounting services as a result of *"two of the largest audit firms being involved with Bank Cruzeiro do Sul (Ernest Young and KPMG) and Deloitte's recent involvement in the episode of Banco Panamericano, there remained PwC as the alternative. This alternative is healthy having in view PwC 's experience in the validation of the adjustments verified in that Bank* [...]".

47.    It would even be grotesque to image what would be the justification of hiring IMS, if there were any. It would be something like: considering that it is a Company without experience in the field, considering that it is a small business with capital stock of R$ 1,000.00, without employees, but that relies on an ex-partner of the Bank's administrator, one has it that it is the best to perform the service, waiving thus eventual competition proceedings...

48.    The situation was so outlandish that, from a request for information formulated by the then Federal Deputy Rubens Bueno, the Treasury Minister answered the following year to the effect that: "*In view of said technical report presented, said Officer of this Government Agency issued an order on March 31, 2014, in which he considered "reproachable and censurable the conduct of Mr. Celso Antunes* [...]  *because it omitted or disregarded a situation that, even though restricted to past facts, of a private nature, could lead to a perception of conflict of interest* (cf. Doc. 15).

This document is a copy of the original, digitally signed by JOAO MENDES DE OLIVEIRA CASTRO and Court of Justice of the State of São Paulo, recorded on 12/07/2017 at 21:11, under No. 10682628320178260100.
To check the original, access the website http://esaj.tjsp.jus.br/pastadigital/pg/abrirconferenciaDocumento.do, inform Case No. 1068262-83.2017.8.26.0100 and code No. 3417EBB

49.     Worse than that, during the management of FGC/IMS,  Banco Cruzeiro do Sul, as recognized by the very director of liquidations of BACEN (Sidnei Marques – cf. Doc. 16), saw the number of complaints from customers against the institution triple. In other words, on top of all that, IMS managed recklessly the credits portfolio.

## PROFESSIONAL LARCENY WITH FRAUD

50.     Were it not enough for all the fakeness put together by the new administration, its apex was still to come. One has already said above that IMS was hired with a limited scope of activity: (i) to manage the credits portfolio; and (ii) supply a license of use and the maintenance of software specialized in the management of financial assets.

51.     However, at the end, tis backyard company issued a report referred to as *"Assessment Report / Insubstantiality / Consigned Credit Portfolio Banco Cruzeiro do Sul"* (cf. Doc. 17) — which was, and continues to be, the essence, an <u>a specific audit report, on a certain asset of the Bank</u> —, in which it would have attested to the insubstantiality of R$ 1,388,363,016.77 in credits of the Bank.

52.     Amazing: a small business, without a qualified technical body, organized months before the organization, <u>without registration as an external auditor with *Comissão de Valores Mobiliários*</u> [the Brazilian Securities & Exchange Commission, without accountants in its staff, hired for a specific scope of activity, ended up affirming that approximately R$ 1.3 billion in credits of the Bank would actually be rotten credits.

53.     Amazing again: such insubstantial report, used by BACEN as foundation for the decree of out-of-court liquidation of the Bank, <u>is simply not signed</u>. It is absolutely apocryphal, containing only the logo of IMS!

54.     What experience IMS has in identifying and verifying "frauds" in credits portfolios? What is the qualification and what are the credentials  of who would have produced the report? How would it be possible for IMS to issue an insubstantial credit report, opining for its risk rating, <u>without the corresponding record of external auditor with CVM</u>?

This document is a copy of the original, digitally signed by JOAO MENDES DE OLIVEIRA CASTRO and Court of Justice of the State of São Paulo, recorded on 12/07/2017 at 21:11, under No. 1068262832017826.
To check the original, access the website http://esaj.tjsp.jus.br/pastadigital/pg/abrirconferenciaDocumento.do, inform Case No. 1068262-83.2017.8.26.0100 and code No. 3417EBB

55.      In fact and incidentally, BACEN Resolution 2.682/99, which covers the criteria and procedures for credit risk rating in the scope of the financial market, establishes in article 12, that "[the] *independent auditor must prepare a substantiated report of review of the criteria adopted by the institution with respect to risk rating in the levels of risk and assessment level as of the provisioning recorded in the financial statements.*"

56.      Let one repeat, how could IMS, a small business, without registration of external auditor in the applicable law, issue an opinion (opinion?) on the insubstantiality of credits held by Banco Cruzeiro do Sul. That is, how could it arrogate to itself the task of producing what the same referred to as "*Assessment report of consigned credit portfolio of Banco Cruzeiro do Sul*", in which "*the work's main objective would be to identify insubstantial transactions*"?

