# EXHIBIT 7

- Accessibility
- Email alerts
- RSS feeds
- Contact us

 www.parliament.uk

Search

- Home
- Parliamentary business
- MPs, Lords & offices
- About Parliament
- Get involved
- Visiting
- Education

- House of Commons
- House of Lords
- What's on
- Bills & legislation
- Committees
- Publications & records
- Parliament TV
- News
- Topics

You are here: Parliament home page > Parliamentary business > Publications and Records > Lords Publications > Judgment Index > Judgment

 HOUSE OF LORDS

**Session 1998-99**
Publications on the Internet
Judgments

**House of Lords**

# Judgments - Credit Lyonnais Nederland N.V. (now known as Generale Bank Nederland N.V.) v. Export Credits Guarantee Department

**HOUSE OF LORDS**

Lord Slynn of Hadley    Lord Woolf    Lord Steyn
Lord Clyde    Lord Millett

## OPINIONS OF THE LORDS OF APPEAL FOR JUDGMENT IN THE CAUSE

### CREDIT LYONNAIS NEDERLAND N.V.
### (NOW KNOWN AS GENERALE BANK NEDERLAND N.V.)
### (APPELLANTS)

### v.

### EXPORT CREDITS GUARANTEE DEPARTMENT
### (RESPONDENTS)

## ON 18 FEBRUARY 1999

**LORD SLYNN OF HADLEY**

My Lords,

I have had the advantage of reading in draft the speech prepared by my noble and learned friend, Lord Woolf M.R. For the reasons he gives I too would dismiss the appeal.

**LORD WOOLF**

My Lords,

This is an appeal by the Generale Bank Nederland N.V. (formerly Credit Lyonnais Bank Nederland N.V.) ("the Bank") from the decision of the Court of Appeal (Stuart-Smith, Hobhouse and Thorpe L.JJ.) [1998] 1 Lloyd's Rep. 19. The Court of Appeal dismissed the Bank's appeal from the decision of Longmore J. [1996] 1 Lloyd's Rep. 200). He held that the Export Credit Guarantee Department ("E.C.G.D.") was not liable to the Bank for the loss which the Bank has sustained due to the fraud of one of its customers in which an employee of E.C.G.D. was involved.

As the action has proceeded through the courts, many of the issues between the parties have been resolved so that there is now only one issue which we have to determine. This issue was accurately and succinctly identified by Stuart-Smith L.J. in his judgment (p. 36 col. 2) in these words:

> "Where A becomes liable to B as a joint tortfeasor with C in the tort of deceit practised by C on B on the basis that A and C have a common design to defraud B and A renders assistance to C pursuant to and in furtherance of the common design, does D, A's employer, become vicariously liable to B, simply because the act of assistance, which is not itself the deceit, is in the course of A's employment with D?"

Surprisingly, having regard to its nature it is accepted by counsel that the issue has not been previously decided.

*The Facts*

The hearing before Longmore J. lasted 28 days. The facts giving rise to the Bank's loss were investigated in depth. However, in order to decide the remaining issue it is not necessary to do more than describe briefly what happened.

The central figure in the fraud was a rogue named Roland Chong. He came to this country from Singapore in 1980. As Longmore J. found:

> "He knew about ways of financing international trade and persuaded the bank that he was a considerable exporter of commercial goods to Nigeria and America. He was aware that exporters could get insurance from the Export Credit Guarantee Department (E.C.G.D.) against the risk of non-payment by the foreign buyer; he was also aware that the bank could be induced to purchase bills of exchange drawn by an exporter on foreign buyers against a guarantee from E.C.G.D. that the foreign buyer would pay for the goods in due

course according to the contract of sale. Mr. Chong had the bright idea of conjuring up wholly imaginary contracts for the sale of goods supported by fraudulently drawn bills of exchange with forged acceptances in the name of imaginary buyers. He obtained money from the bank by selling to it these pieces of paper in the form of accepted bills of exchange; he initially covered his tracks by causing early bills of exchange to be paid off, using for this purpose money he acquired from the bank's purchases of later bills of exchange. He corrupted a senior officer of E.C.G.D., a Mr. Pillai, who dealt with the underwriting of E.C.G.D. guarantees, inducing him to oil the wheels and ensure no awkward questions would be asked. When he had obtained over £10m. of the bank's money, he disappeared."

