UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:

MASSA FALIDA DO BANCO
CRUZEIRO DO SUL S.A.,                                     CASE NO.:14-22974 – LMI
                                                          CHAPTER 15
Debtor in a Foreign Proceeding
_____/
LASPRO CONSULTORES LTDA.,
a Brazilian Sociedade Limitada,

       Plaintiff
v.
                                                          ADV. CASE NO. 16-1315-LMI
ALINIA CORPORATION, a British
Virgin Islands Company Limited by Shares,
110 CPS, INC., a British Virgin Islands
Company Limited by Shares,

       Defendants.
_____/

**DEFENDANTS' 110 CPS, INC. AND ALINIA CORPORATION MOTION TO
EXCLUDE EXPERT REPORT AND TESTIMONY OF ALVIN HOMMERDING**

Defendants, 110 CPS, Inc. ("CPS") and Alinia Corporation ("Alinia") (collectively, the "Defendants"), by and through undersigned counsel and pursuant to Rule 702, Federal Rules of Evidence, hereby request the Court to issue an order excluding the expert report (the "Report") and testimony of Alvin Hommerding ("Hommerding"), and as grounds therefor say:

**INTRODUCTION**

Hommerding demonstrated little knowledge of the Report that he purports to have authored. In deposition, Hommerding confirmed he played a very limited role in the preparation of the Report and was generally unfamiliar with the facts of the case. Hommerding was unable to explain what methodology, if any, had been used to reach the conclusions of the Report. Hommerding was only peripherally involved in the preparation of the Report and confirmed that the project had been led

confirmed the project had been led by Jorge Zaninetti, a Sao Paulo lawyer, not qualified as an accountant.  In fact, the Report is printed on the letterhead of Correa Porto, Mr. Zaninetti's law firm.  Hommerding's deposition made it clear that he was retained as an English speaking spokesman for a Report prepared by a Brazilian law firm.

The Report lacks a reliable factual basis.  Hommerding testified that despite repeated requests to the Trustee, Zaninetti's team did not receive crucial documents essential to the preparation of the Report.  Hommerding was also largely ignorant of facts vital to the preparation of the Report.  Hommerding admitted that he had never visited the data room at the offices of the Debtor, Banco Cruziero do Sul ("BCSUL" or the "Debtor"), to view the Debtor's bank records.  Those members of Zaninetti's team who did visit the data room were not free to roam freely among Debtor's records but were restricted to a limited set of records selected by the Debtor's current administration.  Hommerding did not review the interviews of former bank employees who had knowledge of the allegedly fake loans which are the central issue in this case, and never spoke to any of the Debtor's current staff.  Hommerding admitted that he was unfamiliar with and did not even recognize the July, 2012 IMS Report, which is the foundation for the Trustee's allegation that the Debtor's portfolio contained 682,647 fake salary loans.  Hommerding could not describe the procedures used by PwC to confirm that the Debtor's equity should be eliminated as a result of the alleged fake loans.  Hommerding never met with the Trustee and did not review the Debtor's audited financial statements for the years 2006-11, the period when the allegedly fake loans were being generated.  The Report lacks a sufficient factual foundation and is vague and speculative.

The Report is the product of unreliable methods and procedures.  Hommerding's testimony confirmed that the Zaninetti team did no more than conduct a hasty examination of approximately 3000 screen shots of loans, chosen from a pool of loans thought to contain suspicious characteristics.  There is nothing in the Report to suggest that the Zaninetti team used any

procedures or methodologies at all to analyze these loan screen shots. The Report simply says: "We randomly selected 3000 Sham CC Contracts[1] from the years 2007 to 2011 and analyzed them in Tools and Retaguarda.[2] The analysis of these resulted in the identification of fraud." Report at 11. But this facile conclusion also proved to be wrong. As Hommerding was forced to admit in deposition, examples of the loan printouts examined by Zaninetti's team, introduced as exhibits to the deposition, lacked many of the very characteristics claimed by the Report to indicate falsity, and all showed evidence of payment, inconsistent with the notion that they were false.

