UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:

MASSA FALIDA DO BANCO                    CHAPTER 15
CRUZEIRO DO SUL S.A.,                           CASE NO.:14-22974 – LMI
      Debtor in a Foreign Proceeding
_____/

LASPRO CONSULTORES LTDA.,
a Brazilian Sociedade Limitada,
      Plaintiff,                                     ADV. CASE NO. 16-1315-LMI
v.

ALINIA CORPORATION, a British
Virgin Islands Company Limited by Shares,
110 CPS, INC., a British Virgin Islands
Company Limited by Shares,
      Defendants.
_____/

## PLAINTIFF, LASPRO CONSULTORES, LTDA.'S MOTION TO EXCLUDE OPINIONS RENDERED BY LOPES MACHADO CONSULTORES.

Plaintiff, Laspro Consultores, Ltda. files this Motion to Exclude Opinions Rendered by Lopes Machado Consultores ("LM") based upon the following reasons.

1.      In the expert report filed by LM ("LM Report"), LM presents its expert analysis as answers to fifteen (15) discrete questions (some with subparts) posed by Maria Luisa Garcia de Mendonça ("Mendonça") (a former officer of BCSUL and non-party to this lawsuit). See LM Report, p.: 2. José Fernandez Vidal ("Vidal") was deposed as the representative of LMM on June 5, 2019 and provided further illustration of LM's scope of retention, methodology and opinions.

2.      The LM Report, and Vidal's deposition testimony attempting to explain it are a series of opinions on multiple discrete issues, many of which are either irrelevant and/or well outside the scope of LM's area of purported expertise (accounting). Other opinions do not fall within either of these categories for exclusion, but are the products of either an insufficient factual

basis, a defective methodology, or both.  The LM Report, the testimony "explaining" it by Vidal, as well as Lopes Machado an expert witness, should be excluded.

### Fed. R. Evid. 702 and *Daubert/Kumho* Standard.

3.      As held by the Eleventh Circuit: "The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence." Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999) (citing Daubert, 509 U.S. 579, 592 n. 10).

4.      Rule 702, Federal Rules of Evidence states:

A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if:
(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

5.      "Conclusions and methodology are not entirely distinct from one another … But nothing in either Daubert or the Federal Rules of Evidence requires a District Court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).  In McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1256 (11th Cir. 2002) it was emphasized that *"*Daubert requires that trial courts act as gatekeepers to ensure that speculative, unreliable expert testimony does not reach the jury."  This Court has broad discretion to determine the admissibility of opinion testimony.  Club Car, Inc. v. Club Car (Quebec) Import, Inc., 362 F.3d. 775, 780 (11th Cir. 2004).  The Daubert standards ensure that an expert "employs in the court room the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co., Ltd., v. Carmichael, 526 U.S. 137, 152 (1999).

"The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion." <u>McCorvey</u>, at 1257.

**<u>Insufficient Factual Basis</u>.**

6.      An expert cannot formulate a reliable opinion if he has not accessed the relevant facts, regardless of the credentials of the expert who rendered the opinions.  <u>See Bivins v. Stein</u>, 759 Fed. App'x. 777 (11th Cir. 2018); <u>United States v. Frazier</u>, 387 F.3d 1244, 1261, (11th Cir. 2004) ("Quite simply, under Rule 702, the *reliability* criterion remains a discrete, independent and important requirement for admissibility.").  ).  Expert testimony should be admitted only if "(1) the testimony is based on sufficient facts or data." <u>Quiet Tech. DC-8 Inc. v. Hurel-Dubois UK Ltd.</u>, 326 F.3d 1333, 1341-42 (11th Cir. 2003); see also <u>.</u>  <u>McCorvey v. Baxter Healthcare Corp.</u>, 298 F.3d 1253, 1256 (11th Cir. 2002).

7.      "[A]n expert is not credible when that expert fails to seek out and consider all possible evidence." <u>Jones v. GDCP</u>, 753 F.3d 1171, 1189 (11th Cir. 2014) (internal quotations omitted); <u>see also</u> <u>Callahan v. Campbell</u>, 427 F.3d 897, 921–22 (11th Cir. 2005) (explaining that the expert witness simply repeated everything the family members told her, reviewed only limited information the defendant, and failed to interview others).

