UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:

MASSA FALIDA DO BANCO                                    CHAPTER 15
CRUZEIRO DO SUL S.A.,                                    CASE NO.:14-22974 – LMI
       Debtor in a Foreign Proceeding
_____/

LASPRO CONSULTORES LTDA.,
a Brazilian Sociedade Limitada,
       Plaintiff,                                    ADV. CASE NO. 16-1315-LMI
v.

ALINIA CORPORATION, a British
Virgin Islands Company Limited by Shares,
110 CPS, INC., a British Virgin Islands
Company Limited by Shares,
       Defendants.
_____/

**PLAINTIFF, LASPRO CONSULTORES, LTDA.'S REPLY TO
MEMORANDUM IN OPPOSITION TO PLAINTIFF LASPRO
CONSULTORES, LTDA.'S MOTION TO EXCLUDE OPINIONS
RENDERED BY LOPES MACHADO CONSULTORES (D.E. 180).**

      Plaintiff, Laspro Consultores, Ltda. files this Reply to Defendants' Memorandum in

Opposition to Plaintiff Laspro's Motion to Exclude Opinions Rendered by Lopes Machado

Consultores ("LM") (D.E. 180), and states as follows:

**I. Defendants Concede Certain Opinions by LM Should Be Excluded.**

      1.      Defendants did not argue that LM's opinions regarding the following should not be

excluded: (1) whether or not Cruzeiro do Sul Holding S/A was prevented from acquiring

debentures issued by Patrimonial Maragato; (2) the current state of the property that is the subject

of this suit; (3), that the property under dispute is subject to restrictions in Brazil and in the USA

that prevent their free use; (4) that most (not all) of the FGC team members involved in the BACEN

Report did not have the required qualifications under Brazilian accounting; (5) that rolling over

loans, in and of itself, is not inappropriate; (6) BACEN's alleged attestation to the integrity of BCSUL's systems; (7) that PwC Contadores Publicos Ltda. is not an independent accounting firm, and; (8) that the potential results reported by BCSUL from 2007 – 2010 in Notes "20, 23, 23 and 22" to the financial statements represent amounts that could be realized through market trades or estimated market values.

2.      So these opinions should be excluded by default/consent.

## II. Defendants Failed to Show LM's Other Opinions Should Not Be Excluded for Lack of Expertise, Lack of Factual Basis, Unreliable Methodology and Lack of Helpfulness.

### A. The Effect of Laspro's Joinder of Other Lawsuits in Brazil.

3.      Laspro has already explained numerous times that his role as trustee required him to join the IMS Claim, since it would be the estate that would obtain the damages. See Article 22 of the Brazilian Bankruptcy Law, Item III, sub-item "c". Even Corbo agreed Laspro was required to join these claims. See Depo. Tr. of Corbo, pp.: 233:2 – 234:9. Yet Defendants persist in raising this point out of either tenacity or obstinacy. Thus, this opinion is not helpful to the trier of fact.

4.      LM admitted it is not qualified to opine on this issue because it requires legal analysis and none of the individuals who helped prepare the LM Report is a lawyer. See Vidal Depo. Tr., pp.: 145:15 – 149:6. To this point, Vidal testified that LM rendered this opinion by parroting a letter it received from a lawyer from none other than the law office of Galdino é Coelho. See id.

5.      Such total reliance upon the work of another expert is also an independent grounds for exclusion of an opinion based upon case law Laspro cited which Defendants did not address. See Eberli v. Cirrus Design Corp, 615 F. Supp. 2d 1357, 1364 (S.D. Fla. 2009); Al Luch v. Scottsdale Insurance Co., 2018 WL 1913260 (S.D. Fla. Feb. 2, 2018); Barfield v. Orange City., 911 F.2d 644, 651 n.8 (11th Cir. 1990). See also Davis on Behalf of J.D.D. v. Carroll, 329 F.R.D.

435, 442 (M.D. Fla. 2018) ("While it is true that an expert's testimony may be formulated by the use of the facts, data and conclusions of other experts, such expert must make informed findings and not merely regurgitate another expert's opinion; <u>Arch Specialty Ins. Co. v. Balzebre</u>, No. 10-23775-CIV, 2013 WL 12061814, at *2 (S.D. Fla. Jan. 9, 2013) ("There is a distinction, which is applicable here, between an expert basing his independent opinions upon hearsay and otherwise inadmissible evidence, and an expert merely parroting the expert opinion of another. Whereas the former is contemplated and permitted by the Federal Rules of Civil Procedure, the latter is strictly forbidden.").

**B. BCSUL's Financial State and Declaration of Dividends During Relevant Years.**

6.      Defendants' conflate two separate points raised by Laspro:  (1) that LM simply regurgitated reports prepared by two experts previously retained by the Indio da Costas (the Martins Report and the Letter Report of Lopes & Machado Auditores, hereinafter, "Letter Report"), and; (2) LM relied upon KPMG-Audited financial statements.[1]

7.      As to the first point, Defendants assert that an expert may rely upon the work of a prior expert, and that is certainly true.  But LM's reliance upon the prior work of the authors of the Martins Report and the Letter Report went beyond that.  The LM Report and Vidal's deposition established that Vidal simply parroted the analysis of the Martins Report and Letter Report, had no knowledge as to what those prior experts had done, what they reviewed, or what methods they used.  <u>See</u> LM Report, pp.: 9, 12 – 13; Vidal Depo. Tr., pp.: 103:16 - 123:18; 131:12 – 136:18; 137:10 – 138:1; 164:13:20; 166:11 – 167:7; 168:13:20; 169:24 - 170:14.

---

[1] Defendants do not countervail Laspro's assertion that Vidal testified that no one at LM had read the BACEN Report or that LM had not reviewed or analyzed any of the transactions listed on pages 195 to 196 of the BACEN Report, which included the transactions for which BACEN had cited BCSUL for improperly rolling over.

8.     As set forth above, Defendants do not distinguish the case law which Laspro cited demonstrating that an expert cannot simply act as a conduit for the opinions of another expert.

9.     <u>Rural Water District No. 5 Wagoner City Ok. v. City of Coweta</u>, 2013 WL 5558390 (D.Ok. 2013); <u>International Adhesive Coating Co., Inc. v. Bolton Emerson Int'l, Inc.</u>, 851 F.2d 540, 545 (1st Cir.1988) and <u>United States v. Affleck</u>, 776 F.2d 1451, 1457 (10th Cir.1985), cited by Defendants, are distinguishable because none considered the conduit point that Laspro argues.

10.    As to the second point, Defendants assert that the KPMG-Audited financial statements have not yet been adjudicated as improperly performed since KPMG is a defendant in the Public Prosecutor Actions.  This is an easily refuted and fatal position for Defendants to take.

11.    First, the BACEN Report described in painstaking detail how and why KPMG's audits were improperly performed.  <u>See</u> BACEN Report, pp.: 125 – 145.  As already stated before this Court too many times to count, the BACEN Report's conclusions were adjudicated by the various Brazilian Insolvency Proceedings Orders cited and discussed in Laspro's MSJ (D.E. 152).

12.    As if this were not sufficient, KPMG, and the individual accountants who participated in the audits were subject to an administrative procedure regarding BCSUL's 2008 financial statements that ultimately resulted in sanctions levied against them due to the improper audits, including a BRL $500,000 fine to KPMG and a suspension of five years for both accountants.  <u>See</u> KPMG Order, attached hereto as **Exhibit "1"** (translation will be filed thereafter).  Again, the Public Prosecutor Actions are solely focused on determining who is/are liable for causing BCSUL's insolvency and whether the KPMG or others should be personally responsible for certain damages.

13.     Thus, LM's reliance on KPMG-Audited financial statements already adjudicated to be inaccurate requires exclusion of any opinion based upon them.[2] See Coffey v. Dowley Mfg., Inc., 187 F. Supp. 2d 958, 974 (M.D. Tenn. 2002), aff'd, 89 Fed. Appx. 927 (6th Cir. 2003) ("If Dr. Wilson assumed certain parameters for his computerized finite element analysis, and those parameters were later proven to be incorrect, then the conclusion reached by the computer model would also be incorrect."); Bruno v. Bozzuto's, Inc., 311 F.R.D. 124, 137 (M.D. Pa. 2015) ("Plaintiffs' experts here admittedly relied solely on Defendant's *pro forma* projections, conducted no independent investigations into the validity of those projections, and had no knowledge of the details surrounding their generation."); Legendary Art, LLC v. Godard, CIV.A. 11-0674, 2012 WL 3550040, at *4 (E.D. Pa. Aug. 17, 2012) ("His [Mr. Slocum's] report states that his conclusions 'are predicated upon successful implementation of the Business Plan' (id., Ex. F at 4), and that Legendary Art's losses would not have occurred '[h]ad the Business Plan been executed as expected' (id., Ex. F at 10).  There is no evidence that Mr. Slocumb did anything to verify these profit and loss projections.  Indeed, his report states several times that his analysis 'assumed the validity of the projections.'").

**C. BCSUL's Creation of Fake Salary Loans During the Relevant Years.**

---

[2] Defendants argue that Laspro "disingenuously" asserted that LM did not "review" the KPMG-Audited Financial Statements due to confusion between the accounting term of art and the use of the term as synonymous with "look at".  This is incorrect.  In Vidal's deposition, Vidal stated at first that he relief upon the statements, but later said that he did not rely upon the statements.  See Depo. Tr. of Vidal, pp.: 58:18 – 65:7.  Defendants confusion seems to be based upon Vidal's vacillations and uncertainties on what LM relied.  In paragraphs 10 through 12 of Laspro's motion, Laspro argued that regardless of whether or not LM *relied* upon the KPMG-Audited Financial Statements or solely the Martins Report and letter report of Lopes & Machado Auditores, LM still lacked a sufficient factual basis.  Laspro never asserted that LM did not look at the statements.

14.     Defendants also argue that LM's review of twenty (20) non-randomly selected salary loans which were still in force at the time of the RAET and which showed the receipt of one payment, but for which LM did not verify the origin of the payment (see LM Report, pp.: 28 – 33; Vidal Depo. Tr., pp.: 24:9:20; 43:3 – 44:9; 181:18 – 189:20:22), is somehow a sufficient factual basis to opine on whether or not BCSUL created fake salary loans and is a reliable methodology.

15.     In defense, Defendants argue that the physical contracts were lost.  Defendants fail to address that Defendants and LM were given access to the systems of BCSUL on which all data regarding the salary loans were stored.  Correa Porto was able to analyze data for 20,000 loans. This same data was available to LM, yet LM did not analyze it.

16.     Defendants provide no contrary authority that a review of twenty (20) contracts out of 687,000+, which were not even randomly sampled, is a sufficient data set from which to draw any conclusions, especially since Vidal testified that the FGC's review of 440 contracts was not sufficient (see LM Report, pp.: 29 – 31; Vidal Depo. Tr., p.: 174:9:23; 175:18 – 176:2).

17.     Defendants also failed to distinguish the case law Laspro cited, which states that expert opinions should be excluded when they are based upon inadequate samples.  See In re Chantix (Varenicline) Prods. Liab. Litig., 889 F. Supp. 2d 1272, 1290 (N.D. Al. 2012); Holowecki v. Fed. Exp. Corp., 644 F. Supp. 2d 338, 361 - 362 (S.D.N.Y. 2009), aff'd, 382 Fed. App'x. 42 (2d Cir. 2010); Caraker v. Sandoz Pharm. Corp., 188 F. Supp. 2d 1026, 1030 - 31 (S.D. Ill. 2001).

18.     Additionally, Vidal stated that LM's scope of work was *not* to analyze the contracts to determine if BCSUL created fake salary loans, and instead, LM's scope of work was merely to analyze whether or not a payment was made on any loans still existing at the time of the RAET.

<u>See</u> Vidal Depo. Tr., pp.: 55:10:24[3]; 177:3:20; 185:8 – 186:7[4]; 189:20:22.  Defendants fail to provide any authority that this opinion by LM is helpful.

**D. BCSUL's Loan Approval Policies Applicable to the Salary Loans.**

19.    Defendants next attempt to defend LM's opinion on the loan approval policies, which contradicts Luis Felippe's testimony regarding the same.  In short, the "due diligence" Luis Felippe discussed related mostly to verifying employment status and salary amount.  <u>See</u> Felippe Depo. Tr., pp.: 23:10 – 40:16.

20.    While Luis Felippe testified that any due diligence on the salary loans was minimal and limited to verifying employment status and salary amount because of the "guaranty" of payment of the loans from the individual's salary paid by the public entity (<u>see</u> Felippe Depo. Tr., pp.: 23:22 - 24:4[5]), LM mistakenly opined that the individual CCB approval procedures applied

---

[3]

> 15 Q. So does this reservation have
> 16 anything to do with an inability to render an
> 17 opinion regarding whether or not the consigned
> 18 credit loans were fake or fraudulent?
>
> 19 A. In some way, yes, because I wasn't
> 20 hired to find fraudulent contracts.

[4]

> Page 186
> 1 Q. Okay. So are you saying that the
> 2 scope of your work as defined was only to
> 3 determine whether some contracts were still
> 4 being paid after June 4, 2012, instead of
> 5 analyzing whether or not 682,000 contracts were
> 6 false?
> 7 A. That's exactly what I'm saying.

[5]

> 22 A. So there was no individual analysis,
> 23 because, as I said, we had more than 2.5 million
> 24 loans. So we did the analysis of the public

(see LM Report, pp.: 19 – 26; Vidal Depo. Tr., pp.: 194:23 - 198:21).  This contradiction was clarified by Vidal's subsequent testimony, where he stated that he had not reviewed Luis Felippe's deposition transcript (see Vidal Depo. Tr., p.: 198:14:16) and that the approval policies contained on pages 19 through 26 of the LM Report are related to "CCB" loans, **which are different than the salary loans at issue, here** (see Vidal Depo. Tr., p.: 199:12:16[6]).

21.    Even assuming these policies were applicable, Vidal testified that LM did not render an opinion that BCSUL actually followed these policies in relation to the fake salary loans. See Vidal Depo. Tr., 195:23 – 196:11; 197:17:23[7].  Thus, this opinion is also unhelpful.

**E. IMS's Fitness and Analysis.**

---

25 institution or the city or the state just to find

1 out if they were up to date with payment and to
2 find out their situations, the situation of the
3 state or municipalities, because, as you know, we
4 have a lot in Brazil.

6

12 Q. Okay. So what is the relationship
13 between CCBs and our consigned credit loans, if
14 any?
15 A. They are two different kinds of
16 loans.

7

8 THE WITNESS: No, I didn't do any
9 test to see if the policies were
10 followed or not. I am just saying that
11 BCSUL had these policies.

19 A. I'm saying that there are specific
20 policies to deal with contracts with
21 individuals. If these policies were adequate,
22 if they are followed or not, I didn't make any
23 kind of tests on that.

8

22.     Defendants provided no support for the notion that LM, as a forensic accountant, is qualified to opine whether or not IMS had the necessary qualifications to conduct its IT analysis, other than to say that LM is a forensic accountant and that Laspro's joinder of the IMS Claim means Laspro must agree that IMS's analysis was flawed, which has been repeatedly refuted.

23.     While Defendants' briefly describe LM as an allegedly well-regarded accounting firm, Defendants' failed to address Vidal's fatal testimony that he did not understand the method IMS used, how IMS achieved the conclusion it did or have any experience in the method that IMS used.  See Vidal Depo. Tr., pp.: 157:25 – 158:2; 159:3:9; 162:10:21.  Defendants also failed to cite a single authority establishing that an accountant may opine on the work of an IT Firm (see BACEN Report, pp.: 97 – 98, 212), especially where the accountant testifies he did not understand the work and did not even attempt to replicate the work to test it.  See id., p.: 162:1:9.

24.     Defendants assert that LM's failure to obtain more information regarding IMS was because of the dearth of public information available.  But Defendants assume, without citation, that an expert is limited to only publicly available information and may render an admissible opinion while only seeking publicly available information.

25.     Defendants also fail to establish how an attack of IMS's analysis is helpful, since this analysis is incorporated into the BACEN Report, the conclusions of which were already adjudicated.  See BACEN Report; Brazilian Insolvency Proceedings Orders.

**F. Luis Felippe's and Luis Octavio's Alleged Other Sources of Income During the Relevant Years.**

26.     Whether or not Luis Felippe and Luis Octavio had other sources of income aside from the dividends from BCSUL during the relevant years, without establishing these funds were used to purchase the properties, is irrelevant, and thus unhelpful.

WHEREFORE, Laspro requests this Court grant its motion, and exclude the expert opinions rendered by Lopes Machado Consultores, Ltda. and José Fernandez Vidal and preclude any testimony by anyone on behalf of Lopes Machado Consultores, Ltda., including, but not limited to, José Fernandez Vidal, at trial.  Laspro requests any other relief this Court deems appropriate.

