

*TAGGED OPINION*

**ORDERED in the Southern District of Florida on May 12, 2020.**

**Laurel M. Isicoff
Chief United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:

MASSA FALIDA DO BANCO
CRUZEIRO DO SUL S.A.,

    Debtor in a Foreign Proceeding,
_____/

LASPRO CONSULTORES LTDA.,
a Brazilian Sociedade Limitada,

    Plaintiff

v.

ALINIA CORPORATION, a British
Virgin Islands Company Limited by Shares,
110 CPS, INC., a British Virgin Islands
Company Limited by Shares,

    Defendants.
_____/

Case No.:14-22974-BKC-LMI
Chapter 15

Adv. Pro. No.: 16-01315-LMI

### MEMORANDUM OPINION ON MOTIONS TO EXCLUDE EXPERT REPORTS AND TESTIMONY OF ALVIN HOMMERDING AND LOPES MACHADO CONSTULTORES

1

This matter came before the Court on September 18, 2019, on *Defendants' 110 CPS, Inc. and Alinia Corporation Motion To Exclude Expert Report And Testimony Of Alvin Hommerding* (ECF #154)(the "Hommerding Motion") and *Plaintiff, Laspro Consultores, Ltda.'s Motion to Exclude Opinions Rendered by Lopes Machado Consultores* (ECF #167)(the "LMC Motion")(collectively with the Hommerding Motion – the "Expert Motions"). The Court has reviewed the Expert Motions, the responses[1] filed by the Defendants 110 CPS, Inc. and Alinia Corporation (the "Defendants") and Plaintiff Laspro Consultores LTDA. (the "Plaintiff"), as well as the replies[2]. For the reasons more fully described in this opinion, the Hommerding Motion is DENIED and the LMC Motion is GRANTED in part and DENIED in part.

In the Expert Motions the Plaintiff and the Defendants have raised several concerns which, if present in the final proferred testimony[3], would be excluded under Federal Rule of Evidence 702, and possibly Federal Rule of Evidence 403. However, much of what the Defendants argue are the bases to exclude the testimony of Alvin Hommerding ("Mr. Hommerding") and the findings of the Correa Porto expert report on which his expert testimony is based (the "CP

---

[1] *Plaintiff, Laspro Consultores, LTDA.'s Response To Defendants' Motion To Exclude Expert Report And Testimony Of Alvin Hommerding* (ECF #166); and *Defendants' 110 CPS, Inc. And Alinia Corporation Memorandum In Opposition To Plaintiff Laspro Consultores, Ltda's Motion To Exclude Opinions Rendered By Lopes Machado Consultores (ECF #180)*.

[2] *Defendants' 110 CPS, Inc. And Alinia Corporation Reply Memorandum In Support Of Their Motion To Exclude Expert Report And Testimony Of Alvin Hommerding* (ECF #175) and *Plaintiff, Laspro Consultores, Ltda.'s Reply To Memorandum In Opposition To Plaintiff Laspro Consultores, Ltda.'s Motion To Exclude Opinions Rendered By Lopes Machado Consultores (D.E. 180)* (ECF #182).

[3] At first blush these motions seem premature, but each party relied on, or at least referred to, these depositions and reports in competing motions for summary judgment that have been submitted to the Court for adjudication. However, the depositions, taken by the party seeking to exclude any testimony based on the referenced expert reports, did not describe in any clear way, much of the actual opinion or opinions the expert is supposedly rendering.

Report") are the exact same grounds on which the Plaintiff argues the basis for excluding the testimony of Jose Fernandez Vidal ("Mr. Vidal") as the expert presenting the findings of the Lopes Machado Consultores expert report (the "LMC Report")[4]. So, much of this Court's ruling is based on the old saying – "what is good the goose is good for the gander."