57.      One does not know the answer to all these questions, merely because there is no answer— at least not within the realms of the law.

58.      Add to this, also, as mentioned above, IMS was also hired to "*supply technological infrastructure and data processing*", as well as to supply "*license of use and maintenance of software specializes in the management of financial assets*".

59.      However, from the analysis of the articles of incorporation of the Company, one sees well at the time of contracting, the corporate purpose of the recently-created Company was "*collection activities and registration of information*" (cf. Doc. 12). After hired by FGC and its officers, already with the Bank submitted to RAET, more precisely on 06.25.2012, IMS changes its corporate purpose to (cf. Doc. 18):

This document is a copy of the original, digitally signed by JOAO MENDES DE OLIVEIRA CASTRO and Court of Justice of the State of São Paulo, recorded on 12/07/2017 at 21:11, under No. 10682628320178260100. To check the original, access the website http://esaj.tjsp.jus.br/pastadigital/pg/abrirconferenciaDocumento.do, inform Case No. 1068262-83.2017.8.26.0100 and code No. 3417EBB

fls.18

**CLÁUSULA QUINTA – OBJETO SOCIAL**

A sociedade terá por objeto social as atividades de prestação de serviços de informática, desenvolvimento e produção de sistemas (software), elaboração de programas de computadores (software), prestação de serviços de cobrança extrajudicial, editoração eletrônica, digitação de dados, serviços de escritório, triagem de documentos e elaboração de trabalhos via internet na área de informática, exceto atividades que dependem de inscrição em órgãos ou conselhos de classe.

**CLAUSE 5- CORPORATE PURPOSE**

The corporate purpose of the Company shall be the provision of computing services, development and production of software, preparation of software programs, provision of services of out-of-court collection, electronic editing, typing of data, office services, screening of documents and preparation of works on the internet in the IT area, except activities, which depend on registration in class entities or class councils.

----------------------------------------------------------------------------------------------------------------------

60.    One extracts two logical conclusions from that information. On the one hand, it is glaring that IMS did not have any expertise in the IT area and, after it was hired, to give an air of legitimacy to the dodging, it changed its corporate purpose, manufacturing this expertise on paper — a paper allows everything. On the other hand, one notices, with even greater clarity, the challenge of preparation of the insubstantiality report.

61.    Now, if even upon fabricating the new specialization of the new Company, its members did not even put in its corporate purpose that it was specialized in auditing and credit portfolios analysis, what one sees is that, strictly, who declared the insubstantiality of a consigned credits portfolio in almost R$ 1.5 billion was, at the end, an IT company …

62.    See, in this respect, that if, on the one hand, FGC violate its own bylaws by assuming the management of the Bank — although that corporate act prohibits the Fund from acting as an administrator of public functions, even if by delegation —, on the other, IMS violated its articles of incorporation by producing its audit accounting report declaring the insubstantiality of the credit portfolio.

63.    As one already said, IMS was not registered with CVM as an external auditor. What was not said is the relevance of this point. Therefore, it should be recalled that Banco Cruzeiro do Sul, when it decreed RAET, was a joint stock Company, with its shares traded in the stock exchange — being, as a result of the provisions of article 8 of Law 6.385/76, submitted to that entity's inspection.

64.    Therefore, finding itself under the direct inspection of CVM, it was incumbent upon the Bank to fulfill the provisions and normative regulations of the government entity, among them, the need to hire an <u>audit company duly registered with CVM</u>. And it is obvious that an IT Company was not  qualified enough to be registered with CVM.

This document is a copy of the original, digitally signed by JOAO MENDES DE OLIVEIRA CASTRO and Court of Justice of the State of São Paulo, recorded on 12/07/2017 at 21:11, under No. 1068262832017826 0100. To check the original, access the website http://esaj.tjsp.jus.br/pastadigital/pg/abrirconferenciaDocumento.do, inform Case No. 1068262-83.2017.8.26.0100 and code No. 3417EBB

65.      Especially because, to obtain the registration, IMS should "*be registered in the Civil Register of Legal Entities, as a civil Company, <u>organized exclusively to provide professional audit services and other services inherent to the accounting profession</u>*", content of article 4, I of CVM Instruction No. 308/1999.