The E.C.G.D. has now been privatised. However at the time it was a part of Central Government. It issued the guarantees to assist United Kingdom exporters to which the judge refers. The guarantees were intended to ensure that, in the event of default on the part of an overseas buyer, the exporter would be paid ninety per cent. of the purchase price. This can be valuable to exporters who need to obtain immediate finance for their exports. The guarantees would make it easier for exporters to obtain finance from their bankers by way of loan. The loans would be on the security or following the sale of bills of exchange drawn on and frequently accepted by an overseas buyer which were payable at a future date. E.C.G.D. co-operated with such arrangements by issuing guarantees to the exporters' bank.

Starting in 1983, E.C.G.D. issued a series of guarantees to the Bank in relation to purchases from Mr. Chong of bills of exchange drawn in respect of fictitious export transactions entered into by companies which he owned or controlled. Initially the guarantees were in the form of Comprehensive Bankers Guarantees ("C.B.G."). C.B.G.s provided cover in relation to a number of transactions. The first C.B.G. was issued in July 1983 and altogether nine C.B.G.s were issued between 1983 and 1985. A number of bills of exchange and promissory notes were purchased by the Bank under each C.B.G. Some of the bills and notes were honoured and some were paid later without any substantial loss to the bank. In 1987 and 1988 E.C.G.D. issued guarantees in the form of Specific Bankers Guarantees ("S.B.G.s"). S.B.G.s guaranteed bills relating to specific contracts for capital goods. This appeal concerns four S.B.G.s which were issued in respect of four imaginary export transactions between December 1987 and April 1988.

Mr. Pillai was a senior underwriter of E.C.G.D. although he was only a relatively junior civil servant. He dealt with the issue of the four S.B.G.s. The Court of Appeal held that at the time that he authorised their issue Mr. Pillai was party to a common design with Mr. Chong to deceive the Bank and that he had the requisite knowledge and complicity in Mr. Chong's frauds to make him liable to the Bank as a joint tortfeasor with Mr. Chong. E.C.G.D. accepts that this is the position.

The Bank initially advanced its claim against E.C.G.D. both in contract and in tort. In contract, it claimed that E.C.G.D.'s guarantees secured payment of the bills bought by the Bank. In tort, it claimed that the E.C.G.D. was vicariously liable for the acts of Mr. Pillai in underwriting the guarantees. This was his essential role in the scheme.

The claim in contract is not pursued on this appeal. As for the Bank's claim in tort, a distinction has to be drawn between the claims relating to a transaction backed by one of the C.B.G.s and the subsequent transactions involving the S.B.G.s. As to the C.B.G.s the Bank does not now challenge the finding of the judge that while at the time of the transaction Mr. Pillai had been corrupted as a result of receiving bribes from Mr. Chong he did not yet have the requisite knowledge and complicity in Mr. Chong's frauds to be liable to the Bank as a joint tortfeasor with Mr. Chong. However in relation to the four S.B.G.s, the Court of Appeal held (and this is now accepted by E.C.G.D.) that by the time Mr. Pillai authorised their issue he was a party to a common design with Mr. Chong to deceive the Bank by a fraud of which the issue of the S.B.G.s was an essential part.

In the case of each of the S.B.G.s the bills of exchange and other documents presented to the Bank by Mr. Chong were forged. The supposed purchasers existed and were highly respectable but the contractual documents and the bills of exchange purportedly accepted by the buyers were forged and the buyers knew nothing of the supposed transactions executed in their names. Mr. Pillai had not forged any documents himself and the Court of Appeal held that there was nothing unlawful in issuing the S.B.G.s. It is set out in the statement of facts agreed for this appeal that "it would not have been within the course of his employment or the scope of his authority" for Mr. Pillai to do the acts by which the Bank was deceived. Mr. Pillai in addition, signed letters on the note paper of E.C.G.D. indicating that the transactions were acceptable to E.C.G.D. However, Mr. Pillai had no authority actual or ostensible to write these letters and the letters were not written within the scope of his employment.