The Report is unreliable and speculative and will not be helpful to the finder of fact. The Report, sprawling across 93 pages, is remarkably unoriginal, relying for much of its bulk on regurgitation of random sections of the Report of the Banco Central de Brazil of February 22, 2013 (the "BACEN Report"). As Hommerding admitted, these quoted passages were obviously and admittedly not the work product of the Zaninetti team and often have no relation to the questions they purport to address. Instead, these BACEN excerpts have been included as defamatory filler designed to cover up the fact that the Report is based on limited facts, lacks an adequate methodology, and fails to reach any reasoned and supportable conclusion. As discussed in detail below, the Report and Hommerding's testimony should be excluded.

**DISCUSSION**

    A.    **Factual Background**

The Debtor is a Brazilian bank. Luis Felippe Indio da Costa and his son, Luis Octavio (collectively the "Indio da Costas"), were the controlling shareholders of the Bank. Complaint

---

[1] The term "Sham CC Contracts" is defined at p. 8 of the Report as "Fraudulent or fake CC Contracts that have no economic substance, no clients and no dispursment (sic) and repayment cash flows." The 3000 print outs supposedly reviewed by the Zaninetti team were chosen from a pool of 20,000 "Sham CC Contracts". One would expect, that a selection of this sort would be outcome determinative. However, as it turns out, many of the reviewed contracts do not contain fraudulent characteristics.

[2] Tools and Retaguarda are computer programs used by the Debtor bank. Tools is a system which maintains information about the Debtor's loans; while Retaguarda is a system used to analyze customer creditworthiness.

¶7, 8[3]. On June 4, 2012, the Debtor was intervened by BACEN, which appointed the Fundo Guarantidor de Creditos (the "FGC") as its special temporary administrator. Complaint ¶41.[4] The intervention seems to have occurred due to the discovery of a handful of loans with supposedly suspicious characteristics during BACEN's February 2012 limited examination of the Bank,. The supposedly fraudulent characteristics were that the loans had been originated by the same 9 intermediaries, eight of which shared the same tax ID number;[5] there were no documents demonstrating that the credit was actually released to the borrowers; the loans had not been entered in the Retaguarda system; some customers were identified who had more than one loan; in some loans the information recorded in the Tools system did not match the information on the physical loan documents; and some loans did not have sufficient information about the borrower[6]. BACEN Report p.81. See also, Trustee's answer to Interrogatory No. 16 of Alinia's First Set of Interrogatories.

The FGC individuals appointed as temporary special administrators of the Debtor, hired technology companies BSI Consulting ("BSI") and IMS Technologia e Servicos Ltda. ("IMS), a small, recently formed company, capitalized with $300, with no known expertise, to examine the Debtor's financial condition. According to the BACEN Report, "BSI identified the systemic logic of the false operations, called "invalid" operations, eliminating filters and incorrect procedures." IMS is said to have: "used the criterion of financial flow; that is of replacing the write-offs (for payments), or in their absence, after reconciling with cash movement and processing through a mirrored but independent system, of the Tools system." BACEN Report at

---

[3] References are to the Trustee's Amended Complaint ("Complaint") filed on October 12, 2016 (ECF No. 25).

[4] The FGC is essentially the Brazilian equivalent of the U.S. FDIC.

[5] Virtually all of the salary loans in BCSUL's portfolio were originated by hundreds of third party organizations located around Brazil, not affiliated with BCSUL. Luis Felippe Depo. p. 20:19-21:5

[6] The Retaguarda system is a program designed to assess the creditworthiness of borrowers. Many of the CC Loans did not go through the Retaguarda System because the intermediaries which originated the loans lacked the technology to access the system. Depo of Luis Octavio p. 93:6-21

p.97.[7]  The BACEN Report also describes the work done by IMS as: using "its system called 'Bank.net' which has the main function of management of receivables from financial institutions, to mirror the consigned credit portfolio managed in the Tools system in order to conduct a reverse engineering of the transactions in the last quarter in an attempt to identify invalid operations in this portfolio."  BACEN Report p. 98[8]  These quotes from the BACEN Report are reproduced verbatim in the Report.  This technobabble is incomprehensible and Hommerding was unable to explain what BSI and IMS had actually done.  Hommerding Depo. p. 168:1-173:3.