8.      Also applicable here is <u>Eberli v. Cirrus Design Corp</u>, 615 F. Supp. 2d 1357 (S.D. Fla. 2009), where the defendant's expert based his opinion  solely on testing performed by another expert. .  <u>Id</u> at 1364 (while "an expert's testimony may be formulated by the use of the facts, data and conclusions of other experts … such expert must make some findings and not merely regurgitate another expert's opinion") (internal quotations and citations omitted); see also <u>Al Luch v. Scottsdale Insurance Co.</u>, 2018 WL 1913260 (S.D. Fla. Feb. 2, 2018); <u>Barfield v. Orange City.</u>, 911 F.2d 644, 651 n.8 (11th Cir. 1990) ("The trial judge did not abuse his discretion in concluding

3

that the expert testimony … would not assist the trier of fact" because the expert only considered the information that the parties submitted … "but conducted no other investigation.") (internal citations omitted).

9.      As described below, LM based its entire analysis upon: (1) reports prepared by prior experts retained by the Indio da Costas ( one a Lopes Machado entity[1] and the other a report prepared by Eliseu Martins and Vinícius Aversari Martins; (2) KPMG-audited financial statements and audit reports for BCSULthat the Brazilian Courts previously determined were improperly done and unreliable which led to sanctions against KPMG and the individual auditors involved (Vidal was shockingly unaware of this salient fact), and; (3) the review of—exactly—twenty (20) non-randomly selected loan contracts.[2]

10.     The LM Report and Vidal's testimony makes explicit that LM simply took the reports done by the Indio da Costas' prior experts  and copy/pasted the titles and conclusions of them and into the LM Report, particularly in rendering opinions regarding BCSUL's financial state/profitability *vel non* during years 2007, 2008 and 2010, relevant to determining if BCSUL

---

[1] The name of this entity is Lopes & Machado Auditores Ltda.  Despite the similarity in name to LM, Vidal testified that the only commonality between the two entities is common ownership. See Vidal Depo. Tr., pp.: 103:22 – 104:4; 104:10 – 105:2.  No member of the team involved in the analysis of the prior letter report of Lopes & Machado Auditores was involved in the analysis of the LM Report, and no member of the team that participated in the analysis reflected in the LM Report was involved in the analysis that is reflected in the letter report of Lopes & Machado Auditores.  See id., pp.: 105:3:8.  In fact, the two Lopes Machado entities didn't even share a single employee.  See id., pp.: 106:8:10.

[2] Vidal indicated that he might attempt to offer an opinion regarding review of an additional set of contracts on which payments were allegedly received after the TSAR/RAET was declared. See id., pp.: 190:24 – 191:4.  This would be inadmissible as a late-disclosed opinion.  See Fed. R. Civ. P. 26(a)(2)(B)(i); Reese v. Herbet, 527 F.3d 1253, 1265 (11th Cir. 2008) ("Disclosure of expert testimony within the meaning of the federal rule contemplates not only the identification of the expert, but also the provision of a written report containing a complete statement of all opinions and the basis and reasons therefor.").

4

could have properly paid dividends during this time period (Answers to questions two and nine in

the LM Report).  See LM Report, pp.: 9, 12 – 13; Vidal Depo. Tr., pp.: 103:16 - 123:18; 131:12 –

136:18[3]; 164:13:20.

---

[3]

Page 132
8 Q. Okay. Isn't it true that BCSUL
9 did have some liability, at least at some point
10 in time, for that tax liability?
11 A. It's hard to judge just from what
12 is here, because there was another company that
13 was notified, not Cruziero do Sul. Cruziero do
14 Sul does not own this company.
15 Q. So are you saying that this was a
16 mistake by the Brazilian IRS?
17 A. From what I can see here, it looks
18 like it was a mistake, but I can't make a
19 judgment. It's not a mistake by the one who
20 made the report but by the one who made the
21 adjustment.

Page 134
8 Q. Okay. That's not what I asked,
9 though. I'm asking, did you review the notices
10 of violation that are referred to in 26?
11 A. No.
12 Q. If you turn to the following page
13 and go one page further you'll see a subheading
14 "Tozzni." You'll see a reference to a Tozzni
15 Freire, F-R-E-I-R-E, report. Did you review
16 the Tozzni Freire report?
17 A. No.