August 7, 2019                                       Respectfully submitted,

                                                     SEQUOR LAW, P.A.
                                                     1001 Brickell Bay Drive, 9th Floor
                                                     Miami, Florida 33131
                                                     Telephone (305) 372-8282
                                                     Facsimile (305) 372-8202

                                  By:     */s/ Daniel M. Coyle*
                                          Edward H. Davis
                                          Fla. Bar No. 704539
                                          edavis@sequorlaw.com
                                          Gregory S. Grossman
                                          Florida Bar No. 896667
                                          ggrossman@sequorlaw.com
                                          Daniel M. Coyle
                                          Fla. Bar No. 055576
                                          dcoyle@sequorlaw.com


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed via electronic filing using the CM/ECF system with the Clerk of the Court which sent e-mail notification of such filing to all CM/ECF participants in this case and via regular US mail to all participants who are not on the list to receive e-mail notice/service for this case as indicated on the service list on September 10, 2019.

                                          */s/ Daniel M. Coyle*
                                          Daniel M. Coyle

## <u>SERVICE LIST</u>

**Electronic Mail Notice List**

The following is the list of **<u>parties</u>** who are currently on the list to receive email notice/service for this case.

- Gregory S Grossman    ggrossman@sequorlaw.com, ngonzalez@sequorlaw.com
- Jeremy J Hart    jhart@bastamron.com, mdesvergunat@bastamron.com; dtimpone@bastamron.com; jmiranda@bastamron.com
- Arnoldo B Lacayo    alacayo@sequorlaw.com, afalcon@sequorlaw.com
- Katherine A Sanoja    katherine.sanoja@gstllp.com, quinn.smith@gstllp.com

**Manual Notice List**

- (No manual recipients)

*EXHIBIT "1"*



Boletim de Serviço Eletrônico em 22/11/2017

**MINISTÉRIO DA FAZENDA**
**CONSELHO DE RECURSOS DO SISTEMA FINANCEIRO NACIONAL**

**406ª Sessão**

**Recurso** 13.602

**Processo** 10372.000061/2016-78

**Processo na primeira instância** BACEN 0901463246

**RECURSOS VOLUNTÁRIOS**

**RECORRENTES:** KPMG AUDITORES INDEPENDENTES
RICARDO ANHESINI SOUZA
SILBERT CHRISTO SASDELLI JÚNIOR

**RECORRIDO:** BANCO CENTRAL DO BRASIL

**RELATOR**: WALDIR QUINTILIANO DA SILVA

**EMENTA**: RECURSOS VOLUNTÁRIOS. Auditoria Independente. Emissão de parecer sem ressalvas. Irregularidade de natureza grave, por caracterizar falta com seu dever de evidenciar as irregularidades encontradas. Desprovimento do recurso da pessoa jurídica e parcial provimento dos recursos das pessoas físicas.

**ACÓRDÃO CRSFN** 424/2017

Vistos, relatados e discutidos os presentes autos, os membros do Conselho de Recursos do Sistema Financeiro Nacional decidem conhecer dos recursos por unanimidade e:

1. com relação à recorrente KPMG AUDITORES INDEPENDENTES, pelo cometimento da infração de emitir pareceres sem ressalvas, relativos às demonstrações financeiras do Banco Cruzeiro do Sul S.A., que não refletiam a sua real situação econômico-financeira nas datas-base de 30.6.2008, 30.9.2008 e 31.12.2008, **negar-lhe provimento**, por unanimidade, com base no voto do Relator, mantendo a penalidade de multa pecuniária de no valor de R$500.000,00 (quinhentos mil reais);

2. com relação ao recorrente RICARDO ANHESINI SOUZA, na qualidade de responsável técnico da KPMG Auditores Independentes, pelo cometimento da infração de emitir pareceres sem ressalvas, relativos às demonstrações financeiras do Banco Cruzeiro do Sul S.A., que não refletiam a sua real situação econômico-financeira nas datas-base 30.6.2008, 30.9.2008 e 31.12.2008, **dar-lhe provimento parcial**, por maioria, com base no voto do Conselheiro Thiago Paiva Chaves, para reduzir o prazo da pena de proibição de praticar a atividade de auditoria em instituições financeiras e demais instituições autorizadas a funcionar pelo Banco Central do Brasil de 5 (cinco) anos para 3 (três) anos;

Decisão tomada após votação sucessiva entre múltiplas propostas, com base no art. 27 do RICRSFN, registrando-se:

Votaram originalmente pela manutenção da penalidade de 5 (cinco) anos de proibição o Relator Waldir Quintiliano da Silva; pela aplicação da penalidade de 3 (três) anos de proibição os Conselheiros Sérgio Cipriano dos Santos e Ana Maria Melo Netto Oliveira, acompanhando a divergência inaugurada pelo Conselheiro Thiago Paiva Chaves; e pela aplicação da penalidade de multa no valor de R$250.000,00 (duzentos e cinquenta mil reais), os Conselheiros Alexandre Henrique Graziano e Flávio Maia Fernandes dos Santos.

Confrontando-se as propostas de aplicação de penalidade de 3 (três) anos de proibição e de multa no

valor de R$250.000,00 (duzentos e cinquenta mil reais), votaram pela primeira os Conselheiros Waldir Quintiliano da Silva, Thiago Paiva Chaves, Sérgio Cipriano dos Santos e Ana Maria Melo Netto Oliveira; e, pela segunda, os Conselheiros Flávio Maia Fernandes dos Santos e Alexandre Henrique Graziano, prevalecendo a primeira.

Confrontando-se as propostas de aplicação de penalidade de 5 (cinco) e de 3 (três) anos de proibição, votaram pela primeira o Conselheiro Waldir Quintiliano da Silva; e, pela segunda, os Conselheiros Thiago Paiva Chaves, Flávio Maia Fernandes dos Santos, Sérgio Cipriano dos Santos, Alexandre Henrique Graziano e Ana Maria Melo Netto Oliveira, prevalecendo a segunda.

3. com relação ao recorrente SILBERT CHRISTO SASDELI JÚNIOR, na qualidade de responsável técnico da KPMG Auditores Independentes, pelo cometimento da infração de emitir pareceres sem ressalvas, relativos às demonstrações financeiras do Banco Cruzeiro do Sul S.A., que não refletiam a sua real situação econômico-financeira nas datas-base 30.6.2008, 30.9.2008 e 31.12.2008, **dar-lhe provimento parcial**, por maioria, com base no voto do Conselheiro Thiago Paiva Chaves, para reduzir a pena de proibição de praticar a atividade de auditoria em instituições financeiras e demais instituições autorizadas a funcionar pelo Banco Central do Brasil pelo prazo de 5 (cinco) anos para 3 (três) anos.

Decisão tomada após votação sucessiva entre múltiplas propostas, com base no art. 27 do RICRSFN, registrando-se:

Votaram originalmente pela manutenção da penalidade de 5 (cinco) anos de proibição o Relator Waldir Quintiliano da Silva; pela aplicação da penalidade de 3 (três) anos de proibição os Conselheiros Sérgio Cipriano dos Santos e Ana Maria Melo Netto Oliveira, acompanhando a divergência inaugurada pelo Conselheiro Thiago Paiva Chaves; e pela aplicação da penalidade de multa no valor de R$250.000,00 (duzentos e cinquenta mil reais), os Conselheiros Alexandre Henrique Graziano e Flávio Maia Fernandes dos Santos.

Confrontando-se as propostas de aplicação de penalidade de 3 (três) anos de proibição e de multa no valor de R$250.000,00 (duzentos e cinquenta mil reais), votaram pela primeira os Conselheiros Waldir Quintiliano da Silva, Thiago Paiva Chaves, Sérgio Cipriano dos Santos e Ana Maria Melo Netto Oliveira; e, pela segunda, os Conselheiros Flávio Maia Fernandes dos Santos e Alexandre Henrique Graziano, prevalecendo a primeira.

Confrontando-se as propostas de aplicação de penalidade de 5 (cinco) e de 3 (três) anos de proibição, votaram pela primeira o Conselheiro Waldir Quintiliano da Silva; e, pela segunda, os Conselheiros Thiago Paiva Chaves, Flávio Maia Fernandes dos Santos, Sérgio Cipriano dos Santos, Alexandre Henrique Graziano e Ana Maria Melo Netto Oliveira, prevalecendo a segunda.

Participaram do julgamento os Conselheiros Thiago Paiva Chaves, Flávio Maia Fernandes dos Santos, Sérgio Cipriano dos Santos, Alexandre Henrique Graziano, Waldir Quintiliano da Silva e Ana Maria Melo Netto Oliveira. Impedidos os Conselheiros Otto Eduardo Fonseca de Albuquerque Lobo e Ana Paula Zanetti de Barros Moreira. Ausente o Conselheiro Carlos Portugal Gouvêa. Presente o Senhor Representante da Procuradoria-Geral da Fazenda Nacional Dr. André Alvim de Paula Rizzo, que reiterou o parecer que consta nos autos para opinar pelo não provimento dos recursos.

Brasília, 20 de setembro de 2017.



Documento assinado eletronicamente por **Ana Maria Melo Netto Oliveira**, **Conselheiro(a) Presidente**, em 10/11/2017, às 18:51, conforme horário oficial de Brasília, com fundamento no art. 6º, § 1º, do Decreto nº 8.539, de 8 de outubro de 2015.



A autenticidade deste documento pode ser conferida no site http://sei.fazenda.gov.br/sei/controlador_externo.php?acao=documento_conferir&id_orgao_acesso_externo=0, informando o código verificador **0094755** e o código CRC **75BC2361**.



**MINISTÉRIO DA FAZENDA**
**CONSELHO DE RECURSOS DO SISTEMA FINANCEIRO NACIONAL**

**Recurso** 13.602

**Processo** 10372.000061/2016-78

**Processo na primeira instância** BACEN 0901463246

**RECURSOS VOLUNTÁRIOS**

**RECORRENTES:**  KPMG AUDITORES INDEPENDENTES
RICARDO ANHESINI SOUZA
SILBERT CHRISTO SASDELLI JÚNIOR

**RECORRIDO:**  BANCO CENTRAL DO BRASIL

**RELATOR:**  WALDIR QUINTILIANO DA SILVA

**RELATÓRIO**

**Objeto**

O Banco Central do Brasil instaurou o presente processo administrativo contra a KPMG Auditores Independentes e seus responsáveis técnicos, Ricardo Anhesini Souza e Silbert Christo Sasdelli Júnior, pela irregularidade consistente em emitir pareceres sem ressalvas, pertinentes às demonstrações financeiras do Banco Cruzeiro do Sul S.A. que não refletiam a real situação econômico-financeira do mencionado Banco, nas datas-base 30.6.2008, 30.9.2008 e 31.12.2008, em razão do incremento indevido e relevante dos resultados daquele banco, por meio de cessões de direitos creditórios em condições artificiais a fundos de investimento em direitos creditórios (FIDCs).

A conduta irregular configurou infração ao art. 20 do Regulamento Anexo à Resolução nº 3.198, de 27 de maio de 2004; art. 4º, parágrafo único, da Circular nº 2.676, de 10 de abril de 1996; art. 25, item I-d, da Instrução CVM nº 308, de 14 de maio de 1999; e item III, comentário 3, letra "c", da norma anexa à Resolução CFC nº 607, de 17 de dezembro de 1985. Os indiciados ficaram sujeitos às penalidades previstas no art. 11 da Lei nº 6.385, de 7 de dezembro de 1976, combinado com os §§ 3º e 4º do art. 26 do mesmo diploma legal, com as alterações introduzidas pelo art. 14 da Lei nº 9.447, de 14 de março de 1997.

**Descrição das Ocorrências**

O Banco Cruzeiro do Sul S.A. adotou procedimentos visando à geração de resultados positivos por meio de cessões de direitos creditórios em condições artificiais que alteraram de forma significativa os resultados do exercício de 2008. E a KPMG, por sua vez, emitiu pareceres sem ressalvas relativos às demonstrações financeiras referentes a 30.6.2008, 30.9.2008 e 31.12.2008, validando, assim, demonstrações que não condiziam com a real situação econômico-financeira da instituição auditada e induzindo a erro clientes, Banco Central do Brasil e Sistema Financeiro Nacional.Tais pareceres foram subscritos por Silbert Christo Sasdelli Júnior e Ricardo Anhesini Souza, na qualidade de responsáveis técnicos.

Assim é que o Banco Central do Brasil, em 9.3.2009, comunicou à KPMG que em processo de acompanhamento das atividades das operações e dos resultados do Banco Cruzeiro do Sul havia detectado operações e procedimentos contábeis determinantes para a apuração do resultado do exercício de 2008. Nesse sentido, a

autarquia solicitou não só especial atenção para o assunto, mas também a adoção das medidas cabíveis dentro da esfera de competência da empresa de auditoria. Na mesma oportunidade, foram destacados os efeitos patrimoniais e de resultado decorrentes de algumas operações, dentre as quais as cessões de crédito ao Fundo de Investimento em Direitos Creditórios BCSul Verax Multicred Financeiro (FIDC Multicred) a taxas significativamente inferiores às de mercado e àquelas praticadas com outras instituições financeiras, bem como a estrutura e os parâmetros que envolveram a cessão de fluxos de cartão de crédito consignado em outubro/2008 para o Fundo de Investimento em Direitos Creditórios Aberto BCSul Verax CPP 120 (FIDC CPP 120) e deste ao FIDC Multicred. Foi ressaltada também a atenção especial que mereciam os procedimentos adotados pelo Banco do Cruzeiro do Sul em relação à observância, por completo, do disposto na Resolução nº 3.673, de 26 de dezembro de 2008, no tocante à classificação, ao registro contábil e à divulgação das operações de cessão de crédito realizadas nos meses de novembro e dezembro de 2008. A correspondência da autarquia foi enviada aos recorrentes, antes da publicação dos resultados relativos ao exercício de 2008, o que ocorreu em 20.3.2009.

Em 16.4.2009, a KPMG ofereceu resposta à correspondência da autarquia, informando que o parecer de auditoria relativo às demonstrações financeiras foi emitido com a inserção de parágrafo de ênfase, para destacar as medidas adotadas pelo Banco visando à geração de recursos para manutenção de sua liquidez e o seu realinhamento operacional, aspectos que foram mencionados na nota explicativa nº 1 das referidas demonstrações financeiras.

No parecer das demonstrações financeiras de 31.12.2008, a auditoria independente afirmou ter revisado as informações contábeis referentes ao trimestre findo em 31 de dezembro de 2008, compreendendo o balanço patrimonial, as demonstrações do resultado e das mutações do patrimônio líquido, bem como as notas explicativas e ter efetuado a revisão de acordo com as normas específicas elaboradas pelo Ibracon – Instituto dos Auditores Independentes do Brasil, em conjunto com o Conselho Federal de Contabilidade – CFC.

A KPMG ainda atestou no referido documento que não tinha conhecimento de nenhuma modificação relevante que devesse ser feita nas informações contábeis contidas nas Informações Financeiras Trimestrais (IFT). O parágrafo de ênfase, relatado pela auditoria independente na carta de 16.4.2009, atestou que a administração do banco, frente à crise internacional instalada, adotou medidas visando à geração de recursos para manutenção da sua liquidez e seu realinhamento operacional frente às condições de mercado.

No entanto, o parágrafo de ênfase aposto não trouxe informações quanto à regularidade das práticas contábeis adotadas pelo Banco Cruzeiro do Sul, sendo caracterizado pela descrição em lugar da opinião, pouco conclusiva e, portanto, induzindo a erro os usuários da informação, em desacordo com a orientação contida no item 11.3.7.1 da norma anexa à Resolução CFC nº 953, de 24 de janeiro de 2003. O parecer não demonstrou que havia descumprimento de norma por parte da auditada, em razão do que a KPMG não cumpriu o seu dever na forma expressa na Instrução CVM nº 308, de 1999, configurando falha prevista na Circular nº 2.676, de 1996, além de não observar os procedimentos de auditoria, nos termos do art. 20 do Regulamento Anexo à Resolução nº 3.198, de 2004.

Por outro lado, o Banco Cruzeiro do Sul, com patrimônio líquido ajustado de R$1.148.066 mil em setembro/2008, adotou procedimentos visando à geração de resultados positivos por meio de práticas que não seguiram os preceitos regulamentares e da boa prática bancária, os quais consistiram em cessões de direitos creditórios em condições artificiais e antecipação dos efeitos previstos na Resolução nº 3.533, de 31 de janeiro de 2008, que alteraram de forma significativa os resultados do exercício de 2008. Assim é que essas práticas subsidiaram o pagamento de juros sobre o capital próprio, no valor de R$31 milhões, e de provisão para pagamento de dividendos, no importe de R$63 milhões, no exercício de 2008.

Tais operações foram adotadas de forma continuada e possibilitaram alterar significativamente os resultados do Banco Cruzeiro do Sul, conforme indicado a seguir.