Mr. Hommerding and Mr. Vidal have both been identified as experts to deliver expert reports prepared in connection with this adversary proceeding in which the Plaintiff, the Foreign Representative of BANCO CRUZEIRO DO SUL, S.A. ("BCSUL"), seeks to recover two apartments located in New York, New York as well as various artwork, purportedly purchased by the Defendants through money provided by their ultimate shareholders Luis Felippe Indio da Costa and Luis Octavio Indio da Costa (collectively the "Indio de Costas"), derived from dividends paid by BCSUL at a time when BCSUL was insolvent. Relevant to this dispute is whether BCSUL was, in fact, insolvent at the time the Indio de Costas were paid dividends around the time the apartments and the artwork were purchased (the relevant years are apparently 2007, 2008 and 2010). Central to that issue is whether the earnings of BCSUL were artificially inflated by fraudulent loans, all of which, apparently, were included in a collection of loans (many legitimate) called consigned credit loans or salary loans (the "CC Loans")[5].

---

[4] The Court reviewed the deposition transcripts of Mr. Hommerding (ECF # 144-1) and Mr. Vidal (ECF #144-2) in their entirety.

[5] According to the testimony of Mr. Hommerding, these loans were made to employed individuals, usually those employed by various government agencies. The loans were repaid from the borrower's salary, directly by the employer. Based on the testimony of Mr. Hommerding, it appears the amounts of these loans were generally small – in the thousands (e.g., $5,000 - $9,000), rather than the tens of thousands.

3

At the time BCSUL was initially taken over by the relevant Brazilian banking authorities, the original oversight was managed by Fundo Guarantidor de Creditos (the "FGC") which retained a company called IMS Technologia e Servicos Ltda. ("IMS") to perform some kind of forensic analysis of BCSUL's loan database to identify and sort out fraudulent loans. The report developed by IMS was then incorporated into something called the BACEN Report, which is the report that allegedly demonstrates that BCSUL was insolvent at the time the dividends to Indio de Costas were paid.[6] An additional issue in this adversary proceeding is whether, in fact, the Indio de Costas used the allegedly improperly paid dividends to purchase the apartments and the artwork that are the subject of this adversary proceeding.[7,8]

Federal Rule of Evidence 702 requires that, in order for expert testimony to be admitted the witness must be

> qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

---

[6] The BACEN Report, dated February 22, 2013, was written by an investigation commission from Banco Central de Brazil ("BACEN") tasked with performing an investigation into BCSUL, to determine whether BCSUL issued fraudulent loans (and how many) to inflate asset values, profits, and net equity of the financial institution.

[7] This is a very superficial overview of the facts in dispute not only in this adversary proceeding but in litigation taking place in Brazil relating to the takeover and ultimate bankruptcy of BCSUL. The Court is not making any findings with respect to the facts included in this overview, and acknowledges that the treatment is both cursory and incomplete. The only purpose for including these facts is to provide some context for the any reader of the opinion who is not familiar with the facts of this case.

[8] Because the Court does not have the benefit of the expert reports themselves, the issues about which the experts were asked to opine were extracted, where included, through the Court's review of the respective depositions.

FRE 702 stems from the *Daubert*[9] and *Kumho Tire*[10] cases in which the Supreme Court held that the trial judge is the gatekeeper, "task[ed with]...ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. Expert testimony should not be admitted unless "(1) the testimony is based on sufficient facts or data; (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *McCorvey v. Baxter Healthcare Corp.,* 298 F.3d 1243, 1256 (11th Cir. 2002).

The Defendants seek exclusion of the testimony of Mr. Hommerding as well as the CP Report[11] because (a) Mr. Hommerding is not qualified to testify as an expert in the areas for which he has been retained to testify, and, moreover, he did not prepare the CP Report; (b) the CP Report lacks a sufficient factual basis because the CP team did not receive crucial documents necessary to prepare the CP Report, and rather just cited the work of others without independent analysis or investigation; (c) the CP Report is not the product of reliable principles and methods; and, finally (d) the CP Report will not be helpful to the finder of fact because most of it is just a regurgitation of the BACEN Report, the IMS Report, and a report prepared by a Price Waterhouse Coopers – related entity (the "PWC Report").

---

[9] *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).
[10] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).
[11] Since the CP Report would not normally be admitted into evidence, the Court is not certain from what the CP Report should be excluded.