66.      Taking advantage of the occasion, let one say that, in addition to not being registered with CVM as an independent audit Company for the provision of services to companies, IMS was not even registered with the Regional Accounting Council [*Conselho Regional de Contabilidade]* ("<u>CRC</u>"), nor with the Federal Accounting Council [*Conselho Federal de Contabilidade*] ("<u>CFC</u>"). Article 15 of Law 9.295/1946, which regulates the professional of accountant and the accounting activity:

> "The individuals, firms, companies, associations and enterprises in general, and its branches, who perform or exploit, in any way, technical accounting services, or at their charge, have any section intended to this, <u>can only execute the relevant services, after they prove, before the Accounting Boards, that those in charge of the technical part are professionals exclusively qualified and registered pursuant to the law.</u>
>
> Sole paragraph – The substitution of the professionals oblige the new evidence by the entities to which this article refers."

67.      Not being duly accredited with these bodies, they could never have produced the audit report of consigned credit contracts, as regardless of the violations of the laws and rules which regulate the activity, it injured its own articles of incorporation, which expressly prohibited the development of activities "*which depend on registration in class bodies or entities*".

68.      Nor should one say that the work performed did not have the nature of audit. With respect to this, it is convenient to consult article 25 of the same standard, which provides on technical work affected to accountants, one sees, in section <u>c</u>, that it is an exclusive activity of accountants the "<u>*revision*</u> *of balance sheets and <u>accounts in general</u>*".

This document is a copy of the original, digitally signed by JOAO MENDES DE OLIVEIRA CASTRO and Court of Justice of the State of São Paulo, recorded on 12/07/2017 at 21:11, under No. 10682628320178260100.
To check the original, access the website http://esaj.tjsp.jus.br/pastadigital/pg/abrirconferenciaDocumento.do, inform Case No. 1068262-83.2017.8.26.0100 and code No. 3417EBB

69.    Now, the auditing of consigned credit contracts constitutes, in essence, the <u>revision of accounts</u> <u>receivable</u> that the Bank has with its customers. And, in line with this, IMS in fact meddle in the accounting-financial analysis of contracts; see (Doc. 17):

> Esse processo apontou um grupo de convênios que de forma sistemática mantinham informações constantes e sem ocorrências normais nos andamentos de uma carteira desse tipo.
>
> Além do comportamento observado nas movimentações de pagamentos obtivemos também o perfil da movimentação de novos contratos, efetuando-se mais uma reversão, dessa vez em todos os contratos em aberto desde sua data de cadastramento e liberações, onde se constatou as mesmas características observadas nos pagamentos.
>
> Além das constatações técnicas e comportamentais de toda a movimentação desses convênios obtivemos a comprovação de sua insubsistência com a inexistência de qualquer base financeira para essas operações e nem os possíveis movimentos de pagamentos enviados pelos órgãos conveniados.
>
> Toda a movimentação para geração de operações foi estabelecida a partir de dezembro de 2006, e era mantida até hoje, mantendo uma média de carteira da ordem de R$ 1.600.000.000,00 conforme constante do anexo I.

This process indicated a group of covenants which, in a systematic way, maintained constant information and without normal occurrences in the progresses of a portfolio of this type.

In addition to the behavior observed in the turnovers of payments, we also obtained the profile of the movement of new contracts, making one more reversal, this time in all outstanding contracts, since the date of their registration and releases, where one found the same characteristics noticed in payments.

In addition to the technical and behavioral verifications of all the turnover of these covenants, we obtained evidence of their insubstantiality, with the inexistence of any financial basis for these transactions or movements of payments sent by the accredited bodies.

The entire movement for the generation of operations was established from December 2006, and was maintained until today, keeping an average portfolio in the order of R$ 1,600,000,000.00, as set forth in exhibit I.