None of the Bank's employees were parties to the fraudulent scheme. Nor was there held to be any complicity or bad faith on their part. The official of the Bank who primarily dealt with Mr. Chong was a Mr. Herod. On the Judge's findings, and in the opinion of the members of the Court of Appeal, Mr. Herod, in particular, and the Bank, in general, displayed a remarkable lack of caution in entering into the S.B.G. transactions. Hobhouse L.J. summarised the position at the end of his judgment in these terms:

"The department still has a strong case that the conduct of Mr. Herod and the bank was reckless and that the bank chose to pay money to Mr. Chong's companies without regard to the E.C.G.D. scheme under which they were purporting to operate. Their apparently systematic disregard of the essential features of that scheme including its obviously precautionary features might be capable of supporting an inference sufficient to destroy the causal

connection between their losses and the conduct of Mr. Pillai for which it is alleged that the department should be vicariously liable." (p. 47 cols. 1-2)

It was this conduct on the part of the Bank and its employee which was fatal to the Bank's claim in contract. The S.B.G.s guaranteed payment of the principal element of the sum on the face of the bill if the bill remained unpaid three months after due date of payment. However, the guarantees were confined to bills "in connection with which the bank had taken all reasonable steps to satisfy itself as to its validity and enforceability in the buyer's country . . . ." As the Bank had not taken those steps E.C.G.D. was not liable under the guarantees.

The Court of Appeal having come to the conclusion that the E.C.G.D. was not vicariously liable for the deceit of Mr. Pillai and Mr. Chong, considered it was not necessary to deal with the question of causation. On the appeal, the E.C.G.D. renewed their contention that even if the Department would be liable to the Bank the Bank's loss was not caused by tortious acts for which E.C.G.D. is vicariously liable. The E.C.G.D. contends that the loss was caused by the bank's recklessness in its dealings with Mr. Chong and his companies and this broke the chain of causation between Mr. Pillai's deceit and the Bank's loss.

*The Problem of the Bank*

The Bank would have had no difficulty in succeeding in an action against Mr. Chong or Mr. Pillai. There is no dispute that they would have been liable jointly and severally to the Bank for deceit. The problem of the Bank is establishing the vicarious liability of E.C.G.D. Here the Bank has two difficulties:

(1) The facts on which the liability of Mr. Chong and Mr. Pillai to the Bank for deceit are based are not confined to a single act but consist of a course of conduct and only part of that conduct was in the course of Mr. Pillai's employment. That part was his involvement in the issue by E.C.G.D. of each of the guarantees. However the issue of a guarantee by itself would have had no adverse consequence for the Bank. Indeed, if the Bank had taken the action which it should have done to protect itself, it was E.C.G.D. who would have suffered the loss and not the Bank as a result of the guarantees being issued since E.C.G.D. would have had to honour the guarantees.

(2) The further conduct needed to constitute the tort of deceit which was practised on the Bank was primarily carried out not by Mr. Pillai but Mr. Chong and Mr. Chong never had the authority to act on behalf of E.C.G.D. although Mr. Pillai is jointly responsible for Mr. Chong's conduct.

To meet these difficulties, Mr. Sumption Q.C. on behalf of the Bank advanced two alternative arguments in support of the Bank's appeal. The first argument is that where an employee assists in the violation by another of an individual's rights pursuant to a common design to that end, the employee incurs liability as a joint tortfeasor for the violation and his employer incurs vicarious liability for the violation if the assistance by the employee was in the course of his employment. This it was argued is because the breach of duty which gives rise to the joint liability is to be "rationalised" as a duty not to assist in that violation pursuant to that design. So if the acts which constitute the assistance were done within the course of the employment, then in accord with the ordinary principles on which vicarious liability arises, this is sufficient to make the employer liable. I will call this contention "the joint vicarious liability argument."

The second argument of Mr. Sumption is that the Bank is entitled to succeed because Mr. Pillai's own acts of assistance were themselves tortious because they were carried out with the intention of bringing about a violation of the Bank's rights. I will call this argument "the primary liability argument."