According to the BACEN Report: "with this strategy, 655,483 fictitious contracts were identified…and another 27,164 contracts "created" from old contracts for operations that produced losses…which resulted in a total of 682,647 false operations."  BACEN Report p. 97.  Neither the BACEN Report nor Hommerding makes any attempt to explain how the total of 682,647 "fake" loans was calculated "through this strategy".  Nevertheless, this baseless information was used to create an "Opening Balance Sheet," in which the Debtor's equity was written off, rendering the Debtor bank insolvent.  In addition, the BACEN Report admits that it had no input to IMS' work and its conclusions, which "are based on principles and analyses **that do not coincide with the work of the Central Bank of Brazil**."  BACEN Report at 207 (emphasis added).

In September 2012, BCSUL was placed in extrajudicial liquidation.  Complaint ¶41.  In August 2015, the Debtor was placed in judicial bankruptcy in the Second Bankruptcy and Judicial Reorganization Court of the State of Sao Paulo (the "Brazilian Bankruptcy Court"). Complaint ¶44.  The Chapter 15 proceeding in this Court commenced in June 2014 and the

---

[7] These cryptic descriptions of the work supposedly done by BSI and IMS have never been explained, in the BACEN Report or the Report.  In fact, Hommerding had not reviewed and did not even recognize the IMS Report which is the main support for the Trustee's allegation that the Debtor had approximately 682,000 fake loans in its portfolio.

[8] Hommerding had difficulty in explaining what this language meant and what BSI and IMS had actually done. Depo. p. 168:1-13;168:18-169:3.

above captioned adversary action was filed on July 8, 2016. The Brazilian Bankruptcy Court has jurisdiction over the Foreign Main Proceeding and related Brazilian adversary type lawsuits which are described below.

In 2013, the Sao Paulo Public Prosecutor's office filed two civil lawsuits against the Indio da Costas and the other former officers and directors of the Debtor. One lawsuit sought to hold the defendants liable for the losses allegedly suffered by the Debtor; while the other sought to recover losses allegedly suffered by the Debtor's holding company (the "Public Prosecutor Actions"). Laspro has now been substituted as the Plaintiff in place of the Public Prosecutor.

Indio da Costas filed two lawsuits. In one, filed in 2015, the Indio da Costas sued the FGC and the individuals appointed as the special temporary administrators of the Debtor (the "FGC Action"). The FGC Action alleges that the losses suffered by the Debtor were caused by the FGC and the individual administrators, and accuses them of fabricating the fake loan scheme in order to place the bank in liquidation so that they could loot its assets for their own enrichment. The FGC Action has been consolidated with the Public Prosecutor Actions and is in the discovery phase in the Sao Paulo Bankruptcy Court.

The other lawsuit, filed in 2017, is against the FGC and IMS and asks the Sao Paulo Bankruptcy Court to rescind IMS' appointment and to order it to return the approximately US$30 million that it was paid for its "work" (the "IMS Action"). English translations of the Public Prosecutor Actions, the FGC Lawsuit and the IMS Lawsuit are attached hereto as Exhibits 1, 2, 3, and 4, respectively.

The claims in the instant adversary action track the Public Prosecutor Actions pending in the Sao Paulo Bankruptcy Court. Here, the Trustee alleges that "at least as early as 2008, both Luis Felippe and Luis Octavio participated in a scheme of falsified loans…" Complaint ¶9. The Trustee alleges that more than 682,000 of these fake loans were created. Complaint ¶12.

According to the Complaint, the Indio da Costas used funds derived from the allegedly fake loans to purchase apartments in New York City (the "NY Apartments") which are now held by the Defendants, Alinia and 110 CPS.  Complaint ¶¶19-27; 28-36.  The Complaint alleges that funds derived from the allegedly fake loans were used to purchase valuable art located in the New York Apartments.  Complaint ¶¶37-38 and alleges New York state law claims seeking to avoid the Defendants' title to the NY Apartment and the art.  The Complaint also alleges certain claims based in Brazilian law and aiding and abetting claims based in the law of the British Virgin Islands.  Clearly, all of the claims alleged in the above captioned adversary action (as well as the Public Prosecutor Actions) depend on proof that BCSUL, under the Indio da Costas, generated fake loans which exaggerated the equity and profits of the Bank, allowing dividends not due to be paid to the Indio da Costas, which were then used to purchase the New York Apartments and art.  The Report does not assist the finder of fact with these issues and should be excluded.