Page 136
4 Is it your position that Matos
5 Filho's assessment of probable is incorrect?
6 A. I can't judge that. I don't know.
7 Q. Okay. Is it your position or your
8 viewpoint that the tax liability that is the
9 subject of note 26 should not be reflected on
10 that June 4, 2012 balance sheet of BCSUL that
11 was revised, or the subsequently further
12 revised balance sheet of BCSUL in August of

11.    Unlike the work done by Correa Porto regarding the BACEN Report (where Correa Porto subjected BACEN's conclusions to Correa Porto's own independent analysis and testing before finding consistency in results), LM simply took the work of the Indio da Costa's prior experts and incorporated it by reference into the LM Report and placed them in a chart. See id., pp.: 110:23 - 123:18; 166:11 – 167:7[4]; 168:13:20[5]; 169:24 - 170:14[6].    LM conducted no

---

13 2012?
14 A. I didn't express an opinion on
15 that. I just answered a few questions, and
16 based on these two reports that we understand
17 that they are relevant. We understand that the
18 adjustments should not have been made.

[4]

1 Q. We've already talked about those
2 reports enough. So I want to know, in
3 answering question number nine was there any
4 other analysis that went into this answer other
5 than the analysis contained in those two other
6 reports?
7 A. No.

[5]

13 But my question was actually far
14 simpler. I was asking how much of your answer
15 to question nine was based upon the two
16 reports, the Martins' report and the other
17 Lopes Machado report.
18 A. But it was based on these two
19 reports, not to disconsider this adjustment of
20 1,255,000,000.

[6]

24 Aside from analysis of IMS, its
25 adjustment, its qualifications, what other
Page 170
1 analysis did you or your team do to answer
2 question nine?
3 A. Nothing else.

11 Q. Did you or your team do any of

independent review of the data analyzed by the Indio da Costa's prior experts, conducted no analysis of the method undertaken by the  Indio da Costa's prior experts, and had no discussion with the Indio da Costa's prior experts.  See id., pp.: 106:18 – 110:14; 137:10 – 138:1.  Vidal could not speak to what the prior experts had done; he could only speculate based upon their reports what they  likely reviewed and likely did,.  See id., pp.: 107:15 – 108:12; 111:3 - 136:18; 137:10 – 138:1.

12.     Vidal also testified that whatever original analysis LM conducted of BCSUL's profitability (and thus BCSUL's ability to declare dividends) was based upon LM's review of BCSUL's financial statements  audited by KPMG, and KPMG audit reports, both of which LM accepted as true despite that Brazilian Courts have already held that KPMG's audits were improperly conducted.  See LM Report, pp.: 16 – 18; Vidal Depo. Tr., pp.: 23:2:9; 56:11 – 57:22; 68:7 - 71:11; 138:2:9; 192:21 - 194:22.  Moreover, despite having testified that he had access to the BACEN Report, Vidal testified that no one at LM had read the entire report and LM was not aware that the KPMG audited financial statements were determined to be unreliable due to KPMG's improperly conducted audits.  See id., pp.: 57:23 – 58:17[7]; 71:12:19; 144:9:17.

---

[7]
12 your own retroactive profit or loss analysis of
13 the bank for any of the years reflected in the
14 column on page 12?
15 A. No, we did not.

Page 57
23 Q. And when you did this review of
24 these financial statements, were you aware that
25 KPMG had been the subject of an administrative

Page 58
1 proceeding initiated against it because KPMG's
2 audits during the relevant time period had
3 failed to comply with relevant audit standards?
4 A. I didn't know that.

13.    These problems also doom LM's "opinion" that the potential results reported by BCSUL from 2007 – 2010 in Notes "20, 23, 23 and 22" to the financial statements represent amounts that could be realized through market trades or estimated market values, since this "opinion" is also based upon the KPMG-audited financial statements.[8]  See LM Report, pp.; 16 – 18; Vidal Depo. Tr., pp.:192:21 – 194:22.