### Cessão de direitos creditórios a taxas de desconto baixas

No período de 29.1.2008 a 30.9.2008, o Banco Cruzeiro do Sul S/A realizou diversas operações de cessão de direitos creditórios para o FIDC Multicred, administrado pela Cruzeiro do Sul S.A. DTVM, a taxas de desconto abaixo dos parâmetros de rentabilidade usualmente adotados no mercado, de forma a propiciar a apuração de lucros expressivos. As taxas de desconto médias praticadas nessas operações foram de aproximadamente 6,3% ao ano, enquanto que as taxas DI de um dia, consideradas como o custo de oportunidade no mercado financeiro, variaram de 11,1% a 13,6% ao ano, conforme Tabela 1:

Tabela 1 – Comparativo de taxas de desconto na cessão ao FIDC Multicred X CDI de um dia

| Data | Cessão ao FIDC Multicred (taxa média % a.a.) | CDI de um dia (taxa % a.a.) |
|---|---|---|
| 29.1.2008 | 9,8 | 11,1 |
| 31.1.2008 | 9,8 | 11,1 |
| 27.2.2008 | 9,8 | 11,1 |
| 27.3.2008 | 6,3 | 11,1 |
| 28.3.2008 | 12,9 | 11,1 |
| 31.3.2008 | 6,3 | 11,2 |

| | | |
|---|---|---|
| 25.4.2008 | 6,3 | 11,6 |
| 29.4.2008 | 6,3 | 11,6 |
| 30.4.2008 | 6,3 | 11,6 |
| 16.5.2008 | 6,3 | 11,5 |
| 21.5.2008 | 10,2 | 11,6 |
| 23.5.2008 | 6,3 | 11,5 |
| 28.5.2008 | 6,3 | 11,5 |
| 30.5.2008 | 6,3 | 11,6 |
| 26.6.2008 | 6,3 | 12,1 |
| 27.6.2008 | 6,3 | 12,1 |
| 30.6.2008 | 6,3 | 12,1 |
| 21.7.2008 | 6,3 | 12,1 |
| 31.7.2008 | 6,3 | 12,8 |
| 13.8.2008 | 6,3 | 12,8 |
| 28.8.2008 | 6,3 | 12,8 |
| 29.8.2008 | 6,3 | 12,8 |
| 04.9.2008 | 6,3 | 12,8 |
| 19.9.2008 | 6,3 | 13,6 |
| 30.9.2008 | 6,3 | 13,6 |

Fonte: Relatórios trimestrais elaborados pelo administrador do FIDC Multicred em 15.5.2008, 15.8.2008 e 14.11.2008, sítio eletrônico da Cetip (WWW.cetip.com) e contratos de cessão entre o Banco Cruzeiro do Sul e o FIDIC Multicred.

As taxas de desconto praticadas nas cessões entre o Banco Cruzeiro do Sul e o FIDC Multicred são também inferiores àquelas contratadas pelo próprio Banco Cruzeiro do Sul com terceiros. Com efeito, no 1º semestre de 2008, o banco realizou três cessões de direitos creditórios relacionados a operações de crédito pessoal consignado a instituições não pertencentes ao conglomerado, todas ao Banco do Estado do Rio Grande do Sul S.A. Nas operações realizadas em 9.1.2008, 19.2.2008 e 24.3.2008, as taxas de desconto foram de 14,4% a.a., 13,7% a.a. e 14,8% a.a., respectivamente. A transação concretizada em 24.3.2008 foi realizada três dias antes da realização de uma cessão ao FIDC Multicred à taxa de desconto de 6,3% a.a. A diferença nas taxas de desconto contratadas em datas próximas para ativos de mesma natureza e complexidade não encontra respaldo em aspectos macroeconômicos ou mercadológicos passíveis de verificação, tornando evidente a estratégia do Banco Cruzeiro do Sul de antecipar as receitas disponíveis por meio da utilização de taxas de desconto artificiais e arbitradas em seu favor.

O montante das operações de cessão de crédito para o FIDC Multicred no período de janeiro a setembro de 2008 foi da ordem de R$2.092 milhões, envolvendo 25 operações (as de valores mais expressivos foram realizadas nos últimos dias de cada mês).

O impacto das cessões de crédito ao FIDC Multicred pode ser demonstrado por meio da comparação entre o resultado contábil do Banco Cruzeiro do Sul e o resultado consolidado apurado com base na Instrução CVM nº 408, de 18 de agosto de 2004, segundo a qual as participações em FIDCs, detidas direta ou indiretamente por meio de outros fundos, devem ser consolidadas como entidades de propósito específico (EPE), conforme detalhado a seguir.

### I) Resultado do 1º semestre/2008

O lucro líquido do Banco Cruzeiro do Sul foi de R$150 milhões, enquanto que o consolidado – com a reversão dos resultados das cessões de créditos aos FIDCs ligados, que envolveu aspectos como o estorno das provisões para créditos de liquidação duvidosa e das despesas de comissões relativas às operações cedidas – seria de R$36.090 mil, conforme divulgação trimestral de resultado realizada em 7.8.2008.

### II) Resultado do 3º trimestre/2008

O lucro líquido apurado pelo Banco Cruzeiro do Sul foi de R$27 milhões, sendo que o consolidado foi de apenas R$1 milhão, conforme divulgação trimestral de resultado de 14.11.2008. Assim, no período de janeiro a setembro de 2008, o lucro líquido apresentado pelo Banco Cruzeiro do Sul totalizou R$177 milhões, sendo que o valor de R$140 milhões (79,1%) foi decorrente do impacto das operações de cessão de crédito aos FIDCs ligados.

Houve a antecipação de renda sobre as operações de crédito cedidas, de modo que os direitos creditórios incorporados à carteira do FIDC Multicred passaram a apresentar rendimentos baixos, com reflexo na valorização da cota subordinada em percentual inferior à variação do CDI, comprometendo, assim, o desempenho do resultado futuro, conforme Tabela 2. Considerando que o Banco Cruzeiro do Sul é cotista subordinado do FIDC Multicred com participação superior a 95% do seu patrimônio, o próprio Banco ficou sujeito a essa baixa rentabilidade. Houve, portanto, o reconhecimento antecipado de parcela relevante das rendas de operações de crédito em substituição à apropriação ao longo da duração da operação de crédito.

Tabela 2 – Rendimento das Cotas Subordinadas do IDC Multicred

| Data | Rendimento (% a.m.) | % CDI |
|---|---|---|
| 31.1.2008 | 0,62% | 66,8 |
| 29.2.2008 | 0,59% | 74,4 |
| 31.3.2008 | 0,61% | 73,3 |
| 30.4.2008 | 0,69% | 76,7 |

| 30.5.2008 | 0,76% | 86,8 |
| 30.6.2008 | 0,57% | 60,4 |
| 31.7.2008 | 0,47% | 44,5 |
| 29.8.2008 | 0,88% | 87,1 |
| 30.9.2008 | 1,36% | 124,1 |

Fonte: Relatórios de monitoramento do FIDC Multicred, elaborados pela Austin Rating em 1º.5.2008 e 6.11.2008.

**Operações sucessivas de cessão de direitos creditórios a taxas de desconto discrepantes**

Em 27.10.2008, o Banco Cruzeiro do Sul cedeu ao FIDC CPP 120, também administrado pela Cruzeiro do Sul S.A. DTVM, os direitos creditórios referentes aos fluxos de recebimento de parcelas de cartões de crédito no montante de R$1.155 milhões (valor de face dos fluxos) à taxa média dos contratos, de aproximadamente 64,5% ao ano (metodologia 252 dias úteis/ano), sem o registro de resultados significativos. Na mesma data, esses direitos foram cedidos pelo FIDC CPP 120 ao FIDC Multicred, agora a uma taxa de desconto substancialmente menor (aproximadamente 15,7% ao ano, na mesma metodologia), proporcionando o registro de receita no valor de R$380 milhões pelo FIDC CPP 120, sem que houvesse fatores mercadológicos, econômicos ou de qualquer outra natureza que justificassem essa diferença na taxa de venda do mesmo ativo, na mesma data.

Assim, considerando que o FIDC Multicred é o principal cotista do FIDC CPP 120, e o Banco Cruzeiro do Sul, o cotista subordinado do FIDC Multicred, esse resultado acabou impactando o resultado do Banco (cedente original) via valorização das cotas subordinadas, registrado como ajuste a suposto valor de mercado das aplicações em cotas de fundos de investimento. Verificou-se, portanto, a transferência de titularidade formal dos direitos creditórios, permanecendo os riscos e os benefícios indiretamente com o Banco Cruzeiro do Sul, o que apresentou como consequência a sobrevalorização contábil desses ativos e a apuração de lucros para incrementar o resultado do exercício.

A interposição do FIDC CPP 120 possibilitou ao Banco Cruzeiro do Sul a contabilização da renda de R$380 milhões como ajuste a suposto valor de mercado das cotas do FIDC e o diferimento do pagamento dos tributos correspondentes. O recolhimento dos tributos ocorreria somente por ocasião da amortização ou resgate das cotas, uma vez que o FIDC Multicred é um fundo fechado, nos termos do art. 14 da Instrução Normativa SRF nº 25, de 6.3.2001.

**Antecipação dos efeitos previstos na Resolução nº 3.533, de 2008**

O Banco Cruzeiro do Sul antecipou a adoção dos procedimentos contábeis previstos na Resolução nº 3.533, de 2008, com base na faculdade concedida pelas Resoluções 3.627, de 30 de outubro de 2008, e 3.673, de 2008, com vistas a possibilitar o diferimento dos resultados apurados nas operações de cessão de direitos creditórios com coobrigação realizadas em novembro e dezembro de 2008, no montante de R$13,6 milhões, sem se certificar de que a instituição financeira cessionária adotaria o mesmo procedimento, exigência prevista no inciso II, art. 1º da Resolução nº 3.627, de 2008, e no inciso II, art. 2º da Resolução nº 3.673, de 2008. As cessões a instituições financeiras realizadas no último bimestre de 2008 com os respectivos resultados são listadas na Tabela 3, indicada a seguir.

Tabela 3 – Cessões de crédito realizadas em novembro e dezembro de 2008 -  (R$ mil)

| Data | Cessionário | Resultado |
| --- | --- | --- |
| 05.11.2008 | Banco do Brasil S.A. | (13.671) |
| 06.11.2008 | Banco do Brasil S.A. | (2.164) |
| 24.11.2008 | Banco Nossa Caixa S.A. | 354 |
| 01.12.2008 | Banco do Brasil S.A. | (7.381) |
| 08.12.2008 | Caixa Econômica Federal | (3.365) |
| 18.12.2008 | Banco do Estado do Espírito Santo S.A. – Banestes | 3.630 |
| 29.12.2008 | Banco Nossa Caixa S.A. | 8.960 |
| Total | | (13.636) |

Dentre as cessões contratadas no período, destacam-se aquelas firmadas junto ao Banco do Brasil S.A. em 5/11/2008, 6/11/2008 e 1º/12/2008. Como os contratos foram estabelecidos com coobrigação do cedente, configura-se a retenção substancial de riscos e benefícios, de forma a se enquadrarem no disposto na alínea "c", inciso I, art. 5º da Resolução nº 3.533, de 2008, isto é, as receitas e despesas devem ser apropriadas pelo prazo remanescente da operação.

Ademais, a opção pela adoção antecipada dos procedimentos previstos na Resolução nº 3.533, de 2008, deve, também, ser feita pela contraparte caso seja instituição financeira (conforme arts. 1º, inciso II, da Resolução nº 3.627, de 2008, e 2º, inciso II, da Resolução nº 3.673, de 2008). Assim, o Banco Cruzeiro do Sul só poderia adotar o diferimento do prejuízo observado nas cessões a instituições financeiras em novembro e dezembro de 2008, caso o cessionário também concordasse em seguir o mesmo princípio. Nesse sentido, em 22.12.2008, o Banco Cruzeiro do Sul emitiu as cartas CTRL.ML.013/08, CTRL.ML.014/08 e CTRL.ML.015/08 à Caixa Econômica Federal, ao Banco do Brasil S.A. e ao Banco Nossa Caixa S.A., respectivamente, informando-os sobre a sua decisão de antecipar os efeitos da Resolução nº 3.533, de 2008. Desses cessionários, somente o Banco do Brasil S.A. respondeu, por meio da correspondência Diretoria de Varejo – 2009/102, de 27.1.2009, esclarecendo sua opção pela

não antecipação dos efeitos da Resolução nº 3.533, de 2008.

No entanto, mesmo tendo essa informação antes da publicação dos demonstrativos financeiros de 31.12.2008, o que ocorreu em 20.3.2009, o Banco Cruzeiro do Sul decidiu por diferir o prejuízo decorrente dessas operações (R$23 milhões somente nas cessões ao Banco do Brasil S.A.).

Dessa forma, inexistindo concordância da contraparte, o diferimento para as cessões realizadas com outros cessionários com retenção substancial de riscos e benefícios torna-se irregular na medida em que foi descumprido o estabelecido no inciso I, art. 2º da Resolução nº 3.673, de 2008, que exige a uniformidade na contabilização das cessões.

## Defesa

Regularmente intimados, os indiciados apresentaram defesa conjunta e tempestiva (fls. 1.805/1.870), alegando, em síntese, o que se segue:

- a auditoria independente não tem por finalidade opinar sobre as atividades ou transações específicas da entidade; seu parecer não representa garantia de viabilidade futura da entidade ou algum tipo de atestado de eficácia da administração na gestão dos negócios;

- as operações apontadas na intimação do Banco Central não se enquadram na hipótese de ressalva, pois foram contabilizadas em conformidade com as normas aplicáveis, em especial a Circular nº 3.213, de 10 de dezembro de 2003, que estabelece o reconhecimento dos resultados na data da cessão;

- a emissão de parecer com exceção ou ressalva requer prudência, como norma de conduta, e no período abrangido pelas operações em apreço, o cenário era de severa crise de liquidez; assim, a inclusão de uma ressalva não requerida acarretaria, em um ambiente já altamente conturbado, um componente de julgamento qualitativo inadequado;

- as medidas adotadas pelo Banco Cruzeiro do Sul face à crise foram mencionadas no parágrafo de ênfase, com observância do NBC T 11 (itens 11.3.7.1, 11.3.7.2 e 11.3.8.1); além do mais, não há irregularidade no fato de ser  descritivo o parágrafo de ênfase e não há que se falar tenha ele induzido terceiros a erro;

- os quatro instrumentos normativos mencionados na intimação fazem referência genérica a outras normas e nenhuma delas foi violada pelos defendentes; igualmente genéricas foram outras referências feitas quanto à ofensa às boas práticas bancárias e, portanto, fora do objeto de verificação pela auditoria independente;

- a acusação não informou a norma supostamente violada nas alegadas cessões de direitos creditórios, que teriam sido praticadas a taxas de desconto baixas e nas cessões sucessivas de direitos creditórios; já os efeitos da antecipação previstos na Resolução 3.533, de 2008 não foram relevantes, o que afastaria a necessidade de ressalva;

- não houve tipificação da conduta que se quer punir;

- no curso da auditoria das demonstrações financeiras e IFTs do Banco Cruzeiro do Sul, a KPMG manteve diversos entendimentos com os representantes do Banco Central, mas em nenhum momento foi mencionado que referidas operações deveriam ensejar ressalva no parecer ou que representavam descumprimento de normas;

- as determinações da autarquia feitas por intermédio da carta de 9/3/2009 foram plenamente atendidas, na medida em que a recorrente prestou os devidos esclarecimento então requeridos e as operações em questão tinham sido informadas nas demonstrações financeiras da instituição auditada;

- houve acompanhamento próximo por parte do Banco Central, o que afasta o entendimento de que os recorrentes teriam induzido a autoridade a erro;

- há erro de proibição, o que afastaria punibilidade;

- não se configurou hipótese de ressalva, na emissão dos pareceres em apreço.

### Cessão de Direitos Creditórios a taxas de desconto baixas (FIDC Multicred)

As operações de cessão ao FIDC Multicred, ocorridas de 29.1.2008 a 30.9.2008, foram identificadas e analisadas pela auditoria, como parte dos procedimentos de trabalho para as áreas do balanço impactadas por transações dessa natureza (Operações de Crédito e Resultados com Créditos); sua formalização foi  devidamente realizada por meio de contratos, observando-se o regulamento do fundo, e tiveram como lastro créditos que foram testados quanto a sua existência, valorização e integridade.

A análise das operações de cessão, em conformidade com as normas de auditoria, pode ser conferida nos papéis de trabalho anexados como instrumentos de prova, demonstrando parte dos procedimentos adotados para

averiguar a existência e a precisão do resultado, bem como para validar a apresentação das cessões de crédito realizadas pelo Banco Cruzeiro do Sul e outras entidades.

As operações foram registradas contabilmente, com o resultado apurado na data da contratação da operação, conforme determina a regulamentação do Banco Central (Circular nº 3.213, de 2003), inexistindo a necessidade de consolidação de fundos de investimento.

Constatado o adequado registro contábil das operações, foi examinada ainda a devida informação quanto à existência das cessões de crédito e seus resultados nas demonstrações financeiras e nas IFTs, adequadamente realizadas, em vista, inclusive do disposto na Instrução CVM nº 408, de 2004, que trata das EPEs e prevê a inclusão do FIDC Multicred no resultado consolidado do Banco Cruzeiro do Sul.