5

The Plaintiff seeks to exclude the testimony of Mr. Vidal, or anyone else testifying to the contents of the expert report developed by LMC because (a) Mr. Vidal is not qualified to render expert opinions that require legal or other non-accounting expertise; (b) the report on which Mr. Vidal's testimony is based (the LMC Report) lacks a sufficient factual basis because the LMC team did not receive or review documents to independently analyze or investigate certain reports on which they relied in the LMC Report, including audits prepared by KPMG for BCSUL which have audits have been held by Brazilian courts to be unreliable; (c) that the LMC Report is not the product of reliable principals and methods; and (d) most of the opinions would not be helpful to the trier of fact because either the opinions are irrelevant or the opinions are speculative.

The Court has not had the benefit of the capacity in which the Plaintiff offers Mr. Hommerding as an expert, however, based on his deposition it appears Mr. Hommerding is being offered as an expert in identifying signs of fraud in financial records of business entities.[12] Assuming that is the case[13], then the Court finds that the Hommerding Deposition supports such expertise. The fact that Mr. Hommerding relied on the work of others in preparing the CP Report or his opinions[14] does not disqualify Mr. Hommerding as an expert or from rendering opinions as reflected in the CP Report. "An expert witness can rely on

---

[12] For the facts underlying this adversary proceeding the Court directs the unfamiliar reader to the Court's *Memorandum Opinion and Order Granting in Part and Denying in Part Defendants' Motion to Dismiss Amended Complaint (ECF #29)* (ECF #55).

[13] If that is *not* the field of expertise in which the Plaintiff seeks to certify Mr. Hommerding, this Court, or the trial court, will need to revisit this threshold issue.

[14] The Court did not have the benefit of all the opinions Mr. Hommerding will be asked to render, although presumably the opinions relate to the "questions" referred to in the deposition that Mr. Hommerding and his colleagues were asked to "answer" in preparing the CP Report.

6

assistants to formulate an expert opinion." *Picard v. Merkin (In re Madoff),* 581 B.R. 370, 381 (Bankr.S.D.N.Y. 2017)(citations omitted). Based on a recitation of Mr. Hommerding's professional experiences, and focusing primarily on the last fifteen years, the Court finds that Mr. Hommerding is well qualified to have supervised and reviewed the work of others, conducted his limited analysis, and prepared most of, or at least reviewed and prepared part of, the CP Report, and testify based on the contents of the CP Report (subject to the other issues discussed in this opinion).[15]

However, "[the inquiring party is] entitled to know what [the expert] reviewed and separately, what his assistants reviewed and what they did with that information". *Picard v. Merkin (In re Madoff),* 581 B.R. at 381. This leads to the second issue raised – whether the CP Report lacks sufficient factual basis. Mr. Hommerding testified in his deposition that there are many documents that he and his team requested but were not provided. However, Mr. Hommerding testified that, while he would have liked to have those documents, he did not believe that, ultimately, they were necessary for him to render his opinions.[16] Mr. Hommerding said that, based on the "triangulation" of other documents provided, that he or his team members were able to "answer the questions"

---

[15] At one point Mr. Hommerding testified that he prepared about 40% of the CP Report, but later in his deposition he testified that members of the CP team prepared their own parts of the CP Report and he only reviewed those parts. Of course, what Mr. Hommerding reviewed is somewhat confusing, since, as the questioning seems to indicate, parts of the CP Report appear to be incomprehensible.

[16] Mr. Hommerding testified that there is always something missing when rendering a forensic opinion – "These types of investigations are never - - never have a perfect amount of information. We have to do an analysis and make judgements based on incomplete information." Hommerding Deposition at page 280.

7

notwithstanding the unavailability of the documents requested, and by virtue of the cross-checking to confirm the accuracy of various information.[17] The Court notes, however, that in several instances Mr. Hommerding testified that "we only had three weeks" and "we looked at what we could in the time we had." Interestingly, as the Court will address later in this opinion, the Plaintiff made the same complaint about the LMC Report – Mr. Vidal and his team did not look at any underlying documents with respect to the reports and information on which they relied for cross checking and that the LMC team did all their work in less than a month.