COMPANY SUMMARY QTY. OF CONTRACTS. VALUE

|  | EMPRESA | RESUMO QTD.CONTRATOS | VALOR R$ |
|---|---|---|---|
| 9 | JAVIC | 89.400 | 222.710.166,92 |
| 16 | AMBRA | 75.192 | 293.315.616,50 |
| 33 | ASSOC.Balc.24 | 77.873 | 223.919.776,27 |
| 35 | SAÚDE | 78.280 | 232.452.202,45 |
| 36 | REZENDE | 63.901 | 199.291.570,37 |
| 37 | TRÊS CORAÇÕES. | 65.366 | 200.520.062,20 |
| 39 | COMAR | 66.499 | 202.971.526,37 |
| 41 | UNID. CENTRO | 69.868 | 203.864.797,77 |
| 42 | BASE MILITAR | 70.870 | 206.737.901,95 |
| | TOTAIS | 657.249 | 1.985.783.620,80 |

This document is a copy of the original, digitally signed by JOAO MENDES DE OLIVEIRA CASTRO and Court of Justice of the State of São Paulo, recorded on 12/07/2017 at 21:11, under No. 1068262832017826100. To check the original, access the website http://esaj.tjsp.jus.br/pastadigital/pg/abrirconferenciaDocumento.do, inform Case No. 1068262-83.2017.8.26.0100 and code No. 3417EBB

fls.21

70.      Now, if this does not mean an auditing activity, one should asks then what it would mean. A backyard company processes data and credit contract information of a financial institution activity, with shares traded in the stock Exchange, (allegedly analyzing) the flow of financial turnover in these transactions and reaches the conclusion on the need to of accounting write-off of said assets.

71.      And is this still not an exclusive external auditing activity?!

72.      In short, these considerations reveal a double illegal act in the contracting. By FGC and its officers, who, while performing their job as administrators of an open Company, violated the provisions of CVM and CFC, hiring a backyard firm, allegedly specialized in IT services for the provision of accounting services (!)

73.      For IMS and its officers, for performing actual and professional larceny by fraud, performing illegally the activity of external auditor, providing services to an institution listed in the stock exchange without the due qualification, which could, in fact, characterize the crime characterized in article 10 of the Law of Crimes Against the National Financial System, i.e., "*causing to insert a false element required by the legislation, in financial statements of a financial institution*".

74.      Perhaps it was because of this that nobody wanted to sign the report …

<u>DELETING THE EVIDENCE OF THE CRIME</u>

75.      When concluding his work (from new to that for which it had not been contracted), IMS — read, the ex-partner of Celso Antunes — insisted in deleting the memory of all the computers of the Bank where the data "analyzed" by it were…

76.      It is exactly this which one is reading. Were the suspicious contracting not enough, the performance of a job without experience and appropriate technical qualification, the issuance of an apocryphal report, IMS still deleted the entire databased of the Banco

This document is a copy of the original, digitally signed by JOAO MENDES DE OLIVEIRA CASTRO and Court of Justice of the State of São Paulo, recorded on 12/07/2017 at 21:11, under No. 10682628320178260100.
To check the original, access the website http://esaj.tjsp.jus.br/pastadigital/pg/abrirconferenciaDocumento.do, inform Case No. 1068262-83.2017.8.26.0100 and code No. 3417EBB

fls.22

Cruzeiro do Sul, preventing one from auditing the material which was analyzed by it.

77.    Check in this respect the letter sent on 06.26.2014 by the ex-accountant of the Bank, Mr. Luis Felipe Índio  da Costa, to the then trustee, Mr. Eduardo Bianchini (cf. Doc. 19), and the answer, attesting to the malicious attitude of said dummy corporation (cf. Doc. 20):

> "Dear Sir,
> Having received your answer to my request for information in connection with the quantity and quality of information which was on the computers when they were returned by IMS Tecnologia e Serviços Ltda., a request set forth in my letter of April 9 last, I ask you kindly to clarify if the equipment was returned formatted, that is, if they came without the information which was found in the same at the time of their delivery to said IMS.
> This information is necessary as a complement to the clarifications requested. Truly yours,
> Luis Felipe Indio da Costa" (emphasis added).

> * * *

> "Honorable Mr. LUIS FELIPPE INDIO DA COSTA

> Dear Sir,
> With respect to your letter of 6.26.2014, in which you request to us clarifications about the IT equipment, which, in the property of this Liquidating Party, were returned by the Company IMS TECENOLOCIA E SERVICOS LTDA, we have to inform the following:
> a) With respect to the Servers – considering a total of 11 (eleven) pieces of equipment, such items were returned totally formatted;
> b)  With respect to Computers (PCs) – considering a total 230 (two hundred and thirty) pieces of equipment, it was found that 196 (one hundred and ninety-six) were returned fully formatted and 03 (three) had defects in the relevant HDs, upon their return;
> c) With respect to the "Note Books" – considering a total of 02 (two) of them, such items were returned totally formatted. Truly yours," (emphasis added).