*The joint vicarious liability argument.*

The general approach to vicarious liability is clear beyond *per* adventure. Any number of authoritative statements could be referred to for this purpose. I however take a short passage from the speech of Lord Macnaghten in *Lloyd v. Grace, Smith and Co.* [1912] A.C. 716 because Lord Macnaghtan was citing from a judgment of Blackburn J. who was in turn reflecting a much approved statement in Story on Agency. The passage in the judgment of Blackburn J. as reported in *McGowan & Co. v. Dyer* (1873) L.R. 8 Q.B. 141, 143 is as follows:

> "In Story on Agency, the learned author states, in section 452, the general rule that the principal is liable to third persons in a civil suit "for the frauds, deceits, concealments, misrepresentations, torts, negligences, and other malfeasances or misfeasances, and omissions of duty of his agent *in the course of his employment,* although the principal did not authorise, or justify, or participate in, or indeed know of such misconduct, or even if he forbade the acts, or disapproved of them".

He then proceeds, in section 456:

> "But although the principal is thus liable for the torts and negligences of his agent, yet we are to understand the doctrine with its just limitations, that the tort or negligence occurs in the course of the agency. For the principal is not liable for the torts or negligences of his agent in any matters beyond the scope of the agency, unless

> he has expressly authorised them to be done, or he has subsequently adopted them for his own use and benefit." (at p. 737)

This statement makes clear the principle on which vicarious liability depends. It is that the wrong of the servant or agent for which the master or principal is liable is one committed in the case of a servant in the course of his employment, and in the case of an agent in the course of his authority. It is fundamental to the whole approach to vicarious liability that an employer or principal should not be liable for acts of the servant or agent which are not performed within this limitation. In many cases particularly cases of fraud, the question arises as to whether the particular conduct complained of is an unauthorised mode of performing what the servant or agent is engaged to do. This case however is not concerned with this feature of vicarious liability because there is no dispute as to what acts were done in the course of Mr. Pillai's employment.

This case therefore raises starkly the question of whether, in the case of a joint tort, it is sufficient to make the master liable if the acts of his servant for which he is responsible, do not in themselves amount to a tort but only amount to a tort when linked to other acts which were not performed in the course of the employee's employment.

The other acts may or may not be in the course of the employee's employment whether the other acts are performed by the same person or a different person. In addition, if by a different person, that person may or may not be a fellow employee.

In resolving this issue, as a matter of principle it does not matter whether there is one tortfeasor or two tortfeasors or whether both tortfeasors are employees or only one is an employee. The conduct for which the servant is responsible must constitute an actionable tort and to make the employer responsible for that tort the conduct necessary to establish the employee's liability must have occurred within the course of the employment. If the tort is committed jointly, then it is conduct which is within the course of the employment sufficient to constitute the tort, irrespective of which tortfeasor performed the acts, which is necessary. As both tortfeasors are responsible for the tortious conduct as a whole in the case of joint torts it is not necessary to distinguish between the actions of the different tortfeasors. For vicarious liability what is critical, as long as one of the joint tortfeasors is an employee, is that the combined conduct of both tortfeasors is sufficient to constitute a tort in the course of the employee's employment.

Were the position otherwise, you could have the extraordinary result that if an employee carried out all the acts complained of there would be no liability on the employer, but if the acts were carried out partly by the employee and partly by a non-employee, the employer would be liable. The obverse situation is the same. If an employer would be liable if the employee personally took the action complained of the situation is no different because some of the acts were done by some one who was not an employee as part of a joint enterprise with the employee.

The short answer to Mr. Sumption's first argument is that before there can be vicarious liability, all the features of the wrong which are necessary to make the employee liable have to have occurred in the course of the employment. Otherwise there is no liability. You cannot therefore combine the actions of Mr. Pillai in the course of his employment with actions of Mr. Chong, which if done by Mr. Pillai would be outside the course of Mr. Pillai's employment, and say E.C.G.D. is vicariously liable for the consequence of Mr. Pillai's and Mr. Chong's combined conduct.

*The Primary Liability Argument*

If Mr. Sumption's second argument is correct then this avoids the difficulty that Mr. Chong's conduct is not conduct for which E.C.G.D. is responsible. His second argument would mean Mr. Pillai's conduct in the course of his employment of issuing the guarantees would be tortious because of his intention when they were issued. If this is the position E.C.G.D. would be vicariously liable for that tort.

Mr. Sumption accepts that the argument involves a development or at least the clarification of law so that there will be situations which so far have not been regarded generally as giving rise to liability in tort which would in future do so. Mr. Sumption, however, submits that the extension is based upon well established principles. He contends that the principles are precisely the same as those which underlie other torts in which liability is incurred for assistance in an other's wrong. He refers in particular to the torts of procuring breaches of contract or statutory duty. He argues that there is no justification, as a matter of policy for treating those torts as "self-contained islands of law as opposed to illustrations of a more general and significant principle". He submits that the requirement that there should be an intent to assist in the violation of the plaintiff's right is a complete answer to any floodgates argument.