### B.     Rule 702 Fed. Rules of Evidence-The Daubert Standard

Rule 702, Federal Rules of Evidence states:

> A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 is known as the *Daubert* standard for expert testimony.  In the namesake case of *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1993), the Supreme Court held under Rule 702, a court must act as a gatekeeper and determine whether expert testimony is admissible.  509

U.S. at 597.  Federal courts have held that a trial judge has broad discretion to determine the admissibility of opinion testimony.  *Club Car, Inc. v. Club Car (Quebec) Import, Inc.,* 362 F.3d. 775, 780 (11th Cir. 2004).  The purpose is to ensure that an expert "employs in the court room the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd., v. Carmichael,* 526 U.S. 137, 152 (1999).

The Eleventh Circuit has held that the proponent of the expert testimony bears the burden of demonstrating that it is admissible, stating: "The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence." *Allison v. McGhan Med. Corp.,* 184 F.3d 1300, 1306 (11th Cir. 1999) (*citing Daubert,* 509 U.S. at 592 n. 10).  In *McCorvey v. Baxter Healthcare Corp.,* 298 F.3d 1253, 1257 (11th Cir. 2002), the court stated: "The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion."  The Court went on to state: "Rulings on admissibility under *Daubert* inherently require the trial court to conduct an exacting analysis of the proffered expert's methodology."  *Id.* at 1257.

Nothing requires a court to accept an expert's word.  As the Supreme Court stated, "Conclusions and methodology are not entirely distinct from one another.  Nothing in either *Daubert* or the Federal Rules of Evidence requires a District Court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *Gen. Electric Co., v. Joiner,* 522 U.S. 136, 146 (1997).  As discussed below, Hommerding is poorly qualified and is generally ignorant of the basis of the content of the Report.  The Report lacks a sufficient factual basis on which valid and reasoned conclusions can be based; and has not used reliable methods and principles to reach its conclusions.  These defects render the Report speculative and unreliable.  An unreliable report is not helpful to the finder of fact and should be excluded.

### C.  **Hommerding is Not Qualified and Did Not Author the Report.**

Hommerding is not registered as an accountant in Brazil and has no other Brazilian qualifications.  Depo p.15:11-17[9].  Hommerding was refused a Florida CPA license as "unqualified".  Depo p. 9:14-10:17; Exhibit 1.[10]  Hommerding's resume is inaccurate.  Although he claims membership in numerous accounting organizations, Hommerding admitted in deposition that he is no longer a member of most of them.  For example, Hommerding is not a member of the American Institute of Certified Public Accountants, Depo. p. 17:18-21; the Association of Internal Auditors, Depo. p. 18:14-16; the Association of Certified Fraud Examiners, Depo. p. 19:23-25; 21:3-6; and the Alliance of Merger and Acquisition Advisors Depo. p. 21:7-10; 23:5-8.  Hommerding explained: "I didn't have enough time to deal with all of these.  It became almost a full time job to maintain membership in all of these different organizations."  Depo. p. 19:17-21.

Hommerding's testimony was vague as to whether he had ever previously qualified as an expert witness.  Although Hommerding claims to have acted as an expert on "many occasions", he could not testify clearly about the subject matter and when and where he had done so.  First Hommerding stated that he had never acted as an expert in the United States, and had not been retained as an expert for many years.  Depo. p. 23:19-20.  Then Hommerding testified: "It was-you know, obviously I don't want to get into confidential details, but it wasn't in a court setting, but it was on numerous occasions I have given expert witness on, you know, on accounting and finance issues."  Depo. p. 23:24-24:3.  But when pressed for details, Hommerding waffled.  He admitted that he had not had an expert assignment since he went to Brazil in 2009.  Depo. p. 24:19-25.  As the deposition went on Hommerding's testimony became more muddled and confused.  Although

---

[9] References to Mr. Hommerding's deposition of May 31, 2019 will be "Depo" followed by the page and line of the location of the reference.