14.    Attempting to salvage what might remain of the LM Report's credibility, Vidal then attempted to backtrack and state that LM did *not* rely upon the improperly audited financial statements but instead only looked at them.    See id., pp.: 58:18 – 65:7.  This new position is contrary to Vidal's other testimony and the LM Report referencing that LM relied upon BCSUL's financial statements and KPMG's audit reports to opine that BCSUL was sufficiently profitable to have declared the dividends to the Indio da Costas during years 2007, 2008 and 2010 and even discussing the meaning of "notes" on BCSUL's financial statements during this time period.  See, supra.  So, either LM relied upon the tainted KPMG-audits and tainted KPMG-audited financial statements, or relied solely upon the reports of the  Indio da Costa's prior expert.

---

5 Q. Okay. Prior to generating the
6 report, had you had an opportunity to review
7 and analyze the Central Bank report that we
8 have been referring to in this case
9 colloquially as the BACEN report?
10 A. Not me personally, but the
11 partners involved in the work, yes. It was
12 also used as a document for this work.
13 Q. Okay. Had your partners or you
14 reviewed the portion of the BACEN report that
15 dealt with the issues with the KPMG audits?
16 A. No, because that was not the
17 object of our analysis.

[8] This opinion is also unhelpful to the trier of fact because it is irrelevant, as set forth, infra.

15.     LM also rendered two opinions regarding the professional background of IMS, an IT firm retained by BACEN to render an IT analysis regarding the fake salary loans.  See LM Report, pp.: 11 – 12.  However, LM also admits that it was unable—or unwilling—to locate sufficient information to sufficiently vet IMS or its qualifications, relying only upon some public records searches and the IMS Report, and without, for instance, conducting any interviews with IMS personnel or doing any further investigation, whatsoever.  See id. ("It was not possible to access data to express an opinion on the professional background of 'IMS Tecnologia e Serviços Ltda.'"); Vidal Depo. Tr., pp., 149:16:22; 151:25 – 158:4.  Instead, LM only did a survey on IMS' taxpayer ID, its CNPJ, researched the corporate filings of IMS and looked at the names of IMS' partners and what kinds of jobs they had performed before or if IMS had any famous clients.  See id., pp.:152:12 - 157:07.  LM did no analysis of the software IMS used and no analysis of the mirrored system that IMS created.  See id., p.: 162:1:9.

16.     The LM Report also opines that rolling over loans is proper , in and of itself.[9]  See LM Report, p.: 27.  Vidal testified LM had not reviewed or analyzed any of the transactions listed on pages 195 to 196 of the BACEN Report, which included the transactions for which BACEN had cited BCSUL for improperly rolling over.  See Vidal Depo. Tr., pp.: 202:21 – 203:12.  Vidal also agreed that rolling over loans to disguise a fraud is inappropriate.  See Vidal Depo. Tr., pp.: 201:23 – 202:20.

17.     LM renders no actual opinion regarding whether or not BCSUL made any fake salary loans.  Instead, LM only states that in its review of exactly twenty (20) loans (Vidal did not

---

[9] Of course, this is not the issue here.  The use of rolling over loans to disguise a fraud -- specifically a fraud involving the disguising of payback of fake loans by merely booking new loans that purport to pay off the old loan.  Thus, this opinion is also not helpful to the trier of fact, as set forth, infra.

even review the contracts themselves, just spreadsheets regarding those contracts), that at least one payment was received after the TSAR/RAET was declared on each of these loans.  See LM Report, pp.: 28 – 33; Vidal Depo. Tr., pp.: 24:9:20; 43:3 – 44:9; 181:18 – 182:9.  Strangely, Vidal testified that LM was *not* retained to perform an analysis of the entire loan portfolio to determine whether or not BCSUL made 682,647 fake salary loans, and instead testified that LM's scope was limited to simply examining some loans to determine whether or not any payments were received on any of the 2.5 million salary loans that BCSUL made from 2003 – 2012.  See Vidal Depo. Tr., pp.: 55:10:24[10]; 177:3:20; 185:8 – 186:7[11].  While Vidal asserted that BCSUL received payments regarding these twenty (20) loans, LM did not review documents regarding the source of these payments.  See id., p.: 189:20:22.  Vidal also admitted that LM did not have sufficient data regarding all loan contracts (specifically all contracts that were overdue for more than six months). See id., pp.: 180:3:15.  The only other analysis LM made of the contracts was to determine if all of the allegedly fake salary loans were located in the "H41" table.  See id., pp.: 189:23 – 190:7.