Nas demonstrações financeiras consolidadas, o resultado das cessões de crédito para o FIDC Multicred foi eliminado, sendo, então, reconhecido tal resultado de acordo com o prazo das operações; nesse contexto, o resultado consolidado do Banco do Cruzeiro do Sul foi apresentado, de forma conjunta com as demonstrações financeiras individuais, conforme exigido pela CVM, sem o cômputo do resultado das cessões de crédito, não havendo que se falar em prejuízo aos usuários das informações financeiras, que tiveram acesso a dois demonstrativos contábeis completos – um, elaborado em aderência às normas do Banco Central, incorporando os resultados da cessão; e outro consolidado, elaborado com base nas normas da CVM, com a eliminação dos efeitos das cessões.

Tais dados foram especificados em todas as demonstrações financeiras e IFT, valendo mencionar as notas explicativas 7-e (IFTs de 30.6.2008 e 30.9.2008) e 8-e (IFT de 31.12.2008); note-se que o resultado das operações foi tão bem evidenciado nas demonstrações financeiras e IFTs que a própria acusação delas se serviu para comparar o impacto das cessões de crédito por meio da comparação entre o resultado contábil do BCSul e o resultado consolidado apurado com base na Instrução CVM nº 408, de 2004;

Tendo em vista que as operações de cessão de crédito foram devidamente registradas, de acordo com a regulamentação do Banco Central, não era efetivamente o caso de ressalvar o parecer.

As taxas praticadas não estão abrangidas por prática contábil ou definidas por norma legal ou regulamentar, de modo que a alegada utilização de "taxas de desconto abaixo dos parâmetros de rentabilidade usualmente adotados no mercado" não justificaria também ressalva.

Ademais, conforme já informado na correspondência enviada ao Banco Central do Brasil em 16.4.2009, a redução das taxas de desconto foi verificada e examinada no processo de auditoria, tendo sido, inclusive, objeto de questionamento à administração do banco, que informou os fundamentos que justificaram tal prática. Esta questão foi incluída no relatório circunstanciado sobre os procedimentos contábeis e controles internos do exercício findo em 31.12.2008, que registrou a falta de documentação suporte para análise detalhada das taxas de cessão praticadas pelo banco.

Não há como comparar as taxas praticadas nas cessões celebradas com o FIDC Multicred com as realizadas com o Banrisul, pelo fato por envolverem volumes distintos e perfis de risco diferenciados.

O impacto financeiro destas operações foi substancialmente anulado antes do encerramento do exercício, por conta da posterior necessidade de gerar liquidez no BCSul para minimizar o risco iminente de crise sistêmica, que levou à recompra dos créditos anteriormente cedidos pelas mesmas taxas, com a sua posterior revenda a outros fundos com o apoio do FGC. Desse modo, ao término do exercício, o resultado residual gerado por tais cessões era imaterial.

### Cessão de Direitos Creditórios a taxas de desconto discrepantes (FIDC CPP120)

A operação de cessão de direitos creditórios foi analisada dentro do escopo dos trabalhos de auditoria e constatada a existência de lastro para sua realização, bem como sua devida formalização, registro contábil e liquidação financeira; a operação foi amplamente divulgada nas notas explicativas às demonstrações financeiras e informações financeiras trimestrais.

Não existiam razões para ressalva às demonstrações financeiras e informações financeiras trimestrais, tendo em vista que havia evidências da existência dos créditos cedidos e a operação foi devidamente contabilizada e divulgada nas mencionadas notas explicativas.

O fato de o resultado da cessão entre os fundos ter gerado impacto indireto para o Banco Cruzeiro do Sul não representa nenhuma irregularidade, tampouco determina a ressalva do parecer, na medida em que, caso não houvesse a participação do FIDC CPP120 e a cessão tivesse sido feita diretamente ao FIDC Multicred, de acordo com a Circular nº 3.213, de 2003, o resultado da cessão da carteira também seria reconhecido na mesma data.

A verificação de taxas não é do escopo de auditoria e nem há norma determinando a adoção de taxas para operações específicas, não havendo, portanto, irregularidade na cessão de créditos de em apreço.

A única diferença resultante na realização das duas operações foi a postergação do momento do recolhimento do imposto, o que também não é motivo para ressalva.

A necessidade de averiguação da existência dos créditos, lastro da operação, tendo por base o

comportamento da base de clientes titulares dos cartões de crédito e a adequação dos contratos, determinou a extensão dos procedimentos de auditoria.

**Antecipação dos efeitos previstos na Resolução nº 3.533, de 2008**

A prática não alterou de forma significativa os resultados do BCSul. O resultado negativo das cessões foi de R$13,6 milhões e este valor não era material dentro do parâmetro de relevância para fins de auditoria. Neste cenário, em nenhuma hipótese caberia ressalva por conta deste procedimento, tendo em vista que faltava, no caso, a relevância exigida pelo item 29 da NBC T11 – IT5;

A antecipação dos efeitos da Resolução nº 3.533, de 2008, não era vedada no caso concreto. Esta resolução foi aprovada em 31.1.2008 e seu art. 15 estabeleceu que seus efeitos passariam a ser produzidos em 1º.1.2009. Em 30.10.2008, foi editada a Resolução nº 3.627, de 2008, que facultou a aplicação antecipada do procedimento previsto na Resolução nº 3.533, de 2008.

O BCSul decidiu antecipar os efeitos da nova regra e notificou suas contrapartes, agindo, desta forma, com cautela. Uma única instituição manifestou que não iria antecipar os efeitos da nova regra e só o fez depois de encerrado o exercício social. Neste caso, não há previsão de qual procedimento deveria ser adotado. Assim, não seria razoável exigir que todas as operações até então registradas em demonstrações financeiras fossem alteradas por conta da manifestação intempestiva.

A oposição de uma única instituição inviabilizasse a adoção do procedimento por todas aquelas que contrataram com a primeira, haveria uma reação em cadeia. Todas as demais instituições que contrataram com aquelas também estariam impossibilitadas de efetuar a antecipação, o que tornaria nula a faculdade de adoção antecipada dos efeitos da Resolução nº 3.533, de 2008.

Além do mais, no momento das operações questionadas, a adoção dos procedimentos era iminente: das sete operações apontadas na acusação, seis foram realizadas até 1º.1.2009, data em que a Resolução nº 3.533, de 2008, se tornaria obrigatória, sendo mais provável que outras instituições viessem a antecipar a sua adoção.

Entre a adoção da antecipação pelo BCSul e a divulgação de suas demonstrações financeiras sobreveio, em 26.12.2008, a Resolução nº 3.673, de 2008, que revogou a Resolução nº 3.627, de 2008, e adiou para 1º.1.2010 a adoção dos procedimentos estabelecidos na Resolução nº 3.533, de 2008.

A acusação deixou de considerar que a adoção antecipada dos procedimentos previstos na Resolução nº 3.533, de 2008, foi devidamente divulgada nas demonstrações financeiras do BCSul, tendo sido mencionada na nota explicativa n° 1.


**Decisão de Primeira Instância**


O Banco Central do Brasil, afastando os argumentos das defesas, considerou caracterizadas a materialidade e a autoria da infração grave consistente na emissão de pareceres sem ressalvas, relativos às demonstrações financeiras do Banco Cruzeiro do Sul, que não refletiam a sua real situação econômico-financeira nas datas-base 30.6.2008, 30.9.2008 e 31.12.2008, em razão do incremento indevido e relevante nos resultados daquele banco, por meio de cessões de direitos creditórios em condições artificiais a fundos de investimento em direitos creditórios (FIDCs), decidiu aplicar as seguintes penalidades aos indiciados:

– PROIBIÇÃO de praticar a atividade de auditoria em instituições financeiras e demais instituições autorizadas a funcionar pelo Banco Central do Brasil, pelo prazo de 5 (cinco) anos, aos Srs. Ricardo Anhesini Souza e Silbert Christo Sasdelli Júnior, com fulcro no art. 11, inciso VII, da Lei nº 6.385, de 1976, incluído pelo art. 2º da Lei nº 9.457, de 5 de maio de 1997;

– MULTA no valor de R$500.000,00 (quinhentos mil reais) à KPMG Auditores Independentes, com base no art. 11, § 1º, inciso I, da Lei nº 6.385, de 1976, com alteração introduzida pelo art. 14 da Lei nº 9.447, de 1997 e pelo art. 2º da Lei 9.457, de 1997.

Em suas razões de decidir a autoridade de origem levou em conta os fundamentos, na forma resumida indicada a seguir:

**Questões preliminares**

i) o auditor independente deve observar na prestação de seus serviços as normas e procedimento emanados do CMN, do Banco Central e os da CVM, pelo CFC e pelo IBRACON, conforme determina o art. 20 da Resolução nº 3.198, de 2004; ii) assumir que o auditor poderia divulgar informações não fidedignas, tendo como fundamento a crise econômica, seria desobrigá-lo da independência, e, assim, descaracterizar completamente a finalidade de sua atividade; iii) o incremento nos resultados do banco já vinha sendo praticado desde janeiro de 2008, portanto, em período bem anterior à mencionada crise, conforme demonstrado na decisão condenatória; iv) o fato de a autarquia não ter mencionado em momento anterior, que as referidas operações ensejariam ressalva em parecer ou que representariam descumprimento de normas, não reveste de licitude o procedimento em questão; além do mais, o

Banco Central, em carta de 9.3.2009 dirigida à empresa de auditoria – dias antes da emissão do parecer da KPMG, de 20.3.2009 – recomendava especial atenção às operações de cessão a taxas baixas e a taxas discrepantes, bem como aos procedimentos para o atendimento da Resolução n° 3.673, de 2008; v) não há se falar em erro de proibição, porque a KPMG foi alertada a respeito das transações realizadas pelo Banco e sobre a necessidade de cumprimento das normas de auditoria independente.

## Questões de mérito

vi) o que se questiona não é a apuração do resultado na data de contratação das cessões em atendimento à Circular n° 3.213, de 2003, normativo em vigor na época, mas sim a forma artificial pela qual tais operações de cessão foram realizadas visando ao incremento do resultado do banco, seja por meio da utilização de taxas baixas, fora dos padrões de mercado, seja com a aplicação de taxas discrepantes; vii) o parecer sem ressalvas da auditoria contém um parágrafo de ênfase que destaca as medidas adotadas pela administração do Banco Cruzeiro do Sul, sem demonstrar com exatidão e clareza qual matéria envolveu incerteza relevante e nem informou se essa matéria foi adequadamente divulgada nas demonstrações contábeis do banco; além disso, tal parágrafo não trouxe maiores informações quanto às práticas contábeis adotadas pelo Banco Cruzeiro do Sul, que não propiciaram aos usuários da informação a compreensão do que realmente ocorreu; viii) diante da omissão de informação relevante nas demonstrações contábeis do Banco Cruzeiro do Sul, o auditor independente deveria emitir parecer com ressalva ou adverso além do parágrafo de ênfase adequado (item 26 da NBC T11-IT5).

## Cessão de Direitos Creditórios a taxas de desconto baixas (FIDC Multicred)

ix) os papéis de trabalho, anexados pela defesa, atestam que não foram identificadas divergências no resultado com operações no banco e no consolidado, e apensar de terem identificado uma redução nas taxas de cessão praticadas até março de 2008, sem as devidas explicações da parte do auditado, ainda assim emitiu parecer sem ressalva; x) não foram anexadas pela defesa as referidas "cartas de controles internos" onde se poderia verificar citações expressas aos problemas acima apontados; xi) o relatório circunstanciado sobre os procedimentos contábeis e os controles internos, elaborado pela KPMG e anexado pela defesa (fls. 1.849 a 1.870), concluiu que "não existe um processo de formalização em relatórios com a explicação sobre a razoabilidade das taxas de cessões praticadas no período." (fl. 1.856); assim, verifica-se que, apesar de ter identificado em seus papéis de trabalho "uma redução nas taxas de cessão praticadas", o auditor independente não relacionou essas taxas baixas com o incremento indevido dos resultados do banco, e tampouco estendeu seus procedimentos para verificar o impacto dessa prática no resultado do banco, nem avaliou a relevância desse resultado indevido em relação ao lucro líquido divulgado nas demonstrações financeiras; xii) o resultado positivo das cessões, no valor de R$140 milhões, representou 79% do lucro líquido divulgado de R$178 milhões de janeiro a setembro de 2008, o que demonstra a magnitude e a relevância das operações do BCSul com o FIDC Multicred, motivo pelo qual o lucro artificial deveria ter sido objeto de ressalva no parecer do auditor (fls. 1.681 a 1.701); xiii) independentemente da comparação entre registros contábeis efetuados em bases distintas, as operações de cessão ao FIDC Multicred a taxas baixas são irregulares pelas próprias características de negociação; xiv) ao contrário do que se contém na nota explicativa n° às demonstrações financeiras do Banco Cruzeiro do Sul, denominada "Transações entre partes relacionadas", as taxas de desconto praticadas nas cessões do Banco ao FIDC Multicred ficaram muito abaixo das condições de mercado; xv) a análise dos papéis de trabalho da KPMG (fls. 1.840 a 1.842) indica que, do total da cessões de crédito realizadas pelo Banco Cruzeiro do Sul (R$4.301 milhões), 81% das cessões foram adquiridas por partes relacionadas com o banco (FIDCs ligados); xvi) no caso em questão, o meio empregado para que se alcançasse o incremento indevido dos resultados do banco foi a taxa de desconto utilizada; assim, os auditores não poderiam descurar dessas transações com partes relacionadas que deveriam ter sido objeto de ressalva do parecer; tais fatos comprovam, portanto, que os papéis de trabalho e relatório circunstanciado anexados pela defesa não constituem prova de que os indiciados tivessem feito sua análise de acordo com as normas de contabilidade e suas interpretações técnicas; xvii) as demonstrações financeiras consolidadas do BCSul referentes à data-base 31.12.2008 e respectivo parecer do auditor independente, objeto da acusação, tiveram que ser refeitos e republicados por determinação da CVM, conforme consta em fato relevante publicado em 12.3.2010 (fl. 1.894);

## Cessão de Direitos Creditórios a taxas de desconto discrepantes (FIDC CPP120)

xviii) cabe destacar que o Banco Cruzeiro do Sul não auferiu resultado diretamente com a cessão ao CPP 120, mas indiretamente, com a valorização de 1.876% nas cotas subordinadas desse fundo em um único dia (27.10.2008); como o Banco na prática era, direta e indiretamente, o principal cotista dos FIDCs Multicred e CPP 120, a discrepância de taxas e o elevado percentual de valorização nas cotas subordinadas não poderiam passar despercebidos pelos auditores que deveriam emitir parecer com ressalvas em relação às demonstrações financeiras do Banco Cruzeiro do Sul, maior beneficiado na operação; tais operações de cessão constituíram, em essência, negócios realizados pela mesma pessoa, não havendo, portanto, substância econômica nessas transações, as quais, em razão disso, viabilizaram registros contábeis que não condiziam com a real situação econômico-financeira da instituição; xx) os altos lucros obtidos com as negociações dessas cessões no mesmo dia, da ordem de R$380 milhões, pela utilização de taxas discrepantes, é fator determinante na convicção de que não se tratavam de operações normais de mercado, mas de operações arquitetadas e de forma consciente levadas a termo pelos

participantes (fl. 940).

**Antecipação dos efeitos da Resolução nº 3.533, de 2008, sem a observância dos requisitos previstos na regulamentação (Resolução nº 3.673, de 2008)**

xxi) a norma mencionada pela defesa (item 29 da NBC T11-IT5) define que os desvios apurados pelo auditor, mas não acatados pela administração, sempre que tiverem, individual ou conjuntamente, efeitos relevantes, deverão ser objeto de opinião adversa ou com ressalva por parte do auditor; o auditor independente não descreveu em seu parecer a prática contábil inadequada (antecipação dos efeitos previstos na Resolução nº 3.533, de 2008, por meio da opção oferecida pela Resolução nº 3.673, de 2008, sem a observância dos requisitos previstos nessa resolução), que deveria ser apontada para que não houvesse interpretação incorreta pelos usuários das demonstrações contábeis (NBC T11.6.1.6-a);  a esse respeito, o Banco Central alertou a KPMG e seus responsáveis técnicos por carta (fls. 1.497), dias antes da emissão de seu parecer, de que "merece exame detalhado os procedimentos adotados pelo banco em relação ao atendimento integral do disposto na Resolução nº 3.673, de 26.12.2008"; mesmo tendo sido alertada pelo Banco Central do Brasil, a KPMG não demonstrou que estendeu seus procedimentos de auditoria para permitir maior cobertura e segurança de que as demonstrações financeiras não estavam afetadas por erros ou impropriedades de valores representativos; xxiii) no tocante às operações realizadas, não foram cumpridas as exigências contidas na Resolução nº 3.673, de 2008 (art. 1º, parágrafo único, inciso II), pois as entidades envolvidas (cedente e cessionária) deveriam adotar em conjunto essa antecipação, o que de fato não ocorreu; nesse sentido, a norma é clara quanto à necessidade de haver um acordo de vontades, devendo haver documentação anterior à realização dos contratos comprovando a anuência das partes; xxiv) a conduta dos indiciados demonstrou inobservância às normas e procedimentos que regulam a atividade profissional de auditoria independente, cabendo destacar que os pareceres de auditoria são destinados a oferecer confiabilidade aos demonstrativos contábeis publicados pela instituição; xxv) a responsabilização pelo cometimento das irregularidades, esclareça-se que a KPMG Auditores Independentes age por intermédio de seus representantes legais e os atos desses, no âmbito da função concedida, são considerados atos da própria pessoa jurídica, que por eles se obriga e responde; já Ricardo Anhesini Souza e Silbert Christo Sasdelli Júnior subscreveram o parecer sem ressalva, faltando com seu dever de evidenciar as irregularidades encontradas, conforme NBC T11.4.1.7, não prosperando, pois, a tentativa de eximirem-se de suas responsabilidades.