There is also some question whether Mr. Hommerding's team could have looked at the 20,000 screen shots that he testified they reviewed before whittling the number subject to forensic analysis to 3,000 but that goes to the weight, rather than the admissibility of that testimony.[18]

This testimony leads into the third issue – whether the CP Report was the product of reliable principles and methods. It appears from the portion of his deposition that addressed some of the "questions" that Mr. Hommerding and his group were asked by their client to answer, that a thrust of the expert opinion to be rendered by Mr. Hommerding is whether the BACEN Report accurately identified fraudulent loans and whether the disbursements received by the Indio de Costas were ultimately funneled into the acquisition of the artwork and the

---

[17] The Court will address the "triangulation" testimony later in this opinion.
[18] The Eleventh Circuit cautions trial judges that the "gatekeeping responsibilities" of Rule 403 and Rule 702 are important but "[a]s the ultimate fact-finder, it is the jury that must determine, finally, where the truth in any case lies, and the district judges as gatekeeper may not usurp this function." *U.S. v. Frazier,* 387 F.3d 1244, 1272 (11th Cir. 2004).

apartments that are the subject of this litigation.[19] The Defendants argued at the hearing on the Expert Motions that Mr. Hommerding and his team only looked at the approximately 682,000 loans that had already been identified as fraudulent, and then only looked at 20,000 of those loans, and did a deep dive into 3,000 of the 20,000, when what the team *should* have looked at was a sampling of fraudulent and non-fraudulent loans.  The Court disagrees *if* the purpose of the review was to confirm that the loans upon which the BACEN report rendered its conclusions were accurately identified as fraudulent.  If that is the case then taking a sampling of the loans identified as fraudulent appears reasonable.  The Court also notes that Mr. Vidal testified that the LMC team also only looked at loans that had been identified as fraudulent in the BACEN Report.[20]

The Defendants argue that Mr. Hommerding did not describe any methodology in his deposition.  The Court disagrees. Mr. Hommerding testified that his team used criteria that the BACEN Report identified as indicia of the fraudulent loans including absence of payments, late payments, loans originated by the same nine loan officers, and loans with the same borrower.  However, Mr. Hommerding also testified that he was very familiar with salary loans like the CC

---

[19] *See* Hommerding Deposition, pp. 218-292. There were apparently sixteen questions to be answered, or that were, apparently, answered.

[20] *See* page 44 of the Vidal Deposition. Of course, it appears the Defendants' expert identified a group of 20 loans in the Hommerding selection of 3,000 all of which did *not* appear fraudulent based on one of the criteria that Mr. Hommerding testified was important – the absence of evidence that there were ever payments made on the loans.  However, the evidence of payment, and Mr. Hommerding's explanation in response, go to the weight of his testimony on that issue, not its admissibility.

9

Loans and that he agreed that the criteria was appropriate.[21] Mr. Hommerding then testified that he and his team triangulated the information in the screen shots that were printed, using information that appeared in the other reports that he and the team reviewed which included the BACEN Report, the IMS Report, the PWC Report and information from the infamous KPMG audit. Using that "triangulation", Mr. Hommerding confirmed the information in the BACEN Report as reflected in the screen shots.[22] However, the Court agrees with the Defendants that Mr. Hommerding did not explain what information was triangulated from what documents against what other information to arrive at what conclusions[23], just collectively what documents he and his team used for this cross-checking. And because the Court does not have the benefit of the actual CP Report (to which Mr. Hommerding continually referred - "it's in the report"), it is unclear whether the CP Report clarifies that information. The Defendants argue that Mr. Hommerding couldn't even describe what IMS did so that his or his team's reliance on the IMS Report, for example, could not possibly support any conclusions. Ironically, and as the Court will address further in

---

[21] For example, due to the nature of the CC Loans, Mr. Hommerding testified that there should only be one loan per borrower since the loan is paid back through the borrower's (usually government) pay check, and that, therefore, multiple loans from one borrower is a red flag.
[22] Mr. Hommerding conceded in his deposition that normally he would have required the source documents that he did not get to confirm the accuracy of the information on the screen shots but the absence of the documents was not a problem because of the triangulation – the cross checking of information between the various reports that Mr. Hommerding or his team reviewed.
[23] A good example of this is Mr. Hommerding's testimony regarding the tracing of the payments to the purchase of the artwork and apartments. It is unclear what information Mr. Hommerding or his team looked at to render an opinion regarding what money was used to purchase the artwork and the apartments although the Court notes that it appears that Mr. Hommerding is not opining that the money is traceable. See Hommerding Deposition page 223.

this opinion, the Plaintiff made almost the identical complaint with respect to Mr. Vidal and the the LMC Report.