This document is a copy of the original, digitally signed by JOAO MENDES DE OLIVEIRA CASTRO and Court of Justice of the State of São Paulo, recorded on 12/07/2017 at 21:11, under No. 10682628320178260100.
To check the original, access the website http://esaj.tjsp.jus.br/pastadigital/pg/abrirconferenciaDocumento.do, inform Case No. 1068262-83.2017.8.26.0100 and code No. 3417EBB

78.    In short, it is not enough to transgress; it is necessary to transgress and delete the product of the illegal act...

79.    What is absurd, however, goes beyond the horizon. In addition to destroying the Bank's property, deleting its records and IT registers, FGC "lost" the control of its physical files, as, *"the physical transfer of the documents and relevant records and controls was not adequately and completely made* [...], resulting, at least, in the loss of the controls and records and *as a consequence, in the unreliability of the documentation which is currently kept.*" (cf. Doc. 22).

80.    Sometime later, the confirmation came that the loss of the record (surprise) had occurred in the RAET period, read, during the administration of FGC (cf. Doc. 23):

> "We refer to your letter of 8.28.2014, and to amend letter LIQ/BCSUL/300-2013, of 11.25.2013, we inform that, in accordance with surveys made, the substitution of the Company contracted to keep, control and record the documentation that makes up the collection of this Liquidating Party occurred during the period when this Company was under the Temporary Special Administration System" (emphasis added).

81.    Indeed, the computers were developed with their memories and files fully deleted. It should be noted that the registration data merely deleted by IMS were part of the assets of the Bank and were incinerated by the Company.

82.    In other words, not only IMS deleted the data which were used to prepare such report, it also deleted all and any information that could lead to some kind of inspection of the work that it performed and the services that it provided. In fact, in response to an official letter of the Federal Police on the services effectively provided by IMS, the last liquidating party of the Bank, Eduardo Bianchini, informed categorically that there was no evidence of provision of services, but only an apocryphal report of "insubstantialities" (cf. Doc. 21):

This document is a copy of the original, digitally signed by JOAO MENDES DE OLIVEIRA CASTRO and Court of Justice of the State of São Paulo, recorded on 12/07/2017 at 21:11, under No. 10682628320178260100. To check the original, access the website http://esaj.tjsp.jus.br/pastadigital/pg/abrirconferenciaDocumento.do, inform Case No. 10682628-83.2017.8.26.0100 and code No. 3417EBB

fls.24

"THE WORKS PERFORMED AND THE LINK WITH BCSUL

About the works performed by IMS, and after the research made in the collection of BCSul, we inform that, as evidence, there was located a document referred as the "Assessment Report of the Consigned Credit Portfolio Evaluation Report of Banco Cruzeiro do Sul performed by IMS Tecnologia e Serviços from June 25, 2012" (Exhibit IX), prepared as a result of the contract executed on 6.1.2012 (v. item 2.a, above)" (emphasis added).

83.    Now, one should add this information (on the inexistence of provision of services) to the following: when the RAET was converted into out-of-court liquidation and Mr. Sergio Prates assumed as trustee, the monthly value paid to IMS at the expense of Banco Cruzeiro do Sul became fa figure of around R$ 13 million per month. The business seemed so good that the son of another executive of FGC, Rafael Lattaro (the son of José Lattaro who, among other things, is a defendant in this action), ended up hired by IMS to provide the services also.

84.    It is no coincidence that the hiring and activity of IMS was frequent news on the police pages (cf. Doc. 16), it was even the subject of a police inquiry which is being processed until today in secret (cf. Doc. 24).

FORCED CONFUSION OF PROPERTY

85.    The insolence of the defendants in committing the fraud informed here is such that, at a given time, in order to facilitate the logistics of the fraud they were undertaking, cutting costs and lending celerity and efficiency to it, simply changed the head office of IMS to … the head office of the Bank .

86.    It is exactly that, on 04.26.2013, IMS changed its head office to the office of the Bank. On this same date, it created a branch in the city of Rio de Janeiro. Any guess about the address? Yes, the Bank's office in the capital of the state of Rio de Janeiro.