Why Mr. Sumption's approach is novel is because it does not require the act to be in itself an actionable wrong. He submits that acts of assistance in connection with an other's wrong become themselves tortious if carried out with *the intention of bringing about the violation of a third party's rights*. I emphasise here that although the Bank had initially relied upon an allegation of conspiracy, Mr. Sumption is not basing his argument on conspiracy. He is relying on Mr. Pillai's act alone of facilitating the issue of the guarantee, an act which would not in itself be an actionable wrong, and says it should be actionable because it was done knowingly and with the intention of assisting the actionable wrong of deceit which caused the Bank's loss.

The foundation of Mr. Sumption's argument is the judgment of Erle J. in *Lumley v. Gye* (1853) 2 E. & B. 216. That is the case where an action was brought for maliciously procuring a singer to break her contract by not performing at the plaintiff's theatre. The general statement of Erle J. (at p. 232) is in these terms:

> "It is clear that the procurement of the violation of a right is a cause of action in all instances where the violation is an actionable wrong, as in violations of a right to property, whether real or personal, or to personal security: he who procures the wrong is a joint wrongdoer, and may be sued, either alone or jointly with the agent, in the appropriate action for the wrong complained of. Where a right to the performance of a contract has been violated by a breach thereof, the remedy is upon the contract, against the contracting party; and, if he made to indemnify for such breach, no further recourse is allowed;

and, as in a case of the procurement of a breach of contract, the action is for a wrong and cannot be joined with the action on the contract, and as the act itself is not likely to be of frequent occurrence nor easy of proof, therefore the action for this wrong, in respect of other contracts than those of hiring, are not numerous; but still they seem to me sufficient to show that the principle has been recognised."

This statement of Erle J. is capable of being treated as saying no more than that if you procure the commission of an actionable wrong by another then you are liable for that actionable wrong. The responsibility for the actionable wrong is a form of secondary liability. If it is correct to understand the statement in this way, then it does not assist to make E.C.G.D. liable here. This is because, as already stated, E.C.G.D. can not be vicariously liable for a wrong which was not performed in the course of Mr. Pillai's employment.

The statement of Erle J. is an insecure foundation for what Mr. Sumption seeks to achieve here; the establishment of a new "stand alone" tort committed by Mr. Pillai in the course of his employment. It may be possible to regard Mr. Pillai's conduct as procuring Mr. Chong to deceive the Bank, but this would not assist the Bank since Mr. Pillai would not be acting in the course of his employment in so procuring. In fact his actions which were in the course of his employment probably went no further than facilitating the deceit on the Bank by Mr. Chong. The underwriting of the guarantee and its issue were not unlawful or wrongful so far as the Bank was concerned.

For the purposes of the appeal, there were placed before their Lordships a selection of extracts from the leading text books dealing with the issues on the appeal. However the extracts provide no support for Mr. Sumption's contention. Any assistance for his argument is to be found in a carefully reasoned article by Mr. Philip Sales in the Cambridge Law Journal (1990) pp. 491-514. However, reading that article as a whole, I do not find that it establishes the Bank's case. Mr. Sales was primarily concerned in that article with a distinction between conspiracies to injure another by lawful and unlawful means. In that context he considers the circumstances where a secondary liability in tort can arise. However the problem with arguments based on conspiracy or secondary liability is that in both cases liability would depend upon the deception of the Bank and deceiving the Bank would be outside the scope of Mr. Pillai's employment.