[10] Hommerding admitted that in order to be licensed in Florida he would have to complete three or four accounting courses, which he had abandoned.  Depo. p. 10:13-22.

he had testified that he had not been engaged as an expert since going to Brazil in 2009, Hommerding implied that he had acted in an expert capacity in Brazil, stating: "I have a very strong expertise in Brazil…so many times I would be requested to give my expert opinion on Brazilian related matters, related to accounting." Depo. p. 25:5-10.  But later testimony confirmed these were not expert engagements, but simply due diligence or advisory type assignments for investors which did not involve litigation.  Depo. p. 31:18-32:19.  Eventually Hommerding admitted that he had been retained as an expert only once before in an arbitration which occurred (contrary to his previous testimony) in the United States, before he went to Brazil in 2009.  Depo. p. 33:2-3.  Hommerding refused to identify his client or the subject matter of this single expert retention, citing confidentiality obligations.  Depo p. 36:2-8; 37:5-13.

    The fact that Hommerding may have many years of experience in general accounting work does not mean that he is qualified to act as an expert on the complex topics presented by the instant case.  A good example of this is presented by *Bivins v. Stein,* 759 Fed. Appx. 777 (11th Cir. 2018), where a Florida attorney was retained to act as an expert on the issue of the duties owed by an attorney to a guardian with regard to dealing with the ward's New York real estate investments.  The District Court excluded the expert as unqualified.  On appeal, the Eleventh Circuit found that although the expert had considerable experience in establishing, representing and removing guardians, he was not particularly experienced in New York real estate issues, other than lease disputes.  As the Court stated: "Although Gilbert may understand the duties of an attorney representing a guardian, he does not have the experience to know how a guardian is supposed to act in the context of property law."  *Id* at 781.  The Court held that under these circumstances the District Court had properly excluded the expert.

    Here, given Hommerding's lack of qualification and vagueness about his experience in general, it is difficult for the Trustee to bear the burden of demonstrating that Hommerding has

sufficient experience to render an opinion on the issues presented in this case. Hommerding admitted that he has not done any forensic accounting or fraud investigation in the last six or seven years. Depo p. 51:9-18. Hommerding lacks the specific experience in the issues involved in the making and documenting Brazilian bank loans that is necessary to render an opinion as to whether 682,000 salary loans issued by the Debtor were fake.

Furthermore, as will be discussed in the following section, even if he is found to be marginally qualified, Hommerding's deposition makes it clear that he is generally ignorant of critical issues, did not review available materials and information, did not author most of the Report and failed to ensure that the Report was the product of reliable methodology.

### D.     The Report Lacks a Sufficient Factual Basis[11]

Qualification and reliability are two different things. In *United States v. Frazier,* 387 F.3d 1244, 1261, (11th Cir. 2004), the Eleventh Circuit held that "while an expert's overwhelming qualifications may bear in the reliability of his proffered testimony, they are by no means a guarantor of reliability" Quoting *Quiet Tech. DC-8 Inc. v. Hurel-Dubois UK Ltd.,* 387 F.3d 326, 1341-2 ( 11th Cir. 2003). The *Frazier* Court went on, stating: "Quite simply, under Rule 702, the *reliability* criterion remains a discrete, independent and important requirement for admissibility." 387 F.3d at 1261 (emphasis in original). Reliability of an expert report depends in large part on consideration of sufficient, pertinent facts. Rule 702 specifically requires that an expert's testimony be "based on sufficient facts or data".

Hommerding's testimony and the Report itself show that the opinion lacks a sufficient factual basis. The loans reviewed by the Zaninetti team were carefully selected by the Debtor's employees from a pool of loans thought to have characteristics indicating their non-existence and

---

[11] Hommerding may have violated Rule 201-General Standards of the American Institute of Certified Public Accountants ("AICPA") Professional Standards, in that he has failed to exercise due professional care in the performance of his services, by failing to obtain sufficient relevant data on which to base his opinions

are described in the Report as "Sham CC Contracts Loans or Transactions," which are defined as "fraudulent or fake CC Contracts that have no economic substance…" Report p. 8. Yet, Hommerding failed to express much knowledge even of these limited and carefully curated facts. For example, when asked for a description of the facts he had relied on, Hommerding responded, "Largely what is in this report…You know, it's all written here. I don't know if we need to go verbatim over all of these points." Depo. p. 58:8-18.