---

[10]

    15 Q. So does this reservation have
    16 anything to do with an inability to render an
    17 opinion regarding whether or not the consigned
    18 credit loans were fake or fraudulent?

    19 A. In some way, yes, because I wasn't
    20 hired to find fraudulent contracts.

[11]

    Page 186
    1 Q. Okay. So are you saying that the
    2 scope of your work as defined was only to
    3 determine whether some contracts were still
    4 being paid after June 4, 2012, instead of
    5 analyzing whether or not 682,000 contracts were
    6 false?
    7 A. That's exactly what I'm saying.

18.     The LM Report also renders opinions related to "bank credit bills" (CCBs), including whether BCSUL had formal credit approval policies, if procedures for extending loans through CCBs were audited and if the CCBs were registered with a clearing house. <u>See</u> LM Report, pp.: 19 – 26; Vidal Depo. Tr., pp.: 194:23 - 198:21. To the extent that LM opines that these loan approval policies applied to the salary loans at issue, LM's opinion explicitly contradicts Luis Felippe's testimony that there were few if any underwriting policies applicable to the salary loans. <u>See</u> Felippe Depo. Tr., pp.: 23:10 - 40:16[12]. That LM was not aware of this testimony further underscores the insufficient factual basis upon which its analysis rests. <u>See</u> Vidal Depo. Tr., p.: 198:14:21.

19.     The LM Report also indicates that 95% of the fake salary loans were made for an amount less than R$ 5.000. <u>See</u> LM Report, p.: 29. Despite that the LM Report states that BCSUL was required to notify the SCR of all loans in excess of R$ 100,00 as of October 2010 (<u>see</u> <u>id.</u>), Vidal testified that prior to that date (in other words, during the relevant period of time), BCSUL was only required to report salary loans in excess of R $5.000 to SCR, which is consistent with the BACEN Report's statement on the issue (<u>see</u> Vidal Depo Tr., pp.: 201:6:10).

**<u>LM's Methodology, Where any Methodology Might Exist, Is Unreliable.</u>**

20.     "Rulings on admissibility under <u>Daubert</u> inherently require the trial court to conduct an exacting analysis of the proffered expert's methodology." <u>McCorvey</u>, 298 F.3d at 1257. Courts exclude opinions where the methodology of the expert's analysis lacks impartiality. <u>See Munoz v. Orr</u>, 200 F.3d 291, 301 (5th Cir. 2000) ("The facts showing the insufficiency of Dr. Benz' evidence range from particular miscalculations to his general approach to the analysis ... In his

---

[12] <u>See also</u> Defendants' Motion to Abate or Stay and for Partial Summary Judgment (D.E. 153), ¶10.

depositions, he admitted to failing to consider other variables such as education and experience as explanations for any observed discrepancy between promotion rates and to not performing a multiple regression analysis."); In re Prempro Prods. Liab. Litig., 738 F. Supp. 2d 887, 893 (E.D.Ark.2010) ("Considering the record as a whole, it appears that Dr. Demirovic selected study data that best supported her opinion, while downplaying contrary findings or conclusions. Dr. Demirovic also has partially relied on data that is not statistically significant. These concerns, taken together, significantly undermine the reliability of her proposed testimony.").

21.     Courts also exclude expert opinions based upon statistically insufficient samples of data. See, e.g., In re Chantix (Varenicline) Prods. Liab. Litig., 889 F. Supp. 2d 1272, 1290 (N.D. Al. 2012) "if an expert places undue emphasis or statistically insignificant evidence, it may indicate that the expert's methods are unreliable."); Holowecki v. Fed. Exp. Corp., 644 F. Supp. 2d 338, 361 - 362 (S.D.N.Y. 2009), aff'd, 382 Fed. App'x. 42 (2d Cir. 2010) (holding that a statistics expert's opinion that a company discriminated against older workers was not sufficiently reliable to establish a disparate impact claim); Caraker v. Sandoz Pharm. Corp., 188 F. Supp. 2d 1026, 1030 - 31 (S.D. Ill. 2001)..