**Recursos**

Inconformados, KPMG Auditores Independentes, Ricardo Anhesini Souza e Silbert Christo Sasdelli Júnior apresentaram recursos contra a decisão condenatória, reproduzindo argumentos que na essência já foram apresentados ao processo, em sua fase de tramitação na autoridade de origem, para requerer a reforma integral da decisão condenatória, tendo em vista que: i) as demonstrações financeiras do Banco Cruzeiro do Sul não autorizavam a emissão de parecer com ressalvas; ii) a Circular nº 3.213 autorizava a contabilização do resultado da cessão de crédito na data da contratação da operação; essa norma não continha qualquer exceção relacionada ao fato de as operações serem realizadas entre pessoas jurídicas distintas, ainda que pertencentes ao mesmo grupo econômico e praticadas a alegadamente atípicas; iii) o Banco Central tinha pleno conhecimento dessas operações e não emitiu qualquer determinação contrária à sua realização; iv) a contabilização das operações de cessão expressou a realidade econômica dessas operações; v) o impacto econômico das operações de cessão foi substancialmente eliminado antes do encerramento do exercício, em razão da recompra dos créditos e posterior revenda a outros Fundos, em transações estruturadas com o apoio do FGC; vi) os efeitos das alegadas taxas extraordinárias nas operações de cessão restaram insubsistentes e irrelevantes diante da divulgação simultânea das demonstrações financeiras consolidadas, nas quais os impactos e reflexos da citada operação foram anulados, inexistindo prejuízo ou omissão de informações aos usuários das demonstrações financeiras; vii) as operações envolvendo os Fundos CPP 120 foram corretamente contabilizadas e, mesmo assim, agiram de forma cautelosa, ao inserir em seu relatório um parágrafo de ênfase, para destacar a realização das citadas operações e os motivos que levaram o Banco Cruzeiro do Sul a realizá-las; viii) não havia motivos para que os recorrentes considerassem irregular a antecipação dos efeitos da Resolução nº 3.533, pelo fato de seus efeitos serem imateriais e o banco auditado ter cumprido os requisitos de sua implementação.

**Remessa ao CRSFN**

Parecer da Procuradoria-Geral da Fazenda Nacional

O processo foi submetido à apreciação da PGFN, que emitiu o Parecer PGFN/CAF/CRSFN Nº 28/2016, de 26/2/2016, opinando pela manutenção da decisão de primeiro grau, com base nos seguintes fundamentos: i) o auditor independente exerce papel fundamental para assegurar credibilidade às informações constantes das demonstrações financeiras; nesse sentido o parecer do auditor independente se constitui no documento público que

empresta credibilidade às demonstrações financeiras; ii) no mérito, as condutas irregulares estão devidamente comprovadas nos autos; iii) a dosimetria das penalidades aplicadas está adequada à gravidade dos fatos e à conduta dos recorrentes.

É o relatório.

Waldir Quintiliano da Silva – Conselheiro Relator.

 Documento assinado eletronicamente por **Waldir Quintiliano da Silva**, **Conselheiro Relator**, em 07/07/2017, às 16:31, conforme horário oficial de Brasília, com fundamento no art. 6º, § 1º, do Decreto nº 8.539, de 8 de outubro de 2015.

 A autenticidade deste documento pode ser conferida no site http://sei.fazenda.gov.br/sei/controlador_externo.php? acao=documento_conferir&id_orgao_acesso_externo=0, informando o código verificador **0034147** e o código CRC **CA3001CA**.



**MINISTÉRIO DA FAZENDA**
**CONSELHO DE RECURSOS DO SISTEMA FINANCEIRO NACIONAL**

**Recurso** 13.602

**Processo** 10372.000061/2016-78

**Processo na primeira instância** BACEN 0901463246

### RECURSOS VOLUNTÁRIOS

**RECORRENTES:** KPMG AUDITORES INDEPENDENTES
RICARDO ANHESINI SOUZA
SILBERT CHRISTO SASDELLI JÚNIOR

**RECORRIDO:** BANCO CENTRAL DO BRASIL

**RELATOR:** WALDIR QUINTILIANO DA SILVA

**EMENTA**: RECURSOS VOLUNTÁRIOS. Auditoria Independente. Emissão de parecer sem ressalvas. Irregularidade de natureza grave, por caracterizar falta com seu dever de evidenciar as irregularidades encontradas. Apelos a que se nega provimento.

### VOTO DO RELATOR

## I - Questões Preliminares

Trata-se de analisar os recursos da KPMG Auditores Independentes e Ricardo Anhesini Souza e Silgert Christo Sasdelli Júnior contra a decisão do Banco Central do Brasil que aplicou, às pessoas físicas, individualmente, a pena de PROIBIÇÃO de praticar a atividade de auditoria em instituições financeiras e demais instituições autorizadas a funcionar pelo Banco Central do Brasil, pelo prazo de 5 (cinco) anos, e multa no valor de R$500.000,00 à KPMG Auditores Independentes. É que a autarquia entendeu caracterizada a conduta irregular dos

indiciados, consistente em emitir pareceres sem ressalvas, pertinentes às demonstrações financeiras do Banco Cruzeiro do Sul S.A., que nos termos da decisão condenatória não refletiam a real situação econômico-financeira do mencionado Banco, nas datas-bases 30.6.2008, 30.9.2008 e 31.12.2008, à vista do incremento indevido e relevante dos resultados daquele banco, por meio de cessões de direitos creditórios em condições artificiais a fundos de investimento em direitos creditórios (FIDCs).

Verifico, inicialmente, que estão preenchidas as condições de admissibilidade dos recursos de que se trata, porque os recursos foram apresentados tempestivamente e consta dos autos os documentos de procuração, com poderes de representação dos interesses dos indiciados, em nome dos advogados que firmaram as petições.

## II - Mérito

Na sequência, passo à análise dos fatos que deram origem ao processo que resultou na ação punitiva da autarquia. Veja bem. Os recorrentes atuaram como auditores independentes do Banco Cruzeiro do Sul das demonstrações contábeis da instituição nas datas-bases de 30/6/2008, 30/9/2008 e 31/12/2008. O que se trata no presente processo administrativo é do julgamento da conduta dos indiciados como auditores independentes do Banco Cruzeiro do Sul, para as demonstrações contábeis referentes às datas-bases mencionadas. Para tanto, é de todo conveniente que se analisem as demonstrações financeiras relativas a essas datas-bases, os principais atos de gestão praticados pela instituição auditada e as condições em que tais operações foram ou deixaram de ser reconhecidas nas peças contábeis correspondentes, e diante disso trazer à lume a atuação da empresa de auditoria independente e seus responsáveis técnicos, diante dos instrumentos legais e regulamentares de regência da matéria, seja no âmbito do Banco Central do Brasil, da CVM e do Conselho Federal de Contabilidade.

Mas antes, é de se contextualizar a forma de atuação do Banco, no ambiente de aperto de liquidez que marcou o ano de 2008, época das operações tratadas no presente processo.

O Banco Cruzeiro do Sul, instituição de pequeno porte, tinha atuação voltada para o mercado de concessão de crédito consignado, principalmente junto a servidores do setor público. Nesse sentido, a instituição detinha uma carteira de operações de crédito da ordem de R$ 5,2 bilhões, dos quais R$ 4,7 bilhões eram operações de crédito consignado. E essa posição evidenciava tendência de crescimento, de modo que, no terceiro trimestre, apresentou aumento de 43% em relação à mesma posição de 2007, e 8% em relação ao trimestre anterior.

No entanto, face às condições desfavoráveis de liquidez por que passava o mercado interbancário, a instituição passou no decorrer daquele ano a direcionar sua estratégia, principalmente a partir do terceiro trimestre de 2008, com vistas a viabilizar oportunidades de cessão das carteiras de crédito.  O próprio relatório de resultados do terceiro trimestre da instituição esclarece que a política de cessão da carteira de crédito seria adotada até que as condições de captação de recursos voltassem aos patamares de normalidade, em situação na qual fosse possível manter as posições de créditos consignados em carteira, dada a sua característica que primava pela qualidade e liquidez.

O próprio relatório de resultados do terceiro trimestre de 2008 registra acentuada queda nos resultados apurados pelo banco, evidenciando naquele trimestre queda que foi decorrente do aumento de despesas com captação e com derivativos financeiros. Paralelamente, registrou-se um acréscimo de provisão para devedores duvidosos entre o segundo e o terceiro trimestre de 2008, como reflexo da má qualidade da carteira de crédito. Aliado a este quadro desfavorável é de se apontar, também, o acrescimento dos custos com captação de recursos externos que passaram de 109,3% do CDI para 138% do CDI.

Assim, a cessão da carteira era a via natural, sendo certo que a escolha da modalidade de cessão de crédito sem coobrigação visava a evitar a necessidade de aportes adicionais de recursos próprios sob a forma de aumento de capital, como veio a admitir a própria instituição, à vista do contido nas observações contidas no relatório de resultados já mencionado.

A percepção das limitações das condições de liquidez e da política operacional do Banco se extrai das informações divulgadas nos relatórios de resultados pertinentes ao terceiro e quarto trimestres de 2008, conforme se vê de fls. 1686.

No entanto, como será demonstrado a seguir, o Banco do Cruzeiro do Sul S/A ao implementar sua estratégia de ação, quando da realização das operações de cessão da carteira de crédito, adotou práticas que resultaram na geração de resultados positivos, alterando de forma significativa os resultados do exercício de 2008, mediante a adoção de práticas ilegítimas e contrárias aos instrumentos legais e regulamentares de regência da matéria.

Esses procedimentos atípicos se caracterizaram pela utilização de práticas consistentes em promover a cessão de carteiras de crédito a uma taxa de juros bem inferior à que correspondia à taxa média de juros de mercado. Ou seja, houve a cessão das carteiras de crédito consignado, com a utilização de uma taxa de juros que era inferior à taxa média de juros da carteira. Com isso o valor presente da carteira cedida passa a ser superior ao seu valor efetivo e em consequência o valor pelo qual a carteira é cedida é significativamente superior do que seu valor real, registrado pela contabilidade, em virtude do que se tornou possível o reconhecimento de uma receita considerável no balanço do banco.  Esse procedimento foi sistematicamente adotado no decorrer do segundo semestre de 2008, de modo

que as posições de resultado da instituição ficaram afetadas de forma relevante.

O outro procedimento irregular consistiu em se promover a antecipação de receitas futuras, nos contratos de cessão de crédito, mediante adoção de sistemática contábil própria, sem que as instituições que operaram na contraparte tivessem expressado concordância com o critério contábil, em decorrência do que se configurou o descumprimento da Resolução CMN 3.533, de 2008.

Os fatos estão devidamente comprovados pela documentação anexada aos autos e foram minuciosamente descritos nas intimações que deram origem a este processo administrativo de caráter punitivo.

### Cessão de direitos creditórios a taxas de desconto baixas

Conforme exaustivamente descrito pelo Banco Central do Brasil, nas intimações iniciais do processo, ou demonstrado nos fundamentos da decisão condenatória, o Banco Cruzeiro do Sul S/A procedeu, no período de 29.1.2008 a 30.9.2008, a várias cessões de direitos creditórios, para o FIDC Multicred, administrado pela Cruzeiro do Sul S.A. DTVM, a taxas de desconto bem abaixo dos parâmetros de rentabilidade usualmente adotados no mercado, possibilitando, dessa forma, a apuração de lucros expressivos, para o banco. As taxas de desconto médias praticadas nessas operações foram de aproximadamente 6,3% ao ano, enquanto que as taxas DI de um dia, consideradas como o custo de oportunidade no mercado financeiro, variaram de 11,1% a 13,6% ao ano. A propósito, vale elencar essas informações na tabela indicada a seguir.

**Comparativo de taxas de desconto na cessão ao FIDC Multicred X CDI de um dia**

| Data | Cessão ao FIDC Multicred (taxa média % a.a.) | CDI de um dia (taxa % a.a.) |
|---|---|---|
| 29.1.2008 | 9,8 | 11,1 |
| 31.1.2008 | 9,8 | 11,1 |
| 27.2.2008 | 9,8 | 11,1 |
| 27.3.2008 | 6,3 | 11,1 |
| 28.3.2008 | 12,9 | 11,1 |
| 31.3.2008 | 6,3 | 11,2 |
| 25.4.2008 | 6,3 | 11,6 |
| 29.4.2008 | 6,3 | 11,6 |
| 30.4.2008 | 6,3 | 11,6 |
| 16.5.2008 | 6,3 | 11,5 |
| 21.5.2008 | 10,2 | 11,6 |
| 23.5.2008 | 6,3 | 11,5 |
| 28.5.2008 | 6,3 | 11,5 |
| 30.5.2008 | 6,3 | 11,6 |
| 26.6.2008 | 6,3 | 12,1 |
| 27.6.2008 | 6,3 | 12,1 |
| 30.6.2008 | 6,3 | 12,1 |
| 21.7.2008 | 6,3 | 12,1 |
| 31.7.2008 | 6,3 | 12,8 |
| 13.8.2008 | 6,3 | 12,8 |
| 28.8.2008 | 6,3 | 12,8 |
| 29.8.2008 | 6,3 | 12,8 |
| 04.9.2008 | 6,3 | 12,8 |
| 19.9.2008 | 6,3 | 13,6 |
| 30.9.2008 | 6,3 | 13,6 |

Fonte: Relatórios trimestrais elaborados pelo administrador do em 15.5.2008, e 14.11.2008, sítio eletrônico da Cetip (WWW.cetip.com) e contratos de cessão entre Banco Cruzeiro do Sul e o FIDC Multicred.

Por outro lado, as taxas de desconto praticadas nas cessões entre o Banco Cruzeiro do Sul e o FIDC Multicred são, também, inferiores àquelas contratadas pelo próprio Banco Cruzeiro do Sul com terceiros, no mesmo período de tempo. Ou seja, no 1º semestre de 2008, quando o Cruzeiro do Sul negociou operações semelhantes com o Banco do Estado do Rio Grande do Sul, utilizou taxas de juros compatíveis com as de mercado. Isto é, se as operações eram realizadas com instituições não integrantes do conglomerado Cruzeiro do Sul, as taxas praticadas eram as de mercado. De fato, para as três operações realizadas com o Banrisul, em 9.1.2008, 19.2.2008 e 24.3.2008, as taxas de desconto foram de 14,4% a.a., 13,7% a.a. e 14,8% a.a., respectivamente, muito embora as condições dessas operações fossem em tudo semelhantes àquelas negociadas com o FIDC Multicred, com exceção da taxa de juros incidente. E o que é curioso e digno de nota é que a operação de 24.3.2008 foi realizada três dias antes da realização de uma cessão ao FIDC Multicred à taxa de desconto de 6,3% a.a.

Assim, também não há dúvidas de que, como bem ressaltou a decisão condenatória, a diferença nas taxas de desconto contratadas, em datas tão próximas, para ativos de mesma natureza e complexidade, não encontra justificativa e nem respaldo em qualquer avaliação de cenários macroeconômicos ou de condições mercadológicas verificáveis. Essas circunstâncias, sem dúvidas, reforçam o entendimento de que o Banco Cruzeiro do Sul, ao realizar tais operações, não teve outro objetivo que não o de antecipar receitas que seriam realizadas no futuro, utilizando-se, para tanto, de taxas de desconto artificiais e adrede arbitradas para favorecerem a evidenciação de

resultado que lhe fosse mais favorável.

Vale, ainda, ressaltar que o que é passível de crítica não é a operação de cessão de crédito, em si, mas isto sim a forma como o instituto da cessão de crédito foi utilizado: mediante fórmula engenhosa, com a aplicação de taxa de juros largamente descolada das condições prevalecentes no mercado, para operações semelhantes, no balizamento e precificação das operações realizadas, com a situação agravante de que essas operações foram conduzidas com a participação de instituições pertencentes ao mesmo grupo econômico. É dizer que a prática operacional irregular somente foi possível porque as operações tinham como contraparte instituições ou fundos administrados sob a interferência da própria instituição financeira, ora recorrente.