Indeed, Mr. Hommerding, who appeared woefully unprepared for his deposition, did not remember what methodology his team used, or what information his team took into account, when preparing "their section" of the CP Report. And again, because Mr. Hommerding kept testifying "it's in the report" it may be that actual testimony by a well-prepared Mr. Hommerding, would clearly describe exactly what the CP team did. Therefore it is not clear whether the methodology used by the CP team was reliable. In the absence of better explanation at any trial, any testimony based on the "triangulation" would be inadmissible, either because, if there is no clearer testimony than that which Mr. Hommerding provided at his deposition, any testimony regarding the methodology used by the CP team would be speculative, and therefore inadmissible.

Finally, any part of Mr. Hommerding's expert testimony based solely on the incomprehensible sections of the CP Report, which he testified he didn't understand, is inadmissible under FRE 403[24] because, irrespective of whether the methodology it purports to describe is sound, without better explanation, it is at least confusing. *See U.S. v. Frazier,* 387 F.3d 1244, 1263 (11th Cir. 2004). Unfortunately it was not clear from the Hommerding Deposition whether there

---

[24] "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FRE 403.

11

was an opinion put forth by Mr. Hommerding based on the gibberish that wasn't separately supported by the "triangulation" with a different source.

This leads to the final issue raised by the Hommerding Motion. If, in fact, as the Defendants argue, neither Mr. Hommerding nor his team triangulated anything, but rather the CP Report merely adopts wholesale the findings in the BACEN Report, the PWC Report, the IMS Report, and even parts of the KPMG audit, as Defendants assert, then any testimony or opinion derived solely from that wholesale adoption without any independent analysis is not admissible. While, as the Plaintiff argues, it is appropriate for experts to rely on the opinion of other experts in rendering their own opinions, *Hersh v. United States*, 17-14212-CIV, 2018 WL 6978628 (S.D.Fla. Dec. 7, 2018), an expert may not render an opinion that merely adopts the conclusions of another expert without independent analysis and findings. *Eberli v. Cirrus Design Corp.*, 615 F. Supp.2d 1357, 1364 - 1365 (S.D.Fla. 2009)("[An] expert must make some findings and not merely regurgitate another expert's opinion.").[25] The mere repetition of another expert's opinion is not helpful to the trier of fact, and therefore is not admissible.[26]

In conclusion, there are many troubling aspects to Mr. Hommerding's deposition. But the Defendants have asked that the Mr. Hommerding's entire testimony be excluded, and in the absence of having the CP Report to review, the

---

[25] This is the exact argument, including the same authorities, cited by the Plaintiff in the LMC Motion.
[26] Of course, as the court in *Eberli* pointed out, nothing prevents the party putting forth the testimony of the expert whose opinion the other expert merely adopted wholesale. *Id.* at 1365.

Court is unable to rule on excluding Mr. Hommerding's testimony based on the CP Report at this juncture, especially because much about which the Defendants complain is precisely what the Defendants seek to defend with respect to the attacks leveled by the Plaintiff in the LMC Motion, to which the Court will now turn.