This document is a copy of the original, digitally signed by JOAO MENDES DE OLIVEIRA CASTRO and Court of Justice of the State of São Paulo, recorded on 12/07/2017 at 21:11, under No. 10682628320178260100.
To check the original, access the website http://esaj.tjsp.jus.br/pastadigital/pg/abrirconferenciaDocumento.do, inform Case No. 1068262-83.2017.8.26.0100 and code No. 3417EBB

87.    Will there be a greater signs of spurious relations maintained between FGC and its representatives allocated to the Bank and IMS and its administrators? Now, given all evidence, of an act performed for no reason other than the express intention of the Bank's administrators, at least with its consent, to benefit directly IMS and its members and administrators, reducing, at the expense of the Bank and its creditors, IMS' operating expenses.

88.    And before the defendants utter their criminal discourse that this occurred only to provide efficiency to the "analysis" and the "services" provided by IMS, imagine if the trend catches. In other words, the law office that renders services to the bank changes its head office to the bank, the property Company does the same, the accounting office, the cleaning service company … Finally. The fraud glitters and astonishes, but no so much after this frightening plot.

<u>URGENT EXHIBITION</u>

89.    The facts demonstrated herein, fortunately evidenced by robust documentary evidence, would already be sufficient to the early judgment of the dispute, in accordance with article 355, I of the new Code of Civil Procedure. In effect, it was demonstrated that IMS's involvement with Banco Cruzeiro do Sul occurred amid a not at all Republican succession of events which, in the final analysis, substantiate fraud conducted by FGC, in collusion with the small business and its administrators.

90.    In spite of that, to better subsidize this judgment with the material necessary to the decree of ineffectiveness of the contracting, it is necessary to determine to the defendants, as urgent relief and based on articles 300 and 396 of the CPC [Code of Civil Procedure][7], a display of:

---

[7] Art.  300. The urgent relief shall be granted when there are elements which evidence probability of right and danger of damage or risk to the useful result of the case.
Art. 396. The judge may order that the party display the document or thing which is in his possession.

This document is a copy of the original, digitally signed by JOAO MENDES DE OLIVEIRA CASTRO and Court of Justice of the State of São Paulo, recorded on 12/07/2017 at 21:11, under No. 10682628320178260100.
To check the original, access the website http://esaj.tjsp.jus.br/pastadigital/pg/abrirconferenciaDocumento.do, inform Case No. 1068262-83.2017.8.26.0100 and code No. 3417EBB

a) All the documents that concern the negotiations which ed to the execution of the "*Contract for the Provision of Services of Management of Financial Assets, Collection, Data Processing and Other Covenants*", between IMS and the officers of FGC, even before the fund had been appointed administrator of the Bank, including emails and all and any type of communication between the parties;

b) All the document which concern the insubstantiality report produced by IMS, including those which evidence the methodology used, the calculations and accounts verifications performed as well as the accounting verifications made, as well as persons responsible for the preparation;

c) Complete list of the professional qualification of the persons who worked for IMS and were its members or administrators during the period when it provided services to the Bank;

d) All the documents that evidence the qualification of IMS to manage consigned credit portfolios;

e) All the documents and communications exchanges by the parties, including emails, which demonstrate in which circumstances there occurred the change of the registered office and branch of IMS to the offices of the Bank in São Paulo and Rio de Janeiro.

91.    The urgency in showing such documents is precisely because the subjects covered herein, because they involve a very significant amount and the potential to commit crimes can lead one to get rod pf eventual additional evidence of the illegal act denounced herein. It is convenient however, to consider, that precisely this action duly supported by the evidentiary evidence of the wrongdoings of the evil acts perpetrated by the defendants, eventual negation or display or even existence of documents will only corroborate all that has already been stated above.

92.    On the other hand, there will not be, to this extent, risk of reverse damage in which the mere display of documents which bear relation to the services allegedly provided at first does would not cause any damage to the defendants, except in the case of these documents evidencing that fraud is even worse than that denounced.

This document is a copy of the original, digitally signed by JOAO MENDES DE OLIVEIRA CASTRO and Court of Justice of the State of São Paulo, recorded on 12/07/2017 at 21:11, under No. 10682628320178260100. To check the original, access the website http://esaj.tjsp.jus.br/pastadigital/pg/abrirconferenciaDocumento.do, inform Case No. 1068262-83.2017.8.26.0100 and code No. 3417EBB

fls.27

## FREE LEGAL AID

93.     As one knows, both plaintiffs have their property blocked due to a liability act filed against them by the Federal Prosecutor's Office, not having, today, financial conditions to bear the high legal costs of the claim. Add to this that Luis Felippe does not even exercise any professional activity given his advanced years.