This is made clear by the reasoning of Oliver L.J. in *John Hudson v. Oaten* (unreported) 19 June 1980. In that case the plaintiff was seeking to avoid the provisions of Lord Tenterden's Act (Statute of Frauds Amendment Act 1828), section 6. A company, Lakeview, had agreed to buy a substantial quantity of oil from the plaintiffs but was never in a position to do so. The plaintiffs therefore sought to recover their loss from the defendant, Mr. Oaten, and not Lakeview. Oliver L.J. said of the attempt to do this, which he regarded as ingenious:

"The twin attacks on which Mr. Crawford rests his case are first of all that the mere fact of entering into a contract imports an implied representation of a genuine intention to pay the contract price and, secondly the entry into the contract having been procured by the defendant, he is liable for the representation thus employed. Even assuming in the plaintiffs favour that both of these propositions are true, and I think they are, it still does not appear to me that they get Mr. Crawford over his difficulties. The second proposition, while it may be an adequate description of the consequences of procurement, contains in itself no analysis of the grounds upon which the assumed liability rests. Apart from the tort of conspiracy--and there is no question of that in this case--there is no separate tort of procuring as such. A man who procures the commission by another person of a tortious act becomes liable because he then becomes a principal in the commission of the act. It is his tort but once one gets to that it seems to me that the fallacy of Mr. Crawford's argument becomes apparent. The tort alleged here is the implied false representation of Lakeview's intention to pay, and when one seeks to fasten that onto the defendant as a principal it is at once clear that it is not, so far as he is concerned, a representation as to his own intention, for he made none. The representation for which he is assumed to be liable is the representation of Lakeview's intention."

Here Mr. Sumption is seeking to establish the existence of a separate tort in circumstances which are analogous to those which failed in that case.

Mr. Pollock Q.C. on behalf of E.C.G.D. also relied upon a short passage from a reserved judgment of Diplock J. in *Smith v. Pywell* (The Times 29 April 1959). In the course of his judgment Diplock J. said:

> "There was no separate tort of procuring a third person to commit a tort, but the procurer was a joint tortfeasor with the person who actually committed it."

Mr. Pollock however primarily relied upon a series of intellectual property cases. Of those I should shortly refer to the two cases involving Amstrad Consumer Electronics Plc. Both cases arose because of Amstrad manufacturing, advertising and selling audio systems which incorporated a double cassette deck feature which enabled members of the public to copy cassettes in breach of copyright. The earlier case is *Amstrad Consumer Electronics Plc v. British Phonographic Industry Limited* [1986] F.S.R. 159. In this case Amstrad sought a declaration refuting the suggestion that their retailing of the equipment was unlawful. A declaration was not granted by the Court of Appeal because Amstrad might be guilty of a criminal offence. However in the absence of any evidence that Amstrad was acting in concert with members of the public, the Court of Appeal were clearly of the view that Amstrad's conduct was not tortious.

In the course of his judgment Slade L.J. said:

> "The concept of accessories is a familiar one in the criminal law, however, no authority has been cited to us which shows that a person can be civilly liable as 'accessory' to the tortious act of another (whether the relevant tort arises under the common law or by virtue of statute) unless he is actually a joint tortfeasor or has procured or incited such act (as to which see below). I therefore regard the relevant question under this heading as simply being whether Amstrad could be regarded as joint tortfeasor with those members of the public who infringed the copyrights. . . . The grounds upon which they are alleged to be joint tortfeasors are that . . . 'the defendants knew before parting with each of the said machines that they were certainly (or in the alternative very probably) going to be used by members of the public to infringe one or more of the aforesaid copyrights to the damage of the copyright owners.'
>
> "Accepting that it has this knowledge, even this intention, does this render Amstrad itself an infringer and thus a joint tortfeasor? In my opinion, a long line of authority relating to patents but equally applicable to copyright, shows that it does not:" (at p. 212)

Glidewell L.J. considered that there was no distinct tort of procuring or inciting infringement of copyright.

The later case is *C.B.S. Songs Ltd. v. Amstrad Consumer Electronics Plc.* [1988] A.C. 1013. In this case Amstrad were the defendants and the plaintiffs, suing on behalf of themselves and other copyright owners in the music trade, were seeking an injunction to restrain Amstrad from parting with possession of the equipment without taking precautions which would reasonably ensure that their copyrights would not be infringed by the use of the equipment. Lord Templeman, in a speech with which the other members of the House agreed, dismissed the plaintiffs' appeal against the decision of the Court of Appeal that their writ and statement of claim should be struck out. In the course of his speech, Lord Templeman referred to *Lumley v. Gye* and indicated that the case was one in which both the opera singer and the defendant "were joint wrongdoers participating in an unlawful common design" (at p. 1058F). Lord Templeman made it clear that the only way in which Amstrad could be liable would be as a joint tortfeasor. If they were not a joint tortfeasor they would be under no tortious liability. He said:

> "My Lords, I accept that a defendant who procures a breach of copyright is liable jointly and severally with the infringer for the damages suffered by the plaintiff as a result of the infringement. The defendant is a joint infringer; he intends and procures and shares a common design that infringement shall take place. A defendant may procure an infringement by inducement, incitement or persuasion. But in the present case Amstrad do not procure infringement by offering for sale a machine which may be used for lawful or unlawful

> copying and they do not procure infringement by advertising the attractions of their machine to any purchaser who may decide to copy unlawfully. Amstrad are not concerned to procure and cannot procure unlawful copying. The purchaser will not make unlawful copies because he has been induced or incited or persuaded to do so by Amstrad. The purchaser will make unlawful copies for his own use because he chooses to do so. Amstrad's advertisement may persuade the purchaser to buy an Amstrad machine but will not influence the purchaser's later decision to infringe copyright. . . . Generally speaking, inducement, incitement or persuasion to infringe must be by a defendant to an individual infringer and must identifiably procure a particular infringement in order to make the defendant liable as a joint infringer". (at p. 1058D-H)

This speech of Lord Templeman strongly suggests that there is little scope for the creation of the tort on which Mr. Sumption seeks to rely.

When this case was before the Court of Appeal, leading counsel then appearing on behalf of the Bank strongly relied on there being a relationship between accessories for the purposes of the criminal law and tortious liability for the purposes of the civil law. It was submitted that knowingly to facilitate the commission of a crime amounted to the crime of aiding and abetting and should therefore also amount to a tort. This argument was rejected by the Court of Appeal. Before their Lordships the argument has not focused to the same extent on the alleged relationship between the criminal law and the law of tort. In my judgment to seek to draw analogy between the criminal and civil law in this area is unhelpful. The criminal law historically developed separately. The development of the criminal law was influenced by the distinction between felonies and misdemeanours. In order to determine whether there is any separate tort as Mr. Sumption contends, it is not necessary to answer the question as to whether Mr. Pillai could have been convicted of a criminal offence.

The answer to Mr. Sumption's submissions is independent of the position under the criminal law. The tort upon which he seeks to rely is unsupported by authority. The authority which does exist strongly suggests that there is no such tort. The only purpose for establishing its existence is to make E.C.G.D. vicariously liable for Mr. Pillai's conduct. This is not a justification for the recognition of the new tort. Direct liability for conduct which would be caught by the new tort exists independently of that tort on the well established grounds for making a secondary tortfeasor jointly and severally liable with a principal tortfeasor.

The fact that E.C.G.D. in this situation is not vicariously liable for Mr. Pillai's actions for which he is personally liable does not justify the development of a new foundation for tortious liability. While it can be difficult to determine whether a particular set of circumstances arise in the course of an employee's employment this well recognised limit on an employer's liability for the acts of his employee is generally accepted as being appropriate. It is clearly enunciated in many statements of long-standing authority, such as that of Scrutton L.J. in *The Koursk* [1924] P. 140 at p. 155. I do not consider it desirable to develop new principles of primary tortious liability purely in order to extend the vicarious liability of an employer and to make E.C.G.D. liable in this case.

The answer to the question which Stuart-Smith L.J. posed is that D, A's employer, is not vicariously liable to B.

As E.C.G.D. is not liable to the Bank, I prefer not to deal with the issue of causation which Mr. Pollock raised on E.C.G.D.'s behalf.

My Lords, I would dismiss this appeal.

**LORD STEYN**

My Lords,

For the reasons contained in the speech of Lord Woolf I would also dismiss the appeal.

**LORD CLYDE**

My Lords,

I have had the advantage of reading in draft the speech of my noble and learned friend, Lord Woolf M.R. I agree with it, and for the reasons he gives I too would dismiss the appeal.

**LORD MILLETT**

My Lords,

I have had the advantage of reading in draft the speech of my noble and learned friend, Lord Woolf M.R. I agree with it, and for the reasons he gives I too would dismiss the appeal.

previous

Lords Parliament Commons Search Contact Us Index

© Parliamentary copyright 1999

*Prepared 18 February 1999*

- A-Z index
- Glossary
- Contact us
- Freedom of Information
- Jobs
- Using this website
- Copyright