As the deposition progressed it became clear that Hommerding had a serious fact deficit. Hommerding, a Sao Paulo resident at the time, admitted he had never visited the Sao Paulo data room established by the Trustee to provide access to various records of the Debtor. Depo. p.73:2-5. In fact, Hommerding did not even know where the data room was located. Depo p.71:9-14. Hommerding did not meet with any of the Debtor's staff available for interview. Depo. p.75:21-24. Hommerding never met with Mr. Laspro, the Trustee. Depo. p.53:18-20. Hommerding also failed to review Debtor's audited financial statements for the years 2006 to 11, even though this was the period in which the allegedly fake loans were being created. Hommerding stated: "…we did review some of them. The team did. Jorge (Zaninetti) did. And I conferred with them on it. I did not look at any of them in great detail." Depo. p. 158:25-159: 4

The Zaninetti team was also denied access to vital documents. As Hommerding testified: "My understanding is that the documents—this was a data room that was prepared some time ago, and we had requested a list of documents—a list of additional documents, and basically through silence we were denied access to any additional documents." Depo p. 76:5-11. The team did not receive the physical loan contracts corresponding to the electronic records available in the data room, even though they had volunteered to go to Rio de Janeiro to review them. Depo. p. 86:18-23. This made it impossible for the team to confirm that the electronic entries in the screenshots of the Debtor's database they reviewed matched the physical loan contracts. Depo. p. 91:10-19.

Later in the deposition, Hommerding disclosed that the team had been denied access to fundamental documents which should have been easily available. In deposition, Hommerding referred to a list of documents on page 22 of the Report, which were requested but never received. As Hommerding confirmed, these documents were vital to confirming the conclusions of the Report. The general ledger was requested but not provided, although this would have allowed the team to confirm whether funds had been disbursed on the supposedly fake loans, and whether the allegedly fictional loans had a record of repayment. No documents confirming the assignment of the fake loans were made available. Depo. p. 126:23-127. Depo. p.272:6-273:2.[12] Nor was the team granted access to trial balances and subsidiary ledgers, requiring them to use guesswork, delicately described by Hommerding as their "best assessment" to determine the amount of BCSUL's equity which should have been written off. Depo. p. 280:4-14.

Also, although the Report repeatedly references it, Hommerding admitted that he had never read the IMS Report and did not recognize it. Depo. p. 163:6-10. Hommerding also testified that he could not explain what BSI had done as follows:

> Q But do you know what they actually did?
> A. …in detail, exactly what they did, no.
> Hommerding Depo. p. 168:14-17

Hommerding had little understanding of the data that the IMS Report had manipulated or how IMS had done so. When the description of the work allegedly done by IMS was read to him, Hommerding commented: "Wow that's a mouthful, isn't it." Hommerding Depo p. 168:25. Hommerding continued to struggle to explain what IMS had done.

> Q. I was going to ask, do you have any better idea than me as to what that means?
> A. No. They were looking—I mean, you have hundreds of thousands of contract (sic) there, so you cant do a manual substantive testing process.

---

[12] As will be discussed, Infra, some of the allegedly fictional loans reviewed by the Zaninetti team did have a record of repayment.

Hommerding Depo. p. 169:1-7.

Hommerding went on to speculate as what IMS might have done. Hommerding Depo. p. 168: 8-170:22. But, as he admitted: "…I cant speak on whether that's actually what they did." Hommerding Depo. p. 170:20-22. Hommerding never reviewed the IMS Report before the deposition. Hommerding Depo. p. 172:17-22. Neither Hommerding nor the other members of the Zaninetti team were provided with IMS' work papers, if any. Hommerding Depo. p.173:1-3. This is a significant omission since the IMS Report is the basis for the conclusion that over a billion reals of BCSUL's equity had to be written off. If Hommerding and the Zaninetti team did not understand or were unable to analyze what IMS had done, there is no basis for the conclusions that BCSUL had negative equity or that there were approximately 682,000 fake loans in its portfolio.

Hommerding admitted that he had never viewed the Tools program where all loans were recorded, stating: "I think I testified already at least ten times that I did not go into the data room and did not view the Tools system" Depo. p. 110:7-9. Nor did Hommerding have any familiarity with the information that should have been inputted to the Retaguarda System. Depo. p. 102:3-14. These are significant omissions since the Report notes that the loans were reviewed in Tools and that one of the signs of the fake loans was their absence from the Retraguarda system.