22.     The LM Report answers fifteen (15) questions, created by Mendonça.  Thus, the LM Report is  not the result of a method  constructed by LM and then reliably applied.  The LM Report states:  "As we understand it, you believe that the procedures described in the agreement referred to above and in the scope of our work regarding the questions asked are sufficient for your purposes. We make no representation as to the sufficiency of these procedures."  See LM Report, p. 2; Vidal Depo. Tr., pp.: 47:11 – 53:16.

23.     In short, Mendonça, Star Investimentos and/or the Indio da Costas determined the procedures for LM rather than LM setting the method.

24.     LM's opinions also rely upon a defective methodology that even LM admits is unreliable.  LM simply took the report of the Indio da Costa's prior  experts  and copy/pasted the titles of them into the LM Report.  See, supra.

25.     LM attacks the BACEN Report's analysis as being based upon an insufficient number of loan contracts analyzed (440 contracts were analyzed in the BACEN Report) that were not randomly sampled such that no conclusions can be drawn from the BACEN Report's sample. See LM Report, pp.: 29 – 31; Vidal Depo. Tr., p.: 174:9:23; 175:18 – 176:2.  But LM reviewed only *twenty (20)* contracts that were not randomly selected.  See LM Report, pp.: 29 – 31; Vidal Depo. Tr., pp.: 24:9:20.  Instead, LM selected these contractsbecause at least one payment was allegedly made on each of them after the TSAR/RAET was declared.[13]  See LM Report, pp.: 29 – 31; Depo Tr. of Vidal, pp.: 182:11 – 185:11. LM also did not verify the source from where the payments came and so did not rule out alternative explanations.  See id., p.: 189:20:22.  These methodological flaws render the LM Report and Vidal's testimony unsalvageable.

**LM Is Not Qualified to Render Several of the Opinions.**

26.     An expert may not opine on issues that are outside of the expert's expertise. See Barnext Offshore, Ltd. v. Ferretti Grp. USA, Inc., 2012 WL 13012778, *9 (S.D. Fla. May 24, 2012); Umana-Fowler v. NCL (Bahamas) Ltd., 49 F. Supp. 3d 1120, 1121 (S.D. Fla. 2014) (holding that the expert had never been qualified as a crowd control expert and therefore was properly disqualified).

---

[13] Despite that LM criticizes the larger sample studied by BACEN for not being randomly selected.

27.     Expertise in one field does not qualify a witness to testify about others.  See Lebron v. Sec'y of Florida Dept. of Children & Families, 772 F.3d 1352, 1368 (11th Cir. 2014); Gomez v. Gen. Nutrition Corp., 323 F. Supp. 3d 1368, 1378 (S.D. Fla. 2018).

28.     LM, purportedly retained as a forensic accounting expert, also rendered numerous opinions outside of forensic accounting, including: (1) the effect of Laspro's joinder of various lawsuits in Brazil[14]; (2) the professional background of IMS, a firm that provided analysis in support of the BACEN Report, and whether or not IMS can be considered an expert firm under Brazilian legislation[15]; (3) whether or not Cruzeiro do Sul Holding S/A was prevented from acquiring debentures issued by Patrimonial Maragato[16], and; (4) the current state of the property that is the subject of this suit.

29.     LM, by its own admission, is not qualified to opine as to whether or not Laspro's joinder of two lawsuits pending in Brazil has the effect of Laspro's agreement with the allegations in those lawsuits and thus disagreement with the adjustments in the BACEN Report.  See Vidal Depo. Tr., pp.: 145:15 – 149:6.  Even assuming this is a proper subject for expert opinion, Vidal admitted LM's opinion was based entirely on an a letter written by the same law firm that represents the Indio da Costas in Brazil and is co-counsel to Bast Amron in representing Defendants in this case.  See id.

30.     LM is also not qualified to render an opinion regarding IMS's professional background or IMS's qualifications to be an expert under Brazilian legislation.  As IMS was

---

[14] See LM Report, pp.: 10 – 11.

[15] See id., pp.: 11 - 12.