Cabe destacar que o montante das operações de cessão de crédito para o FIDC Multicred no período de janeiro a setembro de 2008 alcançou a expressiva cifra da ordem de R$ 2.092 milhões, envolvendo 25 operações, com concentração nos últimos dias de cada mês.

Assim é que o lucro líquido do Cruzeiro do Sul, no primeiro semestre de 2008, foi de R$ 150,2 milhões, enquanto que o resultado consolidado do grupo econômico ao qual pertencia o Banco, aí incluído o efeito da reversão das operações de cessão de crédito aos FIDCs, foi de apenas R$ 36,1 milhões, conforme divulgação realizada em 7/8/2008. O lucro líquido do Banco Cruzeiro do Sul apurado no terceiro trimestre de 2008 foi de R$ 27,6 milhões, sendo que o lucro líquido do grupo econômico, após a consolidação de resultados, foi de apenas R$ 1,1 milhão.

Assim, no período de janeiro a setembro de 2008, o lucro líquido do Cruzeiro do Sul foi de R$ 177,8 milhões. E desse montante o valor de R$ 140,6 milhões, isto é 79,1%, foi decorrente do impacto das operações de cessão de crédito.

Conforme já comentado, o objetivo dessas práticas operacionais, consistentes nas operações de cessão de crédito, foi promover a antecipação de receitas sobre as operações de crédito cedidas. Isso trouxe um reflexo negativo para a rentabilidade da carteira do FIDC Multicred, após a incorporação daqueles ativos, carteira que passou a apresentar rendimentos baixos. Dessa forma, houve reflexo direto na valorização da cota subordinada, em percentual inferior à variação do CDI, com comprometimento do desempenho do resultado futuro dessa carteira, conforme demonstrado na tabela apresentada a seguir. E o Banco Cruzeiro do Sul, que é cotista subordinado do FIDC Multicred com participação superior a 95% do seu patrimônio, ficou sujeito a essa rentabilidade baixa.

**Rendimento das Cotas Subordinadas do IDC Multicred**

| Data | Rendimento (% a.m.) | % CDI |
|------|---------------------|-------|
| 31.1.2008 | 0,62% | 66,8 |
| 29.2.2008 | 0,59% | 74,4 |
| 31.3.2008 | 0,61% | 73,3 |
| 30.4.2008 | 0,69% | 76,7 |
| 30.5.2008 | 0,76% | 86,8 |
| 30.6.2008 | 0,57% | 60,4 |
| 31.7.2008 | 0,47% | 44,5 |
| 29.8.2008 | 0,88% | 87,1 |
| 30.9.2008 | 1,36% | 124,1 |

Fonte: Relatórios de monitoramento do FIDC Multicred, elaborados pela Austin Rating em 1º.5.2008 e 6.11.2008.

Verifica-se, portanto, que o efeito das operações de cessão de crédito, na forma mencionada, foi propiciar o reconhecimento antecipado de parcela relevante das receitas de operações de crédito da instituição, em substituição à apropriação daquelas receitas ao longo da duração da operação de crédito.

**Operações sucessivas de cessão de direitos creditórios a taxas de desconto discrepantes**

Passo, agora, à análise das cessões de direitos creditórios, feitas de forma sucessiva, com efeitos relevantes nos resultados apurados pelo Banco Cruzeiro do Sul, pelo simples passeio, por assim dizer, dos fluxos de pagamentos de parcelas de cartões de crédito pelos fundos FIDC CPP 120 e deste para FIDC Multicred. Ou seja, num primeiro momento, há a operação de cessão de direitos creditórios a uma taxa aproximada de 64,5%, e no passo seguinte, realizado no mesmo dia, a mesma carteira segue seu curso, em direção a outro fundo, agora o FIDC Multicred, só que, desta vez, a uma taxa de 15,5%.

Assim é que o valor dos direitos creditórios negociados, referentes aos fluxos de recebimento de parcelas de cartões de crédito, era de R$1.155 milhões, por valor de face dos fluxos. Tais ativos foram cedidos à taxa média dos contratos, de aproximadamente 64,5% ao ano (metodologia 252 dias úteis/ano), sem o registro de resultados significativos. Na mesma data, esses direitos foram cedidos pelo FIDC CPP 120 ao FIDC Multicred, desta feita a

uma taxa de desconto substancialmente menor (aproximadamente 15,7% ao ano, na mesma metodologia), proporcionando o registro de receita no valor de R$ 380 milhões pelo FIDC CPP 120. Ou seja, esta operação gerou uma receita ao FIDC Multicred no valor de R$ 380 milhões, sem que houvesse qualquer justificativa para a utilização de taxas diferentes aplicadas no mesmo dia, para as mesmas operações.

Ora, considerando que FIDC Multicred é o principal cotista do FIDC CPP 120, e que o Banco Cruzeiro do Sul é cotista subordinado do FIDC Multicred, o resultado dessa operação acabou impactando o resultado do Banco, pela valorização das cotas subordinadas. E esse ganho foi registrado como ajuste a suposto valor de mercado das aplicações em cotas de fundos de investimento. Tudo isso se passa porque o FIDC Multicred ao adquirir a carteira a uma taxa de 15,7% promoveu, em seguida, o ajuste dessa carteira ao valor de mercado, gerando assim uma receita de R$ 380 milhões.

Houve, portanto, a transferência de titularidade formal dos direitos creditórios, permanecendo os riscos e os benefícios indiretamente com o Banco Cruzeiro do Sul, o que apresentou como consequência a sobrevalorização contábil desses ativos e a apuração de lucros para incrementar o resultado do exercício. Vale dizer que a interposição do FIDC CPP 120 possibilitou ao Banco Cruzeiro do Sul a contabilização da renda de R$ 380 milhões como ajuste a suposto valor de mercado das cotas do FIDC e o diferimento do pagamento dos tributos correspondentes.

**Antecipação dos efeitos previstos na Resolução nº 3.533, de 2008**

A documentação disponível nos autos comprova amplamente que o Banco Cruzeiro do Sul, de fato, antecipou a adoção dos procedimentos contábeis previstos na Resolução nº 3.533, de 2008, com base na faculdade prevista pelas Resoluções 3.627, de 30 de outubro de 2008, e 3.673, de 2008, sem observar a exigência imposta pelo inciso II, art. 1º da Resolução nº 3.627, de 2008, e inciso II, art. 2º da Resolução nº 3.673, de 2008. Essa sistemática possibilitou, de forma irregular, o diferimento dos resultados apurados nas operações de cessão de direitos creditórios com coobrigação realizadas em novembro e dezembro de 2008, no montante de R$13,6 milhões.

As cessões a instituições financeiras realizadas no último bimestre de 2008 com os respectivos resultados são listadas na Tabela 3, indicada a seguir.

**Tabela 3 – Cessões de crédito realizadas em novembro e dezembro de 2008 - (R$ mil)**

| Data | Cessionário | Resultado |
|---|---|---|
| 05.11.2008 | Banco do Brasil S.A. | (13.671) |
| 06.11.2008 | Banco do Brasil S.A. | (2.164) |
| 24.11.2008 | Banco Nossa Caixa S.A. | 354 |
| 01.12.2008 | Banco do Brasil S.A. | (7.381) |
| 08.12.2008 | Caixa Econômica Federal | (3.365) |
| 18.12.2008 | Banco do Estado do Espírito Santo S.A. – Banestes | 3.630 |
| 29.12.2008 | Banco Nossa Caixa S.A. | 8.960 |
| Total | | (13.636) |

Dentre as cessões contratadas no período, destacam-se aquelas firmadas junto ao Banco do Brasil S.A. em 5/11/2008, 6/11/2008 e 1º/12/2008. É bem de ver que os contratos foram estabelecidos com coobrigação do cedente, mediante a retenção substancial de riscos e benefícios, de forma a se enquadrarem no disposto na alínea "c", inciso I, art. 5º da Resolução nº 3.533, de 2008, isto é, as receitas e despesas devem ser apropriadas pelo prazo remanescente da operação.

Além do mais, o Banco Cruzeiro do Sul só poderia adotar o diferimento do prejuízo observado nas cessões a instituições financeiras em novembro e dezembro de 2008, caso o cessionário também concordasse em seguir o mesmo princípio. Nesse sentido, em 22.12.2008, o Banco Cruzeiro do Sul emitiu as cartas CTRL.ML.013/08, CTRL.ML.014/08 e CTRL.ML.015/08 à Caixa Econômica Federal, ao Banco do Brasil S.A. e ao Banco Nossa Caixa S.A., respectivamente, informando-os sobre a sua decisão de antecipar os efeitos da Resolução nº 3.533, de 2008. Desses cessionários, somente o Banco do Brasil S.A. respondeu, por meio da correspondência Diretoria de Varejo – 2009/102, de 27.1.2009, esclarecendo sua opção pela não antecipação dos efeitos da Resolução nº 3.533, de 2008.

No entanto, mesmo dispondo dessa informação antes da publicação dos demonstrativos financeiros de 31.12.2008, o que veio a ocorrer em 20.3.2009, o Banco Cruzeiro do Sul decidiu por diferir o prejuízo decorrente dessas operações.

Diante do que até aqui foi exposto, restou comprovado que o Banco Cruzeiro do Sul a pretexto de implementar estratégia operacional de negociar suas carteiras de crédito, na busca de liquidez, valeu-se de práticas ilegítimas, porque irregulares, que resultaram na antecipação de receitas futuras, mediante artifícios contábeis, consistentes na negociação sucessiva desses ativos com fundos administrados por instituição integrante de seu grupo financeiro, com a utilização de taxas, definidas de forma arbitrária, de modo a favorecer a ele, banco, principal beneficiário das operações. Além disso, antecipou os efeitos previstos na Resolução nº 3.533, de 2008, sem, no entanto, obedecer as condições estabelecidas no mencionado normativo.

**Atuação da auditoria independente**

Passo nesse ponto a analisar a conduta dos auditores independentes, KPMG Auditores Independentes e Ricardo Anhesini Souza e Silgert Christo Sasdelli Júnior, indiciados no presente processo, por terem emitido pareceres sem ressalvas, pertinentes às demonstrações financeiras do Banco Cruzeiro do Sul S.A., que não refletiam a real situação econômico-financeira do mencionado Banco, nas datas-bases 30/6/2008, 30/9/2008 e 31/12/2008.

Nesse compasso, verifico que não obstante as impropriedades praticadas pela instituição financeira auditada, com efeitos relevantes nas demonstrações contábeis auditadas, conforme já comentado neste voto, ainda assim, a empresa de auditoria independente e seus representantes técnicos, ora recorrentes, emitiram pareceres de auditoria, sem qualquer ressalva, convalidando, em consequência, demonstrações contábeis que não refletiram a real situação econômica e financeira da instituição financeira auditada.

E nem se diga que não havia indícios de cometimento de tais irregularidades. É que tanto a instituição financeira quanto a empresa de auditoria independente foram devidamente alertadas para a impropriedade das condutas irregulares referidas no presente processo administrativo.

Com efeito, o Banco Central do Brasil, em 9.3.2009, comunicou à KPMG que havia detectado operações e procedimentos contábeis que afetaram de forma relevante a apuração do resultado do exercício de 2008, do Banco Cruzeiro do Sul. A autarquia não só fez o alerta, mas solicitou também a especial atenção para o assunto, bem como a adoção das medidas cabíveis dentro da esfera de competência da empresa de auditoria. Na mesma oportunidade, foram devidamente apontados os efeitos patrimoniais e de resultado decorrentes de operações, dentre as quais as cessões de crédito ao Fundo de Investimento em Direitos Creditórios BCSul Verax Multicred Financeiro (FIDC Multicred), praticadas a taxas significativamente inferiores às de mercado. Da mesma forma, a KPMG foi alertada para o fato de que as operações haviam sido conduzidas com instituições pertencentes ao mesmo grupo econômico. A KPMG também teve conhecimento da estrutura e dos parâmetros que nortearam a cessão de fluxos de cartão de crédito consignado em outubro/2008 para o Fundo de Investimento em Direitos Creditórios Aberto BCSul Verax CPP 120 (FIDC CPP 120) e deste ao FIDC Multicred.

A KPMG foi igualmente alertada, para o fato de que mereciam especial atenção os procedimentos adotados pelo Banco do Cruzeiro do Sul em relação à observância, por completo, do disposto na Resolução nº 3.673, de 26 de dezembro de 2008, no tocante à classificação, ao registro contábil e à divulgação das operações de cessão de crédito realizadas nos meses de novembro e dezembro de 2008.

Ainda há mais: a correspondência da autarquia foi enviada aos recorrentes, antes da publicação dos resultados relativos ao exercício de 2008. É dizer que a empresa de auditoria foi alertada a tempo de proceder a uma análise crítica do trabalho de auditoria que vinha sendo conduzido à frente do Banco Cruzeiro do Sul. Ou seja, teve tempo mais do suficiente para rever seu posicionamento a respeito das demonstrações contábeis da instituição auditada.

No entanto, a KPMG preferiu ignorar o alerta feito pela autarquia. Tanto é assim que em 16.4.2009, a recorrente respondeu a correspondência do Banco Central do Brasil, limitando-se a informar que o parecer de auditoria havia sido emitido com a inserção de parágrafo de ênfase, para destacar que as medidas adotadas pelo Banco visavam à geração de recursos para manutenção de sua liquidez e de seu realinhamento operacional, aspectos que haviam sido objeto da nota explicativa nº 1 das referidas demonstrações financeiras.

O certo é que a empresa de auditoria independente, em seu parecer afirmou ter revisado as informações contábeis referentes ao trimestre findo em 31 de dezembro de 2008, compreendendo o balanço patrimonial, as demonstrações do resultado e das mutações do patrimônio líquido, bem como as notas explicativas, atestando, ademais, que a revisão foi feita de acordo com as normas específicas elaboradas pelo Ibracon – Instituto dos Auditores Independentes do Brasil, em conjunto com o Conselho Federal de Contabilidade – CFC.

No referido documento a KPMG atestou, também, que não tinha conhecimento de nenhuma modificação relevante que devesse ser feita nas informações contábeis contidas nas Informações Financeiras Trimestrais (IFT).

É verdade que o parecer da empresa de auditoria independente confirmou, em forma de ênfase, que a administração do banco auditado, frente à crise internacional instalada, havia adotado medidas visando à geração de recursos para manutenção da sua liquidez e seu realinhamento operacional frente às condições de mercado.

Verifico, no entanto, que o parágrafo de ênfase mencionado pelos recorrentes não trouxe maiores esclarecimentos

sobre as práticas irregulares adotadas pelo Banco Cruzeiro do Sul, nos balanços e balancetes auditados. Na verdade, como bem esclareceu a autarquia, o parágrafo de ênfase limitou-se a fazer referências rápidas sobre o fato de a auditada ter promovido alterações em sua política operacional, sem emitir opinião conclusiva sobre os fatos e sem dar maiores explicações sobre os efeitos das práticas operacionais e contábeis adotadas pela instituição auditada.

Como se vê, mesmo se fosse a hipótese de inclusão de parágrafo de ênfase no parecer sobre as demonstrações contábeis do Banco Cruzeiro do Sul, nas datas-bases referidas nos autos, a forma como foi redigido o parágrafo de ênfase não atenderia ao quanto estabelecido no item 11.3.7.1 da Resolução CFC 953, de 2003, porque não trouxe nenhuma avaliação da natureza e nem do efeito associados aos fatos que teriam trazido incertezas nas demonstrações contábeis auditadas. Limitou-se apenas a mencionar o redirecionamento da política operacional da instituição, para operações de cessão de crédito, sem fazer qualquer menção sobre os efeitos tanto patrimoniais quanto ao resultado advindos da nova política operacional e nem das práticas contábeis daí decorrentes.

Destaco, a propósito, o conteúdo do item 11.3.7.1 da norma anexa à Resolução CFC nº 953, de 2003:

*"11.3.7.1 – Quando ocorrer incerteza em relação a fato relevante, cujo desfecho poderá afetar significativamente a posição patrimonial e financeira da entidade, bem como o resultado das suas operações, deve o auditor adicionar um parágrafo de ênfase em seu parecer, após o parágrafo de opinião, fazendo referência à nota explicativa da administração, que deve descrever de forma mais extensa, a natureza e, quando possível, o efeito da incerteza".*

Com isso, o referido parecer induziu a erro os usuários da informação, em desacordo, portanto, com a orientação contida no item 11.3.7.1 da norma anexa à Resolução CFC nº 953, de 24 de janeiro de 2003, primeiro porque a recorrente se utilizou de um instrumento inadequado às circunstâncias (parágrafo de ênfase) e ao recorrer a este instrumento, fê-lo de forma desapropriada, sem atender minimamente ao quanto estabelece o item 11.3.7.1 norma anexa à Resolução CFC 953, de 2003.