The Court will first address that portion of the LMC Motion that seeks to exclude any testimony by Mr. Vidal relating to two legal issues and testimony regarding whether IMS was capable of performing the analysis reflected in the IMS Report, and on which the BACEN Report relied. The Court agrees with Plaintiff's objections and grants the LMC Motion with respect to these portions of Mr. Vidal's testimony and the LMC Report opining as to (1) the effect of the Plaintiff's joinder in various lawsuits in Brazil; (2) whether Cruzeiro de Sol Holding S/A was prevented from acquiring debentures issued by Patrimonial Maragato; (3) the professional background of IMS.[27]

The LMC Motion also seeks to exclude any testimony for which there is no sufficient factual basis – everything relating to whether BCSUL was in fact insolvent during 2007, 2008 and 2010. First, citing to *Eberli,* the same case on which the Defendants relied in the Hommerding Motion, the Plaintiff argues that Mr. Vidal's testimony, and the conclusions in the LMC Report, are based entirely on adopting, without separate analysis, work that was done by prior experts

---

[27] Although Mr. Vidal could possibly testify as a fact witness regarding what he saw in the the public records, etc. about IMS, all of that testimony would be hearsay, and, without the benefit of testifying as an expert, such testimony would not admissible over the objection of the Plaintiff.

13

retained by the Indio de Costas and is therefore inadmissible.[28]  As the Court has already stated with respect to Mr. Hommerding's testimony and the CP Report, to the extent that Mr. Vidal or the LMC Report merely adopts another expert's opinion without independent analysis and findings, that opinion is not admissible. *Eberli v. Cirrus Design Corp.*, 615 F. Supp.2d at 1364 – 1365. However, any objection based on the failure to review underlying working papers is overruled – like Mr. Hommerding, Mr. Vidal testified that he had the necessary information to render his opinions without access to certain information.[29]

Second, the Plaintiff argues, the CP Report relies on the KPMG audit, an audit that has been discredited, for which KPMG has apparently been administratively disciplined and which has been discredited by the Brazilian courts.  What is more, the Plaintiff points out, neither Mr. Vidal nor anyone on his team knew that the KPMG audits had been questioned or compromised.[30] However, apparently Mr. Hommerding and the CP team relied on certain parts of the KPMG audit in preparing the CP Report, and so, apparently, there was information upon which the experts could appropriately rely in rendering the BCSUL solvency opinion. The Court did not have the benefit of seeing the LMC Report either, so to the extent the LMC Report and the CP Report relied on the same or similar information from the KPMG audit, this portion of the LMC Motion

---

[28] The Hommerding Motion argues the expert opinion based on wholesale adoption of another expert's opinion is excludable as being unhelpful, rather than a reflection of poor or no methodology, but no matter which portion of Rule 703 upon which a party relies, such testimony is not admissible.

[29] *See* Vidal Deposition at pp. 54-55.

[30] The Plaintiff points out that Mr. Vidal later backtracked on any reliance on the KPMG audits, or maybe it was the exclusive reliance on the KPMG audits.  The testimony is somewhat confusing.

14

is denied. However, if the opinions in the LMC Report are based on wholesale adoption of the ultimate conclusions in the KPMG Report, then that portion of the LMC Motion is granted.

Third, the Plaintiff argues, the LMC Report relies on only twenty of the CC Loans in rendering its opinion on solvency and that twenty is not an adequate sampling. The Court finds that the Plaintiff misstates the connection between the twenty loans and the opinion that the Plaintiff seeks to exclude.[31] Mr. Vidal testified that he was not retained to render an opinion on whether any of the CC Loans were fake or fraudulent. Rather, LMC was asked to examine some loans to determine whether or not any payments were made on any of the CC Loans within the group of 682,000 identified as fraudulent in the BACEN Report. Mr. Vidal testified that his team looked at twenty of the 682,000 and those twenty showed that payments had been made on those twenty.[32] Thus, that very limited number goes to the weight of that testimony not its admissibility. Whether that information will be sufficient to contradict the Plaintiff's expert on this issue will be up to the jury.[33]

The Plaintiff also argues that Mr. Vidal's testimony should be excluded because the LMC Report either lacks any methodology, or such methodology is unreliable. First, the Plaintiff points out that LMC did not create its own