94.     In view of this, it is utterly necessary the concession of free legal aid, so that this action is not prosecuted, removing the possibility of failing to reach justice on account of the precariousness of the financial situation of plaintiffs.

95.     Alternatively, plaintiffs request that the trustee of the bankrupt estate be summoned to bear the costs of this action, given that the results to be achieved in an eventual success will be reverted to the bankrupt estate and its creditors.

## CONCLUSION AND REQUESTS

96.     In view of the above, plaintiffs request the concession of free legal aid, pursuant to article 98 of the Code of Civil Procedure, and the summons of the defendants to come to the records to recognize the authorship and materiality of the facts narrated herein or, if they wish, to challenge the requests deduced herein.

97.     One herein requests the attachment of urgent relief, so that the defendants come to the records and display their documents:

> a) Those who concert the negotiations which led to negotiation of the "*Contract of Provision of Services of Management of Financial Assets, Collection, Data Processing and Other Covenants*", between IMS and the officers of FGC, even before the fund had been appointed administrator of the Bank, including emails and all and any other communication between the parties;

This document is a copy of the original, digitally signed by JOAO MENDES DE OLIVEIRA CASTRO and Court of Justice of the State of São Paulo, recorded on 12/07/2017 at 21:11, under No. 1068262832017826010. To check the original, access the website http://esaj.tjsp.jus.br/pastadigital/pg/abrirconferenciaDocumento.do, inform Case No. 1068262-83.2017.8.26.0100 and code No. 3417EBB

b) That concern the report of insubstantiality produced by IMS, including those which evidence the methodology used, the calculations and accounting checks, as well as those responsible for the preparation;

c) Complete list of the professional qualification of the persons who worked for IMS and were members or administrators during the period in which it provided services to the Bank;

d) That they evidence IMS' qualification to manage consigned credit portfolios;

e) Documents and communications exchanged by the parties, including emails, which demonstrate in which circumstances the change of the head office and branch o IMS to the offices of the Bank in São Paulo and Rio de Janeiro.

98.    On the merits, they rely that this action be fully accepted so that in view of arts. 130 and following of Law 11.101/2005, ineffectiveness of the contracting of IMS be declared in view of all the frauds evidenced herein, ordering the defendants, jointly and severally, to reimburse damages caused to the Bankrupt Estate, which value may be adjusted (for more or less) in the course of the production of evidence or, if the Judge considers it more convenient, in the stage of liquidation of sentence, pursuant to article 509 and subsequent of the Code of Civil Procedure; and which shall be paid by deposit at the disposal of the Judge of the bankruptcy, so that such funds be reverted directly to the creditors of Banco Cruzeiro do Sul.

99.    Plaintiffs protest for the production of all the evidence admitted in the Law and inform that the power of attorney shall be attached within 15 days, pursuant to the terms of article  104, § 1 of the Code of Civil Procedure - CPC.

100.    Request, in compliance with article 106, I of the Code of Civil Procedure, that all the summons relative to this action be made in the name of the lawyer JOÃO MENDES DE OLIVEIRA CASTRO, registered at OAB/SP [Brazilian Bar Association – São Paulo Section] under No. 346.829, member of law firm GALDINO, COELHO, MENDES, with professional address at Av. Brigadeiro Faria Lima, No. 3900, 11º andar, Itaim Bibi, São Paulo, SP, under penalty of nullity (CPC, article 272, Paragraph 2).

This document is a copy of the original, digitally signed by JOAO MENDES DE OLIVEIRA CASTRO and Court of Justice of the State of São Paulo, recorded on 12/07/2017 at 21:11, under No. 10682628320178260100.
To check the original, access the website http://esaj.tjsp.jus.br/pastadigital/pg/abrirconferenciaDocumento.do, inform Case No. 1068262-83.2017.8.26.0100 and code No. 3417EBB

fls.29

101.    Recall, finally, that the requests deduced herein not have as taxpayer the Bankrupt Estate, which in any case shall be the beneficiary of an eventual adverse judgment.

The amount in controversy is R$ 69,162,143,35[8] for tax purposes.

In these terms,
Begs to be Granted.
São Paulo, July 12, 2017

JOÃO MENDES DE OLIVEIRA CASTRO
OAB/SP Nº 346.829

RAFAEL PIMENTA
OAB/RJ Nº 142.307

ANDRÉ COATES FURQUIM WERNECK
OAB/RJ Nº 189.152

CAMILA ALMEIDA
OAB/RJ Nº 210.850

---

[8] Total amount paid to IMS according to the trustee (cf. Doc. 25).