Hommerding was also unfamiliar with the work done by PwC. PwC is credited with performing "a relatively simple confirmation procedure" which "indicated an amount of non-existent assets of R$1,331,558,000.' Report p. 52. This resulted in the preparation of the Opening Balance Sheet "prepared by the FGC, the negative adjusted to Shareholders' Equity of R$2,236,782 was found" (sic)[13]. But Hommerding never met with anyone from PwC. Depo p. 173:15-23. Although asked directly and repeatedly to describe his understanding of the procedures used by

---

[13] Much of the Report is written in this type of broken English, clearly indicating that Hommerding, born in Minnesota and a native English speaker was not its author. Hommerding essentially admitted that much of the Report was lifted verbatim from the BACEN Report. Depo. P. 226:8-14; 227:1-11.

PwC, Hommerding could not do so, responding only "they performed due diligence procedures" which he could discuss only in broad generalities. Depo. pp. 195:20-197:22.

An expert cannot formulate a reliable opinion if he has not accessed the relevant facts. In *McCorvey v. Baxter Healthcare Corp.,* 298 F.3d 1253, 1256 (11th Cir. 2002) the Eleventh Circuit emphasized that *"Daubert* requires that trial courts act as gatekeepers to ensure that speculative, unreliable expert testimony does not reach the jury." The Court went on to explain that expert testimony should be admitted only if it is clear that "(1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Id. None of these factors are present in the Report.

### E. The Report is Not the Product of Reliable Principles and Methods

Even where an opinion is based on adequate facts, it must reach its conclusions by use of "reliable principles and methods." Rule 702 (2), Fed. R. Ev. See also, *Daubert* at 593. The Report and Hommerding's testimony indicate that few if any methods or procedures of any sort were used in the preparation of the Report. Instead, most of the findings of the Report were plagiarized from the BACEN Report without any effort to independently verify their accuracy. The Report describes the Zaninetti methodology in a simple manner, stating: "We randomly selected 3000 Sham CC Contracts from the years 2007 to 2011 and analyzed them in Tools and Retaguarda. The analysis of these resulted in the identification of fraud." Report p. 11. The Report goes on at page 12 to list the conclusions it supposedly drew from this. These include "Irregularity A" from p. 12-15 of the Report, which states that BCSUL "systematically generated Sham CC Contracts" resulting in misstated financial statements. This conclusory statement is followed by various excerpts from the BACEN Report, and concludes that BACEN determined the assets of BCSUL should be reduced by

R$1.249.5 billion.  The Report does not explain what analysis the team actually did to confirm the amount of the asset reduction.

"Irregularity B" on page 15 of the Report states: "we found that from May 2007 to March 2012, BCSUL adopted procedures of accounting inconsistent assets reflected in financial statements which did not represent its actual economic and financial condition."  The Report states that this discovery resulted in a "regulatory equity adjustment of R$1.123 billion (a different adjustment than that stated in Irregularity A).  However, again there is no explanation of what the Zaninetti team did to determine that the KPMG audited financial statements were inaccurate.

"Irregularity C" on pages 15-16 of the Report discusses Brazilian standards for the preparation of financial statements and concludes that "from May 2007 to March 2012 BCSUL registered accounting entries that did not reflect its real economic-financial condition and resulted in the determination of a regulatory equity adjustment of R$1.123 billion."  Once again, the Report does not explain what procedures and methodologies were used to confirm that this reduction was accurate.

The Report parrots the BACEN Report, which relied on the work allegedly done by the FGC, IMS, BSI and PwC.  The main conclusions of the BACEN Report are that the portfolio of the Debtor Bank contained over 682,000 fake CC loans which required significant write offs of BCSUL's assets, rendering the Debtor insolvent.  But there is no evidence that the Zaninetti team performed any work whatsoever designed to confirm these conclusions.  It seems that all that was done was the examination of the 3000 "Sham CC Contracts".  Hommerding testified that the object in examining the 3000 Sham CC Contracts was simply to verify the allegedly fraudulent characteristics described in the BACEN Report.  Hommerding Depo. p.137:16-138:12.  No work was done to confirm the number of fake loans in the Debtor's portfolio, or the extent to which this should have reduced the Debtor's equity.  Essentially the Report relies on the BACEN Report

(which itself relies on the IMS Report) without performing any tests or procedures to verify its conclusions.  In *Erbeli v. Cirrus Design Group,* 615 F. Supp.2d 1357 (S.D. Fla. 2009), the defendant's expert had based his opinion on testing done by others.  The Court excluded the opinion because it was "not based on any specialized technical or scientific knowledge or methodology and would not assist the trier of fact because it merely parrots another expert's opinion." *Id* at 1364.