[16] See id., pp.: 13 – 16.

retained, not as an accounting firm, but as an IT Firm to render an IT analysis regarding the fake salary loans.  <u>See</u> BACEN Report, pp.: 97 – 98, 212.  Vidal testified that he did not understand the method IMS used, how IMS achieved the conclusion it did or have any experience in the method that IMS used.  <u>See</u> Vidal Depo. Tr., pp.: 157:25 – 158:2; 159:3:9; 162:10:21.  LM, as a forensic accounting firm, does not have the qualifications to opine on a firm specializing in a different professional sphere.[17]

31.     LM is not qualified to opine as to whether or not Cruzeiro do Sul Holding S/A was prevented from acquiring debentures issued by Patrimonial Maragato because this is, again, a legal issue of Brazilian securities laws.  <u>See id</u>., pp.: 172:2 – 172:21.  LM is not a law firm and does not deal in securities law.  <u>See id</u>., pp.: 170:20 – 171:22; 172:24 – 173:9.  Moreover, the opinion is nothing more than an (attempted) application of a Brazilian law—Article 34 of Law No. 4595, of December 31, 1964—to the facts, which is a legal issue for the Court to decide.[18]

**<u>Many of LM's Opinions Are Not Helpful to the Trier of Fact</u>.**

32.     An expert's opinion is inadmissible when it does not assist the trier of fact. <u>Edwards v. Shanley</u>, 580 Fed. App'x 816, 821 (11th Cir. 2014) (explaining that the expert's opinion was inadmissible because "it would not assist the trier of fact in understanding the evidence or determining any fact at issue" because it was "no more than a characterization") (internal quotations omitted); <u>Martin v. City of Atlanta, Ga.</u>, 579 Fed. App'x. 819, 827 (11th Cir. 2014); <u>Linde v. Arab Bank, PLC</u>, 922 F. Supp. 2d 316, 324 (E.D.N.Y. 2013) (expert's opinions as to state of mind, intent, or motive of charitable entities or any other organizations

---

[17] LM's opinions regarding IMS should also be excluded for lack of sufficient factual basis on these grounds, based upon the legal authorities discussed, <u>supra</u>.

[18] As set forth, <u>infra</u>, such an opinion is not helpful to the trier of fact.

were not relevant, and thus opinions were inadmissible); Estate of Collins v. Wilburn, 253 F. Supp. 3d 989, 992 (E.D. Ky. 2017) (expert opinion regarding video footage unhelpful where a jury can view the video just as well).

33.    Many opinions of LM are not helpful to the trier of fact because they are either irrelevant or not properly the subject of an expert's opinion (some of these overlap with opinions already discussed).  These include, whether or not Luis Felippe and Luis Octavio had other sources of income aside from the dividends.  See LM Report, pp.: 8 - 9; Vidal Depo. Tr., pp.: 97:15 – 101:20.  Whether or not the Indio da Costas had other sources of funds besides dividends from BCSUL during the period of time from 2007 to 2010 is irrelevant.  What matters is the source of the funds used to purchase the property.  LM has nothing relevant to say on this matter.

34.    LM also opines on other issues that are unhelpful to the trier of fact: (1) that *most* (not all) of the FGC team members involved in the BACEN Report did not have the required qualifications under Brazilian accounting rules[19]; (2) that BACEN attested to the integrity of BCSUL's systems[20]; (3) that PwC Contadores Publicos Ltda. is not an independent accounting firm[21]; (4) that the potential results reported by BCSUL from 2007 – 2010 in Notes "20, 23, 23

---

[19] See LM Report, pp.: 9 – 10; Vidal Depo. Tr., pp.: 138:20 – 139:16.  Of course, at least one member of the team *did* possess the CFC designation, and this individual signed the revised balance sheet.  See Vidal Depo. Tr., pp.: 139:23 – 140:21; Exhibit 10.

[20] See LM Report, p.: 10.  The LM Report contains no analysis on this point, and merely purports to quote a document.  The purported quotation also mischaracterizes BACEN's conclusion made in the BACEN Report, issued subsequent to this Working Paper.