É dizer que o parecer emitido pela auditoria independente não fez qualquer registro que demonstrasse a existência de prática contábil contrária às normas de regência, por parte da auditada. Dessa forma, ficou caracterizado que a KPMG não cumpriu o seu dever na forma expressa na Instrução CVM nº 308, de 1999, configurando falha prevista na Circular nº 2.676, de 1996, além de não observar os procedimentos de auditoria, nos termos do art. 20 do Regulamento Anexo à Resolução nº 3.198, de 2004.

O que cumpria à KPMG seria, efetivamente, ter emitido parecer com ressalvas, diante da dimensão dos efeitos das práticas operacionais nas demonstrações financeiras advindos da prática contábil adotada pela instituição financeira auditada.

É que como já restou demonstrado no presente voto, a engenharia financeiro-contábil posta em prática pelo Banco Cruzeiro do Sul permitiu que a instituição antecipasse receitas futuras, mediante a utilização de critérios contábeis ilegítimos, em montante expressivo. Os efeitos dessa prática irregular permitiram a alteração dos resultados de forma radical, porque propiciaram a apropriação de receitas de forma irregular, no montante de R$ 140,6 milhões, correspondente a 79,1% do resultado apurados nos balanços da instituição, conforme já amplamente comentado no presente voto.

Não se diga que a empresa de auditoria independente não tivesse conhecimento dessas práticas irregulares. Em primeiro lugar, porque se tratava de prática operacional envolvendo partes relacionadas, o que por si só já recomendava, pela sua relevância, a atenção especial nos procedimentos de auditoria, nos termos dos itens 11.2.12.1 e 11.2.12.2, abaixo transcritos:

*11.2.12.1 – O auditor deve obter evidências suficientes para identificar partes relacionadas na fase de planejamento, possibilitando detectar, no decorrer dos trabalhos, quaisquer transações relevantes que as envolvam.*

*11.2.12.2 – O auditor deve examinar as transações relevantes com partes relacionadas, aplicando os procedimentos necessários à obtenção de informações sobre a finalidade, natureza e extensão das transações, com especial atenção àquelas que pareçam anormais ou envolvam partes relacionadas não identificadas quando do planejamento.*

Em segundo lugar, por envolver cifras muito relevantes quando se analisa não só o volume das operações negociadas (cerca de 40% da carteira de crédito da instituição), num período curto de tempo em que tais operações foram concretizadas, bem como seus efeitos sobre os resultados da instituição.

Em terceiro lugar, porque o Banco Central do Brasil fez alertas expressos sobre a necessidade de a empresa de auditoria dar especial atenção para as práticas contábeis, que a instituição financeira vinha adotando. E nem se há de alegar que o alerta da autoridade de origem tenha sido a destempo, porque a correspondência contendo o alerta foi recebido pela empresa recorrente, antes da divulgação das demonstrações contábeis auditadas. Assim, os recorrentes tiveram tempo mais do suficiente, para reapreciarem as demonstrações contábeis e assim emitirem opinião, sobre os fatos, seja mediante ressalva em seus pareceres, ou através da emissão de parecer com negativa de opinião.

Em quarto lugar, porque a análise dos papéis de trabalho que a própria defesa anexou aos autos (fls. 1838/1848) indica que, apesar de os trabalhos de auditoria terem identificado "...*uma redução entre as taxas de cessão praticadas até março de 2008 e após esse período*", sem que, conforme reconheceu a própria KPMG, a administração do Banco tivesse demonstrado, em relatórios, a razoabilidade e a formalização das taxas praticadas, mesmo assim a empresa de auditoria não viu, nisso, qualquer indício que justificasse o aprofundamento de seus trabalhos de análise.

É verdade que o relatório circunstanciado produzido pela KPMG registrou o fato de que tinha havido uma redução nas taxas da cessão de crédito praticada. No entanto, como ressaltou o Banco Central do Brasil, os recorrentes não atentaram para a repercussão que essa alteração de taxas trouxe sobre os resultados do banco, que assim passaram a transmitir uma visão totalmente equivocada sobre a performance evidenciada nas demonstrações contábeis da instituição auditada, conforme já comentado neste voto.

Na verdade, a KPMG, no decorrer de seus procedimentos de auditoria, teve acesso a informações que indicavam a necessidade de aprofundar sua análise, para avaliar a repercussão da alteração das taxas incidentes nas operações de cessão de direitos creditórios, principalmente pelo volume financeiro envolvido nessas operações.

Diante de todo o que aqui foi exposto, estou convencido da comprovação de que as demonstrações contábeis relativamente às datas-bases mencionadas nos autos não estavam em consonância com Princípios Fundamentais de Contabilidade e Normas Brasileiras de Contabilidade, como bem realçou a decisão condenatória, em seu item 20 (fl. 1903-vº), principalmente pelo fato de terem omitido informação relevante, e pela utilização de práticas contábeis que alteraram de forma artificiosa as posições de resultado da instituição auditada. Nesse sentido, reproduzo aqui o teor do item 16 da decisão condenatória (fl. 1903), que bem abordou a questão:

"*16.     A respeito, cumpre registrar que as instituições financeiras deverão observar principalmente a estrutura conceitual básica da contabilidade e os Princípios Fundamentais de Contabilidade previstos no Cosif (seção 1.2.5) e aprovados pela Resolução CFC 750, de 29 de dezembro de 1993, que requerem que as transações e outros eventos sejam contabilizados e divulgados de acordo com sua essência e realidade econômica, e não somente pela sua forma legal*".

É de se esclarecer, também, que a conduta irregular, tratada no presente processo, é a forma artificial pela qual as operações de cessão foram realizadas visando ao incremento do resultado do banco, seja por meio da utilização de taxas baixas, fora dos padrões de mercado, seja com a aplicação de taxas discrepantes. É de se ver, ainda, como esclareceu a autoridade de origem, que a Circular nº 3.213, de 2003, sequer foi mencionada pela acusação.

Feitos tais comentários, verifico que a situação retratada no processo impunha a emissão de parecer com ressalvas, conforme recomenda o item 26 da Interpretação Técnica NBC T11 – IT-05, para expressar a existência de discordância com as práticas contábeis utilizadas pela empresa auditada. Veja-se, a propósito, a íntegra daquele dispositivo:

*26. Quando as demonstrações contábeis forem afetadas de maneira relevante pela adoção de prática contábil em desacordo com os Princípios Fundamentais de Contabilidade e as Normas Brasileiras de Contabilidade, o auditor deve emitir parecer com ressalva ou adverso.*

A obrigatoriedade de emissão de parecer com ressalvas, como lembrado pelo Banco Central em sua decisão condenatória, está, também, expressa na própria Resolução CFC 607, de 1985, que em seu item 3 (alínea "c") estabelece que "...*o auditor independente, na realização de seus trabalhos, tem o dever de relatar desvios das normas legais e regulamentares e, se esses desvios ocasionarem reflexos relevantes nas demonstrações financeiras, o fato deve ser considerado para emissão do parecer; caso contrário, em relatório específico. É, pois, esperado que o auditor, ao emitir seu parecer sem ressalvas, tenha-se assegurado da inexistência de desvios de efeitos relevantes nas demonstrações financeiras*".

Diante desses comentários, rejeito o argumento de que as demonstrações contábeis do banco auditado não requeriam a emissão de parecer de auditoria sem ressalvas, até porque havia, sim, motivos para considerar incorreta a contabilização adotada pelo Banco Cruzeiro do Sul, como restou comprovado ao longo do presente processo e exaustivamente analisado pelo Banco Central do Brasil, seja nas peças intimatórias de abertura do processo punitivo, seja na decisão condenatória combatida pelos recorrentes.

Passo, nesse ponto, a apreciar as razões de defesa apresentadas pelos recorrentes.

Inicio rechaçando a alegação de que um parecer com ressalvas poderia agravar a já difícil situação de crise de liquidez, por que passava a instituição.

Valho-me, aqui, dos fundamentos da decisão condenatória ao apreciar a matéria. Ou seja, como registrou o Banco Central do Brasil no item 8 de fl. 1902-vº, "...*os profissionais de auditoria independente têm o dever de verificar se houve o descumprimento das disposições legais e regulamentares aplicáveis às atividades da empresa auditada que possam vir a ter reflexos relevantes nas suas demonstrações contábeis, bem como de relatar os desvios encontrados. Dessa forma, o trabalho de auditoria confere maior credibilidade às informações, que, por serem testadas e analisadas por pessoa alheia à administração da empresa, oferecem*

*maior segurança aos usuários dos demonstrativos contábeis".*

Nesse diapasão, vejo que a atuação da auditoria independente é de fundamental importância no processo de conferir transparência e confiabilidade às demonstrações contábeis divulgadas pelas companhias. Os investidores, os acionistas e quotistas das empresas, sejam companhias abertas ou não, bem como seus clientes e até mesmo seus dirigentes e demais interessados nas informações divulgadas pelas empresas, como governos, analistas de mercado e outros interessados, precisam ter um elevado grau de certeza, sobre a confiabilidade dos números e demais informações contidos nas peças contábeis divulgadas por essas companhias. Tudo isso atestado por um agente externo, independente, com a devida qualificação, para que, com base em critérios aferíveis a partir de parâmetros conhecidos e praticados com apuro técnico, ateste a consistência e a confiabilidade dos dados, mediante a aplicação de técnicas de auditoria, levadas a efeito com base em princípios de aceitação geral.

Destaco, a propósito, a respeitável manifestação da PGFN a respeito da importância do papel do auditor, para conferir credibilidade às demonstrações contábeis das entidades auditadas. Veja-se a íntegra dos itens 4 e 5 do Parecer PGFN/CAF/CRSFN/Nº 28/2016, de 26/2/2016, sobre o tema:

*"4. O Auditor independente exerce papel fundamental para assegurar credibilidade às informações financeiras de determinada entidade, ao opinar se as demonstrações contábeis preparadas pela sua administração representam, em todos os aspectos relevantes, sua posição patrimonial e financeira. A atividade de auditoria externa é essencial para a proteção dos usuários das demonstrações contábeis, contribuindo para o funcionamento do mercado, à medida que colabora para o fortalecimento da confiança nas relações entre as entidades auditadas e os usuários daquelas demonstrações.*

*5. O parecer do auditor independente se constitui no documento público que empresta credibilidade àquelas demonstrações, daí resultando responsabilidades para o auditor. A inadequada emissão de parecer pode levar o profissional a sofrer sanção do Conselho regulador, administrativa, civil e/ou criminal".*

Nesse sentido, como realçou o Banco Central do Brasil, o compromisso dos auditores independentes é, sobretudo, com os usuários da informação *"... e esse compromisso é a razão que justifica e impõe que os seus trabalhos sejam realizados com independência daquela administração"*. Assim, admitir que o auditor independente viesse a permitir que as demonstrações contábeis da companhia auditada possam ser divulgadas, contendo informações incompletas, inverídicas, de forma a distorcer e ocultar a real situação econômica ou financeira da companhia auditada, tendo como fundamento a existência de crise econômica, seria aviltar a atuação do auditor independente. Ou pior, seria fulminar a essência de sua atuação, seria subtrair sua independência, descaracterizando por completo a razão de ser de sua atividade, seria desfigurá-lo, transformando-o numa atividade meramente burocrática, sem qualquer importância, e com isso eliminando a oportunidade de contribuição para a melhoria da qualidade das demonstrações contábeis das companhias, com prejuízos enormes para a segurança das informações corporativas.

A propósito da importância do trabalho do auditor independente, é de todo oportuno ainda trazer trechos do voto do Conselheiro Marcos Davidovich, no Recurso n.º 12714, julgado em 27.03.13, onde abordou com muita propriedade o papel que se espera do auditor independente e das responsabilidades, no desempenho de suas funções:

*"3.    Inicialmente, discordo da defesa na medida em que afirma não ter a auditoria independente função de detecção de fraudes. Apesar de não se tratar de finalidade precípua da atividade de auditoria, cada vez mais tem sido atribuída função pública à sua atuação, em razão de sua natureza de gatekeeper. Como tem sido cada vez mais comum a existência de questionamentos acerca desse conceito, entendo pertinente tecer algumas considerações acerca de quais são suas funções, bem como suas responsabilidades.*

*4.    Gatekeepers são intermediários responsáveis pela verificação e, eventualmente, certificação de serviços e produtos disponibilizados a investidores. Dentre esses serviços menciono a verificação de demonstrações contábeis (auditores independentes), avaliação das condições de crédito de companhias e produtos (agências de rating), análise de companhias e de prospectos (analistas de investimento), avaliação de equidade e comutatividade de determinada transação comercial (Bancos de Investimentos ao emitir Fairness opinion) ou mesmo, como defendido por alguns[1], serviços advocatícios, quando estes emprestam sua reputação para garantir a credibilidade da operação. Enfim, o principal ativo dos gatekeepers é sua reputação no mercado.*

*5.    Por outro lado, a reputação lhes é garantida por meio de uma atuação confiável. Usualmente o mercado acaba dando maior credibilidade aos gatekeepers pelo fato de terem menores incentivos para mentir do que quem está envolvido com a operação. Em princípio, como sua reputação no mercado é seu principal ativo, não seriam eles, em tese, capazes de sacrificar esse ativo reputacional construído muitas vezes após longos anos para beneficiar um cliente específico. Serviriam eles como verdadeiras bússolas, apontando a seus clientes o caminho a ser seguido. Nesse sentido, Kraakman[2] entende os gatekeepers como atores que detêm a capacidade de monitorar e controlar, ou ao menos influenciar, a conduta de seus clientes corporativos de forma a dissuadir eventual desejo de transgressão da norma.*

*6.    A principal função desses atores, de acordo com os ensinamentos de Ronald Coase[3], é reduzir os*

*custos na obtenção de informações pelo mercado. Ou seja, os investidores teriam muitos gastos tentando obter, de forma independente, informações acerca dos integrantes do sistema de distribuição do mercado [4], razão pela qual associar estes entes reputacionais a uma entidade ou a um determinado produto tem a função de certificá-los, resolvendo em grande medida o problema da assimetria informacional. Ganha a sociedade que o contrata, em razão da redução dos custos referentes ao acesso de informações fidedignas por parte de agentes do mercado, e ganha o próprio mercado diante do aumento da transparência que a medida proporciona. No caso específico dos auditores independentes, portanto, a sua atuação certifica ao mercado a lisura das informações e dos procedimentos do auditado. Podem ser chamados, portanto, de intermediários reputacionais.*

*7.        Diante dessa função atribuída aos gatekeepers, pergunta-se o que se espera de sua atuação? Inicialmente, entendia-se que a necessidade de garantir seu principal ativo – a reputação – seria suficiente para prevenir uma atuação defeituosa por parte desses profissionais, entretanto, alguns escândalos financeiros colocaram em dúvida essa convicção. Constatou-se, com o tempo, que a reputação tem seus limites, razão pela qual se passou a defender que os auditores devem assumir responsabilidades em razão de trabalhos deficientes. Entretanto, como ressaltado por Michael Raab [5], não há como deixar de notar que se a responsabilidade atribuída a estes entes for excessiva, os serviços por eles prestados ficarão tão dispendiosos que acabará por inviabilizar economicamente sua atuação. A solução encontrada pelo autor, diante da necessidade de conciliar atuação eficaz do auditor independente, como auxiliar dos órgãos de controle, com custos adequados e razoáveis, é exigir que detecte fraudes somente diante da existência de "sinais de alerta" que demandem um maior aprofundamento nos documentos objeto de auditoria. Portanto, somente na presença de red flags é que deveria o auditor realizar procedimentos específicos que permitam desvendar eventual fraude, sob pena de ser responsabilizado pela deficiência.*

*(...)*

*11.        Dentro desse contexto, a própria legislação, como não poderia deixar de ser, não exige que sociedades de auditoria desçam a minúcias, questionando todas as informações apresentadas pelas sociedades auditadas, em qualquer hipótese.    Porém, situações específicas podem demandar um aprofundamento na análise dos elementos apresentados, não havendo como ser sustentada, nestas hipóteses, defesa pautada exclusivamente na confiança depositada no cliente que está sendo auditado. Diante da existência de um sinal de alerta surge para o gatekeeper a obrigação de melhor investigar o suporte que embasa o documento que está sendo analisado. E a investigação não deve se limitar a questionar o auditado sobre a veracidade das informações, ou mesmo obter uma Carta de Responsabilidade, mas sim realizar uma auditoria cujo escopo seja verificar se os documentos estão devidamente embasados".*

Assim, rejeito o argumento dos recorrentes, por ser destituído de qualquer critério de razoabilidade.

O outro ponto que merece destaque é o argumento da defesa, no sentido de que não é papel da auditoria apreciar operações específicas ou mesmo a política operacional do auditado. A propósito, estou de pleno acordo com o entendimento do Banco Central do Brasil, de que os indiciados não foram chamados ao processo por esse motivo e nem para opinar sobre o mérito dos negócios desenvolvidos pela instituição auditada. A conduta irregular pela qual respondem os indiciados nestes autos é a de terem emitido parecer sem ressalvas, sobre demonstrações contábeis, que apresentavam várias distorções e por isso não refletiam a realidade econômica e financeira da instituição auditada, como restou comprovado no presente processo.