---

[31] The Eleventh Circuit in *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329 (11th Cir. 2010) discussed unreliability based upon a small sampling size. The court focused on the importance of statistical context and specifically addressed unreliability due to a lack of statistical analysis, lack of explanation of "whether it was statistically meaningful to extrapolate from such a small sample size"; not accounting for other causes; and a failure to explain inconsistencies among the data surveyed.
[32] Vidal Deposition, pp. 184 – 186.
[33] *See* n. 19, *supra.*

methodology, but rather, approached the analysis as framed by questions outlined by the client. Since this is exactly how the CP Report was framed (questions posed by the Plantiff) the Court is at a loss to understand how this disqualifies the LMC Report or testimony. If it is disqualifying, than the CP Report and Mr. Hommerding's testimony are disqualified as well. Second, the Plaintiff argues that LMC didn't do anything other than adopt wholesale the findings of other reports. However, it appears based on Mr. Vidal's testimony,[34] although he never uses the word "triangulation", that the LMC team and Mr. Vidal used the same methodology that was used by the CP team and Mr. Hommerding – comparing numbers between the BACEN Report, the PWC Report, the IMS Report, the KPMG audit, and other reports. So this portion of the LMC Motion is denied. Third, the Plaintiff argues in its reply that LMC did not analyze data from the BCSUL system even though the LMC team had access to those same electronic files. However, Mr. Vidal testified that the team did, in fact, review that data.[35]

    Finally, there are many opinions that the Plaintiff argues are not relevant and will not assist the trier of fact. The Court will address them in turn.

    a. The opinion regarding whether the Indio de Costas had other sources of money to purchase the apartments and artwork is relevant, so the objection is overruled.

---

[34] It was very difficult to read Mr. Vidal's deposition because the translator does not appear to have been qualified to translate. Indeed the deposition is full of instances when both sides had to correct - on the record - translations that was incorrect. The Court urges the parties to vet any translator for trial better than was apparently done for the translator used for the deposition.
[35] *See* Vidal Deposition pp 19 -21.

16

b. The qualifications of the FGC team involved in the BACEN Report, according to Mr. Vidal's deposition, were not stated as an opinion, according to Mr. Vidal, but rather as a fact.  The deposition does not make clear how this information is relevant.  Because the Court does not know what the LMC Report says about this "fact" the Court cannot assess it's relevancy, and therefore this objection is overruled, for now.

c. Whether PwC Contadores Publicos Ltda. is or is not an idependent accounting firm does not appear to be relevant, and, as the Plaintiff notes, Defendants did not address this objection.  Therefore, the objection is sustained as to this testimony.

d. The potential results reported by BCSUL from 2007-2010 in Notes "20, 23, and 22" to the financial statements represent amounts that could be realized through market trades or estimated market values may or may not be excludable, not because of relevancy, but for the reasons the Court has already addressed.  It appears these opinions are based on the KPMG audits.  If these conclusions are wholesale adoption, they must be excluded for the reasons this Court has already addressed. *See Eberli v. Cirrus Design Corp.*, 615 F. Supp.2d at 1364 – 1365.  Since the Defendants have not responded to this objection, the Court will sustain the objection as to this opinion.

e. Whether BCSUL had formal credit approval policies is irrelevant, in light of Mr. Vidal's testimony that he did not test to see if any of the

policies were actually followed; therefore the objection is sustained as to this testimony.

f. Testimony that rolling over loans is not, in and of itself, inappropriate is relevant; the objection is overruled as to this testimony.

g. Testimony regarding the current state of the apartments and artwork, and whether the use of same is subject to restrictions in Brazil and the United States, does not appear to be relevant. Since the Defendants did not address these points in their response, the objection to this testimony is sustained.

## CONCLUSION

Both parties agree on the law that frames the issues raised in the Expert Motions. However, neither party believes the law applies to *their* expert or expert report. But, as the Court noted earlier in this opinion, what is good for the goose is good for the gander, and in those circumstances in which the experts have performed the same analyses and looked at, or relied upon, the same information, opinion testimony based on that same criteria is not excludable based on the arguments raised. Counsel for the Plaintiff and counsel for the Defendants are directed to prepare orders consistent with this Memorandum Opinion, incorporating by reference only the rulings set forth herein.

# # #

Copies furnished to:
Daniel Coyle, Esq., Plaintiff's Counsel
Jeremy Hart, Esq., Defendants' Counsel

*Attorney Coyle shall serve a copy of this Order on all parties and file a certificate of service.*