This document is a copy of the original, digitally signed by JOAO MENDES DE OLIVEIRA CASTRO and Court of Justice of the State of São Paulo, recorded on 12/07/2017 at 21:11, under No. 10682628320178260100. To check the original, access the website http://esaj.tjsp.jus.br/pastadigital/pg/abrirconferenciaDocumento.do, inform Case No. 1068262-83.2017.8.26.0100 and code No. 3417EBB

## LIST OF DOCUMENTS SUPPORTING THIS ACTION

Doc. 1    Consolidated Headcount of Creditors, in which plaintiffs figure with subordinated credits.

Doc. 2    Private Instrument of Reciprocal Assumption of Obligations and Other Covenants, executed between FGC and Banco Cruzeiro do Sul S.A.

Doc. 3    Email sent by FGC informing that it would not pay the amount falling due. Doc. 4 Statement of Electronic Transfer of Funds - TED.

Doc. 5    Challenge by KPMG in the provisional remedy of exhibition of documents. Doc. 6    Challenge by FGC in the provisional remedy of exhibition of documents.

Doc. 6    Challenge by FGC in the provisional remedy of exhibition of documents.

Doc. 7    Power of attorney granted by FGC.

Doc. 8    Decree of Bacen RAET.

Doc. 9    Opinion of the Office of the Procurator of BACEN.

Doc. 10    Transcription of communication to the market and investors.

Doc. 11    Service Agreement executed with IMS.

Doc. 12    Amendment of the corporate name of M7 COBRANÇA LTDA. to IMS TECNOLOGIA E SERVIÇOS LTDA.

Doc. 13    Minutes of hiring of PwC.

Doc. 14    Minutes of Hiring of IMS.

Doc. 15    Request for information by Federal Deputy Rubens Bueno and answer by the Minister of Finance with reprimand of the conduct of Mr. Celso Antunes.

Doc. 16    Statement made by the BACEN's liquidations officer, Sidnei Marques, attesting to the growth of complaints in the FGC/IMS period of management.

This document is a copy of the original, digitally signed by JOAO MENDES DE OLIVEIRA CASTRO and Court of Justice of the State of São Paulo, recorded on 12/07/2017 at 21:11, under No. 1068262832017826010. To check the original, access the website http://esaj.tjsp.jus.br/pastadigital/pg/abrirconferenciaDocumento.do, inform Case No. 1068262-83.2017.8.26.0100 and code No. 3417EBB



Doc. 17   Valuation Report / Insubstantialities / Consigned Credit Letter Banco Cruzeiro do Sul, issued by IMS in July 2012.

Doc. 18   Amendment of the Corporate Purpose of IMS.

Doc. 19   Letter from Luis Felippe Índio da Costa to the Trustee, Mr. Eduardo Bianchini, on 06.26.2014, requesting clarifications on the equipment returned by IMS.

Doc. 20   Official Letter LIQ/BCSUL/0183/2014, of 07.30.2014, in which the then trustee informs on problems encountered in the equipment.

Doc. 21   Official Letter LIQ/BCSul 0018/2015, of 02.05.2015, in which the then trustee, Eduardo Bianchini, affirms that there were documents supporting the provision of services by IMS, only such apocryphal report of insubstantialities .

Doc. 22   Official Letter LIQ/BCSul-300/2013, of 11.25.2013, in which Mr. Eduardo Bianchini affirms that during the RAET, the change of the security company caused the "loss" of the entire control of the physical records and documents of the Bank.

Doc. 23   Official Letter BCSul/229-2014, of 09.04.2014, in which Mr. Eduardo Bianchini confirms that the "loss" of the entire control of the physical records and documents of Bank occurred during the FGC administration.

Doc. 24   Document supporting bringing of the policy inquiry.

Doc. 25   Voucher of the total amount paid to IMS.

* * *

This document is a copy of the original, digitally signed by JOAO MENDES DE OLIVEIRA CASTRO and Court of Justice of the State of São Paulo, recorded on 12/07/2017 at 21:11, under No. 1068262832017826 0100.
To check the original, access the website http://esaj.tjsp.jus.br/pastadigital/pg/abrirconferenciaDocumento.do, inform Case No. 1068262-83.2017.8.26.0100 and code No. 3417EBB