Hommerding and the Zaninetti team did nothing else designed to confirm the accuracy of the other conclusions of the BACEN Report, resorting instead to quoting lengthy portions of it, complete with citations to the page of the BACEN Report or its appendix, from where the excerpt was lifted.  In fact, Hommerding admitted in deposition that he had never examined the IMS Report which is the basis for the conclusion that there were over 682,000 fake loans in BCSUL's portfolio.  Hommerding Depo. p. 172:17-22.  Nor was Hommerding familiar with the "relatively simple confirmation procedure" used by PwC supposedly to confirm the accuracy of the Opening Balance Sheet.  Depo. pp. 195:20-197:22.  Hommerding also admitted that he performed no procedures to confirm that there were more than 682,000 fake loans in BCSUL's portfolio.  Depo. pp. 237:21-25; 279:25-280:14 (since the team did not have access to the trial balances and subsidiary ledgers it had to make its "best assessment" based on the documentation available).

So, it seems that the only work done by the Zaninetti team was the review of the 3000 Sham CC Contracts to confirm that they contained some or all of the characteristics identified by BACEN indicating that they were fake.  But the Zaninetti team failed even this simple task.  During the deposition, Hommerding was asked to examine a composite exhibit (Exhibit 7), consisting of seven of the loan record print outs that were among those examined by his team to confirm that they did actually contain these characteristics.  All of the examples showed evidence of payments made on the loans which is clearly inconsistent with the notion that they were fake.  See Composite Exhibit 7; depo. pp. 250:22-25; 257:3-8; 259:20-260:4 .

Hommerding had opined that another characteristic was that the fake loans were assigned to investors and removed from the books of BCSUL. Again when asked to examine the exhibit and point out what showed the assignment, he was unable to do so. Depo. p. 252:7-9.

Another alleged characteristic of fraud was that the Sham CC Loans were all originated by the same nine correspondents, eight of whom had the same tax ID number. Again some of the loans in Exhibit 7 were originated by correspondents other that the nine suspected of fraud. Depo. p.264:1-22.

### F.     The Report will not be Helpful to the Finder of Fact.

The final requirement for admission of expert testimony is that it must be helpful to the finder of fact. *Frazier, supra.* at 1244. Rule 702(a). Expert testimony that merely parrots the work of others is not helpful or reliable and should not be admitted. See, *Erbeli,* supra.

This is very similar to the Report, which for the most part simply regurgitates the main points of the BACEN Report without applying any methodology or procedures designed to test these conclusions. The only original work done by the Zaninetti team, the review of the 3000 loans was ineffective at showing that they shared the alleged characteristics of fraud detected by the BACEN Report. This is exactly the type of misleading, unreliable and unscientific speculation that *Daubert* was designed to exclude.

### CONCLUSION

The Report lacks a sufficient factual basis and evidences no use of any rational methodology. Hommerding is unqualified, is ignorant of vital facts and clearly played a limited role in the preparation of the Report. The Report makes no independent findings but simply parrots the BACEN Report. The Report does not explain whether it used any procedures or methodologies to confirm its plagiarized conclusions. The Report is unreliable and useless to the

finder of fact The Report should be excluded and Hommerding barred from testifying as an expert.

>Respectfully submitted,
>
>BAST AMRON LLP
>*Counsel for the Defendants*
>SunTrust International Center
>One Southeast Third Avenue, Suite 1400
>Miami, Florida 33131
>Telephone: (305) 379-7904
>Facsimile: (305) 379-7905
>Email: bamron@bastamron.com
>Email: jhart@bastamron.com
>
>By: */s/ Jeremy J. Hart*
>  Brett M. Amron, Esq. (FBN 0148342)
>  Jeremy J. Hart, Esq. (FBN 510645)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served electronically via CM/ECF, as indicated on the attached service list on this 15th day of July, 2019.

>By: */s/ Jeremy J. Hart*
>  Jeremy J. Hart

## SERVICE LIST

### VIA CM/ECF

- Daniel M Coyle    dcoyle@sequorlaw.com, ngonzalez@sequorlaw.com