[21] See id., p.: 10.  The LM Report also contains no analysis on this point, and merely parrots what LM allegedly did not find regarding one of several PwC entities mentioned in the BACEN Report.  See BACEN Report, pp.: 95, 97, 98, 116, 117, 206, 213 and 241.  The opinion is also both confusing and misleading in that LM is attempting to say that PwC Contadores was not authorized to perform independent auditing services, but PwC Contadores' scope of work as reflected in the BACEN Report was not the performance of an audit, as that term is used as a term of art in the accounting world; PwC Contadores was retained to do some consulting work, and other PwC

and 22" to the financial statements represent amounts that could be realized through market trades or estimated market values[22]; (5) various opinions of "bank credit bills" (CCBs), including whether BCSUL had formal credit approval policies, if procedures for extending loans through CCBs were audited and if the CCBs were registered with a clearing house[23]; (6) that rolling over loans is not inappropriate, in and of itself[24]; (7) that the real properties under dispute are subject to restrictions in Brazil and in the USA that prevent their free use[25], and; (8) that BCSUL had formal loan approval policies (but *not* that BCSUL followed them)[26].

35.    In addition to many of these opinions not being opinions at all, but merely stating the alleged content of documents/records, many are also objectively incorrect according to easily verifiable information.  Also, each of these issues are simply irrelevant to the material facts in

---

entities are mentioned as involved in doing due diligence.  See id.  Vidal agreed that others of these PwC entities, such as PWC Brazil Independent Auditors had the requisite qualifications to do the work described and that in many cases, he could not say that the PwC entity described in different places in the BACEN Report did *not* have the requisite qualifications to do the work described.  See Vidal Depo. Tr., pp.: 203:22 – 206:12.

[22] See id., pp.: 16 – 18.  This testimony relies upon financial statements that Courts in Brazil already determined were unreliable because the financial statements were improperly audited by KPMG.

[23] See id., pp.: 19 – 26.  The salary loans were not CCBs and as set forth, supra, the salary loans were not subject to the procedures applicable to the CCBs.

[24] See id., p.: 27.  The issue in this case is not whether a bank may roll over loans.  The issue is related to fake loans that were generated, and attempts were made to disguise their fraudulent nature, including, but not limited to, by rolling them over (renewing them to the same "borrower").

[25] See id., p. 32; Vidal Depo. Tr., pp.: 191:22 – 192:17.  This is not an opinion in the realm of forensic accounting but is just a statement based upon the freeze orders and MLAT stating that the properties cannot be transferred.  The "opinion" is based upon a statement from the law firm Podval, Antun, Indalecio, Raffaini e Beraldo Advogados, and Bottari e Oliveira Advogados, dated February 15, 2019 summarizing the effect of the freeze orders and MLAT.

[26] See id., pp.: 194:23 - 196:11.  Vidal also states that CCBs—the subject of this opinion—are different than salary loans.  See id., p.: 199:12:16.

issue:  (1) BCSUL's financial state during 2007, 2008 and 2010; (2) whether or not BCSUL's assets were artificially inflated due to fake salary loans; (3) whether or not BCSUL could have permissibly paid dividends to the Indio da Costas, and; (4) whether or not dividends paid to the Indio da Costas were used to buy the properties at issue.

WHEREFORE, Laspro requests this Court grant this motion, and exclude the expert opinions rendered by Lopes Machado Consultores, Ltda. and José Fernandez Vidal and preclude any testimony by anyone on behalf of Lopes Machado Consultores, Ltda., including, but not limited to, José Fernandez Vidal, at trial.  Laspro requests any other relief this Court deems appropriate.

August 7, 2019

Respectfully submitted,
 SEQUOR LAW, P.A.
1001 Brickell Bay Drive, 9th Floor
Miami, Florida 33131
Telephone (305) 372-8282
Facsimile (305) 372-8202

By:     */s/ Daniel M. Coyle*_____
Edward H. Davis
Fla. Bar No. 704539
edavis@sequorlaw.com
Gregory S. Grossman
Florida Bar No. 896667
ggrossman@sequorlaw.com
Daniel M. Coyle
Fla. Bar No. 055576
dcoyle@sequorlaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent via e-mail to ALINIA CORPORATION, 110 CPS, INC., c/o Jeremy J Hart, jhart@bastamron.com, mdesvergunat@bastamron.com,    dtimpone@bastamron.com,    jmiranda@bastamron.com    on August 14, 2019.

*/s/ Daniel M. Coyle*_____
Daniel M. Coyle

18