Por outro lado, o fato de o Banco Central do Brasil não ter determinado a republicação das demonstrações financeiras da instituição auditada não quer dizer tenha a autarquia validado tais procedimentos, até porque, vale insistir, o órgão alertou previamente a empresa de auditoria sobre a impropriedade do procedimento do Banco Cruzeiro do Sul, além de ter solicitado especial atenção para a necessidade de adoção das medidas cabíveis na esfera de competência da empresa de auditoria. Ou seja, em nenhum momento o órgão deu conformidade aos procedimentos do banco auditado. Muito ao contrário. A autoridade de origem, vale repetir, recomendou expressamente à empresa de auditoria que adotasse as medidas que se impusessem em sua área de atuação, frente às distorções identificadas e devidamente levadas ao conhecimento dos indiciados, na qualidade de auditores independentes da instituição financeira.

Também não vejo fundamento na alegação dos recorrentes de que teria havido erro de proibição, pela singela razão de que os recorrentes foram devidamente alertados pelo Banco Central do Brasil, quanto à existência das impropriedades contábeis do procedimento adotado pelo Banco Cruzeiro do Sul. E o alerta, conforme já comentado, foi feito antes da data de divulgação das demonstrações financeiras do banco auditado. Ou seja, os auditores independentes tiveram tempo mais do que suficiente para reavaliar as demonstrações contábeis da instituição auditada e, assim, verificar-se a pertinência de emissão de parecer com ressalva ou com a negativa de opinião. Rejeito, portanto, a tese de ocorrência de erro de proibição, por absoluta falta de fundamento.

Alega-se, ainda, que o impacto econômico das operações mencionadas no processo teria sido eliminado no próprio

exercício em que elas foram realizadas.

No que concerne à cessão de direitos creditórios ao fundo FIDC Multicred, registro que o Banco Cruzeiro do Sul obteve, nessa operação, um resultado positivo de R$ 140 milhões, que representou 79% do lucro líquido de R$ 178 milhões, no período de janeiro a setembro de 2008, o que deixa patente a relevância da operação para a performance do banco naquele período. Como já demonstrado, essa performance foi gerada, tão somente, pela utilização de taxas adrede escolhidas, para calibrar o resultado, que seria fator determinante na apuração do lucro no período considerado.  Assim, não será a interpretação dos resultados consolidados, no grupo econômico, que irá conferir ares de regularidade do procedimento adotado pelo banco recorrente, porque o que está sendo objeto de avaliação são as condutas da instituição indiciada, como entidade autônoma, com personalidade jurídica própria, sujeita à disciplina prevista nos instrumentos legais e regulamentares de regência da atividade bancária. E como restou comprovado, a condução dessas operações teve como objetivo inflar, de forma ilegítima, irregular, os resultados da instituição financeira em apreço. Aliás, o Banco Central analisou bem a questão, nos seguintes termos: *"... independentemente da comparação entre registros contábeis efetuados em bases distintas, as operações de cessão ao FIDC Multicred a taxas baixas são irregulares pelas suas próprias características de negociação."*

Isso não obstante, é de se reconhecer que o Banco Cruzeiro do Sul teve um prejuízo de R$ 292 milhões, com a recompra dos títulos ao fundo FIDC Multicred, pelas taxas originais, com o apoio do FGC. Esses títulos foram na sequência cedidos ao próprio FGC. No entanto, isto se deu, certamente, porque a operação com o FGC teria de se dar a preços de mercado e não a preços inflados pela escolha arbitrária da taxa de juros incidente na operação. Ou seja, quando a operação envolvia entidades dentro do grupo econômico do qual fazia parte o Cruzeiro do Sul foi possível fixar a taxa de juros de forma arbitrária. No entanto, quando a referida carteira teve de ser negociada com uma instituição externa, o Cruzeiro do Sul teve o encontro com a realidade: vender a carteira a preços compatíveis com os de mercado. Mas, antes, teve de recomprá-la do fundo, amargando o prejuízo. Na verdade, apenas desfez a fumaça que antes havia criado.

O Cruzeiro do Sul, no mês seguinte, continuou realizando operações de cessão de crédito, desta feita com o FIDC CPP 120, quando teve um lucro de R$ 380 milhões, dando sequência ao comportamento irregular de incremento indevido de seus resultados, conforme bem realçou o Banco Central do Brasil em sua decisão condenatória, sendo que a repercussão da operação de cessão de direitos creditórios ao fundo FIDC CPP 120, nos resultados do Banco Cruzeiro do Sul, se deu de forma indireta, como bem esclareceu a decisão condenatória, mediante registro de valorização de 1.876% nas cotas subordinadas desse fundo em um só dia, isto no dia 27/10/2008.  Isto porque o Cruzeiro do Sul era na prática o principal cotista dos fundos FIDC Multicred e FIDC CPP120. Assim, como realçado pelo Banco Central, "O*s altos lucros obtidos com as negociações dessas cessões no mesmo dia, da ordem de R$ 380 milhões, pela utilização de taxas discrepantes, é fator determinante na convicção de que não se tratavam de operações normais no mercado, mas de operações arquitetadas e de forma consciente levadas a termo pelas participantes".*

Por sua vez, a antecipação dos efeitos previstos na Resolução CMN nº 3.533, de 2008, se deu sem observância dos princípios estabelecidos pelo referido normativo, qual seja, era necessário que as contrapartes das operações de cessão tivessem concordado em adotar o mesmo procedimento contábil. É que a instituição recorrente adotou o procedimento, unilateralmente, sem conhecimento prévio da manifestação favorável das instituições cessionárias. Apenas o Banco do Brasil, dentre as cinco instituições bancárias, com quem o Cruzeiro do Sul negociou, ofereceu resposta à consulta formulada e mesmo assim a posição foi pela negativa. Mas mesmo assim, o Cruzeiro do Sul adotou os procedimentos de antecipação das receitas, infringindo, portanto, o já mencionado instrumento regulamentar.

A defesa alega que os efeitos dessa operação tiveram repercussão inexpressiva, sem relevância.

No entanto, é de se ver que embora de pouca expressão (R$ 13,0 milhões), esse valor, decorrente de procedimento irregular, veio a se somar aos outros mais, obtidos também de forma irregular, para no conjunto trazer repercussão nos resultados apurados nas demonstrações financeiras, nas datas-bases consideradas.

Assim, cabia à empresa de auditoria independente ter considerado os fatos em seus pareceres, para no conjunto registrar as ocorrências como ressalva a ser expressada no parecer de auditoria, relativamente àquelas demonstrações contábeis.

Alega-se que o impacto econômico das práticas adotadas pelo BCSul foi nulo ou que o efeito das taxas extraordinárias fora anulado, quando se analisa o consolidado do grupo BCSul. Nada mais equivocado do que essa linha de argumentação. Isto porque, conforme já largamente comentado no presente voto, os arranjos propiciados pela arquitetura contábil-financeira adotada pela BCSul teve o propósito de gerar resultados fictícios, porque fabricados por intermédio de subterfúgios de arbitrar taxas de juros, nas operações de cessão de crédito, de modo a evidenciar receitas inexistentes, porque advindas de taxas irreais praticadas naquelas operações entre o banco e fundos por ele administrados. E quando se analisa a composição desses fundos, seus quotistas são pessoas ou entidades ligadas ao próprio banco, em autênticas operações "zé com zé", feitas tão somente para inflar a posição de resultados da instituição bancária. Não se há de aceitar a argumentação de que os efeitos dessas operações

foram posteriormente anulados, quando se olha o consolidado, pela simples razão de que as demonstrações contábeis não podem ser manipuladas ao alvedrio da administração das instituições, para demonstrar resultados inflados, com reflexos diretos no patrimônio, que assim passou a expressar-se por valores irreais e, como se viu, em montantes expressivos, dando uma falsa ideia de boa performance econômica e financeira da instituição em apreço.

Também não se pode aceitar o argumento de que a Circular nº 3.213 autorizava e impunha a contabilização do resultado da cessão de crédito na data da contratação da operação, como justificativa das condutas adotadas pela instituição auditada. De fato, como bem esclareceu a autarquia processante, esse dispositivo regulamentar nem sequer chegou a ser mencionado na peça acusatória. Além do mais, também em linha com o entendimento do Banco Central do Brasil, o que está em questão no presente processo é a forma engenhosa adotada pelo BCSul para gerar resultados, mediante o arbitramento de taxas de juros nas operações de cessão de crédito entre o banco e fundos por ele administrados, com a evidenciação de resultados inflados, de modo a ocultar a real situação econômico-financeira da instituição auditada.

Além do mais, não se pode aceitar o argumento de que essas contabilizações foram feitas de acordo com as normas contábeis aplicáveis às instituições financeiras, porque não se observou, nesses procedimentos, o princípio da competência na apropriação de receitas, porque houve a geração de receitas fictícias, resultante da manipulação de taxas de juros nas operações de cessão de crédito, bem como porque possibilitaram, também, a antecipação de receitas em operações de cessão de crédito, sem a observância de condicionantes expressas na Resolução CMN 3.533, de 2008.

No que diz respeito à responsabilização pelo cometimento das irregularidades, a KPMG Auditores Independentes, agiu por intermédio de seus representantes legais, porque os atos desses, no âmbito da função concedida, são considerados atos da própria pessoa jurídica, que por eles se obriga e responde. Já Ricardo Anhesini Souza e Silbert Christo Sasdelli Júnior subscreveram o parecer sem ressalva, faltando com seu dever de evidenciar as irregularidades encontradas, conforme NBC T11.4.1.7.

Por fim, não vi motivos de qualquer reparo na respeitável decisão da autoridade de origem, quanto à dosimetria das penalidades aplicadas aos indiciados no presente processo, dada a gravidade das condutas irregulares em apreço, conforme demonstrado na documentação acostada aos autos e nos fundamentos constantes das acusações, na decisão condenatória e neste voto. É neste sentido, também, a manifestação da PGFN, a respeito da matéria, consoante se observa do teor do item 28 do voto que apreciou a matéria:

*28.     A dosimetria da pena, não obstante severa, está adequada à gravidade dos fatos e à conduta dos punidos, bem como de suas repercussões. A auditoria realizada no Banco do Cruzeiro do Sul em desacordo com as normas técnicas deu confiabilidade a práticas inidôneas do banco auditado, impedindo que os clientes, os acionstas e terceiros em geral tivessem a real dimensão da situação financeira da instituição".*

[1] COFFEE, John C. *Understanding Enron: It´s About the Gatekeepers, Stupid*. Working Paper n. 207, July 30, 2002, disponível em http://ssrn.com/abstract_id=325240

[2] KRAAKMAN, Reinier H. *Corporate Liability Strategies and Costs of Legal Controls,* 93 Yale L.J. 858, 890 (1984);

[3] COASE, Ronald H. *The Nature of the Firm.* 4 Economica 386, 394-395 (1937);

[4] Estes custos são incluídos nos chamados "*agency costs*";

[5] RAAB, Michael S. *Detecting and Preventing Financial Statement Fraud: The Roles of the Reporting Company and the Indepedent Auditor.* 5 Yale L. & Pol´y Rev. 514 (1986-1987);

**III - Conclusão**

Diante de todo o exposto, em inteira consonância com as conclusões do Banco Central do Brasil, em sua decisão condenatória, verifico que restaram caracterizadas a materialidade e autoria da irregularidade consistente na emissão de parecer sem ressalva, decorrente da não adoção de procedimentos de auditoria adequados e suficientes relativos às demonstrações financeiras do Banco Cruzeiro do Sul, que não refletiam a sua real situação econômico-financeira nas datas-bases 30.6.2008, 30.9.2008 e 31.12.2008, em razão do incremento indevido e relevante nos resultados daquele banco, por meio de cessões de direitos creditórios em condições artificiais a fundos de investimento em direitos creditórios (FIDCs).

Dessa forma, afastando os argumentos de defesa, conheço dos recursos e a eles nego provimento para confirmar as seguintes penalidades aplicadas pela autarquia aos indiciados no presente processo:

- PROIBIÇÃO de praticar a atividade de auditoria em instituições financeiras e demais instituições autorizadas a funcionar pelo Banco Central do Brasil, pelo prazo de 5 (cinco) anos, aos Srs. Ricardo Anhesini Souza e Silbert Christo Sasdelli Júnior, com fulcro no art. 11, inciso VII, da Lei nº 6.385, de 1976, incluído pelo art. 2º da Lei nº 9.457, de 5 de maio de 1997;
- MULTA no valor de R$500.000,00 (quinhentos mil reais) à KPMG Auditores Independentes, com base no art. 11, § 1º, inciso I, da Lei nº 6.385, de 1976, com alteração introduzida pelo art. 14 da Lei nº 9.447, de 1997 e pelo art. 2º da Lei 9.457, de 1997.

É o voto.

Waldir Quintiliano da Silva – Conselheiro Relator.

 Documento assinado eletronicamente por **Waldir Quintiliano da Silva**, **Conselheiro Relator**, em 29/09/2017, às 15:56, conforme horário oficial de Brasília, com fundamento no art. 6º, § 1º, do Decreto nº 8.539, de 8 de outubro de 2015.

 A autenticidade deste documento pode ser conferida no site http://sei.fazenda.gov.br/sei/controlador_externo.php?acao=documento_conferir&id_orgao_acesso_externo=0, informando o código verificador **0034148** e o código CRC **3739BBED**.



**MINISTÉRIO DA FAZENDA**
**CONSELHO DE RECURSOS DO SISTEMA FINANCEIRO NACIONAL**

**Recurso** 13602
**Processo** 10372.000061/2016-78
**Processo na primeira instância** BACEN 0901463246

**RECURSOS VOLUNTÁRIOS**

**RECORRENTES:**        KPMG AUDITORES INDEPENDENTES
RICARDO ANHESINI SOUZA
SILBERT CHRISTO SASDELLI JÚNIOR

**RECORRIDO:**        BANCO CENTRAL DO BRASIL

**RELATOR:**        Waldir Quintiliano Da Silva

**DECLARAÇÃO DE VOTO DO CONSELHEIRO THIAGO PAIVA CHAVES**

1)      Divergi do Conselheiro Relator unicamente na questão das dosimetrias referentes às condenações dos recorrentes Ricardo Anhesini Souza e Silbert Christo Sasdelli Júnior em função da emissão de parecer sem ressalva, decorrente da não adoção de procedimentos de auditoria adequados e suficientes relativos às demonstrações financeiras do Banco Cruzeiro do Sul, que não refletiam a sua real situação econômico-financeira nas datas-bases 30.6.2008, 30.9.2008 e 31.12.2008, em razão do incremento indevido e relevante nos resultados daquele banco, por meio de cessões de direitos creditórios em condições artificiais a FIDCs.

2)      A pena aplicada pelo Relator para ambos os recorrentes foi de proibição de praticar a atividade de auditoria em instituições financeiras e demais instituições autorizadas a funcionar pelo Banco Central do Brasil, pelo prazo de 5 (cinco) anos. Embora eu concorde que as mencionadas operações financeiras distorceram de forma relevante as demonstrações financeiras do BCSul, exigindo assim da Auditoria Independente a elaboração de parecer com ressalva, entendo que a proibição de cinco anos aos recorrentes seja excessiva. Até para manter a coerência e simetria com aquilo que eu votei no recurso 13409, em que alguns diretores do BCSul foram punidos com inabilitação de quatro anos por participarem diretamente dessas operações envolvendo cessões de crédito, avalio que, no caso concreto, não é razoável punir os auditores com uma pena mais severa que a dos próprios diretores do Banco.

3)      Assim sendo, voto pela redução das penas dos recorrentes de 5 (cinco) para 3 (três) anos de proibição, para cada um.

É o voto.

Thiago Paiva Chaves - Conselheiro.

 Documento assinado eletronicamente por **Thiago Paiva Chaves**, **Conselheiro(a)**, em 22/09/2017, às 15:56, conforme horário oficial de Brasília, com fundamento no art. 6º, § 1º, do Decreto nº 8.539, de 8 de outubro de 2015.

 A autenticidade deste documento pode ser conferida no site http://sei.fazenda.gov.br/sei/controlador_externo.php? acao=documento_conferir&id_orgao_acesso_externo=0, informando o código verificador **0096093** e o código CRC **EC1FFCA9**.

 Documento assinado eletronicamente por **Michael George Sawada**, **Secretário(a) Executivo(a) Adjunto(a)**, em 20/11/2017, às 10:37, conforme horário oficial de Brasília, com fundamento no art. 6º, § 1º, do Decreto nº 8.539, de 8 de outubro de 2015.

 A autenticidade deste documento pode ser conferida no site http://sei.fazenda.gov.br/sei/controlador_externo.php? acao=documento_conferir&id_orgao_acesso_externo=0, informando o código verificador **0164940** e o código CRC **58B4568D**.